No. 23-50632

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*

*v.*

GREG ABBOTT, IN HIS CAPACITY AS GOVERNOR OF THE STATE OF TEXAS; STATE OF TEXAS,

*Defendants-Appellants*

On Appeal from the United States District Court for the Western District of Texas, Austin Division

## DEFENDANTS' OPPOSED EMERGENCY MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL AND FOR AN ADMINISTRATIVE STAY

ANGELA COLMENERO
Provisional Attorney General

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

LANORA C. PETTIT
Principal Deputy Solicitor General
Lanora.Pettit@oag.texas.gov

ARI CUENIN
Deputy Solicitor General
State Bar No. 24078385
Ari.Cuenin@oag.texas.gov

COY ALLEN WESTBROOK
Assistant Attorney General

Counsel for Defendants-Appellants

# Certificate of Interested Persons

No. 23-50632

United States of America,

*Plaintiff-Appellee*

*v.*

Greg Abbott, in his capacity as Governor of the State of Texas; State of Texas,

*Defendants-Appellants*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, Appellants, as governmental parties, need not furnish a certificate of interested persons.

/s/ Ari Cuenin
Ari Cuenin
*Counsel of Record for*
*Defendants-Appellants*

## Nature of Emergency

The United States failed to defend Texas's borders, leading to millions of individuals and hundreds of millions of fatal doses of fentanyl, often trafficked by transnational criminal cartels, illegally entering Texas and the US. Consequently, the State declared a border-security disaster and placed an approximately 1,000-foot-long buoy system in the Rio Grande to prevent people and drugs from being trafficked into the State, violating federal and Texas law. The buoys have nearly eliminated illegal crossings of people and drugs where they've been placed.

The US, however, sued Texas and Governor Greg Abbott for violating Section 10 of the Rivers and Harbors Appropriation Act of 1899 because the State deployed the buoys without a permit allegedly required by the US Army Corps of Engineers. Exh. I-A, ECF 1. The US sought a preliminary injunction to force the State to allow untold numbers of cartel members to ford the Rio Grande into Texas pending trial. Exh. I-E, ECF 5. That is "an extraordinary remedy" indeed, *see Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008), especially without "full briefing or factual development," *Firefighters Loc. Union No. 1784 v. Stotts*, 467 U.S. 561, 603 n.7 (1984) (Blackmun, J., dissenting). The US never cleared the high bar for such relief.

The district court held a hearing on August 22, 2023. Exh. I-B, Tr. The State argued the US was unlikely to prevail. *See Winter*, 555 U.S. at 20. No evidence showed the disputed Rio Grande stretch in Maverick County is navigable; no evidence showed the buoys "obstruct" any navigable capacity of the river; and no evidence showed the buoys are "booms" or "other structures" covered by Section 10 of the Act. Besides, Texas has clear constitutional authority to defend its territory

against the invasion that Governor Abbott declared. The district court was duty-bound to avoid such "political questions," Tr. 90, and apply constitutional avoidance, rejecting the US's overbroad reading of the Act. What's more, the equities and public interest overwhelmingly favored the State. *See Winter*, 555 U.S. at 20. But at the hearing, the court refused to let Texas ask the US's witness about millions of "border encounters," "600,000" alien "got-aways," "importation of lethal fentanyl," "unlawful migration," or "cartel activity." Tr. 73-77. The court lacked discretion to overlook those factors, Exh. I-K, ECF 46 (Texas closing argument); courts must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction," *see Winter*, 555 U.S. at 24. *Contra* Exh. I-J, ECF 45 (US closing argument). The court nevertheless "decline[d] to entertain [that] evidence" and granted a preliminary injunction the afternoon of September 6, 2023, Exh. I-C, ECF 50, which Appellants appealed within an hour, Exh. I-D, ECF 51.

The preliminary injunction should be stayed pending appeal. Fed. R. App. P. 8(a). The court improperly found Corps jurisdiction because navigability was a fact question for the court under binding precedent; the decision to credit the Corps' self-serving claim of jurisdiction and rose-colored predictions about potential future commercial river use was misguided, as this river stretch in Maverick County has never been commercially navigable. The US also failed to clearly establish each mandatory-preliminary-injunction factor. A stay is warranted because this Court will likely uphold precedent by reversing the order on appeal. *E.g.*, *Vote.org v. Callanen*, 39 F.4th 297, 309 (5th Cir. 2022). That's enough for a stay pending appeal, but the

equities also overwhelmingly favor Texas. If Texas must move the buoys from their current location, its appellate rights are effectively lost because the harm is already done to Texas's sovereign self-defense and public-safety interests. The US identifies no injury that might counterbalance these harms.

