No. 23-50632

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*

*v.*

GREG ABBOTT, IN HIS CAPACITY AS GOVERNOR OF THE STATE OF
TEXAS; STATE OF TEXAS,

*Defendants-Appellants*

On Appeal from the United States District Court for the
Western District of Texas, Austin Division, 1:23-cv-00853-DAE

## EXHIBITS IN SUPPORT OF DEFENDANTS' OPPOSED EMERGENCY MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL AND FOR AN ADMINISTRATIVE STAY

### VOLUME I

### INDEX OF EXHIBITS[1]

Exhibit

ECF 1, Complaint ................................................... A

Transcript of Preliminary Injunction Hearing........................... B

ECF 50, Order Granting Preliminary Injunction ..................... C

ECF 51, Defendants' Notice of Appeal.................................... D

ECF 5, Plaintiff's Motion for Preliminary Injunction .............. E

---

[1] In these Exhibits, "ECF ___" refers to the district court docket number. Due to space constraints, unless indicated, the attachments to district court filings have not been included in these Exhibits in Support of Defendants' Motion for Stay.

ECF 24, Brief Amcius Curiae of Reps. Arrington et al. in Opposition to Motion for Preliminary Injunction ........................................................ F

ECF 26, Defendants' Memorandum in Opposition to Plaintiff United States' Motion for Preliminary Injunction ..............................................G

ECF 37, Plaintiff's Reply in Support of Motion for Preliminary Injunction........... H

ECF 41, Defendants' Surreply ................................................................. I

ECF 45, Plaintiff's Closing Argument ..................................................... J

ECF 46, Defendants' Closing Argument ..................................................K

EXHIBIT A: COMPLAINT

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

<table>
<tr><td>UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GREG ABBOTT, in his capacity as GOVERNOR OF THE STATE OF TEXAS, and THE STATE OF TEXAS,<br><br>Defendants.</td><td>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>Civil Action No.  1:23-cv-00853</td></tr>
</table>

**COMPLAINT**

Plaintiff, the United States of America, through its undersigned counsel, by the authority of the Attorney General of the United States, and at the request of the Secretary of the Army acting through the United States Army Corps of Engineers ("Corps"), files this Complaint and alleges as follows:

**NATURE OF THE ACTION**

1.      The United States brings this civil enforcement action under sections 12 and 17 of the Rivers and Harbors Appropriation Act of 1899 ("RHA" or "Rivers and Harbors Act"), 33 U.S.C. §§ 406 and 413, against Defendants Greg Abbott, in his official capacity as Governor of the State of Texas, and the State of Texas.

2.      As alleged below, Defendants have built structures in the Rio Grande, a navigable water of the United States, without the Corps' authorization, in violation of RHA section 10, 33 U.S.C. § 403.  These structures include a floating barrier and related infrastructure.

1

3.      As alleged below, Defendants' structures also constitute an unauthorized obstruction to the navigable capacity of waters of the United States in violation of RHA section 10, 33 U.S.C. § 403.

4.      In this action, the United States seeks: (1) to enjoin the building of structures in navigable waters and the obstruction to the navigable capacity of the waters of the United States in violation of the RHA, 33 U.S.C. § 403; and (2) to require Defendants, at their own expense and cost, to remove all structures and obstructions, including a floating barrier and all infrastructure related to the floating barrier, in the Rio Grande.

## JURISDICTION AND VENUE

5.      This Court has subject-matter jurisdiction pursuant to 33 U.S.C. § 406 and 28 U.S.C. §§ 1331, 1345 and 1355.

6.      Venue is proper in the Western District of Texas, Del Rio Division, pursuant to 33 U.S.C. § 406 and 28 U.S.C. § 1391(b) and (c), because the unauthorized structures and obstruction exist in the Rio Grande in the vicinity of Eagle Pass, Texas, which lies within this District, and the events giving rise to the cause of action alleged below occurred in the Rio Grande in the vicinity of Eagle Pass, Texas, which lies within this District.

7.      Venue also is proper in the Western District of Texas, Austin Division, because Austin is the state capital and Defendant Greg Abbott is located in Austin, the unauthorized structures and obstruction exist in the Rio Grande in the vicinity of Eagle Pass, Texas, which lies within this District, and the events giving rise to the cause of action alleged below occurred in the Rio Grande in the vicinity of Eagle Pass, Texas, which lies within this District.  The United States is filing suit in the Western District of Texas, Austin Division, because it is the capital and where a Defendant resides, and a related case is pending there.  That case, *Epi's Canoe & Kayak Team, LLC v. State of Texas*, No. 1:23-cv-00836-DII, was removed to federal court by Governor Greg

Abbott, the State of Texas, and state agencies and officials on July 21, 2023. The plaintiffs in *Epi's Canoe* claim that the floating barrier in the Rio Grande in the vicinity of Eagle Pass, Texas, is unlawful and pray for, among other things, an injunction to restrain Governor Abbott, the State of Texas, and the other state defendants from installing the floating barrier.

## THE PARTIES

8. Plaintiff is the United States of America. Authority to bring this action is vested in the United States Department of Justice pursuant to 28 U.S.C. §§ 516 and 519 and 33 U.S.C. § 413.

9. Defendants are Greg Abbott, in his official capacity as Governor of the State of Texas, and the State of Texas.

10. At all times relevant to the Complaint, Defendants caused and/or controlled the placement and/or construction activities that occurred or are occurring in the Rio Grande and are the subject of this complaint.

## RIVERS AND HARBORS ACT STATUTORY AND REGULATORY BACKGROUND

11. RHA section 10, 33 U.S.C. § 403, prohibits the "creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States." 33 U.S.C. § 403.

12. RHA section 10, 33 U.S.C. § 403, independently prohibits "build[ing] or commenc[ing] the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army."

13.     A Corps permit is required under RHA section 10, 33 U.S.C. § 403, for structures or work in or affecting navigable waters of the United States.  33 C.F.R. § 322.3(a).

14.     "Navigable waters of the United States are those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce.  A determination of navigability, once made, applies laterally over the entire surface of the waterbody, and is not extinguished by later actions or events which impede or destroy navigable capacity."  33 C.F.R. § 329.4.

15.     A "structure" includes, but is not limited to, "any pier, boat dock, boat ramp, wharf, dolphin, weir, boom, breakwater, bulkhead, revetment, riprap, jetty, artificial island, artificial reef, permanent mooring structure, power transmission line, permanently moored floating vessel, piling, aid to navigation, or any other obstacle or obstruction."  33 C.F.R. § 322.2(b).

16.     RHA section 12, 33 U.S.C. § 406, provides that "the removal of any structures or parts of structures erected in violation of the provisions of [33 U.S.C. § 403 and other specified statutory sections] may be enforced by the injunction of any district court exercising jurisdiction in any district in which such structures may exist, and proper proceedings to this end may be instituted under the direction of the Attorney General of the United States."

## GENERAL ALLEGATIONS

17.     The Rio Grande in the vicinity of Eagle Pass, Texas, is a navigable water of the United States.  *See* U.S. Army Corps of Engineers, Fort Worth District, Navigable Waters of the United States in the Fort Worth, Albuquerque, and Tulsa Districts Within the State of Texas at p. 1 (Dec. 20, 2011), Attachment 1[1]; U.S. Coast Guard, Memo from 8th District Commander re:

---

[1] This document also is publicly available at: www.swf.usace.army.mil/Portals/47/docs/regulatory/NavList2011.pdf.  As such, the Court may take judicial notice of it.  *See, e.g.*, *Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005).

Navigability Determination (Oct. 19, 1984), Attachment 2; Decl. of Capt. Brandy Parker Regarding Navigability Determination of the Rio Grande (July 24, 2023), Attachment 3.

18.    Beginning on or before July 10, 2023, and continuing through at least July 17, 2023, the Defendants, and/or persons acting on their behalf or at their direction, placed a floating barrier in the Rio Grande approximately two miles south of the Camino Real International Bridge, Eagle Pass, Texas (hereinafter the "Floating Barrier").  Declaration of Abraham Garcia ¶¶ 2-3 & Ex. 1-2 (July 24, 2023), Attachment 4.  The Floating Barrier appears to include associated infrastructure designed to anchor or fix it in place in the Rio Grande.  *Id.* Ex. 1.

19.    The Floating Barrier consists of a string of buoys each of which is between 4 and 6 feet in diameter.  According to a June 8, 2023, press statement by Governor Abbott, this string of buoys may stretch for at least 1,000 feet.[2]

20.    Defendants do not have authorization from the Corps pursuant to 33 U.S.C. § 403 or 33 C.F.R. § 322.3 for the Floating Barrier or for any associated infrastructure.

21.    Defendants did not seek authorization from the Corps prior to installing the Floating Barrier.

22.    Governor Abbott stated publicly on June 8, 2023, that Texas may seek to build similar floating barriers within the Rio Grande along the United States-Mexico border in Texas in addition to the one then contemplated, and now constructed, in the vicinity of Eagle Pass, Texas.[3]

23.    Because Texas installed the Floating Barrier without seeking the Corps' authorization, the Corps and other relevant federal agencies were deprived of the opportunity to evaluate risks the barrier poses to public safety and the environment, mitigate those risks as

---

[2] *See* https://gov.texas.gov/news/post/governor-abbott-signs-sweeping-package-of-border-security-legislation.

[3] *See* https://gov.texas.gov/news/post/governor-abbott-signs-sweeping-package-of-border-security-legislation.

necessary through the permitting process, and otherwise evaluate whether the project is in the public interest.

24.     Governor Abbott has stated publicly that the Floating Barrier is part of a broader effort called "Operation Lone Star."[4]  According to Governor Abbott, Operation Lone Star also includes the placement of concertina wire near the U.S.-Mexico border.[5]  With respect to the placement of concertina wire, Governor Abbott has stated: "We aren't asking for permission."[6]

25.     On July 20, 2023, United States Assistant Attorney General Todd Kim and United States Attorney Jaime Esparza wrote Governor Abbott and Texas Provisional Attorney General Angela Colmenero, giving the Texas officials notice that the Floating Barrier violates federal law and inviting the State in response to commit to expeditiously remove the Barrier and related structures.  On July 24, 2023, the Governor responded with a letter addressed to President Biden. Attachment 5.  The Governor's letter acknowledges "the floating marine barriers we have deployed in the Rio Grande River in Eagle Pass" and states that "Texas will see you in court, Mr. President." *Id.* at 1.

## COUNT 1:  VIOLATION OF THE RIVERS AND HARBORS ACT

26.     The United States repeats the allegations set forth in Paragraphs 1 through 25 of this Complaint.

---

[4] *See* https://gov.texas.gov/news/post/operation-lone-star-boosts-border-response-with-new-marine-barriers.

[5] *See id.*

[6] *See* https://twitter.com/GregAbbott_TX/status/1638306917939380224?t=BB0rNKcTgwyDn0j8qRiQKQ&s=19.

27.     The Floating Barrier, as constructed, installed, and placed by Defendants (and/or persons acting on their behalf or at their direction) wholly or partially in navigable waters of the United States, constitutes a "structure" within the meaning of RHA section 10, 33 U.S.C. § 403.

28.     The Floating Barrier, as constructed, installed, and placed by Defendants (and/or persons acting on their behalf or at their direction) wholly or partially in navigable waters of the United States, constitutes a "structure," as that term is defined in 33 C.F.R. § 322.2(b).

29.     The Floating Barrier is an obstruction to the navigable capacity of the Rio Grande, a navigable water of the United States.

30.     The Floating Barrier required authorization under RHA section 10, 33 U.S.C. § 403, and the Corps' implementing regulations at 33 C.F.R. Part 322, including 33 C.F.R. § 322.3(a), for its construction, installation, and placement in navigable waters of the United States.

31.     Defendants did not obtain a Corps permit or otherwise obtain the Corps' permission for the construction, installation, or placement of the Floating Barrier in the Rio Grande as required by RHA section 10, 33 U.S.C. § 403.

32.     The unauthorized construction, installation, and placement of the Floating Barrier structure in navigable waters of the United States violates RHA section 10, 33 U.S.C. § 403.

33.     The Floating Barrier's unauthorized obstruction to the navigable capacity of navigable waters of the United States violates RHA section 10, 33 U.S.C. § 403.

34.     Defendants have violated and continue to violate RHA section 10, 33 U.S.C. § 403, by: (a) the construction, installation, and placement of the Floating Barrier in the Rio Grande without a Corps permit; and (b) the creation of an unauthorized obstruction to the navigable capacity of navigable waters of the United States.

## PRAYER FOR RELIEF

35.     WHEREFORE, Plaintiff, the United States of America, respectfully requests that this Court order the following relief:

       a.     Enjoin Defendants from further constructing, installing, placing, or maintaining structures in waters of the United States, except in compliance with the RHA and all other applicable law;

       b.     Enjoin Defendants from creating or maintaining obstructions in or affecting the navigable waters of the United States, except in compliance with the RHA and all other applicable law;

       c.     Compel Defendants to promptly remove the Floating Barrier and any related unauthorized structures from waters of the United States pursuant to the RHA, 33 U.S.C. § 401 *et seq.*, and in accordance with all other requirements of law and consultation with the relevant authorities, including the Corps;

       d.     Compel Defendants to promptly remove the unauthorized obstruction to the navigable capacity of navigable waters of the United States pursuant to the RHA 33 U.S.C. § 401 *et seq.*, and in accordance with all other requirements of law and consultation with the relevant authorities, including the Corps;

       e.     Award the United States its costs and disbursements; and

       f.     Grant such other relief as the Court may deem just and proper.

Respectfully submitted,

TODD KIM
ASSISTANT ATTORNEY GENERAL
Environment & Natural Resources Division

Dated: July 24, 2023          By:     *Brian H. Lynk*
                                 BRIAN H. LYNK, D.C. Bar. No. 459525

8

Senior Trial Counsel
ANDREW KNUDSEN
Trial Attorney
Environmental Defense Section
United States Department of Justice
P.O. Box 7611
Washington, DC 20044
(202) 514-6187 (tel.)
(202) 514-8865 (fax)
brian.lynk@usdoj.gov
JAIME ESPARZA
UNITED STATES ATTORNEY

*James Dingivan*

JAMES E. DINGIVAN
Assistant United States Attorney
Texas Bar No. 24094139
United States Attorney's Office
Western District of Texas
601 N.W. Loop 410, Ste 600
San Antonio, TX 78216
 (210) 384-7372 (tel.)
 (210) 384-7312 (fax)
james.dingivan@usdoj.gov

9

# Exhibit B: Transcript of Preliminary Injunction Hearing

1

1          UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF TEXAS
2                AUSTIN DIVISION

3   UNITED STATES OF AMERICA,      )
    Plaintiff,                     )
4   vs.                           ) Case No. AU:23-CV-00853
                                   )
5   GREG ABBOTT, in his capacity as ) Austin, Texas
    Governor of the State of Texas, )
6   and THE STATE OF TEXAS,        ) August 22, 2023
    Defendants.                    )
7   ********************************************************

8        TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
            BEFORE THE HONORABLE DAVID A. EZRA
9             SENIOR UNITED STATES DISTRICT JUDGE

10  APPEARANCES:
    FOR THE UNITED STATES OF AMERICA:
11     Brian H. Lynk
       Landon Allen Wade
12     James Edward Dingivan
       Kimere J. Kimball
13     Andrew D. Knudsen

14

15  FOR THE DEFENDANTS:
       Patrick K. Sweeten
16     Monroe David Bryant
       Ari Cuenin
17     Munera Al-Fuhaid
       Ethan Szumanski
18

19

20  COURT REPORTER:
    Angela M. Hailey, CSR, CRR, RPR, RMR
21  Official Court Reporter, U.S.D.C.
    262 West Nueva Street
22  San Antonio, Texas  78207
    Phone(210)244-5048
23  angela_hailey@txwd.uscourts.gov

24  Proceedings reported by stenotype, transcript produced by
    computer-aided transcription.
25

```
1                        I N D E X
2    WITNESSES                                PAGE
3    JOSEPH SHELNUTT
4    By Mr. Wade                             7,49
5    By Mr. Sweeten                          21,51
6
7    HILLARY QUAM
8    By Mr. Dingivan                          56
9    By Mr. Sweeten                           71
10
11   LOREN FLOSSMAN
12   By Mr. Bryant                           93,111
13   By Ms. Kimball                           105
14
15
16
17
18
19
20
21
22
23
24
25
```

1    *(Tuesday, August 22, 2023, 9:02 a.m., in open court.)*

2                           *   *   *

3           COURT SECURITY OFFICER:  All rise.

4           COURTROOM DEPUTY CLERK:  Austin 23-CV-00853, United

5    States of America versus Greg Abbott, et al.

6           THE COURT:  Good morning, counsel.  Can we please have

7    appearances?

8           MR. LYNK:  Good morning, Your Honor, Brian Lynk,

9    senior trial counsel at the Department of Justice,

10   Environmental Defense Section.  I'll introduce the other

11   attorneys at the table who have all made appearances, we have

12   Mary Kruger, the civil chief of the U.S. Attorney's Office

13   here, James Dingivan, as well as Landon Wade, assistant U.S.

14   attorneys.  And from my office, Environmental Defense Section,

15   we have Andrew Knudsen and we have Kimere Kimball.

16          THE COURT:  Thank you very much, counsel.

17          MR. SWEETEN:  Good morning, Your Honor, Patrick

18   Sweeten on behalf of the State of Texas and Governor Greg

19   Abbott.  With me today is Ari Cuenin, David Bryant, Munera

20   Al-Fuhaid, and Ethan Szumanski.

21          THE COURT:  All right.  Thank you very much.  We are

22   here this morning for a hearing on the United States motion for

23   preliminary injunction against the defendants seeking to remove

24   or order to have removed the so called floating barrier which

25   Texas has installed in the Rio Grande River near the city of

1   Eagle Pass.

2          Before we get started, I do need to clear a couple of

3   things up.  I did read or had called to my attention some

4   erroneous information that may be out there.  One was that I

5   had denied Texas ability to take depositions of relevant

6   government witnesses.  It is true Texas filed a request to take

7   a number of depositions, the United States opposed that

8   request.  I did, in fact, grant Texas the right to take a

9   number of relevant depositions and they did do that.  So these

10  were not interviews, these were actual depositions that were

11  taken.  We don't do interviews.  So that's number one.

12         Number two, you see me up here with something and

13  normally I've been sitting here as a federal judge by

14  designation of the Chief Justice of the United States for over

15  ten years, so lawyers who appear before me know what this is.

16  I had a procedure done on my vocal cords many, many years ago.

17  If I don't keep my vocal cords somewhat moist during the

18  proceeding, I run the risk of losing my voice.  There may be

19  some who think that is a good thing, but in order for me to do

20  my job I do need to be able to talk, so that's what we've got

21  going on here.  We are in the ceremonial courtroom, I notice

22  we've got a lot of people here.  This is the largest courtroom

23  we have here in the Austin courthouse, and my courtroom is

24  actually upstairs.  It is not that much smaller, but this does

25  hold more people, so we'll try to accommodate as many people as

1   we can.

2          In a preliminary injunction hearing such as this, it

3   is normal for us to have just argument and matters submitted by

4   way of declarations and other materials.  Now, we do have

5   declarations from both sides in the record and those have been

6   received and have and will be considered by the Court.  So

7   that's number one.  Occasionally counsel will request the

8   opportunity to present live witness testimony in particularly

9   cases like this.  It has generally been my policy over the 36

10  years or so I've been a federal judge to allow that kind of

11  presentation.  Now, my understanding is the government U.S. has

12  one witness, is that right?

13         MR. LYNK:  Your Honor, we do expect to call actually

14  two witnesses today, and whether we would call a third remains

15  to be seen.

16         THE COURT:  All right.  And does Texas -- you didn't

17  list that you wanted to call any witnesses, I don't know

18  whether you intend to.

19         MR. SWEETEN:  Your Honor, I think we sent the Court

20  our witness list and designated two potential witnesses as may

21  call.

22         THE COURT:  May call.

23         MR. SWEETEN:  May call witnesses, yes, sir.

24         THE COURT:  All right.  Of course, you're going to be

25  cross-examining their witnesses.

1    MR. SWEETEN:  We will be cross-examining Mr. Shelnutt
2    and Ms. Quam and I think, Your Honor, we've got two that are
3    going to be here and we'll make those determinations as to
4    whether or not we'll call them as the injunction proceedings
5    transpire.

6        THE COURT:  Okay.

7        MR. LYNK:  Your Honor, my apologies, I just wanted to
8    add, because there will be at least two people testifying and
9    then, as counsel noted, there could be others, we have agreed
10   on invoking the Rule on excluding the witness.

11       THE COURT:  The Rule, by the way, is shorthand for the
12   attorney's right to request the Court to exclude anyone from
13   the courtroom who might be testifying, might be testifying,
14   even though they're not for sure testifying, they need to wait
15   outside.  Unfortunately, if they don't get called, they just
16   don't get called, but that's not my decision.  So if you are a
17   potential witness here, you must wait outside.

18       Okay, I do not need opening statements by counsel.  I
19   have carefully reviewed the submissions by counsel.  I have
20   carefully reviewed the declarations and other material that
21   both sides have presented to the Court.  So I do not need
22   opening statements.  I should make it clear that all the
23   materials that I have reviewed have been filed, I ordered them
24   to be filed, and they are available to the public on the public
25   docket of this court in this matter.

1          So, counsel, would you like to call your first witness

2   please.

3          MR. WADE:  Yes, Your Honor, we will call to the stand

4   Mr. Joseph Shelnutt from Army Corps of Engineers.

5          COURTROOM DEPUTY CLERK:  Please raise your right hand.

6                              *   *   *

7          *(Oath administered and JOSEPH SHELNUTT, Plaintiff*

8   *Witness, sworn.)*

9                              *   *   *

10         THE WITNESS:  I do.

11         COURTROOM DEPUTY CLERK:  You can have a seat.

12         THE COURT:  Before we proceed, can you please spell

13   your name for the court reporter?

14         THE WITNESS:  My first name is Joseph, my last name is

15   Shelnutt, S-H-E-L-N-U-T-T.

16         THE COURT:  Thank you.  All right, counsel, you can

17   proceed.

18          *(9:11 a.m.)*

19                       DIRECT EXAMINATION

20   BY MR. WADE:

21   Q.  Mr. Shelnutt, can you please just introduce yourself to the

22   judge?

23   A.  My name is Joe Shelnutt, I work for the U.S. Army Corps of

24   Engineers Regulatory Division, in the Fort Worth District.

25   Q.  How long have you worked with the Corps of Engineers?

1  A.  Approximately eight years.

2  Q.  How long have you been doing the work you currently do as a

3  regulatory project manager?

4  A.  Approximately six years.

5  Q.  So what does your job entail, what are your normal duties?

6  A.  Currently my normal duties are to review potential

7  unauthorized activities in waters of the United States,

8  navigable waters of the United States.

9  Q.  Okay.  So do you in your position with Corps of Engineers

10  help enforce sections of the Rivers and Harbors Act?

11  A.  That is correct.

12  Q.  So what does enforcement of the Rivers and Harbors Act

13  entail?

14  A.  So I'll refer to the regulations, 33 CFR 322.3, Activities

15  Requiring Permits.  So this would be -- we would normally

16  review cases that would come to us or potential cases that

17  would come to us for unauthorized activity or rule compliance

18  verification on authorized activities.

19  Q.  So you mentioned that you investigate potential violations

20  of the Rivers and Harbors Act.  How does one of those

21  investigations typically begin?

22  A.  Typically a report comes to us from various sources, it

23  could be normal citizens, other federal agencies or state

24  agencies or someone within the Corps itself.

25  Q.  So after you receive a complaint, what are some of the next

1   preliminary steps you take in your investigation?

2   A.  We would verify a location, contact information, the

3   extent, potential extent of the potential violation, whether it

4   is in a location that will be under our authority to regulate,

5   and if so, is there an impact or violation at that site.

6   Q.  So what geographic area is under your jurisdiction to

7   regulate?

8   A.  In the Fort Worth District, we cover I believe it's 183

9   counties, which is a lot of Texas, portions of three parishes

10  in Louisiana, and we're bordered on the south by the Galveston

11  District and the west by the Albuquerque District.

12  Q.  You mentioned that you are concerned with navigable waters.

13  Can you tell the Court how you determine what's a navigable

14  water within your jurisdiction?

15  A.  Well, fortunately, I don't have to determine that myself,

16  it's on a list of navigable waters that's available to the

17  public, or the Rio Grande in this case.

18  Q.  And to be clear, you do not make navigability

19  determinations yourself, you rely on those determinations made

20  by others in the Corps?

21  A.  That is correct.

22  Q.  Would that be by one of the District's engineers?

23  A.  I assume it would be by one or several engineers in the

24  District.

25  Q.  Okay.  So after you've done your sort of preliminary

1  investigation, after you received a complaint, do you ever do a

2  site visit to go take a look at what you're looking at?

3  A.  A site visit would be a common practice.

4  Q.  When you go to a site visit, what are you assessing, what

5  are you looking for?

6  A.  We're verifying in many cases what we already know, in some

7  cases we're gathering additional information such as the

8  location of the potential violation, the extent of the

9  potential violation.  We may actually talk to people on site if

10  it warrants it at the time or if we have the opportunity.

11  Q.  Now, if you're investigating a potential violation and

12  there hasn't been a permit that's been submitted, are you

13  working with less information than you would have if you would

14  have gotten the permit application?

15  A.  Usually that's the case.

16  Q.  So I want to talk about now the case we're all here for

17  today involving the floating barrier in the Rio Grande.  When

18  did you become aware that Texas had placed a floating barrier

19  in the Rio Grande River?

20  A.  It would be approximately July 10th.

21  Q.  And how did that come to your attention at first?

22  A.  The first that I was aware was through various media

23  reporting.

24  Q.  Okay.  And so did the Corps of Engineers ever receive a

25  complaint that that was a potential Rivers and Harbors Act

1  violation?

2  A.  Yes.

3  Q.  Approximately when did the Corps receive that complaint, do

4  you remember?

5        MR. SWEETEN:  Sorry, objection to the question.  When

6  did the Corps receive--  I didn't hear the question and I think

7  he's asking what the Corps, beyond this witness's personal

8  knowledge.

9        THE COURT:  I'm going to sustain the objection to the

10 extent that you need to lay a foundation as to how he would

11 know.  Corps of Engineers is a big organization.

12       MR. WADE:  Yes, Your Honor.

13 BY MR. WADE:

14 Q.  Well, did it ever come to your attention that the Corps had

15 received a complaint about this activity on the Rio Grande?

16 A.  Yes.

17 Q.  And when approximately was that?

18 A.  Approximately on the 12th.

19 Q.  July 12th?

20 A.  Yes.

21 Q.  Okay.  And do you know who that complaint came from?

22 A.  It came down from our headquarters in Washington, D.C.

23 Q.  And do you know what entity made the complaint?

24 A.  I do, it was the International Border and Water Commission.

25 Q.  Okay.  And so after that complaint was received, were you

1  assigned to investigate this potential violation?

2  A.  I was.

3  Q.  So I want to walk through the steps you took in your

4  investigation.  So first did you check to see if there was a

5  permit for this work?

6  A.  Yes.

7  Q.  And what did you learn?

8  A.  I reviewed our database and we could find no valid permit

9  for that location.

10  Q.  And did you then verify that the site where this floating

11  barrier was placed was in navigable water within your

12  jurisdiction?

13  A.  Ultimately, yes.

14  Q.  And how did you determine that?

15  A.  Could you repeat the question again?

16  Q.  Sure.  How did you know that you were looking at a

17  navigable water within your jurisdiction to regulate and

18  enforce?

19  A.  Well, I'll refer back, it's on a list, a publicly available

20  list of navigable waters within the Fort Worth District.

21  Q.  And that particular stretch of Rio Grande we're talking

22  about in Maverick County, is that included in the stretch of

23  the Rio Grande that's on that list?

24  A.  It is.

25  Q.  And do you know how that area came to be on that list that

1   you referenced?

2   A.   Yes.

3   Q.   And how so?

4   A.   It was the result of a study that was done a little over

5   four decades ago.

6           MR. SWEETEN:  Your Honor, I'm going to object to this

7   testimony.  In his own declaration, this witness says that the

8   list was compiled in December of 2011.  Mr. Shelnutt was not

9   even employed by the Corps of Engineers in 2011.  He's being

10  asked how it came to be that this is on the list that is kept

11  and maintained by this Fort Worth office.

12          THE COURT:  Without any further foundation, I'm going

13  to have to sustain the objection.

14          MR. WADE:  Okay.

15  BY MR. WADE:

16  Q.   With respect to the list that you had mentioned, do you

17  know how those determinations of navigability ended up on the

18  list, generally speaking?

19          MR. SWEETEN:  Your Honor, I assume this is limited to

20  his personal knowledge?

21          THE COURT:  I think that's true for every question.

22          MR. SWEETEN:  Otherwise, objection, foundation.

23          THE COURT:  The objection is overruled.

24  A.   My understanding is to be on the list that is publicly

25  available that I mentioned earlier is the result of a study

1    that was done on navigability.

2    Q.  Okay.  I want to show you what's been marked as Exhibit 34.

3    Can you turn to that?  And let me know when you pull it up.

4    A.  Okay, I'm there.

5    Q.  Do you recognize this document?

6    A.  I do.

7    Q.  And have you reviewed this document?

8    A.  I have.

9    Q.  Do you understand this to be a navigability determination

10   that the portion of the Rio Grande we're talking about is a

11   navigable water of the United States?

12          MR. SWEETEN:  Objection, Your Honor, he's leading the

13   witness.

14          THE COURT:  He's just asking him about a document in

15   front of his face.  The objection is overruled.  We don't have

16   a jury here.

17   A.  Yes.

18   Q.  So this document at the top references a navigability

19   study.  Is that what you referred to earlier in your testimony?

20   A.  That is correct.

21   Q.  And so can you turn to Exhibit 35 now please?

22   A.  Okay.

23   Q.  And you understand this to be the navigability study that's

24   referenced in Exhibit 34, The Navigability Determination?

25   A.  I do.

1   Q.  Have you reviewed that navigability study?

2   A.  I have reviewed it.

3   Q.  So at this point, let's go back to the steps in your

4   investigation.  You have determined there's not a permit, you

5   know that you're looking at a navigable water that's within

6   your jurisdiction.  After that, what did you do?  What were

7   your next steps?

8          THE COURT:  Listen, we've got a map here.  Where is on

9   this -- are you going to ask him or do we guess where the buoys

10  are on this map, if at all.

11         MR. WADE:  We can do that, Your Honor, yes.

12  BY MR. WADE:

13  Q.  So on this map up here, what area was this violation or

14  this -- what area were the buoys placed in, do you know?

15  A.  I do, it was just downstream of Eagle Pass.

16  Q.  So right where the map shows Eagle Pass, that's about where

17  it was?

18  A.  That's correct.

19         THE COURT:  That red arrow area, is that it right

20  there?

21         THE WITNESS:  That would be approximate, sir, Your

22  Honor.

23         THE COURT:  All right.  And that is within the so

24  called navigable waters, as determined by the document.

25         THE WITNESS:  That would be correct, Your Honor.

1    BY MR. WADE:

2    Q.  Mr. Shelnutt, while that is still up there, can you explain

3    the area that's on the 2011 list, this area of the Rio Grande

4    that's navigable, where does that navigability -- where does

5    that area start and end on that map that's within your

6    jurisdiction?

7    A.  So on the southern portion of the river which is the

8    border, close to Falcon Reservoir in the south, you can see

9    there on the map, within our district all the way up to where

10   we meet the Albuquerque District above Amistad, north of

11   Amistad Reservoir.

12   Q.  Okay.  So after you've seen where this violation or you've

13   assessed where this alleged violation has occurred, you know

14   it's within your jurisdiction, what do you do after that?

15   A.  Once we know it's within our jurisdiction, then we do some

16   remote sensing, just base information about existing condition

17   at the site, is there satellite imagery available at the site

18   that also gives us the baseline conditions or that might record

19   that actual activity, we'll review for that.

20   Q.  So what's the purpose of the remote sensing that you do?

21   A.  So we can have a good sense of what the baseline conditions

22   are at the site or what the impacts might be or in this case

23   what the structures might be if that's available to us.

24   Q.  Okay.  And you're doing this from -- are you doing this

25   from your office or are you doing it at the site or where do

1  you do the remote sensing?

2  A.  It would be desktop from the office.

3  Q.  So did you do that in this case?

4  A.  I did.

5  Q.  After you did sort of your preliminary investigation, did

6  you eventually conduct a site visit?

7  A.  Yes.

8  Q.  And what did you observe during your sight visit?  Did you

9  go to where the actual buoys were placed in the river?

10  A.  We did actually visit the site where the buoys were in the

11  river.

12  Q.  Okay.  Can you just generally recall what you observed when

13  you were down there?

14  A.  Yes, we observed spheres, orange and red spheres

15  approximately four to 6 feet in diameter actually in the water

16  with more actually being taken from some upstream location to

17  be installed in segments along the south end of the segment

18  that was already constructed.  There was heavy equipment in the

19  river, there were workers in the river.  There were airboats

20  and other water craft in the river as well, and as well as

21  people standing in the river too.

22  Q.  And I think I got ahead of myself a little bit.  When did

23  you take this site visit?

24  A.  That would be July 13th of this year.

25  Q.  Okay.  So I want to show you what's been marked as

1   Government's Exhibit 26.  Do you recognize this photo?

2   A.   I do.

3   Q.   And did you take this photo?

4   A.   I took this photo.

5   Q.   Did you take this photo when you were conducting your site

6   visit on July 13th?

7   A.   Yes.

8   Q.   And so I also want to show you Government's Exhibit 27.

9   Now, are you familiar with this photo?

10  A.   I am.

11  Q.   Did you take this photo?

12  A.   I did not.

13  Q.   Who took this photo?

14  A.   Mr. Neil Lebsock took this photo.

15  Q.   Who is Neil Lebsock?

16  A.   Mr. Lebsock is the Chief of Compliance and Enforcement in

17  the Fort Worth District.

18  Q.   So you report to Mr. Lebsock?

19  A.   I do.

20  Q.   Did he accompany you on this trip?

21  A.   He did.

22  Q.   And was this taken at the time you conducted your site

23  visit?

24  A.   Yes.

25  Q.   Can you explain what you understand to be going on, what

1   you saw happening in the river as depicted in this photograph?

2   A.  Yes, there's an excavator actually in the river itself,

3   it's transporting a series of three buoys toward the downstream

4   end of the segment of buoys that appear to already be attached

5   to each other.  There's also some support craft in the form of

6   airboats, and there's also at the time or in this photograph

7   another barge-type craft parked adjacent to or abutting the

8   buoys as well.

9   Q.  So how close were you able to actually get to this site?

10  A.  Approximately a hundred yards or 150 yards, something like

11  that.

12  Q.  Okay.  So you weren't -- were you able to determine the

13  full extent of the construction of the floating barrier or

14  would you like to have had more information about how it was

15  built?

16          MR. SWEETEN:  Objection to the question, form, vague.

17          THE COURT:  Well, I think it's a compound question.

18  You asked him two questions, actually.  Ask him one at a time.

19  BY MR. WADE:

20  Q.  Based on what you observed, were you confident you had

21  sufficient information to know what you were looking at?

22  A.  Not full information to understand what we -- the extent of

23  what was being constructed.

24  Q.  Would you have expected to see those details in a permit

25  application?

1    A.  Yes.

2    Q.  But based on what you saw, did this floating barrier appear

3    to you to be a structure that would require a permit to be

4    lawfully placed in the Rio Grande?

5    A.  Yes.

6    Q.  And how did you come to that conclusion?  What are the

7    features of the floating barrier that led you to that

8    conclusion?

9    A.  Well, I'll refer to the regulations, 33 CFR 322.3,

10   Activities Requiring Regulations, so any work or structure

11   under Section 10, navigable water requires a Department of Army

12   permit.

13   Q.  So based on your training, your experience, what you

14   observed at the site, again did you conclude this was a

15   structure affecting navigable waters?

16   A.  I did.

17   Q.  And did the floating barrier appear to you to be an

18   obstruction to the navigable capacity of the Rio Grande?

19           MR. SWEETEN:  Objection, calls for a legal conclusion.

20           THE COURT:  No, I can give it the weight that I

21   believe it deserves.  It's just his observation.  You can

22   answer the question.

23   A.  Yes.

24   Q.  And how did you come to that conclusion?  Can you explain

25   why did this appear to be an obstruction to navigation?

1    A.  Well, I'll refer back to the regs again at 33 CFR 322.2,

2    Structures.  In that particular part of the regulations, it

3    begins by saying, *A structure is without limitation,* and it

4    gives several examples, but concludes with *or any other*

5    *structure that obstructs or -- any other structure that*

6    *obstructs, that is an obstruction or obstacle.*

7    Q.  So why did you consider this to be an obstruction or

8    obstacle?

9    A.  Well, I guess two reasons.  I think it's obvious that the

10   purpose of this structure is to impede human movement cross

11   river, therefore, it would also impede the movement of a vessel

12   cross river as well.

13   Q.  Thank you, Mr. Shelnutt.

14           MR. WADE:  I'll pass the witness.

15           *(9:32 a.m.)*

16           THE COURT:  Okay.  Cross.

17           MR. SWEETEN:  Yes, Your Honor.

18                      CROSS-EXAMINATION

19   BY MR. SWEETEN:

20   Q.  Good morning, Mr. Shelnutt.

21   A.  Good morning.

22   Q.  You came down from Fort Worth last night or yesterday?

23   A.  Last night.

24   Q.  Met with the lawyers with the Department of Justice

25   yesterday?

1   A.   Maybe a couple of them.

2   Q.   And you've had several occasions now over these last few

3   weeks to meet with the Department of Justice lawyers, correct?

4   A.   I've had occasion to do that.

5   Q.   Now, let's talk about your training and experience.  You're

6   a graduate of Auburn University, 1996, correct?

7   A.   That's correct.

8   Q.   What is your year of birth, Mr. Shelnutt?

9   A.   1963.

10  Q.   And you have now worked for the Corps for approximately

11  eight years; is that right?

12  A.   That's correct.

13  Q.   Before that you worked at something called The Raptor

14  Center in Alabama, correct?

15  A.   Much before that, yes.

16  Q.   You worked at Bartlett Ranches then immediately before you

17  were working at the Corps, is that correct?

18  A.   Not immediately, but after the other place of employment

19  you had mentioned.

20  Q.   So what did you do for between Bartlett Ranches and the

21  Corps of Engineers?

22  A.   I was a freelance consultant.

23  Q.   Now, in the seven years you worked at the Raptor Center in

24  Alabama, and as I understand it that's where you studied

25  eagles, hawks and other birds of prey; is that correct?

1  A.  That's correct.

2  Q.  And what was the time period when you worked there, sir?

3  A.  Approximately 1996 to 2003 or '04.

4  Q.  Okay.  Thank you, sir.  Now, couple things just to get out

5  of the way, you're not a lawyer, correct?

6  A.  That's correct.

7  Q.  And you don't give legal opinions for a living, correct?

8  A.  I do not.

9  Q.  You're not an engineer?

10  A.  I am not.

11  Q.  You have not been involved in the construction industry,

12  correct?

13  A.  That's correct.

14  Q.  And you have not had nautical training on a boat or ship,

15  correct?

16  A.  That's correct.

17  Q.  Now, you provided a deposition in this case, the Court

18  allowed us to take a limited three-hour deposition of you some

19  time back in late July, or early August I think it is, correct?

20  A.  That's correct.

21  Q.  And at that time, you met my colleague, David Bryant,

22  correct?

23  A.  That's correct.

24  Q.  And he asked you questions under oath and you understood at

25  that time that you were under oath just like you are today,

1  correct?

2  A.  That's correct.

3  Q.  Now, you are a regulator project manager in the Fort Worth

4  office, correct?

5  A.  That's correct.

6  Q.  And your two main job duties that you describe in your

7  declaration are that your responsibilities include evaluating

8  permit applications under Section 10 of the RHA and

9  investigating possible unauthorized activities that don't

10 comply with issued permits; is that correct?

11 A.  That is correct.

12 Q.  So the first part is investigating --  evaluating permit

13 applications, that part of your job presupposes that the river

14 in question where permit work is going to be done is a

15 navigable river, correct?

16 A.  So we're talking about in this specific case?

17 Q.  No, sir.  Just as a general matter, I'm just talking about

18 your general in permit application process?

19 A.  So would you state that question again for me.

20 Q.  Yeah.  Typically when you're looking at permits and

21 evaluating them, you're evaluating them for can this project go

22 on in the spot where they want to build the project, correct?

23 A.  That's correct.

24 Q.  That presupposes that that river is a navigable river that

25 is subject to the jurisdiction of the Corps of Engineers,

1  correct?

2          MR. WADE:  Objection, speculation.

3          THE COURT:  I'll overrule that objection.  He can

4  answer that question.

5  A.  In the case of Section 10, that would be correct.

6  Q.  Okay.  And then you also investigate possible unauthorized

7  activities that don't comply with previously issued permits,

8  right?

9  A.  Correct.

10  Q.  Now, prior to July 2023, you had never been to Maverick

11  County, Texas, correct?

12  A.  That's correct.

13  Q.  And Maverick County, Texas is where Eagle Pass is, correct?

14  A.  Yes.

15  Q.  And Eagle Pass is where these buoys that are the subject of

16  this dispute have been placed, correct?

17  A.  Yes.

18  Q.  Prior to July 2023, when you first went to El Paso- sorry,

19  Eagle Pass, you had never been there before, correct?

20  A.  That's correct.

21  Q.  And you had never done an investigation for the purpose of

22  evaluating activities on the Rio Grande for the Fort Worth

23  office prior to this occasion when you were given the buoy

24  issue, correct?

25  A.  So could you state that again please?  I'm being very

1  particular about this.

2  Q.  Prior to July 2023, you had never done an investigation for

3  the purpose or regarding any activities on the Rio Grande River

4  within the Fort Worth Division, correct?

5  A.  That's correct.

6  Q.  And you've never during your time, and you've been once or

7  twice, as I understood it, to the Rio Grande River in Laredo,

8  correct?

9  A.  I have been to Laredo on the river, yes.

10 Q.  And you've never observed any commercial navigation on the

11 Rio Grande River, correct?

12 A.  Not that I was aware of.

13 Q.  Now, we talked about this, but you indicated the date that

14 you first learned of the buoys was in July, and I think you

15 said the 12th of 2023, correct?

16 A.  That's correct.

17 Q.  You said that you first learned about the buoys on the

18 news, right?

19 A.  That's correct.

20 Q.  And you took a site visit then, it sounds like it would

21 have been the next day on July 13th, 2023?

22 A.  That's correct.

23 Q.  Now, when you went to the site at Eagle Pass, there were

24 law enforcement officers from the Operation Lone Star, DPS

25 officers, correct?

1  A.  There were DPS officers in the area.

2  Q.  And you did not make an effort while you were there to

3  speak with anybody from the State of Texas about the buoys as

4  part of your investigation; is that correct?

5  A.  That's correct.

6  Q.  Didn't talk to any state official while you were there?

7  A.  That's correct.

8  Q.  And in fact, to your knowledge, Mr. Shelnutt, no one in the

9  Fort Worth office has made contact with anyone from the State

10  of Texas or agencies or representatives of the state; is that

11  right?

12  A.  I don't have that information.

13          THE COURT:  You don't know one way or the other.

14          THE WITNESS:  I do not.

15  BY MR. SWEETEN:

16  Q.  But certainly you did not, sir?

17  A.  That is correct.

18  Q.  Now, you mentioned earlier that the first report that the

19  Army Corps of Engineers received about the buoys, quote, came

20  down from Washington, D.C.; you recall that?

21  A.  I do.

22  Q.  And in fact, it is true that the actual entity that sent

23  the original report or complaint to the Army Corps of

24  Engineers, you said here today was the IBWC, correct?

25  A.  That's correct.

Joseph Shelnutt - Examination                    28

1  Q.  And the information that the Corps of Engineers received

2  was from the IBWC was a document that included photographs, a

3  map, and a description of what IBWC had seen on the river,

4  correct?

5  A.  That's correct.

6  Q.  When IBWC sent the complaint, did IBWC disclose to you that

7  they had already met with the State of Texas an entire month

8  before on June 12th, 2023?

9  A.  Not to my knowledge.

10 Q.  You were not told, as the declarations show in this case,

11 that IBWC was -- four members of IBWC were fully briefed on the

12 DPS's plan to put the buoys in the river some over a month

13 before you were first contacted in this case, correct?

14       MR. WADE:  I'm going to object to counsel testifying,

15 Your Honor.

16       THE COURT:  Sustained.  It will be stricken.

17 BY MR. SWEETEN:

18 Q.  So you were not told of a meeting that occurred between DPS

19 and the IBWC, correct?

20 A.  I don't have that information.

21 Q.  Well, that's different.  My question is were you told by

22 IBWC who complained to you that they had spoken with DPS

23 officials back in June?

24 A.  No.

25 Q.  Thank you.  You spoke with Mr. Gomez of the IBWC, correct?

1   A.   That is correct.

2   Q.   When you spoke with Mr. Gomez at the scene, and that would

3   have been July 13, did Mr. Gomez tell you he was involved in a

4   meeting with DPS over a month before to discuss the placement

5   of the buoys in the Rio Grande River?

6           MR. WADE:  Objection, Your Honor.

7           THE COURT:  Again, sustained.  You can ask him whether

8   he ever talked to him about it, but you can't inject your own

9   testimony into the question.

10          MR. SWEETEN:   Thank you, Your Honor, yes.

11  BY MR. SWEETEN:

12  Q.   Did you talk with Mr. Gomez about any prior meetings he had

13  had with DPS?

14  A.   No.

15  Q.   And it sounds like you have not been shown declarations

16  from other declarants in this case; is that right?

17  A.   That's correct.

18  Q.   So you mentioned International Boundaries and Waters

19  Commission, that's what IBWC stands for, correct?

20  A.   That's correct.

21  Q.   And it's not strictly a U.S. federal agency, it's an

22  international body, correct?

23  A.   That's my understanding.

24  Q.   And it's composed of two sections, there's the Mexican

25  section and the United States section that make up the IBWC,

1  correct?

2          MR. WADE:  Object to counsel testifying.

3          THE COURT:  Well, he can lead the witness.  It's

4  cross-examination.  I'm going to overrule that.

5  A.  Yes.

6  Q.  Okay.  And you understand that each section of the IBWC is

7  administered separately from the others; is that your

8  understanding?

9  A.  I don't have -- I don't know the structure of IBWC.

10  Q.  Okay.  No worries.  Do you know as you're sitting here

11  which section from IBWC sent the complaint in question to the

12  Corps of Engineers that then came down from Washington?

13  A.  I do not.

14  Q.  Now, we've already talked about the fact that this was your

15  first trip to this segment of the river there in Maverick

16  County, correct?

17  A.  Correct.

18  Q.  And would you agree with me that the segment of the river

19  in Maverick County it covers about 70 river miles?

20  A.  I don't have anything to base that estimate upon.

21  Q.  And to be clear, you yourself have never had occasion to

22  study that segment of the Rio Grande River, correct?

23  A.  That's correct.

24  Q.  But the floating buoy project when it was assigned, it was

25  assigned to you and I think you said to your chief, what was

1  his name again, Mr. Lebsock?

2  A.  Mr. Lebsock.

3  Q.  And the purpose of your visit, you wanted to look at the

4  buoys for yourself, right?

5  A.  That's correct.

6  Q.  And when you first laid eyes on the buoys, I think you

7  described them as large orange buoys, but you observed that

8  they were closer to the U.S. side than the Mexican side, that's

9  what you said, correct?

10  A.  At the time of the site visit, that's correct.

11  Q.  Now, Mr. Lebsock, your chief has not provided a declaration

12  in this case, correct, to your knowledge?

13  A.  Correct.

14  Q.  Has not testified -- is not on the witness list, correct?

15  A.  Correct.

16  Q.  Now, would you estimate that the amount of time you spent

17  at the buoy site was about three and a half hours; isn't that

18  correct?

19  A.  That would be correct.

20  Q.  And when you went to the site of the buoys, during your

21  site visit, you were not aware of seeing any evidence of

22  commercial navigation at the floating buoy site, correct?

23  A.  I was not aware of any of that.

24  Q.  So on your July 13th visit, you met with the -- with

25  American representative from the IBWC, but you also met with a

1  representative from the Mexican side, correct?

2  A.  Correct.

3  Q.  Prior to your visit, did you investigate who manufactured

4  the buoys?

5  A.  No.

6  Q.  Were you aware, did you talk to Customs and Border Patrol

7  about whether they had discussed utilizing similar buoys?

8  A.  I had not.

9  Q.  Did you talk with anybody at Customs and Border Patrol?

10 A.  I did not.

11 Q.  You described the buoys we've already talked about the fact

12 they're orange spheres, 4-foot by six-foot in diameter I think

13 you said, right, sir?

14 A.  Approximately, yes.

15 Q.  And that's in an otherwise, what, 150, 200-foot wide river?

16 A.  I think it would be slightly more than that, but I'm not

17 sure the total width.

18 Q.  Now, you estimated the depth of the river where you saw the

19 buoys as being between knee high and waist high, correct?

20 A.  The depth of the water at the time of the site visit,

21 that's correct.

22 Q.  And that would be about I think you said about one and a

23 half to 3 feet, correct?

24 A.  Correct.

25 Q.  Now, did you view the buoys from the Mexican side of the

1  border?

2  A.  No.

3  Q.  Now, we talked a little bit and you showed a picture

4  earlier, or your counsel did, of what you called I think an

5  excavator out there, correct?

6  A.  Yes.

7  Q.  And when he observed the excavator at the site, it was

8  transporting buoys from an upstream location to place them,

9  correct?

10  A.  That's what I observed.

11  Q.  You did not see those excavators doing actual excavation

12  work, correct?

13  A.  Correct.

14  Q.  And you've never received any information that excavation

15  or other equipment for that matter was used to do anything at

16  the floating buoy site other than to carry and place floating

17  buoys to put them in place, correct?

18  A.  At this time, that's correct.

19  Q.  When you were at the site of the buoys, you saw airboats

20  used by law enforcement, correct?

21  A.  I'm not sure who they were used by.  Yes, correct.

22  Q.  So the water craft that you would have seen in that section

23  of the river was only airboats, correct?

24  A.  There were at least two airboats that I can recall at the

25  time.  There was another barge-type craft there.

1   Q.   Okay.  Well, we'll talk about that, but the airboats, they

2   have a fan on them, right, that allows them to operate in very,

3   very shallow water, correct?

4   A.   That's correct.

5   Q.   And you mentioned a barge and you said that that was being

6   used to stabilize the placement of the buoy system, that's what

7   you saw, right?

8   A.   It was stationary, so I assume that's what it was doing

9   there.

10  Q.   Okay.  It wasn't transporting buoys, it was stabilizing, in

11  your opinion, the placement of the buoys in the river by boats

12  that were placing them there, right?

13  A.   That's what I observed.

14  Q.   When you were at the Rio Grande River that day, you did not

15  see -- you were not aware of seeing any commercial activities

16  either on the Texas side or the Mexican side of the river,

17  correct?

18  A.   Correct.

19  Q.   Now, prior to your first visit to Eagle Pass, you had

20  already concluded that in your opinion the segment of the Rio

21  Grande was subject to the jurisdiction of the Corps of

22  Engineers, correct?

23  A.   That's correct.

24  Q.   And I want to talk a little bit about that conclusion.

25  First, you concluded that the Rio Grande River is on a list

1    maintained within the Fort Worth District of navigable water,

2    correct?

3    A.  Correct.

4    Q.  And so there is -- the list was created I think you said in

5    2011, correct?

6    A.  That list, yes.

7    Q.  And I think it was December 2011?

8    A.  I believe that's correct.

9    Q.  Okay.  And that's prior to you joining the Corps, correct?

10   A.  Yes.

11   Q.  And you told my colleague -- well, let me just ask you.

12   That list is derived from studies that indicate whether a body

13   of water is a, quote, Section 10 navigable water, correct?

14   A.  Yes.

15   Q.  You would agree with me that in the first affidavit that

16   you filed with this court, which would have been in July of

17   2023, late July, that you filed -- that you indicated you had

18   gone to the list to make this determination as to navigability,

19   correct?

20   A.  Yes.

21   Q.  It was not your opinion based on study, based on recent

22   analysis, independently of that list, it just was on the list

23   and therefore it is in, in your view, the Fort Worth District's

24   jurisdiction, correct?

25   A.  That's correct.

1  Q.  And I would assume -- I think you may have covered this,

2  but I just want to make sure it's clear.  You had no part in

3  conducting any sort of study that would have been utilized for

4  purposes of creating that December 2011 list, right?

5  A.  That's correct.

6  Q.  And that list is important because if a water is not

7  navigable, if it's not on that list, it's not in your

8  jurisdiction, correct?

9  A.  It's not in the Section 10 of the Rivers and Harbors Act

10 jurisdiction.

11 Q.  Now, the Corps of Engineers does not rely on Coast Guard

12 determinations of navigability, they rely on creating their own

13 list for their own jurisdictional purposes, correct?

14 A.  That's correct.

15 Q.  But ultimately it's the case, is it, that it is -- one

16 second, let me find my spot, that there is a Corps of Engineers

17 regulation, 329.14 of 33 CFR that says that a conclusive

18 determination of navigability is made only by a federal court.

19 Correct?

20 A.  Correct.

21 Q.  Now, in your second affidavit, you provided then -- so

22 let's give the Court the chronology.  You provided an affidavit

23 that is utilized in the filing by the Department of Justice in

24 late July, your deposition is taken on August 7th by

25 Mr. Bryant, correct?

1   A.  Correct.

2   Q.  And then you provide last week in a reply brief that

3   provided a second declaration from you, correct?

4   A.  Correct.

5   Q.  And it was at this point that the State of Texas and the

6   Court was made aware of what was called the 1975 determination

7   by the Fort Worth engineer, as you say in your declaration,

8   correct?

9   A.  I believe I referred to that in my first declaration, but

10  maybe not as to the title and the purpose of it, but I think I

11  referred to it as a study in the first one.

12  Q.  Now, are you saying you think you mentioned it in the

13  deposition?

14        THE COURT:  No, he didn't say that.  I think he said

15  the declaration; is that right?

16        THE WITNESS:  In the deposition.

17        THE COURT:  Oh, was it in the deposition you used the

18  word "study"?

19        THE WITNESS:  I'm not entirely sure, but I think so.

20  It was the document I was referring to.

21        THE COURT:  Okay.

22  BY MR. SWEETEN:

23  Q.  As of the date of the deposition, when you were being asked

24  questions by Mr. Bryant, you indicated you had not read any

25  study related to the portion of the Rio Grande where the

1  floating buoys were located, correct?

2  A.  That's correct.

3  Q.  You only partially read a study, you said, and were not

4  able to recall the date of the study?

5  A.  That's correct.

6  Q.  So when as far as -- so when you were asked these questions

7  under oath between the first declaration and the second

8  declaration and you were asked what study are you talking

9  about, you indicated you didn't know?

10  A.  I don't think I indicated I didn't know, just that there's

11  this study that's more than four decades old of navigability

12  that we don't refer to on a daily basis to determine if a river

13  or water body is a Section 10 navigable water.

14  Q.  When you provided the first affidavit in this case

15  indicating that this segment of the river was navigable, you

16  had not read any technical aspects of the 1975 study, correct?

17  A.  That's correct.

18  Q.  So just to summarize, when you provided your declaration to

19  the Court, you had gone to the list, had not read technical

20  aspects of the study, and just determined it was in the Fort

21  Worth District office's jurisdiction?

22  A.  Referring to the first declaration.

23  Q.  That's correct, the first declaration.

24  A.  Yes.

25  Q.  And you've said that and you've talked about in your

1   deposition that when you first went to the study, your purpose
2   was not to read its technical portions, but just to confirm
3   that the Fort Worth office possessed the study, correct?
4   A.   That's correct.
5   Q.   So to be clear, you have not done any work yourself
6   regarding the historical uses of the Rio Grande River?
7   A.   Correct.
8   Q.   And the backup study that you weren't able to particularly
9   identify in the deposition was from 1975, correct?
10  A.   That's correct.
11  Q.   And I think that would have made it 48 years old, right?
12  A.   Correct.
13  Q.   There were no updated studies by the Corps of Engineers in
14  the Fort Worth file when you looked that evaluated any aspect
15  of the Maverick County segment of the Rio Grande River,
16  correct?
17  A.   That's correct.
18  Q.   Now, I want to take a look at some portions of that study,
19  so if we could put up G35 please.
20       This is the 1975 study, correct?
21  A.   That's correct.
22  Q.   Let's look down.  So to be clear, Mr. Shelnutt, where you
23  were and where these buoys are is Eagle Pass, Texas, correct?
24  A.   Correct.
25  Q.   That's substantially north of Laredo.  Do you have an

1   estimate for how far north of Laredo that is?

2   A.   It would just be speculation, but quite a ways north of

3   Laredo.

4   Q.   Do you know where Roma, Texas is, sir?

5   A.   I do not.

6   Q.   Now, I'm going to jump around a little bit on this

7   document, so forgive me, but I want to look at some aspects of

8   it, okay?  First, this document discusses historical background

9   in the river and the park, right?

10  A.   I believe there's historical data in there, yes.

11  Q.   If we can go to page four of the 1975 study please, at the

12  end of the second paragraph.  And I'm going to read a portion

13  to you and I'm going to ask you if I've read it correctly,

14  okay?  *In the letter written by Mr. Elliott to Lord Aberdeen,*

15  *Exhibit 13, "In December of 1843, it is noted that in the*

16  *winter and spring months the river would be navigable for great*

17  *distances and general commercial use in the dry season due to*

18  *rapids, navigation in steamboats to the vicinity of Roma,*

19  *Carmago, Mier, and Rio Grande City is cited in several books."*

20       Now, would you have any reason to dispute that Roma,

21  Carmago, Mier and Rio Grande City, we don't have the map

22  anymore, but are substantially down river from Eagle Pass?

23  A.   Again I'm not sure where these locations are in relation to

24  Eagle Pass.

25  Q.   Okay, that's fair.  Let's look down to page five.

1      And by the way, Mr. Shelnutt, just to make it clear, you

2  have a copy of this so you can easily read it up there; is that

3  right?

4  A.  I do, if you give me time to.

5  Q.  Of course, yes, sir.  So if we can look at the first

6  paragraph is what I'm looking at, the first sentence starts off

7  with, *"In October 1846, a successful attempt was made to ascend*

8  *the Rio Grande in the United States steamer Major Brown."*  Do

9  you see that?

10 A.  I do.

11 Q.  And then if we go down, it says, *"She experienced few*

12 *obstacles in reaching the River Salado nearly a hundred miles*

13 *by water above Mier.  Above this there was a series of*

14 *continued shoals, rocks and rapids, among which the boat*

15 *repeatedly grounded.  She at length reached Laredo, a town*

16 *about 600 miles by water above the mouth of the river."*

17 Correct?

18 A.  That's what it says.

19 Q.  So this historical conclusion in this document indicates

20 that a steamer observed shoals, rocks and rapids and then

21 reached only as far as Laredo, correct?

22 A.  That appears to be the condition in 1846.

23 Q.  Now, if we go to page three now of the document, if you

24 look under four where it says, *"Nature and location of*

25 *significant obstructions to navigation,"* that second paragraph,

1   first sentence, are you there?

2   A.   I am.

3   Q.   That says, *"The river is blocked by the major Falcon Dam*

4   *just downstream of the Fort Worth District boundary and by the*

5   *major Amistad Dam near Del Rio."*  That's what that says,

6   correct?

7   A.   It does.

8   Q.   And the Amistad Dam, you know from your visit, is located

9   up river from Eagle Pass, and the Falcon Dam is down river from

10  Eagle Pass, correct?

11  A.   Correct.

12  Q.   If we can go to page six now.  *"In addition to these*

13  *blockages, the 1975 study determined that the Rio Grande can be*

14  *navigated during periods of sufficient float only by fishing*

15  *boats and other shallow draft craft."*  Do you see that on page

16  six, section 7A?

17  A.   I do.

18  Q.   Did I read that correctly?

19  A.   Yes.

20  Q.   But the '75 study also determined that records were

21  inadequate to develop actual or hypothetical high and ordinary

22  low flows, correct?

23  A.   I don't remember that.

24  Q.   Okay.  Let's turn to page three, subsection G please.  And

25  it says, *"Improvements to navigation.  There are not any*

1   *improvements to navigation within the study reached."*

2       Did I read that correctly?

3   A.   You did.

4   Q.   Now, the study acknowledges on page 13, so let me give you

5   time to get there.  We're looking at the last paragraph on page

6   13.  Do you see where it says, the first sentence, *"The*

7   *difficulty in pinpointing the precise head of navigation from a*

8   *historical standpoint stems from the sketchy accounts on use."*

9   Did I read that correctly?

10  A.   Yes.

11  Q.   The 1975 study determined that the physical characteristics

12  in obstruction to flow under natural conditions would have to

13  be overcome for navigation in the Rio Grande, correct?

14  A.   I believe that's correct.

15  Q.   If we go to page six, Section 7B now.  There it says --

16  there's a section called *"If improved,"* are you there with me?

17  A.   I am.

18  Q.   It says, *"Improvement of the Rio Grande for navigation is*

19  *physically possible.  Storage in the Falcon and Amistad*

20  *Reservoirs would have to be judiciously used to provide*

21  *sufficient flow for continuous navigation.  Since navigation*

22  *has fifth priority under existing treaties, there is little*

23  *likelihood of change."*

24      Did I read that correctly?

25  A.   You did.

1  Q.  And then I'll read the last part which says, *"There would*
2  *be serious ecological objections to any channelization."*
3  Right?
4  A.  That's what it states.
5  Q.  Now, you stated in your declaration that there were no
6  plans to improve the Rio Grande for navigation when the Corps
7  conducted this study, right?
8  A.  Yes.
9  Q.  You stated in your declaration that *"In addition to*
10  *possible improvements for navigation, storage in the Falcon Dam*
11  *and Amistad also have to provide sufficient flow for the*
12  *purpose of navigation."*  That's from your declaration, right?
13  A.  Yes.
14  Q.  You also stated that you have no knowledge of federal or
15  federal plans to improve navigation since 1975, correct?
16  A.  That's correct.
17  Q.  Couple more provisions from the study.  *"The 1975 study*
18  *opined ultimately that above Laredo, up to Eagle Pass,*
19  *navigation is impeded by rocks and ledges at lower stages."*
20  Correct?
21  A.  Correct.
22  Q.  The study even says there has never been any practical
23  navigation above Roma, Texas, between there and El Paso, the
24  distance of about a thousand miles, right?
25  A.  I don't remember that exact passage.

1  Q.  Okay, I'll direct you to it.  There's a lot in here.  So if

2  we can go to page 13.  And it's subsection A, third paragraph

3  in the middle.  And it starts with the sentence *"Further,"* are

4  you with me?

5  A.  Not yet.

6  Q.  Okay.

7  A.  Where in that paragraph is that?

8  Q.  Yes, sir, there's a sentence that starts with *"Further"* in

9  the second to the last paragraph on page 13?

10  A.  Okay.

11  Q.  *"Further,"* and I'm reading from the study, right, *"Further,*

12  *there apparently has never been any practical navigation*

13  *between Roma and El Paso, a distance of about a thousand*

14  *miles."*  And it sites to Exhibit 23 for that proposition,

15  correct?

16  A.  Yes.

17  Q.  And you understand that Eagle Pass is located, and you may

18  not know this, but do you know if Eagle Pass is located between

19  Roma, Texas and South Texas and El Paso out in West Texas?

20  A.  Yes.

21  Q.  On page 13, the study goes further to say, *"The normal*

22  *stages of the river apparently was not navigable above Rio*

23  *Grande City."*  Correct?

24  A.  Yes.

25  Q.  On page 14, the study says, *"At present,"* and this is the

1    top of page 14, Mr. Shelnutt, *"At present, there is no*
2    *commercial activity occurring within the study area that would*
3    *qualify as substantial items of commerce.  However, there is*
4    *frequent use of pleasure and fishing boats on Falcon and*
5    *Amistad Reservoirs."*  Did I read that correctly?
6    A.   You did.
7    Q.   And lastly, if we could look down the page at future use.
8    Do you see that?
9    A.   I do.
10   Q.   In the 1975, it here says, *"In terms of future use, there*
11   *are no authorized plans to improve the Rio Grande River for*
12   *navigation in the area of the study.  The natural and ordinary*
13   *condition of the Rio Grande River, its volume of water,*
14   *gradient and regularity of flow do not preclude future*
15   *improvement for smaller commercial craft."*  Did I read that
16   correctly?
17   A.   Yes.
18   Q.   Now, I want to turn away from the study and from your
19   second affidavit and I want to ask you a few additional
20   questions.  You would agree with me that based on your
21   conclusion -- actually, I'm going to withdraw that question, I
22   think I've asked it.
23       I'll ask you a few more questions about your site visit.
24   You do not have any first or secondhand knowledge whether the
25   buoys at issue are structurally built into the Rio Grande

1   River, correct?

2   A.   That's correct.

3   Q.   You don't have any knowledge as to whether or not the buoys

4   at the site location are temporary or permanent, correct?

5   A.   I don't have that knowledge.

6   Q.   And when you were there, you did not ask state employees

7   that question?

8   A.   That's correct.

9   Q.   And when you gave your -- let me just ask it.  Based on

10  what you saw on July 13, 2023, you don't have any reason to

11  believe that the floating buoys at the current site have

12  altered or modified the course of the Rio Grande River, right?

13  A.   That's correct.

14  Q.   The buoys float on top of the river, correct?

15  A.   Correct.

16  Q.   And that's what you observed when you were there?

17  A.   That's correct.

18  Q.   Final questions.  With respect to your expertise, you have

19  not held yourself out as an expert on rivers or navigability,

20  correct?

21  A.   That's correct.

22  Q.   And you're not aware of anyone filing a complaint with the

23  Corps of Engineers that the floating buoys have caused a

24  problem of any kind for any water craft going up or down the

25  Rio Grande River, correct?

1  A.  I'm not aware of that.

2  Q.  Now, you're familiar with the Rivers and Harbors Act,

3  correct?

4  A.  Correct.

5  Q.  You would agree that the floating buoys in this river are

6  not a boom, correct?

7  A.  Correct.

8  Q.  These floating buoys are not a pier?

9  A.  That's correct.

10 Q.  They are not a wharf?

11 A.  Correct.

12 Q.  They are not a breakwater?

13 A.  Correct.

14 Q.  They are not a bulkhead?

15 A.  Correct.

16 Q.  They are not a weir?

17 A.  Correct.

18 Q.  They're not a jetty?

19 A.  Correct.

20 Q.  And they're not a dolphin?

21 A.  Correct.

22     MR. SWEETEN:  I have no further questions.  Thank you,

23 Mr. Shelnutt.

24     (10:16 a.m.)

25     MR. WADE:  Brief redirect, Your Honor?

1        THE COURT:  Yes.

2                   REDIRECT EXAMINATION

3    BY MR. WADE:

4    Q.  Mr. Shelnutt, you were just asked if you had talked to

5    anybody who was with DPS or Texas on your site visit, right?

6    A.  That's correct.

7    Q.  Do you feel like you would have needed to talk to them to

8    come to your conclusion that what you observed was a structure?

9        MR. SWEETEN:  Objection.  Leading, Your Honor.

10        THE COURT:  Well, why don't you rephrase your

11   question.

12        MR. WADE:  Okay.

13   BY MR. WADE:

14   Q.  I'll back up a little bit.  You testified earlier that the

15   floating barrier that you observed you considered that to be a

16   structure within the meaning of the Section 10 of the Rivers

17   and Harbors Act, correct?

18   A.  That's correct.

19   Q.  Do you feel like you would have needed to talk to anyone

20   from Texas to come to that conclusion?

21   A.  Not to make that determination.

22   Q.  And we just went through the navigability study in detail.

23   And again, I want to confirm, you were not the person who

24   conducts these navigability studies, right?

25   A.  That's correct.

1   Q.  Is it your job to second guess the navigability

2   determinations made by the District engineers?

3   A.  It is not.

4   Q.  As a practical matter, do you have to rely on those

5   determinations to do your job as a regulatory project manager?

6   A.  Yes.

7         MR. WADE:  Can we put up Exhibit 34 please, the

8   Government's Exhibit 34.

9         (Pause.)

10        THE COURT:  Is there a problem?

11        COURTROOM DEPUTY CLERK:  The HDMI is not switching

12  over.

13        MR. WADE:  Your Honor, would you like a physical copy?

14        THE COURT:  I've got it.

15  BY MR. WADE:

16  Q.  Turn to Exhibit 34, Mr. Shelnutt.

17  A.  I have.

18  Q.  I want you to go to that second page, paragraph three.  Do

19  you see that?

20  A.  I do.

21  Q.  And this is the navigability determination that you

22  testified about earlier, correct?

23  A.  That's correct.

24  Q.  Paragraph three, this navigability determination states,

25  *"We anticipate no controversy in connection with the above*

1  *declaration."* Did I read that correctly?

2  A.  You did.

3  Q.  And to your knowledge, is this 1975 navigability

4  determination still good, is it still in effect?

5  A.  Yes.

6          MR. WADE:  Pass the witness.

7          (10:20 a.m.)

8          THE COURT:  Very briefly, counsel, and no further than

9  where he went.  We're not going to reopen cross-examination.

10         MR. SWEETEN:  Yes, Your Honor, understood.

11                     RECROSS-EXAMINATION

12 BY MR. SWEETEN:

13 Q.  So you said that you didn't feel the need to talk to

14 anybody from the State of Texas, correct, because it wouldn't

15 have impacted your structure, your determination about

16 structure.  That's roughly what you said, right?

17 A.  That's correct.

18         THE COURT:  Okay, it finally showed up.

19 BY MR. SWEETEN:

20 Q.  While we've got it up, so again what he showed you today,

21 and I am old enough to recognize that little symbol in the

22 bottom right corner, that's the bicentennial symbol, that's the

23 1975 conclusion, correct?

24 A.  That's correct.

25 Q.  So back to my question about structure.  Part of

 1  determination as to structure under -- well, let me ask it a

 2  different way.  You would agree with me that had you spoken

 3  with members of Texas DPS, that you could have asked about

 4  whether or not the intention was to use these buoys as a

 5  temporary tactical measure to stop immigration, but you didn't

 6  do that, correct?

 7  A.  We didn't speak with anybody from DPS.

 8  Q.  And you didn't think it was important to your determination

 9  about structure, correct?

10  A.  That's correct.

11          MR. SWEETEN:  Thank you.

12          THE COURT:  Nobody asked you this question, but what

13  was the final conclusion of the study?

14          THE WITNESS:  It determined a segment of the Rio

15  Grande was navigable between certain points, and I don't

16  remember the exact river miles there, Your Honor.

17          THE COURT:  Do those between those two points cover

18  the area we're concerned about?

19          THE WITNESS:  It does.

20          THE COURT:  Okay.  You can step down.

21          THE WITNESS:  Thank you, Your Honor.

22          (10:22 a.m.)

23          THE COURT:  All of the exhibits which have been

24  referred to will be received for purpose of preliminary

25  injunction hearing in the record as well as the other documents

1 | that have been offered by counsel in their papers, the
2 | declarations.
3 |      MR. SWEETEN:  Sorry, Your Honor.  I didn't hear, was
4 | that a question?
5 |      THE COURT:  This is not a trial, obviously, this is a
6 | preliminary injunction hearing.  What I said was that all --
7 | I'm trying to alleviate the need for you to be jumping up every
8 | moment and offering things into evidence.  I said all of the
9 | documents which have been referred to by counsel and the
10 | declarations and so forth that have been referred to, that have
11 | been filed are being received into evidence.
12 |      MR. SWEETEN:  Okay.
13 |      THE COURT:  That's what I'm saying.
14 |      MR. SWEETEN:  And that includes the evidence on the
15 | defendant's and plaintiff's exhibits that were offered -- that
16 | were sent to the Court yesterday.
17 |      THE COURT:  Of course, not just one side.  Next
18 | witness.
19 |      MR. DINGIVAN:  Your Honor, United States is going to
20 | call Hillary Quam, but she's upstairs -- oh, she's here, Your
21 | Honor.  We can proceed unless the Court would like to --
22 |      THE COURT:  We've got to make sure we have a clear
23 | record, so I'm going to give my reporter -- she says she needs
24 | a little break, we're going to take a ten-minute recess.
25 |      COURT SECURITY OFFICER:  All rise.

1          *(10:24 a.m.)*

2                              *   *   *

3          *(10:43 a.m.)*

4          COURT SECURITY OFFICER:  All rise.

5          THE COURT:  Please be seated.  The Court would note

6     the presence of all counsel as well as the representatives and

7     parties.  Before we get started, I should have really addressed

8     this with you at the very beginning because I don't believe any

9     of you have ever either tried a case in front of me or been in

10    any major hearings in front of me.  So all of the State of

11    Texas has many times as has the United States, not these

12    particular lawyers.

13         In a situation like this where we are dealing with

14    numerous documents, studies, rulings, precedential opinions, it

15    is really, in my view, much less informative for the Court to

16    hear oral closing argument because what happens is the lawyers

17    simply get up and off the top of their head make a closing

18    argument to the Court.  The jury is a whole other story.

19    Obviously, we have to have closing argument in front of a jury,

20    but what I require instead of oral closing argument is a

21    written closing argument.  That gives you time to go back and

22    assess the evidence, to site to the Court the relevant evidence

23    that you are relying upon, gives us a much cleaner and better

24    record, not only for my purposes, but for purposes of any

25    appeal, and it is just so much more beneficial for the parties

 1   as well as the Court.  Now, it will be no more than ten pages
 2   and will be submitted to the Court by Friday.  That gives you
 3   plenty of time.  Today is Tuesday, so by close of business on
 4   Friday.
 5        MR. SWEETEN:  Your Honor, just to clarify, so at the
 6   close of the presentation of the witnesses, then we would then
 7   recess and provide the Court the briefing.
 8        THE COURT:  That is correct.  Look, I was a trial
 9   lawyer and I know everybody likes to get up and make a big
10   flowing closing argument, I enjoyed it myself, and I know that
11   there are members of the press here who really want you to make
12   a closing argument, but they'll have access to your written
13   closing argument which is actually far more beneficial, believe
14   me, than somebody just getting up and going right off the top
15   of their head.  And then they're going to sit down, as I did
16   many times in my legal career and say, geez, I forgot to
17   mention this, that or the other thing.  And this will give you
18   an opportunity to do all of that.  It's just a much better way
19   to go, in my view.  So let's then proceed with your next
20   witness please.
21        MR. DINGIVAN:  Thank you, Your Honor.  United States
22   calls Hillary Quam.
23        THE COURT:  Swear her in please.
24        COURTROOM DEPUTY CLERK:  Please stand and raise your
25   right hand.

1                          *   *   *

2            *(Oath administered and HILLARY QUAM, Plaintiff*

3    *Witness, sworn.)*

4                          *   *   *

5            THE WITNESS:  I do.

6            COURTROOM DEPUTY CLERK:  Have a seat.

7            *(10:48 a.m.)*

8                      DIRECT EXAMINATION

9    BY MR. DINGIVAN:

10   Q.  Ms. Quam, please introduce yourself to the Court.

11   A.  My name is Hillary Quam, I am the U.S./Mexico border

12   affairs coordinator at the Department of State.

13   Q.  Ms. Quam, where are you joining us from today?

14   A.  I now live on Oahu, in Hawaii.

15   Q.  How does the U.S --

16          THE COURT:  My old home.

17   BY MR. DINGIVAN:

18   Q.  What is the U.S. --

19          THE COURT:  Just a minute.  Ms. Quam, would you please

20   spell your last name for the Court?

21          THE WITNESS:  It is Q-U-A-M.

22          THE COURT:  Thank you.

23          MR. DINGIVAN:  Your Honor, she has two declarations.

24          THE COURT:  I remember her declarations, it's for the

25   court reporter's benefit, she doesn't look at the declarations.

1  BY MR. DINGIVAN:

2  Q.  Ms. Quam, why are you living out on Oahu at the moment?

3  A.  My husband was transferred to a position at U.S.

4  Indo-Pacific command on Oahu in February of last year, and our

5  family moved at that time.  And at the time the Department of

6  State agreed to allow me to work remotely from there.

7  Q.  Did that impact your ability to perform your position at

8  all?

9  A.  No.

10  Q.  Can you explain what your position as border coordinator

11  is, what do you do?

12  A.  Sure.  I work within the Bureau of Western Hemisphere

13  Affairs, at the Department of State, and my role is to be the

14  primary adviser and expert on all issues, initiatives,

15  negotiations and programs related to the U.S./Mexico border

16  region.

17  Q.  How long have you had that position?

18  A.  Most recently I've been in the position since March of last

19  year.  I previously held the position from August of 2016 until

20  December of 2018.

21  Q.  What did you do between December 2018 and March 2022?

22  A.  In January 2019, I was detailed to a different position

23  within the Bureau of Western Hemisphere Affairs to stand up the

24  what was at the time the WHA Migration Working Group.  I was in

25  that position until March of 2021 when I was detailed to the

1    Office of the Vice President to serve as the Western Hemisphere

2    adviser for the Vice President.

3    Q.  And you did that until you returned to your current

4    position, correct?

5    A.  Yes.

6    Q.  Now, you've been with the State Department for how long?

7    A.  I have been with the State Department since 2006 and worked

8    for the Department of Homeland Security for two years before

9    that, so I've been with the federal government since 2004.

10   Q.  Are you a civil service officer or a foreign service

11   officer?

12   A.  I'm a civil service officer.

13   Q.  Can you explain to the Court what the difference is?

14   A.  Civil servants, we generally stay in Washington and are

15   supposed to be subject matter experts and provide the

16   institutional knowledge for the Department as the foreign

17   service officers rotate between Washington and embassies

18   abroad.

19   Q.  Now, you wrote in your declaration, the first one, that you

20   were acting director of the Office of Mexican Affairs.  Can you

21   explain a little bit what that means?

22   A.  Sure.  For a period of time this summer, during which time

23   the declaration, my declaration was signed, I also served as

24   the office director for the Office of Mexican Affairs to cover

25   a gap in our leadership team during the summer transition

1    season, so I was in Washington for that period of time to lead

2    the office.

3    Q.  Can you describe a little bit about the structure within

4    that office and how you fit into it?

5    A.  Sure.  At the Office of Mexican Affairs at the Department

6    of State, we have about 16 people in the office.  We are led by

7    an office director and have three deputy director equivalence.

8    One is the person who has the title of the deputy of the

9    office.  We also have myself as the border coordinator and we

10   have a security coordinator.

11   Q.  Do you have a specific focus within that office?

12   A.  So my team's focus in particular is overseeing all of our

13   engagement on the U.S./Mexico border region.

14   Q.  Now, you were -- I guess if you started in this position in

15   August 2016, that was under the Obama administration, correct?

16   A.  Yes, it was.

17   Q.  And then you were in your current position through the

18   Trump administration as well?

19   A.  Yes.

20   Q.  And that's actually when you were selected for the detail

21   position to address to the Western Hemisphere Affairs Migration

22   Working Group, correct?

23   A.  Correct.

24   Q.  That was also under the Trump administration?

25   A.  Yes.

1  Q.  Then you've also continued to work for the State Department

2  even after the transition to the Biden administration?

3  A.  Yes, I was a detailee to the Office of the Vice President,

4  but continued my position with the State Department.

5  Q.  So you've worked under every administration since the Bush

6  administration, correct?

7  A.  That's right.

8  Q.  Before you got to the current position, what other roles

9  have you served in at the Department of State?

10 A.  At the Department of State, I worked in the Office of

11 Central American Affairs for a number of years, it was security

12 focused, looking at anti-gang issues.  I've served as the El

13 Salvador desk officer and the Panama desk officer from 2010

14 to -- no, I'm sorry, from 2012 to 2014, I oversaw a program to

15 encourage more educational exchange between the United States

16 and Western Hemisphere countries, the 100,000 Strong program.

17 And then from 2014 through 2016, I served as the Bureau's

18 executive assistant, which is essentially a chief of staff

19 position for the Bureau of Western Hemisphere Affairs.

20 Q.  Now, in your current position besides being the State

21 Department's primary expert on U.S./Mexican border, do you have

22 other job responsibilities?

23 A.  I directly engage on negotiations with the government of

24 Mexico on issues related to Borden infrastructure and water

25 agreements, health agreements, basically anything that impacts

1   the border itself.

2   Q.  Okay.  Thank you.  I want to now talk more to the buoy

3   issue because we're here today.  When did you first become

4   aware of Texas's intent to place the buoy barrier in the Rio

5   Grande?

6   A.  I became aware of the issue in late June of this year.

7   Q.  Through what source?

8   A.  Primarily through media reports.

9   Q.  When or if were you first contacted about this issue by the

10  government of Mexico?

11  A.  We received a diplomatic note from the government of Mexico

12  in -- it was June 26th of this year.

13  Q.  What is a diplomatic note?

14  A.  A diplomatic note is official correspondence between two

15  governments.  It is a formal diplomatic communication.

16  Q.  How can those be exchanged between two governments?

17  A.  There are two ways that we receive diplomatic notes.

18  Either from the foreign ministry in a country to our embassy

19  there or from the foreign country's embassy in the United

20  States directly to the State Department.

21  Q.  And this June diplomatic note, how was that one delivered?

22  A.  This one was transmitted from the Mexican embassy in

23  Washington to our office at the State Department.

24  Q.  And who received that note?

25  A.  I did.

Hillary Quam – Examination                 62

1   Q.  So what did that note say?

2   A.  That note called attention to Mexico's concerns about the

3   plans to install buoy barriers in the Rio Grande River.  Mexico

4   specifically pointed to concerns about potential obstruction

5   and deflection of water from the barriers and reminded the

6   United States of our treaty obligations to seek concurrence

7   from the International Boundary and Water Commission before

8   anything was built in the channel.

9   Q.  And after you received that diplomatic note, the United

10  States and Mexico engaged in some prescheduled meetings in

11  Washington, D.C., correct?

12  A.  We did.

13  Q.  Can you describe those meetings for the Court?

14  A.  We had two meetings prescheduled in July, July 20th and

15  21st.  Those were our mid-year technical meetings for the 21st

16  Century Border Management initiative as well as the plenary

17  session of the Binational Bridges and Border Crossings Group

18  meeting.

19  Q.  Did Mexico raise any concerns about the buoy barrier at

20  those meetings?

21  A.  Mexico raised the issue of the buoy barriers on the margins

22  at both meetings.

23  Q.  What do you mean by that?

24  A.  That in side conversations.  They did not raise them during

25  the formal discussion itself at the table, but did pull us

1  aside for discussions to raise their concerns.

2  Q.  After those meetings in Washington, D.C., when was the next

3  time that you became aware of a formal correspondence from

4  Mexico on this topic?

5  A.  We received a second diplomatic note from the government of

6  Mexico, it was actually the same day of the Binational Bridges

7  and Border Crossings Group meeting on July 21st, so that was

8  the second diplomatic note from the government of Mexico.

9  Q.  Have you seen that diplomatic note as well?

10  A.  Yes.

11  Q.  What does that one say?

12  A.  So that one reiterated Mexico's concerns about the buoy

13  barriers again and thanked the U.S. government for its actions,

14  specifically for DOJ's engagement to have the buoy barriers

15  removed.

16  Q.  Is that the last receipt of formal correspondence from the

17  government of Mexico in this case?

18  A.  No.  We received a third diplomatic note last week from the

19  government of Mexico.

20  Q.  And what did that one say?

21  A.  The note again acknowledged and thanked the United States

22  for DOJ's engagement on the issue, and communicated formally to

23  the United States Mexico's preference that the International

24  Boundary and Water Commission oversee any removal efforts of

25  the buoy barrier.

1  Q.  Now, in addition to these formal diplomatic correspondence

2  notes that you reviewed, have there been other formal

3  complaints from the government of Mexico about the buoy

4  barrier?

5  A.  Yes, the government of Mexico has raised their concerns at

6  the highest diplomatic levels on two specific occasions.  There

7  was the first phone call that took place between Mexican

8  Foreign Secretary, Barcena, and Secretary of State, Blinken, on

9  July 21st in which the Mexican Foreign Secretary flagged

10  concerns for Secretary Blinken about the buoy barriers.  Again

11  in their first meeting on August 10th, it was also a topic of

12  discussion.

13  Q.  So when the Mexican Foreign Secretary and Secretary of

14  State Blinken met for the first time, this was the first topic

15  that was brought up?

16  A.  Yes.  Well, they discussed the issue during the course of

17  the meeting and then immediately after in the press conference,

18  the joint press conference that the two gave, this was the

19  first topic raised by Foreign Secretary Barcena.

20  Q.  And that's attached to your declaration as well?

21  A.  Yes.

22  Q.  In addition to statements by the government of Mexico

23  diplomatic notes and the statements by the Mexican Foreign

24  Secretary, had the President of Mexico commented on this at

25  all?

1   A.   Yes.  Mexican President Lopez Obrador gives a daily press

2   conference and he has raised the topic or discussed the topic

3   of the buoy barriers six times in his daily press conference

4   since June 25th.

5   Q.   Now, I'm going to switch gears a little bit.  I want to

6   talk to you about a statement you wrote in your first

7   declaration.  You wrote, quote, *If the barrier is not removed*

8   *expeditiously, this presence will have adverse impact on U.S.*

9   *foreign policy.*

10      Can you explain or expound what you mean by "adverse

11  impact"?

12  A.   Absolutely.  So the U.S./Mexico relationship is extensive,

13  very broad.  We work on a number of issues that are of interest

14  to both countries in the bilateral relationship, including

15  economic competitiveness, security issues, cultural, labor,

16  educational issues, the gamut is -- we run the gamut on the

17  issues that we discuss.  So an issue like this distracts from

18  the binational agenda and essentially our concern is that

19  Mexico will not be a willing partner on other issues that we

20  need them while this remains an issue in the relationship.

21  Q.   And those include commercial issues and infrastructure

22  issues as well?

23  A.   Absolutely, yes.

24  Q.   And going a little bit further, what sort of -- based on

25  your experience, what sort of length would you anticipate this

1  adverse impact could have, how long could this impact last?

2         MR. SWEETEN:  Objection, Your Honor, calls for

3  speculation.

4         THE COURT:  I'm going to sustain that objection.  I

5  think she can testify about what has occurred, but I don't

6  think she can speculate as to what may occur.

7         MR. DINGIVAN:  May I be heard on that topic?

8         THE COURT:  Yes.

9         MR. DINGIVAN:  I believe that Ms. Quam has established

10 sufficient foundation based on 19 years of working in the State

11 Department and long time in this current office to have a

12 reasonable expectation as to what Mexico-- how long this might

13 be an issue for the country of Mexico.

14        THE COURT:  Well, she has already testified that it's

15 a significant issue for Mexico.  She's testified to that.  I

16 think the Court can draw its own conclusions as to whether this

17 will continue for some period of time, but I don't think that

18 she's in the position to speak for the government of Mexico as

19 to how long this is going to create an issue for them.  She can

20 certainly testify about -- I believe that her declaration

21 includes some actions that Mexico has already taken or refused

22 to take, she can testify about that.

23        MR. DINGIVAN:  Okay.  I'll move on, Your Honor.

24 BY MR. DINGIVAN:

25 Q.  Let's talk about we're dealing with adverse impacts to a

1   huge multi bilateral relationship between United States and

2   Mexico.  How can a 1,000-foot buoy barrier along a

3   multi-thousand mile border have this type of impact?

4   A.  So essentially this is a major concern for Mexico both as

5   they've noted the potential obstruction and deflection of water

6   which is a concern, but they believe that this is a treaty

7   violation, and that that raises real concerns for them and for

8   us in the international arena.  That Mexico has sensitivities

9   about sovereignty issues and doesn't want to be seen as a

10  lesser partner to the United States.  So an issue like this

11  that impacts the U.S./Mexico border in which there are, you

12  know, potential incursions into Mexico, that this raises major

13  concerns for the government of Mexico.

14  Q.  Have they raised concerns about activities in the past on

15  the part of the United States government in terms of walls and

16  things like that?

17  A.  Yes.

18  Q.  Why is this different or how is this different?

19  A.  For two reasons in particular.  This is different because

20  it is not a U.S. federal government action.  It is different

21  because it's in the river and specifically on the international

22  boundary.  Generally when the U.S. has constructed walls in the

23  past, they are some distance inland into the United States and

24  are very much, while Mexico has raised concerns and generally

25  does not like walls between our two countries, they understand

1  when they are domestically within the United States.

2  Q.  Do you believe, based on your experience, that Mexico

3  believes that this action is provocative intentionally?

4         MR. SWEETEN:  Your Honor, objection, speculation, "do

5  you believe --"

6         THE COURT:  Sustained, sustained.

7  BY MR. DINGIVAN:

8  Q.  You mentioned in your first declaration that one of the

9  most important and sensitive bilateral issues are human

10 migration management and border infrastructures.  Can you

11 explain to the Court why that's so important to Mexican/U.S.

12 relations?

13 A.  Sure.  For border infrastructure in particular, we have 47

14 active border crossings between the United States and Mexico

15 and there is significant trade and travel across the border

16 through those border crossings daily.  It's in both countries'

17 interest to keep the border crossings moving and functional and

18 for the efficient and secure trade that impacts not just the

19 border region, but people throughout both countries.  And then

20 migration management is a major topic in the relationship that

21 Mexico has historically been a transit country for migrants to

22 arrive in the United States, and it's an issue that we've

23 worked on closely together for years.

24 Q.  Now, generally speaking, is the issue of illegal

25 immigration in the United States something the State Department

1  deals with?

2  A.   Immigration within the U.S. and our agency structure is

3  inherently a domestic issue, and the Department of Homeland

4  Security is the primary point of contact for that.  We at the

5  State Department do work on international migration issues

6  which is generally negotiating agreements with foreign

7  countries related to migration, but we do not work directly on

8  immigration to the United States.

9  Q.   Now, I want to talk to you -- you mentioned earlier a

10 little bit about water delivery negotiations.  Can you explain

11 to the Court what you meant by that?

12 A.   Sure.  The United States and Mexico have a number of

13 treaties that essentially govern how we share water between the

14 U.S. and Mexico based on the flows in that portion of the

15 country.  So in the western region of the United States, most

16 of the rivers flow south and we owe certain quantities of water

17 to Mexico on specific cycles.  In Texas, water generally flows

18 north and Mexico owes certain quantities of water to us on

19 cycles.

20 Q.   What's the status of the current water negotiations?

21 A.   So we are about four years in to the current five-year

22 cycle of deliveries here in this portion of the border.  So

23 we -- there is concern that Mexico is not going to meet its

24 water delivery obligations by next year's deadline, and the

25 U.S. government has been working closely with the government of

1   Mexico to negotiate an emergency -- it's called a Minute, but

2   an emergency agreement that would provide, try to attempt to

3   provide more predictability to Texas farmers regarding their

4   water deliveries from Mexico.

5   Q.  How has this buoy barrier impacted those water

6   negotiations?

7   A.  It has essentially slowed those negotiations, and Mexico

8   has indicated that they are less inclined to conclude an

9   Emergency Minute by the end of the year while the buoy barrier

10  remains in place.

11  Q.  Has the State Department received any complaints regarding

12  this issue from Texas citizens?

13  A.  Yes, we have been hearing both from stakeholders here in

14  Texas and there are significant congressional interest in the

15  issue as well.

16  Q.  I just have a few more questions for you.  I want to

17  talk -- one of the things you wrote in one of your declarations

18  was the importance of, quote, *mutual respect for each other's*

19  *sovereignty*.  What do you mean by that?

20  A.  So it's essentially this concept underpins the U.S./Mexico

21  relationship, that the United States and Mexico are equal

22  partners with mutual respect for each other's sovereignty.

23  Q.  In addition to the water negotiations, are there other

24  infrastructure projects that are being made more difficult to

25  negotiate due to this buoy barrier?

1   A.  We do have concerns that Mexico could not be as willing to

2   work with us on major infrastructure projects along the border,

3   that through the President's bipartisan infrastructure law,

4   about $2.6 million was allocated for border infrastructure

5   modernization and upgrades with two of those specific projects

6   being in the Texas region, and there are concerns that Mexico

7   might not be as willing to meet our schedules for those

8   projects as they could be otherwise.

9   Q.  And do we need Mexico's cooperation to complete this

10  infrastructure project?

11  A.  Yes.  Close binational coordination is essential for all of

12  our border infrastructure, that we have to ensure that both

13  sides essentially build what they say they're going to build

14  and the roads meet up in the middle.

15          MR. DINGIVAN:  Thank you, Your Honor.  I'll pass the

16  witness.

17          THE COURT:  Okay.  Cross.

18          MR. SWEETEN:  Thank you, Your Honor.

19          (11:12 a.m.)

20                  CROSS-EXAMINATION

21  BY MR. SWEETEN:

22  Q.  Good morning, Ms. Quam.  Thank you for coming.  You work

23  for the Biden administration, correct, the Department of State?

24  A.  Yes.

25  Q.  It's the case, isn't it, that you have testified that the

1 | thousand feet of an orange buoy in the Rio Grande River is a
2 | source of significant diplomatic concern for Mexico, that's
3 | your testimony, isn't it?
4 | A.  Yes.
5 | Q.  It's certainly not the only issue of great diplomatic
6 | concern between the United States and Mexico, is it?
7 | A.  No.
8 | Q.  For example, you surely are aware that there were
9 | 2.3 million border encounters in FY 2021, correct?
10 | A.  I'm generally aware of the statistics, yes.
11 | Q.  In fact, let's take a look at it, if we could pull up D7.
12 | First let's look at page one and then page 12.
13 |     Okay.  So are you familiar with this report which is from
14 | the Inspector General and it's entitled *Intensifying
15 | Conditions at the Southwest Border are Negatively Impacting CBP
16 | and ICE Employees Health and Morale."*  Have you read this?
17 | A.  I don't know that I have read this report, no.
18 | Q.  This appears to be a government report, correct?
19 | A.  It looks like it.
20 | Q.  Okay.  Seal of the United States on it?
21 |     MR. SWEETEN:  Let's go to page 12, if we could.  Let's
22 | stop there.
23 |     MR. DINGIVAN:  Your Honor, I'm going to object to this
24 | entire questioning out of a report that she has not read and
25 | she's said that she's not familiar with specifically.

1        THE COURT:  The objection is sustained.

2    BY MR. SWEETEN:

3    Q.  May I ask you, are you familiar with the fact that in

4    addition to the 2.3 million people border encounters that we've

5    had, that it's been reported that 600,000 of those are

6    got-aways, are folks that are not processed through any sort

7    of --

8        MR. DINGIVAN:  Same objection, Your Honor.

9        THE COURT:  The objection is sustained.

10   BY MR. SWEETEN:

11   Q.  Are you familiar with how many got-aways there are?  You've

12   talked about the 2.3 million.  How many got-aways of the

13   2.3 million are there?

14       MR. DINGIVAN:  Same objection, Your Honor.

15       MR. SWEETEN:  It's a question as to--

16       THE COURT:  No.  Look, the issue in this case is

17   whether the -- sorry, there appears to be some sort of the --

18       One of the problems we have in the federal court

19   system is we are not first in line for money for equipment.

20       The issue is that we are here for purpose of

21   determining whether this is a barrier to navigation, whether

22   this is a navigable waterway, that's why we're here.  Now, I

23   don't think anybody would reasonably suggest that the United

24   States does not have a serious problem with what has been

25   termed "illegal immigration."  She isn't in a position to give

1  us any insight that has anything to do with this case on that

2  issue except for the argument that Texas has made that this is

3  somehow within the Governor of Texas prerogative to act

4  unilaterally to stop what has been determined by Texas to be an

5  invasion.  Correct?

6          MR. SWEETEN:  Well, I mean --

7          THE COURT:  Isn't that what your argument is?  That

8  Governor Abbott has the unilateral authority to act to stop an

9  invasion of the United States?

10          MR. SWEETEN:  Your Honor, that is part of our argument

11  is yes, that the Governor possesses authority under the

12  invasion clause to stop -- to act to stop unlawful migration

13  and cartel activity.  What I was getting at with my questioning

14  of the witness is she has talked about -- she has focused on

15  this 1,000-foot buoy system.  There are a plethora of other

16  issues.  Now, I could move --

17          THE COURT:  She's already testified in response to

18  your question that she is aware that there are a multitude of

19  issues between the United States and Mexico.  We're not going

20  to delve deeply into areas where she has no expertise

21  whatsoever.

22          MR. SWEETEN:  Okay.  Thank you, Your Honor.  I

23  understand.

24  BY MR. SWEETEN:

25  Q.  Let's move from unlawful migration to other issues.  First

1   of all, you would agree with me that it is a source of concern

2   between the bilateral relationship between the parties that

3   cartel activity is occurring in Mexico that involves drugs and

4   human smuggling, that's a source of friction and discussion

5   certainly in those circles, isn't it?

6   A.   The United States and Mexico do have regular discussions

7   about security issues including cartels.

8   Q.   You touched on water routes, you understand that there

9   are -- and then you talked a little bit about constituent

10  communications to you about the issues.  It's the case, isn't

11  it, that the State of Texas has expressed concern and

12  landowners on the Rio Grande have expressed concern about the

13  lack of water deliveries that are being provided by Mexico.

14  That's also an issue between the two countries, correct?

15          MR. DINGIVAN:  Objection, Your Honor, this is

16  testimony in the question tacked on the very end.

17          THE COURT:  Sustained.

18  BY MR. SWEETEN:

19  Q.   You would agree with me that water issues are a subject of

20  contention between the parties, correct?

21  A.   Water issues, we have water negotiations between the two

22  countries.  They have not raised to the same level of

23  diplomatic concern at this point.

24  Q.   You understand that the federal government has, through

25  IBWC, has received communiques from the State of Texas

1  complaining about the lack of water deliveries that were bound

2  by the treaty, correct?

3  A.   I'm sorry.  Can you repeat that?

4  Q.   Yes.  Are you familiar with letters directed to the IBWC

5  related to lack of water deliveries that are required by treaty

6  obligations?

7  A.   I have not seen specific communications to IBWC.

8  Q.   Okay.  Are you familiar with complaints by Texas landowners

9  about the lack of fulfillment of treaty obligations by Mexico

10  in the Rio Grande River?

11  A.   Yes.

12  Q.   Are you familiar with the fact that the importation of

13  lethal fentanyl, that is an issue, isn't it, that impacts

14  bilateral relationships between Mexico and Texas, right?

15        PLF. COUNSEL:  Objection, Your Honor.  This is again

16  outside the bounds of what you've previously ruled.

17        THE COURT:  The objection is sustained.  Counsel,

18  look, I said it before and I'll say it again, we're going to

19  stay with the issues here.  Now, she has already testified to

20  and the Court will take judicial notice of the fact that

21  illegal drugs do come across the border from Mexico to the

22  United States, the vast majority which come through legal

23  border points, by the way, through subterfuge, and that is an

24  issue that exists between the United States and Mexico and has

25  for decades.  I don't think we need her to testify to that.

1        MR. SWEETEN:  Okay.  And Your Honor, I will just say

2   in response, and I understand the Court's ruling and will

3   adhere to it on the issue of drugs and the illegal migration,

4   but I will say that the DOJ explored and certainly highlighted

5   this issue.  And I'm pointing out --

6        THE COURT:  They certainly highlighted the issue as it

7   relates to the buoys, okay.  The fact that there are other

8   issues between the United States and Mexico is relevant to a

9   degree, but not to a great degree because there are issues

10  between the United States and even its most important partners,

11  Canada and the United States have issues, Mexico and the United

12  States have issues.  The United Kingdom and the United States

13  have issues.  There's no question about that.  There is no two

14  international partners that don't have some disagreements, and

15  that's a fact of life.

16       The question is whether the positioning by the

17  Governor of Texas unilaterally in the Rio Grande River of these

18  buoys constitutes a substantial issue between the United States

19  and Mexico.  That's the issue.  The fact that something else

20  might be a substantial issue is there also, but we know what

21  those issues are.

22       MR. SWEETEN:  I will keep it high level then on that

23  question.

24       THE COURT:  All right.

25       MR. SWEETEN:  In adherence to the Court's order.

1   BY MR. SWEETEN:

2   Q.  So it's the case, isn't it, that the issue of human

3   smuggling is an issue that impacts bilateral relations between

4   Mexico and the United States?

5           MR. DINGIVAN:  Objection, Your Honor.  The Court just

6   ruled that this has to do with the buoy barriers and we're

7   talking about everything but buoy barriers.

8           THE COURT:  She can answer that question, then we're

9   going to move on.

10  A.  The United States and Mexico do cooperate and talk about

11  human smuggling, yes.

12  Q.  Okay.  Now, your testimony was that you first learned of

13  the buoy issue, that there were a thousand feet of buoys put in

14  Eagle Pass, in one place in Eagle Pass, in late June of 2023,

15  isn't that right?

16  A.  That's correct, we received the media reports of the plans

17  to install the barrier.

18  Q.  Are you familiar with the fact that Governor Abbott already

19  had announced the buoys were going to be deployed on June 8th

20  of 2023?

21  A.  We saw the press reports, yes.

22  Q.  And are you aware that state officials briefed officials

23  from the International Borders and Water Commission regarding

24  their plans to put this buoy system out in the river?

25  A.  I am not personally aware of those briefings, no.

1  Q.  In your discussions or work regarding the bilateral

2  negotiations and relationship between Mexico and the U.S., has

3  the issue of migrant safety come up?

4  A.  Generally, yes.

5  Q.  And that's because the U.S. called the border the most

6  dangerous crossing in the world, correct?

7  A.  I couldn't say if that's -- I wouldn't say that's why we

8  discussed that issue with the government of Mexico.

9  Q.  Has Mexico expressed safety for the migrants that are

10 crossing into the United States?

11 A.  Mexico generally supports humane migration practices, yes.

12 Q.  And are you aware that part of the reason for the

13 deployment of the buoys is to prevent drownings of migrants

14 that might try to ford the Rio Grande?

15         MR. DINGIVAN:  Objection, Your Honor.  This is

16 speculation as to what other people are thinking.

17         THE COURT:  Yes, you're asking her to put herself in

18 Governor Abbott's mind.  I don't think she's --

19         MR. SWEETEN:  I'm not trying to do that, Your Honor.

20 BY MR. SWEETEN:

21 Q.  I'm addressing now the orange buoys in the one segment of

22 the river in Maverick County, Texas.  Have you explained that

23 the Governor or that expressions have been made that it might

24 save migrant lives to the government of Mexico.

25 A.  No, I have not.

1   Q.  Have you discussed the fact that not a single person has

2   been injured or killed as a result of the buoys?

3   A.  No, we have not.

4   Q.  So when they've raised the issue, you haven't discussed the

5   fact that, well, it's being monitored and no one has been

6   injured or killed as a result of these buoys?

7              MR. DINGIVAN:  Objection, Your Honor.

8   BY MR. SWEETEN:

9   Q.  You haven't said that in response --

10             THE COURT:  Just a minute.  Yes.

11             MR. DINGIVAN:  I apologize, Your Honor.  Objection to

12  counsel is testifying and asking the witness.

13             THE COURT:  Yes.  Look, I understand your zeal in

14  attempting to get her to testify about these things that are

15  beyond her capacity to testify to.  You've already asked her

16  whether she had discussions, you can ask her about that.  But

17  then you interpose your own view of how this should or should

18  not impact her own interpretation of her discussions, and I

19  don't think she's in the position to tell you that.

20             MR. SWEETEN:  Okay.

21  BY MR. SWEETEN:

22  Q.  Let me ask you this, go back to the timeline.  June 8th

23  Governor Abbott announced it, you said that.  You weren't aware

24  of a discussion on June 12th between state officials and the

25  IBWC, correct?

Hillary Quam – Examination                    81

1   A.   I was not, no.

2   Q.   Then you find out in late June that the buoys have been

3   built, that's when you first learned of it, correct, is that

4   right?

5   A.   Yes, around that timeframe.

6   Q.   And we get a filing from the Department of Justice back in

7   July, July 24th of 2023.  Do you have any reason to dispute

8   that?

9   A.   I would have no reason to dispute that, no.

10  Q.   And in that time, there have been statements that have been

11  made by State Department officials about the relationship with

12  the government of Mexico, correct?

13  A.   Yes.

14  Q.   If we could pull up D35 please.  Okay.  Do you see that

15  document, *"Statement from National Security Adviser Jake*

16  *Sullivan on Legal Pathways Initiative with Mexico"*?

17  A.   I do.

18  Q.   Have you seen that before today?

19  A.   Yes.

20  Q.   Okay.  And it is dated July 28th, 2023, correct?

21  A.   Correct.

22  Q.   So this would have been after the Department of Justice

23  filed a motion with this Court seeking to enjoin the placement

24  of the buoys, right?

25  A.   Yes.

1   Q.   *"Following the very productive meetings that took place*

2   *earlier this week in Mexico between President Andres Manuel*

3   *Lopez Obrador and U.S. delegation led by White House Homeland*

4   *Security Adviser Elizabeth Sherwood-Randall, the United States*

5   *is taking additional steps to expand --"*

6         THE COURT:   Counsel, why are you reading that?

7         MR. SWEETEN:   Well, I want to make sure it's in the

8   record.

9         THE COURT:   Well, do you want to put it in the record?

10  Has it been submitted previously?

11        MR. SWEETEN:   It has been.

12        THE COURT:   All right, then it's in the record.  All

13  right.  You want to ask her a specific question, you don't need

14  to read the whole document.

15        MR. SWEETEN:   Okay.

16  BY MR. SWEETEN:

17  Q.   Let's go to the second paragraph.  *"This builds on a series*

18  *of successful legal pathway initiatives that President Biden*

19  *and President Lopez Obrador have agreed to launch during the*

20  *last year."*  Did I read that sentence correctly.

21  A.   It looks like it.

22  Q.   *"The expanded cooperation between the United States and*

23  *Mexico to manage our shared border in a humane and orderly way*

24  *is a testament to, quote, strong and enduring bonds of*

25  *friendship and partnership between our two countries."*

1  Correct.  Did I read that correctly?

2  A.  Yes.

3  Q.  There's also an attachment 19 that you provided to this

4  Court.  You added an exhibit that has a picture of Antony

5  Blinken.  Do you have this in front of you.  Let's put it up,

6  G24, and we're on the attachment at page five.

7        MR. DINGIVAN:  Your Honor, just for clarity for the

8  purposes of my witness, they've switched now to defendant's

9  exhibit, that's why it's the plaintiff's exhibit so that we're

10 just clear what we're looking at.  I don't think those are in

11 front of her.

12       THE COURT:  No, those aren't in front of her, but

13 she's got a monitor that's got it right in front of her.

14 BY MR. SWEETEN:

15 Q.  So it's your sworn declaration this was attached to it,

16 right, do you recall that?

17 A.  Yes, the transcript of the press conference.

18 Q.  So if we can go very quickly to the next page, first text

19 page please.  And I just want to read one sentence for you.  It

20 starts in the middle of the second paragraph, it says -- and

21 this is Secretary of State, Antony Blinken, your high boss

22 talking, right?  Is that correct?  Yes?

23 A.  Yes, I assume that's what you're going to read, yes.

24 Q.  And it says, *"I don't think there's been a time when we've*

25 *had stronger partnership and collaboration between Mexico and*

1  *the United States, and that's a time when the multiplicity of*

2  *issues and their complexity is also greater than ever before."*

3      Did I read that correctly?

4  A.  Yes.

5  Q.  Can you tell us the date of that statement, do you know?

6  A.  Yes, that was from the August 10th meeting that I mentioned

7  previously.

8  Q.  So 12 days ago Secretary of State Blinken said this, right?

9  A.  Yes.

10 Q.  When you spoke with Mexican officials about this concern

11 that you've said that they expressed, did you cite U.S. law and

12 discuss the Rivers and Harbors Act with them?

13 A.  We discussed the various treaty commitments, yes.

14 Q.  Did you cite U.S. law and the Rivers and Harbors Act

15 specifically?

16 A.  Personally I did not, no.

17 Q.  Did they express -- did the Mexican government express

18 gratitude that you were pursuing an action against the State of

19 Texas for placing these barriers in the Rio Grande?

20 A.  Yes.

21 Q.  You would agree with me that IBWC also expressed

22 gratitude -- has IBWC expressed gratitude for pursuing this

23 action?

24 A.  Not to me, no.

25 Q.  Do you know if they are the ones that initiated this with

1   the Corps of Engineers, do you know?

2   A.   So IBWC is a binational body and there are two sections,

3   there's the U.S. section of the International Boundary

4   Commission and there's CILA, or the Mexican section of the

5   International Boundary and Water Commission.  And then both

6   sections operate independently and then come together as the

7   binational body.  So when we say IBWC, we're generally talking

8   about the joint section and then we have the U.S. section and

9   the Mexican section.

10  Q.   Okay.  So you have -- and in fact, it's an international

11  body, correct?  It's those two -- it's one reports up to the

12  foreign affairs, I guess the foreign affairs minister of Mexico

13  and one reports up to the United States, correct?

14  A.   That's correct and then they come together in the

15  binational commission, but they do not have the status of an

16  international organization.

17  Q.   Do you know if it was the IBWC that initiated the complaint

18  in this case to the Corps of Engineers?

19  A.   I do not know.

20  Q.   Did you at any time encourage the IBWC, you or anyone that

21  you work with, encourage the IBWC to pursue this claim with the

22  Corps of Engineers?

23  A.   No.

24  Q.   On the complaint filed by the Department of Justice is

25  attached a letter from Governor Greg Abbott.  You were talking

1  earlier about constituent communications, correct?

2  A.  Yes.

3  Q.  And have you seen this document which is docket 3-1 filed

4  by the United States, letter from Governor Greg Abbott?

5  A.  No.

6  Q.  This was written July 24, 2023, and you have not had the

7  opportunity to see it?

8  A.  No.

9  Q.  We can go to the next page.  Read the bullets.  Can you see

10  that okay?

11  A.  Yes.

12  Q.  Just read the bullets to yourself.

13      (Pause.)

14      MR. DINGIVAN:  Your Honor, I'm going to lodge the same

15  objection I lodged --

16      THE COURT:  The objection is sustained.  What you're

17  asking her to do is just repeat something she hasn't ever seen

18  before.  I don't know what she could possibly testify to.

19      MR. SWEETEN:  Okay.

20  BY MR. SWEETEN:

21  Q.  The constituent communications that you testified about

22  earlier, you've received competing constituent communications,

23  haven't you, on issues involving the buoys, correct?

24  A.  I'm not sure what you mean.

25  Q.  Well, you were talking earlier, you said that you had had,

1    and I forgot who it was, reach out to you to express concern

2    about the buoys, correct?

3    A.   No.   I said that we have had stakeholder engagement

4    regarding the water negotiations.

5    Q.   Okay.   And you've also heard concerns from constituents

6    about the fact that Mexico is not delivering sufficient water

7    to the United States, correct?

8    A.   Yes.

9            MR. SWEETEN:   No further questions.   Thank you.

10           MR. DINGIVAN:   No redirect, Your Honor.

11           THE COURT:   All right.   Ma'am, you may step down.

12   Thank you very much.   Does the United States have any further

13   witnesses?

14           MR. LYNK:   We do not, Your Honor.

15           THE COURT:   Okay.   Does Texas have any witnesses?

16           MR. SWEETEN:   Your Honor, may we have a minute to

17   briefly conference?

18           THE COURT:   Absolutely.

19           MR. SWEETEN:   Thank you, sir.

20           (11:37 a.m.)

21           Your Honor, I think we are going to -- first of all,

22   we've admitted, the Court has admitted a video taken from the

23   drone of the Rio Grande.

24           THE COURT:   Yes, that's correct, we have that.

25           MR. SWEETEN:   We can show that, it's three minutes and

1   it's a silent clip picture of the Rio Grande.

2           THE COURT:  I'll allow you to do that.

3           MR. SWEETEN:  We'd like to show that, and then

4   secondly we intend to call Loren Flossman of the Cochrane

5   Company who put the buoys in the river.

6           THE COURT:  Okay.  How long do you anticipate her

7   testimony will take because we're getting close to the lunch

8   hour here.

9           MR. SWEETEN:  I think it will be short, 15 minutes or

10  less.

11          THE COURT:  We'll watch the video, then we're going to

12  break for lunch, 12 to 1:00 and come back 1:00 to finish.

13          MR. SWEETEN:  Okay.

14          THE COURT:  The record should reflect that we're

15  seeing a video apparently from August 17th of 2023.  Is that

16  correct, counsel?

17          MR. SWEETEN:  That's correct, Your Honor.  It's a

18  video of approximately several-mile stretch of the Rio Grande

19  from above.

20          THE COURT:  Okay.  The video is in the record.

21          *(11:41 a.m., video playing.)*

22                          *   *   *

23          *(11:45 a.m.)*

24          MR. SWEETEN:  Your Honor, I have one motion to address

25  to the Court that may impact the witnesses that we may need to

1   call.

2          THE COURT:  Sure.

3          MR. SWEETEN:  Your Honor, on Tuesday of last week, the

4   State received a filing I must say that I've never seen before

5   called Plaintiff United States's Notice of New Facts.  In that

6   notice of new facts filed with the Court, there was an

7   allegation that some of the buoys may be on the Mexican side.

8   We dispute that.  Our own contractor has his own view on how

9   that was done, but nevertheless --

10          THE COURT:  I've received by the United States or

11   somehow information reached the Court that Texas had

12   repositioned the buoys.  Is that true?

13          MR. SWEETEN:  There was a follow-up from the DOJ that

14   said, well, now Texas is moving the buoys--

15          THE COURT:  I'm asking you did Texas --

16          MR. SWEETEN:  They have been repositioned back to

17   avoid controversy --

18          THE COURT:  All right.

19          MR. SWEETEN:  -- with our federal partners.  So here

20   is where we are, I don't know what the import of the Court's

21   ruling to have admitted all the exhibits that both parties have

22   provided.  I don't know if I need to address this notice of new

23   facts which seemingly is no longer a matter in dispute.  We had

24   agreed with counsel that they had a witness named Peña that

25   they would agree to bring Peña to testify if they were going to

1  rely on her late filed declaration which was accompanied with

2  this notice of new filing.  And so where I am, Your Honor, is

3  we are prepared to put on Mr. Flossman to talk about the

4  positioning of those buoys, but if the Court is not going to

5  receive this filing --

6          THE COURT:  No, you should bring Mr. Flossman because

7  one of the issues here, obviously, and you spent a lot of time

8  cross-examining on it was the relationship between Mexico and

9  the United States.  Now, let me make it very clear, this Court

10  is not going to delve into political questions.  That is not a

11  purview of this Court.  And the Fifth Circuit has made it very

12  clear in rulings that they have made that it is not the purview

13  of their court either, and so has the Supreme Court, by the

14  way.  So I am not going to get into political question issues

15  in my ruling.  Suffice it to say that what is of concern to the

16  Court is the fact that this buoy, buoys or whatever it is, this

17  long chain of buoys that are apparently, as the record

18  reflects, are cabled together with steel and then have wire

19  underneath to keep people from diving underneath it, I guess,

20  and then are anchored somehow by concrete blocks --

21          MR. SWEETEN:  Uh-huh.

22          THE COURT:  -- is moving with the tide of the river.

23  Because either Texas intentionally placed it out in the middle,

24  which would be a very interesting thing, or if they didn't

25  intentionally put it there so close to the Mexican border, it

1   floated there or was dragged there by the current sufficiently

2   so that Texas saw the need to bring it back.

3             MR. SWEETEN:  Well, Your Honor --

4             THE COURT:  One of these things happened.

5             MR. SWEETEN:  Right, and so that's what my query is

6   about.  If this Court is going to receive this motion for new

7   facts and then the subsequent --

8             THE COURT:  It isn't a motion, it was a notice.

9             MR. SWEETEN:  Notice.  If the Court is going to

10  receive that evidence and if the Court wants to hear from

11  Flossman --

12            THE COURT:  I think you should because I'm concerned

13  if something is moving around in the river.

14            MR. SWEETEN:  And those are tethered to blocks,

15  moveable cement blocks that are on the bottom of the river,

16  they're not moored in any way, they're placed there, so he can

17  testify about those issues.

18            THE COURT:  The question is does this thing with the

19  current, is it capable of being moved?  And I don't know, but

20  the record would indicate that at least the way that it's

21  constructed at the moment, it is, because Texas found the need

22  to bring it back.  And if it wasn't in a position that Texas

23  was comfortable with, they wouldn't have done that.  And the

24  suggestion that they were trying to avoid controversy is

25  probably a good one.

1          MR. SWEETEN:  Well, Your Honor --

2          THE COURT:  That was your statement.

3          MR. SWEETEN:  I think we in the exercise of caution

4    moved it back, we had done readings of --

5          THE COURT:  Well, they say that it was in Mexico,

6    80 percent of it had drifted over to Mexico.  Now, I assume

7    Texas didn't intentionally put it in Mexico.

8          MR. SWEETEN:  We don't agree it was in Mexico.

9          THE COURT:  Okay.

10         MR. SWEETEN:  At any rate, I understand the Court's

11   direction, we'll call Mr. Flossman.

12         THE COURT:  So we will see Mr.Flossman or Ms.

13   Flossman?  Loren could be a man's name or a woman's name?

14         MR. SWEETEN:  It's Mr. Flossman.

15         THE COURT:  I don't know which one it is, I've never

16   met Mr. Flossman.  So we will resume at roughly 1:00.  Court

17   stands in brief recess.

18         COURT SECURITY OFFICER:  All rise.

19         *(11:52 a.m.)*

20                           *   *   *

21         *(1:06 p.m.)*

22         COURT SECURITY OFFICER:  All rise.

23         THE COURT:  Please be seated.  All right, the court

24   notes the presence of all counsel as well as the parties.

25   Counsel, your witness.

 1          MR. SWEETEN:  Your Honor, we do.  Mr. Bryant is going

 2   to call Mr. Flossman.

 3          THE COURT:  All right.

 4          COURTROOM DEPUTY CLERK:  Please raise your right hand.

 5                         *   *   *

 6          *(Oath administered and LOREN FLOSSMAN, Defense*

 7   *Witness, sworn.)*

 8                         *   *   *

 9          THE WITNESS:  I do.

10          COURTROOM DEPUTY CLERK:  You can have a seat.

11          *(1:07 p.m.)*

12                     DIRECT EXAMINATION

13   BY MR. BRYANT:

14   Q.  Mr. Flossman, how are you currently employed?

15   A.  I'm employed with Cochrane USA.

16   Q.  And could you generally describe your current role with

17   Cochrane as it pertains to the floating buoy system that is the

18   subject of this case?

19   A.  I represent that system to their client base, which is

20   international.

21   Q.  Okay.  And prior to your employment with Cochrane, was

22   there a time when you worked for a portion of the federal

23   government?

24   A.  Yes.

25   Q.  What part of the federal government did you work for?

Loren Flossman – Examination                    94

1   A.   I was employed by CBP, Customs and Border Protection and

2   specifically U.S. Border Patrol.

3   Q.   And how long were you with the U.S. Border Patrol and CBP?

4   A.   Since 2007.  Don't ask me to do the math please.

5   Q.   During the period you were with the Border Patrol, did you

6   have any responsibilities related to the Rio Grande River?

7   A.   Yes, I was responsible for the tactical infrastructure

8   program which included the fence barrier wall as it changed

9   from administration, the roads, lights, and Border Patrol

10  facilities along the southwest border, both for 2007 Secure

11  Fence Act and then President Obama's fence bill, and then

12  subsequently Trump, President Trump.

13          MR. BRYANT:  Your Honor, are you hearing the witness

14  okay?

15          THE COURT:  Yes, I can hear him.  The more important

16  question is can the reporter hear.

17  BY MR. BRYANT:

18  Q.   When you were with the U.S. Border Patrol, did you have an

19  overall role with them relating to infrastructure?

20  A.   Yes, I was appointed acquisition manager for the whole

21  program.

22  Q.   In that role, did you have occasion to conduct or supervise

23  testing of the floating barrier system that ultimately later

24  was put into the Rio Grande?

25  A.   Yes, deputy chief of Border Patrol got together with me, I

1  provided their requirements -- or they identified requirements,

2  I provided solutions and wanted to develop a solution that

3  would --

4         MS. KIMBALL:  Objection, Your Honor.  Mr. Flossman

5  appears to be testifying about information that would be

6  covered by deliberative process privilege, discussing Border

7  Patrol's privilege.

8         THE COURT:  Yes.  Unfortunately, I think that's right.

9         MR. BRYANT:  That's fine.  We'll work around that,

10  Your Honor.

11  BY MR. BRYANT:

12  Q.  Did Customs and Border Patrol ultimately decide to consider

13  contracting to deploy the floating barrier system in the Rio

14  Grande?

15         MS. KIMBALL:  Objection, Your Honor.  Same objection

16  regarding deliberative process privilege.

17         MR. BRYANT:  Your Honor, I just asked about the

18  decision, not about the process.

19         THE COURT:  The objection is overruled.

20  A.  Yes, they did.

21  Q.  And did there come a time when that process was canceled

22  after the change of administration at the beginning of 2021?

23  A.  Yes, on the 22nd of January when the proclamation that

24  President Biden put out.

25  Q.  Now, I'd like to ask you some questions about the floating

1  buoy system that is deployed in the Rio Grande now.  Are any

2  parts of that system structurally attached to the riverbed or

3  the shore of the river?

4  A.  No, no parts are attached to the river or to the shore.

5  Q.  Does that floating buoy system include some concrete blocks

6  resting on the riverbed?

7  A.  Yes, it does.

8  Q.  With respect to the system, it's actually placed in

9  Maverick County downstream from Eagle Pass now.  What are the

10  weight of each of the blocks that are deployed?

11  A.  Approximately 3,000 pounds each of the 68 anchors, and then

12  there's some positioning anchors that are about half that

13  weight, 75.

14  Q.  So if I understand you correctly, there are 68 anchors plus

15  of about 3,000 pounds each on the bed of the river?

16  A.  Correct.

17  Q.  Are those concrete blocks capable of drifting or moving

18  within the riverbed in the Rio Grande where they're deployed?

19  A.  No, they were designed specifically based on the flow of --

20  high level flow from the river.

21  Q.  Now, have you been to that location on the Rio Grande in

22  the past few days or weeks?

23  A.  I was there when we installed them was the last time.

24  Q.  And is the general level of the Rio Grande River now in

25  that area low?

1   A.   Yes.

2   Q.   If there comes a day when the river is much higher, even up

3   to flood stage, would those concrete blocks move?

4   A.   No, they're designed -- the weight and the way they're

5   integrated will not allow them to move, but allows the buoys to

6   rise with the water level.

7   Q.   And what's the maximum distance that the river -- that the

8   floating buoy system could expand if there comes a day when

9   there's a huge amount of water going down the Rio Grande River

10  at that point?

11  A.   Chains 12 meters long which allow the buoys to rise

12  12 meters which is about 39, 40 feet I believe.

13  Q.   In your observation --

14        THE COURT:  Just a minute.  So there's 40 feet of

15  chain attached to each buoy?

16        THE WITNESS:  Yes, there's 12 meters, yes.

17        THE COURT:  Okay.

18        THE WITNESS:  Not to each buoy, but there's three

19  buoys that have attached to those anchors.

20        THE COURT:  There's only three of the buoys are

21  attached to the anchors?  Little confusing.

22        THE WITNESS:  So the anchors aren't attached to every

23  buoy.  There's a system of three buoys that repeat itself.

24        THE COURT:  So the anchors are not attached to every

25  buoy, they're only attached to three of the buoys?

1            THE WITNESS:  They're attached to a piece of steel

2    that's got a hook on it and three buoys are attached to that

3    and that repeats itself for the thousand feet, so every three

4    buoys the chains are attached to that segment.

5            THE COURT:  And there is a chain on that that would

6    allow them to rise.

7            THE WITNESS:  12 meters.

8            THE COURT:  Up to 40 feet.

9            THE WITNESS:  Yes, sir.

10            THE COURT:  So what keeps them from moving side to

11    side.

12            THE WITNESS:  In addition to those, the positioning

13    anchors that keep them from moving side to side.  Additionally,

14    when the river flows, it's going to keep the buoys pretty much

15    center, the water doesn't go side to side.

16            THE COURT:  So you're relying on the flow of the

17    river.

18            THE WITNESS:  No, that's why we have the positioning

19    anchors in addition, I'm talking --

20            THE COURT:  I understand that that is north to south.

21    I'm talking east to west.

22            THE WITNESS:  There's north to south with 68 anchors

23    and there's 75 anchors put along the buoy line attached to the

24    system of three buoys to keep it going from east to west

25    limitations.

1          THE COURT:  Okay.

2          THE WITNESS:  When it's shallower.

3          THE COURT:  Okay.

4   BY MR. BRYANT:

5   Q.  Mr. Flossman, when Texas made the decision to put the

6   floating buoy system in the Rio Grande in Maverick County, did

7   it retain some suppliers and contractors to accomplish that?

8   A.  Yes, sir.

9   Q.  And who did Texas retain for that purpose?

10  A.  The company I work for, Cochrane USA.

11  Q.  And did Texas direct Cochrane to place the floating buoy

12  system on the U.S. or Texas side of the Rio Grande?

13  A.  Yes.

14  Q.  What did Cochrane do to carry out Texas direction that the

15  buoy system would be on the Texas and U.S. side of the Rio

16  Grande?

17  A.  The contractor we used, subcontractor, we had them use a

18  mapping system to do a GPS mark at the beginning and at the end

19  based on what we had historically of the border with Mexico,

20  put on the U.S. side of that border.

21  Q.  And as a result of what was done, did you personally

22  conclude when the floating buoy system was placed that it was

23  on the Texas and U.S. side of the international boundaries?

24  A.  Yes, it was my belief that we had, in fact, placed the buoy

25  system within the U.S. side.

1  Q.  And did Cochrane advise Texas that the floating buoy system

2  in Maverick County was on the Texas side of the international

3  boundary?

4  A.  We did.

5  Q.  Did there come a time when you became aware of an

6  allegation that that was not correct and that a portion of the

7  buoy system was on the Mexican side of the international

8  boundary?

9  A.  Yes.

10  Q.  When did you become aware of that?

11  A.  I believe it was last Wednesday, Tuesday or Wednesday last

12  week.

13  Q.  And what came to your attention at that time that caused

14  you to become aware of that allegation?  How did you become

15  aware of that allegation?

16  A.  I was sent a copy from DPS of the filings that IBWC had

17  made.

18  Q.  And did you review the filing?

19  A.  Yes, I did.

20  Q.  And did you see what survey or the date of the survey that

21  IBWC had used to come to the conclusion that a portion of the

22  buoy system was on the Mexican side of the international

23  border?

24  A.  I was surprised to see that it was 2009, as the river moves

25  constantly, and had not been updated.

1  Q.  Why were you surprised to see that it was a 2009 survey

2  that was used by IBWC?

3  A.  I believe the policy is that they did one every ten years

4  because of the movement of the river and the boundaries of that

5  river.

6  Q.  As a result of your knowledge of that policy, did you

7  conclude that the survey that was used was not the most current

8  one, at least according to their policy?

9  A.  The one that was in their filings was not -- was 2009, so

10  that I wouldn't classify as current.

11  Q.  When that filing was made alleging that a portion of the

12  floating buoy system in Maverick County is across the

13  international line into Mexico, what did Texas direct you and

14  your company to do?

15  A.  They directed us to move the system, which includes the

16  anchors, 4 feet to the U.S. side of the boundary line that IBWC

17  identified.

18  Q.  If I understand you correctly, you're saying that Texas

19  directed you to move the system 4 feet to the Texas side of

20  even the boundary as marked in the survey that was submitted to

21  the Court?

22  A.  That is correct.

23  Q.  And did Cochrane take action to fulfill that directive from

24  the State of Texas?

25  A.  Yes, we believe we had.  In fact, we're doing a final

1   survey this afternoon, this evening to, in fact, verify.  And

2   if there's adjustments that need to be made, we'll make them.

3   Q.  When did Cochrane start moving the concrete blocks to

4   accomplish that goal?

5   A.  Friday.

6   Q.  And were you aware that the United States filed a paper

7   with the Court Friday, advising the Court that people were out

8   in the river working?

9   A.  No, I was not aware.

10  Q.  Okay.  Were your people out in the river working to move

11  the concrete blocks on Friday to make absolutely sure that the

12  system is on the Texas side?

13  A.  That's correct, we were.

14  Q.  And did they work all weekend --

15  A.  Yes.

16  Q.  -- to accomplish that?

17  A.  Yes.

18  Q.  When your people went into the river to accomplish that

19  work Friday and over the weekend, did you verify that the

20  concrete blocks had been moved from when they were originally

21  placed?

22  A.  That's correct.

23  Q.  How is it possible to move those 68, 3,000-pound blocks in

24  just a matter of four or five days?

25  A.  We used two track hoes to pick up the blocks and move them.

1  It's designed to be -- to accommodate the move.

2  Q.  In your judgment, is there any way that that river could

3  have moved those blocks?

4  A.  No.

5  Q.  Now, as we sit here today, can you tell the Court under

6  oath that the floating buoys are within the Texas and U.S. side

7  of the river?

8  A.  Currently the buoys are in the U.S. side of the river and I

9  believe the anchor system is inside the Texas, until we do the

10  actual survey this afternoon that verifies it.

11  Q.  If there were any question after the survey, would you move

12  it further?

13  A.  Yes.

14  Q.  And would you encourage IBWC to verify that the current

15  location of the floating buoy system in Maverick County is

16  within the United States and on the Texas side of the

17  international boundary?

18  A.  Definitely.  I think that would put to rest where the buoys

19  would be.

20          MR. BRYANT:  Pass the witness.

21          THE COURT:  All right.  Cross.

22          MR. SWEETEN:  One second, Your Honor.  Mr. Sweet.

23          (Pause.)

24  BY MR. BRYANT:

25  Q.  I just want to clarify something you touched on in your

1  testimony I want to make sure is clear.  Why can't the buoys

2  themselves go, say, 40 or 50 feet to the side if the concrete

3  blocks are not moved?

4  A.  Because there's additional anchors, 75 of them, in addition

5  to the 68 positioning anchors that hang down so to keep the

6  buoy from drifting.  That was part of the design is to be able

7  to let the buoys rise with the river and to keep it from

8  drifting over the boundary line.

9          THE COURT:  So this is a fairly solid arrangement here

10 attached by, what, metal, so that it can't move side to side?

11         THE WITNESS:  No, it's attached by chains.

12         THE COURT:  Metal chains.

13         THE WITNESS:  Yes.

14         THE COURT:  So they can't move side to side.

15         THE WITNESS:  Yes, sir.

16         THE COURT:  And it's fairly solid all the way down.

17         THE WITNESS:  They repeat, so when you say solid --

18         THE COURT:  It's not a solid concrete block, but it's

19 all anchored together so that it is one unified arrangement.

20         THE WITNESS:  Correct, an integrated system.

21         THE COURT:  It's an integrated system and it is

22 attached by metal chain.

23         THE WITNESS:  Yes, sir.

24         THE COURT:  Must be fairly heavy gauge.

25         THE WITNESS:  Yes, sir.

```
1              THE COURT:  All right.
2    BY MR. BRYANT:
3    Q.  And I think you touched on this briefly, but I ask for you
4    to clarify, if you can.  What is the effect of the flow of the
5    river up and down -- the direction of the river, what is the
6    effect of that stabilizing the floating buoy system?
7    A.  In fact, it keeps the buoys in a specific track with the
8    flow of the river.  We didn't have to compensate for east and
9    west flow or north and south, depending how you look at it,
10   across way like you would in an ocean.  So between the anchors
11   and the flow, they're staying pretty much.
12             MR. BRYANT:  Pass the witness.  Thank you.
13             THE COURT:  Okay.  Cross.
14             MS. KIMBALL:  Thank you, Your Honor.
15             (1:26 p.m.)
16                        CROSS-EXAMINATION
17   BY MS. KIMBALL:
18   Q.  Good afternoon, Mr. Flossman.  Mr. Flossman, the floating
19   barrier is designed to stop people and goods moving across the
20   river, right?
21   A.  Designed to stop people, I don't know about goods.
22   Q.  That's the entire purpose, right, to stop people from
23   moving across the river?
24   A.  Correct.
25   Q.  It's not placed in the Rio Grande to identify any sunken
```

1    danger, right?

2    A.  I don't understand the question.

3    Q.  The purpose of it is just to stop movement of people

4    across, right?

5    A.  Correct.

6    Q.  It's not --

7        THE COURT:  Just a minute.  When you say "people",

8    that would also mean people in boats or people in anything, it

9    would stop.

10       THE WITNESS:  Where the buoys are.

11       THE COURT:  Where the buoys are.

12       THE WITNESS:  Yes.  So they can go around it if they

13   choose.

14       MS. KIMBALL:  Mr. Woolner, could you pull up Exhibit

15   G39.

16   BY MS. KIMBALL:

17   Q.  Mr. Flossman, the buoys come together to form a single

18   barrier, correct?

19   A.  Correct.

20   Q.  It forms a single wall in the water, right?

21   A.  It's a buoy, it's not a wall.

22   Q.  They're tethered together, right?

23   A.  Yes.

24   Q.  They're tightly interconnected such that a person can't

25   pass through them, right?  Between them?

```
 1  A.  Yeah, they can attempt to climb over them.
 2          MS. KIMBALL:  Mr. Woolner, could you pull up G26.
 3  BY MS. KIMBALL:
 4  Q.  Boats like these can't pass through the barrier either,
 5  right?
 6  A.  Correct.
 7  Q.  And you mentioned that the barrier is anchored in multiple
 8  places along the thousand-foot length, correct?
 9  A.  Correct.
10  Q.  And that's with 3,000-pound concrete blocks, correct?
11  A.  Correct.
12          MS. KIMBALL:  Mr. Woolner, could you pull up G52.
13  BY MS. KIMBALL:
14  Q.  So are these the concrete blocks that you're referring to?
15  A.  They are.
16  Q.  And are these the -- are these the positioning blocks?
17  A.  If you look at this square rectangle anchor, there's a
18  little round one after that.  That's the positioning.
19  Q.  So the square one are the anchoring ones, and the round
20  ones between are the positioning ones?
21  A.  Correct.
22  Q.  And you said there were 70-some of these of the anchoring
23  ones and 60-some of the positioning ones?
24  A.  Sixty-eight of the anchors with 3,000-pound, and then of
25  the thousand-pound ones, there's about 75, I believe, of those.
```

 1          THE COURT:  Let me ask you a question before I lose

 2   this train of thought.  Now, as I'm looking at these, these are

 3   sitting next to -- well, they're several feet away from the

 4   actual buoy system.  Is that where they remain or do they go

 5   underneath?  Is that where they--

 6          THE WITNESS:  That's where they remain.

 7          THE COURT:  So they are on either side.  And how many

 8   feet away are they from the buoy itself?  Looks like on the

 9   left side, it could be an optical illusion, but it looks like

10   it's further away than it is on the right side.

11          THE WITNESS:  That's correct.  So there is some

12   movement with that.

13          THE COURT:  There is some movement.  So the buoys can

14   move back and forth within those concrete blocks.

15          THE WITNESS:  Yes.

16          THE COURT:  Okay.

17   BY MS. KIMBALL:

18   Q.  Moving the barrier even just a little bit requires heavy

19   machinery, right?

20   A.  Correct.

21   Q.  Requires a track hoe.  So a barrier couldn't just be moved

22   out of the way any time somebody needed to pass across the

23   river at that location, right?

24   A.  Correct.

25   Q.  Approximately how long would it take to remove the barrier

1  from the river?

2  A.  Approximately three weeks.

3  Q.  But isn't it true that you testified that the barriers --

4  the entire barrier has been moved over the course of just three

5  days?

6  A.  Are you asking removed or moved?

7  Q.  Well, you were able to remove the entire barrier, correct?

8  A.  I moved it, yes, we moved it within approximately three

9  days.  Removing it, we would have to disassemble it.  I would

10  have to disconnect the chains that anchor to the buoys and

11  disassemble the buoy connection.

12  Q.  And you keep referring to them as buoys and as a buoy

13  system, but your company markets this as a full length barrier,

14  correct?

15  A.  I can't tell you how the company markets all of its

16  systems.  This is a buoy system, it's a floating buoy system.

17  And in dealing with other clients like the Home Office of the

18  UK, it's a floating buoy system that we're dealing with.

19  Q.  So your company does not market this system as a marine

20  floating barrier?

21  A.  They have two different kind of barriers, one of them is

22  for -- to protect ships from small craft, which is different,

23  has spikes on it versus this one which does not have the

24  spikes, they're smooth buoys.

25          MS. KIMBALL:  Your Honor, I'd like to mark as an

1    exhibit the Cochrane website as a new exhibit, G57.

2              THE COURT:  Okay.  Do we have that on the computer?

3              MS. KIMBALL:  We don't.  We can put it on the screen,

4    but it's not on the JERS system.

5    BY MS. KIMBALL:

6    Q.  Mr. Flossman, do you recognize this as your company's

7    website?

8    A.  Yeah, I recognize the pictures.

9    Q.  And looking at the pictures on this website, these pictures

10   represent the same pictures that are the buoy system here,

11   correct?

12   A.  Correct.

13   Q.  And turning to page two --

14             MS. KIMBALL:  First, I would like to enter this into

15   evidence, Your Honor.

16             THE COURT:  It will be received.

17   BY MS. KIMBALL:

18   Q.  Looking at page two, this system is marketed by your

19   company as a marine floating barrier, correct?

20   A.  Yes.

21   Q.  And your company markets it as a high security perimeter,

22   correct?

23   A.  I don't believe they market this as a high security

24   perimeter.  The initial buoys, talking about high security

25   perimeters, have devices on them to stop boats from crossing.

 1    Q.  But you would agree that this is a barrier system that is
 2    designed to stop the passage across the river, correct?
 3    A.  Of people.
 4    Q.  And it's a system that is firmly in place, it's a sturdy
 5    system?
 6    A.  Firmly in place, it's put in place with anchors and the
 7    system can be moved and removed.
 8    Q.  But you testified that it's very secure in its current
 9    location, correct?
10    A.  Yes.
11    Q.  And it's very difficult to move, correct?
12    A.  With the proper equipment, you can move it.
13            MS. KIMBALL:  No further questions, Your Honor.
14            THE COURT:  Any redirect?
15            MR. BRYANT:  Just a couple questions.
16            *(1:35 p.m.)*
17                      REDIRECT EXAMINATION
18    BY MR. BRYANT:
19    Q.  Mr. Flossman, looking at that Government Exhibit 32, there
20    was a reference to the possibility of the buoys moving to some
21    extent, do you recall that, between the concrete blocks?
22    A.  Yes.
23    Q.  About how far is the maximum amount that the buoys could
24    move?
25    A.  The concrete blocks, the outside ones are pretty much the

1   limits.  That's why that outside buoy, the one I'm calling to

2   the south, I'm not sure to the Mexican side, that DPS has to

3   make sure that that anchor is 4 feet within the boundary,

4   inside the boundary.

5   Q.  In the placement of those buoys and the entire flowing buoy

6   system in Maverick County, was there any excavation done of any

7   kind?

8   A.  No.

9   Q.  And in that process, was there any fill or addition to the

10  riverbed?

11  A.  No.

12  Q.  Have you ever seen any commercial navigation --

13          MS. KIMBALL:  Objection, Your Honor, outside the scope

14  of cross.

15          THE COURT:  Sustained.

16          MR. BRYANT:  No further questions.  Thank you,

17  Mr. Flossman.

18          THE COURT:  Anything else?

19          MS. KIMBALL:  No, Your Honor.  Thank you.

20          THE COURT:  Thank you, sir, you can step down.  Be

21  careful there, those steps.

22          Do you have any other witnesses, sir?

23          MR. SWEETEN:  Your Honor, no other witnesses at this

24  time.

25          THE COURT:  Do you have any rebuttal?

1          MR. LYNK:  No rebuttal witnesses?

2          THE COURT:  All right, very good.  So I won't be, as

3     I've already discussed, hearing any closing argument today.

4     I've set the deadline for the submission of closing argument

5     and the maximum number of pages, doesn't mean you need to use

6     all ten pages.  For 38 years I've told my law students you

7     don't have to use all three hours that you have for your final

8     exam.  They do anyway, and I can understand that.

9          The Court is going to very carefully cabin itself to

10    the issues which are relevant to this motion.  I am quite

11    cognizant of the fact that this is a United States District

12    Court, it is not Congress, it is not the President.  I have

13    strictures that I must and should live within to make sure that

14    my decision is within that bound and not commenting upon

15    politics.  That is not my role.  I'm not here to engage in any

16    type of nor do I have any inclination to engage in any type of

17    political comment in this decision.  That is not why I am here.

18    I have never done so in my entire judicial career and I have no

19    intentions of doing so today.

20          I've noted, as unfortunately is often the case that

21    there's been some mention of the fact that I was appointed to

22    the bench by President Reagan.  I indeed was, but I was

23    appointed by President Reagan with the full support of Senators

24    Daniel Inouye and Spark Matsunaga, so I had both Republican and

25    Democratic support for my nomination and approval.  So I have

 1  throughout my career endeavored to ensure that I have a level

 2  playing field for both sides and that my decisions are based

 3  solely on the facts and the law.  There will be no leaning one

 4  way or the other here from this Court.  Obviously, in any type

 5  of situation such as this, particularly one of such interest to

 6  members of the public, somebody is going to be happy and

 7  somebody is going to be unhappy with the decision I make.  That

 8  is a fact of life that I've lived with my entire career as a

 9  judge.  It is not in any way going to impair my ability to make

10  the right decision in my view, and that's all I can do.

11         I am going to try very hard to get a decision out as

12  quickly as I can, consistent with making sure that I have

13  carefully reviewed all of the materials and taken into

14  consideration the closing arguments of counsel.  I don't send

15  counsel off to prepare a closing argument in writing simply to

16  ignore it.  I do it because I think it will be helpful to me

17  and assist me in making sure that I fully understand their

18  arguments.  I do thank counsel very much, both sides, for your

19  courtesies, for your hard work.  Obviously, we have very

20  capable lawyers in this matter.  I've had a lot of materials

21  presented to me and we've already -- this Court has already

22  began working on this for at least a couple of weeks now, week

23  and a half, however long it's been since it's been filed.  The

24  Court hasn't waited to get the materials, we've already started

25  legal research and reviewing the law and the materials as they

1  came in were reviewed by the Court, so I'm not starting at

2  square zero here.

3          Is there anything else I can address for counsel

4  before we recess for the afternoon?

5          MR. SWEETEN:  No, Your Honor, nothing from the State.

6          MR. LYNK:  Only just to clarify close of business

7  Friday, I assume that's going to be 5:00 p.m. Central time,

8  just want to be clear.

9          THE COURT:  Not around here.  To make sure that you

10  get it in to the clerk in time, I would say 4:00 p.m., to be

11  sure.

12          MR. LYNK:  Thank you, Your Honor.

13          THE COURT:  We work quite a bit later than that, but I

14  don't work in the Clerk's Office, so it would be 4:00 p.m. on

15  Friday would be the latest and you should simultaneously as you

16  file it provide e-copies to opposing counsel and to

17  Ms. Springs, my courtroom deputy, so she can disseminate it to

18  the Court.

19          I would let members of the media know, and I know we

20  have quite a few here today, that these filings are

21  unfortunately -- I think you should have CM/ECF, for us it's

22  CM/ECF, for you it's PACER, you should have PACER access to be

23  able to get these materials after they are filed.  In the old

24  days, you couldn't.  If somebody filed something on Friday, you

25  had to wait until Monday and run to the Clerk's Office to get

1    it, but fortunately now you can get it online.  So you should

2    be able to have it by, if you're interested, by Friday

3    afternoon.  I think they scan it right in, don't they?

4           COURTROOM DEPUTY CLERK:  Yes, Judge.

5           THE COURT:  It will go right in.  Anything else?

6    Nothing?  Well, thank you very much.  I look forward to your

7    filing.  I've taken pretty copious notes here, went through two

8    legal pads, blew out my fountain pen.  So I thank you so much

9    and I will get a decision out as quickly as I can, consistent

10   with getting it out the way I want to get it out.  Thank you so

11   much.

12          COURT SECURITY OFFICER:  All rise.

13          (1:45 p.m.)

14                        *   *   *

15

16

17

18

19

20

21

22

23

24

25

1                        *   *   *   *   *

2    UNITED STATES DISTRICT COURT

3    WESTERN DISTRICT OF TEXAS

4

5         I certify that the foregoing is a correct transcript from

6    the record of proceedings in the above-entitled matter.  I

7    further certify that the transcript fees and format comply with

8    those prescribed by the Court and the Judicial Conference of

9    the United States.

10

11   Date signed:  August 23, 2023

12

13   /s/ Angela M. Hailey

14   Angela M. Hailey, CSR, CRR, RPR, RMR
     Official Court Reporter
15   262 West Nueva Street
     San Antonio, Texas  78207
16   (210)244-5048

17

18

19

20

21

22

23

24

25

# Exhibit C: Order Granting Preliminary Injunction

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | No. 1:23-CV-853-DAE |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| GREG ABBOTT, in his capacity as | § | |
| Governor of the State of Texas, and | § | |
| THE STATE OF TEXAS, | § | |
| | § | |
| Defendants. | § | |

ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION

Before the Court is a Motion for Preliminary Injunction (the

"Motion"), filed on July 26, 2023, by the United States of America ("Plaintiff")

against Greg Abbott, in his official capacity as Governor of the State of Texas, and

the State of Texas (collectively, "Defendants" or "Texas").  (Dkt. # 5.)  Texas filed

a Response to the Motion on August 9, 2023.[1]  (Dkt. # 26.)  The United States filed

a Reply on August 16, 2023.  (Dkt. # 37.)  Texas was granted leave to file a

---

[1] Shortly after the United States filed its Motion, Texas filed a Motion for Expedited Discovery, seeking limited discovery in advance of its response deadline of August 9, 2023.  (Dkt. # 11.)  Over objection of the United States, the Court granted in part Texas's Motion, permitting Texas to conduct three-hour depositions of three declarants upon whom the United States relied in its Motion, and ordering these depositions to occur by or on August 7, 2023.  (Dkt. # 19.)  These auxiliary depositions were attached to Texas's Response.

Surreply on August 20, 2023. (Dkts. ## 40-41.) On August 22, 2023, the Court

held a hearing on the Motion at the federal courthouse in Austin, Texas. At the

hearing, the Court granted the parties leave to file written closing arguments. The

United States filed its closing argument on August 25, 2023. (Dkt. # 45.) Texas

filed its closing argument on August 25, 2023 (Dkt. # 46). Having considered the

parties' arguments, including those in writing, the evidence presented, and the

relevant law, the Court **GRANTS** the United States' Motion for Preliminary

Injunction for the reasons that follow. (Dkt. # 5.)

BACKGROUND

This case concerns Texas's construction of a 1,000-foot floating

barrier in the Rio Grande River near Eagle Pass, Texas. In early June 2023,

Governor Abbott announced Texas's intent to deploy "marine floating barriers" to

"mak[e] it more difficult to cross the Rio Grande and reach the Texas side of the

southern border." Press Release, Office of the Texas Governor, "Governor Abbott

Signs Sweeping Package of Border Security Legislation" (June 8, 2023),

https://gov.texas.gov/news/post/governor-abbott-signs-sweeping-package-of-

border-security-legislation.[2] The "first 1,000 feet of the marine floating barrier"

---

[2] This Court is sympathetic with the aim of curtailing illegal immigration and
illegal importation of drugs. However, the vast majority of illegal drugs which
enter Texas, and indeed the United States in general, come through ports of entry
by using covert means and not through this stretch of the Rio Grande River. See
Michel Martin, How Do Illegal Drugs Cross the U.S.-Mexico Border?, NPR (April

would be deployed near Eagle Pass, Texas.  Id.  In a meeting a few days later,

Texas notified the United States Section of the International Boundary and Water

Commission ("IBWC") of its plan to deploy these barriers at three different

locations in the Eagle Pass area.  (Dkt. # 5-2 at 3.)

On approximately July 10, 2023, and without authorization of any

kind, save the Governor's directive, Texas began installing the barrier system in a

portion of the river roughly two miles downstream of the International Bridge II in

Eagle Pass.  (Dkts. ## 5-1 at 2-7; 5-8 at ¶ 5; 5-2 at ¶¶ 4-5, 10.)  Over the following

week, Texas finished its construction.  The result is a floating barrier comprised of

about 1,000 feet of large four-foot spherical orange buoys fastened together with

heavy metal cables and anchored in place with "heavy concrete blocks placed

systematically on the bed of the Rio Grande River."  (Dkts. ## 5-8 at ¶¶ 10-12; 5-1

at 5-11; 26-3 at 4.)  The buoys are surrounded by 68 anchors of about 3,000 lb

each, and 75 anchors of about 1,000 lb each.[3]  Attached to the bottom of about 500

---

6, 2019) https://www.npr.org/2019/04/06/710712195/how-do-illegal-drugs-cross-
the-u-s-mexico-border ("So the drugs that are actually taking the lives of people
here in the United States—methamphetamine, cocaine, heroin, fentanyl—almost
universally come through the ports of entry along the southern border …. well over
90 percent.").

[3] Testimony on this point was elicited at the hearing from the contractor Texas had
design and install the system, Loren Flossman of the company Cochrane.  The
concrete anchoring system is visible in Exhibit G 52.

feet of the floating barrier is an "anti-dive net" made of stainless-steel mesh extending two feet down into the water. (Dkt. # 26-3 at 4.)

On July 24, 2023, the United States filed this civil enforcement action against Texas under Sections 12 and 17 of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C §§ 406 and 413 (the "RHA"). (Dkt. # 1.) The United States alleges that Texas violated Section 10 of the RHA, 33 U.S.C § 403, by (1) erecting a structure in the Rio Grande River without authorization from the United States Army Corps of Engineers (the "Corps"), and (2) creating an obstruction to the navigable capacity of that waterway without affirmative Congressional authorization. (Id. ¶ 2.) Through the instant action, the United States aims to enjoin Texas from further constructing or maintaining structures or obstructions in the navigable waters of the United States, except in compliance with the RHA and other applicable law. (Id. ¶ 35.) The United States also seeks to compel Texas to remove all such extant structures and obstructions in the Rio Grande River at Texas's own expense. (Id. ¶ 4.)

## LEGAL STANDARD

The purpose of a preliminary injunction is to preserve the relative positions of the parties until a trial on the merits can be held. Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981). A preliminary injunction is an "extraordinary and drastic remedy," which is never awarded as a right. Munaf v.

Geren, 553 U.S. 674, 689–90 (2008).  To obtain a preliminary injunction, a

plaintiff must demonstrate (1) a substantial likelihood of success on the merits; (2)

a substantial threat of irreparable harm if the injunction does not issue; (3) that the

threatened injury outweighs any harm that will result if the injunction is granted;

and (4) that the grant of an injunction is in the public interest.  Moore v. Brown,

868 F.3d 398, 402–03 (5th Cir. 2017) (per curiam); FED. R. CIV. P. 65.  When the

United States is a party, the third and fourth requirements merge.  Nken v. Holder,

556 U.S. 418, 435 (2009).

The party seeking injunctive relief carries the burden of persuasion on

all four requirements.  PCI Transp. Inc. v. W. R.R. Co., 418 F.3d 535, 545 (5th Cir.

2005).  Normally, if a party cannot prove all four elements, a court must deny the

injunctive relief since "[t]he decision to grant a preliminary injunction is to be

treated as the exception rather than the rule."  Miss. Power & Light Co. v. United

Gas Pipe Line Co., 760 F.2d 618, 621 (5th Cir. 1985).

DISCUSSION

Governor Abbott announced that he was not "asking for permission"

for Operation Lone Star, the anti-immigration program under which Texas

constructed the floating barrier.[4]  Unfortunately for Texas, permission is exactly

---

[4] @GregAbbott_TX, Twitter, (Mar. 21, 2023, 5:29 PM),
https://twitter.com/GregAbbott_TX/status/1638306917939380224?t=BB0rNKcTg
wyDn0j8qRiQKQ&s=19.

5

what federal law requires before installing obstructions in the nation's navigable waters.  See 33 U.S.C. § 403.  Texas's construction of the floating barrier has violated two of the three courses of conduct proscribed by Section 10 of the RHA. The first clause of § 10 prohibits "[t]he creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States."  Id.  The second clause makes it unlawful "to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or *other structures* in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army."  Id.

Texas does not contend that it had the requisite authorization from Congress or the Corps to construct the floating barrier.[5]  Instead, it debates (1) whether the Rio Grande River near Eagle Pass is a navigable water of the United States; (2) whether the floating barrier is actually an obstruction or structure under

---

[5] At the hearing, Texas attempted to elicit testimony about a meeting occurring between Texas DPS and the IBWC prior to the buoy installation.  Of course, this meeting is not at issue, as the authorization required by federal law is from Congress and the Army Corps of Engineers, not the IBWC.  Nonetheless, notes from this meeting recount that Texas DPS told IBWC that the buoys would be installed in a different location than they were, and allegedly did not share project plans, but pointed to the State of Texas Land office for communication in the future.

the RHA; and (3) whether the Court should exempt its violation of federal law because Texas is being "actually invaded" by illegal migrants.  For the following reasons, the Court rejects Texas's arguments and grants in modified form the relief the United States requests.

## I.  The United States will likely succeed on the merits of its Section 10 RHA claim against Texas.

### A.  Texas's floating barrier is an obstruction to the navigable capacity of the Rio Grande River and required authorization from Congress.

The first clause of § 10 prohibits "[t]he creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States."  33 U.S.C. § 403.  Texas disputes that (1) the relevant section of the Rio Grande River is navigable; and (2) the buoy system obstructs the navigable capacity of the river.

### 1.  The Rio Grande River near Eagle Pass, Texas, is a navigable water of the United States.

To obstruct the "navigable capacity of any of the waters of the United States," the obstructed waters—the stretch of the Rio Grande River in which the buoys sit[6]—must be navigable.  33 U.S.C. § 403 (further prohibiting creation of

---

[6] Showing that the waters in which the obstruction is placed are navigable waters of the United States is a sufficient, if not necessary, showing.  For instance, an obstruction in a non-navigable area may impact navigable capacity in a downstream area that *is* navigable.  See, e.g., United States v. Rio Grande Dam & Irrigation Co., 174 U.S. 690, 708 (1899) (remanding for determination of whether proposed construction of a dam in nonnavigable portion of Rio Grande [near New Mexico]

structures in any "navigable river, or other water of the United States" without permit from the Army Corps of Engineers).  Navigability is a factual question. United States v. Appalachian Elec. Power Co., 311 U.S. 377, 405 (1940).  The Code of Federal Regulations provides that:

> Navigable waters of the United States are those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commence. A determination of navigability, once made, applies laterally over the entire surface of the waterbody, and is not extinguished by later actions or events which impede or destroy navigable capacity.[7]

33 C.F.R § 329.4.  The Corps' regulations envisage courts making determinations of navigability, admitting that "[p]recise definition of 'navigable waters' and 'navigability' are ultimately dependent on judicial determination, and cannot be made conclusively by administrative agencies."  Id. § 329.3.

A waterway's use or potential use in interstate or foreign commerce bears on its navigability for purposes of the RHA because "the source of the power of the general government" to control navigable waters "arises out of its power to regulate commerce with foreign countries and among the States."  Leovy v. United

---

would impact navigability of *navigable* portion of Rio Grande).  The parties focus their attention in the instant case on whether the area in which the barrier is installed is itself navigable.

[7] This definition applies particularly to the authority of the Army Corps of Engineers with respect to the RHA, rather than the Clean Water Act.  See id.

States, 177 U.S. 621, 633 (1900); see also Rio Grande Dam, 174 U.S. at 703 ("[I]n other words, the jurisdiction of the general government over interstate commerce and its natural highways vests in that government right to take all needed measures to preserve the navigability of the navigable water course of the country, even against any state action."). Thus, the Supreme Court's pre-RHA articulation of navigable waters in The Daniel Ball, 77 U.S. 557, 563 (1871), defined waters that are "navigable in fact," as those "used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water." See also The Montello, 87 U.S. 430, 443 (1874) ("[T]he vital and essential point is whether the natural navigation of the river is such that it affords a channel for useful commerce.").

Following the passage of the 1899 RHA, the Court broadened this definition considerably to include waters formerly used in interstate commerce but no longer capable of such use, Econ. Light & Power Co. v. United States, 256 U.S. 113, 123-24 (1921), and waters not presently used, but capable of future use with reasonable improvement. See Appalachian Elec., 311 U.S. at 408-409 (finding ability of river to be deepened two feet conferred navigability on the improved and unimproved sections); see also Sackett v. Environmental Protection Agency, 143 S. Ct. 1322, 1350-51 (Thomas, J., concurring) (describing the evolution of the

<u>Daniel Ball</u> test beyond waters currently employed in commerce); <u>Miami Valley Conservancy Dist. v. Alexander</u>, 692 F.2d 447, 450 (6th Cir. 1982) (holding that the "essential elements" of a navigable waterway "have remained constant": it "must (1) be or have been (2) used or susceptible of use (3) in the customary modes of trade and travel on water (4) as a highway for interstate commerce").

Accordingly, Texas's focus on the fact that commerce has not been observed on this stretch of the Rio Grande River recently is of no moment: "[t]he extent of existing commerce is not the test" for navigability. <u>United States v. Utah</u>, 283 U.S. 64, 82 (1931); <u>see also</u> <u>United States v. Diamond</u>, 512 F.2d 157, 160 (5th Cir. 1975) (holding that whether a body of water has interstate or foreign commerce or is always navigable in fact is "not necessarily controlling in determining legal navigability."). Indeed, the Supreme Court found the Desplaines River navigable despite "no evidence of actual navigation within the memory of living men." <u>Econ. Light</u>, 256 U.S. at 117-18. Rather, navigability may be established based on evidence of a water's historic use or its susceptibility to future use were reasonable improvements made to the river to facilitate commerce. <u>See, e.g.</u>, <u>Appalachian Elec.</u>, 311 U.S. at 407-09.

Navigability turns on evidence —geological reports, reports of engineers and the Secretary of War, histories, and other sources of information— rather than on speculation. <u>See, e.g.</u>, <u>Rio Grande Dam</u>, 174 U.S. at 694 (listing

evidence relied upon by trial court in forming navigability determination).  The Court finds the evidence presented by the United States sufficient to carry its burden at this stage on the navigability of the relevant portion of the Rio Grande River.

As to historical navigability, the United States provides evidence that Congress itself, contemporaneous with the RHA's enactment, acknowledged the navigability of the Rio Grande River near Eagle Pass.[8]  (Dkt. # 37 at 8.)  In a statutory precursor to the 1899 RHA, Congress "authorize[d] the construction of a bridge over the Rio Grande River between the cities of Eagle Pass, Texas, and Piedras Negras, Mexico," 23 Stat. 29 (1884), that required "free navigation of said river" to be maintained, and gave federal courts jurisdiction over cases "arising from an obstruction or an alleged obstruction to the free navigation thereof."  Id. § 3, 23 Stat. 30; see also 42 Stat. 1482 (1923) (authorizing construction of bridge between Eagle Pass and Piedras Negras "at a point suitable to the interests of navigation across the Rio Grande").  A pair of 1890 statutes authorizing other

---

[8] A joint survey conducted by the United States and the Mexican IBWC on July 27 and 28, 2023, recorded the locations of the buoys and concrete anchors of the line of buoys that Texas deployed approximately two miles downstream of the Camino Real International Bridge, in the vicinity of 28° 40' 21" N, 100° 30' 14" W.  (Dkt. # 32-1 at 1.)  This location is in between the Amistad Reservoir to the North and the Falcon Reservoir to the South.  See https://gps-coordinates.org/my-location.php?lat=28.6725&lng=-100.5038888888889.

commercial projects—electric wires and water pipes—in the same area confirms Congress's interest in preserving the navigability of this region of the Rio Grande River by providing redress in federal district court should the construction of the electrical wires or piping "substantially or materially obstruct[ ]" the "free navigation" of the Rio Grande.  26 Stat. 495 (1890); 26 Stat. 502 (1890).

Once a water is found to be navigable by Congress, it remains so until Congress, not the courts, declares otherwise. [9] <u>Economy Power & Light v. United States</u>, 256 U.S. 113, 124 (1921) (if historically navigable waters "are to be abandoned" due to changes in use or economic need, "it is for Congress, not the courts, so to declare"); <u>United States v. Appalachian Elec. Power Co.</u>, 311 U.S. 377, 408 (1940) ("When once found to be navigable, a water remains so." (citing <u>Economy Power & Light</u>)).  The reason for this is and should be obvious: bodies of water ebb and flow depending on the season and current climate conditions.  For instance, the Court takes judicial notice of the fact that Texas is currently in a long-term drought, which has caused several lakes and rivers, including the Rio Grande River, to be at historically low levels. <u>Low Water Supplies in Rio Grande and Across the World are "New Normal," Expert Says</u>, HOUSTON PUBLIC MEDIA (Aug. 29, 2022).  In 2022, the Amistad Reservoir reached a historically low lake level, and many of the boat ramps on the lake were closed. In June 2023, the lake level

---

[9] As the United States saliently points out.  (Dkt. # 45 at 2.)

had increased capacity by 5.2% from July 2022 levels.  Amistad Current

Conditions, National Park Service (Aug. 7, 2023) https://www.nps.gov/amis/

planyourvisit/conditions.htm.  This upward ebb occurred despite the ongoing

drought.[10] Similarly, the Corp of Engineers recently closed the boat ramps to

Canyon Lake in Central Texas due to the dangers to shallow draft boats posed by

the historic low level of the lake due to this subsisting drought.  Mary Claire Patton

& Justin Horne, Canyon Lake has Reached its Lowest Point in Recorded History,

KSAT (Aug. 28, 2023)   https://www.ksat.com/news/local/2023/08/28/canyon-

lake-has-reached-its-lowest-point-in-recorded-history/.  However, boat ramps will

open again in Canyon Lake and the Amistad Reservoir when water levels rise.

Boat Ramp Status, NATIONAL PARK SERVICE (Aug. 29, 2023) https://www.nps.gov

/amis/planyourvisit/boating.htm#Boat-Ramp (noting that boat ramps may or may

not be open due to "fluctuating lake levels").  The Court also takes judicial notice

of the fact that it is anticipated that Texas may have a wetter than normal winter

due to El Nino conditions, which may cause the Rio Grande River to rise

substantially from its current flows.  This could also occur if the Corp of Engineers

---

[10] The Amistad reservoir levels remain on a downward trend in the summer of
2023; however, the levels are higher than the previous summer, even in the face of
ongoing drought.  Additionally, the Amistad Reservoir Water Level tracker
(http://amistad.uslakes.info/Level.asp) demonstrates the historic ebb of the lake
levels—the lake levels are consistently higher in the winter and drop during the
summer months.

determines that water should be released from the Amistad Reservoir (Lake Amistad) into the Rio Grande River.  There was discussion of this at the hearing where the state's expert, Loren Flossman, testified at some length about how extra link chainage had been provided for on the barrier so that, in the ultimate occurrence, as anticipated, that the river will in fact rise, the buoys can rise up to 12 meters, approximately 40 feet, to accommodate the rise in the level of the river. (Tr. 97:2–12.)  The natural fluctuations in water level only momentarily impact navigability *de facto*, never *de jure*.  Navigability, once granted, can only be revoked by Congress.  Economy Power, 256 U.S. 113, 124 (1921; United States v. Appalachian Elec. Power, 311 U.S. 377, 408 (1940).  While Congress has enacted "non-navigability" declarations for a number of waters, it has not done so for the Rio Grande River, indicating Congress could have and has not revoked Rio Grande's designation as a navigable waterway of the United States.  311 U.S. 377, 408; 33 U.S.C. §§ 21-59mm.

The historical navigability of miles 275.5 to 610.0 of the Rio Grande River—in which the relevant stretch of river lies—is also memorialized in the Corps' 1975 Study and Determination of Navigability (the "Study").[11]  (Dkt. #  37-

---

[11] This was not the earliest Corps determination of navigability: this stretch "has been on the navigable list of the Fort Worth District from the time of the District's creation in 1950."  (Dkt. # 37-5 at 7.)

5.)  As the Study notes, treaties between the United States and Mexico dating back to 1848 require the countries maintain "free and common" "navigation of" the Rio Grande at all points below New Mexico.[12]  (Dkt. # 37-5 at 20 (citing 9 Stat. 928 (1848)); see also 10 Stat. 1034 (the 1853 Gadsden Treaty, identifying the upstream limit of applicability of the 1848 Treaty at a longitudinal and latitudinal point that is near El Paso and well upstream from Eagle Pass, Texas).  And the Study identifies "a great deal of interest . . . during the period between 1829-1882 pertaining to transportation of goods along the Rio Grande River."  (Dkt. # 37-5 at 26.)  In the 1850s, "[a] keelboat and a skiff, manned by sixteen men, ascended the river by channel to a point a thousand miles above [Roma, Texas]" and another account stated that the river was "believed to be navigable for 500 miles above Laredo."  (Dkt. # 37-5 at 68.)  Court cases from this period discuss ferry companies operating between Eagle Pass and Piedras Negras, transporting cotton, for instance.  See U.S. v. Weil, 35 Ct. Cl. 42, 77 (1900) ("At Eagle Pass there were ferryboats in which the cotton was crossed over."); see Tugwell v. Eagle Pass

---

[12] This comports with the Supreme Court's later decision finding the New Mexico stretch of the Rio Grande River non-navigable.  See Rio Grande Dam, 174 U.S. at 699.  The Court in Rio Grande Dam found the treaty unhelpful as to the issue of whether the proposed dam would obstruct the navigability of the Rio Grande River, because "if the proposed dam and appropriation of the waters of the Rio Grande constitute a breach of treaty obligations or of international duty to Mexico, they also constitute an equal injury and wrong to the people of the United States."  Id. at 701.

Ferry Co., 74 Tex. 480, 9 S.W. 120 (1888) (resolving dispute between ferry companies operating between Eagle Pass and Piedras Negras).

Moreover, the river has been and continues to be capable of increased commercial navigation with re-prioritization and increased flow from the Amistad Dam. The expedition that ventured up the river in the 1850s reported that "if the channel were improved in certain passages, steam navigation would be entirely feasible all the way up to Babbitt's Falls (probably RM 750)." (Dkt. # 37-5 at 26.) These improvements were not effectuated, owing to "the advent of the railroads in 1882" and policy choices prioritizing other river uses and purposes over commercial navigation, including construction of the Amistad Dam to divert water for irrigation. (Dkt. # 37-5 at 27.) As the Supreme Court has recognized, "absence of use over long periods of years, because of changed conditions, the coming of the railroad or improved highways does not affect the navigability of rivers in the constitutional sense." Appalachian Elec., 311 U.S. at 409-410; see also Econ. Light, 256 U.S. at 117-18 (finding Desplaines River navigable despite century of disuse owing in part to changes in pattern of trade and increased reliance on horses).

It is not "necessary that the improvements should be actually completed or even authorized"; the RHA merely requires that the waterway is capable of future use with reasonable improvement. Appalachian Elec., 311 U.S.

at 408.  As indicated in the Corps' 1975 report—adopted again in 2011— "[t]he natural and ordinary condition of the Rio Grande River, its volume of water, gradient, and regularity of flow," remain such that "future improvement for smaller commercial craft" is possible.[13]  (Dkt. # 37-5 at 19.)  This showing is sufficient.  It is entirely appropriate that this improvement would require "judicious[] use[]" of the Amistad and other dams.[14]  (Dkt. # 37-5 at 19); see Appalachian Elec., 311 U.S. at 407 ("A waterway, otherwise suitable for navigation, is not barred from that classification merely because artificial aids must make the highway suitable for use before commercial navigation may be undertaken.").  Because "[i]mprovements in the methods of water transportation or increased cost in other methods of transportation may restore the usefulness" of a formerly navigated waterway, courts must recognize the ongoing power of the federal government to

---

[13]  "Small traffic compared to the available commerce of the region is sufficient." Appalachian Elec., 311 U.S. at 409.  The Court's consideration of the past, present, and future commercial uses of the Rio Grande River must be flexible, because navigable waters of the United States might have uses as varied as "the carriage of ocean liners to the floating out of logs" and density of traffic "from the busy harbors of the seacoast to those sparsely settled regions of the Wester mountains."  Id. at 405.

[14]  The Congressional amici concede that a "historically navigable river" that undergoes changed conditions due to man-made obstructions is still, under Supreme Court precedent, a "navigable river," but fail to explain why changed conditions from the Amistad Dam, which Texas's own declarant concedes "water levels are dependent on," should be treated differently. (Dkts. ## 24 at 14-15; 26-1 at 3.)

regulate it under the RHA, despite its modern disuse.[15]  Econ. Light, 256 U.S. at 124.

Finally, though Texas points to the periodic dryness of the river and the segment being "plagued by sandbars and portages," the existence of shallow and sandy portions does not foreclose navigability.  See United States v. Utah, 283 U.S. 64, 86 (1931) ("[T]he master is plainly right in his conclusion that the mere fact of the presence of such sandbars causing impediments to navigation does not make a river nonnavigable."); see also Newbold v. Kinder Morgan SNG Operator, L.L.C., 65 F.4th 175, 181-82 (5th Cir. 2023) (quoting Econ. Light, 256 U.S. at 117) ("Navigability, in the sense of the law, is not destroyed because the water course is interrupted by occasional natural obstructions or portages; nor need the navigation be open at all seasons of the year, or at all stages of the water.").[16]

---

[15] Photographs of Texas installing the floating barrier indicate that at least some "[i]mprovements in the methods of water transportation," Econ. Light, 256 U.S. at 124, have arrived which make this portion of the Rio Grande River navigable: Texas used airboats in this portion of the river and even a small barge. (Dkts. ## 5-1 at 7; 5-8 at 4.)  Testimony corroborates airboats' ability to navigate this stretch of the river.  Ironically, the use of these barge and craft to install the buoy barrier itself constitutes commercial activity, albeit not that necessarily contemplated by Congress.

[16] The Court notes its reliance on evidence in determining the navigability of the Rio Grande River. The Court does not rely solely on the Corps' navigability determination, nor did the U.S. ask it to.  (Dkt. # 46 at 2).

2.    *Texas's floating barrier obstructs the navigable capacity of the Rio Grande.*

Section 10's first clause bars the "creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States."  33 U.S.C. § 403.  Texas admits that it created the floating barrier without Congressional authorization, and the Court has established that the relevant portion of the Rio Grande is navigable.  As to the remaining element, the Court finds that the floating barrier interferes with or diminishes the navigable capacity of the Rio Grande and creates a hazard, and thus, that Texas is liable under the first clause of Section 10.

It is "a question of fact whether the act sought to be enjoined is one which fairly and directly tends to obstruct (that is, interfere with or diminish) the navigable capacity of a stream."  Rio Grande Dam, 174 U.S. at 709.  Texas claims that Section 10 only encompasses obstructions "extending out into rivers and set perpendicular to the current (so as to obstruct vessels navigating up and down the rivers)."  (Dkt. # 26 at 19.)   But this atextual limitation contravenes Supreme Court precedent, which requires courts to "read the 1899 Act charitably in light of the purpose to be served," and "forbids a narrow, cramped reading of . . . Section 10."  United States v. Republic Steel Corp., 362 U.S. 482, 491 (1960).  Under this broad construction, the Court has found matter as small as "fine particles" from an iron mill an obstruction under Section 10.  Id. at 483.  Recognizing that "[t]he

19

Supreme Court has encouraged a broad interpretation of a section 10 'obstruction,'" <u>Vieux Carre Prop. Owners, Residents & Assocs., Inc. v. Brown</u>, 875 F.2d 453, 462-63 (5th Cir. 1989), the Fifth Circuit has likewise construed the term flexibly, without a size or positional limit: from a sunken schooner, <u>United States v. Raven</u>, 500 F.2d 728, 731 (5th Cir. 1974) to a pair of gas pipelines running under the bed of a bayou, <u>United Tex. Transmission Co. v. U.S. Army Corps of Engineers</u>, 7 F.3d 436, 438 (5th Cir. 1993).

   Texas designed and deployed the floating barrier to obstruct lateral movement across the river. <u>See</u> Press Release, Office of the Texas Governor, <u>Operation Lone Star Boosts Border Response with New Marine Barriers</u> (July 14, 2023) (the floating barrier will "prevent people from even crossing the middle part of the Rio Grande River and coming into the state of Texas") https://gov.texas.gov/news/post/operation-lone-star-boosts-border-response-with-new-marine-barriers. That the barrier's obstruction of up-and-down the river navigation is incidental to Texas's primary aim of obstructing bank to bank crossings make no difference. Credible testimony establishes that "[t]he placement and tandem configuration of the buoys present a structural barrier to cross-river navigation and would force a vessel to maneuver around the structure to avoid collision or entanglement at this location." (Dkt. # 5-8 at 6.) As for those navigating up and down the river, the barrier would impede navigation as

"whoever's steering [a] vessel would have to take note of and make sure they avoid it." (Dkt. # 26-6 at 74-75.)

Texas argues that the four-foot width of the barrier makes it no impediment at all. At the hearing, however, testimony was elicited indicating that the floating barrier system is much wider than the four-foot-buoys, alone. (See Exhibit G-52.) Placed four to six feet on either side of the buoy barrier are 68 anchors of about 3,000 lb each, and 75 anchors of about 1,000 lb each attached to the buoys by heavy chain.[17] Photographs show these grey concrete anchors standing from the bed of the river, with no markings to identify them as hazards. These concrete obstacles present a serious risk to watercraft of any kind. Sitting currently at water level, these concrete anchors are not easily seen by oncoming watercraft, including air boats, but are nonetheless at a level that would cause significant damage to any vessel of any size which happened to impact them.[18]

---

[17] Testimony on this point was elicited at the hearing from the contractor Texas had design and install the system, Loren Flossman of the company Cochrane. The concrete anchoring system is visible in Exhibit G 52. The concrete anchors extend out from the connected buoys on either side for a somewhat indeterminate length that the Court understands to be approximately four to six feet on each side.

[18] Texas asserts that any vessel can easily navigate past the floating buoys and that people can simply go around them. (Dkt. # 46 at 6). Stating these claims does not make them true, and these statements are in clear contradiction with the evidence presented to this Court, particularly taking into account the substantial and almost invisible concrete anchors. (Dkt. # 46 at 6).

And while the buoys are allegedly capable of floating to accommodate water level rises, the 143 anchors several feet away from the buoys would be lying just below the surface, making them even more imperceptible to passing vessels than when they sit at current water level.

Texas's own declarants admit that this stretch of the Rio Grande includes hidden obstacles like sand bars, rocks, and natural debris. (Dkt. # 26-1 at 3.) These conditions make it even more imperative for anyone piloting down the river to have free reign of the entire width and a clear view of all obstacles, lest they be forced into a hazard.

Less than six weeks' experience with the floating barrier demonstrates its potential for drifting out of position or catching substantial debris, and thus bears out concerns that the structure "meets engineering standards to withstand predicted high flows" or other changes in conditions. (Dkt. # 5-8 at 6.) There is still some ambiguity as to whether 80% of the buoys ended up in Mexican waters by drifting or by being originally, incorrectly installed there.[19] And contrary to

---

[19] The United States submitted a declaration on August 15, 2023, showing that nearly 80% of the barrier was positioned in Mexican waters, which means—crediting Texas's instance that it was originally placed in U.S. waters—the barrier can drift out of alignment, creating a wider horizontal obstruction. (Compare Dkt. # 26 at 6 ("The [floating barrier] is … entirely within Maverick County, Texas."), with Dkt. # 32 (IBWC topographical survey showing that a majority of the Floating Barrier was located in Mexico as of July 28, 2023)). On August 18, 2023, Texas was observed seemingly "repositioning the Floating Barrier" closer to the United States bank. (Dkt. # 39-1.) At the hearing, testimony was elicited that the buoys were

Texas's claim that the steel mesh attached to the buoys "does not block or catch substantial amounts of debris," (Dkt. # 26-2 at 4), a few weeks after the barrier was installed, one dead body was found "stuck in the southern part of the buoys," and another body was found just upstream of the buoys.  See Press Release No. 309, Mexican Government, SRE Reports Lifeless Body Found in Rio Grande in Eagle Pass Buoy Area (August 2, 2023), https://www.gob.mx/sre/prensa/sre-informa-que-hallan-cuerpo-sin-vida-en-el-rio-bravo-en-la-zona-de-boyas-de-eagle-pass; Information Note No. 06, Ministry of Foreign Affairs-National Institute of Migration Information (August 2, 2023), https://www.gob.mx/sre/documentos/information-note-no-06; Mexico Recovers Body of Honduran Migrant in Rio Grande; Another Body Found Near Floating Barrier, ASSOCIATED PRESS (August 3, 2023), https://apnews.com/article/rio-grande-mexico-texas-buoys-fdb59d6d39db90c5d2902dc7bcd1a960.

---

moved back into Texas waters.  Testimony was also elicited that the buoys could not have drifted.  But in a statement on August 21, 2023, Governor Abbott indicated that they had drifted.  Sandra Sanchez, Abbott Hosts Republican Governors at Border Buoys, "Ground Zero" for Illegal Immigration, KLST SAN ANGELO (August 21, 2023)  https://www.msn.com/en-us/news/us/abbott-hosts-republican-governors-at-border-buoys-ground-zero-for-illegal-immigration/ar-AA1fCccs ("The buoys had drifted toward the Mexico side. And so out of an abundance of caution, Texas went back and moved the buoys to a location where it is clear they are on the United States side, not on the Mexican side.").

Case law "forbids a narrow, cramped reading of . . . Section 10,"
leaving little doubt that Texas's 1,000-foot long, four-foot-wide floating barrier,[20]
anchored with metal wiring to heavy concrete blocks on the bed of the river,
constitutes an obstruction to the navigation of the Rio Grande.  See Republic Steel
Corp., 362 U.S. at 491.  Because this obstruction was not "affirmatively authorized
by Congress," it is in violation of Section 10 of the RHA.  33 U.S.C. § 403.

### B.      Texas's floating barrier is a structure in a navigable water of the United States, and thus required a permit from the Army Corps of Engineers.

To establish a violation of Section 10's second clause, the United
States must show that Texas (1) built or commenced the building (2) "of any
wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structure[]"
(3) in navigable waters (4) outside established harbor lines or where no harbor
lines have been established (5) without the Corps' permission.  33 U.S.C. § 403.
As with the elements of Texas's liability under Section 10's first clause, most
elements of Texas's liability under Section 10's second clause are incontestable.
Texas admits to deploying the floating barrier system without the Corps'

---

[20] The Court notes that the complete barrier structure is wider than four feet. The buoys are four-feet-wide on their own. The anchors on each side of the buoys add to the width of the overall barrier by approximately four to six feet on each side. The width added by the concrete anchoring system is visible in Exhibit G 52. As a result, the total barrier structure is approximately 12 to 20 feet wide when accounting for both the buoys and the concrete anchors.

permission and does not contest that no harbor lines have been established here.[21]
As to the final element of liability, the Court finds that the floating barrier
constitutes either a "boom" or "other structure[ ]" and thus, the United States is
likely to prevail on its claim under the second clause of Section 10.

The floating barrier resembles a "boom," as it is a 1,000-foot-long
chain of buoys fastened together with metal cables and tethered with concrete
blocks to the riverbed, intended to obstruct the passage of vessels and people.
Webster's 1913 dictionary defined a boom as "*[a] strong chain cable*, or line of
spars bound together, extended across a river or the mouth of a harbor, *to obstruct
navigation or passage*" or "[a] line of connected floating timbers stretched across a
river, or *enclosing an area of water*, to keep saw logs, etc., from floating away."
*Boom*, Webster's Revised Unabridged Dictionary (1913) (emphasis added).  Other
dictionary definitions confirm that a boom was understood at the time of the RHA
to be a strong chain of connected floating objects utilized to obstruct passage or
contain items.  See *Boom*, 1 Noah Webster, American Dictionary of the English
Language 25 (1828) (defining a boom as "[a] strong iron chain, fastened to spars,
and extended across a river, or the mouth of a harbor, to prevent an enemy's ships
from passing"); *Boom*, Webster's International Dictionary of the English Language

---

[21] No harbor lines have been established in this stretch of the Rio Grande River.
(Dkt. # 5-8 at 3.)   And as explained above in detail, this portion of the river is
navigable.

(1890) (defining a boom as "[a] chain cable, or line of spars bound together, extended across a body of water to obstruct passage"). The floating barrier, a 1,000-foot-long, four-foot-wide chain of "multiple interconnected buoys tethered via chains to concrete blocks placed on the bed of [a] river," designed to obstruct passage of people and vessels in the Rio Grande, appears to fit comfortably within the definition of "boom" at the time of the RHA's passage.[22]

      Texas argues that the floating barrier is not a boom because it doesn't go bank to bank. But by Texas's proffered 1913 Webster's definition, a boom may "enclos[e] an area of water" without crossing a river.[23] (Dkt. # 26 at 21 (quoting *Boom*, Webster's Revised Unabridged Dictionary (1913).) And as the United States points out, various descriptions and drawings of booms, contemporaneous with the RHA's enactment, run longitudinally with the river. E.g., <u>Atlee v. Union Packet Co.</u>, 88 U.S. 389, 392 (1874) (describing boom running parallel to shore between two piers); Steward Edward White, The Great Log Jam, Popular Monthly (July 1901), http://www.catskillarchive.com/rrextra/lgjam.Html (depicting boom running length of river, parallel to shore).

---

[22] Joseph Shelnutt's testimony at the hearing that the structure was not a "boom" is not dispositive on this issue.

[23] Moreover, Texas elicited testimony during its pre-Response deposition of Captain Peters that there are "multiple uses of the term boom" in nautical terms, including an "oil boom" which is used to "encircle an environmental spill," and thus need not be oriented from bank to bank of a river. (Dkt. # 26-4 at 46.)

And even if the floating barrier does not fit perfectly under the definition of a boom, by Texas's own admission, the "other structures" category encompasses structures "similar in nature" to those previously enumerated.  (Dkt. # 26 at 22 (applying the *ejusdem generis* canon to the catchall "other structures" directs that the term be construed to encompass items similar in nature to the preceding specific terms).)  Thus, the fact that the floating barrier meets all of Texas's criteria for a "boom" except for its orientation to the banks of the river makes it similar enough to that enumerated example to fall within the "other structures" category.[24]

Texas also takes the confusing stance that the floating barrier cannot be a structure under Section 10, because "buoys aid navigation, including around other objects that might obstruct navigation," and because Section 15 of the RHA "mandates the placement of buoys under certain circumstances."  (Dkt. # 26 at 22.)  Texas's convenient, newfound claim about the floating barrier's ability to "aid navigation" contradicts its own description of the barrier as a "physical barrier" created "to deter illegal crossing in hotspots along the Rio Grande River."  (Dkts. ## 26 at 12 (installing the floating barrier "to resolve the acute and immediate need to *construct physical barriers* in the vicinity of the U.S.-Mexico border in the Del

---

[24] And even if the floating barrier were merely a buoy, as Texas seems to claim, a "dolphin"—one of the structures explicitly barred by the Act—is defined to include "a buoy."  *Dolphin*, Webster's Academic Dictionary 178 (1895).

Rio Sector") (emphasis added); 26-2 at 3 ("the floating buoys are part of Texas's response to the border security disaster, and control ingress to a portion of [that area]").)  And its own design—attaching "[a] two-foot-deep anti-dive net" to the barrier—proves as much.  (Dkt. # 26 at 12.)  As described earlier, moreover, the concrete anchoring system composed of 143 concrete blocks placed in the river poses a significant impediment and danger to river traffic even without the buoys and could not possibly be considered an aid to navigation.[25]

Texas strains credulity with its argument that the floating barrier is not permanent enough to constitute a structure.  Should a 1,000-foot-long barrier of four-foot-spherical buoys, "fastened directly under[neath]" with two feet of "[s]tainless steel mesh" and tethered via chains to "heavy concrete blocks placed systematically on the [river] bed" be impermanent, it is hard to imagine what *would* be.  (Dkt. # 26-3 at 4.)  Texas's own declarants attest that it would take "several weeks," heavy equipment, and $300,000 to remove the barrier—let alone to install it in another place.  (Dkts. ## 26-3 at 4; 26-2 at 6.)  And the anchoring system here resembles that used for houseboats, which have been considered a

---

[25] Texas states Section 10 mandates placing buoys in navigable waters, claiming that no one thought buoys were impermissible structures.  (Dkt. # 46 at 8).  A buoy barrier flanked by a concrete anchoring system was not the type of "buoy" contemplated by the legislature who passed Section 10. Further claiming that "treaty provisions mandate a buoy barrier" is similarly a statement that misleadingly overstates the buoy element of this concrete anchor, buoy, steel, and anti-dive net barrier.  (Dkt. # 46 at 8).

structure under Section 10 in Texas's proffered caselaw.  See, e.g., United States v. Estate of Boothby, 16 F.3d 19, 21 (1st Cir. 1994) ("We believe that this regulation lawfully can be applied to houseboats that are found to constitute *permanently moored* vessels.") (emphasis added) (citing United States v. Boyden, 696 F.2d 685, 687 (9th Cir. 1983)); United States v. Angell, 292 F.3d 333 (2d Cir. 2002) (finding houseboat an obstruction in canal).

The floating barrier constitutes either a "boom" or "other structure," in the Rio Grande, and Texas failed to seek a permit from the Corps.  The United States is likely to prevail on its claim that Texas violated the second clause of Section 10.

C.  **Texas's self defense argument is unconvincing.**

Finally, Texas's fallback argument justifies its construction of the floating barrier as an exercise of self defense in the face of "invasion."  This argument fails because (1) the RHA has already balanced policy interests and determined that the nation's interest in free navigation of its waterways is supreme to unauthorized state action, and (2) whether Texas's claim of "invasion" is legitimate is a non-justiciable political question demonstrably committed to the federal political branches.

1.  *The federal government's power to prevent unauthorized obstacles in the nation's navigable waters trumps state policy preferences.*

Texas asks this Court to absolve its RHA violations because they are premised on its disagreement with federal immigration policy.  (See, e.g., Dkt. # 26 at 24 ("Governor Abbott has asserted this power because, due to President Biden's open-border refusal to faithfully execute federal immigration laws, the United States has unconstitutionally refused to 'protect [the State of Texas] against Invasion' by transnational cartels.").)  But "[t]his is not a controversy between equals."  Sanitary Dist. of Chicago v. United States, 266 U.S. 405, 425 (1925).  There "is no question" that the United States' "sovereign power to regulate commerce and control the navigable waters within its jurisdiction" is "superior to that of the States to provide for the welfare or necessities of their inhabitants."  Id. at 425-26.  That state action which violates the RHA may also "concern[ ] the expenditure of great sums and the welfare of millions of men," fails to change the fact that "the interests of the nation are more important than those of any state."  Id. at 425.  The Court cannot override Congress's "broad expression of policy in unmistakable terms," by exempting Texas from the RHA.  Id. at 429. [26]

---

[26] The Court notes that Texas has deployed National Guard troops as well as Public Safety Officers also to the Border to deter illegal immigrants and drug traffickers. Texas is not without resources.

> 2.  *Whether Texas has been "invaded" is a nonjusticiable political question.*

Nonetheless, the political question doctrine bars consideration of Texas's "invasion" defense.  Texas argues that it constructed the floating barrier pursuant to the Self-Defense Clause, U.S. Const. art. I, § 10, cl. 3,[27] because it is being "invaded" by "[t]housands of aliens . . . including members of cartels," and thus asks the Court to exempt Texas's conduct from the RHA.  (Dkt. # 26 at 25-26.)  To credit Texas's allegation of invasion would be to make a policy decision on a topic the Supreme Court and Fifth Circuit have identified as a nonjusticiable political question.[28]

A case "held to involve a political question" displays, on its face, an issue with a "textually demonstrable constitutional commitment . . .  to a

---

[27] The Self-Defense Clause provides that "[n]o State shall, without the Consent of Congress . . . engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay."  U.S. Const. art. I, § 10, cl. 3.

[28] Texas alleges a failure to weigh evidence of the "invasion" by the Court would be "reversible error," despite the topic being a nonjusticiable political question. (Dkt. # 2).  No court has discretion to overlook evidence regarding public consequences of injunctions, but courts do have the discretion to prevent needlessly cumulative evidence.  F.R.C.P. 403.  Given that Texas had already submitted 66 pages of evidence on the border crisis to the Court, which the Court made clear it had reviewed carefully before the hearing, it was within the Court's discretion to stem further discussion of these public consequences by, in Texas's words, "a low-level federal employee." (Dkt. # 46 at 9; Dkt. # 26–7).  Moreover, the Court declines to entertain evidence that counsel attempted to read into the record after a witness disclaimed any knowledge of the material being shown, which is exactly what Texas attempted to do.

31

coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; . . . or an unusual need for unquestioning adherence to a political decision already made." Baker v. Carr, 369 U.S. 186, 217 (1962). "[T]he parties agree that determining an 'invasion' is a nonjusticiable political question," but disagree as to what that means for Texas's "invasion" defense. (Dkt. # 41 at 4 (citing Texas v. United States, 106 F.3d 661, 666-67 (5th Cir. 1997).) Texas argues that whether an invasion has occurred is a matter constitutionally committed to "the Texas Governor." (Id. at 5.) The Court disagrees.

      Several constitutional provisions assign the federal government—not states—the authority to recognize and respond to invasions. See U.S. Const. art. I., § 8, cl. 15 (power to call forth militia); art. I, § 9, cl. 2 (power to suspend habeas corpus); art. IV, § 4 (power to protect against invasion). The Constitution's commitment of the question of an "invasion" is especially strong when it involves "the immigration and the status of aliens," which the Constitution assigns exclusively to Congress. Arizona v. United States, 567 U.S. 387, 394-95 (2012); New Jersey v. United States, 91 F.3d 463, 469 (3d Cir. 1996) (holding that the Naturalization Clause represents "a textually demonstrable constitutional commitment of immigration to the legislative branch"); see also Texas, 106 F.3d at

665 (quoting <u>Fiallo v. Bell</u>, 430 U.S. 787, 792 (1977)) ("'[O]ver no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens.").

Thus, courts of appeals have uniformly declined to consider whether and when an "invasion" occurs because of illegal immigration, as it "involves matters of foreign policy and defense," which the Constitution specifically commits to the federal government.  <u>Padavan v. United States</u>, 82 F.3d 23, 28 (2d Cir. 1996) (finding nonjusticiable plaintiffs' claim that "the federal government violated the Invasion Clause because the influx of legal and illegal aliens into New York State represents an 'invasion,'"); <u>New Jersey</u>, 91 F.3d at 470 (finding nonjusticiable New Jersey's claim of invasion by illegal aliens); <u>Chiles v. United States</u>, 69 F.3d 1094, 1097 (11th Cir. 1995) ("[W]hether the level of illegal immigration is an 'invasion' of Florida and whether this level violates the guarantee of a republican form of government present nonjusticiable political questions."); <u>California v. United States</u>, 104 F.3d 1086, 1091 (9th Cir. 1997) ("There are no manageable standards to ascertain whether or when an influx of illegal immigrants should be said to constitute an invasion.").  Likewise, the Fifth Circuit has dismissed as nonjusticiable Texas's previous claim that the United States' alleged "fail[ure] to control illegal immigration" violated the Naturalization Clause, given that there were no "judicially discoverable standards for determining

whether immigration control efforts by Congress are constitutionally adequate." Texas, 106 F.3d at 664-65.  While Texas looks to Justice Scalia's partial dissent in Arizona for support, that opinion acknowledged the irrelevance of the Self-Defense Clause to Arizona's power to respond to unlawful immigration.  See 567 U.S. at 419 (Scalia, J., concurring in part and dissenting in part).

Texas hopes to distinguish its case from the resounding rejection of similar "invasion" arguments in the cases cited above by centering the argument on the State's right to "engage in War" when "actually invaded."  U.S. Const., art. I, § 10, cl. 3.  But as Texas's amici admits, "by placing the responsibility to protect against invasion on the federal government, the Constitution commits the question of whether an invasion has occurred to the policy making (or political) branches *of the federal government*."  (Dkt. # 33 at 9 (emphasis added).)  And all Texas's new argument does is ask the Court to take the additional step—beyond the nonjusticiable question of whether the federal government has failed to protect Texas from invasion—of sanctioning Texas's assertion of plenary power to declare and respond to "all types of invasions, including invasions from non-state or quasi-state actors."  (Dkt. # 26 at 24.)  Under this logic, once Texas decides, in its sole

discretion, that it has been invaded, it is subject to no oversight of its "chosen means of waging war." (Dkt. # 33 at 7-8.) Such a claim is breathtaking.[29]

## II. The remaining equitable factors weigh in favor of a preliminary injunction.

Where, as here, the United States seeks an injunction enforcing a public-interest statute, the "extraordinary weight courts of equity place upon the public interests in a suit involving more than a mere private dispute," permits the court to grant a preliminary injunction "without making findings of irreparable harm, inadequacy of legal remedy, or the balance of convenience." See United States v. Marine Shale Processors, 81 F.3d 1329, 1359 (5th Cir. 1996); see also United States v. FDIC, 881 F.2d 207, 210 (5th Cir. 1989) ("However, if a statutory violation is involved and the statute by necessary and inescapable inference requires injunctive relief, the movant is not required to prove the injury and public interest factors."). Courts have applied this rule to Section 10 in particular. See

---

[29] Such a reading would give the Governor of Texas more power than is possessed by the President of the Unites States without authorization from Congress. See U.S. Const. art. I, § 8, cl. 11. The Texas Governor could essentially declare and wage war indefinitely at the Texas Border without Congressional authorization or oversight of any kind. The Court notes that Texas has the right to defend itself from imminent armed invasions. However, this authority to act independently only lasts until resources of the federal government can reach the invasion. Texas may not claim self defense from invasion at the border to justify a long-term usurping of Congressional authority. To be clear, the Court recognizes Texas's right and duty protect the people of Texas from those who would do them harm. However, Texas must pursue those goals by legal, congressionally authorized means when it comes to border issues.

United States v. Stoeco Homes, Inc., 498 F.2d 597, 611 (3d Cir. 1974) ("No balancing of interest or need to show irreparable injury is required when an injunction is sought under § 12 to prevent erection or seek removal of an unlawful structure."); United States v. Milner, 583 F.3d 1174, 1193-94 (9th Cir. 2009) (same); United States v. Oak Beach Inn Corp., 744 F. Supp. 439, 446-47 (S.D.N.Y. 1990) (holding that because plaintiff had demonstrated a likelihood of success on the merits of the Section 10 claim, "no further showing is required for a grant of preliminary relief"); cf. Sanitary Dist., 266 U.S. at 432 ("[W]e are not at liberty to consider [alleged harms to a defendant liable under Section 10] as against the edict of a paramount power.").

Thus, the Court's traditional equitable discretion is narrowed to evaluating how equitable considerations "are affected by the selection of an injunction over other enforcement mechanisms" authorized by statute. United States v. Oakland Cannabis Buyers' Coop., 532 U.S. 483, 498 (2001); see id. at 497 (holding courts' equitable discretion cannot "override Congress' policy choice, articulated in a statute, as to what behavior should be prohibited"). The Court's choice "is simply whether a particular means of enforcing the statute should be chosen over another permissible means," and "not whether enforcement is preferable to no enforcement at all." Id. at 497-98; cf. Weinberger v. Romero-Barcelo, 456 U.S. 305, 314 (1982) (explaining that district court in TVA v. Hill,

437 U.S. 153 (1978), lacked discretion to withhold injunction where "only an injunction could vindicate the objectives of the Act"). Here, because preliminary injunctive relief is the only viable mechanism for remedying Texas's statutory violation, such relief must be awarded.

Texas does not contest this legal principle, arguing only that the traditional equitable factors do not merit relief. Even were the Court required to look to these factors, each favors a preliminary injunction.

Credible evidence establishes that the harm from the floating barrier is immediate and ongoing—it is far "more than mere speculation." Janvey v. Alguire, 647 F.3d 585, 601 (5th Cir. 2011). The floating barrier has already placed tremendous strain on the U.S.-Mexico relationship:[30] "one of the most important, dynamic, and economically impactful partnerships in the world." (Dkt. # 5-7 at ¶ 4.) Mexico vigorously denounces the presence of the barrier, expressing its hope for expeditious removal of the barrier as the first topic at the August 10, 2023, meeting between Foreign Secretary Alicia Barcena and Secretary of State Anthony Blinken. (Dkt. # 37-9 at 9-10 (stating concern about the "very delicate situation on

---

[30] Texas cites political statements that the U.S.-Mexico relationship is stronger than ever as evidence its buoy barrier is an inconsequential matter between the two countries. (Dkt. # 46 at 9–10). Texas has drawn the wrong conclusion. The unprecedented strength and collaboration between the countries currently means the U.S. has more to lose than ever as a result of Texas's actions. Texas, not a party to the talks and negotiations between the federal government and Mexico, has failed to present any evidence the barrier is not of significant concern to Mexico.

the border" and interest in getting the buoys out in short order given "most of the buoys are on the Mexican side").)  The floating barrier presents an obstacle not just to persons and vessels in the water, but to the critical discussions between the two nations about "a new mechanism to improve the predictability and reliability of Rio Grande water delivery from Mexico to the United States."  (Dkt. # 5-5 at 6.) The countries are at a "sensitive stage" in formulating an agreement on the topic, set to be completed in December 2023.  (Id.)

The barrier also threatens the IBWC's ability to implement the core provisions of the 1944 Treaty between the United States and Mexico, which is crucial to allocation of waters in the Rio Grande.  (Id. at 6-7.)  The Mexican arm of the IBWC has already stated that "these actions [placing the barrier] could affect cooperation between the two entities going forward," and cancelled a July 24, 2023, meeting concerning water releases in response to the barrier's installation. (Id. at 5-6.)

Mexican officials have also raised humanitarian "concerns at the highest diplomatic levels" about possible loss of life to persons swimming in the Rio Grande, (id. at ¶¶ 10-11), a risk Texas's own declarant corroborates given his description of the "treacherous conditions" migrants face in this stretch of river. (Dkt. # 26-1 at 4 ("People entering the river at this location face treacherous conditions, including hidden eddies that can and do drown swimmers.").)  And as

discussed earlier, such harm may have already come to bear, given the discovery of two bodies near the buoy system in August 2023.

Where the United States is a party, the third and fourth elements of the traditional preliminary injunction analysis—harm to the opposing party and the public interest—merge and essentially require the Court to balance the equities of the case.  Cf. Nken, 556 U.S. at 435.  Texas argues that its interest in "preventing the harms from [drug trafficking] criminality and illegal immigration" outweigh the barrier's harm.  (Dkt. # 26 at 28.)  Though Texas "may have understandable frustrations with the problems caused by illegal immigration," it "may not pursue policies that undermine federal law."  Arizona, 567 U.S. at 416.  And "[t]here is no question" that the United States' authority under the RHA "is superior to that of the States" to implement policies they allege will "provide for the welfare or necessities of their inhabitants."  Sanitary Dist., 266 U.S. at 426.

The Court finds that the barrier's threat to human life, its impairment to free and safe navigation, and its contraindication to the balance of priorities Congress struck in the RHA outweigh Texas's interest in implementing its buoy barrier in the Rio Grande River.[31]  The harm to navigation is clearly evident from

---

[31] As this Court indicated during the hearing on this matter, it is not appropriate for the lower federal courts to usurp the authority of Congress and legislate from the Bench. This Court is mindful of the fact that Governor Abbott's "Operation Lone Star" is controversial and in ruling on this, the Motion for Preliminary Injunction before it, this Court is not issuing an order which approves or disapproves of

the evidence presented, while the State of Texas did not present any credible evidence that the buoy barrier as installed has significantly curtailed illegal immigration across the Rio Grande River. Thus, for the many reasons listed herein, the balance of hardships tips clearly in favor of the United States. The Court also finds that enforcing the RHA is in the public interest, given the impact of the floating barrier on navigation, health, and safety. Moreover, Congress has already "decided the order of priorities" between the United States' interests and those of Texas; the state must comply with permitting requirements if it wants to obstruct or create a structure in the navigable waters of the United States. Oakland Cannabis Buyers' Coop., 532 U.S. at 497.

---

Operation Lone Star as a whole or the Governor of Texas' use of the Texas National Guard and the Department of Public Safety Officers as defenses to patrol the Texas banks of the Rio Grande River. This Court has attempted to cabin its ruling to only the issues placed directly before it by the parties. Unfortunately, the Court was required to address the Governor of Texas's alleged war powers in "repelling an invasion" only because it was an argument made by the State of Texas and therefore this Court was compelled to address it.

<u>CONCLUSION</u>

In summary, the United States' Motion for a Preliminary Injunction is **GRANTED**. The Court has found that the United States is likely to succeed on the merits of its claim that Defendants have violated and continue to be in violation of 33 U.S.C. § 403 and that preliminary injunctive relief is warranted on this basis. To the extent that further findings are required, the Court also find that Texas's conduct irreparably harms the public safety, navigation, and the operations of federal agency officials in and around the Rio Grande. The Court also finds that the balance of the equities and the public interest each favor an injunction. Accordingly, **IT IS HEREBY ORDERED** that:

1.  Defendants and anyone working on their behalf are enjoined and hereby prohibited from building new or placing additional buoys, blockades, or structures of any kind in the Rio Grande River pending final judgement in this matter.

2.  Defendants shall, **by September 15, 2023**, reposition, at Defendants' expense, and in coordination with the United States Army Corps of Engineers, all buoys, anchors, and other related materials composing the

41

floating barrier placed by Texas in the Rio Grande in the vicinity of Eagle Pass, Texas to the bank of the Rio Grande on the Texas side of the river.[32]

**3.**    Absent modification by the Court, the Fifth Circuit Court of Appeals, or the Supreme Court, this Order preliminarily enjoining the above activities shall remain in effect until a final judgment on the merits is entered in this matter.

**IT IS SO ORDERED.**

**DATED**: Austin, Texas, September 6, 2023.

_____
David Alan Ezra
Senior United States District Judge

---

[32] With respect to the buoy barrier that is currently in place, this is a Preliminary Injunction and not a final disposition of this case on the full merits, so this Court is counseled to act in a measured way. As a result, the Court is directing that the buoy barrier be moved from the main waters of the Rio Grande River to the riverbank, rather than removal entirely from the river, so that the barrier does not impede or impair in any way navigation by airboats or other shallow draft craft along the Rio Grande River. The evidence has established that this can be done in a rather expeditious manner, as the Governor himself ordered movement of the buoy barrier, which the federal government maintained was in part in Mexican waters to a position closer to the United States side of the river. Sandra Sanchez, Abbott Hosts Republican Governors at Border Buoys, "Ground Zero" for Illegal Immigration, KLST SAN ANGELO (August 21, 2023) https://www.msn.com/en-us/news/us/abbott-hosts-republican-governors-at-border-buoys-ground-zero-for-illegal-immigration/ar-AA1fCccs. ("The buoys had drifted toward the Mexico side. And so out of an abundance of caution, Texas went back and moved the buoys to a location where it is clear they are on the United States side, not on the Mexican side."). This was done within a period of three days and required only the use of a floating barge and airboats. (Tr. 109:3–11) Finally, the Court intends to expedite this matter in consultation with counsel so that a final resolution on the full merits can be had within the shortest time possible.

Exhibit D: Defendants' Notice of Appeal

**United States District Court**
**Western District of Texas**
**Austin Division**

UNITED STATES OF AMERICA,

    *Plaintiff*,

       v.

GREG ABBOTT, in his capacity as Governor
of the State of Texas, and THE STATE OF
TEXAS,

    *Defendants*.

No. 1:23-cv-00853-DAE

## DEFENDANTS' NOTICE OF APPEAL

Defendants Greg Abbott, in his capacity as Governor of the State of Texas, and the State of Texas appeal this Court's Order entered on September 6, 2023, to the United States Court of Appeals for the Fifth Circuit. *See* Order Granting Plaintiff's Motion for Preliminary Injunction, ECF No. 50. That Order granted the United States' motion for preliminary injunction. *See* Order Granting Plaintiff's Motion for Preliminary Injunction, ECF No. 50; *see also* Pl. U.S.' Opposed Mot. for Prelim. Inj., ECF No. 5. The order granting a preliminary injunction is immediately appealable. *See* 28 U.S.C. § 1292(a)(1).

Date: September 6, 2023

Angela Colmenero
Provisional Attorney General

Brent Webster
First Assistant Attorney General

Grant Dorfman
Deputy First Assistant Attorney General

Ralph Molina
Deputy Attorney General for Legal Strategy

Office of the Attorney General
P. O. Box 12548, MC-009
Austin, TX 78711-2548
(512) 936-2172

Respectfully submitted,

*/s/ Ari Cuenin*
Ari Cuenin
Deputy Solicitor General
Tex. State Bar No. 24078385
ari.cuenin@oag.texas.gov

Patrick K. Sweeten
Special Counsel
Tex. State Bar No. 00798537
patrick.sweeten@oag.texas.gov

Ryan D. Walters
Deputy Chief
Special Litigation Division
Tex. State Bar No. 24105085
ryan.walters@oag.texas.gov

David Bryant
Special Counsel
Tex. State Bar No. 03281500
david.bryant@oag.texas.gov

Munera Al-Fuhaid
Special Counsel
Tex. State Bar No. 24094501
munera.al-fuhaid@oag.texas.gov

**Counsel for Defendants**

## Certificate of Service

On September 6, 2023, this document was filed electronically through the Court's CM/ECF system, which automatically serves all counsel of record.

*/s/ Ari Cuenin*
Ari Cuenin

EXHIBIT E: PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

UNITED STATES OF AMERICA,

        *Plaintiff*,

       v.

GREG ABBOTT, in his capacity as
GOVERNOR OF THE STATE OF TEXAS,
and THE STATE OF TEXAS,

        *Defendants*.

Case No. 1:23-cv-00853-DII

**PLAINTIFF UNITED STATES'
OPPOSED MOTION FOR PRELIMINARY INJUNCTION**

JAIME ESPARZA
UNITED STATES ATTORNEY

JAMES E. DINGIVAN
  Assistant United States Attorney
  Texas Bar No. 24094139
United States Attorney's Office
Western District of Texas
601 N.W. Loop 410, Ste 600
San Antonio, TX 78216
(210) 384-7372 (tel)
(210) 384-7312 (fax)
James.dingivan@usdoj.gov

TODD KIM
ASSISTANT ATTORNEY GENERAL
Environment & Natural Resources Division

BRIAN H. LYNK
  Senior Trial Counsel
  DC Bar No. 459525
ANDREW D. KNUDSEN
  Trial Attorney
  DC Bar No. 1019697
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
(202) 514-6187 (Lynk)
(202) 353-7466 (Knudsen)
(202) 514-8865 (fax)
Brian.lynk@usdoj.gov
Andrew.knudsen@usdoj.gov

Dated: July 26, 2023

*Counsel for the United States of America*

# TABLE OF CONTENTS

Table of Contents ..................................................................................................... ii

Table of Authorities ................................................................................................ iii

Introduction ............................................................................................................. 1

Background .............................................................................................................. 2

   I.  The Rivers and Harbors Act of 1899 ........................................................... 2

  II.  Texas's Floating Barrier in the Rio Grande ................................................ 3

Standard for Decision ............................................................................................. 7

Argument ................................................................................................................. 8

   I.  The United States Will Likely Succeed on the Merits of Its Claim That Texas Has Violated Section 10 of the Rivers and Harbors Act ...................................... 8

     A.  Texas Built an Unpermitted Structure in Navigable Waters of the United States ........ 9

     B.  Texas Created an Unauthorized Obstruction to the River's Navigable Capacity ....... 10

  II.  The United States' Likelihood of Success on the Merits Alone Warrants Preliminary Injunctive Relief .......................................................................... 12

  III. To the Extent Relevant, the Traditional Equitable Considerations Supporting Preliminary Injunctive Relief Are Satisfied .................................................. 13

     A.  A Preliminary Injunction Is Necessary to Prevent Irreparable Harm to Foreign Relations, Public Safety, and Navigation. ................................. 14

     B.  The Equities and Public Interest Strongly Favor Preliminary Injunctive Relief. ....... 16

Conclusion ............................................................................................................. 19

Appendix:

Attachment 1: Declaration of Abraham Garcia
Attachment 2: Declaration of Mario Gomez
Attachment 3: Declaration of Jason D. Owens
Attachment 4: Declaration of Captain Brandy Parker
Attachment 5: Declaration of Jennifer T. Pena
Attachment 6: Declaration of Captain Justin Peters
Attachment 7: Declaration of Hillary Quam
Attachment 8: Declaration of Joseph L. Shelnutt
Attachment 9: Letter from Assistant Attorney General Todd Kim and U.S. Attorney Jaime Esparza to Governor Greg Abbott (July 20, 2023)
Attachment 10: Letter from Governor Greg Abbott to President Joseph R. Biden, Jr. (July 24, 2023)

# TABLE OF AUTHORITIES

**UNITED STATES CONSTITUTION**

Art. I, § 8 cl. 4 .................................................................................................................18

**CASES**

*Am. Ins. Ass'n v. Garamendi*,
    539 U.S. 396 (2003) ...................................................................................................18

*Arizona v. United States*,
    567 U.S. 387 (2012) ................................................................................................1, 18

*City of New York v. Golden Feather Smoke Shop, Inc.*,
    597 F.3d 115 (2d Cir. 2010) .....................................................................................12

*Nken v. Holder*,
    556 U.S. 418 (2009) ...................................................................................................16

*Sanitary Dist. of Chicago v. United States*,
    266 U.S. 405 (1924) ...............................................................................................1, 13

*TVA v. Hill*,
    437 U.S. 153 (1978) ...................................................................................................13

*United States v. Angell*,
    292 F.3d 333 (2d Cir. 2002) .....................................................................................10

*United States v. Boyden*,
    696 F.2d 685 (9th Cir. 1983) ....................................................................................11

*United States v. FDIC*,
    881 F.2d 207 (5th Cir. 1989) .................................................................................7, 12

*United States v. Hayes Int'l Corp.*,
    415 F.2d 1038 (5th Cir. 1969) ....................................................................................7

*United States v. Marine Shale Processors*,
    81 F.3d 1329 (5th Cir. 1996) ..........................................................................7, 12, 16

*United States v. Milner*,
    583 F.3d 1174 (9th Cir. 2009) ..................................................................................12

*United States v. Oak Beach Inn*,
    744 F. Supp. 439 (S.D.N.Y. 1990) ......................................................................11, 13

*United States v. Oakland Cannabis Buyers' Coop.*,
   532 U.S. 483 (2001)..................................................................................13, 18

*United States v. Raven*,
   500 F.2d 728 (5th Cir. 1974) ...............................................................12

*United States v. Republic Steel Corp.*,
   362 U.S. 482 (1960).............................................................................11

*United States v. Rio Grande Dam & Irrigation Co.*,
   174 U.S. 690 (1899).............................................................................11

*United States v. Stoeco Homes, Inc.*,
   498 F.2d 597 (3d Cir. 1974)................................................................13

*United States v. W. Indies Transp., Inc.*,
   127 F.3d 299 (3d Cir. 1997)................................................................10

*Weinberger v. Romero-Barcelo*,
   456 U.S. 305 (1982).............................................................................13

*Winter v. NRDC*,
   555 U.S. 7 (2008)...................................................................................7

*Wyandotte Transp. Co. v. United States*,
   389 U.S. 191, 201 (1967).................................................................2, 19

## STATUTES

33 U.S.C. § 403.................................................................................2, 9, 10, 11

33 U.S.C. § 406.............................................................................................2, 3

33 U.S.C. § 413.................................................................................................2

## CODE OF FEDERAL REGULATIONS

33 C.F.R. § 322.3(a)........................................................................................2

33 C.F.R. § 322.4.............................................................................................2

## DICTIONARY

William Dwight et al., eds., *Century Dictionary and Cyclopedia: A Work of Universal Reference in All Departments of Knowledge with a New Atlas of the World* (1899)...............................9, 10

## INTRODUCTION

This case involves a straightforward violation of the Rivers and Harbors Act ("RHA"). Defendants, Governor Greg Abbott and the State of Texas (collectively, "Texas"), have built a large floating barrier in the middle of an international boundary river, the Rio Grande, without federal authorization. The basic facts are clear, and no further inquiry is needed for this Court to grant the United States immediate injunctive relief in this enforcement action. But even if the United States had to show some irreparable injury beyond an RHA violation, the evidence submitted with this motion carries that burden. Irreparable harm to the United States—including to its critically important relations with Mexico—has already occurred and will only heighten if Texas builds more floating barriers in the Rio Grande (as Governor Abbott has suggested Texas may do) or if the current one is allowed to stand for any substantial period of time.

The Court need not inquire into the balance of the equities or the public interest, but those factors also favor an injunction. "This is not a controversy between equals. The United States is asserting its sovereign power to regulate commerce and to control the navigable waters within its jurisdiction." *Sanitary Dist. of Chicago v. United States*, 266 U.S. 405, 426 (1924) (Holmes, J.). In an RHA enforcement action, "[t]here is no question" that "the authority of the United States to remove obstructions to interstate and foreign commerce … is superior to that of the States" to implement policies they allege will "provide for the welfare or necessities of their inhabitants." *Id.* Governor Abbott's suggestion (Att. 10) that Texas can violate the RHA in service of its own policy priorities inverts the Supremacy Clause and controverts Supreme Court precedent recognizing the federal government's plenary power over immigration and foreign affairs. *See Arizona v. United States*, 567 U.S. 387 (2012).

1

The United States therefore moves the Court to enter a prohibitory injunction against construction of new floating barriers (or additions to the current one), as well as an affirmative injunction compelling Texas to remove the existing barrier within 10 days of the Court's order. *See* Proposed Order.

## BACKGROUND

### I.     The Rivers and Harbors Act of 1899

The RHA was enacted "to prevent obstructions in the Nation's waterways," and the Supreme Court has "consistently found its coverage to be broad." *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967). Section 10 of the RHA prohibits "creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States." 33 U.S.C. § 403. Section 10 independently prohibits "build[ing] or commenc[ing] the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States … except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army." *Id.* A Section 10 permit issued by the United States Army Corps of Engineers ("Corps") is required to build structures or perform work in or affecting such waters. 33 C.F.R. § 322.3(a); *see also id.* § 322.4 (listing narrow exceptions not relevant here).

Section 12 of the RHA provides that "the removal of any structures or parts of structures erected in violation of [Section 10, and other enumerated RHA provisions] may be enforced by the injunction of any district court exercising jurisdiction in any district in which such structures may exist, and proper proceedings to this end may be instituted under the direction of the Attorney General of the United States." 33 U.S.C. § 406; *see also id.* § 413.

## II.     Texas's Floating Barrier in the Rio Grande

The Rio Grande in the vicinity of Eagle Pass, Texas, is a navigable water of the United States within the meaning of RHA Section 10.  *See* Parker Decl. ¶ 6 & Ex. A.  Numerous federal agencies operate on the river and rely on the ability to freely navigate it.[1]  Border Patrol agents at times use small watercraft and shoreline-based devices or tactics, including specialized swift water techniques, to rescue individuals in distress from the Rio Grande.  Owens Decl. ¶ 4.  The Coast Guard may also be called upon to carry out search and rescue, marine environmental response, and law enforcement operations on the Rio Grande.  Peters Decl. ¶ 3.  And the United States Section of the International Boundary and Water Commission ("IBWC") conducts surveying and engineering work in the river, such as taking cross-sections of the riverbed and banks.  Gomez Decl. ¶ 15.

In early June, Governor Abbott announced Texas's intent, as part of a broader initiative called Operation Lone Star, to deploy "marine floating barriers" in the Rio Grande intended to "mak[e] it more difficult to cross the Rio Grande and reach the Texas side of the southern border."  Press Release, "Governor Abbott Signs Sweeping Package Of Border Security Legislation" (June 8, 2023), https://gov.texas.gov/news/post/governor-abbott-signs-sweeping-package-of-border-security-legislation.  The announcement indicated that the "first 1,000 feet" of floating barrier would be deployed near Eagle Pass, Texas.[2]  *Id.*

---

[1] Related litigation in this Court indicates that private parties also use this stretch of the Rio Grande for recreational boating.  *See* Notice of Removal, Ex. A ¶¶ 47-52, Ex. B ¶¶ 69-74, *Epi's Canoe & Kayak Team, LLC v. State of Texas*, No. 1:23-cv-00836 (W.D. Tex. July 21, 2023).

[2] Texas provided a high-level description of its planned buoy barrier system to the United States Section of the IBWC on June 12, 2023, including Texas's plan to deploy such barriers at three different locations.  Gomez Decl. ¶ 3.  Texas did not provide detailed project plans at this meeting, Gomez Decl. ¶ 8, and in any event did not share this information with the Corps.

On or before July 10, Texas began building a floating barrier system in the Rio Grande roughly two miles downstream of the International Bridge II in Eagle Pass (the "Floating Barrier"). *See* Garcia Decl. Ex. 1; Shelnutt Decl. ¶ 5; Gomez Decl. ¶ 4. Texas never sought authorization from the Corps or any federal agency to erect the Floating Barrier, and the Corps has not issued a Section 10 permit for it. Shelnutt Decl. ¶ 14. Photos of Texas's building activities from July 10 show excavators lifting buoy segments and placing them in the river. Garcia Decl. Ex. 1. The buoy segments appear to be anchored in the Rio Grande by large concrete blocks, with additional concrete blocks staged along the bank. *Id.*



*Fig. 1 – Garcia Decl. Ex. 1, full view and closeup of Floating Barrier components on July 10*

On July 13, representatives of the Corps and the IBWC visited the installation site and directly observed Texas building the Floating Barrier. Shelnutt Decl. ¶¶ 8, 10; Gomez Decl. ¶ 11. They observed personnel using boats and an excavator to place portions of the Floating Barrier system in the middle of the river. Gomez Decl. ¶ 11. The installed buoys appeared to be anchored in place in the river. Shelnutt Decl. ¶ 10. At the time of this visit, the Floating Barrier was estimated to be approximately 450 feet long. *Id.*

Photographic evidence depicts Texas's work on the Floating Barrier continuing through at least July 17, 2023. Garcia Decl. Ex. 2. On that date, boats and two excavators continued to

work on the Floating Barrier, with one excavator carrying what appears to be a large concrete block in the Rio Grande. These photographs show that the Floating Barrier is an uninterrupted chain of large, tightly spaced buoys running longitudinally down the Rio Grande. They also show large concrete anchoring structures at intervals along both sides of the Floating Barrier.



*Fig. 2 – Garcia Decl. Ex. 2, full view and closeup of July 17 construction activities*



*Fig. 3 – Garcia Decl. Ex. 2, full view and closeup of Floating Barrier on July 17*

Texas's construction of the Floating Barrier has already substantially harmed the United States' foreign relations with Mexico. Quam Decl. ¶¶ 3, 13. On numerous occasions since late June, the Government of Mexico has lodged protests with the United States, including at the highest diplomatic levels, regarding Texas's deployment of the Floating Barrier. *Id.* ¶¶ 8, 11. Mexico has asserted that the Floating Barrier violates various international treaties. *Id.* ¶ 9.

Mexico has raised humanitarian concerns regarding the prospect that the Floating Barrier could cause injury or death to persons swimming in the Rio Grande, which (in addition to loss of life) could prompt a significant international incident. *Id.* ¶ 10. Deployment of the Floating Barrier is a source of diplomatic concern, and its continued presence is adversely affecting foreign policy. *Id.* ¶¶ 3, 11. In addition to these impacts on U.S. foreign relations, Texas's actions also have disrupted the day-to-day bilateral efforts between the United States and Mexican Sections of the IBWC. For example, in 2020, the United States and Mexico committed to seek agreement by December 2023 on a new mechanism to improve the predictability and reliability of Rio Grande water delivery from Mexico to the United States. Pena Decl. ¶ 25. Citing Texas's actions, however, Mexico recently cancelled a meeting related to this topic and stated that it may need to rethink and limit its cooperation with the United States going forward. *Id.* ¶ 17.

The Floating Barrier also poses threats to navigability and public safety on the river. As Texas intended, the placement and configuration of the structure impedes cross-river navigation. Shelnutt Decl. ¶ 15. Because Texas failed to submit project plans or specifications to the Corps, the Corps has been unable to conduct a complete evaluation of the Floating Barrier's impacts on safety and navigability. *Id.* ¶ 14. But it is clear that any vessel at this location would be forced to maneuver around the Floating Barrier to avoid collision or entanglement. *Id.* ¶ 15. Further, the Corps has been unable to determine whether the Floating Barrier will remain secured during predicted high river flows. *Id.* ¶ 16. If all or part of the Floating Barrier were to be unmoored, it would present additional safety and navigation risks. *Id.*

Further, the Floating Barrier interferes with the federal government's ability to carry out its operations on the Rio Grande. For example, obstructions in the water impair the freedom of movement of Border Patrol personnel conducting rescue operations and potentially delay their

response times.  Owens Decl. ¶ 4.  These rescue situations can be very hazardous for Border

Patrol personnel, as well as for the individuals in distress.  *Id.* ¶ 5; *see also id.* ¶ 6 (discussing

water-related rescues and deaths in Eagle Pass Station area of responsibility).  The Floating

Barrier also impedes the IBWC's ability to independently cross the Rio Grande when carrying

out its surveys and other engineering work.  Gomez Decl. ¶¶ 15-16.

       The United States alerted Texas on July 20 that the Floating Barrier violates Section 10

of the RHA and invited the State to avoid litigation by committing to expeditiously remove it.

*See* Att. 9.  On July 24, Governor Abbott responded with an open letter to President Biden that

acknowledges "the floating marine barriers we have deployed in the Rio Grande River in Eagle

Pass."  *See* Att. 10.  But the Governor summarily denied that Texas had violated Section 10 and

alluded to possible constitutional defenses.  *Id.* at 1.  The United States filed suit later that day.

**STANDARD FOR DECISION**

       Ordinarily, a plaintiff seeking a preliminary injunction must establish that: (1) it is likely

to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary

relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest.

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  But in this RHA enforcement suit,

the United States, "to whom the enforcement of the [public] right has been entrusted," *United

States v. Hayes Int'l Corp.*, 415 F.2d 1038, 1045 (5th Cir. 1969), need not establish irreparable

injury beyond a likely violation of Section 10.  As discussed below in Argument II, the Court

may issue a preliminary injunction "without making findings of irreparable harm, inadequacy of

legal remedy, or the balance of convenience."  *United States v. Marine Shale Processors*, 81

F.3d 1329, 1359 (5th Cir. 1996); *see also United States v. FDIC*, 881 F.2d 207, 210 (5th Cir.

7

1989) (where statute "by necessary and inescapable inference requires injunctive relief," the United States "is not required to prove the injury and public interest factors").

## ARGUMENT

The United States is entitled to a preliminary injunction that directs Texas to remove the Floating Barrier and related structures from the Rio Grande and prohibits Texas from building additional structures or obstructions in the river without federal authorization. The United States is likely to succeed on the merits of its RHA claim because Texas built an unauthorized structure in a navigable water of the United States that is obstructing the Rio Grande's navigable capacity in violation of Section 10. Preliminary relief should be awarded on that basis alone. But, to the extent this Court considers irreparable injury, the balance of equities, and public interest, each of those factors favors the United States. The Floating Barrier is already causing substantial and ongoing harm to the United States' conduct of foreign relations, poses an imminent risk to public safety and navigation, and interferes with the operations of federal agency officials in the river. Those harms outweigh any harm a preliminary injunction might cause Texas.[3]

### I. The United States Will Likely Succeed on the Merits of Its Claim That Texas Has Violated Section 10 of the Rivers and Harbors Act.

The RHA bars building structures in, and obstructing the navigable capacity of, navigable waters of the United States. Commission of *either* of these acts gives rise to liability under RHA Section 10. Texas's own admissions, coupled with other easily demonstrable facts, establish that *both* grounds exist for finding Texas in violation of the Act.

---

[3] The United States reserves the right to seek a more expedited disposition of this motion, and/or a temporary restraining order, if and when the facts may so warrant.

**A. Texas Built an Unpermitted Structure in Navigable Waters of the United States.**

To establish a violation of Section 10's second clause, the United States must show that Texas (1) built or commenced the building (2) "of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structure[]" (3) in navigable waters (4) outside established harbor lines or where no harbor lines have been established (5) without the Corps' permission. 33 U.S.C. § 403 (quoted in full, *supra* at 2). The first, third, fourth, and fifth liability elements are beyond dispute. In his July 24 letter, Governor Abbott openly admitted that Texas built the Floating Barrier. Att. 10 (acknowledging "the floating marine barriers we have deployed in the Rio Grande River in Eagle Pass"). This stretch of the Rio Grande is a navigable water of the United States. Parker Decl. ¶ 6 & Ex. A. No harbor lines have been established. Shelnutt Decl. ¶ 4. And Texas built the Floating Barrier without the Corps' permission. *See id.* ¶¶ 5-6, 13-14.

The remaining liability element also is met. The Floating Barrier is either a "boom" or an "other structure" within the meaning of Section 10. A "boom" is any floating barrier that arrests movement across a waterway. At the time of enactment (and today), the term included, for example, "[a] strong barrier, as of beams, or an iron chain or cable fastened to spars, extended across a river or the mouth of a harbor, to prevent an enemy's ships from passing," as well as "[a] chain of floating logs fastened together at the ends and stretched across a river, etc., to stop floating timber." William Dwight et al., eds., *Century Dictionary and Cyclopedia: A Work of Universal Reference in All Departments of Knowledge with a New Atlas of the World*, at 626 (1899). As observed by a Corps representative before the completion of installation, and reflected by photographic evidence, the Floating Barrier is a string of connected buoys that runs hundreds of feet down the river. Shelnutt Decl. ¶ 10. Subsequent photos indicate that the Floating Barrier likely has reached the 1,000-foot length Texas anticipated prior to construction. *See* Garcia Decl. Ex. 2; *compare with* Compl. ¶ 19 (Governor Abbott's announcement of the

project) *and* Gomez Decl. ¶¶ 3-6 (statements of Texas Department of Public Safety at a June 2023 meeting). Texas principally intended the Floating Barrier to arrest the movement of persons crossing the river, as opposed to movement of ships or timber. But the barrier is nonetheless a "boom."

Even if the Floating Barrier were not a "boom," it undoubtedly fits within Section 10's catchall term, "other structures." A "structure" is a "an edifice or a building of any kind; in the widest sense, any production or piece of work artificially built up, or composed of parts joined together in some definite manner." Dwight, at 6001, *supra*. The Floating Barrier, constructed over a period of days using heavy construction equipment, and consisting of hundreds of yards of connected buoys anchored in place by large concrete blocks on the riverbed, readily meets even the narrowest conception of a "structure." Courts consistently find comparable installations to be "other structures" within the meaning of Section 10. *See, e.g.*, *United States v. Angell*, 292 F.3d 333, 337 (2d Cir. 2002) (floating docks); *United States v. W. Indies Transp., Inc*., 127 F.3d 299, 310 (3d Cir. 1997) (barges strung together and attached to land with rope and wire cable to form a permanent dock).

The United States is thus likely to succeed in showing that Texas violated, and remains in violation of, the second clause of Section 10.

**B. Texas Created an Unauthorized Obstruction to the River's Navigable Capacity.**

Section 10's first clause bars the "creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States." 33 U.S.C. § 403. As with the elements of Texas's liability under Section 10's second clause, most elements of Texas's liability under Section 10's first clause are incontestable. Texas admits deploying the Floating Barrier; it had no federal authorization; and this portion of the Rio Grande is a navigable water of the United States. *See supra* at 9.

The only remaining liability question is whether the Floating Barrier "obstruct[s] … the navigable capacity" of the Rio Grande.  33 U.S.C. § 403.  Because Section 10's first clause does not prohibit "any obstruction *to the navigation*, but any obstruction to the *navigable capacity*," *United States v. Rio Grande Dam & Irrigation Co*., 174 U.S. 690, 708 (1899) (emphasis added), the United States need not prove that the Floating Barrier wholly impedes navigation, but merely that it "interfere[s] with or diminish[es]" the Rio Grande's *capacity* to be navigated.  *Id.* at 709.  "'[O]bstruction' as used in § 10 is broad enough to include diminution of the navigable capacity of a waterway by means not included in the second or third clauses [of that section]"—e.g., by clogging a channel with deposits of inorganic solids.  *United States v. Republic Steel Corp.*, 362 U.S. 482, 489 (1960).[4]

The Floating Barrier manifestly interferes with or diminishes the Rio Grande's navigable capacity, owing to its sheer dimensions—approximately 1,000 feet of linked buoys that each are at least four feet in diameter, *see* Gomez Decl. ¶ 6; Shelnutt Decl. ¶ 10—and its placement in the middle of the river.  *See* Pena Decl. ¶ 16 (Texas's construction crew used heavy equipment "to assemble, drag and anchor the buoys within the Rio Grande channel").  "The placement and tandem configuration of the buoys present a structural barrier to cross-river navigation and would force a vessel to maneuver around the structure to avoid collision or entanglement at this location."  Shelnutt Decl. ¶ 15.  Additionally, "because no information was submitted for project evaluation and potential permitting, it is unknown if the structure meets engineering standards to withstand predicted high flows," which makes its stability uncertain, further lessening the river's

---

[4] Notably, several courts have held that a qualifying "structure" under Section 10's second clause presumptively also constitutes an "obstruction" under Section 10's first clause.  *See, e.g.*, *United States v. Boyden*, 696 F.2d 685, 687 (9th Cir. 1983); *United States v. Oak Beach Inn Corp.*, 744 F. Supp. 439, 443 (S.D.N.Y. 1990).

navigable capacity. *Id.* ¶ 16. It is inconceivable that the Floating Barrier does *not* create an obstacle for anyone seeking to navigate across this part of the river—that is, after all, precisely what Texas intended.[5] Indeed, the Fifth Circuit has affirmed not merely civil, but *criminal*, RHA liability for construction of far lesser obstacles to a water's navigable capacity. *United States v. Raven*, 500 F.2d 728, 731 (5th Cir. 1974) (affirming conviction for obstructing a waterway with an 83-foot sunken schooner).

For all the above reasons, the United States will likely succeed on the merits in showing that Texas violated, and continues to violate, Section 10 of the RHA.

## II. The United States' Likelihood of Success on the Merits Alone Warrants Preliminary Injunctive Relief.

Where, as here, the United States seeks an injunction enforcing a public-interest statute, the "extraordinary weight courts of equity place upon the public interests in a suit involving more than a mere private dispute," *Marine Shale Processors*, 81 F.3d at 1359, justifies a court in granting a preliminary injunction based solely on the United States' likelihood of success on the merits, *see id.* at 1358. *See also FDIC*, 881 F.2d at 210; *City of New York v. Golden Feather Smoke Shop, Inc.*, 597 F.3d 115, 120-21 (2d Cir. 2010). Numerous courts have concluded this rule applies to RHA Section 10 in particular.[6] *See United States v. Milner*, 583 F.3d 1174, 1193-94 (9th Cir. 2009) (explaining that "[n]o balancing of interest or need to show irreparable injury

---

[5] *See* Press Release, "Operation Lone Star Boosts Border Response With New Marine Barriers" (July 14, 2023) (the Floating Barrier will "prevent people from even crossing the middle part of the Rio Grande River and coming into the State of Texas"), https://gov.texas.gov/news/post/operation-lone-star-boosts-border-response-with-new-marine-barriers.

[6] The Fifth Circuit has not squarely addressed the question whether the United States must meet traditional equitable criteria to obtain a preliminary injunction to restrain a Section 10 violation. But the Fifth Circuit has not insisted that the United States meet those criteria in other contexts where the defendant's violation of law imposed "a risk of danger to the public." *Marine Shale Processors*, 81 F.3d at 1359.

is required when an injunction is sought under [RHA] § 12 to prevent erection or seek removal of an unlawful structure") (cleaned up); *United States v. Stoeco Homes, Inc.*, 498 F.2d 597, 611 (3d Cir. 1974) (same); *Oak Beach Inn Corp.*, 744 F. Supp. at 446-47 (holding that because plaintiff had demonstrated a likelihood of success on the merits of RHA Section 10 claim, "no further showing is required for a grant of preliminary relief"); *cf. Sanitary Dist.*, 266 U.S. at 432 ("[W]e are not at liberty to consider [alleged harms to a defendant liable under RHA Section 10] as against the edict of a paramount power.").

Once a plaintiff satisfies the criteria for injunctive relief, where a public-interest statute is at issue the ordered relief must enforce the statute that Congress enacted, and the Court's traditional equitable discretion is narrowed to evaluating how equitable considerations "are affected by the selection of an injunction over other enforcement mechanisms" authorized by statute. *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 498 (2001); *see id.* at 497 (holding courts' equitable discretion cannot "override Congress' policy choice, articulated in a statute, as to what behavior should be prohibited"). The Court's choice "is simply whether a particular means of enforcing the statute should be chosen over another permissible means," and "not whether enforcement is preferable to no enforcement at all." *Id.* at 497-98; *cf. Weinberger v. Romero-Barcelo*, 456 U.S. 305, 314 (1982) (explaining that district court in *TVA v. Hill*, 437 U.S. 153 (1978), lacked discretion to withhold injunction where "only an injunction could vindicate the objectives of the Act"). Here, because preliminary injunctive relief is the only viable mechanism for remedying Texas's statutory violation, such relief should be awarded.

## III. To the Extent Relevant, the Traditional Equitable Considerations Supporting Preliminary Injunctive Relief Are Satisfied.

Even if the Court weighs the traditional equitable factors in considering whether to issue a preliminary injunction, the United States is entitled to that relief.

13

**A. A Preliminary Injunction Is Necessary to Prevent Irreparable Harm to Foreign Relations, Public Safety, and Navigation.**

Irreparable harm to the United States is presumed based on a violation of Section 10 of the RHA. *See supra* at 7. In any event, the evidence establishes that a preliminary injunction is needed to prevent immediate harm to the United States that cannot be remedied by a permanent injunction entered after disposition on the merits.

Texas's deployment of the Floating Barrier has caused significant and ongoing harm to the United States' foreign relations with Mexico. Quam Decl. ¶ 13. Mexico has "raised its concerns at the highest diplomatic levels" regarding Texas's deployment of the Floating Barrier. *Id.* ¶¶ 8, 11. Mexico has specifically asserted that Texas's actions contravene various treaty obligations and has raised humanitarian concerns regarding possible loss of life to persons swimming in the Rio Grande. *Id.* ¶¶ 9-10. Any such loss of life could "quickly give rise to a significant international incident." *Id.* ¶ 10. The United States' ability to successfully pursue its foreign policy goals with Mexico "depends largely on maintenance of a cooperative bilateral relationship based on mutual respect for each other's sovereignty." *Id.* ¶ 12. The continued presence of the Floating Barrier is harming that relationship at a time when the United States and Mexico are engaged in "ongoing dialogues at senior political levels" to address important issues such as: strengthening supply chains; promoting sustainable economic and social development; countering the trafficking of fentanyl, other synthetic drugs, and firearms; and implementing humane migration management and border infrastructure. *Id.* ¶¶ 5-6. Allowing the Floating Barrier to remain in place while the parties litigate this case would further compound this harm. *Id.* ¶ 13.

In addition to these high-level foreign policy concerns, Texas's actions have disrupted the day-to-day cooperative efforts of the IBWC's United States and Mexico Sections on issues of

vital importance, such as management of water deliveries on the Rio Grande.  Pena Decl. ¶ 25.
Texas's actions have spurred the Mexican Section of the IBWC to cancel a meeting and to
reconsider its cooperation with the United States at a sensitive stage in discussions on a new
agreement governing water delivery from Mexico to the United States.  *Id.* ¶¶ 17, 18, 25.

The Floating Barrier also causes imminent irreparable harm because it obstructs lateral
navigation across the Rio Grande for hundreds of yards along the river's length.  Shelnutt Decl.
¶ 15; Gomez Decl. ¶ 6.  This obstruction poses risks to health and public safety.  By design and
by Texas's own admission, *supra* at 12 n.5, the Floating Barrier impedes passage from one side
of the river to the other, forcing vessels to maneuver around it to avoid collision or entanglement.
Shelnutt Decl. ¶ 15.  The Floating Barrier appears to be anchored by a series of large concrete
blocks extending laterally to either side of the buoys, which could also present risks to navigation
and public safety.  *See id.* ¶ 10; Garcia Decl. Exs. 1, 2.  Further, if the Floating Barrier is unable
to withstand predicted high flows and becomes unmoored, it would present additional safety and
navigation risks.  Shelnutt Decl. ¶ 16.  Notably, these impacts to safety and navigability threaten
the missions of several federal agencies that conduct operations in and around the Rio Grande.
*Supra* at 2-3, 6-7.  No relief granted at the end of this case would make up for the continuing
threat to navigation and public safety that the Floating Barrier will impose while the parties
litigate the merits.

There is also a reasonable likelihood that Texas will inflict additional irreparable harms
on the United States absent a preliminary injunction.  With respect to the Floating Barrier that
has already been installed, Texas has informed the IBWC that it may also install netting below
the existing barrier system, which could impose environmental impacts as well as increasing the
risks to public safety and navigability.  Gomez Decl. ¶ 7 & Ex. A.

15

More broadly, in its June 8 press conference, Texas stated its intent to deploy floating barriers in *multiple* portions of the Rio Grande. *Supra* at 3. Texas representatives also told the United States Section of the IBWC on June 12 that Texas intends to install floating barriers in "3 different locations," of which the location of the Floating Barrier is only one. Gomez Decl. ¶¶ 3-4. Texas already has funding and a designated contractor for these projects. *Id.* ¶ 6 & Ex. A. Moreover, it is reasonably likely that Texas will not seek federal authorization for these projects under RHA Section 10. Indeed, in discussing the overall initiative known as "Operation Lone Star" that the Floating Barrier is a part of, Governor Abbott avowed that "[w]e aren't asking for permission."[7] A preliminary injunction is necessary to prevent Texas from inflicting further irreparable harm by again circumventing the RHA, especially since "a court need not balance the hardship when a defendant's conduct has been willful." *Marine Shale Processors*, 81 F.3d at 1358.

**B. The Equities and Public Interest Strongly Favor Preliminary Injunctive Relief.**

Where the United States is a party, the third and fourth elements of the traditional preliminary injunction analysis—harm to the opposing party and the public interest—merge and essentially require the Court to balance the equities of the case. *Cf. Nken v. Holder*, 556 U.S. 418 (2009); *but see supra* Part II (explaining why such a balancing is not required here). The equities in these circumstances strongly favor an injunction.

The significant risk of further irreparable injury posed by Texas's actions outweighs any harm a preliminary injunction might cause Texas. The United States seeks two forms of relief in this motion. First, the United States seeks a prohibitory injunction that would prevent Texas from building or installing additional structures or obstructions in the Rio Grande (or adding to

---

[7] *See* https://twitter.com/GregAbbott_TX/status/1638306917939380224?t=BB0rNKcTgwy Dn0j8qRiQKQ&s=19.

the Floating Barrier itself) without obtaining any authorization required under the RHA while this case proceeds. This limited relief would merely preserve the status quo by preventing further violations of the law and, notably, would not prevent Texas from applying for any authorizations required for such floating barriers under the RHA and other applicable law.[8]

Second, the United States seeks a mandatory injunction requiring Texas to remove the currently installed Floating Barrier, including any supporting infrastructure used to anchor the Floating Barrier, from the Rio Grande. The only harm to Texas from this requested relief would be the cost of personnel and equipment necessary to remove and transport the Floating Barrier and associated infrastructure.

The cost to Texas of removing its unauthorized barrier pales in comparison to the harms that the United States is suffering and will continue to suffer if the Court does not issue the requested preliminary injunction. So long as the Floating Barrier remains in the Rio Grande, it will continue to disrupt the United States' conduct of foreign relations with Mexico, obstruct navigation on the river, present health and public safety risks, and interfere with federal agencies' ability to execute their missions on the river. *Supra* at 14-15. The harm to the United States' foreign relations, in particular, will increase the longer the Floating Barrier remains in place on the Rio Grande. Quam Decl. ¶ 13. Texas's expansion of the Floating Barrier, or installation of additional floating barriers, would only compound these harms.

Texas may argue that an injunction requiring it to remove the Floating Barrier would harm what it describes as the State's "sovereign interest in protecting [its] borders." *See* Att. 10 at 1 (quoting *Arizona*, 567 U.S. at 419 (Scalia, J., concurring in part and dissenting in part)). But

---

[8] The United States makes no representation here regarding what action the Corps or any other federal agency would ultimately take on a hypothetical permit application from Texas.

Texas's desire to pursue its own preferred strategy for deterring migration is insufficient to outweigh the United States' harms here—let alone to override the balance of priorities that Congress struck in Section 10 of the RHA.  Texas has no authority to pursue policies regulating immigration or the international border that are preempted by federal law.  The power to conduct foreign relations, including on the subject of immigration, lies solely with the federal government.  *See* Art. I, § 8 cl. 4 (authorizing federal government to "establish an uniform Rule of Naturalization"); *Arizona*, 567 U.S. at 394 (recognizing federal government's "broad, undoubted power over the subject of immigration" preempts state law on same subject); *Am. Ins. Ass'n*, 539 U.S. at 413 ("There is, of course, no question that at some point an exercise of state power that touches on foreign relations must yield to the National Government's policy, given the concern for uniformity in this country's dealings with foreign nations that animated the Constitution's allocation of the foreign relations power to the National Government in the first place.") (cleaned up).  States "may have understandable frustrations with the problems caused by illegal immigration," but they "may not pursue policies that undermine federal law."  *Arizona*, 567 U.S. at 416; *see also id.* at 422 (Scalia, J., concurring in part and dissenting in part) ("I accept as a given that state regulation [of immigration] is excluded by the Constitution when … it has been prohibited by a valid federal law.").  Texas may not rely on an interest in implementing its own border control policies to "undermine federal law" by thwarting enforcement of the RHA.

Finally, issuing the requested preliminary injunction would serve the public interest.  The public has a compelling interest in the enforcement of federal law, which Texas has violated.  In enacting Section 10, Congress has already "decided the order of priorities" between the United States' interests and those of Texas.  *Oakland Cannabis Buyers' Coop.*, 532 U.S. at 497.  The

harms that Texas's Floating Barrier causes to the United States and the public underscore why Congress struck this balance. The public has a strong interest in waterways that are clear of potentially life-threatening hazards, both for its own use and for use by government agencies that must navigate those waterways to carry out their official duties. And as to the Floating Barrier's impacts on foreign relations, the public certainly has an interest in maintaining "one of the most important, dynamic, and economically impactful partnerships in the world," which is vital to pursuit of the United States' "extensive, multi-faceted agenda to address with Mexico." Quam Decl. ¶¶ 4, 12.

The United States has demonstrated a substantial likelihood of prevailing on the merits—that is, that Texas violated and continues to violate RHA Section 10, which Congress enacted to protect both navigation and safety in waters of the United States. *See Wyandotte Transp. Co.*, 389 U.S. at 201. Restraining Texas from compounding the threat of irreparable harm, and requiring it to abate the existing irreparable harm, is in the public interest.

## CONCLUSION

For the foregoing reasons, the Court should grant the United States' motion for a preliminary injunction and enter the attached proposed order.

Respectfully submitted,

Dated:  July 26, 2023

JAIME ESPARZA                                    TODD KIM
UNITED STATES ATTORNEY               ASSISTANT ATTORNEY GENERAL
                                                            Environment & Natural Resources Division


 */s/ James E. Dingivan*                          */s/ Brian H. Lynk*
JAMES E. DINGIVAN                           BRIAN H. LYNK
   Assistant United States Attorney            Senior Trial Counsel
   Texas Bar No. 24094139                       DC Bar No. 459525
United States Attorney's Office              ANDREW D. KNUDSEN
Western District of Texas                        Trial Attorney
601 N.W. Loop 410, Ste 600                    DC Bar No. 1019697
San Antonio, TX 78216                         U.S. Department of Justice
(210) 384-7372 (tel.)                             Environmental Defense Section
(210) 384-7312 (fax)                             P.O. Box 7611
James.dingivan@usdoj.gov                   Washington, DC 20044
                                                            (202) 514-6187 (Lynk)
                                                            (202) 353-7466 (Knudsen)
                                                            (202) 514-8865 (fax)
                                                            Brian.lynk@usdoj.gov
                                                            Andrew.knudsen@usdoj.gov

                                                            *Counsel for the United States of America*

**CERTIFICATE OF CONFERENCE**

I certify that I conferred via email with counsel for Defendants regarding the relief requested in this motion.  Counsel for Defendants stated that they oppose the motion for a preliminary injunction and the requested relief.

*/s/  Brian Lynk*
Brian Lynk

**CERTIFICATE OF SERVICE**

I certify that on July 26, 2023, a copy of this filing was emailed to counsel for Defendants: Leif Olson, Benjamin Wilson, David Bryan, Munera Al-Fuhaid, and Ryan Walters.

*/s/  Brian Lynk*
Brian Lynk

**EXHIBIT F: BRIEF AMCIUS CURIAE OF REPS. ARRINGTON ET AL. IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

UNITED STATES OF AMERICA,
   *Plaintiff,*

v.

GREG ABBOTT, in his capacity as
GOVERNOR OF THE STATE OF TEXAS,
and THE STATE OF TEXAS,
   *Defendants.*

Case No. 1:23-CV-00853-DII

## BRIEF OF UNITED STATES REPRESENTATIVES JODEY C. ARRINGTON, ET AL AS AMICI CURIAE IN OPPOSITION TO PLAINTIFF UNITED STATES' OPPOSED MOTION FOR PRELIMINARY INJUNCTION

ROBERT HENNEKE
rhenneke@texaspolicy.com
CHANCE WELDON
cweldon@texaspolicy.com
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701
Telephone: (512) 472-2700
Facsimile: (512) 472-2728

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... iii

INTEREST OF AMICUS CURIAE ............................................................................ v

INTRODUCTION ..................................................................................................... 1

ARGUMENT ............................................................................................................. 3

I.    TO ESTABLISH JURISDICTION UNDER THE RIVERS AND
HARBORS ACT, THE GOVERNMENT MUST SHOW THAT
THE WATERS IT SEEKS TO REGULATE ARE NAVIGABLE ...................... 3

II.   THE FEDERAL GOVERNMENT'S POSITION THAT A RIVER
REMAINS NAVIGABLE FOR JURISDICTIONAL PURPOSES
IF IT HAS EVER BEEN NAVIGABLE IN THE PAST, IGNORES
THE TEXT OF THE STATUTE AND WOULD LEAD TO
ABSURD RESULTS ......................................................................................... 6

CONCLUSION ......................................................................................................... 10

CERTIFICATE OF SERVICE ................................................................................ 11

# TABLE OF AUTHORITIES

*Cases:*

*Alabama v. North Carolina,*
   560 U.S. 330 (2010) .......................................................................... 9

*Bond v. United States,*
   572 U.S. 844 (2014) .......................................................................... 3

*Daniel Ball,*
   77 U.S. (10 Wall.) 557 (1870) ........................................................... 4

*Econ. Light & Power Co. v. United States,*
   256 U.S. 113 (1921) .................................................................... 5, 8, 9

*Leovy v. United States,*
   177 U.S. 621 (1900) ................................................................... 3, 4 5

*Sackett v. EPA,*
   143 S. Ct. 1322 (2023) ...................................................................... 5

*Solid Waste Agency v. United States Army Corps of Eng'rs,*
   531 U.S. 159 (2001) ......................................................................... 10

*Terkel v. CDC,*
   521 F. Supp. 3d 662 (E.D. Tex. 2021) .............................................. 3

*United States v. Appalachian Elec. Power Co.,*
   311 U.S. 377 (1940) ....................................................................... 5, 6

*United States v. Bass,*
   404 U.S. 336 (1971) .......................................................................... 3

*United States v. Lopez,*
   514 U.S. 549 (1995) .......................................................................... 3

*United States v. Morrison,*
   529 U.S. 598 (2000) .......................................................................... 6

*United States v. Rio Grande Dam & Irrigation Co.,*
   174 U.S. 690 (1899) ....................................................................... 2, 6

*United States v. Rio Grande Dam & Irrigation Co.,*
 10 N.M. 617 (1900) ............................................................................... 6

*United States v. Rio Grande Dam & Irrigation Co.,*
 184 U.S. 416 (1902) ............................................................................... 6


***Statutes:***

33 U.S.C.S § 403 ..................................................................................... 4


***Other Authorities:***

C. Reid Ferring, The Geology of Texas 4 (2007) (available at:
 https://custom.cengage.com/regional_geology.bak/data/Texas.pdf) ................. 9

Dylan Baddour, *Big Shock in Big Bed,* Texas Observer, (June 29, 2022),
 https://www.texasobserver.org/big-bend-rio-grande-dry-water/ .................. 2, 8

Leon C. Metz, Rio Grande, Handbook of Texas Online, (1952)
 https://www.tshaonline.org/handbook/entries/rio-grande ............................ 2, 7

**INTEREST OF AMICUS CURIAE**

This case turns on the proper interpretation and application of the Rivers and Harbors Act. Amici are members of the United States Congress, represented by the Texas Public Policy Foundation.

- Representative Jodey C. Arrington represents the 19th Congressional District of Texas.

- Representative Brian Babin, D.D.S. represents the 36th Congressional District of Texas.

- Representative Andy Biggs represents the 5th Congressional District of Arizona.

- Representative Vern Buchanan represents the 16th Congressional District of Florida.

- Representative Michael C. Burgess, M.D. represents the 26th Congressional District of Texas.

- Representative Kat Cammack represents the 3rd Congressional District of Florida.

- Representative John Carter represents the 31st Congressional District of Texas.

- Representative Michael Cloud represents the 27th Congressional District of Texas.

- Representative Jeff Duncan represents the 3rd Congressional District of South Carolina.

- Representative Jake Ellzey represents the 6th Congressional District of Texas.

- Representative Lance Gooden represents the 5th Congressional District of Texas.

- Representative Sam Graves represents the 6th Congressional District of Missouri.

- Representative Clay Higgins represents the 3rd Congressional District of Louisiana.
- Representative Ronny L. Jackson represents the 13th Congressional District of Texas.
- Representative Nathaniel Moran represents the 1st Congressional District of Texas.
- Representative August Pfluger represents the 11th Congressional District of Texas.
- Representative David Rouzer represents the 7th Congressional District of North Carolina.
- Representative Chip Roy represents the 21st Congressional District of Texas.
- Representative Keith Self represents the 3rd Congressional District of Texas.
- Representative Pete Sessions represents the 17th Congressional District of Texas.
- Representative Beth Van Duyne represents the 24th Congressional District of Texas.
- Representative Roger Williams represents the 25th Congressional District of Texas.

As members of Congress, Amici have a strong interest in ensuring that federal administrative agencies are bound by the text of Congressional statutes. This is particularly important when, as here, the statute at issue contains a jurisdictional element tying federal authority to Congressional power under the Commerce Clause.

Moreover, Amici represent constituents who live and work adjacent to rivers and streams. These ordinary Americans are also subject to Rivers and Harbors Act—a statute with both civil and criminal penalties. Amici therefore have a strong interest in ensuring that federal agencies do not adopt an over-broad reading of the statute.

# INTRODUCTION

In July of 2023, Texas placed a series of buoys in the Rio Grande River to encourage migrants to cross the border at points of entry rather than crossing the river illegally. The United States Department of Justice responded with this lawsuit, alleging that those buoys were un-permitted obstructions to navigable waters in violation of the Rivers and Harbors Act ("the Act") and must be removed. Given the political importance of issues along the border, both the buoys and the federal lawsuit set off a political firestorm, with both sides making policy arguments about the appropriate response.

Amici do not engage in that policy debate here. Nor do Amici take a position on whether, in fact, the placement of buoys in this particular location violates the Act. Rather, Amici write separately to address important questions about the test that courts should apply when establishing federal jurisdiction under the Act—a statute which can be applied against ordinary Americans in less politically charged contexts.

The Act grants federal agencies authority to police obstructions to the navigability of the "waters of the United States." The term "waters of the United States" was not chosen by accident. At the time the Act was adopted, that legal term of art was understood to limit federal authority to only those navigable waters it would have authority to regulate under the Commerce Clause.

When a statute contains this kind of "jurisdictional element," the burden falls to the federal agency asserting jurisdiction to establish that element has been satisfied. In the present case, that means the agency asserting jurisdiction must provide evidence that the waters it seeks to regulate are "navigable."

Unfortunately, at this early stage of litigation, the federal government has made no serious attempt to do so. Instead, the government points to a 1984 letter (which itself seems to rely on 1947 Coast Guard finding) holding the entirety of the Rio Grande River in Texas is navigable. ECF No. 5, p 13 (citing ECF No. 5-4.) The

government claims that this decades-old information is sufficient, because once a river is deemed navigable, it is allegedly always navigable as a matter of law.  ECF 5-4, p. 6.

But it is not clear that the 1947 Coast Guard finding was accurate when it was written.  See *United States v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690, 699 (1899) (finding that stretches of the Rio Grande in New Mexico are not navigable waters.); see also Leon C. Metz, Rio Grande, Handbook of Texas Online, (1952) https://www.tshaonline.org/handbook/entries/rio-grande (last updated June 13, 2020) (noting that "The Rio Grande has never been navigable except near its mouth and, on rare occasions, to Laredo.").  More importantly, a 1947 observation cannot be the perpetual metric for federal jurisdiction over rivers in Texas.  As any Texan knows, rivers change.  Indeed, hundreds of miles of the Rio Grande that were deemed navigable in the 1947 Coast Guard finding relied on by the government are now dry. Dylan Baddour, *Big Shock in Big Bend*, Texas Observer, (June 29, 2022), https://www.texasobserver.org/big-bend-rio-grande-dry-water/.  The government's "once navigable, always navigable" approach would therefore allow federal agencies to assert perpetual jurisdiction over dry ditches and trickling streams that are well-removed from any actually navigable waters.  Such an approach cannot be justified under a statute that limits agency authority to regulating navigability.

To be clear, amici take no position on whether the stretch of river at issue in this case is currently navigable.  But the test this Court puts forward for establishing federal authority under the Act will apply outside of the narrow confines of this case. Given this broad scope, it is not too much to ask that a federal agency asserting jurisdiction show its work by providing *some* current evidence as to navigability.  To hold otherwise, would allow the agency to rewrite the statute and potentially violate the Constitution.

## ARGUMENT

**I. TO ESTABLISH JURISDICTION UNDER THE RIVERS AND HARBORS ACT, THE GOVERNMENT MUST SHOW THAT THE WATERS IT SEEKS TO REGULATE ARE NAVIGABLE**

At bottom, this case is about federal authority under the Commerce Clause. When discussing the commerce power, "[w]e start with first principles." *United States v. Lopez*, 514 U.S. 549, 552 (1995). The federal government is one of limited and enumerated powers. *Id.* Unlike the states, which have general police powers, the federal government must point to an explicit grant of authority from the Constitution when it chooses to regulate. *Bond v. United States*, 572 U.S. 844, 854 (2014). The Ratifiers of the Constitution believed this limitation on federal power was necessary to "ensure protection of our fundamental liberties." *Lopez*, 514 U.S. at 552.

To meet this burden, Congress often places so-called "jurisdictional elements" in statutes. *Terkel v. CDC*, 521 F. Supp. 3d 662, 673 (E.D. Tex. 2021). For example, a federal statute regulating firearms may limit its scope to those firearms "transported in interstate commerce." See *id*. This approach is designed to ensure "'through case-by-case inquiry,' that all applications of a regulation 'have an explicit connection with or effect on interstate commerce'" and therefore pass constitutional muster. *Id.* (quoting *Lopez*, 514 U.S. at 561-62). In such circumstances, "the Government must prove [the jurisdictional element] as an essential element of the offense…". *United States v. Bass*, 404 U.S. 336, 339 (1971).

The Rivers and Harbors Act contains exactly this sort of jurisdictional element. Congress's authority to regulate rivers and streams is not "expressly granted in the Constitution, but is a power incidental to the express 'power to regulate commerce with foreign nations, and among the several States and with the Indian tribes'" *Leovy v. United States*, 177 U.S. 621, 632 (1900). The Act therefore does not grant authority

to police obstruction to every ditch or creek in the country, but expressly limits its scope to the "creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the *waters of the United States*…" 33 U.S.C.S. § 403 (emphasis added).  At the time the Act was passed "waters of the United States" was a recognized legal term with inherent ties to the Commerce Clause.  Two decades earlier, the Supreme Court held that rivers constitute *"waters of the United States* within the meaning of the acts of Congress" only when they are "navigable in fact." *Daniel Ball*, 77 U.S. (10 Wall.) 557, 563 (1870) (emphasis added).  A river is "navigable in fact," the Court explained, only when it is a "contained highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water." *Id*.  This narrow definition was likely necessary, the Court suggested, because Congress's authority in this area "is limited to commerce 'among the several States,' with foreign nations, and with the Indian tribes." *Id*. at 564-65; see also

In 1900—just a year after the Rivers and Harbors Act was passed—the Court applied this test in *Leovy*, 177 U.S. at 625.  In that case, the federal government sued local officials under the Act for building a dam across Red Pass—a tributary of the Mississippi River—without federal permission.  The local officials countered that the Act did not apply because Red Pass was not navigable.

The district court held an evidentiary hearing.  The sole evidence presented by the federal government as to navigability was the testimony of a few fishermen "that they occasionally went through this pass with small vessels, carrying oysters for planting, and one or two cargoes of willows and timber..." *Id*. at 634.  The district court held this evidence to be sufficient, because, in its view, the passage of any boat or raft was sufficient to establish navigability.  *Id*.

On appeal, the Supreme Court rejected this approach.  Once again, the Court's reading of the statute was anchored in concerns about the Commerce Clause.

Rejecting the government's broad reading, the Court explained that if "the mere capacity to pass in a boat of any size, however small, from one stream or rivulet to another…is sufficient to constitute a navigable water of the United States…[it] would extend the paramount jurisdiction of the United States over all the flowing waters in the States." *Id.* at 633. Instead, the Act must be read with the scope of the commerce power in mind and should only apply when there is evidence showing that the waters can be navigated to such an extent to be "generally and commonly useful to some purpose of trade or agriculture." *Id.* at 634.

In subsequent years, the Court expanded the scope of the Act. In *Econ. Light & Power Co. v. United States*, 256 U.S. 113, 118 (1921), for example, the Court held that the Act reaches rivers that are navigable in their "natural state," even if a man-made obstruction has rendered them currently non-navigable. And in *United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 409 (1940), the Court expanded the Act further to include rivers that have the capacity for navigation with "reasonable improvements." But even these cases made it clear that *Daniel Ball* remains the test for navigability, and that test must be satisfied with evidence. *Sackett v. EPA*, 143 S. Ct. 1322, 1351 (2023) (Thomas, J., concurring); see also *Appalachian Elec. Power Co.*, 311 U.S. at 410 ("With these legal tests in mind we proceed to examine the facts to see whether the 111-mile reach of this river from Allisonia to Hinton, across the Virginia-West Virginia state line, has 'capability of use by the public for the purposes of transportation and commerce.'").

Therefore, the question before this Court is whether the federal government has produced sufficient evidence at this early stage of litigation to show that the waters at issue in this case are navigable in fact.

## II. THE FEDERAL GOVERNMENT'S POSITION THAT A RIVER REMAINS NAVIGABLE FOR JURISDICTIONAL PURPOSES IF IT HAS EVER BEEN NAVIGABLE IN THE PAST, IGNORES THE TEXT OF THE STATUTE AND WOULD LEAD TO ABSURD RESULTS

Historically when the government has wanted to establish jurisdiction under its authority to regulate navigable waters, it has provided substantial evidence as to navigability. See, e.g., *Appalachian Elec. Power*, 311 U.S. at 410-419 (discussing evidence of navigability). In *United States v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690, 699 (1899), for example, the Court considered substantial evidence from both sides before concluding that portions of the Rio Grande in New Mexico were not navigable in fact. The federal government returned to the lower court claiming that even if those portions of the river were not navigable, obstructions there could affect the navigable capacity of the river downstream, and therefore fall under the scope of the Act. See *United States v. Rio Grande Dam & Irrigation Co.*, 10 N.M. 617 (1900). Once again substantial amounts of evidence were produced by both sides and the federal government lost. See, *id.* On appeal, the Supreme Court remanded the case for the production of *even more* evidence. *United States v. Rio Grande Dam & Irrigation Co.*, 184 U.S. 416, 424 (1902).

In the present case, by contrast, the federal government does not meaningfully attempt to show that the relevant portions of the Rio Grande are currently, or even historically, navigable. Instead, the government points to a single conclusory 1984 letter (which itself seems to rely on 1947 Coast Guard finding) holding, without explanation, that the entirety of the Rio Grande River in Texas is navigable. ECF No. 5, p 13 (citing ECF no. 5-4.)

But *ipse dixit* from a single agency claiming that something falls within the commerce power is generally not binding on this Court. *United States v. Morrison*, 529 U.S. 598, 614 (2000) ("Simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so.").

Moreover, there is reason to doubt the Coast Guard's decades-old finding.  The Texas State Historical Association, which has been assessing the Rio Grande since at least 1952, notes that the "Rio Grande has *never* been navigable except near its mouth and, on rare occasions, to Laredo."  Leon C. Metz, Rio Grande, Handbook of Texas Online, (1952) https://www.tshaonline.org/handbook/entries/rio-grande (last updated June 13, 2020) (emphasis added).

But even if the Coast Guard's original assessment of navigability was accurate, the river has changed substantially in the last seventy-six years.  For example, each of the pictures below show the recent state of the river in places that, according to the letter relied on by government, were navigable in 1947.





Dylan Baddour, *Big Shock in Big Bend*, Texas Observer, (June 29, 2022), https://www.texasobserver.org/big-bend-rio-grande-dry-water/.

The government claims these changes to the river's actual navigability do not matter because it claims that under *Econ. Light & Power*, "once a stream has been found to be of navigable use it remains so." ECF No. 5-4, p. 6. But the government misreads that case. *Econ. Light & Power*, involved the application of the Act to a historically navigable river that had arguably lost navigability due to, among other things, unlawful man-made obstructions. As the Court put it:

8

> Since about the year 1835 a number of dams have been built in the Desplaines, without authority from the United States, and one or more of them still remain; besides, a considerable number of bridges of various kinds span the river. *The fact, however, that artificial obstructions exist capable of being abated by due exercise of the public authority, does not prevent the stream from being regarded as navigable in law, if, supposing them to be abated, it be navigable in fact in its natural state.* The authority of Congress to prohibit added obstructions is not taken away by the fact that it has omitted to take action in previous cases.

*Econ. Light & Power*, 256 U.S. at 118 (emphasis added). That case cannot be read so broadly as to relieve the federal government of its duty to *ever* prove navigability through evidence if it can provide a single government report of navigability at any time history.

First, such a broad reading of *Econ. Light & Power* ignores the text of the statute. The Rivers and Harbors Act does not allow for the regulation of *formerly* navigable waters of the United States, it regulates navigable waters of the United States. Neither courts nor agencies may add words to the text. *Alabama v. North Carolina*, 560 U.S. 330, 351–52 (2010) ("We do not—we cannot—add provisions to a federal statute.")

Second, the government's theory that navigability is established if navigation was *ever* possible at *any* time in history, would lead to absurd (and likely unconstitutional) results. The geologic record shows that most of Texas was once covered by seas. C. Reid Ferring, The Geology of Texas 4 (2007) (available at: https://custom.cengage.com/regional_geology.bak/data/Texas.pdf). Indeed, if one takes the Book of Genesis literally, then the entire world was once navigable by boats large enough to carry significant amounts of livestock. *Genesis* 7:17-20 (ESV). Under the federal government's theory, these anecdotes would render any structure built anywhere in Texas an obstruction to navigation subject to federal regulation. That certainly was not the intent of Congress in 1899. As the Supreme Court has made clear, "Congress does not casually authorize administrative agencies to interpret a

statute to push the limit of congressional authority." *Solid Waste Agency v. United States Army Corps of Eng'rs*, 531 U.S. 159, 172-73 (2001).

## CONCLUSION

The path of a river may often change, but unless Congress acts, the text of a federal statute does not. When Congress passed the Rivers and Harbors Act it carefully chose language designed to balance its desire to protect our rivers and harbors for commercial navigation with the limitations placed on its authority under the Commerce Clause. It did not intend to grant federal agencies unchecked power to regulate every ditch and stream that once upon a time could have carried a boat.

The federal government's view in this case would turn the Act into a one-way ratchet, where federal jurisdiction may always expand, but never contract with changes to the river. This approach misreads the statute and, if taken seriously, likely exceeds Congress's authority under the Commerce Clause. See *Solid Waste Agency*, 531 U.S. at 174. (Reading similar language in the Clean Water Act to apply to abandoned gravel pits, isolated ponds, or mudflats, would raise "significant constitutional questions.") This Court should not adopt that approach.

Rather, this Court should do the same thing the Supreme Court did more than a century ago—make the government produce evidence that the waters it seeks to regulate are navigable. While that evidentiary burden may be meager in this case, we cannot know until and unless the evidence is produced. We do know; however, this is an evidentiary burden mandated by the Constitution that the federal government must carry.

Respectfully submitted,

*/s/ Chance Weldon*
ROBERT HENNEKE
TX Bar No. 24046058
rhenneke@texaspolicy.com
CHANCE WELDON
TX Bar No. 24076767

cweldon@texaspolicy.com
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701
Telephone: (512) 472-2700
Facsimile: (512) 472-2728

## CERTIFICATE OF SERVICE

I hereby certify that on August 9, 2023, I electronically filed the foregoing with the Clerk of the Court for the U.S. District Court for the Western District of Texas by using the CM/ECF system, which will serve a copy of same on all counsel of record.

*/s/ Chance Weldon*
CHANCE WELDON

**EXHIBIT G: DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF UNITED STATES' MOTION FOR PRELIMINARY INJUNCTION**

**United States District Court**
**Western District of Texas**
**Austin Division**

| | |
|---|---|
| United States of America, | |
| *Plaintiff*, | |
| v. | No. 1:23-cv-00853-DII |
| Greg Abbott, in his capacity as Governor of the State of Texas, and the State of Texas, | |
| *Defendants*. | |

# Defendants' Memorandum in Opposition to Plaintiff United States' Motion for Preliminary Injunction

### TABLE OF CONTENTS

Background and Facts ................................................................................................ 2

    I.    The Crisis At The Southern Border And Texas's Response. .................................. 2

    II.    The Rio Grande in Maverick County. .................................................................... 5

    III.    The Buoy System. ................................................................................................. 6

    IV.    Deployment Of The Buoy System. ....................................................................... 7

Argument ................................................................................................................ 8

    I.    The United States Is Not Entitled To A Preliminary Injunction Because It Is Unlikely To Succeed On The Merits. ............................................................... 8

        A.    The United States has failed to show that this segment of the Rio Grande is navigable or that the buoy system obstructs navigable capacity. ............................................................................................... 9

        B.    The buoy system does not fall within the Rivers and Harbors Act because it is neither a boom nor any other prohibited structure. ............... 14

        C.    Texas retains sovereign authority to defend itself in the event of invasion, and this Court should construe the Rivers and Harbors Act narrowly in view of the constitutional questions that right poses. ............................................................................................... 18

    II.    The Remaining Factors Do Not Favor a Preliminary Injunction. .......................... 21

Conclusion ............................................................................................................ 23

Certificate of Service ............................................................................................. 24

# Table of Authorities

**Page(s)**

## Cases

*Arizona v. United States,*
   567 U.S. 387 (2012) (Scalia, J., concurring in part and dissenting in part) .................. 18, 20, 21

*Econ. Light & Power Co.,*
   256 U.S. 113 (1921) ................................................................................................................. 9

*Feds for Med. Freedom v. Biden,*
   63 F.4th 366 (5th Cir. 2023) (en banc) ............................................................................... 8

*Hersh v. U.S. ex rel. Mukasey,*
   553 F.3d 743 (5th Cir. 2008) ............................................................................................... 20

*House v. Mayes,*
   219 U.S. 270 (1911) .............................................................................................................. 20

*Inn of Daphne v. United States,*
   No. CIV.A. 97-0796-BH-S, 1998 WL 34024732 (S.D. Ala. Aug. 26, 1998) .............................. 9

*Janvey v. Alguire,*
   647 F.3d 585 (5th Cir. 2011) ............................................................................................... 21

*Justin Indus., Inc. v. Choctaw Secs., L.P.,*
   920 F.2d 262 (5th Cir. 1990) (per curiam) .......................................................................... 8

*Leovy v. United States,*
   177 U.S. 621 (1900) .............................................................................................................. 13

*Martinez v. Mathews,*
   544 F.2d 1233 (5th Cir. 1976) .............................................................................................. 8

*Miami Valley Conservancy Dist. v. Alexander,*
   692 F.2d 447 (6th Cir. 1982) ........................................................................................... 9, 13

*New York v. New Jersey,*
   143 S. Ct. 918 (2023) ............................................................................................................ 22

*Newbold v. Kinder Morgan SNG Operator, L.L.C.,*
   65 F.4th 175 (5th Cir. 2023) ........................................................................................... 10, 11

*Norfolk & W. Co. v. United States,*
   641 F.2d 1201 (6th Cir. 1980) .............................................................................................. 13

iii

*Phenix Const. Co. v. Cornell Steamboat Co.*,
    103 N.E. 891 (N.Y. 1913)................................................................17

*Pillsbury Co. v. Midland Enterprises, Inc.*,
    715 F. Supp. 738 (E.D. La. 1989), *aff'd*, 904 F.2d 317 (5th Cir. 1990)....................12

*PPL Montana, LLC v. Montana*,
    565 U.S. 576 (2012)................................................................9

*Puente de Reynosa, S. A. v. City of McAllen*,
    357 F.2d 43 (5th Cir. 1966)................................................................11

*Rowe v. Granite Bridge Corp.*,
    38 Mass. 344 (1839)................................................................10

*Sackett v. EPA*,
    143 S. Ct. 1322 (2023) (Thomas, J. concurring) ................................9

*Shively v. Bowlby*,
    152 U.S. 1 (1894)................................................................22

*Tate v. Am. Tugs, Inc.*,
    634 F.2d 869 (5th Cir. Unit A Jan. 1981) ................................8

*United States v. Angell*,
    292 F.3d 333 (2d Cir. 2002)................................................................13

*United States v. Appalachian Elec. Power Co.*,
    311 U.S. 377 (1940)................................................................13

*United States v. Bellingham Bay Boom Co.*,
    176 U.S. 211 (1900)................................................................14

*United States v. Bridgeport Towing Line*,
    15 F.2d 240 (D. Conn. 1926)................................................................17

*United States v. Burns*,
    54 F. 351 (C.C.D.W. Va. 1893)................................................................17

*United States v. Estate of Boothby*,
    16 F.3d 19 (1st Cir. 1994)................................................................17

*United States v. Hall*,
    63 F. 472 (1st Cir. 1894)................................................................17

*United States v. Hansen*,
    143 S. Ct. 1932 (2023) ................................................................20

*United States v. Oak Beach Inn Corp.*,
    744 F. Supp. 439 (S.D.N.Y. 1990) ...................................................12

*United States v. Oregon*,
    295 U.S. 1 (1935) ...........................................................................9

*United States v. Republic Steel Corp.*,
    362 U.S. 482 (1960) ..........................................................10, 11, 12

*United States v. Rio Grande Dam & Irrigation Co.*,
    174 U.S. 690 (1899) .................................................................12, 13

*United States v. Utah*,
    283 U.S. 64 (1931) .........................................................................9

*United States v. W. Indies Transp., Inc.*,
    127 F.3d 299 (3d Cir. 1997) ..........................................................13

*Yates v. United States*,
    574 U.S. 528 (2015) ......................................................................16

**Statutes**

33 U.S.C. § 409 .......................................................................15, 16, 17

Pub. L. 107-40, § 2(a), 115 Stat. 224 (Sept. 18, 2001) ....................20

33 U.S.C. § 403 .................................................................................*passim*

1 Stat. 264 ............................................................................................19

1 Stat. 424 ............................................................................................19

Tex. Gov't Code §§ 418.001 *et seq*...................................................4

Tex. Gov't Code § 418.018(c) ...........................................................4

**Other Authorities**

33 C.F.R. § 2.1....................................................................................11

33 C.F.R. § 322.2(b)...........................................................................17

33 C.F.R. §§ 329.1, 329.14 ................................................................10

33 C.F.R. § 329.4..................................................................................9

33 C.F.R. § 329.11................................................................................9

33 C.F.R. § 329.14 ........................................................................................ 11

1 Noah Webster, American Dictionary of the English Language 113 (1828) .................................. 19

ANTONIN SCALIA & BRYAN A. GARNER, *Reading Law: The Interpretation of Legal Texts* (2012) ........................................................................................ 16

1 Noah Webster, American Dictionary of the English Language 25 (1828) .................................. 15

*Boom*, Webster's International Dictionary of the English Language (1890) .................................. 15

*Boom*, Webster's Revised Unabridged Dictionary (1913) ........................................ 15

2d Cong., Sess. I, Ch. 28 (1792) ........................................................................ 19

3d Cong., Sess. II, Ch. 36 (1795) ........................................................................ 19

Dictionary of the English Language 164 (1806) .................................................. 19

Tex. Const. art. IV, § 7 ........................................................................................ 18

U.S. Const. art. I, § 8 ........................................................................................ 19

U.S. Const. art. I, § 8, cl. 11 ............................................................................. 19

U.S. Const. art. I, § 10, cl. 3 ........................................................................ 18, 20

U.S. Const. art. IV, § 4 ........................................................................................ 18

## Introduction

The United States has failed to defend Texas's southern border, leading to millions of individuals and hundreds of millions of fatal doses of drugs like fentanyl illegally entering the State and the United States—often trafficked by cartels that function as transnational criminal organizations. To defend its own borders, since the United States has lawlessly refused to do so, the State has, among other actions, declared a border security disaster and placed an approximately 1,000-foot-long floating buoy system in the Rio Grande to prevent people and drugs from being trafficked into the State in violation of both federal and Texas law. That buoy system is effective; it has nearly eliminated illegal crossings of people and drugs where it has been placed and will ultimately save lives.

The United States' contention that it is entitled to a mandatory preliminary injunction requiring the State to remove the buoys based on the Rivers and Harbors Appropriation Act of 1899 is without merit—as is the United States' request that the State and the Governor be enjoined from deploying additional buoy systems. The segment of the river where the buoy system has been deployed is not navigable; even if it were, the buoy system does not decrease the navigable capacity of the river; and the buoy system is not a boom or other structure prohibited under the Act. Perhaps in some recognition of the severe problems posed by illegal immigration in Texas, the United States has waived the Rivers and Harbors Act as to construction of border barriers where the buoy system has been placed, even while seeking to hold Texas to account for allegedly violating it.

Even if those problems were surmountable for the United States, others are not. Because Texas has a federal constitutional right to defend itself against invasion from even non-state actors, the Court should construe the Rivers and Harbors Act narrowly to avoid a collision between that constitutional right and the federal statute. And the United States has failed to show that the remaining preliminary-injunction factors have been met. The motion for a preliminary injunction should be denied.

## Background and Facts

**I. The Crisis At The Southern Border And Texas's Response.**

**A.** The crisis at the southern border is well known. While U.S. Customs and Border Protection encountered about 458,000 aliens at the border in FY2020, that number skyrocketed to over 1.7 million in FY2021 and nearly 2.4 million in FY2022.[1] In part because of this surge of aliens crossing the border, the number of "gotaways"—aliens who are detected as making an illegal entry but neither found nor apprehended—increased by 303 percent between FY2019 and FY2022, reaching more than 600,000 known gotaways in FY2022.[2] And because "an unknown number of migrants evade detection," the actual number entering the United States illegally is "unknown."[3] In FY2023 alone, which will not end until October, CBP has already encountered nearly 1.8 million aliens—a population greater than the City of Philadelphia—crossing the border.[4] Because Texas shares a land border with Mexico of over 1,200 miles, many of these aliens enter the United States in Texas.

The border crisis is hardly limited to massive unlawful immigration. It also includes deadly drug smuggling, human trafficking, terrorist infiltration, and other criminal drug cartel activities. To date in FY2023, CBP has seized over 22,000 pounds of fentanyl—compared with 8,300 pounds over the same period in FY2022.[5] Fentanyl is potentially lethal at a two-milligram dose and is

---

[1] *See* Ex. G, Department of Homeland Security Office of the Inspector General, OIG-23-24, *Intensifying Conditions at the Southwest Border are Negatively Impacting CBP and ICE Employees Health and Morale*, at p.6 (May 3, 2023), https://tinyurl.com/yckad9sx.

[2] *See id.* at 10.

[3] *Id.*

[4] *See* Ex. H, *Southwest Land Border Encounters*, U.S. Customs and Border Protection, available at https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last visited Aug. 8, 2023).

[5] *CBP Releases June 2023 Monthly Update*, U.S. Customs and Border Protection (July 18, 2023), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-june-2023-monthly-update; *see also* Ex. I, *Drug Seizure Statistics FY2023*, U.S. Customs and Border Protection, available at https://www.cbp.gov/newsroom/stats/drug-seizure-statistics (last visited Aug. 9, 2023).

involved in more deaths of Americans under 50 than any cause of death, including heart disease, cancer, homicide, or suicide. Ex. J. Over 107,000 people in the U.S. died of drug overdoses and drug poisonings in the 12-month period ending in January 2022, of which a staggering 67 percent involved synthetic opioids like fentanyl. *Id.* Fentanyl and other drugs are often illegally smuggled into the United States by cartels that operate as transnational criminal organizations—and that have been designated by the Governor as foreign terrorist organizations.[6]

The dangers of illegal immigration are not confined to those living in the United States. Perilous conditions exist for individuals attempting to illegally cross the U.S.-Mexico border. At least 853 individuals died crossing the U.S.-Mexico border in the past 12 months—a record high.[7] Deaths and disappearances along the U.S.-Mexico border have become commonplace in recent years, and such tragedies are increasing.[8] Indeed, in 2021 there were 78 water-related deaths along the Southwest Border, up from 41 in 2020.[9] Since President Biden took office, a United Nations agency has declared that the U.S.-Mexico border is now the deadliest land crossing in the world.[10]

---

[6]   Press Release, *Governor Abbott Designates Mexican Cartels as Terrorist Organizations*, Office of the Texas Governor (Sept. 21, 2022), https://gov.texas.gov/news/post/governor-abbott-designates-mexican-cartels-as-terrorist-organizations.

[7]   Camilo Montoya-Galvez, *At least 853 migrants died crossing the U.S.-Mexico border in past 12 months—a record high*, CBS News (Oct. 28, 2022, 10:37 AM), https://www.cbsnews.com/news/migrant-deaths-crossing-us-mexico-border-2022-record-high/; Priscilla Alvarez, *A record number of migrants have died crossing the US-Mexico border*, CNN (Sept. 7, 2022, 3:53 PM EDT), https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html.

[8]   *See* Ex. K, *Annual Regional Overview—Executive Summary*, International Organization for Migration's ("IOM") Missing Migrants Project ("MMP") (2021), available at https://missingmigrants.iom.int/sites/g/files/tmzbdl601/files/publication/file/MMP%20annual%20regional%20overview%202021%20LAC_Executive%20Summary-ENG_0.pdf; *see also* Ex. L, *Border Rescues and Mortality Data*, U.S. Customs and Border Protection, available at cbp.gov/newsroom/stats/border-rescues-and-mortality-data (last visited Aug. 9, 2023).

[9]   *See* Ex. L.

[10]   *UN Migration Study Deems US-Mexico Border 'Deadliest' Land Route in the World Based on 2021 Numbers*, (July 4, 2022), https://www.foxnews.com/us/un-migration-study-deems-us-mexico-border-deadliest-land-route-world-based-2021-numbers.

3

The U.S. Border Patrol's Del Rio Sector, which includes Maverick County, is particularly affected by the crisis. *See* Ex. M, Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 85 Fed. Reg. 14,953, 14,954 (Mar. 16, 2020). In just June 2023, CBP recorded nearly 25,000 encounters in the Del Rio Sector, nearly one quarter of encounters along the entire border.[11] Seizures of cocaine, methamphetamine, heroin, fentanyl, and marijuana (combined, by weight) increased 7% from May to June 2023.[12]

**B.** In response to the crisis at the Southwest Border, Governor Abbott declared a border security disaster in 2021 and launched Operation Lone Star.[13] Operation Lone Star fills dangerous gaps left by the Biden Administration's failure to secure the U.S.-Mexico border. And Operation Lone Star has been a success. "Since the launch of Operation Lone Star, the multi-agency effort has led to over 401,900 illegal immigrant apprehensions and more than 32,400 criminal arrests, with more than 29,600 felony charges reported. In the fight against fentanyl, Texas law enforcement has seized over 422 million lethal doses of fentanyl during this border mission."[14] "Every individual who is apprehended or arrested and every ounce of drugs seized would have otherwise made their way into communities across Texas and the nation due to President Joe Biden's open border policies."[15]

---

[11] Ex. N, *Southwest Land Border Encounters (By Component)*, U.S. Customs and Border Protection, available at https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters-by-component (last visited Aug. 9, 2023); *see also* Ex. O.

[12] *CBP Releases June 2023 Monthly Update*, U.S. Customs and Border Protection (July 18, 2023), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-june-2023-monthly-update.

[13] Governor Abbott declared a border security disaster under the Texas Disaster Act of 1975. *See* Tex. Gov't Code §§ 418.001 *et seq.* The disaster area specifically includes Maverick County, Texas. The buoys control ingress to a portion of the disaster area, as specifically authorized by Tex. Gov't Code § 418.018(c).

[14] Press Release, *Operation Lone Star Deploys New Border Security Deterrence Strategies*, Office of the Texas Governor (August 4, 2023), https://gov.texas.gov/news/post/operation-lone-star-stops-criminals-at-president-bidens-open-border.

[15] *Id.*

## II.    The Rio Grande in Maverick County.

The buoys at issue here have been deployed in a segment of the Rio Grande comprised of sand bars, shallow water, water with inconsistent depths, small islands, large rocks, man-made debris, natural debris such as logs and stumps, and sandy shoals; it can be very shallow or even dry. Ex. A, Nordloh Decl. ¶ 5; Ex. D, Gomez Dep. at 10:7–17, 51:7–19. The river is about 200 feet wide where the buoy system is placed. Ex. B, Escalon Decl. ¶ 9; Ex. A, Nordloh Decl. ¶ 9. Although the river's depth in this segment depends on releases from the Lake Amistad Dam and varies slightly day-to-day, Ex. A, Nordloh Decl. ¶ 54, the river is no more than ankle-to-knee deep in many places and is no greater than four feet deep near the site of the floating buoys, Ex. B, Escalon Decl. ¶ 10.

No lawful commercial transportation exists in the Maverick County segment of the Rio Grande. Ex. B, Escalon Decl. ¶ 3. No commercial boats, barges, fishing boats, cargo ships or carriers, tankers, or other commercial vessels operate on this segment. Ex. A, Nordloh Decl. ¶ 7. Law enforcement agencies, including the Tactical Marine Unit of the Texas Highway Patrol, use shallow-draft airboats in this segment of the river. Ex. A, Nordloh Decl. ¶ 6. These law enforcement boats are incapable of bearing the weight of commercial goods. Ex. B, Escalon Decl. ¶ 10; Ex. A, Nordloh Decl. ¶ 6. Larger vessels cannot operate in this segment due to the shallow conditions of the stream and frequent presence of sand bars and islands. Ex. B, Escalon Decl. ¶ 10. While smaller vessels may operate in this segment, the shallow depth, sandbars, and other features of the river described above nonetheless poses dangers to such vessels. Ex. A, Nordloh Decl. ¶ 4, 5. The U.S. Coast Guard has no watercraft in this segment of the Rio Grande and has not deployed watercraft there. *See* Ex. A, Nordloh Decl. ¶ 8; Ex. E, Peters Dep. at 28:14–18, 29:12–30:7; Ex. D, Gomez Dep. at 51:3–6

Instead, this segment of the river sees mostly illegal activities. Ex. B, Escalon Decl. ¶ 4. Indeed, drug and weapons smuggling, human trafficking, and illegal immigration make up the majority of activity around this segment of the river. Ex. B, Escalon Decl. ¶ 4. Mexican cartels are also active in this area. Ex. B, Escalon Decl. ¶ 4. This area is one of the most active hotspots for criminal activities such as drug and weapons smuggling and human trafficking along the length of

5

the river. Ex. B, Escalon Decl. ¶ 13. No lawful traffic should move from bank to bank across the river at this point, and there is no legitimate reason for lateral traffic. Ex. B, Escalon Decl. ¶ 8.

### III. The Buoy System.

To advance the objectives of Operation Lone Star, Governor Abbott "announced the deployment of new marine floating barriers to deter illegal crossings in hotspots along the Rio Grande River."[16] The floating buoys deployed via Operation Lone Star were originally developed for CBP. Ex. C, Flossman Decl. ¶ 3. This solution is part of a broader strategy to resolve the acute and immediate need to construct physical barriers in the vicinity of the U.S.-Mexico border in the Del Rio Sector. *See* Ex. M, 85 Fed. Reg. 14,953, 14,954 (March 16, 2020). Transnational criminal organizations frequently circumvent, defeat, and exploit the existing obstacles. *Id.*

The floating buoys were placed in the river in mid-July 2023. Ex. B, Escalon Decl. ¶ 5.[17] The system is approximately 1,000 feet long and is comprised of multiple interconnected buoys tethered via chains to concrete blocks placed on the bed of the river, entirely within Maverick County, Texas. Ex. C, Flossman Decl. ¶¶ 5, 6; Ex. B, Escalon Decl. ¶ 6. A two-foot-deep anti-dive net made of stainless steel with a gauge of +/- 3mm also runs the entire length under the buoys. Ex. C, Flossman Decl. ¶ 8. The floating buoys do not run across the river. Ex. D, Gomez Dep. at 43:13–15. The buoys have never been referred to or marketed as a boom and are not considered a boom. Ex. C, Flossman Decl. ¶ 5; Ex. F, Shelnutt Dep. At 61:22–23.

The floating buoy system is designed to save lives by directing aliens to appropriate ports of entry while deterring unlawful, dangerous crossings through the water. Ex. C, Flossman Decl. ¶ 4. The system is designed to withstand at least a 100-year flood. Ex. C, Flossman Decl. ¶ 10. The buoys are well-marked, colorful, and under continuous and uninterrupted surveillance by

---

[16] Press Release, *Governor Abbott Signs Sweeping Package of Border Security Legislation*, Office of the Texas Governor (June 8, 2023), https://gov.texas.gov/news/post/governor-abbott-signs-sweeping-package-of-border-security-legislation.

[17] CBP contracted for, and even tested, the buoy system before it was deployed by Texas but cancelled the contract after the change in administration in 2021. Flossman Decl. ¶ 3. At that time, no permit from the U.S. Army Corps of Engineers was considered necessary. *Id.*

Operation Lone Star personnel. Ex. B, Escalon Decl. ¶ 12; Ex. A, Nordloh Decl. ¶ 10. No one has attempted to climb over the buoys, and not a single injury or death due to the floating buoys has been reported. *See* Ex. B, Escalon Decl. ¶ 12.

## IV. Deployment Of The Buoy System.

The floating buoy system as designed and deployed impedes no lawful use of the Rio Grande and has no impact on the ability to navigate those waters. Ex. C, Flossman Decl. ¶ 11; Ex. A, Nordloh Decl. ¶ 10. The buoys occupy approximately three percent of the stream's width and were placed on the shallower, U.S. side of the stream. Ex. A, Nordloh Decl. ¶ 9; Ex. C, Flossman Decl. ¶ 6; Ex. B, Escalon Decl. ¶ 9.

Use of this segment of river is rare in any event; there is no commercial navigation of the Rio Grande in Maverick County. Ex. B, Escalon Decl. ¶ 8. Any vessel capable of going up or down the river at the current site of the floating buoys can easily navigate past the floating buoys. Ex. B, Escalon Decl. ¶ 9. Law enforcement watercraft using this segment of the Rio Grande—the only type of motorized watercraft regularly operating in this segment—readily maneuver around the floating buoys. Ex. A, Nordloh Decl. ¶ 10.

The buoys, by design, are temporarily located. Neither the buoys nor concrete blocks are attached or affixed in any way to the riverbed; no excavation or building occurred in the river. Ex. C, Flossman Decl. ¶ 6; Ex. B, Escalon Decl. ¶ 7. The design and placement of the floating buoys is temporary; they may be dismantled and redeployed using machinery to lift and move the concrete blocks. Ex. C, Flossman Decl. ¶ 5–7.

The buoy system as deployed allows for the free flow of water through this segment and does not interfere with the travel of watercraft up and down the river or the river's navigable capacity. Ex. C, Flossman Decl. ¶ 8, 11; Ex. B, Escalon Decl. ¶ 8. And the floating buoys are being monitored in the event debris must be cleaned off them. Ex. C, Flossman Decl. ¶ 8. No vacuum is created by the system. Ex. C, Flossman Decl. ¶ 8. The only effect this buoy system has on regular activities on this segment of the Rio Grande is to redirect individuals who perilously attempt to cross the river at this location towards lawful ports of entry in a safe manner. Ex. B, Escalon Decl. ¶ 6, 12. It

is safer for aliens to cross at a port of entry instead of through the water—nobody drowns on a bridge.

**ARGUMENT**

The United States is not entitled to a mandatory preliminary injunction. "'A preliminary injunction is an extraordinary remedy never awarded as of right.'" *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 387 (5th Cir. 2023) (en banc) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). "'A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Id.* (quoting *Winter*, 555 U.S. at 20). Because the United States seeks "a mandatory injunction, it bears the burden of showing a clear entitlement to the relief [it seeks] under the facts and the law." *Justin Indus., Inc. v. Choctaw Secs., L.P.*, 920 F.2d 262, 268 n.7 (5th Cir. 1990) (per curiam). Such relief "is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976). A mandatory preliminary injunction alters, rather than preserves, the status quo, and in this instance would provide the primary relief the plaintiff seeks on the merits without even affording the defendants a trial. "Only in rare instances is the issuance of a mandatory preliminary injunction proper." *Tate v. Am. Tugs, Inc.*, 634 F.2d 869, 870 (5th Cir. Unit A Jan. 1981) (internal quotation marks omitted).

**I.   The United States Is Not Entitled To A Preliminary Injunction Because It Is Unlikely To Succeed On The Merits.**

The United States is unlikely to succeed on the merits for at least three reasons. *First*, the United States has failed to show that the applicable section of the Rio Grande is navigable or that the buoy system obstructs navigable capacity. *Second*, because the buoys are neither a "boom" nor "other structure," the Rivers and Harbors Act did not require Texas to seek permission to place them. *Third*, Texas has a sovereign right to defend itself against invasion by transnational cartels like the one occurring here, and this Court should construe the Rivers and Harbors Act narrowly in light of that sovereign right.

8

### A. The United States has failed to show that this segment of the Rio Grande is navigable or that the buoy system obstructs navigable capacity.

**1.** "The history of federal regulation of navigable waters demonstrates that Congress' authority over navigation, as traditionally understood, was narrow but deep. It only applied to a discrete set of navigable waters and could only be used to keep those waters open for interstate commerce." *Sackett v. EPA*, 143 S. Ct. 1322, 1348 (2023) (Thomas, J. concurring). The question of navigability is fact-specific and made on a segment-by-segment basis. *See PPL Montana, LLC v. Montana*, 565 U.S. 576, 594 (2012); *see also United States v. Utah*, 283 U.S. 64, 77 (1931) ("Even where the navigability of a river, speaking generally, is a matter of common knowledge, and hence one of which judicial notice may be taken, it may yet be a question, to be determined upon evidence, how far navigability extends.") (citing *United States v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690, 698 (1899))). In many instances, "the character of a river will, at some point along its length, change from navigable to non-navigable." 33 C.F.R. § 329.11.

To be considered navigable under the Rivers and Harbors Act, a waterway "must (1) be or have been (2) used or susceptible of use (3) in the customary modes of trade and travel on water (4) as a highway for interstate commerce." *Miami Valley Conservancy Dist. v. Alexander*, 692 F.2d 447, 449-450 (6th Cir. 1982); *see also* 33 C.F.R. § 329.4.[18] A waterway with only sporadic commercial use is not navigable—rather a navigable waterway must be of practical service as a highway of commerce. *United States v. Oregon*, 295 U.S. 1, 23 (1935); *Econ. Light & Power Co.*, 256 U.S. 113, 124 (1921). This fact-based, judicially-applied test for navigability has been a feature of American jurisprudence since well before the passage of the Rivers and Harbors Act, and it remains good law to this day. *See e.g., Rowe v. Granite Bridge Corp.*, 38 Mass. 344, 344 (1839) ("A creek in a salt marsh, in order to be deemed *navigable*, must not merely be sufficient to float a small boat at high water, but must be navigable generally and commonly, and not at extraordinary high tides

---

[18] Navigability for the Rivers and Harbors Act is not the same as navigability for purposes of, for example, the Clean Water Act or various state regulations. "In accordance with its more sweeping purpose, the Clean Water Act defines 'navigable waters' more broadly than the understanding of the term in the Rivers and Harbors Act of 1899." *Inn of Daphne v. United States*, No. CIV.A. 97-0796-BH-S, 1998 WL 34024732, at *3 (S.D. Ala. Aug. 26, 1998).

only, to some purpose useful to trade or agriculture."); *The Montello*, 87 U.S. 430, 442 (1874) ("[I]n order to give it the character of a navigable stream, it must be generally and commonly useful to some purpose of trade or agriculture."); *Newbold v. Kinder Morgan SNG Operator, L.L.C.*, 65 F.4th 175, 182 (5th Cir. 2023) ("If the channel in question, in its ordinary condition, has potential commercial value such that it may be called 'navigable,' Plaintiffs have not carried their burden to 'satisfactorily prove[ ]' as much." (quoting *Utah*, 283 U.S. at 82)).

Even if a waterway is theoretically navigable in *some* respects, whether any such navigability would be impaired must be judged against existing uses of the waterway. So, for example, in *United States v. Republic Steel Corp.*, 362 U.S. 482 (1960), the Supreme Court pointed to a district court's factual findings that "the Calumet [River] was used by vessels requiring a 21-foot draft, and that that depth has been maintained by the Corps of Engineers." *Id.* at 483. Because the defendants' milling operations in that case created solid waste deposits that caused "a progressive decrease in the depth of the river in the vicinity of [their] mills," the milling operations could implicate existing navigability. *Id.* at 485.

The United States, however, relies almost entirely (at 3, 9) on a 39-year-old navigability determination made by the Coast Guard that concludes the Rio Grande is navigable "for the entire distance where it forms the international boundary." ECF No. 5-4 at 5. But this determination is no evidence at all. That document acknowledges that it "represents the opinion of the Coast Guard only as to the extent of its own jurisdiction," and expressly disclaims that it establishes the jurisdiction of other agencies, such as the U.S. Army Corps of Engineers. *Id.* [19] And even the Corps recognizes such agency determinations are not dispositive because "conclusive determinations of navigability can be made only by federal Courts." 33 C.F.R. § 329.14.

---

[19]   The Corps division engineers must make a report of factual findings passed on specific criteria as to navigability for purposes of the Rivers and Harbors Act, 33 C.F.R. §§ 329.1, 329.14, an entirely different process and standard than used by the Coast Guard to determine its jurisdiction, 33 C.F.R. § 2.1.

Similarly, the declaration by a regulatory project manager with the Corps provides no evidence for concluding this segment of the Rio Grande has been held navigable, or is currently in fact navigable.[20] Indeed, the United States is entirely silent on whether the waters of this segment of the Rio Grande (within Maverick County, Texas) are of practical service as a highway of commerce. *Cf. Puente de Reynosa, S. A. v. City of McAllen*, 357 F.2d 43, 50–51 (5th Cir. 1966) (looking to affidavits and historical references of current and historic use in determining that the Hidalgo segment of the Rio Grande is navigable under the Rivers and Harbors Act). Furthermore, the United States' witnesses admitted that segments of the Rio Grande, including this segment, can be dry. Ex. D, Gomez Dep. at 51:14–19; Ex. E, Peters Dep. at 27:4–8. When it comes to assessing the navigability in this stretch of the Rio Grande, the United States ignores the need to focus on how this waterway is ordinarily "used by vessels." *Republic Steel*, 362 U.S. at 483. And, as already explained above, that waterway is used by vessels mostly not at all. *Supra* at 4-5, 7.

Texas has shown that this segment of the Rio Grande is not used for interstate or foreign commerce. This segment is shallow and plagued by sandbars and portages and cannot support the customary modes of trade or travel on water. *See* Ex. B, Escalon Decl. ¶ 10; Ex. A, Nordloh Decl. ¶ 5. Individuals with day-to-day exposure to this segment observe no commercial trade. Ex. B, Escalon Decl. ¶ 3; Ex. A, Nordloh Decl. ¶ 7; *see Newbold*, 65 F.4th at 181 (affirming a lack of navigability when "there is no allegation that the channel *is* currently being used for commercial purposes; the nearest evidence of that is that the boat in which [plaintiff] was a passenger was able to traverse the channel," and noting that "neither navigation nor commerce encompass recreational fishing" (internal quotation marks and alterations omitted)). And the United States' own witness, who is familiar with this segment of the Rio Grande, admitted that no other vessels other than law enforcement operating airboats have been seen there. Ex. D, Gomez Dep. at 11:1–12:8. Another United States witness who has been to the Rio Grande stated he is unaware of any

---

[20]   The Corps manager even admitted that he has no knowledge about current, past, or potential future navigation at the portion of the river where the buoys are located. Shelnutt Dep. (unsigned) at 15:5–7, 32:3–18, 46:24–47:20.

commercial navigation on the river in Texas or on the segment at issue. Ex. F, Shelnutt Dep. at 15:5–7, 32:3–18, 46:24–47:20. The United States has not presented any evidence that this segment of the Rio Grande is navigable, and its motion for a preliminary injunction can be denied on this basis alone.

**2.** Even if that were not right, the United States has not shown that the buoy system obstructs navigation. It bears the burden of proving that the buoy system presents an "obstruction . . . to the navigable capacity" of the Rio Grande within the meaning of Section 10 of the Rivers and Harbors Act. 33 U.S.C. § 403. Thus far, all the United States has succeeded in doing is show that the buoys deter illicit passage across the United States border in between established ports of entry. But preventing illegal border crossings is not the same as obstructing the navigable capacity of the Rio Grande. And even if the Rio Grande were navigable in this segment (it is not), the buoys would not obstruct that navigation.

"[T]he mere presence of an object in a navigable river does not necessarily require a finding that the object is in violation of § 403." *Pillsbury Co. v. Midland Enterprises, Inc.*, 715 F. Supp. 738, 761 (E.D. La. 1989), *aff'd*, 904 F.2d 317 (5th Cir. 1990). As the Supreme Court made clear more than 60 years ago, it is not sufficient that an object "may only deter movements in commerce"; it must actually "adversely affect[] navigational capacity." *Republic Steel*, 362 U.S. at 487. Whether Texas's buoys obstruct the navigable capacity of the Rio Grande or, instead, merely deter or divert movements within an otherwise navigable waterway, is a question of fact. *See Rio Grande Dam & Irrigation Co.*, 174 U.S. at 709; *United States v. Oak Beach Inn Corp.*, 744 F. Supp. 439, 444 (S.D.N.Y. 1990).

In determining the answer to that factual question, the Court should focus on the source of authority for, and the purpose of, the Rivers and Harbors Act. Congress' authority over rivers, harbors, and other waters of the United States "is not expressly granted in the Constitution, but is a power incidental to the express power to regulate commerce." *Leovy v. United States*, 177 U.S. 621, 632 (1900). The purpose of the Rivers and Harbors Act, therefore, is to protect "the Nation's right that its waterways be utilized for the interests of the commerce of the whole country." *United*

*States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 405 (1940); *Miami Valley Conservancy Dist.*, 692 F.2d at 449. In accordance with this source of authority and purpose, "a practical construction must be put on these enactments as intended for such large and important purposes." *Leovy*, 177 U.S. at 633.

A practical consideration of the impact of Texas's buoys reveals that they do not obstruct navigable capacity in the sense established in the case law. The requisite obstruction cannot be just a minor or technical one; the plaintiff must show that it "substantially diminishes the navigability of that stream within the limits of present navigability." *Rio Grande Dam & Irrigation Co.,* 174 U.S. at 710. It is no wonder, then, that every riparian case the State has identified finding an obstruction under the Act—including those cited by the United States—involved obstructions extending out into rivers and set perpendicular to the current (so as to obstruct vessels navigating up and down the rivers). *See United States v. Angell*, 292 F.3d 333, 335 (2d Cir. 2002) (the "dock structure" at issue "span[ned] most of the width of the Canal"); *United States v. W. Indies Transp., Inc.*, 127 F.3d 299, 310 (3d Cir. 1997) (defendants created "a large dock" from barges connected to the shore via "walkways . . . constructed out of metal and wood"); *Norfolk & W. Co. v. United States*, 641 F.2d 1201, 1211 (6th Cir. 1980) (the structure at issue was "a collapsed dock, extending 35 feet into the river").

Texas's buoys are set parallel to the current to prevent cross-border fording of the river—not perpendicular to the current in a manner that would obstruct navigation up and down the river in violation of the Act. Because the buoy system occupies just 4 feet out of 200 feet of breadth, any navigation along the river is entirely unimpeded. Indeed, United States' witness admitted that up-and-down river traffic is not blocked by the presence of the buoys. Ex. D, Gomez Dep. at 43:16–22. The shallowness of the Rio Grande at the point of the buoy system allows only extremely shallow-draft boats to navigate this portion of the river, and any boat that could navigate at all "at the current site of the floating buoys can easily navigate past them on either the United States or Mexico side of the River." Ex. B, Escalon Decl. ¶ 9. Under the Rivers and Harbors Act, this segment of the Rio Grande is not navigable, and even if it were, the buoy system would do nothing

13

to detract from its navigable capacity. If anything detracts from that capacity, it is that the river is regularly filled with thousands of individuals illegally fording it to cross from Mexico into the United States.

### B. The buoy system does not fall within the Rivers and Harbors Act because it is neither a boom nor any other prohibited structure.

The United States asserts that Texas, in its deployment of the buoys, engaged in the "building" of certain "structures" that were impermissible under Section 10 of the Rivers and Harbors Act. This erroneous assertion, in turn, rests upon deeply flawed interpretations of the relevant statutory text and supporting case law.

#### 1. Buoys are not booms.

Section 10 of the Rivers and Harbors Act bars "the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures" in a navigable river of the United States, absent the express permission of the Corps. 33 U.S.C. § 403. The word *buoy* is notably absent from the list of structures for which a permit is required. Nevertheless, the United States attempts to shoehorn that word into the statute by claiming that the buoys at issue here qualify as a "boom" within the meaning of Section 10. That attempt to rewrite the statute fails for at least three reasons.

*First*, the United States' own definitions belie its assertion that Texas's buoy system is a boom. The United States mischaracterizes (at 9) a boom as "any floating barrier that arrests movement across a waterway." But immediately following this mischaracterization, the United States cites two definitions that correctly identify a boom as a barrier "extended across a river or mouth of a harbor" or "stretched across a river." While this mischaracterization presents a subtle difference, it is one with a massive directional distinction: a boom is stretched across a river, perpendicular to the flow of the current, to impede traffic moving up and down the river, parallel to the flow of the current. *See United States v. Bellingham Bay Boom Co.*, 176 U.S. 211, 213 (1900) ("[T]he boom crosses the channel of the river and entirely fills it[.]"). A boom is not, as the United States asserts in direct contradiction of its own definitions, designed to prevent movement *across* a river. Rather, a boom is stretched across a river with the intent or effect of preventing movement

14

*up and down* the course of that river. By contrast, Texas's buoy system is designed to prevent unauthorized movement *across* the Rio Grande from one bank to another and is accordingly situated parallel to the river's current. Ex. B, Escalon Decl. ¶ 6, 8. The buoy system is therefore not a boom within the meaning of the Rivers and Harbors Act.

*Second*, this understanding is confirmed by dictionaries close in time to passage of the Rivers and Harbors Act. Webster's 1828 Dictionary defines a boom as "[a] strong iron chain, fastened to spars, and extended across a river, or the mouth of a harbor, to prevent an enemy's ships from passing." *Boom*, 1 Noah Webster, American Dictionary of the English Language 25 (1828). Webster's 1890 Dictionary defines a boom as "[a] chain cable, or line of spars bound together, extended across a body of water to obstruct passage." *Boom*, Webster's International Dictionary of the English Language (1890). And Webster's 1913 Dictionary describes a boom alternately as "[a] strong chain cable, or line of spars bound together, extended across a river or the mouth of a harbor, to obstruct navigation or passage" or "[a] line of connected floating timbers stretched across a river, or enclosing an area of water, to keep saw logs, etc., from floating away." *Boom*, Webster's Revised Unabridged Dictionary (1913). None of these definitions contemplate the buoys at issue here, which discourage illicit and dangerous passage from the Mexico side of the Rio Grande to the Texas side.

*Third*, the Corps manager on whose declaration the United States relies admitted at his deposition that Texas's floating buoys are not a boom. Shelnutt Dep. (unsigned) at 61:22–23.

Moreover, the statutory context surrounding Section 10 of the Rivers and Harbors Act evidences the clear distinction between buoys and booms. While Section 10 of the Act lists booms among the structures that require advance approval from the Corps, Section 15 of the Act mandates the placement and maintenance of "a buoy or beacon" to mark sunken vessels that could pose a hazard to navigation. 33 U.S.C. § 409. In other words, the Act not only permits buoys—it sometimes *requires* them, and without first obtaining approval of the Corps. *Id.* (operator of sunken craft "shall . . . immediately mark it with a buoy" and "failure . . . to do so shall be unlawful"). And it does so because, far from obstructing navigation, buoys *assist* navigation in a waterway. At the

15

very least, this explicit requirement to place buoys in navigable waters under certain circumstances contrasts with Section 10's prohibition on placing obstructive booms, and contradicts the United States' assertion that buoys and booms are one and the same. Buoys and booms were different to the authors of the Rivers and Harbors Act, are different under a straightforward reading of the statutory text, and should not, as a matter of statutory construction, have their differences erased.

### 2. The buoys are not "other structures" within the meaning of the Rivers and Harbors Act.

Perhaps anticipating that its attempt to elide the statutory and definitional separation of the terms "buoy" and "boom" would prove unsuccessful, the United States seeks to stash buoys within Section 10's catchall term "other structures." But reliance on this catchall ignores the *ejusdem generis* (or "of like kind") canon of statutory construction. This canon applies where general words follow specific words within a statute, such as in Section 10 where Congress "has tacked on a catchall phrase at the end of an enumeration of specifics." ANTONIN SCALIA & BRYAN A. GARNER, *Reading Law: The Interpretation of Legal Texts*, 199 (2012). It directs that such general terms be construed to encompass only what is similar in nature to the preceding specific terms, ensuring that those generalities "will not render specific words meaningless." *Yates v. United States*, 574 U.S. 528, 545-46 (2015).

Applied in the context of Section 10, the *ejusdem generis* canon bars the overbroad interpretation of "other structures" promulgated by the United States. If "other structure[]" meant any structure whatsoever, there would be no purpose in Congress's specific mention of the structures listed in Section 10, making it "hard to see why it would have needed to include the examples at all." *Yates*, 574 U.S. at 545–46.

Moreover, as discussed above, the Rivers and Harbors Act affirmatively distinguishes buoys from the sort of obstructions listed in Section 10. Section 15 of the Act mandates the placement of buoys under certain circumstances, 33 U.S.C. § 409, and it does so precisely because buoys aid navigation, including around other objects that might obstruct navigation. This positively indicates that a buoy is different in kind from a "wharf, pier, dolphin, boom, weir, breakwater, bulkhead, [or]

16

jetty." 33 U.S.C. § 403; *see also id.* § 408(a) (distinguishing "buoys" from various "work[s] built by the United States"); *id.* § 403b (implying in a 1986 amendment that the "other structures" catchall would include permanent things like "a dock or a boat launching facility"). Buoys, therefore, are not among the "other structures" contemplated by Section 10, and the United States' assertion to that effect is erroneous.

This conclusion is buttressed by both Corps regulations and precedent, both of which confirm that the word *structure* entails permanence. According to the Corps, "structure" includes "permanent mooring structure[s]" and "permanently moored floating vessel[s]." *See* 33 C.F.R. § 322.2(b). Numerous cases reach the same conclusion. *See, e.g.*, *United States v. Estate of Boothby*, 16 F.3d 19, 21 (1st Cir. 1994) ("We believe that this regulation lawfully can be applied to houseboats that are found to constitute *permanently moored* vessels." (emphasis added) (citing *United States v. Boyden*, 696 F.2d 685, 687 (9th Cir. 1983); *United States v. Oak Beach Inn Corp.*, 744 F. Supp. 439, 444 (S.D.N.Y. 1990))); *United States v. Burns*, 54 F. 351, 363 (C.C.D.W. Va. 1893) ("I think that the obstructions contemplated by [Section 10] are such obstructions as are *permanent in their nature*[, not] the floating of rafts, logs, timber, boats, and vessels." (emphasis added)); *United States v. Bridgeport Towing Line*, 15 F.2d 240, 240 (D. Conn. 1926) (holding that a sunken vessel "constitutes a *permanent* obstruction" (emphasis added)); *Phenix Const. Co. v. Cornell Steamboat Co.*, 103 N.E. 891 (N.Y. 1913) ("The intent of [Section 10] was against the construction of structures of a more, or less, *permanent nature* . . . ." (emphasis added)); *cf. United States v. Hall*, 63 F. 472, 474 (1st Cir. 1894) ("[S]ection 10 of the act of September 19, 1890, was intended to apply to all obstructions of a *permanent character* . . . ." (emphasis added)).

But the buoys at issue here are not permanent. Neither the buoys nor the concrete blocks attached to them are affixed in any way to the riverbed; no excavation or building occurred in the river. Ex. C, Flossman Decl. ¶ 6; Ex. B, Escalon Decl. ¶ 7. And the buoys may be dismantled and redeployed using machinery to lift and move the concrete blocks. Ex. C, Flossman Decl. ¶ 5-7. Regulations and caselaw therefore confirm that the buoy system is not an "other structure" under the Rivers and Harbors Act.

### C. Texas retains sovereign authority to defend itself in the event of invasion, and this Court should construe the Rivers and Harbors Act narrowly in view of the constitutional questions that right poses.

The Constitution provides that "[n]o state shall, without the Consent of Congress, . . . engage in war, unless actually invaded, or in such imminent Danger as will not admit of delay." U.S. Const. art. I, § 10, cl. 3. This provision represents "an acknowledgement of the States' sovereign interest in protecting their borders." *Arizona v. United States*, 567 U.S. 387, 419 (2012) (Scalia, J., concurring in part and dissenting in part). The Constitution thus "leaves intact [States'] inherent power to protect their territory." *Id.* The power to determine whether Texas has been "actually invaded," U.S. Const. art. I, § 10, cl. 3, is vested in the Governor of Texas as the commander-in-chief of the State's militia, *see* Tex. Const. art. IV, § 7. Governor Abbott has asserted this power because, due to President Biden's open-border refusal to faithfully execute federal immigration laws, the United States has unconstitutionally refused to "protect [the State of Texas] against Invasion" by transnational cartels. U.S. Const. art. IV, § 4.

Texas's sovereign power is not limited to repelling invasions by state actors. By its terms, Article I, § 10, Clause 3 applies to all types of invasions, including invasions from non-state or quasi-state actors, like the cartels. Indeed, throughout American history, States have had to use military force to respond to hostile non-state actors. For example, James Madison explained at the Virginia Ratifying Convention how state militia were customarily utilized: "There were a number of smugglers, who were too formidable for the civil power to overcome. The military quelled the sailors, who otherwise would have perpetrated their intentions." 11 James Madison, Debate From Virginia Ratifying Convention (June 16, 1788). And in 1792, Congress exercised its power "[t]o provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions," U.S. Const. art. I, § 8, by authorizing the President to call forth the militia "whenever the United States shall be invaded, or be in imminent danger of invasion from any foreign nation or *Indian tribe.*" An Act to provide for calling forth the Militia to execute the laws of the Union, suppress insurrections, and repel invasions, 1 Stat. 264, 2d Cong., Sess. I, Ch. 28 (1792) (emphasis added). Congress reenacted the same provision in 1795. *See* An Act to provide for calling

18

forth the Militia to execute the laws of the Union, suppress insurrections, and repel invasions; and to repeal the Act now in force for those purposes, 1 Stat. 424, 3d Cong., Sess. II, Ch. 36 (1795) ("imminent danger of invasion from any foreign nation or Indian tribe"). Any notion that "invasion" somehow hinges on the difference between state actors and non-state actors would seem wholly artificial to the Framers: After all, the Constitution gives Congress power to "grant Letters of Marque and Reprisal" authorizing *private actors* to cross international borders to commit hostile acts. U.S. Const. art. I, § 8, cl. 11.

This lack of a limitation to state actors comports with the use of the word invasion near the founding. Webster's 1806 dictionary—the first American English dictionary—defines "invade" broadly, as meaning "to enter or seize in hostile manner." Noah Webster, A compendious Dictionary of the English Language 164 (1806). Webster's 1828 dictionary also defines "invade" broadly, to include not just the entrance of a foreign army into a country, but also "1. . . to enter as an enemy, with a view to conquest or plunder; to attack"; "2. To attack; to assail; to assault"; "3. To attack; to infringe; to encroach on; to violate." 1 Noah Webster, American Dictionary of the English Language 113 (1828). Dictionary definitions at the time defined "invade" as simply "to enter in a hostile manner." Samuel Johnson, [Johnson's] Dictionary (reprint, Boston 1828). An "invasion" was a "hostile entrance" or "an attack." *Id.* Further, "hostile" is not defined to include only state actors. *Id.* ("HO'STILE. adj. [hostilis, Latin.] Adverse; opposite; suitable to an enemy."),  (E'nemy. n.s. [ennemi, French; inimicus, Latin.]  1. A publick foe. . . 2. A private opponent; an antagonist. . . 3. Any one who regards another with malevolence; not a friend. . . ."). Indeed, modern American law also recognizes this sense of the term. After the attacks of September 11, 2001, Congress authorized the use of military force against not only responsible "nations" but also "organizations" and "persons." Authorization for the Use of Military Force, Pub. L. 107-40, § 2(a), 115 Stat. 224 (Sept. 18, 2001).

Thousands of aliens have entered the State illegally, including members of cartels that traffic in people, weapons, and vast quantities of drugs like fentanyl.[21] By any account, this amounts to "ent[ry] in a hostile manner." And the State has the constitutional power to repel that invasion. U.S. Const. art. I, § 10, cl. 3. The State may do so to, for example, protect the health, safety, morals, and general welfare of its citizens. *House v. Mayes*, 219 U.S. 270, 282 (1911).

In view of this constitutional authority, this Court should construe the Rivers and Harbors Act narrowly to avoid the constitutional questions presented by the interaction between the State's constitutional authority to repel invasions and the Rivers and Harbors Act. *See United States v. Hansen*, 143 S. Ct. 1932, 1946 & n.3 (2023) (applying constitutional avoidance in immigration context). "Under the doctrine of constitutional avoidance, '[w]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.'" *Hersh v. U.S. ex rel. Mukasey*, 553 F.3d 743, 753–54 (5th Cir. 2008) (quoting *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568 (1988)). Here, the State has deployed the buoy system to prevent cartels from trafficking an unprecedented number of aliens, an unknown number of terrorists, and illegal drugs such as fentanyl across the Rio Grande. To prevent a collision between the Rivers and Harbors Act and the State's constitutionally guaranteed right to protect itself, the Court should hold that the terms of the Rivers and Harbors Act do not apply here.

As the Supreme Court has recognized, border States "bear[] many of the consequences of unlawful immigration." *Arizona*, 567 U.S. at 397. And those consequences are severe, as detailed above. At a minimum, this Court should not enter a mandatory preliminary injunction that will all

---

[21] Press Release, *Governor Abbott Designates Mexican Cartels As Terrorist Organizations*, Office of the Texas Governor (Sept. 21, 2022), https://gov.texas.gov/news/post/governor-abbott-designates-mexican-cartels-as-terrorist-organizations; Victor Nava, *Armed Men Believed to be Mexican Cartel Members Wearing Body Armor Spotted Crossing Southern Border into Texas*, New York Post (August 8, 2023), https://nypost.com/2023/08/08/armed-men-in-body-armor-spotted-crossing-southern-border/.

but dispose of this case on expedited briefing and without trial, in view of these significant concerns related to federalism and a State's constitutional right to defend itself in case of invasion.

## II.  The Remaining Factors Do Not Favor a Preliminary Injunction.

The United States has failed to show either that irreparable harm will occur prior to the trial on the merits of this case in the absence of a preliminary injunction, or that the equities and public interest favor an extraordinary mandatory preliminary injunction.

**A.** The United States first asserts (at 14–16) that the presence of the buoy system harms its relationship with the government of Mexico. But the evidence that the United States uses to support that proposition is insufficient. Even fully credited, that evidence shows at most that the buoy system "has become the subject of diplomatic concern between Mexico and the United States" and "the presence of the floating barrier in the Rio Grande for any extended period of time . . . would become a major irritant in U.S.-Mexico relations and damage U.S. foreign policy." ECF No. 5-7 at ¶¶ 3, 13. Far from showing that irreparable harm has occurred or even will occur, this is merely speculation that, should this case take months or year to resolve, some harm that might or might not be irreparable would occur in the relationship between the United States and Mexico. But "a showing of '[s]peculative injury is not sufficient'" to support a showing of irreparable harm. *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011) (quoting *Productos Carnic, S.A. v. Cent. Amer. Beef & Seafood Trading Co.*, 621 F.2d 683, 686–87 (5th Cir. 1980)). This is particularly true where, as here, the United States seeks preliminary relief in the form of a disfavored mandatory injunction. In any event, the federal government has no freewheeling power to prevent States from doing anything that "may upset foreign powers." *Arizona*, 567 U.S. at 423–24 (Scalia, J., concurring in part and dissenting in part) (citing *Medellin v. Texas*, 552 U.S. 491 (2008)).

The United States also asserts (at 15) that it will be irreparably harmed because the buoy system interferes with lateral navigation across the Rio Grande and "could present risks to navigation and public safety." But lawful commerce, as opposed to drug or human smuggling, is nonexistent in this segment of the river. Ex. B, Escalon Decl. ¶ 3. Ex. A, Nordloh Decl. ¶ 7. And because there is no port of entry at the site of the buoy system, navigation across the river from

Mexico into the United States is unlawful in any event. Moreover, the mere possibility that either navigation or some risk to navigation could materialize is both contested and speculative—and Texas Department of Public Safety officials monitor the buoy system continuously to minimize such risks in any event. The United States offered no evidence that the buoys are a threat to public safety; the evidence shows the contrary.

**B.** The public interest and the balance of the equities likewise do not support relief, particularly not mandatory injunctive relief. As discussed above, millions of individuals and hundreds of millions of fatal doses of illegal drugs have crossed the State's border with Mexico because of the federal government's refusal to secure it.[22] Five Texans died per day in 2022 from fentanyl poisoning. And the State has a strong interest in preventing the harms from such criminality and illegal immigration from being visited on its citizens. Indeed, the harms that the United States purports to identify—potential future harms to the United States' relationship with Mexico and minor impairments to navigation on a nonnavigable segment of the Rio Grande—are incommensurate with that interest. *See Shively v. Bowlby*, 152 U.S. 1, 24 (1894) (State's "right to prohibit persons not citizens of the state" from "tide waters within the state" was subject only to federal government's right of navigation). Considerations of federalism as well strongly counsel against any federal court injunction that would thwart a State and its commander-in-chief in their efforts to respond to a deadly crisis for less than the most urgent and compelling command of the Constitution or federal law. *See New York v. New Jersey*, 143 S. Ct. 918, 925 (2023) (refusing to interpret compact to "delegat[e] a fundamental aspect of a State's sovereign power—its ability to protect the people, property, and economic activity within its borders").

---

[22] On December 15, 2021, President Biden found that "the trafficking into the United States of illicit drugs, including fentanyl and other synthetic opioids, is causing the deaths of tens of thousands of Americans annually" and declared "a national emergency to deal with the threat." Exec. Order 14059, 86 Fed. Reg. 71549. President Biden continued that national emergency in effect on December 12, 2022. On April 21, 2022, President Biden sent to Congress a National Drug Control Strategy, noting that drug overdoses "have taken a heartbreaking toll claiming 106,854 lives in the most recent 12-month period." A key part of the Strategy was "specific border strategies" to "strengthen interdiction and law enforcement capabilities on our Nation's borders."

What's more, the buoy system protects not only the safety of the State and its citizens, but also aliens attempting to enter Texas. The floating buoy system is designed to save lives and direct aliens to appropriate ports of entry while deterring unlawful, dangerous crossings through the Rio Grande. Ex. C, Flossman Decl. ¶ 4. Aliens who enter the United States and Texas at ports of entry—rather than attempting an illegal and dangerous water crossing on what is reported to be the world's deadliest land border—may enter lawfully if allowed to do so and in any event do not risk death or drowning while illegally crossing the Rio Grande. *Supra*, 3-4. This independently shows that the equities and the public interest do not favor a preliminary injunction.

## Conclusion

The Court should deny the request for a preliminary injunction.

Date: August 9, 2023

Respectfully submitted,

ANGELA COLMENERO
Provisional Attorney General

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

RALPH MOLINA
Deputy Attorney General for Legal Strategy

OFFICE OF THE ATTORNEY GENERAL
P. O. Box 12548, MC-009
Austin, TX 78711-2548
(512) 936-2172

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN
Special Counsel
Tex. State Bar No. 00798537
patrick.sweeten@oag.texas.gov

RYAN D. WALTERS
Deputy Chief
Special Litigation Division
Tex. State Bar No. 24105085
ryan.walters@oag.texas.gov

DAVID BRYANT
Special Counsel
Tex. State Bar No. 03281500
david.bryant@oag.texas.gov

MUNERA AL-FUHAID
Special Counsel
Tex. State Bar No. 24094501
munera.al-fuhaid@oag.texas.gov

**Counsel for Defendants**

## CERTIFICATE OF SERVICE

On August 9, 2023, this document was filed electronically through the Court's CM/ECF system, which automatically serves all counsel of record.

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN

EXHIBIT H: PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

UNITED STATES OF AMERICA,

        *Plaintiff,*

    v.

GREG ABBOTT, in his capacity as
GOVERNOR OF THE STATE OF TEXAS,
and THE STATE OF TEXAS,

        *Defendants.*

Case No. 1:23-cv-00853-DAE

---

## PLAINTIFF UNITED STATES' REPLY IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

JAIME ESPARZA
UNITED STATES ATTORNEY

JAMES E. DINGIVAN
  Assistant United States Attorney
  Texas Bar No. 24094139
United States Attorney's Office
Western District of Texas
601 N.W. Loop 410, Ste 600
San Antonio, TX 78216
(210) 384-7372 (tel)
(210) 384-7312 (fax)
James.dingivan@usdoj.gov

TODD KIM
ASSISTANT ATTORNEY GENERAL
Environment & Natural Resources Division

BRIAN H. LYNK
  Senior Trial Counsel
  DC Bar No. 459525
KIMERE J. KIMBALL
  Trial Attorney
  CA Bar No. 260660
ANDREW D. KNUDSEN
  Trial Attorney
  DC Bar No. 1019697
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
(202) 514-6187 (Lynk)
(202) 514-8865 (fax)
Brian.lynk@usdoj.gov
Kimere.kimball@usdoj.gov
Andrew.knudsen@usdoj.gov

Dated:  August 16, 2023

*Counsel for the United States of America*

# TABLE OF CONTENTS

Table of Contents ..................................................................................................... ii

Table of Authorities .................................................................................................iii

   I.  The United States Will Likely Succeed on the Merits. ...................................... 2

      A.  The RHA Bars Unauthorized Structures and Obstructions in These Waters. .............. 2

      B.  Texas Violated Clause 2 of RHA Section 10 by Building a "Structure." .................... 6

      C.  Texas Violated Clause 1 of Section 10 by "Obstruct[ing] … Navigable Capacity." ... 8

      D.  The Self-Defense Clause Does Not Excuse Texas's Section 10 Violations. ................ 9

   II.  Preliminary Injunctive Relief Is Warranted to Address Texas's RHA Violations. ........... 11

   III. The United States Requests Only a Return to the Status Quo. ......................................... 12

Conclusion ............................................................................................................... 13

# TABLE OF AUTHORITIES

## UNITED STATES CONSTITUTION

U.S. Const. art. I., § 8, cl. 15 ..................................................................................10

U.S. Const. art. I., § 9, cl. 2 ......................................................................................9

U.S. Const. art. I, § 10, cl. 3 ................................................................................9, 10

U.S. Const. art. IV, § 4 ............................................................................................10

## CASES

*Atlee v. Union Packet Co.*,
  88 U.S. 389 (1874) ...........................................................................................7

*Arizona v. United States*,
  567 U.S. 387 (2012) ................................................................................... 10, 12

*Byrum v. Landreth*,
  566 F.3d 442 (5th Cir. 2009) ...........................................................................3

*California v. United States*,
  104 F.3d 1086 (9th Cir. 1997) ....................................................................9, 10

*Chiles v. United States*,
  69 F.3d 1094 (11th Cir. 1995) .........................................................................9

*Clark v. Martinez*,
  543 U.S. 371 (2005) .........................................................................................9

*Economy Power & Light v. United States*,
  256 U.S. 113 (1921) .........................................................................................5

*Martinez v. Mathews*,
  544 F.2d 1233 (5th Cir. 1976) .......................................................................12

*New Jersey v. United States*,
  91 F.3d 463 (3d Cir. 1996) ..........................................................................9, 10

*Newbold v. Kinder Morgan SNG Operator, L.L.C.*,
  65 F.4th 175 (5th Cir. 2023) ...........................................................................6

*Nova Health Sys. v. Edmondson*,
   460 F.3d 1295 (10th Cir. 2006) ................................................12

*Padavan v. United States*,
   82 F.3d 23 (2d Cir. 1996).................................................9, 10

*Sanitary Dist. of Chicago v. United States*,
   266 U.S. 405 (1924) (Holmes, J.) ....................................12

*Texas v. United States*,
   106 F.3d 661 (5th Cir. 1997) ...........................................10

*Tugwell v. Eagle Pass Ferry Co.*,
   9 S.W. 120 (Tex. S. Ct. 1888).........................................4

*United States v. Appalachian Elec. Power Co.*,
   311 U.S. 377 (1940)................................................2, 4, 5, 6

*United States v. Raven*,
   500 F.2d 728 (5th Cir. 1974) ..........................................8

*United States v. Republic Steel Corp.*,
   362 U.S. 482 (1960).......................................................8

*United States v. Rio Grande Dam & Irrigation Co.*,
   174 U.S. 690 (1899).......................................................5

*Vieux Carre Prop. Owners, Residents & Assocs., Inc. v. Brown*,
   875 F.2d 453 (5th Cir. 1989) ..........................................8

*Wages & White Lion Invs., LLC v. U.S. Food & Drug Admin.*,
   16 F.4th 1130 (5th Cir. 2021) ........................................12

## STATUTES

33 U.S.C. § 401 ................................................................3

33 U.S.C. § 403................................................................1, 2

## CODE OF FEDERAL REGULATIONS

33 C.F.R. § 329.4.............................................................6

## DICTIONARY

*Boom*, Webster's International Dictionary of the English Language (1890)...................7

*Boom*, Webster's Revised Unabridged Dictionary (1913) .............................................................7

*Dolphin*, Webster's Academic Dictionary 178 (1895) ...................................................................7

Texas admits that, without federal authorization, it deployed a roughly 1,000-foot barrier consisting of "multiple interconnected buoys tethered via chains to concrete blocks placed on the bed of [a] river," the Rio Grande, that traces the United States' border with Mexico and is "about 200 feet wide where the buoy system is placed." Defs' Mem. in Opp. to Mot. for Prelim. Injunction ("Opp.") 5-6 (ECF 26). Texas asserts that it did this "to repel [an] invasion" of persons and goods, *id.* at 20, by "discourag[ing] passage" across the Rio Grande, *id.* at 15. Yet, in Texas's view, the United States is unlikely to succeed on the merits of its Rivers and Harbors Act ("RHA") Section 10 claim because Texas's Floating Barrier is somehow neither a "structure" nor an "obstruction," and because this particular stretch of the river is not a "navigable river, or other water of the United States." 33 U.S.C. § 403. Texas's contradictory position is without merit, and this Court should reject it.

That is reason enough to award preliminary relief. Texas offers no rebuttal to Point II of our motion, namely, that this Court should award a preliminary injunction to halt a Section 10 violation irrespective of whether the United States establishes irreparable injury beyond that bare violation. Regardless, the United States has shown such injury, chiefly to its relations with Mexico—and that was *before* it was determined that the bulk of Texas's Floating Barrier intrudes into the sovereign territory of Mexico. This intrusion would have been avoided had Texas simply done as Congress instructed: seek and obtain federal authorization before placing any structures or obstructions in the Rio Grande.

Because the Floating Barrier is a single, integrated structure traversing an international boundary, the safest and soundest means for its prompt removal is for a single actor to remove the barrier. The Government of Mexico has requested the United States to effectuate removal of the entire Floating Barrier and associated materials, including the portion of the barrier located in

Mexico's territory, in coordination with the IBWC. An order of this Court requiring removal of the entire Floating Barrier by Defendants, in coordination with the IBWC and the U.S. Army Corps of Engineers, will enable the United States to fulfill that request. Thus, the Court should order Defendants to remove the entirety of their Floating Barrier in coordination with the IBWC and the Corps, and to refrain from building any such barrier elsewhere in the Rio Grande while litigation proceeds.

## I.      The United States Will Likely Succeed on the Merits.

The United States is likely to succeed in showing two violations of RHA Section 10: Texas built a "structure" in a "navigable river, or other water of the United States," and additionally "obstruct[ed]" the "navigable capacity" of that water. 33 U.S.C. § 403. Texas claims first that the United States has not carried its evidentiary burden to show that the Rio Grande, at this specific location, is a water to which Section 10 applies. Texas alternatively argues that its 1,000-foot anchored barrier is neither a structure nor an obstruction. Lastly, Texas suggests there may be an implied exemption to the RHA's prohibition for actions the State takes in furtherance of its own position on immigration. All of Texas's arguments are wrong.

### A.      The RHA Bars Unauthorized Structures and Obstructions in These Waters.

Section 10 prohibits all unauthorized structures and obstructions in "any of the waters of the United States," including but not limited to "navigable river[s]." 33 U.S.C. § 403. It is well established in Supreme Court caselaw that whether a water is "navigable" under Section 10 is not determined *solely* by considering any *current* use in interstate or foreign commerce. Rather, navigability may be established based on evidence of a water's historic use or its susceptibility to future use if reasonable improvements were made to the river to facilitate such commerce. *See, e.g., United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 407-09 (1940). Contrary to Texas's assertion, the United States has carried its burden at this stage to show that the Rio

Grande in the vicinity of Eagle Pass, Texas, is a water subject to Section 10. *See Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009) ("A plaintiff is not required to prove its entitlement to summary judgment in order to establish 'a substantial likelihood of success on the merits' for preliminary injunction purposes.").  The Rio Grande forms a nearly 1,250-mile border between the United States and Mexico (our largest foreign-trade partner), is the central subject of numerous treaties and federal statutes, is a vital water source for the populace and the commerce of several States, and is historically important to commerce and travel in the Southwest.  Texas's position that it is not a "water of the United States" is untenable.

*First*, the Court cannot ignore clear evidence that Congress itself, contemporaneous with the RHA's enactment, acknowledged the navigability of this specific portion of the Rio Grande. Congress had only recently enacted "[a]n act to authorize the construction of a bridge over the Rio Grande River between the cities of Eagle Pass, Texas, and Piedras Negras, Mexico," 23 Stat. 29 (1884), that required "free navigation of said river" to be maintained, and gave federal courts jurisdiction over cases "arising from an obstruction or an alleged obstruction to the free navigation thereof," *id.* § 3, 23 Stat. 30 (Reply Att. 11, numbering consecutively from the Motion's attachments).  This statute—a precursor to Section 9 of the RHA, 33 U.S.C. § 401— created a regime closely resembling RHA Section 10, with the specific aim of protecting the Rio Grande's navigability near Eagle Pass.  *See also* 42 Stat. 1482 (1923) (Reply Att. 12) (authorizing bridge at Eagle Pass only "at a point suitable to the interest of navigation").[1] Congress used comparable language regarding navigability in a pair of 1890 statutes authorizing other commercial projects—electric wires and water pipes—in the same vicinity.  26 Stat. 495

---

[1] Any contrary views of current members of Congress (*e.g.*, as expressed by Congressional amici, ECF 24) do not countermand the legal effect of prior Congresses' duly enacted statutes.

(1890); 26 Stat. 502 (1890) (Reply Atts. 13, 14). Congress's sensitivity to navigation within this portion of the Rio Grande reflected the actual navigation and commercial activity there in that era.[2] "When once found to be navigable, a waterway remains so." *Appalachian Elec. Power Co.*, 311 U.S. at 408.

*Second*, the Fort Worth District of the U.S. Army Corps of Engineers, the agency that Congress charged with administering and enforcing Section 10, has determined that the entirety of the Rio Grande in its jurisdiction (which includes Eagle Pass) is "navigable," within the meaning of the RHA. Mot. for PI Att. 8 (Shelnutt Decl. ¶ 3). Joseph Shelnutt, the Corps' witness whom Texas deposed, cited the agency's 1975 navigability study as the basis for the Corps' designation of this sweep of the river as navigable. Opp. Ex. F, Shelnutt Dep. at 48:23-49:25, 50:6-23. That 1975 study notes intervening economic and policy developments have prioritized other river uses and purposes over commercial navigation, including construction of the Amistad Dam to divert significant quantities of water for irrigation. Reply Att. 15, Shelnutt Decl. ¶ 5 & Ex. B at 15-16. The study nonetheless finds that the Rio Grande could be navigated by some vessels in its then-current "natural condition," *i.e.*, with its flows reduced by dams as noted. *Id.* ¶ 5 & Ex. B at 19. It also finds that "[i]mprovement of the Rio Grande [beyond its natural condition] for navigation is physically possible"—in the *entire* river within the District's

---

[2] *See, e.g.*, Decl. of Joseph L. Shelnutt (Aug. 15, 2023), attaching Navigability Study, Rio Grande, Tributaries, and Lakes, Rio Grande Basin, River Mile 275.5-610.0 (March 31, 1975) ("1975 study") at 26 (pdf page number) (Reply Att. 15, Ex. B at 26) (noting "a great deal of interest … pertaining to transportation of goods along the Rio Grande" in the nineteenth century and citing sources reflecting that steam navigation was then possible well upstream of Eagle Pass, including one expedition that navigated "up to Babbitt's Falls (probably RM 750)," more than 100 miles upstream of Eagle Pass, and another account that the river was considered navigable for "500 miles above Laredo," again well above Eagle Pass); *see also Tugwell v. Eagle Pass Ferry Co.*, 9 S.W. 120 (Tex. S. Ct. 1888) (resolving dispute between ferry companies operating between Eagle Pass and Piedras Negras).

jurisdiction, not just the reach near Eagle Pass—but would require the "judicious[] use[]" of the Amistad and other dams. *Id.* ¶ 6 & Ex. B. at 19; *see also Appalachian Elec. Power*, 311 U.S. at 407 ("A waterway, otherwise suitable for navigation, is not barred from that classification merely because artificial aids must make the highway suitable for use before commercial navigation may be undertaken."). Though Congress's policy choices have rendered some portion of an otherwise navigable river "incapable of [commercial use] according to present methods, either by reason of changed conditions or because of artificial obstructions," the river remains "navigable" if riparian commerce is susceptible to restoration if the policy choices change—even after "a hundred years." *Economy Power & Light v. United States*, 256 U.S. 113, 123-24 (1921).

The Corps' 1975 navigability study also noted long-standing legal precedent regarding the navigability of the Texas stretch of the Rio Grande, including the United States' treaties with Mexico governing the use of the river,[3] as well as the Supreme Court's decision in *United States v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690 (1899).[4]  *See* Reply Att. 15, Ex. B at 23-25.

---

[3] *See, e.g.,* 9 Stat. 928 (Reply Att. 16) (the 1848 Treaty of Guadalupe Hidalgo, declaring that, at all points below New Mexico, "the navigation of" the Rio Grande "shall be free and common to the vessels and citizens of both countries; and neither shall, without the consent of the other, construct any work that may impede or interrupt, in whole or in part, the exercise of this right; not even for the purpose of favoring new methods of navigation."); 10 Stat. 1034 (Reply Att. 17) (the 1853 Gadsden Treaty, identifying the upstream limit of applicability of the 1848 Treaty at a longitudinal and latitudinal point that is near El Paso and well upstream from Eagle Pass, Texas).

[4] In *Rio Grande Dam*, the Supreme Court found it unnecessary to determine if a company's proposal to dam the river upstream, in New Mexico, violated the 1848 and 1853 treaty provisions, as the United States had an independent duty "to preserve, for [its] own citizens, the navigability of its navigable waters." *Id.* at 700-01. The amicus brief of members of Congress cites the Supreme Court's remand in *Rio Grande Dam* for further factual development as a reason not to award a preliminary injunction here. ECF 24 at 6. But the Court did not remand for a determination of navigability of the *Texas* stretch of the Rio Grande; indeed, the Court appears to have *assumed* navigability there. *See* 174 U.S. at 708.

Regarding susceptibility for future commercial use, the Corps found that while there were no plans in 1975 to improve the Rio Grande for navigation throughout the jurisdiction of the Fort Worth District, the river's "natural and ordinary condition …, its volume of water, gradient and regularity of flow do not preclude future improvement for smaller commercial craft."  Reply Att. 15, Ex. B at 27.  That finding suffices to establish navigability.  *See Appalachian Elec. Power*, 311 U.S. at 409 ("Small traffic compared to the available commerce of the region is sufficient.").

Texas cites (Opp. 9) the Corps' regulations implementing the RHA's navigability standard but wrongly argues (Opp. 10) that a finding of navigability must rest on "existing uses of the waterway."  Navigable waters include those that "are presently used, *or have been used in the past, or may be susceptible for use* to transport interstate or foreign commerce."  33 C.F.R. § 329.4 (emphasis added).  That regulatory text is consistent not only with the Supreme Court cases cited above, but also Fifth Circuit precedent, *see Newbold v. Kinder Morgan SNG Operator, L.L.C.*, 65 F.4th 175, 181 (5th Cir. 2023) ("'[T]he extent of existing commerce is not the test' for navigability."), and the Sixth Circuit standard that Texas ostensibly adopts (Opp. 9).[5]

Therefore, the portion of the Rio Grande in the vicinity of Eagle Pass, Texas, is a navigable water to which the prohibitions of RHA Section 10's first and second clauses apply.

### B.    Texas Violated Clause 2 of RHA Section 10 by Building a "Structure."

Texas's claim that its 1,000-foot floating barrier is not a "structure" is implausible.  Even Texas concedes that the catchall phrase "other structure" includes any structure that is "similar in nature to the preceding specific terms" (Opp. 16), including the term "boom."  Texas attempts to

---

[5] The Congressional amici concede that a "historically navigable river" that undergoes changed conditions due to man-made obstructions is still, under Supreme Court precedent, a "navigable river," and they fail to explain why changed conditions from the man-made dam diversions on the Rio Grande should be treated differently.  *See* ECF 24 at 8-9.

draw a "subtle," "directional distinction" (Opp. 14) between its Floating Barrier and a boom, based on Texas's (erroneous) assertion that a boom is always positioned perpendicular to the current, whereas the majority of Texas's Floating Barrier is positioned roughly parallel to the current. But even if a 90° rotation could suffice to render the Floating Barrier not a "boom," a mere difference in spatial orientation does not make it sufficiently *dissimilar* to a "boom" to remove the otherwise-covered structure from the scope of the RHA's prohibitions.

In any event, Texas's directional distinction is without merit. The essence of a "boom" is that it "obstruct[s] passage," *Boom*, Webster's International Dictionary of the English Language (1890), whether of vessels, logs, or—in the case of Texas's Floating Barrier—persons and goods. Obstruction of passage may occur laterally as well as longitudinally. For example, as Texas observes, a boom may "enclos[e] an area of water" without crossing a river. Opp. 15 (quoting *Boom*, Webster's Revised Unabridged Dictionary (1913)). Moreover, it is not hard to find descriptions and drawings of booms, contemporaneous with the RHA's enactment, that run longitudinally with the river. *E.g.*, *Atlee v. Union Packet Co.*, 88 U.S. 389, 392 (1874) (describing boom running parallel to shore between two piers); Frank Leslie, *The Great Log Jam*, Popular Monthly (July 1901), http://www.catskillarchive.com/rrextra/lgjam.Html (depicting boom running length of river, parallel to shore).

That the specific word "buoy" does not appear in Section 10 is irrelevant. The Floating Barrier is not an isolated "buoy" used to "*assist* navigation," Opp. 15, but a "buoy system" that, by virtue of its sheer size and composition, functions as a "physical barrier[]," *id.* at 6. And even if the floating barrier were merely a buoy, a "dolphin"—one of the structures explicitly barred by the Act—is defined to include "a buoy." *Dolphin*, Webster's Academic Dictionary 178 (1895).

Texas asserts (Opp. 17) that the Floating Barrier is too impermanent to comprise an RHA "structure." But its own declarants attest that moving the barrier would require "several weeks," heavy machinery, and $300,000. Opp. Ex. C, Flossman Decl. ¶¶ 6-7; Opp. Ex. B, Escalon Decl. ¶ 14. If that were enough to exempt a structure from RHA coverage, it would render the statute a nullity. To take one example, Texas's archetype of a "boom"—a "strong chain cable," Opp. 15—would be far too easily moved to be a structure covered by the Act.

In sum, Texas is in violation of Clause 2 of Section 10.

**C.   Texas Violated Clause 1 of RHA Section 10 by "Obstruct[ing] … Navigable Capacity."**

Texas argues (Opp. 12-13) that navigable capacity can only be considered in relation to present-day commerce. But "[t]he Supreme Court has encouraged a broad interpretation of a section 10 'obstruction,'" and the Fifth Circuit has approved the Corps' consideration of "possible future effects in navigable waters." *Vieux Carre Prop. Owners, Residents & Assocs., Inc. v. Brown*, 875 F.2d 453, 462-63 (5th Cir. 1989). The Floating Barrier is a threat to navigation, not just across the river but also up and down the river, as "whoever's steering [a] vessel would have to take note of and make sure they avoid it." Opp. Ex. F, Shelnutt Dep. 72:14-74:5.

Texas asserts without foundation (Opp. 13-14) that Section 10 prohibits only obstructions "extending out into rivers and set perpendicular to the current." That limitation does not appear in the text, and Texas cites no authority finding that an object did not obstruct a river because it was not so positioned. On the contrary, courts routinely find "obstruction" by objects that do not extend perpendicularly from the shore. The Supreme Court held industrial solids deposited into a river were an obstruction. *United States v. Republic Steel Corp.*, 362 U.S. 482, 485 (1960). The Fifth Circuit held that a sunken schooner was an obstruction. *United States v. Raven*, 500

F.2d 728, 731 (5th Cir. 1974). If both "floating particles" and "an 83 ft. schooner" create obstructions, there is no doubt that the 1000-foot Floating Barrier does.

### D. The Self-Defense Clause Does Not Excuse Texas's Section 10 Violations.

Texas argues (Opp. 18-21) that it constructed the Floating Barrier pursuant to the Self-Defense Clause, U.S. Const. art. I, § 10, cl. 3, because Texas purportedly is being "invaded," and that the Court accordingly must interpret the RHA to exempt Texas's facially unlawful conduct. This is not a "constitutional avoidance" defense, but a sweeping claim that States may ignore the will of Congress whenever their Governors unilaterally declare an "invasion." Texas asks the Court not to "choos[e] between competing plausible interpretations of a statutory text"—its argument is divorced from and makes no reference to the RHA's words—but rather to "render [the] statute a chameleon, its meaning subject to change depending on the presence or absence of constitutional concerns in each individual case." *Clark v. Martinez*, 543 U.S. 371, 382 (2005). The RHA's text is not fairly amenable to Texas' construction, under which it could create *any* structure or obstruction in *any* water of the United States to fend off a self-declared invasion.

In any event, there are no constitutional concerns that bear on the interpretive question here because the political-question doctrine bars consideration of Texas's "invasion" allegation. Courts of appeals have uniformly held that what constitutes an "invasion" triggering the Self-Defense Clause is a nonjusticiable political question. *See California v. United States*, 104 F.3d 1086, 1090-91 (9th Cir. 1997); *New Jersey v. United States*, 91 F.3d 463, 469-70 (3d Cir. 1996); *Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996); *Chiles v. United States*, 69 F.3d 1094, 1097 (11th Cir. 1995). Whether and when an "invasion" occurs is a matter of foreign policy and national defense, which the Constitution specifically commits to the federal government. *See Padavan*, 82 F.3d at 28; *California*, 104 F.3d at 1091; *New Jersey*, 91 F.3d at 470. That commitment is especially strong when the purported invasion also involves "the subject of

immigration and the status of aliens," which the Constitution assigns exclusively to Congress.[6] *Arizona v. United States*, 567 U.S. 387, 394-95 (2012); *New Jersey*, 91 F.3d at 469.

In particular, "there are no manageable standards to ascertain whether or when an influx of illegal immigrants should be said to constitute an invasion." *California*, 104 F.3d at 1091; *accord New Jersey*, 91 F.3d at 470. For much the same reason, the Fifth Circuit has dismissed as nonjusticiable a claim that the United States' purported "fail[ure] to control illegal immigration" violated the Naturalization Clause, finding that there are no "judicially discoverable standards for determining whether immigration control efforts by Congress are constitutionally adequate." *Texas v. United States*, 106 F.3d 661, 664-65 (5th Cir. 1997).

Even if Texas's Self-Defense Clause argument were justiciable, it would fail. Immigration is not the kind of "invasion" contemplated by the Self-Defense Clause. An invasion is "armed hostility from another political entity, such as another state or foreign country that is intending to overthrow the state's government."[7] *Padavan*, 82 F.3d at 28; *California*, 104 F.3d at 1091; *see Debates and Other Proceedings of the Convention of Virginia*, 302 (2d ed., 1805) (Reply Att. 18) (reflecting James Madison's understanding that "invasion" means "invasion from other states, as well as from foreign powers"). The Self-Defense Clause's narrow applicability is

---

[6] Amicus the Immigration Reform Law Institute ("IRLI") agrees that identifying an "invasion" is a political question, but wrongly asserts that as a result the Court *must accept* Texas's claim of invasion as valid. ECF 33 at 5-7. The Constitution does not commit this issue to Texas's sole discretion. Several constitutional provisions assign the *federal* government—not states—the authority to recognize and respond to invasions. *See* U.S. Const. art. I., § 8, cl. 15 (power to call forth militia), art. I, § 9, cl. 2 (power to suspend habeas corpus). Indeed, numerous courts have found (and IRLI concedes) that the Self-Defense Clause's corresponding provision at U.S. Const. art. IV, § 4 commits the question whether an invasion has occurred to the federal government. ECF 33 at 4, 5; *California*, 104 F.3d at 1091; *New Jersey*, 91 F.3d at 469.

[7] Texas tries to find support (Opp. 18) in Justice Scalia's partial dissent in *Arizona*. But even that opinion acknowledged the irrelevance of the Self-Defense Clause to Arizona's power to respond to unlawful immigration. 567 U.S. at 419 (Scalia, J., concurring in part and dissenting in part).

evident from the extraordinary powers it unlocks when triggered: A state that has been "actually invaded" may "engage in War," even without Congress's consent. U.S. Const. art. I, § 10, cl. 3; *cf.* ECF 33 at 7-8 (brief of amicus IRLI arguing that once Texas decides, in its sole discretion, that it has been "actually invaded," it is subject to no federal oversight of its "chosen means of waging war"). It is implausible that the Constitution would so substantially undermine its vesting of the war powers in the federal government by permitting states to unilaterally take these actions in response to immigration by individuals.

For all these reasons, the Court should reject Texas's invitation to write an "unlawful immigration" exception into the RHA, as it should reject the rest of Texas's merits arguments. The United States is likely to succeed on the merits.

## II. Preliminary Injunctive Relief Is Warranted to Address Texas's RHA Violations.

Because this suit seeks to enforce a violation of a public-interest statute, the Court may grant a preliminary injunction based solely on the United States' likelihood of success on the merits. Mot. 12-13. Texas does not contest this principle in its Opposition and has therefore forfeited any arguments against it.

But to the extent this Court considers all the traditional equitable factors, each favors a preliminary injunction. Mot. 13-19. The irreparable harm to the United States if the Floating Barrier remains in place, or if Texas builds additional barriers, is far from "speculative." Opp. 21. The harm to the United States' conduct of foreign relations is *immediate* and *ongoing*, as the evidence shows.[8] Texas's conduct is already "the subject of diplomatic concern between Mexico and the United States," and has concretely disrupted the countries' cooperative efforts to manage the delivery of water to the United States. Quam Decl. ¶ 3; Pena Decl. ¶¶ 16-18, 25. Since the

---

[8] Texas also fails to dispute any harm to federal agency operations on the Rio Grande that the U.S. established in its opening motion. Opp. 21-22; *see* Mot. 3, 6-7, 15

United States filed its motion, removal of the Floating Barrier has remained a top-priority issue in foreign relations between the two nations, *see* Quam Decl. (August 15, 2023) ¶¶ 3, 4 (Reply Att. 19), and that concern has only been exacerbated by the knowledge that the bulk of this unlawful structure is actually located in Mexican territory, ECF 32. That the harm might become *worse* without injunctive relief does not mean no harm is occurring now. Only the prompt removal of the entire Floating Barrier will remedy this harm.

Finally, the public interest and balance of equities favor preliminary relief. Mot. 16-19. The United States is merely seeking to enforce Congress's clear command in Section 10 of the RHA. Texas's invocation of "[c]onsiderations of federalism," Opp. 22, rings hollow in light of *Arizona*'s holding that states may not "undermine federal law" in pursuit of their own preferred immigration policies. *See* 567 U.S. at 416. "There is no question" that the United States' authority under the RHA "is superior to that of the States" to implement policies they allege will "provide for the welfare or necessities of their inhabitants." *Sanitary Dist. of Chicago v. United States*, 266 U.S. 405, 426 (1924) (Holmes, J.).

## III.   The United States Requests Only a Return to the Status Quo.

Texas contends (Opp. 8) that the United States carries a heavier burden because it seeks a "mandatory injunction" that "goes well beyond simply maintaining the status quo pendente lite." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976). On the contrary, the United States' motion seeks to restore the "last peaceable uncontested status existing between the parties before the dispute developed," which is the generally accepted meaning of status quo. *See Nova Health Sys. v. Edmondson*, 460 F.3d 1295, 1298 n.5 (10th Cir. 2006); *cf. Wages & White Lion Invs., LLC v. U.S. Food & Drug Admin.*, 16 F.4th 1130, 1144 (5th Cir. 2021). The relevant status quo is the state of affairs *before* Texas deployed its unlawful barrier in the Rio Grande.

Developments since the United States' motion was filed do not alter the appropriateness of the relief requested in the Motion.  While it is now clear that the Floating Barrier straddles an international border, it remains a single, integrated structure whose prompt and safe removal can best be effected in a single operation.  The Government of Mexico has requested that the United States effectuate removal of the entire Floating Barrier and associated materials, including the portion of the barrier located in Mexico's territory, in coordination with the IBWC.  An order requiring removal of the entire Floating Barrier by Defendants in coordination with the IBWC, as well as the Corps, will enable the United States to fulfill that request.  This Court should so order.  Further, as our Motion requests, the Court should enter prohibitory injunctive relief that prevents Texas from building additional structures in the Rio Grande (for which it has publicly announced plans) without authorization from the Corps.

## CONCLUSION

The Court should grant the United States' motion for a preliminary injunction.

Respectfully submitted,

Dated:  August 16, 2023

JAIME ESPARZA
UNITED STATES ATTORNEY

TODD KIM
ASSISTANT ATTORNEY GENERAL
Environment & Natural Resources Division

*/s/ James E. Dingivan*
JAMES E. DINGIVAN
  Assistant United States Attorney
  Texas Bar No. 24094139
United States Attorney's Office
Western District of Texas
601 N.W. Loop 410, Ste 600
San Antonio, TX 78216
(210) 384-7372 (tel.)
(210) 384-7312 (fax)
James.dingivan@usdoj.gov

*/s/ Brian H. Lynk*
BRIAN H. LYNK
  Senior Trial Counsel
  DC Bar No. 459525
KIMERE J. KIMBALL
  Trial Attorney
  CA Bar No. 260660
ANDREW D. KNUDSEN
  Trial Attorney
  DC Bar No. 1019697
U.S. Department of Justice
Environmental Defense Section

P.O. Box 7611
Washington, DC 20044
(202) 514-6187 (Lynk)
(202) 514-8865 (fax)
Brian.lynk@usdoj.gov
Andrew.knudsen@usdoj.gov
Kimere.kimball@usdoj.gov

*Counsel for the United States of America*

## CERTIFICATE OF SERVICE

I certify that on August 16, 2023, a copy of this filing was served on all counsel of record using this Court's electronic filing system.

*/s/ Brian H. Lynk*
Brian H. Lynk

EXHIBIT I: DEFENDANTS' SURREPLY

**United States District Court**
**Western District of Texas**
**Austin Division**

| | |
|---|---|
| United States of America, | |
| *Plaintiff*, | |
| v. | No. 1:23-cv-00853-DAE |
| Greg Abbott, in his capacity as Governor of the State of Texas, and the State of Texas, | |
| *Defendants*. | |

**Defendants' Surreply to the United States'**
**Reply in Support of Motion for Preliminary Injunction**

Perhaps recognizing that its Rivers and Harbors Act theory is doomed, the United States remakes it on the fly. After filing a preliminary-injunction motion supported by eight declarations, ECF 5, the United States filed a "Notice" claiming the buoys cross the U.S.–Mexico boundary in violation of international treaties, ECF 30. The United States filed this after Texas responded, ECF 26, even though the IBWC conducted its survey almost *two weeks* prior. When it replied, the United States attached two new declarations, contending irreparable harm now flows from diplomatic disruption from the IBWC's "discovery." ECF 32. A new merits theory, fresh factual allegations, a novel foreign-relations harm—the United States seems never at a loss for new ideas.

I.    **The United States cannot increase its likelihood of success on the merits by cooking up new legal theories or new facts.**

In its motion, the United States pressed two theories under Section 10: that Texas's buoys (1) obstruct a navigable waterway and (2) are a covered "structure." It newly argues that the buoys violate treaty obligations. ECF 32; *see also* ECF 37 at 1, 10–11. It claims a waterway need not be "navigable" for the Act to apply. ECF 37 at 7–8. It agrees that buoys do not violate the Act if they do not become a buoy *system*. *Id.* at 12. And while conceding the existence of an "invasion" is a

1

nonjusticiable question, the United States insists Texas lacks authority to defend itself. *Id.* at 9–11.

**A.** The United States disclaims any need to conduct a navigability analysis based on the notion that "waters of the United States" need not be navigable. ECF 37 at 7. That is dubious after *Sackett v. EPA*, 143 S. Ct. 1322 (2023), and out of step with Section 10's repeated references to navigation, 33 U.S.C. § 403 ("navigable capacity," "navigable river," "navigable water"). Perhaps that is why the United States never develops this argument, leaning instead on a new, old study contending this stretch of the Rio Grande has potential to *become* navigable. Supreme Court precedent rejects that analytical framework. *See United States v. Republic Steel Corp.*, 362 U.S. 482, 483, 485 (1960) (assessing navigable use against present state of waterway). So, the United States ignores *Republic Steel* in its navigability discussion. And it refuses to face its own witnesses' concessions that this part of the river is *not* commercially navigable. ECF 26-5 at 12, 52–53; ECF 37-5 at 3.

The United States fails to bolster its case with the 1975 navigability study it located for its reply. First, the study found no verifiable past commercial navigation of the Rio Grande around Eagle Pass; no present commercial navigation there; and no plans for future commercial navigation—the study even references statements that there "has never been any 'practical navigation' between Roma . . . and El Paso," a 1000-mile distance that includes the Eagle Pass area. ECF 37-5 at 26–27; *see also id.* at 19 (noting "little likel[i]hood of change" and that any possible improvements' "economic justification appear[s] doubtful"). Second, despite the insistence that the Supreme Court "*assumed* navigability" in *United States v. Rio Grande Dam & Irrigation Co.*, ECF 37 at 10, the study recognized the opposite: The Court remanded—even though the Rio Grande may have been navigable in *some* portions—because navigability was a matter "requiring evidence, and to be determined by proof." ECF 37-5 at 24–25 (quoting *Rio Grande Dam*, 174 U.S. 690, 698 (1899)).

2

The argument that navigability is purely an exercise of the imagination proves too much. With enough time and effort, even Interstate 35 could be made into a navigable waterway. This is not what the countries envisioned when guaranteeing a mutual right to navigate the Rio Grande.

**B.** The United States also reinvents its legal theory with respect to Section 10's ban on "obstruction" and enumerated "structures." Finding the Act wanting, it urges this Court to review bilateral agreements between the United States and Mexico. ECF 37 at 10–11. The two countries have long allowed navigation along the Rio Grande. *See* 1848 Treaty, art. VII; 1853 Treaty, art. IV; 1884 Convention, art. V; 1944 Treaty, art. 3. But the United States never mentions how those agreements describe the navigability guarantee or when it is infringed.

For one thing, the United States and Mexico agreed that "[n]o artificial change in the navigable course of the river, by building jetties, piers, or obstructions which may tend to deflect the current or produce deposits of alluvium, or by dredging to deepen another than the original channel . . . or by cutting waterways to shorten the navigable distance, shall be permitted." 1884 Convention, art. III. These impediments hinder navigation up and down the river—not across it. That is why the countries agreed that "such common right [to navigation] shall continue without prejudice throughout the actually navigable main channels of the said rivers, from the mouth of the Rio Grande to the point where the Rio Colorado ceases to be the international boundary." 1884 Convention, art. V. It is also why the 19th- and 20th-century statutes the United States added in its reply concern obstructions "across" the Rio Grande. ECF 37-1, 37-2, 37-3, 37-4.

Next, the United States gives ground. "[A]n isolated 'buoy'" might be okay, "but a 'buoy system'" is not. ECF 37 at 12. But the bilateral agreements with Mexico foreclose this contention. For more than 150 years the countries have guaranteed: (1) a general right to navigate (2) up and

down the Rio Grande (3) where it is actually navigable. Simultaneously, those agreements bless buoy systems. Where dams form lakes, federal law directs IBWC to "establish in the artificial lakes, *by buoys or by other suitable markers, a practicable and convenient line* to provide for the exercise of jurisdiction." 1944 Treaty, art. 21 (emphasis added). This buoy system, moreover, serves not only to "assist navigation," but also to "*mark the boundary* for the application of the customs and police regulations of each country." *Id.* (emphasis added). This is consistent with the treaty's navigability guarantee, 1944 Treaty, art. 3, because buoys (including buoy systems) are not "obstructions." It is no surprise that they are missing from Section 10's detailed list of "structures."

**C.** On the treatment of foreign invasions, the parties agree that determining an "invasion" is a nonjusticiable political question. *Cf. Texas v. United States*, 106 F.3d 661, 666–67 (5th Cir. 1997). The United States cannot argue otherwise, having conceded that "there are no manageable standards" to apply. ECF 37 at 14–15. But the United States is wrong on States' authority to repel invasions. *Id.* at 14 (citing only Second, Third, Ninth, and Eleventh Circuit decisions).

The federal government must protect each State "against Invasion and . . . domestic Violence." U.S. Const. art. IV, § 4. On its face, this provision establishes two different rules for dealing with two different scenarios. For a "domestic" attack, States may seek help from the federal government ("on Application of the Legislature, or of the Executive"). For an "Invasion," however, States need not apply to the federal government. That comports with what the Constitution says elsewhere—a State may take certain measures "without the consent of Congress" if "actually invaded, or in such imminent Danger as will not admit of delay." U.S. Const. art. I, § 10, cl. 3; *see Sveen v. Melin*, 138 S. Ct. 1815, 1826–27 (2018) (Gorsuch, J., dissenting).

4

Founding-era sources support this conclusion—including the United States' source. In the Virginia ratifying convention, James Madison "perceive[d] no competition in these clauses [art. I, § 10, cl. 3 and art. IV, § 4]." ECF 37-8 at 3. Instead, they attest "to a concurrence of the power" between federal and state governments. *Id.* As he put it: "Does this bar the States from calling forth their own militia? No—but it gives them a supplemental security to suppress insurrections and domestic violence." *Id.* Alexander Hamilton also took for granted that States had independent authority to suppress or repel invasions: "If the interposition of the general government should not be needed"—because a State could handle the matter itself—the provision for federal intervention "will be a harmless superfluity." The Federalist No. 43. The framers thus understood that the Constitution permitted a State to work alone or with the federal government to repel an invasion.

Just as the President has exclusive "authority to decide whether the exigency has arisen" for purposes of Article I, Section 8, Clause 15, *Martin v. Mott*, 25 U.S. 19, 29–30 (1827), so too the Texas Governor has exclusive authority to decide whether the exigency has arisen under Article I, Section 10, Clause 3, *Moyer v. Peabody*, 212 U.S. 78, 83–85 (1909). Because this authority "results from the nature of the power itself," and federal and state governments have the same or (as Madison put it) "concurren[t]" power to repel invasions, it makes no sense to treat good faith exercises of federal or state authority differently. *Sterling v. Constantin*, 287 U.S. 378, 399 (1932).

Texas has not argued that every illegal entry into Texas is an "invasion" or that States may invoke that authority via differing "position on immigration." ECF 37 at 7, 10. Texas acts to protect migrants from harm, as even the United States' witnesses recognize. *Cf.* ECF 26-5 at 25. But hostile non-state actors moving in open defiance of lawful state authority (mass entry of armed cartels trafficking human beings, illegal drugs, and guns) is an invasion the federal government refuses to

acknowledge. Justice Story himself understood that "[t]he southern states, being more peculiarly open to danger from this quarter, ought" to "be more particularly tenacious of a constitution" guarding against invasion—and "accession of alien residents" may create the threat Article IV, Section 4 guards against. 3 Story, Commentaries on the Constitution §§ 1815, 1819 (1833).

## II. The United States cannot claim irreparable diplomatic harm under treaty obligations with which it has not even bothered to comply.

All that leaves is the United States' new theory of irreparable harm—namely, that foreign and diplomatic relations with Mexico will be irreparably damaged and that compliance with the border boundary established by the IBWC is "a top-priority issue" that cannot wait. ECF 37 at 16–17.

Despite this show of concern for treaty obligations, the United States has not maintained compliance with them. Per bilateral treaty, IBWC "shall with appropriate precision delineate the international boundary on maps or aerial photographic mosaics." 1970 Treaty, art. II.C. IBWC must do so periodically and "in any event at intervals not greater than ten years." *Id.* The United States' declarants admit that "the current IBL delineation was recorded in 2009 as Minute 315." ECF 32-1 at 2; *see also id.* at 14 (indicating Exhibit B figure was mapped against a 2008 map). IBWC's "current" map thus expired under the treaty's terms in 2019.

After failing in its treaty obligations for *four years*, the United States cannot complain that the buoys present an emergency justifying an injunction today. Nor should courts rely on stale maps when the United States and Mexico agreed to "promptly" update those maps in recognition of the inevitable and natural "changes in the channels of th[e] rivers." 1970 Treaty, Preamble. Accordingly, even assuming IBWC applied a sound methodology in determining whether the buoy barrier crosses the international boundary as of 2009, neither government thought it was "a top-priority issue" to comply with its obligation to delineate the international boundary.

6

Date: August 19, 2023

Angela Colmenero
Provisional Attorney General

Brent Webster
First Assistant Attorney General

Grant Dorfman
Deputy First Assistant Attorney General

Ralph Molina
Deputy Attorney General for Legal Strategy

Office of the Attorney General
P. O. Box 12548, MC-009
Austin, TX 78711-2548
(512) 936-2172

Respectfully submitted,

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN
Special Counsel
Tex. State Bar No. 00798537
patrick.sweeten@oag.texas.gov

RYAN D. WALTERS
Deputy Chief
Special Litigation Division
Tex. State Bar No. 24105085
ryan.walters@oag.texas.gov

DAVID BRYANT
Special Counsel
Tex. State Bar No. 03281500
david.bryant@oag.texas.gov

MUNERA AL-FUHAID
Special Counsel
Tex. State Bar No. 24094501
munera.al-fuhaid@oag.texas.gov

**Counsel for Defendants**

## Certificate of Service

On August 19, 2023, this document was filed electronically through the Court's CM/ECF system, which automatically serves all counsel of record.

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN

# Exhibit J: Plaintiff's Closing Argument

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

UNITED STATES OF AMERICA,

    *Plaintiff,*

    v.

GREG ABBOTT, in his capacity as
GOVERNOR OF THE STATE OF TEXAS,
and THE STATE OF TEXAS,

    *Defendants.*

Case No. 1:23-cv-00853-DAE

---

## PLAINTIFF UNITED STATES' POST-HEARING CLOSING ARGUMENT IN SUPPORT OF PRELIMINARY INJUNCTION

JAIME ESPARZA
UNITED STATES ATTORNEY

JAMES E. DINGIVAN
  Assistant United States Attorney
  Texas Bar No. 24094139
United States Attorney's Office
Western District of Texas
601 N.W. Loop 410, Ste 600
San Antonio, TX 78216
(210) 384-7372 (tel)
(210) 384-7312 (fax)
James.dingivan@usdoj.gov

TODD KIM
ASSISTANT ATTORNEY GENERAL
Environment & Natural Resources Division

BRIAN H. LYNK
  Senior Trial Counsel
  DC Bar No. 459525
ANDREW D. KNUDSEN
  Trial Attorney
  DC Bar No. 1019697
KIMERE J. KIMBALL
  Trial Attorney
  CA Bar No. 260660
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
(202) 514-6187 (Lynk)
(202) 514-8865 (fax)
Brian.lynk@usdoj.gov
Andrew.knudsen@usdoj.gov
Kimere.kimball@usdoj.gov

Dated:  August 25, 2023

*Counsel for the United States of America*

The evidence presented in connection with the United States' Motion for Preliminary Injunction (ECF 5) establishes that the United States is likely to succeed on the merits of its claim that Texas violated Section 10 of the Rivers and Harbors Act (RHA), 33 U.S.C. § 403. Further consideration of the traditional equitable factors is unnecessary (Mot. 12-13), but if the Court considers them, the evidence establishes irreparable harm to the United States and that the balance of equities and the public interest favor a preliminary injunction. Finally, the evidence supports the United States' requested scope and timing of the injunction.

## I.   The United States is likely to succeed on the merits.

Based on all the evidence, the United States is likely to establish that Texas is violating Section 10—both its first clause ("obstruction . . . to the navigable capacity") and, independently, its second clause ("building of . . . structures"). 33 U.S.C. § 403. Conversely, Texas' unprecedented, far-reaching "invasion" defense is decidedly unlikely to succeed.

### A.   The relevant segment of the Rio Grande is a Section 10 "navigable river."

The United States is likely to succeed in establishing that the Rio Grande in the vicinity of Eagle Pass, Texas is a "navigable river" under Section 10.[1] Four Acts of Congress (*see* Exhibits G-45 to G-48) recognized, and enacted provisions to protect, the "navigability" of the Rio Grande in connection with authorizing bridges and other projects involving foreign commerce (electric wiring and water connections) between Eagle Pass and Piedras Negras, Mexico. *See* Reply 3-4 (ECF 37); Surreply 3 (ECF 41) (Texas conceding that these statutes "concern obstructions 'across' the Rio Grande" at Eagle Pass). This alone establishes the government's likelihood of success. *See Economy Power & Light v. United States*, 256 U.S.

---

[1] It is unnecessary for present purposes to decide whether the Rio Grande is a "water of the United States," 33 U.S.C. § 403, for reasons other than its navigability, such as its status as an international boundary river.

113, 124 (1921) (if historically navigable waters "are to be abandoned" due to changes in use or economic need, "it is for Congress, not the courts, so to declare"); *United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 408 (1940) ("When once found to be navigable, a water remains so." (citing *Economy Power & Light*)). Congress indeed has enacted "non-navigability" declarations for a number of waters, but not the Rio Grande. 33 U.S.C. §§ 21-59mm.

With respect to the larger segment of the Rio Grande over which the Corps' Fort Worth District exercises RHA regulatory jurisdiction, the Court heard Mr. Shelnutt's testimony about the District Engineer's March 31, 1975 navigability determination and the study underlying that determination. G-34, G-35; Tr. 14-15. These documents establish that the District Engineer properly determined the Rio Grande is an RHA navigable water from river mile 275.5—the boundary between the Fort Worth and Galveston Districts—to river mile 610.0, which is the boundary between the Fort Worth and Albuquerque Districts, about 135 miles upstream of Eagle Pass. G-34 at 1, 2; G-35 at 14-15, 18. Mr. Shelnutt testified that this 1975 determination is the Corps' basis for including the Rio Grande on its 2011 list of Fort Worth District RHA navigable waters. Tr. 12-15; *see also* Compl. Att. 1. He testified that the 1975 determination remains in effect and that he relies on it in his day-to-day work as a regulatory project manager for the District. Tr. 50-51. His testimony is consistent with a Corps regulation stating that "[a] determination of navigability, once made, applies … and is not extinguished by later actions or events." 33 C.F.R. § 329.4. Mr. Shelnutt also confirmed that the Barrier is within the stretch of the Rio Grande subject to this determination. Tr. 15.

The Corps' 1975 study provides evidence of the historic navigability of this segment of the Rio Grande, and its susceptibility of use in commercial navigation with reasonable improvements, where either suffices as a matter of law (Reply 2, 6). The study found that "a

great deal of interest prevailed during the period between 1829-1882 pertaining to transportation of goods along the Rio Grande." G-35 at 18. Although navigation "above Laredo up to Eagle Pass" was "impeded by rocks and ledges at low water stages," accounts from the era nonetheless "reveal sufficient interest and available commerce to accommodate river travel above Laredo." *Id.* Historical accounts also indicate that the river was considered navigable by steam to points above river mile 610.0 and well upstream of Eagle Pass, if improvements were made to the river channel. *Id.* at 10, 18. Keelboat navigation was successfully completed to about 1300 miles upstream from the mouth of the river—more than *800 miles* above Eagle Pass. *Id.* at 10. Ultimately, railroads supplanted commercial navigation in the study area. *Id.* at 18.

With respect to the Rio Grande's "natural conditions" in 1975, the study observed that the river's natural flows were then (as they are now) reduced by diversion at multiple dams, including (since 1968) the Amistad Dam near the Fort Worth District's upper boundary. G-35 at 7, 8; *see* G-33 ¶ 5 (Mr. Shelnutt's declaration of Aug. 16, 2023, explaining "natural condition" means "natural condition with flows altered by the Amistad Dam"). Even with these diversions, the study found that shallow draft boats can navigate the river during periods of sufficient flow (G-35 at 11); this remains true today, as several boats were in the vicinity during the Barrier's construction. Tr. 17; G-26, G-27. The study also found that "[i]mprovement of the Rio Grande for navigation is physically possible. Storage in the Falcon and Amistad Reservoirs would have to be judicially used to provide sufficient flow for continuous navigation." G-35 at 11.

This evidence demonstrates the United States is likely to prove that the full stretch of the Rio Grande within the Fort Worth District is navigable. In *Economy Power & Light*, the Court affirmed decisions holding that the Desplaines River in Illinois was navigable for purposes of section 9 of the RHA. 256 U.S. at 115-17. That river had not actually been used in commercial

navigation for a century at the time of the Court's review.  *Id.* at 117-18.  The Court emphasized that it could not, "without doing violence to [the] manifest purpose" of the RHA, "limit [the statute's] prohibition to such navigable waters as were, at the time of its passage, or now are, actually open for use."  *Id.* at 124.  Rather, navigable water status also applies to long unused rivers and streams that remain susceptible to use in commercial navigation if "improvements … [to] restore the usefulness of th[e] stream" are undertaken.  *Id.*

In *Appalachian Electric Power*, the Court reversed decisions that erroneously denied the navigability of the New River in Virginia and West Virginia without considering evidence that improvements could make that river available for commercial navigation.  311 U.S. at 406-07.  The Court's analysis of the river's Radford-Wiley's Falls segment is particularly instructive.  Similar to the Rio Grande's upper reaches (*see* G-35 at 10, 18), in the 19th century the Radford-Wiley's Falls segment was navigable by shallow-draft keelboats ("eight feet wide, drawing two feet") and there was interest in making river channel improvements to facilitate such navigation.  311 U.S. at 417-18.  These plans were abandoned due to changing economic conditions, with the Corps opining that improvements for navigation would be "cost prohibitive."  *Id.* at 418; *compare* G-35 at 11 (acknowledging that the economic justification for re-purposing the Rio Grande's flows to support navigation "appear[ed] doubtful").  Nonetheless, the Court held that the Radford-Wiley's Falls segment was a navigable water based on its historic use and its improvability for easier keelboat navigation.  311 U.S. at 418.  The Court emphasized that such a river does not lose its status as a navigable water merely because alternative uses in commerce for its flows—*e.g.*, for hydropower development—become economically favored over commercial navigation.  *See id.* at 426.  Such uses are "from the public's standpoint a by-product of the general use of the rivers for commerce."  *Id.*  Here, too, the current prioritization of Rio

Grande flows for other uses like power generation and irrigation (G-35 at 8, 28) over commercial navigation does not change that river's *legal* status as a navigable water subject to Section 10.

In sum, the evidence shows the United States is likely to succeed on this issue. To the extent Texas relies on the alleged absence of *current* commercial navigation, its argument is contrary to Supreme Court precedent. In any event, such an argument contradicts Texas's claim that its Barrier will prevent millions of dollars in illicit commerce from crossing the Rio Grande.

**B.    Texas built a "structure" in violation of Section 10's second clause.**

Section 10's second clause makes it unlawful to "build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures" in an RHA navigable water without a Corps permit. 33 U.S.C. § 403. The United States likely will succeed in showing that Texas built an unauthorized "structure" in the Rio Grande.

The evidence indicates that the Barrier is a qualifying "structure."[2] Texas's witness Mr. Flossman, who is familiar with the Barrier's design and construction, testified that it consists of a series of units of 3 attached buoys, which are linked together in the river to extend approximately 1,000 feet. Tr. 97-98. Each buoy unit includes a steel piece attached by metal chain to a concrete positioning anchor that weighs about 1,000 pounds, with a total of 75 such anchors attached to the Barrier. Tr. 97-98, 104, 107. The Barrier is also attached to 68 concrete block

---

[2] It is immaterial whether the Barrier would also constitute a "boom" (Opp. 14-16), although it likely would (Reply 6-7). The statutory clause plainly encompasses "structures" *other* than the listed types of marine construction. 33 U.S.C. § 403. Texas asserts (Opp. 16) that the *ejusdem generis* canon somehow constrains the Court from a straightforward application of the term "other structure." The Fifth Circuit has cautioned that this canon "is not a cast-iron rule" and is "*never* applied to defeat the real purpose of the statute." *United States v. Mackay*, 757 F.3d 195, 197-98 (5th Cir. 2014) (emphasis added). The Barrier need not precisely match any listed maritime item and is at least sufficiently similar to one or more listed items to satisfy this canon.

anchors weighing 3,000 pounds each. Tr. 107; G-52 (photo in which Mr. Flossman identified both anchor types). Mr. Flossman agreed that the Barrier is an "integrated system." Tr. 104. The Barrier is thus a "structure" within the meaning of the second clause. Mot. 9-10; Reply 6-8.

Finally, Texas's argument that the Barrier is not "permanent" enough to be a structure lacks merit. Reply 8. The cases Texas cited for this proposition (Opp. 17) are inapposite. Most concerned vessels, but no vessel is at issue here. One case held that "rafts, logs, timber, boats and vessels" floating "loose and adrift" were not an "obstruction." *United States v. Burns*, 54 F. 351, 363 (C.D.D.W. Va. 1893). The Barrier is not "loose and adrift"; to the contrary, it is so heavily anchored to the riverbed that Mr. Flossman testified it is physically *incapable* of drifting. Tr. 103-04. Texas's construction of a single, "integrated system" linked by metal and chain and anchored by nearly 140 tons of concrete[3] satisfies any plausible "permanence" criterion.

### C. The Barrier "obstruct[s] … the navigable capacity" of the Rio Grande.

Section 10's first clause prohibits "[t]he creation of any obstruction" to the "navigable capacity" of the river that is "not affirmatively authorized by Congress." 33 U.S.C. § 403. The United States likely will succeed in establishing that Texas violated this clause as well.

Mr. Shelnutt testified that the Corps' regulations apply to "any other obstacle or obstruction." Tr. 21 (citing 33 C.F.R. § 322.2). He concluded after his site visit that the Barrier would constitute an "obstacle or obstruction" under the regulations because "it would [] impede the movement of a vessel [a]cross [the] river." Tr. 21. Texas's witness Mr. Flossman agreed that the Barrier would stop boats from crossing the river at the Barrier's location. Tr. 106. Mr. Flossman also acknowledged that while he refers to it as a "buoy system," his employer's website markets it as a "marine floating barrier." Tr. 110; *see* G-57. The evidence indicates that

---

[3] Sixty-eight 3,000-lb anchors + seventy-five 1,000-lb anchors = 279,000 pounds. *See* Tr. 107.

the Barrier "interfere[s] with or diminish[es]" the river's capacity to be navigated.  *United States v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690, 709 (1899); *see* Mot. 10-12, Reply 8-9.

> **D.** **The United States is likely to succeed on the merits notwithstanding Texas's "invasion" defense.**

Texas is unlikely to succeed on its novel theory that Texas is exempt from RHA Section 10 because it is "engag[ing] in War" in response to an "actual inva[sion]."  U.S. Const. art. I, § 10, cl. 3; *see* Opp. 18-21 (ECF 26); Surreply 4-6 (ECF 41).  The doctrine of constitutional avoidance cannot apply to narrow the RHA's scope, as there is no plausible alternative interpretation of the statutory text that would permit Texas's conduct.  Reply 9; *see also Jennings v. Rodriguez*, 138 S. Ct. 830, 843 (2018).  Instead, Texas claims that—based on its self-declared "invasion"—the Constitution empowers it to *ignore* the RHA (and, apparently, any other statute standing in its way).  The Court should reject this assertion for at least three reasons.

First, appellate courts have uniformly held that whether a given set of facts amounts to an "invasion" is committed to the political branches of the *federal* government.  Reply 9-10.  Texas argues that *it* views the same facts differently than the political branches of the federal government, and that Governor Abbott's view that there is an "invasion" allows Texas to ignore Congress and its commands.  To avoid "inappropriate interference in the business of the other branches" of the federal government, the Court should decline to consider Texas' unprecedented defense.  *United States v. Munoz-Flores*, 495 U.S. 385, 394 (1990).

Second, as a matter of textual interpretation, neither immigration nor criminal activity is the kind of "invasion" the Constitution contemplates.  Reply 10-11; *California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997); *Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996).  Texas's contrary position relies on sources addressing states' power to address domestic *insurrection*, not *invasions*.  Surreply 4-5.

Third, even if Texas *has* been "actually invaded," U.S. Const. art. I, § 10, cl. 3, the Constitution does not give Texas *carte blanche* to "take certain measures" that it unilaterally chooses, Surreply 4, in disregard of any inconsistent federal statute. The constitutional provision on which Texas relies speaks only of "engag[ing] in War," and "war" has always meant "[a] contest between nations or states, carried on by force." *War*, Noah Webster, American Dictionary of the English Language (1828); *see also* 3 J. Story, Commentaries on the Constitution §§ 1172, 1398 (1833). Texas does not claim to be engaged in war with another political entity. Nor does Texas attempt to show any actual conflict between its exercise of asserted self-defense power and the RHA. Moreover, this clause prohibits states from engaging in war unless there is such exigency "as will not admit of delay." U.S. Const. art. I, § 10, cl. 3. That language is properly read as a whole, and in context, to apply only when a state lacks time to coordinate with the federal government, but here Texas *did* have time to seek federal authorization for its response to irregular migration and the asserted harms caused by cartels. Texas has not claimed otherwise.

Given the novelty of Texas's argument—and the extraordinary implications of its claim of sole discretion to declare an actual invasion and unilaterally, and indefinitely, engage in conduct unbound by federal statutes—Texas is decidedly unlikely to succeed in its defense.

## II. The traditional equitable factors all favor the United States.

The United States' likelihood of success is reason alone to grant a preliminary injunction. Mot. 12-13. But if resort to the usual equitable factors is necessary, those factors support relief.

The evidence shows that the Barrier is causing significant and ongoing harm to the United States' relations with Mexico. Mot. 14-15; Reply 11-12; G-22, G-24, G-36, G-37. Hillary Quam, the State Department's "primary adviser and expert on all issues, initiatives,

negotiations and programs related to the U.S./Mexico border region," testified that the Barrier is a "major concern" for Mexico and "will have an adverse impact on U.S. foreign policy" if not removed expeditiously. Tr. 57, 67; G-24 ¶ 3. Specifically, Mexico remains concerned that the Barrier potentially obstructs and deflects the water of the Rio Grande in violation of the two governments' treaty, and this kind of issue can have implications for Mexico's sovereignty and its status as an equal partner to the United States. Tr. 67. Mexico has sent multiple diplomatic notes to the United States regarding its concerns about Texas's conduct and has directly raised its objections at the highest diplomatic levels. Tr. 61-65.

As long as the Barrier remains in place, it threatens Mexico's participation as a "willing partner" in aspects of the United States' agenda that require binational cooperation, including improving water deliveries from Mexico to Texas, improving border infrastructure, managing migration, countering drug and firearms trafficking, promoting sustainable economic and social development, and strengthening supply chains. Tr. 65, 68-71; G-24 ¶¶ 5-6. Those harms are not mere "speculation," Opp. 21, but are being felt now. The two nations are negotiating an emergency agreement to "provide more predictability to Texas farmers regarding their water deliveries from Mexico," Tr. 70, with a goal of concluding the agreement this year, G-22 ¶ 25. In light of Texas's conduct, Mexican officials cancelled a July meeting of these negotiations and "indicated that they are less inclined to conclude an Emergency Minute by the end of the year while the buoy barrier remains in place." Tr. 70; G-22 ¶¶ 17-18.[4]

---

[4] The Barrier also poses potential harm to federal agency operations on the Rio Grande. Both the U.S. Border Patrol and the International Boundary and Water Commission ("IBWC") carry out activities requiring the ability to freely navigate the river in boats. Mot. 6-7; Exs. G-8, G-21, G-22; *supra* at 6-7 (boats cannot pass through the Barrier). Texas has not disputed these harms.

The balance of equities likewise favors the United States. Congress has already struck the balance between the two parties' interests in the RHA, and the United States merely seeks to enforce Congress's command. Mot. 16-19; *cf. United States v. Locke*, 529 U.S. 89, 120 (2000) ("The authority of Congress to regulate interstate navigation, without embarrassment from intervention of the separate States and resulting difficulties with foreign nations, was cited in the Federalist Papers as one of the reasons for adopting the Constitution." (citing *e.g.*, The Federalist Nos. 44, 12, 64.)). Moreover, without a preliminary injunction, Texas is likely to *continue* violating the RHA. Texas has announced plans to build additional barriers in the Rio Grande. Mot. 16. And Texas's unannounced decision to reposition the Barrier while this Motion was pending strongly indicates that, absent a court order, Texas will continue to ignore the RHA.

## III.    The Court should grant the United States' requested preliminary injunction.

The Court should enjoin Texas from building new structures or creating new obstructions in any portion of the Rio Grande subject to the RHA without federal authorization and should also order Texas to remove the Barrier from the river within ten days of the Court's order. That is more than enough time for Texas to comply. Texas's recent efforts to move the Barrier in response to the IBWC's joint survey results demonstrate that it has the personnel and equipment standing ready to begin work in a few days. ECF 32 (notice of survey results filed Aug. 15, 2023); Tr. 102 (stating Texas began moving the Barrier on August 18th). And while Texas's witness Mr. Flossman claimed removing the Barrier would take "[a]pproximately three weeks," actions speak louder than words: even absent a court order, he testified that Texas repositioned the entire Barrier in "approximately three days." Tr. 108-09. Texas has not argued that ten days is too short a time to remove the Barrier, and the evidence does not support such an argument.

Respectfully submitted,

Dated:  August 25, 2023

10

JAIME ESPARZA
UNITED STATES ATTORNEY

 /s/ James E. Dingivan
JAMES E. DINGIVAN
   Assistant United States Attorney
   Texas Bar No. 24094139
United States Attorney's Office
Western District of Texas
601 N.W. Loop 410, Ste 600
San Antonio, TX 78216
(210) 384-7372 (tel.)
(210) 384-7312 (fax)
James.dingivan@usdoj.gov

TODD KIM
ASSISTANT ATTORNEY GENERAL
Environment & Natural Resources Division

 /s/ Brian H. Lynk
BRIAN H. LYNK
   Senior Trial Counsel
   DC Bar No. 459525
ANDREW D. KNUDSEN
   Trial Attorney
   DC Bar No. 1019697
KIMERE J. KIMBALL
   Trial Attorney
   CA Bar No. 260660
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
(202) 514-6187 (Lynk)
(202) 514-8865 (fax)
Brian.lynk@usdoj.gov
Andrew.knudsen@usdoj.gov
Kimere.kimball@usdoj.gov

*Counsel for the United States of America*

**CERTIFICATE OF SERVICE**

I certify that on August 25, 2023, a copy of this filing was served on all counsel of record using this Court's electronic filing system.

/s/ *Brian H. Lynk*
Brian H. Lynk

# EXHIBIT K: DEFENDANTS' CLOSING ARGUMENT

**United States District Court**
**Western District of Texas**
**Austin Division**

United States of America,

    *Plaintiff,*

       v.

Greg Abbott, in his capacity as Governor of
the State of Texas, and the State of Texas,

    *Defendants.*

No. 1:23-cv-00853-DAE

**D**EFENDANTS' **C**LOSING **A**RGUMENT
**S**UBMITTED IN **O**PPOSITION TO
**M**OTION FOR **P**RELIMINARY **I**NJUNCTION

The United States seeks a preliminary injunction forcing the State to allow untold numbers of cartel members to ford the Rio Grande onto Texas soil. That would be "an extraordinary remedy" indeed. *See Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). Even more so since "[t]he time pressures involved in a request for a preliminary injunction require courts to make determinations without the aid of full briefing or factual development." *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 603 n.7 (1984) (Blackmun, J., dissenting). This is why a plaintiff *must* establish each and every element to win a preliminary injunction: "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20.

The US falls far short of this high bar. Its own witnesses show it is unlikely to succeed on the merits—no evidence shows this stretch of the Rio Grande is navigable; no evidence shows the buoys "obstruct" any navigable capacity of the river; and no evidence shows the buoys are "booms" or "other structures" covered by Section 10 of the Rivers and Harbors Act. And even if there were such evidence, Texas has clear constitutional authority to defend its territory against the invasion that Governor Abbott has declared. As this Court acknowledged, such "political questions" are "not a purview of this Court." Tr. 90:10–11. This Court is therefore duty-bound to apply constitutional avoidance to reject the US's reading of the Rivers and Harbors Act.

What's more, although the Court refused to let Texas develop the record on the equities and public interest at the hearing on the US's motion, those factors overwhelmingly favor the State. No court has discretion to overlook such evidence. *See Winter*, 555 U.S. at 24 (courts "must pay *particular* regard for the public consequences in employing the extraordinary remedy of injunction" (emphasis added)). Texas was not permitted to ask the US's witness about "the 2.3

million . . . border encounters," the "600,000 . . . got-aways" at the border, "the importation of lethal fentanyl," "unlawful migration," or "cartel activity." Tr. 73–77. Failure to weigh such evidence would be reversible error. The Court should thus deny the preliminary injunction sought by the US. At most, only a more limited, prohibitory injunction would be proper—forbidding Texas from deploying additional buoys but allowing the buoys already deployed to remain in the river.

## I.     The Rivers and Harbors Act Does Not Ban Buoys in the Rio Grande in Maverick County.

### a.   The Corps lacks jurisdiction over this non-navigable stretch of the Rio Grande.

Navigability is a prerequisite to the Corps' jurisdiction under the Act and is determined segment by segment. *PPL Mont., LLC v. Montana*, 565 U.S. 576, 594 (2012); *cf. Miami Valley Conservancy Dist. v. Alexander*, 692 F.2d 447, 451 (6th Cir. 1982) (rejecting jurisdiction over 36.5-mile river stretch). Corps regulations sensibly acknowledge that, at some point along its length, a river may change from navigable to non-navigable. 33 C.F.R. § 329.11(b). The Supreme Court already said as much about the Rio Grande. *United States v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690, 698 (1899) (stating this river "is not navigable within the limits of the territory of New Mexico"). Binding precedent likewise repudiates the idea that the Rio Grande is navigable for the entire 1,200-mile stretch on the Texas-Mexico border. *See Puente de Reynosa v. City of McAllen*, 357 F.2d 43, 50–51 (5th Cir. 1966). Here, the relevant waterway is a 1,000-foot stretch near Eagle Pass.

To exercise jurisdiction over that segment, the US cannot rely solely on the Corps' self-serving assertion of jurisdiction over *300 miles* of the river in a 1975 Corps of Engineers navigability determination. G-34. The US cannot demand that the Court merely defer to that determination. Navigability is a fact question that "should be determined by evidence" in open court, not simply claimed by agency officials behind closed doors. *Rio Grande*, 174 U.S. at 698 (remanding for trial

court factfinding). Because "[j]urisdiction over . . . portions of" a river "is in controversy," the US must "prove" the disputed stretches are navigable. *Miami*, 692 F.2d at 451. Here, the Corps' 48-year-old navigability determination is allegedly based on a 1975 Corps of Engineers study that Corps employee Joseph Shelnutt found in the Corps' Ft. Worth office. Tr. 12:10–15:2. But Shelnutt—the US's only witness on this point—had "not read any technical aspects" of the study. D-6 at 50–52. The US will have its chance to defend its assertion of jurisdiction at trial. But the present record does not prove that the disputed segment is navigable.

Rather, the law and the facts show that the disputed segment is *non*-navigable. Congress's authority to pass the Act rests on the Commerce Clause, so covered waters must be "of practical service as a highway of commerce." *Econ. Light & Power Co. v. United States*, 256 U.S. 113, 124 (1921). They "must (1) be or have been (2) used or susceptible of use (3) in the customary modes of trade and travel on water (4) as a highway for interstate commerce." *Miami*, 692 F.2d at 449–50. If commercial use is only "sporadic and ineffective," or "exceptional, and only in times of temporary high water," then the waters are non-navigable. *Id.* at 449. Commercial use is judged by the "customary mode of travel," *id.* at 451, for commercial shipping in the area, *United States v. Republic Steel Corp.*, 362 U.S. 482, 483–85 (1960). Evidence that people "waded or walked" through water hardly suggests commercial navigability. *United States v. Oregon*, 295 U.S. 1, 20–21 (1935). And just because small craft can cross bank-to-bank does not make it "a highway of commerce." *United States v. Crow, Pope & Land Enters.*, 340 F. Supp. 25, 34–35 (N.D. Ga. 1972).

Refusing to analyze navigability would contravene not only *Sackett v. EPA*, 143 S. Ct. 1322 (2023), and Section 10's repeated references to "navigable" waters, 33 U.S.C. § 403, but also the Act's genesis as an exercise of Congress's *Commerce* Clause power, U.S. CONST. art. I, § 8, cl. 3. If

the Act really did not require showing commercial navigability, then its constitutional "validity might well be questioned." *Leovy v. United States*, 177 U.S. 621, 633 (1900). The US's interpretation would also conflict with Texas's constitutional right to defend its territory against *invasion*, *see* U.S. CONST. art. I, § 10, cl. 3; *id.* art. IV, § 4; TEX. CONST. art. IV, § 7, which the US concedes is a nonjusticiable issue, *see* ECF 41 at 4–6. This Court must construe the Act to avoid such constitutional problems. *See United States v. Hansen*, 143 S. Ct. 1932, 1946 & n.3 (2023).

At the hearing, the US called only one navigability witness, who repeatedly testified he had *never* seen commercial navigation in this stretch of river. Tr. 26:10–12; Tr. 31:20–23; Tr. 34:14–18. Joseph Shelnutt nevertheless deemed the waterway navigable—sight unseen—"just" because "a list" said it was. Tr. 34:19–25; Tr. 35:4–25. But even that list, Mr. Shelnutt agreed, relied on a study "more than four decades old" that admitted this stretch of the river had no commercial navigation. Tr. 44:17–21; Tr. 45:11–20; Tr. 46:1–6. That study notes that there "has never been any 'practical navigation' between Roma . . . and El Paso," a 1000-mile stretch that includes Eagle Pass; that only one "extraordinary" military expedition passed Roma but no "substantial items of commerce were shipped from this point"; that "actual accounts of commercial travel [were] lacking" because "[a]bove Laredo up to Eagle Pass . . . navigation was impeded by rocks and ledges"; and that the "present use test" couldn't justify navigability as there was "no commercial activity within the study area" in 1975. G-35 at 10, 18–19. Neither a one-off "exceptional" use, *Rio Grande*, 174 U.S. at 699, nor "military expeditions," *Miami*, 692 F.2d at 451, will suffice.

Nor does it matter that the US thinks—contrary to the 1975 study and Supreme Court precedent—that the river could someday *become* navigable. ECF 41 at 2 (citing *Republic Steel*, 362 U.S. at 483–85). Even assuming the possibility of improvement for *future* use may be considered,

the US entirely failed to prove that "the costs of improvement would be justified by the benefits to commercial transit in this area." *Lykes Bros. Inc. v. U.S. Army Corps of Eng'rs*, 821 F. Supp. 1457, 1464 (M.D. Fla. 1993), *aff'd*, 64 F.3d 630 (11th Cir. 1995); *Crow*, 340 F. Supp. at 35–36 (absent "these two crucial factors, the court cannot balance the opposing interests").

The 1975 study's legal analysis is equally unhelpful to the US. It relies on "treaties between the United States and Mexico together with the *Rio Grande River* case." G-35 at 17. But *Rio Grande* (and *Puente de Reynosa*, 357 F.2d at 50–51) rejected the idea that the entire river was navigable under treaties, which merely preserve free navigation where the Rio Grande is "actually navigable." ECF 41 at 3. The study's exhibits recognize the same. *See* G-35 at 76 ("treaties provide that the navigation of the *actually navigable* main channels of the river is made free and common"); *see also* ECF 41 at 2 (addressing US's statutes). Far from assuming navigability in *Rio Grande*, the Court remanded because navigability was a matter "requiring evidence, and to be determined by proof." *Id.* at 16–17 (quoting 174 U.S. at 698).

Other evidence tells the same story. Conditions are shallow, rocky, or even dry; full of sandbars and debris; and can be dangerous for watercraft. D-2 ¶¶ 4–5; D-4 at 10:7–17, 51:7–19. No commerce or trade activities exist in this segment. D-1 ¶¶ 3, 10; D-2 ¶ 7; D-6 at 15:5–7, 32:3–18, 46:24–47:20; D-4 at 11:1–12:8. Lawful activity is limited to shallow-water vessels like law-enforcement airboats. D-4 at 11:1–12:8; D-2 ¶ 6. Larger vessels cannot operate due to shallow conditions, sand bars, and islands. D-1 ¶ 10. "Hidden dangers" can "punch holes in the hull of a boat." D-2 ¶ 4. And crossing the river is illegal: it's lawful to cross the border *only* at a port of entry. *See* 8 U.S.C. § 1325; 19 U.S.C. § 1459.

      **b.  The buoy system does not "obstruct" any (hypothetical) navigable capacity and is not a "boom" or "other structure."**

5

1. Even if this waterway were navigable, the US bears the burden of proving the buoy system presents an "*obstruction . . .* to the navigable capacity" of the Rio Grande. 33 U.S.C. § 403 (emphasis added); *see, e.g.*, *Miami*, 692 F.2d at 451. The issue is whether an activity "substantially diminishes the navigability of that stream within the limits of present navigability." *Rio Grande*, 174 U.S. at 710. "The question always is one of fact whether such appropriation substantially interferes with the navigable capacity within the limits where navigation is a recognized fact." *Id.* The "mere presence of an object in a navigable river does not necessarily" violate the Act. *Pillsbury Co. v. Midland Enters., Inc.*, 715 F. Supp. 738, 761 (E.D. La. 1989), *aff'd*, 904 F.2d 317 (5th Cir. 1990). An object that "may only deter movements in commerce" will not do—it must "adversely affect[]" navigation such that it "tends to *destroy* the navigable capacity of one of the navigable rivers of the United States." *Republic Steel*, 362 U.S. at 487–88 (emphasis added). In short, it is insufficient to point to an object that a boater must simply note and navigate around.

The US failed to show the buoy system substantially diminishes the navigability of this waterway. Evidence shows the buoys do not obstruct travel up and down the river at the site. D-5 at 43:16–22; D-1 ¶ 9. Because its width "from bank to bank" is about 200 feet (maybe more according to a US witness, Tr. 32:15–17), any vessel "going up or down the River at the site of the floating buoys can easily navigate past them." D-1 ¶ 9; *see also* Tr. 106:3–13 (people can simply "go around [the buoys] if they choose"). Insofar as there is any navigation, it is available "up and down the river by all." D-1 ¶ 9. The US's own witness, Mario Gomez, testified the traffic he saw was limited to law-enforcement airboats, which could travel "up the river and down the river" since the buoys were merely "four-foot-diameter floating barriers." D-5 at 43:09–44:01. He noted the buoys do not run side-to-side to block traffic up- or down-river. *Id.* at 43:13–15. Instead, they run *parallel*

to the current to prevent illicit cross-border fording of the river. D-1 ¶¶ 6, 8.

**2.** Nor did Texas build "booms" or "other structures." 33 U.S.C. § 403. There was no action to "build or commence the building" of anything covered by the Act. The buoys were deployed in mid-July 2023. D-1 ¶¶ 5–17. Their design and placement are temporary; they may be dismantled and redeployed with machinery to lift and move the concrete anchoring blocks. D-3 ¶¶ 5–7. No construction or excavation—and no affixing, bolting, or attachment to the riverbed or shore— occurred during or after placement. Tr. 95–96; D-3 ¶ 6; D-1 ¶ 7. And testimony of Cochrane USA project manager Loren Flossman shows that, although the buoys will not drift on their own, they can be (and have been) repositioned intentionally in a matter of days. Tr. 102–03.

Section 10 of the Act bars "the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures" in navigable waters without a Corps permit. 33 U.S.C. § 403. Mr. Shelnutt's testimony forecloses any claim that the buoys qualify under the listed terms. Tr. 48:5–23 (agreeing that the buoys are not a "boom," a "pier," a "wharf," a "breakwater," a "weir," a "bulkhead," a "jetty," or a "dolphin"); D-6 at 61:22–23. Having conceded that the buoys do not fit within any of the eight items Congress enumerated, the US nevertheless insists the buoys fall within the catchall for "other structures." But the *ejusdem generis* canon bars overbroad readings of general words where Congress "has tacked on a catchall phrase at the end of an enumeration of specifics." Scalia & Garner, Reading Law 199 (2012). Such general terms encompass only what is similar in nature to the specific terms. *Yates v. United States*, 574 U.S. 528, 545–46 (2015). And what the enumerated terms here have in common—whether projecting from one shore to another (like a boom or weir), or jutting out from one shore into the water (like a pier, wharf, breakwater, bulkhead, or jetty), or spanning offshore waters (like a dolphin)—is that all of them are permanent

structures that may *stretch across* a waterway. *Cf. United States v. Burns*, 54 F. 351, 363 (C.C.D.W. Va. 1893). By design, Texas's buoys are impermanent and parallel to the water. ECF 41 at 3.

More importantly, this statutory text, like all statutory text, must be considered in context. *See Dubin v. United States*, 143 S. Ct. 1557, 1566 (2023). And context here sinks the US. For one thing, the Act prohibits obstructions across the board. But it elsewhere *mandates* placing buoys in navigable waters—without obtaining approval from federal authorities. *See* ECF 26 at 16–17 (citing 33 U.S.C. § 409). Clearly, no one thought buoys were impermissible structures.

That result makes sense, too, in light of bilateral treaties. The 1944 treaty with Mexico requires IBWC to place "buoys [in] a practicable and convenient line" to "mark the boundary" between the two countries in certain places along the Rio Grande. ECF 41 at 3–4 (citing 1944 Treaty, art. 21). It cannot be that whether an item qualifies as an impermissible structure turns on whether US or state officials placed it there. Given that treaty provisions mandate a buoy barrier while *also* guaranteeing a mutual right to navigation, buoys cannot be classed as structures barred by the Act. But even if buoys could fall within "other structures," such that Section 10's circa-1899 prohibition conflicts with the 1944 treaty, the latter provision would control. *See Cook v. United States*, 288 U.S. 102, 118–19 (1933) (enforcing later-enacted treaty over earlier-enacted statute).

## II. Balancing the Equities Requires Weighing a Litany of Harms to Texas and All Americans Against a Contrived Injury to US-Mexico relations.

Courts are not "mechanically obligated to grant an injunction for every violation of law when the United States is the plaintiff." *United States v. Marine Shale Processors*, 81 F.3d 1329, 1360 (5th Cir. 1996) (cleaned up). Mandatory injunctions ordering a party to take certain actions rather than merely refrain from acting—like the one the US requests here—are "particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Martinez v.*

*Mathews*, 522 F.2d 1233, 1243 (5th Cir. 1976). The US has failed to meet its burden to show that the alleged irreparable harm, equitable balance, and public interest support an injunction. ECF 26 at 8. Injunctive relief should be denied, or at least stayed pending appeal.

**A.** The US proved no irreparable harm. The buoys occupy a "de minimis" space in one 70-mile stretch of a 1,200-mile river. *See* D-1 ¶ 9; D-5 at 51:3–6. They were placed over two weeks before the US sued. *See* D-3 ¶ 7. And there is no alleged interference with commercial shipping. After all, commerce is nonexistent on this part of the river. D-1 ¶ 3; D-2 ¶ 7; *accord* D-16; D-17. The US relies instead on vague diplomatic tensions with Mexico. During the PI hearing, the US presented testimony from a low-level federal employee, Hillary Quam, who claimed Mexico has expressed "concerns" that Texas is preventing the US from complying with treaty obligations. Tr. 63–67. And border-boundary compliance, the US says, is "a top-priority issue." ECF 37 at 11–12. Any claimed urgency is, however, impossible to square with the US and Mexico's *four-year* delay in meeting their border-mapping obligations under the 1970 Treaty. ECF 41 at 6. But even assuming the two countries have suddenly decided to take treaties seriously, the federal government cannot stop States from doing everything that "may upset foreign powers." *Arizona v. United States*, 567 U.S. 387, 423–24 (2012) (Scalia, J., concurring in part and dissenting in part).

In any event, this Court rightly noted that all "international partners . . . have some disagreements." Tr. 77:6–15. And when it comes to the relationship between the US and Mexico, cabinet-level officials tasked with overseeing federal diplomatic relations with Mexico tell a different story than Ms. Quam. National Security Advisor Sullivan called U.S.-Mexico relations a "strong and enduring bond[ ] of friendship and partnership." D-35. And Secretary of State Blinken said he couldn't recall a time of "stronger partnership and collaboration" between the countries,

even though "the multiplicity of issues and their complexity is also greater than ever" and *even though the buoys had already been in place for weeks*. D-36. According to the Biden Administration, relations have never been better. This Court should take the US at its word. In balancing the equities, the only thing on the US's side of the scale is alleged friction in U.S.-Mexico relations—something entirely at odds with the federal government's own dereliction in its treaty obligations and its principal officers' assertions that the U.S.-Mexico relationship has never been stronger. This sort of "[s]peculative injury" is "not sufficient" for irreparable harm. *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). The requested preliminary injunction, which is all the more extraordinary for its mandatory nature, cannot issue. *See Martinez*, 544 F.2d at 1243.

**B.** The other side of the scale overwhelmingly favors Texas. In balancing equities and considering the public interest, courts must consider how an injunction hurts the public: It is in the public interest to reduce the flow of fentanyl, to combat human trafficking, and to protect Texans from unlawful trespass and violent attacks on their property by drug cartels; it is also in the public interest to minimize the risks to migrants of drowning while making a perilous journey to and through illegal points of entry. *Cf.* D-1 ¶¶ 4, 12–13. And it surely remains in the public interest to treat laws as worthy of respect, not easily flouted. Texas tried to expound on this evidence at the PI hearing. But the Court rejected Texas's repeated efforts to raise such issues, which were said to be "of [no] concern to the Court." *See, e.g.*, Tr. 73, 76, 86, 90. The Court should obviate any chance of error by denying a preliminary injunction or, at least, staying any order enjoining Texas pending an appeal to the Fifth Circuit. *See* FED. R. APP. P. 8(a)(1)(A). The public interest clearly favors keeping the buoys in the water, which save lives by deterring unlawful, dangerous crossings in one of the most active hotspots for drug- and human-trafficking on the river. D-1 ¶¶ 4, 8, 13; D-3 ¶ 4.

10

Date: August 25, 2023

Angela Colmenero
Provisional Attorney General

Brent Webster
First Assistant Attorney General

Grant Dorfman
Deputy First Assistant Attorney General

Ralph Molina
Deputy Attorney General for Legal Strategy

Office of the Attorney General
P. O. Box 12548, MC-009
Austin, TX 78711-2548
(512) 936-2172

Respectfully submitted,

*/s/ Patrick K. Sweeten*

Patrick K. Sweeten
Special Counsel
Tex. State Bar No. 00798537
patrick.sweeten@oag.texas.gov

Ryan D. Walters
Deputy Chief
Special Litigation Division
Tex. State Bar No. 24105085
ryan.walters@oag.texas.gov

David Bryant
Special Counsel
Tex. State Bar No. 03281500
david.bryant@oag.texas.gov

Munera Al-Fuhaid
Special Counsel
Tex. State Bar No. 24094501
munera.al-fuhaid@oag.texas.gov

**Counsel for Defendants**

## Certificate of Service

On August 25, 2023, this document was filed electronically through the Court's CM/ECF system, which automatically serves all counsel of record.

*/s/ Patrick K. Sweeten*
Patrick K. Sweeten