No. 23-50632

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*

*v.*

GREG ABBOTT, IN HIS CAPACITY AS GOVERNOR OF THE STATE OF
TEXAS; STATE OF TEXAS,

*Defendants-Appellants*

On Appeal from the United States District Court for the
Western District of Texas, Austin Division, 1:23-cv-00853-DAE

## EXHIBITS IN SUPPORT OF DEFENDANTS' OPPOSED EMERGENCY MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL AND FOR AN ADMINISTRATIVE STAY

### VOLUME II

### INDEX OF EXHIBITS[1]

Exhibit

Selected Defense Exhibits from Preliminary Injunction Hearing:

ECF 26-2, Declaration of Victor Escalon (D-1)[2] ............................................. A

ECF 26-1, Declaration of Chris Nordloh (D-2) ................................................. B

ECF 26-3, Declaration of Loren Flossman (D-3) ............................................. C

---

[1] In these Exhibits, "ECF ___" refers to the district court docket number. Due to space constraints, unless indicated, the attachments to district court filings have not been included in the Exhibits in Support of Defendants' Motion to Stay.

[2] "(D-___)" refers to the label affixed to Defendants' Exhibits submitted to the district court for the Preliminary Injunction Hearing.

ECF 26-4, Deposition of Justin Peters (D-4) ...................................................D

ECF 26-5, Deposition of Mario Gomez (D-5).................................................. E

ECF 26-6, Deposition of Joseph Shelnutt (D-6) ............................................. F

ECF 26-8, Southwest Land Border Encounters (D-8) .....................................G

ECF 26-10, Fentanyl Awareness (D-10) ......................................... H

ECF 26-13, Federal Register (D-13)................................................... I

ECF 26-14, Southwest Land Border Encounters (D-14) .................................J

ECF 26-15, Southwest Land Border Encounters (D-15) ................................K

Declaration of Ramon Gonzalez (D-16) ........................................ L

Declaration of Ben Valdez (D-17) ................................................M

UN Migration Study Deems US-Mexico Border 'Deadliest' Land
Route in the World Based on 2021 Numbers, Fox News
(July 4, 2022)[3] .......................................................... N

Executive Order, No. GA-41 (D-22)................................................O

---

[3] A copy of this article was admitted as Defense Exhibit 21 (D-21) at the Preliminary Injunction Hearing. Due to the poor text quality of that exhibit, however, a substitute copy of that article has been provided here.

## EXHIBIT A: ECF 26-2, DECLARATION OF VICTOR ESCALON (D-1)

**United States District Court**
**Western District of Texas**
**Austin Division**

UNITED STATES OF AMERICA,

    *Plaintiff*,

        v.

GREG ABBOTT, in his capacity as Governor
of the State of Texas, and THE STATE OF
TEXAS,

    *Defendants*.

No. 1:23-cv-00853-DII

---

EPI'S CANOE & KAYAK TEAM, LLC AND
JESSIE FUENTES,

    *Plaintiffs*,

        v.

STATE OF TEXAS, *et al.*,

    *Defendants*.

No. 1:23-cv-00836-DII

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION**

# EXHIBIT B

Defendant's
Exhibits

1

# United States District Court

## Western District of Texas

## Austin Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | No. 1:23-cv-00853 - DII |
| GREG ABBOTT, in his capacity as Governor of the State of Texas, and the STATE OF TEXAS, | |
| Defendants. | |

## DECLARATION OF VICTOR ESCALON

## IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

1.      My name is Victor Escalon. I am the Regional Director for the Texas Department of Public Safety ("DPS") with responsibility for the operations of DPS in South Texas, and specifically in Maverick County, Texas, where the floating buoys that are the subject of this action are currently located.

2.      I have responsibility for DPS operations in a total of twenty-seven counties of South Texas. These counties range along the Rio Grande River near Brownsville, Texas, to the area including Del Rio, Texas. I have served in this position for approximately four years. I have served with the DPS for a total of

approximately twenty-nine years.  I began working on Operation Lone Star in March of 2021 and continue to work in that capacity.

3.      I am familiar with the conditions and uses of the approximately 70-mile segment of the Rio Grande River in Maverick County, Texas. To my knowledge, there is not now, and there has not been in the time I have served in the DPS, any substantial lawful commercial navigation of the Rio Grande River at or near this segment, including at or near the current site of the floating buoys that are the subject of this action.  I am unaware of any use of this segment of the Rio Grande River for any commercial activity or transportation of lawful goods. I also do not call a single occasion when I observed a presence from the U.S. Coast Guard in that area of the Rio Grande.

4.      I have been told by DPS personnel that recreational kayaks or canoes are occasionally but rarely seen in the area of the floating buoys, but I have not seen any.  I have been told that they are more visible around the 4th of July. In my experience and based on intelligence and reports I have received, the majority of the use of the River in Maverick County is for (a) unlawful smuggling of drugs and weapons; unlawful human trafficking; and unlawful migration from the Mexican side of the River to the United States side of the River and (b) law enforcement activities that seek to counteract unlawful activities. Mexican drug cartels are and have been active in this area.  Accordingly, the area where the floating buoys are currently located is within the Maverick County portion of the Border Security Disaster Area designated by Texas Governor Greg Abbott from 2021 to the present. The floating buoys are part of Texas' response to the border security disaster, and control ingress to a portion of the Border Security Disaster Area.

5.       I am also familiar with the floating buoys that are currently in the Rio Grande River in Maverick County, Texas. The plans to place these floating buoys at that location were publicly announced by the Governor of Texas on June 8, 2023. The floating buoys were placed at their current site in mid-July 2023.

6.      The floating buoys at their current site are entirely within Texas and entirely within the Maverick County segment of the Rio Grande. Both Maverick County, Texas and the State of Texas include the land under the Rio Grande River to the international boundary between the United States and Mexico, which I understand to be the mid-point of the Rio Grande River. Thus, the floating buoys at their current site effectively control and direct ingress in a portion of Maverick County, Texas to lawful U. S. Customs and Border Patrol points of entry. Surveillance of the floating buoys is maintained by DPS or Texas National Guard personnel at all hours of the day, each day. There are no spikes, concertina wire, or razor wire on the buoys.

7.      The floating buoys are not affixed to the riverbed of the Rio Grande River in any way. They are connected to removable concrete blocks that currently are at rest on the bottom of the River, but not embedded, driven into, or structurally attached to the riverbed. No excavation was conducted to deploy the floating buoys or concrete blocks. Machinery can be used to lift and move the concrete blocks at any time. For these reasons, I do not regard the floating buoys and related items as a "structure" in the ordinary sense of that term. There is steel mesh under the floating buoys to prevent diving or swimming under them, but the steel mesh also is not embedded or structurally attached to the riverbed. The steel mesh is generally parallel to the river's flow at its current site, and does not block or catch substantial amounts of debris, or other materials floating down the River.

8.      The floating buoys are attached to each other and are aligned parallel with the flow of the Rio Grande River at their current site. Based on my observations, the floating buoys, the steel mesh, and the concrete blocks do not substantially interfere with or alter the flow of water down the Rio Grande River. The buoys rise and fall with the flow of the river. Because the floating buoys extend for only about one thousand feet or less than 0.2 miles; and because there is little if any commercial navigation of the Rio Grande River in Maverick County, the floating buoys at their current site do not substantially interfere with the navigable capacity of the Rio Grande River or the navigation of the Rio Grande

River. No lawful traffic should move from bank to bank across the River at this point; there is no legitimate reason for lateral traffic here.

9.      At the current site of the floating buoys on the Rio Grande River, the width of the river from bank to bank is approximately 200 feet. The diameter of the floating buoys is approximately four feet. As a result, any vessel going up or down the River at the current site of the floating buoys can easily navigate past them on either the United States or Mexico side of the River. The buoys occupy a de minimis portion of the width stream. To the extent the River is capable of any navigation in this segment, as a practical matter, the River at that site is open to navigation up and down the river by all.

10.     At the site of the floating buoys, I estimate that the Rio Grande River is generally four feet or less in depth under current conditions. In some areas near the current site of the floating buoys, the river is no more than ankle or knee deep for an adult and there are many small islands and sandbars in the River. I have not seen the River flood here. Its depth rises and falls only slightly.  The only watercraft I have ever seen operate in this segment of the river are law enforcement boats incapable of bearing the weight of commercial goods or small recreational craft like a kayak or canoe.  Larger vessels would not be able to operate due to the shallow conditions of the stream and frequent presence of sand bars and islands.

11.     The surrounding land use on the United States side of the Rio Grande River at the point where the floating buoys are located is rural or industrial, with no real ranching and few landowners actively using this segment. At one time there was a caliche mining pit in the area, but its operations have ceased.

12.     The floating buoys are currently under constant 24-hour surveillance by members of Operation Lone Star.  Since the installation of the buoys, I have not seen a single person attempt to climb over the buoys, nor have I seen anyone injured or killed due to their interaction with the buoys. Further, no other member of Operation Lone Star has reported to me that anyone has attempted to climb over the buoys and no injuries or deaths have been reported to me that occurred while

using the buoys.  I believe the buoys provide a safe means of redirecting the flow of unlawful immigration to lawful points of entry without impeding the flow of the river or watercraft.

13.     In addition, I have observed the level of unlawful activity at the Rio Grande River and in Maverick County, Texas.  Based on my observations the level of unlawful activity in that area is currently at an extremely high level. This area is one of the most active hotspots for criminal activities such as drug and weapons smuggling and human trafficking along the entire length of the Rio Grande River in the area for which I have responsibility. In my judgment, the value of the floating buoys at their current site is far greater than any possible effect they could have on the lawful navigation in the Rio Grande River. And I believe they are very useful tools to direct migrants intending to unlawfully cross at that point to a port of entry.

14.     The buoys are designed for temporary use and are able to be moved to other locations as necessary. Although the buoys are temporarily located and movable, the cost to remove the buoys is estimated at $300,000.

I hereby declare under penalty of perjury, pursuant to 28 U. S. C. § 1746, that the foregoing is true and correct to the best of my knowledge and information.
Signed this  9th    day of August 2023.

*Victor Escalon*
_____

Victor Escalon

Texas Department of Public Safety

**EXHIBIT B: ECF 26-1, DECLARATION OF CHRIS NORDLOH (D-2)**

**United States District Court**
**Western District of Texas**
**Austin Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | |
| v. | No. 1:23-cv-00853-DII |
| GREG ABBOTT, in his capacity as Governor of the State of Texas, and THE STATE OF TEXAS, | |
| *Defendants*. | |

_____

| | |
|---|---|
| EPI'S CANOE & KAYAK TEAM, LLC AND JESSIE FUENTES, | |
| *Plaintiffs*, | |
| v. | No. 1:23-cv-00836-DII |
| STATE OF TEXAS, *et al.*, | |
| *Defendants*. | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**

# EXHIBIT A

Defendant's Exhibits

2

**DECLARATION OF MAJOR CHRIS NORDLOH**
**IN OPPOSITION TO THE MOTION FOR PRELIMINARY INJUNCTION**

1.    My name is Chris Nordloh. I serve as a Major within the Tactical Marine Unit of Texas Highway Patrol, a Division of the Texas Department of Public Safety, and have responsibility over a large area in Texas, including the segment of the Rio Grande in Maverick County where the floating buoys at issue in this matter currently exist.

2.    My responsibilities include performing marine and water rescues, maritime patrols, riverine, and coastal operations. Overall, I have worked for the Texas Department of Public Safety for 27 years. Currently I work to support Operation Lone Star.

3.    I am personally familiar with the Maverick County segment of the Rio Grande, having grown up in the area and engaged in outdoor recreation and hunting here my whole life. Professionally, I have worked in this region since 2009. I consistently work in this segment of the Rio Grande throughout the year and possess comprehensive knowledge of its features, characteristics, and dangers of this segment of the river.

4.    Part of my responsibilities in the Tactical Marine Unit involve traveling this segment of the Rio Grande by air boat.  Hidden dangers exist in patchworks all over this stretch of the Rio Grande that can punch holes in the hull of a boat, even

the metal hull of an air boat which is much harder than a typical fiberglass hull. For that reason, only skilled law enforcement agents well-acquainted with and trained in traveling this stretch of the river should operate watercraft in it. It is very difficult and dangerous for even the airboats to operate in this segment of the river without professional training. Even marine and water rescues performed by my team may be hazardous depending on the conditions. My team exercises caution and care in these situations.

5.    This stretch of the Rio Grande where the floating buoys are currently located is comprised of sand bars, shallow water, water with inconsistent depths, small islands, large rocks, man-made debris, natural debris such as logs and stumps, and sandy shoals. People entering the river at this location face treacherous conditions, including hidden eddies that can and do drown swimmers. Water levels are dependent on releases from the Lake Amistad Dam located approximately 70 miles upstream. The depth of this segment varies from day to day—even within the same day—and obstacles even recently exposed can be covered within hours and hide just below the water, posing great threats to boats.

6.    Very few boats, outside law enforcement watercraft, operate on this stretch of the river where the floating buoys are currently located. Due to shallow waters, the largest boats capable of operating here are air boats with very shallow

draft and a maximum capacity of four to six persons due to the extremely limited weight capacity. The air boats do not have the capacity to carry cargo.

7.    An air boat, or perhaps, in theory, a recreational kayak, canoe, or light jet boat, is the only type of watercraft capable of operating on the river in this segment due to the sand bars and shallow water, which is usually about a foot and half deep. I have never seen a commercial barge, fishing boat, cargo ship or carrier, tanker, or any other commercial vessel in this stretch of the Rio Grande in Maverick County.

8.    In my experience, I have never seen a U.S. Coast Guard boat near Eagle Pass in the Rio Grande—I have seen U.S. Coast Guard vessels only several hours away—over 200 miles south near Mission, Texas where the river is substantially deeper.

9.    The Rio Grande varies from approximately 100 to 400 feet in width through Maverick County, Texas. In the immediate vicinity of the floating buoys' current location, the Rio Grande is approximately 200 feet wide. The deeper side of the river in the vicinity of the buoys is on the Mexican half of the river. The buoys are placed within Texas on the shallower U.S. side.

10.    The floating buoy system poses no obstacle to traveling up and down the river. The buoys are very well marked and colorful. The law enforcement watercraft using this segment of the Rio Grande (the only type of watercraft I have

seen operate in this segment) readily maneuver around the buoys with no problems. Based on my experience in the river, the floating buoys at their current location have no impact on the ability to navigate the waters of the Rio Grande in the Maverick County segment for lawful purposes, or on the navigable capacity of the river.

I hereby declare under penalty of perjury, pursuant to 28 U. S. C. § 1746, that the foregoing is true and correct to the best of my knowledge and information.

Signed this 8th day of August 2023.

_____

Chris Nordloh

Texas Department of Public Safety

# EXHIBIT C: ECF 26-3, DECLARATION OF LOREN FLOSSMAN (D-3)

**United States District Court**
**Western District of Texas**
**Austin Division**

| | |
|---|---|
| United States of America, | |
| *Plaintiff*, | |
| v. | No. 1:23-cv-00853-DII |
| Greg Abbott, in his capacity as Governor of the State of Texas, and the State of Texas, | |
| *Defendants*. | |

---

| | |
|---|---|
| Epi's Canoe & Kayak Team, LLC and Jessie Fuentes, | |
| *Plaintiffs*, | |
| v. | No. 1:23-cv-00836-DII |
| State of Texas, *et al.*, | |
| *Defendants*. | |

**Defendants' Opposition to Plaintiffs' Motions for Preliminary Injunction**

# EXHIBIT C

Defendant's Exhibits

3

United States District Court

Western District of Texas

Austin Division

UNITED STATES OF AMERICA,

    Plaintiff,

v.

GREG ABBOTT, in his capacity as
Governor of the State of Texas, and
the STATE OF TEXAS,

    Defendants.

No. 1:23-cv-00853 - DII

# DECLARATION OF LOREN FLOSSMAN
## IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

    1.    My name is Loren Flossman. I am the Project Manager with Cochrane USA with responsibility for the manufacture and subsequent deployment of the floating buoys in the segment of the Rio Grande River in Maverick County, Texas, that are the subject of this action. In my role as Project Manager at Cochrane USA, I supervised the completion of the design, manufacture, assembly, and deployment of the floating buoys.

    2.    Prior to my work at Cochrane USA, I was employed by U.S. Customs and Border Protection in the from July 2007 to December 2022, in the U. S. Border Patrol HQ as Director of the Infrastructure Portfolio and CBP's Designated Acquisition Manager for the S8B Barrier Program. My responsibilities with U.S. Customs and Border Patrol included environmental compliance; real estate

acquisition, design, and construction of the CPB Border Barrier along the southwest border . Through my career and current employment, I am familiar and have firsthand experience with the floating buoy system at issue.

3. Through my employment at the U.S. Customs and Border Patrol, I first became familiar with the design and testing of the floating buoy system, which was originally contracted for by the U.S. Customs and Border Patrol in 2020. An Army Corps of Engineers permit was to my knowledge never considered by U.S. Customs and Border Patrol to deploy the buoy system at that time. The contract for the floating buoys associated with U.S. Customs and Border Patrol was ultimately cancelled in January 2021 as a result of the Presidential Proclamation directing DHS to cease all Border Barrier Construction. However, U.S. Customs and Border Patrol agents tested the same system at the U. S. Border Patrol Academy in Artesia, New Mexico. The three day testing proved the floating buoys' efficacy and demonstrated no additional danger to agents or migrants. CBP viewed the floating buoys as a tool that would save lives by reducing drownings.

4. The subject system was designed to be a mechanism to save lives and direct migrants to appropriate U. S. Customs and Border Patrol points of entry while deterring unlawful, dangerous crossings; drug smuggling; human trafficking; and terrorist infiltration. The floating buoy system has been used in other countries, such as Nigeria and South Africa.

5. The buoy system cannot fairly be characterized as, and is not sold, marketed, or referred to, as a "boom". It is not meant for containment and is not permanent. Rather, the floating buoy system may be moved or removed at any time. The buoy system is comprised of multiple interconnected buoys which can be extended to any length and customized and relocated according to their application. Its design is temporary in nature and allows for it to be picked up and redeployed at other points as needed.

6.     The 1,000-feet long floating buoy system at issue is tethered via chains to concrete blocks which were placed on the bed of the Rio Grande River. Each buoy is approximately four feet in diameter. The anchoring system consists of concrete blocks tha are not attached in any way to the riverbed. No excavation or building occurred in the river when they were installed. After being staged on land, the floating buoys were deployed into the river group-by-group in prefabricated sets of three—each group of three attached in place within the river are attached to the concrete blocks via chain hinge. Track Hoe loaders were used to neatly place the buoys and concrete blocks in the river. Track Hoe loaders were used because their buckets can easily lift, carry, and place the system segments. The buoys were located using GPS coordinates to ensure they are placed within the United States half of the Rio Grande.

7.     Deployment of such a floating buoy system may take less than a week. The deployment of this system started on July 10, 2023 and deployed with the initial concrete anchors on July 14, 2023.  Dismantling or movement of an entire floating buoy system may occur in a matter of several weeks. Removal typically takes longer than deployment due to the inherent tamper resistant nature of the design.

8.     Stainless steel mesh fastened directly under the buoys acts as anti-dive net, extending two feet down into the water, and runs about 50 percent of the length of the buoy system. Currently the anti-dive net touches the riverbed. However, when the river depth increases the anti-dive net rises off the bed. The anti-dive net is made of line wires and cross wires with a gauge of +/- 3mm. This design allows water to freely pass through it. Currently the subject system is being monitored daily in the event there is any debris collection and to allow any necessary cleaning may occur. No vacuum is created by the system.

9.     The subject floating buoy system tolerates and is meant to withstand at least a 100-year flood. The system is designed with heavy concrete blocks placed systematically on the bed of the Rio Grande River to prevent movement about the river. The design of chains, which are 12-meters in length, allows the floating buoys

to rise and fall with the elevation of the water while maintaining the same position on top of the river.

10.     Ultimately, the floating buoy system as designed and deployed in no way impedes existing lawful uses of the Rio Grande River, to the extent any lawful use of this river segment exists, which I have not seen in my time at this location. The floating buoy system as deployed does not interfere with the travel of watercraft up and down the river. Moreover, the design and positioning of the buoy system allows for the free flow of water through this segment of the Rio Grande River. Accordingly, the floating buoys do not substantially interfere with the navigable capacity of the Rio Grande River. Thus, in my judgment, the harm to the public interest in law enforcement from removal of the floating buoys at their current location would greatly outweigh any harm to any lawful navigation of the River.

I hereby declare under penalty of perjury, pursuant to 28 U. S. C. § 1746, that the foregoing is true and correct to the best of my knowledge and information.

Signed this ___9___ day of August 2023.

Loren Flossman

**EXHIBIT D: ECF 26-4, DEPOSITION OF JUSTIN PETERS (D-4)**

**United States District Court**
**Western District of Texas**
**Austin Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| *Plaintiff*, | | |
| v. | | No. 1:23-cv-00853-DII |
| GREG ABBOTT, in his capacity as Governor of the State of Texas, and THE STATE OF TEXAS, | | |
| *Defendants*. | | |

_____

| | | |
|---|---|---|
| EPI'S CANOE & KAYAK TEAM, LLC AND JESSIE FUENTES, | | |
| *Plaintiffs*, | | |
| v. | | No. 1:23-cv-00836-DII |
| STATE OF TEXAS, *et al.*, | | |
| *Defendants*. | | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**

# EXHIBIT D

Defendant's Exhibits

4

```
            IN THE UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF TEXAS
                     AUSTIN DIVISION

UNITED STATES OF AMERICA,    *
                             *
     Plaintiff               *
                             *
v.                           *  CIVIL ACTION
                             *     NO. 1:23-00853-DAE
GREG ABBOTT, in His          *
Official Capacity as         *
Governor of the State of     *
Texas, and the State of      *
Texas,                       *
                             *
     Defendants.             *
```

                VIDEOCONFERENCED ORAL DEPOSITION

                              OF

                    CAPTAIN JUSTIN PETERS

                    Monday, August 7, 2023




                    (REMOTELY REPORTED)




          VIDEOCONFERENCED ORAL DEPOSITION OF CAPTAIN

JUSTIN PETERS, produced as a witness at the instance of

the Defendants, and duly sworn, was taken in the above-

styled and numbered cause on Monday, August 7, 2023,

from 11:17 a.m. to 12:44 p.m., before Debbie D.

Cunningham, CSR in and for the State of Texas, remotely

reported via Machine Shorthand, pursuant to the Federal

Rules of Civil Procedure.

                    --ooOoo--

```
 1                    APPEARANCES

 2

 3   FOR PLAINTIFF:

 4        U.S. ATTORNEY'S OFFICE - DEPARTMENT OF JUSTICE
          Environment & Natural Resources Division
 5        150 M. Street N.E.
          Washington, DC 20002
 6        (T) 202.514.2275

 7             By:  Kimere Kimball, Esq.
                    kimere.kimball@usdoj.gov
 8                     AND
          U.S. ATTORNEY'S OFFICE - DEPARTMENT OF JUSTICE
 9        601 N.W. Loop 410, Suite 600
          San Antonio, Texas  78216
10        (T) 210.384.7100

11             By:  Mary Kruger, Esq.
                    mary.kruger@usdoj.gov
12


13
     FOR DEFENDANTS:
14
          OFFICE OF THE ATTORNEY GENERAL OF TEXAS
15        Special Counsel for Civil Litigation
          300 W. 15th Street
16        Austin, Texas  78701
          (T) 512.475.4133
17
               By:  Patrick Sweeten, Esq.
18                  Patrick.Sweeten@oag.texas.gov
                          AND
19                  Jake Marx, Esq.
                    Jake.Marx@oag.texas.gov
20

21
                    --ooOoo--
22

23

24

25
```

INDEX

APPEARANCES                                  2


EXAMINATION OF CAPTAIN JUSTIN PETERS:

BY MR. SWEETEN                               6

BY MS. KIMBALL                               58



CHANGES AND SIGNATURE                        60

REPORTER'S CERTIFICATION                     62

4

1                        EXHIBIT INDEX

2    Exhibit Number       Description                    Page

3     Exhibit 1     1984 Coast Guard Determination     11

4     Exhibit 2     Image of Rio Grande River          11

5     Exhibit 3     Declaration of Captain Justin      11
                    Peters

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Monday, August 7, 2023, 11:17 a.m.)

 2                    P R O C E E D I N G S

 3              THE REPORTER:  This is the

 4    Deposition of Captain Justin Peters, in the

 5    matter of the United States of America versus

 6    Greg Abbott, et al.  We are conducting this

 7    deposition remotely, and we are located in our

 8    preferred respective locations.  We are on the

 9    record at 11:17 a.m. Central Standard Time.

10              My name is Debbie Cunningham,

11    and my business address is 9901 Brodie Lane,

12    Austin, Texas 78748.

13              Would all parties present please

14    introduce themselves for the record?

15              MR. SWEETEN:  This is Patrick

16    Sweeten on behalf of Governor Greg Abbott and

17    the State of Texas.

18              MS. KIMBALL:  This is Kimere

19    Kimball U.S. Department of Justice, Environment

20    & Natural Resources Division, on behalf of the

21    United States; and with me today in San Antonio

22    is Mary Kruger at the U.S. Attorney's Office of

23    the Western District of Texas.

24              MR. SWEETEN:  And let me add

25    that Jake Marx is with me as well.  I forgot to
```

 1    introduce him.

 2                THE WITNESS:  My name is

 3    Captain Justin Peters, U.S. Coast Guard.

 4                (Witness sworn by the reporter.)

 5                MR. SWEETEN:  Let me just show

 6    that this deposition is being taken pursuant to

 7    the Federal Rules of Civil Procedure.

 8                Also, through negotiations on

 9    Friday, Counsel for the State of Texas and

10    Governor Abbott and Counsel for the DOJ agreed

11    to take this deposition by Zoom, rather than

12    require Mr. Peters -- or Captain Peters to

13    appear in Texas or have this in person.

14                CAPTAIN JUSTIN PETERS,

15      having been duly sworn, testified as follows:

16                     EXAMINATION

17    BY MR. SWEETEN:

18         Q.   Captain Peters, will you state your

19    full name, please?

20         A.   Justin David Peters.

21         Q.   And Justin -- I mean, Captain, how

22    old are you?

23         A.   50.

24    ▓▓   ▓▓▓▓▓   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

25    ▓▓   ▓▓▓▓▓▓▓▓▓▓▓

```
 1        Q.   All right.  And how long have you
 2  worked at the Coast Guard, sir?
 3        A.   Over 31 years.
 4        Q.   Okay.  All right.  As you know, I'm
 5  the attorney representing the State of Texas
 6  and Governor Abbott.  I'm going to be taking
 7  your deposition today.  Have you ever had your
 8  deposition taken before today?
 9        A.   No.
10        Q.   Okay.  You understand today that you
11  are under oath here in this proceeding?
12        A.   Yes.
13        Q.   You've had the opportunity to speak
14  with your lawyer about a deposition and what it
15  is, correct?
16        A.   That is correct.
17        Q.   You understand that you'll be
18  providing testimony to the Court in this case
19  in the matter of The United States of America
20  versus Gregg Abbott, et al., correct?
21        A.   Yes.
22        Q.   You understand that the testimony
23  today that you will provide might be used in a
24  court proceeding?
25        A.   Yes.
```

1    Q.    And that you're under oath today just

2  as you would be if you were in court, correct?

3    A.    Yes.

4    Q.    All right.  So I'm just going to go

5  through a couple of ground rules since this is

6  your first deposition.  I'm not going to

7  belabor these since I assume you've had the

8  opportunity to talk to your attorney about

9  this, but I'm going to be asking you a series

10  of questions today.  If at any time you do not

11  understand a question that I'm asking you,

12  please ask me to rephrase it; and I'll be more

13  than happy to do that.  Okay?  Is that fair?

14    A.    Yes.

15    Q.    If you do answer the question, then

16  I'll assume you understood what the question

17  was asking.  Is that fair?

18    A.    Yes.

19    Q.    Okay.  A couple of things:  The court

20  reporter can't get down if we're both talking

21  at the same time.  So I'm going to try today to

22  endeavor to let you finish your answer; and if

23  you would please let me finish my question,

24  that way we'll make sure we have a cleaner

25  record here.  Okay?

1    A.    Yes.

2    Q.    One other rule is the court reporter

3  can't take down in the transcription that she's

4  typing out today shakes of the head, nods,

5  "uh-huhs" or "huh-uhs."  So there may be times

6  today -- it's normal in conversation for us to

7  do those types of things and I typically would

8  understand it; but because we're trying to make

9  sure there's a clear record, there may be a

10  time or two today that I say, "Does that mean

11  'yes'?"  Or I'll follow up on a nonverbal

12  gesture; but at all times, if you would,

13  provide a verbal answer.  That way we'll make

14  sure the transcription is clear.  Okay?

15    A.    Yes, I understand.

16    Q.    Okay.  Thank you.

17          Captain Peters, where do you

18  live, sir?

19    A.    I live in Annandale, Virginia.

20    Q.    All right.  And are you at the --

21  tell me where your main office is.  Where do

22  you go to work?

23    A.    Coast Guard Headquarters.

24    Q.    Okay.  And where is that?

25    A.    Washington, D.C.

Justin Peters - 8/7/2023

10

```
 1        Q.   Okay.  Now, you've had the

 2   opportunity to speak with your attorney today

 3   in advance of this deposition; is that correct?

 4        A.   Yes.

 5        Q.   Okay.  And your attorney is Kimere

 6   Kimball?

 7             MR. SWEETEN:  I hope I got that

 8   right, Kimere.

 9        A.   Yes, that's correct.

10        Q.   (BY MR. SWEETEN)  Okay.  And have you

11   spoken, outside of your attorneys -- because

12   I'm not going to ask you about conversations

13   you had with her -- outside of her, have you

14   had conversations about this deposition that

15   you're providing today?

16        A.   Can you clarify if you're asking

17   about scheduling the deposition or the

18   deposition itself?

19        Q.   I'm not as interested in scheduling.

20   Like, for example, if you've talked about times

21   you'd be available or wouldn't be, things

22   you're doing other than this, that's not what

23   I'm asking.

24             I'm asking more along the lines

25   of you knew you had a deposition today.  Did
```

1  you talk to anyone other than your attorneys in

2  advance of this deposition to prepare you for

3  the deposition?

4      A.   I spoke to Department of Justice

5  attorneys and Coast Guard attorneys together.

6      Q.   Did you speak to anybody outside of

7  that group?

8      A.   No.

9      Q.   Were you shown any documents in those

10 meetings?

11     A.   I was shown my declaration.

12     Q.   Okay.  Were you shown any other

13 documents?

14     A.   No.

15     Q.   Okay.

16            (Exhibit 1 marked.)

17            (Exhibit 2 marked.)

18            (Exhibit 3 marked.)

19            MR. SWEETEN:  All right.  Jake,

20 I need you to e-mail Kimere Kimball the

21 exhibits, please.

22            MS. KIMBALL:  Sorry.  Hold on

23 just a second.  I don't have my e-mail open.

24            THE REPORTER:  I assume this is

25 off the record?

```
 1                  MR. SWEETEN:  Yes, we can go off

 2   the record.  Thank you.

 3                  (Off the record from 11:28

 4            to 11:31 a.m.)

 5        Q.   (BY MR. SWEETEN)  Captain Peters, I'm

 6   going to show you what's been marked as

 7   Exhibit Number 1 to this deposition; and it is

 8   a document that at the very top has U.S.

 9   Department of Transportation, United States

10   Coast Guard letterhead.  It's a letter dated

11   October 19th, 1984.

12                  Do you have that in front of

13   you, sir?

14        A.   Yes, I do.

15        Q.   Okay.  And you're familiar with this

16   document, correct?

17        A.   I have seen this document before,

18   yes.

19        Q.   Okay.  Because this document was

20   actually attached to the preliminary injunction

21   that was filed by the Department of Justice.

22   Are you aware of that, sir?

23        A.   I'm aware that this was a

24   declaration, yes.

