No. 23-50632

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*

*v.*

GREG ABBOTT, IN HIS CAPACITY AS GOVERNOR OF THE STATE OF TEXAS; STATE OF TEXAS,

*Defendants-Appellants*

On Appeal from the United States District Court for the
Western District of Texas, Austin Division, 1:23-cv-00853-DAE

## EXHIBITS IN SUPPORT OF DEFENDANTS' OPPOSED EMERGENCY MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL AND FOR AN ADMINISTRATIVE STAY

### VOLUME V

### INDEX OF EXHIBITS[1]

Exhibit

Selected Plaintiff's Exhibits from Preliminary Injunction Hearing (cont'd):

ECF 37-5, 1975 US Army Corps of Engineers Navigability Determination (Exhibit B to Shelnutt Declaration) (G-35):

Part 1: pp. 1-50 ............................................................................ A

---

[1] In these Exhibits, "ECF ___" refers to the district court docket number. Due to space constraints, unless indicated, the attachments to district court filings have not been included in the Exhibits in Support of Defendants' Motion to Stay.

EXHIBIT A: 1975 US ARMY CORPS OF ENGINEERS
NAVIGABILITY DETERMINATION (EXHIBIT B TO
SHELNUTT DECLARATION) (G-35) — PART 1: PP. 1-50

# NAVIGABILITY STUDY

## RIO GRANDE, TRIBUTARIES, AND LAKES

## RIO GRANDE BASIN

### RIVER MILE 275.5 TO 610.0



Government's Exhibit
US v Abbott
1:23-cv-00853-DII
**G35**

MARCH 1975

G35.0001

# TABLE OF CONTENTS

Subject                                                                Page No.

### REPORT OF FINDINGS

1.  Name of Water Body . . . . . . . . . . . . . . . . . .        1

2.  Tributary to . . . . . . . . . . . . . . . . . . . . .        1

3.  Physical Characteristics . . . . . . . . . . . . . . .        1

    a.  Type:  (River, bay, slough, estuary, etc.) . . .          1

    b.  Length . . . . . . . . . . . . . . . . . . . . . .        1

    c.  Approximate Discharge Volumes . . . . . . . . .           2

    d.  Fall per mile . . . . . . . . . . . . . . . . . .         2

    e.  Extent of tidal influence . . . . . . . . . . .           3

    f.  Range between ordinary high and ordinary
        low water. . . . . . . . . . . . . . . . . . . .          3

    g.  Improvements to navigation . . . . . . . . . . .          3

4.  Nature and location of significant obstructions
    to navigation . . . . . . . . . . . . . . . . . . . .         3

5.  Authorized Projects. . . . . . . . . . . . . . . . . .        3

    a.  Nature, condition and location of any
        improvement made under projects authorized
        by Congress . . . . . . . . . . . . . . . . . . .         3

    b.  Description of projects authorized but not
        constructed . . . . . . . . . . . . . . . . . . .         4

    c.  List of known survey documents or reports
        describing the water body. . . . . . . . . . . .          4

    d.  Listings of books having information about
        the water body . . . . . . . . . . . . . . . . .          4

6.  Past or present interstate commerce . . . . . . . .           4

    a.  General types, extent, and period in time, and

        b.  Documentation . . . . . . . . . . . . . . . .         4

i

| | | Page No. |
|---|---|---|
| 7. | Potential Use for Interstate Commerce . . . . . . . . . . : | 6 |
| | a. If in natural condition . . . . . . . . . . . . . . | 6 |
| | b. If improved . . . . . . . . . . . . . . . . . . . . | 6 |
| 8. | Nature of jurisdiction known to have been exercised by federal agencies, if any . . . . . . . . . | 6 |
| 9. | State or Federal court decisions relating to navigability of the water body, if any . . . . . . . . | 6 |
| 10. | Remarks . . . . . . . . . . . . . . . . . . . . . . . . | 8 |
| | a. Tributaries . . . . . . . . . . . . . . . . . . . . | 8 |
| | b. Lakes and dams . . . . . . . . . . . . . . . . . . | 9 |
| 11. | Finding of navigability (with date) and recommendation for determination . . . . . . . . . . . | 9 |

OPINION OF DISTRICT COUNSEL

| 1. | Navigable by Treaty . . . . . . . . . . . . . . . . . . | 10 |
|---|---|---|
| 2. | U. S. Supreme Court Decision . . . . . . . . . . . . . | 11 |

FINDINGS

| | River Mile 275.5 to 610 . . . . . . . . . . . . . . . . | 12 |
|---|---|---|
| 3. | Past, Present and Future Use (for record purposes only) | 12 |
| | a. Past Use . . . . . . . . . . . . . . . . . . . . . . | 13 |
| | b. Present Use . . . . . . . . . . . . . . . . . . . . | 14 |
| | c. Future Use . . . . . . . . . . . . . . . . . . . . . | 14 |
| 4. | Tributaries and Lakes . . . . . . . . . . . . . . . . . | 14 |

FINDINGS

| | Tributaries and Lakes . . . . . . . . . . . . . . . . . | 15 |
|---|---|---|

G35.0003

LIST OF EXHIBITS
TO THE REPORT OF FINDINGS AND
THE OPINION OF THE DISTRICT COUNSEL

| Description | EXHIBIT |
|---|---|
| Map of Rio Grande Basin | 1 |
| Profile, River Miles 0 to 615 (Extract from Report on Survey of Santa Isabel Creek, dated 1939) | 2 |
| Profile, River Miles 547 to 953 (Extract from report by International Boundary and Water Commission, dated 1951) | 3 |
| Listing of Obstructions (Extract from List of Bridges Over the Navigable Waters of the United States, dated 1941) | 4 |
| Extract from Texas Water Development Board Report 48, dated 1966 | 5 |
| Extract from Texas Water Development Board Report 126, dated 1971 | 6 |
| Extract from Senate Document 65, 86th Congress, 1st Session | 7 |
| Extract from Handbook of Texas, dated 1952 | 8 |
| List of Known Survey Documents or Reports Describing the Rio Grande | 9 |
| Listing of Books Having Information About the Rio Grande | 10 |
| Extract from Rio Grande, River of Destiny, dated 1949 | 11 |
| Extract from The Handbook of Texas, dated 1952 | 12 |
| Extract from British Correspondence Concerning Texas in The Southwestern Historical Quarterly, dated 1914 | 13 |
| Extract from People and Plots on the Rio Grande, dated 1957 | 14 |

G35.0004

LIST OF EXHIBITS (Cont'd)

| Description | EXHIBIT |
| --- | --- |
| Notes on Early Steamboating in the <u>Southwestern Historical Quarterly</u>, dated 1945 | 15 |
| Extract from <u>Great River</u>, dated 1954 | 16 |
| Extract from <u>East Texas Riverboat Era and Its Decline</u>, dated 1965 | 17 |
| Extract from <u>Galveston District Listing of Navigable Waterways</u>, dated 1971 | 18 |
| Extracts from <u>Treaties and Other International Agreements of the United States of America</u> Vol 9, dated 1972 | 19, 20, 21, 22, and 24 |
| Extract from House Document 359, 71st Congress, 2d Session, dated 1930 | 23 |
| Extract from <u>The Handbook of Texas</u>, dated 1952 | 25 |
| List of early opinions (OCE) on waterways in Galveston District | 26 |
| Map of Falcon Reservoir prepared by A.I.D. Associates, Inc., 1975 Edition | 27 |
| Map of Amistad Reservoir prepared by A.I.D. Associates, Inc., 1974 Edition | 28 |
| Extract from Treaty to Resolve Pending Boundary Differences and Maintain the Rio Grande, etc., dated November 23, 1970 | 29 |

G35.0005

REPORT OF FINDINGS

NAVIGABILITY STUDY

RIO GRANDE, TRIBUTARIES, AND LAKES

RIO GRANDE BASIN, TEXAS

The reach under consideration lies within the boundaries of the Fort Worth District. The dividing line between the Fort Worth and Galveston Districts is the west line of Starr County, river mile 275.5. This is just upstream of the Falcon damsite. The dividing line between the Fort Worth and Albuquerque Districts is river mile 610.0, which is the upper limits of Amistad Reservoir. Certain data and comments are, of necessity, applicable to the entire basin.

1. <u>Name of waterbody</u>: Rio Grande, river miles 275.5 to 610.0.

2. <u>Tributary to</u>: Drains into the Gulf of Mexico a few miles east of Brownsville, Texas.

3. <u>Physical characteristics</u>:

   a. <u>Type</u>: The Rio Grande basin lies in the southwestern United States and northeastern Mexico. The drainage area is 182,215 square miles, of which 88,968 square miles are in the United States and 48,259 square miles in Texas. A portion of the basin in Mexico is non-contributing. The basin has an airline length of approximately 1,820 miles and a maximum width of 235 miles.

   The streambed elevation varies from about elevation 12,000 feet mean sea level at its source to approximately elevation 3,000 feet at El Paso to sea level near Brownsville. The upper reaches are snow and spring fed while the reach in New Mexico is typically desert. The river is deeply incised in the Big Bend reach, where it flows through the magnificant Santa Elena, Mariscal, Vencente, and Boquillas canyons. The river is approximately 1,700 feet below the rim in the Mariscal canyon. In its lower reaches the river is a typical irregularly flowing stream found in semiarid climates. The sinuosity increases considerably and the flood plain becomes much wider. Exhibit 1 is a map showing the outline of the basin and other significant features.

   b. <u>Length</u>: The Rio Grande heads at the foot of the continental divide north of the San Juan Mountains in southern Colorado, flows south through New Mexico and enters Texas near El Paso. The International Boundary and Water Commission states the length as 1,896 miles, which is

G35.0006

considerably below the 2,200 mile figure often used. It forms the boundary between the United States and the Republic of Mexico for 889 to 1,248 miles, depending upon the method of measurement. Also, depending upon methods of measurement, the Rio Grande is the fourth or fifth longest North American River. It is the second longest river entirely within or bordering the United States.

     c.  <u>Approximate discharge volumes</u>: Data for this subsection is not included for gages above the Fort Worth District boundary.

| Gage | Max flow, cfs Discharge | Date | Min flow, cfs Discharge | Date | Mean flow, cfs (3) Discharge | Per. of Rec. |
|---|---|---|---|---|---|---|
| Del Rio | 1,140,000 | Jun 54 | 176 | Jul 68 | 2,280 | 1961-68 |
| Eagle Pass | 946,100 | Jun 54 | 24 | Jun 53 | 2,813 | 1948-68 |
| Laredo | 716,900 | Jun 54 | 0 | (1) | 3,069 | 1948-68 |
| Rio Grande City | 220,000 | Sep 67 | 0 | (1) | 3,726 | 1954-68 |
| Brownsville | 31,700 | Oct 45 | 0 | (2) | 774 | 1954-68 |

(1)  More than 1 occasion
(2)  Numerous occasions
(3)  Flows at Rio Grande City and Brownsville have been regulated by Falcon Reservoir since impoundment began in August 1953. Mean flow reflects regulation and diversions. Flows at Del Rio, Eagle Pass, and Laredo have been regulated by Amistad Reservoir since impoundment began in May 1968. Mean flow does not reflect regulation.

     d.  <u>Fall per mile</u>: The average fall is about 6.3 feet per mile. The fall for specific reaches is given in the following table.

| Landmark | Distance River mile | in reach (miles) | Approx. streambed elevation (mean sea level) | Fall in reach (feet) | Avg. slope (feet per mile) |
|---|---|---|---|---|---|
| Langtry Gage | 613 | | 1175 | | |
| | | 75 | | 325 | 4.3 |
| Del Rio | 538 | | 850 | | |
| | | 103 | | 350 | 3.4 |
| Selected Point | 435 | | 500 | | |
| | | 170 | | 350 | 2.1 |
| El Tigre Arroyo | 265 | | 150 | | |
| | | 265 | | 160 | 0.6 |
| Mouth | 0 | | -10 | | |

2

G35.0007

Neither a complete profile or a recent profile could be found. Exhibits 2 and 3 are partial profiles. There are minor discrepancies between these profiles and certain other data.

     e. <u>Extent of tidal influence</u>: Not applicable to this report.

     f. <u>Range between ordinary high and ordinary low flows</u>: Records are inadequate to develop actual or hypothetical ordinary high and ordinary low flows.

     g. <u>Improvements to navigation</u>: There are not any improvements to navigation within the study reach.

   4. <u>Nature and location of significant obstructions to navigation</u>:

     The Rio Grande is obstructed by four highway and two railroad bridges in the study reach. Exhibit 4 gives data about several of these bridges. This listing does not show the Southern Pacific railroad bridge at Eagle Pass or the new highway bridge just downstream of Amistad Dam. The bridge at Zapata was removed because of the large width of Falcon Reservoir at the bridge's former location.

     The river is blocked by the major Falcon Dam just downstream of the Fort Worth District boundary and by the major Amistad Dam near Del Rio. Exhibits 5 and 6 contain extensive data about these obstructions. There is a diversion dam and intake owned by the Maverick County Water Control and Improvement District No. 1 approximately 15 miles downstream of Del Rio. There are also several small diversion dams for supplying water to Mexican irrigators.

     Exhibits 7, 8, 13, and 23 contain data about the river channel in the study reach. It is described as shifting and tortuous with relatively steep slopes except in the lowest reach. The presence of rapids in the lower reaches is noted in exhibit 13.

