No. 23-50632

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*

*v.*

GREG ABBOTT, IN HIS CAPACITY AS GOVERNOR OF THE STATE OF TEXAS; STATE OF TEXAS,

*Defendants-Appellants*

On Appeal from the United States District Court for the
Western District of Texas, Austin Division, 1:23-cv-00853-DAE

## EXHIBITS IN SUPPORT OF DEFENDANTS' OPPOSED EMERGENCY MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL AND FOR AN ADMINISTRATIVE STAY

### Volume VI

### INDEX OF EXHIBITS[1]

Exhibit

Selected Plaintiff's Exhibits from Preliminary Injunction Hearing (cont'd):

ECF 37-5, 1975 US Army Corps of Engineers Navigability Determination (Exhibit B to Shelnutt Declaration) (G-35):

Part 2: pp. 51-92 ......................................................................... A

---

[1] In these Exhibits, "ECF ___" refers to the district court docket number. Due to space constraints, unless indicated, the attachments to district court filings have not been included in the Exhibits in Support of Defendants' Motion to Stay.

EXHIBIT A: 1975 US ARMY CORPS OF ENGINEERS
NAVIGABILITY DETERMINATION (EXHIBIT B TO
SHELNUTT DECLARATION) (G-35) — PART 2: PP. 51-92

Notes on Early Steamboating
on the Rio Grande by
Harbart Davenport in the
Southwestern Historical Quarterly
Volume 49, October 1945

## *Notes on Early Steamboating on the Rio Grand*

## HARBERT DAVENPORT

The earliest effort at steamboat navigation of the Rio Grande, above Matamoros, was that by Henry Austin in 1829. He brought to the Rio Grande a stout, well built steamboat called the *Ariel*, and operated it between Matamoros and Camargo for several months. Henry Austin had an irascible disposition, and the easy going business methods of the inhabitants did not appeal to him. Austin quarreled with the municipal authorities of the communities he was serving; and there is a story that an ordinance of either Reynosa or Camargo forbade steamboats to tie up within the municipal limits, on the ground that the gases from their smokestacks were deleterious to the inhabitants' health. Since the *Ariel* was of too deep draft for successful navigation of the Rio Grande, Austin gave up after a few months and took the *Ariel* north where she was lost within the year on Galveston Bay.

Mirabeau B. Lamar, whose flair for assembling historical facts was as remarkable as was his inability to use them, notes (evidently from information obtained from Henry Austin):

> Captain Henry Austin was the first man to introduce a steamboat into Texas. He had been a year in enterprising projects on Del Norte. He had taken a steamboat there with a view of opening trade with Chihuahua. He expended a large amount of money; effected little [see General Austin's letter to him about the navigation of Del Norte], and then came around to the mouth of the Brazos, and ascended to Brazoria with his boat. This was the first on this river, as it had been the first on the Del Norte.[1]

Egerton, English surveyor for the Grant and Beale's Colony, reporting in 1834 implies that there was another attempt at Rio Grande navigation soon after Austin's departure, but of this I have found no other account. Egerton says:

> The course of the Rio Grande from the Dolores Ferry [above modern Eagle Pass] to a short distance below the town of Loredo is in various placed more or less impeded at low water by rocks . . . at about two leagues below the Presidio del Rio Grande, one of the ledges traverses the river, in an oblique direction, from one bank to the other . . . imme-

---

[1] *Lamar Papers*, No. 2407, VI, 172. On his reaching Brazoria, see his letter to General Austin, dated August 25, 1830.

EXHIBIT 15

G35.0051

Case 2:23-cv-00683-DAB Document 16-3 Page Filed Date Filed 09/05/2023

diately below this the river, for about half a league, is turned into a variety of channels by a vast number of islands, from whence this place is called Las Islitas. . . . Having passed the great ledge, deep water is at once found, a channel which leads by a tortuous route through Las Islitas, completely avoiding the numerous minor ledges. . . . A short distance below Loredo is another great ledge, traversing the river in a similar way, from bank to bank. . . . Having reached this far, the Gulf of Mexico may be gained without further impediment or difficulty, beyond a necessary knowledge of the river, as in the Mississippi. . . . Above the Dolores Ferry, I am disposed to believe that the river is perfectly open into Chihuahua and New Mexico. I do not, however, speak from personal observation, as I do respecting the lower river. . . . A few years since a steamboat ascended the river to the lower great ledge, but, the water being rather low, the captain was reluctant to pass it, although there was sufficient depth, fearful lest he be left on the upper side, in case the river fell. The steamboat was of ordinary construction, as was another which had previously ascended above Camargo.[2]

It is certain that there was no practical or commercial navigation above Matamoros until after the occupation of that city by General Zachary Taylor in May, 1846. General Taylor importuned the quartermaster general for light steamboats; several of these were purchased at Pittsburgh, Pennsylvania, by Major John Saunders, of the quartermaster's department, and transported to the Rio Grande, in June, 1846. Among the earliest arrivals, were the *Corvette, Whitesville, Major Brown,* and *Colonel Cross.* Mifflin Kenedy, who had assisted Saunders in making his purchases, brought out the *Corvette.* Samuel C. Reid, in *Scouting Expeditions of McCulloch's Rangers,*[3] describes the voyage of the steamboat *J. E. Roberts,* much overloaded, which left Matamoros for Camargo, July 13, 1846. This boat grounded the afternoon of July 15, fifteen miles above Reynosa, and was rescued by the steamboat *Brownsville,* voyaging downstream. General Taylor and staff travelled from Matamoros to Camargo, aboard the *Corvette,* at about the same time. Reid also relates that a number of McCulloch's rangers, mustered out of service at Monterrey, September 30, 1846, made their way from Camargo to Matamoros, aboard the steamboat *Whitesville,* which cleared from Camargo, October 10.

At about the same time General Patterson, commanding on the Rio Grande, sent the *Major Brown* above Camargo, on a trial voyage. Concerning this exploration of the river, John

[2] William Kennedy, *Texas* (Second edition; London, 1841), I, 56-60.
[3] Samuel C. Reid, *Scouting Expeditions of McCulloch's Rangers* (Philadelphia, 1847), 29ff.

G35.0052

Case 2:23-506833-D Document 16 3 Page 5 filed Date Filed 09/05/2023 00

Russell Bartlett, the first United States Boundary Commissioner, said:

> In October, 1846, a successful attempt was made to ascend the Rio Grande in the United States steamer Major Brown, by order of General Patterson, with a view to ascertain whether or not it were possible to open a communication between Carmargo and the Presidio del Norte. This vessel drew but two feet of water. She experienced few obstacles in reaching the river Salado, nearly a hundred miles by water above Mier. Above this there was a series of continued shoals, rocks and rapids, among which the boat repeatedly grounded. She at length reached Laredo, a town about six hundred miles by water above the mouth of the river.[4]

Because of a fall in the river while the *Major Brown*, Mark Sterling, master, was at Laredo, the steamboat was tied up there for several months.[5]

The military need for navigation on the Rio Grande ended July 4, 1848, with the promulgation of the Treaty of Guadalupe Hidalgo, and the river boats then being operated were sold by the quartermaster to Charles Stillman, Matamoros merchant and founder of the new town of Brownsville, as a river port, on the American side. Stillman's steamboating was, to him, disappointing. The boats were not well designed for Rio Grande service, besides having been rather well used up. Stillman thought his Brownsville-Matamoros ferry a more profitable venture; and two of the veteran river boats, the *Whitesville* and the *Frankland*, were abandoned at Brownsville in a way that blocked the only available ferry landing which Stillman did not control. The ships were removed in December, 1849, by the sheriff of Cameron County on order of the commissioners' court.

Mifflin Kenedy, meantime, had quit the steamboating which brought him to the Rio Grande for a commercial venture in the Mexican trade. Stillman's steamboating was, for the most part, conducted by river-boat captains James O'Donnell and Richard King. King, an experienced young steamboatman on shallow Southern rivers, entered the government service on the Rio Grande in 1847 as pilot of the *Corvette*, of which Mifflin Kenedy was master. Later he became master of the *Colonel Cross*. Stillman, anxious to be rid of a losing venture, sought to interest Mifflin Kenedy in his line of steamboats, and Kenedy sought counsel and assistance from O'Donnell and

---

[4] John Russell Bartlett, *Personal Narrative* (London, 1854), II, 509.
[5] See *Lamar Papers*, Nos. 2235, 2237, 2239, 2252, 2257, 2269, 2279, 2281, VI, 22-40.

G35.0053

Case 2:23-cv-06883-DDP Document 16 Page Filed Date Filed 09/07/2023 00

the practical King. King was convinced that Rio Grande navigation could be made profitable only by constructing new types of boats, especially designed for Rio Grande conditions: stout side-wheelers, of five hundred tons burden to handle traffic in the open Gulf, from the ocean port at Brazos de Santiago to deep water above the mouth of the Rio Grande, and light draft stern-wheelers of two hundred tons burden, to operate from Brownsville and Matamoros upstream. The new partnership of "M. Kenedy & Co.," composed of Kenedy, King, O'Donnell, and Stillman, was organized in 1850 to build and operate boats of these new types. O'Donnell sold his interest to Kenedy in 1852. M. Kenedy & Co., as thus reorganized, continued to operate twenty-six boats in all at huge profits until Stillman left the Rio Grande for New York, in 1865. The firm was then reorganized as "King, Kenedy & Co.," and continued in profitable operation until the building of railroads ended the steamboat era, in 1882.

The *Grampus*, first of the five hundred ton Rio Grande sidewheelers, operated between Brazos de Santiago and Brownsville and Matamoros. She was skippered by Richard King. Earliest of the light draft stern-wheelers was the *Comanche*, operated by Mifflin Kenedy. The great commercial success of this undertaking resulted from the wise distribution of partnership responsibility and power. Kenedy had the patience, tact, and understanding to make lasting friends of his sensitive but appreciative customers from the North Mexican states. King, only, of the partners, possessed the driving force essential to handling the ocean-going and lightering problems of the firm. That this partnership was admirably constituted, the vast fortunes built by Stillman, King, and Kenedy are ample proof.[4]

---

[4] The essential facts relating to the development of commercial steamboating on the Rio Grande may be found, somewhat scattered, in Frank C. Pierce's *A Brief History of the Lower Rio Grande Valley* (1917) and in the manuscript, Memoirs of Colonel John S. Ford, especially in his chapters entitled "M. Kenedy & Co.," and "King, Kenedy & Co." Such additional details as are here presented were gleaned by the writer from many interesting conversations with the late Captain William Kelly, of Brownsville, who was an officer in the United States quartermaster service, in charge of Rio Grande river boats, in 1865-1866. Kelly, mustered out of service during 1866 at the mouth of the Rio Grande was immediately employed by Mifflin Kenedy for similar duties with King, Kenedy & Company, with whom he continued until that firm dissolved. He then operated on his own account until, at the turn of the last century, steamboating on the Rio Grande came to an end with the disintegration of the *Bessie*, last of the *Comanche* type stern-wheelers to negotiate the sandbars of the erratic border stream.

