No. 23-50632

UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff/Appellee*,

v.

GREG ABBOTT, in his official capacity as Governor of Texas, and
STATE OF TEXAS,
*Defendants/Appellants*

**UNITED STATES' OPPOSITION TO MOTION FOR
STAY PENDING APPEAL**

JAIME ESPARZA
*United States Attorney*

JAMES E. DINGIVAN
LANDON WADE
*Assistant United States Attorneys*
United States Attorney's Office
Western District of Texas
601 N.W. Loop 410, Ste 600
San Antonio, TX 78216

TODD KIM
*Assistant Attorney General*

ANDREW M. BERNIE
MICHAEL T. GRAY
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 532-3147
michael.gray2@usdoj.gov

## CERTIFICATE OF INTERESTED PERSONS

Under the fourth sentence of Fifth Circuit Rule 28.2.1, Appellees, as a

governmental party, need not furnish a certificate of interested persons.

/s/Michael T. Gray
MICHAEL T. GRAY
Attorney, Appellate Section
Environment and Natural Resources
Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 532-3147
michael.gray2@usdoj.gov

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..................................................i

TABLE OF AUTHORITIES ..........................................................................iv

INTRODUCTION ............................................................................................1

BACKGROUND ..............................................................................................2

    A.    Factual background ...........................................................................2

    B.    Proceedings below..............................................................................2

ARGUMENT ....................................................................................................6

I.    The district court did not abuse its discretion by issuing the
preliminary injunction. ...........................................................................6

    A.    Texas is unlikely to succeed on the merits of its appeal. ......................7

        1.    The district court did not clearly err in finding that
the relevant section of the Rio Grande is a Section
10 "navigable river." ...................................................................7

        2.    Violating Section 10 in two different ways, Texas
built a "boom" or "other structure" and also has
obstructed the Rio Grande's navigable capacity. .....................12

        3.    Texas's constitutional defenses do not present any
serious legal questions on the merits. .......................................14

    B.    Texas is not likely to succeed in showing that the district
court erred in weighing the equitable factors.....................................16

II.    Texas has not shown that the equities warrant a stay during the
pendency of this appeal. ..........................................................................20

III.    At minimum, the district court's prohibitory injunction should
not be stayed. ..........................................................................................22

CONCLUSION .................................................................................................22

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Arizona v. United States*,
567 U.S. 387 (2012) .............................................................15

*Barber v. Bryant*,
833 F.3d 510 (5th Cir. 2016) .............................................21

*California v. United States*,
104 F.3d 1086 (9th Cir. 1997) ..................................... 15-16

*Economy Light & Power Co. v. United States*,
256 U.S. 113 (1921) ............................................ 3, 8, 9, 11, 14

*Jennings v. Rodriguez*,
138 S. Ct. 830 (2018) .........................................................15

*Nken v. Holder*,
556 U.S. 418 (2009) ...................................................... 7, 22

*Nova Health Sys. v. Edmondson*,
460 F.3d 1295 (10th Cir. 2006) ........................................22

*Oklahoma v. Texas*,
258 U.S. 574 (1922) .............................................................9

*Padavan v. United States*,
82 F.3d 23 (2d Cir. 1996) ..................................................16

*Restaurant Law Center v. United States Dep't of Lab.*,
66 F.4th 593 (5th Cir. 2023) ...............................................7

*Speaks v. Kruse*,
445 F.3d 396 (5th Cir. 2006) ...............................................7

*United States v. Appalachian Elec. Power Co.*,
311 U.S. 377 (1940) ......................................... 3, 8, 10, 11, 12

*United States v. FDIC*,
    881 F.2d 207 (5th Cir. 1989) ...............................................................16

*United States v. Marine Shale Processors*,
    81 F.3d 1329 (5th Cir. 1996) ...................................................... 6, 16

*United States v. Munoz-Flores*,
    495 U.S. 385 (1990) ..........................................................................15

*United States v. Rio Grand Dam & Irrigation*,
    174 U.S. 690 (1899) ..........................................................................12

*Vote.Org v. Callanen*,
    39 F.4th 297 (5th Cir. 2022) .............................................................20

