No. 23-50632

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

GREG ABBOTT, IN HIS CAPACITY AS GOVERNOR
OF THE STATE OF TEXAS; STATE OF TEXAS,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

## BRIEF FOR APPELLANTS

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

LANORA C. PETTIT
Principal Deputy Solicitor General
Lanora.Pettit@oag.texas.gov

ARI CUENIN
Deputy Solicitor General

COY ALLEN WESTBROOK
Assistant Attorney General

MUNERA AL-FUHAID
Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Counsel for Defendants-Appellants

# Certificate of Interested Persons

No. 23-50632

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

GREG ABBOTT, IN HIS CAPACITY AS GOVERNOR OF THE STATE OF TEXAS; STATE OF TEXAS,

*Defendants-Appellants.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, Appellants, as governmental parties, need not furnish a certificate of interested persons.


/s/ Lanora C. Pettit
LANORA C. PETTIT
*Counsel of Record for*
*Defendants-Appellants*

i

## Statement Regarding Oral Argument

This Court has scheduled oral argument for Thursday, October 5, 2023, at 9:00 A.M. in New Orleans. Defendants-Appellants Governor Abbott and the State of Texas respectfully submit that oral argument will assist the Court's review on several important constitutional and statutory issues raised in this appeal, including whether the Rivers and Harbors Appropriation Act of 1899 can be applied here consistent with the Commerce Clause and Texas's self-defense rights, and whether Section 10 of the Act prohibits a floating buoy system deployed by Texas to combat criminal cartels illegally trafficking people, drugs, and guns across the Rio Grande.

# Table of Contents

Page

Certificate of Interested Persons ...............................................................i

Statement Regarding Oral Argument .......................................................ii

Table of Authorities .................................................................................v

Introduction .............................................................................................1

Statement of Jurisdiction ........................................................................3

Issues Presented .....................................................................................3

Statement of the Case .............................................................................4

    I.   Facing an Unprecedented Influx of Hostile Actors, Texas
        Deploys Buoys in One of the Rio Grande's Criminal Hotspots .................4

    II.  Not Content to Abandon the Border, the US Sues to Undercut
        Texas's Efforts to Backfill Federal Inaction ..............................8

    III. The District Court Grants a Preliminary Injunction After the US
        Misrepresents the Nature of Texas's Buoy System ..................10

Summary of the Argument........................................................................12

Standard of Review ..................................................................................14

Argument...................................................................................................14

    I.   The US Is Not Likely to Succeed on the Merits of Its Claims
        Under the Rivers and Harbors Act.............................................14

        A.  The contested stretch of ankle-deep water is not
            commercially "navigable," so the Corps lacks jurisdiction................15

        B.  The narrow line of buoys does not "obstruct" navigation
            along a stretch of river more than 200 feet wide from bank to
            bank ...............................................................................21

        C.  Unlike the "structures" prohibited in the Act, the string of
            buoys is not a permanent fixture stretched across a waterway ..........25

        D.  The Court must interpret the Act to avoid—not to conflict
            with—the Constitution .......................................................31

    II.  The US Also Failed to Carry Its Burden Under the Remaining
        Three Elements of *Winter*'s Preliminary-Injunction Standard .................39

A.  All of *Winter*'s requirements apply to all plaintiffs—including the federal government .................................................................40

B.  The US failed to show it would suffer irreparable harm absent a preliminary injunction ..................................................... 41

C.  The district court also erred in weighing the equities and public interest, which clearly favored Texas ...................................... 43

III. Even If the US Could Somehow Satisfy *Winter*, the District Court Here Distorted the Law of Preliminary Injunctions ................................. 45

A.  The district court imagined evidence that was not there and ignored the evidence Texas introduced ............................................. 45

B.  Awarding an injunction that in no way addresses the plaintiff's purported injury attests to the absence of irreparable harm............................................................................ 47

Conclusion........................................................................................48

Certificate of Service........................................................................49

Certificate of Compliance ................................................................49

# Table of Authorities

Page(s)

**Cases:**

*Abbott v. Biden*,
70 F.4th 817 (5th Cir. 2023) ........................................................... 36

*Ali v. Fed. Bureau of Prisons*,
552 U.S. 214 (2008) ........................................................................ 26

*Appleby v. City of New York*,
271 U.S. 364 (1926) ........................................................................ 27

*Arizona v. United States*,
567 U.S. 387 (2012) ........................................... 9, 34-35, 39, 42

*Bates v. Illinois Central R.R. Co.*,
66 U.S. 204 (1861) ......................................................................... 27

*Biden v. Texas*,
142 S. Ct. 2528 (2022) ..................................................................... 9

*Brown v. United States*,
12 U.S. 110 (1814) .......................................................................... 38

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ........................................................................ 47

*California v. United States*,
104 F.3d 1086 (9th Cir. 1997) ....................................................... 34

*Chiles v. United States*,
69 F.3d 1094 (11th Cir. 1995) ....................................................... 34

*Cook v. United States*,
288 U.S. 102 (1933) ........................................................................ 30

*The Daniel Ball*,
77 U.S. 557 (1870) .......................................................................... 32

*Dubin v. United States*,
143 S. Ct. 1557 (2023) ................................................................... 29

*Econ. Light & Power Co. v. United States*,
256 U.S. 113 (1921) ........................................................................ 17

*FTC v. Credit Bureau Center, LLC*,
937 F.3d 764 (7th Cir. 2019) ......................................................... 41

*Gibbons v. Ogden*,
22 U.S. 1 (1824) ............................................................................. 15

*Gilman v. Philadelphia*,
   70 U.S. 713 (1865) ........................................................................ 15

*Greenleaf-Johnson Lumber Co. v. Garrison*,
   237 U.S. 251 (1915) ....................................................................... 27

*Harrison v. Young*,
   48 F.4th 331 (5th Cir. 2022) ......................................................... 14

*Heckman v. Sutter*,
   119 F. 83 (9th Cir. 1902) ............................................................... 27

*Hersh v. U.S. ex rel. Mukasey*,
   553 F.3d 743 (5th Cir. 2008) ........................................................ 31

*Holyoke Co. v. Lyman*,
   82 U.S. 500 (1872) ........................................................................ 27

*Justin Indus. Inc. v. Choctaw Sec., L.P.*,
   920 F.2d 262 (5th Cir. 1990) (per curiam) .................................. 14

*Kansas v. Garcia*,
   140 S. Ct. 791 (2020) ...................................................................... 9

*Leovy v. United States*,
   177 U.S. 621 (1900) ................................................................. 15, 32

*Lessee of Pollard v. Hagan*,
   44 U.S. 212 (1845) ........................................................................ 31

*Lindsay & Phelps Co. v. Mullen*,
   176 U.S. 126 (1900) ....................................................................... 26

*Lykes Bros. Inc. v. USACE*,
   821 F. Supp. 1457 (M.D. Fla. 1993),
   *aff'd*, 64 F.3d 630 (11th Cir. 1995) ............................................... 19

*Martin v. Mott*,
   25 U.S. 19 (1827) ........................................................................... 36

*Martinez v. Mathews*,
   544 F.2d 1233 (5th Cir. 1976) ....................................................... 43

*Miami Valley Conservancy Dist. v. Alexander*,
   692 F.2d 447 (6th Cir. 1982) .................................................... 16, 17

*Mock v. Garland*,
   75 F.4th 563 (5th Cir. 2023) .......................................................... 40

*The Montello*,
   87 U.S. 430, 442 (1874) ................................................................. 15

*Moyer v. Peabody*,
212 U.S. 78 (1909) ....................................................................... 36

*New Jersey v. United States*,
91 F.3d 463 (3d Cir. 1996) ......................................................... 34

*New York v. New Jersey*,
598 U.S. 218 (2023) ..................................................................... 44

*NFIB v. Sebelius*,
567 U.S. 519 (2012) .................................................... 18, 19, 33

*Norfolk & W. Co. v. United States*,
641 F.2d 1201 (6th Cir. 1980) ............................................. 22-23

*Nuncio v. Johnson*,
208 F.3d 1007, 2000 WL 178147 (5th Cir. 2000) ............... 25

*Oklahoma v. Texas*,
258 U.S. 574 (1922) ............................................................ 15, 20

*Padavan v. United States*,
82 F.3d 23 (2d Cir. 1996) ........................................................... 34

*Petro United Terminals, Inc. v. J.O. Odfjell Chem. Carriers*,
756 F. Supp. 269 (E.D. La. 1991) ......................................... 28

*Phenix Const. Co. v. Cornell Steamboat Co.*,
103 N.E. 891 (N.Y. 1913) ......................................................... 28

*Philadelphia v. Standard Oil Co. of Pennsylvania*,
12 F. Supp. 647 (E.D. Pa. 1934) ............................................. 28

*Plyler v. Doe*,
457 U.S. 202 (1982) ....................................................................... 9

*Pound v. Turck*,
95 U.S. 459 (1877) ..................................................................... 27

*PPL Mont., LLC v. Montana*,
565 U.S. 576 (2012) ................................................................... 15

*Rollins v. Fort Bend ISD*,
89 F.3d 1205 (5th Cir. 1996) ................................................... 25

*Sackett v. EPA*,
598 U.S. 651 (2023) ........................................................15, 19, 31

*SBC Commc'ns, Inc. v. FCC*,
154 F.3d 226 (5th Cir. 1998) ................................................... 38

*Sealed Appellee 1 v. Sealed Appellant 1*,
767 F.3d 418 (5th Cir. 2013) ................................................... 29

*Smith v. Turner*,
    48 U.S. 283 (1849) ........................................................................ 33

*Sterling v. Constantin*,
    287 U.S. 378 (1932) ................................................................ 34, 36

*Susquehanna Boom Co. v. West Branch Boom Co.*,
    110 U.S. 57 (1884) ........................................................................ 27

*Sveen v. Melin*,
    138 S. Ct. 1815 (2018) ................................................................. 35

*Tate v. Am. Tugs, Inc.*,
    634 F.2d 869 (5th Cir. Unit A Jan. 1981) ........................................ 14

*Texas v. United States*,
    50 F.4th 498 (5th Cir. 2022) ........................................................ 40

*Texas v. White*,
    74 U.S. 700 (1868) ................................................................. 33-34

*Tugwell v. Eagle Pass Ferry Co.*,
    9 S.W. 120 (Tex. 1888) ................................................................ 18

*United States v. Angell*,
    292 F.3d 333 (2d Cir. 2002) ........................................................ 22

*United States v. Appalachian Power Co.*,
    311 U.S. 377 (1940) ............................................... 17, 18, 19, 33

*United States v. Bellingham Bay Boom Co.*,
    176 U.S. 211 (1900) ...................................................................... 27

*United States v. Billingsley*,
    615 F.3d 404 (5th Cir. 2010) .................................................. 40-41

*United States v. Boyden*,
    696 F.2d 685 (9th Cir. 1983) ........................................................ 28

*United States v. Bridgeport Towing Line*,
    15 F.2d 240 (D. Conn. 1926) ........................................................ 28

*United States v. Burns*,
    54 F. 351 (C.C.D. W. Va. 1893) .............................................. 26, 28

*United States v. Cooley*,
    141 S. Ct. 1638 (2021) ................................................................. 34

*United States v. Coombs*,
    37 U.S. 72 (1838) .......................................................................... 32

*United States v. Crow, Pope & Land Enters., Inc.*,
    340 F. Supp. 25 (N.D. Ga. 1972) ........................................ 16, 18, 20

