No. 23-50632

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

*Defendant-Appellee,*

*v.*

GREG ABBOTT, IN HIS CAPACITY AS GOVERNOR OF THE STATE OF TEXAS; STATE OF TEXAS,

*Plaintiffs-Appellants.*

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

## RECORD EXCERPTS FOR APPELLANTS

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

LANORA C. PETTIT
Principal Deputy Solicitor General
Lanora.Pettit@oag.texas.gov

ARI CUENIN
Deputy Solicitor General

COY ALLEN WESTBROOK
Assistant Attorney General

MUNERA AL-FUHAID
Assistant Attorney General

Counsel for Defendants-Appellants

# TABLE OF CONTENTS

1.  Docket sheet (ROA.1-14) ................................................................. Tab 1
2.  Notice of appeal (ROA.1007-08) .................................................... Tab 2
3.  Challenged order (ROA.965-1006) ................................................. Tab 3

# CERTIFICATE OF SERVICE

On September 21, 2023, these record excerpts were served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Lanora C. Pettit
LANORA C. PETTIT

**TAB 1: DOCKET SHEET (ROA.1-14)**

DH,INTAPP

# U.S. District Court [LIVE]
# Western District of Texas (Austin)
# CIVIL DOCKET FOR CASE #: 1:23-cv-00853-DAE

United States of America v. Abbott et al
Assigned to: Judge David A. Ezra
 Related Case:  1:23-cv-00836-RP
 Case in other court:  USCA Fifth Circuit, 23-50632
Cause: 33:403 Obstruction of Navigable Waters

Date Filed: 07/24/2023
Jury Demand: None
Nature of Suit: 893 Environmental Matters
Jurisdiction: U.S. Government Plaintiff

**Plaintiff**

**United States of America.**                    represented by   **Andrew D. Knudsen**
U.S. Department of Justice, Environment &
Natural Resources
P.O. Box 7611
Washington, DC 20044
202-353-7466
Email: andrew.knudsen@usdoj.gov
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brian H. Lynk**
U.S. Department of Justice
Environmental Defense Section
P.O. Box 23986
Washington, DC 20026-3986
(202) 514-6187
Fax: (202) 514-8865
Email: brian.lynk@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kimere J Kimball**
DOJ-Enrd
Environment and Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044-7611
202-514-2285
Fax: 202-514-8865
Email: kimere.kimball@usdoj.gov
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Landon Allen Wade**
United States Attorney's Office
903 San Jacinto Blvd.

Suite 334
Austin, TX 78701
512-370-1255
Email: landon.wade@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Mary F. Kruger**
United States Attorneys Office
Chief, Civil Division
601 NW Loop 410, Suite 600
San Antonio, TX 78216
210-384-7300
Fax: 210/384-7322
Email: mary.kruger@usdoj.gov
*ATTORNEY TO BE NOTICED*

**James Edward Dingivan**
U.S. Attorney's Office
601 NW Loop 410, Suite 600
San Antonio, TX 78216
210-384-7372
Email: james.dingivan@usdoj.gov
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Greg Abbott**
*in his capacity as Governor of the State of Texas*

represented by **Ari Cuenin**
Office of the Attorney General of Texas
209 W 14 St., 7th Fl
Austin, TX 78701
512-936-1827
Fax: 512-474-2697
Email: ari.cuenin@oag.texas.gov
*ATTORNEY TO BE NOTICED*

**Monroe David Bryant , Jr**
Office of the Texas Attorney General
Special Litigation Division
P.O Box 12548
(MC-009)
Austin, TX 78711-2548
512-936-2266
Fax: 512-457-4110
Email: david.bryant@oag.texas.gov
*ATTORNEY TO BE NOTICED*

**Munera Al-Fuhaid**
Office of the Attorney General
PO Box 12548
Austin, TX 78711-2548
512-936-2176

Email: munera.al-fuhaid@oag.texas.gov
*ATTORNEY TO BE NOTICED*

**Patrick K. Sweeten**
Office of the Attorney General of Texas
Special Counsel Unit
P.O. Box 12548
Mc-009
Austin, TX 78711-2548
512-463-4139
Fax: 512-457-4110
Email: Patrick.Sweeten@oag.texas.gov
*ATTORNEY TO BE NOTICED*

**Ryan Daniel Walters**
Office of the Texas Attorney General
Special Litigation Division
P.O. Box 12548 (MC 009)
Austin, TX 78711-2548
512-936-2714
Email: ryan.walters@oag.texas.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**The State of Texas**                represented by   **Ari Cuenin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Monroe David Bryant , Jr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Munera Al-Fuhaid**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Patrick K. Sweeten**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan Daniel Walters**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Jodey Arrington**                  represented by   **Chance D. Weldon**
Texas Public Policy Foundation
901 Congress Avenue
Austin, TX 78701
512-472-2700
Email: cweldon@texaspolicy.com
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Robert E Henneke**
Texas Public Policy Foundation
901 Congress Avenue
Austin, TX 78701
512-472-2700
Fax: 512-472-2728
Email: rhenneke@texaspolicy.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Dr. Brian Babin**                    represented by    **Chance D. Weldon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert E Henneke**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Cong. Andy Biggs**                    represented by    **Chance D. Weldon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert E Henneke**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Cong. Vern Buchanan**                    represented by    **Chance D. Weldon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert E Henneke**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Michael C. Burgess**                    represented by    **Chance D. Weldon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert E Henneke**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**Katherine Kat Cammack**                    represented by    **Chance D. Weldon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert E Henneke**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**John Carter**                    represented by    **Chance D. Weldon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert E Henneke**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**Michael Cloud**                    represented by    **Chance D. Weldon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert E Henneke**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**Jeff Duncan**                    represented by    **Chance D. Weldon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert E Henneke**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

| | | |
|---|---|---|
| **Jake Ellzey** | represented by | **Chance D. Weldon**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Robert E Henneke**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **Lance Gooden** | represented by | **Chance D. Weldon**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Robert E Henneke**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **Sam Graves** | represented by | **Chance D. Weldon**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Robert E Henneke**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **Clay Higgins** | represented by | **Chance D. Weldon**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Robert E Henneke**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **Ronny L Jackson** | represented by | **Chance D. Weldon**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Robert E Henneke**<br>(See above for address) |

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Nathaniel Moran**                     represented by     **Chance D. Weldon**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Robert E Henneke**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Amicus**

**August Pfluger**                      represented by     **Chance D. Weldon**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Robert E Henneke**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Amicus**

**David Rouzer**                        represented by     **Chance D. Weldon**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Robert E Henneke**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Amicus**

**Chip Roy**                            represented by     **Chance D. Weldon**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Robert E Henneke**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Amicus**

**Keith Self**                          represented by     **Chance D. Weldon**
                                                           (See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert E Henneke**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Pete Sessions**                    represented by  **Chance D. Weldon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert E Henneke**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Beth Van Duyne**                   represented by  **Chance D. Weldon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert E Henneke**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Roger Williams**                   represented by  **Chance D. Weldon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert E Henneke**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Immigration Reform Law Institute**  represented by  **Matt A. Crapo**
Immigration Reform Law Institute
25 Massachusetts Ave., NW
Ste 335
Washington, DC 20001
571-435-3582
Fax: 202-464-3590
Email: mcrapo@irli.org
*LEAD ATTORNEY*

| | | |
|---|---|---|
| 07/27/2023 | 8 (p.170) | NOTICE of Attorney Appearance by Monroe David Bryant, Jr on behalf of Greg Abbott, The State of Texas . Attorney Monroe David Bryant, Jr added to party Greg Abbott(pty:dft), Attorney Monroe David Bryant, Jr added to party The State of Texas (pty:dft) (Bryant, Monroe) (Entered: 07/27/2023) |
| 07/29/2023 | 9 (p.172) | MOTION to Appear Pro Hac Vice by Brian H. Lynk *for Andrew Knudsen* (Fee waived) by on behalf of United States of America.. (Lynk, Brian) Modified on 7/31/2023 (jv2). (Entered: 07/29/2023) |
| 07/31/2023 | 10 (p.177) | ORDER GRANTING 9 (p.172) Motion to Appear Pro Hac Vice for Attorney Andrew D. Knudsen for United States of America. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center. Signed by Judge Robert Pitman. (jv2) (Entered: 07/31/2023) |
| 07/31/2023 | 11 (p.178) | Opposed MOTION for Discovery *on an Expedited Basis* by Greg Abbott, The State of Texas. (Attachments: # 1 (p.15) Proposed Order)(Bryant, Monroe) (Entered: 07/31/2023) |
| 08/01/2023 | 12 (p.189) | ORDER that this action is TRANSFERRED to Judge David A. Ezra for all proceedings. Signed by Judge Robert Pitman. (jv2) (Entered: 08/01/2023) |
| 08/01/2023 | 13 (p.190) | ORDER re 11 (p.178) Opposed MOTION for Expedited Discovery filed by The State of Texas. Plaintiff is ORDERED to file a response, if any, on or before 12:00 p.m. on 08/03/2023. Signed by Judge David A. Ezra. (jv2) (Entered: 08/01/2023) |
| 08/02/2023 | 14 (p.191) | Memorandum in Opposition to Motion, filed by United States of America., re 11 (p.178) Opposed MOTION for Discovery *on an Expedited Basis* filed by Defendant The State of Texas, Defendant Greg Abbott (Attachments: # 1 (p.15) Attachment 1: Pre-filing correspondence of counsel)(Lynk, Brian) (Entered: 08/02/2023) |
| 08/02/2023 | 15 (p.209) | NOTICE of Attorney Appearance by Patrick K. Sweeten on behalf of Greg Abbott, The State of Texas . Attorney Patrick K. Sweeten added to party Greg Abbott(pty:dft), Attorney Patrick K. Sweeten added to party The State of Texas (pty:dft) (Sweeten, Patrick) (Entered: 08/02/2023) |
| 08/02/2023 | 16 (p.211) | NOTICE *of Motion to Consolidate in Related Case* by Greg Abbott, The State of Texas (Attachments: # 1 (p.15) Exhibit)(Bryant, Monroe) (Entered: 08/02/2023) |
| 08/03/2023 | 17 (p.225) | NOTICE of Attorney Appearance by Ryan Daniel Walters on behalf of Greg Abbott, The State of Texas . Attorney Ryan Daniel Walters added to party Greg Abbott(pty:dft), Attorney Ryan Daniel Walters added to party The State of Texas (pty:dft) (Walters, Ryan) (Entered: 08/03/2023) |
| 08/03/2023 | 18 (p.227) | ORDER FOR BRIEFING AND SETTING HEARING re: 5 (p.67) Opposed MOTION for Preliminary Injunction : for 8/22/2023 at 09:00 AM before Judge David A. Ezra. Signed by Judge David A. Ezra. (cc3) (Entered: 08/04/2023) |
| 08/03/2023 | 19 (p.228) | ORDER GRANTING IN PART AND DENYING IN PART 11 (p.178) Opposed MOTION for Discovery on an Expedited Basis. Signed by Judge David A. Ezra. (cc3) (Entered: 08/04/2023) |
| 08/04/2023 | 20 (p.237) | NOTICE of Attorney Appearance by Landon Allen Wade on behalf of United States of America.. Attorney Landon Allen Wade added to party United States of America.(pty:pla) (Wade, Landon) (Entered: 08/04/2023) |

