No. 23-50632

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States of America,

Plaintiff-Appellee,

v.

Greg Abbott, in his capacity as Governor of the State of Texas;
State of Texas,

Defendants-Appellants.

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

## BRIEF FOR *AMICUS CURIAE*
## IMMIGRATION REFORM LAW INSTITUTE
## IN SUPPORT OF APPELLANTS

MATT A. CRAPO
CHRISTOPHER J. HAJEC
Immigration Reform Law Institute
25 Massachusetts Ave., NW, Suite 335
Washington, DC 20001
Telephone: (202) 232-5590

Attorneys for *Amicus Curiae*

**SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS**

Pursuant to Fifth Circuit Rule 28.2.1 and Fed. R. App. P. 26.1, *amicus curiae* Immigration Reform Law Institute makes the following disclosures:

1)      For non-governmental corporate parties please list all parent corporations: None.

2)      For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock: None.

3)      The following entity has an interest in the outcome of this case: Immigration Reform Law Institute.

DATED: September 27, 2023          Respectfully submitted,

/s/ Matt Crapo
Matt A. Crapo
Immigration Reform Law Institute
25 Massachusetts Ave., NW, Suite 335
Washington, DC 20001
Telephone: (202) 232-5590

Attorney for *Amicus Curiae*

# TABLE OF CONTENTS

**Page**

SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS

TABLE OF AUTHORITIES ........................................................................ ii

INTEREST OF *AMICUS CURIAE* ............................................................. 1

INTRODUCTION ..................................................................................... 2

ARGUMENT ............................................................................................ 4

I.   The Validity of Texas's Invocation and Exercise of its Constitutional Power to Repel an Invasion is a Non-Justiciable Political Question .......................... 4

II.  General Regulations Established by Congress Cannot Constrain Texas's Constitutional Power to Repel an Invasion ................................................. 10

CONCLUSION ......................................................................................... 16

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ariz. Dream Act Coalition v. Brewer*,
   855 F.3d 957 (9th Cir. 2017) ............................................................... 1

*Baker v. Carr*,
   369 U.S. 186 (1962) ............................................................................ 6

*California v. United States*,
   104 F.3d 1086 (9th Cir. 1997) ............................................................ 7

*Chiles v. United States*,
   874 F. Supp. 1334 (S.D. Fla. 1994), *aff'd* 69 F.3d 1094 (11th Cir. 1995) ........... 7

*Fourco Glass Co. v. Transmirra Products Corp.*,
   353 U.S. 222 (1957) .......................................................................... 14

*Kansas v. Garcia*,
   140 S. Ct. 791 (2020) ........................................................................ 13

*Lichter v. United States*,
   334 U.S. 742 (1948) ................................................................. 9, 10, 11

*Morton v. Mancari*,
   417 U.S. 535 (1974) ................................................................... 14, 15

*New Jersey v. United States*,
   91 F.3d 463 (3d Cir. 1996) ................................................................. 7

*Posadas de Puerto Rico Assocs. v. Tourism Co.*,
   478 U.S. 328 (1986) ............................................................................ 9

*Matter of Silva-Trevino*,
   26 I. & N. Dec. 826 (B.I.A. 2016) ...................................................... 1

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018) ...................................................................... 1

*United States v. Borden Co.*,
   308 U.S. 188 (1939)......................................................................15

*United States v. Estate of Romani*,
   523 U.S. 517 (1998)......................................................................14

*United States v. Texas*,
   579 U.S. 547 (2016).......................................................................1

*Wash. All. Tech Workers v. U.S. Dep't Homeland Security*,
   50 F.4th 164 (D.C. Cir. 2022)........................................................1

*Young v. Hawaii*,
   992 F.3d 765 (9th Cir. 2021) .........................................................5

## U.S. CONSTITUTION

U.S. Const. amend. X .........................................................................5

U.S. Const. art. I, § 10, cl. 3 ("State Self-Defense Clause")...................... 2, *passim*

U.S. Const. art. IV, § 4 ...................................................................5, 7

U.S. Const. art. VI, cl. 2 ..................................................................14

