No. 23-50632

UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff/Appellee*,

v.

GREG ABBOTT, in his capacity as Governor of the State of Texas, and
STATE OF TEXAS,
*Defendants/Appellants*

On appeal from the United States District Court for the Western District of Texas
Case No. 1:23-cv-00853

## APPELLEE'S ANSWERING BRIEF

JAIME ESPARZA
*United States Attorney*

JAMES E. DINGIVAN
LANDON A. WADE
*Assistant United States Attorneys*
United States Attorney's Office
Western District of Texas
601 N.W. Loop 410, Ste 600
San Antonio, TX 78216

TODD KIM
*Assistant Attorney General*

ANDREW M. BERNIE
MICHAEL T. GRAY
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 532-3147
michael.gray2@usdoj.gov

## CERTIFICATE OF INTERESTED PERSONS

Under the fourth sentence of Fifth Circuit Rule 28.2.1, Appellees, as a

governmental party, need not furnish a certificate of interested persons.

/s/Michael T. Gray
MICHAEL T. GRAY
Attorney, Appellate Section
Environment and Natural Resources
Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 532-3147
michael.gray2@usdoj.gov

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is scheduled for October 5, 2023.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..........................................................i

STATEMENT REGARDING ORAL ARGUMENT ............................................. ii

TABLE OF AUTHORITIES .............................................................................v

INTRODUCTION ..........................................................................................1

STATEMENT OF JURISDICTION..................................................................3

STATEMENT OF THE ISSUE........................................................................3

STATEMENT OF THE CASE.........................................................................3

    A.    Statutory and Regulatory Background ...................................3

    B.    Factual background ...............................................................4

    C.    Proceedings below.................................................................5

SUMMARY OF ARGUMENT .......................................................................9

ARGUMENT ..............................................................................................11

I.    The district court correctly held that the United States is likely
to succeed on the merits of its RHA claims. ..................................12

    A.    The district court correctly found that the United States is
likely to prevail in showing that the relevant section of
the Rio Grande is a Section 10 "navigable river." .............12

        1.    Evidence of the river's historical navigability
amply supports the court's "navigability" finding....................13

        2.    Evidence of the river's capacity for future
navigation amply supports the court's
"navigability" finding. .............................................17

3.  Texas's other arguments on navigability lack
    merit. ............................................................................21

B.  Texas's barrier obstructs the Rio Grande's navigable
    capacity.........................................................................24

C.  Texas's barrier is a "boom" or "other structure" built
    without a permit............................................................29

D.  Texas's defense that is has been "actually invaded" and
    therefore may "engage in war" is without merit. ...............35

II.  The district court did not abuse its discretion in weighing the
     equities. ..................................................................................44

A.  The district court correctly held that Congress decided
    the public interest in the RHA.........................................44

B.  The district court did not abuse its discretion in finding
    that the equities weigh in favor of an injunction................47

III.  The district court committed no other error in issuing a
      preliminary injunction. ..........................................................50

IV.  At minimum, the district court's prohibitory injunction should
     be affirmed.............................................................................52

CONCLUSION...................................................................................52

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Arizona v. United States*,
    567 U.S. 387 (2012)...............................................................................37, 41

*Atlee v. Union Packet Co.*,
    88 U.S. 389 (1874).........................................................................................30

*Baker v. Carr*,
    369 U.S. 186 (1962).......................................................................................37

*Ball v. LeBlanc*,
    792 F.3d 584 (5th Cir. 2015) ........................................................................50

*In re Bonvillian Marine Serv., Inc.*,
    19 F.4th 787 (5th Cir. 2021) ........................................................................45

*Byrum v. Landreth*,
    566 F.3d 442 (5th Cir. 2009) .................................................................18, 20

*California v. United States*,
    104 F.3d 1086 (9th Cir. 1997) ...............................................................36, 39

*Chiles v. United States*,
    69 F.3d 1094 (11th Cir. 1995) .....................................................................37

*Chy v. Freeman*,
    92 U.S. 275 (1875).........................................................................................41

*City of New York v. Golden Feather Smoke Shop, Inc.*,
    597 F.3d 115 (2d Cir. 2010) .........................................................................44

*Economy Light & Power Co. v. United States*,
    256 U.S. 113 (1921)....................................................................12, 16, 17, 20

*Epi's Canoe & Kayak Team, LLC v. Texas*,
    No. D-1-GN-23-003613 (98th Jud. Dist. Travis Co. Tex.)..........................22

*Equitable Life Assur. Soc. of U.S. v. MacGill,*
    551 F.2d 978 (5th Cir. 1977) ..........................................................31

*Jennings v. Rodriguez,*
    138 S. Ct. 830 (2018)....................................................................36

*Lomax v. Ortiz-Marquez,*
    140 S. Ct. 1721 (2020)..................................................................34

*Lykes Bros. Inc. v. USACE,*
    821 F. Supp. 1457 (M.D. Fla. 1993) ...........................................19

*New Jersey v. United States,*
    91 F.3d 463 (3d Cir. 1996) ...........................................................37

*Nielsen v. Preap,*
    139 S. Ct. 954 (2019)....................................................................23

*Norfolk & W. Co. v. United States,*
    641 F.2d 1201 (6th Cir. 1980) ......................................................28

*Norris v. Causey,*
    869 F.3d 360 (5th Cir. 2017) ..................................................23, 52

*Oklahoma v. Texas,*
    258 U.S. 574 (1922).......................................................................14

*Padavan v. United States,*
    82 F.3d 23 (2d Cir. 1996) ...................................................37, 39, 40

*PPL Montana, LLC v. Montana,*
    565 U.S. 592-93 (2012) .................................................................14

*Puente de Reynosa, S.A. v. City of McAllen,*
    357 F.2d 43 (5th Cir. 1966) ..........................................................16

*Restaurant Law Center v. U.S. Dep't of Labor,*
    66 F.4th 593 (5th Cir. 2023) .........................................................11

*Rodriguez de Quijas v. Shearson/American Express, Inc.,*
    490 U.S. 477 (1989).......................................................................23

*Rollins v. Home Depot USA*,
    8 F.4th 393 (5th Cir. 2021) ............................................................ 45

*Sackett v. EPA*,
    598 U.S. 651 (2023) ...................................................................... 23

*Sanitary Dist. of Chicago v. United States*,
    266 U.S. 405 (1924) ...................................................................... 46

*Sesay v. United States*,
    984 F.3d 312 (4th Cir. 2021) ........................................................ 48

*Speaks v. Kruse*,
    445 F.3d 396 (5th Cir. 2006) ........................................................ 11

*Sterling v. Constantin*,
    287 U.S. 378 (1932) ...................................................................... 36

*Texas v. United States*,
    106 F.3d 661 (5th Cir. 1997) ........................................................ 37

*The Daniel Ball*,
    77 U.S. 557, 10 Wall. 557 (1871) ................................................ 12

*Tugwell v. Eagle Pass Ferry Co.*,
    74 Tex. 480, 9 S.W. 120 (1888) ................................................... 15

*United States v. Angell*,
    292 F.3d 333 (2d Cir. 2002) ................................................... 25, 28

*United States v. Appalachian Elec. Power Co.*,
    311 U.S. 377 (1940) ........................................... 12, 14, 15, 16, 18, 19, 20, 22

*United States v. Boyden*,
    696 F.2d 685 (9th Cir. 1983) ........................................................ 25

*United States v. Crow, Pope & Land Enter., Inc.*,
    340 F. Supp. 25 (N.D. Ga. 1972) .................................................. 15

*United States v. Diamond*,
    512 F.2d 157 (5th Cir. 1975) ........................................................ 22

*United States v. Estate of Boothby*,
    16 F.3d 19 (1st Cir. 1994)...............................................................24

*United States v. FDIC*,
    881 F.2d 207 (5th Cir. 1989) ..........................................................44

*United States v. Lopez*,
    514 U.S. 549 (1995)..........................................................................21

*United States v. Marine Shale Processors*,
    81 F.3d 1329 (5th Cir. 1996) .......................................8, 44, 45, 46

*United States v. Mackay*,
    757 F.3d 195 (5th Cir. 2014) ..........................................................32

*United States v. Milner*,
    583 F.3d 1174 (9th Cir. 2009) ........................................................44

*United States v. Morrison*,
    529 U.S. 598 (2000)..........................................................................21

*United States v. Munoz-Flores*,
    495 U.S. 385 (1990)..........................................................................37

*United States v. Oakland Cannabis Buyers' Coop.*,
    532 U.S. 483 (2001)..........................................................................46

*United States v. Raven*,
    500 F.2d 728 (5th Cir. 1974) ....................................................24, 25

*United States v. Republic Steel Corp.*,
    362 U.S. 482 (1960)..................................................18, 25, 26, 27

*United States v. Rio Grande Dam & Irrigation Co.*,
    174 U.S. 690 (1899)..........................................24, 25, 27, 28

*United States v. Sineneng-Smith*,
    140 S. Ct. 1575 (2020).....................................................................30

*United States v. Stoeco Homes, Inc.*,
    498 F.2d 597 (3d Cir. 1974) ...........................................................45

*United States v. Utah*,
    283 U.S. 64 (1931)........................................................................22

*United States v. W. Indies Transp., Inc.*,
    127 F.3d 299 (3d Cir. 1997) .......................................................28

*United States v. Weil*,
    35 Ct. Cl. 42 (1900) ....................................................................15

*Vieux Carre Prop. Owners, Residents & Assoc., Inc. v. Brown*,
    875 F.2d 453 (5th Cir. 1989) .......................................................29

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)..........................................................................11

*Wyandotte Transp. Co. v. United States*,
    389 U.S. 191 (1967).......................................................................3

*Yates v. United States*,
    574 U.S. 528 (2015)......................................................................32

## Constitution

U.S. Const. art. I, § 8, cl. 11...............................................................41, 42

U.S. Const. art. I, § 10, cl.3...........................................................38, 39, 41, 42

U.S. Const. art. II, § 2 cls. 1 & 2.............................................................42

## Statutes and Court Rules

28 U.S.C. § 1292(a)(1)................................................................................3

28 U.S.C. § 1331 .......................................................................................3

28 U.S.C. § 1345 .......................................................................................3

28 U.S.C. § 1355 .......................................................................................3

Rivers and Harbors Act of 1899
    33 U.S.C. § 403 ..................................................................... 3, 4, 5, 13, 24, 29

