No. 23-50632

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

GREG ABBOTT, IN HIS CAPACITY AS GOVERNOR OF THE STATE OF TEXAS; STATE OF TEXAS,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

## REPLY BRIEF FOR APPELLANTS

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

MUNERA AL-FUHAID
Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

JUDD E. STONE II
Solicitor General

LANORA C. PETTIT
Principal Deputy Solicitor General
Lanora.Pettit@oag.texas.gov

ARI CUENIN
Deputy Solicitor General

COY ALLEN WESTBROOK
Assistant Attorney General

Counsel for Defendants-Appellants

# TABLE OF CONTENTS

Page

Table of Authorities ........................................................................................ ii

Introduction ..................................................................................................... 1

Argument ......................................................................................................... 3

   I.   The US Is Not Likely to Succeed on Its Rivers and Harbors Act
      Claim ...................................................................................................... 3

      A.  The contested stretch of ankle-deep water is not and has
          never been commercially "navigable" ....................................... 3

      B.  The buoys do not "obstruct" (hypothetical) navigation along
          a stretch of river more than 200 feet wide ............................... 9

      C.  Unlike the "structures" prohibited in the Act, the string of
          buoys is not a permanent fixture across a waterway ............ 12

      D.  The district court's reading of the Act flouts the Constitution ......... 14

  II.  The US Failed to Shoulder Its Burden Under the Remaining
      Three Elements of *Winter* ...................................................................... 18

      A.  All of *Winter*'s requirements apply to the federal government ........... 19

      B.  The US has not shown it would suffer irreparable harm
          absent a preliminary injunction ............................................. 20

      C.  The district court erred in weighing the equities and public
          interest .................................................................................... 21

Conclusion ..................................................................................................... 24

Certificate of Service ..................................................................................... 25

Certificate of Compliance ............................................................................. 25

## TABLE OF AUTHORITIES

Page(s)

**Cases:**

*Bas v. Tingy*,
    4 U.S. 37 (1800) ............................................................... 17

*Biden v. Texas*,
    142 S. Ct. 2528 (2021) ........................................................ 5

*Coastal Corp. v. Tex. E. Corp.*,
    869 F.2d 817 (5th Cir. 1989) ........................................... 13

*The Daniel Ball*,
    77 U.S. 557 (1871) .............................................................. 2

*Leovy v. United States*,
    177 U.S. 621 (1900) ............................................................ 3

*Lessee of Pollard v. Hagan*,
    44 U.S. 212 (1845) .............................................................. 3

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) .......................................................... 21

*Miller v. United States*,
    78 U.S. 268 (1870) ........................................................... 17

*The Montello*,
    87 U.S. 430 (1874) ............................................................. 4

*Moyer v. Peabody*,
    212 U.S. 78 (1909) ........................................................... 16

*NFIB v. Sebelius*,
    567 U.S. 519 (2012) ......................................................... 15

*Oklahoma v. Texas*,
    258 U.S. 574 (1922) ..................................................... 2, 6, 9

*PPL Montana, LLC v. Montana*,
    565 U.S. 576 (2012) ........................................................... 7

*Ray v. Comm'r of Internal Revenue*,
    13 F.4th 467 (5th Cir. 2021) ............................................... 9

*Rose v. Raffensperger*,
    584 F. Supp. 3d 1278 (N.D. Ga. 2022) ........................... 17

*Rucho v. Common Cause*,
    139 S. Ct. 2484 (2019) ..................................................... 16

*Sackett v. EPA,*
    598 U.S. 651 (2023)..................................................................... 2, 5

*Sanitary District of Chicago v. United States,*
    266 U.S. 405 (1925) ....................................................................... 20

*Smith v. Turner,*
    48 U.S. 283 (1849) ..........................................................................15

*Sterling v. Constantin,*
    287 U.S. 378 (1932) .........................................................................16

*Sumner v. Mata,*
    449 U.S. 539 (1981) .........................................................................17

*United States v. Crow, Pope & Land Enters., Inc.,*
    340 F. Supp. 25 (N.D. Ga. 1972)................................................... 4, 6

*United States v. Appalachian Elec. Power Co.,*
    311 U.S. 377 (1940).............................................................6, 7, 8, 9

*United States v. Marine Shale Processors,*
    81 F.3d 1329 (5th Cir. 1996) .....................................................3, 19

*United States v. Milner,*
    583 F.3d 1174 (9th Cir. 2009)........................................................11

*United States v. Oak Beach Inn Corp.,*
    744 F. Supp. 439 (S.D.N.Y. 1990) ................................................ 12

*United States v. Republic Steel Corp.,*
    362 U.S. 482 (1960) ...........................................................2, 10, 12

*United States v. Rio Grande Dam & Irrigation Co.,*
    174 U.S. 690 (1899) ..............................................................*passim*

*Wyatt v. Hunt Plywood Co.,*
    297 F.3d 405 (5th Cir. 2002)......................................................... 12

*Winter v. NRDC,*
    555 U.S. 7 (2008.....................................................................*passim*

**Constitutional Provisions and Statutes:**

U.S. Const.:
    art. I, § 4, cl. 1 ...........................................................................16
    art. I, § 10, cl. 2 ..........................................................................16
    art. I, § 10, cl. 3.............................................................1, 16, 17, 22
    art. IV, § 4 ...................................................................... 1, 16, 18
    amend. XIII ................................................................................. 1

