No. 23-50632

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

GREG ABBOTT, IN HIS CAPACITY AS GOVERNOR OF THE STATE OF TEXAS; STATE OF TEXAS,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

## SUPPLEMENTAL EN BANC BRIEF FOR APPELLANTS

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

AARON L. NIELSON
Solicitor General
Aaron.Nielson@oag.texas.gov

LANORA C. PETTIT
Principal Deputy Solicitor General

WILLIAM F. COLE
Deputy Solicitor General

COY ALLEN WESTBROOK
Assistant Attorney General

Counsel for Defendants-Appellants

# Certificate of Interested Persons

No. 23-50632

United States of America,

*Plaintiff-Appellee,*

*v.*

Greg Abbott, in his capacity as Governor of the State of Texas; State of Texas,

*Defendants-Appellants.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, Appellants, as governmental parties, need not furnish a certificate of interested persons.

/s/ Aaron L. Nielson

Aaron L. Nielson

*Counsel of Record for*
*Defendants-Appellants*

i

## Statement Regarding Oral Argument

This Court has calendared this case for en banc oral argument during the week of May 13, 2024. Governor Abbott and the State of Texas agree that oral argument is warranted. This appeal arose out of Texas's Operation Lone Star, which Governor Abbott launched to stem the tide of crime, drugs, weapons, and trafficked humans pouring over the United States' southern border. As part of that program, Texas proposed to deploy buoy arrays in the Rio Grande near common crossing points to direct migrants to legal ports of entry and discourage illegal cross-river traffic. To date, Texas has deployed a single, test buoy array near Eagle Pass, Texas.

Although the test array is only 1,000 feet long and floats in water that is often knee-to-waist deep, a panel of this Court affirmed an injunction requiring its removal under the Rivers and Harbors Appropriation Act of 1899. That statute, aimed to protect the nation's commercial shipping, forbids any "obstructions" to the "navigable capacity" of any waters of the United States or building "structures" in "navigable river[s]" absent a permit from the U.S. Army Corps of Engineers. Because the district court's order misreads the statutory text and sets the statute on a collision course with multiple provisions of the Constitution, the Governor and the State agree that oral argument will aid the Court's decisional process.

# Table of Contents

Page

Certificate of Interested Persons ...............................................................i

Statement Regarding Oral Argument .....................................................ii

Introduction...................................................................................................1

Statement of Jurisdiction ..........................................................................3

Issues Presented ..........................................................................................3

Statement of the Case ...............................................................................3

    I.   The Crisis at the United States Southern Border......................3

    II.  Federal Inaction Exacerbates the Crisis. ...................................6

    III. Facing an Unprecedented Influx of Hostile Actors, Texas Deploys Buoys in One of the Rio Grande's Criminal Hotspots.............................7

    IV. Procedural History. ................................................................10

Summary of the Argument......................................................................12

Standard of Review ..................................................................................15

Argument......................................................................................................15

    I.   The Federal Government is Unlikely to Succeed on the Merits of its Claim that the Buoy System Violates the Rivers and Harbors Act...........15

        A.  The contested stretch of ankle-deep water is not commercially "navigable," whether in the past, present, or future. .......................16

        B.  Four-foot-wide buoys do not "obstruct" (hypothetical) navigation in a river 200 feet wide. ..................................................27

        C.  The buoy system is not a "structure" prohibited by the Act because it is not a permanent fixture floating across a waterway.......33

        D.  The Court should interpret the Act to harmonize, not conflict, with the Constitution. ......................................................39

    II.  The Federal Government Also Failed to Establish the Remaining Three Elements of *Winter*'s Preliminary-Injunction Standard. ................42

        A.  The federal government was required to meet the *Winter* standard. ..........................................................................42

B.  The federal government failed to show it would suffer irreparable harm absent a preliminary injunction. ................................. 43

C.  The district court also erred in weighing the equities and public interest, which clearly favor Texas. ................................... 44

Conclusion ............................................................................................ 48

Certificate of Service ............................................................................ 49

Certificate of Compliance .................................................................... 49

# Table of Authorities

**Page(s)**

**Cases:**

*Ali v. Fed. Bureau of Prisons*,
  552 U.S. 214 (2008) ........................................................... 35

*Appleby v. City of New York*,
  271 U.S. 364 (1926) ........................................................... 36

*Arizona v. United States*,
  567 U.S. 387 (2012) ........................................................... 44

*Bates v. Ill. Cent. R.R. Co.*,
  66 U.S. 204 (1861) ............................................................ 36

*Biden v. Texas*,
  597 U.S. 785 (2022) ...................................................... 7, 21

*Buttrey v. United States*,
  690 F.2d 1186 (5th Cir. 1982) ........................................ 17

*Chicago v. Envt'l Def. Fund*,
  511 U.S. 328 (1994) ........................................................... 39

*CSX Transp., Inc. v. Ala. Dep't of Revenue*,
  562 U.S. 277 (2011) ........................................................... 35

*Dubin v. United States*,
  599 U.S. 110 (2023) ........................................................... 37

*Econ. Light & Power Co. v. United States*,
  256 U.S. 113 (1921) .................................................... 24, 30

*Epic Sys. Corp. v. Lewis*,
  584 U.S. 497 (2018) ........................................................... 14

*Gilman v. Philadelphia*,
  70 U.S. (3 Wall.) 713 (1865) ........................................... 17

*Greenleaf-Johnson Lumber Co. v. Garrison*,
  237 U.S. 251 (1915) ........................................................... 36

*Harrison v. Young*,
  48 F.4th 331 (5th Cir. 2022) ........................................... 15

*Heckman v. Sutter*,
  119 F. 83 (9th Cir. 1902) ................................................. 36

*Hersh v. U.S. ex rel. Mukasey*,
  553 F.3d 743 (5th Cir. 2008) ........................................... 39

*Holyoke Co. v. Lyman,*
   82 U.S. 500 (1872) ....................................................................... 36

*Janvey v. Alguire,*
   647 F.3d 585 (5th Cir. 2011) ...................................................... 44

*Justin Indus. Inc. v. Chocktaw Sec., L.P.,*
   920 F.2d 262 (5th Cir. 1990) ...................................................... 15

*Leovy v. United States,*
   177 U.S. 621 (1900) ..................................................................... 17

*Lindsay & Phelps Co. v. Mullen,*
   176 U.S. 126 (1900) ..................................................................... 35

*Medellín v. Texas,*
   552 U.S. 491 (2008) ..................................................................... 33

*Miami Valley Conservancy Dist. v. Alexander,*
   692 F.2d 447 (6th Cir. 1982) ........................................... 18, 21, 25

*Mock v. Garland,*
   75 F.4th 563 (5th Cir. 2023) ...................................................... 42

*Morrison v. Olson,*
   487 U.S. 654 (1988) ..................................................................... 25

*Moyer v. Peabody,*
   212 U.S. 78 (1909)........................................................................ 41

*New York v. New Jersey,*
   598 U.S. 218 (2023) ..................................................................... 47

*NFIB v. Sebelius,*
   567 U.S. 519 (2012) ..................................................................... 40

*Norfolk & W. Co. v. United States,*
   641 F.2d 1201 (6th Cir. 1980) .................................................... 28

*Nuncio v. Johnson,*
   208 F.3d 1007 (5th Cir. 2000) .................................................... 34

*Oklahoma v. Texas,*
   258 U.S. 574 (1922)............................................................... 17, 24

*Petro United Terminals, Inc. v. J.O. Odfjell Chem. Carriers,*
   756 F. Supp. 269 (E.D. La. 1991) .......................................... 36-37

*Phenix Constr. Co. v. Cornell Steamboat Co.,*
   103 N.E. 891 (N.Y. 1913) ........................................................... 37

*Philadelphia v. Standard Oil Co. of Pa.,*
   12 F. Supp. 647 (E.D. Pa. 1934) ............................................... 36

*Pollard v. Hagan,*
   44 U.S. (3 How.) 212 (1845) ...................................................... 16

*Pound v. Turck*,
     95 U.S. 459 (1877) ................................................................... 36
*PPL Mont., LLC v. Montana*,
     565 U.S. 576 (2012) ..............................................16, 17, 21, 26
*Puente de Reynosa, S.A. v. City of McAllen*,
     357 F.2d 43 (5th Cir. 1966) ................................................... 25
*Rollins v. Fort Bend ISD*,
     89 F.3d 1205 (5th Cir. 1996) ................................................. 34
*Sackett v. EPA*,
     598 U.S. 651 (2023) ............................................................16, 17
*Sealed Appellee 1 v. Sealed Appellant 1*,
     767 F.3d 418 (5th Cir. 2013) ................................................. 37
*Susquehanna Boom Co. v. W. Branch Boom Co.*,
     110 U.S. 57 (1884) ........................................................... 35-36
*Tate v. Am. Tugs, Inc.*,
     634 F.2d 869 (5th Cir. Unit A Jan. 1981) ........................... 15
*Texas v. DHS*,
     No. 2:23-CV-55-AM, 2023 WL 8285223 (W.D. Tex. Nov. 29, 2023) ..5, 7,10, 45
*In re The Montello*,
     87 U.S. (20 Wall.) 430 (1874) ..........................................17, 19
*United States v. Abbott*,
     87 F.4th 616 (5th Cir. 2023) ...........................................*passim*
*United States v. Angell*,
     292 F.3d 333 (2d Cir. 2002) ..................................................28
*United States v. Appalachian Elec. Power Co.*,
     311 U.S. 377 (1940) .............................21, 22, 23, 25, 31
*United States v. Bellingham Bay Boom Co.*,
     176 U.S. 211 (1900) ......................................................... 34, 35
*United States v. Boyden*,
     696 F.2d 685 (9th Cir. 1983) ................................................. 37
*United States v. Bridgeport Towing Line*,
     15 F.2d 240 (D. Conn. 1926) ................................................. 37
*United States v. Burns*,
     54 F. 351 (C.C.D. W. Va. 1893) .........................................35, 37
*United States v. Central Soya, Inc.*,
     697 F.2d 165 (7th Cir. 1982) ................................................. 17
*United States v. Crow, Pope & Land Enters.*,
     340 F. Supp. 25 (N.D. Ga. 1972) ............................. 18, 25, 31

*United States v. Estate of Boothby*,
   16 F.3d 19 (1st Cir. 1994) ........................................................ 37, 39
*United States v. Female Juvenile*,
   103 F.3d 14 (5th Cir. 1996) ............................................................30
*United States v. Hall*,
   63 F. 472 (1st Cir. 1894) ................................................................ 37
*United States v. Hansen*,
   599 U.S. 762 (2023) ........................................................................40
*United States v. Oak Beach Inn Corp.*,
   744 F. Supp. 439 (S.D.N.Y. 1990) ................................................ 37
*United States v. Oregon*,
   295 U.S. 1 (1935) .....................................................................18, 31
*United States v. Republic Steel Corp.*,
   362 U.S. 482 (1960) ................................................ 13, 22, 27, 29, 30
*United States v. Rio Grande Dam & Irrigation Co.*,
   174 U.S. 690 (1899)...............................17, 18, 19, 21, 23, 27, 28, 31
*United States v. Rio Grande Dam & Irrigation Co.*,
   184 U.S. 416 (1902)........................................................................36
*United States v. Sineneng-Smith*,
   140 S. Ct. 1575 (2020) ................................................................... 34
*United States v. W. Indies Transp., Inc.*,
   127 F.3d 299 (3d Cir. 1997) ...........................................................28
*Vieux Carre Property Owners, Residents & Assocs., Inc. v. Brown*,
   875 F.2d 453 (5th Cir. 1989) ................................................... 29, 30
*Willson v. Black-Bird Creek Marsh Co.*,
   27 U.S. (2 Pet.) 245 (1829).......................................................17, 18
*Winter v. NRDC*,
   555 U.S. 7 (2008) ............................................................. 2, 3, 15, 42
*Zeller v. Am. Int'l Corp.*,
   292 F. 822 (3d Cir. 1923) ...............................................................36