Consistent with Rule 8(a)(1), the State sought a stay below before seeking relief here. In written closing arguments, the State requested that any preliminary injunction be stayed. Exh. I-K at 9-10. Because the court did not grant a stay, Appellants understand a stay to be implicitly denied essentially for the reasons supporting the preliminary injunction. *See* Fed. R. App. P. 8(a)(2)(A)(ii). The State thus immediately filed this Motion by 2pm the next day.

Appellants respectfully request a stay by **12pm September 11, 2023**. The district court gave the State until September 15 to "reposition . . . all buoys, anchors, and other related materials composing the floating barrier placed by Texas in the Rio Grande in the vicinity of Eagle Pass, Texas to the bank of the Rio Grande on the Texas side of the river," though not ordering "removal entirely from the river." Exh. I-C at 41-42 & n.32. A ruling by 12pm on September 11 is needed for "coordination" with the Corps per court order (at 41), and with the State's contractor, who confirmed that repositioning was possible in "four or five days," Tr. 102. Emergency consideration is required under Circuit Rule 27.3. Additionally, or alternatively, the State seeks an immediate administrative stay pending this Motion's resolution. *E.g.*, *BST Holdings v. OSHA*, No. 21-60845, 2021 WL 5166656, at *1 (5th Cir. Nov. 6, 2021) (per curiam).

## Background

**1.** A crisis of human trafficking, drug smuggling, and terrorist infiltration exists along Texas's 1,200-mile border with Mexico. In FY2023, Customs and Border Protection has already encountered nearly 1.8 million aliens crossing the border.[1] But the true number of aliens entering the US illegally is unknown; the number detected but neither found nor apprehended increased over 300% in the past four years.[2] In FY2023, CBP seized over 22,000 pounds of fentanyl, a synthetic opioid, potentially lethal at 2mg doses, that kills more Americans under 50 than anything else.[3] Fentanyl is often illegally smuggled into the US by transnational criminal cartels, which Governor Abbott designated as foreign-terrorist organizations.[4]

Maverick County is particularly affected by the crisis.[5] In June 2023, nearly 25% of all Border Patrol encounters occurred in the CBP sector that covers Maverick County.[6] Since President Biden took office, the US-Mexico border has been declared

---

[1] Exh. II-G, Southwest Land Border Encounters (D-8).

[2] ECF 26-7, DHS Office of Inspector General, 6, 10 (May 3, 2023) (D-7).

[3] *See* Exh. III-B, CBP Releases June 2023 Monthly Update (D-33); Exh. II-H, Fentanyl Awareness (D-10).

[4] Exh. III-E, Press Release, Off. of Tex. Gov. (Sept. 21, 2022), https://gov.texas.gov/news/post/governor-abbott-designates-mexican-cartels-as-terrorist-organizations.

[5] *See* Exh. II-J, Fed. Reg. (D-13).

[6] Exh. II-J, Southwest Land Border Encounters (D-14); *see* Exh. II-K, Southwest Land Border Encounters (D-15).

the deadliest land crossing worldwide.[7] A record-high 853 migrants died crossing it between October 2021 and October 2022.[8]

**2.** The Rio Grande in Maverick County contains sand bars, small islands, large rocks, debris, logs, stumps, and sandy shoals; it can be very shallow or even dry. Exh. II-B, Nordloh Decl. ¶5 (D-2); Exh. II-E, Gomez Dep. at 10, 51 (D-5). The river is often ankle-to-knee deep and no deeper than four feet near the disputed site, Exh. II-A, Escalon Decl. ¶10 (D-1).

No lawful commercial transportation or commercial vessels operate there. Exh. II-A ¶3; Exh. II-B, ¶7. Law enforcement uses shallow-draft airboats, incapable of commercial-goods transport, to operate. Exh. II-B ¶6; Exh. II-A ¶10. Smuggling drugs and weapons, human trafficking, and illegal immigration constitute most activity in the area, one of the most active crime hotspots along the Rio Grande. Exh. II-A ¶¶4, 13. There's no lawful traffic, and no legitimate reason for traffic, bank-to-bank. Exh. II-A ¶8.

**3.** In 2021, Governor Abbott declared a border-security disaster and launched Operation Lone Star, which has "led to over 401,900 illegal immigrant apprehensions and more than 32,400 criminal arrests, with more than 29,600 felony

---

[7] Exh. II-N, *UN Migration Study Deems US-Mexico Border 'Deadliest' Land Route in the World Based on 2021 Numbers*, Fox News (July 4, 2022). This source was hearing-exhibit D-21.