25        Q.   Okay.  So let's talk about what this
```

 1  document is.  First of all, it is a document
 2  written by T. W. Snook of the United States
 3  Coast Guard; is that correct?
 4          MS. KIMBALL:  I can scroll over
 5  here.
 6      A.  Yes.
 7      Q.  (BY MR. SWEETEN)  And it is from --
 8  it says, "From:  Commander, Eighth Coast Guard
 9  District, To:  Commanding Officer, Marine
10  Safety Office Corpus Christi, Texas."  Did I
11  describe that correctly?
12      A.  Yes.
13      Q.  All right.  Now, the date -- this
14  letter is 40 years old almost, correct?
15      A.  1984, yes.
16      Q.  It's 39 years old.  Is my math wrong?
17      A.  Um, I mean, I don't want to get my
18  math wrong (laughing.)
19      Q.  All right.  Very good.
20          So let's look at the document
21  that's been attached to an affidavit in this
22  case and attached to the Preliminary Injunction
23  Motion filed by the Department of Justice.  In
24  Number 1 it says, "From 1947 to 1975 the Rio
25  Grande River was listed among the navigable

14

 1  waters of the United States pursuant to

 2  treaties with Mexico and for Coast Guard

 3  regulatory purposes."  Did I read that first

 4  sentence correctly?

 5       A.   Yes.

 6       Q.   Okay.  And the purpose of -- what is

 7  the purpose of the navigability determination

 8  that's here on this page?

 9       A.   I'm not in a position to answer that.

10       Q.   Okay.  Have you reviewed this

11  document before today?

12       A.   I have seen the document, yes.

13       Q.   Okay.  And you understand that it

14  states that, "The Rio Grande River was listed

15  among the navigable waters of the U.S. pursuant

16  to treaties with Mexico and for Coast Guard

17  regulatory purposes."  Do you see that?

18       A.   Yes, I do.

19       Q.   Now, it's also the case that if we go

20  to Number 3, that that letter says, "This

21  represents the opinion of the Coast Guard only

22  as to the extent of its own jurisdiction, and

23  does not address the jurisdiction of other

24  agencies."  Did I read that last sentence

25  correctly?

1    A.    Yes.

2    Q.    And that sentence is part of this

3 navigability determination that has been

4 provided in this lawsuit, correct?

5    A.    That is my understanding.

6    Q.    Okay.  Are you aware of

7 Captain Brandy Parker's review -- she is, as I

8 understand it, with the Judge Advocate

9 General's Office of the Coast Guard -- her

10 review of the Coast Guard's navigability

11 determination?

12    A.    I am familiar that she provided this

13 document to the Department of Justice.

14    Q.    Okay.  And this is not a document

15 that you provided.  This is something that

16 Captain Brandy Parker provided, correct?

17    A.    That is my understanding.

18    Q.    Okay.  So is it the case that -- when

19 I asked you what it was earlier, it sounded

20 like you didn't have great familiarity with

21 this document and what its import is.  Is that

22 fair to say, Captain Peters?

23    A.    Yes.

24    Q.    Okay.  And so if I were to ask you if

25 you agreed with her determinations, her

Case 23-50632-DE   Document 13   Filed 08/09/23   Page 39 of 289

Justin Peters - 8/7/2023

16

1   findings about the '84 navigability

2   determination and whether or not it's still in

3   effect, that's not something you would know

4   sitting here today, correct?

5          A.   That is not under -- that information

6   is not under my purview.

7          Q.   Okay.  And so you don't know that as

8   you're sitting here today, correct?

9          A.   That is correct.

10         Q.   All right.  And you're not testifying

11  one way or the other as to whether or not this

12  is a navigability determination that is still

13  in effect, correct?

14         A.   I'm not in a position to answer that.

15         Q.   Okay.  And so the answer is "no,"

16  you're not testifying one way or the other,

17  correct, about this navigability determination?

18  I just want to make sure we're clear, close

19  that out.

20         A.   I am not testifying to the contents

21  of this document.

22         Q.   All right.  I understand.  Thank you:

23               "The Rio Grande River remains

24  navigable waters of the United States."  That's

25  something that Captain Brandy Parker said.

17

1 That's not something you're here to testify

2 about or know about, correct?

3     A.   That is correct.

4     Q.   Okay.  That the navigability

5 determination makes no qualification, that's

6 not something you're here to talk about.

7 That's something that we would have to talk

8 with Captain Parker about; is that correct?

9     A.   I am not able to answer that.

10    Q.   Okay.  If I were to ask you what is

11 the definition of "navigable waters" that was

12 used by T. W. Snook in providing this

13 determination, you wouldn't know that, correct?

14    A.   That's correct.

15    Q.   Okay.  The same with what

16 Captain Parker's opinion is in what she

17 reviewed.  You wouldn't know what she was

18 utilizing as the definition of "navigable

19 waters" used for this determination in this

20 letter, correct?

21    A.   That is correct.

22    Q.   Okay.  Thank you for your testimony.

23         All right.  Now, as you're

24 sitting here today, are you aware there are

25 1247 river miles between Texas and -- on the

1  southern border of Texas, sir?

2      A.   No, I am not.

3      Q.   Okay.  Then let me ask it more

4  generally.  With respect to the -- hold on a

5  second.

6             In the letter it talks about

7  mile 0 to mile 1247, correct?

8             MS. KIMBALL:  Are we talking

9  about Exhibit 1?

10             MR. SWEETEN:  Yes, ma'am.  Yes,

11  Kimere.

12             MS. KIMBALL:  Can you just tell

13  me where that is so I can get the document --

14             MR. SWEETEN:  Oh, sure.

15  Paragraph 1.  And it is, I think, Line 2.

16      A.   Can you restate the question?

17      Q.   (BY MR. SWEETEN)  Yeah, yeah, no

18  problem.

19             It says, "This determination

20  covers the river for the entire distance..."

21  And if you skip down, it says mile 0 to mile

22  1247.  You are not here to testify whether or

23  not -- what of those miles of river you believe

24  to be navigable today, correct?

25      A.   I am not able to testify to that.

1   Q.   Okay.  And you're not offering an

2   opinion on that, correct?

3   A.   No, I am not.

4   Q.   Okay.  Thank you.

5          Oh, I forgot to ask you a couple

6   of questions about the Coast Guard.  The Coast

7   Guard, tell me generally:  What is their job?

8   A.   The Coast Guard has multiple

9   statutory missions that are assigned to us via

10  law.  The Coast Guard conducts a variety of

11  missions, to include search and rescue, law

12  enforcement, marine environmental protection,

13  waterway management, and a variety of other

14  missions.

15  Q.   Thank you, sir.

16         Now, the Coast Guard is a public

17  entity, correct?  It is not a private entity

18  engaged in commerce; is that accurate?

19  A.   That is correct.

20  Q.   And the Coast Guard is not a

21  commercial operation in any way, correct?

22  A.   That is correct, to the best of my

23  knowledge.

24  Q.   Okay.  Now, we talked a little bit

25  about this on Exhibit 1, which was the Coast

20

1   Guard's determination.  Are you aware of any

2   other federal agency, other than the Coast

3   Guard, that has determined that the segments

4   within Maverick County of the Rio Grande River

5   are, indeed, navigable?

6        A.   I do not know.

7        Q.   Okay.  Are you aware as you're

8   sitting here of a single federal court decision

9   that has determined that the segments of the

10  river in Maverick County are in any way

11  navigable?

12       A.   I am not aware of that information.

13       Q.   Thank you.

14            Are you aware of a single state

15  court determination that has held that the

16  river areas within Maverick County are

17  navigable?

18       A.   I do not have that information.

19       Q.   Okay.  Let me ask you another

20  question.  It's the case, isn't it, that the

21  Coast Guard does not make navigability

22  determinations under the Rivers and Harbors

23  Act?  Is that accurate?

24            MS. KIMBALL:  Objection, calls

25  for a legal conclusion and also is outside the

21

1  scope of discovery authorized by the Court,

2  which is limited to just the question of

3  obstructions.

4           The witness is instructed not to

5  answer.

6           MR. SWEETEN:  Okay.  So the

7  instruction is you're telling him not to answer

8  the question that I asked; is that right?

9           MS. KIMBALL:  That's correct.

10         MR. SWEETEN:  Okay.

11    **Q.   (BY MR. SWEETEN)  Now, have you been**

12  **to -- you understand that at issue in this**

13  **litigation are a series of buoys that are in**

14  **the -- currently in the Rio Grande River in**

15  **Maverick County, right?**

16         MS. KIMBALL:  Could you clarify

17  if Maverick County is the county where Eagle

18  Pass is?

19         MR. SWEETEN:  Maverick County is

20  where Eagle Pass is, yes, Kimere.

21    A.   Yes, I am aware.

22    **Q.   (BY MR. SWEETEN)  Okay.  Now, have**

23  **you, yourself, personally been to the site**

24  **where the buoys are?**

25    A.   No.

1     Q.   Okay.  And I'm asking:  Ever in your
2  life?
3     A.   That is correct.
4     Q.   Okay.
5     A.   I have not been there.
6     Q.   Thank you.
7          So if I were to ask you
8  personally as you're sitting here whether or
9  not that stretch of river where the buoys
10  are -- and I think the Department of Justice
11  has alleged it's a thousand feet -- if I were
12  to ask you what commercial traffic looks like
13  in that area, if there is any, would you be
14  able to answer that?
15     A.   I do not know that information.
16     Q.   Okay.  Thank you.
17          I want to circle back to the
18  letter as far as -- and I think I asked this
19  already, but I just want to be clear; and then
20  we'll leave that whole area, Captain Peters.
21  As far as what the basis of the Coast Guard's
22  navigability determination contained in this
23  letter is, that's not something you know one
24  way or the other; is that accurate?
25     A.   That information is not in my

1  purview.

2      Q.   Okay.  Thank you, sir.

3              MR. SWEETEN:  One second.  Okay?

4              (Off the record from 11:44

5          to 11:45 a.m.)

6      Q.   (BY MR. SWEETEN)  Okay.  I told you

7  we'd leave navigability.  I want to go on to

8  another subject.  It's related, though.

9              Are you aware of what U.S. Coast

10  Guard operations are on the Rio Grande?

11      A.   I am aware of some Coast Guard

12  operations on the Rio Grande, but not in their

13  totality.

14      Q.   Okay.  Now, it's my understanding --

15              MS. KIMBALL:  Sorry.  We were

16  disconnected for a second.  I don't know if you

17  asked a question or...

18              MR. SWEETEN:  Okay.  No worries.

19  I'll start the question over.

20      Q.   (BY MR. SWEETEN)  It's the case,

21  isn't it, that the closest Coast Guard base to

22  the Rio Grande River would be found at

23  South Padre Island; is that correct?

24      A.   I do not know that for a fact.

25      Q.   Okay.  It's the case, isn't it, that

1  there is no Coast Guard base on the Rio Grande,

2  correct?

3      A.   To the best of my knowledge, that is

4  correct.

5      Q.   All right.  And, Captain Peters, let

6  me ask you:  Have you ever been on the Rio

7  Grande River?

8      A.   No.

9      Q.   Okay.  Have you ever served while in

10 the Coast Guard on the Rio Grande River?

11     A.   Not on the Rio Grande River.

12     Q.   Okay.  You said earlier that you were

13 able to describe some operations on the Rio

14 Grande.  Let me ask you this:  You understand

15 that the Rio Grande, it goes from Brownsville

16 to McAllen; and then it goes up to Eagle Pass

17 and to Del Rio.  Have you ever at any time been

18 aware of a Coast Guard operation that occurred

19 north of McAllen, upriver from McAllen?

20     A.   I am not familiar with the geography

21 of the border.

22          MS. KIMBALL:  Do you have a map

23 that you can show?

24          MR. SWEETEN:  I think we do, but

25 let me ask it a different way.

1    Q.   (BY MR. SWEETEN)  What operations are

2  you familiar with that the Coast Guard performs

3  on the Rio Grande River, if any?

4    A.   The Coast Guard currently has

5  deployable specialized forces, which include

6  boats, in the Rio Grande Valley that are

7  currently deployed; and there was a team that

8  was also operating on Falcon Lake that is no

9  longer there.

10    Q.   Okay.  Now, where is Falcon Lake in

11  relation to where these contested buoys are?

12    A.   I do not -- I cannot testify to that.

13    Q.   Okay.  Do you know if Falcon Lake is

14  accessible to the river at the point where the

15  buoys are?

16    A.   I do not have that information.

17    Q.   Okay.  Are you familiar -- now, you

18  had talked about the Rio Grande Valley,

19  correct?  You described an operation that

20  occurred there, correct?

21    A.   I understand that there are boats

22  operating in the Rio Grande Valley, but I do

23  not know the exact location.

24    Q.   Do you know how far north Eagle Pass

25  is from the Rio Grande Valley?

1     A.   No.

2     Q.   Okay.  At what point were the

3 operations occurring in the Rio Grande Valley,

4 where geographically?

5     A.   I do not have that information.

6     Q.   Okay.  If testimony were to indicate

7 that the Coast Guard -- that individuals have

8 never seen a Coast Guard vessel north of

9 McAllen, would you have any -- upriver from

10 McAllen, would you have any reason to dispute

11 that as you're sitting here?

12     A.   I do not know that information.

13     Q.   Okay.  Prior to making the

14 declaration in this case, Captain Peters, were

15 you aware of those Coast Guard operations,

16 those two that you just described?

17     A.   Yes.

18     Q.   Okay.  Were you aware prior to

19 providing the declaration in this case that

20 segments of the Rio Grande River can be -- are

21 completely dry?

22     A.   No.

23     Q.   Okay.  Do you know that one way or

24 the other?

25     A.   I do not know that information.

27

```
1        Q.   And I should say "can be dry."  Will

2   you answer the question just with -- let me ask

3   it again.

4             Were you previously aware prior

5   to providing the declaration in this matter

6   that some segments of the Rio Grande River can

7   be dry?

8        A.   I have seen that on the news.

9        Q.   Okay.

10            MS. KIMBALL:  Sorry.  We just

11  disconnected and reconnected again.  Did you

12  ask a question?

13            MR. SWEETEN:  No, I did not ask

14  a question during that time, Kimere.

15       Q.   (BY MR. SWEETEN)  What Coast Guard

16  operations exist near Eagle Pass other than

17  you've described something at Falcon Lake and

18  you described something in the Rio Grande

19  Valley?  Can you describe any other operations

20  that occur at or near Eagle Pass, Texas?

21       A.   The Coast Guard has members deployed

22  to Eagle Pass now that are assisting Customs

23  with information technology support.

24       Q.   Okay.  When were those assets

25  deployed in Eagle Pass?
```

1    A.    Approximately 60 days ago, and they

2  are still there now.

3    Q.    All right.  And they were -- and can

4  you tell me -- you say those assets are there.

5  Are those assets in the water, or are those

6  assets on the surface?

7    A.    It is personnel only.

8    Q.    Okay.  So there's no -- the Coast

9  Guard has deployed no watercraft in Maverick

10  County or Eagle Pass; is that correct?

11    A.    I can only testify to where they have

12  been in recent memory, but I cannot say that

13  definitively over a long period of time.

14    Q.    Okay.  Well, what about in the last

15  60 days?  Has the Coast Guard deployed a single

16  watercraft in Maverick County or Eagle Pass in

17  the last 60 days?

18    A.    No, not to the best of my knowledge.

19    Q.    Okay.  Now, the individual from the

20  Coast Guard that was sent to assist Customs and

21  Border who was not tasked with having a

22  watercraft, what is that individual's job title

23  or duties -- job duties is a better question?

24        MS. KIMBALL:  Objection,

25  misstates testimony.

1          But you can answer.

2     A.   Those members that are there are

3   performing information technology assistance.

4     **Q.   (BY MR. SWEETEN)  Okay.  So you've**

5   **got some Coast Guard IT personnel working with**

6   **Customs and Borders.  And that's the only**

7   **presence that you're able to testify about in**

8   **Maverick County; is that accurate?**

9     A.   That is the only presence that I am

10  able to testify to.

11    **Q.   Okay.  Thank you.**

12          **Has the Coast Guard conducted**

13  **water rescues on the stretch of river located**

14  **within Maverick County?**

15    A.   I'm not aware of that.

16    **Q.   And that's at any point, correct?**

17    A.   That is correct.  I do not have that

18  information.

19    **Q.   Okay.  Has the Coast Guard performed**

20  **search and rescue in Maverick County at any**

21  **time?**

22    A.   I do not know.

23    **Q.   Has the Coast Guard provided marine**

24  **environmental responses or law enforcement**

25  **responses in Maverick County at any time?**

1    A.   I do not know.

2    Q.   Does the Coast Guard assist either

3 the federal government or the Texas state

4 officials with stopping drug trafficking,

5 trafficking of Fentanyl, or human trafficking

6 in Maverick County?

7    A.   I do not know.

8    Q.   Okay.  Are you familiar -- I know

9 that you said that -- let me just make sure

10 it's clear.  You have not been to this stretch

11 of river where the contested buoys are before

12 today, correct?

13    A.   That is correct.

14    Q.   Are you familiar with what types of

15 watercraft are typically used in the river

16 segment at issue near Eagle Pass?

17    A.   No, I am not.

18    Q.   Have you ever seen any vehicles on

19 the Rio Grande River in Maverick County

20 transporting goods or logs?

21    A.   No, I have not.

22    Q.   Okay.  Have you ever seen any non-law

23 enforcement watercraft in the area of the buoys

24 in Maverick County that were recreational

25 craft?

1          MS. KIMBALL:  Objection, lacks

2     foundation.

3          But you can answer.

4     A.   I do not know that information.

5     **Q.   (BY MR. SWEETEN)  Okay.  Have you**

6     **ever seen watercraft in any other segment of**

7     **the Rio Grande River?**

8          MS. KIMBALL:  Objection, lacks

9     foundation.

10          But you can answer.

11     A.   No.

12     **Q.   (BY MR. SWEETEN)  Have you researched**

13     **the historical watercraft used in the**

14     **Rio Grande area in Maverick County?**

15     A.   No.

16     **Q.   Do you know if the Rio Grande River**

17     **in Maverick County is subject to the ebb and**

18     **flow of tides?**

19     A.   No, I do not know.

20     **Q.   Are you aware of whether or not the**

21     **segment of river where the buoys are is**

22     **especially treacherous to persons who are**

23     **crossing in the water?**

24     A.   I do not know.

25     **Q.   Would it in any way surprise you to**

1  know that this segment of river where the buoys

2  are is comprised of sandbars; water; shallow

3  water; water with inconsistent depths; small

4  islands; rocks; manmade debris; natural debris,

5  such as logs and stumps; and sandy shoals?

6      A.   I do not have that information.

7      Q.   Okay.  I would assume, based on your

8  prior testimony, that you are not here to opine

9  on whether the Rio Grande River near Eagle Pass

10 is a highway of commerce, correct?

11     A.   I do not have that information.

12     Q.   Okay.  As far as whether or not

13 interstate commerce is transported at this

14 segment of the river in Maverick County, you

15 don't have an opinion one way or the other as

16 you're sitting here, correct?

17     A.   I do not have that information.

18     Q.   Okay.  All right.  You stated in your

19 affidavit -- do you have your affidavit in

20 front of you, Captain Peters?

21     A.   Yes.

22     Q.   You stated in your affidavit that you

23 were informed that the State of Texas is

24 constructing a floating barrier within the

25 boundaries of the Rio Grande River, correct?

Case 23-50632   Document 18   Page 56   Date Filed 09/07/2023
Case 1:23-cv-00853-DAE   Document 13   Filed 08/09/23   Page 56 of 289
Justin Peters - 8/7/2023

33

1     A.   That is correct.

2     Q.   Who informed you of this, sir?

3     A.   Coast Guard attorneys.

4     Q.   Okay.  Was that at or near the

5   time that your declaration was signed,

6   Captain Peters?

7     A.   It was prior to the declaration.

8     Q.   Okay.  How much before?

9     A.   Approximately one week.

10    Q.   Okay.  So a week before the date of

11   your declaration, which I think here is the

12   25th day of July, so on July 18th, you were

13   first -- approximately --

14             MS. KIMBALL:  Sorry.

15    Q.   (BY MR. SWEETEN)  I'll start over.  I

16   apologize.

17    A.   Thank you.

18    Q.   So you indicated that you first

19   learned of the construction of the buoys some

20   seven days before the execution of your

21   declaration, which is dated July 25th, 2023; is

22   that correct?

23    A.   That is the date of the declaration.

24   I had personal knowledge that the buoys were

25   being placed from watching the news.  That was

Case: 23-50632   Document: 18   Page: 57   Date Filed: 09/07/2023

34

1  prior to being informed by Coast Guard

2  attorneys.

3      Q.   Okay.  I think I understand.  So do

4  you know approximately when the buoy

5  construction began?

6      A.   I do not.

7      Q.   Okay.  And there's some other

8  declarants that have talked about there was a

9  meeting between DPS and some members of the

10 federal government.  Were you ever involved in

11 any meetings to discuss the buoys prior to you

12 first learning about them on the news?

13     A.   No.

14     Q.   Okay.  So you first learned about it

15 on the news.  Do you think that would have been

16 sometime in July?

17     A.   It may have been in July, or it could

18 have been prior to.  I don't recall.

19     Q.   Okay.  But then the first official

20 contact you had -- so you had seen it on the

21 news; and then you said a week before the

22 declaration was signed, you were approached to

23 discuss the buoys, correct?

24     A.   Yes.

25     Q.   And who approached you?

35

```
 1          A.   Coast Guard attorneys.

 2          Q.   Okay.  So from an operational

 3   standpoint, the only time that you were ever

 4   contacted or that you've discussed the buoys in

 5   any part of your job at the Coast Guard was

 6   when you were first contacted by Coast Guard

 7   attorneys about the buoys, right?

 8          A.   Yes.

 9          Q.   Have you seen pictures of the

10   floating buoys?

11          A.   Yes.

12          Q.   And you have described the string of

13   buoys that exist near the Camino Real

14   International Bridge in your affidavit,

15   correct?

16          A.   Yes, it is located in my affidavit.

17          Q.   Okay.  And do you know where exactly

18   the Camino Real International Bridge is in

19   relation to Eagle Pass?

20          A.   No.

21          Q.   I think we've established from your

22   testimony that you would not have seen those in

23   person.  What were you relying upon to say that

24   you have seen those floating buoys?

25                    MS. KIMBALL:  Objection,
```

```
 1   misstates the document.

 2        Q.   (BY MR. SWEETEN)  Okay.  Well, let me

 3   find in the document specifically where that

 4   is; and then we can talk about it.

 5             All right.  So I've got

 6   Paragraph 4.  It says, "I have been informed

 7   that the State of Texas is constructing a

 8   floating barrier within the boundaries of the

 9   Rio Grande River."  Let's stop there.

10             You were informed by Coast Guard

11   attorneys; is that correct?

12        A.   That is correct.

13        Q.   And that was at or near the time you

14   were asked to sign a declaration in this case,

15   correct?

16        A.   That was prior to me signing the

17   declaration.

18        Q.   It was a week before, right?

19        A.   Yes.

20        Q.   Okay.  Then it says, "The floating

21   barrier reportedly consists of a string of

22   buoys between 4 to 6 feet in diameter."  Who

23   provided you that information?

24        A.   Coast Guard attorneys.

25        Q.   Okay.  A week before you signed your
```

Justin Peters - 8/7/2023

37

1  declaration, correct?

2      A.   Yes.

3      Q.   Okay.  Then you say, "...which is

4  anchored to the bed of river near the Camino

5  Real International Bridge, Eagle Pass, Texas."

6  Did I read that right?

7      A.   Yes.

8      Q.   Okay.  And who told you that it was

9  anchored to the bed of the river near the

10 Camino Real International Bridge?

11     A.   Coast Guard attorneys.

12     Q.   A week before the declaration,

13 correct?

14     A.   Yes.

15     Q.   And just to be clear, you've never

16 seen these buoys before with your own eyes?

17     A.   That is correct.

18     Q.   Now, when you were told these things,

19 that they are 4 to 6 feet in diameter, that

20 they are anchored to the bed of the river, this

21 was told to you by the lawyers in the case?

22          (Connection with the witness

23 lost.)

24          THE REPORTER:  Do you want me to

25 go off the record?

1          MR. SWEETEN:  Yeah, that's fine.

2     Thank you.

3               (Off the record from 12:03

4          to 12:14 p.m.)

5     **Q.   (BY MR. SWEETEN)  Before we left,**

6     **there was a question that I had asked.  Then**

7     **you got cut off, and we didn't hear your**

8     **answer.  So I'm going to have Debbie read the**

9     **question, please.**

10              (The requested material was read

11    by the reporter as follows:

12              "QUESTION:  Now, when you were

13    told these things, that they are 4 to 6 feet in

14    diameter, that they are anchored to the bed of

15    the river, this was told to you by the lawyers

16    in the case?")

17         A.   By Coast Guard attorneys, yes.

18         **Q.   (BY MR. SWEETEN)  And no one else?**

19         A.   No.

20         **Q.   All right.  You described the string**

21    **of buoys as being anchored to the bed of the**

22    **river; is that correct?**

23         A.   Yes.

24         **Q.   Do you have any personal knowledge as**

25    **to how those were anchored to the bed?**

1        A.   The only personal knowledge I have is

2   what I saw in the news.

3        Q.   Okay.  And as far as whether they are

4   or whether they aren't anchored to the bed,

5   that's not something that you have personal

6   knowledge of, right?

7        A.   I do not have that knowledge.

8        Q.   Okay.  And, similarly, if I were to

9   ask you how the buoys are affixed, you don't

10  know the answer to that, correct?

11       A.   No, I do not.

12       Q.   Okay.  Now, you indicated that the

13  State of Texas did not contact the Coast Guard

14  prior to the installation and construction of

15  the floating barriers.  That's what you said,

16  isn't it?

17       A.   I said the Coast Guard was not

18  contacted by the State of Texas.  That is

19  correct to the best of my knowledge.

20       Q.   Okay.  Is it your testimony that the

21  State of Texas had some statutory duty to

22  contact the Coast Guard prior to setting up

23  buoys in the portion of the Rio Grande River in

24  Maverick County?

25                 MS. KIMBALL:  Objection, calls

```
 1  for a legal conclusion.

 2              You can answer.

 3       A.   Can you restate the question, please?

 4       Q.   (BY MR. SWEETEN)  Yes.  Why are you

 5  saying that the U.S. Coast Guard was not

 6  contacted by the State of Texas prior to the

 7  installation and construction of the floating

 8  barrier?  That's what Paragraph 5 says, right?

 9       A.   Paragraph 5 says, "The U.S. Coast

10  Guard was not contacted by the State of Texas

11  prior to the installation and construction of

12  this floating barrier."

13       Q.   Okay.  And you're not suggesting in

14  any way that the State of Texas had some duty

15  to contact the Coast Guard about that

16  installation, are you?

17       A.   That information would not be under

18  my purview.

19       Q.   Okay.  Now, when you use the word

20  "construction" as you had -- as you've done in

21  Paragraph 4 -- it says, "I have been informed

22  the State of Texas is constructing a floating

23  barrier," what do you mean by "constructing a

24  floating barrier"?

25       A.   I would -- I would use that term
```

1  to -- installing, erecting, or constructing, my

2  personal view of the -- from the news was --

3  showed excavators putting and moving the

4  barriers in the river.

5      Q.   Okay.  But "construction" is the term

6  you used, not "installing" or "erecting."  You

7  said, "construction."  Is there a reason you

8  chose that over "placing," for example?

9      A.   No.

10     Q.   Okay.  Now, you don't have any

11 personal knowledge as to whether any, quote,

12 "excavation" occurred at the site, do you?

13     A.   No, I do not.

14     Q.   Okay.  And you didn't personally

15 observe construction, correct?

16     A.   Only what I saw in the news.

17     Q.   Okay.  And you didn't personally

18 observe the installation that you talk about,

19 correct?

20     A.   Only what I've seen in the news and

21 what I was informed by Coast Guard attorneys.

22     Q.   Other than what you saw in the

23 news -- and, by the way, are we talking about

24 print media or broadcast media or both?

25     A.   Broadcast media.

Case 23-50632-DAE Document 18 Page: 65 Date Filed 09/07/2023
Case 1:23-cv-00853-DAE Document 118 Filed 09/07/2023
Justin Peters - 8/7/2023

42

1   Q.   Okay.  And so you saw some video film

2  on -- like, are we talking about on ABC news,

3  on a news source like that?

4   A.   I generally watch Fox News and CNN.

5   Q.   Okay.  And so you would have seen

6  the -- whatever was going on with the buoys

7  that you saw, you saw it on TV on Fox or CNN?

8   A.   Yes.

9   Q.   Now, you describe these buoys as a

10  floating barrier, don't you?

11   A.   Yes.

12   Q.   Now, it's the case, isn't it, that

13  the buoys that are present that you've seen on

14  TV do not stretch across the river laterally to

15  block upward and downstream traffic, if it even

16  exists there, correct?

17   A.   I only know what I saw on the news --

18   Q.   Okay.  And so what you --

19   A.   -- and what I was told by Coast Guard

20  attorneys.

21   Q.   Okay.  So what you saw on the news

22  was, you would agree with me, not a buoy that

23  blocked upstream or downstream traffic,

24  correct?

25   A.   I cannot attest to that.

Case: 23-50632    Document: 13    Page: 66    Date Filed: 09/07/2023

Justin Peters - 8/7/2023

43

1    Q.   You don't know one way or the other?

2    A.   No.

3    Q.   You're not affirmatively telling this

4    Court that in any way, shape, or form, that the

5    string of buoys is impeding upstream or

6    downstream traffic at the location of the

7    buoys, correct?

8    A.   I do not have that information.

9    Q.   Okay.  And if I were to ask you:  Can

10   watercraft, to the extent any even exist at

11   this location, go upstream or downstream,

12   that's not an answer that you have for the

13   Court today, correct?

14   A.   I am not in a position to answer

15   that.

16   Q.   Okay.  Now, when you used the term

17   "floating barrier" in Paragraph 4 and in

18   Paragraph 6, who coined that term for you?

19   A.   The draft language was provided by

20   Coast Guard attorneys.

21   Q.   Okay.  That's not your language; that

22   was provided to you, correct?

23   A.   That is correct.

24   Q.   Okay.  And as far as -- I've already

25   sort of asked you this -- a barrier to what, do

Case: 23-50632   Document: 18   Date Filed: 09/07/2023   Page: 67

Justin Peters - 8/7/2023

44

1  you have any information on that?

2      A.   Only what I saw in the news.

3      Q.   Okay.  Now, the buoys were completed.

4  Have you seen them since they were completed,

5  Captain Peters?

6      A.   I do not know when they were

7  completed.  I can't answer that.

8      Q.   Okay.  And have you seen them since

9  they were totally completed?

10     A.   I do not know when they were

11 completed.

12     Q.   Do you have any information to

13 indicate that the State of Texas has tried to

14 go string another string of floating buoys

15 somewhere else in the river?

16     A.   I do not have that information.

17     Q.   Now, you've been in the Coast Guard

18 31 years, correct?

19     A.   Yes.

20     Q.   And you have been on -- have you

21 spent time on watercraft?

22     A.   Yes.

23     Q.   And can you give us some idea of your

24 tours of duty in the Coast Guard, like, where

25 you've served on watercraft, particularly?

```
 1       A.   I have served on large ships, down

 2  to small, 25-foot boats from Cape Cod,

 3  Massachusetts to Florida.

 4       Q.   Okay.  I bet I almost don't even have

 5  to ask this:  A log boom, do you know what that

 6  is?

 7       A.   No.

 8       Q.   Okay.  Do you know what a boom is,

 9  generally?

10       A.   Can you define it for me?

11       Q.   Well, I was going to ask if you knew

12  what a boom was generally in nautical terms.

13       A.   A boom from -- there are multiple

14  uses of the term.

15       Q.   So I've already asked you about the

16  log boom.  That's not something you've got

17  familiarity with?

18       A.   No.

19       Q.   What about an oil boom?

20       A.   Yes.

21       Q.   Okay.  Now, tell me:  What is the

22  function of an oil boom?

23       A.   It is to -- in the Coast Guard, it is

24  used to encircle an environmental spill to

25  assist in preventing it from spreading.
```

1    Q.   So the oil boom is designed to
2    contain a spill, correct?
3         A.   That is the use of it, yes.
4         Q.   Okay.  And booms can be used to
5    contain anything, like, logs or floating
6    debris, correct?
7         A.   I can only attest to what we use them
8    for in the Coast Guard, which is to contain a
9    substance that may have been released into the
10   water.
11        Q.   Okay.  And you would agree that booms
12   can also be something -- could be defined as a
13   long beam projecting from the mast of a derrick
14   to support or guide cargo; is that right?
15        A.   That's not information that I can
16   answer and attest to.
17        Q.   Okay.  Now, you would agree that the
18   floating buoys are not a wharf, correct?
19        A.   I cannot attest to that.
20        Q.   Okay.  Do you know if -- so you're
21   not attesting to whether or not they're
22   dolphins or piers or breakwaters or bulkheads,
23   jetties or booms?  That's not your testimony,
24   right?
25        A.   I cannot attest to what the buoys

47

1  are.

2       Q.   Okay.

3            MR. SWEETEN:  All right.  Give

4  me one second.  I'm still trying to -- I'm

5  going to go off the record for 3 minutes and be

6  right back on.  We're getting near the end,

7  Captain Peters.  Okay?

8            THE WITNESS:  Yes.

9            MR. SWEETEN:  Thank you, sir.

10           (Off the record from 12:26

11       to 12:27 p.m.)

12      Q.   (BY MR. SWEETEN)  All right.  Captain

13  Peters, we're getting near the end; but I do

14  have more questions for you, sir.  Okay?

15      A.   Yes, sir.

16      Q.   Now, in your affidavit -- and I'm

17  looking at Paragraph 7 in particular -- you

18  used the term, quote, "navigable waterway,"

19  "navigable channel," "navigational traffic

20  patterns."  Would you agree with me that those

21  words were given to you by the Coast Guard

22  attorneys in your first meeting prior to

23  providing the declaration in this case?

24      A.   They were given to me in the draft

25  declaration.

1      Q.  Okay.  So those are not your words.

2  Those are the words of the attorneys for the

3  Coast Guard?

4      A.  They are my words in there, in my

5  declaration; but the language specifically was

6  provided by Coast Guard attorneys.

7      Q.  Okay.  So the first people to call it

8  "navigable waterway," "navigable channel,"

9  "navigational traffic patterns," the people

10  that coined those terms for you gave this to

11  you in a draft already written, correct?

12      A.  It was a collaborative process.  They

13  submitted the first draft.

14      Q.  Okay.  But those terms were first

15  given to you by the Coast Guard; and then you

16  signed the declaration, right?

17      A.  Yes.

18      Q.  All right.  So let's go to

19  Paragraph 7 where you use it.  You say, "If

20  consulted, the Coast Guard will require further

21  study of the barrier to appropriately assess

22  the impacts of the barrier to the navigable

23  waterway to ensure that placement of this

24  structure within a navigable waterway of the

25  United States complies with all applicable laws

1  and regulations."  Did I read that correctly?

2  It's the second sentence of the paragraph.

3       A.   Yes, you did.

4       Q.   All right.  Now, what are you saying

5  with respect to navigable waterway?  What does

6  that mean here?

7       A.   A federal navigable waterway would

8  have -- if the Coast Guard is consulted, would

9  conduct study of that waterway for any -- if a

10  barrier was placed and the Coast Guard was

11  consulted, the Coast Guard would conduct

12  studies to appropriately assess whether it was

13  in compliance with any federal laws and

14  regulations.

15       Q.   Okay.  So you were describing an

16  instance where if the State of Texas were to

17  seek a permit to construct a floating barrier

18  through the Army Corps of Engineers, right?

19       A.   That is my understanding, but

20  waterway management is not within my purview.

21       Q.   Okay.  And that's kind of what I'm

22  getting at.  When you're calling it a navigable

23  waterway, you're talking about the general

24  process of a navigable waterway.  It is not

25  your opinion and you're not trying to tell this

1    Court that, "I know this is a navigable

2    waterway," right?

3        A.   I have seen the declaration from

4    Coast Guard District 8 that defines it as a

5    navigable waterway.  That's the only way I can

6    define that.

7        Q.   Okay.  So the only basis for you --

8    if you were even saying this is a navigable

9    waterway, the only basis for that would be

10   looking at the affidavit of another witness in

11   this case, correct?

12       A.   Determining navigable waterways is

13   not within my purview.

14       Q.   Okay.  And it's not something that

15   you're providing this Court testimony about.

16   You're not saying, "This is a navigable

17   waterway where these buoys were built," are

18   you?

19       A.   I am saying that if it is a navigable

20   waterway, the Coast Guard could be called upon

21   to conduct Coast Guard missions.

22       Q.   Got it.  And I think I understand,

23   through your clarification, that what that

24   means is if it were -- you're saying -- by

25   saying that, you're not telling this Court

1  affirmatively this is or is not a navigable

2  waterway.  That is not in your purview, right?

3       A.   I do not determine, personally,

4  navigable waterways, that is correct.

5       Q.   And it is not your testimony here

6  today that it is, is it?

7       A.   My testimony is that I've seen the

8  Coast Guard declaration that defines this as a

9  navigable waterway.

10      Q.   And other than that, you have no

11  personal knowledge as to whether this is a

12  navigable waterway, correct?

13      A.   I do not have any personal knowledge.

14      Q.   You've never been there --

15      A.   That is correct.

16      Q.   -- right?

17               You've never studied it, right?

18      A.   That is correct.

19      Q.   You've seen only pictures on Fox and

20  CNN?

21      A.   And in the DOJ motion.

22      Q.   Okay.  You don't know what kind of

23  traffic goes up and down the river at that

24  section?

25      A.   I do not.

Case: 23-50063-DAE   Document: 18   Page: 75   Date Filed: 09/07/2023

Justin Peters - 8/7/2023

52

1    Q.   And you are not opining that it is a

2    navigable waterway here today to this Court?

3    A.   I have said that I've seen the Coast

4    Guard declaration that it's a navigable

5    waterway provided by Coast Guard District 8.

6    Q.   I understand that you've seen the

7    affidavit, but this is an important question.

8    Other than seeing the affidavit, you have no

9    other information -- and, by the way, the

10   affidavit you're talking about -- let's be

11   clear -- is from a lawyer for the Coast Guard,

12   right?

13   A.   I'd have to refer to the document on

14   who signed it.

15   Q.   Well, isn't it Brandy Parker of the

16   Judge Advocate General?

17   A.   I don't believe she signed the

18   document.

19   Q.   Can you tell me what document you're

20   referring to?

21   A.   The exhibit that you provided to us.

22   Q.   Oh, Exhibit 1?

23   A.   Yes.

24   Q.   Oh, okay.  I think I understand.  So

25   you're saying the only basis on which you know

 1    whether or not this is a navigable waterway is

 2    this 39-year-old letter from T. W. Snook, which

 3    is Exhibit Number 1 that we went over, correct?

 4        A.    That is the only reference that I

 5    have.

 6        Q.    Okay.  And let's be very clear.  If

 7    we read Paragraph Number 3 of that singular

 8    reference that you have, it says, quote, "This

 9    represents" --

10             MS. KIMBALL:  Hold up.  Let me

11    get it up so he can see it.

12             Okay.  Go ahead.

13        Q.    (BY MR. SWEETEN)  "This represents

14    the opinion of the Coast Guard only as to the

15    extent of its own jurisdiction and does not

16    address the jurisdiction of other agencies,"

17    correct?  That's what that says?

18        A.    That is what the document says.

19        Q.    All right.  And that's the only basis

20    upon which you are saying that you -- that

21    you're even remotely discussing the idea of

22    navigable waters, correct?

23             MS. KIMBALL:  Objection --

24             MR. SWEETEN:  Bad question.  Let

25    me ask it again.

1    Q.   (BY MR. SWEETEN)  The only thing that
2  you've looked at that would lead you to believe
3  this is a navigable water is this sheet that I
4  just read Paragraph 3 from, correct?
5    A.   That is the only reference that I've
6  seen.
7    Q.   You have no other personal knowledge
8  to lead you to that conclusion or for that
9  testimony, correct?
10   A.   Determining navigable waterways is
11 not within my purview.
12   Q.   Okay.  Thank you.
13        Captain Peters, in Paragraph 7
14 of your affidavit, you say, "If the State of
15 Texas seeks a permit to construct the floating
16 barrier through the Army Corps of Engineers,
17 the Army Corps of Engineers may consult the
18 Coast Guard as a supporting agency."  Did I
19 read that first sentence correctly?
20   A.   That is correct.
21   Q.   And that means the Army Corps of
22 Engineers does not always consult the Coast
23 Guard on permits related to the Rivers and
24 Harbors Act, correct?
25   A.   I do not have that information.

    Q.   Well, I mean, you say here "may

consult the Coast Guard."  I would think that

also means they may not consult the Coast

Guard?

    A.   Permitting is not within my purview.

    Q.   Well, here, you're talking about

seeking a permit; and you say the Corps of

Engineers may consult the Coast Guard as a

supporting agency.  If that's outside of your

purview, do you have an explanation for why

that is contained in your sworn declaration?

    A.   In my personal experience, I have

been contacted in previous tours by the Army

Corps of Engineers.

    Q.   Okay.  So there have been times that

you were contacted.  Do you recall what those

projects were?

    A.   No.

    Q.   Were any of those projects on the

Rio Grande River?

    A.   No.

    Q.   Were any of those projects in

Maverick County, Texas?

    A.   No.

    Q.   Were any of those projects in

1    Eagle Pass, Texas?

2         A.   No.

3         Q.   Okay.  And you would agree with me

4    that there's likely to be a whole class of

5    permits that the Corps of Engineers does not

6    contact the Coast Guard about, correct?

7         A.   I do not have that information.

8         Q.   Okay.  Do you know what the term

9    "navigable capacity" means, Captain Peters?

10        A.   No, I do not.

11        Q.   Okay.  Do you have an opinion one way

12   or the other as to whether -- let me back up

13   and ask it a different way.

14              Since you've never been to the

15   river, since you've not studied the river,

16   since navigable capacity is not within your

17   purview, would you agree with me that you have

18   no opinion on whether or not the buoys, the

19   string of buoys, interfere in any way with the

20   traffic on the river?

21        A.   I'm not in a position to answer that.

22        Q.   And you're not suggesting they impact

23   the navigable capacity, as you're sitting here

24   today, are you?

25        A.   I'm not in a position to answer that.

57

```
 1       Q.   Okay.  All right.  Captain Peters, I
 2   don't have any -- well, let's take a 5-minute
 3   break just to make sure.  I was about to end
 4   this, but give me just a few minutes to talk to
 5   my cocounsel here.  Okay?
 6               MS. KIMBALL:  Before we go --
 7   well, we can off the record.
 8               (Off the record from 12:39
 9               to 12:42 p.m.)
10       Q.   (BY MR. SWEETEN)  I just have, I
11   think, one more question; and that is:  The
12   navigability determination, this one that we
13   talked about --
14       A.   Yes.
15       Q.   -- are you aware of any more recent
16   navigability determinations than this letter?
17       A.   I am not aware of any other than that
18   letter; and to the best of my knowledge, my
19   personal knowledge, the Coast Guard has not
20   been asked to provide any additional analysis.
21       Q.   Okay.  At this time point, have you
22   understood the questions that I've asked you
23   today, Captain Peters?
24       A.   Yes.
25       Q.   Okay.  Are there any answers that you
```

 1  want to change that we discussed today?

 2      A.   No.

 3      Q.   Have I been courteous to you today,

 4  Captain Peters?

 5      A.   Yes, you have.

 6      Q.   Okay.  I wish you a great vacation

 7  from here forward.  We appreciate your time

 8  today.  I hope I've been efficient in trying to

 9  conduct the examination.  We wish you the very

10  best.

11           MS. KIMBALL:  I have one

12  question I want to clarify before we go off the

13  record.

14           MR. SWEETEN:  Sure.  Of course.

15                EXAMINATION

16  BY MS. KIMBALL:

17      Q.   Captain Peters, you testified earlier

18  about the documents that you saw in preparation

19  for your deposition.  Do you recall that

20  testimony?

21      A.   Yes.

22      Q.   Do you recall if I showed you a

23  photograph during prep?

24      A.   I do not recall.  The only

25  photographs that I had seen were from the DOJ

1  motion, but I don't recall if we did that

2  during the prep.

3      **Q.   Okay.**

4              MS. KIMBALL:  No further

5  questions.

6              MR. SWEETEN:  None from me.

7  Once again, we appreciate it.

8              MS. KIMBALL:  Oh, and he will

9  read and sign.

10             MR. SWEETEN:  Debbie, we're

11 going to need -- we're off the record, right?

12             THE REPORTER:  This concludes

13 the deposition at 12:44 p.m.)

14        (Deposition concluded at 12:44 p.m.)

15                 --ooOoo--

16

17

18

19

20

21

22

23

24

25

60

1                    CHANGES AND SIGNATURE

2    WITNESS NAME:              DATE OF DEPOSITION:

3    CAPTAIN JUSTIN PETERS        August 7, 2023

4    PAGE/LINE    CHANGE              REASON

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

61

```
 1              I, CAPTAIN JUSTIN PETERS, have read the

 2     foreging deposition and hereby affix my signature that

 3     same is true and correct, except as noted herein.