   5. <u>Authorized projects</u>:

     a. <u>Nature, condition, and location of any improvements made under projects authorized by Congress</u>: Several Soil Conservation Service structures authorized by Public Law 566 have been constructed on tributaries of the Rio Grande. The Falcon and Amistad Reservoirs, which are under the control of the International Boundary and Water Commission, are authorized projects. The Falcon damsite is located at river mile 270.5, 5 miles below the Fort Worth District's lower boundary. However, the major portion of the reservoir lies in the district. The Amistad damsite is located at river mile 567.0, approximately 12 miles upstream from Del Rio, Texas. Exhibits 5, 6, 27, and 28 contain additional data about these structures. The Amistad Dam was called Diablo Dam during planning.

3

G35.0008

   b.  Description of projects authorized but not constructed:

       There are no known authorized projects in the reach under study.
The 1944 treaty (also referred to as the 1945 treaty by some authors)
with Mexico which ultimately led to the construction of the Falcon and
Amistad Reservoirs does make provision for a third reservoir.  However,
topographic conditions at the site are very poor.

       c.  List of known survey documents or reports describing the
waterbody:  See exhibit 9 for listing.

       d.  Listing of books having information about the waterbody:
See exhibit 10 for listing.

   6.  Past or present interstate commerce:

       a.  General type, extent, and period in time and b.  Documentation:

       To avoid confusion in some of the exhibits, it should be noted
the Rio Grande has been known by many names.  These include the Rio Bravo,
Rio Bravo del Norte, Rio Grande del Norte, Rio del Norte, Rio San
Guenaventura, Rio Ganapetuan, Rio Turbio, Posage, and Rio de las Palmas.
Explorer Juan de Onate, who arrived on the banks near present day El Paso
in 1598, is credited with naming the stream Rio Grande.  The map in
exhibit 11 shows most of the locations cited in this section.

       The Rio Grande was the first Texas river on which steam navigation
was attempted.  (Exhibit 12).  Henry Austin's Ariel was the ship.  After
a few months unsuccessful operation, the Ariel was moved to the Brazos
River in August, 1830.  In a letter written by a Mr. Elliot to Lord
Aberdeen (Exhibit 13) in December of 1843, it is noted that in the winter
and spring months the river would be navigable for great distances in
light iron boats.  It was also stated the river was ill fitted for
general commercial use in the dry season due to rapids.  Navigation in
steamboats to the vicinity of Roma, Carmago, Mier, and Rio Grande City is
cited in several books.  (Exhibits 14, 15, 16, and 17)

       The first practical navigation occurred during the Mexican-
American War.  General Zachary Taylor importuned the quartermaster for
light steamboats for patrol and military transportation purposes.  The
Corvette, Whitesville, Major Brown, and Colonel Cross arrived from Pitts-
burg in June, 1846.  Other steamboats plying the Rio Grande at the time
were the J. E. Roberts and the Brownsville.

       Navigation was extended further upstream, as shown by this excerpt
from Notes on Early Steamboating on the Rio Grande (Exhibit 15):

4

G35.0009

In October, 1846, a successful attempt was made to ascend the Rio Grande in the United States steamer <u>Major Brown</u>, by order of General Patterson, with a view to ascertain whether or not it were possible to open a communication between Carmargo and the Presidio del Norte. This vessel drew but two feet of water. She experienced few obstacles in reaching the river Salado, nearly a hundred miles by water above Mier. Above this there was a series of continued shoals, rocks and rapids, among which the boat repeatedly grounded. She at length reached Laredo, a town about six hundred miles by water above the mouth of the river.

This successful effort is also noted in exhibit 17 and briefly in exhibit 14. Exhibit 14 contains an account of bandits using river boats as a means of transportation to their next border town victim.

<u>Great River</u> (Exhibit 6) contains the following account of navigating to the Big Bend reach. This is the farthest upstream area of which an account was found.

One was about the system of supplying the river forts by boat. The head of steam navigation in the 1850's (and in fact until the twentieth century when the last steamer ran in 1907) was Roma. Goods were trans-shipped upriver to the forts by pack and wagon from there. But the report of an early quartermaster of Fort Brown was extraordinary, even though his claims and recommendations came to nothing, as so often happened with Army reports. First of all, until steamboats were released from wartime troop duty, he supplied the river garrisons by keelboat. And then in 1850 he sent an expedition up the river with orders to navigate to the farthest possible place. He hoped to discover that shipping could utilize far more of the river's length than it had so far done. A keelboat and a skiff, manned by sixteen men, ascended the river by channel to a point a thousand miles above the head of steam travel or about thirteen hundred miles above the mouth. It was an astonishing penetration for a river with so little water, and the expeditioneers came back, all safe, to report optimistically that if the channel were improved in certain passages, steam navigation would be entirely feasible all the way "up to Babbitt's Falls." These falls were described as "not perpendicular, but a rapid descent of some 200 feet in about half a mile." They were walled in by a perpendicular gorge hundreds of feet high - so high, with such rocky darkness below the slit of sky overhead, that "the stars could be seen at mid-day."

5

G35.0010

It was a new piece of knowledge of the Rio Grande, and it may have described one of the canyons of the Big Bend. ___

The entire reach of the river within the Galveston District is classified as navigable (Exhibit 18).

7. Potential use for interstate commerce:

a. If in natural condition: The Rio Grande can be navigated during periods of sufficient flow only by fishing boats and other shallow draft craft. The data contained in the physical characteristics and obstructions to flow portions of section 3, as well as various exhibits, is indicative of the natural conditions which would have to be overcome.

b. If improved: Improvement of the Rio Grande for navigation is physically possible. Storage in the Falcon and Amistad Reservoirs would have to be judiciously used to provide sufficient flow for continuous navigation. Since navigation has fifth priority under existing treaties, there is little likelyhood of change. The area is adequately served by other transportation modes, thus making economic justification appear doubtful. There would be serious ecological objections to any channelization.

8. Nature of jurisdiction known to have been exercised by Federal agencies, if any: The International Boundary and Water Commission has jurisdiction over the Rio Grande. The Rio Grande Compact Commission enforces the applicable statutes.

9. State or Federal Court decisions relating to navigability of the waterbody, if any:

The case of United States v. Rio Grande Dam and Irrigation Co. et al., 19 S. Ct. 770, refers to the navigability of the Rio Grande. The case was ultimately decided by the Supreme Court of the United States, on appeal from the Supreme Court of the Territory of New Mexico.

The Rio Grande Dam and Irrigation Company wanted to construct a dam across the river in the territory of New Mexico for the purpose of diverting waters for irrigation. The Attorney General of the United States, on May 24, 1897, filed a bill of complaint to prohibit the construction of this dam and the appropriation of water for the purpose of irrigation. A temporary injunction was issued on the filing of the bill. The Attorney General's arguments state that no authority had been given for the construction of the dam. He also set forth the treaty stipulations between the United States and the Republic of Mexico with reference to the navigability of the Rio Grande. The defendants denied that the river was susceptible

6

to navigation above Roma, Texas, or had been used beneficially for the
purposes of navigation in the Territory of New Mexico, and that the
contemplated use of the waters would deplete the flow so as to seriously
obstruct the navigability of the river.  The Territorial Court ruled in
favor of the defendants, taking judicial notice that Rio Grande is not
navigable within the Territory of New Mexico.  The Attorney General then
appealed the decision to the Supreme Court of the United States.  The
Supreme Court reversed and remanded the decision of the Territorial Court,
stating

> "Without pursuing this further we are of the opinion
> that there was error in the conclusion of the lower
> courts; that the decree must be reversed, and the
> case remanded with instructions to set aside the
> decree of dismissal, and to order an inquiry into
> the question whether the intended acts of the
> defendants in the construction of a dam and in
> appropriating the waters of the Rio Grande will
> substantially diminish the navigability of that
> stream within the limits of present navigability,
> and, if so, to enter a decree restraining those acts
> to the extent that they will so diminish."

The case referred to the seventh article of the Treaty of Guadalupe
Hildalgo (February 2, 1848) and the fourth article of the Gasden Treaty
(December 30, 1853).  Briefly, the seventh article states navigation of
the Bravo shall be free and common to the vessels and citizens of both
countries and the fourth article sets the upper boundaries.  Article
seven and the applicable portion of article four are reprinted below.
Exhibits 20 and 21 contain additional data on the respective treaties.

Note that the upper limit of navigability is set at the $31^{o}$ 47' 30"
parallel of north latitude in the fourth article of the Gasden Treaty
and at $31^{o}$ 47' in the first article of the Gasden Treaty.  The court
recognized the northernmost boundary.

### ARTICLE VII, TREATY OF GUADALUPE HILDALGO

The river Gila, and the part of the Rio Bravo del Norte
lying below the southern boundary of New Mexico, being,
agreeably to the fifth Article, divided in the middle
between the two Republics, the navigation of the Gila and
of the Bravo below said boundary shall be free and common
to the vessels and citizens of both countries; and neither
shall, without the consent of the other, construct any work
that may impede or interrupt, in whole or in part, the
exercise of this right; not even the purpose of favoring

7

G35.0012

new methods of navigation. Nor shall any tax or contribu-
tion, under any denomination or title, be levied upon
vessels or persons navigating the same, or upon merchandise
or effects transported thereon, except in the case of
landing upon one of their shores. If, for the purpose of
making the said rivers navigable, or for maintaining them
in such state, it should be necessary or advantageous to
establish any tax or contribution, this shall not be done
without the consent of both Governments.

The stipulations contained in the present Article shall
not impair the territorial rights of either Republic,
within its established limits.

### ARTICLE 4th, GASDEN TREATY
### (Portion)

The several Provisions, stipulations and restrictions
contained in the 7th Article of the Treaty of Guadalupe
Hidalgo, shall remain in force only so far as regards the
Rio Bravo del Norte below the initial of the said Boundary
provided in the First Article of this Treaty that is to say
below the intersection of the $31^{\circ}$ 47' 30" parallel of lati-
tude with the Boundary Line established by the late Treaty
dividing said river from its mouth upwards according to
the 5th Article of the Treaty of Guadalupe. (Sic)

The navigable status of the Rio Grande is further recognized in
the Treaty of November 12, 1884, Boundary Waters: Rio Grande and Rio
Colorado, which is reprinted as Exhibit 22. This treaty was in effect
until 1970.

Exhibit 23 suggests that the head of navigation was moved down-
stream to Fort Quitman (which is above the study area); however, a close
reading of the Convention of 1906 (Exhibit 19) does not indicate a change
in limits of navigability.

Several interesting points are contained in the treaty of February
3, 1944, Utilization of Waters of Colorado and Tujuana Rivers and of the
Rio Grande. (Exhibits 24 and 25). This treaty recognized that prior
treaties had dealt only with defining the border and with navigability and
had not encompassed the subject of complementary usage of the discharges.
Article three of this treaty expressly recognized joint usage of inter-
national waters with navigation having the fifth order of preference.

10. Remarks:

a. Tributaries: The principal tributaries on the Texas side
are the Pecos and Devils Rivers, the Pecos being in the Albuquerque

8

G35.0013

District. The Devils River has a drainage area of 4,305 square miles or 2.36 percent of the total basin drainage area. This river had a maximum discharge at the Juno gage of 370,000 cubic feet per second (cfs) in September, 1932. The minimum discharge was 38 cfs in May, 1948, and the average discharge for the period of record (1925-49) was 196 cfs. The difference between the ordinary high and ordinary low flow is 1.54 feet. Amistad Reservoir backwater covers about 13 miles of the river including the former Lake Walk and Devils Lake. No record of navigation on this river was found. The river was ruled non-navigable on 31 March 1932 (Exhibit 26).

There are several other very small tributaries on the Texas side. These are San Felipe Creek (near Del Rio), Unnamed Tributary (Eagle Pass), Santa Isabel Creek (just upstream of Laredo) and Zacate and Chacon Creeks (Laredo). The drainage areas of these creeks are miniscule and there are many obstructions on Unnamed Tributary, Zacate, and Chacon Creeks. None are gaged and at best flow is intermittent.

b. Lakes and dams: The major international Falcon and Amistad dams have been mentioned several times. Reference is again made to exhibits 5, 6, 27, and 28 for pertinent data. Quite a bit of recreational use is made of these lakes. There are also several small diversion dams but their locations are not known. Country Club Dam (Casa Blanca Lake) lies northeast of Laredo on Chacon Creek. This an off-channel lake with a capacity of 20,000 acre-feet.

11. Findings of Navigability (with date) and recommendations for determination:

It is determined as of 26 March 1975 that the Rio Grande from river mile 275.5 to 610.0 on the United States side from the centerline of the normal channel is navigable, and it is recommended that this portion of the Rio Grande be reaffirmed as a navigable water of the United States.

It is determined as of 26 March 1975 that Falcon Reservoir at and below elevation 296.4 feet mean sea level and Amistad Reservoir at and below elevation 1117.0 feet mean sea level, on the United States side from the centerline of the normal channel are navigable, and it is recommended that these portions of the named reservoirs be declared navigable waters of the United States.

Further, it is determined as of 26 March 1975, that all tributaries on the United States side between river miles 275.5 and 610.0 and lakes thereon are non-navigable and it is recommended that all tributaries on the United States side and lakes thereon be declared non-navigable waters.