G35.0054

Extract from Great River
Volume II, 1954

# 27.

## El Dorado

Of the war's consequences, some were small, of concern to perhaps only one or two. At noon one day in February, 1848, President Polk had a caller—the ex-Empress Ana María Iturbide who came from Philadelphia with her friend, a Miss White, to interpret for her, to ask about her pension from the Mexican government which owing to the war she was not receiving. In her anxious isolation of language, Doña Ana gathered from Miss White that the President would do what he could. He would ask for a grant from Congress, and did so. There the matter was lost in committee, until thirteen years later the exiled and so briefly imperial matron died in Philadelphia.

Other consequences were national. When the terrific news of the discovery of gold came from California, Mexico knew what she had lost with the war, the Americans what they had gained—the Golden Land, El Dorado, at last—and, as an American magazine put it, "then began the rising and the rush." It rose in such appetite and fury that Henry David Thoreau was moved to groan, "Going to California . . . it is only three thousand miles nearer Hell. . . . What a comment, what a satire on our institutions! The conclusion will be that mankind will hang itself upon a tree. And who would interfere to cut it down?" In a sense, the rush was never to end for the rest of the nation. With varying objectives in the popular imagination, there would always be something lying in wait to be taken on the golden strand. Once again the Western frontier called, and the United States replied with movement.

Some travellers went by clipper ship from the Eastern ports, sailing to Panama for a jungle passage to the other ocean and a precarious coastwise shipping to the north; or continuing around Cape Horn and up the west coast of the Americas. Some landed at the Arms of Saint James in the Gulf, sailed up the Rio Grande in rusty steamboats left over from the war, and went overland across northern Mexico from

EXHIBIT 16

G35.0055

Many volunteer units had enlisted for stated, short terms of service. Now at <u>Camargo</u> when all the energy of the army was needed for the coming campaign in the interior, <u>hundreds of men said good-bye and returned downriver on the steamboats that were headed for the Gulf to bring up more troops and supplies.</u> Of those going home, "the great majority" were "pretty well disgusted with their service," which for them had meant only heat, and illness, and inaction on the outlandish river. But enough were left with the General to make a great display, and on August seventeenth he reviewed them, all drawn up in order of battle. Their line was over three quarters of a mile long—"one of the most magnificent military displays we have had since the last war." With General Taylor four other general officers inspected seven regiments of infantry and two battalions of horse artillery. All were in dress blues, the officers with gold stripes, except the General, who rode the line "in plain undress." He was himself again. He "never looked in better health or spirits," for action was soon to be resumed.

On the following day the first division moved into Mexico, by way of Mier, to be followed by one division a week until all but small holding forces were gone from the Rio Grande. The transport problem over the deserts had been solved—nineteen hundred pack mules with Mexican drivers took the place of most of the horse-drawn wagons. General Scott should have witnessed the difficulties of loading tent poles and canvas and mess chests and sheet-iron kettles and a hundred other articles on the little beasts, which took several hours at the outset of each day's march, so that the first-packed grew tired of standing, and broke and ran, sometimes bucking or rolling till they managed to scatter their burdens. Still, there was no better way to cross the wastes with an army's duffel.

As the movement got under way, the staff at Camargo heard that Mexico was in a state of revolution. President Paredes, who had marched toward the frontier as far as San Luis Potosí with eight thousand troops, was thrown out of office, and a provisional president had sent for the one man who despite his record could unite all Mexicans under his familiar name—Santa Anna. Under a safe-conduct honored by the United States, Santa Anna on his way home from exile in Cuba had landed at Veracruz an August sixteenth, and was proceeding to the capital to take charge. General Taylor now had his principal adversary.

Monterrey lay a hundred and fifty miles southwest of Camargo. The last of the Rio Grande divisions moved out on September first

G35.0056

Case 2:23-cv-00823-DAE    Document 16    Page 9    Date Filed 09/07/2023

and honors." Sure of their power, the desert pirates hardly bothered to hide. An Army officer going upstream as a steamboat passenger in 1876 said that his vessel passed right through a herd of stolen cattle "that the Mexicans were driving across the river. Part of the cattle were on one side of the river and part on the other, and the Mexicans were stripped, and had the saddles off their horses, and were in the river driving the cattle across."

When Americans on the border hoped for war against Mexico to force an end to the outrages, they considered how the cure might be worse than the ill; for the Mexican side was far more populous than the Texan side, and, said a Texan witness before Congress, "We are not so foolish but that we know that a war with Mexico, unless premeditated and our Government fully prepared for it, would result in the immediate occupation by Mexicans, for a time at least, of all that country bordering on the river, and would, consequently, involve the loss of the larger part of our stock and the destruction of all our property." Certainly the Army was not "fully prepared" for war on the border in 1876, when out of his Departmental troops General Ord could assign only four hundred to the Rio Grande, of which only three hundred were cavalry. It was all he had to work with, though in the previous year he had asked for a regiment of cavalry "for service on the lower river, and, if practicable, a light-draught iron clad" to be sent to Point Isabel by the Navy "provided with a sufficient number of steam-launches to patrol the river Rio Grande." He was sure that the vessels would be even better than a regiment "to stop the marauding." Cruising launches "could show continually where parties had recently crossed into American territory, or might be crossing, and as the telegraph" was "being laid on the banks, cavalry stationed along the river (an exceedingly crooked one) could get notice to the point and take the trail. . . ." The river's own action made the task of patrolling hard and the pursuit difficult, for in flood or freshet the river chopped away banks, and destroyed roads and trails, and in the lower flats inundated great tracts with mud, so that troops were forced to keep to the high ground. Further, as the river changed its course after storm, it also changed the boundary, so that soldiers were not always certain where they might act on their own ground.

On both sides of the river the "bad man" ruled. If he was a Mexican, he was, at his most impressive, a "general," like Cortina or Canales, both of whom were busy at the congenial task of combining theft with revolutionary gestures, and with fighting each other. If he was an

G35.0057

and these made his tour more amusing. One was about the system of supplying the river forts by boat. The head of steam navigation in the 1850s (and in fact until the twentieth century when the last steamer ran in 1907) was Roma. Goods were transshipped upriver to the forts by pack and wagon from there. But the report of an early quartermaster of Fort Brown was extraordinary, even though his claims and recommendations came to nothing, as so often happened with Army reports. First of all, until steamboats were released from wartime troop duty, he supplied the river garrisons by keelboat. And then in 1850 he sent an expedition up the river with orders to navigate to the farthest possible place. He hoped to discover that shipping could utilize far more of the river's length than it had so far done. A keelboat and a skiff, manned by sixteen men, ascended the river by channel to a point a thousand miles above the head of steam travel, or about thirteen hundred miles above the mouth. It was an astonishing penetration for a river with so little water, and the expeditioneers came back, all safe, to report optimistically that if the channel were improved in certain passages, steam navigation would be entirely feasible all the way "up to Babbitt's Falls." These falls were described as "not perpendicular, but a rapid descent of some 200 feet in about half a mile." They were walled in by a perpendicular gorge hundreds of feet high—so high, with such rocky darkness below the slit of sky overhead, that "the stars could be seen at mid-day." It was a new piece of knowledge of the Rio Grande, and it may have described one of the canyons of the Big Bend. In his enthusiasm the leader of the expedition could see steam navigation having its terminus in the profitless canyon. But even though such pioneer quartermasters argued how practical it would be to fit the river for steam commerce, nothing was done to extend the steamboats' range; for by the international treaties of peace, both Mexico and the United States were bound to consult each other in any engineering works on the boundary river. Such combined action would have to wait for a new century, and then it would turn not to meandering travel by channel, but to irrigation and power projects, such as the international Falcón Dam, which would be dedicated by the American and Mexican presidents in 1953.

In another notion, the Army's quartermaster department hoped to transplant a form of transportation suitable for desert operations, and the Inspector General was in a position to report on its progress. In May, 1856, an American officer arrived at Indianola on the Gulf bringing with him from Smyrna "a drove of Camels of 34 in number,

Extract from East Texas
Riverboat Era and Its Decline
1965

# APPENDIX

## Navigation on the Central and West Texas Rivers

The earliest efforts at steamboat navigation in Texas was on the fickle Rio Bravo (Rio Grande), by Henry Austin aboard the Ariel. He brought to the Rio Grande a stout, well built little steamboat and operated it between Matamoros and Carmargo for several months. Legend has it that some of the settlements along the river objecting to the billowing black smoke from her smokestacks and requested that she not land nearby. The Ariel then left the Rio Grande and was on the Brazos in 1830.

The Rio Grande, or Rio Bravo, from Dolores Ferry, just above the present town of Eagle Pass, to a short distance below the town of Laredo was more or less impeded at low water by rocks. (In East Texas it was timber "rafts.")

General Zachary Taylor was sent to occupy the American side of the Rio Grande in 1846. He built Fort Brown, opposite Matamoros, and ordered several light draught steamboats from the boatyards in Pittsburgh, Pennsylvania, and had them mounted with cannon. They were the Corvette, the Whitesville, Major Brown and Colonel Cross.

In October 1846, a successful attempt was made to ascend the Rio Grande in the Major Brown from Camargo to Presidio Del Norte. This vessel drew but two feet of water and reached Salado River with little difficulty, but when she reached the region above Mier she grounded repeatedly on the shoals, rocks, and rapids. At length she managed to reach Laredo, a town about six hundred miles by water above the mouth of the river. Because of low water the Major Brown was tied up at Laredo for several months.

With the treaty of Guadalupe Hidalgo, signed February 2, 1848, the need for navigation of the Rio Grande by the Coast Guard ended. By this treaty, among other things, Mexico agreed to the Rio Grande as the Mexico-Texas boundary.

The Whitesville and the Franklin were abandoned at Brownsville in a position that blocked the ferry landing and they were not removed until December 1849, by the local sheriff.

Later, Charles Stillman, a Matamoros merchant, built the river port on the American side of the Rio Grande, and with his partners, Richard King and Miffin Kenedy, made a sizable fortune in the river traffic. Richard King was captain of the Corvette, and later the

92

Exhibit 17

G35.0059

side-wheeler Grampus. Kenedy was captain of the stern-wheeler Comanche.

The Rio Bravo has a course estimated from 1500 to 1700 miles in length and was believed to be navigable for 500 miles above Laredo, which is upwards of 200 miles from the coast, by steamboats of light draught for at least seven months of the year.

The Lavaca, Guadalupe, San Antonio, and River de las Nuces (nuts in Spanish) were more or less navigable part of the year.