## Statutes

23 Stat. 29 (1884) ......................................................................................8

24 Stat. 28 (1886) ......................................................................................8

24 Stat. 63 (1886) ......................................................................................8

26 Stat. 495 (1890) ....................................................................................8

26 Stat. 502 (1890) ....................................................................................8

39 Stat. 251 (1916) ....................................................................................8

42 Stat. 1482 (1923) ..................................................................................4

33 U.S.C. § 403 (1899) ................................................................ 2, 3, 12, 13

Tex. Gov't Code § 418.016 .......................................................................21

Tex. Gov't Code § 418.018(c) .............................................................. 20, 21

## INTRODUCTION

Texas built a 1,000-foot-long barrier in the Rio Grande River along the international border without any federal authorization and in clear violation of the Rivers and Harbors Act (RHA). After holding an evidentiary hearing, the district court granted the United States' preliminary-injunction motion in a carefully reasoned decision, finding a likelihood of success on the merits of the United States' RHA claim and rejecting Texas's defenses as meritless. Texas asks this Court to stay the portion of the preliminary injunction requiring Texas to move the barrier. Texas forfeits any request for a stay as to the portion precluding Texas from installing further barriers.

Texas's request should be rejected. Texas fails to establish that it is likely to succeed in its appeal, as the record amply supports the district court's findings that the relevant stretch of the Rio Grande is a "navigable water" under Supreme Court precedent applying the RHA; that Texas's barrier—including nearly 140 tons of concrete installed with heavy machinery and anchoring the system to the riverbed—violates the RHA as an unpermitted "structure" and also as an "obstruction . . . to the navigable capacity" of the Rio Grande; and that the United States will suffer irreparable harm, including to its relationship with Mexico, if the barrier is not promptly removed. Finally, the public interest supports preserving the

injunction pending appeal, as Texas's unsupported policy-based assertions cannot overcome federal law.

## BACKGROUND

### A.    Factual background

Three basic, undisputed facts underlie this suit. First, in mid-July, Texas built a 1,000-foot-long barrier in the Rio Grande along (and initially across) the international border by Eagle Pass, Texas, tethering interlocking buoys to almost 140 tons of concrete blocks to anchor the barrier in the river. Exh. I-B:97-98, 104, 107; Exh. I-G:5-6. Second, Texas neither sought nor obtained Congress's permission or a permit from the U.S. Army Corps of Engineers, despite the requirements of RHA Section 10, 33 U.S.C. § 403. Third, Texas refused to remove the barrier after being notified that Section 10 prohibited this work.

### B.    Proceedings below

On July 24, the United States filed suit, and it moved for a preliminary injunction two days later. The district court allowed Texas limited discovery, including depositions, and then, on August 22, held a hearing at Texas's request, with testimony from three witnesses.

On September 6, the district court granted the United States' motion in a 42-page decision. Exh. I-C (Order). As it explained, although "Governor Abbott announced that he was not asking for permission" to construct the barrier,

"permission is exactly what federal law requires before installing obstructions in the nation's navigable waters." Order 5-6 (quotation marks omitted).

The district court first found that the Rio Grande near Eagle Pass is a navigable water of the United States under the RHA. Order 7-18. It explained that under Supreme Court precedent, navigable waters "include waters formerly used in interstate commerce but no longer capable of such use," Order 9 (citing *Econ. Light & Power Co. v. United States*, 256 U.S. 113, 123-24 (1921)), as well as "waters not presently used, but capable of future use with reasonable improvement," *id.* (citing *United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 408-09 (1940)). "Accordingly, Texas's focus on the fact that commerce has not been observed on this stretch of the Rio Grande River recently is of no moment." Order 10.

Applying that framework, the district court found that the United States "presented sufficient evidence to carry its burden at this stage" to show navigability within the meaning of the RHA. First, the court noted that Congress has *four* times enacted statutes requiring the maintenance of "free navigation" in this stretch of the Rio Grande. Order 11 (citing statutes). Congress, having found the river navigable, is the only body that can revoke the designation, and it has not done so. Order 14. The district court also found that "[t]he historical navigability of miles 275.5 to 610.0 of the Rio Grande River—in which the relevant stretch of

river lies—is also memorialized in" a 1975 Corps study that reiterates a finding first made in 1950 that was itself re-adopted in 2011. Order 14-16. Based on those facts, evidence of navigation in the 1850s, and court cases addressing commercial navigation on the river, the district court found that the relevant stretch of the Rio Grande was historically navigable.