*United States v. Estate of Boothby*,
  16 F.3d 19 (1st Cir. 1994) ...................................................28
*United States v. FDIC*,
  881 F.2d 207 (5th Cir. 1989) ...............................................40
*United States v. Hall*,
  63 F. 472 (1st Cir. 1894) .....................................................29
*United States v. Hansen*,
  143 S. Ct. 1932 (2023) ........................................................31
*United States v. Lopez*,
  514 U.S. 549 (1995) .............................................................18
*United States v. Marine Shale Processors*,
  81 F.3d 1329 (5th Cir. 1996) ...............................................40
*United States v. Morrison*,
  529 U.S. 598 (2000) .........................................................18, 33
*United States v. Oak Beach Inn Corp.*,
  744 F. Supp. 439 (S.D.N.Y. 1990)........................................28
*United States v. Oregon*,
  295 U.S. 1 (1935) ................................................................16
*United States v. Republic Steel Corp.*,
  362 U.S. 482 (1960) ..............................................18, 21, 22, 23
*United States v. Rio Grande Dam & Irrigation Co.*,
  174 U.S. 690 (1899)...........15, 16, 17, 19, 20, 21, 22, 27, 33
*United States v. Sineneng-Smith*,
  140 S. Ct. 1575 (2020) ........................................................25
*United States v. Verdugo-Urquidez*,
  494 U.S. 259 (1990) .............................................................38
*United States v. W. Indies Transp., Inc.*,
  127 F.3d 299 (3d Cir. 1997) ................................................22
*United States v. Weil*,
  35 Ct. Cl. 42 (1900)..............................................................18
*Willson v. Black-Bird Creek Marsh Co.*,
  27 U.S. 245 (1829) ...............................................................15
*Winter v. NRDC*,
  555 U.S. 7 (2008) ...............2, 3, 12, 13, 14, 39, 40, 41, 45, 47
*Yates v. United States*,
  574 U.S. 528 (2015)..............................................................26

*Zeller v. American International Corp.*,
   292 F. 822 (3d Cir. 1923) ...................................................................28

**Constitutional Provisioins, Statutes, and Rules:**

U.S. Const.:
   art. I, § 8, cl.3 ....................................................................................32
   art. I, § 8, cl.11 ..................................................................................38
   art. I, § 8, cl.15 ..................................................................................36
   art. I, § 10, cl.2 ..................................................................................35
   art. I, § 10, cl.3 ............................................................... 34, 35, 36, 37
   art. IV, § 4 .......................................................................8, 34, 35, 36

Tex. Const. art. IV, § 7 ........................................................................36

8 U.S.C.:
   § 1226(d)(1) ........................................................................................8
   § 1231(a)(1)(A) ...................................................................................8
   § 1225(b)(2)(A) ...................................................................................8
   § 1325 .............................................................................................18, 41

19 U.S.C. § 1459 ..............................................................................18, 41

28 U.S.C.:
   § 1292(a)(1) .........................................................................................3
   § 1331 ...................................................................................................3
   § 1345 ...................................................................................................3

33 U.S.C.:
   § 403 .......................................................................... 10, 21, 25, 32
   § 403b ................................................................................................28
   § 406 ..................................................................................................22
   § 408(a) ..............................................................................................29
   § 409 ..................................................................................................29

IRCA § 115, 100 Stat. 3384, Pub. L. No. 99-603 .................................8

Tex. Gov't Code § 418.018(c) ..............................................................6

Authorization for the Use of Military Force, Pub. L. 107, § 2(a),
   115 Stat. 224 (Sept. 18, 2001) ..........................................................39

33 C.F.R.:
   § 322.2(b) ..........................................................................................28
   § 329.11(b) .........................................................................................15

**Other Authorities:**

4 Annals of Cong. 788 (1794) ...............................................................38

Antonin Scalia & Bryan A. Garner, Reading Law (2012) ......................................26

Blackstone, Commentaries ..................................................................................38

Brief for US, *Biden v. Texas*, No. 21-954................................................................9

Comunicado No. 309, Secretaría de Relaciones Exteriores, Gobierno de Mexico (Aug. 2, 2023).......................................................................45

Exec. Order No. 14059, 86 Fed. Reg. 71549 (Dec. 15, 2021)...............................43

The Federalist No. 43 .........................................................................................36

James Madison, Debate from Virginia Ratifying Convention (June 16, 1788) ........38

Joel Rose, *A Majority of Americans See an 'Invasion' at the Southern Border, NPR Poll Finds*, NPR (Aug. 18, 2022) ..................................................39

John S.D. Eisenhower, Intervention! The United States and the Mexican Revolution 1913-1917 (1993) .........................................................38-39

Johnson's Dictionary (Boston 1828) ..................................................................37

Joseph Story, Commentaries on the Constitution of the United States (1833) ...........................................................................................................8

Miriam. Jordan, *Smuggling Migrants at the Border Now a Billion-Dollar Business*, N.Y. Times (July 25, 2022) ..............................................................4-5

Memorandum from Acting Director, U.S. Immigration & Customs Enforcement (Feb. 18, 2021)...........................................................................9

Michel Martin, *How Do Illegal Drugs Cross the U.S.-Mexico Border?*, NPR (April 6, 2019) ......................................................................................39

Noah Webster, American Dictionary of the English Language (1828)...................37

Noah Webster, A Compendious Dictionary of the English Language (1806) ........37

Pier: Webster's New International Dictionary 1633 (1930) ..................................27

Press Release, Off. of Tex. Gov. (June 8, 2023), ...................................................6

Press Release, Office of Tex. Gov. (September 15, 2023) ......................................6

Report on the Legal and Policy Frameworks Guiding the United States' Use of Military Force (2016).................................................................39

Stephen Dinan, *$20 Billion Payday: Biden's Border Surge Sends Smuggling Prices Soaring*, Wash. Times (Sept. 27, 2022) ................................33

Todd Bensman, Overrun: How Joe Biden Unleashed the Greatest Border Crisis in U.S. History (2023).............................................................4, 5

Treaty Between the United States of America & Mexico, Nov. 14, 1944.........24, 30

Treaty to Resolve Pending Boundary Differences & Maintain the Rio
    Grande and Colorado River as the International Boundary,
    November 23, 1970, T.I.A.S. No. 7313 ............................................................... 11

Treaty with Mexico, Dec. 30, 1853, 10 Stat. 1034 ...................................................24

Treaty with the Republic of Mexico, Feb. 2, 1848, 9 Stat. 928 .............................24

Convention Between the United States of America & The United
    States of Mexico, Nov. 12, 1884 .......................................................................24

Webster's New International Dictionary (1930) ............................................ 27, 28

# Introduction

No longer the range of isolated "coyotes," the US-Mexico border is the turf for multi-billion-dollar transnational criminal organizations. The Biden Administration's failure to defend the border has enabled, enriched, and empowered them. Every day these hostile non-state actors traffic lethal fentanyl, enslaved people, and untraceable weapons across the Rio Grande into Texas. Border towns must shoulder an unprecedented humanitarian crisis.

To protect Texans and migrants alike, Governor Abbott declared a border-security disaster in 2021, ROA.1702-05, and launched Operation Lone Star, which has led to over 447,800 illegal-immigrant apprehensions, 34,200 criminal arrests, 31,200 felony charges, and 428 million lethal doses of fentanyl seized. As part of that mission, the Governor deployed marine floating barriers to deter illegal crossings in hotspots along the Rio Grande. The buoys control ingress to the disaster area as authorized by state law. The 1,000-foot-long buoy system at issue here was deployed in Maverick County near Eagle Pass, Texas, and has nearly eliminated illegal crossings of people and drugs at that hotspot. While the public benefits of these strategically placed buoys are manifest, their impact on lawful river travel is nonexistent: No vessels transport commercial goods here, cross-river traffic is illegal, and the law-enforcement airboats are unimpeded by the buoys.

Nevertheless, the US insists the buoys violate the Rivers and Harbors Appropriation Act of 1899 (the "Act") because Texas deployed them without a permit allegedly required from the U.S. Army Corps of Engineers (the "Corps"). It sought a preliminary injunction forcing the State to remove the buoys and to stop placing new

ones—all of which would allow untold numbers of cartel agents to ford the Rio Grande onto Texas soil. That relief is "an extraordinary remedy" indeed. *Winter v. NRDC*, 555 U.S. 7, 24 (2008).

To obtain such relief, the US must show that: it "is likely to succeed on the merits," it "is likely to suffer irreparable harm in the absence of preliminary relief," "the balance of equities tips in [its] favor," and "an injunction is in the public interest." *Id.* at 20. The US did none of that. It offered no evidence that this stretch of the Rio Grande is navigable; that the buoys "obstruct" any commercial navigable capacity; or that the buoys are the kind of "structures" prohibited by the Act. In any event, Texas has express constitutional authority to defend its territory against the invasion that Governor Abbott has declared. Courts are therefore duty-bound to read the Act to avoid hampering Texas's acknowledged ability to defend itself and its citizens.

Although the district court refused to let Texas fully develop the record on the equities and public interest, those factors overwhelmingly favored the State. Texas was not permitted to ask the US's witness about "the 2.3 million . . . border encounters," the "600,000 . . . got-aways" at the border, "the importation of lethal fentanyl," "unlawful migration," or "cartel activity." Tr. 73-77.[1] But no court has discretion to overlook such evidence; instead it must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24. This Court should reverse.

---

[1] The preliminary-injunction hearing transcript is not yet in the record.

## Statement of Jurisdiction

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1345. This appeal was timely filed the day the injunction was entered, giving this Court jurisdiction under 28 U.S.C. § 1292(a)(1).

## Issues Presented

1. The district court acknowledged that the Act is grounded on the Commerce Clause and that Texas has independent authority to repel an invasion under the Invasion Clauses. The only "commercial" activity at the contested stretch of the Rio Grande is illicit bank-to-bank smuggling; Texas's buoy system does not "obstruct" navigation up- or down-river; and federal law and treaties require deploying buoys. Is the US likely to prove a violation of the Act, and can it do so without any commercial nexus and while thrusting the courts into an "invasion" question the US concedes is nonjusticiable?

2. In *Winter v. NRDC*, 555 U.S. 7 (2008), the Supreme Court announced a familiar four-part test for obtaining a preliminary injunction. Is the US uniquely exempt from satisfying the second, third, and fourth *Winter* elements anytime it seeks to enforce "a public interest statute"?

3. Everyone agrees the district court's injunction allows Texas to keep its buoy system in the Rio Grande. Was it proper to award extraordinary relief where the alleged injury need not (and will not) be urgently redressed?

Statement of the Case

## I.  Facing an Unprecedented Influx of Hostile Actors, Texas Deploys Buoys in One of the Rio Grande's Criminal Hotspots.

A crisis of human trafficking, drug smuggling, and terrorist infiltration exists along Texas's 1,200-mile border with Mexico. For three years, the number of aliens illegally crossing the southern border has ballooned. U.S. Customs and Border Protection ("CBP") encountered about 458,000 aliens at the border in FY2020, 1.7 million in FY2021, and 2.4 million in FY2022. ROA.1516. So far in FY2023, CBP has already encountered nearly 1.8 million. ROA.1572. Those numbers omit individuals detected as making an illegal entry but neither found nor apprehended (there were more than 600,000 in FY2022) and the "unknown number of migrants who evade detection" entirely. ROA.1520.