| | | |
|---|---|---|
| 08/04/2023 | 21 (p.239) | MOTION *for Admission Pro Hac Vice (fee waived)* by United States of America.. (Attachments: # 1 (p.15) Exhibit)(Kimball, Kimere) (Entered: 08/04/2023) |
| 08/07/2023 | 22 (p.245) | ORDER GRANTING 21 (p.239) MOTION for Admission Pro Hac Vice as to KIMERE J. KIMBALL. Signed by Judge David A. Ezra. (cc3) (Entered: 08/07/2023) |
| 08/09/2023 | 23 (p.246) | MOTION for Leave to File Amicus Brief by Chance Weldon. by Jodey Arrington, Brian Babin, Andy Biggs, Vern Buchanan, Michael C. Burgess, Katherine Kat Cammack, John Carter, Michael Cloud, Jeff Duncan, Jake Ellzey, Lance Gooden, Sam Graves, Clay Higgins, Ronny L Jackson, Nathaniel Moran, August Pfluger, David Rouzer, Chip Roy, Keith Self, Pete Sessions, Beth Van Duyne, Roger Williams. (Attachments: # 1 (p.15) Exhibit 1, # 2 (p.47) Proposed Order)(Weldon, Chance) (Entered: 08/09/2023) |
| 08/09/2023 | | Text Order GRANTING 23 (p.246) Motion for Leave to File Amicus Brief. Entered by Judge David A. Ezra. (This is a text-only entry generated by the court. There is no document associated with this entry.) (Entered: 08/09/2023) |
| 08/09/2023 | 24 (p.268) | BRIEF of United States Representatives Jodey C. Arrington, et al. as Amici Curiae in Opposition to Plaintiff United States' Opposed Motion for Preliminary Injunction. (jv2) (Entered: 08/09/2023) |
| 08/09/2023 | 25 (p.285) | Unopposed MOTION for Leave to Exceed Page Limitation by Greg Abbott, The State of Texas. (Attachments: # 1 (p.15) Proposed Order)(Sweeten, Patrick) (Entered: 08/09/2023) |
| 08/09/2023 | 26 (p.288) | Response in Opposition to Motion, filed by Greg Abbott, The State of Texas, re 5 (p.67) Opposed MOTION for Preliminary Injunction filed by Plaintiff United States of America. (Attachments: # 1 (p.15) Exhibit, # 2 (p.47) Exhibit, # 3 (p.53) Exhibit, # 4 (p.61) Exhibit, # 5 (p.67) Exhibit, # 6 (p.167) Exhibit, # 7 (p.169) Exhibit, # 8 (p.170) Exhibit, # 9 (p.172) Exhibit, # 10 (p.177) Exhibit, # 11 (p.178) Exhibit, # 12 (p.189) Exhibit, # 13 (p.190) Exhibit, # 14 (p.191) Exhibit, # 15 (p.209) Exhibit)(Sweeten, Patrick) (Entered: 08/09/2023) |
| 08/10/2023 | | Text Order GRANTING 25 (p.285) Defendants' Unopposed Motion for Leave to File Excess Pages. Entered by Judge David A. Ezra. (This is a text-only entry generated by the court. There is no document associated with this entry.) (arlc) (Entered: 08/10/2023) |
| 08/10/2023 | 27 (p.659) | Unopposed MOTION to Stay *Defendants' Deadline to Respond to the Complaint* by Greg Abbott, The State of Texas. (Attachments: # 1 (p.15) Proposed Order)(Walters, Ryan) (Entered: 08/10/2023) |
| 08/14/2023 | 28 (p.662) | ORDER GRANTING 27 (p.659) Defendants' Unopposed Motion for a Stay of Their Deadline to Respond to the Complaint. Signed by Judge David A. Ezra. (jv2) (Entered: 08/14/2023) |
| 08/14/2023 | 29 (p.663) | MOTION to Appear Pro Hac Vice by Matt A. Crapo *in opposition to Plaintiff's motion for preliminary injunction* ( Filing fee $ 100 receipt number ATXWDC-17767707) by on behalf of Immigration Reform Law Institute. (Crapo, Matt) (Entered: 08/14/2023) |
| 08/14/2023 | 30 (p.668) | NOTICE of Attorney Appearance by Paul M. Davis on behalf of Immigration Reform Law Institute, Immigration Reform Law Institute. Attorney Paul M. Davis added to party Immigration Reform Law Institute(pty:am) (Davis, Paul) (Entered: |

| | | |
|---|---|---|
| | | 08/14/2023) |
| 08/14/2023 | 31 (p.670) | Unopposed MOTION for Leave to File Amicus Brief *in opposition to Plaintiff's motion for preliminary injunction* by Matt A. Crapo. by Immigration Reform Law Institute. (Attachments: # 1 (p.15) Brief of Immigration Reform Law Institute as Amicus Curiae in Opposition to Plaintiff's motion for preliminary injunction, # 2 (p.47) Proposed Order)(Crapo, Matt) (Entered: 08/14/2023) |
| 08/15/2023 | 32 (p.691) | NOTICE *of Survey by the International Boundary and Water Commission* by United States of America. (Attachments: # 1 (p.15) Exhibit Supplemental Declaration of Jennifer T. Pena)(Knudsen, Andrew) (Entered: 08/15/2023) |
| 08/15/2023 | | Text Order GRANTING 31 (p.670) Unopposed Motion for Leave to File Amicus Brief. Entered by Judge David A. Ezra. (This is a text-only entry generated by the court. There is no document associated with this entry.) (arlc) (Entered: 08/15/2023) |
| 08/15/2023 | 33 (p.709) | Memorandum of Law in Opposition to Motion, filed by Immigration Reform Law Institute as Amicus Curiae, re 5 (p.67) MOTION for Preliminary Injunction filed by Plaintiff United States of America. (jv2) (Entered: 08/15/2023) |
| 08/15/2023 | 34 (p.724) | ORDER GRANTING 29 (p.663) Motion to Appear Pro Hac Vice for Attorney Matt A. Crapo for Immigration Reform Law Institute. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center Signed by Judge David A. Ezra. (jv2) (Entered: 08/15/2023) |
| 08/15/2023 | 35 (p.725) | Unopposed MOTION for Leave to Exceed Page Limitation by United States of America.. (Attachments: # 1 (p.15) Proposed Order)(Kimball, Kimere) (Entered: 08/15/2023) |
| 08/16/2023 | | Text Order GRANTING 35 (p.725) Unopposed Motion for Leave to File Excess Pages. Plaintiff, the United States, may file a reply in support of its motion for a preliminary injunction up to and including 13 pages. Entered by Judge David A. Ezra. (This is a text-only entry generated by the court. There is no document associated with this entry.) (arlc) (Entered: 08/16/2023) |
| 08/16/2023 | 36 (p.729) | NOTICE of Attorney Appearance by Ari Cuenin on behalf of Greg Abbott, The State of Texas . Attorney Ari Cuenin added to party Greg Abbott(pty:dft), Attorney Ari Cuenin added to party The State of Texas (pty:dft) (Cuenin, Ari) (Entered: 08/16/2023) |
| 08/16/2023 | 37 (p.731) | REPLY to Response to Motion, filed by United States of America., re 5 (p.67) Opposed MOTION for Preliminary Injunction filed by Plaintiff United States of America. (Attachments: # 1 (p.15) Attachment 11, # 2 (p.47) Attachment 12, # 3 (p.53) Attachment 13, # 4 (p.61) Attachment 14, # 5 (p.67) Attachment 15: Shelnutt Decl & Exhibits, # 6 (p.167) Attachment 16, # 7 (p.169) Attachment 17, # 8 (p.170) Attachment 18, # 9 (p.172) Attachment 19: Quam Decl & Exhibit)(Lynk, Brian) (Entered: 08/16/2023) |
| 08/18/2023 | 38 (p.892) | ORDER RESETTING PRELIMINARY INJUNCTION HEARING. Hearing RESET for 8/22/2023 at 09:00 AM before Judge David A. Ezra. Signed by Judge David A. Ezra. (jv2) (Entered: 08/18/2023) |
| 08/18/2023 | 39 (p.893) | NOTICE *of New Facts* by United States of America. (Attachments: # 1 (p.15) Declaration of Evelio Siller)(Lynk, Brian) (Entered: 08/18/2023) |

| | | is available in the Clerk's Office or by clicking the hyperlink above. (jv2) (Entered: 09/06/2023) |
|---|---|---|
| 09/06/2023 | 52 | Payment of USCA Appeal Fee received $ 505 receipt number ATXWDC-17851480 (Cuenin, Ari) (Entered: 09/06/2023) |
| 09/07/2023 | 53 (p.1009) | ORDER of USCA that Appellants motion for administrative stay of the order of the Western District of Texas, Austin Division dated September 6, 2023, is GRANTED pending further order of the Court.(klw) (Entered: 09/08/2023) |
| 09/12/2023 | 54 (p.1011) | TRANSCRIPT REQUEST by Greg Abbott, The State of Texas for dates of 8/22/23. Proceedings Transcribed: Preliminary Injunction Hearing. Court Reporter: Angela Hailey.. (Walters, Ryan) (Entered: 09/12/2023) |

TAB 2: NOTICE OF APPEAL (ROA.1007-08)

Case 1:23-cv-00853-DAE   Document 62   Filed 09/21/23

**United States District Court**
**Western District of Texas**
**Austin Division**

UNITED STATES OF AMERICA,

    *Plaintiff*,

        v.

GREG ABBOTT, in his capacity as Governor
of the State of Texas, and THE STATE OF
TEXAS,

    *Defendants*.