## STATUTES

8 U.S.C. § 1182(a)(6)(A)(i) .............................................................12

8 U.S.C. § 1227(a)(1)(B) ................................................................12

8 U.S.C. § 1325............................................................................12

Rivers and Harbors Act, § 10,
   33 U.S.C. § 403..........................................................................11

Secure Fence Act of 2006, § 2(a) & (b),
   Pub. L. 109-367, 120 Stat. 2638 (Oct. 26, 2006)................................13

## **MISCELLANEOUS**

9 Nicolay and Hay, Works of Abraham Lincoln (1894) ........................................11

C. Hughes, War Powers Under the Constitution (Sept. 5, 1917) .............................9

## INTEREST OF *AMICI CURIAE*[1]

The Immigration Reform Law Institute ("IRLI") is a non-profit 501(c)(3) public interest law firm dedicated to litigating immigration-related cases on behalf of, and in the interests of, United States citizens, and also to assisting courts in understanding and accurately applying federal immigration law. For more than twenty years the Board of Immigration Appeals has solicited supplementary briefing, drafted by IRLI staff, from the Federation for American Immigration Reform, of which IRLI is a supporting organization. IRLI has litigated or filed *amicus curiae* briefs in a wide variety of cases, including *Trump v. Hawaii*, 138 S. Ct. 2392 (2018); *United States v. Texas*, 579 U.S. 547 (2016); *Ariz. Dream Act Coalition v. Brewer*, 855 F.3d 957 (9th Cir. 2017); *Wash. All. Tech Workers v. U.S. Dep't Homeland Security*, 50 F.4th 164 (D.C. Cir. 2022), *petition for cert. filed*, No. 22-1071 (S. Ct. May 1, 2023); and *Matter of Silva-Trevino*, 26 I. & N. Dec. 826 (B.I.A. 2016).

---

[1] All parties have consented in writing to the filing of IRLI's *amicus curiae* brief. No counsel for a party in this case authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation of this brief. No person other than *amicus curiae*, its members, or its counsel made a monetary contribution to the preparation or submission of this brief.

## <u>INTRODUCTION</u>

This case arises in the context of the federal government's ongoing abdication of its duty to protect the various States from invasion and to execute the nation's immigration laws faithfully. Since inauguration day on January 20, 2021, the federal government has terminated effective immigration enforcement policies such as the Migrant Protection Protocols (colloquially known as the "Remain in Mexico policy"), restricted interior immigration enforcement actions, and ceased all border wall construction projects. The federal government's abdication of its responsibility to secure the border and protect the country from invasion has resulted an estimated 5.5 million illegal aliens' crossing the border since inauguration day. *See* FAIR Analysis: 5.5 Million Illegal Aliens Have Crossed our Borders Since Biden Took Office—How is Secretary Mayorkas Still Employed?, dated Oct. 25, 2022, available at: https://www.fairus.org/press-releases/border-security/fair-analysis-55-million-illegal-aliens-have-crossed-our-borders (last visited Sept. 26, 2023).

In response to this unprecedented border crisis, on July 7, 2022, Governor Abbott issued Executive Order GA-41, in which he invoked the State of Texas's inherent right, as recognized by Article I, § 10, of the United States Constitution, to

"secure the State of Texas and repel the illegal immigration that funds the cartels."[2] Governor Abbott authorized State officials "to respond to this illegal immigration by apprehending immigrants who cross the border between ports of entry or commit other violations of federal law, and to return those illegal immigrants to the border at a port of entry." Exec. Order GA-41 at 2. More recently, Governor Abbott announced plans to deploy "marine floating barriers" in the Rio Grande to "mak[e] it more difficult to cross the Rio Grande and reach the Texas side of the southern border." Press Release, "Governor Abbott Signs Sweeping Package Of Border Security Legislation" (June 8, 2023), available at: https://gov.texas.gov/news/post/governor-abbott-signs-sweeping-package-of-border-security-legislation (last visited Sept. 26, 2023); *see also* D. Ct. Op. at 2. One such marine floating barrier has been constructed in the Rio Grande "roughly two miles downstream of the International Bridge II in Eagle Pass," Texas. D. Ct. Op. at 3.