    33 U.S.C. § 406 .............................................................................. 4, 47

    33 U.S.C. § 413 ..................................................................................... 4

February 2, 1848,
    9 Stat. 922, 1848 WL 6374 ........................................................... 25, 26

Act of May 15, 1886, c. 332,
    24 Stat. 28 ........................................................................................ 15

23 Stat. 29 ............................................................................................. 15

Act of May 17, 1886, c. 354,
    24 Stat. 63 ........................................................................................ 15

26 Stat. 495 ........................................................................................... 15

26 Stat. 502 ........................................................................................... 15

Act of June 30, 1916, c. 200,
    39 Stat. 251 ....................................................................................... 15

42 Stat. 1482 ......................................................................................... 15

Fed. R. App. P. 4(a)(1)(B) ........................................................................ 3

Fed. R. App. P. 28(a)(8)(A) ................................................................. 23, 52

Fed. R. Evid. 201 .................................................................................. 50

## Federal Regulations

33 C.F.R. § 322.3(a) ................................................................................. 4

33 C.F.R. § 325.2(e)(4) ............................................................................ 43

**Other Authorities**

2 Records of the Federal Convention of 1787 625-26 (Farrand ed.).......................43

3 J. Story, Commentaries on the Constitution § 1404 n.1 (1873) ...........................43

3 J. Story, Commentaries on the Constitution § 1172 (1833) ...........................39, 41

Art. of Conf., art. VI (1781)...................................................................................42

*Boom*, Webster's International Dictionary of the English Language
    (1890)...............................................................................................................30

*Boom*, Webster's Revised Unabridged Dictionary (1913) ......................................30

*Debates and Other Proceedings of the Convention of Virginia*, 302
    (2d ed., 1805).................................................................................................39

Edmund Randolph, 3 Debates in the Several State Conventions 70
    (Elliot ed. 1836).............................................................................................40

Frank Leslie, *The Great Log Jam*, Popular Monthly (July 1901),
    http://www.catskillarchive.com/rrextra/lgjam.html .......................................30

*Invade*, 1 Noah Webster, American Dictionary of the English
    Language 113 (1828)......................................................................................40

*Invasion*, Stewart Rapalje & Robert L. Lawrence, A Dictionary of
    American & English Law (1899) .....................................................................40

*Obstruction*, Black's Law Dictionary (11th ed. 2019) .............................................27

*Structure*, The Century Dictionary and Cyclopedia (1900)....................................31

Treaty on Utilization of Waters of the Colorado and Tijuana Rivers
    and of the Rio Grande, art. 21, Feb. 3, 1944 .................................................26

*War*, Noah Webster, American Dictionary of the English Language
    (1828)...............................................................................................................39

## INTRODUCTION

Texas appeals from a preliminary injunction directing it to move to the riverbank a 1,000-foot-long barrier it built in the middle of the Rio Grande, along the international border, without federal authorization. The barrier violates the Rivers and Harbors Act of 1899 (RHA), which Congress enacted to protect navigable rivers both by prohibiting obstructions to their navigable capacity absent congressional authorization and by prohibiting structures in rivers without a permit from the U.S. Army Corps of Engineers (Corps). The United States sued to compel Texas to remove the barrier and to prevent Texas from building more barriers in the river without federal authorization.

After allowing Texas limited discovery and holding an evidentiary hearing, the district court concluded that Texas's actions likely violated the statute and that the equities favored the United States. The district court therefore granted a preliminary injunction requiring Texas to move the barrier to the riverbank and prohibiting Texas from building more barriers in the river while the case proceeds.

The district court did not abuse its discretion in granting the injunction. The court correctly found that the United States will likely prevail in demonstrating that the relevant stretch of the Rio Grande is navigable within the established meaning of the RHA, that a 1,000-foot barrier in the middle of the river obstructs its navigable capacity, and that, in any event, the barrier is an unpermitted "boom" or

1

"other structure." The court also correctly rejected Texas's theory that the barrier is a constitutionally protected exercise of Texas's right to "engage in war" in response to being "actually invaded." And the court correctly concluded that because the RHA is a public-interest statute, the public interest clearly favors an injunction, and one could appropriately issue here without further consideration of the equities. Texas did not attempt to refute that argument in the district court and therefore forfeits any challenge to it here. The district court nonetheless also correctly found that the United States will suffer irreparable harm, including to its relationship with Mexico, if the barrier is not promptly moved. Finally, the court correctly found no credible evidence that Texas's barrier has served to curb unlawful immigration or cartel activity, or further any other legitimate interest asserted by Texas.

Texas's opening brief supplies unsupported speculation and rhetoric rather than any sound basis to overturn the district court's reasoned order. Texas cannot overcome the well-established legal principles underlying the district court's order, and it cannot dispute the simple facts, as found by that court. Texas's attempt to inject a constitutional question into the court's straightforward application of the RHA is equally untethered from legal precedent and common sense. This Court should immediately dissolve the administrative stay and affirm.

2

## STATEMENT OF JURISDICTION

(a)     The United States filed this action alleging that Texas violated Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403. The district court had jurisdiction under 28 U.S.C. §§ 1331, 1345, and 1355.

(b)     The district court entered a preliminary injunction. ROA.1005-1006. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

(c)     The district court entered the preliminary injunction order on September 6, 2023. ROA.1005-1006. Texas filed a notice of appeal the same day. ROA.1007. This appeal is timely under Federal Rule of Appellate Procedure 4(a)(1)(B).

## STATEMENT OF THE ISSUE

Whether the district court abused its discretion when it issued a preliminary injunction requiring Texas to move the barrier to the bank of the Rio Grande and prospectively prohibiting Texas from building other barriers in the river until the case is resolved.

## STATEMENT OF THE CASE

### A.     Statutory and Regulatory Background

Congress enacted the RHA "to prevent obstructions in the Nation's waterways," and the Supreme Court has "consistently found its coverage to be broad." *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967). Section

3

10 of the RHA prohibits "creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States." 33 U.S.C. § 403. Section 10 independently prohibits "build[ing] or commenc[ing] the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States . . . except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army." *Id.*; *see also* 33 C.F.R. § 322.3(a).

Section 12 of the RHA provides that "the removal of any structures or parts of structures erected in violation of [Section 10, and other enumerated RHA provisions] may be enforced by the injunction of any district court exercising jurisdiction in any district in which such structures may exist, and proper proceedings to this end may be instituted under the direction of the Attorney General of the United States." 33 U.S.C. § 406; *see also id.* § 413.

## B.   Factual background

In mid-July, Texas built a 1,000-foot-long barrier in the Rio Grande along (and initially crossing) the international border with Mexico by Eagle Pass, Texas, tethering interlocking four-foot buoys to almost 140 tons of concrete blocks to anchor the barrier in the river. ROA.967-968. Texas neither sought nor obtained Congress's permission or a permit from the Corps, despite the requirements of

RHA Section 10, 33 U.S.C. § 403. ROA.967. And Texas refused to remove the barrier after being notified by the United States that Section 10 prohibited the unauthorized barrier. ROA.55-56 (Governor's letter).

### C. Proceedings below

The United States filed suit, and it moved for a preliminary injunction two days later. The district court allowed Texas limited depositions. While the parties were briefing the preliminary injunction motion, an International Boundary and Water Commission (IBWC) survey concluded that much of the barrier was in Mexico, ROA.691, and in response Texas unilaterally moved the barrier without notice to the United States or the district court, ROA.893-901.

The district court held a hearing on the motion, with testimony from three witnesses, and then granted the United States' motion in a 42-page decision. ROA.965. The district court first found that the Rio Grande near Eagle Pass is a navigable water of the United States under the RHA, as the United States "presented sufficient evidence to carry its burden at this stage." ROA.971-982. The court noted that Congress has four times enacted statutes requiring the maintenance of "free navigation" in this stretch of the Rio Grande. ROA.975 (citing statutes). And it found that "[t]he historical navigability of miles 275.5 to 610.0 of the Rio Grande River—in which the relevant stretch of river lies—is also memorialized in" a 1975 Corps study, which itself reiterates a 1950 finding of navigability that the

Corps re-adopted in 2011. ROA.978-980. Those facts, evidence of navigation in the 1850s, and court cases addressing competitive commercial navigation on the river demonstrated the relevant stretch of the Rio Grande was historically "navigable" under the RHA. As the court explained, historical navigability is sufficient under the RHA as authoritatively construed by the Supreme Court. ROA.972-974, 978.

Second, the district court separately found that this stretch of the Rio Grande is "navigable" because it is capable of "increased commercial navigation with re-prioritization and increased flow from the Amistad Dam." ROA.980. "The natural and ordinary condition of the Rio Grande River" and "its volume of water, gradient, and regularity of flow" remain such that "future improvement for smaller commercial craft" is possible. ROA.981 (quotation marks omitted). The court likewise found that increased flow could result naturally, enabling future navigation. ROA.976-978. Again, the court applied Supreme Court precedent holding that susceptibility to future navigation is sufficient. ROA.972-974.

Next, the district court concluded that Texas's barrier obstructs the navigable capacity of the Rio Grande under Section 10's first clause. ROA.983-988. The court pointed to, among other things: (1) Texas's self-described purpose of obstructing lateral transit across the river; (2) credible testimony establishing that "[t]he placement and tandem configuration of the buoys present a structural barrier

6

to cross-river navigation"; (3) concrete blocks that are not easily seen and that "present a serious risk to watercraft of any kind"; and (4) testimony from Texas's own declarants "that this stretch of the Rio Grande includes hidden obstacles like sand bars, rocks, and natural debris" that "make it even more imperative for anyone piloting down the river to have free reign of the entire width and a clear view of all obstacles, lest they be forced into a hazard." ROA.983-987 (quotation marks omitted).

Then, the district court concluded that the barrier violated the RHA for the independent reason that it constitutes a "boom" or "other structure[]" requiring a permit under Section 10's second clause. ROA.989. Referencing multiple dictionaries, the court explained that the barrier "resembles a 'boom,'" as it is "a 1,000-foot-long chain of buoys fastened together with metal cables and tethered with concrete blocks to the riverbed, intended to obstruct the passage of vessels and people." ROA.989. Alternatively, the court ruled, the barrier clearly falls within the "other structures" category. ROA.991-992.