16 U.S.C. § 796(8).............................................................................. 7

33 U.S.C.:
  § 403 ................................................................................. 1, 9, 10, 12
  § 408 ........................................................................................... 14
  § 409 ......................................................................................10, 14
U.S. Code Title 8 ............................................................................. 1

**Other Authorities:**

Antonin Scalia & Bryan A. Garner, *Reading Law* (2012) ....................................9, 14

Convention Between the U.S. & Mexico, art. V at 4, Nov. 12, 1884........................ 7

Laura Gottesdiener et al., *Migrants Are Being Raped at Mexico Border as They Await Entry to US*, Reuters (Sept. 29, 2023)............................................. 22

Nat'l Parks Service, *Ancient Depths* (Feb. 25, 2019), ................................................ 4

Susie Coen, *Baby Boy Dies After Ingesting Fentanyl at New York Nursery*, The Telegraph (Sept. 17, 2023) ........................................................... 22

Tim Hains, *Sen. Katie Britt: What I Saw at the Border Was Not the American Dream, It Was a Nightmare*, RealClearPolitics (Sept. 27, 2023)....................................................................................................................... 22

Utilization of Waters of the Colorado and Tijuana Rivers and of the Rio Grande, U.S.-Mex., art. 21, Nov. 14, 1944, T.S. 944 ....................................11

Virginia Allen, *'America's New Slave Trade' Is Here at Hands of Mexican Cartels, Border Expert Tells Lawmakers*, Daily Signal (July 19, 2023) ....................................................................................................... 22

Webster's New Collegiate Dictionary (1949) ........................................................ 10

William Barr, Opinion, *The U.S. Must Defeat Mexico's Drug Cartels*, Wall St. J. (Mar. 2, 2023) ....................................................................................... 3

# Introduction

The US was right when it stated that "the public has a compelling interest in the enforcement of federal law." ROA.88. That means all of federal law, including federal immigration laws found in Title 8 of the U.S. Code, the federal prohibitions against trafficking in drugs and humans in Title 18 and the Thirteenth Amendment of the U.S. Constitution, the defense guarantees in Article IV, § 4 and Article I, § 10, cl. 3 of the U.S. Constitution, and the rules of procedure governing federal courts. The US would nevertheless ignore all of these laws to fixate on just one: It asks this Court to accept the notion that a 19th-century law designed to protect *commercial navigation*, 33 U.S.C. § 403, somehow sweeps away a State's sovereign authority over a "shallow," "even dry" riverbed, ROA.407, 448, though not one witness has ever seen lawful commercial traffic there, ROA.321, 327, 485-86. This Court should decline the invitation.

For evidence that this case is not really about enforcing the Rivers and Harbors Appropriation Act of 1899, look no further than the fact that when the US Army Corps of Engineers contacted IBWC officials about Texas's buoy system in July, it did not even mention that law—much less complain that the buoys were blocking commercial travel in the river. ROA.441-42. Now, having settled on the Act to undercut Texas's efforts in Eagle Pass, the US invokes a 50-year-old, incoherent "study" for the proposition that there was "evidence of navigation in the 1850s." The evidence, though, was a single exploratory Army expedition that reportedly achieved "an astonishing penetration for a river with so little water." ROA.1095. Needless to say, the ankle-deep stretch of the Rio Grande that the US attempts to

shoehorn into the Rivers and Harbors Act here is a far cry from "a continued highway over which commerce" can travel. *The Daniel Ball*, 77 U.S. 557, 564 (1871).

Even if the military's exploration—which it conspicuously never tried again—could somehow transform a sandy shoal into a highway of commerce, the Act's preclearance rules for "obstruction[s]" and "structures" must be interpreted in the context of its protection of navigation—*i.e.*, the movement of "[b]oats with a sufficient draft" to "ascend and descend" rivers. *Oklahoma v. Texas*, 258 U.S. 574, 589 (1922). The Supreme Court has already rejected the view that navigation is obstructed whenever an object around which a navigator must maneuver is placed in a waterway. *United States v. Republic Steel Corp.*, 362 U.S. 482, 487-88 (1960). To adopt that view now would expand not just the Corps' jurisdiction but also federal criminal law to reach ordinary activities that occur in creeks and streams across the Nation. Giving such sweep to a Commerce Clause statute cannot be squared with the notion, reaffirmed earlier this year, that "[r]egulation of land and water use lies at the core of traditional state authority" as understood by the Founders. *Sackett v. EPA*, 598 U.S. 651, 679 (2023). Nor can it be squared with Texas's right to self-defense, which is why the US must argue that the Constitution—contrary to its plain text—leaves States entirely at the mercy of the federal government. That idea would have been shouted out of Independence Hall.

This sweeping interpretation of the Act is made worse by the US's insistence that it is entitled to a unique exemption from three of the four preliminary-injunction factors required by *Winter v. NRDC*, 555 U.S. 7, 20 (2008). Those factors apply to all plaintiffs seeking a preliminary injunction and they cannot support an injunction

against Texas's deployment of buoys. The US effectively concedes (at 51-52) the buoys are causing no irreparable harm; meanwhile they help to impede the daily incursion of transnational criminal organizations that "have become potent paramilitary forces, with heavily armed mobile units able to stand their ground against the Mexican military." William Barr, Opinion, *The U.S. Must Defeat Mexico's Drug Cartels*, Wall St. J. (Mar. 2, 2023), https://tinyurl.com/3dfa8w5u. And in balancing actual human suffering against press releases from Mexico, it is clear which side equity favors. This Court should reverse.