**Constitutional Provisions and Statutes:**
U.S. Const.
   art. I, § 8 ................................................................................. 12, 40
   art. I, § 10, cl.3 .............................................................................. 41
   art. IV, § 4.......................................................................................6

8 U.S.C.
  § 1225(b)(2)(A) ..................................................................6
  § 1226(d)(1) .......................................................................6
  § 1231(a)(1)(A) ..................................................................6
  § 1325 ...............................................................................46
16 U.S.C.
  § 796(8) ............................................................................21
19 U.S.C.
  § 1459 ...............................................................................46
28 U.S.C.
  § 1292(a)(1) ........................................................................3
  § 1331 .................................................................................3
  § 1345 .................................................................................3
33 U.S.C.
  § 403.......................................10, 12, 13, 14, 16, 17, 27, 31, 34, 40
  § 403b ................................................................................37
  § 406 ..................................................................................30
  § 408(a) .............................................................................38
  § 409 ..................................................................................38
Tex. Gov't Code
  § 418.018(c) ........................................................................8
33 C.F.R.
  § 322.2(b) ..........................................................................37
  § 329.11(b) ........................................................................18

**Other Authorities:**

Andy Newman & Dana Rubinstein, *Chaos, Fury, Mistakes: 600 Days
  Inside New York's Migrant Crisis*, N.Y. Times (Dec. 26, 2023) ........................5-6

Antonin Scalia & Bryan A. Garner, Reading Law: Interpreting Legal
  Texts (2012) ....................................................................... 35

Convention Between the United States of America & the United
  States of Mexico, art. V at 4, Nov. 12, 1884.....................................32

First Amended Complaint, *United States v. Abbott*, No. 1:23-cv-853-DAE
  (W.D. Tex. Oct. 23, 2023), ECF 60 ..................................................16

Gaige Davila, *High Migration Through Texas Border Town of Eagle Pass
  Strains Resources*, NPR (Sept. 22, 2023), http://tinyurl.com/39snem9n ........5, 6

Immigration Reform and Control Act of 1986, Pub. L. No. 99-603
§115, 100 Stat. 3359 ..........................................................................6

Jack Flynn & Jerry Knapp, *Airboat: Advantages for River Rescue Missions*,
Fire Apparatus & Emergency Equipment Magazine (Apr. 1, 2021),
http://tinyurl.com/AirBoatLand .................................................. 8-9

Joseph Story, Commentaries on the Constitution of the United States (1833).........6

Memorandum from Acting Director, U.S. Immigration & Customs
Enforcement, Dep't of Homeland Security (Feb. 18, 2021),
https://tinyurl.com/fu6h7epf .............................................................7

*Mexico recovers 2 bodies from the Rio Grande, including 1 found near
floating barrier that Texas installed*, CBS News (Aug. 3, 2023),
http://tinyurl.com/32jc9erj ...............................................................46

Miriam Jordan, *Smuggling Migrants at the Border Now a Billion-Dollar
Business*, N.Y. Times (July 25, 2022) ............................................. 4, 5

Order Denying Defendants' Opposed Motion to Stay, *United States v.
Abbott*, No. 1:23-CV-853-DAE (W.D. Tex. Jan. 24, 2024), ECF 76 .................. 12

Press Release, Office of Tex. Gov. (June 8, 2023),
https://tinyurl.com/y9sp5y4t ...............................................................8

Press Release, Office of Tex. Gov. (Sept. 15, 2023),
https://tinyurl.com/4274pwhs ..............................................................8

Rafael Prieto-Curiel et al., *Reducing Cartel Recruitment Is the Only Way
to Lower Violence in Mexico*, 381 Science 1312 (2023)............................4

Report of U.S. House Special Committee on Texas Frontier Troubles
(Feb. 29, 1876) ................................................................................ 41

*Southwest Land Border Encounters*, U.S. Customs & Border Patrol,
http://tinyurl.com/bdebv2t4 (last accessed Feb 16, 2024)................................3

Speaker of the U.S. House, Biden Administration Actions that Have
Undermined Border Security and Encouraged Illegal Immigration
(Jan. 9, 2024), http://tinyurl.com/y2b3emzd ..................................6-7

Transcript of Preliminary Injunction Hearing, *United States v. Abbott*,
No. 1:23-cv-853-DAE (W.D. Tex. Sept. 19, 2023), ECF 56 ......................*passim*

Treaty Between the United States of America & Mexico, art. III ,
Nov. 14, 1944, 59 Stat. 1219 ...............................................................32

Treaty with Mexico, art. IV, Dec. 30, 1853, 10 Stat. 1034.....................................32

Treaty with the Republic of Mexico, art. VII, Feb. 2, 1848, 9 Stat. 928 .................32

U.S. Department of Homeland Security, Coast Guard Develops and
    Tests Environmentally-Friendly Buoy Moorings (Apr. 30, 2018),
    http://tinyurl.com/DHSBuoys ..................................................................... 39

Unaccompanied Children at the Border: Federal Response and the
    Way Forward, Hearing Before the Subcomm. on Border Security,
    Facilitation, and Operations of the H. Comm. on Homeland Sec.,
    117th Cong. (2021) (statement of Patrick J. Lechleiter, Acting
    Executive Associate Director Homeland Security Investigations) ................. 4, 5

Webster's New International Dictionary (1930) ............................................ 35, 36

# Introduction

A United Nations study has declared the United States-Mexico border the deadliest land crossing in the world. ROA.1690-94. Every day multi-billion-dollar transnational criminal organizations traffic lethal fentanyl, enslaved persons, and untraceable weapons across the Rio Grande into Texas. Governor Abbott declared a border-security disaster in 2021, ROA.1702-05, and launched Operation Lone Star, which has led to hundreds of thousands of apprehensions, tens of thousands of felony charges, and hundreds of millions of lethal doses of fentanyl seized.

As part of his mission to protect Texas, its citizens, and aliens who enter the State, the Governor deployed a marine floating barrier to deter illegal crossings in hotspots along the Rio Grande and to direct migrants to safe, lawful points of entry. The 1,000-foot-long buoy system at issue here was a test array deployed in Maverick County near Eagle Pass, Texas. It is uncontested that no vessels transport commercial goods in the shallow waters where the buoys are located, that cross-river traffic is illegal, and that law-enforcement airboats are unimpeded by the buoys.

Nevertheless, the federal government insists the buoys violate the Rivers and Harbors Appropriation Act of 1899 (the "Act") because Texas deployed them without a permit from the U.S. Army Corps of Engineers (the "Corps"). The federal government sought, and received, a preliminary injunction forcing the State to move the buoys closer to the Texas riverbank and to stop placing new buoys in the river—thereby allowing untold numbers of cartel agents to ford the Rio Grande onto Texas soil.

To obtain such "an extraordinary remedy," the federal government was *supposed* to show that it "is likely to succeed on the merits," it "is likely to suffer irreparable harm in the absence of preliminary relief," "the balance of equities tips in [its] favor," and "an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20, 24 (2008). The federal government did none of that, however, instead offering a legal theory contrary to the Act's plain language and design. The federal government offered no evidence that this stretch of the Rio Grande is navigable; that the buoys "obstruct" any commercial navigable capacity; or that the buoys are the kind of "structures" prohibited by the Act. And it made no attempt to reconcile its sweeping view of the Act with Texas's express constitutional authority to defend its citizens from the imminent danger posed by the hostile actors streaming over its borders. By itself, the district court's acceptance of the federal government's flawed legal arguments warrants reversal.

The district court, however, also committed an additional error: It did not allow Texas to fully develop the record on the equities and public interest. Texas was wrongfully forbidden to ask the federal government about "the 2.3 million . . . border encounters," the "600,000 . . . got-aways" at the border, "the importation of lethal fentanyl," "unlawful migration," or "cartel activity." Tr.73-77.[1] But even the limited evidence before the district court confirms that the public interest and balance of equities overwhelmingly favored Texas. "[P]ay[ing] particular regard for the

---

[1] Citations following this convention are to the transcript of the district court's preliminary-injunction hearing. *See* Transcript of Preliminary Injunction Hearing, *United States v. Abbott*, No. 1:23-cv-853-DAE (W.D. Tex. Sept. 19, 2023), ECF 56.

public consequences"—as it must before "employing the extraordinary remedy of injunction"—this Court accordingly should reverse. *Winter*, 555 U.S. at 24.

## Statement of Jurisdiction

The district court had jurisdiction under 28 U.S.C. §§1331, 1345, and this Court has jurisdiction over this timely filed appeal under 28 U.S.C. §1292(a)(1).

## Issues Presented

**1.** Whether the federal government met its burden of showing that the relevant 1,000-foot segment of the Rio Grande is presently, historically, or prospectively commercially navigable, and that the buoys "obstruct" any such hypothetical "navigable capacity" or constitute a "structure" requiring a Corps permit under the Act.

**2.** Whether the federal government met the remaining three *Winter* factors.

## Statement of the Case

## I.   The Crisis at the United States Southern Border.

Texas's border with Mexico is in crisis because of human trafficking, drug smuggling, and terrorist infiltration. U.S. Customs and Border Protection ("CBP") alien encounters on the border have ballooned from about 458,000 in fiscal year 2020, to 1.7 million in fiscal year 2021, just shy of 2.4 million in fiscal year 2022, and nearly 2.5 million in fiscal year 2023. ROA.1516. So far in fiscal year 2024, that figure has already topped three-quarters of a million. *See, e.g.*, *Southwest Land Border Encounters*, U.S. Customs & Border Patrol, http://tinyurl.com/bdebv2t4 (last accessed Feb 16, 2024). Those numbers omit an "unknown number of migrants [who] evade detection" and the hundreds of thousands detected but never found. ROA.1520.

This surge is being fueled by transnational criminal cartels for whom human suffering is good business. *See* ROA.1591. Trafficking across the southern border has metastasized "from a scattered network of freelance 'coyotes' into a multi-billion-dollar international business controlled by organized crime." Miriam Jordan, *Smuggling Migrants at the Border Now a Billion-Dollar Business*, N.Y. Times (July 25, 2022), https://tinyurl.com/442zeau7. In fact, these cartels, which "have increasingly acquired a transnational dimension," are now the fifth largest employer in Mexico. Rafael Prieto-Curiel et al., *Reducing Cartel Recruitment Is the Only Way to Lower Violence in Mexico*, 381 Science 1312 (2023). "U.S.-bound human smuggling and related criminal activities are estimated by the Homeland Security Operational Analysis Center to produce revenues of $2 billion to $6 billion per year." Unaccompanied Children at the Border: Federal Response and the Way Forward, Hearing Before the Subcomm. on Border Security, Facilitation, and Operations of the H. Comm. on Homeland Sec., 117th Cong. (2021) (statement of Patrick J. Lechleiter, Acting Executive Associate Director Homeland Security Investigations).