[8] Exh. III-A, *At least 853 migrants died crossing the U.S.-Mexico border in past 12 months—a record high*, CBS News (Oct. 28, 2022). This source was hearing-exhibit D-24.

charges reported," and "over 422 million lethal doses of fentanyl" seized.[9] To advance Operation Lone Star's objectives, Governor Abbott "announced the deployment of new marine floating barriers to deter illegal crossings in hotspots along the Rio Grande River."[10] The buoys control ingress to the disaster area, which includes Maverick County, as authorized by state law. *See* Tex. Gov't Code § 418.018(c).

The buoys were deployed in mid-July 2023, parallel to the river's flow. Exh. II-A ¶¶5-8; Exh. II-E at 43. The 1,000-foot-long system comprises multiple interconnected buoys tethered via chains to concrete blocks placed on the riverbed. Exh. II-C, Flossman Decl. ¶¶5, 6 (D-3); Exh. II-A ¶6. By design, the buoys' placement is temporary; they can be moved with heavy machinery but not inadvertently. Exh. II-C ¶¶5-7; Tr. 102-03. The buoys save lives by directing aliens to ports of entry and deterring water crossings. Exh. II-C ¶4. No one has attempted to climb the buoys, and no injury from them has been reported. Exh. II-A ¶¶6, 12.

The ability to navigate the Rio Grande is unimpacted by the buoys as designed and deployed. Exh. II-C ¶10; Exh. II-B ¶10. Any vessel capable of going up or down the river at the site can easily navigate past them. Exh. II-A ¶¶8-9; Exh. II-C ¶8.

---

[9] Exh. III-F, Press Release, Off. of Tex. Gov. (Aug. 4, 2023), https://gov.texas.gov/news/post/operation-lone-star-stops-criminals-at-president-bidens-open-border.

[10] Exh. III-G, Press Release, Off. of Tex. Gov. (June 8, 2023), https://gov.texas.gov/news/post/governor-abbott-signs-sweeping-package-of-border-security-legislation.

Law-enforcement watercraft—the only type of motorized watercraft regularly operating in the segment—easily maneuver past the buoys. Exh. II-B ¶10.

**4.** The US sued Texas and Governor Abbott, claiming the buoys violated the Rivers and Harbors Act. Exh. I-A. The US also sought a mandatory preliminary injunction seeking the buoys' immediate removal in Maverick County. Exh. I-E. The US argued the buoys were in the Corps' "navigable waters," triggering jurisdiction, because Maverick County is within a *300-river-mile stretch* the Corps declared navigable. Exh. I-J at 1-5. The US argued Texas violated Section 10 of the Act because the buoys obstructed "navigable capacity" of navigable waters, or were "booms" or "other structures" covered by the Act. Exh. I-J at 5-7.

The State countered that self-serving assertions of jurisdiction cannot supplant the court's duty to *find* navigability from the evidence, which proved the disputed stretch *non*-navigable. The State also argued the US had no likelihood of success under the Act; that contrived friction to US-Mexico relations from the buoys wasn't irreparable harm; and that the equities and public safety favored Texas. Exh. I-K at 2-8.

**5.** Following a hearing, the district court granted the preliminary injunction. Accepting Corps jurisdiction over the disputed river segment, the court concluded that the US was likely to succeed on its statutory claims, declared it unnecessary to even consider prongs 2 through 4 of the preliminary-injunction standard, and ordered the State to move the entire buoy system to Texas's riverbank by September 15. Exh. I-C.

STATEMENT OF JURISDICTION

Jurisdiction to review a preliminary injunction lies under 28 U.S.C. § 1292(a)(1).

ARGUMENT

This Court has "inherent" power to hold a preliminary injunction "in abeyance while it assesses the legality of the order." *Nken v. Holder*, 556 U.S. 418, 426 (2009) (citation omitted). All stay factors are met here: (1) The State will likely succeed on the merits; (2) it will suffer irreparable harm absent a stay; (3) a stay won't substantially harm the US; and (4) the public interest favors a stay. *Id*. But where the "balance of the equities weighs *heavily* in favor of granting the stay," only a "serious legal question" is required. *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 397 (5th Cir. 2020).

The State meets either test. The equities overwhelmingly favor a stay: Texas's sovereignty and self-defense interests are irreparably harmed even if Texas prevails on appeal. This case also presents serious legal questions with "a broad impact on relations between the states and the federal government." *Weingarten Realty Invs. v. Miller*, 661 F.3d 904, 910 n.9 (5th Cir. 2011). Moreover, the district court erred on the merits.