 4

 5              _____

 6              CAPTAIN JUSTIN PETERS

 7

 8     THE STATE OF _____  )

 9              Before me, _____, on

10     this day personally appeared CAPTAIN JUSTIN PETERS,

11     known to me (or proved to me under oath or through

12     _____) (description of identity card or other

13     document) to be the person whose name is subscribed to

14     the foregoing instrument and acknowledged to me that

15     they executed same for the purposes and consideration

16     therein expressed.

17              Given under my hand and seal of office on

18     this _____ day of _____, _____.

19

20

21              _____

22              NOTARY PUBLIC IN AND FOR

23              THE STATE OF _____

24              My Commission Expires:_____

25
```

62

```
 1   STATE OF TEXAS      )

 2             REPORTER'S CERTIFICATION

 3       I, DEBBIE D. CUNNINGHAM, CSR, hereby certify that

 4   the witness was duly sworn and that this transcript is a

 5   true record of the testimony given by the witness.

 6       I further certify that I am neither counsel for,

 7   related to, nor employed by any of the parties or

 8   attorneys in the action in which this proceeding was

 9   taken.  Further, I am not a relative or employee of any

10   attorney of record in this cause, nor am I financially

11   or otherwise interested in the outcome of the action.

12       I further certify that pursuant to FRCP

13   Rule 30(f)(1) that the signature of the deponent was

14   requested by the deponent or a party before the

15   completion of the deposition and that the signature is

16   to be before any notary public and returned within 30

17   days from date receipt of the transcript.  If returned,

18   the attached Changes and Signature Page contains any

19   changes and the reasons therefore.

20       Subscribed and sworn to by me this day, August 7,

21   2023.

22                   Debbie D. Cunningham, CSR
                     Expiration:  6/30/25
23                   INTEGRITY LEGAL SUPPORT SOLUTIONS
                     9901 Brodie Ln, Ste. 160-400
24                   Austin, Texas 78748
                     www.integritylegal.support
25                   512-320-8690; FIRM # 528
```

EXHIBIT E: ECF 26-5, DEPOSITION OF MARIO GOMEZ (D-5)

**United States District Court**
**Western District of Texas**
**Austin Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | |
| v. | No. 1:23-cv-00853-DII |
| GREG ABBOTT, in his capacity as Governor of the State of Texas, and THE STATE OF TEXAS, | |
| *Defendants*. | |

| | |
|---|---|
| EPI'S CANOE & KAYAK TEAM, LLC AND JESSIE FUENTES, | |
| *Plaintiffs*, | |
| v. | No. 1:23-cv-00836-DII |
| STATE OF TEXAS, *et al.*, | |
| *Defendants*. | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**

# EXHIBIT E

Defendant's Exhibits

5

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

UNITED STATES OF AMERICA,      )
                               )
                               )
            Plaintiff,         )
                               )
VS.                            )   CIVIL ACTION
                               )   NO.1:23-00853-DAE
                               )
                               )
GREG ABBOTT, in his official   )
capacity as Governor of the    )
State of Texas, and the State  _
of Texas,                      )
                               )
                               )
            Defendants.        )

------------------------------------

ORAL DEPOSITION OF

MARIO GOMEZ

AUGUST 7, 2023

VOLUME 1

------------------------------------

ORAL DEPOSITION OF MARIO GOMEZ, produced as a witness at

the instance of the DEFENDANT, and duly sworn, was taken in the

above-styled and numbered cause on August 7, 2023, from 2:07

p.m. to 3:21 p.m., before Ariana McCoy, CSR in and for the

State of Texas, reported by stenographic means, at the office

of USAO San Antonio Office, 601 Northwest Loop 410, Suite 600,

San Antonio, Texas 78216, pursuant to the Federal Rules of

Civil Procedure and the provisions stated on the record or

attached hereto.

```
 1                    A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF, UNITED STATES OF AMERICA:

 4

 5        Ms. Krystal-Rose Perez
          United States Department of Justice
          Boards and Divisions Agency
 6        825 North Capitol Street, Northeast 2224
          Washington, DC 20002
 7        202-727-5365- phone
          krystal-rose.perez@usdoj.gov

 8

 9   FOR THE PLAINTIFF, UNITED STATES OF AMERICA:

10        Ms. Mary Kruger
          United States Attorney's Office
11        Western District of Texas
          601 Northwest Loop 410
12        Suite 600
          San Antonio, Texas 78216
13        210-384-7100- phone

14

15   FOR THE DEFENDANTS, GREG ABBOTT AND THE STATE OF TEXAS:

16        Mr. Patrick Sweeten
          Office of the Attorney General of Texas
17        Special Counsel
          P.O. Box 12428
18        Austin, Texas 78711
          512-936-7236- phone
19        patrick.sweeten@oag.texas.gov

20

21   FOR THE DEFENDANTS, GREG ABBOTT AND THE STATE OF TEXAS:

22        Mr. Jake Marx
          Office of the Attorney General of Texas
23        Assistant Attorney General
          P.O. Box 12428
24        Austin, Texas 78711
          512-936-7236- phone
25        jake.marx@oag.texas.gov
```

1    FOR THE INTERNATION BOUNDARY AND WATER COMMISSION:

2         Ms. Rebecca Rizzuti (via Phone)
          International Boundary and Water Commission
3         General Attorney
          4191 North Mesa Street
4         El Paso, Texas 79902
          800-262-8857- phone

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

INDEX

                                                        PAGE

Appearances......................................    02

Stipulations.....................................    05

MARIO GOMEZ
     Examination by Mr. Sweeten.....................    05

Signature and Changes............................    53

Reporter's Certificate...........................    55


                        EXHIBITS

     DESCRIPTION                            PAGE


     Exhibit 1...............................    12
          Declaration of Mario Gomez
     Exhibit 2...............................    16
          CBP Releases June 2023

5

```
 1                    P R O C E E D I N G S

 2                    THE REPORTER:  Today is August 7th, 2023.  The

 3      time is 2:07 p.m.  We're on the record.  Mr. Gomez, would you

 4      please raise your right hand?

 5                         MARIO GOMEZ,

 6      having been first duly sworn, testified as follows:

 7                         EXAMINATION

 8      BY MR. SWEETEN:

 9          Q.   Good afternoon.  Will you please state your full name

10      for the record, sir?

11          A.   Mario Gomez.

12          Q.   Mr. Gomez, what is your business address?

13          A.   My business address, 1 Reservoir Road, Falcon

14      Heights, Texas 780- -- 78545.

15          Q.   All right.  And you live in -- live in what city?

16          A.   Laredo, Texas.

17          Q.   Laredo.  Okay.  All right.  And -- and you work -- do

18      you commute to work at the Falcon Dam address you just gave us?

19          A.   Yes.

20          Q.   Okay.  And -- and how long have you held that?  By --

21      by the way, what's the -- what is your position there?

22          A.   Area Operations Manager.

23          Q.   Okay.  And you work at the Amistad Dam Field Office

24      of the United States, Section of the IBWC; is that right?

25          A.   At the moment.
```

6

1    Q.   Okay.  Why do you say at the moment?  Are you

2 leaving?

3    A.   No.  Normally my position is at Falcon Dam Field

4 office, right now I'm a TDY, so 120 days detailed to Amistad.

5    Q.   Okay.  So you're working at Amistad for 120 days.  Is

6 that like an MOU or a Memorandum of Understanding or something?

7    A.   It's -- yeah, like a temporary thing that -- your new

8 duty station.

9    Q.   Okay.  So you've worked at Falcon Head before this?

10    A.   Yes.

11    Q.   And now you work at Amistad for the 120-day period?

12    A.   Yes.

13    Q.   All right.  How long have you worked at Falcon Head?

14    A.   I started with the agency as area manager was --

15 since about 2013 or '14.

16    Q.   Okay.  And -- and what do you do as the area manager

17 of Falcon Head?  Let's start there.

18    A.   Okay.  So it's mainly operations and maintenance of

19 the dam and hydroelectric power plant, which is maintaining the

20 dam, telemetry equipment.  Same with the power plant, keeping

21 the units operational.

22    Q.   Okay.  And what do you do for Amistad, is it the same

23 type of job?

24    A.   Yes.

25    Q.   Okay.  So basically your -- your specialty is dams,

1    correct?

2         A.   Yes.

3         Q.   All right.  And let -- let me just ask you a few

4    things.  You work for the IBWC, which is, as I understand it,

5    is sort of a -- a joint -- well, explain to me what it is.

6         A.   International Bond and Water Commission, I guess it's

7    a -- an international agency.  The U.S. section and the Mexican

8    section.  And our mission mainly relates to boundary

9    demarcation, flood control, water -- allocation of water

10   resources.  Some other, like, sanitation and water quality.

11        Q.   Okay.  And -- and I'm going to stop here.  And I've

12   forgotten to kind of ask you, have you had your deposition

13   taken before today?  Before today, any depositions?

14        A.   No.

15        Q.   Okay.  Has your lawyer had the opportunity to explain

16   what a deposition is and sort of the deposition process?

17        A.   Yes.

18        Q.   Okay.  A few things, few rules of the road, I'll just

19   run by you.  First of all, you understand you're under oath at

20   all times today?

21        A.   Yes.

22        Q.   You understand you're testifying as if you were --

23   were in court and that portions of your testimony could be

24   pertinent to the Court sitting in on this matter?

25        A.   Yes.

1      Q.   Okay.  We've got here today, a court reporter, that's

2  going to be taken down the words that you and I say to each

3  other.  I'm going to try my very best to not step on your

4  answer when you're giving an answer.  I'm going to try to let

5  you complete the answer, and if you would, in turn, try to let

6  me complete my question.  And that way we can make sure that we

7  have a clear record of what you and I talked about today.

8  Okay?

9      A.   Yes.

10     Q.   You can do that for me.  The second thing is, often

11  in conversation we use gestures and head nods and uh-huh and

12  uh-uh.  And so she can't take those down or if we -- if we do

13  read them later, we won't know what they were.  So there may be

14  times today where I ask you to -- to give a verbal answer.

15  If -- if you and I -- if -- if they're -- if -- if we are

16  giving gestures or uh-huhs or uh-uh or shakes of the head, I

17  may just ask you, "Is that yes or no?"

18          And so I'm doing that to make sure I've got a

19  clear record and that's the reason.  Okay?

20     A.   Okay.

21     Q.   All right.  Also, I'm -- when I ask a question, if

22  you don't understand what I'm asking you, feel free to just ask

23  me to rephrase it.  I'll try to -- my very best to do that.  If

24  you answer the question though, I'll -- I'll assume that you

25  understood what the question asked; is that fair?

1    A.   Okay.

2    Q.   All right.  And we were talking about your work on

3  the dams.  You don't work -- or -- or do you work for Customs

4  and Border Patrol or have any role with Customs and Border

5  Patrol?

6    A.   No.

7    Q.   Okay.  Do you have any role with -- with the Coast

8  Guard of any kind?

9    A.   No.

10    Q.   Okay.  Do you have any functional role working on the

11  actual Rio Grande River itself, other than the dam release,

12  obviously into the Rio Grande?  Do you work on the river?

13    A.   Yes.

14    Q.   You do work on the river.  What do you do?  What are

15  your function -- what are your jobs on that -- that interact

16  with working on the river?

17    A.   My personal?

18    Q.   Say it again.

19    A.   My personal role?

20    Q.   Yeah.

21    A.   Site inspections.

22    Q.   Okay.  And what types of site inspections do you do

23  on the river?

24    A.   Since part of our mission is flood control, so -- so

25  we look out for any developments, any activities are going on

Case 23-50063253-DCE Document 13 Page: 97 Date Filed 09/07/2023

1  in the river, any new construction sort of.  And that's sort of
2  my duties, just to report on any new developments.  There are
3  some activities that go through it for agency review.  We
4  review them and my role is to sometimes visit those sites just
5  to make sure that the work is carried out to the specs that
6  they -- that the proponent proposed.
7      **Q.   Okay.  Are you familiar with the section of the river**
8  **where the buoys that are the subject of this lawsuit are**
9  **positioned right now?**
10     A.   Yes.
11     **Q.   Okay.  And let me just ask you, if you could give us**
12 **a de- -- a description of that part of the river in your own**
13 **words.**
14     A.   Well, I don't know.  It's kind of shallow area,
15 there's green vegetation on the Mexican embankment.  The U.S.
16 side, it's a little bit silty, I guess, sandy.  I don't know
17 what else.
18     **Q.   Are there -- are there rocks located in the river?**
19 **Shallow parts, too?**
20     A.   I cannot say.  I can't remember.
21     **Q.   Can you tell us, are there barriers on the -- on**
22 **the -- the river islands -- barrier islands there?**
23     A.   There at that particular site?
24     **Q.   Yes, at that particular site?**
25     A.   Not that I can recall.

11

1       Q.    Okay.  As I understand it, the majority of watercraft

2   on that portion of the river is law enforcement right now and

3   their -- and their airboats.  Would you agree with that

4   statement?

5       A.    Yes.

6       Q.    Are there any other watercraft that you could single

7   out right now in that section of the river?  The area of the

8   buoys.

9       A.    Can't say that.

10      Q.    Okay.  There's not any that you could think of other

11  than law enforcement presence in that general section, correct?

12      A.    That's correct.

13      Q.    Okay.  And -- and law enforcement is not -- the --

14  the boats that are able to operate in and around that section

15  of the river are -- are -- are these airboats, right, that

16  don't require a lot of depth to navigate, correct?

17      A.    Yes.

18      Q.    Because if you required a lot of depth to navigate,

19  you wouldn't be able to -- to negotiate large portions of that

20  river, correct?

21      A.    Yes.

22      Q.    Okay.  Any other watercraft you can think of other

23  than the airboats that you see from time to time from law

24  enforcement?

25      A.    No.

1      Q.   Okay.  So the types of boats that would be in that

2  section of the buoys are law enforcement airboats you've --

3  you've said.  Have you ever seen any non-law enforcement

4  watercraft in that area?

5      A.   I cannot say I have.

6      Q.   Okay.  What about any kind of recreational craft of

7  any kind in that area?

8      A.   While I visited, I did not see any of that.

9      Q.   Okay.  All right.  I'm going to ask you just as a

10 general question, have you ever sat down and researched the

11 historical watercraft uses of the Rio Grande that are in the

12 Maverick County portion specifically?

13     A.   I cannot say that.

14     Q.   Okay.  Are you aware of any federal or state court

15 decisions that have determined the -- whether or not that area

16 is navigable waters?

17     A.   I cannot say that.

18     Q.   Okay.  All right.  When were you first approached to

19 provide an affidavit or a declaration in this case, Mr. Gomez?

20     A.   Probably last week.

21     Q.   Okay.  Let me show you a copy of it.  I'll go ahead

22 and mark it as Exhibit 1 for purposes of this deposition.

23              (Exhibit 1 marked.)

24              MR. SWEETEN:  Clean copy for Mr. Gomez here.

25 Can you help me out with that?

1                    MR. MARX:  Yes.

2                    MR. SWEETEN:  There's about 10 of them in there.

3                    MR. MARX:  All right.  Here we go.

4                    MR. SWEETEN:  That's the color, I should mark

5      that as 1.

6                    MS. KRUGER:  Yeah, this is the one.

7                    MS. PEREZ:  Oh.

8                    MS. KRUGER:  This is -- yeah.  Yeah.  Yeah.

9                    MR. SWEETEN:  Just put a 1 right there.  There

10     you.  Okay.

11          Q.   (BY MR. SWEETEN)  All right.  So very quickly just

12     want to ask you, is this -- this -- I know this is called --

13     this is Exhibit 1, but it's called Detachment 2 on the front

14     page.  Is this the declaration that you were asked to provide

15     in this case, Mr. Gomez?

16          A.   Yes.

17          Q.   And who asked you to provide this, sir?

18          A.   My lawyers.

19          Q.   Okay.  Can you tell me who specifically you've had

20     interactions with?

21          A.   IBWC lawyers.

22          Q.   Okay.  Is that -- I don't remember her name on the

23     phone.

24          A.   Ms. -- Ms. Rebecca Rizzuti and Ms. Jennifer Pena.

25          Q.   Okay.  So -- so those two individuals are the people

1   that you've talked to about this -- this issue, correct?

2       A.   Yes.

3       Q.   When did you first learn about this lawsuit filed by

4   DOJ?  I guess, let me ask it a different way because you knew

5   it was coming, right, because you signed an affidavit in

6   advance of the lawsuit, executed on July 25th, 2023; is that

7   right?

8       A.   I cannot speak.

9            MS. PEREZ:  Objection, form.

10      Q.   (BY MR. SWEETEN)  Well, let me ask it another way.

11           When did you first learn about the lawsuit?

12  Because it appears you executed the affidavit the day after the

13  lawsuit, which is then part of the preliminary injunction

14  motion that was filed the next day.  So when did you first hear

15  about the lawsuit?

16      A.   Yeah, I cannot say when exactly.

17      Q.   Okay.  And then you were obviously contacted either

18  on the 25th or before that time about providing a declaration,

19  correct?

20      A.   I know it was last week.  I can't say specific date.

21      Q.   Okay.  So it was like either it would've been Monday

22  or Tuesday of last week, would you think?

23      A.   I guess I signed it on -- signed it on the 25th.

24      Q.   I don't have my calendar, so...

25      A.   Yeah.

1    Q.   I have -- here -- let's -- let's figure it out

2    together.

3              All right.  Okay.  So it was signed the -- it --

4    it says it signed the 25th, so that would've been Tuesday of

5    not last week, but the week before.

6    A.   Okay.

7    Q.   So two weeks ago is when you first signed this

8    declaration?

9    A.   Right.

10   Q.   Okay.  Is that on the day you signed the declaration?

11   Was that the day that you met with the attorneys in the case?

12   A.   I met with the attorneys for this?

13   Q.   For the IBWC.

14   A.   Yes.

15   Q.   You met with the two attorneys from the IBWC, was it

16   the same day that you executed this?

17   A.   To review my statement.

18   Q.   Okay.  So you had had a previous meeting with those

19   attorneys.  Do you know when that was?

20   A.   Happened so fast.

21   Q.   Okay.

22   A.   Maybe.

23   Q.   So you have probably seen quite a bit being in both

24   of the Falcon at -- at the Falcon Lake Dam -- Falcon Lake --

25   A.   Falcon Dam.

Case 1:23-cv-00853-DAE Document 118 Filed 09/07/2023 Page 103 of 289
Case 1:23-cv-00853-DAE Document 118 Filed 09/07/2023 Page 103 of 289
Mario Gomez - 8/7/2023
16

1    Q.   Falcon Dam and the Amistad Dam, you've seen a lot

2  with respect to the border crisis, correct?

3            MS. PEREZ:  Objection, form.

4    Q.   (BY MR. SWEETEN)  Have you seen -- I mean, you're

5  familiar with the current border crisis, aren't you?

6    A.   I don't keep up with the information.

7            MS. PEREZ:  Objection, form.

8    Q.   (BY MR. SWEETEN)  Okay.

9            MS. PEREZ:  You can answer if you can.

10   Q.   (BY MR. SWEETEN)  You -- you would agree with me

11 that -- that at this -- that over the last two years that --

12 that millions of migrants have gone over, have crossed the Rio

13 Grande to migrate into the United States, correct?

14   A.   I cannot say.

15   Q.   Okay.  Well, let -- let me just ask you.  I'll just

16 show you a document.  I'll mark it as Exhibit Number 2.  Take a

17 look at that.

18            (Exhibit 2 marked.)

19            MR. SWEETEN:  If you could add that to them.

20            MS. PEREZ:  Thanks.

21   Q.   (BY MR. SWEETEN)  And I'm show you there's official

22 government.

23            MR. SWEETEN:  Yeah, we've got you.

24   Q.   (BY MR. SWEETEN)  There's official government

25 document of from the U.S. Customs and Border Patrol.  Do you

1   see that?  And -- and do you see what it's entitled?  The CBPs,

2   Customs of Border Patrol releases June 2023 monthly update,

3   right?

4        A.   Yes.

5        Q.   In it they're talking -- one thing they're talking

6   about, if we can go to page 2 together, an Operation Artemis.

7   Do you see that?  It's in the middle of the page with those

8   bullet points.  Do you see it, sir?

9        A.   Yes, sir.

10       Q.   See you where it says -- by the way, did you have

11  any -- any part or were you aware of Operation Artemis that

12  began on June 5th, according to this document "And had made

13  over 130 seizures, including 21 pill presses, more than 5,000

14  pounds of precursor chemicals, more than 300 pounds of

15  methamphetamine and over 5,000 pounds of other drugs."  Were

16  you familiar with that -- that operation?

17       A.   I cannot say.

18       Q.   Okay.  Okay.  So if we can go, ensuring border

19  security and effectively managing migration from the CPB

20  document, if you look at the top of the second page of Exhibit

21  Number 2, it says "In June, the first full month since the

22  lifting of the Title 42 Public Health Order, U.S. Border Patrol

23  recorded 99,545 encounters between ports of entry along the

24  southwest border."  Do you see that, where it says that?

25       A.   Okay.

1    Q.   Okay.  Do you have any estimate -- I mean, do you --

2    living where you do, which is along the -- working where you do

3    along the border, do you have any estimate as to how many

4    migrants have illegally entered the United States over the last

5    two years, say?

6              MS. PEREZ:  Objection, scope.  I'm going to

7    direct the witness not to answer because this obviously goes

8    outside the scope of what the Court ordered.

9              MR. SWEETEN:  What did the Court order?  What

10   did -- let's -- let's --

11             MS. PEREZ:  The topic is just going to be about

12   the obstruction under the Court order --

13             MR. SWEETEN:  Well, no, let's just -- read it to

14   me what you're saying prohibits this question.

15             MS. PEREZ:  Yeah.  Page 6 of the Court's

16   August 3rd order states that "The Court finds it proper to

17   allow expedited discovery for the limited purpose of

18   investigating the factual assertions made by the declarance on

19   obstruction."

20             MR. SWEETEN:  Okay.  Well, I mean, I -- my

21   argument would be that -- that, you know, this goes to the

22   certainly to the balancing of interests portion.  This goes to

23   the -- the -- the purpose of -- of putting the buoys out.  I'm

24   not going to belabor this though, but I'll just -- I'll ask the

25   last question and then if you're going to instruct him not to

 1  answer then -- then that's -- we'll go forth on other things.

 2      Q.  (BY MR. SWEETEN)  I was going to ask you if you had

 3  any estimate as to how many illegal migrants came into the --

 4  into the U.S. over the last two year period, if you know about

 5  it?

 6          MS. PEREZ:  Same objection.  And I'll go ahead

 7  and -- you can go ahead and answer, if you know, Mr. Gomez.

 8      A.  No, I don't know.

 9      Q.  (BY MR. SWEETEN)  Okay.  Let's move on.  I do really

10  want to engage with the things that you've -- you've indicated

11  in your affidavit in particular.  Do you have any understanding

12  as to -- and one of the things that you discussed in your

13  affidavit is the DPS operations of -- of placing some buoys in

14  the river, correct?

15      A.  Correct.

16      Q.  And you understand that the purpose of placing those

17  buoys was because it is a -- a section of the river where

18  the -- the Operation Lone Star is trying to prohibit migrants

19  from crossing from what -- the Mexican side to the Texas side;

20  is that your understanding of the buoys?

21          MS. PEREZ:  Objection, form.

22      A.  Correct.

23      Q.  (BY MR. SWEETEN)  Okay.  Now, you've -- in your

24  affidavit you provided pictures and so if we can have that.

25  Thank you.  I've lost my copy apparently.  Is it under here?

1   There we go.  That's better.

2          Okay.  So let's turn to the affidavit itself,

3  and the first paragraph you talk about what it is you do.  You

4  currently work in Maverick County, Texas, correct?

5      A.   Correct.  Right.

6      Q.   And you're familiar with the -- your familiarity with

7  the Rio Grande, would you agree, that not all of the Rio Grande

8  is the same as far as water levels, flow, terrain, et cetera?

9  That some -- that -- that it differs along the 1200 mile

10  stretch of the Rio Grande River based on your experience?

11      A.   I would agree.

12      Q.   Okay.  And in your affidavit on paragraph 3, you talk

13  about a meeting that you attended in El Paso with DPS.  Do you

14  recall that meeting?

15          MS. PEREZ:  Objection, form.

16      A.   Meeting?

17      Q.   (BY MR. SWEETEN)  So in paragraph 3 it says, "On

18  June 12th, 2023, I attended a meeting in Eagle Pass, Texas,

19  with the Texas Department of Public Safety."

20      A.   Yes.

21      Q.   Did I read that correctly?

22      A.   (Nods head.)

23      Q.   Okay.  Can you tell me who was in attendance at that

24  meeting?

25      A.   They're in Exhibit A.

1    Q.   Okay.  Let's go to Exhibit A.  And -- and Exhibit A,

2 as I understand it, is a one page document that is dated

3 June 12th, 2023 that you indicate sort of summarizes your

4 meeting with DPS; is that right?

5    A.   I would agree.

6    Q.   Okay.  And did you -- were you asked to write this,

7 or did you write this as a matter of course?

8    A.   This was prepared by our safety advanced engineer,

9 his name is listed there, Evelio Siller.

10    Q.   Okay.  All right.  You say, "The buoy project is part

11 of Governor Greg Abbott's loans Operation Lone Star Initiative.

12 The City of Eagle Pass are 100 percent on board with the

13 DPS/Texas National Guard operations for border security."  Did

14 I read that correctly?

15    A.   Yes.

16    Q.   Okay.  Do you know who's -- it -- it says that's a --

17 one of the Meeting Notes and Highlights.  Is that -- do you

18 recall who said these things, or would you say that's just a

19 summary of the things that were discussed?

20    A.   I believe maybe Mr. Isaac Gonzalez.

21    Q.   Okay.

22    A.   Lieutenant.

23    Q.   And let's go over who was at the meeting.  There was

24 an individual named Mario Gomez, who -- he is with the IBWC; is

25 that correct?

```
 1        A.   Yes.

 2        Q.   That's you?

 3        A.   Yes.

 4        Q.   Demetrius Gaines, IBWC?

 5        A.   Assistant area manager.

 6        Q.   Okay.  Evelio Siller is your assistant?

 7        A.   He's safety advanced engineer.

 8        Q.   Okay.  Luise Martinez?

 9        A.   He's in charge of our security.

10        Q.   Okay.  Isaac Gonzalez?

11        A.   DPS, Lieutenant.

12        Q.   All right.  Mr. Cordova?

13        A.   Can't recall who.

14        Q.   And then you said Laredo section lead.  Do you know

15   who that was?

16        A.   No, I can't remember.  I just remember that he was

17   from the Laredo area.

18        Q.   Okay.  And those were all the IBWC attendees and all

19   the DPS attendees that you recall being at the meeting,

20   correct?

21        A.   Correct.

22        Q.   Was it a cordial meeting?

23        A.   Yes.

24        Q.   It says that the issue of Operation Lone Star and

25   operations for border security were discussed at the meeting?
```

1     A.   Yes.

2     Q.   Okay.  And -- and have you had prior meetings with

3 DPS on the issue of border security?

4     A.   No.

5     Q.   Okay.  Is this the first one you attended with DPS?

6     A.   Yes.

7     Q.   Okay.  Or was it a -- what -- what was it a helpful

8 meeting or -- and -- and a positive meeting generally?

9     A.   Yes, I would say so.

10     Q.   Okay.  All right.  And at the meeting it was

11 discussed that Maverick County would be an initial test site

12 for the buoy system, correct?

13     A.   Yes.

14     Q.   That the "Buoy system project had been an ongoing

15 7-month design project with coordination between DPS,

16 Department of Homeland Security, Texas National Guard, Texas

17 Parks and Wildlife."  And that it had been approved and funded

18 by the state of Texas.  That's what this says about the

19 meeting, correct?

20     A.   Yes.

21     Q.   And is that what was discussed in the meeting, that

22 it had been that sort of joint project between DHS and DPS and

23 the other agencies listed?

24     MS. PEREZ:  Objection, form.

25     A.   DHS, it was more of a heads up.

1       Q.   (BY MR. SWEETEN)  Okay.

2       A.   Yeah, that was it.

3       Q.   So this says though that, the buoy system project had

4   been an ongoing 7-month design project with coordination with

5   DHS.  Was DHS coordinated with on the buoy design as this says?

6       A.   I can't say.

7       Q.   Okay.  You weren't involved in that in -- in the

8   development of the project prior to this meeting on June 12th;

9   is that what I'm understanding?

10      A.   Right.  I can't...

11      Q.   Okay.  All right.  Is this the first time that you

12  had heard of the buoy system?

13      A.   I can say yes.

14      Q.   Okay.  So the June 12th meeting was the first time

15  you ever heard buoys discussed, correct?

16           That's, yes?  Gotcha.

17      A.   Yes.

18      Q.   All right.  And -- and so it's the case then that --

19  that they may have had multiple discussions before, but this

20  was your first time to discuss buoys with them, correct?

21      A.   Correct.

22      Q.   Okay.  It says that the buoy system will be installed

23  in three strategic locations to prevent that drownings.  That

24  is what was discussed at the meeting, correct?

25      A.   Correct.

1    Q.   Okay.  That, in other words -- and are you aware that

2    last year some 1,238 migrants drowned?  No.  "1,238 migrant

3    deaths and disappearances were recorded in 2021."  Did you --

4    were you aware that that figure was that high?

5             MS. PEREZ:  Objection, scope, but you can

6    answer, if you know, Mr. Gomez.

7    A.   No, I don't.

8    Q.   (BY MR. SWEETEN)  Okay.  I mean, you -- you knew it

9    was high though?  I mean, you knew it's dangerous for migrants

10   to cross rivers and migrate in non ports of entry, correct?

11            MS. PEREZ:  Same objection, and you can answer,

12   if you know, Mr. Gomez?

13   A.   Crossing the river, yeah, it's dangerous.

14   Q.   (BY MR. SWEETEN)  Okay.  This says from the meeting

15   notes, it says, "Installation of the first (1,000 ft) of buoy

16   system will start approximately July 7th-10th of 2023 with an

17   estimated completion of 2-3 weeks."  Did I read that correctly?

18   A.   Yes.

19   Q.   Were you appreciative of the fact that -- that this

20   was being openly discussed by these multiple agencies, both

21   state and federal, the issue of -- of the buoy system, and that

22   you were included and given a heads up?

23   A.   Yes.

24   Q.   Okay.  Are those folks that you generally have had

25   good relationships with and coordination with in the past?

1      A.   This was my first meeting with DPS --

2      Q.   Okay.

3      A.   -- from that area.

4      Q.   Did you walk away with a good impression of that

5   meeting?

6      A.   Yes.

7      Q.   Okay.  It says that there was there -- what was --

8   I -- I think this says what was discussed is that there would

9   be a "Buoy System-interconnecting linkable 4 foot diameter

10  floating barriers."  Did I read that right?

11     A.   Yes.

12     Q.   Okay.  That the manufacturer of the buoys was

13  Cochrane, USA.  The contractor was Spencer Construction, and

14  then that DP -- that, I'm sorry.  "Texas Parks and Wildlife had

15  brought up concerns about utilizing netting.  Project plans

16  were not shared at the meeting."  But the "Local operation has

17  been instructed to point IBWC to the State of Texas Land office

18  for further project details."  Did I read that correctly?

19     A.   Yes.

20     Q.   Is there anything outside of what's been reported

21  on -- in these notes that you're saying that you recall about

22  the meeting?  Or does this accurately capture what happened at

23  the meeting in your opinion?

24     A.   I think it's captured here.

25     Q.   Okay.  Now, DPS in -- in paragraph 4, I'm -- I'm kind

Case 1:23-cv-00853-DAE Document 114 Date Filed 09/07/2023
Case 1:23-cv-00853-DAE Document 86-5 Filed 09/07/23 Page 27 of 237
Mario Gomez - 8/7/2023

27

1    of going back to page 3 of your affidavit, Mr. Gomez.  It says

2    that you were told, in the meeting, that DPS said this was a

3    test for these buoy barriers, correct?

4        A.    Yes.

5        Q.    Okay.  Were you aware, either from the meeting or

6    sometime after that, that the buoy system had actually been

7    developed for the federal government to employ at some point?

8        A.    Can't say that I remember right now.

9        Q.    Okay.  And it looks like I -- I think from your

10   affidavit, it appears that though there was some discussion of

11   putting it at the International Railroad Bridge near Eagle

12   Pass, that it ended up being placed in another location; is

13   that right?

14       A.    That is correct.

15       Q.    Okay.  And how far from the -- how far from the

16   International Bridge was -- were the buoys placed

17   approximately?

18       A.    Two, three miles.

19       Q.    Okay.  And do you know why they chose that test site

20   for the buoys rather than the International Bridge?

21       A.    No.

22       Q.    Okay.  Did you have any problem with that?  Like, did

23   that change anything for you?

24       A.    No.

25       Q.    Okay.  Now, I want to be clear there have, to your

 1   knowledge, there's not been construct -- there's not been the

 2   placement of buoys in any other portion of the river other than

 3   that one stretch that I think is captured in your affidavit; is

 4   that correct?

 5        A.   Yes.

 6        Q.   And no con- -- no -- no efforts have been taken to

 7   place buoys in any other place that you are aware of, correct?

 8        A.   Correct.

 9        Q.   Okay.  With -- to the buoys that are placed that

10   are -- that are there presently, I -- I think you've described

11   they've been described as being about 1,000 feet long, correct?

12        A.   Correct.

13        Q.   And is that about right?

14        A.   I would say, yes.

15        Q.   Okay.  Now, you would agree with me that there --

16   there have not been any reported injuries or deaths as a result

17   of the placement of those buoys, correct?

18        A.   I cannot say.

19        Q.   Okay.  You don't know one way or the other?

20        A.   Correct.

21        Q.   Okay.  Do you know if the area is monitored by Texas

22   DPS's or -- or the Texas Military Department, the buoy area?

23        A.   I cannot say.  I saw them there during my site, but I

24   cannot say --

25        Q.   Okay.

1     A.    -- it's monitored.

2     Q.    **How many times have you been to the -- the buoy site**

3  **since the buoys have been either construct -- been**

4  **constructed -- in the process of being constructed or finished?**

5     A.    Weekly basis.

6     Q.    **About every other week -- every week; is that right?**

7     A.    Since my first site --

8     Q.    **Okay.**

9     A.    -- when I first visited a -- or once while they were

10 identified there on that site, I would say every week maybe.

11    Q.    **Okay.**

12    A.    Once a week.

13    Q.    **Okay.  And when you're there, what -- what is it that**

14 **you're there to do to observe or something else?**

15    A.    Again, report site conditions.

16    Q.    **Okay.  And who do you report those site conditions**

17 **to?**

18    A.    It would be my chain of command.

19    Q.    **Okay.  And other than the fact that the buoys are**

20 **there, have there been any -- have you -- have you shared any**

21 **concerns as to human safety about the -- the buoys being there?**

22    A.    No.

23    Q.    **Okay.  You took some photographs of the of the buoys;**

24 **is that correct?**

25    A.    Yes.

1      Q.   And did you do that through dr- -- drone?  Did you

2  fly a drone?

3      A.   No.

4      Q.   Okay.  All right.  You -- you were on-site then when

5  you took them?

6      A.   Yes.

7      Q.   Okay.  And you -- were you in any way prevented from

8  taking those pictures at all?

9      A.   No.

10     Q.   Okay.  So let's look -- let's kind of go through your

11  pictures if we can.  Can you tell me what this document, which

12  is at page 8 of 21, what this is a picture of?

13     A.   This was part of the Evelio Siller report.

14     Q.   Can you say what report that was?

15     A.   The -- the Exhibit A.

16     Q.   Okay.  So you're talking about the June 12th meeting?

17     A.   Correct.

18     Q.   This -- this was given to you -- was this given to

19  you during the meeting?

20     A.   No.

21     Q.   Okay.  How was this created, this page 8 of the

22  affidavit?

23     A.   I can't say.

24     Q.   Okay.  Do you think it was created by DPS or one of

25  the Texas agencies?  Do you think IBWC created it?  Do you

1   think the DHS folks?

2       A.   No, our -- -our staff did this.

3       Q.   Oh, your staff at IBWC did this?

4       A.   Yes.

5       Q.   Okay.  And -- and what was the purpose of creating

6   this?  Just to show where you thought DPS had indicated in the

7   June 12th meeting they would be putting the buoys?

8       A.   That is correct.

9       Q.   Okay.  And it turned out to be that -- that those

10  buoys were actually their -- their test run of the buoys was --

11  actually occurred two miles, approximately two miles south --

12      A.   That is correct.

13      Q.   -- on the river?

14           Okay.  So they were not put at this location at

15  the International Bridge, but instead downriver about two

16  miles?

17      A.   That's correct.

18      Q.   All right.  Is there -- and -- let's see.

19           All right.  Let's go to page 10, which is your

20  next picture.  That was part of your affidavit.  Now, it

21  appears that this picture must have been taken before those

22  buoys were placed into the water; is that correct?

23      A.   It would appear so.

24      Q.   Okay.  And do you have an idea of approx- -- you took

25  this picture, correct?