9

G35.0014

OPINION OF DISTRICT COUNSEL
RIO GRANDE RIVER, TEXAS
RIVER MILE 275.5 to 610.0

The facts are set forth in pages 1 through 9 under Report of Findings (ROF). Additional supporting facts where needed are included herein. The area of the Rio Grande River under study is that portion of the Rio Grande River which falls within the jurisdiction of the Fort Worth District, covering River Mile (RM) 275.5 to 610.0. RM 275.5 represents the boundary of the Fort Worth/Galveston Districts or the west line of Starr County, just upstream of the Falcon dam. RM 610.0 is the boundary of the Fort Worth/Albuquerque Districts or the upper limits of Amistad Reservoir just below the mouth of the Pecos River. The Galveston District list of navigable waters dated 2 September 1971 contains the Rio Grande up to RM 275.5 (Exhibit 18). The Rio Grande River from RM 275.5 to 610 has been on the navigable list of the Fort Worth District from the time of the District's creation in 1950. The Albuquerque District considers the Rio Grande navigable within its jurisdiction up to RM 1171.3 (American Dam at El Paso, Texas).

1. Navigable by Treaty

Congress has the power ". . . to regulate Commerce with foreign nations, and among the several states . . ." U.S.C.A. Const. Art. 1, Sect. 8, Cl. 3. The President has power to make treaties with the advice and consent of the Senate, U.S.C.A. Const. Art. 2, Sect. 2, Cl. 2, provided it is not contrary to the Constitution. De Geofroy v. Riggs, 133 U.S. 258, 267, 10 S. Ct. 295 (1890). The Constitution declares a treaty to be the law of the land. U.S.C.A. Const. Art. 6, Cl. 2. A treaty is to be regarded as equivalent to an act of the Legislature, whenever treaty operates of itself, without aid of any legislative provision. Valentine v. U.S. ex rel. Neidecker, 299 U.S. 5, 10, 57 S. Ct. 100 (1936).

To preserve and protect the Rio Grande River, which forms the international boundary between Mexico and the United States along the Texas border, these two nations entered into a treaty well over a hundred years ago. Pertinent to navigation, Article VII of the Treaty of Guadalupe Hidalgo (9 STAT. 928) dated 2 February 1848 contained the provision that, below the southern boundary of New Mexico, the Rio Grande River shall remain common to vessels and citizens of both countries (Exhibit 20). In 1853, Article IV of the Gasden Treaty (10 STAT. 1034) dated December 30, 1853 affirmed the force and effect of Article VII of the earlier treaty (1848) as to the Rio Grande River only (Exhibit 21). Article IV further set the upper limits of navigability at the 31° 47' 30" parallel of latitude (ROF 7), which is below the southern boundary of New Mexico.

The navigable status of the Rio Grande is further recognized by Article V of the Convention of November 12, 1884 (24 STAT. 1011). See Exhibit 22. However, Article VIII.A. of the Treaty of November 23, 1970 abolished the 1884 convention but did not violate the provisions of earlier treaties

10

pertaining to navigation (Exhibit 29). It is reported that by the Convention of May 21, 1906 (34 STAT. 2953), the two nations formally agreed that ". . . along the river from El Paso to Fort Quitman navigation could be entirely eliminated and the water devoted to the more profitable service of irrigation." (Exhibit 23). It was further noted that the "spirit is dead, if not the letter," of those earlier provisions of the treaties which pertained to navigation. Admittedly, the provisions of the 1906 Convention permitted the equitable distribution of waters for irrigation purposes and disposed of claims arising by reason of diversion of waters between the Mexican Canal and Fort Quitman, but the 1906 Convention was silent on the effect of earlier treaties pertaining to navigation. Subsequently, in the Treaty of February 3 and November 1944 (59 STAT. 1219), the two countries agreed to construct two dams thereby expanding the uses of the Rio Grande (Exhibit 24) but it recognized the long standing Article VII of the 1848 treaty as to navigation. In fact, the nations specifically set navigation as the fifth order of perference in Article 3. This order of consumptive use was reaffirmed in Article III.F of the 1970 treaty (Exhibit 29). Therefore, no treaties or conventions were found which nullified Article VII of the 1848 treaty and Article IV of the 1853 treaty pertaining to navigation. It is therefore concluded that the Rio Grande River within the study area remains a navigable water of the United States.

## 2. U. S. Supreme Court Decision

The 1848 and 1853 treaties were discussed in U. S. v. Rio Grande Dam & Irrigation Co., 174 U.S. 690, 699-701, 19 Sup. Ct. 770, 773-4 (1899). In this case, defendants proposed a dam across the river in the territory of New Mexico for the purpose of irrigation. The Supreme Court held that the United States had a duty to its own citizens to preserve navigability and declined to consider whether the proposed construction was a violation of the above treaties. Id at 774. The Court distinguished jurisdiction for navigability purposes from determination of navigability. Accordingly, the Supreme Court reversed and remanded the case and ordered an ". . . inquiry into the question whether the intended acts of the defendants in the construction of a dam and in appropriating the waters of the Rio Grande will substantially diminish the navigability of that stream within the limits of present navigability. . . " Id at 777.

In considering the point on judicial notice, the Court stated:

> " It is reasonable that the courts take judicial notice that certain rivers are navigable and others not, for these are matters of general knowledge. But it is not so clear that it can fairly be said, in respect to a river known to be navigable, that it is, or ought to be, a matter of common knowledge at what particular place between its mouth and its source navigability ceases. And so it may well be doubted whether the courts will take judicial notice of that fact. It would seem that such a matter was one requiring evidence, and to be

11

G35.0016

"determined by proof. That the Rio Grande, speaking
generally, is a navigable river, is clearly shown
by the affidavits. It is also a matter of common
knowledge, and therefore the courts may properly
take judicial notice of that fact. But how many
know how far up the stream navigability extends?
Can it be said to be a matter of general knowledge,
or one that ought to be generally known? If not, it
should be determined by evidence. Examining the
affidavits and other evidence introduced in this case,
it is clear to us that the Rio Grande is not navigable
within the limits of the territory of New Mexico. Id
at 773."

Hence, the Court recognized that the Rio Grande was not a navigable stream
within the territory of New Mexico. Id at 773.

At page 774, the Court alluded to the navigable portion and stated:

". . . but here the Rio Grande, so far as it is a navi-
gable stream, lies as much within the territory of the
United States as in that of Mexico, it being, where
navigable, the boundary between the two nations, and
the middle of the channel being the dividing line."

## FINDINGS

Based on the treaties between United States and Mexico together with
the Rio Grande River case, we find that the Rio Grande River between River
Miles 275.5 and 610 and north of the centerline of the normal channel is a
navigable water of the United States.

3.  Past, Present and Future Use (For record purposes only)

A stream is navigable if: ". . . (1) it presently is being used or is
suitable for use, or (2) it has been used or was suitable for use in the
past, or (3) it could be suitable for use in the future by reasonable improve-
ments."

Rochester Gas and Electric Corp. v. FPC, 344 F.2d 594, 596 (2d Cir. 1965),
cert. den., 382 U.S. 832 (1965). The position of the U. S. Supreme Court
enunciated in U. S. v. The Steamer Montello, 87 U.S. (20 Wall.) 430, 441
(1872) as modified by U. S. v. Appalachian Electric Power Co., 311 U.S. 377,
409 (1941), is as follows:

"The capability of use by the public for purposes of
transportation and commerce affords the true criterion
of the navigability of a river, rather than the extent
and manner of that use. If it be capable . . . of being
used for purposes of commerce, no matter in what mode the
commerce may be conducted, it is navigable in fact and
becomes in law a public river or highway."

12

**a. Past Use**

As stated in the Report of Findings (ROF 4-5) and supporting Exhibits (11, 12, 14, 15, 16), a great deal of interest prevailed during the period between 1829 – 1882 pertaining to transportation of goods along the Rio Grande River. Steamboats frequented the Port of Roma (below the study area), which is believed to be the early head of <u>steam</u> navigation (Exhibits 14, 16). Cotton, war supplies, and other goods as well as troops made up the items of commerce. The military need for navigation ended in 1848 with the signing of the Treaty of Guadalupe Hidalgo, heretofore discussed. To a lesser extent river navigation was vital to the life style of the area up to Laredo (about RM 320), which is only about 45 miles above the Fort Worth/Galveston boundary. See Exhibits 14, 17.

Above Laredo up to Eagle Pass (about RM 475), navigation was impeded by rocks and ledges at low water stages. Conflicting reports reveal sufficient interest and available commerce to accommodate river travel above Laredo but actual accounts of commercial travel are lacking.

It is reported that ". . . the Rio Grande would be navigable for a great distance in light iron boats. . ." in the spring and winter months (Exhibit 13). But, at normal stages the river apparently was not navigable above Rio Grande City which is below Roma (Exhibit 14). Following one expedition up the Rio Grande in the late 1800's it was determined that the Rio Grande was susceptible to be improved for steam navigation up to Babbitt's Falls (probably RM 750). However, no action was ever taken to accomplish this proposal (Exhibit 16). Another account suggested that the Rio Grande" . . . was believed to be navigable for 500 miles above Laredo. . ." (Exhibit 17), which is above the study area. Further, there apparently has never been any "practical navigation" between Roma (about RM 225) and El Paso, a distance of about 1000 miles (Exhibit 23). Moreover, it is clear that the advent of railroads in 1882 led to the decline and eventual extinction of commercial navigation on the Rio Grande. "Improvements in the methods of water transporation or increased cost in other methods of transportation may restore the usefulness of this stream; since it is a natural interstate [and international] waterway, it is within the power of Congress to improve it at the public expense. . ." <u>Economy Light and Power Co</u>. v. <u>U. S.</u>, 256 U.S. 113, 124 (1921).

The difficulty in pinpointing the precise head of navigation from a historical standpoint stems from the sketchy accounts on use. As noted above, an expedition took place in 1850 in a keelboat and a skiff manned by sixteen men who penetrated to a <u>reported</u> distance of 1000 miles (Exhibit 16) above the head of steam travel (Roma). There is no showing that substantial items of commerce were shipped from this point. These pioneer quartermasters believed that it would be practical to extend steam navigation further upstream by improving the channel in certain passages. In light of the treaties and the Rio Grande case heretofore discussed, it appears unnecessary to determine whether sufficient past use occurred in the study area to meet the test as set forth in <u>Rochester Gas</u> case, supra.

13

G35.0018

b. Present Use

At present, there is no commercial activity occurring within the study area which would qualify as substantial items of commerce. However, there is frequent use of pleasure and fishing boats on Falcon and Amistad Reservoirs (Exhibits 27 and 28).

Above the study area there is increasing interest for canoeing and float trips. The river gets its water from a tributary, the Rio Conchos, which adds substantial flow to the river in the Presidio area (about RM 850). The Texas Parks and Wildlife Department has recommended that the Rio Grande from Presidio to Lajistas (50 miles) be classified as a scenic waterway and from Lajitas to Langtry (243 miles) be classified as a wild waterway. See generally, Texas Waterways, by Texas Parks & Wildlife Department dated November 1973. These portions of the Rio Grande are in the Big Bend area, which is a few miles above the Amistad Reservoir. Below Amistad to Falcon Reservoir, there is some recreational boating along this controlled waterway which depends on water releases.

In reviewing the several cases on recreational craft as the sole ingredient of navigation, it appears that the Rio Grande River within the study area does not meet the present use test as laid down in the Rochester case, supra.

c. Future Use

There are no authorized plans to improve the Rio Grande River for navigation in the area of study. The natural and ordinary condition of the Rio Grande River, its volume of water, gradient and regularity of flow do not preclude future improvement for smaller commercial craft (ROF 6).

4. Tributaries and Lakes

"Federal regulatory jurisdiction . . . extends laterally over the entire water surface and bed of a navigable water body, which includes all the land and water below the ordinary high water mark." According to paragraph 11 of ER 1165-2-302, the ordinary high water mark for Falcon Reservoir is the normal conservation pool level, or 296.4 feet above sea level (Exhibit 27). For Amistad Reservoir, the normal conservation pool level is 1117 feet (Exhibit 25).

The extent of present use at these two reservoirs is limited to pleasure boating and fishing. Several mariners offer boats for hire with motors (see directory on Exhibits 27 & 28). Capacity for a wider use is evident by data contained in Exhibits 5, 27, and 28).

Federal courts generally take the position that large lakes are navigable when they lie in two states. Stallworth v. McFarland (Admiralty), 350 F.Supp 920, 925 (W.D. La, 1972); Welborn Boat Co. v. Fireman's Fund Ins. Co. (Admiralty), 201 F.2d 833 (5th Cir. 1953); Davis v. U. S. (Regulatory),

14

185 F.2d 938, 943 (9th Cir. 1950), cert. den., 340 U.S. 932 (1951). Both Amistad and Falcon Reservoirs inundate parts of two countries, the United States and Mexico.

An examination of the principal tributary, Devil's River, (ROF 8) in the study area revealed no data which supports a finding that this tributary has been used, is presently being used, or is susceptible for use in the future for interstate commerce. This stream is a small, limited and restricted body of water with a normal discharge of only 196 cfs (ROF 8). Devil's River was declared non-navigable by the Chief of Engineer on 31 March 1932 (Exhibit 26). There is no evidence available that suggests that this opinion of non-navigability should be altered.

It is evident from the Report of Findings, page 9, that the smaller tributaries between RM 275.5 and 610 lack capacity for navigation. Further, no evidence was found showing that these small tributaries had been used, are being used, or are susceptible for use in the future for transporting interstate commerce.