Historically the Guadalupe is interesting because it was on the banks of this stream that Gonzales, the town which fired the first shots for independence in the Texas Revolution, was founded. Also the Old Spanish Trail follows this river for about forty miles.

Prince Solms-Braunfels, leader of the German colonization in Texas, landed with his immigrant settlers at a place called Carl's Haven on March 14, 1845. Carl's Haven later became known as Indianola and was an important shipping point for cattle, hides, and cotton until the Gulf storm of 1875. At that time the town was completely destroyed.

From Carl's Haven on Lavaca Bay, the German colonist made the 150 miles overland, some in ox-wagons, to New Braunfels. Germans also settled at Fredericksburg on the Pedernales and at Cuero near the coast on the Guadalupe. More than 5,000 came in 1845-46.

The Rio Colorado had rafts of driftwood some ten or twelve miles from the mouth which prevented navigation at that point, but some historians claim the river was navigable by steamboat above the raft to the LaBahia crossing in Fayette County, near LaGrange. Goods brought down the river had to be unloaded and hauled overland past the raft and then reloaded on boats bound for the gulf.

In 1858, the state appropriated money for a canal around the obstruction, but after the Civil War efforts to keep the river open for navigation ceased and the driftwood raft grew until it extended far upriver. By 1900, rice growing, fed by the reservoir of river water held back by the natural dam, had become commercially important in the region.

The cannibal Karanchua Indians lived in their tepee among the sand dunes and formidable cane brakes near the mouth of the Colorado, but they were no great threat to the early colonist because sickness and death had reduced their numbers to a mere handful.

The San Antonio River was navigable at least as far as Goliad, (La Bahia), meaning gigantic, in the early days of river traffic. On December 23, 1833, Dr. Beals, the empresario, wrote in his diary, "The inhabitants (of Goliad) are, almost without exception, gamblers and smugglers, and gain their subsistence by those two occu-

93

G35.0060

Extract from Galveston District Listing of Navigable Waterways, dated Sept. 1971

| District: Galveston | Rivers, bayous, creeks, canals, intracoastal waterways. | | Harbors, bays, lakes and sounds. | | Remarks |
| State: Texas | | | | | |
| Waterway | Navigable length in Miles | Miles under authorized project. | Length of main channel or Sailing course in miles | Miles under authorized project | |
| Rhodair Gully | 2.2 | - | - | - | Port Acres, Texas Trib of Taylor Bayou |
| Rio Grande | 275.5 | - | - | - | Galveston District Boundary at West Line of Starr County at Falcon Village, Texas |
| Robinson Bayou | 6.7 | - | - | - | High Island, Texas Trib of East Bay |
| Robinson Lake | - | - | 1.5 | - | High Island, Texas Trib of East Bay |
| Rock Creek | 5.5 | - | - | - | Livingston, Texas Trib of Trinity River |
| Rocky Creek | 10.7 | - | - | - | Near Onalaska, Texas Trib of Kickapoo Creek |
| Rogers Gully | 0.6 | - | - | - | Near Harmaston, Texas Trib of Lake Houston |
| Rollover Bay | - | - | 1.5 | - | At Gilchrist, Texas Trib of East Bay |
| Rollover Pass | 0.3 | - | - | - | Near Caplen, Texas Between Rollover Bay and Gulf of Mexico |

Exhibit 18

EXTRACT FROM
TREATIES AND OTHER INTERNATIONAL
AGREEMENTS OF THE UNITED STATES OF AMERICA
1776-1949, Vol. 9

Compiled under the direction of Charles T. Bevans,
Department of State, March 1972

# DISTRIBUTION OF WATERS OF RIO GRANDE

*Convention signed at Washington May 21, 1906*
*Senate advice and consent to ratification June 26, 1906*
*Ratified by the President of the United States December 26, 1906*
*Ratified by Mexico January 5, 1907*
*Ratifications exchanged at Washington January 16, 1907*
*Entered into force January 16, 1907*
*Proclaimed by the President of the United States January 16, 1907*

34 Stat. 2953; Treaty Series 455

The United States of America and the United States of Mexico being desirous to provide for the equitable distribution of the waters of the Rio Grande for irrigation purposes, and to remove all causes of controversy between them in respect thereto, and being moved by considerations of international comity, have resolved to conclude a Convention for these purposes and have named as their Plenipotentiaries:

The President of the United States of America, Elihu Root, Secretary of State of the United States; and

The President of the United States of Mexico, His Excellency Señor Don Joaquín D. Casasús, Ambassador Extraordinary and Plenipotentiary of the United States of Mexico at Washington; who, after having exhibited their respective full powers, which were found to be in good and due form, have agreed upon the following articles:

## ARTICLE I

After the completion of the proposed storage dam near Engle, New Mexico, and the distributing system auxiliary thereto, and as soon as water shall be available in said system for the purpose, the United States shall deliver to Mexico a total of 60,000 acre-feet of water annually, in the bed of the Rio Grande at the point where the head works of the Acequia Madre, known as the Old Mexican Canal, now exist above the city of Juarez, Mexico.

## ARTICLE II

The delivery of the said amount of water shall be assured by the United States and shall be distributed through the year in the same proportions as the water supply proposed to be furnished from the said irrigation system to lands

924

EXHIBIT 19

in the United States in the vicinity of El Paso, Texas, according to the following schedule, as nearly as may be possible:

|  | Acre feet per month | Corresponding cubic feet of water |
|---|---|---|
| January | 0 | 0 |
| February | 1,090 | 47,480,400 |
| March | 5,460 | 237,837,600 |
| April | 12,000 | 522,720,000 |
| May | 12,000 | 522,720,000 |
| June | 12,000 | 522,720,000 |
| July | 8,180 | 356,320,800 |
| August | 4,370 | 190,357,200 |
| September | 3,270 | 142,441,200 |
| October | 1,090 | 47,480,400 |
| November | 540 | 23,522,400 |
| December | 0 | 0 |
| Total for the year | 60,000 acre-feet | 2,613,600,000 cubic-feet |

In case, however, of extraordinary drought or serious accident to the irrigation system in the United States, the amount delivered to the Mexican Canal shall be diminished in the same proportion as the water delivered to lands under said irrigation system in the United States.

## ARTICLE III

The said delivery shall be made without cost to Mexico, and the United States agrees to pay the whole cost of storing the said quantity of water to be delivered to Mexico, of conveying the same to the international line, of measuring the said water, and of delivering it in the river bed above the head of the Mexican Canal. It is understood that the United States assumes no obligation beyond the delivering of the water in the bed of the river above the head of the Mexican Canal.

## ARTICLE IV

The delivery of water as herein provided is not to be construed as a recognition by the United States of any claim on the part of Mexico to the said waters; and it is agreed that in consideration of such delivery of water, Mexico waives any and all claims to the waters of the Rio Grande for any purpose whatever between the head of the present Mexican Canal and Fort Quitman, Texas, and also declares fully settled and disposed of, and hereby waives, all claims heretofore asserted or existing, or that may hereafter arise, or be asserted, against the United States on account of any damages alleged to have been sustained by the owners of land in Mexico, by reason of the diversion by citizens of the United States of waters of the Rio Grande.

G35.0063

926                              MEXICO

## ARTICLE V

The United States, in entering into this treaty, does not thereby concede, expressly or by implication, any legal basis for any claims heretofore asserted or which may be hereafter asserted by reason of any losses incurred by the owners of land in Mexico due or alleged to be due to the diversion of the waters of the Rio Grande within the United States; nor does the United States in any way concede the establishment of any general principle or precedent by the concluding of this treaty. The understanding of both parties is that the arrangement contemplated by this treaty extends only to the portion of the Rio Grande which forms the international boundary, from the head of the Mexican Canal down to Fort Quitman, Texas, and in no other case.

## ARTICLE VI

The present Convention shall be ratified by both contracting parties in accordance with their constitutional procedure, and the ratifications shall be exchanged at Washington as soon as possible.

In witness whereof, the respective Plenipotentiaries have signed the Convention both in the English and Spanish languages and have thereunto affixed their seals.

Done in duplicate at the City of Washington, this 21st day of May, one thousand nine hundred and six.

ELIHU ROOT          [SEAL]
JOAQÚIN D. CASASÚS   [SEAL]

G35.0064

Extract from
Treaties and Other International Agreements of the United States of Amer
1776-1949, Vol 9
compiled under the direction of
Charles T. Bevans, Department of State, March 1972

# PEACE, FRIENDSHIP, LIMITS, AND SETTLEMENT (TREATY OF GUADALUPE HIDALGO)

*Treaty signed at Guadalupe Hidalgo February 2, 1848*
*Senate advice and consent to ratification, with amendments, March 10, 1848* [1]
*Ratified by the President of the United States, with amendments, March 16, 1848* [1]
*Ratified by Mexico May 30, 1848*
*Ratifications exchanged at Querétaro May 30, 1848*
*Entered into force May 30, 1848*
*Proclaimed by the President of the United States July 4, 1848*
*Articles V, VI, and VII amended and article XI abrogated by treaty of December 30, 1853* [2]
*Article XXI continued in effect by convention of March 24, 1908* [3]
*Articles II–IV, XII–XV, and XVII–XX terminated upon fulfillment of terms*

**9 Stat. 922; Treaty Series 207** [4]

In the name of Almighty God:

The United States of America, and the United Mexican States, animated by a sincere desire to put an end to the calamities of the war which unhappily

---

[1] For United States amendments to arts. III, IX–XII, and XXIII, see footnotes to those articles. An additional and secret article was stricken out pursuant to the Senate resolution. It reads as follows:

"ADDITIONAL AND SECRET ARTICLE

"Of the Treaty of Peace, Friendship, Limits and Settlement between the United States of America and the Mexican Republic, signed this day by their respective Plenipotentiaries.

"In view of the possibility that the exchange of the ratifications of this treaty may, by the circumstances in which the Mexican Republic is placed, be delayed longer than the term of four months fixed by it's twenty-third Article for the exchange of ratifications of the same; it is hereby agreed that such delay shall not, in any manner, affect the force and validity of this Treaty, unless it should exceed the term of eight months, counted from the date of the signature thereof.

"This Article is to have the same force and virtue as if inserted in the treaty to which it is an Addition.

"In faith whereof, we, the respective Plenipotentiaries have signed this Additional and Secret Article, and have hereunto affixed our seals respectively. Done in Quintuplicate at the City of Guadalupe Hidalgo on the second day of February, in the year of Our Lord one thousand eight hundred and forty-eight.

| | |
|---|---|
| "N. P. TRIST | [SEAL] |
| LUIS G. CUEVAS | [SEAL] |
| BERNARDO COUTO | [SEAL] |
| MIG¹ ATRISTAIN | [SEAL]" |

The text printed here is the amended text as proclaimed by the President.
[2] TS 208, *post*, p. 812.
[3] TS 500, *post*, p. 927.
[4] For a detailed study of this treaty, see 5 Miller 207.