Second, the district court independently found that this stretch of the Rio Grande is capable of "increased commercial navigation with re-prioritization and increased flow from the Amistad Dam." Order 16. "The natural and ordinary condition of the Rio Grande River" and "its volume of water, gradient, and regularity of flow" remain such that "future improvement for smaller commercial craft" is possible. Order 17 (quotation marks omitted). The court likewise concluded that increased flow could result naturally, enabling future navigation. Order 12-14. Given evidence of historical and potential future navigability, the district court found the evidence sufficient to conclude, at this early stage in the case, that the Rio Grande at Eagle Pass is navigable under the RHA.

The district court next concluded that Texas's barrier obstructs the navigable capacity of the Rio Grande under Section 10's first clause. Order 19-24. The court pointed to, among other things: (1) Texas's self-described purpose to obstruct lateral movement across the river; (2) credible testimony establishing that "[t]he placement and tandem configuration of the buoys present a structural barrier to

4

cross-river navigation and would force a vessel to maneuver around the structure to avoid collision or entanglement at this location"; (3) concrete obstacles that are not easily seen and that "present a serious risk to watercraft of any kind"; and (4) testimony from Texas's own declarants "that this stretch of the Rio Grande includes hidden obstacles like sand bars, rocks, and natural debris" that "make it even more imperative for anyone piloting down the river to have free reign of the entire width and a clear view of all obstacles, lest they be forced into a hazard." Order 19-23 (quotation marks omitted).

The district court then independently concluded under Section 10's second clause that the barrier constitutes a "boom" or "other structure[]" requiring a permit. Order 25. The court explained, referring to multiple dictionaries, that the barrier "resembles a 'boom,'" as it is "a 1,000-foot-long chain of buoys fastened together with metal cables and tethered with concrete blocks to the riverbed, intended to obstruct the passage of vessels and people." *Id.* Alternatively the barrier clearly falls within the "other structures" category. Order 27-29.

Finally, the court rejected Texas's "self-defense" argument, concluding that Texas's disagreement with federal immigration policy did not entitle it to violate a federal statute, Order 30, and held that the question whether an actual invasion is occurring that would permit Texas to engage in war under U.S. Const. art. I, § 10, cl.3, is committed to the political branches of the *federal* government, Order 31-32.

5

Turning to the equities, the court concluded that precedent establishes that it had no need to find irreparable harm or balance the equities in determining that injunctive relief must be awarded to remedy Texas's RHA violations. Order 35 (quoting *United States v. Marine Shale Processors*, 81 F.3d 1329, 1358-59 (5th Cir. 1996)). But the district court nevertheless analyzed those traditional equitable factors and found that they supported an injunction, given, among other things, that "[t]he floating barrier has already placed tremendous strain on the U.S.-Mexico relationship." Order 37-38. By contrast, "the State of Texas did not present any credible evidence that the barrier as installed has significantly curtailed illegal immigration across the Rio Grande River." Order 38.

The court enjoined Texas from building new or placing additional structures in the river pending final judgment, and directed that, by September 15, Texas must reposition the current barrier (including anchors and other related materials) to the Texas-side riverbank in coordination with the Corps. Order 41-42. The court also intends to expeditiously move to final judgment. Order 42 n.32.

## ARGUMENT

### I. The district court did not abuse its discretion by issuing the preliminary injunction.

Texas, as the party seeking a stay pending appeal, must prove that a stay is warranted. *Nken v. Holder*, 556 U.S. 418, 433-34 (2009). This Court considers: "(1) whether the stay applicant has made a strong showing that [it] is likely to

6

succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 434. The first two factors are the most "critical," but a stay is never granted as "a matter of right, even if irreparable injury might otherwise result." *Id.* at 433.

This Court reviews the district court's ultimate decision to grant the preliminary injunction only for abuse of discretion. *Speaks v. Kruse*, 445 F.3d 396, 399 (5th Cir. 2006). Findings of fact are reviewed for clear error and conclusions of law *de novo*. *Restaurant Law Center v. U.S. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023) (citation omitted).