Both Texas citizens and migrants themselves—many unaccompanied minors—are often at the mercy of transnational criminal cartels that see smuggling as good business. Todd Bensman, Overrun: How Joe Biden Unleashed the Greatest Border Crisis in U.S. History 29-32, 193 (2023). This year alone, CBP has seized over 22,000 pounds of fentanyl—a synthetic opioid that is lethal at 2mg doses and is the leading cause of death for Americans under 50. ROA.1580-82. But "[f]or the first time in history, the cartel proceeds from human smuggling [may] have surpassed those from drug smuggling." Bensman, *supra*, at 41. Even the *New York Times* recognizes that trafficking across the southern border has changed "from a scattered network of freelance 'coyotes' to a multi-billion-dollar international business controlled by organized crime, some of Mexico's most violent drug cartels." Miriam

4

Jordan, *Smuggling Migrants at the Border Now a Billion-Dollar Business*, N.Y. Times (July 25, 2022), https://tinyurl.com/442zeau7. Meanwhile, in FY2022 the number of border apprehensions of individuals on the FBI's terrorist watchlist was "500 percent more than in *the prior five years combined*." Bensman, *supra*, at 255-56 (emphasis added); *see also id.* at 258-64.

Other perils exist for individuals attempting to illegally cross the border. A record high of 853 illegal immigrants died crossing it between October 2021 and October 2022. ROA.1712-18. A United Nations agency has declared the US-Mexico border the deadliest land crossing in the world. ROA.1690-94.

In 2021, Governor Abbott declared a border-security disaster and launched Operation Lone Star to mitigate the effects of this unprecedented crisis. As part of that initiative, the Governor has:

- detailed law-enforcement officers to plug border staffing gaps;

- heightened vehicle inspections by the Department of Public Safety;

- bused aliens to sanctuary cities in other States, which now recognize the southern border poses a national problem;

- constructed miles of border wall after the US ceased construction;

- invoked the Texas Disaster Act to enhance penalties for criminal trespass on private land;

- designated transnational criminal cartels smuggling drugs, people, and weapons into Texas as foreign terrorist organizations; and

- invoked the Invasion Clauses of the U.S. Constitution, ROA.57-59.

These efforts have "led to over 477,800 illegal immigrant apprehensions," "more than 34,200 criminal arrests, with more than 31,200 felony charges reported," and "over 428 million lethal doses of fentanyl" seized. Press Release, Office of Tex. Gov. (Sept. 15, 2023), https://tinyurl.com/4274pwhs. "Every individual who is apprehended or arrested and every ounce of drugs seized would have otherwise made their way into communities across Texas and the nation." *Id.*

In addition to those historic initiatives, Governor Abbott also "announced the deployment of new marine floating barriers to deter illegal crossings in hotspots along the Rio Grande River." Press Release, Office of Tex. Gov. (June 8, 2023), https://tinyurl.com/y9sp5y4t. The buoys were originally designed for CBP, ROA.1284, as part of a broader strategy to construct physical barriers in the Del Rio Sector, *see* ROA.652-54. Maverick County—which includes Eagle Pass, Texas—has been particularly affected by the crisis, *see* ROA.651-54, representing nearly 25% of all CBP encounters in June 2023, ROA.656, 658. Seizures there of cocaine, methamphetamine, heroin, fentanyl, and marijuana increased by 7% in June 2023 and 9% in July 2023. ROA.1764.

Given Eagle Pass's status as one of the most active criminal hotspots along the Rio Grande—and the documented ability of transnational criminal cartels to circumvent other obstacles, ROA.652-54—the Governor deployed buoys near the city in mid-July 2023 under his authority to control ingress to a disaster area. Tex. Gov't Code § 418.018(c). The buoys are deployed in a 1,000-foot segment of the Rio Grande that is shallow but inconsistent in depth and riddled with sandbars, small islands, large rocks, natural and man-made debris, and sandy shoals. ROA.320, 407,

448. The river segment is about 200 feet wide, ROA.321, 327, and when it isn't dry, it is often ankle-to-knee deep and never more than four feet deep near the buoys. ROA.327.

Although cartels are active in the area, ROA.325, there is no lawful commercial transportation, ROA.1275. Law-enforcement agencies use shallow-draft airboats, ROA.320-21, incapable of bearing commercial goods, ROA.320-21, 327. Natural conditions make it practically impossible for larger vessels—*e.g.*, barges, fishing boats, cargo ships, tankers, or other commercial vessels—to operate. ROA.321, 327. Instead, this segment of the river sees mostly illegal activities, like smuggling drugs and weapons, human trafficking, and illegal immigration. ROA.1273, 1275-76.

The buoy system comprises multiple interconnected buoys tethered via chains to concrete blocks placed on the riverbed, ROA.326, 1284-85, and is connected to a two-foot-deep stainless-steel anti-dive net, ROA.1285. Designed to be temporary, the system is not attached or affixed to the riverbed, ROA.326, 1285, but may be dismantled and redeployed by moving the concrete blocks, ROA.1284-85. The blocks, however, will remain where they are placed. Tr. 102-03. And because the buoys were placed parallel to the river's flow, ROA.1393, they allow the free movement of water and do not interfere with watercraft traveling along the river, ROA.321-27, 1285-86. The buoys occupy approximately 3% of the stream's width and were placed on the shallower, Texas side. ROA.321, 327, 1285. Any vessel capable of navigating at the site can easily avoid them. ROA.327. Law-enforcement airboats readily maneuver around the buoys. ROA.321-22.

The buoys are well-marked, colorful, and under uninterrupted surveillance by law-enforcement personnel, ROA.321-22, 327-28, including for debris accumulation, ROA.1285. No one has attempted to climb over the buoys, and no injuries or deaths due to the buoys have been reported. ROA.327-28. Indeed, the buoys save lives by directing aliens to ports of entry at bridges while deterring unlawful, dangerous water crossings. ROA.326-28, 1284.

## II. Not Content to Abandon the Border, the US Sues to Undercut Texas's Efforts to Backfill Federal Inaction.

Federal law assigns the US certain duties that would help restrain the sudden sweep of crime and violence at the southern border. Immigration statutes obligate the federal government to: detain certain aliens pending removal proceedings, 8 U.S.C. § 1225(b)(2)(A); share investigative resources with state and local authorities to aid them in identifying aggravated felons, *id.* § 1226(d)(1); apprehend and deport aliens within 90 days of being finally ordered removed, *id.* § 1231(a)(1)(A); and enforce "the immigration laws of the United States . . . vigorously and uniformly," IRCA § 115, 100 Stat. 3384, Pub. L. No. 99-603. More fundamentally, the Constitution obliges the US to "protect each [State] against Invasion," U.S. Const. art. IV, § 4, including any that might result "by the accession of alien residents," 3 Joseph Story, Commentaries on the Constitution of the United State*s* § 1815 (1833) (quoting The Federalist No. 43).

In recent years, the US has ignored these obligations, claiming its *laissez-faire* turn is merely the consequence of scarce federal resources. For example, when constricting the authority of ICE employees to arrest and deport aliens, the US stated

"ICE operates in an environment of limited resources. Due to these limited resources, ICE has always prioritized, and necessarily must prioritize, certain enforcement and removal actions over others." Memorandum from Acting Director, U.S. Immigration & Customs Enforcement, Dep't of Homeland Security (Feb. 18, 2021), https://tinyurl.com/fu6h7epf. It told the Supreme Court the same thing when defending its decision to abandon the "Remain in Mexico" program: "Congress has not provided DHS with sufficient appropriations to detain all the noncitizens" that federal law requires. Brief for US at 5, *Biden v. Texas*, No. 21-954. So, the Secretary of Homeland Security abandoned the program based on "the extent of agency personnel and resources required to implement" it. *Id.* at 9; *see also id.* at 4, 13, 16, 29-30; *Biden v. Texas*, 142 S. Ct. 2528, 2543 (2022).

Operation Lone Star has filled the gap left by the US's dereliction of duty: It takes lawful steps to protect Texas, its residents, and Americans everywhere from the sudden influx of hostile non-state actors. *See Plyler v. Doe*, 457 U.S. 202, 228 n.23 (1982). And there is no doubt the buoys have slowed the flood of criminal activity.

Given the federal government's representations that it *would* secure the border if only it *could*, the US should not object to Texas's picking up some of the slack. Yet it has, making clear by this lawsuit that "the need to allocate 'scarce enforcement resources,' . . . is not the problem here." *Arizona v. United States*, 567 U.S. 387, 434-35 (2012) (Scalia, J., concurring in part and dissenting in part). The Biden Administration has simply settled on "priorities or preferences" that encourage illegal immigration, irrespective of its calamitous consequences and infidelity to "the Laws of the United States." *Kansas v. Garcia*, 140 S. Ct. 791, 806-07 (2020).

## III. The District Court Grants a Preliminary Injunction After the US Misrepresents the Nature of Texas's Buoy System.

The US claimed that this shallow stretch of the Rio Grande is "navigable" and that the narrow buoy system stretching down the center of the river is a prohibited "obstruction" or "structure[]" under Section 10 of the Act, 33 U.S.C. § 403. ROA.15. It sought a preliminary injunction mandating removal of the existing buoys and prohibiting Texas from deploying more. ROA.67. It argued the buoys were in "navigable waters" (and thus subject to Corps jurisdiction) because Maverick County is within a *300-river-mile stretch* the Corps declared navigable almost 50 years ago. ROA.72-73, 1085. The US next argued the buoys obstructed the river's "navigable capacity," or were "booms" or "other structures" built without a permit, in violation of Section 10 of the Act. ROA.917-19. Texas timely opposed. ROA.288-317. It countered that the court must *find* navigability based on evidence, not self-serving jurisdictional assertions. And it argued the US was unlikely to succeed under the Act because the river is *non*-navigable; contrived friction in US–Mexico relations from the buoys was not irreparable harm; and the equities and public safety favored Texas. ROA.301, 314-16.

The US subsequently filed a document titled "Notice of Survey of the International Boundary and Water Commission," claiming "that a majority of the floating barrier . . . is located within the territory of Mexico." ROA.692; *see also* ROA.696. It filed this notice after Texas opposed the motion—even though the IBWC had completed its survey *two weeks* prior. ROA.691, 695. Then, in its reply brief, the US

attached two new declarations claiming irreparable harm was "exacerbated" by the IBWC's discovery that the buoys were (allegedly) in Mexican waters. ROA.736, 747.

But the US failed to disclose that it had itself violated the operative bilateral treaty. Under this agreement, IBWC "shall with appropriate precision delineate the international boundary on maps or aerial photographic mosaics" at "intervals not greater than ten years." Treaty to Resolve Pending Boundary Differences & Maintain the Rio Grande and Colorado River as the International Boundary, Nov. 23, 1970, T.I.A.S. No. 7313, at 23, art. II.C (1970 Treaty); ROA.1220. The US and Mexico have thus recognized the inevitable and natural "changes in the channels of th[e] rivers." *Id.* at preamble. But the US's own filing establishes that "the current IBL delineated"—that is, the boundary line—"was recorded *in 2009* as Minute 315." ROA.696 (emphasis added). Despite accusing Texas of violating this treaty—and the district court's expressed concern that the buoys might have been placed in Mexico, ROA.986-87, the US has never acknowledged that IBWC's "current" map expired under the treaty's terms in 2019.[2]

The district court issued a preliminary injunction on September 6, 2023, ordering Texas to "reposition . . . all buoys, anchors, and other related materials composing the floating barrier placed by Texas in the Rio Grande" to the water along

---

[2] Notwithstanding its continued belief based on GPS data that the buoys were placed in US waters, Tr. 99-100, Texas moved them back to obviate the US's (mistaken) assertion that they sat in Mexican waters. Tr. 89. IBWC now concedes "the entire buoy line [is] located within the United States." *United States v. Abbott*, 1:23-cv-853, ECF No. 57-1, ¶ 8 (W.D. Tex. Sept. 19, 2023).