No. 1:23-cv-00853-DAE

---

## DEFENDANTS' NOTICE OF APPEAL

Defendants Greg Abbott, in his capacity as Governor of the State of Texas, and the State of Texas appeal this Court's Order entered on September 6, 2023, to the United States Court of Appeals for the Fifth Circuit. *See* Order Granting Plaintiff's Motion for Preliminary Injunction, ECF No. 50. That Order granted the United States' motion for preliminary injunction. *See* Order Granting Plaintiff's Motion for Preliminary Injunction, ECF No. 50; *see also* Pl. U.S.' Opposed Mot. for Prelim. Inj., ECF No. 5. The order granting a preliminary injunction is immediately appealable. *See* 28 U.S.C. § 1292(a)(1).

1

Date: September 6, 2023

Angela Colmenero
Provisional Attorney General

Brent Webster
First Assistant Attorney General

Grant Dorfman
Deputy First Assistant Attorney General

Ralph Molina
Deputy Attorney General for Legal Strategy

Office of the Attorney General
P. O. Box 12548, MC-009
Austin, TX 78711-2548
(512) 936-2172

Respectfully submitted,

*/s/ Ari Cuenin*
Ari Cuenin
Deputy Solicitor General
Tex. State Bar No. 24078385
ari.cuenin@oag.texas.gov

Patrick K. Sweeten
Special Counsel
Tex. State Bar No. 00798537
patrick.sweeten@oag.texas.gov

Ryan D. Walters
Deputy Chief
Special Litigation Division
Tex. State Bar No. 24105085
ryan.walters@oag.texas.gov

David Bryant
Special Counsel
Tex. State Bar No. 03281500
david.bryant@oag.texas.gov

Munera Al-Fuhaid
Special Counsel
Tex. State Bar No. 24094501
munera.al-fuhaid@oag.texas.gov

**Counsel for Defendants**

## Certificate of Service

On September 6, 2023, this document was filed electronically through the Court's CM/ECF system, which automatically serves all counsel of record.

*/s/ Ari Cuenin*
Ari Cuenin

2

23-50632.1008

**Tab 3: Challenged Order (ROA.965-1006)**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | No. 1:23-CV-853-DAE |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| GREG ABBOTT, in his capacity as | § | |
| Governor of the State of Texas, and | § | |
| THE STATE OF TEXAS, | § | |
| | § | |
| Defendants. | § | |

## ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Before the Court is a Motion for Preliminary Injunction (the

"Motion"), filed on July 26, 2023, by the United States of America ("Plaintiff")

against Greg Abbott, in his official capacity as Governor of the State of Texas, and

the State of Texas (collectively, "Defendants" or "Texas"). (Dkt. # 5.) Texas filed

a Response to the Motion on August 9, 2023.[1] (Dkt. # 26.) The United States filed

a Reply on August 16, 2023. (Dkt. # 37.) Texas was granted leave to file a

---

[1] Shortly after the United States filed its Motion, Texas filed a Motion for Expedited Discovery, seeking limited discovery in advance of its response deadline of August 9, 2023. (Dkt. # 11.) Over objection of the United States, the Court granted in part Texas's Motion, permitting Texas to conduct three-hour depositions of three declarants upon whom the United States relied in its Motion, and ordering these depositions to occur by or on August 7, 2023. (Dkt. # 19.) These auxiliary depositions were attached to Texas's Response.

23-50632.965

Surreply on August 20, 2023.  (Dkts. ## 40-41.)  On August 22, 2023, the Court

held a hearing on the Motion at the federal courthouse in Austin, Texas.  At the

hearing, the Court granted the parties leave to file written closing arguments.  The

United States filed its closing argument on August 25, 2023.  (Dkt. # 45.)  Texas

filed its closing argument on August 25, 2023 (Dkt. # 46).  Having considered the

parties' arguments, including those in writing, the evidence presented, and the

relevant law, the Court **GRANTS** the United States' Motion for Preliminary

Injunction for the reasons that follow.  (Dkt. # 5.)

BACKGROUND

This case concerns Texas's construction of a 1,000-foot floating

barrier in the Rio Grande River near Eagle Pass, Texas.  In early June 2023,

Governor Abbott announced Texas's intent to deploy "marine floating barriers" to

"mak[e] it more difficult to cross the Rio Grande and reach the Texas side of the

southern border."  Press Release, Office of the Texas Governor, "Governor Abbott

Signs Sweeping Package of Border Security Legislation" (June 8, 2023),

https://gov.texas.gov/news/post/governor-abbott-signs-sweeping-package-of-

border-security-legislation.[2]  The "first 1,000 feet of the marine floating barrier"

---

[2] This Court is sympathetic with the aim of curtailing illegal immigration and
illegal importation of drugs.  However, the vast majority of illegal drugs which
enter Texas, and indeed the United States in general, come through ports of entry
by using covert means and not through this stretch of the Rio Grande River.  See
Michel Martin, How Do Illegal Drugs Cross the U.S.-Mexico Border?, NPR (April

2

23-50632.966

would be deployed near Eagle Pass, Texas.  Id.  In a meeting a few days later, Texas notified the United States Section of the International Boundary and Water Commission ("IBWC") of its plan to deploy these barriers at three different locations in the Eagle Pass area.  (Dkt. # 5-2 at 3.)

On approximately July 10, 2023, and without authorization of any kind, save the Governor's directive, Texas began installing the barrier system in a portion of the river roughly two miles downstream of the International Bridge II in Eagle Pass.  (Dkts. ## 5-1 at 2-7; 5-8 at ¶ 5; 5-2 at ¶¶ 4-5, 10.)  Over the following week, Texas finished its construction.  The result is a floating barrier comprised of about 1,000 feet of large four-foot spherical orange buoys fastened together with heavy metal cables and anchored in place with "heavy concrete blocks placed systematically on the bed of the Rio Grande River."  (Dkts. ## 5-8 at ¶¶ 10-12; 5-1 at 5-11; 26-3 at 4.)  The buoys are surrounded by 68 anchors of about 3,000 lb each, and 75 anchors of about 1,000 lb each.[3]  Attached to the bottom of about 500

---

6, 2019) https://www.npr.org/2019/04/06/710712195/how-do-illegal-drugs-cross-the-u-s-mexico-border ("So the drugs that are actually taking the lives of people here in the United States−methamphetamine, cocaine, heroin, fentanyl−almost universally come through the ports of entry along the southern border …. well over 90 percent.").

[3] Testimony on this point was elicited at the hearing from the contractor Texas had design and install the system, Loren Flossman of the company Cochrane.  The concrete anchoring system is visible in Exhibit G 52.

23-50632.967

feet of the floating barrier is an "anti-dive net" made of stainless-steel mesh extending two feet down into the water.  (Dkt. # 26-3 at 4.)

On July 24, 2023, the United States filed this civil enforcement action against Texas under Sections 12 and 17 of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C §§ 406 and 413 (the "RHA").  (Dkt. # 1.)  The United States alleges that Texas violated Section 10 of the RHA, 33 U.S.C § 403, by (1) erecting a structure in the Rio Grande River without authorization from the United States Army Corps of Engineers (the "Corps"), and (2) creating an obstruction to the navigable capacity of that waterway without affirmative Congressional authorization.  (Id. ¶ 2.)  Through the instant action, the United States aims to enjoin Texas from further constructing or maintaining structures or obstructions in the navigable waters of the United States, except in compliance with the RHA and other applicable law.  (Id. ¶ 35.)  The United States also seeks to compel Texas to remove all such extant structures and obstructions in the Rio Grande River at Texas's own expense.  (Id. ¶ 4.)

## LEGAL STANDARD

The purpose of a preliminary injunction is to preserve the relative positions of the parties until a trial on the merits can be held.  Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981).  A preliminary injunction is an "extraordinary and drastic remedy," which is never awarded as a right.  Munaf v.

23-50632.968

Geren, 553 U.S. 674, 689–90 (2008).  To obtain a preliminary injunction, a

plaintiff must demonstrate (1) a substantial likelihood of success on the merits; (2)

a substantial threat of irreparable harm if the injunction does not issue; (3) that the

threatened injury outweighs any harm that will result if the injunction is granted;

and (4) that the grant of an injunction is in the public interest.  Moore v. Brown,

868 F.3d 398, 402–03 (5th Cir. 2017) (per curiam); FED. R. CIV. P. 65.  When the

United States is a party, the third and fourth requirements merge.  Nken v. Holder,

556 U.S. 418, 435 (2009).

      The party seeking injunctive relief carries the burden of persuasion on

all four requirements.  PCI Transp. Inc. v. W. R.R. Co., 418 F.3d 535, 545 (5th Cir.

2005).  Normally, if a party cannot prove all four elements, a court must deny the

injunctive relief since "[t]he decision to grant a preliminary injunction is to be

treated as the exception rather than the rule."  Miss. Power & Light Co. v. United

Gas Pipe Line Co., 760 F.2d 618, 621 (5th Cir. 1985).

DISCUSSION

      Governor Abbott announced that he was not "asking for permission"

for Operation Lone Star, the anti-immigration program under which Texas

constructed the floating barrier.[4]  Unfortunately for Texas, permission is exactly

---

[4] @GregAbbott_TX, Twitter, (Mar. 21, 2023, 5:29 PM),
https://twitter.com/GregAbbott_TX/status/1638306917939380224?t=BB0rNKcTg
wyDn0j8qRiQKQ&s=19.

23-50632.969

what federal law requires before installing obstructions in the nation's navigable waters.  See 33 U.S.C. § 403.  Texas's construction of the floating barrier has violated two of the three courses of conduct proscribed by Section 10 of the RHA.  The first clause of § 10 prohibits "[t]he creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States."  Id.  The second clause makes it unlawful "to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or *other structures* in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army."  Id.

Texas does not contend that it had the requisite authorization from Congress or the Corps to construct the floating barrier.[5]  Instead, it debates (1) whether the Rio Grande River near Eagle Pass is a navigable water of the United States; (2) whether the floating barrier is actually an obstruction or structure under

---

[5] At the hearing, Texas attempted to elicit testimony about a meeting occurring between Texas DPS and the IBWC prior to the buoy installation.  Of course, this meeting is not at issue, as the authorization required by federal law is from Congress and the Army Corps of Engineers, not the IBWC.  Nonetheless, notes from this meeting recount that Texas DPS told IBWC that the buoys would be installed in a different location than they were, and allegedly did not share project plans, but pointed to the State of Texas Land office for communication in the future.

23-50632.970

the RHA; and (3) whether the Court should exempt its violation of federal law because Texas is being "actually invaded" by illegal migrants.  For the following reasons, the Court rejects Texas's arguments and grants in modified form the relief the United States requests.