---

[2] Executive Order No. GA-41, relating to returning illegal immigrants to the border, is available at: https://gov.texas.gov/uploads/files/press/EO-GA-41.pdf (last visited Sept. 26, 2023). Two months later, on September 21, 2022, Governor Abbott issued Executive Order No. GA-42, in which he designated certain Mexican drug cartels as foreign terrorist organizations. Available at: https://gov.texas.gov/uploads/files/press/EO-GA-42_Mexican_cartels_foreign_terrorist_orgs_IMAGE_09-21-2022.pdf (last visited Sept. 26, 2023).

The district court issued a preliminary injunction directing the State of Texas to remove the existing barrier and prohibiting the construction of any new floating barriers. D. Ct. Op. at 41-42. The district court erred in concluding that the government is likely to succeed on the merits. The Court should vacate the district court's preliminary injunction because Article 1, § 10, cl. 3, of the Constitution explicitly recognizes that Texas retains its inherent authority to exercise war powers in the event of an invasion, and in doing so is not subject to the control of Congress.

## ARGUMENT

As Texas persuasively argues in its opening brief, the Rivers and Harbors Act ("RHA") should be read narrowly to avoid serious constitutional issues. Appellants' Br. at 31-39. If, however, such issues cannot be avoided, and the RHA and a State's valid invocation of its direct power under the Constitution are held to conflict, it is the former that should give way.

## I.    The Validity of Texas's Invocation and Exercise of its Constitutional Power to Repel an Invasion is a Non-Justiciable Political Question.

Article I, section 10, clause 3, of the Constitution ("State Self-Defense Clause"), reads (emphasis added):

> *No State shall, without the Consent of Congress*, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or *engage in War, unless actually invaded*, or in such imminent Danger as will not admit of delay.

A corresponding constitutional provision, sometimes referred to as "the Invasion Clause," requires the federal government to protect each state from invasion. U.S. CONST. art. IV, § 4 ("The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion"). These two constitutional provisions, read together with the reservation of state powers in the Tenth Amendment, show that the people conferred upon the federal government the primary responsibility to protect each State against invasion, but that the States *retained* their respective sovereign prerogatives to "engage in war" if "actually invaded." Thus, at the very least, if the federal government fails to protect a State from invasion, such State, as recognized by the State Self-Defense Clause, retains its inherent authority to engage in war. *See Young v. Hawaii*, 992 F.3d 765, 815 (9th Cir. 2021) (citing the prohibition in the State Self-Defense Clause as "corresponding[]" to the federal government's duty to defend against invasion), *vacated and remanded on other grounds*, 142 S. Ct. 2895 (2022).

The parties agree, and the district court held, D. Ct. Op. at 32, that whether an invasion has occurred is a nonjusticiable political question. *See*, *e.g.*, Appellants' Br. at 35 (citing ROA 744-45, 916-18). The district court erred, however, in determining that the Constitution always commits this question to the political branches of the *federal government*. D. Ct. Op. at 32-34. Rather, the State

Self-Defense Clause commits this determination to the various States, which

retained their respective sovereign powers to engage in war in the event of an

actual invasion *without* the consent of Congress.

In *Baker v. Carr*, the Supreme Court set forth the political question standard

as follows:

> It is apparent that several formulations which vary slightly according to
> the settings in which the questions arise may describe a political
> question, although each has one or more elements which identify it as
> essentially a function of the separation of powers. Prominent on the
> surface of any case held to involve a political question is found a
> textually demonstrable constitutional commitment of the issue to a
> coordinate political department; or a lack of judicially discoverable and
> manageable standards for resolving it; or the impossibility of deciding
> without an initial policy determination of a kind clearly for nonjudicial
> discretion; or the impossibility of a court's undertaking independent
> resolution without expressing lack of the respect due coordinate
> branches of government; or an unusual need for unquestioning
> adherence to a political decision already made; or the potentiality of
> embarrassment from multifarious pronouncements by various
> departments on one question.

369 U.S. 186, 217 (1962).

 Under this standard, as several courts of appeals have held, the question of

whether an invasion has occurred within the meaning of the Invasion Clause is

non-justiciable and committed to the political branches of the federal government.