Finally, the court rejected Texas's "self-defense" argument, concluding that Texas's disagreement with federal immigration policy does not entitle it to violate a federal statute, ROA.994, and that whether an actual invasion is occurring that would permit Texas to engage in war under Article I, section 10, is a question committed to the political branches of the *federal* government, ROA.995-996.

7

Turning to the equities, the court concluded that it had no need to find irreparable harm or balance the equities in determining that injunctive relief must be awarded because Congress has already decided the public interest weighs heavily in favor of an injunction. ROA.999 (citing *United States v. Marine Shale Processors*, 81 F.3d 1329, 1358-59 (5th Cir. 1996)). The district court nevertheless analyzed those traditional equitable factors and found that they support an injunction, given, among other things, that "[t]he floating barrier has already placed tremendous strain on the U.S.-Mexico relationship." ROA.1001-1002. By contrast, "the State of Texas did not present any credible evidence that the barrier as installed has significantly curtailed illegal immigration across the Rio Grande River." ROA.1004.

The court enjoined Texas from building new or placing additional structures in the river pending final judgment, and directed that, by September 15, Texas must reposition the current barrier (including anchors and other related materials) to the Texas-side riverbank in coordination with the Corps. ROA.1005-1006.

Texas timely appealed and moved for a stay pending appeal and an administrative stay. This Court granted the administrative stay, carried the motion for stay pending appeal with the case, and expedited briefing and argument.

8

# SUMMARY OF ARGUMENT

The district court did not abuse its discretion in issuing a preliminary injunction requiring Texas to move its barrier to the banks of the Rio Grande and prohibiting Texas from building more barriers in the river during this litigation.

1. The district court correctly ruled that the United States is likely to succeed in demonstrating that the Rio Grande is a "navigable river" under the RHA and that Texas has obstructed the river's navigable capacity without congressional permission, built a "boom" or "other structure" in the river without a Corps permit, or both. Navigability is a factual question, and one that the Supreme Court has long understood to encompass rivers that have supported commercial navigation in the past or could support commercial navigation in the future if subject to reasonable improvements. The district court correctly found both to be true here, based on substantial evidence that the river was historically navigable and that with reasonable improvements and re-prioritization of water use, the relevant stretch of the Rio Grande could support commercial navigation. Texas's barrier obstructs the navigable capacity of the river both by blocking cross-river activity (as it was designed to do) and by forcing any craft navigating up-and-down the river to avoid the barrier. And even if that were not so, the barrier is plainly a "boom" or "other structure" in the river, as it consists of a 1,000-foot-long chain of interconnected buoys anchored to the riverbed with 140 tons of concrete blocks.

9

The district court also correctly rejected Texas's constitutional defenses. Texas's theory that federal regulation of its barrier potentially runs afoul of the Commerce Clause—an argument Texas barely even briefed in the district court— is foreclosed by the Supreme Court's precedent interpreting the RHA. Texas's other theory—that the barrier is a constitutionally protected exercise of its supposed right to "engage in war" in response to being "actually invaded," that neither the federal executive, Congress, or any court can countermand—is unsupported by any legal precedent and contravenes the basic premises of our federal system. The district court correctly concluded that whether there is an "invasion" is a non-justiciable political question assigned to the federal political branches. But even if the issue could be decided by the courts, Texas has not been "actually invaded," nor does it even claim to be "engaged in war" in response. The Constitution therefore provides no cover for Texas's unlawful obstruction of navigation.

2. The district court also did not abuse its discretion in weighing the equities. The district court correctly concluded, consistent with precedent from this Court, that the RHA is a public interest statute such that the public interest weighs heavily in favor of an injunction to remedy Texas's unlawful conduct, obviating the need to consider irreparable harm and the balance of the equities. Texas did not challenge that ruling below and therefore forfeits any challenge to it here. Still, the

district court fully examined the equities and correctly concluded that the United States will suffer harm to navigation, federal operations, and its relationship with Mexico if the barrier remains in place. By contrast, the harm to Texas from an injunction are illusory, as no credible evidence shows that the barrier is reducing the harms Texas alleges.

3. Finally, Texas makes no argument specific to the part of the injunction prohibiting Texas from building more barriers in the river. This Court should affirm in full, but at the very least there is no basis for vacating the prohibitory injunction.

## ARGUMENT

This Court reviews the district court's grant of a preliminary injunction only for abuse of discretion. *Speaks v. Kruse*, 445 F.3d 396, 399 (5th Cir. 2006). Findings of fact are reviewed for clear error and conclusions of law *de novo*. *Restaurant Law Center v. U.S. Dep't of Labor*, 66 F.4th 593, 597 (5th Cir. 2023) (citation omitted).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S.

7, 20 (2008). The district court correctly found that the United States met those

requirements, and that decision was not an abuse of discretion.

## I.   The district court correctly held that the United States is likely to succeed on the merits of its RHA claims.

### A.   The district court correctly found that the United States is likely to prevail in showing that the relevant section of the Rio Grande is a Section 10 "navigable river."

Under binding precedent, a "navigable river" under Section 10 of the RHA

is one that currently supports commercial navigation, historically supported

commercial navigation, *or* could be made to support commercial navigation with

reasonable improvements. *United States v. Appalachian Elec. Power Co.*, 311 U.S.

377 (1940) ("*Appalachian Power*"); *Economy Light & Power Co. v. United States*,

256 U.S. 113 (1921); *The Daniel Ball*, 77 U.S. 557, 10 Wall. 557 (1871). That rule

is constitutionally grounded and makes eminent sense, because Congress's power

to regulate waters turns on its ability to decide whether such waters should be used

for interstate commerce. *See*, *e.g.*, *Appalachian Power*, 311 U.S. at 404 ("The

power of the United States over its waters which are capable of use . . . arises from

the commerce clause."). Whether Congress presently chooses to prioritize such use

does not affect its power to make that assessment.

Applying that established standard, the district court did not clearly err in

finding that the United States is likely to prevail in demonstrating that the portion

of the Rio Grande at issue is a "navigable river" under Section 10 of the RHA.[1]

The district court correctly found that the United States presented sufficient

evidence both that the Rio Grande was historically navigable and that it has the

capacity for future navigation.

### 1. Evidence of the river's historical navigability amply supports the court's "navigability" finding.

First, the district court committed no clear error in its factual findings related

to historical navigability. It correctly found that a 1975 Corps study memorializes

the historical navigability of the relevant river segment. ROA.978-980. The study

found that "a great deal of interest prevailed during the period between 1829-1882

pertaining to transportation of goods along the Rio Grande." ROA.1103. Although

navigation "above Laredo up to Eagle Pass" was "impeded by rocks and ledges at

low water stages," accounts from the era nonetheless "reveal sufficient interest and

available commerce to accommodate river travel above Laredo." ROA.1103.

Historical accounts also indicate that, with improvements to the channel, the river

would be navigable by steamboat to points above river mile 610.0 and well

upstream of Eagle Pass. ROA.1082, 1095, 1103. Keelboat navigation was

---

[1] Section 10 prohibits structures built in "any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States." 33 U.S.C. § 403. Though the focus at the preliminary injunction stage was on whether the Rio Grande in this stretch is a "navigable river," the United States may also demonstrate at the merits stage that, as an international boundary water, the Rio Grande is an "other water of the United States."

successfully completed to more than 800 miles above Eagle Pass. ROA.1095.

Texas characterizes the study as something "that one of [the United States']

witnesses found on a list in the Corps' Fort Worth office," as if it were procured

for litigation purposes.[2] But the study's meticulous findings reflect the Corps'

longstanding views, were well-supported, and were re-adopted by the Corps in

2011. ROA.763.

   No less important, during the same period, four Acts of Congress protected

the river's navigability in connection with authorizing bridges and other projects

involving foreign commerce between Eagle Pass, Texas, and Piedras Negras,

Mexico. ROA.975-976. That congressional judgment is itself entitled to great—

and possibly dispositive—weight. *See Appalachian Power*, 311 U.S. at 408

("When once found to be navigable, a waterway remains so."). At the very least,

the four statutes show that Congress considered this stretch of the river

"susceptible" to navigation and sought to preserve its authority over the river,

which is sufficient under *Appalachian Power*.[3]

---

[2] In another red herring, Texas highlights a witness's statement that he had not read
the report, Br. 16, which has nothing to do with whether the report's findings
support the district court's conclusion that the area was historically navigable.

[3] Texas incorrectly discounts those statutes by quoting *Oklahoma v. Texas*, 258
U.S. 574, 585-86 & n.6 (1922). Br. 20. But that case involved State title to
riverbeds, *see* 258 U.S. at 578, which turns on navigability at the time of statehood,
without taking into account any reasonable improvements, *see PPL Montana, LLC
v. Montana*, 565 U.S. 592-93 (2012) (explaining different navigability tests). In

14

Two additional reported cases confirm the historical presence of competitive commercial navigation on the river, as they concerned disputes about the ferrying of cotton between Eagle Pass and Piedras Negras. *See United States v. Weil*, 35 Ct. Cl. 42, 77 (1900) ("At Eagle Pass there were ferryboats in which the cotton was crossed over."); *Tugwell v. Eagle Pass Ferry Co.*, 74 Tex. 480, 9 S.W. 120 (1888) (resolving dispute between rival ferry companies operating between Eagle Pass and Piedras Negras). ROA.979-980. Texas discounts those cases, claiming that bank-to-bank commercial traffic does not satisfy navigability. Br. 18 (citing *United States v. Crow, Pope & Land Enter., Inc.*, 340 F. Supp. 25, 35 (N.D. Ga. 1972)). But Texas's contention finds no support in the RHA's text or in *Appalachian Power*, which did not prohibit the consideration of ferry traffic when determining navigation. Instead, *Appalachian Power* expressly acknowledged the existence of ferry traffic on as a part of the relevant legal analysis, 311 U.S. at 413, and this

_____

*Oklahoma*, unlike here, indications that Congress recognized the potential for future navigation would have been irrelevant. In any event, the statutes are materially different from those in *Oklahoma*. There, Congress merely delegated the navigability questions to the Secretary of War, giving him "authority" to "secure free and complete navigation" by requiring alterations in the project. Act of May 15, 1886, c. 332, 24 Stat. 28; *see also* Act of May 17, 1886, c. 354, 24 Stat. 63; Act of June 30, 1916, c. 200, 39 Stat. 251. The Rio Grande statutes instead reflect a congressional judgment about navigability by providing that the "free navigation" of the river shall not be interfered with, with Congress providing for redress in federal district court for navigability obstructions and reserving the right to withdraw authorization for the projects "in case the free navigation of the river shall at any time be substantially or materially obstructed". 23 Stat. 29 (1884); 26 Stat. 495 (1890); 26 Stat. 502 (1890); *see also* 42 Stat. 1482 (1923).