## ARGUMENT

## I.  The US Is Not Likely to Succeed on Its Rivers and Harbors Act Claim.

### A.  The contested stretch of ankle-deep water is not and has never been commercially "navigable."

**1.**  The States that formed the Union in 1788—and those that joined thereafter—retained their sovereign power over the waterways within and along their territory. *Lessee of Pollard v. Hagan*, 44 U.S. 212, 230 (1845). The federal government may encroach upon that sovereign power by regulating waterways as an "incident[]" of its power to regulate commerce, *Leovy v. United States*, 177 U.S. 621, 632 (1900), but only if a "particular place between [a river's] mouth and its source" functions as a "highway[] for commerce" using the "customary modes of trade and travel," *United States v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690, 698 (1899). The US admits (at 9) "[n]avigability is a factual question," about which it has the burden of proof.

The US largely abandons (at 12-13) any claim that this shallow, dry stretch of the Rio Grande can be used for commercial navigation today, much less that it "generally and commonly" functions as an actual thoroughfare of waterborne commercial traffic in the "ordinary"—rather than the "exceptional"—course, *Rio Grande*, 174 U.S. at 699. For good reason. All witnesses conceded this waterway is not being used, and cannot be used, to transport commercial goods. *See* ROA.353, 362; ROA.407-08; ROA.469, 485, 501, 525; ROA.319-21; ROA.325-27. The US alludes (at 21-22) to "one business" allegedly operating kayaks on the river. But "[i]t is not . . . every small creek in which a fishing skiff or gunning canoe can be made to float at high water which is deemed navigable." *Rio Grande*, 174 U.S. at 698-99 (quoting *The Montello*, 87 U.S. 430, 442 (1874)); *accord United States v. Crow, Pope & Land Enters., Inc.*, 340 F. Supp. 25, 34 (N.D. Ga. 1972) (finding non-navigable a river whose "main appeal lies" in recreational use).

**2.** The US nevertheless claims (at 13-17) the waterway was deemed navigable in the past and thus remains navigable in perpetuity. There are at least three problems with that theory. *First*, "many of the lands that now make up America's national parks were once completely underwater." Nat'l Parks Serv., *Ancient Depths* (Feb. 25, 2019), https://tinyurl.com/ymtt63vv. Under a once-navigable-always-navigable approach, it's hard to see why an area "stretch[ing] from the Gulf of Mexico all the way to Montana" could not be deemed navigable water. *Id.*; *see also* ROA.268-

83. To state the argument is to refute it. *Sackett*, 598 U.S. at 681 (rejecting that "literally every body of water in the country" is navigable).[1]

*Second*, the US's primary evidence of past navigability (at 14) is a 1975 study by the Corps that, far from making "meticulous findings" of navigability that are "well-supported," actually refutes the US's contentions. That study unequivocally states that there "has never been any 'practical navigation' between Roma . . . and El Paso." ROA.1103. To the contrary, the study notes that, "at normal stages, the river apparently was not navigable above Rio Grande City," which is more than 250 river miles below Eagle Pass, due to "rocks and ledges at low water stages," that begin slightly downriver of Roma but become pervasive once the river reaches Laredo. ROA.1103. Although the study highlights certain isolated instances of navigation in the 19th century, those accounts are concededly "sketchy" about both their nature and location. ROA.1103. In fact, the study ultimately found it "unnecessary to determine whether sufficient past use occurred in the study area to meet the test" for navigability. ROA.1103. The district court, in other words, concluded the river was navigable in the past primarily by relying on a study that refused to conclude the river was navigable in the past. ROA.978-80.

---

[1] Perhaps sensitive to this concern, the US insists (at 14, 17) that the Corps "re-adopted" its decades-old navigability determination in 2011. Because the US has admitted that its decades-old determination is still in effect, *e.g.*, ROA.31, any implication that officials conducted a new survey of the river and reached the same conclusions should be rejected. *Cf. Biden v. Texas*, 142 S. Ct. 2528, 2544 (2021).

The US's reliance (at 15) on two isolated accounts of cross-river ferry traffic in 1888 and 1900 is similarly misplaced. If the US were right that such cross-river traffic could suffice for navigability, the *Appalachian Power* Court could have stopped after pointing to similar evidence of cross-river ferry traffic. *United States v. Appalachian Power Co.*, 311 U.S. 377, 413 (1940). It did not. Instead, it went on to discuss "authenticated instances of boating *along this stretch*" of river for more than five pages. *Id.* at 413-19 (emphasis added). Why? Because crossing a river—whether by ferry, bridge, or foot traffic—is not the same as using the river itself as a commercial highway. *Crow*, 340 F. Supp. at 32.