"Human smuggling enterprises and cartels often maintain a symbiotic relationship, both with cartels controlling the major U.S. and foreign drug markets, while smuggling networks control the smuggling flow, otherwise known as 'illicit pathways.'" *Id.* And "since mid-2019, some have taken a more active approach in human smuggling, increasing and diversifying sources of income with an activity they view as low risk." *Id.* The "criminality does not stop" at human smuggling: some "migrants become victims of human or labor trafficking . . . when criminal networks introduce force, fraud, or coercion into smuggling schemes to induce victims into

forced labor or commercial sex." *Id.* And these criminal enterprises frequently engage in "other transnational crimes such as gang activity, identity benefit fraud, money laundering, bulk cash smuggling, narcotics smuggling, arms trafficking, and terrorism and [n]ational security related crime." *Id.* To take just one example: between the beginning of 2023 and the September preliminary-injunction hearing in this case, CBP had seized over 22,000 pounds of fentanyl—a synthetic opioid that is lethal at 2mg doses and is a leading cause of death for Americans under 50. ROA.1580-82.

For migrants lucky enough to avoid "some of Mexico's most violent drug cartels," Jordan, *supra*, other perils exist for individuals attempting to illegally cross the border. A record-high of 853 illegal immigrants died crossing between October 2021 and October 2022. ROA.1712-18. Border towns like Eagle Pass are increasingly at the "epicenter" of this humanitarian crisis. *Texas v. DHS*, No. 2:23-CV-55-AM, 2023 WL 8285223, at *4 (W.D. Tex. Nov. 29, 2023). According to Eagle Pass Mayor Rolando Salinas, Jr., the recent surge of border crossings is like "nothing that we've seen ever ... to have so many people crossing in without consequence." Gaige Davila, *High Migration Through Texas Border Town of Eagle Pass Strains Resources*, NPR (Sept. 22, 2023), http://tinyurl.com/39snem9n. After roughly 14,000 people—about half of Eagle Pass's population—entered the city in less than two weeks, Mayor Salinas declared a state of disaster. *Id.*[2]

---

[2] Indeed, large metropolitan areas have struggled to cope with just a tiny fraction of the influx faced every day by small towns along the border. *E.g.*, Andy Newman &

## II.  Federal Inaction Exacerbates the Crisis.

Congress has assigned the federal government certain duties that would help restrain the sudden sweep of crime and violence at the southern border. Immigration statutes obligate the federal government to (among other things): detain certain aliens pending removal proceedings, 8 U.S.C. §1225(b)(2)(A); aid state and local authorities in identifying aggravated felons, *id.* §1226(d)(1); apprehend and deport aliens within 90 days of being finally ordered removed, *id.* §1231(a)(1)(A); and enforce "the immigration laws of the United States . . . vigorously and uniformly," Immigration Reform and Control Act of 1986, Pub. L. No. 99-603 §115, 100 Stat. 3359, 3384. And the Constitution itself obliges the federal government to "protect each [State] against Invasion," U.S. Const. art. IV, §4, including any that might result "by the accession of alien residents," 3 Joseph Story, Commentaries on the Constitution of the United States §1815 (1833) (quoting The Federalist No. 43); *see also* ECF 142 at 16-21 (Ho, J., dissenting).[3]

The federal government has not simply failed to contain this crisis; it at times has helped create it. *E.g.*, *Texas*, 2023 WL 8285223, at *14; *see also* Speaker of the U.S. House, Biden Administration Actions that Have Undermined Border Security

---

Dana Rubinstein, *Chaos, Fury, Mistakes: 600 Days Inside New York's Migrant Crisis*, N.Y. Times (Dec. 26, 2023), http://tinyurl.com/4w56dn99.

[3] Unless otherwise noted, all references to "ECF" are to this Court's public docket. Consistent with the supplemental nature of this en banc brief, Texas focuses on issues raised in the panel opinion and in Texas's petition for rehearing en banc. For the avoidance of doubt, however, Texas stands by every argument in its panel-stage briefing.

and Encouraged Illegal Immigration (Jan. 9, 2024), http://tinyurl.com/y2b3emzd.
For example, three years ago—almost to the day—the federal government ordered
ICE employees *not* to arrest and deport aliens as required by federal law and required
ICE to "prioritize[] certain enforcement and removal actions over others." Memo-
randum from Acting Director, U.S. Immigration & Customs Enforcement, Dep't of
Homeland Security (Feb. 18, 2021), https://tinyurl.com/fu6h7epf. And one of the
first actions taken by the current Administration was to terminate the highly effective
"Remain in Mexico" program that required "certain non-Mexican nationals arriv-
ing by land from Mexico [to] be returned to Mexico to await the results of their re-
moval proceedings." *Biden v. Texas*, 597 U.S. 785, 791 (2022); *see id.* at 819 (Alito,
J., dissenting) (observing that DHS "found that total border encounters decreased
by 64 percent after" this program "was implemented," and DHS considered it an
"indispensable tool in addressing the ongoing crisis at the southern border").

## III. Facing an Unprecedented Influx of Hostile Actors, Texas Deploys Buoys in One of the Rio Grande's Criminal Hotspots.

In 2021, Governor Abbott declared a border-security disaster and launched Op-
eration Lone Star. As part of that initiative, the Governor has:

- detailed law-enforcement officers to plug border-staffing gaps;

- transported aliens to cities in other States;

- constructed miles of border wall and other barrier infrastructure;

- invoked the Texas Disaster Act to enhance penalties for criminal trespass on private land in the disaster area;

- designated transnational criminal cartels smuggling drugs, people, and

weapons into Texas as foreign terrorist organizations; and

- invoked the Invasion Clauses of the U.S. Constitution, ROA.57-59.

These efforts have "led to over 447,800 illegal immigrant apprehensions," "more than 34,200 criminal arrests, with more than 31,200 felony charges reported," and "over 428 million lethal doses of fentanyl" seized. Press Release, Office of Tex. Gov. (Sept. 15, 2023), https://tinyurl.com/4274pwhs. Most relevant here, on June 8, 2023, Governor Abbott "announced the deployment of new marine floating barriers to deter illegal crossings in hotspots along the Rio Grande River," Press Release, Office of Tex. Gov. (June 8, 2023), https://tinyurl.com/y9sp5y4t, and thereby control ingress to a disaster area, Tex. Gov't Code §418.018(c).

Texas selected as the test location Maverick County, which includes Eagle Pass. The Rio Grande in that area is about 200-feet wide, ROA.321, 327, and is riddled with sandbars, small islands, large rocks, natural and man-made debris, and sandy shoals, ROA.320, 407, 448. When the river isn't dry, it is often ankle-to-knee deep and—the record demonstrates—never more than four feet deep near the buoys. ROA.327. Because the Eagle Pass area is easily traversed on foot, particularly given the shallow water, it has been hit particularly hard by the border crisis, *see* ROA.652-54, representing nearly 25% of all CBP encounters in June 2023, ROA.656, 658.

Criminal cartels are active in the area, ROA.325, but there is no lawful, bank-to-bank commercial transportation, ROA.1275. Along the river, law-enforcement agencies use shallow-draft airboats, ROA.320-21, that are more capable of crossing dry land than they are of bearing commercial goods, ROA.320-21, 327; *see also, e.g.*, Jack Flynn & Jerry Knapp, *Airboat: Advantages for River Rescue Missions*, Fire Apparatus

& Emergency Equipment Magazine (Apr. 1, 2021), http://tinyurl.com/AirBoat-Land (describing how airboats are useful for rescue missions because they can "traverse very shallow water" and "skim over land, snow, and ice"). Natural conditions make it practically impossible to operate commercial vessels such as barges, fishing boats, cargo ships, or tankers. ROA.321, 327. Instead, this segment of the river is mostly home to illegal activities, like smuggling drugs and weapons and human trafficking. ROA.1273, 1275-76.

The buoy system was originally designed for CBP as part of a broader strategy to construct physical barriers in the Del Rio Sector. ROA.652-54, 1284. It comprises multiple interconnected buoys tethered via chains to concrete blocks placed on the riverbed, ROA.326, 1284-85, parallel to the river's flow, ROA.1393. This temporary system is not affixed to the riverbed, ROA.326, 1285, but instead uses weights to keep it in place, Tr.102-03, allowing it to be dismantled and redeployed, ROA.1284-85. Although connected to a two-foot-deep stainless-steel anti-dive net, ROA.1285, the buoy array allows the free movement of water and does not interfere with watercraft traveling along the river, ROA.321-27, 1285-86. To the contrary, the array occupies only approximately 3% of the stream's width and is placed on the shallower, Texas side. ROA.321, 327, 1285. Any vessel capable of navigating at the site can easily avoid the buoys, ROA.327, and law-enforcement airboats readily do, ROA.321-22.

The bright-orange buoys are well-marked, colorful, and constantly surveilled by law-enforcement personnel, ROA.321-22, 327-28, including for debris accumulation, ROA.1285; *see also* ROA.1018-23 (photographs). No one has attempted to climb

over the buoys, and no one has been injured by them. ROA.327-28. Indeed, the buoys save lives by directing individuals to ports of entry at bridges while deterring unlawful, dangerous water crossings. ROA.326-28, 1284; *cf. Texas*, 2023 WL 8285223, at *3 (finding that Texas's deployment of concertina wire at border-crossing hotspots "was so successful that illegal border crossings dropped to less than a third of their previous levels").

## IV. Procedural History.

On July 24, 2023, the federal government sued Texas and Governor Abbott, alleging that this shallow stretch of the Rio Grande is "navigable" for purposes of the Rivers and Harbors Act, and that the narrow buoy system is a prohibited "obstruction" or "structure[]" under Section 10 of the Act, 33 U.S.C. §403. ROA.15. In seeking a preliminary injunction mandating removal of the existing buoys, ROA.67, the federal government did not address the geographic features of the Rio Grande near Eagle Pass. Rather, it argued the buoys were in "navigable waters" (and thus subject to Corps jurisdiction) because Maverick County is within a *300-river-mile stretch* that the Corps declared navigable almost 50 years ago. ROA.72-74, 1085-86. The federal government further argued the buoys obstructed the river's "navigable capacity," or were "booms" or "other structures" built without a permit, in violation of Section 10. ROA.79-82. Texas countered that the federal government was unlikely to succeed under the Act because—under the proper legal standard—the river is *non*-navigable and the equities and public interest favor Texas. ROA.301, 314-16.

Following expedited proceedings that limited Texas's ability to present its case, *see, e.g.*, ECF 11 at 2, the district court ordered Texas to "reposition . . . all buoys, anchors, and other related materials composing the floating barrier placed by Texas in the Rio Grande" to the water along Texas's riverbank by September 15. ROA.1005-06 & n.32. The court also prohibited Texas from placing additional buoys elsewhere. ROA.1005. Texas appealed within an hour, ROA.1007, and sought an administrative stay from this Court, which was promptly granted, ROA.1009.

A split panel of this Court concluded that the district court did not abuse its discretion in granting a preliminary injunction. *United States v. Abbott*, 87 F.4th 616, 635 (5th Cir. 2023). In dissent, Judge Willett explained how the panel misunderstood the correct legal "test for navigability" and departed from "a century-plus of precedent." *Id.* at 635.

Agreeing with Texas that the definition of "navigable waters" is an issue with far-reaching consequences that will (and should) guide further proceedings in this matter, ECF 105, this Court granted en banc review, ECF 115. Just two days after the Court ordered rehearing en banc in May, the district court ordered the parties to designate witnesses within five days and set a trial "as early in March as we can." ECF 124 at 1. Because that *sua sponte* order threatened the en banc Court's jurisdiction and would severely prejudice the State's ability to defend itself, Texas sought emergency relief from this Court. *Id.* The Court denied that motion in a divided order with multiple opinions, but a majority of the Court emphasized that the district court should not rush to resolve such "an historic case that deserves a record

assembled with utmost thoroughness and evenhandedness for the interests of both sovereigns." *Id.* at 9 (Willett, J., concurring).[4]

## Summary of the Argument

Because the United States did not meet any of *Winter*'s four prongs, the district court erred as a matter of law by entering a preliminary injunction.