## I.  The Equities Heavily Favor a Stay While This Court Considers Serious Constitutional-Avoidance Questions.

**A.** The equities heavily favor a stay. States enjoined from effectuating their statutes generally suffer an automatic irreparable injury. *E.g.*, *Vote.org*, 39 F.4th at 308. Here, the mandatory order to move the buoys contravenes the border-security disaster declared in Maverick County. *See* Tex. Gov't Code § 418.018(c). The buoys

8

were deployed under the Governor's constitutional authority to defend Texas from transnational-criminal-cartel invasion. *See* U.S. CONST. art. I, § 10, cl. 3; *id.* art. IV, § 4; TEX. CONST. art. IV, § 7. The merits of his assessment aren't at issue: notwithstanding the district court's criticisms (at 32-34), the parties agree that determining an "invasion" is a nonjusticiable political question, Exh. I-H, ECF 37 at 9-10.

Absent a stay, an appellate victory wouldn't remedy the significant federalism damage. Border States "bear[] many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397 (2012). Those consequences are severe, as detailed above. Moving the buoys exacerbates dangers to migrants enticed to cross the border unlawfully, and to Texans harmed by human trafficking, drug smuggling, and unchecked cartel violence. *See* Exh. II-A ¶¶4, 8, 12-13; Exh. II-C ¶¶4, 10. And "[b]ecause the State is the appealing party, its interest and harm merge with that of the public." *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (per curiam).

Conversely, the US has no evidence of any actual, much less substantial, injury from a stay. Tellingly, by letting the buoys remain in the water along the riverbank, the district court (at 42 n.32) did nothing to address the purported humanitarian risks and diplomatic concerns that the US invoked as irreparable harms. The court erred by entering a preliminary injunction imposing new harms upon Texas without remedying harms alleged by the US. "A plaintiff seeking a preliminary injunction must establish ... that he is likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. The US's alleged harms, however, will

just as likely persist in the *presence* of the preliminary relief ordered—good evidence those harms are illusory since the court never saw fit to fix them.

**B.** There are "serious legal question[s]" about whether the district court construed the Rivers and Harbors Act consistently with the Constitution. *Tex. Democratic Party*, 961 F.3d at 397. Under constitutional-avoidance doctrine, "'[w]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.'" *Hersh v. U.S. ex rel. Mukasey*, 553 F.3d 743, 753-54 (5th Cir. 2008) (citation omitted).

As 22 amici Congress members explained, allowing Corps jurisdiction over the disputed river stretch raises serious constitutional issues under the Commerce Clause. Exh. I-F, ECF 24. The district court (at 16-18) read the Act to sweep beyond any plausible nexus to commerce. And the only commercial activity referenced by the US is "millions of dollars in illicit commerce . . . crossing the Rio Grande" in Maverick County. Exh. I-J at 5. A stay is warranted while this Court analyzes the dubious suggestion that Congress passed the Act so the Corps could impede State efforts to stop drug smuggling and human trafficking.

The US's reading of the Act raises other serious constitutional issues given that the buoys' deployment combats the border crisis in Maverick County. The Act should be interpreted narrowly, avoiding conflict with Texas's self-defense rights explained above. *Cf. United States v. Hansen*, 143 S. Ct. 1932, 1946 & n.3 (2023) (applying constitutional avoidance in immigration context). Instead, the district court put the Act and the Constitution on a collision course—even after conceding

Texas's independent authority to repel invasion (at 35 n.29) and that the existence of an invasion is a nonjusticiable question (at 31-33). This Court should grant a stay while considering these important issues.

## II. Defendants Will Likely Prevail Because the Rivers and Harbors Act Doesn't Ban Buoys in the Rio Grande in Maverick County.

### A.   The Corps lacks jurisdiction over this non-navigable river stretch.

Navigability is a prerequisite for the Corps' jurisdiction; the extent of navigability is determined segment-by-segment. *PPL Mont., LLC v. Montana*, 565 U.S. 576, 594 (2012); *cf. Miami Valley Conservancy Dist. v. Alexander*, 692 F.2d 447, 451 (6th Cir. 1982) (rejecting jurisdiction over 36.5-mile river stretch). The Corps' own regulations acknowledge that, at some point in their length, rivers may change from navigable to non-navigable. 33 C.F.R. § 329.11(b). The Supreme Court has said as much about the Rio Grande. *United States v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690, 698 (1899) (this river "is not navigable within the limits of the territory of New Mexico"). Unsurprisingly, precedent repudiates the idea that border waters are necessarily navigable, *Oklahoma v. Texas*, 258 U.S. 574, 584-85 (1922), and that the Rio Grande is navigable for the entire 1,200-mile Texas-Mexico border, *see Puente de Reynosa v. City of McAllen*, 357 F.2d 43, 50-51 (5th Cir. 1966). Here, the relevant portion is a 1,000-foot stretch in Maverick County.