```
 1        A.   No.

 2        Q.   Okay.  Do you know who took this picture?

 3        A.   I believe that's Mr. Demetrius Gaines, our assistant

 4   area man.

 5        Q.   Okay.  And was -- what -- was he asked by you to take

 6   the picture?

 7        A.   No.

 8        Q.   Do you know why he took the picture?

 9        A.   I cannot say that I do.

10        Q.   Okay.  And this -- this simply shows what the orange

11   buoys look like before they're deployed, correct?

12        A.   That is correct.

13        Q.   Okay.  And then there's another picture, it's a

14   little hard to see, but there's another picture it looks like

15   of the buoys there on page 11 of 21.

16        A.   Yes.

17        Q.   And once again, this is before they were deployed,

18   correct?

19        A.   Correct.

20        Q.   And -- and this -- what -- what location -- where

21   were they?  Where are they here?

22        A.   They appear to be at the Shelby Park.

23        Q.   Shelby Park in Eagle Pass, Texas, correct?

24        A.   Correct.

25        Q.   Okay.  The next picture on page 12 of 21 also -- is
```

1    that also taken in Shelby Park?

2         A.   Yes.

3         Q.   Okay.  And this is just another -- the buoys from

4    another angle, correct?

5         A.   Yes.

6         Q.   Okay.  Prior to deployment.  And then we have other

7    pictures.  If we look on page 14 of 21, is this still -- still

8    at Shelby Park before the buoys have been deployed in the

9    river?

10        A.   Yes.

11        Q.   Okay.

12        A.   This is -- yes.

13        Q.   By the way, at the meeting on -- on the 12th, was

14   anybody from Cochrane there --

15        A.   No.

16        Q.   -- at the meeting?

17        A.   No.

18        Q.   Representative of the corporation that made them was

19   there?

20        A.   No.

21        Q.   Okay.  Is it the case that these buoys are made, do

22   you know of -- of foam and -- and plastic; is that correct?

23        A.   I cannot say.

24        Q.   Okay.  All right.  I'll show you the next picture.

25   Is this another picture of Shelby Park, and I'm talking about

1    picture 15 of 21?

2       A.   Yes.

3       Q.   All right.  And -- and what is that showing us?

4       A.   Guess you can't see, but there's Conex boxes far away

5    down there.

6       Q.   Okay.  And those are Conex boxes that have been up

7    for how long?

8              MS. PEREZ:  Objection, form.

9       Q.   (BY MR. SWEETEN)  Do you know how long those Conex

10   boxes have been there?

11      A.   I cannot say.

12      Q.   Okay.  And what was the purpose of taking the picture

13   of the Conex boxes?

14      A.   Site conditions.

15      Q.   Okay.  And are -- are those deployed at the border or

16   are they just resting in Shelby County [sic] -- Shelby Park?

17      A.   I cannot say --

18      Q.   Okay.

19      A.   -- where property line is.

20      Q.   Okay.  But are those deployed -- is the river back

21   over the --

22      A.   Yes.

23      Q.   I think you're showing me here, right?

24      A.   Yes.

25      Q.   Okay.  And the river is back there?

1    A.    Yes.

2    Q.    Okay.  So are the Conex boxes in place in order to

3  stop immigration or somebody crossing there; is that right?

4             MS. PEREZ:  Objection, form.

5    A.    Conex boxes are in Shelby Park.

6    Q.    (BY MR. SWEETEN)  Okay.  But I -- I'm trying to

7  figure out, are they deployed at the river or they just parked

8  there for -- for temporary use, if you know?

9    A.    No.

10   Q.    You don't know?

11   A.    I mean, they're not inside the river.

12   Q.    Okay.

13   A.    They're outside the river.

14   Q.    They're outside the river.  Okay.  And do you know

15  where those -- were those Conex boxes ever deployed or are they

16  still in Shelby Park?

17   A.    Last time I -- I was there, yes.

18   Q.    They were still in Shelby Park when you were last in

19  Shelby Park?

20   A.    Yes.

21   Q.    And when was that approximately?

22   A.    Maybe two weeks.  I can't recall.

23   Q.    Okay.  So I -- I guess I'm trying to figure out what

24  are we -- what -- why is this picture part of your affidavit?

25   A.    It's describes site conditions.

1    Q.   Okay.  All right.  Let's go to the next page, page 16

2  of 21.  Where is this location where these buoy -- this shows

3  some buoys, looks like some fasteners.  Where was this taken,

4  Shelby Park?

5    A.   Yes.

6    Q.   Okay.  Does this reflect anything other than that

7  these are the buoys pred- -- pre-deployment in the river?

8    A.   No.

9    Q.   Okay.  And same -- looks like it's the same with

10  page 17 of 21.  These are the -- these are the buoys before

11  they were deployed in the river, correct?

12    A.   Yes.

13    Q.   Okay.  Okay.  If we can turn now to the next picture,

14  which is page 19 of 21.  What -- so we -- we can see that there

15  is fence and there is concertina wire at the -- at the area of

16  the of the river.  Do you see that?

17    A.   Yes.

18    Q.   And do you know when those, let's -- let's talk about

19  the wire that was deployed outside of the fence.  Do you see

20  those there, the wire?

21    A.   Yes.

22    Q.   Okay.  Do you know when that was put there?

23    A.   No.

24    Q.   Okay.  It could have been months ago?  Could have

25  been recently?

1      A.   Yes.

2      Q.   Okay.  And then I think you can see in the right most

3  portion of the picture, you can see the buoys in the river; is

4  that correct?

5      A.   Yes.

6      Q.   Okay.  Would you agree with me that there's no wire

7  that's reflected in any of the pictures of the buoys that we've

8  seen?  There's no wire on the buoys, correct?

9      A.   I cannot say that.

10     Q.   Okay.  I mean, we can go back and look at all these,

11 but you -- you would agree that on any of the pictures that

12 we've gone through, and we've gone through about six or seven I

13 would guess, there's not any concertina wire on those buoys,

14 correct?

15     A.   Yeah, I cannot say that.  I cannot say that there was

16 wire on the --

17     Q.   You did not say that there was?

18     A.   No.

19     Q.   No.  No.  No, I'm not saying that you said that.  I'm

20 just asking that there's not, is that?

21     A.   No, there's not.

22     Q.   All right.  Very good.  I wasn't accusing you of

23 saying that to --

24     A.   No, I mean, I cannot say that there is not.

25     Q.   Okay.  All right.

```
 1        A.    I mean...
 2        Q.    Well let -- let's look at the next picture because
 3   it's a clearer picture, I think of the buoys.
 4        A.    Okay.
 5        Q.    Now, on this picture of the buoys, there's no
 6   concertina wire on those buoys, correct?
 7        A.    Correct.
 8        Q.    Okay.  And with respect to -- to the -- it looks like
 9   there's a piece of equipment out there.  Was this -- would this
10   have been about the time that the buoys were placed out into
11   the river?
12        A.    That is correct.
13        Q.    Okay.
14              MS. KRUGER:  Counsel, was this page 20 here?
15              MR. SWEETEN:  Yeah.  So we are on page 20 of 21
16   in case -- yeah.  He's on it.  I'm on it.
17              MS. KRUGER:  Okay.  Twenty or 21?  I just got
18   lost.
19              MR. SWEETEN:  Page 20 of 21.
20              MS. KRUGER:  Okay.  Got it.  Sorry.  Thanks.
21        Q.    (BY MR. SWEETEN)  All right.  So it looks like
22   there's a piece of equipment.  Do you know what it was doing
23   out there?
24        A.    Based off picture 20 and 21, it was transporting
25   buoys.
```

1    Q.   It was transporting buoys out there.  Okay.  Now,

2    there was no excavation that was occurring where those buoys

3    are?

4    A.   I cannot say.

5    Q.   Okay.  Did you take this picture, this picture number

6    20 of 21?

7    A.   Yes.

8    Q.   Okay.  When you were there, did you see any

9    excavation activities occurring under -- at the -- at the bed

10   of the river?

11   A.   No.

12   Q.   Okay.  There was no ex- -- there was no digging up of

13   soil, no dis- -- no -- no construction other than placing buoys

14   out in the river, correct?

15   A.   While I was there --

16   Q.   Okay.

17   A.   -- I did not see any of that.

18   Q.   Okay.  Thank you.  Now, we, as I said, we can see

19   these buoys better.  There's no concertina wire on those buoys,

20   right?

21   A.   Yeah.  Yes.  There's no concertina wire on there.

22   Q.   Okay.  Do you know approximately how many days -- how

23   long it took them to install this section of buoys?

24   A.   No.

25   Q.   Okay.  It is not your contention, is it, that the

1  buoys are on the -- the Mexican side of the river; is it?

2      A.   I cannot say.

3      Q.   Okay.  You're not claiming that though here, right?

4      A.   No. No.

5      Q.   Okay.  Okay.  Do you know how the buoys are kept in

6  place?

7      A.   No.

8      Q.   Okay.  It is not your testimony, is it, that these

9  buoys are moored to the -- to the floor of the river; is it?

10      A.   No.

11      Q.   Okay.  Was it told to you in the June 12th meeting

12  that the buoys were temporary?

13      A.   No.

14      Q.   Was it told to you that they could be moved to other

15  locations?

16      A.   Okay.

17      Q.   Is that a yes?

18      A.   Okay.  Can you repeat the question?

19      Q.   Yes.  Was it told to you that those were temporary

20  structures, the buoys?  Not structures.  That they were

21  temporarily going to be placed in the river?

22      A.   I can't say that temporary was specifically

23  described.

24      Q.   Okay.  Was it told to you that those could be placed

25  in different -- could be moved to different parts of the river?

41

1      A.   Yes.

2      **Q.   Okay.**

3      A.   That's fair.

4      **Q.   All right.  And was it told to you that that was a**

5      **possibility that they would move to different areas of the**

6      **river with these buoys?**

7      A.   I was told that these buoys could go up on other

8      sites, but not necessarily that these buoys could be

9      transported.

10     **Q.   Okay.  But that was your assumption, correct?  If**

11     **they could be moved that they -- these -- these very buoys**

12     **could be moved also, correct?**

13     A.   I guess you could say.

14     **Q.   Okay.  So I asked you if you knew whether the buoys**

15     **were moored to the floor of the ocean -- the river, and you**

16     **said you didn't know one way or the other; is that correct?**

17     A.   Correct.

18     **Q.   All right.  I want to ask a few questions along those**

19     **lines and the answer may be the very same.  Do you know if --**

20     **if the buoys in any way were affixed to the bottom of the**

21     **river?**

22     A.   No.

23     **Q.   Do you know if they were attached in any way to the**

24     **bottom of the river?**

25     A.   No.

1    Q.   Okay.  Do you know if they were bolted in any way to

2 the bottom of the river?

3    A.   No.

4    Q.   Okay.  Now, are you aware of letters exchanged

5 between the IBWC and different departments of -- of Texas state

6 government regarding issues on the border?

7    A.   Can't say that I have.

8    Q.   Okay.  So if -- if there had been letters, like, say,

9 earlier in the year about water from Mexico or other issues,

10 that's not something that you were a part of or know about,

11 correct?

12    A.   I would say --

13    Q.   Okay.

14    A.   -- correct.

15    Q.   When is the last time you saw the buoys?

16    A.   Sometime last week of July.

17    Q.   And had the -- does do the pictures that are here on

18 page 20 of 21 and 21 of 21, you see these?  Does it still look

19 like that approximately?

20    A.   No, I think it's longer now.

21    Q.   Okay.  Do you know how much longer it is then?

22    A.   No.

23    Q.   Okay.  Because it looks like they were still

24 constructing it in these pictures; is that right?

25    A.   Correct.

1      Q.   All right.  Thank you, Mr. Gomez.  Now, you have not

2  seen -- when you saw it -- the last time you saw it, you did

3  note there had not been concertina wire, any kind of wire or

4  any structure -- okay.  Let me ask the question again.

5           You had not concertina wire nor any sort of

6  spike, structures or anything like that have been placed on

7  those buoys, correct?

8      A.   Correct.

9      Q.   Okay.  All right.  When we look at the pictures on

10  page 20 and 21, it appears that the buoys are, they're running

11  parallel to the banks of both sides of the river, correct?

12      A.   Somewhat apparently.

13      Q.   Somewhat.  They -- they do not go across the river,

14  correct?

15      A.   Correct.  Yeah.

16      Q.   And -- and they, in other words, traffic that wanted

17  to go upriver or downriver is not blocked by those buoys,

18  correct?

19           MS. PEREZ:  Objection, form.  You can answer,

20  Mr. Gomez.

21      A.   I guess they could travel up -- up the river and down

22  the river.

23      Q.   Okay.  Because as you say in your affidavit, you --

24  you explained that -- that the buoys are four-foot-diameter

25  floating barriers manufactured by Cochrane, USA, correct?

1     A.   Correct.

2     Q.   All right.  As far as the -- as to the installation

3 and the -- and characteristics of the buoys, you would agree

4 with me that the expert here would likely be Cochrane, USA, the

5 manufacturer of those buoys, correct?

6     A.   Correct.

7     Q.   Okay.  In paragraph 11, you talk about -- you say,

8 and that's on page 4 if you want to read it with me.  All

9 right.  So this first sentence says that "On July 13th, 2023, I

10 drove personnel from the Mexican Section of the Commission and

11 the U.S. Army Corps of Engineers to the installation site

12 approximately 2 miles downstream of International Bridge."  Did

13 I read that correctly?

14     A.   Yes.

15     Q.   How often do you work with the U.S. Army Corps of

16 Engineers?

17     A.   Not very much.

18     Q.   Okay.  Did the Army Corps of Engineers tell you why

19 they were interested in the buoys that were being built?

20 being -- being placed in the river?

21     A.   Again?

22     Q.   Yeah.  Did the U.S. Army Corps of Engineers tell you

23 why they were there and -- and wanted to see the buoys that had

24 been placed in the river?

25     A.   Clean Water Act.

1     Q.   Okay.  Anything else other than Clean Water Act, did

2  they say?

3     A.   Not that I recall.

4     Q.   Did they tell you whether or not they -- they had a

5  problem with the -- in the -- the placement of the buoys in the

6  river?

7     A.   Not that I can recall.

8     Q.   They didn't complain about the buoys in the river?

9     A.   Not that I can recall.

10     Q.   Okay.  Did anybody from the Corps of Engineers

11  indicate that they thought it was blocking travel in the river?

12     A.   Not that I can recall.

13     Q.   Okay.  In paragraph 14, you say "Texas has not

14  provided USIBWC with any design drawings, construction plans,

15  or other technical information on the installation or design of

16  the buoy system."  Do you see that?

17     A.   Yes.

18     Q.   Did I read that provision correctly?

19     A.   Yes.

20     Q.   Okay.  And -- and is -- are -- are -- you didn't say

21  it here, you're -- are -- you're not suggesting that -- that

22  DPS or the state officials had to provide that under -- had to

23  provide that to the USIBWC, are you?

24     A.   Normally -- if I can answer.  Normally, any

25  floodplain -- I mean, any activities within the floodplain,

1    they would go for USIBWC review.  Any activities or any

2    construction that happens on the River Grande Floodplain so...

3         Q.    Well, let's go through it again though.  You --

4    you've indicated that -- that you -- you're not familiar with

5    how you -- you said the word construction.  Okay?

6         A.    Any type of development.

7         Q.    Well, I mean, I think that's what the lawsuit fight

8    is about.

9         A.    Okay.

10        Q.    But -- but -- but with respect to buoys placed in the

11   river, what authority would you be relying upon to suggest that

12   you -- that the State of Texas has to provide notice to the

13   IBWC that a buoys been put in the river?

14        A.    I would just base off experience that activities I

15   report, and I would say they would go for agency review or not.

16   The agency would notify me.

17        Q.    Okay.  Are you claiming right now that there is some

18   law that requires the State of Texas if they're going to put a

19   buoy out that, they have to tell the IBWC, and if so, I want to

20   know what that law is.

21        A.    Okay.

22        Q.    What?

23        A.    No, I'm saying that normally when there's any

24   activities or development that happens within the floodplain, I

25   normally report up --

47

```
1        Q.    Okay.

2        A.    -- to -- that's all I mean.

3        Q.    Did -- did you report the June 12th meeting that the

4   state officials had had with you and -- and multiple other

5   agencies about the buoys?

6        A.    Yes.

7        Q.    Okay.

8        A.    That was in the Exhibit A.

9        Q.    In the middle?

10       A.    Yeah.

11       Q.    Yeah.  Okay.  Here you say -- first of all, the term

12  floating barriers.  How did you come up -- did the -- did the

13  attorneys come up with the word floating barriers or did you?

14             MS. PEREZ:  Counsel, could you...

15             MR. SWEETEN:  On -- on paragraph 16.

16       A.    That's probably me.

17       Q.    (BY MR. SWEETEN)  Okay.  You -- here you say that

18  they "are an impediment to the sections crossing independently

19  in this part of the river."  Did I read that correctly?

20       A.    Yes.

21       Q.    Now, can you tell me a single time when the IBWC over

22  this 1,000 foot stretch has tried to cross that portion of the

23  river?

24       A.    Not since July 20th.

25       Q.    Okay.
```

1      A.    July 25th.

2      Q.    Okay.

3      A.    I would say no.

4      Q.    What about before July 20th?  When is this -- when --

5      A.    I mean, since before July 20th.

6      Q.    Got it.

7      A.    Up to July 25th.

8      Q.    All right.  There's -- let me rephrase the question,

9  make sure it's clear what you just said.  You've said that

10  there's not a single time prior to July 25th, 2023 that you can

11  recall the IBWC attempting -- the section attempting to cross

12  in this area of the river.  That's what you just said, correct?

13     A.    Yeah, the U.S. --

14           MS. PEREZ:  Objection, form.

15     A.    -- I --

16           MR. SWEETEN:  He -- he's answering.

17     Q.    (BY MR. SWEETEN)  Go -- go ahead.

18     A.    Yeah, I'm trying to remember.  I can't recall.

19     Q.    Okay.  You can't recall a time?

20     A.    Yeah.

21     Q.    Okay.  And then what -- were there any plans that the

22  IBWC had in the over 70 miles of river that exists in Maverick

23  County to cross that specific section of the river?  The 1,000

24  foot area of the river there?

25     A.    Yeah.  Without agency review, I cannot say.

1    Q.    Okay.  Now, you say in the next paragraph "On July

2    20th, 2023, the Mexican Section of the Commission planned to

3    survey the riverbed just upstream of the buoy system."  Did I

4    read that correctly?

5    A.    Yes.

6    Q.    Okay.  And with respect to that, you're saying

7    upstream, approximately how far upstream would you say they

8    were going to -- to do this, go survey the riverbed?

9    A.    Right at the buoy site.

10   Q.    Okay.  You're saying -- now, here it's -- it doesn't

11   say right at the buoy site, it says just upstream of the buoy

12   system.  So which one of those two is correct?

13   A.    Right at the buoy site.  Just upstream of the buoy,

14   right there.

15   Q.    Okay.  So is there any reason that that riverbed

16   survey could not be conducted in as much as it's north -- it --

17   it'd be north of the of -- of the buoy site?

18   A.    No, north of the buoy, you could carry it out.

19   Q.    Okay.  So it could still, this riverbed survey can

20   still be carried out?

21   A.    Upstream of the buoy, yes.

22   Q.    Okay.  And -- and the DPS officers on duty have not

23   tried to stop you-all from doing IBWC work actively, correct?

24   A.    Correct.

25   Q.    There's not been any time when you've had DPS say

1    you're not going where -- where you were going, correct?

2        A.   Correct.

3        Q.   All right.  Because you have your job to do, and they

4    have their job to do, right?

5        A.   Correct.

6        Q.   Okay.  And their job is to try to stop the flow of

7    migrants and the dangerous crossings in the Rio Grande; isn't

8    it?

9             MS. PEREZ:  Objection, form.  Mr. Gomez, you can

10   answer, if you know.

11       A.   I'm not fully aware of all the DPS duties.

12       Q.   (BY MR. SWEETEN)  Isn't that your understanding of

13   just what Operation Lone Star is trying to do?

14       A.   Correct.

15       Q.   Okay.

16            MR. SWEETEN:  All right.  I'm going to take a --

17   a break.  I've got to talk my co-counsel.  I've got to see what

18   other questions I've got to ask.  So we're going to take a

19   break real fast, if that's okay?  Maybe take five?

20            MS. KRUGER:  Yeah, that's great.

21            THE REPORTER:  3:07 p.m., off the record.

22            (Break taken from 3:07 p.m. to 3:18 p.m.)

23            THE REPORTER:  Okay.  3:18 p.m., back on the

24   record.

25       Q.   (BY MR. SWEETEN)  Thank you, Mr. Gomez.  We're back

1  on the record after the break.  Just have a few more questions

2  for you, sir.

3            First, have you ever seen a U.S. Coast Guard

4  vessel in the -- in the entire 70-some-odd mile stretch of

5  re- -- of the Rio Grande in Maverick County?

6      A.   No.

7      Q.   Okay.  Second, with respect to the segments of the

8  river that are in Maverick County, would you agree that some of

9  those, there's sand bars in a lot of areas in the river in that

10  70 mile stretch?

11      A.   I really cannot say --

12      Q.   Okay.

13      A.   -- certainty.

14      Q.   Would you agree that some of those areas show shallow

15  water -- have shallow?

16      A.   Yes.

17      Q.   Okay.  And when we're talking shallow, it can get

18  very shallow, like sometimes even dry, correct?

19      A.   Yes.

20      Q.   Okay.  So there's -- there's not consistent depths

21  along the -- along the river section of this in Maverick

22  County, correct?  There's -- there's a lot of inconsistency in

23  depth, correct?

24      A.   There's inconsistencies of depth, you know, lots of

25  the river, so I would imagine Maverick County's probably

1  similar.

2      Q.   Okay.  Like a lot of other sections of the Rio

3  Grande, inconsistent depths.  Okay.  Are there small islands in

4  sections of -- in -- in segments of the Rio Grande in Maverick

5  County?

6      A.   Can't say, but there are islands on the river.

7      Q.   Okay.  Are there at times large rocks in the river

8  along that 70 mile stretch?

9      A.   I cannot say.

10     Q.   Okay.  Sometimes manmade debris is in that river?

11     A.   Manmade debris?  Are you talk of plastics?

12     Q.   Yeah.

13     A.   Yes.

14     Q.   Okay.  Sometimes there's natural debris like log

15  stumps in the river?

16     A.   Yes.

17     Q.   Sandy shoals along that 70 mile segment of the river?

18     A.   I would say, yes.

19          MR. SWEETEN:  I have no further questions.

20  Mr. Gomez, thank you for your time.

21          THE WITNESS:  Thank you.

22          MS. PEREZ:  And we don't have any questions.

23          THE REPORTER:  Okay.  3:21 p.m., off the record.

24          (End of proceedings.)

25

53

1                         CHANGES AND SIGNATURE

2    WITNESS NAME: MARIO GOMEZ          DATE: AUGUST 7, 2023

3    PAGE LINE        CHANGE              REASON

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

54

1        I, MARIO GOMEZ, have read the foregoing deposition
and hereby affix my signature that same is true and correct,
2  except as noted above.

3

4

                  _____
5                  MARIO GOMEZ

6

7

8

9  THE STATE OF _____)

10  COUNTY OF _____)

11

12        Before me, _____, on this day

13  personally appeared MARIO GOMEZ, known to me (or proved to me

14  under oath or through _____) (description

15  of identity card or other document) to be the person whose name

16  is subscribed to the foregoing instrument and acknowledged to

17  me that they executed the same for the purposes and

18  consideration therein expressed.

19        Given under my hand and seal of office this

20  _____ day of _____, _____.

21

22

23                  _____
                  NOTARY PUBLIC IN AND FOR
24                  THE STATE OF _____
                  COMMISSION EXPIRES: _____
25

```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF TEXAS
 2

 3  UNITED STATES OF AMERICA,        )
                                     )
 4                   Plaintiff,      )
    VS.                              )
 5                                   )  CIVIL ACTION
                                     )  NO.1:23-00853-DAE
 6  GREG ABBOTT, in his official     )
    capacity as Governor of the      )
 7  State of Texas, and the State    )
    of Texas,                        )
 8                                   )
                     Defendants.     )
 9                                   )

10                    REPORTER'S CERTIFICATION
                      DEPOSITION OF MARIO GOMEZ
11                         AUGUST 7, 2023

12

13       I, Ariana McCoy, Certified Shorthand Reporter in and for

14  the State of Texas, hereby certify to the following:

15       That the witness, MARIO GOMEZ, was duly sworn by the

16  officer and that the transcript of the oral deposition is a

17  true record of the testimony given by the witness;

18       That the deposition transcript was submitted on

19  August 9, 2023 to the witness or to the attorney for the

20  witness for examination, signature and return to me by

21  September 8, 2023;

22       That the amount of time used by each party at the

23  deposition is as follows:

24  Ms. Krystal-Rose Perez   .....00 HOUR(S):00 MINUTE(S)

25  Mr. Patrick Sweeten      .....01 HOUR(S):04 MINUTE(S)
```

1      That pursuant to information given to the deposition

2  officer at the time said testimony was taken, the following

3  includes counsel for all parties of record:

4  Ms. Krystal-Rose Perez.

5

6      That $_____ is the deposition officer's charges to

7  the Plaintiff for preparing the original deposition transcript

8  and any copies of exhibits;

9      I further certify that I am neither counsel for, related

10  to, nor employed by any of the parties or attorneys in the

11  action in which this proceeding was taken, and further that I

12  am not financially or otherwise interested in the outcome of

13  the action.

14      Certified to by me this 8th day of August, 2023.

15

16

17  _____

18  Ariana McCoy, Texas CSR 9745
    Expiration Date: 08/31/2023

19  Integrity Legal Support Solutions
    9901 Brodie Lane

20  Suite 160-400
    Austin, Texas

21  210-277-6200- phone

22

23

24

25

**EXHIBIT F: ECF 26-6, DEPOSITION OF JOSEPH SHELNUTT (D-6)**

**United States District Court**
**Western District of Texas**
**Austin Division**

| | |
|---|---|
| United States of America,<br><br>   *Plaintiff*,<br><br>       v.<br><br>Greg Abbott, in his capacity as Governor of the State of Texas, and the State of Texas,<br><br>   *Defendants*. | No. 1:23-cv-00853-DII |
| Epi's Canoe & Kayak Team, LLC and Jessie Fuentes,<br><br>   *Plaintiffs*,<br><br>       v.<br><br>State of Texas, *et al.,*<br><br>   *Defendants*. | No. 1:23-cv-00836-DII |

**Defendants' Opposition to Plaintiffs' Motions for Preliminary Injunction**

# EXHIBIT F

Defendant's Exhibits

6

```
                 UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS

UNITED STATES OF AMERICA,        )
                                 )
                 Plaintiff,      )
                                 )
v.                               )  Civil Action
                                 )
GREG ABBOTT, IN HIS OFFICIAL     )  No.: 1:23-00853-DAE
CAPACITY AS GOVERNOR OF THE      )
STATE OF TEXAS, AND THE STATE    )
OF TEXAS,                        )
                                 )
                 Defendant.      )



              -----------------------------------

                        ORAL DEPOSITION OF

                        JOSEPH SHELNUTT

                        AUGUST 7, 2023

                           VOLUME 1

              -----------------------------------
```

ORAL DEPOSITION OF JOSEPH SHELNUTT, produced as a witness at the instance of the DEFENDANT, and duly sworn, was taken in the above-styled and numbered cause on August 7, 2023, from 10:00 a.m. to 1:06 p.m., before Amber Garcia, Notary Public in and for the State of Texas, reported by machine shorthand, at the United States Attorney's Office, 801 Cherry Street, Fort Worth, Texas 75201, pursuant to the Federal Rules of Civil Procedure.

                        A P P E A R A N C E S

FOR THE PLAINTIFF:

        MR. BRIAN LYNK
        United States Attorney's Office - Department of Justice
        601 N.W. Loop 410
        Suite 600
        San Antonio, Texas 78216
        Phone: (202) 532-3131
        Brian.lynk@usdoj.gov


        MR. LANDON A. WADE
        United States Attorney's Office - West District
        903 San Jacinto Boulevard
        Suite 334
        Austin, Texas 78701
        Phone: (512) 916-5858
        landon.wade@usdoj.gov


        MS. KATHERINE T. ROONEY
        U.S. Army Corps of Engineers - Assistant District
        Counsel
        Phone: (817) 886-1149
        katherine.t.rooney@usace.army.mil


FOR THE DEFENDANT:

        MR. DAVID BRYANT
        Office of the Attorney General of Texas
        300 W. 15th Street
        Austin, Texas 78701
        Phone: (512) 936-2275
        david.bryant@oag.texas.gov

3

INDEX

                                                        PAGE

Appearances........................................     2

JOSEPH SHELNUTT
     Examination by Mr. Bryant........................  5

Signature and Changes..............................    94

Reporter's Certificate.............................    96


                        EXHIBITS

NO.              DESCRIPTION                          PAGE

Exhibit 1        Subpoena to Testify                  9

Exhibit 2        Mr. Shelnutt's Declaration           10

Exhibit 3        Map of U.S. Army Corps of Engineers  75
                 Districts

Exhibit 4        List of Navigable Waters             77

Exhibit 5        Portion of Coast Guard Regulation    87