## FINDINGS

Based on the facts presented, coupled with existing legal precedents, we find Falcon Reservoir (at and below 296.4 feet elevation) and Amistad Reservoir (at and below 1117 feet elevation) north of centerline of their respective normal channels to be navigable waters of the United States; we find that all northern tributaries on the United States side to the Rio Grande between River Miles 275.5 and 610.0, together with lakes thereon, should not be regarded as navigable waters of the United States. See page 12 for other findings.

26 March 1975

AUBREY V. BURKETT
District Counsel

15

G35.0020



RIO GRANDE BASIN

EXHIBIT 1

G35.0021

SANTA ISABEL CREEK, TEXAS
TRIBUTARY DRAINAGE AREAS
LOWER RIO GRANDE

SCALES AS SHOWN

U.S. ENGINEER OFFICE, GALVESTON, TEXAS    JULY,'39

SUBMITTED:        RECOMMENDED:        APPROVED:

ASST. ENGR.       CAPT. C OF E        CCL. C OF E
                  CHIEF, SURVEYS DIV.

TO ACCOMPANY SURVEY REPORT ON FLOOD CONTROL
DATED AUGUST 1, 1939

LEGEND

RIVER MILES
880 DRAINAGE AREAS
WATERSHED DIVIDES
STREAM GAGING STATION (ACTIVE)
STREAM GAGING STATION (DISCONTINUED)

SCALE OF MILES

RIO GRANDE PROFILE



Del Rio Ga. Sta.

Devils River

2.9 feet per mile

Pecos River

3.5 feet per mile

Langtry Ga. Sta.

Agua Verde Ga. Sta.

RIVER

DISTANCE

San Rocendo Canyon

FROM

Maravillas Creek

4.5 feet per mile
Average River Fall

GULF

OF

Boquillas Ga. Sta.

MEXICO

ELEV ABOVE U.S. C.& G.

LEGE
RIVE

Johnson's Ranch Ga. Sta.

G35.0023

navigable waters of the United States, July 1941

List of bridges over the navigable waters of the United States—Continued

| Miles above mouth | Nearest town, street, etc. | Owner | Type of bridge | Number of spans | Clear width normal to channel (in feet) — Left | Center | Right | Clear height of lowest point of superstructure (in feet) above — M. S. L. | M. L. W. | H. W. | Authorized by | Date | Plans approved by War Dept. | Date of completion | Operating regulations and closed periods | Purpose for which bridge is used | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Richardsons Channel, N. J.** | | | | | | | | | | | | | | | | |
| 1 | Wildwood, N. J. | Cape May County | F | 18 | | 36 | | 6.98 | 9.5 | 4.75 | State | 1892 | Apr. 6, 1916 | Aug. 3, 1917 | | Highway | 1 |
| | **Richardsons Creek, Ga.** | | | | | | | | | | | | | | | | |
| 2.5 | Thunderbolt, Ga. | Chatham County | Sw | 2 | 27 | | 27 | 9.6 | 12.6 | 5.5 | do | Feb. 21, 1873 | Aug. 14, 1926 | Dec. 30, 1926 | (¹) | do | 2 |
| | **Richland Creek, Tenn.** | | | | | | | | | | | | | | | | |
| 3 | Dayton, Tenn. | State of Tennessee | F | 3 | | 40 | | 601.5 | ‡ 16.3 | * 6.1 | | | | | | | 3 |
| 3.6 | do | do | F | 4 | | 23 | | 600.8 | ‡ 15.8 | * 5.4 | | | | 1940 | | do | 3 |
| 3.8 | do | Rhea County | F | 1 | | 41 | | 589.4 | ‡ 14.4 | * 4 | | | | | | do | 3 |
| | **Richmond Creek, Staten Island, N. Y.** | | | | | | | | | | | | | | | | |
| 2 | Richmond Ave. | City of New York | B | 1 | | 60 | | | 14 | 9 | State | May 4, 1897 | Mar. 23, 1929 | Oct. 29, 1931 | (²) | do | 2 |
| | **Ridley Creek, Pa.** | | | | | | | | | | | | | | | | |
| .25 | Chester, 4th St. | Delaware County | F | 1 | | 140 | | 18.2 | 21.5 | 16.1 | do | Feb. 14, 1907 | July 21, 1930 | May 21, 1931 | | do | .25 |
| .30 | Chester | Pennsylvania R. R. | F | 1 | | 75 | | 13.1 | 16.4 | 11 | do | | | | | Railroad | .30 |
| .45 | Chester | Reading Co. | F | 1 | | 75 | | 14.3 | 17.6 | 12.2 | do | | | | | do | .45 |
| .47 | Chester, 6th St. | Philadelphia Transportation Co. | F | 1 | | 74 | | 15 | 18.3 | 12.9 | | Apr. 4, 1863 | Mar. 9, 1917 | Mar. 11, 1920 | | Trolley | .47 |
| .55 | Chester | Pennsylvania R. R. | F | 1 | | 125 | | 22.2 | 25.5 | 20.1 | do | Feb. 14, 1907 | July 15, 1929 | Jan. 15, 1930 | | Railroad | .55 |
| .60 | Chester, 9th St. | Delaware County | F | 1 | | 125 | | 16.7 | 20 | 15 | do | | | | | Trolley and highway | .60 |
| .9 | Morton Ave., Chester | do | F | 1 | | 50 | | 10.7 | 14 | 9.5 | do | Feb. 14, 1907 | July 15, 1929 | Jan. 15, 1930 | | Highway | .9 |
| 1 | Chester | B. & O. R. R. Co. | F | 1 | | 130 | | 12.7 | 16 | 12 | do | June 13, 1836 | Oct. 17, 1916 | May 11, 1917 | | Railroad | 1 |
| | **Rigolets Pass, La.** | | | | | | | | | | | | | | | | |
| 0 | Dunbar, La. | L. & N. R. R. Co. | Sw | 9 | 153.75 | | | 14.5 | 14.8 | 11.9 | Congress | Mar. 2, 1868 | Nov. 20, 1922 | June 13, 1925 | (²) | do | 0 |
| 6.2 | Fort Pike (New Orleans), La. | Louisiana Highway Commission | Sw | 4 | 152 | | 153 | 17.2 | 17.2 | 14.6 | State | Nov. 18, 1921 | Apr. 27, 1927 | June 9, 1930 | (²) | Highway | 6.2 |
| | **Rio Grande, Texas and Mexico** | | | | | | | | | | | | | | | | |
| 61 | Brownsville, Tex. | Gateway Bridge Co. | F | 1 | | 364 | | 39 | 22.2 | 5.4 | Congress | Feb. 26, 1926 | May 10, 1926 / Apr. 12, 1928 | July 4, 1928 | | do | 61 |
| 61.5 | do | Brownsville & Matamoras Bridge Co. (Missouri Pacific Railway) | Sw | 4 | 96 | | 96 | 38.5 | 21.7 | 4.9 | do | May 20, 1908 | 1910 | | (²) | Highway and railway | 61.5 |
| 120 | Mercedes, Tex. | B. & P. Bridge Co. | F | 1 | | 294 | | 79.5 | 23 | 1.9 | do | May 1, 1928 | July 21, 1928 | Sept. 1, 1928 | | Highway | 120 |
| 162 | Hidalgo, Tex. | Valley Bridge Co. | Sus | 1 | | 444 | | 103.7 | 24 | −3.5 | do | Feb. 7, 1925 | Feb. 27, 1926 | July 10, 1926 | | do | 162 |
| 254 | Roma, Tex. | Starr County Bridge Co. | F | 1 | | 623 | | 180 | 34 | −1.4 | do | Mar. 2, 1927 | Aug. 29, 1927 | Mar. 1, 1928 | | do | 254 |
| 277 | Zapata, Tex. | B. & P. Bridge Co. | F | 1 | | 534 | | 204.2 | 45 | 2.1 | do | Mar. 29, 1926 | Oct. 27, 1924 | Oct. 13, 1929 | | do | 277 |
| 362 | Laredo, Tex. | National Railroad of Mexico | F | 6 | 170 | 170 | 170 | 283.1 | 29 | −20.6 | do | Jan. 27, 1910 | May 27, 1910 | | | Railway | 362 |
| 362.6 | Convent St., Laredo, Tex. | Laredo Bridge Co. | F | 7 | 126 | 127 | 126 | 287.1 | 33 | −16.6 | do | May 29, 1884 | | | | Highway | 362.6 |
| 453 | Eagle Pass, Tex. | Eagle Pass & Piedras Negras Bridge Co. | F | 10 | 140 | 140 | 140 | 729.8 | 44 | −2.1 | do | June 14, 1926 | Dec. 31, 1926 | June 30, 1927 | | do | 453 |
| 543 | Del Rio, Tex. | Citizens Bridge Co. | F | 4 | 145 | 145 | 145 | 973 | 38 | −7 | do | Mar. 4, 1923 | Oct. 5, 1923 | July 4, 1929 | | do | 543 |
| 850 | Presidio, Tex. | Kansas City, Mexico & Orient R. R. Co. | F | 1 | | 20 | | 2,558 | 26 | 6 | do | Feb. 18, 1928 | June 9, 1930 | Oct. 23, 1930 | | Railway | 850 |
| 902 | do | H. E. Dupuy & P. D. Anderson | F | 1 | | 28 | | 2,560 | 18 | −2 | do | Mar. 2, 1910 | | | | do | 902 |
| 1144 | San Antonio, Tex. | Lee Moor | F | 14 | | 275 | | | 8.2 | | do | Mar. 10, 1926 | May 4, 1926 | Oct. 11, 1927 | | Highway | 1144 |
| 171 | Ysleta, Tex. | Alex Gonzales | F | 27 | | 22 | | | 11.7 | | Congress | Dec. 8, 1924 | Jan. 18, 1929 | Oct. 16, 1929 | | do | 171 |
| 171 | South Station St., El Paso, Tex. | El Paso Electric Co. and El Paso & Juarez Traction Co. | F | 15 | 29 | 29 | 29 | | 9.2 | | do | Feb. 1, 1924 | Feb. 29, 1924 | Oct. 16, 1924 | | Railway and highway | 171 |
| 1171.1 | South Mesa St., El Paso, Tex. | Mexico Northwestern Ry. Co. | F | | | 15 | | | 6.6 | | | | | | | Railway | 1171.1 |
| 1171.2 | South El Paso St., El Paso, Tex. | Santa Fe-Mexican Central Ry. Co. | F | | | 100 | | | 11 | | | | | | | do | 1171.2 |
| 1171.3 | Santa Fe St., El Paso, Tex. | El Paso Electric Co. and El Paso & Juarez Traction Co. | F | 7 | 58.6 | 58.6 | 58.6 | | 10.7 | | Congress | May 19, 1926 | Oct. 15, 1928 | Aug. 1, 1929 | | Railway and highway | 1171.3 |
| | **Rhodes Cove, Md.** | | | | | | | | | | | | | | | | |
| | Thomas P. O., Md. | Col. W. A. Starrett | F | | | | | | | | State | May 11, 1929 | | | | Highway | |

Exhibit D

¹ Operating regulations approved July 15, 1929.
‡ Coincides with Tennessee River (Chickamauga Pool) mile 504.5.
* Not computed flat road elevation which is to control adjustment.

² Operating regulations approved July 31, 1935.
³ Operating regulations approved Oct. 11, 1929, as amended Jan. 8, 1933.
⁴ Toll bridge.

Extract from Texas Water Development
Board Report 48, Dec. 1966

## 76. Falcon Dam and International Falcon Reservoir

### Location

Falcon Dam and International Falcon Reservoir are in the Rio Grande Basin in Starr County, 3 miles west of Falcon Heights on the Rio Grande at river mile 270.5, 80 miles downstream from Laredo. The reservoir is in Starr and Zapata Counties, Texas and in Estado de Tamaulipas, Mexico.

### Ownership and History of Development

The project is owned by the United States and Mexico, and is operated by the International Boundary and Water Commission.

In 1944 the United States and Mexico signed the most recent of a series of treaties affecting the land and water boundary between the two countries. Among the most important clauses of the Water Treaty of 1944 are those providing for equitable distribution, between the two nations, of the waters of the two principal international streams, the Rio Grande (below Fort Quitman) and the Colorado River, which empties into the Gulf of California. The treaty provides for the construction of necessary works for the maximum conservation and utilization of the waters of the Rio Grande. On the Rio Grande the treaty authorizes the necessary international storage dams to be jointly constructed by the two governments through the International Boundary and Water Commission.

Falcon Dam was authorized by the International Boundary and Water Commission--United States and Mexico. Its development was for conservation, irrigation, power, recreation, and flood control uses. Under the terms of the treaty, the United States will receive 58.6 percent of the conservation storage and Mexico will receive 41.4 percent. The United States' share of the cost was 35 million dollars.

Plans for the dam and two power plants were approved in the fall of 1949, construction began in 1950, and the completion date was April 18, 1954. Deliberate impoundment began August 25, 1953, and the project was dedicated October 19, 1953.

Falcon is one of several projects under the jurisdiction of the International Boundary and Water Commission, and is one of the most important to Texas.

Records of contents from January 1953 through September 30, 1957 are contained in Bulletin 5807-A of the State Board of Water Engineers and from January 1953 in publications of the International Boundary and Water Commission, United States and Mexico.