791

Exhibit 20

G35.0065

MEXICO

for facilitating such evacuation, and rendering it convenient to the troops, and for promoting a good understanding between them and the inhabitants.

If, however, the ratification of this treaty by both parties should not take place in time to allow the embarkation of the troops of the United States to be completed before the commencement of the sickly season, at the Mexican ports on the Gulf of Mexico; in such case a friendly arrangement shall be entered into between the General in Chief of the said troops and the Mexican Government, whereby healthy and otherwise suitable places at a distance from the ports not exceeding thirty leagues shall be designated for the residence of such troops as may not yet have embarked, until the return of the healthy season. And the space of time here referred to, as comprehending the sickly season, shall be understood to extend from the first day of May to the first day of November.

All prisoners of war taken on either side, on land or on sea, shall be restored as soon as practicable after the exchange of ratifications of this treaty. It is also agreed that if any Mexicans should now be held as captives by any savage tribe within the limits of the United States, as about to be established by the following Article, the Government of the said United States will exact the release of such captives, and cause them to be restored to their country.

## ARTICLE V [1]

The Boundary line between the two Republics shall commence in the Gulf of Mexico, three leagues from land, opposite the mouth of the Rio Grande, otherwise called Rio Bravo del Norte, or opposite the mouth of it's deepest branch, if it should have more than one branch emptying directly into the sea; from thence, up the middle of that river, following the deepest channel, where it has more than one to the point where it strikes the Southern boundary of New Mexico; thence, westwardly along the whole Southern Boundary of New Mexico (which runs north of the town called *Paso*) to it's western termination; thence, northward, along the western line of New Mexico, until it intersects the first branch of the river Gila; (or if it should not intersect any branch of that river, then, to the point on the said line nearest to such branch, and thence in a direct line to the same;) thence down the middle of the said branch and of the said river, until it empties into the Rio Colorado; thence, across the Rio Colorado, following the division line between Upper and Lower California, to the Pacific Ocean.

The southern and western limits of New Mexico, mentioned in this Article, are those laid down in the Map, entitled *"Map of the United Mexican States, as organized and defined by various acts of the Congress of said Republic, and constructed according to the best authorities. Revised edition. Published at New York in 1847 by J. Disturnell:"* Of which Map a Copy is added to

---

[1] For an amendment to art. V, see treaty of Dec. 30, 1853 (TS 208), *post*, p. 812.

Case 2:23-cv-06333-DAC Document 16 Page: 19 Date Filed: 09/07/2023

this Treaty,[8] bearing the signatures and seals of the Undersigned Plenipotentiaries. And, in order to preclude all difficulty in tracing upon the ground the limit separating Upper from Lower California, it is agreed that the said limit shall consist of a straight line, drawn from the middle of the Rio Gila, where it unites with the Colorado, to a point on the Coast of the Pacific Ocean, distant one marine league due south of the southernmost point of the Port of San Diego, according to the plan of said port, made in the year 1782, by Don Juan Pantoja, second sailing-Master of the Spanish fleet, and published at Madrid in the year 1802, in the Atlas to the voyage of the schooners *Sutil and Mexicana:* of which plan a Copy is hereunto added,[9] signed and sealed by the respective Plenipotentiaries.

In order to designate the Boundary line with due precision, upon authoritative maps, and to establish upon the ground landmarks which shall show the limits of both Republics, as described in the present Article, the two Governments shall each appoint a Commissioner and a Surveyor, who, before the expiration of one year from the date of the exchange of ratifications of this treaty, shall meet at the Port of San Diego, and proceed to run and mark the said Boundary in it's whole course to the mouth of the Rio Bravo del Norte. They shall keep journals and make out plans of their operations; and the result, agreed upon by them, shall be deemed a part of this treaty, and shall have the same force as if it were inserted therein. The two Governments will amicably agree regarding what may be necessary to these persons, and also as to their respective escorts, should such be necessary.

The Boundary line established by this Article shall be religiously respected by each of the two Republics, and no change shall ever be made therein, except by the express and free consent of both nations, lawfully given by the General Government of each, in conformity with it's own constitution.

## ARTICLE VI [10]

The vessels and citizens of the United States shall, in all time, have a free and uninterrupted passage by the Gulf of California, and by the river Colorado below it's confluence with the Gila, to and from their possessions situated north of the Boundary line defined in the preceding Article: it being understood that this passage is to be by navigating the Gulf of California and the river Colorado, and not by land, without the express consent of the Mexican Government.

If, by the examinations which may be made, it should be ascertained to be practicable and advantageous to construct a road, canal or railway, which should, in whole or in part, run upon the river Gila, or upon it's right or it's

[8] For a reproduction of the Disturnell map, see 5 Miller (inside back cover).
[9] For a reproduction of the plan of the Port of San Diego, see 5 Miller (opposite p. 236).
[10] For amendments to arts. VI and VII, see treaty of Dec. 30, 1853 (TS 208), *post,* p. 814.

Case 2:23-cv-01253-DLR Document 16 Filed 09/07/2023 Page 20 of 44

left bank, within the space of one marine league from either margin of the river, the Governments of both Republics will form an agreement regarding its construction, in order that it may serve equally for the use and advantage of both countries.

## ARTICLE VII

The river Gila, and the part of the Rio Bravo del Norte lying below the southern boundary of New Mexico, being, agreeably to the fifth Article, divided in the middle between the two Republics, the navigation of the Gila and of the Bravo below said boundary shall be free and common to the vessels and citizens of both countries; and neither shall, without the consent of the other, construct any work that may impede or interrupt, in whole or in part, the exercise of this right: not even for the purpose of favoring new methods of navigation. Nor shall any tax or contribution, under any denomination or title, be levied upon vessels or persons navigating the same, or upon merchandise or effects transported thereon, except in the case of landing upon one of their shores. If, for the purpose of making the said rivers navigable, or for maintaining them in such state, it should be necessary or advantageous to establish any tax or contribution, this shall not be done without the consent of both Governments.

The stipulations contained in the present Article shall not impair the territorial rights of either Republic, within it's established limits.

## ARTICLE VIII

Mexicans now established in territories previously belonging to Mexico, and which remain for the future within the limits of the United States, as defined by the present Treaty, shall be free to continue where they now reside, or to remove at any time to the Mexican Republic, retaining the property which they possess in the said territories, or disposing thereof and removing the proceeds wherever they please; without their being subjected, on this account, to any contribution, tax or charge whatever.

Those who shall prefer to remain in the said territories, may either retain the title and rights of Mexican citizens, or acquire those of citizens of the United States. But, they shall be under the obligation to make their election within one year from the date of the exchange of ratifications of this treaty: and those who shall remain in the said territories, after the expiration of that year, without having declared their intention to retain the character of Mexicans, shall be considered to have elected to become citizens of the United States.

In the said territories, property of every kind, now belonging to Mexicans not established there, shall be inviolably respected. The present owners, the heirs of these, and all Mexicans who may hereafter acquire said property by contract, shall enjoy with respect to it, guaranties equally ample as if the same belonged to citizens of the United States.

G35.0068

Extract from
Treaties and Other International Agreements of the United States of America
1776-1949, Vol 9
compiled under the direction of
Charles T. Bevans, Department of State, March 1972

# BOUNDARIES (GADSDEN TREATY)

*Treaty signed at México December 30, 1853*
*Senate advice and consent to ratification, with amendments, April 25,*
*1854* [1]
*Ratified by Mexico May 31, 1854*
*Ratified by the President of the United States, with amendments,*
*June 29, 1854* [1]
*Ratifications exchanged at Washington June 30, 1854*
*Entered into force June 30, 1854*
*Proclaimed by the President of the United States June 30, 1854*
*Article 8 terminated December 21, 1937, by treaty of April 13, 1937* [2]

10 Stat. 1031; Treaty Series 208

In the Name of Almighty God

The Republic of Mexico and the United States of America desiring to remove every cause of disagreement, which might interfere in any manner with the better friendship and intercourse between the two Countries; and especially, in respect to the true limits which should be established, when notwithstanding what was covenanted in the Treaty of Guadalupe Hidalgo in the Year 1848,[3] opposite interpretations have been urged, which might give occasion to questions of serious moment: to avoid these, and to strengthen and more firmly maintain the peace, which happily prevails between the two Republics, the President of the United States has for this purpose, appointed James Gadsden Envoy Extraordinary and Minister Plenipote.liary of the same near the Mexican Government, and the President of Mexico has appointed as Plenipotentiary "ad hoc" His Excellency Don Manuel Diez de Bonilla Cavalier Grand Cross of the National and Distinguished Order of Guadalupe, and Secretary of State and of the Office of Foreign Relations, and Don Jose Salazar Ylarregui and General Mariano Monterde as Scientific Commissioners invested with Full powers for this Negotia-

---

[1] As a result of the United States amendments, the terms of the treaty were radically altered: arts. 1 and 2 were rewritten; arts. 3 and 4 were rewritten and combined as art. 3; art. 8 was deleted; and there were several minor corrections of the text. For a detailed study of this treaty, and texts of the articles as signed, see 6 Miller 293.
The text printed here is the amended text as proclaimed by the President.
[2] TS 932, *post*, p. 1023.
[3] Treaty signed Feb. 2, 1848 (TS 207, *ante*, p. 791).

812

EXHIBIT 21

G35.0069

/

tion who having communicated their respective Full Powers, and finding them in due and proper form, have agreed upon the Articles following.

### ARTICLE 1st

The Mexican Republic agrees to designate the following as her true limits with the United States for the future; Retaining the same dividing line between the two California's, as already defined and established according to the 5th Article of the Treaty of Guadalupe Hidalgo, the limits between the Two Republics shall be as follows: Beginning in the Gulf of Mexico, three leagues from land, opposite the mouth of the Rio Grande as provided in the fifth article of the treaty of Guadalupe Hidalgo, thence as defined in the said article, up the middle of that river to the point where the parallel of 31° 47′ north latitude crosses the same, thence due west one hundred miles, thence south to the parallel of 31°20′ north latitude, thence along the said parallel of 31°20′ to the 111th meridian of longitude west of Greenwich, thence in a straight line to a point on the Colorado river twenty english miles below the junction of the Gila and Colorado rivers, thence up the middle of the said river Colorado until it intersects the present line between the United States and Mexico.