Texas does not approach the showing necessary to justify a stay under those standards.

## A.    Texas is unlikely to succeed on the merits of its appeal.

### 1.    The district court did not clearly err in finding that the relevant section of the Rio Grande is a Section 10 "navigable river."

Texas is unlikely to succeed in establishing that the district court clearly erred by finding that the portion of the Rio Grande where Texas installed its barrier is a "navigable river" under Section 10. Texas appears to admit that the navigability requirement is met through evidence of either historical navigation or susceptibility to future commercial use with reasonable improvements. Mot. 12;

*see Economy Power & Light*, 256 U.S. at 115-17; *Appalachian Electric Power*, 311 U.S. at 406-07. But Texas does not meaningfully engage with that standard or with the evidence the district court considered; instead, it argues that there is a lack of evidence of current commerce on the relevant stretch. Mot. 13-15. The district court correctly applied binding precedent to find that Texas's argument about current navigability was "of no moment." Order 10.

The court committed no clear error in its factual findings related to historical navigability. It correctly found that a 1975 Corps study memorializes the historical navigability of the relevant river segment. Order 14-16. In finding the river navigable, that study considered historical evidence of navigability and assessed the river segment's physical characteristics and the possibility for improvements to facilitate navigation. The study found that "a great deal of interest prevailed during the period between 1829-1882 pertaining to transportation of goods along the Rio Grande." Exh. V-A:18. Although navigation "above Laredo up to Eagle Pass" was "impeded by rocks and ledges at low water stages," accounts from the era nonetheless "reveal sufficient interest and available commerce to accommodate river travel above Laredo." *Id.* Historical accounts also indicate that, with improvements to the channel, the river would be navigable by steam to points above river mile 610.0 and well upstream of Eagle Pass. *Id.* at 10, 18. Keelboat

navigation was successfully completed to more than 800 miles above Eagle Pass. *Id.* at 10.

Four Acts of Congress protected the river's "navigability" in connection with authorizing bridges and other projects involving foreign commerce between Eagle Pass, Texas, and Piedras Negras, Mexico. Order 11-12. Texas discounts those statutes as "only precautionary," like the statutes in *Oklahoma v. Texas*, 258 U.S. 574, 585-86 & n.6 (1922), Mot. 14, but the language Congress used in those statutes is materially different than the statutory language at issue in *Oklahoma*. For example, the Eagle Pass statutes provide for redress in federal district court for navigability obstructions, unlike the *Oklahoma* statutes. *Compare* 23 Stat. 29 (1884); 26 Stat. 495 (1890); 26 Stat. 502 (1890) *with* Act of May 15, 1886, c. 332, 24 Stat. 28; Act of May 17, 1886, c. 354, 24 Stat. 63; Act of June 30, 1916, c. 200, 39 Stat. 251.

Based on those facts and other evidence, including court cases involving commercial navigation of the river, Order 15-16, the district court correctly found sufficient evidence of historical navigability to establish the government's likelihood of success. *See Economy Power & Light*, 256 U.S. at 124; *Appalachian Elec. Power*, 311 U.S. at 408 ("When once found to be navigable, a water remains so.").

The evidence likewise supports the district court's alternative finding that the Rio Grande has the capacity for *future* navigation. As the district court found, as early as 1850, a report concluded "if the channel were improved in certain passages, steam navigation would be entirely feasible." Order 16. The Corps' 1975 study (readopted in 2011) observed that the river's natural flows were reduced by diversion at multiple dams, including (since 1968) the Amistad Dam near the Corps' Fort Worth District's upper boundary. Exh. V-A:7, 8. Even with those diversions, the study found that shallow draft boats can navigate the river during periods of sufficient flow, *id.* at 11, as Texas proved when installing the barrier, Order 18 n.15. The study also found, and the district court credited, Order 17, that "[i]mprovement of the Rio Grande for navigation is physically possible" if the river's flow were increased with water from connected reservoirs. Exh. V-A:11.