Texas's riverbank by September 15. ROA.1005-06 & n.32. The court also prohibited Texas from placing additional buoys elsewhere. ROA.1005.

Texas appealed within an hour, ROA.1007, and promptly sought a stay from this Court. This Court entered an administrative stay the next day. ROA.1009. In its emergency filings, the State emphasized the component of the district court's injunction that mandated the State reposition the buoys in just 9 days. ROA.1005-06. But contrary to the US's response, ECF 30 at 7, 28, Texas has unquestionably appealed the entire injunction, ROA.1007.

## Summary of the Argument

A straightforward application of *Winter*'s four-part test shows that the district court erred by entering a preliminary injunction here.

**I.** The US failed to show a likelihood of success on the merits for four reasons. *First*, the Corps lacks jurisdiction because this stretch of the Rio Grande is non-navigable. The US's own evidence confirms there has *never* been any commercial navigation in the disputed area and, assuming courts may consider hypothetical future commercial use, the US adduced no evidence that this stretch of river could be made navigable through reasonable improvements. *Second*, assuming the Corps has jurisdiction, the US's own witness testified that the buoys do not "obstruct" traffic along the river in violation of the Act. Instead, they run parallel to the current to prevent illicit cross-border fording. *Third*, the buoy system does not qualify as a "structure[]" requiring a federal permit under the Act because it is impermanent and does not stretch across the current. *Fourth*, the US's contrary reading would flout the Constitution. Interpreting the Act to sweep beyond any commercial nexus would

exceed Congress's Commerce Clause power. And countermanding the State's authority under the Invasion Clauses is flatly inconsistent with the Constitution's text and the US's concession that the exercise of such authority presents a nonjusticiable political question.

**II.** The US also failed to carry its burden under the remaining three elements of *Winter*'s four-part test. Perhaps that is why the US claims it need only meet the first element. But *Winter*'s standard applies to all litigants. The federal government's alleged irreparable harm based on concerns over treaty compliance is impossible to square with its own continued failure to fulfill treaty obligations—and its willful refusal to acknowledge those obligations in federal court. The public interest plainly favors efforts to reduce the flow of deadly fentanyl, combat human trafficking, protect Texans from unlawful trespass and violent attacks on their property, and divert migrants to safe, legal points of entry. Texas's buoys serve these interests, save lives, and have effectively eliminated dangerous crossings in one of the most active drug-smuggling and human-trafficking hotspots on the river. In balancing the equities, these benefits clearly outweigh the only harms the US presses.

**III.** Unable to award injunctive relief under that traditional standard, the district court reimagined this case from top to bottom—ignoring the evidence Texas presented, conjuring (inaccurate) evidence of its own, and crafting an injunction that does not even redress the injury that supposedly justifies "extraordinary" relief in this case.

## STANDARD OF REVIEW

A "preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion.'" *Harrison v. Young*, 48 F.4th 331, 342 (5th Cir. 2022). Any "plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. Because the US sought a "mandatory injunction" compelling Texas to move the buoys, it bore "the burden of showing a clear entitlement to the relief [it seeks] under the facts and the law." *Justin Indus. Inc. v. Choctaw Sec., L.P.*, 920 F.2d 262, 268 n.7 (5th Cir. 1990) (per curiam). "Only in rare instances is the issuance of a mandatory preliminary injunction proper." *Tate v. Am. Tugs, Inc.*, 634 F.2d 869, 870 (5th Cir. Unit A Jan. 1981). This Court "review[s] the district court's grant of [a] preliminary injunction for abuse of discretion, reviewing underlying factual findings for clear error and legal conclusions de novo." *Harrison*, 48 F.4th at 339.

## ARGUMENT

### I.   The US Is Not Likely to Succeed on the Merits of Its Claims Under the Rivers and Harbors Act.

The US failed to prove, as a matter of fact, that the disputed waterway is commercially navigable—and thus subject to Corps jurisdiction. Moreover, the buoys do not obstruct navigable capacity (if any) and are not "structures" prohibited by the

Act. The Court must also reject the US's reading of the Act to avoid constitutional conflict with the Commerce Clause and Texas's self-defense rights.

## A. The contested stretch of ankle-deep water is not commercially "navigable," so the Corps lacks jurisdiction.

**1.** The US is a government of enumerated powers, and the Act is grounded upon Congress's power to regulate interstate and foreign commerce. *See Gibbons v. Ogden*, 22 U.S. 1, 197 (1824); *Sackett v. EPA*, 598 U.S. 651, 686-87 (2023) (Thomas, J. concurring). Navigability is a prerequisite for Corps jurisdiction under the Act and must be assessed in a "segment-by-segment approach," *PPL Mont., LLC v. Montana*, 565 U.S. 576, 594 (2012)—as the Corps acknowledges, 33 C.F.R. § 329.11(b). Precedent establishes that not all border waters are navigable, *Oklahoma v. Texas*, 258 U.S. 574, 584-85 (1922), and that the Rio Grande is not navigable for its entire 1,200-mile course between Texas and Mexico, *United States v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690, 698 (1899). This case concerns a 1,000-foot stretch of the Rio Grande in Maverick County.

More than a century of Supreme Court precedent discussing navigability focuses on a waterway's capacity to facilitate actual commerce "in the nature of a highway." *See, e.g.*, *Willson v. Black-Bird Creek Marsh Co.*, 27 U.S. 245, 250-51 (1829); *Gilman v. Philadelphia*, 70 U.S. 713, 724-25 (1865); *The Montello*, 87 U.S. 430, 442 (1874); *Rio Grande*, 174 U.S. at 698; *Leovy v. United States*, 177 U.S. 621, 627-28 (1900). As a result, the river "must (1) be or have been (2) used or susceptible of use (3) in the customary modes of trade and travel on water (4) as a highway for interstate

commerce." *Miami Valley Conservancy Dist. v. Alexander*, 692 F.2d 447, 449-50 (6th Cir. 1982).

Sporadic use is not navigability. *Id.* at 449. And commercial navigability cannot be established by showing that the river may be forded on foot, *United States v. Oregon*, 295 U.S. 1, 20-21 (1935), or that small craft can ferry bank-to-bank, *United States v. Crow, Pope & Land Enters., Inc.*, 340 F. Supp. 25, 34-35 (N.D. Ga. 1972). Because "[j]urisdiction over" "portions of" a river "is in controversy," the Corps' say-so is not enough. Navigability is a fact question that "should be determined by evidence" in open court. *Rio Grande*, 174 U.S. at 698 (remanding for trial-court factfinding).

Rather than "prove" the disputed stretch is navigable, *Miami*, 692 F.2d at 448, 451, the US demanded obedience to a 1975 study that one of its witnesses found on a list in the Corps' Fort Worth office, Tr. 12:10-15:2, and which that witness admitted he had "not read," ROA.1457-59. In other words, the US's lone navigability witness deemed the disputed waterway navigable "just" because "a list" said it was. Tr. 34-35.

**2.** The evidence adduced at the preliminary-injunction hearing does not help the US. The 1975 study itself *admitted* this stretch of the river had no commercial navigation. Tr. 44-46. In fact, that study says there "has never been any 'practical navigation' between Roma . . . and El Paso," a 1,000-mile stretch that includes the buoys' location in Maverick County; that one "extraordinary" military expedition passed Roma but no "substantial items of commerce were shipped from this point"; that "actual accounts of commercial travel [were] lacking" because "[a]bove Laredo up to Eagle Pass . . . navigation was impeded by rocks and ledges"; and that there

was "no commercial activity occurring within the study area" in 1975. ROA.1095, 1103-04.

Because neither a one-off "exceptional" use, *Rio Grande*, 174 U.S. at 699, nor "military expeditions," *Miami*, 692 F.2d at 451, will suffice, the district court erred in relying on the study's isolated examples, ROA.979-80. But even the study acknowledges "difficulty in pinpointing the precise head of navigation from a historical standpoint," because those isolated accounts of the river's use are "sketchy." ROA.1103. In the end, the study punts, deeming it "unnecessary to determine whether sufficient past use occurred in the study area to meet the test" for navigability. ROA.1103. At the preliminary-injunction hearing, both sides' witnesses attested that what was true "more than four decades" ago remains true today: Current commercial use is not only nonexistent, *supra* at 6-7, it is impossible due to shallow conditions, sand bars, and islands, ROA.1278-79.

The only "commerce" the US has ever pointed to is "millions of dollars in illicit" activity from Mexico to Texas. ROA.944. But the US has cited no Supreme Court decision finding navigability based on bank-to-bank traffic. In fact, the Court has suggested the very opposite. Because navigability asks whether a waterway is "of practical service as *a highway* of commerce," *Econ. Light & Power Co. v. United States*, 256 U.S. 113, 124 (1921) (emphasis added), its analysis has turned on commercial navigability "along" a river, "up" and "down" its course, and "from" one point "to" another, *United States v. Appalachian Power Co.*, 311 U.S. 377, 414-16 (1940). The district court observed that "[c]ourt cases from this period discuss ferry" operations transporting items like cotton between Texas and Mexico. ROA.979 (citing

*United States v. Weil*, 35 Ct. Cl. 42 (1900), and *Tugwell v. Eagle Pass Ferry Co.*, 9 S.W. 120 (Tex. 1888)). But "[t]he existence of ferries is no more an example of commercial use than the presence of a bridge or railroad trestle whose primary purpose is *to avoid the river rather than to employ it* as a means for trade and transportation." *Crow*, 340 F. Supp. at 35 (emphasis added). That is why the Supreme Court deemed evidence of "small public ferries going from one bank to the other" insufficient in *Appalachian Power*, demanding instead evidence that the New River was used as a "highway" up- and down-river. *Compare* 311 U.S. at 413, *with id.* at 414-16.

In any event, any bank-to-bank traffic between Mexico and Texas is *illegal*. 8 U.S.C. § 1325; 19 U.S.C. § 1459. Despite the US's decision to characterize the trafficking of human beings and drugs as "illicit commerce," ROA.944, crime does not qualify as commercial activity under the Commerce Clause, *see United States v. Morrison*, 529 U.S. 598, 609-17 (2000) (citing *United States v. Lopez*, 514 U.S. 549 (1995)). This Court should not bless an effort to ground federal jurisdiction on the Biden Administration's desire to preserve the free flow of trafficked human beings, deadly fentanyl, and untraceable weapons into Texas.

**3.** The Supreme Court has suggested that potential for commerce might suffice for navigability in some scenarios *under a different statute. See Appalachian Power*, 311 U.S. at 406-08 (discussing the Water Power Act). But the Court is unlikely to expand that holding to the Act given subsequent precedent, which has refocused navigability on the *present use* of a waterway, *see United States v. Republic Steel Corp.*, 362 U.S. 482, 483, 485 (1960), and which emphasizes that actual commerce must "already" exist as a predicate for federal authorities to "regulate" under the Commerce

Clause, *NFIB v. Sebelius*, 567 U.S. 519, 550-58 (2012). Just as Congress cannot "bring the subject of the regulation into existence" by speculating about future purchases of health insurance, so too it cannot bring a navigable waterway into existence by speculating that dry riverbeds might be made into flowing streams. *Id.*; *see also Sackett*, 598 U.S. at 686-92 (Thomas, J., concurring).