## I. The United States will likely succeed on the merits of its Section 10 RHA claim against Texas.

### A. Texas's floating barrier is an obstruction to the navigable capacity of the Rio Grande River and required authorization from Congress.

The first clause of § 10 prohibits "[t]he creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States."  33 U.S.C. § 403.  Texas disputes that (1) the relevant section of the Rio Grande River is navigable; and (2) the buoy system obstructs the navigable capacity of the river.

### 1. The Rio Grande River near Eagle Pass, Texas, is a navigable water of the United States.

To obstruct the "navigable capacity of any of the waters of the United States," the obstructed waters—the stretch of the Rio Grande River in which the buoys sit[6]—must be navigable.  33 U.S.C. § 403 (further prohibiting creation of

---

[6] Showing that the waters in which the obstruction is placed are navigable waters of the United States is a sufficient, if not necessary, showing.  For instance, an obstruction in a non-navigable area may impact navigable capacity in a downstream area that *is* navigable.  See, e.g., United States v. Rio Grande Dam & Irrigation Co., 174 U.S. 690, 708 (1899) (remanding for determination of whether proposed construction of a dam in nonnavigable portion of Rio Grande [near New Mexico]

23-50632.971

structures in any "navigable river, or other water of the United States" without

permit from the Army Corps of Engineers).  Navigability is a factual question.

United States v. Appalachian Elec. Power Co., 311 U.S. 377, 405 (1940).  The

Code of Federal Regulations provides that:

> Navigable waters of the United States are those waters that are subject to the
> ebb and flow of the tide and/or are presently used, or have been used in the
> past, or may be susceptible for use to transport interstate or foreign commence.
> A determination of navigability, once made, applies laterally over the entire
> surface of the waterbody, and is not extinguished by later actions or events
> which impede or destroy navigable capacity.[7]

33 C.F.R § 329.4.  The Corps' regulations envisage courts making determinations

of navigability, admitting that "[p]recise definition of 'navigable waters' and

'navigability' are ultimately dependent on judicial determination, and cannot be

made conclusively by administrative agencies."  Id. § 329.3.

A waterway's use or potential use in interstate or foreign commerce

bears on its navigability for purposes of the RHA because "the source of the power

of the general government" to control navigable waters "arises out of its power to

regulate commerce with foreign countries and among the States."  Leovy v. United

---

would impact navigability of *navigable* portion of Rio Grande).  The parties focus
their attention in the instant case on whether the area in which the barrier is installed
is itself navigable.

[7] This definition applies particularly to the authority of the Army Corps of Engineers
with respect to the RHA, rather than the Clean Water Act.  See id.

23-50632.972

States, 177 U.S. 621, 633 (1900); see also Rio Grande Dam, 174 U.S. at 703 ("[I]n other words, the jurisdiction of the general government over interstate commerce and its natural highways vests in that government the right to take all needed measures to preserve the navigability of the navigable water course of the country, even against any state action."). Thus, the Supreme Court's pre-RHA articulation of navigable waters in The Daniel Ball, 77 U.S. 557, 563 (1871), defined waters that are "navigable in fact," as those "used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water." See also The Montello, 87 U.S. 430, 443 (1874) ("[T]he vital and essential point is whether the natural navigation of the river is such that it affords a channel for useful commerce.").

Following the passage of the 1899 RHA, the Court broadened this definition considerably to include waters formerly used in interstate commerce but no longer capable of such use, Econ. Light & Power Co. v. United States, 256 U.S. 113, 123-24 (1921), and waters not presently used, but capable of future use with reasonable improvement. See Appalachian Elec., 311 U.S. at 408-409 (finding ability of river to be deepened two feet conferred navigability on the improved and unimproved sections); see also Sackett v. Environmental Protection Agency, 143 S. Ct. 1322, 1350-51 (Thomas, J., concurring) (describing the evolution of the

23-50632.973

<u>Daniel Ball</u> test beyond waters currently employed in commerce); <u>Miami Valley</u>

<u>Conservancy Dist. v. Alexander</u>, 692 F.2d 447, 450 (6th Cir. 1982) (holding that

the "essential elements" of a navigable waterway "have remained constant": it

"must (1) be or have been (2) used or susceptible of use (3) in the customary

modes of trade and travel on water (4) as a highway for interstate commerce").

      Accordingly, Texas's focus on the fact that commerce has not been

observed on this stretch of the Rio Grande River recently is of no moment: "[t]he

extent of existing commerce is not the test" for navigability.  <u>United States v. Utah</u>,

283 U.S. 64, 82 (1931); <u>see also</u> <u>United States v. Diamond</u>, 512 F.2d 157, 160 (5th

Cir. 1975) (holding that whether a body of water has interstate or foreign

commerce or is always navigable in fact is "not necessarily controlling in

determining legal navigability.").  Indeed, the Supreme Court found the Desplaines

River navigable despite "no evidence of actual navigation within the memory of

living men." <u>Econ. Light</u>, 256 U.S. at 117-18.  Rather, navigability may be

established based on evidence of a water's historic use or its susceptibility to future

use were reasonable improvements made to the river to facilitate commerce. <u>See,</u>

<u>e.g.</u>, <u>Appalachian Elec.</u>, 311 U.S. at 407-09.

      Navigability turns on evidence —geological reports, reports of

engineers and the Secretary of War, histories, and other sources of information—

rather than on speculation.  <u>See, e.g.</u>, <u>Rio Grande Dam</u>, 174 U.S. at 694 (listing

23-50632.974

evidence relied upon by trial court in forming navigability determination).  The Court finds the evidence presented by the United States sufficient to carry its burden at this stage on the navigability of the relevant portion of the Rio Grande River.

As to historical navigability, the United States provides evidence that Congress itself, contemporaneous with the RHA's enactment, acknowledged the navigability of the Rio Grande River near Eagle Pass.[8]  (Dkt. # 37 at 8.)  In a statutory precursor to the 1899 RHA, Congress "authorize[d] the construction of a bridge over the Rio Grande River between the cities of Eagle Pass, Texas, and Piedras Negras, Mexico," 23 Stat. 29 (1884), that required "free navigation of said river" to be maintained, and gave federal courts jurisdiction over cases "arising from an obstruction or an alleged obstruction to the free navigation thereof."  Id. § 3, 23 Stat. 30; see also 42 Stat. 1482 (1923) (authorizing construction of bridge between Eagle Pass and Piedras Negras "at a point suitable to the interests of navigation across the Rio Grande").  A pair of 1890 statutes authorizing other

---

[8] A joint survey conducted by the United States and the Mexican IBWC on July 27 and 28, 2023, recorded the locations of the buoys and concrete anchors of the line of buoys that Texas deployed approximately two miles downstream of the Camino Real International Bridge, in the vicinity of 28° 40' 21" N, 100° 30' 14" W.  (Dkt. # 32-1 at 1.)  This location is in between the Amistad Reservoir to the North and the Falcon Reservoir to the South.  See https://gps-coordinates.org/my-location.php?lat=28.6725&lng=-100.5038888888889.

23-50632.975

commercial projects—electric wires and water pipes—in the same area confirms Congress's interest in preserving the navigability of this region of the Rio Grande River by providing redress in federal district court should the construction of the electrical wires or piping "substantially or materially obstruct[ ]" the "free navigation" of the Rio Grande.  26 Stat. 495 (1890); 26 Stat. 502 (1890).

Once a water is found to be navigable by Congress, it remains so until Congress, not the courts, declares otherwise. [9] Economy Power & Light v. United States, 256 U.S. 113, 124 (1921) (if historically navigable waters "are to be abandoned" due to changes in use or economic need, "it is for Congress, not the courts, so to declare"); United States v. Appalachian Elec. Power Co., 311 U.S. 377, 408 (1940) ("When once found to be navigable, a water remains so." (citing Economy Power & Light)).  The reason for this is and should be obvious: bodies of water ebb and flow depending on the season and current climate conditions.  For instance, the Court takes judicial notice of the fact that Texas is currently in a long-term drought, which has caused several lakes and rivers, including the Rio Grande River, to be at historically low levels. Low Water Supplies in Rio Grande and Across the World are "New Normal," Expert Says, HOUSTON PUBLIC MEDIA (Aug. 29, 2022).  In 2022, the Amistad Reservoir reached a historically low lake level, and many of the boat ramps on the lake were closed. In June 2023, the lake level

---

[9] As the United States saliently points out.  (Dkt. # 45 at 2.)

had increased capacity by 5.2% from July 2022 levels.  Amistad Current

Conditions, National Park Service (Aug. 7, 2023) https://www.nps.gov/amis/

planyourvisit/conditions.htm.  This upward ebb occurred despite the ongoing

drought.[10]  Similarly, the Corp of Engineers recently closed the boat ramps to

Canyon Lake in Central Texas due to the dangers to shallow draft boats posed by

the historic low level of the lake due to this subsisting drought.  Mary Claire Patton

& Justin Horne, Canyon Lake has Reached its Lowest Point in Recorded History,

KSAT (Aug. 28, 2023)   https://www.ksat.com/news/local/2023/08/28/canyon-

lake-has-reached-its-lowest-point-in-recorded-history/.  However, boat ramps will

open again in Canyon Lake and the Amistad Reservoir when water levels rise.

Boat Ramp Status, NATIONAL PARK SERVICE (Aug. 29, 2023) https://www.nps.gov

/amis/planyourvisit/boating.htm#Boat-Ramp (noting that boat ramps may or may

not be open due to "fluctuating lake levels").  The Court also takes judicial notice

of the fact that it is anticipated that Texas may have a wetter than normal winter

due to El Nino conditions, which may cause the Rio Grande River to rise

substantially from its current flows.  This could also occur if the Corp of Engineers

---

[10] The Amistad reservoir levels remain on a downward trend in the summer of 2023; however, the levels are higher than the previous summer, even in the face of ongoing drought.  Additionally, the Amistad Reservoir Water Level tracker (http://amistad.uslakes.info/Level.asp) demonstrates the historic ebb of the lake levels—the lake levels are consistently higher in the winter and drop during the summer months.