For example, the Ninth Circuit has held that "to determine that the United States

has been 'invaded' when the political branches have made no such determination

would disregard the constitutional duties that are the specific responsibility of other

branches of government, and would result in the Court making an ineffective non-judicial policy decision." *California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997). And the Third Circuit (quoting *Baker, supra*) has held this question non-justiciable because of "'a textually demonstrable constitutional commitment of the issue to a coordinate political department,' and 'a lack of judicially discoverable and manageable standards for resolving it.'" *New Jersey v. United States*, 91 F.3d 463, 468-470 (3d Cir. 1996). *See also Chiles v. United States*, 874 F. Supp. 1334, 1342-1344 (S.D. Fla. 1994) (finding the invasion question non-justiciable because of a lack of judicially discoverable and manageable standards for resolving it), *aff'd* 69 F.3d 1094, 1097 (11th Cir. 1995) (citing *Baker* generally). In short, the Invasion Clause in Article IV of the Constitution, because it places the responsibility to protect against invasion on the federal government, and because there are no workable judicial standards to resolve whether an invasion has occurred, commits that question to the policy making (or political) branches of the federal government, not the judicial branch.

But, just as Article IV, § 4, of the Constitution commits the question of whether an invasion has occurred to the political branches of the federal government, the State Self-Defense Clause, at least within broad limits not reached here, commits the same question *to the States*. The Clause recognizes that the States *retain* their inherent power to engage in war in the event of an actual

invasion. And they do not retain it subject to the oversight of Congress, but rather even without its consent.

The district court erroneously construed IRLI's *amicus* brief below as suggesting that the question of whether an invasion has occurred was committed "to the policy making (or political) branches *of the federal government*" in this case. D. Ct. Op. at 34 (referring to "Texas's amici" and citing Dkt. # 33 at 9) (emphasis by D. Ct.). But, as noted above, the Constitution, at least for purposes of the State Self-Defense Clause, commits this determination to the various States, which retained their inherent authority to engage in war in the case of an actual invasion. To read the Clause as committing this decision to the federal government would read the phrase "without the consent of Congress" out of that provision.

As Texas rightly points out, Governor Abbott, as the Governor of Texas, has the "power to determine whether Texas has been 'actually invaded.'" Appellants' Br. at 36. Here, Governor Abbott has asserted Texas's sovereign interest in protecting her borders by invoking State Self-Defense Clause, thereby enabling the State of Texas to protect its own territory against invasion by "transnational criminal cartels." *Id.* at 5 (citing ROA 57-59). Because the Constitution commits the question of whether an invasion has occurred to a political actor, the State of Texas, and because there are, at least within broad limits, no manageable standards

for the judiciary to apply, Governor Abbott's invocation of the State's inherent and retained authority to defend itself is non-justiciable.

Similarly, whatever actions constitute a permissible exercise of the war power is also, at least within broad limits, non-justiciable and is committed by the Constitution to any State that has been invaded. As the Supreme Court has recognized, "'[t]he power to wage war is the power to wage war successfully.'" *Lichter v. United States*, 334 U. S. 742, 780 (1948) (quoting address by C. Hughes, War Powers Under the Constitution (Sept. 5, 1917)). Though it is for an invaded State to decide, the greater power to "engage in War" granted in the Constitution would unquestionably include the lesser power to build a floating marine barrier to prevent invaders from entering the State. *See*, *e.g.*, *Posadas de Puerto Rico Assocs. v. Tourism Co.*, 478 U.S. 328, 345-46 (1986) (holding under this principle that the greater power to ban gambling casinos includes the lesser power to ban their advertising); *Lichter*, 334 U.S. at 778-79 ("[T]he exercise of broad discretion as to methods to be employed may be essential to an effective use of its war powers by Congress.").

In sum, under the State Self-Defense Clause, the various States reserved and did not surrender their respective inherent sovereign prerogatives to engage in war in the event of an actual invasion. What constitutes an actual invasion is committed to the respective States in the Clause, and (at least within broad parameters) neither

this question nor the question of what means of waging war are appropriate is amenable to judicial resolution. This Court should hold that whether an invasion of Texas has occurred and whether Texas has chosen an appropriate means to engage in war are both non-justiciable political questions, to be decided by Texas. And, because Texas's determinations are non-justiciable, this Court should not second-guess their validity under the Constitution.