15

Court has done the same, *see Puente de Reynosa, S.A. v. City of McAllen*, 357 F.2d 43, 51 (5th Cir. 1966).

More importantly, the ferry traffic at issue in *Weil* and *Tugwell* involved *expressly commercial* enterprises transporting a commercial good across an international boundary. "Small traffic compared to the available commerce of the region is sufficient" to demonstrate navigability. *Appalachian Power*, 311 U.S. at 409. The district court opinion in *Crow*, by contrast, considered intrastate bank-to-bank ferry traffic occurring entirely within Georgia on the Chattahoochee River, not commerce across an international boundary. The district court here thus correctly found sufficient evidence of historical navigability to establish the government's likelihood of success. *See* 311 U.S. at 408; *Economy Light & Power*, 256 U.S. at 124.

The district court's historical navigability analysis is fully consistent with Supreme Court precedent on navigability. In *Economy Light & Power*, the Supreme Court affirmed decisions holding that the Des Plaines River in Illinois was navigable for purposes of Section 9 of the RHA. 256 U.S. at 115-17. That river had not been used in commercial navigation *for a century* beforehand. *Id.* at 117-18. The Court nonetheless emphasized that it could not, "without doing violence to [the] manifest purpose" of the RHA, "limit its prohibition to such navigable waters as were, at the time of its passage, or now are, actually open for

16

use." *Id.* at 124. Instead, navigable waters include long unused rivers and streams that remain susceptible to use in commercial navigation with "improvements . . . [to] restore the usefulness of th[e] stream." *Id.*

## 2. Evidence of the river's capacity for future navigation amply supports the court's "navigability" finding.

There likewise was no clear error in the district court's alternative finding that the Rio Grande has the capacity for future navigation. The evidence of historical navigability described above reinforces that the Rio Grande has long been thought susceptible to navigation in this stretch. As the district court found, as early as 1850, a report concluded that "if the channel were improved in certain passages, steam navigation would be entirely feasible." ROA.980. The Corps' 1975 study (again, readopted in 2011) observed that the river's natural flows were diverted, and thereby diminished, at multiple dams, including the Amistad Dam near the Corps' Fort Worth District's upper boundary. ROA.1092-1093. The study found that, even with those diversions, shallow draft boats can navigate the river during periods of sufficient flow, ROA.1096, as Texas proved when installing the barrier, ROA.982 n.15. The study also found, and the district court credited, ROA.981, that "[i]mprovement of the Rio Grande for navigation is physically possible" if the river's flow were increased with water from connected reservoirs. ROA.1096.

Texas offers two responses to the district court's future navigation analysis, neither of which is persuasive. First, Texas contends that potential for future commerce is insufficient and that *Appalachian Power* is distinguishable because it involved the Water Power Act rather than the RHA. Br. 18-19. There is nothing to that assertion. In *Appalachian Power*, the Court started with the proposition that "Sections 9 and 10 of the Rivers and Harbors Act of 1899 make it unlawful to construct a dam in any navigable water of the United States without the consent of Congress" and noted that the United States had sued alleging violations of "both the Rivers and Harbors Act and the Federal Water Power Act." 311 U.S. at 398, 401. The Court drew no distinction between navigability under the two statutes, nor did it suggest that its navigability analysis might apply only to the Water Power Act. *Id.* at 406-08. Texas's related assertion, Br. 18, that the Supreme Court "refocused navigability on the *present use* of a waterway" in *United States v. Republic Steel Corp.*, 362 U.S. 482, 483, 485 (1960), is also incorrect, as the navigability of the river in *Republic Steel* was well established and not put in issue.

Texas also contends that the United States failed to quantify what reasonable improvements would be necessary to make the Rio Grande navigable, or to conduct any sort of cost-benefit analysis. Br. 19. As an initial matter, Texas demands a level of proof far beyond that necessary at the preliminary injunction stage. *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009) ("A plaintiff is not

required to prove its entitlement to summary judgment in order to establish 'a substantial likelihood of success on the merits' for preliminary injunction purposes.").[4] In any event, the district court correctly found that the evidence demonstrates improvements to the Rio Grande, reprioritization of water from nearby reservoirs, or even modest changes in flow due to natural causes, would make the river susceptible to use in commercial navigation. ROA.981-982.

Moreover, Texas's demand for a current cost-benefit analysis is unwarranted, as the Supreme Court in *Appalachian Power* contemplated "a balance between cost and need at a time *when the improvement would be useful*," 311 U.S. at 407-08 (emphasis added). Thus, no such analysis is required, as Congress does not lose the power over a navigable river because improvements to facilitate commercial navigation are not currently justified by a cost-benefit analysis. *See id.* As the district court found, reasonable improvements to facilitate navigation were contemplated in the late-1800s, but those "improvements were not effectuated, owing to 'the advent of the railroads in 1882' and policy choices prioritizing other river uses and purposes over commercial navigation, including construction of the Amistad Dam to divert water for irrigation." ROA.980. In *Appalachian Power* there was an "absence of use" because of "the coming of the

---

[4] This posture alone distinguishes this appeal from *Lykes Bros. Inc. v. USACE*, 821 F. Supp. 1457 (M.D. Fla. 1993), which came in a final decision following a multi-week trial on the merits.

railroad" but the Court held that non-usage "does not affect the navigability of rivers in the constitutional sense." 311 U.S. at 409-410; *see also Econ. Light*, 256 U.S. at 117-18. The same is true here.

The facts of *Appalachian Power* are particularly instructive. In *Appalachian Power*, the Court reversed decisions that erroneously determined the New River in Virginia and West Virginia was not navigable without considering evidence that improvements could make that river available for commercial navigation. 311 U.S. at 406-07. Like the Rio Grande's upper reaches (ROA.1095, 1103), in the 19th century the Radford-Wiley's Falls segment of the New River was navigable by shallow-draft keelboats ("eight feet wide, drawing two feet") and there was interest in improving the channel to facilitate such navigation. 311 U.S. at 417-18. Although those plans were eventually abandoned due to changing economic conditions, the Court held the segment navigable based on its historic use and its improvability for keelboat navigation. *Id.* at 418. A river does not lose its navigable-water status merely because alternative uses of the water (like hydropower development) become more economically favored. *See id.* at 426. Such uses are "from the public's standpoint a by-product of the general use of the rivers for commerce." *Id.* Here too, the Rio Grande's current prioritization for power generation and irrigation (ROA.1093, 1096, 1113) does not change its legal status as a navigable water.

There was thus no error in the district court's finding of navigability on either ground, let alone clear error on both grounds.

### 3. Texas's other arguments on navigability lack merit.

In challenging the district court's navigability finding, Texas frames the overarching legal issues incorrectly in three respects. First, Texas repeatedly contends that the United States has not "prove[d]" the Rio Grande navigable at this early stage of the case. Br. 16 (quotation marks omitted); *see also* Br. 19-20. But that is not the standard at this juncture, and the United States provided sufficient evidence of navigability to carry its burden at the preliminary injunction stage. *See Byrum*, 566 F.3d at 446.

Second, Texas continues to insist there is no present commercial use of this stretch of the river.[5] Br. 17-18. But at least one business operating on the river has

---

[5] Although the United States did not argue that any present, illegal use of the river establishes its navigability, and the district court did not rely on present commercial navigation, Texas asserts that the Court must ignore, for navigability purposes, the cross-river illegal commercial activity that Texas ostensibly erected the barrier to obstruct. Br. 18, 33. This Court need not address that issue, but Texas is simply wrong when it asserts that "crime does not qualify as commercial activity." Br. 18. Instead, both *United States v. Morrison*, 529 U.S. 598, 609-17 (2000), and *United States v. Lopez*, 514 U.S. 549 (1995), hold that courts must look to the underlying conduct to determine whether it is commercial in nature, such that violence against women (in *Morrison*) and mere possession of a gun in a school zone (in *Lopez*) were not economic activities and were thus beyond Congress's Commerce Clause power. In any event, that illicit commercial activities, unfortunately, may be occurring on the river further demonstrates that the river could also be used for legitimate, future commerce.

21

sued Texas over the barrier. *See Epi's Canoe & Kayak Team, LLC v. Texas*, No. D-1-GN-23-003613 (98th Jud. Dist. Travis Co. Tex.). Regardless, as the district court explained, a lack of current commercial activity is of "no moment" in the analysis under the RHA. ROA.974. As noted above, the Supreme Court has made clear that "[t]he extent of existing commerce is not the test" for navigability. *United States v. Utah*, 283 U.S. 64, 82 (1931); *see also United States v. Diamond*, 512 F.2d 157, 160 (5th Cir. 1975) (holding that current commercial navigation is "not necessarily controlling on legal navigability"); *supra* pp. 12-13. Those precedents are binding on the district court and on this Court.

Finally, Texas suggests that the district court's reading of the RHA potentially raises a Commerce Clause issue. Br. 31-33. According to Texas, if there is no evidence of current "commercial navigability," then Congress's authority over the river is doubtful. *Id.* But the district court here applied the interpretation of the RHA required by longstanding Supreme Court precedent, which neither the district court nor this Court is at liberty to disregard. *See*, *e.g.*, *Appalachian Power*, 311 U.S. at 408. And *Appalachian Power* holds that preserving Congress's authority over the channels of commerce requires interpreting the RHA to preserve Congress's ability to make policy determinations about how to use potentially navigable waters. *Id.* ("The power of Congress over commerce is not to be hampered because of the necessity for reasonable

22

improvements to make an interstate waterway available for traffic.").[6] *Appalachian Power* directly applies to this case, and this Court would not be at liberty to disregard it even if Texas had identified some way in which the decision "appears to rest on reasons rejected in some other line of decisions," as this Court must leave to the Supreme Court "the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989).