*Third*, the absence of evidence of actual navigation cannot be overcome by pointing to 19th-century treaties or statutes that made passing reference to "free navigation." To start, the 1848 Treaty of Hidalgo expressly acknowledges the need for actions "making the said rivers navigable." ROA.1204. That only highlights how the language the US cites is merely "precautionary," *Oklahoma*, 258 U.S. at 586, and does not obviate the Court's duty to "determine[] by proof" whether a waterway is navigable, *Rio Grande*, 174 U.S. at 698. And every one of the laws the US cites authorized a company to construct something—a railway bridge, electricity wires, water pipes—stretching across the river. ROA.750-60. By instructing companies not to interfere with free navigation, those laws plainly evince concern for the ability to "ascend and descend" the river. *Oklahoma*, 258 U.S. at 589.[2]

---

[2] Bilateral agreements upon which the US relies reflect a similar understanding, safeguarding the right to free navigation "*from* the mouth of the Rio Grande *to* the

**3.**   Unable to show past or present commercial navigation, the US repeatedly insists (at vii, 18, 23) that under *Appalachian Power* a waterway is "navigable" if it could hypothetically allow commercial navigation in the future. As Texas explained in its opening brief (at 18), that case interpreted a different statute—the Water Power Act. *See Appalachian Power*, 311 U.S. at 407; *PPL Mont., LLC v. Montana*, 565 U.S. 576, 592 (2012) (describing *Appalachian Power* as a Water Power Act case). Although the US asserts (at 18) the distinction makes no difference here, it elsewhere acknowledges (at 14-15 n.3) that different statutes are subject to "different navigability tests" under Supreme Court precedent. And the Water Power Act instructs courts to consider whether waters are navigable "either in their natural *or improved condition*." 16 U.S.C. § 796(8) (emphasis added). The Rivers and Harbors Act contains nothing like the italicized language.

Even if *Appalachian Power*'s reasonable-improvement standard applied, the US makes no effort to satisfy it. Despite citing *Appalachian Power* (at vii) more than any other source, the US studiously avoids discussing the opinion's navigability analysis. *Appalachian Power* cautioned that "there are obvious limits to such improvements as affecting navigability." 311 U.S. at 407. There "must be a balance between cost and need" showing that improvement is both "physically" and "financially" practicable based on "natural present conditions"—not "high engineering skill and the

---

point where the Rio Colorado ceases to be the international boundary." Convention Between the US & Mexico, art. V at 4, Nov. 12, 1884 (emphases added).

expenditure of vast sums of money." *Id.* at 407 & n.26. Otherwise, the Court explained, improvement would not be "reasonable." *Id.*

The *Appalachian Power* Court ultimately found the New River susceptible to reasonable improvement only because "[t]he Government supported its allegation of improvability" with evidence:

- past use of the river for "through navigation" showed that "little was needed in the way of improvement";

- historical accounts showed the "typical" or "usual" kind of commercial boats used, including their depth and the type of freight they could bear;

- concrete estimates of costs for improvement to meet the needs of such watercraft showed that $30,000 could procure 54 miles of navigability; and

- specific plans showed *how* those improvements could be implemented without fundamentally altering the river's current.

*Id.* at 412-17.

The US does not even argue it could make that kind of showing at trial, maintaining instead (at 19-20) that such evidence is unnecessary. Once again, it points to the 50-year-old study reciting how hopeful navigators thought some undisclosed portion of the river was susceptible to improvement *more than 170 years ago*. But once again, the study does not say what the US claims, stating only that "[i]mprovement of the Rio Grande for navigation is physically possible." ROA.1096. It was also physically possible to connect the Atlantic and Pacific Oceans by blasting a 51-mile canal across the Isthmus of Panama. The study says nothing about the "balance between cost and need" in creating a 250-mile canal between Roma and Eagle Pass—either

now or in the past. *Appalachian Power*, 311 U.S. at 407. Neither does the single sentence reporting how expeditioners in 1850 were "optimistic[]" that the Rio Grande was improvable through unspecified means at unknown costs. ROA.1103, 1143. Such vague antebellum bullishness is not sufficient.

4.    Perhaps recognizing that this stretch of the Rio Grande—which has no commercial navigation now, "has never [seen] any 'practical navigation'" in the past, ROA.1103, and cannot be reasonably made navigable in the future—is not a "navigable water" under the Act, the US suggests in a footnote (at 13 n.1) that the contested stretch of river might still be covered as an "other water of the United States" because it forms part of a boundary. That new argument is forfeited. *See Ray v. Comm'r of Internal Revenue*, 13 F.4th 467, 476 (5th Cir. 2021). It is also foreclosed by Supreme Court precedent. *See Rio Grande*, 174 U.S. at 700 (international boundary water not covered by the Act); *Oklahoma*, 258 U.S. at 584-85 (state boundary water not covered by the Act).

Section 10 does not govern this non-navigable stretch of the Rio Grande. Even if this Court could overlook that threshold defect, the US is not likely to show that the buoys violate either of the operative provisions upon which it relies.

## B.  The buoys do not "obstruct" (hypothetical) navigation along a stretch of river more than 200 feet wide.

Texas's buoy system does not "obstruct[] . . . the navigable capacity" of this stretch of river. 33 U.S.C. § 403. Because the US does not seriously dispute the absence of "present navigability"—or any lawful commercial traffic to obstruct—it cannot show that the buoys "substantially diminish the navigability of that stream

within the limits of [that] navigability." *Rio Grande*, 174 U.S. at 709-10. To the contrary, the US's own witness acknowledged that the buoys leave any navigator free to move "up the river and down the river." ROA.440. The US makes three counterarguments, none of which has merit.