**I.** Enacted pursuant to Congress's powers under the Commerce Clause, U.S. Const. art. I, §8, the Rivers and Harbors Act forbids any "obstruction" to the "navigable capacity of any of the waters of the United States," or the building of any statutorily defined "structure[]" in any "navigable river," without pre-clearance from the Corps. 33 U.S.C. §403. The federal government is unlikely to prevail on the merits of its claim that placement of these buoys violates the Act for three reasons.

*First*, the Corps has no jurisdiction over this 1,000-foot stretch of the Rio Grande because it is not presently, historically, or prospectively "navigable" for commercial purposes. The federal government has never attempted to demonstrate that this stretch of river is *presently* navigable or could be made navigable *someday* through

---

[4] Judge Douglas's separate opinion stated that Texas "misleadingly suggested to this court that the district court had failed to rule on its motion." ECF 142 at 11 n.1 (Douglas, J., concurring). Respectfully, that assessment is incorrect: When Texas filed its motion here, it attached the district court's most recent order and informed the Court that "[t]he district court . . . ha[d] not ruled on Texas's motion." ECF 124 at 2 & n.1. As the district court recognized, it ruled several hours later. Order Denying Defendants' Opposed Motion to Stay, *United States v. Abbott*, No. 1:23-CV-853-DAE (W.D. Tex. Jan. 24, 2024), ECF 76. Texas promptly sought emergency relief to enable this Court to resolve Texas's motion before the district court's deadline, thus avoiding contempt or being precluded from designating experts.

reasonable improvements: The undisputed evidence is that this portion of the river is often ankle-to-knee deep and never more than four feet deep near the buoys—in addition to being riddled with sandbars, small islands, large rocks, natural and man-made debris, and sandy shoals. ROA.320, 327, 407, 448. Instead, the federal government insists that this contested stretch of the Rio Grande had once *been* navigable. This argument, however, rests on significant errors of law and fact. For example, the federal government points to *cross-river* traffic (*i.e.*, boats going from one riverbank to the other) rather than *down-river* traffic, even though the need for cross-river traffic only proves that the river impedes commerce rather than facilitates it. The federal government also relies on a 1975 Corps study that concedes there "has never been any 'practical navigation' between Roma . . . and El Paso"—a 1,000-mile stretch that includes the buoys' location in Maverick County, ROA.1103. As Judge Willett explained, this study "never found navigability based on historical or then-current use." *Abbott*, 87 F.4th at 638 (Willett, J., dissenting).

*Second*, even if—contrary to the federal government's own evidence—the contested portion of the Rio Grande were hypothetically navigable, the narrow, 1,000-foot buoy system does not remotely constitute an "obstruction" to the river's putative "navigable capacity." 33 U.S.C. §403. As the Supreme Court has explained, an "obstruction" must "adversely affect[]" navigation such that it "tends to *destroy* the navigable capacity of one of the navigable waters of the United States." *United States v. Republic Steel Corp.*, 362 U.S. 482, 487-88 (1960) (emphasis added). The buoys do no such thing: Comprised of "four-foot-diameter" buoys, ROA.1393-94, the array occupies only about 3% of the river's 200-foot span. Tr.32. Law-

13

enforcement airboats—the only watercraft *any* witness identified as traversing this stretch of the river—can and do easily travel "up the river and down the river." ROA.1393.

*Third*, the buoy system does not constitute a "structure[]" requiring a Corps permit. 33 U.S.C. §403. Unlike the other structures listed in the Act, the buoy system is impermanent and does not stretch across the river. *See Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 512 (2018) (describing *ejusdem generis* canon of construction). And the Act elsewhere treats buoys differently than prohibited structures. These conclusions are all supported by foundational principles of federalism and constitutional avoidance. The federal government's authority does not extend to anything that is wet, and it must be understood against the backdrop of Texas's sovereign authority to defend itself.

**II.**  Even if the federal government had established a likelihood of success on the merits, it failed to meet its burden on the remaining three preliminary-injunction elements. The federal government's vague assertions of diplomatic harm to U.S.-Mexico relations are speculative, unsupported, and inconsistent with its other public statements. Moreover, as the federal government admitted at oral argument, *infra* at 44, the district court's injunction does nothing to remedy the diplomatic harms it asserted. In balancing the negligible benefits of the injunction, the district court also improperly discounted record evidence that the buoys have proven to be an effective tool to quash criminal activity, and instead looked to extra-record material—that it misread—to conclude that the buoys pose a threat to human life and to (nonexistent) navigation. An injunction cannot stand in the face of such legal error.

## Standard of Review

A "preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion.'" *Harrison v. Young*, 48 F.4th 331, 342 (5th Cir. 2022). Any "plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. Because the federal government sought a "mandatory injunction" compelling Texas to move the buoys, it bore "the burden of showing a clear entitlement to the relief [it seeks] under the facts and the law." *Justin Indus. Inc. v. Choctaw Sec., L.P.*, 920 F.2d 262, 268 n.7 (5th Cir. 1990) (per curiam). "Only in rare instances is the issuance of a mandatory preliminary injunction proper." *Tate v. Am. Tugs, Inc.*, 634 F.2d 869, 870 (5th Cir. Unit A Jan. 1981). This Court "review[s] the district court's grant of [a] preliminary injunction for abuse of discretion, reviewing underlying factual findings for clear error and legal conclusions de novo." *Harrison*, 48 F.4th at 339.

## Argument

## I.   The Federal Government is Unlikely to Succeed on the Merits of its Claim that the Buoy System Violates the Rivers and Harbors Act.

This Court should reverse the preliminary-injunction order because the federal government is unlikely to succeed on the merits of its sole claim under the Rivers

and Harbors Act.[5] The Act forbids "[t]he creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States," 33 U.S.C. §403. The Act also prohibits "build[ing] or commenc[ing] the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any . . . navigable river" without the express permission of the Corps. *Id.* According to the federal government, Texas's deployment of the buoy system along a 1,000-foot stretch of the Rio Grande violates these two prohibitions. ROA.20-21. The federal government is wrong for at least three reasons.

### A. The contested stretch of ankle-deep water is not commercially "navigable," whether in the past, present, or future.

**1.** As the Supreme Court recently reaffirmed, "[r]egulation of land and water use lies at the core of traditional state authority." *Sackett v. EPA*, 598 U.S. 651, 679 (2023). That is, the States that formed the Union in 1788—and those, like Texas, later admitted on equal footing—retained their sovereign power over the waterways within and along their territory, *Pollard v. Hagan*, 44 U.S. (3 How.) 212, 230 (1845), "subject only to rights surrendered and powers granted by the Constitution to the Federal Government," *PPL Mont., LLC v. Montana*, 565 U.S. 576, 590 (2012).

The federal government therefore does not have unfettered authority to regulate any body of water in the United States. Instead, it may encroach upon the sovereign

---

[5] The federal government subsequently amended its complaint to include an additional claim under the 1848 Treaty of Guadalupe Hidalgo. *See* First Amended Complaint, ¶¶ 42-45, *United States v. Abbott*, No. 1:23-cv-853-DAE (W.D. Tex. Oct. 23, 2023), ECF 60 at 9. That claim is not at issue here.

powers of the States only as an "incident[]" of its own constitutional authority. *Leovy v. United States*, 177 U.S. 621, 632 (1900). Relevant here, the Commerce Clause—to the extent it applies—must provide any constitutional justification for the Rivers and Harbors Act. *See, e.g.*, *Sackett*, 598 U.S. at 659; *Buttrey v. United States*, 690 F.2d 1186, 1188 (5th Cir. 1982); *United States v. Central Soya, Inc.*, 697 F.2d 165, 167-68 (7th Cir. 1982). Accordingly, Corps jurisdiction over "obstruction[s]" or "structures" placed in waterways must be tethered to "the navigable capacity of any of the waters of the United States," including "navigable river[s]." 33 U.S.C. §403. This reflects the geological fact that not all border waters are navigable. *See Oklahoma v. Texas*, 258 U.S. 574, 584-85 (1922).

For nearly two centuries, the term "navigable" has "almost always" been used "in relation to ships," *Sackett*, 598 U.S. at 673, which use a waterway to facilitate actual commerce "in the nature of a highway," *Willson v. Black-Bird Creek Marsh Co.*, 27 U.S. (2 Pet.) 245, 246 (1829). The Supreme Court has adopted the rule that "'those rivers must be regarded as public navigable rivers in law which *are navigable in fact*,'" meaning "'they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water.'" *United States v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690, 698 (1899) (emphasis added) (quoting *In re The Montello*, 87 U.S. (20 Wall.) 430, 439 (1874)); *see also Gilman v. Philadelphia*, 70 U.S. (3 Wall.) 713, 724-25 (1865); *Leovy*, 177 U.S. at 627-28. Moreover, this question must be assessed based upon a "segment-by-segment approach," *PPL Mont.*, 565 U.S. at 594, because, as the Corps itself acknowledges, "[t]he character of [any]

river will, at some point along its length, change from navigable to non-navigable," 33 C.F.R. §329.11(b).

Although the navigability of a particular segment is a question of fact that "should be determined by evidence" presented in court, *Rio Grande*, 174 U.S. at 698, certain legal standards guide the analysis. "A navigable waterway of the United States must (1) be or have been (2) used or susceptible of use (3) in the customary modes of trade and travel on water (4) as a highway for interstate commerce." *Miami Valley Conservancy Dist. v. Alexander*, 692 F.2d 447, 449-50 (6th Cir. 1982). Conversely, "where commercial use or susceptibility of use is 'sporadic and ineffective,' the river is not navigable." *Id.* (quoting *United States v. Oregon*, 295 U.S. 1, 23 (1935)). Similarly, "[a] waterway is not navigable when 'its use for any purposes of transportation has been and is exceptional, and only in times of temporary high water.'" *Id.* (quoting *Rio Grande*, 174 U.S. at 699). And because a central focus of the analysis is "the customary modes of trade and travel on water," *Rio Grande*, 174 U.S. at 699, a finding of commercial navigability cannot be based upon a showing that the river may be forded by foot, *Oregon*, 295 U.S. at 20-21, traversed bank-to-bank by ferry, *United States v. Crow, Pope & Land Enters.*, 340 F. Supp. 25, 34-35 (N.D. Ga. 1972), or used for military purposes "through great quantities of manpower," *Miami Valley*, 692 F.2d at 451. Rather than suggesting navigability "in the nature of a highway," *Black-Bird Creek*, 27 U.S. at 246, such facts demonstrate the opposite—that the river impedes commerce.

Consistent with these legal principles, the Supreme Court has concluded that the Rio Grande is not navigable for its entire 1,200-mile course. *Rio Grande*, 174 U.S.

at 699. Instead, only portions of the river satisfy the Act's (and Constitution's) requirements. The legal question here thus is whether the particular segment of the Rio Grande at issue falls within the portions of the river that are navigable.

**2.**   Here, both the district court and the panel erred as a matter of law when they found the contested 1,000-foot stretch of the Rio Grande to be navigable under the Supreme Court's standard. ROA.971-82; *Abbott*, 87 F.4th at 622-28. The federal government failed to meet its burden at the preliminary-injunction hearing that this short segment of the river is presently, historically, or prospectively navigable for commercial purposes.