The US cannot demand deference to the Corps' self-serving assertion of jurisdiction over *300 river miles* in a 1975 Corps navigability determination. Exh. IV-C, Shelnutt Decl. ¶¶4-5 (G-33); Exh. IV-D, Shelnutt Decl. Ex. A (G-34). Navigability is a fact question that "should be determined by evidence" in court, not

simply claimed by agency officials. *Rio Grande*, 174 U.S. at 698 (remanding for trial-court factfinding). Because "[j]urisdiction over" "portions of" a river "is in controversy," the US must "prove" the disputed stretch is navigable. *Miami*, 692 F.2d at 448, 451. Here, the Corps' 48-year-old navigability determination is allegedly based on a 1975 study that Corps employee Joseph Shelnutt found in a file in the Corps' Ft. Worth office. Tr. 12-15. But Shelnutt—the US's only navigability witness—hadn't actually "read any technical aspects" of the study. Exh. II-F, Shelnutt Dep. at 50-52 (D-6). The US utterly failed to meet its burden to prove navigability in support of its preliminary-injunction motion.

Indeed, the record shows the disputed segment is *non*-navigable. Congress's authority to pass the Act invokes the Commerce Clause, so covered waters must be "of practical service as a highway of commerce." *Econ. Light & Power Co. v. United States*, 256 U.S. 113, 124 (1921). Waters "must (1) be or have been (2) used or susceptible of use (3) in the customary modes of trade and travel on water (4) as a highway for interstate commerce." *Miami*, 692 F.2d at 449-50. If commercial use is only "sporadic and ineffective," or "exceptional," then waters are non-navigable. *Id.* at 449. Commercial use is judged by the "customary mode of travel," *id.* at 451, for commercial shipping nearby, *United States v. Republic Steel Corp.*, 362 U.S. 482, 483-85 (1960). Evidence that people "waded or walked" through water hardly suggests commercial navigability. *United States v. Oregon*, 295 U.S. 1, 20-21 (1935). And just because small craft can ferry bank-to-bank doesn't make it "a highway of commerce." *United States v. Crow, Pope & Land Enters.*, 340 F. Supp. 25, 34-35 (N.D. Ga. 1972).

The district court's refusal to demand proof of commercial navigability (at 16-18) contravenes *Sackett v. EPA*, 143 S. Ct. 1322 (2023), Section 10's references to "navigable" waters, 33 U.S.C. § 403, and the Act's *Commerce* Clause grounding, U.S. CONST. art. I, § 8, cl. 3. If such statutes really didn't require showing commercial navigability, their constitutional "validity might well be questioned." *Leovy v. United States*, 177 U.S. 621, 633 (1900). As noted *supra*, courts must interpret the Act to avoid constitutional conflicts.

At the hearing, Shelnutt, the US's lone navigability witness, testified he'd *never* seen commercial navigation in this river segment. Tr. 26, 31, 34. He nevertheless deemed the waterway navigable "just" because "a list" said it was. Tr. 34-35. But even that list, Shelnutt agreed, relied on a study "more than four decades old" that admitted this river stretch lacked commercial navigation. Tr. 44-46. That study relays governmental reporting that there "has never been any 'practical navigation' between Roma . . . and El Paso," a 1000-mile stretch that includes Eagle Pass; that only one "extraordinary" military expedition passed Roma but no "substantial items of commerce were shipped from this point"; that "actual accounts of commercial travel [were] lacking" because "[a]bove Laredo up to Eagle Pass . . . navigation was impeded by rocks and ledges"; and that the "present use" test couldn't justify navigability as there was "no commercial activity occurring within the study area" in 1975. Exh. V-A, Shelnutt Decl. Ex. B at 10, 18-19 (G-35). Because neither a one-off "exceptional" use, *Rio Grande*, 174 U.S. at 699, nor "military expeditions," *Miami*, 692 F.2d at 451, will suffice, the district court's reliance on them (at 15-16) cannot stand.