```
1                    P R O C E E D I N G S
2              THE REPORTER:  We are on the record.  This is
3    the deposition of Joseph Shelnutt in the matter of United
4    States of America versus Greg Abbott, et al.  Our location is
5    801 Cherry Street in Forth Worth, Texas, and we are on the
6    record at 10:00 a.m.  My name is Amber Garcia and my business
7    address is 9901 Brodie Lane, Austin, Texas 78748.
8              Would all Counsel present please state their
9    appearances for the record.
10             MR. LYNK:  This is Brian Lynk from the
11   Department of Justice Environmental Defense Section on behalf
12   of Plaintiff, The United States.  I'm lead counsel for the
13   United States in this matter.
14             MR. WADE:  This is Landon Wade for the U.S.
15   Attorney's Office for the Western District of Texas, also
16   Counsel for Plaintiff in this matter.
17             MS. ROONEY:  Katherine Rooney, Counsel for the
18   U.S. Army Corps of Engineers, also for the plaintiff.
19             MR. BRYANT:  My name is David Bryant.  I'm
20   special counsel in the office of the Attorney General of Texas,
21   representing the defendants in this case.
22             THE REPORTER:  Do y'all have any further
23   stipulations y'all would like to put on the record?
24             MR. BRYANT:  None as far as I'm concerned.
25             MR. LYNK:  None that we have as well.
```

1      MR. BRYANT:  Okay.  Mr. Shelnutt, we're here in

2 a case in which you --

3              THE REPORTER:  I need to swear in the witness.

4              MR. BRYANT:  I'm sorry?

5              THE REPORTER:  I need to swear him in.  Sorry.

6              MR. BRYANT:  Okay.  Please do.

7                     JOSEPH SHELNUTT,

8 having been first duly sworn, testified as follows:

9                       EXAMINATION

10 BY MR. BRYANT:

11     **Q.   Mr. Shelnutt, we're here in a -- a case in which**

12 **you've given a declaration in support of a motion for**

13 **preliminary injunction by the United States of America.  By**

14 **agreement, we're taking this deposition and it is limited for**

15 **purposes of today to a maximum of three hours, and I'll ask the**

16 **court reporter to keep track of the time that we're on the**

17 **record.  Could you state your office address, please?**

18     A.   It's the federal building here in Fort Worth.  I'm

19 not sure the exact street address.

20     **Q.   But you know how to get there?**

21     A.   I do know how to get there, yes.

22     **Q.   Okay.  How long have you worked for the Army Corps of**

23 **Engineers?**

24     A.   Approximately eight years.

25     **Q.   And what did you do immediately prior to becoming**

 1  employed by the Army Corps of Engineers?

 2       A.    I was a freelance consultant.

 3       Q.    **What type of consulting did you do during that**

 4  **period?**

 5       A.    Various kinds of biological consulting.

 6       Q.    **Okay.  And during that period, where were you**

 7  **located?**

 8       A.    Which period?

 9       Q.    **The period when you were a freelance consultant.**

10       A.    In Hood County, Texas.  And prior to that, in Central

11  Alabama.

12       Q.    **When did you begin that period of freelance**

13  **consulting?**

14       A.    Approximately, 2004 to 2000- -- no.  No.

15  Approximately, 2008.

16       Q.    **Okay.  And typically, who were your clients during**

17  **your freelance consulting work?**

18       A.    Various.  They might be nonprofits that might have

19  some interest in various biological work or conservation work.

20  Some might have an interest in running their -- advice on

21  running their boards, which has overlap into the actual work

22  that they do.

23       Q.    **Have you ever done any freelance consulting or other**

24  **work for the State of Texas or any agency or -- or subdivision**

25  **of the State of Texas?**

1      A.   I had some overlap into consulting with the Texas A&M

2   University system.

3      Q.   **Anything else?**

4      A.   With the State of Texas?

5      Q.   **Yes, sir.**

6      A.   Not that I can recall.

7      Q.   **Okay.  When did you graduate from college with a**

8   **bachelor's degree?**

9      A.   1996.

10     Q.   **And what was your first employment after you**

11  **completed your degree?**

12     A.   I was the director of the Raptor Center at Auburn

13  University.

14     Q.   **How long did you have that job?**

15     A.   Well, that's quite a while ago, so approximately

16  seven years.

17     Q.   **And what was your next job after your work with the**

18  **Raptor Center?**

19     A.   I worked for Bartlett Ranches, and they also had a --

20  a linked conservancy linked with their ranches, so...

21     Q.   **And what did you do for the Bartlett Ranches while**

22  **you were employed by them?**

23     A.   I did various educational outreach concerning

24  wildlife conservation, birds of prey.  Also implemented

25  wildlife management scenarios on their three properties.

1    Q.   Where are their three properties located, in general?

2    A.   At the time?

3    Q.   Yes.

4    A.   Central Alabama; Brock, Texas and Chugwater, Wyoming.

5    Q.   All right.  Once you became employed by the Army

6  Corps of Engineers, what was your first position there?

7    A.   I was a regulatory specialist in the evaluations

8  branch of the Regulatory Division here in Forth Worth, Texas.

9    Q.   When did you begin your employment with the Army

10 Corps of Engineers?  It was about eight years ago, but --

11   A.   Approximately mid November of 2015.

12   Q.   And what, if any, specialized training did you

13 receive in connection with your work in the Regulatory Division

14 of the Army Corps of Engineers?

15   A.   Since I've been employed with the Corps of Engineers?

16   Q.   Yes.

17   A.   Various -- what's known as "regulatory prospect

18 courses" that deal with the execution of duties in the

19 regulatory role.  Some are more specialized, have to do with

20 jurisdiction, compliance enforcement, various repair and

21 wetland training.

22   Q.   After your initial position with the Army Corps of

23 Engineers, what was your next position?

24   A.   Regulatory project manager.

25   Q.   And is that your current position?

1    A.   It is.

2        Q.   When did you first become a regulatory project

3    manager for the Army Corps of Engineers?

4    A.   I'm going to say, approximately, 2017, maybe early

5    2018, somewhere in that time frame.  I'm not sure of the exact

6    date.

7        Q.   Okay.  You have the title of Regulatory Project

8    Manager.  What types of projects does that refer to?

9    A.   Projects that would come to the Regulatory Division

10   concerning Section 4 for the Clean Water Act and Section 10 of

11   the Rivers and Harbors Act of 1899.

12       Q.   Okay.  And what does such a project typically consist

13   of?

14   A.   Well, it could be a broad range.  Typically,

15   applicants that come to us are seeking to impact waters in one

16   of those two statutes that may require a permit, or they may

17   seek advice on how to proceed preapplication.

18       Q.   To whom do you report in your current position?

19   A.   I report to Mr. Neil Lebsock.

20       Q.   What's his title?

21   A.   He is the chief of the Compliance Enforcement Branch

22   within the Fort Worth Regulatory Division.

23       Q.   All right.  Let me hand you what's been marked as

24   Exhibit 1 to your deposition.

25              (Exhibit No. 1 was marked.)

| 1 | MR. BRYANT: Excuse my reach. |
| 2 | MR. LYNK: Thank you. |
| 3 | Q. (BY MR. BRYANT) Have you seen this document before, |
| 4 | Mr. Shelnutt? |
| 5 | A. I have not. |
| 6 | Q. Okay. This is a -- a subpoena pursuant to which the |
| 7 | defendants requested that you testify today, and you are here, |
| 8 | so I guess you didn't need to know that you had a subpoena. |
| 9 | Appreciate your presence. Let me hand you what's been marked |
| 10 | as Exhibit 2 to your deposition. |
| 11 | (Exhibit No. 2 was marked.) |
| 12 | MR. LYNK: Thank you. |
| 13 | MR. BRYANT: Sure. |
| 14 | Q. (BY MR. BRYANT) Can you identify Exhibit 2, |
| 15 | Mr. Shelnutt? |
| 16 | A. Sorry. What was the question again? |
| 17 | Q. Could you identify or tell us what that document is? |
| 18 | A. It's my declaration. |
| 19 | Q. Okay. And is that a declaration that you, |
| 20 | personally, signed? |
| 21 | A. It is. |
| 22 | Q. And did you, personally, prepare all of that |
| 23 | declaration? |
| 24 | A. I -- this declaration was -- parts of this was |
| 25 | drafted. I took the declaration, I edited it, and I reviewed |

1  it, and then I signed it.

2       Q.   Okay.  Did you, personally, draft any of the

3  declaration that's Exhibit 2?

4       A.   Did I personally -- what was the question again?

5       Q.   Did you, personally, draft it as opposed to review

6  and edit it?

7       A.   I did not draft all of it, but I reviewed all of it,

8  and I edited portions of it.

9       Q.   Okay.  And my question is whether you drafted any of

10  it?

11      A.   Yes.

12      Q.   What portions?

13      A.   Oh, I edited portions on Item 1, Item 2, portions of

14  Item 5.

15      Q.   Are these -- these -- when you say "Item 5," are you

16  referring to the numbered Paragraph 5?

17      A.   I am.

18      Q.   Okay.  And are you saying that you originally drafted

19  portions of that or just that you edited portions of that?

20      A.   I edited.

21      Q.   Okay.

22      A.   And which means that I changed things and I

23  inserted -- I added to it.

24      Q.   Very good.  Okay.  Can --

25      A.   Would you like me to continue?

Case 1:23-cv-00853-DAE Document 187 Filed 09/07/2023 Page 157 of 289
Case 1:23-cv-00853-DAE Document 18 Filed 09/07/2023 Page: 157 of 289
Joseph Shelnutt - 8/7/2023

12

1    Q.   Are there any -- are there any paragraphs that you

2 originally drafted?

3    A.   Complete paragraphs, is that what you're asking?

4    Q.   No.  Just paragraphs that you took the first draft

5 of, as opposed to got them from someone else and -- and edited

6 or added to.

7    A.   No.

8    Q.   Mr. Shelnutt, I believe that Exhibit 2 indicates that

9 you have a master's degree.  When did you receive that master's

10 degree?

11   A.   2015.

12   Q.   Okay.  And was that an online degree or did you go

13 somewhere to get that?

14   A.   It was an online degree.

15   Q.   And what was the specific topic or topics that were

16 the subject of your master's degree?

17   A.   Environmental Policy with a concentration in Fish and

18 Wildlife Management.

19   Q.   Okay.  And was that a -- done at the request or at

20 the expense of the Army Corps of Engineers?

21   A.   It was not.

22   Q.   Mr. Shelnutt, my understanding is that the Fort Worth

23 District of the Army Corps of Engineers includes some counties

24 that are along the Rio Grande River.  Do you know how many?

25   A.   I do not know a total number of counties.

1    Q.   Do you know the approximate length of the river over

2   which the Fort Worth District of the Army Corps of Engineers

3   has jurisdiction?

4    A.   I do not know the approximate length.

5    Q.   Okay.  Do you know how many permits have been issued

6   by the Army Corps of Engineers with respect to projects on the

7   Rio Grande section of the Fort Worth District?

8    A.   I do not.

9    Q.   Do you know if there are any?

10    A.   I'm aware that there are project numbers that appear

11   along the Rio Grande.

12    Q.   Does that mean that there are permits issued or could

13   it be simply that those are applications or expressions of

14   interest in -- in getting a permit?

15    A.   Both.

16    Q.   Okay.  So is it fair to say that you don't know

17   whether the Fort Worth District has actually issued any permits

18   for projects on the portion of the Rio Grande River that is

19   within its jurisdiction?

20    A.   Are you speaking of the entire portion of the

21   Rio Grande?

22    Q.   That is within the Fort Worth Division's

23   jurisdiction.

24    A.   The Fort Worth District has completed permits on the

25   Rio Grande River.

14

1      Q.   Okay.  Could you further identify any of them?

2      A.   Not personally.

3      Q.   Is it correct that you have not personally worked on

4  a permit application with respect to the -- any project on the

5  Rio Grande River within the Fort Worth Division?

6      A.   I recall working in -- on projects in proximity --

7  close proximity to the Rio Grande River, but I do not remember

8  working on projects that were in waters of the Rio Grande

9  River.

10     Q.   Okay.

11     A.   That I was assigned.

12     Q.   Have you ever worked on applications for permits or

13  related projects within Maverick County, Texas?

14     A.   No.

15     Q.   Prior to July 2023, did you ever travel to Maverick

16  County, Texas in connection with your work with the Army Corps

17  of Engineers?

18     A.   No.

19     Q.   Prior to July 2023, had you ever been to Maverick

20  County, Texas in any -- in your life?

21     A.   No.

22     Q.   Is it correct that one of the things that you do in

23  your job is to do investigations of reports of situations that

24  might require a permit from the Army Corps of Engineers?

25     A.   Yes.

Case 1:23-cv-00632-DII Document 18 Filed 08/09/24 Page 160 of 238
Case 1:23-cv-00853-DAE Document 16 Filed 09/07/2023
Joseph Shelnutt - 8/7/2023

15

1      Q.   Have you ever done an investigation for that purpose

2   with respect to any activities on the Rio Grande River within

3   the Fort Worth Division prior to July 2023?

4      A.   No.

5      Q.   Have you ever observed any commercial navigation on

6   the Rio Grande River in Texas?

7      A.   Not that I'm aware of.

8      Q.   Had you ever seen the Rio Grande River prior to July

9   2023?

10      A.   Yes.

11      Q.   Where -- what portions of the Rio Grande River had

12   you seen prior to July 2023?

13      A.   Approximate vicinity of Laredo, Texas.

14      Q.   And on how many occasions had you been there?

15      A.   I believe three times.

16      Q.   Were those all in connection with your work for the

17   Army Corps of Engineers?

18      A.   In Laredo?

19      Q.   Yes.

20      A.   Correct.

21      Q.   Excuse me.  Have you ever seen the Rio Grande River

22   in the area generally referred to the "Rio Grande Valley,"

23   which is closer to the Gulf of Mexico than Laredo or Maverick

24   County?

25      A.   No.

1     **Q.  Okay.  I understand that you do, as part of your job,**

2  **investigations of reports of activity that might require**

3  **permits from the Army Corps of Engineers; is that right?**

4     A.  That's correct.

5     **Q.  And what's your methodology for doing such**

6  **investigations when you're asked to do so?**

7     A.  Well, it depends on what the -- what the assignment

8  is.  So typically, we refer to -- I'm going to call it

9  "complaints," that may come to us from various sources as

10  unauthorized activity or potential or alleged unauthorized

11  activity.  In that case, we may have a lot of information or we

12  may have very little to -- to no information, and you could

13  take various tracks there.

14         We -- I could be forced to find various contacts

15  to make our initial contact with.  We may already have that

16  information or we can go ahead and make that contact.  First,

17  we need to determine, is it a water under our jurisdiction, and

18  then has a impact to that water occurred, and if so, did it

19  require a permit?

20     **Q.  Now, you referred to a "contact."  What -- who would**

21  **that be?**

22     A.  Potential violator.

23     **Q.  Okay.**

24     A.  Or witnesses.

25     **Q.  Do you typically -- or is it part of your methodology**

1   to get in touch with what I would refer to as the

2   "complainant," any -- the person or persons who may have made

3   the Corps of Engineers aware of some situation that might need

4   investigation?

5       A.   So you mean the person reporting?

6       Q.   That would be the person or persons reporting a

7   situation that brings it to your attention.

8       A.   Usually, we have that person's information.  They --

9   they bring the complaint to us or the information to us.  I

10  don't know if it's a complaint at that point.  And they can

11  elect to remain anonymous or they can elect not to.  But we

12  typically have some -- some level of information about them and

13  how to get in touch with them, yes.

14      Q.   And so is it typical that you would get in touch with

15  them?

16      A.   With the person alleging a violation?

17      Q.   Yes.

18      A.   It depends.

19      Q.   Okay.  Is there any place that either your personal

20  methodology or the divisions methodology or the Corps's

21  methodology for investigating a report or complaint of that

22  kind is written down?

23              MR. LYNK:  Object to form.

24      A.   Yes.

25      Q.   (BY MR. BRYANT)  Where is that?

1     A.   It would be in the project file.

2     Q.   And is that a -- a different document for each

3 different project?

4     A.   It would be.

5     Q.   Okay.  Is there any more general statement of the

6 methodology that the Army Corps of Engineers or your division

7 uses in investigating reports or complaints about activities

8 that might require permits?

9     A.   There are.  There's a -- there's a course, it's

10 called a "prospect course" for compliance and enforcement

11 personnel.  These personnel -- various districts around the

12 country attend these courses regularly, and that's where they

13 get their initial training on how to conduct business under the

14 compliance and enforcement branch.

15     Q.   Okay.  Is there anything else that describes the

16 required or expected methodology for investigating such a

17 report or complaint?

18     A.   There is a -- yes.  There -- in the regs, there's the

19 regulations for compliance enforcement.  And I believe it's

20 33 CFR 326.

21     Q.   Okay.  In connection with the -- what I'll refer to

22 as "floating buoys" in the Rio Grande River that are the

23 subject of this action, when did you first become aware of

24 them?

25     A.   Approximately around July 10th.

1      Q.    And how did you become aware of them at that time?

2      A.    Public media.

3      Q.    Do you recall any particular public media that you

4  accessed at that time?

5      A.    I don't recall.  There was numerous public media

6  reports.  I don't recall a specific one --

7      Q.    Okay.

8      A.    -- a specific outlet.

9      Q.    Did you or the Army Corps of Engineers receive any

10 complaints or reports other than what they may have seen in the

11 public media?

12     A.    In the Fort Worth office?

13     Q.    Yes, let's start with that.

14     A.    At -- so I'm going to ask, at what time did you ask?

15 What time frame -- would you repeat the question, sir?

16     Q.    Yeah.  I'm -- what -- say, anytime after June 1st,

17 2023, did the Fort Worth office of the Army Corps of Engineers

18 or anybody within it, to your knowledge, receive a complaint or

19 a report regarding floating buoys in the Rio Grande River that

20 are the subject of this case?

21     A.    Yes.

22     Q.    Who did you receive such a report or complaint from?

23     A.    It came down from our headquarters in Washington,

24 D.C.

25     Q.    Okay.  Do you know of any person or persons who sent

1   that report or complaint to the Fort Worth Division of the Army
2   Corps of Engineers in June or July of 2023?
3       A.   My understanding is that -- I'm aware that the
4   International Border [sic] and Water Commission, IBWC.
5       Q.   And what information did the Fort Worth Division
6   receive fr- -- either from Army Corps of Engineers headquarters
7   in Washington or from the International Border [sic] Waters
8   Commission regarding the floating buoys in June or July of
9   2023?
10      A.   It was a -- a document that contained text describing
11  what they had seen, photographs, and at least one map.
12      Q.   When you say "they," who are you referring to?
13      A.   IBWC.
14      Q.   Okay.  Did that information express concern about the
15  location of the floating buoys, and whether they were on the
16  Texas side or the Mexican side of the International Boundary
17  Line?
18      A.   So -- so my recollection is that document contained
19  information that related to potential impacts in the Shelby
20  Park area.  And I believe that original document referred to
21  buoys so- -- downstream of Shelby Park.
22      Q.   Okay.  Did that document express any concern about
23  whether the -- the buoys that were in the river were on the
24  Texas or Mexican side of the international boundary?
25      A.   I don't recall language in that document that

1  addressed that particular aspect.

2      Q.    Okay.  Did you later receive an expression of concern

3  on that subject from anyone?

4      A.    I don't recall concern about that particular aspect.

5      Q.    Okay.  When you -- when you went to Maverick County

6  or at any other time, did you verify that the floating buoys at

7  their then current location were on the Texas side of the

8  international boundary?

9      A.    I'm unaware exactly where the international boundary

10  is within the Rio Grande.

11      Q.    Okay.  Did you verify that the buoys at their current

12  location are closer to the Texas shore than to the Mexican

13  shore at that location?

14                    MR. LYNK:  Object to form.

15      A.    What I observed at -- at the time of the site visit

16  on the 13th of July while this structure was under

17  construction, it was closer to the United States side of the

18  river.

19      Q.    (BY MR. BRYANT)  Okay.  And have you ever received

20  any information to the contrary?

21      A.    I have not.

22      Q.    Once the Fort Worth Division received the media

23  reports regarding the floating buoys that you described and the

24  communication from the International Border Waters Commission,

25  was the -- this project assigned to you, personally?

1     A.   Yes.

2          Q.   Who else, if anyone, was also assigned responsibility

3     for this project relating to the floating buoys?

4     A.   So my chief has worked in tandem with me on this.

5          Q.   And when you refer to your chief, are you -- "chief,"

6     are you referring to Mr. -- is it Lebstock?

7     A.   Mr. Neil Lebsock.

8          Q.   Lebsock.   Thank you.   In the course of -- strike

9     that.

10              What's the first thing you did with respect to

11    your investigation related to the floating buoys, aside from

12    read the news -- the public media reports you described, and

13    the communication or document from the International Border

14    Waters Commission?

15    A.   So -- and this is typical, is to check and see if

16    there are any permits that may -- or active projects that may

17    be in the -- at that location or in the vicinity of that

18    location.

19         Q.   And did you do that in early July 2023?

20    A.   I did that after July 10th, 2023.

21         Q.   Okay.   And I think your determination is described in

22    your declaration that you did not locate any permits or active

23    projects relating to the floating buoys; is that correct?

24    A.   That is correct.

25         Q.   And what's the next thing that you did with respect

 1  to your investigation of the reports with respect to the

 2  floating buoys in the Rio Grande River?

 3      A.   So I employed various remote sensing tools to

 4  understand the conditions at the sites.

 5      Q.   Could you describe what you -- what remote sensing

 6  tools you're referring to?

 7      A.   That would be the available LIDAR data.  Also,

 8  topographic maps.  I would say in -- in some cases, verify if

 9  there is a Section 10 water under the Rivers and Harbors Act of

10  1899, but, well, that's already known.  Various oth- -- you

11  know, make sure that the -- are we still -- sorry.  Are we

12  still on the remote sensing?

13      Q.   Yes.

14      A.   Okay.  So there's various layers and tools that we

15  have that include the LIDAR data, and it would be various

16  aspects of LIDAR data.  Some of it doesn't all display the same

17  thing, but various other layers may give us better granularity.

18  So it's typical to review all that, and I did that in this --

19  in this case as well.

20      Q.   Approximate --

21      A.   Also --

22      Q.   Sorry.  Go ahead and finish your answer.

23      A.   Also checked on -- I did a cross river profile at

24  Shelby Park, and I believe I did one where the buoys are as

25  well.  And so that cross river profile from, you know,

1  somewhere upland on the east side of the riverbank typically --

2  typically gives us the relief at the riverbank, and the relief

3  at the riverbed all the way across.  So it's just a better way

4  of having a picture of what conditions are on the site.

5      Q.  And what tools are used to do such a cross river

6  profile?

7      A.  In this case, a publicly available tool, such as

8  Google Earth can be employed to do that.

9      Q.  Okay.  And what, if anything, relevant to your

10  investigation did you learn from doing the cross river profile

11  with respect to the Shelby Park area?

12      A.  There was -- there was a disturbance there -- well, I

13  should say there was an impact to the Rio Grande in that

14  location where a portion of the channel had been filled between

15  an island in the Rio Grande, and the bank on the United States

16  side of the Rio Grande River.  And so I verified that the

17  bottom elevation of the river was the same in the main river

18  channel as was previously present in the channel that's been

19  filled now.

20      Q.  Okay.  And how did you determine that in the Shelby

21  Park area there had been some filling of a portion of the

22  river?

23      A.  Initially, that was in the IBWC's document to us.

24      Q.  Okay.  Was there anything else that you did that

25  verified that?

1      A.   We conducted a site visit on the 13th of July where I

2 could confirm firsthand the fill had taken place in that

3 location.

4      Q.   **Anything else?**

5      A.   Could you be more specific?

6      Q.   **Was there anything else that -- that caused you to**

7 **conclude that -- that there had been some filling of an area**

8 **near Shelby Park?**

9      A.   So to clarify, we're talking about just at Shelby

10 Park?

11      Q.   **Yes.  Right now.  I'll ask you about the actual buoy**

12 **side in a minute.**

13      A.   So I believe the document that was supplied to us

14 with IB- -- from IBWC and our site visit was, you know, the

15 confirmation of that through the site visit was the only thing.

16      Q.   **Okay.  Now, if I understood you correctly, you think**

17 **you also did a cross river profile or may have done one with**

18 **respect to the actual location where the -- the buoys were**

19 **located in the river that you actually saw on July 13th, 2023;**

20 **is that correct?**

21      A.   Correct.

22      Q.   **Did you -- were any documents created as a result of**

23 **these profiles that you did either at the Shelby Park area or**

24 **at the site of the floating buoys?**

25      A.   Yes.

Case 1:23-cv-00853-DAE Document 118 Page: 171 of 289 Date Filed: 09/07/2023
Case 1:23-cv-00853-DAE Document 118 Page: 171 Filed 08/16/23 Page 209 of 238
Joseph Shelnutt - 8/7/2023

26

1    Q.    What are those documents?

2    A.    They are KMZ files.

3    Q.    Okay.  Could you explain what that means?

4    A.    Well, using the -- the Google Earth -- the publicly

5    available Google Earth app, you can save and -- the profile and

6    various other data to a single file called a KMZ file, and so

7    that packaged file was saved to the project file.

8    Q.    Okay.  And so that's within your project file here at

9    the Fort Worth Division now?

10   A.    Yes.

11   Q.    Okay.  As a result of any cross river profile that

12   you did at the location where the floating buoys are currently

13   located, what, if any, information did you get?

14   A.    So doing these -- these elevation profiles like that

15   is routine for me.  It just confirmed where the riverbanks are

16   in relation to the other aerial data and remote sensing data

17   that we have.

18   Q.    Okay.  And do you recall anything in particular that

19   you learned about the site where the floating buoys are

20   currently located?

21   A.    So do you mean in the context of the elevation

22   profile?

23   Q.    It would include that, yes.

24   A.    So you've got to be more specific than that, so I

25   mean...

1    Q.    I'll do my best.

2    A.    Okay.

3    Q.    So as I understand it, you used LIDAR topographic

4 maps and may have used Google Earth to get information about

5 the Rio Grande River at the area where the floating buoys are

6 located; is that correct?

7    A.    That's correct.

8    Q.    And what did you learn from the -- from your work

9 with respect to those tools before you went to the actual site?

10    A.    So much like the -- much like previously, it confirms

11 the -- where the approximate riverbanks are, and they match up

12 with the aerials, the actual aerials that we're able to -- to

13 see, satellite imagery we're able to see.  And it shows us the

14 elevation of the riverbed as you travel across the width of the

15 river, take a cross section through the river.

16    Q.    Okay.  And do you recall any- -- anything,

17 specifically, that you learned about that site through using

18 those tools?

19    A.    Nothing that we didn't already know.  That there's

20 water present, there's a, you know, riverbed elevation present,

21 you know, that changes somewhat acro- -- as you travel across

22 the river, as you would expect.

23    Q.    Okay.  Anything else?

24    A.    No.

25    Q.    All right.  Your declaration indicates that you went

Case 1:23-cv-00853-DAE Document 18 Filed 08/11/23 Page 173 of 289
Case 1:23-cv-00853-DAE Document 18 Filed 09/07/2023 Page 173 of 289
Joseph Shelnutt - 8/7/2023

28

 1   to the -- to sites in Maverick County, Texas on July 13th,

 2   2023; is that correct?

 3       A.   Correct.

 4       Q.   How long were you there?

 5       A.   Approximately three to three and a half hours.

 6       Q.   And was all of that time at or near the -- the bank

 7   of the Rio Grande River or was some time either in Eagle Pass

 8   or elsewhere?

 9       A.   There was a -- a certain amount of time spent

10   traveling.

11       Q.   Approximately how much?

12       A.   30 minutes.

13       Q.   Okay.  And did you spend a portion of that period at

14   or near Shelby Park?

15       A.   Yes.

16       Q.   Approximately how much time did you spend at or near

17   Shelby Park?

18       A.   45 minutes to an hour and 15 minutes.

19       Q.   And when you went on that site visit, who did you

20   meet with aside from Mr. Lebsock, who I understand accompanied

21   you?

22       A.   We met with Mario Gomez from the IBWC.  Later,

23   Mr. Gomez's counterpart, Mexican counterpart, crossed into the

24   United States, and he met up with us.

25       Q.   And what was his name?

1      A.   His first name is Enrique.  I don't know his last

2 name.

3      Q.   **Was he introduced to you?**

4      A.   He was.

5      Q.   **Did you meet with anybody else besides the persons**

6 **you've already named?**

7      A.   No.

8      Q.   **Did you meet with anybody from the State of Texas,**

9 **Texas Department of Public Safety or any other agency of the**

10 **State of Texas?**

11     A.   No.

12     Q.   **Did you make any effort to meet with anybody from the**

13 **State of Texas in connection with that site visit?**

14     A.   No.

15     Q.   **Why not?**

16     A.   At the time, it was a preliminary investigation and

17 we were still gathering information, and that wasn't a part of

18 our agenda for the day.

19     Q.   **Prior to that site visit, did you or anybody else**

20 **from the Fort Worth Division, to your knowledge, get in touch**

21 **with the State of Texas or any agencies or representatives of**

22 **the State of Texas in connection with the matter of the**

23 **floating buoys in the Rio Grande River?**

24     A.   So I did not.  I can't speak for others.

25     Q.   **Well, have you been told about anybody else doing**

Case 23-50632    Document 53-1    Page: 175    Date Filed: 09/07/2023

30

1  that?

2      A.   I have not.

3      Q.   Okay.  Have you received any reports, by any means,

4  that someone from the Fort Worth Division did get in touch with

5  the State of Texas prior to the site visit?

6              MR. LYNK:  Object to form.

7              You can answer.

8      A.   No.

9      Q.   (BY MR. BRYANT)  So there's a portion of the visit

10 that related to Shelby Park, and a portion that related to the

11 portion of the river where the floating buoys were located.

12 Did you view or inspect any other portions of the Rio Grande

13 River in that site visit?

14     A.   No.

15     Q.   About what is the distance between the Shelby Park

16 area that you visited on July 13th, 2023 and the site of the

17 floating buoys in the Rio Grande that you also visited on that

18 date?

19     A.   Approximately two to two-and-a-half miles.

20     Q.   Do you know where the U.S. Customs Border Patrol

21 ports of entry are in or near Eagle Pass, Texas?

22     A.   You're referring to the controlled points of entry

23 between --

24     Q.   Yes, sir.

25     A.   -- the United States and Mexico?

1      Q.   Yes, sir.

2      A.   Approximately, I'm aware.

3      Q.   Okay.  Approximately, what is the distance between

4  the port of entry nearest the site of the floating buoys, and

5  the site of the floating buoys?

6            MR. LYNK:  I'll object as beyond the scope of

7  the limited subject matter the court authorized today, but I'm

8  not giving you instruction, so you can answer.

9      A.   Well, I have not measured that distance, so it would

10 be total speculation.

11     Q.   (BY MR. BRYANT)  Okay.  When you were at the Shelby

12 Park area on July 13th, 2023, did you observe any commercial

13 navigation in the Rio Grande River at that site?

14     A.   I'm not aware of any.

15     Q.   Okay.  When you were at the site of the floating

16 buoys, two to two-and-a-half miles downstream from the Shelby

17 Park site, did you observe any evidence of commercial

18 navigation at the floating buoy site?

19     A.   I'm not aware of that.

20     Q.   Have you ever received any information or reports of

21 any commercial navigation at or near the current site of the

22 floating buoys in the Rio Grande River that are subject of this

23 case?

24            MR. LYNK:  Object to form.

25            You can answer.

1    A.    Could you answer -- could you repeat that -- the
2    first part of that, at least, so...
3        Q.    (BY MR. BRYANT)  Okay.  And I'm happy anytime when
4    I -- if I don't make myself clear to repeat and/or try to
5    clarify my question.  I understand that you did not observe any
6    commercial navigation or evidence of commercial navigation at
7    the floating buoy site that day.  I'm now asking whether or
8    not, through other means, you have received any information
9    regarding any present, past or future commercial navigation at
10   that floating buoy site?
11       A.    So I -- I'm not aware of that personally in my role
12   in the Regulatory Division.
13       Q.    Okay.
14       A.    So...
15       Q.    And so I'm -- so we're clear, when I -- when you say
16   "personally," are you including any reports you may have
17   received from other people, either written or in other forms?
18       A.    Correct.
19       Q.    Okay.  Now, when you met with Mr. Mario Gomez on
20   July 13th, 2023, what discussion did you have?
21       A.    We discussed his -- obviously, his document that he
22   supplied to the Corps and where he took the photographs, and
23   his -- his regurgitation of what he observed at the time.  We
24   also discussed, obviously, some logistics about where we were
25   going to go or the plan of where we -- where we might go during

1  the site visit, and what we might see at various points on the

2  site visit.

3      Q.   Have you read Mr. Gomez's declaration in this matter?

4      A.   I have not.

5      Q.   Okay.  Do you recall anything else of your

6  conversation with Mr. Gomez on that occasion beyond what you've

7  already told me?  And let me clarify.  When I say "your

8  conversation," that would include Mr. Lebsock's conversation

9  with Mr. Gomez or anyone else who was present at the time and

10  you witnessed.

11     A.   So I -- I do recall some conversation between his

12  counterpart, Mr. Gomez's counterpart from Mexico.  I wasn't

13  really a party to this -- I didn't participate in this

14  conversation.  I don't believe Mr. Lebsock participated in the

15  conversation either, but I do remember Mr. Gomez translating,

16  you know, his -- Enrique's Spanish, saying -- you know, giving

17  his observations about what he observed from the Mexican side

18  of the river, and photographs that he had taken.  Other than

19  that, I don't remember specifics.

20     Q.   Okay.

21     A.   Yeah.

22     Q.   If I understand correctly, there was a first part of

23  the conversation that did not include the gentleman you refer

24  to as Enrique; is that correct?  A part of the conversation

25  before he arrived in Texas?

1      A.    Oh, yes.

2      Q.    Okay.  And who was present for that conversation?

3      A.    Myself, Mario Gomez and Mr. Lebsock.

4      Q.    Okay.  No one else was present for any part of that

5  conversation?

6      A.    Are you referring to a specific conversation or

7  just...

8      Q.    No.  Just the --

9      A.    No, I don't --

10     Q.    -- any conversations that you had with Mr. Gomez and

11 Mr. Lebsock on that occasion.

12     A.    That's -- that's correct.

13     Q.    Okay.  And about how much later was the conversation

14 that included the gentleman referred to as Enrique?

15     A.    I don't know for sure, but I'm going to say about an

16 hour.

17     Q.    Okay.  Was that also at the Shelby Park site?

18     A.    It was outside the Shelby Park site.

19     Q.    Okay.

20     A.    Yeah.

21     Q.    What's your best description of where it occurred?

22     A.    On the -- on the street outside the Shelby Park site.

23     Q.    Okay.  And who was present for that conversation, if

24 anyone, besides Mr. Gomez, Mr. Lebsock, Enrique and yourself?

25     A.    No one.

Q.   Okay.  And what was conveyed to you by Mr. Gomez that

had been said by the gentleman referred to as Enrique?

A.   So you have to understand when he's translating from

Spanish, my Spanish is rudimentary, so I'm getting bits and

pieces, and Mr. Gomez is giving truncated, you know, account of

what Enrique is telling us.  Basically, he's just getting --

giving some information about Enrique's observation from the

other side about how he saw and heard construction activity

and -- but I don't remember over what time frame Enrique was

referring to.

And also, he said something about that there may

be some -- he couldn't identify a noise some piece of equipment

was making, and I remember some conversation going back and

forth about -- that didn't involve me, about what piece of

equipment or multiple pieces of equipment that might be

involved in that.

There was also some conversation about the

Mexican side of the IBWC using -- or potentially use a drone,

but I have no idea if that was previous use or planned use,

so...

Q.   I think you mentioned earl- -- strike that.

Is there anything else that you can recall of

that conversation?

A.   I don't recall anything -- yeah.

Q.   I think you mentioned that some information that

1   Enrique or others on the Mexican side of the commission had

2   taken some photographs.  Were any photographs provided to --

3   either to Mr. Gomez or to the Army Corps of Engineers from the

4   Mexican side?

5       A.   I'm not aware of any.

6       Q.   Okay.  Is that true today?

7       A.   I'm not aware of any, that's correct.

8                MR. BRYANT:  Why don't we take a short break --

9                MR. LYNK:  Sure.

10               MR. BRYANT:  -- if that's okay with you?

11               MR. LYNK:  Yeah.  That's great.

12               THE REPORTER:  We're going off the record at

13  10:55 a.m.

14               (Break taken from 10:55 a.m. to 11:05 a.m.)

15               THE REPORTER:  We are back on the record.  The

16  time is 11:05 a.m.

17      Q.   (BY MR. BRYANT)  Mr. Shelnutt, I'm looking at

18  Exhibit 2, which is your declaration, and at Paragraph 8, it

19  says, quote, I made a site visit to Eagle Pass to investigate

20  the placement of the floating barrier on July 13th, 2023.  Is

21  it correct that that was not the only reason for your visit on

22  that occasion?

23      A.   That's correct.

24      Q.   And one additional reason was to -- to review the

25  area near Shelby Park?

Case 1:23-cv-00853-DAE Document 18 Page: 132 Date Filed: 09/07/2023
Case 1:23-cv-00853-DAE Document 18 Filed 08/07/23 Page 209 of 238
Joseph Shelnutt - 8/7/2023

37

1    A.   That's correct.

2    **Q.   Were there any other reasons?**

3    A.   Other than to -- excuse me.  Other than to view the

4  location where the floating buoys are, those are the two

5  objectives.

6    **Q.   Okay.  And Paragraph 8 states, in part, quote, We met**

7  **with a U.S. representative and a Mexican representative from**

8  **the International Boundary and Water Commission, and they**

9  **accompanied us on the site visit.  Did the Mexican**

10  **representative from the International Boundary and Water**

11  **Commission accompany you and Mr. Lebsock on the site visit to**

12  **the site of the floating buoys?**

13    A.   Yes.

14    **Q.   And did Mr. Gomez also do so?**

15    A.   Yes.

16    **Q.   About how long were the group of you at the site of**

17  **the floating buoys on that day?**

18    A.   So we were there twice.  Okay?  Initially, it was

19  just Mr. Lebsock, Mr. Gomez and myself, and then we left to

20  meet Enrique from Mexico, had the conversation we discussed

21  earlier, and then we went back to the site where the floating

22  buoys were.  So your question is how long with those two

23  combined?

24    **Q.   That was my question, but I'll also ask you, how long**

25  **was each one?**

1    A.   Sure.   They were approximately the same length,

2    approximately 30 minutes each.   I didn't time it, so that's --

3    good.

4    **Q.   When I first read your declaration, Mr. Shelnutt,**

5    **when you said, quote, We met with a U.S. representative, I**

6    **thought that might refer to a member of Congress.   But am I**

7    **correct that you didn't meet with any members of Congress when**

8    **you had your site visit on July 13th, 2023?**

9    A.   We met with no members of Congress on that date.

10   **Q.   Okay.   Did you meet with any government officials**

11   **aside from the ones that you've already named?**

12   A.   No.

13   **Q.   Have you met with any Congress people or government**

14   **officials relating to the floating buoy sites at any other**

15   **time?**

16   A.   No.

17   **Q.   Have you communicated with any government officials**

18   **or elected officials regarding the floating buoy sites at any**

19   **other time?**

20   A.   No.

21   **Q.   To your knowledge, has anybody in the Corps of**

22   **Engineers met with elected officials or other government**

23   **officials regarding the floating buoy sites at any point today?**

24            MR. LYNK:   Object to form.

25   A.   I'm not aware of that.

Case 1:23-cv-00632-DAE Document 18 Page: 134 of 283 Filed 09/07/2023
Case 1:23-cv-00632-DAE Document 18 Page: 134 of 283 Filed 09/07/2023
Joseph Shelnutt - 8/7/2023
39

1    Q.   (BY MR. BRYANT)  Do you recall any conversation that

2  was had with the Mexican representative referred to as Enrique

3  when he was present at the site of the floating buoys on

4  July 13th, 2023?

5    A.   The only -- the only communication I can remember

6  that happened between myself and Enrique had to do with his

7  operation of some range-finding equipment and measurement of,

8  you know, the buoys.

9    Q.   Tell me what you recall in that regard.

10    A.   It was simply a -- a struggled, broken Spanish,

11  broken English conversation where he was trying to operate

12  and -- and figure out how to operate and tell me -- ask me how

13  to operate his range-finding equipment.

14    Q.   He had range-finding equipment with him at the time?

15    A.   He had a small range-finding device.

16    Q.   Okay.  Did -- did Enrique or you succeed in getting

17  any data from the range-finding equipment on July 13th, 2023?

18    A.   Yes.

19    Q.   What data did you get?

20    A.   We calculated the length of the buoy structure at the

21  time at approximately -- and this is very approximately, 450

22  feet.

23    Q.   Anything else that you learned from the range-finding

24  equipment?

25    A.   I know that Enrique was trying to ascertain the

40

1    channel width at that location.

2        Q.    What, if any, information did -- did you understand

3    he obtained in that regard?

4        A.    I understood that he was successful in gaining some

5    channel width information at that location, but we didn't

6    gather that information.

7        Q.    Okay.

8        A.    And by "we," I mean myself, and the Regulatory

9    Division here.

10       Q.    And you don't recall anything he said as to the width

11   of the channel at that point?

12       A.    I don't recall.

13       Q.    Did you or anybody else from the Army Corps of

14   Engineers do anything to either measure or estimate the width

15   of the channel of the Rio Grande River at the point where

16   there -- the floating buoys are located?

17       A.    There were some mixed conversation about that between

18   Mr. Gomez, Enrique and Mr. Lebsock as well, along the same

19   general lines as I've just described.

20       Q.    Well, as you sit here today, do you have access to

21   either a measurement or an estimate of the width of the channel

22   of the Rio Grande River at the point of the floating buoys

23   current site?

24       A.    Yes, through our remote sensing tools that we

25   mentioned earlier.

Case 1:23-cv-00853-DAE Document 138 Filed 09/07/23 Page 186 of 289
Case 1:23-cv-00632-DII Document 136 Filed 08/09/23 Page 186 of 289
Joseph Shelnutt - 8/7/2023
41

1   Q.   And what is that?

2   A.   I don't recall the exact width of the channel there.

3   Q.   Do you recall the approximate width?

4   A.   It would be speculation without looking at my notes.

5   Q.   Do you know the current length of the floating buoys,

6   either precise or -- either measured or estimated?

7   A.   I do not.

8   Q.   In Paragraph 10 of your declaration, which is

9   Exhibit 2, it states that, quote, From the bank, we observed

10   orange spheres with a 4 to 6-foot diameter being installed in

11   shallow water of the Rio Grande with the use of an excavator

12   supported by individuals standing on the riverbed, two

13   airboats, and large type watercraft.  Did you do any measuring

14   or estimation of the depth of the water of the Rio Grande where

15   the floating buoys were located on July 13th, 2023?

16   A.   The only estimation we did of the water depth at that

17   approximate location was a scale of an individual standing or

18   individual standing in the water against the height of the

19   water on their body.

20   Q.   And approximately was -- what was the height of the

21   water based on that estimation?

22   A.   Very -- very approximately, knee height to waist

23   height at that time.

24   Q.   Okay.  So is it correct that what you observed was

25   the -- that the -- the depth of the water at the point where

1  the floating buoys were installed was approximately knee to

2  waist high for an adult person?

3     A.   Yes.

4     Q.   Would it be fair to say that's, roughly, a foot and a

5  half to three feet?

6          MR. LYNK:  Object to form.

7     A.   Where the individuals were standing, I could agree

8  with that.

9     Q.   (BY MR. BRYANT)  Okay.  And you didn't make any

10  measurements as to other locations where the floating buoys

11  were?

12     A.   No --

13     Q.   You had no -- no basis to estimate that?

14     A.   No.  That's correct.

15     Q.   Have you or anybody at the Corps of Engineers made

16  any other measurements or estimates of the depth of the water

17  at the site of the floating buoys currently at any other time?

18     A.   I have not.  I'm not aware of others.

19     Q.   Okay.  In Paragraph 10 of your declaration, you

20  mention the presence of an excavator.  Is that the machine that

21  is depicted in the photograph on Page 3 of Exhibit 2?

22     A.   Yes.  It's the piece of equipment with the bucket

23  attached to it.

24     Q.   Okay.  And did you see any actual excavation or

25  evidence of excavation at or near the site of the floating

1 buoys on July 13th, 2023?

2     A.   At the time I was present at the site, I did not see

3 that.

4     Q.   Okay.  Have you ever seen any evidence of excavation

5 in connection with the current site of the floating buoys in

6 the Rio Grande River?

7     A.   With regard to the site of the floating buoys, no.

8     Q.   Okay.  Did you see any evidence of any fill in the

9 Rio Grande River at the site of the floating buoys in Maverick

10 County, Texas on July 13th, 2023?

11     A.   From my vantage point, I could not identify a fill in

12 the Rio Grande River.

13     Q.   Have you ever received information or seen any

14 evidence of any fill in the Rio Grande River at or near the

15 site of the floating buoys in the Rio Grande River as they're

16 currently located?

17     A.   I do not have any information to that effect at this

18 time.

19     Q.   Okay.  Did you see what you referred to as an

20 "excavator" doing any work at the site of the floating buoys on

21 July 13th, 2023, that did not involve actual excavation?

22     A.   So could you repeat that one more time?

23     Q.   I'll try.

24     A.   Okay.

25     Q.   When you were there on July 13th, 2023, did you see

1    the excavator or the machine you just -- you identified as an

2    excavator doing some other work that did not involve actual

3    excavation?

4         A.   Yes.

5         Q.   And what work did you see that -- that machine or

6    equipment do?

7         A.   Transporting buoys from an upstream location, I

8    assume that was on the upland site to the work site in the

9    river to install, you know, another chain of -- of buoys to the

10   existing floating buoys.

11        Q.   Okay.  So as I -- as I look at the photograph on

12   Page 3, I see a machine that appears to have -- to have what I

13   would call a "bucket" that is of the kind that I've seen used

14   for excavation.  If I understand you correctly, you did not see

15   that used for excavation that day, but did you see that bucket

16   used just to transport and place buoys in the river?

17        A.   Correct.

18        Q.   Did you see it do anything else?

19        A.   Not while I was present, no.

20        Q.   Okay.  Have you ever received any information that

21   any excavator or other equipment was used to do anything at the

22   floating buoy site other than carry and place floating buoys?

23        A.   I'm not aware of anything else.

24        Q.   Okay.  In Paragraph 10 of your declaration, you also

25   mention airboats.  Are airboats -- are those the airboats that

1   are depicted in the photograph on Page 3 of Exhibit 2?

2        A.   That's correct.

3        Q.   And when you refer to an airboat, how -- what would

4   you -- how would you describe that or define it?

5        A.   It'd be a vessel with a fan mounted in the rear of

6   the vessel that propels the vessel forward.

7        Q.   Okay.  And as you understand it, are airboats

8   watercraft that are used where the depth of the water may be

9   shallow or nonexistent, so that you have to have a propeller up

10  out of the water to -- to propel them?

11       A.   I'm aware, in my experience with airboats, is they

12  can be used in shallow water.

13       Q.   Okay.  And did that appear to be the kind of water

14  that the two airboats were operating in on July 13th, 2023, at

15  the site of the floating buoys?

16       A.   Well, the airboats were in various positions while I

17  was there.  Some of it may be characterized as shallow.  Other

18  depths, I'm not aware of according to where they were

19  positioned at the time.  Yeah.

20       Q.   Okay.  You also referred to in Paragraph 10 of your

21  declaration that's Exhibit 2, quote, barge-type watercraft,

22  unquote.  Is that -- is the boat that you refer to as a

23  "barge-type watercraft" also depicted in the photograph on

24  Page 3?

25       A.   It is.

1    Q.   Is it -- strike that.

2              What, if anything, did you observe that

3    watercraft doing on July 13th, 2023?

4    A.   The barge-type watercraft was, I believe, stationary

5    the entire time I was there.  So I didn't -- I assumed it was

6    stabilizing the buoy system at that point in the structure, but

7    I don't know what it was doing, so...

8    Q.   Okay.  On July 13th, 2023, did you see any other

9    watercraft or types of watercraft than those depicted in the

10   photograph on Page 3 of Exhibit 2?

11   A.   I don't recall.

12   Q.   Could you describe what you observed of the use of

13   the land on the Texas side at the site of the floating buoys on

14   July 13th, 2023?

15   A.   From -- from my vantage point during the site visit

16   on that date, I could see that there was concertina wire along

17   the riverbank.  There was a portion immediately land side of

18   the river, and land side of that concertina wire that appeared

19   to be used as a -- as a road, but I don't know how -- I don't

20   know if that road connected anywhere.  More concertina wire, I

21   could see upstream and downstream in various positions.

22   Q.   Okay.

23   A.   Yeah.

24   Q.   Did you see any evidence at all of any commercial

25   activities on the Texas side of the river at the floating buoy

1   site on July 13th, 2023?

2        A.   I'm not aware of any.

3        Q.   And you stood over there, right?

4        A.   I stood?

5        Q.   On the Texas side of the river as you made your

6   observations?

7        A.   That's correct.

8        Q.   And looking up and down the river, did you see any

9   docks or piers or any other evidence of -- of commercial

10  navigation at that floating buoy site?

11       A.   I don't recall seeing anything of that nature.

12       Q.   As you looked over to the Mexican side of the

13  Rio Grande at the floating buoy site, if you did, did you see

14  any evidence of commercial activity?

15       A.   I don't recall seeing anything of that nature there

16  either.

17       Q.   Have you ever, at any other time, seen or received

18  any evidence of any commercial activities at or near the

19  floating buoy site on the Texas side of the Rio Grande River?

20       A.   No.

21       Q.   And you mentioned that there's concertina wire on

22  that side of the Rio Grande River.  How did you avoid or get

23  past that, or did you?

24       A.   We did not.

25       Q.   Okay.  So about how far away from the bank of the

 1  river were you and Mr. Gomez and Mr. Lebsock and the gentleman

 2  we refer to as Enrique when you made your observations on

 3  July 13th, 2023?

 4      A.   My estimate is 50 to 75 feet.

 5      Q.   Is it correct that you did not make any effort to get

 6  closer access to the work on that date?

 7      A.   That's --

 8      Q.   "You," meaning all four of you?

 9      A.   That's correct.

10      Q.   Now, had -- prior to your site visit on July 13th,

11  had you concluded that the portion of the river where the

12  floating buoys were located was subject to the jurisdiction of

13  the Army Corps of Engineers?

14      A.   Yes.

15      Q.   How did you do that, how did you arrive at that

16  conclusion?

17      A.   The Rio Grande at that location is a Section 10 water

18  under the Rivers and Harbors Act of 1899, and is within our

19  jurisdiction under that act.

20      Q.   And my question --

21      A.   Additionally, it is a perennial water of the United

22  States under Section 404, The Clean Water Act.

23      Q.   How did you conclude, prior to the site visit, that

24  the location where the floating buoys are located was subject

25  to the jurisdiction of the Corps of Engineers under Section 10

 1  of the Rivers and Harbors Act of 1899?

 2          MR. LYNK:  I'll object that this is beyond the

 3  scope of what the Court authorized limited discovery for today,

 4  but you can answer the question.

 5      A.   So the Rio Grande River is on an established list of

 6  navigable waters within Texas -- within our area of

 7  responsibility at the Fort Worth District.

 8      Q.   (BY MR. BRYANT)  Okay.  Anything else?

 9      A.   That list is derived from studies that indicate

10  whether a water body is a Section 10 navigable water.

11      Q.   Okay.  Anything else?

12      A.   No.

13      Q.   Have you ever seen or read a -- any study related to

14  the portion of the Rio Grande River where the floating buoys

15  are located?

16      A.   We -- have I ever seen or read?

17      Q.   Yes.

18      A.   That's the question?

19      Q.   Yes.

20      A.   Yes.

21      Q.   Okay.  What -- could you describe that?

22      A.   Yes.  It would be the study that was performed, and I

23  don't remember the date, that codifies the Rio Grande River as

24  a Section 10 traditional navigable water under the Rivers and

25  Harbors Act of 1899.

Case 1:23-cv-06032-DLC   Document 18   Filed 08/10/23   Page 195 of 238
Case 1:23-cv-06853-DLC   Document 18   Filed 09/07/2023
Joseph Shelnutt - 8/7/2023

50

1    Q.   Okay.  Have you read that study?

2    A.   I have not read that study in its entirety.

3    Q.   When did you partially read it, if at all?

4    A.   So sometime, and this is very approximate, after -- I

5    believe, after July 13th.

6    Q.   And what, specifically, do you recall from your

7    partial reading of the study after July 13th, 2023?

8    A.   Confirming the title and the date, and, generally,

9    the contents.

10   Q.   Could you explain what you mean by "the title"?

11   A.   Verifying that that was a document -- correct

12   document.

13   Q.   Okay.  And what title did it have that confirmed to

14   you it was the correct document?

15   A.   I don't remember the specific title of the document.

16   Q.   Okay.  And you also said you read the dates.  What

17   dates do you refer to?

18   A.   The date the document would have been generated.

19   Q.   Okay.  And what was that?

20   A.   I don't recall the exact date.

21   Q.   What do you recall as the date, approximately, if

22   anything?

23   A.   That'd be total speculation now.

24   Q.   Okay.

25   A.   Yeah.

51