EXHIBIT 5

## Physical Description

The dam is a compacted, rolled-earth structure with a controlled spillway on the United States' side of the river with a total length of 26,294 feet and a height of 150 feet with the top of the dam at elevation 323.0 feet above msl. The maximum width of the base is 1,000 feet, and the crown width is 35 feet with a roadway across the top of the entire structure. The embankment contains over 12.6 million cu yd of earthfill. The upstream face is protected by a 3-foot blanket of riprap, and the downstream face is protected by dumped rock.

The reservoir has a summer storage capacity of 2,371,220 acre-feet and a surface area of 78,340 acres at conservation storage level at elevation 296.4 feet above msl, which is the top of the conservation storage space. Above this elevation there is 909,480 acre-feet of flood-control storage capacity. An additional 400,000 acre-feet of conservation storage is allowed during the winter, which reduces the flood-control capacity accordingly. Other capacities are listed at the close of this section.

The drainage area above the dam is 164,482 square miles, of which 87,760 is in the United States and 76,722 is in Mexico.

Of the reservoir capacity, 300,000 acre-feet was allocated for sediment reserve.

The gated spillway is on the United States' side and has a net opening of 300 feet with crest elevation 256.7 feet above msl controlled by six fixed-wheel-type lift gates, 50 feet wide by 50 feet high. The spillway discharge capacity is 456,000 cfs with maximum design flood stage at elevation 314.2 feet above msl. The water enters a chute 1,300 feet long, and is dissipated before entering a control channel leading to the Rio Grande.

There are two 72-inch outlets for water release for each nation, when the turbines are not operating, to supply the downstream requirements. Invert on the United States' side is at elevation 225.0 and on the Mexican side at 205.0 feet above msl.

A power plant with auxiliary equipment is built on each side of the river, and each plant has three 10,500 kw generating units with provision for the fourth unit when justified. The first generation of electricity was October 11, 1954. Power from the United States plant is distributed by Central Power & Light Company.

Pertinent data on Falcon Dam and International Falcon Reservoir are listed below.

| | | |
|---|---:|---|
| Length of dam in Mexico ..................... | 16,161 | feet |
| Length of dam in United States .............. | 10,133 | feet |
| Height of dam above streambed ............... | 150 | feet |
| Base width .................................. | 1,000 | feet |
| Crown width ................................. | 35 | feet |
| Earth and rockfill .......................... | 12,600,000 | cu yd |
| Riprap ..................................... | 360,000 | cu yd |
| Concrete ................................... | 232,000 | cu yd |
| Reinforcing steel .......................... | 10,300 | tons |
| Total crest length of spillway including piers .......................... | 350 | feet |
| Chute length ............................... | 1,300 | feet |
| Maximum discharge capacity ................. | 456,000 | cfs |

Capacities and surface areas as of July 1956 sedimentation survey by the International Boundary and Water Commission, used in published records beginning January 1, 1959

| Feature | Elevation (feet above msl) | Capacity (acre-feet) | Area (acres) |
|---|---|---|---|
| Top of dam | 323.0 | -- | -- |
| Maximum design flood stage | 314.2 | 4,080,800 | 115,600 |
| Top of spillway gates | 306.7 | 3,280,700 | 98,960 |
| Top of conservation storage space (winter) | 301.2 | 2,767,400 | 87,210 |
| Top of conservation storage space (summer) | 296.4 | 2,371,200 | 78,340 |
| Bottom of power storage space | 248.0 | 258,900* | 15,580 |
| Invert of low outlet | 203.33 | 2,820† | 758 |
| Riverbed at axis of dam | 175.0 | 0 | 0 |

\* Sedimentation storage
† Dead storage

**OWNER**

AMISTAD RESERVOIR

United States and Mexico. Operated by the International Boundary and Water Commission.

**ENGINEER (Design)**

United States: U.S. Army Corps of Engineers, Fort Worth District and International Boundary and Water Commission.
Mexico: Ministry of Hydraulic Resources, Mexico, D. F.

**LOCATION**

On the Rio Grande in Val Verde County, Texas and Estado de Coahuila, Mexico, 12 miles northwest of Del Rio, Texas.

**DRAINAGE AREA**

The total contributing area above the dam is 126,423 square miles of which 82,690 is in the United States.

**DAM**

| | |
|---|---|
| Type | Earthfill and concrete |
| Length | 32,000 ft (9,585 in U.S.) |
| Maximum height | 254 ft |
| Top width | 35 ft. |

**SPILLWAY**

| | |
|---|---|
| Type | Ogee crest on concrete section |
| Control | 16 tainter gates, each 50 by 54 ft |
| Crest elevation | 1,086.4 ft above msl |
| Crest length | 800 ft (net) |

**OUTLET WORKS**

U.S. : 5 penstocks, each 14.5 ft diameter, with inlet elevation 930.0 ft above msl
Mexico: 4 penstocks, each 15.75 ft diameter, with inlet elevation 965.2 ft above msl
Prior to power installation, water requirements will be released through a bypass in U.S. No. 5 penstock modified for this purpose.

**POWER GENERATING FEATURES**

Two powerplants are planned with capacity of 80,000 kw each.

**AUTHORIZATION**

By the International Boundary and Water Commission — United States and Mexico.

**RESERVOIR DATA** (Based on 1969 data International Boundary and Water Commission)

| FEATURE | ELEVATION (FEET ABOVE MSL) | CAPACITY (ACRE-FEET) | AREA (ACRES) |
|---|---|---|---|
| Top of dam | 1,152.3 | — | — |
| Maximum design flood stage | 1,145.12 | 5,658,600 | 89,000 |
| Top flood control storage space | 1,140.4 | 5,249,700 | 84,400 |
| Top conservation storage space | 1,117.0 | 3,505,400 | 64,900 |
| Invert lowest outlet (U.S. penstock) | 930.0 | 8,000 | 700 |
| Net usable conservation storage | — | 3,497,400 | — |

EXHIBIT 6

G35.0028

Extract from Senate Document 65,
86th Congress, 1st Session

**4** :PROPOSED DIABLO DAM AND RESERVOIR

8. *Physiography and topography.*—On its course from Fort Quitman to the gulf, the Rio Grande flows successively through three physiographic provinces, namely the Basin and Range, the Great Plains, and the Coastal Plain. The contributing drainage area above the Diablo Dam site lies almost entirely in the rugged mountainous Basin and Range province and the Great Plains province, a region of much lower altitude and comparatively moderate relief.

The Balcones Escarpment, an important factor in the development of flood-producing storms in the drainage basin, lies just outside the eastern boundary of the basin (see exhibit 1) and separates the Coastal Plains from the Great Plains which includes the eastern portion of the watershed. In the main, the Great Plains region is one of gentle rise not exceeding 5 or 6 feet to the mile on the average, and the otherwise rather uniform surface of the region is at times interrupted by low ranges of hills separated by narrow valleys and is occasionally dissected by deep canyonlike arroyos.

The western and largest part of the drainage basin lies within the Basin and Range province, which consists of high plains, deep canyons, and mountains constituting the southern extension of the Rockies. Many peaks in this section exceed 7,000 feet above sea level. The Davis and Guadalupe Mountains in Texas form the principal ranges in the northwestern portion of the drainage basin. The southern portion of the watershed in the Basin and Range province is a high, much dissected plateau extending beyond the Rio Grande far into Mexico.

The topography of the section of the drainage basin in Mexico is even more varied than the part in Texas. Mexico's portion of the basin divides itself naturally into three sections: the Sierra Madre Occidental, the Central Plateau, and the Sierra Madre Oriental regions (see exhibit 1). The Sierra Madre Occidental forms the western boundary of the Rio Conchos Basin. This is a region of rugged topography, much of it above 7,000 feet, with the mountains reaching more than 9,000 feet in the southern portion. This imposing range is a barrier to moisture-bearing winds from the Pacific Ocean. On the southeastern boundary of the basin lies the Sierra Madre Oriental. Less majestic than its western counterpart, it nevertheless has an important influence on the climate of the surrounding area. The forced ascent of the onshore winds from the Gulf of Mexico up the flank of these mountains often produces very heavy rainfalls just outside the basin, and occasionally some spill over into the drainage basin area. Between the two ranges lies the high Central Plateau of Mexico. This is the "tierra templada" or temperate region, temperate in climate because of its elevation, despite its southerly latitude.

9. *River channel.*—For a distance of some 475 miles below Fort Quitman to the easterly boundary of the Basin and Range Province near the San Francisco Creek confluence, the river follows a tortuous course through many very deep canyons separated by narrow intermontane valleys. Continuing downstream in the Great Plains province and to the Diablo Dam site, a distance of 125 miles, the river is entrained throughout in a meandering moderately deep canyon ranging in depth from 600 feet in Martin Canyon near the upper end of this reach to 150 feet at the Diablo site. The gradient of the river is comparatively steep in the upper province, ranging on the average from 4½ feet to 6½ feet per mile. In the lower section the river

*above mile 610*

*below mile 610*

Exhibit 7

G35.0029

gradient gradually flattens and within the Diablo Reservoir site the average river fall is about 2.9 feet per mile.

10. *General geology of the region.*—From Fort Quitman to Del Rio, Tex., the Rio Grande traverses portions of two very distinctive physiographic subprovinces. In the upper 475 miles of this reach, the river passes through a district of extremely diversified relief known as the Mexican Highlands, a subprovince of the Basin and Range Province. Within the Mexican Highlands, the river transects at oblique angles a succession of roughly parallel northwest trending mountain ranges and elongated high plateau segments separated either by troughlike valleys or narrow, almost level basins. In crossing certain of these mountain barriers, the river has incised the remarkably deep picturesque gorges of the Big Bend, among the most spectacular of which are Santa Helena and Mariscal Canyons in the Big Bend National Park, which have maximum depths of 1,900 feet and 1,500 feet, respectively. Upon leaving the easterly boundary of the Mexican Highlands and almost due south of Sanderson, Tex., the river enters the southern sector of the Edwards Plateau, a subprovince of the Great Plains Province. For the next 125 miles on its course to Del Rio, Tex., the Rio Grande traverses, in a continuous generally steep-walled canyon, an area of low relief characterized by almost level-topped uplands, which represent a broad, slightly uplifted, mildly flexured and faulted peneplane.

Although older rocks are sporadically exposed in comparatively small areas in the upper section, formations present along and adjoining the river from Fort Quitman to Del Rio are preponderantly members of the Cretaceous, Tertiary, and Quaternary systems, with rocks of the Cretaceous system being the most extensively exposed. The deep canyons of the Mexican Highlands are walled mostly by massive limestone strata of the Lower Cretaceous, and throughout the downstream province the river is almost continuously entrenched in these limestones as are the Pecos and Devils Rivers for many miles upstream from their confluences with the Rio Grande. Clays, shales, and flaggy limestones of the Upper Cretaceous series, next in order of importance, are most widespread in the basins of the Mexican Highlands and within broad areas bordering the river in the downstream sector. Few exposures of Tertiary rocks are to be found in the Edwards Plateau sector and these occur exclusively south of the border, where, in several small isolated ar as, the older Cretaceous sediments are intersected by thin crosscutting and concordant intrusives. Rocks of this period are most prevalent in the Mexican Highlands where tuffaceous sediments, flows, and intrusives occupy expansive areas. Tertiary intrusives in the form of plugs, dikes, and sills, have invaded both the Cretaceous and early Tertiary rocks throughout the Mexican Highlands. The most important of the Quaternary deposits comprise Pleistocene basin filling materials and terrace gravels widely distributed in the intermontane valleys of the Mexican Highlands and isolated remnants of once extensive Pleistocene terrace deposits in the Edwards Plateau sector. Recent alluvial deposits consist primarily of intimately mixed gravels, silts, and clays confined largely to the bottoms and adjacent silt terraces along the river and its main tributaries.

G35.0030

obtained throughout that period. The estimated annual quantities for each of the three sections below Fort Quitman are listed in table 1, appended.

### WATER SUPPLY

29. *Historical river flows.*—Collection of stream-flow records on the Rio Grande below Fort Quitman began in 1900 when 11 stations were established at key points on the river and its tributaries. These were operated until 1914 when, except for a few months in 1919 and 1920, stream gaging on the international portion of the river was suspended until 1923. In that year, gaging resumed with the establishment of 18 stations which have since been operated continuously. Since 1931, when the present joint program of stream gaging by the Commission was adopted, a total of 25 stations have been operated. In order to obtain continuous discharge data since 1900 flows during the 10 missing years, 1914 through 1923, were estimated at the key points from U.S. Weather Bureau gage-height records and other data available during that period.

The 57-year records of historical flows thus obtained at pertinent points, from Fort Quitman to the site of Falcon Dam, are summarized below.