For the performance of this portion of the Treaty each of the two Governments shall nominate one Commissioner to the end that, by common consent, the two thus nominated having met in the City of Paso del Norte, three months after the exchange of the ratifications of this Treaty may proceed to survey and mark out upon the land the dividing line stipulated by this article, where it shall not have already been surveyed and established by the Mixed Commission according to the Treaty of Guadalupe keeping a Journal and making proper plans of their operations. For this purpose if they should Judge it is necessary, the contracting Parties shall be at liberty each to unite to its respective Commissioner Scientific or other assistants, such as Astronomers and Surveyors whose concurrence shall not be considered necessary for the settlement and ratification of a true line of division between the two Republics; that line shall be alone established upon which the Commissioners may fix, their consent in this particular being considered decisive and an integral part of this Treaty, without necessity of ulterior ratification or approval, and without room for interpretation of any kind by either of the Parties contracting.

The dividing line thus established shall in all time be faithfully respected by the two Governments without any variation therein, unless of the express and free consent of the two, given in conformity to the principles of the Law of Nations, and in accordance with the Constitution of each country respectively.

In consequence, the stipulation in the 5th Article of the Treaty of Guadalupe upon the Boundary line therein described is no longer of any force, wherein it may conflict with that here established, the said line being

G35.0070

Case 2:23-cv-00253-DC Document 16-3 Page 23 of 44 Date Filed 09/07/2023

considered annulled and abolished wherever it may not coincide with the present, and in the same manner remaining in full force where in accordance with the same.

## ARTICLE 2nd

The government of Mexico hereby releases the United States from all liability on account of the obligations contained in the eleventh article of the treaty of Guadalupe Hidalgo, and the said article and the thirty third article of the treaty of amity, commerce and navigation between the United States of America and the United Mexican States concluded at Mexico, on the fifth day of April, 1831,[*] are hereby abrogated.

## ARTICLE 3rd

In consideration of the foregoing stipulations, the government of the United States agrees to pay to the government of Mexico, in the city of New York, the sum of ten millions of dollars, of which seven millions shall be paid immediately upon the exchange of the ratifications of this treaty, and the remaining three millions as soon as the boundary line shall be surveyed, marked, and established.

## ARTICLE 4th

The Provisions of the 6th and 7th Articles of the Treaty of Guadalupe Hidalgo having been rendered nugatory for the most part by the Cession of Territory granted in the First Article of this Treaty, the said Articles are hereby abrogated and annulled and the provisions as herein expressed substituted therefor—The Vessels and Citizens of the United States shall in all Time have free and uninterrupted passage through the Gulf of California to and from their possessions situated North of the Boundary line of the Two Countries. It being understood that this passage is to be by navigating the Gulf of California and the river Colorado, and not by land, without the express consent of the Mexican Government, and precisely the same provisions, stipulations and restrictions in all respects are hereby agreed upon and adopted and shall be scrupulously observed and enforced by the Two Contracting Governments in reference to the Rio Colorado, so far and for such distance as the middle of that River is made their common Boundary Line, by the First Article of this Treaty.

The several Provisions, Stipulations and restrictions contained in the 7th Article of the Treaty of Guadalupe Hidalgo, shall remain in force only so far as regards the Rio Bravo del Norte below the initial of the said Boundary provided in the First Article of this Treaty That is to say below the intersection of the 31°47′30″ parallel of Latitude with the Boundary Line established by the late Treaty dividing said river from its mouth upwards according to the 5th Article of the Treaty of Guadalupe.

[*] TS 203, *ante*, p. 764.

G35.0071

Extract from
Treaties and Other International Agreements of the United States of Ameri
1776-1949, Vol 9
compiled under the direction of
Charles T. Bevans, Department of State, March 1972

# BOUNDARY WATERS: RIO GRANDE
# AND RIO COLORADO

*Convention signed at Washington November 12, 1884*
*Senate advice and consent to ratification June 23, 1886*
*Ratified by the President of the United States July 10, 1886*
*Ratified by Mexico August 11, 1886*
*Ratifications exchanged at Washington September 13, 1886*
*Entered into force September 13, 1886*
*Proclaimed by the President of the United States September 14, 1886*

.24 Stat. 1011; Treaty Series 226

CONVENTION BETWEEN THE UNITED STATES OF AMERICA AND THE UNITED
STATES OF MEXICO, TOUCHING THE BOUNDARY-LINE BETWEEN THE TWO
COUNTRIES WHERE IT FOLLOWS THE BED OF THE RIO GRANDE AND THE
RIO COLORADO

Whereas, in virtue of the 5th article of the Treaty of Guadalupe Hidalgo
between the United States of America and the United States of Mexico, con-
cluded February 2, 1848,[1] and of the first article of that of December 30
1853,[2] certain parts of the dividing line between the two countries follow the
middle of the channel of the Rio Grande and the Rio Colorado, to avoid dif
ficulties which may arise through the changes of channel to which those river
are subject through the operation of natural forces, the Government of the
United States of America and the Government of the United States of Mexico
have resolved to conclude a convention which shall lay down rules for the de
termination of such questions, and have appointed as their Plenipotentiaries

The President of the United States of America, Frederick T. Frelinghuy
sen, Secretary of State of the United States; and the President of the Unite
States of Mexico, Matias Romero, Envoy Extraordinary and Minister Plen
potentiary of the United Mexican States;

Who, after exhibiting their respective Full Powers, found in good and du
form, have agreed upon the following articles:

[1] TS 207, *ante*, p. 791.
[2] TS 208, *ante*, p. 812.

8

Exhibit 22

G35.0072

MEXICO

## ARTICLE I

The dividing line shall forever be that described in the aforesaid Treaty and follow the centre of the normal channel of the rivers named, notwithstanding any alterations in the banks or in the course of those rivers, provided that such alterations be effected by natural causes through the slow and gradual erosion and deposit of alluvium and not by the abandonment of an existing river bed and the opening of a new one.

## ARTICLE II

Any other change, wrought by the force of the current, whether by the cutting of a new bed, or when there is more than one channel by the deepening of another channel than that which marked the boundary at the time of the survey made under the aforesaid Treaty, shall produce no change in the dividing line as fixed by the surveys of the International Boundary Commissions in 1852; but the line then fixed shall continue to follow the middle of the original channel bed, even though this should become wholly dry or be obstructed by deposits.

## ARTICLE III

No artificial change in the navigable course of the river, by building jetties, piers, or obstructions which may tend to deflect the current or produce deposits of alluvium, or by dredging to deepen another than the original channel under the Treaty when there is more than one channel, or by cutting waterways to shorten the navigable distance, shall be permitted to affect or alter the dividing line as determined by the aforesaid commissions in 1852 or as determined by Article I. hereof and under the reservation therein contained; but the protection of the banks on either side from erosion by revetments of stone or other material not unduly projecting into the current of the river shall not be deemed an artificial change.

## ARTICLE IV

If any international bridge have been or shall be built across either of the rivers named, the point on such bridge exactly over the middle of the main channel as herein determined shall be marked by a suitable monument, which shall denote the dividing line for all the purposes of such bridge, notwithstanding any change in the channel which may thereafter supervene. But any rights other than in the bridge itself and in the ground on which it is built shall in event of any such subsequent change be determined in accordance with the general provisions of this convention.

## ARTICLE V

Rights of property in respect of lands which may have become separated through the creation of new channels as defined in Article II. hereof, shall

G35.0073

Case 2:23-cv-06033-DDC Document 16-37 Page 26 Date Filed 09/07/2023

not be affected thereby, but such lands shall continue to be under the jurisdiction of the country to which they previously belonged.

In no case, however, shall this retained jurisdictional right affect or control the right of navigation common to the two countries under the stipulations of Article VII. of the aforesaid Treaty of Guadalupe Hidalgo; and such common right shall continue without prejudice throughout the actually navigable main channels of the said rivers, from the mouth of the Rio Grande to the point where the Rio Colorado ceases to be the international boundary, even though any part of the channel of said rivers, through the changes herein provided against, may be comprised within the territory of one of the two nations.

## ARTICLE VI

This convention shall be ratified by both parties in accordance with their respective constitutional procedure, and the ratifications exchanged in the city of Washington as soon as possible.

In witness whereof the undersigned Plenipotentiaries have hereunto set their hands and seals.

Done at the city of Washington, in duplicate, in the English and Spanish languages, this twelfth day of November, A.D. 1884.

FREDK. T. FRELINGHUYSEN    [SEAL]
M. ROMERO    [SEAL]

Case 3:53-cv-01247-JO-SBC   Document 3342   Filed 06/02/58   PageID.11205   Page 27 of 44

REPORT OF INTERNATIONAL WATER COMMISSION     **11**

Bancalari as its representative on the Colorado and Mr. Gustavo P. Serrano on the Rio Grande. After several days of continuous conferences the report on the Colorado was presented on November 1, and that on the Rio Grande on November 8. These two reports state the attitude of the respective sections of the commission, and they will be found in full in the minutes for those dates appearing hereinafter.

The differences in the views of the two sections rendered it impossible to submit unanimous recommendations from the commission to the two Governments. On the Colorado recommendations were made for a study of the present flood control system—a representative to be appointed by the American and Mexican sections, after which the commission adjourned on November 9, 1929. Since then Mr. Jose L. Favela has been designated by the Mexican section and Mr. Ray M. Priest by the American section. The results of their study will be reported to their respective sections.

## CONCLUSIONS

The preceding pages of this report tell of the meetings and conferences of the commission. The appendices which follow give the facts gathered by the investigators. The conclusions of the American section which follow are the result of study of the needs of both countries and of the political and economic views of the people on both sides of the boundary. It will be seen the views once held by the two countries regarding navigation have been modified by changed conditions and that the exigencies of agricultural and urban growth are forcing an unregulated division of such of the waters of the three streams as may be utilized without the much-needed storage of flood waters or essential international understandings. The discussion of the three streams is preceded by a statement of the American section's views on the principles which it believes should control American action on navigation, consumptive and industrial uses of water from the common water supply on the two sides of the boundary.

### NAVIGABILITY

The flow of the Tia Juana River is very intermittent in character, being very heavy at times and at other times carrying no perceptible surface flow. Therefore, the Tia Juana has never been considered a navigable stream and the treaties on this subject, between the two countries, do not mention this river.

The treaty of Guadalupe Hidalgo in 1848 and the subsequent treaty for the Gadsden Purchase in 1853 both laid down the theory of navigability of the Rio Grande and the Colorado River and the boundary convention of 1884 confirmed but limited somewhat navigation rights. Navigation was a matter of considerable importance if the time these treaties were concluded as freight movements by boat, however precarious, were vastly more economical and efficient than by ox-cart over undeveloped roads which then formed the only other means of transit. Also at the time these treaties were made most of the entire natural flow of the rivers was discharged into the ocean.

EXHIBIT 23

G35.0075

Navigation has never been extensive, however, on either river. Both carry large quantities of silt which causes the formation of constantly shifting bars, covered only by shallow water, and in their lower reaches their channels are tortuous and ever-changing. Both rivers flow through regions of scanty and uncertain rainfall in which the development of natural resources and the establishment and maintenance of civilized communities, require the diversion from their channels of the waters of the streams for irrigation, domestic and industrial purposes.