As the district court concluded, the evidence demonstrates the United States is likely to prove, in multiple ways, that the full stretch of the Rio Grande within the Fort Worth District is navigable. In *Economy Power & Light*, the Supreme Court affirmed decisions holding that the Des Plaines River in Illinois was navigable for purposes of Section 9 of the RHA. 256 U.S. at 115-17. That river had not been used in commercial navigation *for a century* beforehand. *Id.* at 117-18. The Court nonetheless emphasized that it could not, "without doing violence to [the] manifest purpose" of the RHA, "limit its prohibition to such navigable waters

10

as were, at the time of its passage, or now are, actually open for use." *Id.* at 124. Instead, navigable waters include long unused rivers and streams that remain susceptible to use in commercial navigation with "improvements . . . [to] restore the usefulness of th[e] stream." *Id.*

In *Appalachian Electric Power*, the Court similarly reversed decisions that erroneously determined the New River in Virginia and West Virginia was not navigable without considering evidence that improvements could make that river available for commercial navigation. 311 U.S. at 406-07. Like the Rio Grande's upper reaches (Exh. V-A:10, 18), in the 19th century the Radford-Wiley's Falls segment of the New River was navigable by shallow-draft keelboats ("eight feet wide, drawing two feet") and there was interest in improving the channel to facilitate such navigation. 311 U.S. at 417-18. Although those plans were eventually abandoned due to changing economic conditions, the Court held the segment navigable based on its historic use and its improvability for keelboat navigation. *Id.* at 418. Such a river does not lose its navigable-water status merely because alternative uses of the water (like hydropower development) become more economically favored. *See id.* at 426. Such uses are "from the public's standpoint a by-product of the general use of the rivers for commerce." *Id.* Here too, the Rio Grande's current prioritization for power generation and irrigation (Exh. V-A:8, 28) does not change its legal status as a navigable water.

11

There was thus no error in finding navigability on either ground, let alone clear error on both grounds.

**2.    Violating Section 10 in two different ways, Texas built a "boom" or "other structure" and also has obstructed the Rio Grande's navigable capacity.**

The district court correctly concluded that the United States is likely to succeed in proving that Texas's barrier violates Section 10 in two independent respects: as an obstruction and as an unpermitted structure. The district court's factual findings are correct and certainly not clearly erroneous.

First, the district court found that the barrier is an "obstruction" to "navigable capacity" under Section 10's first clause. 33 U.S.C. § 403. Whether there is an obstruction to a river's navigable capacity is a fact question. *United States v. Rio Grande Dam & Irrigation Co.,* 174 US 690, 710 (1899). The barrier is *designed* to obstruct cross-river navigation, Order 20, but Texas's only argument is that its barrier avoids obstructing navigation "up and down the river" because it lies parallel to the current. Mot. 15-16. Texas never explains why the orientation of the obstruction is relevant under the RHA. Regardless, the district court found that the barrier impedes navigation up and down the river as well, because anyone navigating the river must heed and avoid the barrier, particularly its 143 submerged concrete anchors, which "present a serious risk to watercraft of any kind,"

12

especially given the river's shallow spots and hidden dangers. Order 21. Texas does not even acknowledge that finding, much less demonstrate clear error.

Second, the district court correctly concluded that the United States is likely to prove that Texas violated Section 10's second clause, which makes it unlawful to "build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures" in a "navigable river, or other water of the United States" without a Corps permit. 33 U.S.C. § 403. The evidence supports the district court's finding that Texas's 1,000-foot barrier of interlinked buoys connected by chains to concrete anchors is a "boom" or "other structure." As the court concluded, a "boom" generally means "a strong chain of connected floating objects"—exactly what we have here—without any requirement that they extend shore-to-shore. Order 25-26.

In any event, Texas's barrier is clearly prohibited as an "other structure." Order 26-28. Texas cites the principle that a catchall phrase like "other structure" "encompass[es] only what's similar in nature to the specific terms." Mot. 17. But assuming that principle even applies to a list like this—which was intended to comprehensively prohibit building structures in navigable waterways without permission—that "similar in nature" standard is met here. As the district court noted, "the floating barrier meets all of Texas's own criteria for a 'boom' except for its orientation to the banks of the river." Order 27. That directional distinction

does not make the barrier so *fundamentally* unlike a boom and the other listed terms as to justify Texas's argument that it is not even an "other structure."