Even assuming *Appalachian Power*'s conception of navigability could apply here, the analysis must focus on whether (1) the "natural condition" of the disputed waterway (2) could permit "customary modes" of trade and travel (3) such that it constitutes a "highway of commerce" (4) for "through navigation" along the waterway (5) with only practically "reasonable improvements." 311 U.S. at 407, 411, 413-17. The US, for its part, must "support[] its allegations" on each of those elements with proof. *Id.* at 417.

The US made no effort to quantify or even describe what improvements could be performed, how they could be practically accomplished on this waterway, how much they would cost, what depth of boat could be used there for through traffic, whether they comply with other statutes (*e.g.*, NEPA), and what volume and kind of commercial goods could be transported. Absent record evidence that any improvements would be both financially and physically practicable, a court has no basis to conclude that such improvements would be "reasonable," meeting "a balance between cost and need." *Id.* at 407 n.26 (citing *Rio Grande*, 174 U.S. at 699). The district court should have required proof that "the costs of improvement would be justified by the benefits to commercial transit in this area," *Lykes Bros. Inc. v. USACE*, 821 F. Supp. 1457, 1464 (M.D. Fla. 1993), *aff'd*, 64 F.3d 630 (11th Cir. 1995). Absent

"these two crucial factors," the district court cannot credit future use because a "court cannot balance the opposing interests." *Crow*, 340 F. Supp. at 35-36.

To make up for the US's evidentiary shortfall, the district court relied repeatedly on unfounded conjecture. *See* ROA.974, 980. For instance, it speculated that there might be "re-prioritization and increased flow from the Amistad Dam." ROA.980. But the US's own evidence refutes such prospects: There were "[n]o authorized plans" to improve the river for future commercial use because navigation is "fifth" among competing water-use priorities, meaning there is "little likel[i]hood of change." ROA.1096. Although re-prioritization is possible, it is not reasonable when "[t]here would be serious ecological objections to any channelization," and the economic justifications for improvements "appear doubtful." ROA.1096, 1104. *Contra* ROA.941-44, 980-82. The district court even made predictions that would give a weatherman pause: Rainfall from "El Nino," it speculated, might make this section navigable one day. ROA.977.

The district court—like the 1975 study before it, ROA.1102—also erred by relying on statutes referencing "free navigation" along the Rio Grande. *See* ROA.973-74. Such language is "only precautionary and not intended as an affirmation of navigable capacity in that locality." *Oklahoma*, 258 U.S. at 586. Even the study recognizes that treaties merely "provide that the navigation of the *actually navigable* main channels of the river is made free and common." ROA.1161 (emphasis added). Far from assuming navigability, *Rio Grande* (which the study cites) remanded on that issue because it was a matter "requiring evidence, and to be determined by proof."

174 U.S. at 698. Statutes or treaties referencing navigability are not substitutes for actual evidence of commercial navigation.

### B. The narrow line of buoys does not "obstruct" navigation along a stretch of river more than 200 feet wide from bank to bank.

**1.** Even if this part of the Rio Grande were navigable, the US still must show that Texas has violated the Act, which prohibits "[t]he creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of" a covered waterway. 33 U.S.C. § 403. To be an "obstruction," an object must "adversely affect[]" navigation such that it "tends to *destroy* the navigable capacity of one of the navigable waters of the United States." *Republic Steel*, 362 U.S. at 487-88 (emphasis added). An object that "may only deter movements in commerce" is not enough. *Id.* Because this requires proof that the object "substantially diminish[es] the navigability of that stream within the limits of present navigability," it "always" presents a question "of fact[.]" *Rio Grande*, 174 U.S. at 709-10.

The US failed to meet this burden, too. It is hard to obstruct commercial navigation that does not yet exist. *Supra* at 16-19. And during the preliminary-injunction hearing, its own witness acknowledged that: the buoys do not run bank-to-bank to block traffic up- or down-river, ROA.1393; the disputed stretch is more than 200 feet wide, Tr. 32; and traffic was limited to law-enforcement airboats, which could easily travel "up the river and down the river" because the buoys were merely "four-foot-diameter floating barriers," ROA.1393-94. Even on the district court's more expansive view, which included the concrete anchors, the buoy system is only 16 feet wide. ROA.985. Either way, any boats small enough to be able to float in the shallow waters

can easily maneuver past the buoys. ROA.1275, 1450. To the extent this stretch permits navigation up- and down-river at all, such navigation is entirely unimpeded. And the buoys do not, in fact, impede the only lawful navigation in this section—shallow-draft law-enforcement airboats. Because they run with the current, the buoys merely prevent illicit cross-border fording without obstructing river travel. ROA.1274-75, 1450. That should have ended the matter.

**2.** The district court found the buoy system was an "obstruction" because a navigator would have to "take note of" the buoys and "maneuver around" them. ROA.984-85. This argument proves too much. The very same thing could also be said of a recreational swimmer or a stray soccer ball—a navigator would have to take note of and maneuver around literally *any* object in the waterway. Given that the Act carries *criminal* punishment, *see* 33 U.S.C. § 406, such a reading is entirely implausible.

Little wonder, then, that Supreme Court precedent rejects the district court's approach. As explained above, an object that "may only deter movements in commerce" won't do—it must "adversely affect[]" navigation. *Republic Steel*, 362 U.S. at 487; *see also Rio Grande*, 174 U.S. at 710. And an object most naturally impedes vessels navigating along a river when it extends into the river and is set perpendicular to the current. *See United States v. Angell*, 292 F.3d 333, 335 (2d Cir. 2002) (examining "dock structure" that "span[ned] most of the width of the Canal"); *United States v. W. Indies Transp., Inc.*, 127 F.3d 299, 310 (3d Cir. 1997) (examining "large dock" from barges connected to shore); *Norfolk & W. Co. v. United States*, 641 F.2d

1201, 1211 (6th Cir. 1980) (examining "collapsed dock, extending 35 feet into the river").

It is true, as the district court observed, ROA.983, that "fine particles" contributed to obstructing navigable capacity in *Republic Steel*, 362 U.S. at 483. But *Republic Steel* does not stand for the proposition that any object—no matter how infinitesimally small—becomes an obstruction the moment it touches water. In that case, the aggregate effect of millions of particles reduced a navigable channel from 21 feet of depth to as little as 12 feet. *See id.* at 484. Judged against existing commercial use, halving the river's depth would clearly impede its use as a highway. No amount of "tak[ing] note" and "maneuver[ing]" could permit a navigator accustomed to using the types of watercraft appropriate for the river's prior depth to navigate that same river with 9 feet of alluvial deposits now littering the riverbed. Far from helping the US, *Republic Steel* confirms the Act's "obstruction" clause is concerned with navigation up and down the river.

The buoys, by contrast, in no way alter the river's makeup or otherwise inhibit its (imagined) use as a commercial highway. The river is more than 200 feet wide, and the buoys take up 4 to 16 feet. Tr. 32:15-17; ROA.1393-94. Texas is unaware of any boat that is 100 feet wide and can float in knee-deep water. Straining to find some way to construe the buoys as obstructive, the district court declared the buoy system is "not easily seen." ROA.985. That *sua sponte* assertion is completely unsupported by record evidence. No witness testified that the anchoring blocks pose unseen hazards for navigators. And no witness testified that law-enforcement boats have, in fact, collided with the bright orange buoy system.

**3.** Given the lack of any change to the ability to navigate up- and down-river on either side of the buoys, the district court pointed to the buoy system's ability to obstruct traffic *across* the river. But once again, this argument proves too much. It is impossible to square with agreements between the US and Mexico, which have long recognized that "such common right [to navigation] shall continue without prejudice throughout the *actually navigable* main channels of the said rivers, *from* the mouth of the Rio Grande *to* the point where the Rio Colorado ceases to be the international boundary." Convention Between the United States of America & the United States of Mexico, art. V at 4, Nov. 12, 1884 (emphases added); *see also* Treaty with the Republic of Mexico, art. VII, Feb. 2, 1848, 9 Stat. 928, 928-29; Treaty with Mexico, art. IV, Dec. 30, 1853, 10 Stat. 1034; Treaty Between the United States of America & Mexico, art. 3 at 8, Nov. 14, 1944 (1944 Treaty). To preserve that guarantee, the two countries agreed that "[n]o artificial change in the navigable course of the river, by building jetties, piers, or obstructions which may tend to deflect the current or produce deposits of alluvium, or by dredging to deepen another than the original channel," or "by cutting waterways to shorten the navigable distance, shall be permitted." 1884 Convention, art. III. All those impediments hinder navigation up and down the river—not across it.[3] At least one treaty actually *requires* the placement of objects that—like Texas's buoy system—would form a border "boundary" and prevent traffic across the river. ROA.915-16 (citing 1944 Treaty). Because

---

[3] So, too, for the statutes the US has cited. *See* ROA.750-60.

Texas's buoys do not obstruct navigation *along* the river, they are consistent with both the Act and these treaties.

### C.  Unlike the "structures" prohibited in the Act, the string of buoys is not a permanent fixture stretched across a waterway.

**1.** The buoys are also consistent with the next clause of Section 10, which prohibits "build[ing] . . . any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in [covered waters] except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army." 33 U.S.C. § 403. Notably absent from that detailed list of prohibited structures is "buoys." And the US's own witness—both during his deposition and again at the preliminary-injunction hearing—unequivocally admitted that the buoys are not *any* of the listed structures. Tr. 48; ROA.1468.

Absent any evidence from the US—and in the teeth of a concession by its own witness—the district court nevertheless declared the buoy system a "boom." ROA.989-90 & n.22. This Court has previously rejected as "unreasonable" an argument that is "based on . . . overlooking [a] concession." *Nuncio v. Johnson*, 208 F.3d 1007, 2000 WL 178147, at *12 (5th Cir. 2000). And it has observed that "concessions" usually provide a reason to "discount"—not to bolster—the conceding party's evidence. *Rollins v. Fort Bend ISD*, 89 F.3d 1205, 1214 (5th Cir. 1996). The district court's decision to take matters into its own hands flouts the party-presentation principle. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579-81 (2020).

In any event, the district court's assertion that the buoy system "resembles" a boom even though it might "not fit perfectly" under that definition shows the buoy system is not, in fact, a boom. ROA.989.

**2.** That leaves the US's claim (which the district court also accepted) that the buoy system falls within Section 10's bucket of "other structures." ROA.991-93. When Congress provides a detailed list of items followed by a catchall term, courts must construe the latter to avoid rendering the former superfluous. Antonin Scalia & Bryan A. Garner, Reading Law 199 (2012). This interpretive principle, known as the *ejusdem generis* canon, directs that general terms be construed to encompass only what is similar in nature to the preceding specific terms, ensuring that those generalities "will not render specific words meaningless." *Yates v. United States*, 574 U.S. 528, 545-46 (2015) (plurality op.).

Courts applying *ejusdem generis* must identify an "obvious and readily identifiable genus" and determine what is common to that genus based on surrounding context. Scalia & Garner, *supra*, at 207-08; *see also Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225 (2008) (canon turns on the "common attribute" shared). What the listed terms here have in common is permanence and the capacity to stretch across a waterway. *Cf. United States v. Burns*, 54 F. 351, 361-63 (C.C.D. W. Va. 1893). How far the object extends into the waterway varies, but contemporary dictionaries and precedent reflect that each term shares these attributes:

- Boom: Webster's New International Dictionary 254 (1930) ("a chain cable or line of spars **extended across a river** or the mouth of a harbor, to obstruct passage"); *Lindsay & Phelps Co. v. Mullen*, 176 U.S. 126, 154 (1900) ("constructed" boom "**extend[ed] across the main channel** of

the Mississippi river and into the territory of Wisconsin"); *United States v. Bellingham Bay Boom Co.*, 176 U.S. 211, 211 (1900) ("boom . . . **constructed across the Nooksack river**"); *Susquehanna Boom Co. v. West Branch Boom Co.*, 110 U.S. 57, 57-58 (1884) (similar).