13

23-50632.977

determines that water should be released from the Amistad Reservoir (Lake Amistad) into the Rio Grande River.  There was discussion of this at the hearing where the state's expert, Loren Flossman, testified at some length about how extra link chainage had been provided for on the barrier so that, in the ultimate occurrence, as anticipated, that the river will in fact rise, the buoys can rise up to 12 meters, approximately 40 feet, to accommodate the rise in the level of the river. (Tr. 97:2–12.)  The natural fluctuations in water level only momentarily impact navigability *de facto*, never *de jure*.  Navigability, once granted, can only be revoked by Congress.  Economy Power, 256 U.S. 113, 124 (1921; United States v. Appalachian Elec. Power, 311 U.S. 377, 408 (1940).  While Congress has enacted "non-navigability" declarations for a number of waters, it has not done so for the Rio Grande River, indicating Congress could have and has not revoked Rio Grande's designation as a navigable waterway of the United States.  311 U.S. 377, 408; 33 U.S.C. §§ 21-59mm.

The historical navigability of miles 275.5 to 610.0 of the Rio Grande River—in which the relevant stretch of river lies—is also memorialized in the Corps' 1975 Study and Determination of Navigability (the "Study").[11]  (Dkt. # 37-

---

[11] This was not the earliest Corps determination of navigability: this stretch "has been on the navigable list of the Fort Worth District from the time of the District's creation in 1950."  (Dkt. # 37-5 at 7.)

23-50632.978

5.)  As the Study notes, treaties between the United States and Mexico dating back to 1848 require the countries maintain "free and common" "navigation of" the Rio Grande at all points below New Mexico.[12]  (Dkt. # 37-5 at 20 (citing 9 Stat. 928 (1848)); see also 10 Stat. 1034 (the 1853 Gadsden Treaty, identifying the upstream limit of applicability of the 1848 Treaty at a longitudinal and latitudinal point that is near El Paso and well upstream from Eagle Pass, Texas).  And the Study identifies "a great deal of interest . . . during the period between 1829-1882 pertaining to transportation of goods along the Rio Grande River."  (Dkt. # 37-5 at 26.)  In the 1850s, "[a] keelboat and a skiff, manned by sixteen men, ascended the river by channel to a point a thousand miles above [Roma, Texas]" and another account stated that the river was "believed to be navigable for 500 miles above Laredo."  (Dkt. # 37-5 at 68.)  Court cases from this period discuss ferry companies operating between Eagle Pass and Piedras Negras, transporting cotton, for instance.  See U.S. v. Weil, 35 Ct. Cl. 42, 77 (1900) ("At Eagle Pass there were ferryboats in which the cotton was crossed over."); see Tugwell v. Eagle Pass

_____

[12] This comports with the Supreme Court's later decision finding the New Mexico stretch of the Rio Grande River non-navigable.  See Rio Grande Dam, 174 U.S. at 699.  The Court in Rio Grande Dam found the treaty unhelpful as to the issue of whether the proposed dam would obstruct the navigability of the Rio Grande River, because "if the proposed dam and appropriation of the waters of the Rio Grande constitute a breach of treaty obligations or of international duty to Mexico, they also constitute an equal injury and wrong to the people of the United States."  Id. at 701.

23-50632.979

Ferry Co., 74 Tex. 480, 9 S.W. 120 (1888) (resolving dispute between ferry companies operating between Eagle Pass and Piedras Negras).

Moreover, the river has been and continues to be capable of increased commercial navigation with re-prioritization and increased flow from the Amistad Dam. The expedition that ventured up the river in the 1850s reported that "if the channel were improved in certain passages, steam navigation would be entirely feasible all the way up to Babbitt's Falls (probably RM 750)." (Dkt. # 37-5 at 26.) These improvements were not effectuated, owing to "the advent of the railroads in 1882" and policy choices prioritizing other river uses and purposes over commercial navigation, including construction of the Amistad Dam to divert water for irrigation. (Dkt. # 37-5 at 27.) As the Supreme Court has recognized, "absence of use over long periods of years, because of changed conditions, the coming of the railroad or improved highways does not affect the navigability of rivers in the constitutional sense." Appalachian Elec., 311 U.S. at 409-410; see also Econ. Light, 256 U.S. at 117-18 (finding Desplaines River navigable despite century of disuse owing in part to changes in pattern of trade and increased reliance on horses).

It is not "necessary that the improvements should be actually completed or even authorized"; the RHA merely requires that the waterway is capable of future use with reasonable improvement. Appalachian Elec., 311 U.S.

16

23-50632.980

at 408.  As indicated in the Corps' 1975 report—adopted again in 2011— "[t]he
natural and ordinary condition of the Rio Grande River, its volume of water,
gradient, and regularity of flow," remain such that "future improvement for smaller
commercial craft" is possible.[13]  (Dkt. # 37-5 at 19.)  This showing is sufficient.  It
is entirely appropriate that this improvement would require "judicious[] use[]" of
the Amistad and other dams.[14]  (Dkt. # 37-5 at 19); see Appalachian Elec., 311
U.S. at 407 ("A waterway, otherwise suitable for navigation, is not barred from
that classification merely because artificial aids must make the highway suitable
for use before commercial navigation may be undertaken.").  Because
"[i]mprovements in the methods of water transportation or increased cost in other
methods of transportation may restore the usefulness" of a formerly navigated
waterway, courts must recognize the ongoing power of the federal government to

---

[13]  "Small traffic compared to the available commerce of the region is sufficient."
Appalachian Elec., 311 U.S. at 409.  The Court's consideration of the past, present,
and future commercial uses of the Rio Grande River must be flexible, because
navigable waters of the United States might have uses as varied as "the carriage of
ocean liners to the floating out of logs" and density of traffic "from the busy harbors
of the seacoast to those sparsely settled regions of the Wester mountains."  Id. at
405.

[14]  The Congressional amici concede that a "historically navigable river" that
undergoes changed conditions due to man-made obstructions is still, under Supreme
Court precedent, a "navigable river," but fail to explain why changed conditions
from the Amistad Dam, which Texas's own declarant concedes "water levels are
dependent on," should be treated differently. (Dkts. ## 24 at 14-15; 26-1 at 3.)

23-50632.981

regulate it under the RHA, despite its modern disuse.[15]  Econ. Light, 256 U.S. at 124.

Finally, though Texas points to the periodic dryness of the river and the segment being "plagued by sandbars and portages," the existence of shallow and sandy portions does not foreclose navigability.  See United States v. Utah, 283 U.S. 64, 86 (1931) ("[T]he master is plainly right in his conclusion that the mere fact of the presence of such sandbars causing impediments to navigation does not make a river nonnavigable."); see also Newbold v. Kinder Morgan SNG Operator, L.L.C., 65 F.4th 175, 181-82 (5th Cir. 2023) (quoting Econ. Light, 256 U.S. at 117) ("Navigability, in the sense of the law, is not destroyed because the water course is interrupted by occasional natural obstructions or portages; nor need the navigation be open at all seasons of the year, or at all stages of the water.").[16]

---

[15] Photographs of Texas installing the floating barrier indicate that at least some "[i]mprovements in the methods of water transportation," Econ. Light, 256 U.S. at 124, have arrived which make this portion of the Rio Grande River navigable: Texas used airboats in this portion of the river and even a small barge.  (Dkts. ## 5-1 at 7; 5-8 at 4.)  Testimony corroborates airboats' ability to navigate this stretch of the river.  Ironically, the use of these barge and craft to install the buoy barrier itself constitutes commercial activity, albeit not that necessarily contemplated by Congress.

[16] The Court notes its reliance on evidence in determining the navigability of the Rio Grande River. The Court does not rely solely on the Corps' navigability determination, nor did the U.S. ask it to.  (Dkt. # 46 at 2).

18

23-50632.982

2.     *Texas's floating barrier obstructs the navigable capacity of the Rio Grande.*

Section 10's first clause bars the "creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States."  33 U.S.C. § 403.  Texas admits that it created the floating barrier without Congressional authorization, and the Court has established that the relevant portion of the Rio Grande is navigable.  As to the remaining element, the Court finds that the floating barrier interferes with or diminishes the navigable capacity of the Rio Grande and creates a hazard, and thus, that Texas is liable under the first clause of Section 10.

It is "a question of fact whether the act sought to be enjoined is one which fairly and directly tends to obstruct (that is, interfere with or diminish) the navigable capacity of a stream."  Rio Grande Dam, 174 U.S. at 709.  Texas claims that Section 10 only encompasses obstructions "extending out into rivers and set perpendicular to the current (so as to obstruct vessels navigating up and down the rivers)."  (Dkt. # 26 at 19.)   But this atextual limitation contravenes Supreme Court precedent, which requires courts to "read the 1899 Act charitably in light of the purpose to be served," and "forbids a narrow, cramped reading of . . . Section 10."  United States v. Republic Steel Corp., 362 U.S. 482, 491 (1960).  Under this broad construction, the Court has found matter as small as "fine particles" from an iron mill an obstruction under Section 10.  Id. at 483.  Recognizing that "[t]he

19

23-50632.983

Supreme Court has encouraged a broad interpretation of a section 10 'obstruction,'" <u>Vieux Carre Prop. Owners, Residents & Assocs., Inc. v. Brown</u>, 875 F.2d 453, 462-63 (5th Cir. 1989), the Fifth Circuit has likewise construed the term flexibly, without a size or positional limit: from a sunken schooner, <u>United States v. Raven</u>, 500 F.2d 728, 731 (5th Cir. 1974) to a pair of gas pipelines running under the bed of a bayou, <u>United Tex. Transmission Co. v. U.S. Army Corps of Engineers</u>, 7 F.3d 436, 438 (5th Cir. 1993).

   Texas designed and deployed the floating barrier to obstruct lateral movement across the river. <u>See</u> Press Release, Office of the Texas Governor, <u>Operation Lone Star Boosts Border Response with New Marine Barriers</u> (July 14, 2023) (the floating barrier will "prevent people from even crossing the middle part of the Rio Grande River and coming into the state of Texas") https://gov.texas.gov/news/post/operation-lone-star-boosts-border-response-with-new-marine-barriers. That the barrier's obstruction of up-and-down the river navigation is incidental to Texas's primary aim of obstructing bank to bank crossings make no difference. Credible testimony establishes that "[t]he placement and tandem configuration of the buoys present a structural barrier to cross-river navigation and would force a vessel to maneuver around the structure to avoid collision or entanglement at this location." (Dkt. # 5-8 at 6.) As for those navigating up and down the river, the barrier would impede navigation as

23-50632.984

"whoever's steering [a] vessel would have to take note of and make sure they avoid it."  (Dkt. # 26-6 at 74-75.)