## II. General Regulations Established by Congress Cannot Constrain Texas's Constitutional Power to Repel an Invasion.

The district court determined that by constructing the floating marine barrier in the Rio Grande without federal permission, Texas has violated the RHA. D. Ct. Op. at 24-29. But to accept the district court's determination that Texas violated the RHA would be to write out the phrase "without the consent of Congress" from the State Self-Defense Clause.

*Lichter* is instructive. There, the Supreme Court quoted President Lincoln's reflection on the power of Congress to pass a Conscription Act as follows:

> The Constitution gives Congress the power [to raise and support armies], but it does not prescribe the mode, or expressly declare who shall prescribe it. In such case Congress must prescribe the mode, or relinquish the power. There is no alternative . . . . The power is given fully, completely, unconditionally. It is not a power to raise armies if State authorities consent; nor if the men to compose the armies are entirely willing; but it is a power to raise and support armies given to Congress by the Constitution, without an "if."

334 U.S. at 756 n.4 (quoting 9 Nicolay and Hay, Works of Abraham Lincoln 75-77 (1894)). Likewise, there is no "if" in the State Self-Defense Clause pertaining to Congress or any political branch of the federal government, no condition allowing Congress to control the States in exercising their inherent war-making power. On the contrary, the Constitution recognizes that the various States may exercise it even over Congress's objection.

Because the Constitution thus broadly dispenses with any need for approval by Congress, moreover, it also should be read to dispense with any need for approval by an agency to which Congress has delegated such authority in a statute. Otherwise, Congress could too easily circumvent the Constitution's removal of any need for its consent, and veto State self-defense by proxy. That State war powers, if validly invoked, may be exercised without such direct or delegated consent disposes of any statutory or preemption arguments based on the RHA. Insofar as the RHA requires Texas to receive federal permission for its barriers, RHA § 10, 33 U.S.C. § 403, that requirement is unconstitutional as applied to Texas's valid, chosen means of waging war. Far from needing this federal consent under the State Self-Defense Clause, Texas may employ its chosen means even over the objection of Congress itself, let alone the Army Corps of Engineers.

The district court described Texas's retained right to wage war in self-defense under the State Self-Defense Clause, "subject to no oversight," as

"breathtaking." D. Ct. Op. at 35; *see also id.* at note 29 (suggesting that the Governor's power would exceed that of the President under this reading). But the district court failed to recognize that the Governor's actions are constrained both by political considerations and by the Texas legislature. And, as Texas points out, while other States "may choose to allocate their self-defense power differently," Texas has seen fit to vest this power in the Governor. Appellants' Br. at 36. Instead of breathtaking, it is rather unremarkable that such inherent self-defense power is retained by each of the fellow States of the Union and may be invoked or exercised by the appropriate state actor in response to an actual invasion.

Also, in determining that Texas lacks the authority to act in self-defense without the consent of Congress, the district court stressed that the Constitution commits the regulation of immigration and the admission of aliens exclusively to Congress. D. Ct. Op. at 32-33. But aliens who surreptitiously cross into the United States with the assistance of the cartels are not acting in compliance with Congress's immigration laws nor seeking lawful admission. Instead, such aliens are violating immigration laws. *See* 8 U.S.C. § 1182(a)(6)(A)(i) (making any alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, inadmissible); *id.* § 1227(a)(1)(B) (making any alien who is present in the United States in violation of law deportable); *id.* § 1325 (making it unlawful for an

alien to enter or attempt to enter the United States at any time or place other than as designated by immigration officers). Therefore, Texas's actions to prevent such aliens from crossing the Rio Grande are in furtherance of the purposes of federal immigration law, and as such are not preempted. *See*, *e.g.*, *Kansas v. Garcia*, 140 S. Ct. 791, 806-07 (2020) (holding that State laws that overlap to some degree with federal immigration laws are not preempted where it is possible to comply with both laws and federal interests are not frustrated). Far from frustrating federal purposes, Texas's actions are in complete alignment with Congress's goal of preventing unlawful immigration. Congress has directed the Secretary of Homeland Security to "take all actions the Secretary determines necessary and appropriate to achieve and maintain operational control over the entire international land and maritime borders of the United States …." § 2(a), Secure Fence Act of 2006, Pub. L. 109-367, 120 Stat. 2638 (Oct. 26, 2006). Congress defined "operational control" to mean "the prevention of *all unlawful entries into the United States*, including entries by terrorists, other unlawful aliens, instruments of terrorism, narcotics, and other contraband." *Id.* § 2(b) (emphasis added). Texas's actions to prevent unlawful entries into the United States are therefore fully aligned with Congress's purposes and goals, and thus, pursuant to *Garcia*, not preempted.