Moreover, Texas never directly challenges the RHA as unconstitutional, forfeiting the argument. *Norris v. Causey*, 869 F.3d 360, 373 n.10 (5th Cir. 2017) (noting that a party forfeits an argument by failing to adequately brief it); Fed. R. App. Proc. 28(a)(8)(A) (requiring appellant's argument to contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which appellant relies"). And the narrowing canon of constitutional avoidance that Texas invokes applies only where there is room in the statute for ambiguity. *Nielsen v. Preap*, 139 S. Ct. 954, 972 (2019). The RHA's prohibitions, however, are clear and do not admit room for the use of such interpretive tools.

---

[6] Texas cites Justice Thomas's concurrence in *Sackett v. EPA*, *see* Br. 15, 19, 31, which of course is non-precedential. But that concurrence accepts the view of *Appalachian Power* taken by the district court. 598 U.S. 651, 696 (2023) (Thomas, J., concurring) (noting that "in *Appalachian* [*Power*], the Court continued to apply the concept of navigability to determine the scope of Congress' Commerce Clause authority" and "made clear that the term 'navigable waters' remained tethered to Congress' traditional channels-of-commerce authority"); *id.* at 702 n.7.

## B.     Texas's barrier obstructs the Rio Grande's navigable capacity.

The district court correctly held that the United States will likely succeed in proving that Texas's barrier violates Section 10 as an obstruction to the Rio Grande's navigable capacity. ROA.983-88; *see* 33 U.S.C. § 403. The district court's factual findings are correct and certainly not clearly erroneous.

Whether there is an obstruction to a river's navigable capacity is a question of fact. *United States v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690, 710 (1899). As a threshold matter, the barrier Texas built in the Rio Grande is *designed* to obstruct cross-river navigation; indeed, that is the entire purpose of the barrier. ROA.984. It therefore reduces the navigable capacity of the river in that respect, as the district court found credible evidence that it presents "a structural barrier to cross-river navigation." ROA.984.

Texas never explains why that cross-river obstruction is not a sufficient obstruction to the navigable capacity for purposes of RHA Section 10. And under established case law, the orientation of the obstruction is irrelevant under the RHA. Courts routinely find "obstruction" by objects that do not extend perpendicularly from the shore, including this Court's finding that a sunken schooner created an obstruction. *United States v. Raven*, 500 F.2d 728, 731 (5th Cir. 1974); *see also United States v. Estate of Boothby*, 16 F.3d 19, 21 (1st Cir. 1994) ("We believe that this regulation lawfully can be applied to houseboats that are found to constitute

24

permanently moored vessels." (citing *United States v. Boyden*, 696 F.2d 685, 687

(9th Cir. 1983))); *United States v. Angell*, 292 F.3d 333 (2d Cir. 2002) (finding

houseboat an obstruction in canal). If permanently moored houseboats and an "83

ft. schooner" that was "grounded . . . toward the [St. John's River's] easterly

shore," *Raven*, 500 F.2d at 730, create an obstruction to navigable capacity, surely

a 1,000-foot barrier in the middle of the river does. Indeed, an obstruction of any

scale to the navigable capacity is prohibited, whether it be industrial solids

deposited into the river, *Republic Steel*, 362 U.S. at 485, or dams built far upstream

in non-navigable stretches of the river, *Rio Grande Dam*, 174 U.S. at 709.

Texas is also wrong to contend that the treaties between the United States

and Mexico allow obstructions to cross-river navigation. Br. 24. The cited portion

of those treaties recognize a free-navigation rule first mandated in the Treaty

between the United States of America and the Mexican Republic of Peace,

Friendship, Limits, and Settlement, February 2, 1848, 9 Stat. 922, 1848 WL 6374.[7]

That treaty provides that navigation on the Rio Grande "shall be free and common

to the vessels and citizens of both countries; and neither shall, without the consent

of the other, construct any work that may impede or interrupt, in whole or in part,

---

[7] On September 28, 2023, the United States moved for leave to amend its complaint to add a count alleging a Supremacy Clause claim based on the 1848 Treaty. ECF 58. The merits of that claim are not before this Court in this preliminary injunction appeal.

the exercise of this right; not even for the purpose of favoring new methods of navigation." *Id.* art. VII. Nowhere in the 1848 Treaty, or in the subsequent treaties requiring the continued adherence to that free-navigation rule, did the two countries limit the rule to only navigation up and down the river. To the contrary, the same provision in the 1848 Treaty imposing the free-navigation rule explicitly contemplates cross-river navigation, as it recognizes that either country's vessels or citizens could be landing upon the other country's shores. *See id.* To the extent Texas also relies on a later 1944 treaty to support its argument that "buoys" are allowed, which it claims suggests cross-river impediment to navigation is permitted, Br. 24 (citing Treaty on Utilization of Waters of the Colorado and Tijuana Rivers and of the Rio Grande, art. 21, Feb. 3, 1944), the argument has no merit because that provision addresses marker buoys that are placed in "artificial lakes" (not the regular course of the river) by the IBWC with the consent of both governments, none of which is the case here. No treaty restricts the RHA to cover only navigation up and down the Rio Grande.

Texas next contends that there is no obstruction to navigable capacity here because the obstruction must "tend to destroy the navigable capacity" of the river, and boats can go around its barrier, which lies parallel to the current. Br. 21 (quoting *Republic Steel*, 362 U.S. at 487-88). This contention is entirely atextual; an "obstruction" is simply something that "impedes or hinders" or is "an obstacle."

26

Black's Law Dictionary (11th ed. 2019). It need not prevent or "destroy" the thing that it is obstructing. Texas is thus wrong on the governing standard, which is whether the "act sought to be enjoined is one which fairly and directly tends to obstruct (that is, *interfere with or diminish*) the navigable capacity of a stream." *Rio Grande Dam*, 174 U.S. at 709 (emphasis added). The snippet from *Republic Steel* that Texas relies on did not change the meaning of "obstruct" or narrow the governing test—indeed, the very passage Texas quotes gives "the concept of 'obstruction,' as used in [Section] 10, broad sweep." 362 U.S. at 487. And as the Supreme Court further emphasized, courts must avoid adopting "a narrow, cramped reading of . . . Section 10." *Id.* at 491.

Regardless, the district court found that the barrier does obstruct navigation even up and down the river because anyone navigating the river must heed and avoid the barrier, particularly its 143 submerged concrete anchors, which "present a serious risk to watercraft of any kind." ROA.985. Texas attacks that finding, claiming that it is "completely unsupported by record evidence." Br. 23. But there is ample evidence, from Texas's own witnesses, that the barrier includes submerged concrete anchoring blocks on either side of the visible buoys, including photographic evidence of the blocks themselves. ROA.74-75; ROA.96-98 (photographs); ROA.299 (Texas's brief, collecting citations); ROA.326 (Texas's declaration); ROA.896 (U.S. declaration); Tr. 97-98, 104, 107. And the district

court also relied on evidence that anyone navigating the river would have to take note of and avoid the barrier. ROA.984-985; ROA.526-528. That is a sufficient evidentiary basis for the district court's finding that the barrier, including its concrete blocks, obstructs the river's navigable capacity because it tends to "interfere with or diminish" that capacity. *Rio Grande Dam*, 174 U.S. at 709. Against that factual record, Texas cannot seriously argue that its anchored, 1,000-foot barrier is like a "stray soccer ball." Br. 22.

Further, the barrier's location in the middle of the river restricts a vessel's ability to freely navigate by, for example, preventing it from moving to one side of the river to avoid shallows and hidden obstacles in the course of the river. ROA.986. As the district court found, it is therefore "imperative for anyone piloting down the river to have free reign of the entire width and a clear view of all obstacles, lest they be forced into a hazard." ROA.986. Indeed, in this respect at least, the barrier's placement in the middle of the river makes it more of an obstruction to navigable capacity than docks extending from the shore out some distance into a river, which even Texas admits are obstructions to navigable capacity. Br. 22-23 (citing *United States v. Angell*, 292 F.3d 333, 335 (2d Cir. 2002); *United States v. W. Indies Transp., Inc.*, 127 F.3d 299, 310 (3d Cir. 1997); *Norfolk & W. Co. v. United States*, 641 F.2d. 1201, 1211 (6th Cir. 1980)).

Texas also suggests that navigable capacity should be considered only in relation to present-day commerce. Br. 20-22. But the statutory language precludes obstruction to "navigable capacity," and the "Supreme Court has encouraged a broad interpretation of a section 10 'obstruction." *Vieux Carre Prop. Owners, Residents & Assoc., Inc. v. Brown*, 875 F.2d 453, 462-63 (5th Cir. 1989). This Court has therefore approved consideration of "possible future effects in navigable waters." *Id.* A 1,000-foot-long, 16-foot-wide barrier of buoys, chain, and concrete running down the middle of the Rio Grande obstructs the river's *capacity* for navigation, as that area of the river is off-limits to any watercraft for as long as the barrier remains. And it is not just the current barrier that matters in the analysis, as Texas has announced its intention to build more, and the preliminary injunction restrains Texas from doing so. Any additional barrier would further obstruct the Rio Grande's navigable capacity.

### C.     Texas's barrier is a "boom" or "other structure" built without a permit.

The district court also correctly concluded that the United States is likely to prove that Texas violated Section 10's second clause, which provides an independent basis for the district court's preliminary injunction. That clause makes it unlawful to "build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures" in a "navigable river, or other water of the United States" without a Corps permit. 33 U.S.C. § 403. The

evidence supports the district court's finding that Texas's 1,000-foot barrier of interlinked buoys connected by chains to concrete anchors is a "boom" and certainly an "other structure."

As the court concluded, a "boom" generally means "a strong chain of connected floating objects"—exactly what we have here—without any requirement that they extend shore-to-shore. ROA.989-990. The essence of a "boom" is that it "obstruct[s] passage," *Boom*, Webster's International Dictionary of the English Language (1890), whether of vessels, logs, or—as Texas intended—persons and goods. Obstruction of passage may occur laterally as well as longitudinally. For example, a boom may "enclos[e] an area of water" without crossing a river. *Boom*, Webster's Revised Unabridged Dictionary (1913). Moreover, it is not hard to find descriptions and drawings of booms, contemporaneous with the RHA's enactment, that run longitudinally with the river. *E.g.*, *Atlee v. Union Packet Co.*, 88 U.S. 389, 392 (1874) (describing boom running parallel to shore); Frank Leslie, *The Great Log Jam*, Popular Monthly (July 1901), http://www.catskillarchive.com/rrextra/lgjam.html (depicting boom running length of river, parallel to shore).[8]

_____

[8] Texas's contention that the district court violated "the party-presentation principle" by concluding that the barrier was a "boom" notwithstanding a supposed "concession" to the contrary, Br. 25 (citing *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579-81 (2020)), is specious. The United States expressly argued below that the barrier was a boom. ROA.80. That one witness answered "No" when asked whether he would consider the buoys a boom, ROA.1468, was obviously not a concession by the United States, and the district court did not "take matters into its

30

In any event, Texas's barrier is clearly prohibited as an "other structure." ROA.990-992. A "structure" is "that which is built or constructed" including "any production or piece of work artificially built up, or composed of parts joined together in some definite manner." *Structure*, The Century Dictionary and Cyclopedia (1900). As the district court concluded, if a "1,000-foot-long barrier of four-foot-spherical buoys, fastened directly underneath with two feet of stainless steel mesh and tethered via chains to heavy concrete blocks placed systematically on the river bed," is not a structure built in the river, then "it is hard to imagine what *would* be." ROA.992 (cleaned up).