*First*, the US insists (at 26-27) that the buoys need not actually have any meaningful impact on navigation because "an 'obstruction' is simply something that 'impedes or hinders' or is 'an obstacle.'" But to "obstruct" is also defined as "[t]o block up; stop up or close, as a way; to place an obstacle in, or fill with obstacles." Webster's New Collegiate Dictionary 580 (1949). That is why the Supreme Court has already held that an object violates the Act only if it "adversely affects" navigation in a way that "*tends to destroy* the [river's] navigable capacity." *Republic Steel*, 362 U.S. at 487-88 (emphasis added). The US counters (at 27) that *Republic Steel* gave obstruction a "broad sweep." Yet even that decision did not authorize a reading as broad as the one the US urges here—that obstruction refers to any object a navigator must take note of and maneuver around. ROA.984-85. Nor could it, as the Act recognizes that some obstacles are inevitable and may be marked rather than removed. *See* 33 U.S.C. § 409. Even so, the US never disavows its reading of the Act to cover any waterborne obstacle, on pain of criminal liability.

*Second*, the US continues to rely (at 24) principally on the fact that the buoys deter cross-river criminal activity. But Congress did not prohibit obstruction simpliciter, only "obstruction . . . *to the navigable capacity*" of the river. 33 U.S.C. § 403 (emphasis added). And the Supreme Court has repeatedly explained how the Act's references to navigation concern a watercourse's use as a highway. *Supra* at 3.

Bilateral agreements between the US and Mexico confirm that understanding. For example, one treaty provision requires the placement of buoys in the Rio Grande. *See* Treaty Between the U.S. & Mexico, art. 21, Nov. 14, 1944. The US objects (at 26) that this provision concerns portions of the river where the water forms lakes and tasks IBWC rather than state officials with placing the buoys. This misses the point: Alongside other agreements safeguarding a general right to navigate along the river, *supra* at 6, the countries also require placement of buoys in the river at the international boundary. As Texas has explained (at 24-25, 30), this reflects the understanding of both countries that a buoy barrier is consistent with the navigability guarantee because it does not impede movement up and down the river. Even the US's sources suggest that obstructing travel along the river is what matters. For example, when the 1975 study refers to "obstructions," it discusses highway overpasses, railway bridges, and dams—all of which could stretch across the watercourse and could thus impede movement up- or down-river. ROA.1093. The same goes for 19th-century statutes authorizing companies to construct cross-river works but requiring them to avoid blocking through traffic on the water. *Supra* at 6.

*Third*, the US mischaracterizes (at 24-25) Texas's argument as suggesting that the test for obstruction turns solely on an object's orientation to the riverbank. Not so. Texas's argument focuses on the river's use as a "highway[] for commerce" using the "customary modes of trade and travel." *Rio Grande*, 174 U.S. at 698. As Texas explained (at 23), the alluvial deposits in *Republic Steel* did that by significantly altering a river's depth and thereby limiting what ships could move along it. The buoy barrier does nothing like that. The district court's contrary conclusion that the

buoys impede navigation up- and down-river remains completely unsupported by record evidence. Although there was evidence that the barrier includes weighted (and visible) blocks, there was no evidence that those features pose hidden dangers to law-enforcement airboats. The district court was not entitled to imagine its own nautical facts. *Cf. Rio Grande*, 174 U.S. at 698 (noting that it is not a "matter of common knowledge at which particular place between its mouth and its source navigability ceases").

### C. Unlike the "structures" prohibited in the Act, the string of buoys is not a permanent fixture across a waterway.

Also unsupported is the conclusion that the buoys constituted a "wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structure[]" prohibited by the Act. 33 U.S.C. § 403. It is undisputed that buoys are not listed and that the US's own witness repeatedly agreed the buoys are none of those items. ROA.515; Tr. 48. Though the US may understandably have second thoughts (at 30-31 n.8) about the witness it chose, that is a straightforward *factual* issue—not a legal one. *See United States v. Oak Beach Inn Corp.*, 744 F. Supp. 439, 444 (S.D.N.Y. 1990). And the US can concede such facts away. *See, e.g.*, *Wyatt v. Hunt Plywood Co.*, 297 F.3d 405, 411 (5th Cir. 2002). The district court's decision to overlook that concession departed from the party-presentation principle—especially when the US introduced no other evidence suggesting the buoy system is somehow an enumerated structure.

As Texas has explained (at 26-28), the buoys do not fall within the umbrella of "other structures" because they lack two things the listed structures all have in

common—(1) the capacity to stretch across a waterway (2) as a permanent fixture. The US makes two counterarguments, neither of which has merit.

*First*, the US observes (at 30) that the enumerated items need not always reach across a body of water. That misunderstands how the *ejusdem generis* canon functions: It asks what terms placed in a single list have in common, not what they could mean independent of that context. So, in a list that describes "cats, dogs, ferrets, and other animals," the catchall phrase should be interpreted to capture only domestic pets, even though not all cats and dogs—think a tiger or dingo—are domesticated. Here, too, what matters is what the listed items have in common in the context of obstructing a river: the capacity to stretch laterally (and thus impede up- and down-river traffic) and permanently (in a way that cannot be easily evaded).