*First*, no one argues that this portion of the Rio Grande is *presently* commercially navigable.[6] *See Abbott*, 87 F.4th at 636-37 & n.6 (Willett, J., dissenting); ROA.982 (district court observing "modern disuse" of this stretch of the Rio Grande). For good reason: All witnesses at the evidentiary hearing conceded that this waterway is not presently being used, and cannot be used, to transport commercial goods. ROA.353, 362; ROA.407-08; ROA.469, 485-86, 501, 525; ROA.319-21; ROA.325-27. That undisputed testimony makes sense given that—apart from the sandbars, small islands, large rocks, natural and man-made debris, and sandy shoals, ROA.320,

---

[6] In its panel briefing, the federal government alluded to "one business" that allegedly operated kayaks on the river. ECF 78 at 21-22. But it is blackletter law that "not . . . every small creek in which a . . . canoe can be made to float at high water . . . is deemed navigable." *Rio Grande*, 174 U.S. at 699-700 (quoting *The Montello*, 87 U.S. (20 Wall.) at 442).

407, 448—the water level is often ankle-to-knee deep and never more than four feet deep near the buoys, ROA.327.

*Second*, although the federal government's focus throughout this litigation has been on establishing *historical* navigability, the evidence presented in the district court undermines any 'once-navigable-always-navigable' theory. Specifically, the federal government grounds its historical-navigability argument primarily on a 1975 Corps study that its lone navigability witness found stashed in the Corps' Fort Worth office, Tr.12:10-15:2—but which the witness conceded he had "not read" before the suit was filed. ROA.1457-59. In that study "the Corps never found navigability based on historical or then-current use." *Abbott*, 87 F.4th at 638 (Willett, J., dissenting). As the study explained, there "has never been any 'practical navigation' between Roma . . . and El Paso," a 1,000-mile stretch that indisputably includes the buoys' location. ROA.1103. The study further explained that "at normal stages, the river apparently was not navigable above Rio Grande City," which is more than 250 river miles down-river from Eagle Pass, due to "rocks and ledges at low water stages" that begin slightly downriver of Roma but become pervasive in the vicinity of Laredo. ROA.1103. That is why "actual accounts of commercial travel [were] lacking," and there was "no commercial activity occurring within the study area" in 1975. ROA.1095, 1103-04.

True, the 1975 study identified one "extraordinary" military expedition that ventured past Roma to see how far the river *could* be navigated—an expedition that even the expeditioners deemed an "astonishing penetration for a river with so little water." ROA.1095. The study also included isolated, "sketchy accounts" of

exploration, often at unspecified locations. ROA.1103. But the Supreme Court has held that a one-off "exceptional" use does not establish navigability because it does not show that the river was used as a commercial highway. *Rio Grande*, 174 U.S. at 699. This Court's sister circuit has said the same about "military expeditions." *Miami*, 692 F.2d at 451. "Any evidence of past use in the Corps's study is," therefore, "too sporadic and exceptional to establish historical navigability." *Abbott*, 87 F.4th at 638 (Willett, J., dissenting). And ultimately, the 1975 study cannot show historical navigability because it found it "unnecessary to determine whether sufficient past use occurred in the study area to meet the test" for navigability. ROA.1103.[7]

*Third*, the federal government can find no shelter in an argument that this stretch of the Rio Grande might be made navigable in the future. ECF 78 at 17-21. As an initial matter, such a speculative argument depends upon application of a test regarding the Water Power Act. *See United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 406-08 (1940); *accord PPL Mont.*, 565 U.S. at 592 (describing *Appalachian Power* as a Water Power Act case). That distinction matters because the Water Power Act directs courts to consider whether waters are navigable "either in their natural *or improved condition*," 16 U.S.C. §796(8) (emphasis added)—forward-looking statutory language conspicuously absent from the Rivers and Harbors Act. The Court

---

[7] The Court should reject the federal government's assertion (ECF 78 at 14) that the Corps "re-adopted" its decades-old navigability determination in 2011 by pointing to the same study. *Cf. Biden*, 597 U.S. at 807-08 (observing that where "the grounds for agency action are inadequate," the agency may offer "a fuller explanation of the agency's reasoning at the time of the agency action" or "'deal with the problem afresh' by taking new agency action").

should not extend *Appalachian Power* to the Rivers and Harbors Act because it both ignores textual distinctions between the two statutes and creates serious tension with subsequent precedent, which has refocused navigability on the *present use* of a waterway. *See Republic Steel*, 362 U.S. at 483-85.

But even assuming *Appalachian Power* does apply here, the federal government made no effort to satisfy its standards. A finding of potential future navigability must focus on whether (1) the "natural condition" of the disputed waterway (2) could permit "customary modes" of trade and travel (3) such that it constitutes a "highway[] for commerce" (4) for "through navigation" along the waterway (5) with only practically "reasonable improvements." *Appalachian Power*, 311 U.S. at 406-07 & n.21, 413-17. But "there are obvious limits to such improvements as affecting navigability." *Id.* at 407. After all, there "must be a balance between cost and need" showing that improvement is both "physically" and "financially" practicable based on "natural present conditions"—not "high engineering skill and the expenditure of vast sums of money." *Id.* at 407 & n.26. Otherwise, the improvements would not be "reasonable." *Id.* at 408.

The federal government made no effort at the evidentiary hearing to quantify or even describe what "reasonable improvements" could be performed to make navigable this segment of the Rio Grande—which sometimes has no meaningful amount of flowing water at all. In *Appalachian Power*, "[t]he Government supported its allegation of improvability" of the New River with specific evidentiary support, including concrete estimates of costs and specific plans showing how those improvements could be implemented. *Id.* at 412-17.

In contrast, here "the United States has presented no evidence of costs or commercial benefits," *Abbott*, 87 F.4th at 641-42 (Willett, J., dissenting), of blasting a canal on par with that in Erie, New York through the bedrock of West Texas. Moreover, the federal government has provided no information about whether a canal could be created consistent with other statutory commands—for example, the National Environmental Policy Act. *But see* ROA.1096 ("There would be serious ecological objections to any channelization [of the Rio Grande]."). As a result, the district court had no basis to conclude that (unspecified) improvements would be "reasonable," "financially" or "physically." *Appalachian Power*, 311 U.S. at 407-08 & n.26 (citing *Rio Grande*, 174 U.S. at 699).

**3.**    Despite the absence of evidence demonstrating that this stretch of the Rio Grande was presently, historically, or prospectively navigable, the district court concluded that the contested portion of the river was both historically and prospectively navigable, ROA.975-82, and the now-vacated panel opinion affirmed the district court's holding as to historical (but not prospective) navigability, *Abbott*, 87 F.4th at 623-28. These erroneous conclusions rely on "inapplicable statutes, treaties, cases, and other evidence." *Id.* at 636 (Willett, J., dissenting).

*First*, both the district court and the panel erred by pointing to a grab-bag of 19th century statutes and treaties that used the term "free navigation" in connection with the Rio Grande *generally*, as a stand-in for evidence that the contested portion of the Rio Grande *specifically* was historically navigable. ROA.975-76, 979; *Abbott*, 87 F.4th at 626. As an initial matter, because navigability is, "of course, a factual question" for courts, these documents are no substitute for evidence. *Appalachian Power*,

311 U.S. at 405. That is particularly true as the Supreme Court has recognized that strikingly similar statutes were "only precautionary and not intended as an affirmation of navigable capacity in that locality." *Oklahoma*, 258 U.S. at 586.

The statutes and treaties here bear the textual hallmarks of such precaution. For example, the 1848 Treaty of Guadalupe Hidalgo acknowledges the need for actions "*making* said rivers navigable," ROA.1204 (emphasis added), thus indicating that the river was *not* historically navigable. The treaty's further statement that there shall be no interference with "free and common" navigation of the Rio Grande, ROA.1203, does not establish navigability, because it is not a "specific factual finding[] of navigability" but instead a " 'precautionary' statement[] that navigability should not be obstructed *where it exists.*" *Abbott*, 87 F.4th at 638 (Willett, J., dissenting) (emphasis in original). This makes sense: Each of the cited statutes authorized a company to construct something—a railway bridge, electricity wires, water pipes—stretching across the river, but simultaneously forbade those companies to obstruct navigation on the Rio Grande, ROA.750-60, to the extent it existed—a "preliminary question" to which none of the statutes spoke, *Abbott*, 87 F.4th at 638 (Willett, J., dissenting); *accord Oklahoma*, 258 U.S. at 586.

*Second*, the district court and the panel pointed to "[c]ourt cases from" the late 19th century that "discuss ferry companies operating between Eagle Pass and Piedras Negras, transporting cotton" from bank to bank as evidence of historical navigability. ROA.979; *see also Abbott*, 87 F.4th at 625-26. But bank-to-bank traffic does nothing to demonstrate whether a waterway is "of practical service as a *highway* of commerce." *Econ. Light & Power Co. v. United States*, 256 U.S. 113, 124 (1921)

(emphasis added). A river stands as an impediment to—not a highway for—transport *across* its span. For that reason, the Supreme Court's analysis has turned on commercial navigability "along" a river, "up" and "down" its course, and "from one" point "to" another. *Appalachian Power*, 311 U.S. at 413-16. Evidence of "small public ferries going from one bank to the other" is therefore insufficient, standing alone, to establish navigability. *Compare id.* at 413, *with id.* at 414-16; *see also, e.g.*, *Puente de Reynosa, S.A. v. City of McAllen*, 357 F.2d 43, 50-51 (5th Cir. 1966); *Crow*, 340 F. Supp. at 35. Just as "shackles" are not "an effective means of locomotion," *Morrison v. Olson*, 487 U.S. 654, 706 (1988) (Scalia, J., dissenting), barriers to commerce do not demonstrate commercial navigability.

*Third*, the panel looked to four anecdotes about 19th-century expeditions along the Rio Grande that it discovered in books and periodicals. *Abbott*, 87 F.4th at 624-25. Yet these historical snippets are legally and factually inapposite. The first two of the panel's examples discuss military expeditions during and immediately after the Mexican-American War. *Id.* But "[m]ilitary use of the rivers through great quantities of manpower" does not establish navigability because it "was not the customary mode of travel" for commercial activities at the time. *Miami*, 692 F.2d at 451. Beyond that legal error, the panel's reliance on these two military expeditions to establish past navigability "ignore[s] Texas geography." *Abbott* 87 F.4th at 640 (Willett, J., dissenting). To wit, these expeditions were between "Laredo," "[Fort] Ringgold[,] and Brownsville" on the one hand, and in the "Big Bend" region on the other. The 1,000-foot stretch of the river at issue here is not within the geographic

scope of either military expedition. *See PPL Mont.*, 565 U.S. at 593 (explaining that navigability is determined "segment-by-segment").

For the same reason, the panel cannot establish past navigability by pointing to an excerpt from a book stating that "[i]n 1861 the Rio Grande was navigable for two hundred miles, and Texas-grown cotton was brought to the mouth of the river by small boats for the transfer to ocean-going vessels in the Gulf of Mexico." *Abbott*, 87 F.4th at 625. By its own terms, this purported "200-mile navigable segment started at the Rio Grande's mouth [in the Gulf of Mexico] and thus stopped short of where the [buoys are] today." *Id.* at 640 (Willett, J., dissenting).

The panel's fourth and final piece of evidence—an excerpt from an 1843 letter from a British explorer speculating that "I dare say, that in the winter and spring Months, the Rio Grande would be navigable for a great distance in light iron boats"—is even further afield. *Id.* at 625 (majority op.). Gauzy antebellum hypothe-sizing about the part-time navigability of unspecified sections of the Rio Grande can hardly suffice as *evidence* of past commercial navigability of the at-issue 1,000-foot section of the river hundreds of miles upriver from the contemporary head of steam-ship travel at Roma. ROA.1103.