The same is true of the district court's puzzling forecast (at 13) about increased water, like from "El Nino"—something never raised by either litigant and unsupported by record evidence. It's immaterial whether the US merely thinks the stretch could someday *become* navigable. Even assuming courts may consider prospective future use through improvements, *but see Republic Steel*, 362 U.S. at 483-85, the US's evidence refutes such prospect: there were "[n]o authorized plans" for future use and competing water-use priorities meant "little likel[i]hood of change." Exh. V-A, G-35 at 11, 19. The US never proved "the costs of improvement would be justified by the benefits to commercial transit in this area," *Lykes Bros. Inc. v. U.S. Army Corps of Eng'rs*, 821 F. Supp. 1457, 1464 (M.D. Fla. 1993), *aff'd*, 64 F.3d 630 (11th Cir. 1995). Absent "these two crucial factors," a "court cannot balance the opposing interests." *Crow*, 340 F. Supp. at 35-36. By taking "judicial notice" (at 13) merely that river levels *could* rise, the district court erred.

Nor can the US rely on statutes referencing "free navigation" at points on the Rio Grande. Exh. I-C at 11. Such language is "only precautionary and not intended as an affirmation of navigable capacity in that locality." *Oklahoma*, 258 U.S. at 585-86. The US's own study reflects a similar legal error. It relies on "treaties between the United States and Mexico together with the *Rio Grande River* case." Exh. V-A, G-35 at 17. But *Rio Grande* (and *Puente de Reynosa*, 357 F.2d at 50-51) repudiate the idea that the entire Rio Grande was navigable. And, like the Supreme Court in *Oklahoma*, 258 U.S. at 584-85, the study's exhibits recognize that the treaties merely "provide that the navigation of the actually navigable main channels of the river is made free and common," Exh. VI-A, G-35 at 76. Far from assuming navigability, the

*Rio Grande* Court remanded because navigability was a matter "requiring evidence, and to be determined by proof." 174 U.S. at 698.

As noted *supra* at 5, the evidence proves the segment is non-navigable. Both sides' witnesses attest that commerce or trade activities are nonexistent. *See* Exh. II-A, ¶¶3, 10; Exh. II-B ¶7; Exh. II-D, Peters Dep. at 19 (D-4); Exh. II-F at 15, 31-32, 46-47. And crossing the river is illegal. *See* 8 U.S.C. § 1325; 19 U.S.C. § 1459.

## B.  The buoys don't "obstruct" any (hypothetical) navigable capacity and aren't a "boom" or "other structure."

**1.** Even if this waterway were navigable, the US didn't prove the buoy system presents an "obstruction" to "the navigable capacity" of the Rio Grande. 33 U.S.C. § 403; *see, e.g.*, *Miami*, 692 F.2d at 449-51. The issue is whether activities "substantially diminish the navigability of that stream within the limits of present navigability"; the question "always is one of fact whether such appropriation substantially interferes with the navigable capacity within the limits where navigation is a recognized fact." *Rio Grande*, 174 U.S. at 710. The "mere presence of an object in a navigable river does not necessarily" violate the Act. *Pillsbury Co. v. Midland Enters., Inc.*, 715 F. Supp. 738, 761 (E.D. La. 1989), *aff'd*, 904 F.2d 317 (5th Cir. 1990). An object that "may only deter movements in commerce" won't do—it must "adversely affect[]" navigation such that it "tends to destroy the navigable capacity of one of the navigable waters of the United States." *Republic Steel*, 362 U.S. at 487-88.

The US failed to show the buoys substantially diminish any navigability. The buoys obstruct neither upriver nor downriver travel. Because the river's width

"from bank to bank" is about 200 feet (maybe more per a US witness, Tr. 32), vessels can easily maneuver past them. Exh. II-A ¶9; Exh. II-E at 43; *see* Tr. 106 (traffic can simply "go around [the buoys]"). Any navigation is available "up and down the river by all." Exh. II-A ¶9. The US's own witness, Mario Gomez, testified the traffic he saw was limited to law-enforcement airboats, which could travel "up the river and down the river" unimpeded by "four-foot-diameter floating [buoy] barriers." Exh. II-E at 43-44. The buoys prevent illicit cross-border fording without obstructing river travel because they run with the current. Exh. II-E at 43; Exh. II-A ¶¶6-8.

**2.** Nor did Texas build "boom[s]" or "other structures." 33 U.S.C. § 403. There was no action to "build or commence the building" of anything. *Id.* By design, the buoy system's placement is temporary; they may be dismantled and redeployed with machinery to reposition the concrete anchoring blocks. Exh. II-C ¶¶5-7. When Texas's buoy system was deployed, no construction or excavation—and no affixing, bolting, or attachment to the riverbed or shore—occurred. Tr. 95-96; Exh. II-C ¶6; Exh. II-A ¶7. And testimony of Loren Flossman, the buoys' project manager, shows that, although the parties dispute whether buoys were initially placed on the river's Texas's side, they could only be (and have only been) repositioned intentionally. Tr. 102-03.