```
 1        Q.   And what do you recall of the portion of the study
 2   that you read?
 3        A.   I didn't read specific technical data in the report.
 4        Q.   What do you recall of what you did read?
 5        A.   There were maps presence -- present.  It was signed
 6   and dated.
 7        Q.   When you say the -- "it was signed and dated," are
 8   you referring to the maps or the study?
 9        A.   The study.
10        Q.   Okay.  But you don't recall the approximate date?
11        A.   I do not.
12        Q.   Okay.  Did you determine that the study that you
13   looked at after July 13th, 2023, was a study that specifically
14   related to the portion or segment of the Rio Grande River where
15   the floating site -- buoys are sited at currently?
16        A.   Yes.
17        Q.   What did it say that caused you to come to that
18   conclusion?
19        A.   It gave a -- the map portion of it that identified
20   the Rio Grande in its location and its length.
21        Q.   Okay.  So was this a study that concluded that the
22   entire length of the Rio Grande was covered?
23        A.   Not the entire length.
24        Q.   Okay.  What part was not covered, according to the
25   study?
```

Case 1:23-cv-00632-DII   Document 18   Page: 197   Date Filed 09/07/2023
Case 1:23-50632   Document 53-1   Document 18   Page: 197   Date Filed 09/07/2023

Joseph Shelnutt - 8/7/2023

52

1    A.   I'm not entirely sure.

2    **Q.   Aside from looking at a map that showed it as**

3    **covered, do you recall any text that you read that stated that**

4    **any portion of Maverick County was covered by the study's**

5    **conclusions?**

6              MR. LYNK:  Object to form.

7              You can answer.

8    A.   So -- so as -- as previously discussed, you know, my

9    objective for encountering this document was to confirm that

10   we -- we actually possessed the document locally.  And so I did

11   not read any technical aspects of the document.

12   **Q.   (BY MR. BRYANT)  Did you obtain any information as to**

13   **who were the authors of the document?  And the document I'm**

14   **referring to is the study that you looked at.**

15   A.   No.

16   **Q.   Do you know if that document or study was prepared in**

17   **the 21st century?**

18   A.   Meaning after?

19   **Q.   After the ball dropped on New Year's 2000?**

20   A.   Of -- my under- -- that'd be speculation too.  I'm

21   not --

22   **Q.   Okay.  Do you know if that study was prepared in**

23   **the -- in the 20th century?**

24             MR. LYNK:  Object to form.

25   A.   I'm not entirely sure, but I believe so.

1    Q.    (BY MR. BRYANT)  Okay.

2    A.    Yeah.

3    Q.    Is it fair to say that in concluding that the area

4  where the floating sites -- the floating buoys are currently

5  sited, you're relying on the list that the Army Corps of

6  Engineers compiled, and the existence of studies by unknown

7  persons that the Corps keeps as backup for that list?

8    A.    That's correct.

9    Q.    And you don't have any personal knowledge of that

10  otherwise?

11    A.    So could you clarify, any personal knowledge of?

12    Q.    Of whether that body of water is -- where the -- the

13  buoys are located is subject to Section 10 of the Rivers and

14  Harbors Act of 1899?

15    A.    So the knowledge I do have is the long established

16  list that we use on a daily basis to -- to refer to traditional

17  navigable waters under Section 10 of the Rivers and Harbors Act

18  of 1899.  So I trust and affirm that that list is accurate.

19    Q.    Okay.  And you didn't do anything else other than

20  what you've described to arrive at the conclusion of coverage?

21    A.    That's correct.

22    Q.    Okay.  Based on what you observed on July 13th, 2023,

23  and any other information that you have, do you know if the

24  floating buoys that are the subject of this action are in any

25  way structurally built into the bed of the Rio Grande River?

54

1    A.    I don't have any firsthand knowledge of how -- no.

2    **Q.    Okay.  Do you have any secondhand knowledge?**

3    A.    No.

4    **Q.    Okay.  So you don't know whether the floating buoys**

5    **are part of some structure in the bed of the river there?**

6    A.    We don't have information to make those

7    determinations, no.

8    **Q.    Okay.  Do you have any knowledge either first- or**

9    **secondhand as to whether or not the floating buoys at that site**

10   **are temporary or permanent?**

11   A.    So again, we don't have any -- any information that

12   makes us -- so we can make a determination to that effect.

13   **Q.    And is it correct that as of this date, to your**

14   **knowledge, the Army Corps of Engineers has not contact- --**

15   **contacted the State of Texas or any representative thereof to**

16   **get any information about whether the site of the floating**

17   **buoys is one in which there's been any kind of structural**

18   **attachment to the riverbed or any kind of building?**

19                    MR. LYNK:  Object to form.

20                    You can answer.

21   A.    So I don't have any knowledge outside of our

22   Regulatory Division here in the Fort Worth District.  I have

23   not had any contact to that effect, so...

24   **Q.    (BY MR. BRYANT)  Okay.  And I just want to be sure I**

25   **understand your answer.  You said that there's no knowledge**

1    outside of the Regulatory Division.  Is there knowledge on that

2    subject within the Regulatory Division by people other than

3    yourself personally, to your knowledge?

4         A.   I'm not aware of it.

5         Q.   Okay.  And is it also true that to the best of your

6    knowledge, there's nobody in the Fort Worth Division of the

7    Army Corps of Engineers who has sought any information from the

8    State of Texas about whether the floating buoys are temporary

9    or permanent?

10              MR. LYNK:  Object to form.

11              You can answer.

12        A.   I don't have that information.

13              MR. BRYANT:  Let's go off the record for a

14   second.

15              THE REPORTER:  Going off the record at

16   11:41 a.m.

17              (Break taken from 11:41 a.m. to 11:42 a.m.)

18              THE REPORTER:  We are going back on the record

19   at 11:42 a.m.

20        Q.   (BY MR. BRYANT)  Mr. Shelnutt, based on what you saw

21   on July 13th, 2023, or any other information you have, do you

22   have any reason to believe that the floating buoys at their

23   current site have altered or modified the course of the Rio

24   Grande River?

25        A.   So I don't have any information to understand that

1  the course of the river or mod- -- modification of the course

2  of the river has occurred.

3      Q.   Based on what you observed on July 13th, 2023, or

4  from any other sources, do you have any reason to believe that

5  the floating buoys, as they're currently located, interfere

6  with any navigation up and down the Rio Grande River?

7      A.   Yes.

8      Q.   What is that reason?

9      A.   So if you refer to 33 CFR 322.3, I believe,

10 Activities Requiring Permits.  So -- and I'm paraphrasing here.

11     Q.   Okay.

12     A.   So the navigable capac- -- navigable capacity of the

13 river, if it's affected by work or structures in the river,

14 requires a permit.  So that being said, for example, if a -- an

15 applicant were to come to us, and they have, for work in, over

16 or under a Section 10 water, under the Rivers and Harbors Act

17 of 1899, that requires a permit, because even a structure under

18 the river, that was tunneled under the river that didn't impact

19 the water course at all, but it was under the river, that

20 requires a permit too, because that's considered to affect the

21 navigable capacity of the river.

22          So in this case we have a -- a structure of

23 floating buoys that's actually in the water, and could present

24 a -- a -- an effect to navigation or the navigable capacity of

25 the water body.

1     Q.   I understand that you -- you have been trained and --

2  and no doubt spent a lot of time being aware of and applying

3  the Corps of Engineers regulations.  My question was more of

4  a -- just a common sense question that does not apply to those

5  or to the technical term "navigable capacity."  And it is

6  whether the buoys, as they're currently located in the Rio

7  Grande River, do you have any reason to believe they actually

8  interfere with any navigation up and down the river?

9     A.   So -- so I have to -- I have to rely on, in my

10  capacity in the -- in the Regulatory Division here in Fort

11  Worth, I have to rely on my capacity as a regulator and refer

12  to the regulations.  Also, I -- I know very little, and

13  certainly not an expert about navigation or -- or all the

14  various expertise that may go into determining if something is

15  or is not, on a layman's basis, an obstacle.  So I don't think

16  I can speak to that, so...

17     Q.   Okay.  Now, you used the term "navigle-" --

18  "navigable capacity."  What do you understand that to mean?

19     A.   Effects to navigation.  So in this case, I cannot say

20  that there's no effect to the navigable capacity of the river

21  due to the structure that we're discussing in the river at that

22  location.

23     Q.   Based on what you have observed and otherwise

24  learned, do you have a reason to believe that the floating

25  buoys, as they are currently sited, actually and substantially

1  interfere with any navigation up and down the Rio Grande River?

2  　　　　　MR. LYNK:  I'm going to object to form.

3  　　　　　You can answer.

4  　　A.　So I'll state again, in my capacity as a regulator, I

5  have to refer to and follow the regulation in our normal

6  capacity as regulators.  And, you know, requiring -- or

7  authorizations for such structures, this is a -- the typical --

8  this may not be a typical one in its -- in its current form

9  we're discussing today, but typically, when people come to us

10  or we -- we determine that there's a structure in a navigable

11  water, you know, we evaluate the capacity of it to obstruct or

12  potential to obstruct navigation in that area, so I would see

13  as no different here.

14  　　　　　MR. BRYANT:  Objection, nonresponsive.

15  　　Q.　(BY MR. BRYANT)  Have you or anybody else at the

16  Corps of Engineers, to your knowledge, ever received any report

17  or complaint that the floating buoys have caused a problem of

18  any kind for any watercraft going up and down the Rio Grande

19  River?

20  　　A.　I'm not aware of that.

21  　　Q.　Okay.  If somebody places a single buoy in the Rio

22  Grande River, is it your understanding that that requires a

23  permit from the Corps of Engineers?

24  　　A.　That's not enough information for me to make a

25  determination on it.

1      Q.   What additional information would you need?

2      A.   Method of placement, purpose of the placement, how

3 it's anchored, the location, various other aspects of it.

4 Is -- is it permanent or temporary, for example, so...

5      Q.   **In your conversation with Mario Gomez or the**

6 **gentleman we've referred to as Enrique, did they express any**

7 **concern to you or Mr. Lebsock, to your knowledge, about the**

8 **floating buoys actually interfering with any navigation in the**

9 **Rio Grande River?**

10     A.   I know that there was concern, but I don't know the

11 nature of the concern.

12     Q.   **Have you or anybody else at the Army Corps of**

13 **Engineers, to your knowledge, received any complaints about the**

14 **floating buoys of a political nature related to Mexico's**

15 **reaction to them?**

16     A.   So could you -- could you state that again?

17     Q.   **Okay.  Have you or anybody else at the Corps of**

18 **Engineers, to your knowledge, received any communications of a**

19 **political nature from any representatives of Mexico,**

20 **representatives in the U.S. or the government of Mexico about**

21 **political problems caused by the existence of the floating**

22 **buoys in the Rio Grande River?**

23              MR. LYNK:  I'm going to object that that

24 question is beyond the scope of the authorized discovery topic,

25 as well as very compound.

1          You can answer, if you know the answer.

2     A.   I'm not aware of that.

3     Q.   (BY MR. BRYANT)  Have you ever seen any evidence

4  of -- or heard any reports of any kind of lawful cross-river

5  traffic at the site of the floating buoys in Maverick County on

6  the Rio Grande River?

7     A.   I'm not aware of that.

8     Q.   Are you aware of unlawful traffic across the Rio

9  Grande River at the site of the floating buoys before the buoys

10 were there?

11    A.   No.

12    Q.   Are you aware that the floating buoys in Maverick

13 County are within a disaster area declared by the governor of

14 Texas related to illegal drug smuggling, human trafficking,

15 terrorist infiltration and illegal immigration?

16         MR. LYNK:  Object as beyond scope.

17         You can answer.

18    A.   I'm not aware of that.

19    Q.   (BY MR. BRYANT)  Are you aware that the Department of

20 Homeland Security has determined that the area where the

21 floating buoys were located is a area of intensity for drug

22 smuggling?

23         MR. LYNK:  Same objection.  You can answer.

24    A.   I'm not aware of that.

25    Q.   (BY MR. BRYANT)  If you were aware of it, would it

 1  make any difference to you in your -- in your assessment of

 2  whether or not the floating buoys require a permit under the

 3  Section 10 of the Rivers and Harbors Act?

 4      A.   I'm not aware that it would at all.

 5      Q.   Yeah.  Based on what you observed and otherwise know

 6  about the floating buoys in the river at -- that are the

 7  subject of this lawsuit, based on the current location, would

 8  you refer to them as a "pier"?

 9      A.   No.

10      Q.   Would you refer to them as a "wharf"?

11      A.   No.

12      Q.   Would you consider them a "breakwater"?

13      A.   No.

14      Q.   Would you consider them a "bulkhead"?

15      A.   No.

16      Q.   Would you consider them a "weir"?

17      A.   No.

18      Q.   Would you consider them a "dolphin"?

19      A.   No.

20      Q.   Would you consider them a "jetty"?

21      A.   No.

22      Q.   Would you consider them a "boom"?

23      A.   No.

24      Q.   Have you ever either done any work yourself or

25  received any information regarding the historical uses of the

 1  Rio Grande River for commercial navigation anywhere in the

 2  vicinity of the current location of the floating buoys?

 3      A.   No.

 4      Q.   If somebody applies for a permit from the Corps of

 5  Engineers for a project, generally, of -- of the nature of the

 6  floating buoys, as you understand them, approximately what time

 7  range would you think would be necessary for the Corps to act

 8  on such permit?

 9      A.   Well, first, I'd have to understand what the

10  applicant was seeking to do within the water body, and we

11  simply don't have enough information to really respond to

12  that -- that question accurately for time frames, because it --

13  it could go, depending if it -- if it fit under a certain

14  regulatory or permitting pathway, it could take less time.  Or

15  if it had to -- had to have more review, it could take a little

16  longer time frame.  But at this point, since we don't have an

17  application with information about the project, various aspects

18  of the project, we simply don't have a -- I don't see how we

19  can answer that question right now.  I'm sorry.

20      Q.   Okay.

21      A.   Yeah.

22      Q.   And I certainly understand you can't answer that

23  question with precision.  I don't even want you to -- I'm not

24  even asking you about that specific project.  But typically,

25  when you say "less time" or "more time," what kind of range is

 1  that for processing and issuing a permit by the Corps of

 2  Engineers for a project very generally similar to the floating

 3  buoys?

 4      A.   Well, I can give you -- maybe the best way to answer

 5  this is two possible scenarios, and I'm not indicating that

 6  it's one of the two at all --

 7      Q.   Fair enough.

 8      A.   -- or something else.  If someone approached us for a

 9  project -- proposed a project in waters such as the Rio Grande,

10  if the impact was of such a nature, it might fit under a -- one

11  of the nationwide permits, which we're required to give a

12  response within 45 to 60 days of the -- of when we consider the

13  application federally complete.  If it won't fit under -- in

14  one of the existing nationwides, then it would go to what's

15  called a standard individual permit.  There is a 120-day goal

16  of rendering a decision once it's considered federally

17  complete.

18      Q.   Thank you.  And I -- I know that that term "federally

19  complete" is, kind of, a term of art.  Could you explain for

20  somebody like me who's not really familiar with it all that is

21  involved in going from an initial expression of interest and

22  getting a permit, to getting a permit that is, quote, federably

23  [sic] -- federally complete, unquote?

24      A.   Sure.  Well, we would need all the required, you

25  know, information about the project, dimensions, cubit yards of

1  fill, acres of fill, linear feet of fill, if it's fill, all the

2  maps and figures that go with that, plus, you know, the text

3  description that would go with that.  We'd also need an

4  understanding of, you know, is there compensatory mitigation

5  involved or is there none, state that.  You know, if it -- if

6  it rose to a limit requiring that.

7             Understand, I'm simply describing it in general

8  here.  I'm not speaking to what's -- what may be required for

9  the floating buoys at this location at this time.  Our review

10 would also include things like, you know, the Endangered

11 Species Act, would there be an impact to federally listed

12 species at this location.  That could entail coordination with

13 the U.S. Fish and Wildlife Service.

14             Also the historic -- I'm sorry -- the -- yes,

15 the Historic Preservation Act.  There needs to be a review

16 there.  That's routine for that to happen.  That'd be

17 Section 106 of the Historic Preservation Act.  And that's

18 typical for all -- those sorts of reviews are typical for both

19 general permits or nationwide permits, and standard individual

20 permits too.

21             So in general, that's what is required.  There's

22 more detail, depending on the nature of the project.  I mean,

23 you could imagine some of these projects are simple in nature,

24 and they don't require a lot of elaboration if they're simple

25 in nature.  Some are more complex and require a lot of

65

1  elaboration or clarification and coordination with other

2  federal -- could entail coordination with other federal and

3  state agencies.

4  **Q.  So all that you just described to me are things that**

5  **happen prior to the time that an application is deemed**

6  **federally complete?**

7  A.   Not all of that, but it does affect our ability to

8  render a decision.  So you can still -- there can still be --

9  determined to be federally complete, which is a lower bar than

10  being able to make a decision.  So for example, if -- if we had

11  everything that we needed in this theoretical project, but

12  there still needed to be coordination with, say, the Fish and

13  Wildlife Service for a potential impacted list of species,

14  Fish and Wildlife Service would be coordinating with us, we

15  would be coordinating with them.  Whoever the lead federal

16  agency is would be coordinating with them.  And then they would

17  have to go through their process.

18             So we could be federally complete, but we still

19  have to wait on their process till they're -- till they're done

20  with that, and that usually entails a biological assessment

21  about the project and they would -- it may entail them

22  producing a biological opinion, but not always necessary.  But

23  whatever decision of coordination, we have to wait for the end

24  of that to play out.

25             And if that's all we're waiting on, then we can

1  go ahead and render our federal decision in writing right

2  immediately after that.  And that would be the same for

3  coordination, say, under the Historic Preservation Act --

4  National Historic Preservation Act, too, if we required that

5  kind of coordination.

6  **Q.   Okay.  If I understand you correctly, and please**

7  **correct me if I'm wrong, first, the applicant has to go through**

8  **the steps of providing all of the information that is required**

9  **to fully and accurately describe the proposed project, and also**

10 **has to get a -- some type of study or information relating to**

11 **the biological or fish and wildlife impacts of the proposed**

12 **project, and the potential Historic Preservation Act**

13 **implications of the proposed project before it can reach the**

14 **stage of being, quote, federally complete?**

15                    MR. LYNK:  Object to form.

16                    Go ahead.

17 **Q.   (BY MR. BRYANT)  Is that correct?**

18 A.   Not entirely.

19 **Q.   Okay.  Could you correct me, please.**

20 A.   I'll attempt to.  So yes, you were correct in that

21 the applicant's responsibility is, is give us a certain amount

22 of information, you know, describe -- generally describing the

23 project.  Yes.  And in that, some of the things are the

24 required figures for the project, description of the project,

25 we may even need some engineering specs for the project too, so

1  we can either review that or have someone else in the Corps

2  locally here review the engineering specs if we're not capable

3  of doing that.

4          Also, the statement about the mitigation, you

5  know, if that's required or not, if it rises to the level of

6  needing some sort of -- of mitigation.  And again, I'm not

7  speaking to this specific project in the Rio Grande that we're

8  here today discussing.  I'm talking about a typical project.

9          If you meet all those criteria there, then it

10  can be federally complete.  If you have sufficient information

11  to make a decision on all those criteria, it can be federally

12  complete.  In some cases, and not every case, it could require

13  a coordination with, say, the Fish and Wildlife Service,

14  because it could -- if there's a listed species in that

15  location, it may be affected by the project.  That has nothing

16  to do with federally complete.  But it delays our ability to

17  render a decision until that process is complete.

18          So I'm not saying that's necessary, and I'm not

19  saying it is or isn't for this floating buoy project.  I'm just

20  trying to give you an example of -- of what, typically, might

21  occur, you know?  So I could -- in this case, though, I could

22  see us coordinating with the IBWC in this case.  But I don't

23  know in what form, because it's -- again, we don't have any

24  information for the project, so...

25      **Q.   Have you ever personally been involved in a project**

68

1  or learned of a project that did require coordination with the

2  IBWC?

3      A.   I have not been.

4      Q.   Okay.  Are you aware of any such projects that had

5  been handled by the Fort Worth Division of the Army Corps of

6  Engineers?

7      A.   So I'm not personally aware of that.

8      Q.   Okay.  So if I understand, there's Level 1, which is

9  getting to a federally complete application, then there is a

10 Level 2, which is where you have a federally complete

11 application, but you don't have all the steps completed that

12 would allow the Army Corps of Engineers to actually make a

13 decision on the application for a permit.  And then there's

14 whatever period is required for the Corps of Engineers to

15 decide whether to issue the permit after it completes Level 2,

16 and reaches the point at which the -- the Corps of Engineers

17 could act on the permit?

18     A.   Well, I wouldn't describe those as levels.  But the

19 vast majority of applicants that come to us, we can simply make

20 a determination when they've supplied us with enough

21 information it is federally complete, and we can render a

22 decision.  But in the case that they maybe have to -- we may

23 have to involve or coordinate with another federal or state

24 agency, that can entail a diff- -- you know, more time.

25     Q.   And sometimes does it require coordination with

Case 1:23-cv-00853-DAE Document 118 Page: 214 of Date Filed 09/07/2023
Case 1:23-cv-00853-DAE Document 87 Filed 09/07/2023
Joseph Shelnutt - 8/7/2023

69

1   multiple federal or state agencies?

2       A.   From -- for complex projects, that's typical.

3       Q.   Okay.  Have you or anybody at the Army Corps of

4   Engineers, to your knowledge, done any research regarding

5   potential commercial uses of the Rio Grande River in the

6   segment where the floating buoys are located?

7       A.   I'm not aware of that.

8       Q.   Okay.  Is it fair to say that the -- the Rio Grande

9   River in Maverick County is not subject to the ebb and flow of

10  the tides?

11      A.   That's correct.

12      Q.   Is it fair to say that, to the best of your

13  knowledge, the Rio Grande in -- River in Maverick County is not

14  presently used to transport interstate or foreign commerce?

15      A.   I don't know the answer to that question.

16      Q.   Do you -- do you have any knowledge that it is used

17  to --

18              MR. LYNK:  Object --

19      Q.   (BY MR. BRYANT)  -- presently to inter- -- to

20  transport interstate or foreign commerce?

21              MR. LYNK:  Object to form.

22      A.   I'm not aware of actual use in that capacity.

23      Q.   (BY MR. BRYANT)  Okay.  Has the Rio Grande in

24  Maverick County, to your knowledge, been used in the past to

25  transport interstate or foreign commerce?

```
 1      A.    So I'm not personally aware of that.

 2      Q.    Are you aware by even second- or thirdhand means?

 3      A.    No.

 4            MR. LYNK:  Object to form.

 5            Sorry.

 6      Q.    (BY MR. BRYANT)  Okay.  Do you have any information

 7  or knowledge, either personal or secondhand, that the Rio

 8  Grande in Maverick County is or may be susceptible for use to

 9  transport interstate or foreign commerce?

10      A.    Well, it's designated as a Section 10 water, so I

11  would -- I would -- I would rely on that designation.

12      Q.    Okay.  Do you have any information other than that?

13      A.    No.

14      Q.    Do you have any knowledge regarding any historical

15  use of canoes or other frontier craft on the Rio Grande River

16  in Maverick County, Texas?

17            MR. LYNK:  I'm going to object that this line of

18  questioning is going beyond the scope of -- that was authorized

19  for expedited discovery today.

20            You can answer, if you know the answer.

21      A.    I don't know.

22      Q.    (BY MR. BRYANT)  Do you have any knowledge of any

23  transportation of grains, furs or other agricultural products

24  up and down the Rio Grande River in Maverick County?