*Historical river flows—Rio Grande 1900–1956, inclusive*

[Annual quantities in acre-feet]

| Location | River mile | Average | Maximum | Minimum |
|---|---|---|---|---|
| Fort Quitman | (inverted) 0 | 335,300 | 1,550,200 | 5,900 |
| Lower Presidio (below mouth of Rio Conchos) | 214 | 1,380,700 | 3,826,500 | 117,700 |
| Langtry (above Devils and Pecos Rivers) | 533 | 1,574,700 | 4,279,400 | 325,100 |
| Diablo Dam site (Del Rio station) (below Devils and Pecos Rivers) | 602 | 2,935,000 | 6,307,000 | 727,700 |
| Site of Falcon Dam | 893 | 4,058,600 | 8,407,100 | 813,700 |

30. *Source of river flows.*—The sources of historic inflows above the Diablo site are tabulated as follows:

*Sources of historical flows passing the Diablo Dam site, 1900–1956—Average annual amounts*

| Source | Acre-feet | Percent of total |
|---|---|---|
| Rio Grande, Fort Quitman | 335,300 | 11.2 |
| Rio Conchos | 1,064,000 | 35.6 |
| Terlingua Creek | } 54,700 | 1.8 |
| Alamito Creek | | |
| Pecos River | 393,300 | 13.2 |
| Devils River | [1] 515,600 | 17.3 |
| Goodenough Spring | 97,700 | 3.3 |
| Unmeasured sources | 524,400 | 17.6 |
| Total | 2,935,000 | 100.0 |

[1] Includes an estimated quantity of 100,000 acre-feet annually contributed below the Devils River gaging station 4.5 miles upstream from mouth, as determined by records secured since August 1954 at mouth of river.

Included in the above total flows are relatively small but important contributions from springs located along the Rio Grande upstream from the Diablo site, a distance of about 300 miles, and along the

G35.0031

**PROPOSED DIABLO DAM AND RESERVOIR**

Devils and Pecos Rivers. The largest, Goodenough Spring, contributes a minimum annual flow of 60,000 acre-feet to the river, and the combined average annual flow of all springs is estimated to amount to about 400,000 acre-feet. The flows are relatively uniform and provide a minimum base flow at the Diablo site of about 500 cubic feet per second.

The sources of inflows to the river from the Diablo site to Falcon Dam are tabulated as follows:

*Sources of historical flows between Diablo Dam site and Falcon Dam—Average annual amounts*

| Source | Acre-feet | Percent of total |
|--------|----------:|-----------------:|
| San Felipe and Pinto Creeks_____ (United States) | 63,600 | 5.9 |
| San Rodrigo, Escondido_____ } (Mexico) | } 670,500 | 62.5 |
| San Diego and Salado Rivers and Arroyo las Vacas } | | |
| Unmeasured sources_____ | 339,500 | 31.6 |
| Total_____ | ¹,073,600 | 100.0 |

Downstream from Falcon Dam to the gulf, the principal inflows to the river are from the Mexican tributaries Rio San Juan and Rio Alamo, the waters of which are, by the terms of the 1944 Water Treaty, wholly allotted to Mexico. The remaining inflows are from ordinarily dry arroyos which drain the narrow watershed bordering the river below Falcon Dam comprising 2,440 square miles, and are estimated to an.ount to an average of 226,000 acre-feet annually.

The river flows, largely derived from the highly variable precipitation, vary erratically over wide ranges from year to year and from month to month. Review of the historic flows at Diablo Dam site shows that 50 percent of the total flow in the 57-year record period occurred in 30 percent of the years. Characteristic of the historical flows is the occurrence of periods of up to 11 consecutive years of subnormal flows, usually separated by 1 or 2 years of much above-normal flows.

31. *Channel and other losses.*—The records show that in the section of the river from the Diablo Dam site to Falcon Reservoir, there are during ordinary flows net gains in the river discharge, excluding measured tributary inflows; but at times of floods large net losses occur in the same section. Net losses were especially significant during the 1954 flood when the records show a loss of about 405,000 acre-feet after taking into account seepage returns to the channel which occurred for several months after the flood. Analysis of the records shows that net losses occur in this section whenever river discharges exceed about 50,000 cubic feet per second and that the total of the net losses averaged about 30,000 acre-feet annually over the 57-year period of record.

In addition, records of losses from Falcon Reservoir since storage began in August 1953, reflect large losses over and above those due to water-surface evaporation, when the total quantity in storage exceeds about 1 million acre-feet. Such additional losses apparently due to seepage and transpiration amounted to an estimated 300,000 acre-feet during the 1954 flood alone. Study of such losses, assuming Falcon Reservoir had been in operation since 1900 without upstream

G35.0032

storage, indicates that they may be expected to average about 145,000 acre-feet annually.

Since about 93 percent of the flows of the 1954 flood were waters allocated to the United States, of the total of about 705,000 acre-feet of channel and reservoir losses incident to that flood, approximately 650,000 acre-feet of the losses were suffered by the United States. In addition, this country suffered a loss of about 320,000 acre-feet in 1954 by reason of a transfer, under article 8(b) of the 1944 Water Treaty, of that amount of water to Mexico in Falcon Reservoir, since the U.S. inflows in that year were more than sufficient to fill its portion of the total conservation storage in Falcon Reservoir. Thus, in 1954 alone, the United States lost nearly 1 million acre-feet of water sorely needed in the years immediately following.

32. *Quality of waters.*—The records available of chemical analysis of samples of water taken from the Rio Grande below Fort Quitman are summarized in the following table:

| Rio Grande stations | Period of record | Total dissolved solids in tons per acre-foot | | |
|---|---|---|---|---|
| | | Average | Annual maximum | Annual minimum |
| Fort Quitman | 1930–56 | 2.36 | 5.25 | 0.51 |
| La Nutria | 1936–41 | 2.27 | 2.79 | 1.96 |
| Upper Presidio | 1935–56 | 1.92 | 2.74 | .38 |
| Johnson Ranch | 1948–56 | .92 | 1.29 | .84 |
| Langtry | 1945–56 | .77 | .83 | .64 |
| Eagle Pass | 1935–54 | .95 | 1.53 | .49 |
| Laredo | July 1935–56 | .71 | | |
| Roma | 1944–54 | .72 | .95 | .51 |
| Rio Grande City | 1934–46 | .88 | 1.15 | .68 |
| Las Palmas | 1936–43 | .69 | .74 | .63 |
| Lower Brownsville | 1934–56 | .80 | 1.03 | .69 |

According to criteria developed by the U.S. Department of Agriculture, Bulletin No. 962, the results of the sampling indicate that except for the flows in the uppermost reach from Fort Quitman to Upper Presidio, the waters of the Rio Grande may be generally classified as "good."

33. *Estimated future river flows.*—In order to develop the quantities of probable future flows of the Rio Grande below Fort Quitman available for regulation and utilization by the two countries, the historical flows for each year were modified by subtracting therefrom the estimated increased depletions which have developed to the present over those which actually obtained in each year beginning in 1900 and were further modified by deducting such additional depletions as are contemplated in the future.

In addition to the historic river and tributary flows, basic data available and used in developing the probable future flows, included information on areas historically irrigated on the U.S. side contained in the water bulletins of the International Boundary and Water Commission, from an irrigated area survey made in 1922, diversion census in 1938, and irrigated and irrigable area surveys made in 1939 and 1940, all by the U.S. Section. On the Mexican side, in addition to the irrigated area data contained in the water bulletins, a detailed field investigation was made in 1940 by the Mexican authorities. From these data, estimates were made by each Section of the Commission of

areas actually irrigated each year since 1900 in the portions of the basin in its country. To develop the water requirements of the irrigated lands, studies were made by engineers of the two Sections, developing consumptive use coefficients for each portion of the basin using available temperature and precipitation data. In addition, studies were made to develop the effects upon river flows of the reservoirs and regulation works constructed in the basin since 1900, assuming each had been in operation throughout the past 57 years.

Future depletions in the U.S. portion of the basin were assumed to be those required to serve existing developments. In the Mexican portion of the basin, future depletions included certain increases over those for present developments according to the advice of the Mexican Section.

The future flows of the Rio Grande at Fort Quitman were estimated by adjusting the historic flows to indicate the quantities which would have passed that station, if existing works upstream had been in operation since 1900, including: Elephant Butte storage dam (where storage began in 1915), Cabello storage dam (1938), and the irrigation projects downstream therefrom, the American diversion dam and canal (completed in 1938), and the Rio Grande rectification project (1938) and canalization project (1943). The historic flows at Fort Quitman, estimated to average 335,300 acre-feet per year, were thus reduced to an amount averaging about 191,900 acre-feet per year to reflect probable future flows which will consist principally of irrigation drainage and waste waters.

With respect to tributaries in the United States: on the Pecos River, account was taken that its future flows at the mouth will be limited largely to runoff from the watershed below Red Bluff Dam (completed in 1936) plus return flows from the irrigation project downstream therefrom, with only occasional spills at that dam. The resulting modification of historical flows, which averaged 393,000 acre-feet annually, indicate that future flows of the Pecos River at the mouth will probably amount to an average of about 325,800 acre-feet annually. The historical inflows from Alamito, Terlingua, San Felipe, and Pinto Creeks, which together averaged 118,300 acre-feet, were modified on the basis that the acreage irrigated in the future on these creeks may include the total area under existing works, amounting to 7,700 acres. On this basis, future flows from these named creeks are estimated to average 109,100 acre-feet annually. Neither in the Devils River Basin nor near Goodenough Spring is there any irrigation existing or anticipated in the future, and hence the historic flows from these sources which averaged 515,600 and 97,700 acre-feet, respectively, are assumed to obtain in the future.

With respect to tributaries in Mexico: On the Rio Conchos, estimates made by the Mexican section of future inflows assumed that each of the reservoirs—Boquilla (where storage began in 1914), La Colina (1940), Rosetilla (1940), and Madero (1948), were in operation and that the full contemplated irrigation development in the Rio Conchos Basin comprising 286,394 acres was in operation throughout the past 57-year study period. Accordingly, the historical inflows from the Rio Conchos, which averaged 1,064,400 acre-feet per year, were modified such that the average annual future inflows to the Rio Grande are estimated to amount to about 622,500 acre-feet per

**G35.0034**

**year.** The historical flows of the Arroyo las Vacas, Rio San Diego, Rio San Rodrigo, Rio Escondido, and Rio Salado which together averaged 670,800 acre-feet, were similarly modified to take into account existing and contemplated future depletions, such that the probable future total flow of these tributaries is estimated to average 556,200 acre-feet annually.

From the channel of the Rio Grande, Fort Quitman to Falcon Dam, total future depletions on the U.S. side were assumed to be those required for irrigation of lands presently under irrigation works which surveys indicate amount to 19,700 acres in the section above the Diablo Dam site, and 66,000 acres in the section downstream therefrom to Falcon Dam. On the Mexican side, future depletions from the main channel were reported by the Mexican section to be the quantities required for irrigation of about 19,700 acres from Fort Quitman to Diablo Dam site and about 89,500 acres in the section downstream to Falcon Dam. The total quantities of water diverted from the main stream for the contemplated future irrigation of lands on the two banks of the river, estimated from consumptive use studies by the two sections of the Commission and taking into account the availability of flows in the main stream, amount to an average of about 108,000 acre-feet annually in the section from Fort Quitman to Diablo Dam site, and 413,000 acre-feet annually in the section downstream therefrom to Falcon Dam.

The estimated annual total future flows of the Rio Grande at the Diablo Dam site and at the site of Falcon Dam, as developed from the historical flows on the bases described above, are listed for the 57-year period, 1900–1956, in table 2, appended.

Below Falcon Dam, no depletions are anticipated in the runoff from the portion of the watershed bordering the river (excluding the Rio Alamo and Rio San Juan whose waters are allocated to Mexico), so that the historic inflows from this portion of the watershed estimated to average 226,000 acre-feet annually are expected to obtain in the future.

The resulting estimated average annual depletions and future flows at the key points below Fort Quitman are summarized as follows:

*Total flows (United States and Mexico)*

[Average annual quantities in acre-feet]

|  | Historical flows | Estimated average increased depletions over historical depletions | Estimated probable future flows |
|---|---|---|---|
| (1) At Diablo Dam site | 2,985,000 | 691,000 | 2,294,000 |
| (2) At site of Falcon Dam | 4,058,600 | 1,171,600 | 2,887,000 |
| (3) Inflows below Falcon Dam (excluding Rio Alamo and Rio San Juan) | 226,000 | 0 | 226,000 |
| Total (2)+(3) | 4,284,600 | 1,171,600 | 3,113,000 |

**34. U.S. share of future river flows.**—From the estimated total future inflows to the Rio Grande, there were computed the allocations to this country pursuant to the 1944 water treaty, which comprise: all of the estimated future waters reaching the main channel from the

47248—59——3

G35.0035

LOCATION MAP

SCALE 1:7,000,000

PROPOSED DIABLO DAM

MILES
0  20  40  60  80  100

SCALE 1:1,400,000

INTERNATIONAL BOUNDARY & WATER COMMISSION
UNITED STATES AND MEXICO
RIO GRANDE INTERNATIONAL DAMS PROJECT
GENERAL MAP OF RIO GRANDE
PROPOSED
DIABLO DAM

El Paso, Texas, Oct. 30-1957   14319

Case 2:23-cv-00223-DC   Document 16   Page Filed on Date Filed 09/07/20 2300

G35.0036

DIABLO DAM AND RESERVOIR

Note: Lambert Projection, Texas State South Central Zone

SCALE IN THOUSANDS OF FEET

INTERNATIONAL BOUNDARY AND WATER COMMISSION
UNITED STATES AND MEXICO
RIO GRANDE INTERNATIONAL DAMS PROJECT
PROPOSED
DIABLO DAM
AND RESERVOIR

47248 O-59 (Face p. 80) No. 14

Extract From
THE HANDBOOK OF TEXAS, Vol. II
by the Texas Historical
Association, 1952

**Rio Grande.** The Rio Grande heads at the foot of the Continental Divide north of the San Juan Mountains in southern Colorado and flows generally southward through New Mexico to enter Texas at the northwestern corner of El Paso County. After forming a portion of the boundary between El Paso County, Texas, and Dona Ana County, New Mexico, the river from just west of the city of El Paso to its mouth at the Gulf of Mexico is the international boundary between the United States and Mexico and thus the southern or western boundary of the Texas counties of El Paso, Hudspeth, Presidio, Brewster, Terrell, Val Verde, Kinney, Maverick, Webb, Zapata, Starr, Hidalgo, and Cameron.