## COLORADO RIVER

The provisions of these treaties concerning navigation are not, however, the same for the two rivers. With respect to the Colorado River, the treaties laid down no restriction upon the complete sovereignty of the United States over the river or its water within its territorial boundaries, but they do grant, in perpetuity to the vessels and to the citizens of the United States a right of free and uninterrupted navigation through Mexico by way of the Gulf of California and the Colorado River. They show no acknowledgment or grant of any right in Mexico, to any part of that river or its waters except such as are incident to its territorial sovereignty over a portion of its channel; there being no provision for Mexico to navigate the boundary portion of the stream and no obligation on the United States to maintain the navigability of the river.

Mexico has never, as far as the members of this section can ascertain, made any effort to maintain a navigable channel between the Gulf of California and the point where the Colorado River crosses the boundary line between the two countries. Instead of seeking to preserve and improve the navigable character of the Colorado the people of both countries have diverted the waters by head gates, dams and pumps, and are raising a wide variety of valuable crops. They recognize, however, the inevitable destructive effect on navigation as an incident of a more valuable development in other directions. As a result of this development practically the entire low water flow of the river is diverted onto irrigated lands. It also supplies extensive municipal and industrial uses in the seven States of the Colorado River Basin as well as a much more restricted area in Mexico. Within recent years the flow of the river reaching the Gulf of California has been so greatly modified by diversion for consumptive use that navigation in Mexico has become impossible

As the development of the Colorado River Basin has gone forward railroads and well-established highways have been built thus assisting to render navigation on any portion of the river unnecessary,

## RIO GRANDE

With respect to the Rio Grande, the treaties provide that the navigation of the actually navigable main channels of the river is made free and common to the citizens of both countries and neither country may, without the consent of the other, construct any work that may impede or interrupt this navigation.

There has never been any practical navigation on the 1,044 miles of river from El Paso to Roma. From Roma to the Gulf

navigation has never been extensive and in the past 25 years it has been practically abandoned.

Under a joint resolution of Congress of April 29, 1890, and a protocol of May 6, 1896, the two countries began investigations looking to the equitable division of the waters of this river, so that irrigation from the boundary portion of the river might be expanded in an orderly way. Since that time, except from 1911 to 1924, the two Governments have been seeking a basis for an equitable division of these waters for irrigation and other beneficial uses. The Federal and State authorities of both countries have authorized and acquiesced in large and important diversions of water, from the boundary portion of the river. Almost the entire flow of the river which passed El Paso when the early treaties were made is now diverted for irrigation upon thousands of acres of land extending from the river headwaters in the State of Colorado, down to Fort Quitman, Tex. Since the signing of the old treaties there has grown up, in Mexico and in the United States on the tributaries and along the main river valley below Fort Quitman, irrigation uses upon thousands of acres of fertile land, as well as extensive domestic, municipal, and industrial uses in the many communities that now dot the lower Rio Grande Basin. By treaty in 1906 the two Governments formally agree that along the river from El Paso to Fort Quitman navigation could be entirely eliminated and the water devoted to the more profitable service of irrigation. At the present time, except in years of unusually high flow, the entire discharge of the river, in its lower reaches, is diverted and used during the season of lower-river flow each year.

As these developments have gone forward, well-established highways and railroads have been built, thus rendering navigation on the Rio Grande unnecessary.

It is therefore apparent that the conditions which form the basis of the agreement in the old treaties concerning navigation of the Rio Grande and Colorado Rivers have so completely changed that the spirit is dead, if not the letter, of those parts of the treaties which deal with navigation.

### DIVISION OF THE WATERS

The need for irrigation along the international boundary, in the valleys of all three rivers, has led to a large consumptive use of water in both countries. This has extended without any coordinated plans for such development or understanding as to where or how future development is to be carried on. The commission has sought to reach an agreement on principles which would control the division of the water between the two countries. Such an agreement is necessary to protect existing uses, avert dangerous controversies, and provide a safe foundation for future development. In doing this the commission was confronted by the fact that all of the water of the Colorado now being used in Mexico comes from the United States, while about two-thirds of the water of the Rio Grande now being used in Texas below Fort Quitman comes from Mexico. The irregular flow of the Tia Juana and the use of its underground waters prevented a determination of the contributions of each of the two countries to the present uses on each side the boundary.

G35.0077

Extract from
Treaties and Other International Agreements of the United States of America
1776-1949, Vol 9
compiled under the direction of
Charles T. Bevans, Department of State, March 1972

# UTILIZATION OF WATERS OF COLORADO AND TIJUANA RIVERS AND OF THE RIO GRANDE

*Treaty signed at Washington February 3, 1944; protocol signed at Washington November 14, 1944*

*Senate advice and consent to ratification, with understandings, April 18, 1945* [1]

*Ratified by Mexico October 16, 1945*

*Ratified by the President of the United States, with understandings, November 1, 1945* [1]

*Ratifications exchanged at Washington November 8, 1945*

*Entered into force November 8, 1945*

*Proclaimed by the President of the United States November 27, 1945*

59 Stat. 1219; Treaty Series 994

### TREATY

The Government of the United States of America and the Government of the United Mexican States: animated by the sincere spirit of cordiality and friendly cooperation which happily governs the relations between them; taking into account the fact that Articles VI and VII of the Treaty of Peace, Friendship and Limits between the United States of America and the

---

[1] The United States understandings read as follows:

"(a)  That no commitment for works to be built by the United States in whole or in part at its expense, or for expenditures by the United States, other than those specifically provided for in the treaty, shall be made by the Secretary of State of the United States, the Commissioner of the United States Section of the International Boundary and Water Commission, the United States Section of said Commission, or any other officer or employee of the United States, without prior approval of the Congress of the United States. It is understood that the works to be built by the United States, in whole or in part at its expense, and the expenditures by the United States, which are specifically provided for in the treaty, are as follows:

"1.  The joint construction of the three storage and flood-control dams on the Rio Grande below Fort Quitman, Texas, mentioned in article 5 of the treaty.

"2.  The dams and other joint works required for the diversion of the flow of the Rio Grande mentioned in subparagraph II of article 5 of the treaty, it being understood that the commitment of the United States to make expenditures under this subparagraph is limited to its share of the cost of one dam and works appurtenant thereto.

"3.  Stream-gaging stations which may be required under the provisions of section (j) of article 9 of the treaty and of subparagraph (d) of article 12 of the treaty.

1166

EXHIBIT 24

G35.0078

Case: 23-50063-253-DD Document 16-37 Page: 31 Date Filed: 09/07/2023

United Mexican States signed at Guadalupe Hidalgo on February 2, 1848,[2] and Article IV of the boundary treaty between the two countries signed at the City of Mexico December 30, 1853[3] regulate the use of the waters of the Rio Grande (Rio Bravo) and the Colorado River for purposes of navigation only; considering that the utilization of these waters for other purposes is desirable in the interest of both countries, and desiring, moreover, to fix and delimit the rights of the two countries with respect to the waters of the Colorado and Tijuana Rivers, and of the Rio Grande (Rio Bravo) from Fort Quitman, Texas, United States of America, to the Gulf of Mexico, in order to obtain the most complete and satisfactory utilization thereof, have resolved to conclude a treaty and for this purpose have named as their plenipotentiaries:

The President of the United States of America:

Cordell Hull, Secretary of State of the United States of America, George S. Messersmith, Ambassador Extraordinary and Plenipotentiary of the United States of America in Mexico, and Lawrence M. Lawson, United States Commissioner, International Boundary Commission, United States and Mexico; and.

The President of the United Mexican States:

Francisco Castillo Nájera, Ambassador Extraordinary and Plenipotentiary of the United Mexican States in Washington, and Rafael Fernández MacGregor, Mexican Commissioner, International Boundary Commission, United States and Mexico; who, having communicated to each other their

---

"4. The Davis Dam and Reservoir mentioned in subparagraph (b), of article 12 of the treaty.

"5. The joint flood-control investigations, preparation of plans, and reports on the Rio Grande below Fort Quitman required by the provisions of article 6 of the treaty.

"6. The joint flood-control investigations, preparations of plans, and reports on the lower Colorado River between the Imperial Dam and the Gulf of California required by article 13 of the treaty.

"7. The joint investigations, preparation of plans, and reports on the establishment of hydroelectric plants at the international dams on the Rio Grande below Fort Quitman provided for by article 7 of the treaty.

"8. The studies, investigations, preparation of plans, recommendations, reports, and other matters dealing with the Tijuana River system provided for by the first paragraph (including the numbered subparagraphs) of article 16 of the treaty.

"(b)  Insofar as they affect persons and property in the territorial limits of the United States, the powers and functions of the Secretary of State of the United States, the Commissioner of the United States Section of the International Boundary and Water Commission, the United States Section of said Commission, and any other officer or employee of the United States, shall be subject to the statutory and constitutional controls and processes. Nothing contained in the treaty or protocol shall be construed as impairing the power of the Congress of the United States to define the terms of office of members of the United States Section of the International Boundary and Water Commission or to provide for their appointment by the President by and with the advice and consent of the Senate or otherwise.

Footnotes continued on following page.

G35.0079

1168　　　　　　　　　MEXICO

respective Full Powers and having found them in good and due form, have agreed upon the following:

## I. PRELIMINARY PROVISIONS

### ARTICLE 1

For the purposes of this Treaty it shall be understood that:

(a) "The United States" means the United States of America.
(b) "Mexico" means the United Mexican States.

---

Footnotes continued from previous page.

"(c) That nothing contained in the treaty or protocol shall be construed as authorizing the Secretary of State of the United States, the Commissioner of the United States Section of the International Boundary and Water Commission, or the United States Section of said Commission, directly or indirectly to alter or control the distribution of water to users within the territorial limits of any of the individual States.

"(d) That 'international dam or reservoir' means a dam or reservoir built across the common boundary between the two countries.

"(e) That the words 'international plants', appearing in article 19, mean only hydro-electric generating plants in connection with dams built across the common boundary between the two countries.

"(f) That the words 'electric current', appearing in article 19, mean hydroelectric power generated at an international plant.

"(g) That by the use of the words 'The jurisdiction of the Commission shall extend to the limitrophe parts of the Rio Grande (Rio Bravo) and the Colorado River, to the land boundary between the two countries, and to works located upon their common boundary . . .' in the first sentence of the fifth paragraph of article 2, is meant: 'The jurisdiction of the Commission shall extend and be limited to the limitrophe parts of the Rio Grande (Rio Bravo) and the Colorado River, to the land boundary between the two countries, and to works located upon their common boundary. . . .'

"(h) The word 'agreements' whenever used in subparagraphs (a), (c), and (d) of article 24 of the treaty shall refer only to agreements entered into pursuant to and subject to the provisions and limitations of treaties in force between the United States of America and the United Mexican States.