Texas disagrees, contending that the barrier is merely temporary and not affixed, bolted, or attached to the riverbed. Mot. 16. But as the district court concluded, if a "1,000-foot-long barrier of four-foot-spherical buoys, fastened directly underneath with two feet of stainless steel mesh and tethered via chains to heavy concrete blocks placed systematically on the river bed" is not a structure built in the river, then "it is hard to imagine what *would* be." Order 28 (cleaned up).

### 3.    Texas's constitutional defenses do not present any serious legal questions on the merits.

Texas briefly hints at two constitutional arguments that it says present serious legal questions on the merits. Mot. 10-11. First, Texas suggests that the district court's reading of the RHA potentially raises a Commerce Clause issue, Mot. 10, but Texas barely mentioned the Commerce Clause in the district court and does not develop any argument on this point in its stay motion. Any such claim is thus doubly forfeited. Regardless, the district court here applied the interpretation of the RHA required by Supreme Court precedent to remain consistent with the Commerce Clause. *See*, *e.g.*, *Appalachian Electric Power*, 311 U.S. at 408 (noting how "[t]he power of Congress over commerce" demanded this understanding of RHA navigability).

Second, Texas asserts there is a serious question about its "self-defense rights" under the Constitution that should have counseled in favor of a narrow interpretation of the RHA. Mot. 10-11. The doctrine of constitutional avoidance cannot apply to narrow the RHA's scope, as Texas has never offered (and the RHA is not susceptible to) any plausible alternative interpretation of the statutory text that would permit Texas's conduct. *Jennings v. Rodriguez*, 138 S. Ct. 830, 843 (2018). Instead, Texas claimed in the district court that—based on its own declaration of an "invasion"—the Constitution empowers it to *ignore* the RHA.

The district court correctly concluded that whether a given set of facts amounts to an "invasion" is committed to the political branches of the *federal* government, and particularly so when the asserted invasion "involves 'the immigration and the status of aliens.'" Order 32-34 (quoting *Arizona v. United States*, 567 U.S. 387, 394-95 (2012)). To avoid "inappropriate interference in the business of the other branches" of the federal government, the district court correctly declined to consider Texas's unprecedented defense. *United States v. Munoz-Flores*, 495 U.S. 385, 394 (1990). And even if it were justiciable, illegal immigration is not the kind of "invasion" contemplated by U.S. Const. art. I, § 10, cl.3. An invasion is "armed hostility from another political entity, such as another state or foreign country that is intending to overthrow the state's government." *Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996); *California v. United*

*States*, 104 F.3d 1086, 1091 (9th Cir. 1997). The single, half-hearted paragraph in Texas's stay motion, which barely develops the issue, is insufficient to obtain a stay.

> **B.      Texas is not likely to succeed in showing that the district court erred in weighing the equitable factors.**

Texas argues that the equities did not favor a preliminary injunction, Mot. 18-19, but it forfeits any challenge to the district court's initial conclusion that, where there is a clear violation of the RHA, injunctive relief may issue *without* weighing the equities. Order 35-37. When the United States seeks an injunction enforcing a public-interest statute, the "extraordinary weight courts of equity place upon the public interests in a suit involving more than a mere private dispute" justifies a court in granting a preliminary injunction "without making findings of irreparable harm, inadequacy of legal remedy, or the balance of convenience." *Marine Shale Processors*, 81 F.3d at 1358-59; *see also United States v. FDIC*, 881 F.2d 207, 210 (5th Cir. 1989). And as the district court noted, it is established that this rule applies to RHA Section 10. Order 36 (collecting citations). Here, "preliminary injunctive relief is the only viable mechanism for remedying Texas's statutory violation of the RHA," a statute that expressly provides for injunctions, and thus the court properly concluded it would award relief even without reference to the traditional equitable factors. Order 37. Texas makes no effort to show that

the district court was mistaken. Texas is therefore unlikely to succeed in demonstrating that the district court abused its discretion on the equities.