- Pier: Webster's New International Dictionary 1633 (1930) ("A breakwater, groin, or mole **extending into navigable water** for use as a landing place…hence, a structure **built out into the water with piles**"); *Pound v. Turck*, 95 U.S. 459, 461 (1877) ("piers…**across the stream**"); *Bates v. Illinois Central R.R. Co.*, 66 U.S. 204, 207 (1861) ("constructed" pier "was **run across**" the river).

- Wharf: Webster's New International Dictionary 2322 (1930) ("A structure of timber, masonry, iron, earth, or other material, built on the shore of a harbor, river, canal, or the like, and **usually extending from the shore to deep water**"); *Greenleaf-Johnson Lumber Co. v. Garrison*, 237 U.S. 251, 256 (1915) ("continuous wharf of three sides" "made **extension into the river** from two points on the shore"); *Heckman v. Sutter*, 119 F. 83, 87 (9th Cir. 1902) (attempt "to **construct a wharf** … **across the tide flats** to the deep water").

- Breakwater: Webster's New International Dictionary 272 (1930) ("A structure for **breaking the force of waves**, as a mole or sea wall"); *Rio Grande*, 184 U.S. at 419 ("breakwater … **across the Rio Grande** or the waters thereof").

- Weir: Webster's New International Dictionary 2318-19 (1930) ("A **dam in a river to stop** and raise the water"); *Holyoke Co. v. Lyman*, 82 U.S. 500, 513 (1872) (statute prohibiting "any weir" "in or **across rivers or streams**").

- Bulkhead: Webster's New International Dictionary 289 (1930) ("A structure of wood or stone to **resist the pressure of earth or water**; a partition wall or structure, as in a mine"); *Appleby v. City of New York*, 271 U.S. 364, 386 (1926) ("city **erected a bulkhead outshore** from such westerly line and filled up the space between it and the old bulkhead and destroyed the use of the wharf").

- Jetty: Webster's New International Dictionary 1162 (1930) ("A structure,

as a pier or mole of wood or stone, **extended into a sea, lake or river, to influence the current** or tide"); *Zeller v. American International Corp.*, 292 F. 822, 823 (3d Cir. 1923) (US "built a stone jetty ... **diagonally down the river ... to deflect the current**").

- Dolphin: Webster's New International Dictionary 659 (1930) ("A **mooring post or posts on a wharf** or beach"); *Philadelphia v. Standard Oil Co. of Pennsylvania*, 12 F. Supp. 647, 648 (E.D. Pa. 1934) ("a line of dolphins" together with a wharf "**extend into the river**"); *Petro United Terminals, Inc. v. J.O. Odfjell Chem. Carriers*, 756 F. Supp. 269, 271 (E.D. La. 1991) (describing a "facility" of "**seven dolphin platforms connected by a catwalk**" jutting into the Mississippi River).

Even the district court's dictionary citations highlight a capacity to "stretch[]" or "extend[] across a river" or other "body of water." ROA.989-90. Tellingly, when Congress amended the law in 1986 to provide lighting rules for certain items falling within the "other structure[]" category, it also chose permanent structures that extend across a waterway. *See* 33 U.S.C. § 403b ("a dock or a boat launching facility").

Corps regulations and precedent confirm the Act is focused on *permanent* structures. The Corps itself interprets "structure" to include "permanent mooring structure[s]" and "permanently moored floating vessel[s]." 33 C.F.R. § 322.2(b). Courts have long construed Section 10 the same way—as covering structures "permanent in nature." *United States v. Burns*, 54 F. 351, 363 (C.C.D. W.Va. 1893). *See, e.g.*, *United States v. Estate of Boothby*, 16 F.3d 19, 21 (1st Cir. 1994); *United States v. Boyden*, 696 F.2d 685, 687 (9th Cir. 1983); *United States v. Oak Beach Inn Corp.*, 744 F. Supp. 439, 444 (S.D.N.Y. 1990); *United States v. Bridgeport Towing Line*, 15 F.2d 240, 240 (D. Conn. 1926); *Phenix Constr. Co. v. Cornell Steamboat Co.*, 103 N.E. 891 (N.Y. 1913). From its earliest days, Section 10 and its predecessor were "intended

to apply to all obstructions of a permanent character." *United States v. Hall*, 63 F. 472, 474 (1st Cir. 1894).

By design, however, Texas's buoys are impermanent and incapable of crossing the current as presently deployed. *See* Tr. 95-96; ROA.1274, 1284-85. The buoy system is unquestionably temporary—not permanent. Texas's ability to move the barrier closer to the Texas border shows that it can be moved in a matter of days. Tr. 102-03. At the same time, however, the buoy system cannot be moved inadvertently. *Id.* As the buoy system was positioned, so it will remain. It therefore will not stretch across the waterway like the enumerated structures. The buoy system is not an "other structure[]" under the Act.

Surrounding context suggests a clear distinction between "other structures" and "buoys." *See Dubin v. United States*, 143 S. Ct. 1557, 1566 (2023). Start with the Act itself, which "must be read as a whole," harmonizing "individual terms or phrases." *Sealed Appellee 1 v. Sealed Appellant 1*, 767 F.3d 418, 421 (5th Cir. 2013). Other provisions of the Act demonstrate that Congress knew how to use the term *buoy* when it wanted to. Section 14, for example, classes "buoys" as an "established marker[]" (such as a boundary mark or tide gauge) and distinguishes it from a "work[]" (such as a pier or wharf). 33 U.S.C. § 408(a). It seems Congress views buoys as decidedly *unlike* the structures enumerated in Section 10.

Or take Section 15, which requires the owner of a sunken vessel to flag the site with "a buoy or beacon." 33 U.S.C. § 409. It does not require Corps pre-approval. *Id.* (operator of sunken craft "shall . . . immediately mark it with a buoy"). This not only indicates that buoys are different from other structures. It also subjects them to

a diametrically opposed rule: Section 10 prohibits "other structures" globally unless approved by federal officials. Section 15 mandates placing "buoys" in navigable waters even without obtaining federal approval. In other words, the latter provision says "buoys" may be placed without the sorts of restrictions that the former provision imposes on "other structures." It simply cannot be, then, that buoys are covered by Section 10 and thus permitted only "on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army." The obvious way to read Section 10 and Section 15 harmoniously is to recognize that "buoys" are not "other structures."

Bilateral treaties with Mexico suggest the same thing. For more than 150 years the US and Mexico have guaranteed: (1) a general right to navigate (2) up and down the Rio Grande (3) where it is actually navigable. Simultaneously, those agreements bless buoy systems. The 1944 US-Mexico treaty requires placing "buoys" in "a practicable and convenient line" between the countries in certain places along the Rio Grande. 1944 Treaty, art. 21. Such a buoy system, moreover, can properly serve not only to assist navigation, but also to "*mark the boundary* for the application of the customs and police regulations of each country." *Id.* (emphasis added). This is consistent with the same treaty's navigability guarantee, *id.* art. 3, because buoys (including buoy systems) are not "obstructions" or "structures" prohibited by the Act. But even assuming some conflict, the later-enacted 1944 Treaty controls over the Act's circa-1899 prohibition. *See Cook v. United States*, 288 U.S. 102, 118-19 (1933). A string of temporary buoys set parallel to the current therefore cannot violate the Act.

## D. The Court must interpret the Act to avoid—not to conflict with—the Constitution.

Texas has provided the best way to interpret the Act's plain text. *Supra* Part I.A-C. At minimum, however, Texas's reading is not "'plainly contrary to the intent of Congress'" and also comports with the Constitution. *Hersh v. U.S. ex rel. Mukasey*, 553 F.3d 743, 753-54 (5th Cir. 2008) (citation omitted). The US, by contrast, proffers a view of the Act that would exceed any sound conception of Congress's Commerce Clause authority and would snuff out Texas's inherent right to preserve itself as enshrined in the Invasion Clauses. Because no court lightly assumes that Congressmen violated their oaths to uphold the Constitution, this Court must construe the Act to avoid the constitutional conflict the district court invited. *See United States v. Hansen*, 143 S. Ct. 1932, 1946 & n.3 (2023).

**1.** States have an undeniable interest in the waterways that lie within and along their territory. Even "today, States enjoy primary sovereignty over their waters, including navigable waters—stemming from their status as independent sovereigns following Independence, or their later admission to the Union on an equal footing with the original States." *Sackett*, 598 U.S. at 686 (Thomas, J., concurring). Because "[t]he shores of navigable waters, and the soils under them . . . were reserved to the states respectively," *Lessee of Pollard v. Hagan*, 44 U.S. 212, 230 (1845), the federal government "possesses no authority over navigable waters except that granted by the Constitution," *Sackett*, 598 U.S. at 686 (Thomas, J., concurring).

Federal authority, in turn, is granted and limited by the Constitution. Congress's authority to regulate rivers and streams is not "expressly granted in the Constitution,

but is a power incidental to the express 'power to regulate commerce with foreign nations, and among the several states, and with the Indian tribes.'" *Leovy*, 177 U.S. at 632. And because that power is a mere incident, it comprehends the "power to regulate navigation" only "as connected with the commerce with foreign nations, and among the states." *United States v. Coombs*, 37 U.S. 72, 78 (1838) (Story, J.). For any statute touching on navigation to be lawful, there must be a nexus to commerce. *See The Daniel Ball*, 77 U.S. 557, 564-65 (1870). That, of course, is why the Supreme Court for so long determined navigability by reference to actual commercial traffic. *Supra* at 15-16.

Here, the US ignores that limitation and argues that the Act empowers federal officials to regulate waterways even where there is no evidence of present commercial activity or capacity, no evidence of plans for future commercial navigation, and no description of reasonably practicable improvements that could make such navigation possible. *Supra* at 16-20. The district court's acquiescence in that reading and its refusal to demand proof of commercial navigability, ROA.980-82, contravenes not only Section 10's repeated references to "navigable" waters, 33 U.S.C. § 403 ("navigable capacity," "navigable river," "navigable water"), but more fundamentally its *Commerce Clause* grounding, U.S. Const. art. I, § 8, cl.3. As 22 amici Congressmen explained below, ROA.268-84, without requiring a commercial-navigability showing, the constitutional validity of the Act "might well be questioned." *Leovy*, 177 U.S. at 633.

The only commercial activity referenced by the US below was "millions of dollars in illicit commerce . . . crossing the Rio Grande" in Maverick County. ROA.944.

This Court should reject the dubious suggestion that Congress passed the Act so the US could impede Texas's efforts to stop drug smuggling and human trafficking. Human smuggling may be a multi-billion-dollar business for cartels, Stephen Dinan, *$20 Billion Payday: Biden's Border Surge Sends Smuggling Prices Soaring*, Wash. Times (Sept. 27, 2022), https://tinyurl.com/5a7mf6dd, but criminal activity is not commerce for constitutional purposes, *see Morrison*, 529 U.S. at 609-17. And Congress's power to regulate commerce "assumes there is already something to be regulated." *NFIB*, 567 U.S. at 550. Determining the outer reaches of the Commerce Clause is *not* an exercise in flights of imagination.