Texas argues that the four-foot width of the barrier makes it no impediment at all.  At the hearing, however, testimony was elicited indicating that the floating barrier system is much wider than the four-foot-buoys, alone.  (See Exhibit G-52.)  Placed four to six feet on either side of the buoy barrier are 68 anchors of about 3,000 lb each, and 75 anchors of about 1,000 lb each attached to the buoys by heavy chain.[17]  Photographs show these grey concrete anchors standing from the bed of the river, with no markings to identify them as hazards. These concrete obstacles present a serious risk to watercraft of any kind. Sitting currently at water level, these concrete anchors are not easily seen by oncoming watercraft, including air boats, but are nonetheless at a level that would cause significant damage to any vessel of any size which happened to impact them.[18]

---

[17] Testimony on this point was elicited at the hearing from the contractor Texas had design and install the system, Loren Flossman of the company Cochrane.  The concrete anchoring system is visible in Exhibit G 52. The concrete anchors extend out from the connected buoys on either side for a somewhat indeterminate length that the Court understands to be approximately four to six feet on each side.

[18] Texas asserts that any vessel can easily navigate past the floating buoys and that people can simply go around them.  (Dkt. # 46 at 6).  Stating these claims does not make them true, and these statements are in clear contradiction with the evidence presented to this Court, particularly taking into account the substantial and almost invisible concrete anchors. (Dkt. # 46 at 6).

23-50632.985

And while the buoys are allegedly capable of floating to accommodate water level rises, the 143 anchors several feet away from the buoys would be lying just below the surface, making them even more imperceptible to passing vessels than when they sit at current water level.

Texas's own declarants admit that this stretch of the Rio Grande includes hidden obstacles like sand bars, rocks, and natural debris. (Dkt. # 26-1 at 3.) These conditions make it even more imperative for anyone piloting down the river to have free reign of the entire width and a clear view of all obstacles, lest they be forced into a hazard.

Less than six weeks' experience with the floating barrier demonstrates its potential for drifting out of position or catching substantial debris, and thus bears out concerns that the structure "meets engineering standards to withstand predicted high flows" or other changes in conditions. (Dkt. # 5-8 at 6.) There is still some ambiguity as to whether 80% of the buoys ended up in Mexican waters by drifting or by being originally, incorrectly installed there.[19] And contrary to

_____

[19] The United States submitted a declaration on August 15, 2023, showing that nearly 80% of the barrier was positioned in Mexican waters, which means—crediting Texas's instance that it was originally placed in U.S. waters—the barrier can drift out of alignment, creating a wider horizontal obstruction. (Compare Dkt. # 26 at 6 ("The [floating barrier] is … entirely within Maverick County, Texas."), with Dkt. # 32 (IBWC topographical survey showing that a majority of the Floating Barrier was located in Mexico as of July 28, 2023)). On August 18, 2023, Texas was observed seemingly "repositioning the Floating Barrier" closer to the United States bank. (Dkt. # 39-1.) At the hearing, testimony was elicited that the buoys were

23-50632.986

Texas's claim that the steel mesh attached to the buoys "does not block or catch substantial amounts of debris," (Dkt. # 26-2 at 4), a few weeks after the barrier was installed, one dead body was found "stuck in the southern part of the buoys," and another body was found just upstream of the buoys. See Press Release No. 309, Mexican Government, <u>SRE Reports Lifeless Body Found in Rio Grande in Eagle Pass Buoy Area</u> (August 2, 2023), https://www.gob.mx/sre/prensa/sre-informa-que-hallan-cuerpo-sin-vida-en-el-rio-bravo-en-la-zona-de-boyas-de-eagle-pass; Information Note No. 06, Ministry of Foreign Affairs-National Institute of Migration Information (August 2, 2023), https://www.gob.mx/sre/documentos/information-note-no-06; <u>Mexico Recovers Body of Honduran Migrant in Rio Grande; Another Body Found Near Floating Barrier</u>, ASSOCIATED PRESS (August 3, 2023), https://apnews.com/article/rio-grande-mexico-texas-buoys-fdb59d6d39db90c5d2902dc7bcd1a960.

---

moved back into Texas waters. Testimony was also elicited that the buoys could not have drifted. But in a statement on August 21, 2023, Governor Abbott indicated that they had drifted. Sandra Sanchez, <u>Abbott Hosts Republican Governors at Border Buoys, "Ground Zero" for Illegal Immigration</u>, KLST SAN ANGELO (August 21, 2023) https://www.msn.com/en-us/news/us/abbott-hosts-republican-governors-at-border-buoys-ground-zero-for-illegal-immigration/ar-AA1fCccs ("The buoys had drifted toward the Mexico side. And so out of an abundance of caution, Texas went back and moved the buoys to a location where it is clear they are on the United States side, not on the Mexican side.").

23-50632.987

Case law "forbids a narrow, cramped reading of . . . Section 10," leaving little doubt that Texas's 1,000-foot long, four-foot-wide floating barrier,[20] anchored with metal wiring to heavy concrete blocks on the bed of the river, constitutes an obstruction to the navigation of the Rio Grande. See Republic Steel Corp., 362 U.S. at 491. Because this obstruction was not "affirmatively authorized by Congress," it is in violation of Section 10 of the RHA. 33 U.S.C. § 403.

B. **Texas's floating barrier is a structure in a navigable water of the United States, and thus required a permit from the Army Corps of Engineers.**

To establish a violation of Section 10's second clause, the United States must show that Texas (1) built or commenced the building (2) "of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structure[]" (3) in navigable waters (4) outside established harbor lines or where no harbor lines have been established (5) without the Corps' permission. 33 U.S.C. § 403. As with the elements of Texas's liability under Section 10's first clause, most elements of Texas's liability under Section 10's second clause are incontestable. Texas admits to deploying the floating barrier system without the Corps'

---

[20] The Court notes that the complete barrier structure is wider than four feet. The buoys are four-feet-wide on their own. The anchors on each side of the buoys add to the width of the overall barrier by approximately four to six feet on each side. The width added by the concrete anchoring system is visible in Exhibit G 52. As a result, the total barrier structure is approximately 12 to 20 feet wide when accounting for both the buoys and the concrete anchors.

23-50632.988

permission and does not contest that no harbor lines have been established here.[21]
As to the final element of liability, the Court finds that the floating barrier
constitutes either a "boom" or "other structure[ ]" and thus, the United States is
likely to prevail on its claim under the second clause of Section 10.

　　　　The floating barrier resembles a "boom," as it is a 1,000-foot-long
chain of buoys fastened together with metal cables and tethered with concrete
blocks to the riverbed, intended to obstruct the passage of vessels and people.
Webster's 1913 dictionary defined a boom as "*[a] strong chain cable*, or line of
spars bound together, extended across a river or the mouth of a harbor, *to obstruct
navigation or passage*" or "[a] line of connected floating timbers stretched across a
river, or *enclosing an area of water*, to keep saw logs, etc., from floating away."
*Boom*, Webster's Revised Unabridged Dictionary (1913) (emphasis added).  Other
dictionary definitions confirm that a boom was understood at the time of the RHA
to be a strong chain of connected floating objects utilized to obstruct passage or
contain items.  See *Boom*, 1 Noah Webster, American Dictionary of the English
Language 25 (1828) (defining a boom as "[a] strong iron chain, fastened to spars,
and extended across a river, or the mouth of a harbor, to prevent an enemy's ships
from passing"); *Boom*, Webster's International Dictionary of the English Language

---

[21] No harbor lines have been established in this stretch of the Rio Grande River.
(Dkt. # 5-8 at 3.)   And as explained above in detail, this portion of the river is
navigable.

23-50632.989

(1890) (defining a boom as "[a] chain cable, or line of spars bound together, extended across a body of water to obstruct passage"). The floating barrier, a 1,000-foot-long, four-foot-wide chain of "multiple interconnected buoys tethered via chains to concrete blocks placed on the bed of [a] river," designed to obstruct passage of people and vessels in the Rio Grande, appears to fit comfortably within the definition of "boom" at the time of the RHA's passage.[22]

Texas argues that the floating barrier is not a boom because it doesn't go bank to bank. But by Texas's proffered 1913 Webster's definition, a boom may "enclos[e] an area of water" without crossing a river.[23] (Dkt. # 26 at 21 (quoting *Boom*, Webster's Revised Unabridged Dictionary (1913).) And as the United States points out, various descriptions and drawings of booms, contemporaneous with the RHA's enactment, run longitudinally with the river. E.g., Atlee v. Union Packet Co., 88 U.S. 389, 392 (1874) (describing boom running parallel to shore between two piers); Steward Edward White, The Great Log Jam, Popular Monthly (July 1901), http://www.catskillarchive.com/rrextra/lgjam.Html (depicting boom running length of river, parallel to shore).

---

[22] Joseph Shelnutt's testimony at the hearing that the structure was not a "boom" is not dispositive on this issue.

[23] Moreover, Texas elicited testimony during its pre-Response deposition of Captain Peters that there are "multiple uses of the term boom" in nautical terms, including an "oil boom" which is used to "encircle an environmental spill," and thus need not be oriented from bank to bank of a river. (Dkt. # 26-4 at 46.)

And even if the floating barrier does not fit perfectly under the definition of a boom, by Texas's own admission, the "other structures" category encompasses structures "similar in nature" to those previously enumerated. (Dkt. # 26 at 22 (applying the *ejusdem generis* canon to the catchall "other structures" directs that the term be construed to encompass items similar in nature to the preceding specific terms).) Thus, the fact that the floating barrier meets all of Texas's criteria for a "boom" except for its orientation to the banks of the river makes it similar enough to that enumerated example to fall within the "other structures" category.[24]

Texas also takes the confusing stance that the floating barrier cannot be a structure under Section 10, because "buoys aid navigation, including around other objects that might obstruct navigation," and because Section 15 of the RHA "mandates the placement of buoys under certain circumstances." (Dkt. # 26 at 22.) Texas's convenient, newfound claim about the floating barrier's ability to "aid navigation" contradicts its own description of the barrier as a "physical barrier" created "to deter illegal crossing in hotspots along the Rio Grande River." (Dkts. ## 26 at 12 (installing the floating barrier "to resolve the acute and immediate need to *construct physical barriers* in the vicinity of the U.S.-Mexico border in the Del

---

[24] And even if the floating barrier were merely a buoy, as Texas seems to claim, a "dolphin"—one of the structures explicitly barred by the Act—is defined to include "a buoy." *Dolphin*, Webster's Academic Dictionary 178 (1895).