Finally, whether Texas is bound by Congress's general rules and regulations, and whether the RHA or the Immigration and Nationality Act (INA) preempt

Texas's marine defenses, is also decidable by the more specific provision over the more general rule. The RHA is a general law governing navigable waters such as the Rio Grande. The INA regulates immigration. In contrast, the State Self-Defense Clause deals with the specific circumstance of a State's exercising its war powers in the event of an actual invasion. Ordinarily, specific terms prevail over general terms. "However inclusive may be the general language of a statute, it will not be held to apply to a matter specifically dealt with in another part of the same enactment." *Fourco Glass Co. v. Transmirra Products Corp.*, 353 U.S. 222, 228 (1957) (citations omitted). The same principle is used to resolve conflict between two statutes. *See*, *e.g.*, *United States v. Estate of Romani*, 523 U.S. 517, 532 (1998) (later, more specific statute governs); *see also Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) (a general statute will not be held to have repealed by implication a more specific one unless there is "clear intention otherwise").

It is, of course, impossible for a statute to preempt a constitutional provision, since the only laws that are, along with the Constitution itself, "the supreme Law of the Land" are those "made in Pursuance" of the Constitution. U.S. CONST. art. VI, cl. 2. To the extent a federal statute conflicts with the Constitution, as would be necessary somehow to preempt it, it is not a constitutional statute and cannot preempt anything, let alone the constitutional provision with which it conflicts.

Thus, States' exercises of their valid authority under the State Self-Defense Clause are not preempted by either the RHA or the INA. Rather, as with statutes,

> [t]he courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective. "When there are two acts upon the same subject, the rule is to give effect to both if possible."

*Mancari*, 417 U.S. at 551 (quoting *United States v. Borden Co.*, 308 U.S. 188, 198 (1939)). The RHA, the INA, and the State Self-Defense Clause, all being the supreme law of the land, should all be given effect, and that is accomplished by the displacement of the RHA and the INA in narrow situations where the State Self-Defense Clause is validly invoked. And, as shown above, the validity of an invocation of the Clause, at least within broad parameters, is not to be decided by courts, but is a nonjusticiable political question committed to the States.

In sum, even if the Court were to decide that Texas's actions conflict with the terms of the RHA or the INA, Texas retains the inherent authority to take those actions under the State Self-Defense Clause. And, as long as the State deems those actions necessary to repel an actual invasion, the Constitution recognizes its authority to take them without the federal consent required by the RHA. Because Texas validly invoked its retained inherent authority under the State Self-Defense Clause, its chosen means of defense take precedence, and the federal government cannot show any substantial likelihood of success on the merits of this action.

## **CONCLUSION**

For the forgoing reasons, the Court should reverse and vacate the district court's preliminary injunction.

DATED: September 27, 2023          Respectfully submitted,

/s/ Matt Crapo
Matt A. Crapo
Christopher J. Hajec
Immigration Reform Law Institute
25 Massachusetts Ave., NW, Suite 335
Washington, DC  20001
Telephone: (202) 232-5590

Attorneys for *Amicus Curiae*

**CERTIFICATE OF SERVICE**

I certify that on September 27, 2023, I electronically filed the foregoing

*amicus* brief with the Clerk of the Court for the United States Court of Appeals for

the Fifth Circuit by using the appellate CM/ECF system.  Participants in the case

are registered CM/ECF users, and service will be accomplished by the appellate

CM/ECF system.

/s/ Matt Crapo
Matt A. Crapo

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with Fed. R. App. P. 27(d)(2)(A) because it contains 3,668 words, as measured by Microsoft Word software. The brief also complies with the typeface and style requirements of Fed. R. App. P. 32(a)(5) & 32(a)(6) because it has been prepared in a proportionally spaced, Roman-style typeface of 14 points or more.

DATED: September 27, 2023  Respectfully submitted,

        /s/ Matt Crapo
        Matt A. Crapo