In arguing that its barrier system is not a "structure," Texas does not actually engage with definitions of that term, and it does not even *argue* that its barrier system does not qualify as a "structure" as that term would commonly have been understood at the time of the RHA's enactment. Texas instead bases its statutory-text argument almost entirely on the *ejusdem generis* principle that a catchall phrase like "other structure" "encompass[es] only what is similar in nature to the preceding specific terms." Br. 26.

That tactic fails for multiple reasons. The principle Texas invokes is an application of the more basic principle that statutory terms are interpreted

_____

own hands," Br. 25, when it resolved this legal issue consistent with the United States' position. Regardless, "it is well settled that a court is not bound to accept as controlling stipulations as to questions of law." *Equitable Life Assur. Soc. of U.S. v. MacGill*, 551 F.2d 978, 983 (5th Cir. 1977).

according to their ordinary meaning. Thus, it is not a "cast-iron rule," nor may it be applied "to defeat the real purpose of the statute." *United States v. Mackay*, 757 F.3d 195, 197-98 (5th Cir. 2014). Texas's reliance on *Yates v. United States*, 574 U.S. 528 (2015), Br. 26, only proves the point. There, the Supreme Court interpreted a criminal statute covering destruction, alteration, or falsification of a "record, document, or tangible object" and considered whether "tangible object" included a *fish*. Notwithstanding the fundamental dissimilarity between a fish on the one hand and a record or document on the other, the lower courts ruled that a fish did qualify as a tangible object, and the case was—in the words of Justice Alito, who supplied the deciding vote to reverse—"close." 574 U.S. at 549 (Alito, J., concurring in the judgment).

Texas's invocation of *ejusdem generis*, by contrast, comes nowhere close to justifying the State's claim that "structure" should be read as excluding its 1,000-foot-long barrier anchored by concrete. Initially, every feature of this clause—including its use of the word "any" and its enumeration of eight terms followed by the catchall term "other structures"—suggests that it was intended to comprehensively establish a need for federal permission before construction of any structures in navigable waterways. There is no indication that Congress intended to limit the clause's requirement to seek that permission to particular *species* of structures, as Texas contends. Br. 27-29.

32

But even assuming the "similar in nature" requirement applies to "other structure," it is easily met here. Each item in the list is a structure that is built in water and tends to obstruct navigation, nothing more. The catchall term "other structure" is thus intended to capture structures built in water that might obstruct navigation. Texas's barrier squarely fits that description. As the district court noted, "the floating barrier meets all of Texas's own criteria for a 'boom' except for its orientation to the banks of the river." ROA.991. As noted above, the directional distinction Texas invokes does not even take its barrier out of the "boom" category. But even if the barrier is not a boom, it borders on the absurd to contend that the barrier is so *fundamentally unlike* a boom and the other listed terms as to justify Texas's argument that it is not even an "other structure."

Urging otherwise, Texas contends that its barrier is unlike the RHA's list of prohibited structures because those structures supposedly have two things in common that it claims its barrier lacks: "permanence and the capacity to stretch across a waterway." Br. 26. Neither of those distinctions is persuasive.

Start with "capacity to stretch across a waterway." Texas does not contend that all the specifically listed items *in fact* stretch across a waterway, and they obviously do not—a pier, for example, does not invariably or even usually stretch across an entire waterway, and many of the other listed terms do not either. And Texas acknowledges that "[h]ow far the object extends into the waterway varies,"

33

Br. 26, and the definitions it cites for most of the terms suggest that they do not even *ordinarily* stretch across a waterway, Br. 27-28 (quoting dictionaries defining a wharf as "usually extending from the shore to deep water" and a jetty as "extending into a sea, lake, or river"). Plus, bulkheads and breakwaters typically run parallel to the shore to control erosion. In other words, this supposed "commonality" appears to be either illusory, meaningless, or both. But even assuming all the other listed terms have the theoretical capacity to stretch across a waterway—whatever that means—surely Texas's 1,000-foot-long barrier also has the "capacity to stretch across" the 200-foot-wide Rio Grande, even if it is currently not employed in that manner.

Texas's argument based on permanence fares no better. The word permanent appears nowhere in the RHA, and courts "may not narrow a provision's reach by inserting words Congress chose to omit." *Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1725 (2020). Permanence is not a quality inherent in the word "structure," nor is there any apparent reason why Congress would want the requirement to seek a Corps permit to depend on whether a putative structure theoretically could be removed. Texas argues that its buoys can be moved "in a matter of days." Br. 29. So can the Big Top of a traveling circus or a Ferris wheel, but nobody would argue that when erected, they are not structures. Moreover, even expressly covered objects like wooden piers or rock jetties can be disassembled, and even moved to

34

another location and reassembled. Arguably, wooden piers built by hand in the early 1900s would even be considered less permanent than Texas's barrier, which required heavy, diesel-powered equipment to install and move. ROA.992. Texas does not show any meaningful sense in which its barrier is any less "permanent" than the other enumerated terms.

Further, Texas asserts that as "the buoy system was positioned, so it will remain." Br. 29; *see also* Tr. 96. And even if Texas's intentions were relevant, there is no indication that Texas has any plans to remove the barrier absent a court order requiring it to do so. That it *can* be moved does not mean that Texas intends it to be anything other than a permanent, unauthorized feature of the Rio Grande for the foreseeable future. In short, those two measures of supposed commonality do not withstand scrutiny, and both apply to Texas's structure in any event.

### D.    Texas's defense that is has been "actually invaded" and therefore may "engage in war" is without merit.

Texas contends that this Court should adopt its view of the RHA because to do otherwise would be contrary to its supposed right to "engage in war" when it is "actually invaded." Br. 31. The doctrine of constitutional avoidance cannot apply to narrow the RHA's scope, as Texas has never offered (and the RHA is not susceptible to) any plausible alternative interpretation of the statutory text that would permit Texas's conduct. *Jennings v. Rodriguez*, 138 S. Ct. 830, 843 (2018). And for reasons developed more fully below, Texas's theory does not raise any

35

serious constitutional question that could inform this Court's interpretation of the RHA (or the resolution of this appeal) in any way whatsoever.

Texas's claim is really that the Constitution empowers it to *ignore* the RHA based on Texas's own declaration that it has been "actually invaded." Indeed, Texas claims the authority to ignore not just the RHA, but *all* federal statutory law, as it now asserts that even if Congress does not consent to Texas's actions or disagrees with Texas's conclusions about whether the State has been invaded, "Congress cannot countermand such state action by statute." Br. 35. The district court correctly described that as a "breathtaking" claim, ROA.999, one that if accepted would mean "that the fiat of a state Governor, and not the Constitution of the United States, would be the supreme law of the land"—an "obviously untenable" conclusion. *Sterling v. Constantin*, 287 U.S. 378, 397-98 (1932).

There are at least five problems with Texas's contention, any one of which is sufficient to reject its argument.

First, the district court correctly concluded that whether immigration and cartel activity mean a state has been "actually invaded" under the Constitution is a non-justiciable political question committed to the political branches of the *federal* government. *See California v. United States*, 104 F.3d 1086, 1090-91 (9th Cir. 1997); *New Jersey v. United States*, 91 F.3d 463, 469-70 (3d Cir. 1996); *Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996); *Chiles v. United States*, 69 F.3d

1094, 1097 (11th Cir. 1995); *cf. Texas v. United States*, 106 F.3d 661, 667 (5th Cir.

1997) (finding that Texas "suggests no manageable standards by which a court

could decide the type and degree of immigration law enforcement that would

suffice to comply with [the] strictures" of the Constitution). The asserted invasion

here "involves 'the immigration and the status of aliens,'" ROA.996-998 (quoting

*Arizona v. United States*, 567 U.S. 387, 394-95 (2012)), which are federal concerns

that have been addressed repeatedly by Congress and the President. To avoid

"inappropriate interference in the business of the other branches" of the federal

government, the district court correctly declined to consider Texas's unprecedented

defense. *See United States v. Munoz-Flores*, 495 U.S. 385, 394 (1990).

Texas oddly frames this as a "concession," Br. 13, 37, that "[t]he district

court had no basis to second-guess Governor Abbott's determination," Br. 37. Not

so. Texas ignores that nonjusticiable political questions are those constitutionally

committed to the political branches of the *federal* government, not the states. The

doctrine is "essentially a function of the separation of powers," *Baker v. Carr*, 369

U.S. 186, 217 (1962), that recognizes limits that Article III imposes upon courts to

accord appropriate respect to the other branches of the federal government, in the

exercise of their constitutional powers. That makes particular sense here, given that

the purpose of the clause is to deny states the power to engage in war with only a

limited, *temporary* exception in case of an actual emergency, and that such

37

temporary power is not extended simply because the measures Congress and the
Executive have adopted to respond to circumstances at the border do so in a
manner different from that preferred by the state. *See infra* pp. 41-42.

But more fundamentally, to say something is a political question is to say
that a court must resolve the case without answering that question (or dismiss the
case if it is not otherwise justiciable). It does not mean that anytime a party invokes
a constitutional provision that presents a political question, that party automatically
prevails. Here, it is *Texas* that seeks relief from the application of the RHA based
on a claim that its actions are a protected exercise of its power to "engage in war"
when "actually invaded." U.S. Const. art. I, § 10, cl.3. A court's inability to resolve
that political question does not mean Texas's conduct is made unreviewable by its
invocation of the clause. It simply means that courts are obligated to apply
otherwise applicable federal law, including duly enacted statutes like the RHA and
the more general vesting of responsibility for national security, foreign relations,
and immigration in the federal government, and let the political branches of the
federal government, potentially in consultation with state government, determine
whether a state has been "actually invaded" and, if so, what actions by the state are
authorized in response.