The US suggests (at 35) Texas's observation that the buoys will remain where they are placed is a statement of "intention" to make the buoys permanent. This statement, however, merely corrected the US's misleading suggestion that the buoys inadvertently drifted into Mexican waters. ROA.918, 961; ECF 11 at 18-19; ECF 61 at 10-11.[3] Texas's consistent position is that the buoys are designed to be moveable; Mr. Flossman testified only that the buoys are incapable of drifting on their own. Tr.102-03.

---

[3] Because the US repeats that suggestion (at 5) based on its continuing misrepresentation about the current international border, this Court could vacate the preliminary injunction on that basis alone as a sanction. *See, e.g.*, *Coastal Corp. v. Tex. E. Corp.*, 869 F.2d 817, 821-22 (5th Cir. 1989) (vacating injunction for misrepresentations).

*Second*, the US criticizes (at 31-32) Texas's invocation of the *ejusdem generis* canon without attempting to define the outer limit of "other structures." The canon simply recognizes that consulting surrounding context—and taking care not to gut specifically enumerated words of meaning—is part of how courts identify the meaning of generic terms like "structure." Antonin Scalia & Bryan A. Garner, *Reading Law* 199 (2012). After all, if Congress used the word "structure" the way the US suggests (at 31) here—to mean anything "composed of parts joined together in some definite manner"—then the enumerated list really would be pointless. The US's definition could include a soccer ball, which is "composed of parts" like a latex bladder, cotton lining, polyester stitching, and a polyurethane outer shell—all hopefully "joined together in [a] definite manner." A general term that broad calls out for careful attention to surrounding context.

Whether or not the buoy system is "fundamentally unlike" a boom (US at 33), it *is* unlike the listed items with respect to those two traits they share. That is why the Act elsewhere requires the placement of buoys without observing the pre-clearance rules that apply to "other structures," 33 U.S.C. § 409, and classes them separately from structures like piers and wharfs, *id.* § 408(a). The US offers no response to these contextual clues that Texas flagged (at 29-30).

## D.  The district court's reading of the Act flouts the Constitution.

The US's response only highlights how its reading of the Act conflicts with the Constitution. This Court should not adopt it.

**1.**   The US is wrong to read the Act's reference to "navigable" waters to include any waterway that has *ever* been thought capable of being used someday for

commercial navigation—even if only in the distant past or in the distant future. *Supra* Part I.A. It is likewise wrong to read the Act as imposing criminal liability for allowing any obstacle to find its way into a watercourse. *Supra* Part I.B-C. These capacious readings cannot be squared with the Commerce Clause for the reasons Texas has explained (at 31-33).

In response, the US openly claims (at 12) that Congress's power here "turns on its ability to decide whether such waters should be used for interstate commerce." Yet *NFIB v. Sebelius*—which the US nowhere cites, let alone distinguishes—says the opposite: Commerce must already exist in order to be regulated, and cannot be spoken into existence. 567 U.S. 519, 550-58 (2012). Under this recent, binding precedent, Congress's Commerce Clause power is decidedly *not* the "ability to decide whether" commerce should exist. The US can ignore that binding precedent if it chooses, but this Court cannot.

**2.** Similarly off-base is the US's response (at 36-37) to the fundamental proposition that Texas identifies in the Invasion Clauses—that the Rivers and Harbors Act cannot vitiate a State's right to defend itself from violent threats. Because the US rightly concedes (at 36-37) that invoking self-defense authority is a political question, the only question on which this Court may opine is whether the States *have* any self-defense authority at all.

As Texas has already explained (at 33-37), the Constitution's text, founding-era thought, and Supreme Court precedent all demonstrate that States retained the "power of self-preservation" embodied in Article I, § 10, cl. 3. *Smith v. Turner*, 48 U.S. 283, 400 (1849) (McLean, J.). The US (at 36) finds it "breathtaking" that

Congress could not countermand a State's actions under Article I, § 10, cl. 3. That happens to be what the Constitution says: Just one sentence away, the Import-Export Clause makes state action "subject to the Revision and Controul of the Congress." U.S. Const. art. I, § 10, cl. 2. Meanwhile, Article I, § 10, cl. 3 contains no such limiting language. Besides expressing dismay at the Constitution's plain text, the US makes no meaningful effort to address the authority supporting concurrent federal and state authority to repel invasions.

Instead, the US attempts to make this easy question hard by suggesting (at 37-38) that political questions can only ever apply "to the political branches of the *federal* government," and that this Court must therefore wade into sensitive questions about Texas's actions. That would surprise the Supreme Court, which held just four years ago that the propriety (or impropriety) of partisan gerrymandering was a nonjusticiable political question committed to *the States*. *Rucho v. Common Cause*, 139 S. Ct. 2484, 2506-07 (2019). Political questions are not limited to the federal government. They attach whenever the Constitution textually commits a decision to a political actor—federal *or* state—who is tasked with making the sorts of decisions courts are ill-equipped to make. *Id.* at 2495-96 (noting that Article I, § 4, cl. 1 assigns districting to state legislatures); *id.* at 2498-2506 (identifying no judicially manageable standard to police partisan districting).