*Finally*, the district court (but not the panel), speculated that the contested stretch of the Rio Grande might be made navigable in the future—for example, if there were "re-prioritization and increased flow from the Amistad Dam," ROA.980-81, or if there were increased rainfall from "El Nino," ROA.977. But the federal gov-ernment's own evidence was that since at least 1975 there have been "[n]o current plans"—or even contemplated plans, ROA.1083—to improve the river for future

commercial use because navigation is "fifth" among competing water-use priorities, ROA.1096. And there is "little likel[i]hood of change"—not just because the priorities for water use are set by treaty, ROA.1096, but also because "the advent of railroads in 1882," not to mention interstate highways, "led to the decline and eventual extinction of commercial navigation on the Rio Grande," ROA.1103. It would also take an extraordinary amount of resources (if it could be done at all) to turn a waterway that sometimes has no meaningful flow of water into a segment broad and deep enough to allow for downriver commerce.

Given that commercial navigation on the Rio Grande has never happened before, does not happen now, and is not the subject of real-world plans to accomplish someday, the district court's conjecture about what *might* happen to make the river navigable in the future cannot support a mandatory preliminary injunction today. ROA.1096, 1104. *Contra* ROA.940-44, 980-82.

## B. Four-foot-wide buoys do not "obstruct" (hypothetical) navigation in a river 200 feet wide.

**1.** Even if this part of the Rio Grande were (or could be made) navigable, the federal government is also unlikely to show that Texas has violated the Act because the buoys do not "creat[e] . . . any obstruction not affirmatively authorized by Congress, to the navigable capacity of" a covered waterway. 33 U.S.C. §403.

To constitute an "obstruction," an object must "adversely affect[]" navigation such that it "tends to *destroy* the navigable capacity of one of the navigable waters of the United States." *Republic Steel*, 362 U.S. at 487-88 (emphasis added). An object that "may only deter movements in commerce" is not enough. *Id.* at 487; *see also Rio*

*Grande*, 174 U.S. at 710. And an object most naturally impedes vessels navigating along a river when it extends into the river and is set perpendicular to the current. *See, e.g.*, *United States v. Angell*, 292 F.3d 333, 335 (2d Cir. 2002) (examining "dock structure" that "span[ned] most of the width of the Canal"); *United States v. W. Indies Transp., Inc.*, 127 F.3d 299, 310 (3d Cir. 1997) (examining "large dock" from barges connected to shore); *Norfolk & W. Co. v. United States*, 641 F.2d 1201, 1211 (6th Cir. 1980) (examining "collapsed dock, extending 35 feet into the river"). In other words, establishing the existence of an obstruction requires proof that the object "substantially diminish[es] the navigability of that stream within the limits of present navigability," which—consistent with that legal standard—"always" presents a question "of fact." *Rio Grande*, 174 U.S. at 709-10.

The federal government also has not met its burden with respect to this requirement. At the outset, it is hard to obstruct commercial navigation that does not exist, has never existed, and almost certainly will never exist. *Supra* at 16-27. Regardless, the federal government's own witness acknowledged that: The buoys do not run bank-to-bank to block traffic up- or down-river, ROA.1393; the disputed stretch of the river is more than 200 feet wide, Tr.32; and traffic was limited to law-enforcement airboats, which could easily travel "up the river and down the river" because the buoys were merely "four-foot-diameter floating barriers," ROA.1393-94.

Even on the district court's more expansive view, which included the concrete anchors, the buoy system is only 16-feet wide. ROA.985. Either way, any boats small enough to be able to float in the shallow waters can—and, in fact, do—easily maneuver past the buoys. ROA.1275, 1451-53. Indeed, even though the buoys are near

Texas's shoreline, airboats freely travel on both sides of them. And boats larger than flat-bottomed airboats would run aground given how shallow the river is in Eagle Pass. To the extent this stretch permits travel up- and down-river at all, the federal government's own witness concedes that it is entirely unimpeded because anyone "could travel . . . up the river and down the river." ROA.440; *see also* ROA.1274-75, 1451-53. That should have ended the matter.

**2.** The district court disagreed, citing *Republic Steel* to conclude that the word "obstruction" must be construed broadly to reach any object in the water that a navigator would have to "take note of . . . [to] avoid it" and "maneuver around." ROA.984-85. The panel appeared to agree. *See Abbott*, 87 F.4th at 628-29. To support this capacious interpretation, the district court pointed to the Supreme Court's statement in *Republic Steel* that the Act must be interpreted "broad[ly]." ROA.983-84; *Abbott*, 87 F.4th at 628 & n.11. But that reading of the word "broadly" is divorced from context—namely, the Supreme Court's instruction for courts to "include[] not only activities causing a measurable fluctuation in the water level, but also clogging of the channel with deposits of inorganic solids." *Vieux Carre Property Owners, Residents & Assocs., Inc. v. Brown*, 875 F.2d 453, 462 (5th Cir. 1989). After all, "lowering the water level" and "clogging the channel with deposits of inorganic solids" were not specifically mentioned in Section 10 of the Act, but the Court viewed "the term 'obstruction' as used in [Section] 10 [to be] *broad* enough to include diminution of the navigable capacity of a waterway by means not included in the second or third clauses." *Republic Steel*, 362 U.S. at 489 (emphasis added).

To read "obstruction" so broadly as to include these buoys would be to effectively remove any limits. No evidence in this case even suggests that the buoys have resulted in "fluctuation[s] in the water level" or "clogging of the channel" such that the "navigable capacity" of the river was "affected." *Vieux Carre*, 875 F.2d at 462. Instead, the evidence demonstrated the opposite—that the buoys have no effect on (nonexistent) navigability. *See supra* at 16-27. Moreover, the district court's view—endorsed by the panel—that anything that must be evaded is an "obstacle" under the Act would apply equally to a recreational swimmer, a stray soccer ball, or any object in the waterway. Given that the Act carries criminal punishment, *see* 33 U.S.C. §406, such a reading is entirely implausible. *Cf. United States v. Female Juvenile*, 103 F.3d 14, 16-17 (5th Cir. 1996) ("Axiomatic in statutory interpretation is the principle that laws should be construed to avoid an absurd or unreasonable result.").

The district court and panel were equally off-base to suggest that if "fine particles" contributed to obstructing navigable capacity in *Republic Steel*, the much larger buoys must count as an obstruction too. ROA.983; *Abbott*, 87 F.4th at 628. *Republic Steel* does not stand for the proposition that any object—no matter how "fine"—becomes an obstruction the moment it touches water. There, the aggregate effect of millions of particles reduced a navigable channel from 21 feet of depth to 12 feet. *See Republic Steel*, 362 U.S. at 484. Judged against existing commercial use, halving the river's depth would clearly impede the river's "practical service as a *highway* of commerce." *Econ. Light & Power Co.*, 256 U.S. at 124. The buoys, by contrast, in no way alter the river's makeup or otherwise inhibit its (hypothetical) use as a commercial highway. The river is more than 200 feet wide, and the buoys take up just over a yard

each. ROA.321, 327; ROA.1393-94. Texas is unaware of any boat that is 100 feet wide and can float in knee-deep water, and the federal government has never pointed to any.

Finally, the district court concluded that the buoy system was an obstruction because it is "not easily seen by oncoming watercraft" and would cause "damage to a vessel of any size that" collided with them. ROA.985; *Abbott*, 87 F.4th at 630. That *sua sponte* conclusion is unsupported by record evidence, which includes numerous color photos showing that the bright orange buoy system is hard to miss. ROA.1018-23. No witness testified that the anchoring blocks pose unseen hazards for navigators—or pose "any [other] concerns as to human safety" for that matter. ROA.1379.

**3.** The district court and the panel also pointed to the buoy system's ability to obstruct "lateral movement across the river." ROA.984; *Abbott*, 87 F.4th at 629. This is the same legal error that defeats the district court's misplaced reliance on cross-river ferries and the like. *See supra* at 24-25. Congress did not prohibit obstruction simpliciter; it prohibited "obstruction . . . *to the navigable capacity*" of the river. 33 U.S.C. §403 (emphasis added). And navigable capacity is *not* the capacity to cross the waterway on foot, *Oregon*, 295 U.S. at 20-21, or traverse it bank-to-bank by ferry, *Crow*, 340 F. Supp. at 34-35. Instead, the Act's references to navigation concern a watercourse's use as a "highway[] for commerce[]," *Rio Grande*, 174 U.S. at 698, "along" a river, "up" and "down" its course, and "from one" point "to another," *Appalachian Power*, 311 U.S. at 413-16.

Bilateral agreements between the United States and Mexico confirm this understanding. These treaties have long recognized that "such common right [to

navigation] shall continue without prejudice throughout the actually navigable *main channels* of the said rivers, *from* the mouth of the Rio Grande *to* the point where the Rio Colorado ceases to be the international boundary." Convention Between the United States of America & the United States of Mexico, art. V at 4, Nov. 12, 1884 (1884 Convention) (emphases added). To preserve that guarantee, the two countries agreed that "[n]o artificial change in the navigable course of the river, by building jetties, piers, or obstructions which may tend to deflect the current or produce deposits of alluvium, or by dredging to deepen another than the original channel," or "by cutting waterways to shorten the navigable distance, shall be permitted." *Id.* art. III.[8] Such impediments hinder navigation up and down the river—not across it.[9] And at least one treaty actually *requires* the placement of objects—like Texas's buoy system—that would form a border "boundary" and prevent traffic across the river. ROA.915-16 (citing 1944 Treaty).

    **4.**   The panel also pointed to declarations from the federal government's witnesses to suggest that the buoys are obstructing efforts from Mexico to survey part of the river, attempts by CBP to save individuals from drowning, and "the work of federal officials in this segment" generally. *Abbott*, 87 F.4th at 629 n.14. As an initial matter, because none of these Mexican or federal activities are *commercial navigation*

---

[8] *See also* Treaty with the Republic of Mexico, art. VII, Feb. 2, 1848, 9 Stat. 928, 928-29 (1848 Treaty); Treaty with Mexico, art. IV, Dec. 30, 1853, 10 Stat. 1034 (1853 Treaty); Treaty Between the United States of America & Mexico, art. III at 8, Nov. 14, 1944, 59 Stat. 1219 (1944 Treaty).

[9] So, too, for the statutes the federal government has cited. *See* ROA.750-60.

activities, they are not pertinent to the Rivers and Harbors Act claim at issue here. *See supra* at 17-18. Regardless, merely because some action by a state has diplomatic implications does not mean the federal government has a free hand to prevent that action. *See, e.g.*, *Medellín v. Texas*, 552 U.S. 491 (2008).

Moreover, the record contradicts the panel's factual premises even if they were relevant. For example, the federal government's own witness testified that he could not remember a single time prior to July 2023—notably, *after* the deployment of the buoys—that the International Boundary and Water Commission ("IBWC") sought to cross the 1,000-foot stretch of the Rio Grande at issue here, let alone attempt to survey the area where the buoys are placed. ROA.444-45. Furthermore, that witness testified that the survey the panel references could have been conducted just north of the buoy site, and that no Texas Department of Public Safety officials have prevented IBWC officials from carrying out their work. ROA.445-47. Similarly, no evidence in the record suggests that the buoys have prevented any Border Patrol agents from saving migrants from drowning or that they otherwise constitute "a threat to human life." ROA.1003. And nothing in the record supports the panel's statement that any other "work of federal officials in this segment" has been obstructed. *Abbott*, 87 F.4th at 629 n.14.