Section 10 of the Act bars "the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures" in navigable waters without a Corps permit. 33 U.S.C. § 403. Shelnutt testified unequivocally that the buoys aren't a "boom," a "pier," a "wharf," a "breakwater," a "weir," a "bulkhead," a "jetty,"

or a "dolphin." Tr. 48; Exh. II-F at 61. Notwithstanding this concession, the district court (at 27) found the buoys were either a boom or "similar enough" under Section 10's "other structures" catchall. But the *ejusdem generis* canon bars overbroad readings where Congress "has tacked on a catchall phrase at the end of an enumeration of specifics." Scalia & Garner, *Reading Law* 199 (2012). Such general terms encompass only what's similar in nature to the specific terms. *Yates v. United States*, 574 U.S. 528, 545-46 (2015) (plurality op.). What the listed terms here have in common—whether extending shore-to-shore (like booms), jutting out from the shore (like piers), or spanning offshore waters (like dolphins)—is permanence and the ability to go *across* waterways. *Cf. United States v. Burns*, 54 F. 351, 361-63 (C.C.D.W. Va. 1893). By design, Texas's buoys are impermanent, enclose nothing, and track the current.

Moreover, the ruling flouts statutory context. *See Dubin v. United States*, 143 S. Ct. 1557, 1566 (2023). The Act prohibits obstructions globally, but it elsewhere *mandates* placing buoys in navigable waters—without obtaining federal authorities' approval. *See* Exh. I-G, ECF 26 at 15-17 (citing 33 U.S.C. § 409). Clearly, no one thought buoys were impermissible structures. Treaties show the same. The 1944 US-Mexico treaty requires placing "buoys" in "a practicable and convenient line" to "mark the boundary" between the countries in certain places along the Rio Grande. Exh. I-I, ECF 41 at 3-4 (citing 1944 Treaty, art. 21). Given that treaty provisions mandate buoy barriers while *also* guaranteeing mutual-navigation rights, buoys aren't structures barred by the Act. But even assuming some conflict, the

later-enacted 1944 Treaty controls over the Act's earlier-enacted circa-1899 prohibition. *See Cook v. United States*, 288 U.S. 102, 118-19 (1933).

## III. The court erred in weighing the harms to Texas against a contrived injury to US-Mexico relations.

Courts are not "mechanically obligated to grant an injunction for every violation of law when the United States is the plaintiff." *United States v. Marine Shale Processors*, 81 F.3d 1329, 1360 (5th Cir. 1996) (cleaned up). Mandatory preliminary injunctions ordering party action are "particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976). The district court abused its discretion because the alleged irreparable harm, equitable balance, and public interest didn't clearly favor the preliminary injunction.

**A.** The US proved no irreparable harm. The buoys occupy a "de minimis" space in a 1,000-foot stretch of a 1,200-mile river. *See* Exh. II-A ¶9; Exh. II-E at 20, 51. They cannot obstruct commercial shipping, which is nonexistent. Exh. II-A ¶3; Exh. II-B ¶7; *accord* Exh. II-L, Gonzalez Decl. (D-16); Exh. II-M, Valdez Decl. (D-17) (area-resident declarations). And they were placed over two weeks before the US sued. *See* Exh. II-C ¶7. In hearing testimony, a low-level federal employee claimed that Mexico expressed "concerns" that Texas is stymying US compliance with treaty obligations. Tr. 63-67. And border-boundary compliance, the US says, is "a top-priority issue." Exh. I-H at 11-12. Any claimed urgency is, however, irreconcilable with the US and Mexico's *four-year (and counting)* delay in meeting border-mapping obligations under the 1970 Treaty. *See* Exh. I-I at 6. Besides, States

needn't avoid everything that "may upset foreign powers." *Arizona*, 567 U.S. at 423-24 (Scalia, J., concurring in part and dissenting in part).

Regardless, cabinet-level officials recently called US-Mexico relations a "strong and enduring bond[] of friendship and partnership." Exh. III-C, Announcement by Jake Sullivan at 2 (D-35). Indeed, the Secretary of State couldn't recall times of "stronger partnership and collaboration" between the countries, *even though the buoys had been in place for weeks*. Exh. III-D, August 10 Statement at 2 (D-36). This Court should take the US at its word: the contrary assertion of diplomatic friction is the sort of "[s]peculative injury" that is "not sufficient" for irreparable harm. *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). "There [are] no two international partners that don't have some disagreements," as the district court said, "and that's a fact of life," Tr. 77—not clear grounds for mandatory injunctive relief, *see Martinez*, 544 F.2d at 1243.