25      A.    I don't have that information.
```

1     Q.   Okay.  Do you have any information regarding any

2  transportation of logs or any other commercial product up and

3  down the Rio Grande River in Maverick County?

4     A.   I don't have that information.

5     Q.   Have you ever seen in the Rio Grande River in

6  Maverick County any watercraft or vessels other than law

7  enforcement or government vessels?

8     A.   Well, I've noticed watercraft in the river, but I --

9  I could not identify definitively what they are in -- in every

10  case.

11     Q.   Okay.  Were there any watercraft in the river that

12  you've seen that you could definitely identify as not being

13  part of law enforcement or government?

14              MR. LYNK:  Object to form.

15     A.   Not that I'm aware.

16     Q.   (BY MR. BRYANT)  Okay.  Have you ever seen any

17  vessels in the Rio Grande River in Maverick County that were

18  transporting any kind of goods other than the buoys?

19     A.   Not that I'm aware.

20     Q.   Have you ever seen any recreational watercraft on the

21  Rio Grande River in Maverick County?

22              MR. LYNK:  Object to form.

23     A.   Not that I'm aware.

24     Q.   (BY MR. BRYANT)  Have you ever received any

25  information about any such recreational watercraft in use in

 1  the Rio Grande River in Maverick County, Texas?

 2     A.   I don't have any information to that effect.

 3     Q.   Okay.  We talked earlier about a -- a bunch of

 4  different terms that I asked, and I asked you whether or not

 5  you regarded the floating buoys as a jetty.  What do you

 6  understand a jetty to be?

 7     A.   A structure in a river that directs or deflects

 8  float --

 9     Q.   Okay.

10     A.   -- for a particular reason.

11     Q.   And what do you understand a -- a boom to be?

12     A.   A similar -- similar situation.

13     Q.   Okay.  Do you recall -- I'm sorry.  Strike that.

14          Do you regard the buoys as either an aid or an

15  obstacle to navigation of the Rio Grande River?

16          MR. LYNK:  Object to form.

17          You can answer.

18     A.   Excuse me.  With the information I have, I don't

19  believe it's an aid to navigation.

20     Q.   (BY MR. BRYANT)  Okay.

21     A.   So the second part of that is -- refers to being an

22  obstacle --

23     Q.   An obstacle, yes.

24     A.   It appears to affect the navigable capacity of the

25  river under the regulations.

1    Q.   Okay.  And since I'm not 100 percent sure about what

2  the regulations mean by "navigable capacity," I need to ask you

3  to answer my question, which is, do you regard it as an -- as

4  an obstacle to navigation of the river?

5              MR. LYNK:  Object to form.

6              You can answer.

7    A.   Okay.  Well, certainly, the -- you know, with the

8  configuration of the -- the line of buoys in the river, it's

9  a -- it's -- it's a barrier to cross river navigation.  So --

10 so a vessel can't navigate from one side of the river to the

11 other without encountering that obstacle there.  So does that

12 answer your question?

13   Q.   (BY MR. BRYANT)  Well, if -- if that means -- if

14 that's what you mean by it being an obstacle to navigation,

15 then it does.  Do you regard it as an obstacle to navigation in

16 any other sense?

17   A.   Well, as I stated in my declaration, I -- you know,

18 the -- a vessel traveling from one side of the river to the

19 other in that location would have to either maneuver around it

20 or it would in- -- you know, impact it or come into contact

21 with it -- with the barrier, the floating buoys in this case.

22   Q.   Okay.

23   A.   It's -- it is also, I think, blatantly obvious that,

24 you know, if a vessel's navigating the river, you know, up or

25 downstream, it's an -- it's a object that the -- whoever's

1  driving or steering the vessel would have to take note of and

2  make sure they avoid it.

3      **Q.  They'd have to avoid it by going 6 or 10 feet to one**

4  **side of it?**

5      A.  Avoid it at whatever distance they deem necessary.

6      **Q.  Yeah.  But the -- the buoys are only, what, at**

7  **maximum, six feet in diameter, up and down --**

8              MR. LYNK:  Object to form.

9              Sorry.

10     **Q.  (BY MR. BRYANT)  -- you know, as -- as you approach**

11 **them from up river?**

12             MR. LYNK:  Object to form.

13     A.  So when I was on-site on the 13th of July as they

14 were being constructed, that's -- that's what I observed,

15 correct.

16     **Q.  (BY MR. BRYANT)  Okay.  To your knowledge, is the**

17 **U.S. Coast Guard at all active in the portion of the Rio Grande**

18 **River that is within the jurisdiction of the Fort Worth**

19 **Division of the Army Corps of Engineers?**

20     A.  I don't have information to answer that.

21     **Q.  Okay.**

22             MR. LYNK:  Counsel --

23             MR. BRYANT:  Let's take a break.

24             MR. LYNK:  Yeah.  That's what I was about to

25 ask.

1          THE REPORTER:  We are going off the record at

2   12:17 p.m.

3          (Break taken from 12:17 p.m. to 12:31 p.m.)

4          THE REPORTER:  We are going back on the record

5   at 12:31 p.m.

6     Q.   (BY MR. BRYANT)  Mr. Shelnutt, I have marked a few

7   more exhibits.  Could you take a look at what I've marked as

8   Exhibit 3 to your deposition?

9          (Exhibit No. 3 was marked.)

10    A.   Okay.

11    Q.   (BY MR. BRYANT)  Exhibit 3 is a map that I copied

12  from the -- from an Army Corps of Engineers website, but aside

13  from that, can you identify that map?

14    A.   This is a map of Texas and surrounding states that

15  shows various U.S. Army Corps of Engineers districts.

16    Q.   Have you seen that map or a map like that before?

17    A.   I have.

18    Q.   Okay.  And do you ever consult that in your work for

19  the Army Corps of Engineers?

20    A.   Yes.

21    Q.   Okay.  And I wish the -- it were more distinct,

22  because I think the original is in color.  But as you look at

23  the portion of Exhibit 3 that depicts the Rio Grande River and

24  its course in Texas, is that divided up within several

25  different Army Corps of Engineers districts?

1    A.   Yes.

2    Q.   And it's pretty easy, I think, to see on Exhibit 3

3 where the jurisdiction of the Galveston District of the Army

4 Corps -- Corps of Engineers ends on the Rio Grande River.  And

5 then what division has the jurisdiction over the area of the

6 Rio Grande River just west of where the Galveston District's

7 jurisdiction stops?

8    A.   So just upstream of the Rio Grande River from the

9 Galveston District is the Fort Worth District's.

10    Q.   Okay.  And what counties along the Rio Grande River

11 does the Fort Worth District have jurisdiction over?

12    A.   Webb, Maverick, Kinney, Val Verde.

13    Q.   Okay.  And at the Val Verde county line on the west,

14 what Army Corps of Engineer district takes over jurisdiction?

15    A.   Well, that would be the Albuquerque District.

16    Q.   So the Albuquerque District has jurisdiction over

17 quite a number of counties in Texas along the Rio Grande River?

18    A.   Correct.

19    Q.   Do you have any knowledge or information as to why

20 that division of responsibility among three different Army

21 Corps of Engineers districts along the Rio Grande River was

22 done?

23    A.   Those -- those district boundary lines were done

24 before my -- before I came along as a Corps employee, so I'm

25 sure -- I'm not aware of the data they made this decision upon.

1    Q.   Do you have any information as to why it was made by

2  whoever made it?

3    A.   Any -- anything -- any response I would have would be

4  speculative, so...

5    Q.   Okay.  I think in your declaration, it says that your

6  office is located some seven hours from Eagle Pass, Texas; is

7  that right?

8    A.   That's correct.

9    Q.   Is there any part of your -- of the Fort Worth

10 District that is farther from your office than Maverick County,

11 Texas?

12   A.   Well, I can't be sure, but that's one of the furthest

13 reaches away from the office that we have jurisdiction over.

14   Q.   Okay.  Could you take a look at --

15   A.   Or responsibility.

16   Q.   I'm sorry.  I didn't mean to cut you off.

17   A.   That's okay.

18   Q.   Could you take a look at Exhibit 4.

19       (Exhibit No. 4 was marked.)

20   Q.   (BY MR. BRYANT)  Can you identify Exhibit 4, and

21 please take whatever time you need to review it before you

22 answer the question.

23   A.   Yeah.  It's a -- it's a list of navigable waters in

24 the United States in the Fort Worth District.

25   Q.   Is this a -- a list or document that you use in your

 1  work for the Corps of Engineers?

 2      A.   This is a document that we refer to on a regular

 3  basis.

 4      Q.   And is -- this document bears the date,

 5  December 20th, 2011.  Is this the same 2011 document that you

 6  refer to in your declaration?  I believe it's referred to in

 7  Paragraph 3.  Or a document is.  I wanted to see if this

 8  Exhibit 4 is that document.

 9      A.   That is correct.

10      Q.   Okay.  So is it fair to say that, fundamentally,

11  Exhibit 4 is the basis on which you concluded that the current

12  location of the floating buoys in the Rio Grande River in

13  Maverick County, Texas is part of the navigable waters of the

14  United States?

15      A.   That's correct.

16      Q.   Now, earlier, I asked you -- earlier, I asked you

17  about the involvement of the Coast Guard in the area of the

18  Rio Grande River that is within the jurisdiction of the

19  Fort Worth Division.  Do you know whether or not the Coast

20  Guard has a different definition of navigable waters of the

21  United States than the Army Corps of Engineers does?

22      A.   If they follow a different definition, then I'm

23  unaware of it.

24      Q.   Okay.  Do you ever have occasion to deal with U.S.

25  Coast Guard in your work?

1    A.   So in -- in my work, our district has, but I

2 personally have not.

3    Q.   **Okay.  What is your understanding of the situations**

4 **in which the Fort Worth District of the Army Corps of Engineers**

5 **has dealings with the U.S. Coast Guard?**

6    A.   I -- I'm not cognizant of the entire situation where

7 we might have cause to coordinate with or communicate with the

8 Coast Guard, but I do know Section 9 of The Rivers and Harbors

9 Act is one of those -- one of those instances.

10    Q.   **Okay.  Are you aware of any involvement of the U.S.**

11 **Coast Guard in making any determinations pursuant to Section 10**

12 **of the Rivers and Harbors Act of 1899?**

13    A.   So when you say "making a determination," are you

14 referring to our determination?

15    Q.   **Either our -- either the Army Corps of Engineers**

16 **determinations or any other agencies' determinations.**

17    A.   So could you repeat the entire question again?

18    Q.   **I'll do my best.**

19    A.   Thank you.

20    Q.   **Are you aware of any involvement of the United States**

21 **Coast Guard in the making of determinations under Section 10 of**

22 **The Rivers and Harbors Act of 1899 by the Army Corps of**

23 **Engineers or any other federal agency?**

24    A.   No.

25    Q.   **Has anybody ever suggested that it would be advisable**

1  or even relevant to -- to consult the U.S. Coast Guard in any

2  way in making a determination under Section 10 of The Rivers

3  and Harbors Act of 1899?

4          MR. LYNK:  Object to form.

5          You can answer.

6      A.   No.

7      Q.   (BY MR. BRYANT)  We talked a little bit today about

8  whether or not the floating buoys in the Rio Grande River that

9  are the subject of this lawsuit are structurally connected to

10  the bed of the Rio Grande River.  Do you have any understanding

11  as to what the term "structure" means under the -- Section 10

12  of The Rivers and Harbors Act of 1899?

13      A.   My understanding is just, patently obvious,

14  structure, you know, as commonly referred to as, you know, any

15  structure in layman's terms.

16      Q.   Well, what does -- what does that mean to you?

17  Because it's -- you know, it's not a -- something I think

18  everybody would automatically agree with.

19      A.   An object or -- or other equipment present in the

20  waterway.

21      Q.   Okay.  Well, a fish is an object.  There are lot of

22  things that are objects.  Would you call all of them

23  structures?

24      A.   I wouldn't call something that's biological an

25  object.

Case 1:23-cv-01032-DCM Document 18 Page: 226 Filed 08/10/23 Page 209 of 289
Case 1:23-cv-00632-UNA Document 1 Filed 09/07/2023

Joseph Shelnutt - 8/7/2023

81

1      Q.    Okay.

2      A.    No.

3      Q.    Would you call a rock a structure?

4      A.    If it's naturally occurring, no.  If it's placed

5  there by, you know, a human -- deliberate human interaction,

6  then it could be considered, you know, an object, either

7  singularly or in aggregate with other such, you know, objects.

8      Q.    Okay.  And you know, I'm not -- I'm not just trying

9  to argue with you.

10     A.    I understand.

11     Q.    I'm really trying to understand what -- how you would

12  define that term, because if I throw a rock in the water, then

13  I placed it in there, but to me that's not a structure.  And

14  that's probably true even if I threw 10 or 100 of them in the

15  water.  So what is your def- -- what is your best definition of

16  a structure?

17             MR. LYNK:  Object to form.

18     Q.    (BY MR. BRYANT)  For purposes of this Section 10 of

19  the har- -- Rivers and Harbors Act of 1899.

20     A.    Well, if you're asking would I consider the floating

21  buoys or, you know, the system that -- not the bu- -- not only

22  the buoys themselves, but any other apparent structures or

23  devices that might be employed to hold it in place or otherwise

24  make it function as -- make it a viable -- viably function as

25  it's intended, then I consider that a structure.

1                So to get back to your rock, I mean, if
2   someone's skipping rocks across the river, it may end up in the
3   river, obviously, that's not a structure.  But placement of
4   material in such a way, in singularly or in aggregate --
5   aggregate, whether it's a natural material, it could be
6   constructed or -- or aligned in a way that might be considered
7   a structure is a possibility, but also manufactured material or
8   the movement of other material that might be aggregated or
9   assembled in a way could also be considered a structure.
10       **Q.   Well, would you consider it a structure in all**
11   **instances?**
12       A.   Would I consider what a structure?
13       **Q.   What you just described.**
14           MR. LYNK:  Object to form.
15       A.   As I describe and understand it, I just described
16   what I would consider a structure.  But, you know, I would --
17   we don't make decisions on theoretical, you know, definitions.
18   We make decisions on the information that's in front of us to
19   define what a structure might be.
20       **Q.   (BY MR. BRYANT)  Okay.**
21       A.   Okay?
22       **Q.   If I were to string a lot of the kind of rafts that**
23   **you and I might float in a swimming pool on together in a**
24   **river, would you consider that a structure?**
25           MR. LYNK:  Object to form.

 1     A.   Well, I don't have a lot of information to base that

 2     on.  You know -- you know, it's -- it's possible.

 3     **Q.   (BY MR. BRYANT)  Okay.  You testified, if I**

 4     **understood you correctly earlier, that the Army Corps of**

 5     **Engineers would consider a tunnel that goes under a river as**

 6     **affecting its navigable capacity; is that correct?**

 7     A.   That's what the regulations indicate.

 8     **Q.   Okay.  Could you explain to me as best you understand**

 9     **it why tunneling under a river affects the navigable capacity**

10     **of that river?**

11     A.   So I don't know all the -- the reasons behind that,

12     but some of it points to, you know, if you have a tunnel under

13     the river, you know, or a structure under the river that has a,

14     say, a pipe with -- with material in the pipe, there is

15     potential for that structure to become -- or tunnel, if it's

16     just a tunnel, to actually become, through flows and energy

17     movement across the riverbed or -- or maybe material in the --

18     in the tunnel or pipe might be -- might encounter pressures

19     that either make it exposed to the riverbed or could actually,

20     you know, erupt material out of the pipe into the riverbed, and

21     therefore, cause a navigation or affect navigable capacity.

22     Now, I don't know that that's the entire reason for that, but

23     that's my understanding.

24     **Q.   Are you aware of instances in which the Courts have**

25     **found that the Army Corps of Engineers interpreted terms in the**

84

1   law too broadly?

2        A.   I'm not aware of specific instances or specific

3   cases.

4        Q.   Okay.  Have you ever heard of a case called Sackett

5   versus the Environmental Protection Agency that was decided

6   May 25th, 2023?

7        A.   I've heard of that.

8        Q.   Yeah.  And is that one in which the Supreme Court of

9   the United States found that a definition that the EPA and the

10  Army Corps of Engineers had been using was too broad, and --

11  and they made a different decision?

12            MR. LYNK:  I'll object that questions about the

13  Sackett Case are going beyond the scope of the authorized

14  expedited discovery topic.

15            You can answer, if you know the answer.

16       A.   I'm -- I'm aware of the Sackett case.  There's been a

17  lot of publicity, obviously.  I haven't read the information

18  around it.  All that I've read or heard of excerpts, I don't

19  know, so I don't know if it's -- your characterization of "too

20  broadly" applies or not.

21       Q.   (BY MR. BRYANT)  Okay.  Would you agree that,

22  ultimately, it's the Courts and the judges who have to decide

23  what laws like The Rivers and Harbors Act of 1899 mean rather

24  than the Army Corps of Engineers?

25       A.   So the Army Corps of Engineers in its regulatory

1   capacity often interprets the -- the laws that's given to us

2   and the regulations that's given to us.  I also understand

3   regularly that things change in the legal environment where

4   that affects our understanding and interpretation of laws and

5   regulations and things shift, and we shift with them as

6   required.

7   **Q.   And do you understand that it's the -- it's the**

8   **Courts, the judges, who make the definitive interpretation of**

9   **what the law means, that you -- that you at the Army Corps of**

10   **Engineers have to do your best to enforce?**

11   A.   Yes.

12   **Q.   Okay.  The Rio Grande River's a long river, even just**

13   **in Texas.  Have you seen it referred to as different segments**

14   **in your work at the Army Corps of Engineers?**

15   A.   I have not.

16   **Q.   Okay.  Have you seen enough of the Rio Grande River**

17   **to know that it really is quite different at different points**

18   **in the river?**

19   MR. LYNK:  Object to form.

20   You can answer.

21   A.   Well, like any -- any, you know, perennial

22   waterbody -- flowing waterbody that courses along a distance,

23   it's -- it's natural to encounter, you know, different

24   ecological and biological and geomorphological, you know,

25   changes across its continual.

1      Q.   (BY MR. BRYANT)  And is that true of the Rio Grande
2   River in Texas?

3      A.   The Rio Grande River changes in function and form
4   along its course.

5      Q.   Okay.  Based on what you've seen of the floating
6   buoys in the Rio Grande River in Maverick County, Texas, do you
7   see any harm that they're actually doing at this point?

8      A.   Well, I don't -- harm to -- harm in what way?

9      Q.   Well, that -- I would include any way.

10            MR. LYNK:  I'm going to object that this is
11   beyond the scope of the authorized expedited discovery.  I'm
12   actually going to instruct the witness not to answer on this
13   one.  The -- the Court did not authorize testimony about -- or
14   discovery into the issue of harm.

15      Q.   (BY MR. BRYANT)  Could you take a look at exhibit --
16   let's see.

17            MR. BRYANT:  Do we have a five?  Okay.  This one
18   is marked 6.

19            THE REPORTER:  Oh, it says -- sorry.

20            MR. BRYANT:  Should we mark it 5?

21            THE REPORTER:  No, it's 5.  I just have bad
22   handwriting.

23            MR. BRYANT:  Oh, okay.  I'm sorry.  I misread
24   it.

25            THE REPORTER:  I could put a new sticker.

87

1          (Exhibit No. 5 was marked.)

2          **Q.   (BY MR. BRYANT)  Okay.  Let me show you,**

3  **Mr. Shelnutt, what's been marked as Exhibit 5.  This is a**

4  **portion of a regulation of the Coast Guard.  Have you ever seen**

5  **or consulted that regulation in connection with your work for**

6  **the Army Corps of Engineers?**

7          A.   So not the Coast Guard regulation, so...

8          **Q.   Okay.  And I assume you have -- have consulted the**

9  **Army Corps of Engineers regulation on a similar subject?**

10          A.   Correct.

11          **Q.   Okay.  Is it fair to say, then, that -- that the**

12  **Coast Guard regulation that is in Exhibit 5 is not something**

13  **that you have considered relevant at all to your work at the**

14  **Army Corps of Engineers to date?**

15          A.   Well, let me take a minute to read over this, because

16  I don't know --

17          **Q.   Please do.**

18          A.   I don't know if there's overlap or how much overlap

19  there is between Coast Guard regulations and regulations that

20  might be relevant to -- to us in the Corps.

21          **Q.   Okay.  And please take as much time as you --**

22          A.   Okay.

23          **Q.   -- as you want to review Exhibit 5.**

24          A.   (Reviewing document.)  Okay.

25          **Q.   So my question is, have you ever considered or do you**

1  consider now the Coast Guard's definition that's set forth in

2  Exhibit 5 as relevant to determinations of -- under Section 10

3  of The Rivers and Harbors Act of 1999 [sic] as far as you and

4  the Army Corps of Engineers are concerned?

5       A.   So there are portions of this document, Exhibit 5,

6  that seem familiar to me.  But since this is, you know, some of

7  this refers to U.S.C. 1321 and 1322, and you know, what -- what

8  various aspects of this, you know, language means here and

9  others.  So I can understand that there's significant overlap

10 between, you know, our regulations under 18 -- Rivers and

11 Harbors Act under 18- -- Rivers and Harbors Act of 1899 and

12 this.

13          But I'm not sure the -- I'm not sure of the

14 exact wording here, so I want to say that we rely on,

15 traditionally, you know, our regulations, and we don't go to

16 another agency's interpretation of regulations to -- typically,

17 to make those decisions.

18      Q.   Okay.

19      A.   That is not to say that we don't coordinate, if

20 necessary, with other -- other agencies --

21      Q.   Okay.

22      A.   -- you know, and their requirements, so...

23      Q.   Is it fair to say that you did not in any way consult

24 the regulation that's Exhibit 5 or anything else from the Coast

25 Guard --

1    A.   I didn't -- I didn't look --

2    Q.   -- in making your determination with respect to the

3    floating buoys that are in the Rio Grande River?

4    A.   I didn't look at this -- these regulations that you

5    have marked at Exhibit 5 to make a determination.

6    Q.   Okay.  And you didn't get any -- have any other

7    interaction with the Coast Guard?

8    A.   No.

9    Q.   Okay.  Let me just try to sum up a few things, and

10   then I think we're done.  Strike that.

11             Let me ask another question or two.  Did

12   Mr. Lebsock have any role in determining for the Corps of

13   Engineers whether or not the floating buoys constitute a

14   violation of Section 10 of The Rivers and Harbors Act of 1899?

15   A.   So since -- since he's my chief and this is, you

16   know, a visible project on the Rio Grande, naturally, we

17   discussed it.  And so we both agree that -- that yes.

18   Q.   Okay.  Would you say that he -- he made the decision

19   more than you or that you made the decision more than him or --

20   A.   I think it --

21   Q.   -- were they both equal?

22   A.   I think it's equal.

23   Q.   Okay.  Did anybody else at the Army Corps of

24   Engineers, besides the two of you, have a role in that

25   decision?

1     A.    At the district level here in Fort Worth, no.

2     **Q.    At any other level?**

3     A.    Decisions outside of the Fort Worth District, I'm not

4  privy to.

5     **Q.    Well, my question is, did anyone outside the**

6  **Fort Worth District in the Corps of Engineers have any role in**

7  **making this particular decision with respect to the floating**

8  **buoys, to your knowledge?**

9     A.    Well, to my knowledge -- to my knowledge, no.

10    **Q.    Okay.  And in making the conclusion that -- that the**

11 **floating buoys violate Section 10 of The Rivers and Harbors Act**

12 **of 1899, as I understand it, no one did any kind of study or**

13 **observation of any present navigation of that section of the**

14 **Rio Grande River; is that right?**

15            MR. LYNK:  Object to form.

16    A.    I'm not aware of any recent study.

17    **Q.    (BY MR. BRYANT)  Okay.  And is it also true that in**

18 **making that determination, the Army Corps of Engineers did not**

19 **make any consideration of possible future commercial uses or**

20 **navigation of that section of the Rio Grande River?**

21            MR. LYNK:  Object to form.

22    A.    Could you restate that again?

23    **Q.    (BY MR. BRYANT)  I'll try.  Is it correct that in**

24 **making the determination that the floating buoys violate**

25 **Section 10 of The Rivers and Harbors Act of 1899, the Army**

1    Corps of Engineers did not include any consideration of

2    possible future commercial navigation in that area of the Rio

3    Grande River where the floating buoys are currently located?

4        A.    So at the Fort Worth District, no.

5        Q.    Do you know of any other part of the Corps of

6    Engineers that did consider that?

7        A.    I'm not aware.

8        Q.    Okay.  And is it correct that the Army Corps of

9    Engineers did not make any study or consideration of any past

10   commercial navigation in the section of the Rio Grande River

11   where the floating buoys are located in making its

12   determination that the floating buoys violate Section 10 of the

13   Rivers and Harbors Act of 1899?

14               MR. LYNK:  Object to form.

15               You can answer.

16       A.    So I'm not aware of any recent studies, and I'm

17   not -- and we did not refer to or research any other studies --

18       Q.    (BY MR. BRYANT)  Okay.  And --

19       A.    -- at the Fort Worth District level.

20       Q.    Okay.  Are you aware of any such consideration at any

21   other level?

22       A.    I'm not aware.

23       Q.    And in making that determination with respect to the

24   current site of the floating buoys, is it also correct that the

25   Army Corps of Engineers did not consider and has not determined

1 **whether the floating buoys substantially interfere with any**

2 **commercial navigation on the Rio Grande River?**

3     A.   Specifically commercial navigation, you're asking?

4     **Q.   That's my -- that was my question, yes.**

5     A.   We didn't -- we didn't do a study to make a

6 determination, specifically, about commercial navigation.

7     **Q.   Did you do anything else other than look at -- at the**

8 **list?**

9     A.   No.  Referring to the list is common for us to do in

10 this state -- in this district.

11           MR. BRYANT:  Mr. Shelnutt, thank you very much,

12 and I pass the witness.

13           MR. LYNK:  Just go off the record, and I'll take

14 a quick -- quick break.

15           THE REPORTER:  We are going off the record at

16 1:03 p.m.

17           (Break taken from 1:03 p.m. to 1:06 p.m.)

18           THE REPORTER:  We are going back on the record

19 at 1:06 p.m.

20           MR. LYNK:  I have no questions for the witness.

21           MR. BRYANT:  Mr. Shelnutt, thank you very much.

22 Appreciate your time and your thoughtfulness.

23           THE WITNESS:  Thank you.

24           THE REPORTER:  Okay.  And Mr. Lynk, just for the

25 record, do you want a copy of the transcript?

Case 1:23-cv-03053-LDH Document 18 Page 238 Filed 09/07/2023
Case 1:23-cv-03053-LDH Document 18 Page 238 Filed 09/07/2023
Joseph Shelnutt - 8/7/2023

93

1                    MR. LYNK:  I do.

2                    THE REPORTER:  Okay.  We are going off the

3     record at 1:06 p.m.

4                    (End of proceedings at 1:06 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    CHANGES AND SIGNATURE

2   WITNESS NAME: JOSEPH SHELNUTT        DATE: AUGUST 7, 2023

3   PAGE LINE        CHANGE                 REASON

4   _____

5   _____

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____
```

1        I, JOSEPH SHELNUTT, have read the foregoing
deposition and hereby affix my signature that same is true and
2    correct, except as noted above.

3

4

5                          _____
                            JOSEPH SHELNUTT

6

7

8

9    THE STATE OF _____)

10   COUNTY OF _____)

11

12       Before me, _____, on this day

13   personally appeared JOSEPH SHELNUTT, known to me (or proved to

14   me under oath or through _____) (description of

15   identity card or other document) to be the person whose name is

16   subscribed to the foregoing instrument and acknowledged to me

17   that they executed the same for the purposes and consideration

18   therein expressed.

19       Given under my hand and seal of office this

20   _____ day of _____, _____.

21

22                          _____
                            NOTARY PUBLIC IN AND FOR
23                          THE STATE OF _____
                            COMMISSION EXPIRES: _____
24

25

```
 1                    UNITED STATES DISTRICT COURT
                   FOR THE WESTERN DISTRICT OF TEXAS
 2
    UNITED STATES OF AMERICA,        )
 3                                   )
                        Plaintiff,   )
 4                                   )
    v.                               )  Civil Action
 5                                   )
                                     )  No.: 1:23-00853-DAE
 6  GREG ABBOTT, IN HIS OFFICIAL     )
    CAPACITY AS GOVERNOR OF THE      )
 7  STATE OF TEXAS, AND THE STATE    )
    OF TEXAS,                        )
 8                                   )
                        Defendant.   )
 9                                   )

10

11                    REPORTER'S CERTIFICATION

12                  DEPOSITION OF JOSEPH SHELNUTT

13                        AUGUST 7, 2023

14

15       I, Amber Garcia, Notary Public in and for the State of

16  Texas, hereby certify to the following:

17       That the witness, JOSEPH SHELNUTT, was duly sworn by the

18  officer and that the transcript of the oral deposition is a

19  true record of the testimony given by the witness;

20       That the deposition transcript was submitted on

21  August 8, 2023 to the witness or to the attorney for the

22  witness for examination, signature and return to me by

23  September 7, 2023;

24       That the amount of time used by each party at the

25  deposition is as follows:
```

1   MR. BRIAN LYNK.....00 HOUR(S):00 MINUTE(S)
    MR. DAVID BRYANT.....02 HOUR(S):38 MINUTE(S)
2

3        That pursuant to information given to the deposition

4   officer at the time said testimony was taken, the following

5   includes counsel for all parties of record:

6   MR. BRIAN LYNK, Attorney for Plaintiff

7   MR. LANDON A. WADE, Attorney for Plaintiff

8   MS. KATHERINE T. ROONEY, Attorney for Plaintiff

9   MR. DAVID BRYANT, Attorney for Defendant

10        That $_____ is the deposition officer's charges

11  to the Defendant for preparing the original deposition

12  transcript and any copies of exhibits;

13        I further certify that I am neither counsel for, related

14  to, nor employed by any of the parties or attorneys in the

15  action in which this proceeding was taken, and further that I

16  am not financially or otherwise interested in the outcome of

17  the action.

18        Certified to by me this 8th day of August, 2023

19

20

21        _____
          Amber Garcia, Notary ID No. 13426953-9
22        Expiration Date:  3/24/2027
          Integrity Legal Support Solutions
23        Firm Registration No. #528
          9901 Brodie Ln, Ste. 160-400
24        Austin, Texas 78748
          (512) 320-8690
25

# Exhibit G: ECF 26-8, Southwest Land Border Encounters (D-8)

**United States District Court**
**Western District of Texas**
**Austin Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff*, v. GREG ABBOTT, in his capacity as Governor of the State of Texas, and THE STATE OF TEXAS, *Defendants.* | No. 1:23-cv-00853-DII |

| | |
|---|---|
| EPI'S CANOE & KAYAK TEAM, LLC AND JESSIE FUENTES, *Plaintiffs*, v. STATE OF TEXAS, *et al.*, *Defendants.* | No. 1:23-cv-00836-DII |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**

# EXHIBIT H

Defendant's Exhibits

8

Case: 23-50632   Document: 18   Page: 245   Date Filed: 09/07/2023



### FY Southwest Land Border Encounters by Month

**U.S. Customs and Border Protection (CBP) Encounters**
US Border Patrol (USBP) Title 8 Apprehensions,
Office of Field Operations (OFO) Title 8 Inadmissible Volumes,
and Title 42 Expulsions by Fiscal Year (FY)

|  | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2023 (FYTD) | 231,539 | 235,208 | 252,330 | 157,361 | 156,633 | 193,262 | 211,999 | 206,702 | 144,571 | | | | 1,789,605 |
| 2022 | 164,837 | 174,845 | 179,253 | 154,874 | 166,010 | 222,574 | 235,785 | 241,136 | 207,834 | 200,162 | 204,087 | 227,547 | 2,378,944 |
| 2021 | 71,929 | 72,113 | 73,994 | 78,414 | 101,099 | 173,277 | 178,795 | 180,597 | 189,034 | 213,593 | 209,840 | 192,001 | 1,734,686 |
| 2020 | 45,139 | 42,643 | 40,565 | 36,585 | 36,687 | 34,460 | 17,106 | 23,237 | 33,049 | 40,929 | 50,014 | 57,674 | 458,088 |

### FY Comparison by Demographic



**Source:** USBP and OFO official year end reporting for FY20-FY22; USBP and OFO month end reporting for FY23 to date. Data is current as of 7/6/2023.

EXHIBIT H: ECF 26-10, FENTANYL AWARENESS (D-10)

**United States District Court**
**Western District of Texas**
**Austin Division**

| | |
|---|---|
| United States of America, | |
| *Plaintiff*, | |
| v. | No. 1:23-cv-00853-DII |
| Greg Abbott, in his capacity as Governor of the State of Texas, and the State of Texas, | |
| *Defendants*. | |

---

| | |
|---|---|
| Epi's Canoe & Kayak Team, LLC and Jessie Fuentes, | |
| *Plaintiffs*, | |
| v. | No. 1:23-cv-00836-DII |
| State of Texas, *et al.*, | |
| *Defendants*. | |

**Defendants' Opposition to Plaintiffs' Motions for Preliminary Injunction**

# EXHIBIT J

Defendant's Exhibits

10

🇺🇸 An official website of the United States government
Here's how you know ⌄

`</>`

# FENTANYL AWARENESS
## #just**KNOW**

*"Fentanyl is the single deadliest drug threat our nation has ever encountered," said Administrator Anne Milgram. "Fentanyl is everywhere. From large metropolitan areas to rural America, no community is safe from this poison. We must take every opportunity to spread the word to prevent fentanyl-related overdose death and poisonings from claiming scores of American lives every day."*



# Faces of Fentanyl

The Drug Enforcement Administration (DEA) has created a special exhibit, The Faces of Fentanyl, to commemorate the lives lost from fentanyl poisoning. If you would like to submit a photo of a loved one lost to fentanyl, please send* their name, age, and photograph to fentanylawareness@dea.gov for DEA's consideration, or post a photo and their name to social media using the hashtag #JustKNOW.

**\*BY SUBMITTING PHOTOGRAPHS FOR DEA'S CONSIDERATION AND SHARING YOUR STORY, YOU AUTHORIZE DEA THE RIGHT TO USE THESE MATERIALS WITHOUT LIMITATION.**

The DEA Faces of Fentanyl Wall exhibit is located at DEA Headquarters, at 700 Army Navy Drive, Arlington, VA 22202. Visitors can view the wall Tuesday through Saturday, 10 a.m. to 4 p.m.

**Please note:** DEA Headquarters is a federal building, and visitors must comply with security rules and procedures. Guests over the age of 18 must present a valid government issued photo ID. All bags, purses, etc., will be screened, and guests will be required to step through a metal detector.



# National Fentanyl Awareness Day (May 9, 2023)

National Fentanyl Awareness Day aims to amplify nationwide efforts to increase awareness and decrease demand for fentanyl, which is a highly addictive synthetic opioid that continues to drive the overdose epidemic.



Fentanyl is involved in more deaths of Americans under 50 than any cause of death, including heart disease, cancer, homicide, suicide and other accidents. Learn more at fentanylawarenessday.org <https://www.fentanylawarenessday.org> and spread the word to save a life. Illicit fentanyl is driving the recent increase in US drug overdose deaths.

This National Fentanyl Awareness Day, we're proud to spread the word to save lives.

According to the CDC, 107,375 people in the United States died of drug overdoses and drug poisonings in the 12-month period ending in January 2022.  A staggering 67 percent of those deaths involved synthetic opioids like fentanyl.  Some of these deaths were attributed to fentanyl mixed with other illicit drugs like cocaine, methamphetamine, and heroin, with many users unaware they were actually taking fentanyl. Only two milligrams of

**fentanyl is considered a potentially lethal dose; it's particularly dangerous for someone who does not have a tolerance to opioids.**



# National Fentanyl Prevention and Awareness Day 2023



August 21st is a coordinated day of response by grassroots fentanyl awareness organizations and families impacted by fentanyl to educate the public about the dangers of illicit fentanyl. DEA is proud to work with families who have been affected by fentanyl poisonings to spread the word and save lives.

#facingfentanylnow

Learn more about the danger of illicit fentanyl at https://facingfentanylnow.org <https://facingfentanylnow.org> or www.dea.gov/onepill <https://www.dea.gov/onepill>.

Read Press Release <https://www.dea.gov/press-releases/2022/08/19/dea-recognizes-national-fentanyl-prevention-and-awareness-day>

Case 1:23-cv-03053-DAE Document 18 Page 256 of 289 Filed 09/07/2023

# Resources

**National Fentanyl Awareness Day**

**DEA Resources**

**Parental Resources**

**Treatment Resources**

**Additional Resources**

Cite



## SAMHSA Behavioral Health Treatment Locator

Address, city, state or zip code

**Go**

## Who We Are </who-we-are>

About </who-we-are/about>

Domestic Divisions </divisions>

Foreign Offices </foreign-offices>

Contact Us </who-we-are/contact-us>

DEA Museum <https://museum.dea.gov/>

## What We Do </what-do>

Drug Prevention </what-we-do/education-and-prevention>

Law Enforcement </law-enforcement>

Diversion Control Division <https://www.deadiversion.usdoj.gov>

News </news>

## Careers </careers>

Overview </careers>

Special Agent </careers/special-agent>

Diversion Investigator </careers/diversion-investigator>

Intelligence Research Specialist </careers/intelligence-research-specialist>

## Resources </resources>

Drug Information </drug-information>

Employee Assistance Program </resources/eap>

Equal Opportunity Employer </how-to-apply/equal-opportunity-employer>

FOIA </foia>

Publications

Media Galleries </resources/media-galleries>

VWAP </resources/vwap>

## Doing Business with the DEA

</resources/doing-business-dea>

## Overview

</resources/doing-business-dea>

## Current Vendors

</doing-business-dea/current-vendors>

## Prospective Vendors </doing-business-dea/prospective-vendors>

## Security Clauses

</doing-business/security-clauses>

## Security Forms

</doing-business-dea/security-forms>

## Small Business Program </doing-business-dea/small-business>

## Policies <>

## Accessibility, Plug-ins & Policy

</resources/accessibility%20and%20policy>

## Legal Policies & Disclaimers

<https://www.justice.gov/legalpolicies>

## No FEAR Act

<https://www.justice.gov/jmd/eeo-program-status-report>

## Privacy Policy

<https://www.justice.gov/doj/privacy-policy>

## U.S. Department of Justice EEO Policy

<https://www.justice.gov/jmd/file/790081/download>

## USA.gov

<https://www.usa.gov/espanol/>

## Whistleblower Protection

<https://oig.justice.gov/hotline/whistleblower-protection>



# United States Drug Enforcement Administration

DEA.gov is an official site of the U.S. Department of Justice <https://www.justice.gov/>



<https:/ <https:/ <https:/ <https:/
/www.f /www.t /www.li /www.i
aceboo witter.c nkedin. nstagra

## DEA Contact Center

deahq/ hq> mpany/ deahq>
> drug-
Contact the Webmaster </contact-us>
enforce
ment-
admini
stration
>

(202) 307-1000 info@dea.gov

EXHIBIT I: ECF 26-13, FEDERAL REGISTER (D-13)

**United States District Court**
**Western District of Texas**
**Austin Division**

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff*,<br><br>v.<br><br>GREG ABBOTT, in his capacity as Governor of the State of Texas, and THE STATE OF TEXAS,<br><br>*Defendants*. | No. 1:23-cv-00853-DII |

---

|  |  |
|---|---|
| EPI'S CANOE & KAYAK TEAM, LLC AND JESSIE FUENTES,<br><br>*Plaintiffs*,<br><br>v.<br><br>STATE OF TEXAS, *et al.*,<br><br>*Defendants*. | No. 1:23-cv-00836-DII |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**

# EXHIBIT M

Defendant's Exhibits

13

respondents, including through the use of automated collection techniques or other forms of information technology.