In its upper reaches the Rio Grande has the character of a spring-fed, snow-fed mountain stream; in its middle course, that of a desert stream; and in its lower course, that of a typical, irregularly flowing stream in a semiarid climate. Three-fourths of the flow in the lower course is from Mexico. The principal tributaries on the Texas side are the Pecos and Devils rivers. The length of the stream as the Texas boundary is approximately 900 miles and the Texas drainage area is estimated at 40,616 square miles.

The name Rio Grande, meaning Great River, is supposed to have first been applied to the stream in April, 1598, by Juan de Oñate,[57] who crossed the stream in the vicinity of the present city of El Paso and christened the place Paso del Norte when he went through a ceremony taking possession of the whole American Northwest in the name of the Spanish king. The Rio Grande has been identified as the stream which was called Rio de las Palmas by Alonso Álvarez de Piñeda[57] in 1519 and by Alvar Núñez, Cabeza de Vaca,[57] in 1529. It is also supposed to be the river which Fernando del Bosque named Rio San Buenaventura del Norte in 1675 and which Father Damian Massanet[57] called Ganapetuan in 1691. As the Spaniards became more familiar with the river, its name became more settled. In New Mexico the river was known as the Rio del Norte. In its middle course, it was called Rio Grande; while further towards its mouth, where it flowed through the country inhabited by wild Indians (Indios bravos), it took the name of Rio Bravo, or sometimes, doubtless from the color of its water, that of Rio Turbio.

The French on the basis of Rène Robert Cavelier, Sieur de la Salle's[57] accidental landing on the Texas coast made half-hearted attempts to claim that Louisiana extended to the Rio Grande. The claim was still mentioned as late as 1803, the time of the Louisiana Purchase, and was not definitely renounced until the Adams-Oñis Treaty[57] of 1819, but the Rio Grande for more than two centuries

had been claimed by Spain and considerable control had been exercised during much of that time.

On December 19, 1836, during the first session of the Texas Congress, an act locating the boundaries of Texas set forth a claim of the Rio Grande from mouth to source as the southwestern and western boundary of Texas. The claim set aside the documentary testimony of more than a century. The only basis for such a claim was the secret portion of the so-called treaty of Velasco,[57] which Antonio López de Santa Anna[57] had repudiated as soon as he was released from Texan captivity and which the Mexican government had never recognized. Stephen F. Austin, writing as secretary of state to William H. Wharton,[57] who was in the United States attempting to secure annexation for Texas, instructed Wharton to compromise on the southwestern boundary if he felt that would aid Texas in securing admission to the Union. During the entire period of the Republic little settlement was made below the Nueces, and the Rio Grande was never actually under Texan control until authority was established by General Zachary Taylor[57] at the beginning of the Mexican War. The Rio Grande was finally recognized by Mexico as the Texas boundary in the treaty of Guadalupe Hidalgo.[57] (For additional information on the Rio Grande as an international boundary, *see* Rio Grande Boundary.)

The waters of the Rio Grande have been used for irrigation since the latter part of the seventeenth century when Spanish missionaries supervised the Pueblo Indians in the building of canals. Some of the ditches built in 1680 near the village of Ysleta had been in continuous use to as late as the 1940's. Because of the international character of the stream no impounding project was possible until 1945, when a treaty between the United States and Mexico provided for the construction of storage dams by the International Boundary Commission.[57] Falcon Dam, which was under construction in 1949, is the first of three projected dams. The north abutment of Falcon Dam will be in Starr County, Texas. The reservoir will impound an estimated 3,300,000 acre-feet of water which will be used primarily for irrigation in the Lower Rio Grande Valley and in the area around Reynosa and Matamoros in the adjoining state of Tamaulipas, Mexico.

*See also* Rio Grande Compact, Rio Grande Flood Control, Rio Grande Rectification Project, Rio Grande Water Apportionment, and Rio Grande Valley.

EXHIBIT 8

G35.0038

EXHIBIT 9

LIST OF KNOWN SURVEY DOCUMENTS
OR REPORTS DESCRIBING THE
RIO GRANDE

United States Geological Survey Water Supply Paper Number 448, Gazetter
of Streams of Texas, by the United States Geological Survey, dated 1919

Water Resources by the U. S. Army Corps of Engineers in Texas, by the
U. S. Army Corps of Engineer, dated 1973

Texas Water Development Board Report 48, Dams and Reservoirs in Texas,
dated 1966, and Report 121, Dams in Reservoirs in Texas, dated 1971

The Texas Water Plan, by the Texas Water Development Board, dated 1968

Water Developments and Potentialities of the State of Texas, by an
Interagency Committee, dated 1958

Survey Report on San Felipe Creek, Del Rio, Texas, by the Fort Worth
District, U. S. Army Corps of Engineers, dated 1971

Texas Waterways, by the Texas Parks and Wildlife Department, dated 1973

Detailed Project Report for Local Flood Protection, Unnamed Tributary,
Eagle Pass, Texas, by the Fort Worth District, U. S. Army Corps of
Engineers, dated 1974

Detailed Project Report for Flood Control, Zacate Creek, Laredo, Texas,
by the Fort Worth District, U. S. Army Corps of Engineers, dated 1973

Report on Survey of Santa Isabel Creek, Texas, for Flood Control and
Allied Purposes, by the U. S. Engineer Office, Galveston, Texas,
dated 1939

Various Soil Conservation Service Work Plans.
Various Flood Plain Information Reports.
Various Reports of the International Boundary and Water Commission.

Report of the American Section of the International Water Commission,
States and Mexico, House Document 359, 71st Congress, 2d Session,
by the American Section of the International Water Commission, dated 1930

Rio Grande International Storage Dams Project: Proposed Amistad Dam
Reservoir (Formerly known as Diablo Dam), Senate Document 65, 86th Congress,
1st Session, by the International Boundary and Water Commission, United
States Section, dated 1955.

There are other House and Senate Documents applicable to the basin but
these are the only ones applicable to this reach.

EXHIBIT 9

**G35.0039**

EXHIBIT 10

## LISTING OF BOOKS HAVING INFORMATION ABOUT THE RIO GRANDE

The Handbook of Texas, Volume II, by the Texas State Historical Association, dated 1952

List of Bridges Over the Navigable Waters of the United States, complied in the office of the Chief of Engineers, United States Army, dated 1941

Supreme Court Reporter, Volume 19, dated 1899

Great River, The Rio Grande in North American History, Volumes I and II, by Paul Horgan, dated 1954

People and Plots on the Rio Grande, by Virgil N. Lott and Viginia M. Fenwick, dated 1957

Rio Grande, by Harvey Fergusson, dated 1933

Along The Rio Grande, by T. H. Lewis, dated 1916

The Romance of Davis Mountains and Big Bend Country, by Carlysle Raht, dated 1919

Rio Grande: Mainline of the Rockies, by Lucius Beebe, dated 1962

The Lower Rio Grande Valley of Texas, by Lee and Lillian Stambaugh, dated 1954

Gringo Builders, by J. L. Allhands, dated 1931

Texas Almanac, by A. H. Belo Corporation, dated 1973

Texas Waterways, by the Texas Parks and Wildlife Department, dated 1973

Various Volumes of the Southwestern Historical Quarterly
The Rio Grande River of Destiny, by Laura Gilpin, dated 1919

Texas Gulf Coast, Volume II, by J. L. Clark and E. M. Scott, dated 1955

Laredo on the Rio Grande, by Kathleen da Corma, dated 1949

A Brief History of the Lower Rio Grande Valley, by Frank C. Pierce, dated 1917

Historical Heritage of the Lower Rio Grande, by Florence Johnson Scott, dated 1937

Texas Rivers and Rapids, by B. M. Noled, dated 1974

EXHIBIT 10

**G35.0040**

### Extract from Rio Grande, River
### of Destiny by Laura Gilpin
#### dated 1949

effort to block the approach of Santa Ana, the valiant band of 187 Texans fortified themselves within the Alamo, where for eleven days they stood siege. On the sixth of March, 1836, the famous battle of the Alamo ended when the gallant defenders had fought to the last man against the overwhelming force of Santa Ana's army of three thousand. For forty days General Houston skillfully maneuvered his forces and with a surprise attack he defeated Santa Ana's superior numbers in the Battle of San Jacinto, a battle lasting but eighteen minutes, capturing the Mexican general and a large part of his army.

Texas now stood independent, although it was voted at the first election to seek annexation to the United States. For nearly ten years the Lone Star flag waved over Texas soil, as many difficulties beset the young republic. While a continual procession of new immigrants was arriving from the United States, the Comanche and Cherokee Indians were making constant raids on small settlements, and Mexicans were still troublesome in the south. To deal with these various disturbances the Texas Rangers were organized to protect the citizens of the new republic. In October, 1845, the Congress of the United States voted to admit Texas to the Union and the march of westward colonization moved onward.

Mexico had threatened to regard the annexation of Texas as a declaration of war and the year of 1846 brought the Army of the United States into the Valley of the Rio Grande, where the first battle of the Mexican war was fought. Under the command of General Zachary Taylor, the Mexican forces were defeated in the Battles of Palo Alto and Resaca de la Palma, near the mouth of the river. The fighting moved westward, culminating in the final struggle in California. With the signing of the Treaty of Guadalupe Hidalgo in 1848, peace came once more to the land of the Rio Grande. For thirteen years constructive enterprises progressed as Brownsville was built and commerce moved across the river to and from Mexico.

But the War Between the States again brought activity of a military nature as the mouth of the Rio Grande became of increasing importance to the Confederacy. With the tightening of the blockade around the South, Brownsville and nearby Port Isabel were the only remaining ports for foreign shipping. In 1861 the Rio Grande was navigable for two hundred miles, and Texas-grown cotton was brought to the mouth of the river by small boats for the transfer to ocean-going vessels in the Gulf of Mexico. Down the coast in small boats and across the land by wagon came cotton to be sold to Europe. Up the coast and back across the land went supplies for the Confederate Army, as these were imported from England, France, and Mexico. The Battle of Palmito Hill, the last battle of the Civil War, was fought on the north bank of the Rio Grande near the mouth of the river on May 12-13, 1865, thirty-four days after the signing of peace, for news traveled slowly in those days.

Frontier life followed as the country was further explored and civil authority established, and the border struggled to settle itself into the paths of peace.

159

EXHIBIT 11

G35.0041



200

Extract From
## THE HANDBOOK OF TEXAS, Vol. II
### by the Texas Historical
### Association, 1952

**River Navigation.** Because of practically non-existent overland transportation in Texas before the coming of the railroads in 1860–1865, the people of the state made numerous efforts to navigate Texas rivers by steamboat. In 1811, Stephen F. Austin had planned to utilize the *Lively* " on the Colorado, but Henry Austin's " *Ariel* " was the first steamboat on a Texas river. Following a few months' unsuccessful operation on the Rio Grande, the *Ariel* was moved to the Brazos in August, 1830, and in December, 1830, after several attempts to make New Orleans, the *Ariel* was laid up to rot near Harrisburg. In 1834, encouraged by a subscription list formed by a number of planters, Robert Wilson and William P. Harris " put the *Cayuga* in service on the Brazos. The *Yellow Stone* " began to ply the Brazos in 1836 and reached San Felipe in February. By 1840 there were at least two small vessels, the *Mustang* and the *Lady Byron*, operating above Brazoria. In 1840 the *Constitution*, a reclaimed ocean steamer, took a load of three hundred bales of cotton over the Velasco bar, which was the principal impediment to navigation on the Brazos.

On the Colorado, six miles above Matagorda, a log raft six miles long impeded navigation. Two companies were chartered to remove the raft, but their attempts as well as those of others, were unsuccessful. By 1838 the *David Crockett* and other keel boats of light draft were operating above the raft, and in th' spring of 1845, the *Kate Ward*, constructed especially for Colorado trade was launched at Matagorda. This boat had a keel of 110 feet, a beam of 24 feet, and would carry 600 bales of cotton in three feet of water. A channel was cut through the raft and the *Kate Ward* reached Austin on May 8, 1845.

One of the first attempts to navigate the Trinity River was made by the *Branch T. Archer*, which in May, 1838, ascended the river 350 miles. Although navigation on the Trinity was frequently hindered by low water, by 1840 the *Ellen Frankland* and the *Vesta* were in fairly continuous service, and when the *Ellen Frankland* was wrecked in 1844, the *Scioto Belle* " replaced her. The first attempts to navigate the narrow, tortuous Buffalo Bayou were made by the *Laura* (January, 1837), the *Constitution* (June, 1837), the *Leonidas* (August, 1837), and the *Friend* (March, 1838). By 1840 there was a regular service between Houston and Galveston. A raft near Victoria hindered navigation of the Guadalupe, but by 1841 the *Swan* had begun a fairly regular run as far as the raft. Although a canal was cleared around the raft in July, 1841, the Guadalupe apparently never did a significant river trade, and the *Swan* was later purchased by a New Orleans concern which operated a line of steamers on Red River.