"(i) The word 'disputes' in the second paragraph of article 2 shall have reference only to disputes between the Governments of the United States of America and the United Mexican States.

"(j) First, that the one million seven hundred thousand acre-feet specified in subparagraph (b) of article 10 includes and is not in addition to the one million five hundred thousand acre-feet, the delivery of which to Mexico is guaranteed in subparagraph (b) of article 10; second, that the one million five hundred thousand acre-feet specified in three places in said subparagraph (b) is identical with the one million five hundred thousand acre-feet specified in said subparagraph (a); third, that any use by Mexico under said subparagraph (b) of quantities of water arriving at the Mexican points of diversion in excess of said one million five hundred thousand acre-feet shall not give rise to any future claim of right by Mexico in excess of said guaranteed quantity of one million five hundred thousand acre-feet of water.

"(k) The United States recognizes a duty to require that the protective structures to be constructed under article 12, paragraph (a), of this treaty, are so constructed, operated, and maintained as to adequately prevent damage to property and lands within the United States from the construction and operation of the diversion structure referred to in said paragraph."

<sup></sup> TS 207, *ante*, p. 791.
<sup></sup> TS 208, *ante*, p. 812.

G35.0080

(c)    "The Commission" means the International Boundary and Water Commission, United States and Mexico, as described in Article 2 of this Treaty.

(d)    "To divert" means the deliberate act of taking water from any channel in order to convey it elsewhere for storage, or to utilize it for domestic, agricultural, stockraising or industrial purposes whether this be done by means of dams across the channel, partition weirs, lateral intakes, pumps or any other methods.

(e)    "Point of diversion" means the place where the act of diverting the water is effected.

(f)    "Conservation capacity of storage reservoirs" means that part of their total capacity devoted to holding and conserving the water for disposal thereof as and when required, that is, capacity additional to that provided for silt retention and flood control.

(g)    "Flood discharges and spils" means the voluntary or involuntary discharge of water for flood control as distinguished from releases for other purposes.

(h)    "Return flow" means that portion of diverted water that eventually finds its way back to the source from which it was diverted.

(i)    "Release" means the deliberate discharge of stored water for conveyance elsewhere or for direct utilization.

(j)    "Consumptive use" means the use of water by evaporation, plant transpiration or other manner whereby the water is consumed and does not return to its source of supply. In general it is measured by the amount of water diverted less the part thereof which returns to the stream.

(k)    "Lowest major international dam or reservoir" means the major international dam or reservoir situated farthest downstream.

(l)    "Highest major international dam or reservoir" means the major international dam or reservoir situated farthest upstream.

## ARTICLE 2

The International Boundary Commission established pursuant to the provisions of the Convention between the United States and Mexico signed in Washington March 1, 1889 [4] to facilitate the carrying out of the principles contained in the Treaty of November 12, 1884 [5] and to avoid difficulties occasioned by reason of the changes which take place in the beds of the Rio Grande (Rio Bravo) and the Colorado River shall hereafter be known as the International Boundary and Water Commission, United States and Mexico, which shall continue to function for the entire period during which the present Treaty shall continue in force. Accordingly, the term of the Convention of March 1, 1889 shall be considered to be indefinitely extended, and

[4] TS 232, *ante*, p. 877.
[5] TS 226, *ante*, p. 865.

G35.0081

Case 2:23-cv-05053-DOC Document 16 Filed 09/07/23 Page 34 of 44 Page ID

**1170**          MEXICO

the Convention of November 21, 1900 [6] between the United States and Mexico regarding that Convention shall be considered completely terminated.

The application of the present Treaty, the regulation and exercise of the rights and obligations which the two Governments assume thereunder, and the settlement of all disputes [7] to which its observance and execution may give rise are hereby entrusted to the International Boundary and Water Commission, which shall function in conformity with the powers and limitations set forth in this Treaty.

The Commission shall in all respects have the status of an international body, and shall consist of a United States Section and a Mexican Section. The head of each Section shall be an Engineer Commissioner. Wherever there are provisions in this Treaty for joint action or joint agreement by the two Governments, or for the furnishing of reports, studies or plans to the two Governments, or similar provisions, it shall be understood that the particular matter in question shall be handled by or through the Department of State of the United States and the Ministry of Foreign Relations of Mexico.

The Commission or either of its two Sections may employ such assistants and engineering and legal advisers as it may deem necessary. Each Government shall accord diplomatic status to the Commissioner, designated by the other Government. The Commissioner, two principal engineers, a legal adviser, and a secretary, designated by each Government as members of its Section of the Commission, shall be entitled in the territory of the other country to the privileges and immunities appertaining to diplomatic officers. The Commission and its personnel may freely carry out their observations, studies and field work in the territory of either country.

The jurisdiction of the Commission shall extend to the limitrophe parts of the Rio Grande (Rio Bravo) and the Colorado River, to the land boundary between the two countries, and to works located upon their common boundary, [8] each Section of the Commission retaining jurisdiction over that part of the works located within the limits of its own country. Neither Section shall assume jurisdiction or control over works located within the limits of the country of the other without the express consent of the Government of the latter. The works constructed, acquired or used in fulfillment of the provisions of this Treaty and located wholly within the territorial limits of either country, although these works may be international in character, shall remain, except as herein otherwise specifically provided, under the exclusive jurisdiction and control of the Section of the Commission in whose country the works may be situated.

The duties and powers vested in the Commission by this Treaty shall be in addition to those vested in the International Boundary Commission by

[6] TS 244, *ante,* p. 910.
[7] For an understanding relating to the word "disputes," see footnote 1, p. 1168.
[8] For an understanding relating to the meaning of these words, see footnote 1, p. 1168.

G35.0082

the Convention of March 1, 1889 and other pertinent treaties and agreements in force between the two countries except as the provisions of any of them may be modified by the present Treaty.

Each Government shall bear the expenses incurred in the maintenance of its Section of the Commission. The joint expenses, which may be incurred as agreed upon by the Commission, shall be borne equally by the two Governments.

## ARTICLE 3

In matters in which the Commission may be called upon to make provision for the joint use of international waters, the following order of preferences shall serve as a guide:

1. Domestic and municipal uses.
2. Agriculture and stockraising.
3. Electric power.
4. Other industrial uses.
5. Navigation.
6. Fishing and hunting.
7. Any other beneficial uses which may be determined by the Commission.

All of the foregoing uses shall be subject to any sanitary measures or works which may be mutually agreed upon by the two Governments, which hereby agree to give preferential attention to the solution of all border sanitation problems.

## II. RIO GRANDE (RIO BRAVO)

### ARTICLE 4

The waters of the Rio Grande (Rio Bravo) between Fort Quitman, Texas and the Gulf of Mexico are hereby allotted to the two countries in the following manner:

A. To Mexico:

(a) All of the waters reaching the main channel of the Rio Grande (Rio Bravo) from the San Juan and Alamo Rivers, including the return flow from the lands irrigated from the latter two rivers.

(b) One-half of the flow in the main channel of the Rio Grande (Rio Bravo) below the lowest major international storage dam, so far as said flow is not specifically allotted under this Treaty to either of the two countries.

(c) Two-thirds of the flow reaching the main channel of the Rio Grande (Rio Bravo) from the Conchos, San Diego, San Rodrigo, Escondido and Salado Rivers and the Las Vacas Arroyo, subject to the provisions of sub-paragraph (c) of paragraph B of this Article.

MEXICO

(d)   One-half of all other flows not otherwise allotted by this Article occurring in the main channel of the Rio Grande (Rio Bravo), including the contributions from all the unmeasured tributaries, which are those not named in this Article, between Fort Quitman and the lowest major international storage dam.

**B. To the United States:**

(a)   All of the waters reaching the main channel of the Rio Grande (Rio Bravo) from the Pecos and Devils Rivers, Goodenough Spring, and Alamito, Terlingua, San Felipe and Pinto Creeks.

(b)   One-half of the flow in the main channel of the Rio Grande (Rio Bravo) below the lowest major international storage dam, so far as said flow is not specifically allotted under this Treaty to either of the two countries.

(c)   One-third of the flow reaching the main channel of the Rio Grande (Rio Bravo) from the Conchos, San Diego, San Rodrigo, Escondido and Salado Rivers and the Las Vacas Arroyo, provided that this third shall not be less, as an average amount in cycles of five consecutve years, than 350,-000 acre-feet (431,721,000 cubic meters) annually. The United States shall not acquire any right by the use of the waters of the tributaries named in this subparagraph, in excess of the said 350,000 acre-feet (431,721,000 cubic meters) annually, except the right to use one-third of the flow reaching the Rio Grande (Rio Bravo) from said tributaries, although such one-third may be in excess of that amount.

(d)   One-half of all other flows not otherwise allotted by this Article occurring in the main channel of the Rio Grande (Rio Bravo), including the contributions from all the unmeasured tributaries, which are those not named in this Article, between Fort Quitman and the lowest major international storage dam.

In the event of extraordinary drought or serious accident to the hydraulic systems on the measured Mexican tributaries, making it difficult for Mexico to make available the run-off of 350,000 acre-feet (431,721,000 cubic meters) annually, allotted in subparagraph (c) of paragraph B of this Article to the United States as the minimum contribution from the aforesaid Mexican tributaries, any deficiencies existing at the end of the aforesaid five-year cycle shall be made up in the following five-year cycle with water from the said measured tributaries.

Whenever the conservation capacities assigned to the United States in at least two of the major international reservoirs, including the highest major reservoir, are filled with waters belonging to the United States, a cycle of five years shall be considered as terminated and all debits fully paid, where-upon a new five-year cycle shall commence.

Extract From
**THE HANDBOOK OF TEXAS, Vol II**
by the Texas Historical
Association, 1952

**Rio Grande Water Apportionment.** Apportionment of water of the Rio Grande between the United States and Mexico is determined by treaties made in 1906 and 1944. By the treaty of 1906 the United States promised to deliver 60,000 acre-feet of water annually for irrigation in the Juárez valley, peak period of delivery falling in April, May, and June. In return Mexico waived all claims for any purpose to the waters of the river between the head of the Mexican Canal and Fort Quitman, Texas.

The 1944 treaty dealt with the Rio Grande between Fort Quitman and the Gulf of Mexico. The following order of preference in joint use of the international waters was set up: (1) domestic and municipal uses, (2) agriculture and stock raising, (3) electric power, (4) other industrial uses, (5) navigation, (6) fishing and hunting, and (7) any other beneficial use to be determined by the International Boundary Commission.¶

Under Article IV Mexico received all of the waters of the San Juan and Alamo rivers, one-half of the flow in the main channel of the Rio Grande below the lowest major international storage dam; two-thirds of the flow in the main channel from the Conchos, San Diego, San Rodrigo, Escondido, and Salado rivers and Las Vacas Arroyo, provided that the United States receive from these same six streams not less than 350,000 acre-feet annually as an average in five-year cycles, and one-half of all other flows not otherwise allotted occurring in the main channel of the Rio Grande.