Moreover, the court was well within its discretion in determining that the equities support an injunction anyway. The district court correctly found that the barrier is causing significant and ongoing harm to the nation's conduct of foreign relations with Mexico. Order 37-38. At the hearing, the State Department's expert on U.S.-Mexico border matters testified that the barrier is a "major concern" for Mexico and "will have an adverse impact on U.S. foreign policy" if not removed expeditiously. Exh. I-B:57, 67; ECF 5-4 G-24 ¶ 3. The district court found that testimony and other "credible evidence" established that the "harm from the floating barrier is immediate and ongoing" by placing "tremendous strain on the U.S.-Mexico relationship." Order 37. In addition, the district court found that the barrier is an obstacle to "critical discussions between the two nations" on Rio Grande water delivery that are at a "sensitive stage." Order 38. In light of Texas's conduct, Mexico cancelled a July meeting of those negotiations and "indicated that they are less inclined to conclude an Emergency Minute by the end of the year while the buoy barrier remains in place." Exh. I-B:70; ECF 5-4 G-22 ¶¶ 17-18. The district court also found that the barrier threatens implementation of the 1944 Treaty between the United States and Mexico and has resulted in humanitarian concerns raised by Mexico "at the highest diplomatic levels." Order 38. Texas is

thus flatly incorrect when it dismissively characterizes this injury as "contrived." Mot. 18. The United States demonstrated that injury through record evidence and the district court did not clearly err in crediting that evidence.

Ignoring all that evidence, Texas relies on diplomatic statements asserting that the relationship between the United States and Mexico is currently strong. Mot. 19. But as the district court pointed out, the "unprecedented strength and collaboration between the countries currently means the U.S. has more to lose than ever as a result of Texas's actions." Order 37 n.30.

Texas has also not shown that the district court abused its discretion in balancing the equities or weighing the public interest when it concluded that "Texas's conduct irreparably harms the public safety, navigation, and the operations of federal agency officials in and around the Rio Grande." Order 41. The district court also correctly concluded that Congress has already struck the proper balance in the RHA, and that Texas may not override Congress's choice to pursue its own goals. Order 39.

Texas speculates that the barrier will reduce illegal immigration and drug trafficking, but the district court found that Texas did not present any credible evidence that the barrier has accomplished that goal. Order 40. And there is no such evidence. Texas asserts in its motion that "dangerous crossings" have been eliminated, and that it seeks to deter unlawful entry and other crime. Mot. 19. But

Texas's citations do not support its assertions. First, Texas cites the declaration of

Victor Escalon, but the paragraphs cited pertain to Mr. Escalon's view of river use,

Exh. II-A ¶ 4, his observations about the barrier's effects on river flow and

navigable capacity, *id.* ¶ 8, his observation that he had not seen anyone try to climb

over the barrier as of August 9, *id.* ¶ 12, and his belief that the area is an active

criminal hotspot, *id.* ¶ 13. Second, Texas cites the declaration of Loren Flossman,

but that declaration merely states that the "system was *designed to* . . . direct

migrants to appropriate U.S. Customs and Border Patrol points of entry" and is not

evidence that the system has worked. Exh. II-C ¶ 4 (emphasis added). None of that

remotely supports Texas's mischaracterization that the buoys "have effectively

eliminated dangerous crossings in one of the most active drug-smuggling and

human-trafficking hot spots on the river." Mot. 19-20. Nor does Texas explain how

if—as it contended below—its "buoys occupy a 'de minimis' space" in the Rio

Grande, Exh. I-K:9, it can possibly be as effective as Texas claims. At the very

least, the district court did not clearly err in finding Texas's evidence lacking.

Texas also complains that the district court did not allow it to cross-examine

a federal witness on these matters at the hearing. Mot. 2, 19. That was because

those topics were beyond the witness's knowledge. Exh. I-B:74. Texas could have

introduced its own testimony or documentary evidence, but it elected not to do so.

The court considered and addressed the evidence Texas did submit, contrary to

Texas's contentions. Dkt. 26 at 2; Exh. I-B:52-53; Order 31 n.28, 39-40. Texas's

assertion that the district court declined to consider its evidence in granting the

injunction, Mot. 2, is thus groundless.

## II.    Texas has not shown that the equities warrant a stay during the pendency of this appeal.

As described above, the district court did not clearly err in determining that

Texas's assertion that its barrier is reducing illegal immigration or drug trafficking

is unsupported. As a result, Texas's purported harm during the pendency of this

appeal is speculative. To credit Texas's assertion (which would not warrant a stay

in any event), this Court must conclude—without any supporting evidence in the

record—that the barrier is effective in reducing illegal immigration and drug

trafficking, and that if the barrier is moved to the riverbank, Texas is likely to

suffer some greater harm while this appeal is pending than it would otherwise.