Although the US repeatedly points to *Appalachian Power* for federal authority over waterways that could become commercially navigable, that decision eschewed announcing any hard and fast "test," 311 U.S. at 404, and it reaffirmed older cases like *Rio Grande, id.* at 407 n.26. In any event, the district court's decision finding Corps jurisdiction here without even those safeguards provided in *Appalachian Power, see id.* at 406, 417, would be an unprecedented extension of already questionable precedent, *supra* at 18-19. This Court need not—and should not—adopt a view of the Act so completely untethered from interstate and foreign commerce.

**2.** In addition to reading the Act to exceed Congress's power to pass it, the decision below also vitiated a right the Constitution expressly reserved to the States. Upon joining the Union, "the States did not part with that power of self-preservation which must be inherent in every organized community." *Smith v. Turner*, 48 U.S. 283, 400 (1849) (McLean, J.). After all, "[t]he Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States." *Texas v. White*,

74 U.S. 700, 725 (1868). To that end, it provides that "[n]o state shall, without the Consent of Congress, . . . engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay." U.S. Const. art. I, § 10, cl.3. It also provides that the "United States . . . shall protect each [State] against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence." U.S. Const. art. IV, § 4.

The parties agree that whether there is an "invasion" that justifies taking measures under either clause presents a nonjusticiable political question. *See* ROA.744-45, 916-18. That is because "the nature of the power itself" is committed to executive discretion. *Sterling v. Constantin*, 287 U.S. 378, 399 (1932). For this reason, as the US put it, "there are no manageable standards to ascertain whether or when an influx of illegal immigrants should be said to constitute an invasion." ROA.745 (citing *California v. United States*, 104 F.3d 1086, 1090-91 (9th Cir. 1997); *New Jersey v. United States*, 91 F.3d 463, 469-70 (3d Cir. 1996); *Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996); *Chiles v. United States*, 69 F.3d 1094, 1097 (11th Cir. 1995)).

The *only* question here, then, is whether the States have the same kind of power when faced with an invasion as the federal government has. They most certainly do, as even the district court recognized. *See* ROA.999 n.29 ("The Court notes that Texas has the right to defend itself."). For one thing, States—like other sovereigns—have "inherent power to protect their territory." *Arizona*, 567 U.S. at 419 (Scalia, J., concurring in part and dissenting in part); *cf. United States v. Cooley*, 141 S. Ct. 1638, 1643 (2021) (Indian tribes "retain inherent power" to address conduct

that "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe").

The Constitution memorializes that inherent power in the ratified text. If "actually invaded, or in such imminent Danger as will not admit of delay," States *may* take action even "without the Consent of Congress." U.S. Const. art. I, § 10, cl.3; *Sveen v. Melin*, 138 S. Ct. 1815, 1826–27 (2018) (Gorsuch, J., dissenting). And Congress cannot countermand such state action by statute as it can *other* state action. *See* U.S. Const. art. I, § 10, cl.2 (subjecting state tax laws "to the Revision and Controul of the Congress"). Article IV obliges the federal government to protect each State "against Invasion[] and . . . domestic Violence." U.S. Const. art. IV, § 4. On its face, this provision imposes an obligation on the federal government—not a limitation on States. But it also establishes two different rules for dealing with two different scenarios. For a "domestic" attack, States may seek help from the federal government ("on Application of the Legislature, or of the Executive"). *Id.* For an "Invasion," however, States need not invite federal protection. *Id.* Together, the Invasion Clauses memorialize concurrent federal and state authority to repel invasions.

Founding-era sources support this conclusion. In the Virginia ratifying convention, James Madison "perceive[d] no competition in these clauses"—that is, Article I, § 10, cl.3 and Article IV, § 4. ROA.869. Instead, they attest "to a concurrence of the power" between federal and state governments. ROA.869. As Madison put it: "Does this bar the States from calling forth their own militia? No—but it gives them a *supplemental* security to suppress insurrections and domestic violence." ROA.869 (emphasis added). The Federalist Papers likewise took for granted that States had

independent authority to defend themselves: "If the interposition of the general government should not be needed"—because a State could handle the matter itself under Article I, § 10, cl.3—the provision for federal intervention under Article IV, § 4 "will be a harmless superfluity." The Federalist No. 43. The framers thus recognized that when it came to repelling an invasion, the Constitution permitted a State to work with the federal government. If the federal government proved unnecessary or unwilling, the State could work alone instead.

Supreme Court precedent, unsurprisingly, confirms that federal and state governments exercise the *same* power. Just as the President has exclusive "authority to decide whether the [foreign or domestic] exigency has arisen" for purposes of Article I, § 8, cl.15, *Martin v. Mott*, 25 U.S. 19, 29-30 (1827) (Story, J.), so too the State has exclusive authority to decide whether the foreign or domestic exigency has arisen under Article I, § 10, cl.3, *Moyer v. Peabody*, 212 U.S. 78, 83-85 (1909) (Holmes, J.). And because "the nature of the power itself" "necessarily" confers discretion, federal and state exercises of this power are subject only to the *same* good-faith constraint—not judicial second-guessing. *Sterling*, 287 U.S. at 399.

Other States may choose to allocate their self-defense power differently. But as for Texas, the power to determine whether it has been "actually invaded" or otherwise faces "imminent Danger as will not admit of delay," U.S. Const. art. I, § 10, cl.3, is vested in the Governor as the commander-in-chief of Texas's militia, *see* Tex. Const. art. IV, § 7; *see also Abbott v. Biden*, 70 F.4th 817, 822-23, 842 (5th Cir. 2023). Governor Abbott has asserted this power here because the US has unconstitutionally refused to protect Texas—and, more importantly, its citizens—against the dangers

36

posed by transnational cartels. The district court had no basis to second-guess Governor Abbott's determination that a sudden influx into Texas of hostile non-state actors perpetrating human slavery, violent assaults, weapon- and drug-smuggling, and other crimes on an unprecedented scale justify Operation Lone Star's initiatives. Nor did it have any basis to ignore the US's concession that there are no manageable standards to even perform such second-guessing.

In any event, the unprecedented crisis that the federal government refuses to acknowledge—the sudden and mass entry of criminal cartels trafficking human beings, drugs, and weapons—plainly triggers Texas's self-defense authority. The US protests that Texas's sovereign power is limited to repelling invasions by state actors. That is obviously wrong. For one thing, the Constitution speaks disjunctively about state authority to handle an "invasion" *or* "imminent Danger." U.S. Const. art. I, § 10, cl.3. Texans living on the border today know what "imminent Danger" feels and looks like.

For another thing, nothing in the text limits this self-defense authority to only *some* kinds of invasions. Contemporaneous dictionaries show that "to invade" had a broad sweep. *See* Noah Webster, A Compendious Dictionary of the English Language 164 (1806) ("to enter or seize in hostile manner"); 1 Noah Webster, American Dictionary of the English Language 113 (1828) ("to enter as an enemy, with a view to conquest or plunder; to attack"; "To attack; to infringe; to encroach on; to violate"). So, too, did "invasion." *See* Johnson's Dictionary (Boston 1828) ("hostile entrance" or "an attack"). And "hostile" was not confined only to diplomatic hostility. *Id.* ("Adverse; opposite; suitable to an enemy." or "1. A publick foe . . . 2. A

private opponent; an antagonist . . . 3. Any one who regards another with malevolence; not a friend . . . ”).

Any notion that "invasion" hinges on the difference between state actors and non-state actors would seem wholly artificial to the Framers. After all, the Constitution gives Congress power to "grant Letters of Marque and Reprisal." U.S. Const. art. I, § 8, cl.11. And the defining trait of such letters is that they authorize *private actors* to cross international borders to commit hostile acts. *See Brown v. United States*, 12 U.S. 110 (1814); 1 Blackstone, Commentaries *249-51. In the immediate aftermath of the Constitution's ratification, Congress exercised this power to authorize private citizens to engage in piracy against French ships. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 267 (1990) (citing 1 Stat. 579); *see also* 4 Blackstone, Commentaries *86.

A historical practice of American governments engaging with non-state actors continued from the founding up to the present day. James Madison explained at the Virginia Ratifying Convention how it "actually happened at Alexandria" that the state militia were used "to suppress smugglers . . . too formidable for the civil power to overcome." 11 James Madison, Debate from Virginia Ratifying Convention (June 16, 1788). Joseph Story conceived of the Whiskey Rebellion—an uprising of non-state actors in Pennsylvania between 1791 and 1794—as an insurrection. 3 Story, *supra*, § 1808; *see also SBC Commc'ns, Inc. v. FCC*, 154 F.3d 226, 236 n.17 (5th Cir. 1998) (quoting 4 Annals of Cong. 788 (1794)) (same). In 1916, the US sent forces into Mexico to pursue a band of non-state actors because the Mexican government "was incapable of policing" its own border and tracking down Pancho Villa. John

S.D. Eisenhower, Intervention! The United States and the Mexican Revolution 1913-1917, at 227-50 (1993). After 9/11, Congress authorized the use of military force against not only responsible "nations" but also "organizations" and "persons." Authorization for the Use of Military Force, Pub. L. 107-40, § 2(a), 115 Stat. 224 (Sept. 18, 2001). The Obama Administration rightly observed that "[t]he inherent right of self-defense is not restricted to threats posed by States." Report on the Legal and Policy Frameworks Guiding the United States' Use of Military Force 9 (2016).

Since the district court consulted extra-record evidence, ROA.966-67 (citing Michel Martin, *How Do Illegal Drugs Cross the U.S.-Mexico Border?*, NPR (April 6, 2019), https://tinyurl.com/2ptsb6sb), it is worth noting that most Americans agree the crisis along our southern border *is* an invasion. *See* Joel Rose, *A Majority of Americans See an 'Invasion' at the Southern Border, NPR Poll Finds*, NPR (Aug. 18, 2022), https://tinyurl.com/2p84ctzy; *cf. Arizona*, 567 U.S. at 436 (Scalia, J., concurring part and dissenting in part) (Arizona's "citizens feel themselves under siege by large numbers of illegal immigrants who invade their property, strain their social services, and even place their lives in jeopardy.").

## II. The US Also Failed to Carry Its Burden Under the Remaining Three Elements of *Winter*'s Preliminary-Injunction Standard.

The US was wrong to insist that it was excused from proving that it would suffer irreparable harm, that the public interest favored an injunction, and that the equities favored an even more porous border. ROA.746-47. And the district court abused its discretion in concluding those factors favored extraordinary relief. ROA.1001-04.

## A.  All of *Winter*'s requirements apply to all plaintiffs—including the federal government.

At the outset, this Court may dismiss any suggestion that the US was absolved of the preliminary-injunction showing that applies to other plaintiffs. *Contra* ROA.999-1000. Texas readily acknowledges that the likelihood-of-success prong is often the most important consideration when assessing whether to award a preliminary injunction, *Mock v. Garland*, 75 F.4th 563, 587 n.60 (5th Cir. 2023), especially because the US is likely to *lose* on the merits here, *supra* Part I. But the US's truly bold claim—that it need not meet the final three *Winter* prongs anytime it "seeks an injunction enforcing a public interest statute"—is a bridge too far. ROA.86.

The US cited no decision of this Court supporting that proposition postdating the Supreme Court's 2008 decision in *Winter*. *See* ROA.77-78 (citing *United States v. Marine Shale Processors*, 81 F.3d 1329 (5th Cir. 1996), and *United States v. FDIC*, 881 F.2d 207 (5th Cir. 1989)). So, to create a novel exception, the US and the district court had to go looking for non-binding decisions outside this circuit. *See* ROA.82-83, 999-1001. But even taking those decisions for all they're worth, not one of them involved a dispute like this one, pitting the interests of the US against *another sovereign*. The US may think it is entitled to "special solicitude" in the *Winter* analysis, but it has done nothing to show why States on the other side of the "*v.*" are not entitled to the same. *Texas v. United States*, 50 F.4th 498, 514 (5th Cir. 2022).