23-50632.991

Rio Sector") (emphasis added); 26-2 at 3 ("the floating buoys are part of Texas's response to the border security disaster, and control ingress to a portion of [that area]").) And its own design—attaching "[a] two-foot-deep anti-dive net" to the barrier—proves as much. (Dkt. # 26 at 12.) As described earlier, moreover, the concrete anchoring system composed of 143 concrete blocks placed in the river poses a significant impediment and danger to river traffic even without the buoys and could not possibly be considered an aid to navigation.[25]

Texas strains credulity with its argument that the floating barrier is not permanent enough to constitute a structure. Should a 1,000-foot-long barrier of four-foot-spherical buoys, "fastened directly under[neath]" with two feet of "[s]tainless steel mesh" and tethered via chains to "heavy concrete blocks placed systematically on the [river] bed" be impermanent, it is hard to imagine what *would* be. (Dkt. # 26-3 at 4.) Texas's own declarants attest that it would take "several weeks," heavy equipment, and $300,000 to remove the barrier—let alone to install it in another place. (Dkts. ## 26-3 at 4; 26-2 at 6.) And the anchoring system here resembles that used for houseboats, which have been considered a

---

[25] Texas states Section 10 mandates placing buoys in navigable waters, claiming that no one thought buoys were impermissible structures. (Dkt. # 46 at 8). A buoy barrier flanked by a concrete anchoring system was not the type of "buoy" contemplated by the legislature who passed Section 10. Further claiming that "treaty provisions mandate a buoy barrier" is similarly a statement that misleadingly overstates the buoy element of this concrete anchor, buoy, steel, and anti-dive net barrier. (Dkt. # 46 at 8).

23-50632.992

structure under Section 10 in Texas's proffered caselaw.  See, e.g., United States v. Estate of Boothby, 16 F.3d 19, 21 (1st Cir. 1994) ("We believe that this regulation lawfully can be applied to houseboats that are found to constitute *permanently moored* vessels.") (emphasis added) (citing United States v. Boyden, 696 F.2d 685, 687 (9th Cir. 1983)); United States v. Angell, 292 F.3d 333 (2d Cir. 2002) (finding houseboat an obstruction in canal).

The floating barrier constitutes either a "boom" or "other structure," in the Rio Grande, and Texas failed to seek a permit from the Corps.  The United States is likely to prevail on its claim that Texas violated the second clause of Section 10.

## C.    Texas's self defense argument is unconvincing.

Finally, Texas's fallback argument justifies its construction of the floating barrier as an exercise of self defense in the face of "invasion."  This argument fails because (1) the RHA has already balanced policy interests and determined that the nation's interest in free navigation of its waterways is supreme to unauthorized state action, and (2) whether Texas's claim of "invasion" is legitimate is a non-justiciable political question demonstrably committed to the federal political branches.

23-50632.993

1.    *The federal government's power to prevent unauthorized obstacles in the nation's navigable waters trumps state policy preferences.*

Texas asks this Court to absolve its RHA violations because they are premised on its disagreement with federal immigration policy.  (See, e.g., Dkt. # 26 at 24 ("Governor Abbott has asserted this power because, due to President Biden's open-border refusal to faithfully execute federal immigration laws, the United States has unconstitutionally refused to 'protect [the State of Texas] against Invasion' by transnational cartels.").)  But "[t]his is not a controversy between equals."  Sanitary Dist. of Chicago v. United States, 266 U.S. 405, 425 (1925).  There "is no question" that the United States' "sovereign power to regulate commerce and control the navigable waters within its jurisdiction" is "superior to that of the States to provide for the welfare or necessities of their inhabitants."  Id. at 425-26.  That state action which violates the RHA may also "concern[ ] the expenditure of great sums and the welfare of millions of men," fails to change the fact that "the interests of the nation are more important than those of any state."  Id. at 425.  The Court cannot override Congress's "broad expression of policy in unmistakable terms," by exempting Texas from the RHA.  Id. at 429. [26]

---

[26] The Court notes that Texas has deployed National Guard troops as well as Public Safety Officers also to the Border to deter illegal immigrants and drug traffickers.  Texas is not without resources.

23-50632.994

2. *Whether Texas has been "invaded" is a nonjusticiable political question.*

Nonetheless, the political question doctrine bars consideration of Texas's "invasion" defense. Texas argues that it constructed the floating barrier pursuant to the Self-Defense Clause, U.S. Const. art. I, § 10, cl. 3,[27] because it is being "invaded" by "[t]housands of aliens . . . including members of cartels," and thus asks the Court to exempt Texas's conduct from the RHA. (Dkt. # 26 at 25-26.) To credit Texas's allegation of invasion would be to make a policy decision on a topic the Supreme Court and Fifth Circuit have identified as a nonjusticiable political question.[28]

A case "held to involve a political question" displays, on its face, an issue with a "textually demonstrable constitutional commitment . . . to a

---

[27] The Self-Defense Clause provides that "[n]o State shall, without the Consent of Congress . . . engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay." U.S. Const. art. I, § 10, cl. 3.

[28] Texas alleges a failure to weigh evidence of the "invasion" by the Court would be "reversible error," despite the topic being a nonjusticiable political question. (Dkt. # 2). No court has discretion to overlook evidence regarding public consequences of injunctions, but courts do have the discretion to prevent needlessly cumulative evidence. F.R.C.P. 403. Given that Texas had already submitted 66 pages of evidence on the border crisis to the Court, which the Court made clear it had reviewed carefully before the hearing, it was within the Court's discretion to stem further discussion of these public consequences by, in Texas's words, "a low-level federal employee." (Dkt. # 46 at 9; Dkt. # 26–7). Moreover, the Court declines to entertain evidence that counsel attempted to read into the record after a witness disclaimed any knowledge of the material being shown, which is exactly what Texas attempted to do.

coordinate political department; or a lack of judicially discoverable and

manageable standards for resolving it; or the impossibility of deciding without an

initial policy determination of a kind clearly for nonjudicial discretion; . . . or an

unusual need for unquestioning adherence to a political decision already made."

Baker v. Carr, 369 U.S. 186, 217 (1962).  "[T]he parties agree that determining an

'invasion' is a nonjusticiable political question," but disagree as to what that means

for Texas's "invasion" defense.  (Dkt. # 41 at 4 (citing Texas v. United States, 106

F.3d 661, 666-67 (5th Cir. 1997).)  Texas argues that whether an invasion has

occurred is a matter constitutionally committed to "the Texas Governor."  (Id. at

5.)  The Court disagrees.

   Several constitutional provisions assign the federal government—not

states—the authority to recognize and respond to invasions.  See U.S. Const. art. I.,

§ 8, cl. 15 (power to call forth militia); art. I, § 9, cl. 2 (power to suspend habeas

corpus); art. IV, § 4 (power to protect against invasion).  The Constitution's

commitment of the question of an "invasion" is especially strong when it involves

"the immigration and the status of aliens," which the Constitution assigns

exclusively to Congress.  Arizona v. United States, 567 U.S. 387, 394-95 (2012);

New Jersey v. United States, 91 F.3d 463, 469 (3d Cir. 1996) (holding that the

Naturalization Clause represents "a textually demonstrable constitutional

commitment of immigration to the legislative branch"); see also Texas, 106 F.3d at

23-50632.996

665 (quoting <u>Fiallo v. Bell</u>, 430 U.S. 787, 792 (1977)) ("'[O]ver no conceivable

subject is the legislative power of Congress more complete than it is over' the

admission of aliens.").

Thus, courts of appeals have uniformly declined to consider whether

and when an "invasion" occurs because of illegal immigration, as it "involves

matters of foreign policy and defense," which the Constitution specifically

commits to the federal government.  <u>Padavan v. United States</u>, 82 F.3d 23, 28 (2d

Cir. 1996) (finding nonjusticiable plaintiffs' claim that "the federal government

violated the Invasion Clause because the influx of legal and illegal aliens into New

York State represents an 'invasion,'"); <u>New Jersey</u>, 91 F.3d at 470 (finding

nonjusticiable New Jersey's claim of invasion by illegal aliens); <u>Chiles v. United

States</u>, 69 F.3d 1094, 1097 (11th Cir. 1995) ("[W]hether the level of illegal

immigration is an 'invasion' of Florida and whether this level violates the

guarantee of a republican form of government present nonjusticiable political

questions."); <u>California v. United States</u>, 104 F.3d 1086, 1091 (9th Cir. 1997)

("There are no manageable standards to ascertain whether or when an influx of

illegal immigrants should be said to constitute an invasion.").  Likewise, the Fifth

Circuit has dismissed as nonjusticiable Texas's previous claim that the United

States' alleged "fail[ure] to control illegal immigration" violated the Naturalization

Clause, given that there were no "judicially discoverable standards for determining

23-50632.997

whether immigration control efforts by Congress are constitutionally adequate." Texas, 106 F.3d at 664-65.  While Texas looks to Justice Scalia's partial dissent in Arizona for support, that opinion acknowledged the irrelevance of the Self-Defense Clause to Arizona's power to respond to unlawful immigration.  See 567 U.S. at 419 (Scalia, J., concurring in part and dissenting in part).

Texas hopes to distinguish its case from the resounding rejection of similar "invasion" arguments in the cases cited above by centering the argument on the State's right to "engage in War" when "actually invaded."  U.S. Const., art. I, § 10, cl. 3.  But as Texas's amici admits, "by placing the responsibility to protect against invasion on the federal government, the Constitution commits the question of whether an invasion has occurred to the policy making (or political) branches *of the federal government*."  (Dkt. # 33 at 9 (emphasis added).)  And all Texas's new argument does is ask the Court to take the additional step—beyond the nonjusticiable question of whether the federal government has failed to protect Texas from invasion—of sanctioning Texas's assertion of plenary power to declare and respond to "all types of invasions, including invasions from non-state or quasi-state actors."  (Dkt. # 26 at 24.)  Under this logic, once Texas decides, in its sole

23-50632.998

discretion, that it has been invaded, it is subject to no oversight of its "chosen means of waging war."  (Dkt. # 33 at 7-8.)  Such a claim is breathtaking.[29]

## II.   The remaining equitable factors weigh in favor of a preliminary injunction.

Where, as here, the United States seeks an injunction enforcing a public-interest statute, the "extraordinary weight courts of equity place upon the public interests in a suit involving more than a mere private dispute," permits the court to grant a preliminary injunction "without making findings of irreparable harm, inadequacy of legal remedy, or the balance of convenience."  See United States v. Marine Shale Processors, 81 F.3d 1329, 1359 (5th Cir. 1996); see also United States v. FDIC, 881 F.2d 207, 210 (5th Cir. 1989) ("However, if a statutory violation is involved and the statute by necessary and inescapable inference requires injunctive relief, the movant is not required to prove the injury and public interest factors.").  Courts have applied this rule to Section 10 in particular.  See

---

[29] Such a reading would give the Governor of Texas more power than is possessed by the President of the Unites States without authorization from Congress.  See U.S. Const. art. I, § 8, cl. 11. The Texas Governor could essentially declare and wage war indefinitely at the Texas Border without Congressional authorization or oversight of any kind. The Court notes that Texas has the right to defend itself from imminent armed invasions.  However, this authority to act independently only lasts until resources of the federal government can reach the invasion.  Texas may not claim self defense from invasion at the border to justify a long-term usurping of Congressional authority.  To be clear, the Court recognizes Texas's right and duty protect the people of Texas from those who would do them harm.  However, Texas must pursue those goals by legal, congressionally authorized means when it comes to border issues.