Second, if Texas's "invasion" defense were justiciable, it would fail because
the border activity about which Texas complains is not the kind of "invasion"

contemplated by the clause of the Constitution they invoke. *Id*. An invasion under

the Constitution is "armed hostility from another political entity, such as another

state or foreign country that is intending to overthrow the state's government."

*Padavan*, 82 F.3d at 28; *California*, 104 F.3d at 1091; *Debates and Other

Proceedings of the Convention of Virginia*, 302 (2d ed., 1805) (reflecting James

Madison's understanding that "invasion" means "invasion from other states, as

well as from foreign powers"). It is not irregular migration or the alleged

underenforcement of laws against illegal, transboundary activity by private, non-

state actors. Such actions are insufficient by themselves to justify allowing states to

"engage in War" unilaterally.

　　Texas resists that conclusion, asserting an unprecedented and broadly

sweeping approach to what constitutes an "invasion" in this context. Br. 37-39. But

Article I, Section 10 does not merely refer to invasion in the abstract; it appears in

a clause authorizing a State to "*engage in War*" when "actually invaded." And

"war" was traditionally understood to mean "[a] contest between nations or states,

carried on by force." *War*, Noah Webster, American Dictionary of the English

Language (1828); *see also* 3 J. Story, Commentaries on the Constitution §§ 1172,

1398 (1833). To make sense of the clause, the power granted to the state ("engage

in War") must be commensurate with the event triggering that power ("actually

invaded"). *See* Edmund Randolph, 3 Debates in the Several State Conventions 70

("in forming a government, the powers to be given must be commensurate to the object" to be obtained) (Elliot ed. 1836). Thus, "actually invaded" under this Clause must mean armed hostilities with a "state or foreign country" or at least the equivalent to a "political entity" that has comparable capacity, none of which Texas claims here. *Padavan*, 82 F.3d at 28.

Texas's dictionary definitions of "invade" and "invasion" confirm rather than refute the limited scope of "actually invaded" in Article I, Section 10, Clause 3, because in the relevant sense those definitions anticipate an "enemy, with a view to conquest" or an "attack." Br. 37. And Texas leaves out part of some definitions, omitting from its quotation of an 1828 dictionary the first definition of invade: "To enter a country, as an army with hostile intentions." *Invade*, 1 Noah Webster, American Dictionary of the English Language 113 (1828), cited at Br. 37. Other dictionaries confirm that sense. *See Invasion*, Stewart Rapalje & Robert L. Lawrence, A Dictionary of American & English Law (1899) ("the incursion of an army for conquest or plunder"). Texas does not allege such threats here.

This leads to the third problem with Texas's argument. Texas does not even claim to be "engaged in war" with anyone, much less another state, foreign nation, or "political entity." *Padavan*, 82 F.3d at 28. Indeed, Texas shrinks from even using the word "war" beyond the necessity of once quoting the Constitution, Br. 34, even though the power to engage in war—not to build structures—is the only

activity the clause authorizes. That omission speaks volumes. Because Texas does not assert and cannot establish that it is engaging in "war," or that it could do so in these circumstances, it cannot defend its actions on constitutional grounds.

Fourth, even if Texas were engaged in war, its conduct exceeds the very limited circumstances in which the Constitution authorizes a state to "engage in war." Congress has the power to declare war, U.S. Const. art. I, § 8, cl.11, and states generally may not engage in war, *id.* § 10, cl.3. The Constitution did not prohibit the states from engaging in war without consent only to allow a state to usurp the federal government's power and drag the United States into an indefinite war on a single Governor's declaration of an indeterminate "invasion." Otherwise, "a single State can, at her pleasure, embroil us in disastrous quarrels with other nations," a proposition from which the Supreme Court long ago rightly recoiled. *Chy v. Freeman*, 92 U.S. 275, 280 (1875); *see also Arizona*, 567 U.S. at 395; The Federalist No. 3 (noting that federal power is necessary in part because "bordering States . . . under the impulse of sudden irritation, and quick sense of apparent interest or injury" could take action that would undermine foreign relations); 3 J. Story, Commentaries on the Constitution § 1164.

Instead, the Constitution preserved a state's ability to repel an invasion or an imminent threat of one without first obtaining congressional consent when circumstances would not "admit of delay." U.S. Const. art. I, § 10. And it did so at

a time when the nation was in its infancy, when every state was bordered by the sea or a foreign power or both, when it might take weeks for word of invasion to reach Congress and, if not in session, for Congress to assemble, and when the actual deployment of federal forces might take even longer. Yet even under those markedly different circumstances, it was understood that—vis-à-vis the states—the Constitution places in the hands of the federal government matters of foreign policy, national defense, declarations of war, immigration, and the protection from invasions, *see*, *e.g.*, U.S. Const. art. I, § 8, cls.1, 3, 4, 11-14, 15; *id.* art. II, § 2 cls.1 & 2. And states are generally prohibited from agreements with foreign powers and engaging in war, U.S. Const. art. I, § 10, such that a state's power to engage in war necessarily lasts only until Congress can be consulted and decide whether to give its consent or authorize a federal response.[9] That standard is obviously not met here.

---

[9] The history of Article I, Section 10 confirms that understanding of the Constitution's text. Br. 35-36. Article VI of the Articles of Confederation expressly limited a state's power to engage in war "till the united states in congress assembled can be consulted." Art. of Conf., art. VI (1781). That clause was carried over at the Constitutional Convention, with similar language appearing in each successive draft until the last working day of the convention, September 15, 1787, when the clause explicitly allowed a state to "engage in war" when "actually invaded" only "until Congress can be consulted." 2 Records of the Federal Convention of 1787 625-26 (Farrand ed.). At that point, the Convention amended Section 10 to add the prohibition on duties of tonnage. *Id.* After the addition, Madison noted that "The remainder of the paragraph was then remoulded and passed" in its final form, with no indication in the Records that the Convention intended any further substantive change. *Id.* It would have been obvious to the

Finally, Texas does not even attempt to show any actual conflict between its desire to exercise its asserted power by building a barrier in the Rio Grande and the RHA. In fact, nothing about the current situation justifies Texas's disregard of the RHA. Here, Texas could have sought Congress's consent to its obstruction of the Rio Grande's navigable capacity. It could have requested an expedited Corps permit for its barrier. *See* 33 C.F.R. § 325.2(e)(4). If the permit were denied, Texas could have challenged the action in federal court following normal procedures for judicial review of agency action under the Administrative Procedure Act. Instead, Texas acted unilaterally and in defiance of federal law, claiming it does not need Congress's or the Executive's approval. The district court was right to reject that extraordinary assertion and to require Texas to move the barrier and to prevent Texas from building any more barriers in the Rio Grande.

---

Convention that a state's power to engage in war would expire once Congress was informed of the facts and reached its own conclusion about whether war was justified or other measures should be taken, given the rest of the constitutional design, rendering the explicit reference superfluous. Justice Story thus noted that the prohibitions on states engaging in war found in the Articles of Confederation "differ more in form than in substance from those in the Constitution." 3 J. Story, Commentaries on the Constitution § 1404 n.1 (1873). Similarly, Madison noted that the "powers relating to war and peace, armies and fleets, treaties and finance" were already provided by the Articles of Confederation, and the Constitution did not "enlarge" them, but "only substitutes a more effectual mode of administering them." The Federalist No. 45.

## II.     The district court did not abuse its discretion in weighing the equities.

The district court concluded that the equities favored the United States in two alternative ways, either of which independently supports affirmance.

### A.     The district court correctly held that Congress decided the public interest in the RHA.

First, the district court concluded that, where there is a clear violation of the RHA, injunctive relief may issue without examining irreparable harm or the balance of equities, because Congress has already resolved where the public interest lies. ROA.999-1001. When the United States seeks an injunction enforcing a public-interest statute, the "extraordinary weight courts of equity place upon the public interests in a suit involving more than a mere private dispute" justifies a court in granting a preliminary injunction "without making findings of irreparable harm, inadequacy of legal remedy, or the balance of convenience." *Marine Shale Processors*, 81 F.3d at 1358-59; *see also United States v. FDIC*, 881 F.2d 207, 210 (5th Cir. 1989); *City of New York v. Golden Feather Smoke Shop, Inc.*, 597 F.3d 115, 120-21 (2d Cir. 2010). The RHA preserves the public interest in navigation of the nation's waterways. Other courts have therefore applied that rule to violations of RHA Section 10. ROA.1000; *United States v. Milner*, 583 F.3d 1174, 1193-94 (9th Cir. 2009) ("No balancing of interest or need to show irreparable injury is required when an injunction is sought under [RHA] § 12 to prevent erection or

44

seek removal of an unlawful structure") (citation omitted); *United States v. Stoeco Homes, Inc.*, 498 F.2d 597, 611 (3d Cir. 1974) (same).

Texas did not attempt to rebut this point before the district court and has forfeited its arguments here. *Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021) ("A party forfeits an argument by failing to raise it in the first instance in the district court—thus raising it for the first time on appeal."). Now, for the first time, Texas contends that those cases do not survive the Supreme Court's decision in *Winter*. Br. 40-41. But this Court must apply its precedents unless "unequivocally overruled" by the Supreme Court. *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021) (noting that "for a Supreme Court decision to change our Circuit's law, it '. . . must 'unequivocally' overrule prior precedent") (citation omitted). Contrary to Texas's assertion, *Marine Shale Processors* is consistent with *Winter*. The United States does not ask to be excused from *Winter*'s four factors. Instead, *Marine Shale Processors* and the RHA Section 10 cases hold that for some statutes, including the RHA, Congress has already decided that the public interest weighs so heavily in favor of an injunction as to be determinative under "traditional principles of equity." *Marine Shale Processors*, 81 F.3d at 1358-59. That is because of the "extraordinary weight" courts place upon

the public interests and the "deference courts afford the political branches in

identifying and protecting the public interest." *Id.* at 1359.[10]

The rule from *Marine Shale Processors* is also consistent with other

Supreme Court cases. For example, the Supreme Court has held that federal courts'

equitable discretion cannot "override Congress' policy choice, articulated in a

statute, as to what behavior should be prohibited." *United States v. Oakland*

*Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001). With respect to the RHA, the

Supreme Court has noted that courts "are not at liberty to consider [alleged harms

to a defendant liable under RHA Section 10] as against the edict of a paramount

power." *Sanitary Dist. of Chicago v. United States*, 266 U.S. 405, 432 (1924).