Because the power of self-defense goes to the very core of sovereignty, it poses a nonjusticiable question committed to the sovereign that wields it, *Moyer v. Peabody*, 212 U.S. 78, 83-85 (1909), subject only to limited review as to whether the sovereign has invoked that authority in "good faith," *Sterling v. Constantin*, 287 U.S. 378, 400

(1932). That does not mean the self-defense power is limitless or that a State "is subject to no oversight of its 'chosen means of waging war.'" ROA.999. For one thing, federal courts should presume that state officials will follow the Constitution. *See, e.g.*, *Sumner v. Mata*, 449 U.S. 539, 549 (1981); *Rose v. Raffensperger*, 584 F. Supp. 3d 1278, 1288 (N.D. Ga. 2022). As relevant here, that includes the requirement that a State be "actually invaded" or "in . . . imminent Danger." U.S. Const. art. I, § 10, cl. 3. More fundamentally, though, States authorized to "engage in War" are—presumably like the US itself—bound by the law of nations when responding to such threats. *See Miller v. United States*, 78 U.S. 268, 305-06 (1870).[4]

Despite repeatedly conceding (at 36-37, ROA.744-45) that no manageable standards guide judicial assessment of the decision to repel an invasion, the US defends the district court's decision to second-guess Texas's exercise of self-defense power here. And because no manageable standards exist, all the US can offer in support (at 38-39) are ad hoc limits, like the idea that the States' self-defense authority can never apply to non-state actors. That would surprise the 5th Congress and the 107th, which authorized the use of military force by and against non-state actors. As Texas explained (at 38-39)—and the US nowhere rebuts—federal and state forces have long been called upon to take hostile measures to deal with non-state actors.

---

[4] Law-of-nations principles also show why the US errs (at 39-41) in conflating "the power granted" and the "event triggering" it with full-scale war. States, like other sovereigns, may take lesser defensive measures in an "imperfect" state of hostilities. *Bas v. Tingy*, 4 U.S. 37, 40-41 (1800) (Washington, J.). Texas's restrained, non-violent tactics in the face of imminent danger to its people are thus cause for praise, not criticism.

The US's position is also deeply troubling. Under its reasoning (at 41-42), if Blackwater or the Wagner Group crossed the shallow Rio Grande in tanks, Texas's hands would be tied as soon as the federal government had been informed and opted not to act. Apparently, the US thinks (at 10) the "basic premise of our federal system" is that the federal government can incite hostile entry into a border State, refuse to fulfill its constitutional obligations under Article IV, § 4, and render that State entirely powerless to protect itself. The Framers anticipated and repudiated this: They designed Article I, § 10, cl. 3 as a safety valve to address scenarios where the federal government was unable or unwilling to meet its obligations under Article IV, § 4. That is why the Constitutional Convention *deleted* language that would have keyed the States' self-defense power to the federal government's caprice, as the US itself notes (at 42-43 n.9).

The Biden Administration may not think the crisis at the border represents an invasion. Governor Abbott disagrees. Because that is precisely the political question upon which federal courts cannot opine, *supra* at 16, the Court must take the existence of an invasion as a given when interpreting the Act.

## II.  The US Failed to Shoulder Its Burden Under the Remaining Three Elements of *Winter*.

The US has also failed to show that it met its burden on the remaining equitable factors for an injunction, which it acknowledges (at 11-12) in describing the standard of review. It cannot avoid the standard by wishing it away.

### A.  All of *Winter*'s requirements apply to the federal government.

Determined to avoid *Winter* at all costs, the US makes three arguments for why it does not apply. *First*, it insists (at 45) that Texas has "forfeited" any argument that the remaining three requirements apply here. But Texas has consistently argued that *all four* elements of *Winter* apply, both in its opening brief (at 14, 39-45) and in the district court, *see* ROA.301, 314-16; ROA.918; ROA.953, 960-62. In any event, as the US notes elsewhere (at 30-31 n.8), parties cannot stipulate away the correct meaning of the law.

*Second*, the US claims (at 45) it is not "ask[ing] to be excused from *Winter*'s four factors," only that those factors will always be satisfied anytime the merits favor the US "for some statutes." But there can be no mistake. The US (at 14) asks this Court to approve awarding a preliminary injunction "without making findings of irreparable harm, inadequacy of legal remedy, or the balance of convenience." That is nothing short of "ask[ing] to be excused" from the factors the Supreme Court has required. The US offers no response to Texas's observation (at 40-41) that this special rule for "public-interest statute[s]" would effect a sea change for other laws routinely subjected to *Winter*.

*Third*, the US points (at 46) to a snippet from *Sanitary District of Chicago v. United States*, 266 U.S. 405 (1925). Assuming that statement says what the US thinks, it was written decades before *Winter*. It cannot support a general exception to the Supreme Court's controlling preliminary-injunction standard for some broad group of public-interest statutes. The US's response demonstrates why it cannot succeed under the *Winter* test as written.

### B. The US has not shown it would suffer irreparable harm absent a preliminary injunction.

Although it previously claimed the very "*presence* of the Floating Barrier" "in the Rio Grande" caused it irreparable diplomatic and humanitarian harm, *e.g.*, ROA.84, it now admits (at 52) that it was "reasonable" to allow the buoys to remain in the river—just not where Texas originally deployed them. The US's approval of an injunction that in no way addresses its purported injuries—but that won a "positive" soundbite from Mexico—demonstrates how baseless the claimed injuries really are. Appellants' Br. 47.