## C. The buoy system is not a "structure" prohibited by the Act because it is not a permanent fixture floating across a waterway.

**1.** The buoys are also consistent with the next clause of Section 10, which prohibits "build[ing] . . . any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in [covered waters] . . . except on plans recommended by

the Chief of Engineers and authorized by the Secretary of the Army." 33 U.S.C. §403. Notably absent from that detailed list of prohibited structures is "buoys." And the federal government's own witness—both during his deposition and again at the preliminary-injunction hearing—unequivocally admitted that the buoys are not *any* of the listed structures. Tr.48; ROA.1468.

Absent any evidence from the federal government—and in the teeth of a concession by its own witness—the district court nevertheless declared the buoy system a "boom." ROA.989-90 & n.22. This Court has previously rejected as "unreasonable" an argument that is "based on . . . overlook[ing] [a] concession." *Nuncio v. Johnson*, 208 F.3d 1007, 2000 WL 178147, at *12 (5th Cir. 2000) (per curiam). And it has observed that "concessions" usually provide a reason to "discount"—not to bolster—the conceding party's evidence. *Rollins v. Fort Bend ISD*, 89 F.3d 1205, 1214 (5th Cir. 1996). The district court's decision flouts the party-presentation principle. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579-81 (2020).

Furthermore, the district court's assertion that the buoy system "resembles" a boom even though it might "not fit perfectly" under that definition shows the buoy system is not, in fact, a boom. ROA.989. The Supreme Court has described a boom as a structure that "crosses the channel of the river and entirely fills it" with the exception of "a 'trip,' which may be opened and vessels pass through the same on their way up and down the river." *United States v. Bellingham Bay Boom Co.*, 176 U.S. 211, 213 (1900). And contemporaneous dictionary definitions confirm that the buoy structure is not a boom because the buoy system does not extend *across* the Rio Grande. *See infra* at 35-36.

**2.** That leaves the federal government's argument (which the district court and panel accepted) that the buoy system falls within the bucket of "other structures." ROA.991-93; *Abbott*, 87 F.4th at 630-31. But when Congress provides a detailed list of items followed by a catchall term, courts must construe the latter to avoid rendering the former superfluous. Antonin Scalia & Bryan A. Garner, Reading Law: Interpreting Legal Texts 199 (2012). This interpretive principle, known as the *ejusdem generis* canon, directs that general terms be construed to encompass only what is similar in nature to the preceding specific terms, ensuring that those generalities "will not render specific words meaningless." *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 295 (2011).

Courts applying *ejusdem generis* must identify an "obvious and readily identifiable genus" and determine what is common to that genus based on surrounding context. Scalia & Garner, *supra*, at 207-08; *see also Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225 (2008) (canon turns on the "common attribute" shared). What the listed terms here have in common is permanence and the capacity to stretch across a waterway. *Cf. United States v. Burns*, 54 F. 351, 361-63 (C.C.D. W. Va. 1893). How far the object extends into the waterway varies, but contemporary dictionaries and precedent reflect that each term shares these attributes:

- Boom: Webster's New International Dictionary 254 (1930) [hereinafter *Webster's*] ("A chain cable or line of spars **extended across a river** or the mouth of a harbor, to obstruct passage"); *Lindsay & Phelps Co. v. Mullen*, 176 U.S. 126, 154 (1900) ("constructed" boom "**extend[ed] across the main channel** of the Mississippi river and into the territory of Wisconsin"); *Bellingham Bay Boom Co.*, 176 U.S. at 211 ("a certain boom . . . [was] **constructed across the Nooksack river**"); *Susquehanna Boom Co. v.*

*W. Branch Boom Co.*, 110 U.S. 57, 57-58 (1884) (similar).

- Pier: Webster's 1633 ("A breakwater, groin, or mole **extending into navigable water** for use as a landing place . . . hence, a structure **built out into the water with piles**"); *Pound v. Turck*, 95 U.S. 459, 461 (1877) ("piers . . . **across the stream**"); *Bates v. Ill. Cent. R.R. Co.*, 66 U.S. 204, 207 (1861) ("constructed" pier "was **run across**" the river).

- Wharf: Webster's 2322 ("A structure of timber, masonry, iron, earth, or other material, built on the shore of a harbor, river, canal, or the like, and **usually extending from the shore to deep water**"); *Greenleaf-Johnson Lumber Co. v. Garrison*, 237 U.S. 251, 256 (1915) ("continuous wharf of three sides" "made **extensions into the river** from two points on the shore"); *Heckman v. Sutter*, 119 F. 83, 87 (9th Cir. 1902) (attempt "to **construct a wharf** . . . **across the tide flats** to the deep water").

- Breakwater: Webster's 272 ("A structure for **breaking the force of waves,** as a mole or sea wall"); *United States v. Rio Grande Dam & Irrigation Co.*, 184 U.S. 416, 419 (1902) ("breakwater . . . **across the Rio Grande** or the waters thereof").

- Weir: Webster's 2318-19 ("A **dam in a river to stop** and raise the water"); *Holyoke Co. v. Lyman*, 82 U.S. 500, 513 (1872) (statute prohibiting "any weir" "in or **across rivers or streams**").

- Bulkhead: Webster's 289 ("A structure of wood or stone to **resist the pressure of earth or water**; a partition wall or structure, as in a mine"); *Appleby v. City of New York*, 271 U.S. 364, 386 (1926) ("city **erected a bulkhead outshore** from such westerly line and filled up the space between it and the old bulkhead and destroyed the use of the wharf").

- Jetty: Webster's 1162 ("A structure, as a pier or mole of wood or stone, **extended into a sea, lake or river, to influence the current** or tide"); *Zeller v. Am. Int'l Corp.*, 292 F. 822, 823 (3d Cir. 1923) (US "built a stone jetty . . . **diagonally down the river . . . to deflect the current**").

- Dolphin: Webster's 659 ("A **mooring post or posts on a wharf** or beach"); *Philadelphia v. Standard Oil Co. of Pa.*, 12 F. Supp. 647, 648 (E.D. Pa. 1934) ("a line of dolphins" together with a wharf "**extend into the river**"); *Petro United Terminals, Inc. v. J.O. Odfjell Chem. Carriers*,

756 F. Supp. 269, 271 (E.D. La. 1991) (describing a "facility" of "**seven dolphin platforms connected by a catwalk**" jutting into the Mississippi River).

Even dictionary definitions the district court cited highlight a capacity to "stretch[]" or "extend[] across a river" or other "body of water." ROA.989-90. Tellingly, when Congress amended the law in 1986 to provide lighting rules for certain items falling within the "other structure[]" category, it also chose (i) permanent structures (ii) that extend across a waterway. *See* 33 U.S.C. §403b ("a dock or a boat launching facility").

Corps regulations and precedent confirm the Act is focused on *permanent* structures. The Corps itself interprets "structure" to include "permanent mooring structure[s]" and "permanently moored floating vessel[s]." 33 C.F.R. §322.2(b). Courts have long construed Section 10 the same way—as covering structures "permanent in nature." *Burns*, 54 F. at 363. *See, e.g.*, *United States v. Estate of Boothby*, 16 F.3d 19, 21 (1st Cir. 1994); *United States v. Boyden*, 696 F.2d 685, 687 (9th Cir. 1983); *United States v. Oak Beach Inn Corp.*, 744 F. Supp. 439, 444 (S.D.N.Y. 1990); *United States v. Bridgeport Towing Line*, 15 F.2d 240, 240 (D. Conn. 1926); *Phenix Constr. Co. v. Cornell Steamboat Co.*, 103 N.E. 891 (N.Y. 1913). From its earliest days, Section 10 and its predecessor were "intended to apply to all obstructions of a permanent character." *United States v. Hall*, 63 F. 472, 474 (1st Cir. 1894).

**3.**    Surrounding context further confirms a clear distinction between "other structures" and "buoys." *Cf. Dubin v. United States*, 599 U.S. 110, 119-20 (2023). Start with the Act itself, which "must be read as a whole," harmonizing "individual terms or phrases." *Sealed Appellee 1 v. Sealed Appellant 1*, 767 F.3d 418, 421 (5th Cir.

2013). Other provisions of the Act demonstrate that Congress knew how to use the term "buoy" when it wanted. Section 14, for example, classes "buoys" as an "established mark[]" (such as a boundary mark or tide gauge) and distinguishes it from a "work[]" (such as a pier or wharf). 33 U.S.C. §408(a). Congress thus views buoys as decidedly *unlike* the structures enumerated in Section 10.

Or take Section 15, which requires the owner of a sunken vessel to flag the site with "a buoy or beacon." 33 U.S.C. §409. It does not require Corps pre-approval. *Id.* (operator of sunken craft "shall . . . immediately mark it with a buoy"). This not only indicates that buoys are different from other structures, but it also subjects them to a diametrically opposed rule. Section 10 prohibits "other structures" unless approved by federal officials; Section 15 mandates placing "buoys" in navigable waters without obtaining federal approval. It simply cannot be, then, that buoys are covered by Section 10 and thus permitted only "on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army." The way to read Section 10 and Section 15 harmoniously is to recognize that "buoys" are not "other structures."

**4.** Both the district court and the panel nonetheless concluded that the buoy system falls within the category of "other structures" because it is fastened to the riverbed via concrete blocks attached to chains and because it would take several weeks to fully remove and install in another place. ROA.991-92; *Abbott*, 87 F.4th at 631.

The undisputed evidence, however, is that Texas's buoys are designed to be *impermanent*, and they are incapable of crossing the current as presently deployed.

*See* Tr.95-96; ROA.1274, 1284-85. To be sure, Texas could not remove them instantaneously, but the record reflects that the barrier can be shifted in a matter of days. Tr.102-03. The buoy system thus is neither permanent nor stretched across the waterway, and so is markedly unlike the "other structure[s]" under the Act.

The district court was also incorrect to suggest that this analysis changes just because the "anchoring system" for the buoys "resembles that used for houseboats." ROA.992. The First Circuit has held that a houseboat might constitute an "other structure[]" when *not seaworthy* and deployed to circumvent regulations. *Estate of Boothby*, 16 F.3d at 21. By definition, a ship that cannot sail is permanent, and "most buoys are currently attached to the seafloor by concrete anchors, also called sinkers, and heavy metal chains." U.S. Department of Homeland Security, Coast Guard Develops and Tests Environmentally-Friendly Buoy Moorings (Apr. 30, 2018), http://tinyurl.com/DHSBuoys. Yet Congress chose *not* to list buoys among the prohibited structures in Section 10 and treated them differently in Sections 14 and 15. *Supra* at 37-38. The district court and the panel should have respected this distinction. *Chicago v. Envt'l Def. Fund*, 511 U.S. 328, 338 (1994) ("[I]t is generally presumed that Congress acts intentionally and purposely" when it "includes particular language in one section of a statute but omits it in another.").

### D. The Court should interpret the Act to harmonize, not conflict, with the Constitution.

Texas has provided the best way to interpret the Act's plain text. *Supra* Part I.A-C. At minimum, however, Texas's reading is not "'plainly contrary to the intent of Congress.'" *Hersh v. U.S. ex rel. Mukasey*, 553 F.3d 743, 753-54 (5th Cir. 2008)

(citation omitted). The federal government, by contrast, proffers a view of the Act that would exceed any sound conception of Congress's Commerce Clause authority and would nullify Texas's constitutional right to self-defense. This Court must construe the Act to avoid the constitutional conflict the district court's analysis invites. *See United States v. Hansen*, 599 U.S. 762, 781 & n.3 (2023).