**2.** The countervailing equities and public interests overwhelmingly favor Texas. The district court erred (at 38-40) in considering the injunction's public harm. It's in the public interest to reduce the flow of fentanyl, to combat human trafficking, to protect Texans from unlawful trespass and violent attacks on their property by criminal cartels, and to minimize the risks to migrants of drowning while journeying to and through illegal entry points. *Cf.* Exh. II-A, ¶¶4, 12-13. When Texas raised such issues, they were wrongly said to be "of [no] concern to the Court." *See, e.g.*, Tr. 73, 76, 86, 90. But the public interest clearly favored the buoys, which have effectively eliminated dangerous crossings in one of the most active drug-smuggling

and human-trafficking hotspots on the river. *See* Exh. II-A, ¶¶4, 8, 12-13; Exh. II-C, ¶¶4, 10.

## IV. The Court Should Enter an Administrative Stay.

For these reasons, Appellants also request an administrative stay while the Court considers this Motion. Such administrative stays are routine. *E.g.*, *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 227-28 (5th Cir. 2020). Absent a stay pending appeal, the Court's immediate administrative stay will prevent irreparable harm while it considers this Motion.

## Conclusion

A stay pending appeal and, or alternatively, an immediate administrative stay should be granted.

Respectfully submitted.

Angela Colmenero
Provisional Attorney General

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Lanora C. Pettit
Principal Deputy Solicitor General
Lanora.Pettit@oag.texas.gov

/s/ Ari Cuenin
Ari Cuenin
Deputy Solicitor General
State Bar No. 24078385
Ari.Cuenin@oag.texas.gov

Coy Allen Westbrook
Assistant Attorney General

Counsel for Defendants-Appellants

## Certificate of Compliance with Rule 27.3

I certify the following in compliance with Fifth Circuit Rule 27.3:

- Before filing this Motion, counsel for Appellants contacted the Clerk's Office and opposing counsel to advise them of the intent to file this Motion. Counsel for Appellants also made telephone calls to the offices of opposing counsel before filing this Motion.

- The facts stated herein supporting emergency consideration of this motion are true and complete.

- The Court's review of this motion is requested as soon as possible, but no later than **12pm September 11, 2023**. In addition, or alternatively, Appellants respectfully request an immediate administrative stay while the Court considers this motion.

- True and correct copies of relevant orders and other documents are attached as exhibits to this motion.

- This motion is being served at the same time it is being filed.

- The names of counsel representing the parties, including contact information of all counsel, are as follows:

> James E. Dingivan
> Landon Wade
> Assistant United States Attorneys
> United States Attorney's Office
> Western District of Texas
> 601 N.W. Loop 410, Ste 600
> San Antonio, TX 78216
> (210) 384-7372 (tel.)
> (210) 384-7312 (fax)
> James.dingivan@usdoj.gov
> Landon.wade@usdoj.gov

Brian H. Lynk
SENIOR TRIAL COUNSEL
Kimere J. Kimball
Andrew D. Knudsen
TRIAL ATTORNEYS
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
(202) 514-6187 (tel.)
(202) 514-8865 (fax)
Brian.lynk@usdoj.gov
Andrew.knudsen@usdoj.gov
Kimere.kimball@usdoj.gov

Andrew M. Bernie
andrew.m.bernie@usdoj.gov
950 Pennsylvania Avenue NW
Washington, D.C. 20530
202-514-4010

Michael T. Gray
michael.gray2@usdoj.gov
950 Pennsylvania Avenue NW
Washington, D.C. 20530
202-532-3147


*Counsel for the United States of America*

/s/ Ari Cuenin
ARI CUENIN

## CERTIFICATE OF CONFERENCE

On September 7, 2023, counsel for Appellants conferred with counsel for Appellee, who stated that Appellee opposes the relief requested in this motion and will file a response in opposition to the motion, and may respond to the administrative stay request in a separate filing from the stay pending appeal. The filing of this motion was also preceded by telephone calls to the clerk's office and to the offices of opposing counsel on September 7, 2023, advising of the intent to file the emergency motion.

/s/ Ari Cuenin
ARI CUENIN

## Certificate of Service

On September 7, 2023, this document was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Ari Cuenin
Ari Cuenin

## Certificate of Compliance

This motion complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5194 words, excluding the parts of the motion exempted by rule; and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Ari Cuenin
Ari Cuenin