**Proposed Project: National Survey of Substance Abuse Treatment Services (N–SSATS) (OMB No. 0930–0106)— Extension**

The Substance Abuse and Mental Health Services Administration (SAMHSA) is requesting an extension of the National Survey of Substance Abuse Treatment (N–SSATS) data collection (OMB No. 0930–0106), which expires on September 30, 2020. N–SSATS provides both national and state-level data on the numbers and types of patients treated and the characteristics of facilities providing substance abuse treatment services. It is conducted under the authority of Section 505 of the Public Health Service Act (42 U.S.C.

290aa–4) to meet the specific mandates for annual information about public and private substance abuse treatment providers and the clients they serve.

This request includes:

• Collection of N–SSATS, which is an annual survey of substance abuse treatment facilities; and

• Updating of the Inventory of Behavioral Health Services (I–BHS) which is the facility universe for the N–SSATS. I–BHS is also the facility universe for the annual survey of mental health treatment facilities, the National Mental Health Services Survey (N–MHSS). The I–BHS includes all substance abuse treatment and mental health treatment facilities known to SAMHSA. (The N–MHSS data collection is covered under OMB No. 0930–0119.)

The information in I–BHS and N–SSATS is needed to assess the nature

and extent of these resources, to identify gaps in services, and to provide a database for treatment referrals. Both I–BHS and N–SSATS are components of the Behavioral Health Services Information System (BHSIS).

The request for OMB approval will include a request to update the I–BHS facility listing on a continuous basis and to conduct the N–SSATS and the between cycle N–SSATS (N–SSATS BC) in 2021, 2022, and 2023. The N–SSATS BC is a procedure for collecting services data from newly identified facilities between main cycles of the survey and will be used to improve the listing of treatment facilities in the online Behavioral Health Treatment Services Locator.

Estimated annual burden for the BHSIS activities is shown below:

| Type of respondent and activity | Number of respondents | Responses per respondent | Total responses | Hours per response | Total burden hours |
|---|---|---|---|---|---|
| **States** | | | | | |
| I–BHS Online [1] | 56 | 75 | 4,200 | 0.08 | 336 |
| State Subtotal | 56 | .................... | 4,200 | .................... | 336 |
| **Facilities** | | | | | |
| I–BHS application [2] | 800 | 1 | 800 | 0.08 | 64 |
| Augmentation screener | 1,300 | 1 | 1,300 | 0.08 | 104 |
| N–SSATS questionnaire | 17,000 | 1 | 17,000 | 0.67 | 11,333 |
| N–SSATS BC | 1,000 | 1 | 1,000 | 0.58 | 580 |
| Facility Subtotal | 20,100 | .................... | 20,100 | .................... | 12,081 |
| Total | 20,156 | .................... | 24,300 | .................... | 12,417 |

[1] States use the I–BHS Online system to submit information on newly licensed/approved facilities and on changes in facility name, address, status, etc.
[2] New facilities complete and submit the online I–BHS application form in order to get listed on the Inventory.

Send comments to Carlos Graham, SAMHSA Reports Clearance Officer, 5600 Fisher Lane, Room 15E57A, Rockville, MD 20852 *OR* email him a copy at *carlos.graham@samhsa.hhs.gov*. Written comments should be received by May 15, 2020.

**Carlos Graham,**
*Social Science Analyst.*
[FR Doc. 2020–05274 Filed 3–13–20; 8:45 am]
**BILLING CODE 4162–20–P**

## DEPARTMENT OF HOMELAND SECURITY

**Office of the Secretary**

**Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended**

**AGENCY:** Office of the Secretary, Department of Homeland Security.

**ACTION:** Notice of determination.

**SUMMARY:** The Acting Secretary of Homeland Security has determined, pursuant to law, that it is necessary to waive certain laws, regulations, and other legal requirements in order to ensure the expeditious construction of barriers and roads in the vicinity of the international land border in Val Verde

County, Texas, and Maverick County, Texas.

**DATES:** This determination takes effect on March 16, 2020.

**SUPPLEMENTARY INFORMATION:** Important mission requirements of the Department of Homeland Security (''DHS'') include border security and the detection and prevention of illegal entry into the United States. Border security is critical to the nation's national security. Recognizing the critical importance of border security, Congress has mandated DHS to achieve and maintain operational control of the international land border. Secure Fence Act of 2006, Public Law 109–367, section 2, 120 Stat. 2638 (Oct. 26, 2006) (8 U.S.C. 1701 note). Congress defined ''operational control'' as the prevention of all unlawful entries into the United States, including entries by terrorists, other

unlawful aliens, instruments of terrorism, narcotics, and other contraband. *Id.* Consistent with that mandate from Congress, the President's Executive Order on Border Security and Immigration Enforcement Improvements directed executive departments and agencies to deploy all lawful means to secure the southern border. Executive Order 13767, section 1. In order to achieve that end, the President directed, among other things, that I take immediate steps to prevent all unlawful entries into the United States, including the immediate construction of physical infrastructure to prevent illegal entry. Executive Order 13767, section 4(a).

Congress has provided to the Secretary of Homeland Security a number of authorities necessary to carry out DHS's border security mission. One of those authorities is found at section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended ("IIRIRA"). Public Law 104–208, Div. C, 110 Stat. 3009–546, 3009–554 (Sept. 30, 1996) (8 U.S.C 1103 note), as amended by the REAL ID Act of 2005, Public Law 109–13, Div. B, 119 Stat. 231, 302, 306 (May 11, 2005) (8 U.S.C. 1103 note), as amended by the Secure Fence Act of 2006, Public Law 109–367, section 3, 120 Stat. 2638 (Oct. 26, 2006) (8 U.S.C. 1103 note), as amended by the Department of Homeland Security Appropriations Act, 2008, Public Law 110–161, Div. E, Title V, section 564, 121 Stat. 2090 (Dec. 26, 2007). In section 102(a) of IIRIRA, Congress provided that the Secretary of Homeland Security shall take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States. In section 102(b) of IIRIRA, Congress mandated the installation of additional fencing, barriers, roads, lighting, cameras, and sensors on the southwest border. Finally, in section 102(c) of IIRIRA, Congress granted to the Secretary of Homeland Security the authority to waive all legal requirements that I, in my sole discretion, determine necessary to ensure the expeditious construction of barriers and roads authorized by section 102 of IIRIRA.

## Determination and Waiver

### Section 1

The United States Border Patrol's Del Rio Sector is an area of high illegal entry. In fiscal year 2019, the United States Border Patrol ("Border Patrol") apprehended over 57,000 illegal aliens attempting to enter the United States between border crossings in the Del Rio Sector. Also in fiscal year 2019, there were over 146 drug-related events between border crossings in the Del Rio Sector, through which Border Patrol seized over 40 pounds of marijuana, over 15 pounds of cocaine, over 24 pounds of heroin, and over 195 pounds of methamphetamine. Additionally, Val Verde County, Texas, and Maverick County, Texas, which are located in the Del Rio Sector, have been identified as a High Intensity Drug Trafficking Area by the Office of National Drug Control Policy.

Due to the high levels of illegal entry of people and drugs within the Del Rio Sector, I must use my authority under section 102 of IIRIRA to install additional physical barriers and roads in the Del Rio Sector. Therefore, DHS will take immediate action to replace existing pedestrian fencing in the Del Rio Sector. The segments within which such construction will occur are referred to herein as the "project areas" and are more specifically described in Section 2 below.

The current pedestrian barrier in the Del Rio Sector does not provide the level of impedance necessary to effectively secure the border. Transnational criminal organizations frequently defeat and exploit the existing fencing for narcotics and human smuggling due to its inferior design and dilapidated condition. Construction of new fencing with a more operational effective design will allow Border Patrol to secure the border more effectively. Within the project areas roads will also be constructed or improved and lighting will be installed.

To support DHS's action under section 102 of IIRIRA, I requested that the Secretary of Defense, pursuant to 10 U.S.C. 284(b)(7), assist by constructing fence, roads, and lighting within the Del Rio Sector in order to block drug smuggling corridors across the international boundary between the United States and Mexico. The Secretary of Defense has concluded that the support requested satisfies the statutory requirements of 10 U.S.C. 284(b)(7) and that the Department of Defense will provide such support in the project areas described in Section 2 below.

### Section 2

I determine that the following areas in the vicinity of the United States border, located in the State of Texas within the United States Border Patrol's Del Rio Sector, are areas of high illegal entry (the "project areas"):

• Starting approximately two and one-half (2.5) miles north and west of the Del Rio Port of Entry and extending south and east for approximately three and one-half (3.5) miles; and

• Starting approximately one-half (0.5) mile south of the Eagle Pass II Port of Entry and extending north for approximately three (3) miles.

There is presently an acute and immediate need to construct physical barriers and roads in the vicinity of the border of the United States in order to prevent unlawful entries into the United States in the project areas pursuant to sections 102(a) and 102(b) of IIRIRA. In order to ensure the expeditious construction of the barriers and roads in the project areas, I have determined that it is necessary that I exercise the authority that is vested in me by section 102(c) of IIRIRA.

Accordingly, pursuant to section 102(c) of IIRIRA, I hereby waive in their entirety, with respect to the construction of physical barriers and roads (including, but not limited to, accessing the project areas, creating and using staging areas, the conduct of earthwork, excavation, fill, and site preparation, and installation and upkeep of physical barriers, roads, supporting elements, drainage, erosion controls, safety features, lighting, cameras, and sensors) in the project areas, all of the following statutes, including all federal, state, or other laws, regulations, and legal requirements of, deriving from, or related to the subject of, the following statutes, as amended:

The National Environmental Policy Act (Pub. L. 91–190, 83 Stat. 852 (Jan. 1, 1970) (42 U.S.C. 4321 *et seq.*)); the Endangered Species Act (Pub. L. 93–205, 87 Stat. 884 (Dec. 28, 1973) (16 U.S.C. 1531 *et seq.*)); the Federal Water Pollution Control Act (commonly referred to as the Clean Water Act (33 U.S.C. 1251 *et seq.*)); the National Historic Preservation Act (Pub. L. 89–665, 80 Stat. 915 (Oct. 15, 1966), as amended, repealed, or replaced by Pub. L. 113–287, 128 Stat. 3094 (Dec. 19, 2014) (formerly codified at 16 U.S.C. 470 *et seq.*, now codified at 54 U.S.C. 100101 note and 54 U.S.C. 300101 *et seq.*)); the Migratory Bird Treaty Act (16 U.S.C. 703 *et seq.*); the Migratory Bird Conservation Act (16 U.S.C. 715 *et seq.*); the Clean Air Act (42 U.S.C. 7401 *et seq.*); the Archeological Resources Protection Act (Pub. L. 96–95, 93 Stat. 721 (Oct. 31, 1979) (16 U.S.C. 470aa *et seq.*)); the Paleontological Resources Preservation Act (16 U.S.C. 470aaa *et seq.*); the Federal Cave Resources Protection Act of 1988 (16 U.S.C. 4301 *et seq.*); the Safe Drinking Water Act (42

U.S.C. 300f *et seq.*); the Noise Control Act (42 U.S.C. 4901 *et seq.*); the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act (42 U.S.C. 6901 *et seq.*); the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. 9601 *et seq.*); the Archaeological and Historic Preservation Act (Pub. L. 86–523, 74 Stat. 220 (June 27, 1960) as amended, repealed, or replaced by Pub. L. 113–287, 128 Stat. 3094 (Dec. 19, 2014) (formerly codified at 16 U.S.C. 469 *et seq.,* now codified at 54 U.S.C. 312502 *et seq.*)); the Antiquities Act (formerly codified at 16 U.S.C. 431 *et seq.,* now codified at 54 U.S.C. 320301 *et seq.*); the Historic Sites, Buildings, and Antiquities Act (formerly codified at 16 U.S.C. 461 *et seq.,* now codified at 54 U.S.C. 3201–320303 & 320101–320106); the Farmland Protection Policy Act (7 U.S.C. 4201 *et seq.*); National Fish and Wildlife Act of 1956 (Pub. L. 84–1024 (16 U.S.C. 742a, *et seq.*)); the Fish and Wildlife Coordination Act (Pub. L. 73–121, 48 Stat. 401 (March 10, 1934) (16 U.S.C. 661 *et seq.*)); the National Trails System Act (16 U.S.C. 1241 *et seq.*); the Wild Horse and Burro Act (16 U.S.C. 1331 *et seq.*); the Administrative Procedure Act (5 U.S.C. 551 *et seq.*); the Rivers and Harbors Act of 1899 (33 U.S.C. 403); the Wild and Scenic Rivers Act (Pub. L. 90–542 (16 U.S.C. 1281 *et seq.*)); the Eagle Protection Act (16 U.S.C. 668 *et seq.*); the Native American Graves Protection and Repatriation Act (25 U.S.C. 3001 *et seq.*); and the American Indian Religious Freedom Act (42 U.S.C. 1996).

This waiver does not revoke or supersede any other waiver determination made pursuant to section 102(c) of IIRIRA. Such waivers shall remain in full force and effect in accordance with their terms. I reserve the authority to execute further waivers from time to time as I may determine to be necessary under section 102 of IIRIRA.

Dated: March 11, 2020.

**Chad F. Wolf,**

*Acting Secretary of Homeland Security.*

[FR Doc. 2020–05347 Filed 3–13–20; 8:45 am]

**BILLING CODE 9111–14–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**[Docket No. DHS–2019–0047]**

**Privacy Act of 1974; System of Records**

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of new system of records.

**SUMMARY:** In accordance with the Privacy Act of 1974, the Department of Homeland Security (DHS) proposes to establish a new DHS system of records titled, "Department of Homeland Security/ALL–043 Enterprise Biometric Administrative Records (EBAR) System of Records (SOR)." This system of records allows the DHS to collect and maintain administrative and technical records associated with the enterprise biometric system known as the Automated Biometric Identification System (IDENT) and its successor information technology system, currently in development, called the Homeland Advanced Recognition Technology (HART).

Additionally, DHS is issuing a Notice of Proposed Rulemaking (NPRM) to exempt this system of records from certain provisions of the Privacy Act, elsewhere in the **Federal Register**. This newly established system will be included in the Department of Homeland Security's inventory of record systems.

**DATES:** Submit comments on or before April 10, 2020. This new system will be effective upon publication, with the exception of the routine uses, which will become effective April 10, 2020.

**ADDRESSES:** You may submit comments, identified by docket number DHS–2019–0047 by one of the following methods:

• *Federal e-Rulemaking Portal: http:// www.regulations.gov.* Follow the instructions for submitting comments.

• *Fax:* 202–343–4010.

• *Mail:* Jonathan R. Cantor, Acting Chief Privacy Officer, Privacy Office, Department of Homeland Security, Washington, DC 20528–0655.

*Instructions:* All submissions received must include the agency name and docket number DHS–2019–0047. All comments received will be posted without change to *http:// www.regulations.gov,* including any personal information provided.

*Docket:* For access to the docket to read background documents or comments received, go to *http:// www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** For general questions and for privacy issues, please contact: Jonathan R. Cantor, *privacy@hq.dhs.gov,* (202) 343–1717, Acting Chief Privacy Officer, Privacy Office, Department of Homeland Security, Washington, DC 20528–0655.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

In 2007, DHS published the DHS/US–VISIT–001 DHS Automated Biometric Identification System (IDENT), 72 FR 31080 (June 5, 2007) system of records notice (SORN). The IDENT SORN covered biometric holdings for the entire Department. Since then, the Department's Privacy Act framework and technology for enterprise biometrics has evolved as the Department has matured. DHS Component SORNs now cover the collection, maintenance, and use of the biometrics records collected directly by each Component. The Department, however, still published a SORN to cover biometrics first collected and received from non-DHS entities, DHS/ALL–041 External Biometric Records (EBR) SORN, 83 FR 17829 (April 24, 2018), which governs the maintenance and use of biometrics and associated biographic information received from non-DHS entities. DHS is establishing DHS/ALL–043 Enterprise Biometric Administrative Records (EBAR) to cover the administrative and technical records associated with the enterprise biometric system, known as the Automated Biometric Identification System (IDENT) and its successor information technology system, currently in development, called the Homeland Advanced Recognition Technology (HART). Together, the EBAR SORN, EBR SORN, and the underlying Component SORNs will replace the IDENT and Technical Reconciliation Analysis Classification System (TRACS) SORNs. DHS will rescind the IDENT and TRACS SORNs by publishing a *notice of rescindment* in the **Federal Register**, following publication of this SORN.

The Office of Biometric Identity Management (OBIM) maintains the Department's primary repository of biometric information held by DHS in connection with varied missions and functions, including law enforcement; national security; immigration screening; border enforcement; intelligence; national defense; background investigations relating to national security positions; and credentialing consistent with applicable DHS authorities.

The primary repository, currently IDENT and its successor information technology (IT) system, HART, is a centralized and dynamic DHS-wide biometric database that also contains limited biographic and encounter history information needed to place the biometric information in proper context. The information is collected by, on behalf of, in support of, or in cooperation with DHS and its components and may contain personally identifiable information collected by Federal, State, local, tribal, foreign, or international agencies, consistent with

# Exhibit J: ECF 26-14, Southwest Land Border Encounters (D-14)

**United States District Court**
**Western District of Texas**
**Austin Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | |
| v. | No. 1:23-cv-00853-DII |
| GREG ABBOTT, in his capacity as Governor of the State of Texas, and THE STATE OF TEXAS, | |
| *Defendants*. | |

---

| | |
|---|---|
| EPI'S CANOE & KAYAK TEAM, LLC AND JESSIE FUENTES, | |
| *Plaintiffs*, | |
| v. | No. 1:23-cv-00836-DII |
| STATE OF TEXAS, *et al.*, | |
| *Defendants*. | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**

# EXHIBIT N



**U.S. Customs and Border Protection (CBP) Encounters**
U.S. Border Patrol (USBP) Title 8 Apprehensions, Office of Field Operations (OFO)
Title 8 Inadmissible Volumes, and Title 42 Expulsions by Fiscal Year to Date
(FYTD) 2023



Select a component:  ◉ USBP
                     ○ OFO



**FY2023 YTD USBP Southwest Land Border Encounters**

| FYTD | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|

| All 99,545 | Title 8 99,545 |
|------------|----------------|

| San Diego | 12,906 |
| El Centro | 1,680 |
| Yuma | 8,969 |
| Tucson | 24,360 |
| El Paso | 13,229 |
| Big Bend | 412 |
| Del Rio | 24,634 |
| Laredo | 1,919 |
| Rio Grande Valley | 11,436 |

**Citizenship Grouping**

| Other | Mexico | Honduras | Guatemala | El Salvador |
|-------|--------|----------|-----------|-------------|
| 43,332 | 33,967 | 10,657 | 9,547 | 2,042 |

**Demographic by Citizenship Grouping**

| Single Adults | 61,540 |
| FMUA | 31,264 |
| UC / Single Minors | 6,741 |

**Source:** USBP and OFO month end reporting for FY23TD. Data is current as of 7/6/2023.

# Exhibit K: ECF 26-15, Southwest Land Border Encounters (D-15)

**United States District Court**
**Western District of Texas**
**Austin Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | |
| v. | No. 1:23-cv-00853-DII |
| GREG ABBOTT, in his capacity as Governor of the State of Texas, and THE STATE OF TEXAS, | |
| *Defendants*. | |

| | |
|---|---|
| EPI'S CANOE & KAYAK TEAM, LLC AND JESSIE FUENTES, | |
| *Plaintiffs*, | |
| v. | No. 1:23-cv-00836-DII |
| STATE OF TEXAS, *et al.*, | |
| *Defendants*. | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**

# EXHIBIT O





**U.S. Customs and Border Protection**

Select a component:  ◉ USBP   ○ OFO



## FY2023 YTD USBP Southwest Land Border Encounters

| FYTD | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|

| **All** **1,513,441** | Title 8 963,593 | Title 42 549,848 |
|---|---|---|

| Sector | Value |
|--------|-------|
| San Diego | 170,322 |
| El Centro | 45,675 |
| Yuma | 154,935 |
| Tucson | 234,667 |
| El Paso | 347,629 |
| Big Bend | 10,290 |
| Del Rio | 293,377 |
| Laredo | 37,036 |
| Rio Grande Valley | 219,510 |

### Citizenship Grouping

| Other | Mexico | Guatemala | Honduras | El Salvador |
|-------|--------|-----------|----------|-------------|
| 787,717 | 463,873 | 120,911 | 102,337 | 38,603 |

### Demographic by Citizenship Grouping

| Single Adults | 1,053,614 |
| FMUA | 365,006 |
| UC / Single Minors | 94,821 |

**Source:** USBP and OFO month end reporting for FY23TD. Data is current as of 7/6/2023.

**EXHIBIT L: DECLARATION OF RAMON GONZALEZ (D-16)**

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

UNITED STATES OF AMERICA,

    **Plaintiff,**

**v.**

**GREG ABBOTT, in his capacity as Governor of the State of Texas, and the STATE OF TEXAS,**

    **Defendants.**

No. 1:23-cv-00853 - DII

## DECLARATION OF RAMON GONZALEZ
## IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

1.      My name is Ramon Gonzalez. I am a United States citizen and reside in Maverick County, Texas. I am employed by the Maverick County Sheriff's Department and am a pastor with my church, Vida de Fe Internacional.

2,      I was born in Mexico near Piedras Negras in Coahuila in 1958. In the early 1970's, my father bought a ranch that was upriver from Piedras Negras. The ranch had three to four kilometers of frontage on the Rio Grande River (or Rio Bravo as it is referred to in Mexico). That ranch was opposite Maverick County, Texas.

Defendant's Exhibits

16

3.    I worked on that ranch as I was growing up. I studied at Monterrey Tech in Monterrey, Mexico beginning in 1979, and then returned to become a rancher on that ranch on the Rio Grande (Rio Bravo) in the early 1980's. I continued to ranch there until the early 2000's.

4.    In 2012, I was called to become a pastor. I moved to Maverick County, Texas, and obtained a United States residence card. In 2018, I became a naturalized United States citizen.

5.    As a result of my experiences over the last fifty years, I am familiar with the condition and uses of the Rio Grande River (Rio Bravo) in and near Maverick County, Texas as they existed from the early 1970's until today.

6.    I have never seen any lawful commercial navigation on the Rio Grande River (Rio Bravo) opposite Maverick County, Texas in my life.

7.    I have seen people crossing over the River from Mexico to Maverick County, Texas and the United States. However, I have seen virtually no traffic across the River in the Maverick County, Texas area other than migration, smuggling, and human trafficking. I also have seen no boats traveling up and down the River in the Maverick County, Texas area other than law enforcement or government boats.

8.    I have seen some fishing on the River in that area opposite Maverick County, Texas, mostly from the banks of the River. This fishing was for recreation or personal/family consumption, but no commercial fishing. Because of releases into the River from maquiladora plants in Mexico, the water quality in portions of that area of the River is not very good for fish.

I hereby declare under penalty of perjury, pursuant to 28 U. S. C. § 1746, that the foregoing is true and correct to the best of my knowledge and information.

Signed this __16__ day of August 2023.

Ramon Gonzalez

# Exhibit M: Declaration of Ben Valdez (D-17)

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF TEXAS**

**AUSTIN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **No. 1:23-cv-00853 – DII** |
| **GREG ABBOTT, in his capacity as Governor of the State of Texas, and the STATE OF TEXAS,** | |
| **Defendants.** | |

### DECLARATION OF BEN VALDEZ
### IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

1.     My name is Ben Valdez. I am a United States citizen and reside in Del Rio, Texas. I retired in 2021 after twenty-one years of service with the United States Customs and Border Patrol ("CBP").

2,     During my career with CBP, I worked in and along the Rio Grande River in Texas. For eleven years, I was stationed in Del Rio. I was stationed for seven years in Eagle Pass, Maverick County, Texas, and for three years at Eagle Pass South in Maverick County, Texas. During my time with CBP in both the Del Rio and Eagle Pass area, I not only observed activities in the Rio Grande River directly, but also through CBP cameras that monitor activities on the Rio Grande

Defendant's Exhibits

Defendant's Exhibits

17

River 24 hours a day, 7 days a week. The CBP cameras also had night vision capability so that activity on the Rio Grande River at night was visible. Part of my duties for CBP for many years was monitoring activities on the Rio Grande River in or near Maverick County, Texas, and also other Texas counties adjacent to the Rio Grande River.

3.      For two and one-half years when I was stationed in Eagle Pass and Eagle Pass South, I was assigned to airboats active in the Rio Grande River in Maverick County, Texas. During that period, I traveled in airboats up the Rio Grande River to the Del Rio, Texas area, and down the Rio Grande river to the Laredo, Texas area. However, the great majority of my work in airboats during that period was on the Rio Grande River in Maverick County, Texas.

4.      As a result of my experience in CBP, and especially my years assigned to CBP airboats, I am familiar with the condition and uses of the Rio Grande River (Rio Bravo) in and near Maverick County, Texas as they existed during the last couple of decades up to 2021.

5.      The conditions in the Rio Grande River in and near Maverick County, Texas were unsuitable for commercial navigation throughout my CBP career. The River there is of inconsistent depth, but mostly too shallow to accommodate boats of a size that would be needed for commercial navigation. There are many obstacles in the River in that area. The obstacles are dangerous to boats traveling up and down the River or across the River in the Maverick County area. Sometimes the obstacles are visible, but often the obstacles are submerged in water that cannot be seen from boats on the River at all or can be seen only when a boat is almost on top of them.

6.      I have seen in the River in the Maverick County area submerged or partially submerged steel or lead pipe; fence posts; rocks; and other obstacles that would make commercial navigation of the River in the Maverick County area

impractical or impossible. There are weir dams on the River that make the River extremely shallow. There also are rock crossings that only can be negotiated by very shallow boats travelling in a zigzag fashion by someone who know the rock crossings well.

7.     I have seen airboats and other boats with very shallow draft collide with such obstacles on the Rio Grande River in the Maverick County area. I have seen some boats sustain significant damage from collisions with obstacles on the River in that area.

8.     I have never seen any lawful commercial navigation on the Rio Grande River opposite Maverick County, Texas.

9.     I have seen law enforcement and government use of the Rio Grande River in the Maverick County area. That includes Mexican law enforcement and emergency personnel. I have seen CPB and other federal. state. and local law enforcement and government use of the Rio Grande River in Maverick County, Texas. I have seen people crossing the River from Mexico to Maverick County, Texas and the United States, which is unlawful under 8 U. S. C. § 1325. The Maverick County, Texas area, also was an active area for illegal smuggling and human trafficking across the Rio Grande River from Mexico up until I retired from CPB in 2021.

10.     Based on what I saw and heard in my twenty-one years with CBP, there is and has been virtually no traffic up and down the River in the Maverick County, Texas area other than law enforcement or government boats. Based on what I saw and heard in that period, there is and has been virtually no traffic across the River in the Maverick County. Texas area other than unlawful migration, smuggling, and human trafficking.

11.    I have occasionally seen some fishing on the River in that area opposite Maverick County, Texas, for recreation or personal family consumption, but no commercial fishing. I also occasionally saw Texas game wardens in the Maverick County area on the River looking for illegal fishing activity. I don't recall seeing kayaks or canoes on the River in the Maverick County area.

I hereby declare under penalty of perjury, pursuant to 28 U. S. C. § 1746, that the foregoing is true and correct to the best of my knowledge and information.

Signed this __18__ day of August 2023.

Ben Valdez

**EXHIBIT N: UN MIGRATION STUDY DEEMS US-MEXICO BORDER 'DEADLIEST' LAND ROUTE IN THE WORLD BASED ON 2021 NUMBERS, FOX NEWS (JULY 4, 2022)**



U.S.   Politics   World   Opinion   Media   Video   AI   More ☐

Login   Watch TV

TRENDING



IMMIGRATION

# UN migration study deems US-Mexico border 'deadliest' land route in the world based on 2021 numbers

Border Patrol agents have encountered record numbers of migrants in recent years

By **Peter Aitken** · **Fox News**

Published July 4, 2022 10:48am EDT



**Former ICE director slams Biden admin on immigration, border crisis: 'It's going to get worse'**

Former ICE director Jonathan Fahey criticizes the Biden administration for encouraging illegal immigration and refusing to take responsibility for the crisis at the border.

A new study has labeled the border crossing between the U.S. and Mexico the [deadliest migration land route](#) in

the world.

The study, conducted by the Missing Migrants Project and published by the International Organization for Migration (IOM), recorded at least 1,238 deaths during migration in the Americas in 2021, with at least 728 of those deaths occurring on the U.S-Mexico border.

"The number of deaths on the United States-Mexico border last year is significantly higher than in any year prior, even before COVID-19," Edwin Viales, author of the report, said. "Yet, this number remains an undercount due to the diverse challenges for data collection."

"Our data shows the growing crisis of deaths during migration in the region, and the need to strengthen the forensic capacity of the authorities to identify deaths on these routes," he added. "We cannot forget that every single number is a human being with a family who may never know what happened to them."

BORDER PATROL AGENTS IN TEXAS DISCOVER MIGRANTS SMUGGLED INSIDE TOOLBOXES AT CHECKPOINT

The study cites the Venezuelan economic crisis as a major factor that has driven people from their home countries and forced them to take "irregular routes, including overseas crossings to Caribbean nations."



**Body bags lie at the scene where a tractor-trailer with multiple dead bodies was discovered, Monday, June 27, 2022, in San Antonio. (AP Photo/Eric Gay)**

The dangers of the crossing made headlines last week after the discovery of a tractor-trailer in San Antonio, Texas, containing 46 migrants who died and 16 who required immediate hospitalization. Some of those taken to the hospital died shortly after arrival.

BIDEN BORDER POLICY ROOTED IN 'LAWLESSNESS': REP. CAMMACK

The victims came from Mexico, Guatemala and Honduras, highlighting the scope of the migration route. IOM reported that this brought the total number of victims along the border to 493 for 2022 alone.



**Image 1 of 3**

**Migrants take temporary shelter at a basketball court in Juan Rodriguez Clara, Mexico, on Nov. 24, 2021. (Alejandro Cegarra/Bloomberg via Getty Images)**

Border Patrol officers have encountered record numbers of migrants trying to cross the southern border during the past year, with 239,416 recorded last month and 235,478 the month before that.

The numbers have continued to grow, and the number of deaths has increased as well: The Missing Migrants

Project recorded 854 deaths in 2019 and 798 deaths in 2020, making the 2021 figure a startling jump.

But the project stresses that even these numbers do not capture the entire picture due to a lack of official sources to collect data, meaning that the study's figures represent a significant undercount.

CLICK HERE TO GET THE FOX NEWS APP

The study ended with a plea for countries to "honor their commitments… to save migrant lives and prevent further deaths and disappearances."

*Fox News' Paul Best contributed to this report.*

Peter Aitken is a Fox News Digital reporter with a focus on national and global news.

## Sponsored Stories You May Like

Recommended by

## Sponsored Stories

Recommended by

## More From Fox News

- **Gutfeld: The media doesn't know Trump, something big is coming**
  Fox News

- **Trump's booking height and weight sets social media ablaze: 'Wait, what?'**
  Fox News

- **Biden DOJ sues Elon Musk's SpaceX for hiring Americans over refugees**
  Fox News

- **Arsonist accidentally lights self on fire while attempting to set church ablaze: video**
  Fox News

- **Life sentence for Montana woman guilty of torturing and killing 12-year-old grandson**
  Fox News

- **Portland serial killer dies at home after sentence of just probation**
  Fox News

## More From Fox News

EXHIBIT O: EXECUTIVE ORDER, NO. GA-41 (D-22)



GOVERNOR GREG ABBOTT

July 7, 2022

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
_____1PM_____ O'CLOCK

JUL 0 7 2022

Secretary of State

The Honorable John B. Scott
Secretary of State
State Capitol Room 1E.8
Austin, Texas 78701

Dear Mr. Secretary:

Pursuant to his powers as Governor of the State of Texas, Greg Abbott has issued the following:

      Executive Order No. GA-41 relating to returning illegal immigrants to the border.

The original executive order is attached to this letter of transmittal.

Respectfully submitted,

Gregory S. Davidson
Executive Clerk to the Governor

GSD:gsd

Attachment

Defendant's
Exhibits

22

# Executive Order

## BY THE
## GOVERNOR OF THE STATE OF TEXAS

**Executive Department**
**Austin, Texas**
**July 7, 2022**

### EXECUTIVE ORDER
### GA 41

*Relating to returning illegal immigrants to the border.*

———————

WHEREAS, securing the international border is the federal government's responsibility, but President Biden has refused to enforce the immigration laws enacted by Congress, including statutes mandating detention of certain immigrants who have claimed asylum or committed a crime; and

WHEREAS, the cartels refer to these open-border policies as *la invitación* ("the invitation"), reflecting the perception that President Biden welcomes immigrants to make the dangerous trek across our southern border; and

WHEREAS, an immigrant's journey to the United States can even prove fatal, as evidenced by the recent discovery of 53 dead bodies inside a smuggler's truck, and by a recent report from a United Nations agency describing our southern border as the deadliest land crossing in the world during President Biden's first year in office; and

WHEREAS, at least 42 subjects on the terrorist watchlist have been arrested while attempting to cross the border illegally since January 2021, and an unknown number have crossed while evading detection, demonstrating that an insecure border is a pathway for terrorists to enter the United States; and

WHEREAS, President Biden's failure to protect our border has necessitated action by the State of Texas to ensure public safety and to defend against violations of its sovereignty and territorial integrity; and

WHEREAS, I, Greg Abbott, Governor of Texas, issued a disaster proclamation on May 31, 2021, which has been amended and renewed in each subsequent month effective through today, certifying under Section 418.014 of the Texas Government Code that the surge of individuals unlawfully crossing the Texas-Mexico border posed an ongoing and imminent threat of disaster for a number of Texas counties and for all state agencies affected by this disaster; and

WHEREAS, through Operation Lone Star, I have deployed thousands of brave men and women from the Texas National Guard and the Texas Department of Public Safety to secure the border, to enforce the laws of Texas, and to prevent, detect, and interdict transnational criminal behavior; and

WHEREAS, by employing a variety of strategies, Operation Lone Star has resulted in thousands of apprehensions and criminal arrests, along with the seizure of thousands of weapons, hundreds of millions of lethal doses of fentanyl, and other contraband; and

WHEREAS, the Biden Administration's decision to end Title 42 expulsions, which has been halted by a federal court, and to terminate the Remain-in-Mexico policy, will

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
___1 PM___ O'CLOCK

JUL 0 7 2022

invite the cartels to smuggle millions more illegal immigrants into Texas, as evidenced by the Biden Administration's projection that terminating Title 42 expulsions will result in as many as 18,000 immigrant apprehensions per day; and

WHEREAS, President Biden's border crisis hit a new record in May 2022, which saw the largest number of immigrants arrested or encountered along our southern border since U.S. Customs and Border Protection began keeping track in 2000, and these unprecedented numbers are overwhelming local communities across Texas; and

WHEREAS, President Biden's reckless refusal to secure the border will provide material support to the cartels, allow them to smuggle more dangerous people, drugs, and weapons into Texas, and embolden cartel gunmen to continue shooting at state and federal officials; and

WHEREAS, President Biden's failure to faithfully execute the immigration laws enacted by Congress confirms that he has abandoned the covenant, in Article IV, § 4 of the U.S. Constitution, that "[t]he United States . . . shall protect each [State in this Union] against Invasion," and thus has forced the State of Texas to build a border wall, deploy state military forces, and enter into agreements as described in Article I, § 10 of the U.S. Constitution to secure the State of Texas and repel the illegal immigration that funds the cartels; and

WHEREAS, in the Texas Disaster Act of 1975, the Legislature charged the Governor with the responsibility "for meeting . . . the dangers to the state and people presented by disasters" under Section 418.011 of the Texas Government Code, and expressly authorized the Governor to "issue executive orders . . . hav[ing] the force and effect of law" under Section 418.012; and

WHEREAS, the Governor can call on state military forces to enforce the law under Article IV, § 7 of the Texas Constitution and Sections 431.111 and 437.002 of the Texas Government Code; and

WHEREAS, an immigrant commits a federal crime under 8 U.S.C. § 1325(a)(1) by entering the United States between the ports of entry that have been designated as field offices by federal immigration officers; and

WHEREAS, the Supreme Court's opinion in *Arizona v. United States* specifically does not "address whether reasonable suspicion of illegal entry or another immigration crime would be a legitimate basis for prolonging a detention, or whether this too would be preempted by federal law," 567 U.S. 387, 414 (2012);

NOW, THEREFORE, I, Greg Abbott, Governor of Texas, by virtue of the power and authority vested in me by the Constitution and laws of the State of Texas, do hereby authorize and empower the Texas National Guard and the Texas Department of Public Safety to respond to this illegal immigration by apprehending immigrants who cross the border between ports of entry or commit other violations of federal law, and to return those illegal immigrants to the border at a port of entry.

This executive order shall remain in effect and in full force unless it is modified, amended, rescinded, or superseded by the governor. This executive order may also be amended by proclamation of the governor.

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
____1ᵖᵐ____ O'CLOCK

JUL 0 7 2022



Given under my hand this the 7th
day of July, 2022.

GREG ABBOTT
Governor

ATTESTED BY:

JOHN B. SCOTT
Secretary of State

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
____1 PM____ O'CLOCK

JUL 0 7 2022