A hundred-mile raft above Shreveport, partially cleared by Henry Shreve in 1833, for a long time hindered navigation of Red River. Ben Milam " in July, 1831, with the steamboat *Alps*, was the first to navigate successfully the treacherous path through the raft. Because of its length and location, Red River was the most important in Texas river navigation, and, after Shreve cleared the remainder of the raft in 1838, was readily navigable for at least 1,600 miles of its length.

River navigation played an important role in the development of Texas before the Civil War, and by the middle of the nineteenth century there were a number of steamboats on each of the most important rivers, despite water so shallow that not infrequently schedules were interrupted. Down-river and coastwise shipments to Galveston kept a number of steamers in regular service to New Orleans, the first regular run having been scheduled in 1837. River port towns for several decades occupied positions of importance in Texas commerce that they rapidly lost with the coming of the railroads. *See also* Ocean Shipping.

BIBLIOGRAPHY: William R. Hogan, A Social and Economic History of the Texas Republic (Ph.D. thesis, University of Texas, 1942); Herbert Davenport, "Notes on Early Steamboating on the Rio Grande," *Southwestern Historical Quarterly*, XLIX (1945-1946).

*Seymour V. Connor*

EXHIBIT 12

G35.0043

Extract from British Correspondence
Concerning Texas, Edited by
Ephriam Douglass Adams
in the <u>Southwestern Historical Quarterly</u>
Volume 18, July 1914

*British Correspondence Concerning Texas*   83

## BRITISH CORRESPONDENCE CONCERNING TEXAS

### XI

EDITED BY EPHRAIM DOUGLASS ADAMS

ELLIOT TO ABERDEEN[1]

*Private.*                                    Galveston Dec. 2d. 1843.
My Lord,

The late accounts from Mexico induce me to address Your Lordship upon some points which may be of interest if these difficulties should grow into serious heats. Since I have been in this Country I have been endeavouring to procure some trust worthy information respecting the suitableness of the Rio Grande for purposes of Commerce, and therefore if need me, for flotilla operation.

An intelligent English Mariner of the name of Simpton was in the Service of the Texian Government, in command of a small revenue vessel is well acquainted with the Mouth of that river, and I hope in the course of a few weeks to forward Your Lordship a chart of it, rudely drawn indeed, but upon the general correctness of which I should be disposed to place reliance. He is now absent at Corpus Christi, but will bring his papers back with him, and I shall then be able to select what may be useful.

<u>The river itself, so far as I can learn from persons who have crossed it at various points as high up as the Presidio Grande</u> (which Your Lordship will find marked on all the Maps) <u>is ill fitted for general commercial use, or military transport, being very shallow in the dry season. and it is said, having rapids, before that point.</u> All the rivers however, discharging themselves into the Gulf, vary greatly in their navigable facilities, according to the season, and <u>I dare say, that in the winter and spring Months, the Rio Grande would be navigable for a great distance in light iron boats,</u> such as are used in the upper Ganges and Indus. There is a safe anchorage at it's Mouth called the "Brassos del Norte" for vessels not exceeding 10 feet of draught, but on the bar itself, there are not more than 7 feet of water.

[1] F. O.; Texas, Vol. 6.

EXHIBIT 13

G35.0044

My experience in China, My Lord, taught me that one very serious want of our Military Marine is a sufficiency of vessels of force and resource, either of the Steam arm, or sailing, of a light draught of water. For expeditionary purposes into an enemy's Country, and conjoint operation, when troops must be covered and supplied, this is a very great want, and I would take the liberty to submit that three classes of iron Steam boats would be very necessary for effective Service in Mexico. The largest like the "Nemesis," "Pluto," and "Pligothen" and not to draw more than 6 feet of water at the utmost, with a full supply of coal and other Materiel. A second, with a lighter Armament say a long 18 lb. brass gun, forward and aft not to draw more than 3 feet or 3 feet and a half, and lastly four or six of the class of boats employed on the Upper Indus and Ganges, or even more with a force of ten or fifteen sail of boats of these classes it may be depended upon that there would be no difficulty in penetrating into the heart of Mexico, by the Rio Grande and the rivers to the *Southward* and *Westward* of Vera Cruz. It may be added too that after San Juan had fallen there would be no manner of use for any large Ships or Steam boats on this Coast of Mexico, except to serve as Depots for the light force in advance.

Matamoros, Tampico, Alvarado, Tabasco are all accessible to Vessels of the draught I have indicated. Indeed I should mention that at Tabasco there are *11* feet of water on the bar, and that is one point to which I would most particularly draw Your Lordship's attention.

The temper of Yucatan and Tabasco towards the present Government of Mexico is a consideration of much interest. The Tabasco river, or indeed the rivers into which the Main stream branches are navigable for a great distance. The Texian Corvette "Austin" for example drawing upwards of 10 feet of Water went up as high as San Juan de Baptiste (about 80 Miles from the Mouth) and I believe there is said to be a boat communication very nearly the whole way to the City of Mexico by that Stream.

If that point were at once secured, and the people of that Province assured of protection and security at the period of the General Settlement, it is in the highest degree probable, that they would at once declare against the Central Government, and either join themselves to Guatemala or to Yucatan, forming a Republic with easy means of communication between the two Seas, and good

G35.0045

Extracts from People and Plots on the
Rio Grande by V. N. Lott and V. M. Fenwick
dated 1957

MYTHICAL RINGGOLD

Major George H. Thomas "set up housekeeping in tents outside the compound." That was Lee's first introduction to Ft. Ringgold and it is certain that he did not occupy the so-called "Lee House" on that assignment.

In November, after the trial had worn out half a dozen officers and lawyers, the case was suddenly transferred to Ft. Brown and accordingly, Lee and Thomas boarded the steamer *Ranchero* at Ringgold and floated down river to the Brownsville post. Here they again encountered a housing shortage and were forced to occupy a small room in the officers' quarters with one Lieutenant Howard, all three men sleeping on blankets spread on the floor. Howard's young wife went to live with a sister in Brownsville in the meantime.

As at Ringgold, the court-martial dragged out slowly, but Lee was by this time resigned to his fate and took the monotony philosophically, devoting his time, between wrangles at the court, to visiting Matamoros, across the Rio Grande, and being entertained in homes of several Brownsville families. The name of Lee, even then, was magic to Texans. In Matamoros he saw orange trees on the plaza which had been bearing fruit for many years and on one occasion, so he wrote his family, he was a guest in the home of the Richard Kings, the same Captain King who owned the *Ranchero*, the steamer which had conveyed him to Ft. Brown from Ft. Ringgold. This was also the same Richard King who married the daughter of the first Protestant minister in Brownsville, the Rev. Hiram Chamberlain, founder of the Presbyterian Church in Matamoros, which is still standing. Miss Henrietta Chamberlain and Richard King were married on December 10, 1854. (see *History of the Valley*, by Frank Pierce.)

Lee's visit to the King home was not an event of world-shaking importance but proves one fact: that the first oranges in the Valley were not at Laguna Seca in Hidalgo

3

EXHIBIT 14

G35.0046

Case 2:23-cv-00253-D Document 15 Page 49 Date Filed 09/05/23

to the adventurers was filibusters.

One other myth about Mier. Not so very long ago we were doing a bit of research on the Mexican war when we ran across an item that stymied us. The writer, speaking of the return of General Taylor to the States after his victory at Saltillo, said that he left Monterrey on November 8, 1847, and arrived at Mier on the following day; that he was entertained there by the Third Dragoons; that he left Mier on the 11th on the *Major Brown*, arriving in Camargo the same day and after reviewing the 10th Infantry regiment, left for Matamoros (or Brownsville) on the *Colonel Cross*. The writers, one of them especially, know the Alamo River as well as their own back yards, and know full well that no sternwheeler ever got up that stream from the Rio Grande. It is a physical impossibility and not even a skiff could make the voyage due to the numerous rock ledges in that tributary. We are convinced that the writer of that bit of nonsense must have meant Roma. We believe this for that steamers did make it to Roma is well known and substantiated; they came up to Roma when the Rio was enjoying one of its infrequent rises. At normal stage not even the big Rio Grande was navigable above Rio Grande City, due to a rock ledge at a point about six miles down river at the ranch called Rosita, which extends from one bank to the other and in the years gone, long long gone, formed an island, the channels of which are too narrow for boats at low stages of the river. It is there now and old-timers tell us that is has always been there.

In closing this chapter, we'd like to add that there has long been a mistaken idea in the Valley as to the ownership of the "Old Davis House." One historian recently published a history of the Valley and in covering the Davis story said that the old home was still owned by the Davis heirs. This is a mistake. The old house was jointly owned by the Grand Lodge of Masons of Texas and surviving heirs of the Davis

87

G35.0047

there were battleships at sea, their black hulls looming up menacingly, their guns booming.

Living amid this maneuvering of armies and crashing of cannon balls were hardy pioneers of the Lower Rio Grande Valley. The military post located at Clarksville had been established by General Zachary Taylor before Fort Brown and where military posts were set up pioneers soon came to settle. When Captain Richard King and Captain Miflin Kenedy began their boat operations from the mouth of the Rio Grande to Rio Grande City, and as far up as Roma when the river was high, Clarksville became important because it was the point of unloading sea-going freighters and reloading the merchandise and supplies on the river boats. The little town had from three to four hundred inhabitants in those early days and was a quiet little place. There was a stagecoach to Brownsville, but there were no streets and the little frame buildings were dotted along the sand hills.

Families had horses, sheep, goats and cattle, and there was a general store owned by the Clark family, so prominent in the early history of the Valley.

Lazy, dreamy Bagdad across the Rio Grande didn't come to life until the armies swarmed around; then it literally came alive with a bang! At one time there were 35,000 humans living there.

That fatal year, 1863, brought the end of all peace and quiet, for in that year the first little black Federal gunboat steamed up at sea and the cannon balls began whistling. For two years that sound was the constant warning of danger. With only three hours warning, families had to abandon their homes in Clarksville. They wrapped belongings in sheets and blankets, piled them into little ferries and crossed the Rio Grande just ahead of the landing of the Federal soldiers from the gunboat. The Federal soldiers took charge. They moved into the homes, took over all ware-

96

G35.0048

individual desires, the men with a lust for fast living and a quick dollar became bandits. There was no authority to stop them, no officers to whom the defenseless civilians might appeal so the only resource was to force them to stay away by remaining armed. Bandits would come to houses in Clarksville and shoot men on sight without provocation, without explanation. They would get on the river boats and invade towns up and down the Rio Grande. No one from Clarksville to Rio Grande City was safe and Bagdad was even worse. There the riots really broke out.

To stop the trouble which began so often in Bagdad, a group of American officers took four companies of Negro soldiers to Bagdad to settle matters. The American officers were captured though soon released, but the enlisted soldiers got out of control and started looting the town. They ran wild for three days, but were eventually shot by residents of Bagdad, by Americans who went across for that specific purpose, and by each other. With that episode, the boom days of Clarksville and Bagdad, as far as guns and prosperity were concerned, ended.

The final chapter for both towns was to come in 1874. Seven years before this a hurricane struck the Gulf coast. Most of the houses, in fact, some records say all but one home in Clarksville, were washed away. The King and Kenedy Steamship Company rebuilt and repaired its battered boats and went on working on the wharves and warehouses at Clarksville so that business might go on from the mouth of the river to Rio Grande City. The little iron boats chugged down the river, out the mouth and around Brazos Island, where the Morgan Line boats called and where smaller boats carried cargo across the bay to Point Isabel. But those seven years, between 1867 and 1874, brought the end of that business, too.

In 1874 a terrific hurricane struck the coast and washed away every piece of lumber, every stick and stone within

99

G35.0049

### People and Plots on the Rio Grande

Carrizo (now Zapata), Ramireno and most important of all, so far as border history is concerned, Old Dolores.

Dolores is where the first settlement in Texas by Europeans was made south of Ysleta. The established historical fact that Dolores was the first European settlement in Texas below Ysleta, and not Penitas — as commonly thought — comes from no less an authority than Dr. Carlos Castañeda, who certainly needs no introduction to the readers of this history. He is a professor of history at the University of Texas, an authority on early Spanish history in the United States, cited by the Spanish government and the Roman Catholic Church for his contributions to the history of the Spanish government in its discoveries in the western hemisphere, and to the history of the Church in the same area. Dolores was established in 1750 by Don Juan Borrego. (For further information see *The Kingdom of Zapata*, by Virgil N. Lott, published by The Naylor Company).

The road, from its beginning at Brownsville to Rio Grande City, followed the meanderings of the river, and a personal knowledge of these meanderings convinces us that there is no river on earth more sinuous than the Rio Grande. Even today, after it has undergone to some degree a straightening out by the U. S. Army over which it transported supplies before the advent of the railway, to the old army post of Ft. Ringgold from Ft. Brown, the Rio Grande continues to take the path of least resistance and in doing so makes a three-to-one trip: where it could go three miles, it snakes along for nine.

We are not intentionally overlooking the part that river steamboats played in the transportation of supplies for Taylor's army. These played a most important role in the history of the conflict and for many years thereafter river navigation was vital to the life of the area between Ringgold and Brownsville, and to some extent as far up as Laredo.

138

G35.0050