Also under Article IV the United States was given all of the waters of the Pecos and Devils rivers, Goodenough Spring, and Alamito, Terlingua, San Felipe, and Pinto creeks; one-half of the flow in the main channel of the Rio Grande below the lowest major international storage; one-third of the flow reaching the main channel of the Rio Grande from the Conchos, San Diego, San Rodrigo, Escondido, and Salado rivers and Las Vacas Arroyo, provided that this be not less than 350,000 acre-feet annually as an average in five-year cycles; and one-half of all other flows not otherwise allotted occurring in the main channel of the Rio Grande.

The quantity of water allotted to the United States not only took care of existing needs but also permitted expansion of irrigated areas.

BIBLIOGRAPHY: Walace Hawkins, "Water Rights in United States-Mexico Streams," *Temple Law Quarterly*, V (January, 1931); J. Simsarian, "The Diversion of Waters Affecting the United States and Mexico," *Texas Law Review*, XVII (December, 1938); Charles Timm, "Some International Problems Arising from Water Diversion on the United States-Mexican Boundary," *Southwestern Social Science Quarterly*, XV (March, 1935).

EXHIBIT 25

IN GALVESTON, TEXAS, DISTRICT

Opinions by Office Chief of Engineers, (See correspondence file 2401/2395)

| WATERWAY. | MILES ABOVE MOUTH | HEAD OF NAVIGATION DEFINITE POINT CONSIDERED AS HEAD OF NAVIGATION | DATE OF OPINION OF C. OF E. | REMARKS |
|---|---|---|---|---|
| Alligator Bayou, Tex. | | Non-Navigable | 18 Apr.1937 | |
| Alligator Bayou, New drainage canal | 0.3 | Navigable to salt water gate near T. & N. O. R.R. bridge | 3 Apr.1946 | Permit issued to Jefferson Co. Drainage Dist. No. 7, Permit No. 109 |
| Bastrop Bayou, Texas | 20 | | 25 Mar.1932 | |
| Brays Bayou, Texas | 3 | Telephone Cut-Off Road Bridge | 2 May 1932 | |
| Brazos River, Texas | | Old Washington | 26 Jul.1934 | Date of letter from Division Office |
| Buffalo Bayou, Texas | *23 | Franklin Avenue Bridge | 25 Mar.1932 | 7 miles above turning basin |
| Coney Creek, Texas | 30 | Immediately downstream from bridge near Hawkinsville | 2 May 1932 | 3. |
| Cedar Bayou, Texas | 16 | Needle Point | 25 Mar.1932 | |
| Chocolate Bayou, Texas | 16½ | 6 Miles above M. P. R.R. Bridge at Liverpool | 2 May 1932 | |
| Clear Creek, Texas | 20 | Friendswood | 26 Jul.1934 | Date of letter from Division Office |
| Colorado River, Texas | 21 | | 25 Mar.1932 | |
| Corpus Christi Pass, Tex. | | Navigable | | |
| Devils River, Texas | * | Non-Navigable | 31 Mar.1932 | * |
| Dickinson Bayou, Texas | 20 | | 26 Jul.1934 | Date of letter from Division Office |
| Double Bayou, Texas (East Branch) | 12 | | 25 Mar.1932 | |
| (West Branch) | 8 | | 25 Mar.1932 | |
| Drainage Canal between Taylors Bayou and Gulf Intracoastal Waterway | | Navigable | 3 Apr.1946 | Permit issued to Jefferson Co. Drainage Dist. No. 7, Permit No. 109 |
| Guadalupe River, Texas | | Non-Navigable 24 miles below Chero | 23 Jan.1937 | Letter to Department of Agriculture |
| Gum Bayou, Texas | | Non-Navigable | April 1937 | EXHIBIT 26 |

G35.0086

NAVIGABLE STATUS OF CERTAIN MATERIAYS
IN GALVESTON, TEXAS, DISTRICT

Opinions by Office Chief of Engineers, (See correspondence file 2401/2395)

| WATERWAY | MILES ABOVE MOUTH | HEAD OF NAVIGATION DEFINITE POINT CONSIDERED AS HEAD OF NAVIGATION | DATE OF OPINION OF C. OF E. | REMARKS |
|---|---|---|---|---|
| Hillebrandt Bayou, Tex. | | Navigable to State Hwy No. 124, bridge at South City limits of Beaumont | 15 Apr.1948 | Letter to Division Engineer from OCE, 3rd Ind Permit No. 606 |
| Hunting Bayou, Texas | 1.2 | Dam at mile 1.21 | 19 Oct.1948 | OCE, 2nd Ind Permit No. 150 |
| Johnson Bayou, La. | 4.5 | Lower landing at mouth of Shallow Bayou | 25 Mar.1932 | |
| Keith Lake Gully, Texas | 400 ft. | Dam | 24 Aug.1932 | Entrance to Keith Lake (PAG 9/15) |
| Leon River, Texas | | Non-Navigable | 5 Aug.1932 | Date of letter from Division Office |
| Los Olmos Creek, Tex. | | Non-Navigable | 24 Sept.1935 | |
| Navasota River, Texas | | Non-Navigable | 5 Aug.1932 | Date of letter from Division Engineer |
| Navidad River, Texas | | Non-Navigable at a point 10,000 ft. upstream from highway bridge on present traveled route between Edna and La ard | 1 Nov.1933 | Bridge is at Texana Letter to Department of Agriculture |
| Neches River, Texas | 126 | Navigable below mouth of Angelina River. | 28 Oct.1942 | Letter to Senator Tom Connally from OCE |
| Nueces River, Texas | 48 | Non-Navigable at Hwy bridge on Hwy between La Fruita and Sandia | 10 Dec.1931 | Letter to Department of Agriculture |
| Oyster Creek, Texas | 23 | | 25 May 1932 | |
| Pecan Bayou, Texas | | Non-Navigable | 31 Mar.1932 | |
| Pecos River, Texas | | Non-Navigable | 31 Mar.1932 | |
| Sabine River, Texas and La. | 97 | Belgrade, Texas | 26 Apr.1932 | |
| San Antonio River, Tex. | | Non-Navigable | 5 Aug.1932 | Date of letter from Division Engineer |
| San Jacinto River, Tex. | 12½ | Houston-Liberty Hwy. bridge | 2 May 1932 | |

G35.0087

NAVIGABLE STATUS OF CERTAIN WATERWAYS
IN GALVESTON, TEXAS, DISTRICT

Opinions by Office Chief of Engineers, (See correspondence file 2401/2395)

| WATERWAY | MILES ABOVE MOUTH | HEAD OF NAVIGATION DEFINITE POINT CONSIDERED AS HEAD OF NAVIGATION | DATE OF OPINION OF C. OF E. | REMARKS |
|---|---|---|---|---|
| San Marcos River, Tex. | | Non-Navigable | 31 Mar.1932 | |
| Shallow Bayou, La. | 1 | Upper landing, 5.5 miles from Sabine Lake | 25 Mar.1932 | Prong of Johnson Bayou, La. |
| Simms Bayou, Texas | 3 | | 25 Mar.1932 | |
| Texas Bayou, Texas | | Non-Navigable | 12 Aug.1938 | OCE, 11th Ind |
| Turtle Bay, Texas | | Non-Navigable | 10 Mar.1937 | Act of Congress |
| Turtle Bayou, Texas | | Non-Navigable | 10 Mar.1937 | Act of Congress |
| White Oak Bayou, Tex. | | Non-Navigable | 19 Mar.1935 | |

3.

G35.0088

EXTRACT FROM THE TREATY OF 1970

## MEXICO

### Treaty to Resolve Pending Boundary Differences and Maintain the Rio Grande and Colorado River as the International Boundary[1]

*Signed at México November 23, 1970;*
*Ratification advised by the Senate of the United States of America*
*November 29, 1971;*
*Ratified by the President of the United States of America*
*December 9, 1971;*
*Ratified by Mexico January 24, 1972;*
*Ratifications exchanged at Washington April 18, 1972;*
*Proclaimed by the President of the United States of America*
*May 2, 1972;*
*Entered into force April 18, 1972.*
*With exchange of notes*
*Signed at México and Tlatelolco December 18 and 21, 1970.*

———

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

## A PROCLAMATION

CONSIDERING THAT:

The treaty between the United States of America and the United Mexican States to resolve pending boundary differences and maintain the Rio Grande and Colorado River as the international boundary was signed at Mexico City on November 23, 1970, the text of which treaty is annexed;

The Senate of the United States of America by its resolution of November 29, 1971, two-thirds of the Senators present concurring therein, gave its advice and consent to the ratification of the treaty;

The treaty was duly ratified by the President of the United States of America on December 9, 1971, and was duly ratified on the part of the United Mexican States;

It is provided in Article IX of the treaty that the treaty shall enter into force on the date of the exchange of ratifications;

———

[1] The numbered footnotes herein were added by the Department of State.

(371)                                    TIAS 7313

**EXHIBIT 29**

**G35.0089**

later changes occur, in accordance with the provisions of this Treaty.

## ARTICLE VIII

The following agreements shall be terminated as of the entry into force of this Treaty, without prejudice to any right, title or interest which has accrued thereunder except as otherwise provided in this Treaty with respect to such right, title or interest:

A.  the Convention Touching the International Boundary Line, signed on November 12, 1884; [1]

B.  the Convention for the Elimination of Bancos in the Rio Grande, signed on March 20, 1905; [2] and

C.  to the extent that they are inconsistent with this Treaty:

   (1)  Article V of the Treaty of Guadalupe Hidalgo, signed on February 2, 1848; [3]

---

[1] TS 226; 24 Stat. 1011.
[2] TS 461; 35 Stat. 1863.
[3] TS 207; 9 Stat. 926; 18 Stat. 494.

TIAS 7313

G35.0090

F.   When in the limitrophe reaches of the Rio
     Grande and Colorado River, a part of the
     channel temporarily loses its character
     as the boundary by reason of the changes
     contemplated in paragraphs B and C of
     this Article, the international character
     of the use and consumption of those waters,
     in the order established under Article 3
     of the Treaty of February 3, 1944, [1] shall
     not be modified.

## ARTICLE IV

In order to reduce to a minimum the shifting of
the channels of the Rio Grande and the Colorado River
in their limitrophe sections, and the problems that
would be caused by the separation of tracts of land,
the Contracting States agree that:

A.   Each Contracting State, in the limitrophe
     sections of the Rio Grande and the Colorado
     River, may protect its bank against erosion
     and, where either of the rivers has more
     than one channel, may construct works in

---

[1] TS 994; 59 Stat. 1225.

TIAS 7313

G35.0091