Texas has not proved any of that; therefore, it has not met its burden to

demonstrate that a stay is warranted.

To get around that problem, Texas argues that irreparable injury is automatic

when a State is enjoined from effectuating its statutes, and that the order to remove

the barrier "contravenes the border-security disaster declared in Maverick County"

pursuant to Texas Government Code § 418.018(c). Mot. 8 (citing *Vote.Org v.

Callanen*, 39 F.4th 297 (5th Cir. 2022)). But Texas is incorrect that the district

court's order does not allow Texas to implement a state statute. The Disaster Act

itself limits the Texas Governor's authority to suspend *state laws* (including in an effort to control ingress and egress under section 418.018(c)). Tex. Gov't Code § 418.016. It neither provides for a border barrier nor purports to authorize a suspension of federal law to achieve that aim. *Id.*

Regardless, a stay would not be in the public interest even if the district court's order did prevent Texas from implementing the Disaster Act. *Nken*, 556 U.S. at 433. Indeed, this Court has previously denied a stay of a preliminary injunction preventing the implementation of state law. *Barber v. Bryant*, 833 F.3d 510, 511 (5th Cir. 2016). As *Barber* held, the relevant "status quo"—an "important factor in deciding whether to grant a stay"—is the state of the world which existed before the parties' dispute. *Id.*; *accord Nova Health Sys. v. Edmondson*, 460 F.3d 1295, 1298 n.5 (10th Cir. 2006). Here, the relevant status quo is the state of affairs before Texas deployed its unlawful barrier in the Rio Grande. A stay would not maintain the relevant status quo; it would allow Texas to continue to further disrupt the status quo, federal operations (*see* Order 41), and the relationship between the United States and Mexico despite the State's clear violation of federal law.

Indeed, the district court's measured order does not even require full return to the pre-litigation status quo, allowing Texas to move the barrier to the Texas riverbank pending final judgment. Order 42 n.32. Contrary to Texas's assertion that the district court's order thus does not give the United States any relief, Mot.

9, the order requires moving the barrier so that it does not "impede or impair in any way navigation," Order 42 n.32, and has already had at least one other positive impact—on September 7, the President of Mexico positively mentioned the order in his daily press conference.

### III. At minimum, the district court's prohibitory injunction should not be stayed.

Texas does not contest the portion of the preliminary injunction that prevents placement of further barriers during this litigation. While it seeks a "stay pending appeal" without elaboration, Mot. 21, its arguments concern only the portion of the preliminary injunction requiring it to move the barrier, *e.g.*, Mot. 8-9. Any argument for stay of the prohibitory injunction is thus forfeited, and regardless fails *a fortiori* for the same reasons the stay should be rejected as to the mandatory injunction.

## CONCLUSION

This Court should deny the motion for a stay pending appeal.

Respectfully submitted,

JAIME ESPARZA
*United States Attorney*

JAMES E. DINGIVAN
LANDON WADE
*Assistant United States Attorneys*
United States Attorney's Office
Western District of Texas
601 N.W. Loop 410, Ste 600
San Antonio, TX 78216

/s/ *Michael T. Gray*
TODD KIM
*Assistant Attorney General*

ANDREW M. BERNIE
MICHAEL T. GRAY
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 532-3147
michael.gray2@usdoj.gov

September 11, 2023
90-5-1-1-22454

## CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2023, I electronically filed the foregoing response with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.

The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/Michael T. Gray
MICHAEL T. GRAY
*Attorney, Appellate Section*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 532-3147
michael.gray2@usdoj.gov

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

I hereby certify that this response complies with the requirements of Fed. R. App. P. 27(d)(1)(E) because it has been prepared in 14-point Times New Roman, a proportionally spaced font.

I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains **5,183 words**, excluding the parts of the response exempted under Rule 32(a)(7)(B)(iii), according to the count of Microsoft Word.

*/s/Michael T. Gray*
MICHAEL T. GRAY
*Attorney, Appellate Section*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 532-3147
michael.gray2@usdoj.gov