In any event, this argument sweeps much too far. In most cases where the US seeks an injunction, "a public interest statute is at issue." ROA.83. Yet the US is *still* required to satisfy all four *Winter* elements. *See, e.g.*, *United States v. Billingsley*, 615

F.3d 404, 406-07, 408 n.4 (5th Cir. 2010) ("the well known four-factor test" applied to US suit for injunction under Fair Housing Act). That the "government [is] seeking [injunctive] relief" is thus "[o]ne factor informing the public interest" element, not a basis to shirk that element (and others) entirely. *FTC v. Credit Bureau Center, LLC*, 937 F.3d 764, 793 (7th Cir. 2019). Surely the US does not think the Rivers and Harbors Act is more of a public interest statute than the Fair Housing Act. Like any other litigant, the US needed to make each of *Winter*'s four preliminary-injunction showings.

## B. The US failed to show it would suffer irreparable harm absent a preliminary injunction.

The US proved no irreparable harm. The buoys occupy "de minimis" space in a 1,000-foot span of a 1,200-mile river. ROA.1275, 1401. They were deployed over two weeks before the US sued. ROA.1285. And the US's own evidence showed commercial shipping is nonexistent on this part of the river. ROA.1273, 1285; *accord* ROA.1612-18. Because there is no port of entry at the site of the buoy system, navigation across the river from Mexico into the US is completely illegal. 8 U.S.C. § 1325; 19 U.S.C. § 1459. The district court clearly erred in stating that the buoys posed an "impairment to free and safe navigation." ROA.1003.

The US tried to bridge this gap by relying on vague diplomatic tensions with Mexico. During the preliminary-injunction hearing, a low-level federal employee testified Mexico has expressed "concerns" that Texas is preventing the US from complying with treaty obligations. Tr. 63-67. But despite insisting that border-boundary compliance is "a top-priority issue," ROA.746-47, its own declarants establish that

the US is four years late in complying with its obligation to delineate the international boundary. *Supra* at 10-11. Mexico, for its part, has consistently refused to honor its water-allocation commitments, to the harm of Texans. *See* Tr. 75-76. These years-long (and ongoing) failures demonstrate that neither government thought treaty compliance was "a top-priority issue." Assuming the two countries have suddenly decided to take treaties seriously, the federal government cannot stop States from doing whatever "may upset foreign powers." *Arizona*, 567 U.S. at 423-24 (Scalia, J., concurring in part and dissenting in part).

In any case, the district court rightly noted that all "international part-ners . . . have some disagreements." Tr. 77. And when it comes to the US-Mexico relationship, cabinet-level officials tell a different story than the low-level witness called to testify. National Security Advisor Sullivan called US-Mexico relations a "strong and enduring bond[] of friendship and partnership." ROA.1775. And Secre-tary of State Blinken said he couldn't recall a time of "stronger partnership and col-laboration" between the countries, even though "the multiplicity of issues and their complexity is also greater than ever," and even though the buoys had already been in place for weeks. ROA.1777. According to the Biden Administration, relations have never been better.

This Court should take the US at its word. In balancing the equities, the only thing on the US's side of the scale is alleged friction in US-Mexico relations—some-thing entirely at odds with the federal government's own neglect of treaty obligations and its principal officers' assertions that relations have never been stronger. "There [are] no two international partners that don't have some disagreements," as the

district court said, "and that's a fact of life," Tr. 77—not a clear ground for mandatory injunctive relief, *see Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976).

## C. The district court also erred in weighing the equities and public interest, which clearly favored Texas.

Finally, the district court erred in failing to conclude that countervailing equities and public interests overwhelmingly favor Texas. ROA.1002-04. It's in the public interest to reduce the flow of fentanyl, to combat human trafficking, to protect Texans from unlawful trespass and violent attacks on their property by criminal cartels, and to minimize the risks to migrants of drowning while journeying to and through illegal entry points. *Cf.* ROA.1273, 1275. When Texas raised such issues, they were wrongly lumped together as "political" issues that were "of [no] concern to the Court." *See, e.g.*, Tr. 73, 76, 90. But the public interest clearly favored the buoys, which have effectively eliminated dangerous crossings in one of the most active drug-smuggling and human-trafficking hotspots on the river. *See* ROA.1273-76, 1284, 1286.

As discussed above, millions of individuals and hundreds of millions of fatal doses of fentanyl have crossed the State's border with Mexico because of the federal government's refusal to secure it. Even the Biden Administration declared "a national emergency to deal with the threat" of fentanyl and found that "the trafficking into the United States of illicit drugs, including fentanyl and other synthetic opioids, is causing the deaths of tens of thousands of Americans annually." Exec. Order No. 14059, 86 Fed. Reg. 71549, 71549 (Dec. 15, 2021). The State has a strong interest in protecting its citizens from such irreparable harms.

Meanwhile the purported harms the US identifies—potential hindrances to the US's relationship with Mexico and minor impairments to navigation on a non-navigable segment of the Rio Grande—are incommensurate with that interest. Absent the most urgent and compelling command of the Constitution or federal law, federalism concerns strongly counsel against any federal court injunction that would thwart a State and its commander-in-chief in their efforts to respond to a deadly crisis. *See New York v. New Jersey*, 598 U.S. 218, 225 (2023) (refusing to interpret compact to "delegat[e] . . . a fundamental aspect of a State's sovereign power—its ability to protect the people, property, and economic activity within its borders").

What's more, the buoy system protects not only the safety of the State and its citizens, but also aliens attempting to enter Texas. The buoy system is designed to save lives and direct aliens to appropriate ports of entry at bridges while deterring unlawful, dangerous crossings through the Rio Grande. ROA.1284. Aliens who enter the US and Texas at ports of entry—rather than attempting an illegal and dangerous water crossing on the world's deadliest land border—may enter lawfully if allowed to do so and in any event do not risk death or drowning while illegally crossing the Rio Grande. ROA.326-28, 1284. Nobody drowns on a bridge. Rather than supporting the US, humanitarian concerns disfavored a preliminary injunction.

Contrary to the district court's suggestion, there was no evidence that the barriers are "a threat to human life." ROA.1003. Indeed, the only evidence in the record attests that the barriers *reduce* the threat to human life. ROA.1274-76. The district court erroneously relied on false news reports repeated in Mexican press releases, suggesting that the barriers had something to do with deaths in the river "just

upstream" of the barriers. ROA.987. Because this incident, and the issue of human safety, was not raised by any evidence the US offered, at the very least this Court should vacate the injunction and give Texas a chance to correct the district court's misunderstanding.

## III. Even If the US Could Somehow Satisfy *Winter*, the District Court Here Distorted the Law of Preliminary Injunctions.

Disregarding Texas's evidence foreclosing injunctive relief, the district court went outside the record to find facts of its own. In the process, it also turned the "extraordinary remedy" of a preliminary injunction into a remedy that need not even meaningfully engage with the plaintiff's theory of harm.

### A. The district court imagined evidence that was not there and ignored the evidence Texas introduced.

Despite holding a preliminary-injunction hearing, the district court made clear that it was not content to rest on the evidence the parties adduced. Throughout its opinion, the court took "judicial notice" of extra-record assertions—some of which, are just plain false. *See* ROA.965-66 n.2, 976-77, 986-87 & n.19, 1003.

For example, the district court felt comfortable repeating a false claim that the buoy system has *killed* people: Pointing to humanitarian concerns about "possible loss of life," the district court ruminated that "such harm may have already come to bear, given the discovery of two bodies near the buoy system in August 2023." ROA.1002-03. News reports and rumor, *see, e.g.*, Comunicado No. 309, Secretaría de Relaciones Exteriores, Gobierno de Mexico (Aug. 2, 2023), https://tinyurl.com/4wp43rtn, are no substitute for sworn testimony. Uncontradicted

testimony confirmed that the buoys are under constant surveillance, and that no one has been harmed trying to cross them. ROA.326-28. A careful reader of news reports could have learned that the deceased individuals tragically drowned miles upstream before floating into the buoy system.

To take another example, the district court made predictions about near-term rainfall in Texas to bolster its prediction that this dry riverbed could someday be made navigable by "El Nino." ROA.977. But the US produced no meteorologist to testify about weather patterns, and no limnologist to testify about how the Rio Grande's water levels might change.

Similarly, when forced to acknowledge the epidemic of dangerous drugs flowing across the border, the district court took "judicial notice" of the notion that most illegal drugs cross at ports of entry. ROA.966-67. But it never stopped to consider how the need to divert law-enforcement resources to illegal river crossings has reduced the ability to detect drug smuggling at ports of entry.

At the same time, the district court refused to allow Texas to put some facts into the record and ignored other facts the State managed to introduce. The Court never once acknowledged that the US's "current" boundary line is invalid under controlling treaties. ROA.986-87 n.19. It refused to let Texas introduce evidence of how the public interest is served by measures the State has taken. ROA.995 n.28. What's worse, it then *faulted* the State for not "present[ing] any credible evidence" with respect to those benefits that it was prevented from discussing at the preliminary-injunction hearing. ROA.1004. Nor is it true that "those topics were beyond the [US] witness's knowledge." ECF 30 at 25. After all, the US tendered Ms. Quam as

*the authority* on US-Mexico relations and "basically anything that impacts the border itself." Tr. 57-61.

## B. Awarding an injunction that in no way addresses the plaintiff's purported injury attests to the absence of irreparable harm.

Finally, the district court's own injunction demonstrates that the US's claims need not be taken seriously. As the plaintiff here, the US had to show it would suffer irreparable harm *absent* a preliminary injunction. *Winter*, 555 U.S. at 20. And a court issuing an injunction must be careful to tailor the relief so that it is "no more burdensome to the defendant than necessary" to remedy the plaintiff's injury. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). The US in this case claimed it was irreparably harmed by the very presence of the buoys in the water and the "humanitarian threat" they pose for as long they remain there.

The district court's injunction, however, permits the buoys to remain in the water and does not order their "removal entirely from the river." ROA.1006 & n.32. It therefore invites the very harms that the US says entitled it to a preliminary injunction in the first place. The fact that the district court never saw fit to fix those "harms" is good evidence they are illusory. Perhaps it is unsurprising that, in opposing a stay, the US has shifted its claim of purported harms by noting that Mexico has spoken approvingly of the district court's injunction. ECF 30 at 28. The US's *real* injury, it seems, is any impediment to President Biden's desire to sell border States down the river to appease America's treaty-flouting neighbor. That "harm" pales in comparison when balanced against Texas's bona fide public interest concerns and the broader equities that Texas's border efforts seek to secure. *Supra* Part II.B-C.

## Conclusion

The Court should reverse the order granting a preliminary injunction.

Respectfully submitted.

/s/ Lanora C. Pettit

|  |  |
|---|---|
| Ken Paxton | Lanora C. Pettit |
| Attorney General of Texas | Principal Deputy Solicitor General |
|  | Lanora.Pettit@oag.texas.gov |
| Brent Webster | |
| First Assistant Attorney General | Ari Cuenin |
|  | Deputy Solicitor General |

Coy Allen Westbrook
Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Munera Al-Fuhaid
Assistant Attorney General

Counsel for Defendants-Appellants

## CERTIFICATE OF SERVICE

On September 21, 2023, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Lanora C. Pettit
LANORA C. PETTIT

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,998 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Lanora C. Pettit
LANORA C. PETTIT