23-50632.999

United States v. Stoeco Homes, Inc., 498 F.2d 597, 611 (3d Cir. 1974) ("No

balancing of interest or need to show irreparable injury is required when an

injunction is sought under § 12 to prevent erection or seek removal of an unlawful

structure."); United States v. Milner, 583 F.3d 1174, 1193-94 (9th Cir. 2009)

(same); United States v. Oak Beach Inn Corp., 744 F. Supp. 439, 446-47 (S.D.N.Y.

1990) (holding that because plaintiff had demonstrated a likelihood of success on

the merits of the Section 10 claim, "no further showing is required for a grant of

preliminary relief"); cf. Sanitary Dist., 266 U.S. at 432 ("[W]e are not at liberty to

consider [alleged harms to a defendant liable under Section 10] as against the edict

of a paramount power.").

 Thus, the Court's traditional equitable discretion is narrowed to

evaluating how equitable considerations "are affected by the selection of an

injunction over other enforcement mechanisms" authorized by statute.  United

States v. Oakland Cannabis Buyers' Coop., 532 U.S. 483, 498 (2001); see id. at

497 (holding courts' equitable discretion cannot "override Congress' policy choice,

articulated in a statute, as to what behavior should be prohibited").  The Court's

choice "is simply whether a particular means of enforcing the statute should be

chosen over another permissible means," and "not whether enforcement is

preferable to no enforcement at all."  Id. at 497-98; cf. Weinberger v. Romero-

Barcelo, 456 U.S. 305, 314 (1982) (explaining that district court in TVA v. Hill,

36

23-50632.1000

437 U.S. 153 (1978), lacked discretion to withhold injunction where "only an

injunction could vindicate the objectives of the Act"). Here, because preliminary

injunctive relief is the only viable mechanism for remedying Texas's statutory

violation, such relief must be awarded.

Texas does not contest this legal principle, arguing only that the

traditional equitable factors do not merit relief. Even were the Court required to

look to these factors, each favors a preliminary injunction.

Credible evidence establishes that the harm from the floating barrier is

immediate and ongoing—it is far "more than mere speculation." Janvey v.

Alguire, 647 F.3d 585, 601 (5th Cir. 2011). The floating barrier has already placed

tremendous strain on the U.S.-Mexico relationship:[30] "one of the most important,

dynamic, and economically impactful partnerships in the world." (Dkt. # 5-7 at

¶ 4.) Mexico vigorously denounces the presence of the barrier, expressing its hope

for expeditious removal of the barrier as the first topic at the August 10, 2023,

meeting between Foreign Secretary Alicia Barcena and Secretary of State Anthony

Blinken. (Dkt. # 37-9 at 9-10 (stating concern about the "very delicate situation on

---

[30] Texas cites political statements that the U.S.-Mexico relationship is stronger than
ever as evidence its buoy barrier is an inconsequential matter between the two
countries. (Dkt. # 46 at 9–10). Texas has drawn the wrong conclusion. The
unprecedented strength and collaboration between the countries currently means
the U.S. has more to lose than ever as a result of Texas's actions. Texas, not a party
to the talks and negotiations between the federal government and Mexico, has
failed to present any evidence the barrier is not of significant concern to Mexico.

23-50632.1001

the border" and interest in getting the buoys out in short order given "most of the

buoys are on the Mexican side").) The floating barrier presents an obstacle not just

to persons and vessels in the water, but to the critical discussions between the two

nations about "a new mechanism to improve the predictability and reliability of

Rio Grande water delivery from Mexico to the United States." (Dkt. # 5-5 at 6.)

The countries are at a "sensitive stage" in formulating an agreement on the topic,

set to be completed in December 2023. (Id.)

       The barrier also threatens the IBWC's ability to implement the core

provisions of the 1944 Treaty between the United States and Mexico, which is

crucial to allocation of waters in the Rio Grande. (Id. at 6-7.) The Mexican arm of

the IBWC has already stated that "these actions [placing the barrier] could affect

cooperation between the two entities going forward," and cancelled a July 24,

2023, meeting concerning water releases in response to the barrier's installation.

(Id. at 5-6.)

       Mexican officials have also raised humanitarian "concerns at the

highest diplomatic levels" about possible loss of life to persons swimming in the

Rio Grande, (id. at ¶¶ 10-11), a risk Texas's own declarant corroborates given his

description of the "treacherous conditions" migrants face in this stretch of river.

(Dkt. # 26-1 at 4 ("People entering the river at this location face treacherous

conditions, including hidden eddies that can and do drown swimmers.").) And as

23-50632.1002

discussed earlier, such harm may have already come to bear, given the discovery of two bodies near the buoy system in August 2023.

Where the United States is a party, the third and fourth elements of the traditional preliminary injunction analysis—harm to the opposing party and the public interest—merge and essentially require the Court to balance the equities of the case.  Cf. Nken, 556 U.S. at 435.  Texas argues that its interest in "preventing the harms from [drug trafficking] criminality and illegal immigration" outweigh the barrier's harm.  (Dkt. # 26 at 28.)  Though Texas "may have understandable frustrations with the problems caused by illegal immigration," it "may not pursue policies that undermine federal law."  Arizona, 567 U.S. at 416.  And "[t]here is no question" that the United States' authority under the RHA "is superior to that of the States" to implement policies they allege will "provide for the welfare or necessities of their inhabitants."  Sanitary Dist., 266 U.S. at 426.

The Court finds that the barrier's threat to human life, its impairment to free and safe navigation, and its contraindication to the balance of priorities Congress struck in the RHA outweigh Texas's interest in implementing its buoy barrier in the Rio Grande River.[31]  The harm to navigation is clearly evident from

---

[31] As this Court indicated during the hearing on this matter, it is not appropriate for the lower federal courts to usurp the authority of Congress and legislate from the Bench. This Court is mindful of the fact that Governor Abbott's "Operation Lone Star" is controversial and in ruling on this, the Motion for Preliminary Injunction before it, this Court is not issuing an order which approves or disapproves of

23-50632.1003

the evidence presented, while the State of Texas did not present any credible

evidence that the buoy barrier as installed has significantly curtailed illegal

immigration across the Rio Grande River.  Thus, for the many reasons listed

herein, the balance of hardships tips clearly in favor of the United States.  The

Court also finds that enforcing the RHA is in the public interest, given the impact

of the floating barrier on navigation, health, and safety.  Moreover, Congress has

already "decided the order of priorities" between the United States' interests and

those of Texas; the state must comply with permitting requirements if it wants to

obstruct or create a structure in the navigable waters of the United States.  <u>Oakland

Cannabis Buyers' Coop.</u>, 532 U.S. at 497.

---

Operation Lone Star as a whole or the Governor of Texas' use of the Texas
National Guard and the Department of Public Safety Officers as defenses to patrol
the Texas banks of the Rio Grande River. This Court has attempted to cabin its
ruling to only the issues placed directly before it by the parties. Unfortunately, the
Court was required to address the Governor of Texas's alleged war powers in
"repelling an invasion" only because it was an argument made by the State of
Texas and therefore this Court was compelled to address it.

40

<u>CONCLUSION</u>

In summary, the United States' Motion for a Preliminary Injunction is

**GRANTED**.  The Court has found that the United States is likely to succeed on

the merits of its claim that Defendants have violated and continue to be in violation

of 33 U.S.C. § 403 and that preliminary injunctive relief is warranted on this basis.

To the extent that further findings are required, the Court also find that Texas's

conduct irreparably harms the public safety, navigation, and the operations of

federal agency officials in and around the Rio Grande.  The Court also finds that

the balance of the equities and the public interest each favor an injunction.

Accordingly, **IT IS HEREBY ORDERED** that:

1.  Defendants and anyone working on their behalf are enjoined and hereby

    prohibited from building new or placing additional buoys, blockades, or

    structures of any kind in the Rio Grande River pending final judgement in

    this matter.

2.  Defendants shall, **by September 15, 2023**, reposition, at Defendants'

    expense, and in coordination with the United States Army Corps of

    Engineers, all buoys, anchors, and other related materials composing the

41

23-50632.1005

floating barrier placed by Texas in the Rio Grande in the vicinity of Eagle

Pass, Texas to the bank of the Rio Grande on the Texas side of the river.[32]

**3.** Absent modification by the Court, the Fifth Circuit Court of Appeals, or the

Supreme Court, this Order preliminarily enjoining the above activities shall

remain in effect until a final judgment on the merits is entered in this matter.

**IT IS SO ORDERED.**

**DATED**: Austin, Texas, September 6, 2023.

_____

David Alan Ezra
Senior United States District Judge

---

[32] With respect to the buoy barrier that is currently in place, this is a Preliminary Injunction and not a final disposition of this case on the full merits, so this Court is counseled to act in a measured way. As a result, the Court is directing that the buoy barrier be moved from the main waters of the Rio Grande River to the riverbank, rather than removal entirely from the river, so that the barrier does not impede or impair in any way navigation by airboats or other shallow draft craft along the Rio Grande River. The evidence has established that this can be done in a rather expeditious manner, as the Governor himself ordered movement of the buoy barrier, which the federal government maintained was in part in Mexican waters to a position closer to the United States side of the river. Sandra Sanchez, _Abbott Hosts Republican Governors at Border Buoys, "Ground Zero" for Illegal Immigration_, KLST SAN ANGELO (August 21, 2023) https://www.msn.com/en-us/news/us/abbott-hosts-republican-governors-at-border-buoys-ground-zero-for-illegal-immigration/ar-AA1fCccs. ("The buoys had drifted toward the Mexico side. And so out of an abundance of caution, Texas went back and moved the buoys to a location where it is clear they are on the United States side, not on the Mexican side."). This was done within a period of three days and required only the use of a floating barge and airboats. (Tr. 109:3–11) Finally, the Court intends to expedite this matter in consultation with counsel so that a final resolution on the full merits can be had within the shortest time possible.

23-50632.1006