Thus, Texas's suggestion that its views of the public interest are entitled to equal

weight as the United States' views, Br. 40, runs squarely into *Sanitary District*. As

the Court explained there, in an RHA enforcement action, "[t]here is no question"

that "the authority of the United States to remove obstructions to interstate and

foreign commerce . . . is superior to that of the States" to implement policies they

allege will "provide for the welfare or necessities of their inhabitants." *Id.* at 426.

---

[10] *Marine Shale Processors* also notes that under traditional equitable principles, "a
court need not balance the hardship when a defendant's conduct has been willful."
81 F.3d at 1358. Texas's open defiance of the RHA thus equally requires a
preliminary injunction without further consideration of the equities.

Here, the district court concluded that "preliminary injunctive relief is the only viable mechanism for remedying Texas's statutory violation of the RHA," a statute that expressly provides for injunctions, 33 U.S.C. § 406, and thus the court properly concluded relief was appropriate even without reference to irreparable harm or the balance of equities. ROA.1001.

### B.    The district court did not abuse its discretion in finding that the equities weigh in favor of an injunction.

Moreover, the district court was well within its discretion in alternatively determining that the equities support an injunction. It correctly found that the barrier is causing significant and ongoing harm to the nation's conduct of foreign relations with Mexico. ROA.1001-1002. At the hearing, the government's witness on U.S.-Mexico border matters testified that the barrier is a "major concern" for Mexico and "will have an adverse impact on U.S. foreign policy" if not removed expeditiously. Tr. at 57, 67; ROA.1054. The district court found that testimony and other "credible evidence" established that the "harm from the floating barrier is immediate and ongoing" by placing "tremendous strain on the U.S.-Mexico relationship." ROA.1001. In addition, the district court found that the barrier is an obstacle to "critical discussions between the two nations" on Rio Grande water delivery that are at a "sensitive stage." ROA.1002. In light of Texas's conduct, Mexico cancelled a July meeting of those negotiations and "indicated that [it is] less inclined to conclude an Emergency Minute by the end of the year while the

47

buoy barrier remains in place." Tr. at 70; ROA.1046. The district court also found

that the barrier threatens implementation of the 1944 Treaty between the United

States and Mexico and has resulted in humanitarian concerns raised by Mexico "at

the highest diplomatic levels." ROA.1002.

Texas is thus incorrect when it characterizes the injury to the government's

diplomatic relations as "contrived." Br. 10. The United States demonstrated that

injury, and the district court did not clearly err in relying on that evidence. *See*,

*e.g.*, *Sesay v. United States*, 984 F.3d 312, 315 (4th Cir. 2021) ("[J]udicial

deference is required where executive officials, such as the consular officer here,

possess expertise in matters falling outside judicial competency, including local

conditions in foreign countries, diplomatic relationships and protocols, and

national security needs."). Texas instead relies on diplomatic statements asserting

that the relationship between the United States and Mexico is currently strong. Br.

42. But as the district court pointed out, the "unprecedented strength and

collaboration between the countries currently means the U.S. has more to lose than

ever as a result of Texas's actions." ROA.1001 n.30.

Texas also has not addressed, much less shown abuse of discretion in, the

district court's finding that "Texas's conduct irreparably harms the public safety,

navigation, and the operations of federal agency officials in and around the Rio

Grande." ROA.1005. For example, both the U.S. Border Patrol and the IBWC

carry out activities requiring the ability to freely navigate the river in boats. ROA.1027; ROA.1041-1042; ROA.1048.

As for its own harms, Texas speculates that the barrier will reduce illegal immigration and criminal trafficking, but the district court found that Texas did not present any credible evidence that the barrier has accomplished that goal. ROA.1004. And there is no such evidence. Texas asserts that "dangerous crossings" have been "effectively eliminated," and that it seeks to deter unlawful entry and other crime. Br. 43. But Texas's citations do not support its assertions.

First, Texas cites the declaration of Victor Escalon, but the pages cited pertain to Mr. Escalon's view of river use, his observations about the barrier's effects on river flow and navigable capacity, his observation that he had not seen (or been told about) anyone trying to climb over the barrier as of August 9, and his belief that the area is an active criminal hotspot. ROA.1273-1276. Second, Texas cites the declaration of Loren Flossman, but that declaration merely states that the "system was *designed to* . . . direct migrants to appropriate U.S. Customs and Border Patrol points of entry," not that the system has worked. ROA.1284 (emphasis added). None of the cited evidence remotely supports Texas's assertion that the barrier has "effectively eliminated dangerous crossings in one of the most active drug-smuggling and human-trafficking hot spots on the river." Br. 42. Nor does Texas explain how if—as it contends—its "buoys occupy a 'de minimis'

space" in the Rio Grande, Br. 41, the barrier can possibly be as effective as Texas

claims. At the very least, the district court did not clearly err in finding insufficient

Texas's evidence that the barrier is reducing criminality at the border.[11]

## III. The district court committed no other error in issuing a preliminary injunction.

Texas faults the district court for taking judicial notice of the fact that drugs

typically enter Texas through ports of entry and not this stretch of the Rio Grande,

ROA.966 n.2, that Texas is currently in drought, ROA.976-977, and that dead

bodies were found in or around the barrier, ROA.987. Each of those publicly

available facts is a proper subject for judicial notice, *see* Fed. R. Evid. 201, and

Texas has made no showing that the district court's doing so here "altered the

outcome" by affecting the relief awarded by the district court. *Ball v. LeBlanc*, 792

F.3d 584, 591-92 (5th Cir. 2015).[12]

---

[11] Texas has never claimed (and thus forfeited any argument) that the (self-inflicted) cost of moving the barrier causes it any relevant harm. Even if that were harm, it would not outweigh the harms to the United States found by the district court.

[12] Texas takes particular exception to the district court's observation that "possible loss of life . . . may have already come to bear" given the discovery of dead bodies in or near the barrier. Br. 44-45 (citing ROA.1002-1003). But the pertinent facts about the incident are not disputed, and there is no indication or argument that the district court's observation about the *possibility* that the barrier played a role in the drownings affected the relief it awarded. *Ball*, 792 F.3d at 591-92.

Texas also complains that the district court "refused to let Texas introduce evidence of how the public interest is served by measures the State has taken." Br. 46. But the district court in no way restricted Texas from making the record it wanted to. Texas attached the evidence it thought appropriate as exhibits to its brief in opposition to the preliminary injunction motion, *see* ROA.1014-1015 (listing Defendants' 36 exhibits), and Texas chose not to put on a witness at the preliminary injunction hearing to offer testimony on "how the public interest is served" by its measures. The district court allowed Texas limited discovery and permitted Texas to introduce the evidence it thought relevant. What the district court disallowed was Texas's attempt to improperly introduce evidence by asking a government witness questions that she testified were beyond her personal knowledge and then attempting to read the evidence into the record anyway. ROA.995 n.28. The court considered and addressed the evidence Texas did submit, contrary to Texas's contentions. ROA.995; ROA.1003-1004. Texas's assertion that the district court refused to let it make a record is thus groundless.

Finally, Texas asserts that the district court's injunction does not redress the United States' injury because it does not order the barrier's "removal entirely from the river." Br. 47. If true, perhaps that would have been grounds for a cross-appeal by the United States, and Texas does not explain how vacating the injunction will help remedy that supposed defect. But the injunction requires Texas to move the

barrier to the "bank of the Rio Grande" so that it does not "impede or impair in any way navigation" while litigation is pending, Order 42 & n.32, which in the United States' judgment is a reasonable form of preliminary relief. And, of course, the injunction also prevents Texas from building any more barriers, providing significant relief on that front. The preliminary injunction has also already had some positive impact on relations with Mexico—on September 7, the President of Mexico positively mentioned the order in his daily press conference.

## IV. At minimum, the district court's prohibitory injunction should be affirmed.

Texas says that it is appealing the "entire injunction," Br. 12, but it presents no argument about the injunction's prohibition on building further barriers during this litigation. Instead, its arguments concern only the portion of the preliminary injunction requiring it to move the barrier. Br. 14-48. Any argument against the prohibitory injunction is thus forfeited. *Norris*, 869 F.3d at 373 n.10; Fed. R. App. Proc. 28(a)(8)(A). Regardless, any such argument fails because new barriers would violate the RHA in the same way and only increase the harms to navigation, federal operations, and foreign relations that Texas's initial barrier has caused.

## CONCLUSION

This Court should immediately dissolve the administrative stay and affirm the district court's preliminary injunction order.

Respectfully submitted,


JAIME ESPARZA                                /s/*Michael T. Gray*
*United States Attorney*                     TODD KIM
                                             *Assistant Attorney General*

JAMES E. DINGIVAN                            ANDREW M. BERNIE
LANDON A. WADE                               MICHAEL T. GRAY
*Assistant United States Attorneys*          *Attorneys*
United States Attorney's Office              Environment and Natural Resources
Western District of Texas                    Division
601 N.W. Loop 410, Ste 600                   U.S. Department of Justice
San Antonio, TX 78216                        Post Office Box 7415
                                             Washington, D.C. 20044
                                             (202) 532-3147
                                             michael.gray2@usdoj.gov


September 2023
90-5-1-1-22454

## CERTIFICATE OF SERVICE

I hereby certify that on September 29, 2023, I electronically filed the foregoing response with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.

The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/Michael T. Gray
MICHAEL T. GRAY
*Attorney, Appellate Section*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 532-3147
michael.gray2@usdoj.gov

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

I hereby certify that this response complies with the requirements of Fed. R.

App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New

Roman, a proportionally spaced font.

I further certify that this brief complies with the type-volume limitation of

Fed. R. App. P. 32(a)(7)(B) because it contains **12,984 words**, excluding the parts

of the response exempted under Rule 32(a)(7)(B)(iii), according to the count of

Microsoft Word.

_/s/Michael T. Gray_
MICHAEL T. GRAY
_Attorney, Appellate Section_
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 532-3147
michael.gray2@usdoj.gov