Even if we ignore that glaring problem, the US's arguments fail on their own terms. The US was not caught off guard by Texas's unilateral action: Texas officials informed IBWC in advance about the buoys, including their genesis as a project approved by the federal government, their purpose to secure the border and "prevent drownings," planned "strategic locations" near Eagle Pass, anticipated timing of deployment, and specifications of the buoy system itself. ROA.109; ROA.418-24. Nor are the buoys to blame for any treaty non-compliance. As Texas explained (at 41-42)—and the US nowhere refutes—the US and Mexico have not complied with relevant treaties for years. *See* ROA.135-36. And a federal employee testified that the buoys have in no way impeded IBWC's cross-border work. ROA.445-46; ROA.491. Most importantly, and contrary to the district court's baseless assertion, neither Texas nor the US's own witness has expressed "concerns as to human safety," ROA.42, despite around-the-clock surveillance, ROA.326-27. The record is thus devoid of evidence that the US will be irreparably harmed absent an injunction.

## C.  The district court erred in weighing the equities and public interest.

The record is admittedly light on evidence of the border crisis and Texas's proposed solution—because the district court refused to entertain it. From the start, the district court arbitrarily circumscribed the evidentiary inquiry. It limited any discovery to whether the buoys obstruct navigation. ROA.235. At the time, the US was only too happy to object during depositions to any question that strayed toward the invasion along the border or how Texas's buoys might help to stop it. ROA.415-16, 422, 447, 485; *cf.* ROA.354-55. At the preliminary-injunction hearing, the US lodged the same objections, and the district court repeatedly sustained them. Tr.72-74, 76, 78, 80. Texas tried to build a record, but the district court would not allow it.

The US attempts (at 46) to justify that ruling by asserting a federal court should not accord "equal weight" to the items on Texas's side of the scale. It can cite no authority for such a remarkable position, which runs counter to the ordinary rule that States are accorded "special solicitude"—not special disadvantage—in demonstrating harms due to their position in our federal system. *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007).

The US next tries to trivialize (at 21 n.5) those harms to the public interest that Texas has identified and sought to remedy. Among other ills the US deems simply "unfortunate[]," are women being raped and trafficked,[5] newly-arrived migrants

---

[5] Laura Gottesdiener et al., *Migrants Are Being Raped at Mexico Border as They Await Entry to US*, Reuters (Sept. 29, 2023), https://tinyurl.com/yshanvrm; Virginia Allen, *'America's New Slave Trade' Is Here at Hands of Mexican Cartels, Border Expert Tells Lawmakers*, Daily Signal (July 19, 2023), https://tinyurl.com/5bfnkjzj.

being extorted daily by cartel members,[6] and infants dying after accidentally coming into contact with fentanyl residue.[7] While the US may be content to delay solving a problem of its own creation, the Americans and migrants experiencing this suffering know it will not "admit of delay." U.S. Const. art. I, § 10, cl. 3.

Finally, faced with uncontradicted record evidence that the buoys *do* help reduce cross-river traffic and the dangers it poses to Texas, its citizens, and migrants, the US makes half-hearted attempts to undercut that testimony. For example, it notes (at 49) that Mr. Escalon's assertion that nobody has successfully crossed the buoy system was made only "as of August 9." That is how sworn declarations work. Mr. Escalon could not have (honestly) made sworn assertions about the future. This theory of why Texas and the public interest are not harmed by the injunction is also irreconcilable with the US's theory on the merits. The US cannot in the same breath claim (at 6, 7, 9, 21 n.5, 24, 25, 52) that the buoys violate Section 10 because they "block[] cross-river" criminal traffic, and argue (at 2, 8, 11, 49, 50) that "no credible evidence" shows buoys help deter cross-river criminal traffic.

Moreover, as the US acknowledges (at 29), "it is not just the current barrier that matters in the analysis." The US recognizes that this buoy system is a "test site" before Texas places additional buoys at other criminal hotspots, ROA.105, 109, for

---

[6] Tim Hains, *Sen. Katie Britt: What I Saw at the Border Was Not the American Dream, It Was a Nightmare*, RealClearPolitics (Sept. 27, 2023), https://tinyurl.com/mt3u7x9p.

[7] Susie Coen, *Baby Boy Dies After Ingesting Fentanyl at New York Nursery*, The Telegraph (Sept. 17, 2023), https://www.telegraph.co.uk/world-news/2023/09/16/baby-boy-dead-ingesting-fentanyl-new-york-nursery-bronx/.

which "Texas already has funding and a designated contractor," ROA.86. That is why it has consistently sought to prevent Texas from deploying more buoys. ROA.22. Meanwhile, Texas appealed the entire preliminary injunction—both its mandatory and its prohibitory components—because it intends to use this cost-effective tool more broadly. The US's commitment to opposing any efforts to reduce human suffering, while kowtowing to a neighbor that does nothing to stop it, is enough to dampen the pride of any American. This Court should not bless that distorted view of the equities.

## Conclusion

The Court should reverse the order granting a preliminary injunction.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Munera Al-Fuhaid
Assistant Attorney General


Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Judd E. Stone II
Solicitor General

/s/ Lanora C. Pettit
Lanora C. Pettit
Principal Deputy Solicitor General
Lanora.Pettit@oag.texas.gov

Ari Cuenin
Deputy Solicitor General

Coy Allen Westbrook
Assistant Attorney General

Counsel for Defendants-Appellants

## CERTIFICATE OF SERVICE

On October 3, 2023, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Lanora C. Pettit
LANORA C. PETTIT

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,252 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Lanora C. Pettit
LANORA C. PETTIT