1.   The Act, grounded in Congress's power under the Commerce Clause, requires that any "obstruction" or "structure" to navigation be linked to *commercial* navigability. *Supra* at 17-18. For the federal government to "regulate" under the Commerce Clause, the commerce must already exist. *NFIB v. Sebelius*, 567 U.S. 519, 550-58 (2012). But the federal government's statutory arguments ignore that limitation and accept the notion that the Act empowers federal officials to regulate waterways even where there is no evidence of present commercial activity or capacity; no evidence of plans for future commercial navigation; and no description of reasonably practicable improvements that could make such navigation possible. *Supra* at 19-27. The district court's acceptance of that reading and its refusal to demand proof of commercial navigability, ROA.980-82, contravenes not only Section 10's repeated references to "navigable" waters, 33 U.S.C. §403, but more fundamentally the statute's *Commerce Clause* grounding, U.S. Const. art. I, §8, cl.3. The federal government can no more bring a navigable waterway into existence—and thereby extend its authority into an area of traditional state control—by speculating that dry riverbeds might someday be made into flowing streams than it can "bring the subject of the regulation into existence" by speculating about future purchases of health insurance. *NFIB*, 567 U.S. at 550-58.

**2.**   The federal government's arguments, if accepted here would also run head-long into Texas's right, if "actually invaded, or in such imminent Danger as will not admit of delay," to act in self-defense even "without the Consent of Congress." U.S. Const. art. I, §10, cl.3; *see also* ECF 142 at 18-20 (Ho, J., dissenting). Founding-era sources confirm States' authority to repel invasions without federal permission. *See* ECF 412 at 19-20 (Ho, J., dissenting); ECF 61 at 35-36. So does historical practice, ECF 61 at 38-39, and Supreme Court precedent, *e.g.*, ECF 61 at 36 (citing *Moyer v. Peabody*, 212 U.S. 78, 83-85 (1909) (Holmes, J.)). In 1874, for example, Texas's Governor invoked that Clause in a letter to the U.S. Attorney General explaining the State was taking defensive measures because the federal government had failed "to defend the people of Texas against hostile invasion" by criminal gangs entering from Mexico. Report of U.S. House Special Committee on Texas Frontier Troubles 164-67 (Feb. 29, 1876). Tellingly, "Attorney General Williams acquiesced in those conclusions." *Id.* at 16.

The panel, though characterizing Texas's self-defense argument as a "plausible defense," ignored all of this on the ground that the district court had "adequately considered" the argument and that "it would be best considered on a fully developed record." *Abbott*, 87 F.4th at 631. That rationale is inconsistent with—and suggests the panel properly rejected—the federal government's (errant) argument that Texas's invocation of the Invasion Clause reflects a nonjusticiable political question resolvable only by the *federal* political branches. *See* ECF 83 at 16-18; ECF 142 at 19-21 (Ho, J., dissenting). But, regardless, the panel was wrong to put off Texas's *constitutional* argument on the (errant) ground that the United States has a likelihood of

prevailing on a *statutory* argument, especially because—under the canon of constitutional avoidance—the meaning of the Constitution is directly relevant to how the Court should construe the statue. Applying that canon, this Court should hold that Texas's buoys do not violate any federal statutory prohibition.

## II. The Federal Government Also Failed to Establish the Remaining Three Elements of *Winter*'s Preliminary-Injunction Standard.

The federal government also failed to supply evidence necessary to meet the remaining preliminary-injunction elements: that "there is irreparable harm and the balance of equities, and the public interest . . . favor injunctive relief." *Mock v. Garland*, 75 F.4th 563, 586-87 & n.60 (5th Cir. 2023). This Court can and should reverse on this basis as well.

### A. The federal government was required to meet the *Winter* standard.

At the federal government's urging, the district court concluded that the federal government need not make any showing of the three remaining preliminary-injunction elements because it is likely to prevail on the merits. ROA.999-1001. The panel correctly refused to follow the district court's lead because, as Texas has explained, no case post-dating *Winter* even hints that the United States is absolved from meeting its requirements. ECF 61 at 40-41; ECF 83 at 19. The full Court should reject the district court's narrow view of *Winter*—which if accepted would affect a sea change for other litigation routinely subject to *Winter*—for the same reasons.

**B. The federal government failed to show it would suffer irreparable harm absent a preliminary injunction.**

**1.**    The Court should also hold that the federal government failed to prove that the injunction will prevent irreparable harm. To make this showing, the federal government relied on vague assertions of diplomatic tension with Mexico. ECF 78 at 47-48. Both the district court and the panel credited that speculation. ROA.1001-03; *Abbott*, 87 F.4th at 632-34. The law and facts, however, are to the contrary.

During the preliminary-injunction hearing, a federal employee testified that Mexico has expressed "concerns" that Texas is preventing the federal government from complying with its treaty obligations to delineate the countries' boundaries with respect to the Rio Grande. Tr.63-67. But despite insisting that border-boundary compliance is "a top-priority issue," ROA.746-47, the federal government's own evidence establishes that it is four years late in meeting its obligations. *Compare* ROA.969 (observing that the boundary was last delineated "in 2009"), *with* ROA.1220 (1970 Treaty requiring the international boundary to be delineated at "intervals not greater than ten years"). Placement of these buoys, therefore, cannot be the cause of any federal treaty non-compliance.

Moreover, the federal government was not caught off guard by Texas's actions: Texas officials informed IBWC in advance about the buoys, including their genesis as a project for the federal government, their purpose to secure the border and "prevent drownings," planned "strategic locations" near Eagle Pass, anticipated timing of deployment, and specifications of the buoy system itself. ROA.109; ROA.418-24. And most importantly, a federal employee testified that the buoys have in no way

impeded IBWC's cross-border work. ROA.445-46; ROA.491. In any case, as the district court noted, all "international partners . . . have some disagreements." Tr.77. But the federal government cannot stop States from taking otherwise lawful action just because it "may upset foreign powers." *Arizona v. United States*, 567 U.S. 387, 423-24 (2012) (Scalia, J., concurring in part and dissenting in part).

**2.** Furthermore, it is "entirely unclear how the injunction alleviates the United States' [alleged] diplomatic harms." *Abbott*, 87 F.4th at 642 (Willett, J., dissenting). The district court's injunction permits the buoys to remain in the water and does not order their "removal entirely from the river." ROA.1006 n.32. It therefore invites the very harms the federal government says entitled it to a preliminary injunction—as the federal government unequivocally acknowledged during oral argument before this Court.[10] Oral Argument at 25:00-25:12. That the district court never saw fit to fix the alleged "harms" is good evidence they were never "more than mere speculation." *Janvey v. Alguire*, 647 F.3d 585, 601 (5th Cir. 2011).

### C. The district court also erred in weighing the equities and public interest, which clearly favor Texas.

Finally, the federal government failed to show that the balance of the equities and public interest favor granting the injunction. The public interest favors reducing the flow of fentanyl, combatting human trafficking, protecting Texans from unlawful

---

[10] Notwithstanding its earlier insistence that the very "*presence* of the Floating Barrier" was the cause of its irreparable diplomatic harm, ROA.84, the federal government conceded in briefing to this Court that it is "reasonable" to allow the buoys to remain in the river—now that Mexico has spoken "positive[ly]" about the district court's injunction. ECF 78 at 52.

trespass and violent attacks on their property by criminal cartels, and minimizing the risks to migrants of drowning while journeying to and through illegal entry points. *Cf.* ROA.1273, 1275. The district court nevertheless identified—and the panel credited—three reasons why the balance of equities and public interest favor issuance of the preliminary injunction: the buoys supposedly (1) threaten human life and safety, (2) impair navigation, and (3) violate the Act. ROA.1003-04; *Abbott*, 87 F.4th at 634-35. Each fails in turn.

*First*, the district court's assertion that the buoys pose a "threat to human life," ROA.1003, is entirely unfounded. When discussing whether the buoys presented any "concerns for human safety," the federal government's own witness identified none. ROA.1379. That assessment has proven accurate: The buoys have been in the Rio Grande for more than seven months under around-the-clock surveillance. *See* ROA.327-28. Not one person has been injured by contact with the buoys. *See* ROA.327-28. And no one has attempted to climb over them—much less succeeded in doing so. *See* ROA.327-28. The buoys have thus proven an effective tool to channel illicit cross-river criminal activity to other locations, while presenting no danger to anyone. *See* ROA.327-28; *see also Texas*, 2023 WL 8285223, at *14 (explaining that removing border barriers is "begetting life-threatening crises for aliens and agents both" by encouraging dangerous river crossings between ports of entry).

Instead of relying on the evidence provided regarding the safety and efficacy of the buoys, the district court took "judicial notice" of extra-record assertions—some of which are just plain false. *See* ROA.965-66 n.2, 976-77, 986-87 & n.19, 1002-03. Most egregiously, the district court implied that the buoys caused the death of two

individuals whose "bodies" were discovered "near the buoy system," ROA.1003, even though the news reports made clear that those deceased individuals tragically drowned miles upstream before floating into the buoy system, *see, e.g.*, *Mexico recovers 2 bodies from the Rio Grande, including 1 found near floating barrier that Texas installed*, CBS News (Aug. 3, 2023), http://tinyurl.com/32jc9erj. Such errors demonstrate why it was improper to take judicial notice of such news reports in the first place. *See Abbott*, 87 F.4th at 643 (Willett, J., dissenting). But the district court compounded that error by using such extra-record evidence to "spin the river's naturally treacherous conditions as evidence that the *barrier* is dangerous." *Id.* Such a "logical leap" is unsupportable and reason alone to vacate the preliminary injunction. *Id.*

*Second*, the district court's conclusion that the buoys "impair[] free and safe navigation" is equally flawed. ROA.1003. Again, the federal government's own witness admitted that anyone "could travel . . . up the river and down the river." ROA.440. The buoys occupy "de minimis" space in a 1,000-foot span of a 1,200-mile river (approximately 0.016% of the entire river). ROA.1275, 1401. Moreover, the federal government's own evidence showed commercial shipping is nonexistent on this part of the river. ROA.1273, 1285; *accord* ROA.1612-18. Indeed, navigation across the river from Mexico into the United States is illegal. 8 U.S.C. §1325; 19 U.S.C. §1459.

*Third*, because this 1,000-foot segment of the Rio Grande is not navigable, the Act is not relevant here, nor is the "balance of priorities Congress struck in the" Act. ROA.1003. Federalism concerns also strongly counsel against any federal-court injunction that would thwart a State and its commander-in-chief in their efforts to

respond to a deadly crisis. *See New York v. New Jersey*, 598 U.S. 218, 225 (2023) (refusing to interpret compact to "delegat[e] . . . a fundamental aspect of a State's sovereign power—its ability to protect the people, property, and economic activity within its borders"). By any measure, the public interest favors addressing the "border crisis" that Governor Abbott has identified.

## Conclusion

The Court should reverse the district court's order granting a preliminary injunction.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

/s/ Aaron L. Nielson
Aaron L. Nielson
Solicitor General
Aaron.Nielson@oag.texas.gov

Lanora C. Pettit
Principal Deputy Solicitor General

William F. Cole
Deputy Solicitor General

Coy Allen Westbrook
Assistant Attorney General

Counsel for Defendants-Appellants

## CERTIFICATE OF SERVICE

On February 16, 2024, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Aaron L. Nielson
AARON L. NIELSON

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,965 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Aaron L. Nielson
AARON L. NIELSON