No. 23-50632

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

GREG ABBOTT, in his capacity as Governor of the State of Texas;
STATE OF TEXAS,

Defendants-Appellants,

———————

On Appeal from the United States District Court for the Western
District of Texas, Austin Division (No. 1:23-CV-853-DAE)
Honorable David Alan Ezra, United States District Judge

**EN BANC BRIEF OF *AMICI CURIAE* KANSAS, ALABAMA, ALASKA,
ARKANSAS, FLORIDA, GEORGIA, IDAHO, INDIANA, IOWA,
KENTUCKY, LOUISIANA, MISSISSIPPI, MISSOURI, MONTANA,
NEBRASKA, NORTH DAKOTA, OKLAHOMA, SOUTH CAROLINA,
SOUTH DAKOTA, TENNESSEE, UTAH, WEST VIRGINIA,
WYOMING, AND VIRGINIA IN SUPPORT OF APPELLANTS**

KRIS W. KOBACH
   *Kansas Attorney General*
ANTHONY J. POWELL
   *Solicitor General*
120 SW 10th Ave., 2nd Floor
Topeka, KS 66612-1597
(785) 296-2215
anthony.powell@ag.ks.gov

*Counsel for Amicus Curiae*

[additional counsel listed following signature block]

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................. iii

TABLE OF AUTHORITIES .........................................................iv

INTERESTS OF AMICI AND AUTHORITY TO FILE........................... 1

INTRODUCTION................................................................... 3

ARGUMENT ........................................................................ 5

   I.   The States have a constitutional right to defend themselves that federal law cannot override absent, at a minimum, a clear statement.................................................................... 5

     A.   The States' constitutional right to self-defense.......................... 5

     B.   History supports the need for a right of self-defense. ............... 12

     C.   The constitutional importance of the States' right to self-defense requires Congress to speak clearly before limiting that right. .................................................................... 14

  II.   The Rivers and Harbors Act does not limit Texas's ability to defend itself from the illegal migrant invasion on the southern border. ................................................................... 18

     A.   The mass illegal migration on the southern border is an invasion and imminent threat. ..................................... 18

     B.   The current Administration has refused to act to stop the flow of illegal immigration on the southern border—and has even made it worse. ................................................................. 24

     C.   Texas's actions are an appropriate act of self-defense that the Rivers and Harbors Act does not clearly prohibit. ........................ 27

CONCLUSION .................................................................... 30

CERTIFICATE OF SERVICE..................................................... 33

CERTIFICATE OF COMPLIANCE................................................ 34

# TABLE OF AUTHORITIES

## Cases

*Alfred L. Snapp & Son., Inc. v. Puerto Rico ex rel. Barez*,
  458 U.S. 592 (1982) ..................................................................... 6

*Arizona v. United States*,
  567 U.S. 387 (2012) ..................................................................... 7

*Biden v. Nebraska*,
  143 S. Ct. 2355 (2023) ............................................................... 16

*Biden v. Texas*,
  142 S. Ct. 2528 (2022) ............................................................... 18

*Cummings v. City of Chicago*,
  188 U.S. 410 (1903) ................................................................... 29

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ................................................................... 12

*Dunbar v. Seger-Thomschitz*,
  615 F.3d 574 (5th Cir. 2010) .................................................... 17

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*,
  485 U.S. 568 (1988) ................................................................... 15

*FCC v. Prometheus Radio Project*,
  141 S. Ct. 1150 (2021) ............................................................... 27

*Florida v. United States*,
  2023 WL 2399883 (N.D. Fla. Mar. 8, 2023) ...................... 22, 24

*Florida v. Mayorkas*,
  2023 WL 3398099 (N.D. Fla. May 11, 2023) ........................... 24

*General Land Office v. Biden,*
    71 F.4th 264 (5th Cir. 2023) .......................................................... 21, 25

*Gonzalez v. CoreCivic, Inc.,*
    986 F.3d 536 (5th Cir. 2020) ................................................................ 15

*Green Valley Special Util. Dist. v. City of Schertz,*
    969 F.3d 460 (5th Cir. 2020) ................................................................ 29

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991) ................................................................................. 5

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.,*
    968 F.3d 454 (5th Cir. 2020) ................................................................ 28

*Hernandez v. Mesa,*
    140 S. Ct. 735 (2020) ............................................................................ 20

*In re Abbott,*
    645 S.W.3d 276 (Tex. 2022) ................................................................. 11

*Louisiana v. CDC,*
    603 F. Supp. 3d 406 (W.D. La. 2022) ....................................... 21, 22, 24

*Mayor, Aldermen and Commonality of City of New York v. Miln,*
    36 U.S. (11 Pet.) 102 (1837) .................................................................. 6

*Murphy v. NCAA,*
    138 S. Ct. 1461 (2018) .......................................................................... 10

*New York v. United States,*
    505 U.S. 144 (1992) ........................................................................ 7, 10

*Oklahoma v. Texas,*
    358 U.S. 574 (1922) .............................................................................. 12

*Porter v. Bowen,*
    518 F.3d 1181 (9th Cir. 2008) ............................................................. 13

*Printz v. United States*,
521 U.S. 898 (1996) ............................................................ 8, 9

*Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*,
531 U.S. 159 (2001) ............................................................ 15

*Tex. Educ. Agency v. U.S. Dep't of Educ.*,
908 F.3d 127 (5th Cir. 2018) ............................................. 10

*Texas v. Biden (MPP I)*,
554 F. Supp. 3d 818 (N.D. Tex. 2021) ........................... 19, 21

*Texas v. Biden (MPP III)*,
20 F.4th 928 (5th Cir. 2021) ............................................ 27

*Texas v. Biden (MPP V)*,
2022 WL 17718634 (N.D. Tex. Dec. 15, 2022) .................. 24

*Texas v. United States*,
40 F.4th 205, 218 (5th Cir. 2022) ..................................... 24

*Texas v. White*,
74 U.S. (7 Wall.) 700 (1868) .............................................. 7

*The Prize Cases*,
67 U.S. 635 (1862) ............................................................ 24

*Trustees of Dartmouth Coll. v. Woodward*,
17 U.S. (4 Wheat.) 518 (1819) .......................................... 29

*United States v. Abbott*,
2023 WL 5740596 (W.D. Tex. 2023) ........................ 9, 11, 18

*United States v. Belmont*,
301 U.S. 324 (1937) .......................................................... 17

*West Virginia v. EPA*,
  142 S. Ct. 2587 (2022) ........................................................ 16

*Younger v. Harris*,
  401 U.S. 37 (1971) ............................................................... 9

## Constitutional Provisions, Statutes, and Rules

18 U.S.C. § 229 .................................................................... 16

33 U.S.C. § 403 ............................................................... 15, 28

33 U.S.C. § 406 .................................................................... 29

Fed. R. App. P. 29 ................................................................. 1

U.S. Const. art. I, § 8, cl. 11 ............................................... 16

U.S. Const. art. I, § 10, cl. 3 ............................................. 5, 9

U.S. Const. art. II, § 2, cl. 2 ............................................... 16

U.S. Const. art. IV, § 4 .......................................................... 9

U.S. Const. art. VI, cl. 2 ...................................................... 16

## Other Authorities

Aaron R. Petty, *Migrants as a Weapons System*,
  13 J. Nat'l Security L. & Pol'y 113 (2022) ..................... 22, 23

Amy Coney Barrett, *Substantive Canons and Faithful Agency*,
  90 B.U. L. Rev. 109 (2010) ................................................. 17

Border of the United States and Redirection of Funds Diverted to
  Border Wall Construction,
  86 Fed. Reg. 7,225 (Jan. 20, 2021) ................................... 26

Byron Johnson, *The 'Bandit War' and the Porvenir Massacre* 5
  (2015) .................................................................. 14

Consolidated Appropriations Act, 2020,
  Pub. L. No. 116-93, Div. D, § 209(a)(1), 133 Stat. 2317 (2019) ............. 25

Consolidated Appropriations Act, 2021,
  Pub. L. No. 116-260, Div. F, § 210, 134 Stat. 1182 (2020) ................... 25

DHS, *Explanation of the Decision to Terminate the Migrant Protection
  Protocols* 26 (Oct. 29, 2021) ........................................... 2, 20

DHS, *The Border Wall System Is Deployed, Effective, and Disrupting
  Criminals and Smugglers* (Oct. 29, 2020) ............................. 26

DHS, *Walls Work* (Dec. 12, 2018) ........................................ 25

Federalist No. 43 (James Madison) ................................. 8, 9, 12

Kenneth Chan, *State Failure and the Changing Face of the* Jus ad
  Bellum,
  18 J. Conflict & Security L. 395 (2013) ............................... 22

Mark C. Poznansky et al., Opinion, *Putin Weaponizing Refugees:
  NATO Must Draw Red Lines and Enforce Them* (Mar. 10, 2022) ....... 23

Mike Cox, *A Brief History of the Texas Rangers*, Tex. Ranger Hall of
  Fame & Museum (2018) ................................................. 13

Ophelie Jacobson, *Gov. Reynolds Blames Increases in Drugs on
  Southern Border During Visit*, KCCI 8 (Aug. 21, 2023) ............... 21

Paul Cool, *My Men Are All Frontiersmen: El Paso's Tejano Texas
  Rangers in the 1870s* (2017) .......................................... 13

Peter Aitken, *UN Migration Study Deems US-Mexico Border 'Deadliest'
  Land Route in the World Based on 2021 Numbers*, Fox News (July 4,
  2022) ................................................................. 19

*The Biden Border Crisis – Part I Before House Committee on the Judiciary*, 118th Congress (2023) ........................................................ 20

The President's Constitutional Auth. to Conduct Military Operations Against Terrorists & Nations Supporting Them, 25 Op. O.L.C. 188 (2001) .......................................................... 5

The White House, *Report on the Impact of Climate Change on Migration* (2021) ...................................................................... 23

U.S. Customs & Border Protection, *Southwest Land Border Encounters* (last updated Aug. 3, 2023) .................................................. 18

## INTERESTS OF AMICI AND AUTHORITY TO FILE

*Amici curiae*, the States of Kansas, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Oklahoma, South Carolina, South Dakota, Tennessee, Utah, West Virginia, Wyoming, and Virginia file this brief in support of Defendants-Appellants, Governor Abbott and the State of Texas. As States, they "may file an amicus brief without the consent of the parties or leave of court." Fed. R. App. P. 29(a)(2).[1]

*Amici* States file this brief because the federal government has lost operational control of the southern border. The result is as tragic as it was predictable: A flood of illegal immigration across the Southern border that has brought with it crime, human trafficking, and hundreds of thousands of fentanyl deaths to the people of this country. In both scope and effect, the wave of illegal migrants pouring across the border is like an invasion.

---

[1] Because *Amici* States are States, the statements set out in Rule 29(a)(4)(E) are not required.

1

Texas is at ground zero of this invasion, but its effects are felt in *Amici* States. As numerous cases in this circuit have established, and as is admitted by the Department of Homeland Security (DHS), "many noncitizens [who illegally cross the border] proceed to interior States." *See* DHS, *Explanation of the Decision to Terminate the Migrant Protection Protocols* 26 (Oct. 29, 2021).[2] They bring with them all the attendant ills of illegal immigration. Texas's border barrier therefore does not just protect its own residents; it protects *Amici* States and their citizens as well.

*Amici* States therefore have a specific interest in seeing the barrier maintained. They have a broader interest as well. The Constitution guarantees the States' right to self-defense expressly and as a natural incident of the States' status as sovereign entities. Here, however, the federal government has sought to disable Texas's exercise of that right by claiming that it violates a federal law focused on the navigability of the nation's waterways, a law that does not expressly limit the States' ability to engage in self-defense. That is inconsistent with the status of

---

[2]    *Available at* https://www.dhs.gov/sites/default/files/2022-01/21_1029_mpp-termination-justification-memo-508.pdf.

the right of self-defense as a core component of the States' sovereign status—a status that is integral to federalism—and is expressly guaranteed by the Constitution.

## INTRODUCTION

*Amici* States agree with Texas's analysis of the merits. But this is more than a case about obstructions in navigable waterways—this is a case about self-defense, and the federal government's failure to protect the States against an invasion of illegal aliens at the southern border.

The current administration has not only failed to secure the border, but also has willfully enacted policies that have encouraged illegal immigration. The result: millions of illegal aliens crossing the southern border and continuing into the interior. That defiance of the nation's immigration laws has resulted in increasing violations of the States' criminal codes. Human and drug trafficking are on the rise, driven by the cartels in Mexico. At the same time, the massive influx of illegal aliens has strained State resources meant to provide and protect the U.S. citizen and lawfully present aliens in the States. Texas's response in the face of this crisis is logical and proportionate: building a barrier to prevent illegal migration. The federal government's response—a suit

premised on a federal law dealing generally with the navigability of the nation's waterways—is inexplicable. The district court's injunction against Texas is simply incorrect.

The Constitution preserves the States' ability to act in their self-defense. It does so expressly as well as implicitly—through the States' residual sovereignty and the structural design of the instrument. It is also an extensive right that authorizes measures like the ones Texas has taken here. The constitutional dimensions to the States' right of self-defense means that federal law should not be construed to limit that right in the absence of a clear statement to that effect.

Such a clear statement is absent from the Rivers and Harbors Act—the law the district court relied on in granting the injunction here. As a result, the law does not bar Texas from constructing a barrier on a section of the Rio Grande River to stem the tide of illegal migration into this country.

## ARGUMENT

I.  **The States have a constitutional right to defend themselves that federal law cannot override absent, at a minimum, a clear statement.**

### A.    The States' constitutional right to self-defense.

The States have the authority to defend themselves.  This authority stems from express constitutional provisions, and is implicit in the "system of dual sovereignty between the States and Federal Government," *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991), and in the broader constitutional structure.

Textually, the Constitution enshrines the States' right to self-defense in the Self-Defense Clause.  That clause provides that "[n]o State shall, without the Consent of Congress … engage in War, *unless actually invaded*, or in imminent Danger as will not admit of delay."  U.S. Const. art. I, § 10, cl.3 (emphasis added).  Thus, under the Constitution's plain terms, a State that is "actually invaded" or "in imminent Danger as will not admit of delay," may defend itself through emergency measures.  *Id.*

That is a significant power.  "[T]he Framers understood that making and engaging in war to be broader than simply 'declaring' war."  The President's Constitutional Auth. to Conduct Military Operations Against Terrorists & Nations Supporting Them, 25 Op. O.L.C. 188, 192

(2001) (citing the Self-Defense Clause).  The former allows "the initiation of military hostilities" while the latter is "only necessary to 'perfect' a conflict under international law."  *Id.*

The right of States to robust self-defense as enshrined in the Self-Defense Clause implies the authority to use lesser measures to protect themselves, like building a physical barrier on their border.  Even easier should be the question as to whether a State could float an impermanent barrier to ensure its border is protected.  It would be strange indeed if the Constitution permitted the States to engage in preemptive armed conflict to protect themselves, but not to build a buoy barrier to accomplish the same goal.

The Constitution's acknowledgment that the States, as separate sovereigns, have an interest in the "maintenance and recognition of [their] border[s]," *Alfred L. Snapp & Son., Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982), that allows them to exclude goods and aliens, *see Mayor, Aldermen and Commonality of City of New York v. Miln*, 36 U.S. (11 Pet.) 102, 132 (1837), encompass a State's right to float a protective barrier to assert control of its border.

6

"[T]he Constitution did not strip the States of [the] authority [to exclude people and goods from their interior].  To the contrary, two of the Constitution's provisions were designed to enable the States to prevent 'the intrusion of obnoxious aliens through other States.'"  *Arizona v. United States*, 567 U.S. 387, 418 (2012) (Scalia, J., concurring in part and dissenting in part) (quoting Letter from James Madison to Edmund Randolph (Aug. 27, 1792), *in* 1 *Writings of James Madison* 226 (G. Hunt ed. 1900)) (discussing U.S. Const. art. I, § 8, cl. 4, and art. IV, § 2, cl. 1). "Two other provisions," including the Self-Defense Clause, "are an acknowledgment of the States' sovereign interest in protecting their borders." *Id.* at 419 (talking also of U.S. Const., art. I, § 10, cl. 2).

That the States may act to defend their borders is also part of the constitutional design.  "The preservation of the States, and the maintenance of their governments, are as much within the design and care of the Constitution as the preservation of the Union and the maintenance of the National government." *Texas v. White*, 74 U.S. (7 Wall.) 700, 725 (1868); *see also New York v. United States*, 505 U.S. 144, 162–63 (1992) (quoting the same and gathering sources).  Nothing is

more fundamental to the continued preservation of the States than their ability to defend themselves.

States' responsible defense of their borders ensures a double security for the Union just as it provides a "'double security … to the rights of the people.'" *Printz v. United States*, 521 U.S. 898, 922 (1996) (quoting Federalist No. 39 (James Madison)). By vesting in the federal government *and* the States the ability to defend the Union, the Constitution contains a failsafe. If a State cannot, or does not, defend itself or its republican government, the federal government must do so. *See*, *e.g.*, U.S. Const. art. IV, §4 (requiring the United States to "guarantee to every State … a Republican Form of Government, and [to] protect each of them against Invasion" and in some cases domestic violence). But if the federal government fails to defend the States, then the States may fill in the gaps, as Texas has done here.

The Framers ensured that double security by protecting the States' sovereignty. The States' sovereign status imposes on them the duty to protect their citizens against invasion, for "[a] protection against invasion is due from every society to the parts composing it." Federalist No. 43 (James Madison). But the possibility of a State being forced to act in self-

defense, *see* U.S. Const. art. I, § 10, cl. 3, is a powerful incentive for the federal government to take its duty to protect the nation seriously. At the same time, the duty of the federal government to counter invasion and to ensure a republican form of government in each State, *see* U.S. Const. art. IV, § 4, is a powerful counterweight against "the caprice of particular States, … the ambition of enterprising leaders, [and] … the intrigues and influence of foreign power[.]" Federalist No. 43. Thus, "'[t]he different governments will control each other'" to the benefit of the Union and the rights of its citizens. *Printz*, 521 U.S. at 921 (quoting Federalist No. 39).

The States' right to self-defense is thus another reflection of the value and the strength of "Our Federalism." *Younger v. Harris*, 401 U.S. 37, 44 (1971) (quotations omitted). It is an authority that the Constitution protects expressly and is vital to the constitutional design. It is also an authority that, contra the district court, *see Abbott*, 2023 WL 5740596, at *12, each State must decide for itself when it is appropriate to use.

That conclusion follows from the Self-Defense Clause. The clause limits the States' ability to act in self-defense to two situations. First,

where Congress has consented to the State doing so, and second, where the State is "actually invaded, or in such imminent Danger as will not admit of delay." To conclude that the federal government is the arbiter of when there is a need for a State to engage in self-defense reads "unless" out of the clause; it would mean that in *all* cases, a State cannot engage in self-defense absent congressional consent. That improperly inverts the meaning of the Self-Defense Clause by failing "to give effect … to every clause and word of" the provision. *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 908 F.3d 127, 133 (5th Cir. 2018) (quotations omitted).

It also follows from the fact the right to self-defense is part of the States' "'residuary and inviolable sovereignty.'" *Murphy v. NCAA*, 138 S. Ct. 1461, 1475 (2018) (emphasis added) (quoting Federalist No. 39). Congress, and the federal government more generally, has "the power to regulate individuals, not States." *New York v. United States*, 505 U.S. 144, 166 (1992). To vest the determination of whether a State may act in its self-defense permits the federal government to regulate how States exercise this aspect of their sovereign authority—and that the federal government cannot do. *See, e.g.*, *New York*, 505 U.S. at 166 ("We have always understood that even where Congress has the authority under the

10

Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts.").

What does not follow is that once a State decides that the exigencies of a situation require defensive action, the State "is subject to no oversight of its 'chosen means'" of self-defense *Abbott*, 2023 WL 5740596, at *12. There is oversight, but it is internal, driven by the political checks and balances within each State and democratic accountability to the voters of the State. In Texas, for example, "the executive power is spread across several distinct elected offices, and the Legislature has over the years created a wide variety of state agencies … whose animating statutes do not subject their decision to the Governor's direct control." *In re Abbott*, 645 S.W.3d 276, 280 (Tex. 2022).

In sum, the Constitution's text, the principle of sovereignty in the federal design, and the broader constitutional structure all support the conclusion that the States have a robust right to engage in self-defense.

Contained within that right is presumptively acts to repel invasion or prevent imminent danger, up to and including armed combat.

## B. History supports the need for a right of self-defense.

History bears out the States' need for self-defense. To start, there is the need for protection from other States—a concern that, according to James Madison, justified the guarantees in Article IV, § 4. *See* Federalist No. 43 ("The latitude of the expression here used seems to secure each State, not only against foreign hostility, but against ambitious or vindictive enterprises of its more powerful neighbors."). Madison was not mistaken. Texas and Oklahoma, for example, called out their militias to support their competing claims to the Red River. *See Oklahoma v. Texas*, 358 U.S. 574, 579–80 (1922).

While the federal government should intercede in such cases, it does not always do so. The "Bleeding Kansas" conflict, for example, involved violence in a constituent part of the Union (the Kansas Territory) and elements of the federal government seeking to render Kansas powerless to resist those violent incursions. *See District of Columbia v. Heller*, 554 U.S. 570, 609 (2008) ("'[T]he Senator from South Carolina has had the face to say openly, on this floor, that [the people of

Kansas] should be disarmed.'") (quoting The Crime Against Kansas, May 19–20 in *American Speeches: Political Oratory From the Revolution to the Civil War* 553, 606–07 (T. Widmer ed. 2006) (quoting a speech by Senator Sumner); *Porter v. Bowen*, 518 F.3d 1181, 1184 (9th Cir. 2008) (Kleinfeld, dissenting from denial of rehearing en banc) ("A United States Senator from Missouri led an invasion of 'border ruffians' into Kansas to swell the vote for the proslavery candidate in the 1854 territorial election.") (quotations omitted).

In addition, there are foreign threats—something to which Texas is no stranger. During the late 19th Century, the Texas Rangers provided protection against raids on the frontier. *See* Paul Cool, *My Men Are All Frontiersmen: El Paso's Tejano Texas Rangers in the 1870s*, at 3 (2017);[3] *see also* Mike Cox, *A Brief History of the Texas Rangers*, Tex. Ranger Hall of Fame & Museum (2018) ("The Frontier Battalion was organized in 1874 to create a permanent military force to protect the Texas frontier."). And in the midst of the chaos on the southern border during the Mexican Revolution, "Gov. O.B. Colquitt wrote Ranger Capt. John R.

---

[3]    *Available    at    https://www.texasranger.org/wp-content/uploads/2017/07/History-Salt-Warriors.pdf.

Hughs: 'I instruct you and your men to keep them (Mexican raiders) off of Texas territory if possible, and if they invade the State to let them understand they do so at the risk of their lives.'" Cox, *supra*.

These, and other examples, show that States must be able to defend themselves because the federal government may not always be able, or willing, to do so. Texas's build-up of Ranger forces on the southern border in 1915 during the Mexican Revolution, for example, occurred before "a massive [federal] troop buildup on the border" in 1916. Byron Johnson, *The 'Bandit War' and the Porvenir Massacre* 5 (2015).[4] Indeed, the federal government denied Governor Ferguson's request for troops in June 1915 because "combating banditry was a state responsibility." *Id.*

C.  **The constitutional importance of the States' right to self-defense requires Congress to speak clearly before limiting that right.**

The constitutional importance of the States' right to self-defense, as well as its necessity as shown by history, require Congress to speak clearly before attempting to limit the States' right to self-defensive actions.

---

[4]  *Available at* https://www.texasranger.org/wp-content/uploads/2019/02/HISTORY-Mexican-Revolution-and-Porvenir-Massacre.pdf.

14

That necessarily follows from several existing clear-statement doctrines. Because the States' right to self-defense "concerns federalism," it implicates "'the well-established principle that it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides the usual constitutional balance of federal and state powers.'" *Gonzalez v. CoreCivic, Inc.*, 986 F.3d 536, 539 (5th Cir. 2020) (quoting *Bond v. United States*, 572 U.S. 844, 858 (2014)). Requiring a clear statement in this context also follows the rule that courts "will construe statute[s] to avoid [constitutional] problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988).

Furthermore, the ubiquity of congressional delegations of authorities to agencies—such as in the Rivers and Harbors Act, *see* 33 U.S.C. § 403—risks the creation of agency rules and statutory interpretations trenching on the States' right to self-defense. A clear statement requirement ensures "that Congress intended that result." *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172 (2001). And agency intrusions into areas of State law will

15

implicates the major-questions doctrine. *See West Virginia v. EPA*, 142 S. Ct. 2587, 2621 (2022) (Gorsuch, J., concurring). Indeed, States' ability to defend themselves will involve issues of "economic and political significance." *Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023) (quotations omitted). In summary, Congress must say that a federal law impairs a State's right to self-defense before a statute is construed to limit that right.

That is not to say the federal government can never directly limit a State's ability to exercise its right to self-defense. Congress may well be able to limit certain aspects of the right in its exercise of its enumerated powers. *See, e.g.*, U.S. Const. art. I, §8, cl. 11 (authorizing Congress to "make Rules concerning Captures on Land and Water"). The treaty-making power may be another example. *See* U.S. Const. art. II, §2, cl. 2. Treaties are "the supreme Law of the Land," U.S. Const. art. VI, cl. 2, and so they—and the laws Congress passes to execute them—may limit the States' exercise of their right to self-defense by, for example, limiting the weapons available to the States. *See* 18 U.S.C. §229 (implementing treaty obligations restricting chemical weapons). And the President's foreign affairs power in Article II may restrict a State's right of self-

defense depending on the "'clarity or substantiality'" of the conflict between the foreign policy and the State's claim of self-defense. *Dunbar v. Seger-Thomschitz*, 615 F.3d 574, 578 (5th Cir. 2010) (quoting *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 419 n.11 (2003)); *see United States v. Belmont*, 301 U.S. 324, 330 (1937) ("Governmental power over external affairs is not distributed, but is vested exclusively in the national government.").

What is clear however—and what matters for purposes of this case—is that cases touching on the States' right to self-defense involve high stakes and fundamental constitutional considerations. A clear-statement requirement is thus an appropriate "'stop and think' measure[] that discipline[s] Congress to consider carefully the constitutional implications of its policies." Amy Coney Barrett, *Substantive Canons and Faithful Agency*, 90 B.U. L. Rev. 109, 175 (2010).

II.    **The Rivers and Harbors Act does not limit Texas's ability to defend itself from the illegal migrant invasion on the southern border.**

A.    **The mass illegal migration on the southern border is an invasion and imminent threat.**

The district court did not address Texas's claims that there is an invasion on the southern border. *See Abbott*, 2023 WL 5740596, at *11–*12. But it is hard to describe what is occurring on the border any other way. "In fiscal year 2021, the Border Patrol reported more than 1.7 million encounters with aliens along the Mexican border." *Biden v. Texas*, 142 S. Ct. 2528, 2549 (2022) (Alito, J., dissenting). That number increased to nearly 2.5 million in 2023. U.S. Customs & Border Protection, *Southwest Land Border Encounters* (last updated Feb. 5, 2024).[5] Those numbers are just the beginning. As Texas noted in its stay motion, "the number [of aliens crossing the border] detected but neither found nor apprehended increased 300% in the past four years." Dkt. 11, at 4.

In fact, the Biden Administration has completely lost control of the border. Former Border Patrol Chief Rodney Scott, in his June 14, 2023

---

[5]    *Available at* https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.

testimony before Congress, concluded that there is an ongoing "crisis at our border," the border patrol remains overwhelmed, "[t]he cartels continue to control who and what is entering the United States," and the "chaos at the southwest border [is] a result of actions taken by the Biden Administration."[6] At a March 15, 2023, hearing before the House Committee on Homeland Security, then-Border Patrol Chief Raul Ortiz testified that the Department of Homeland Security no longer had "operational control" of the border.

With the invasion has come a crisis. The Southern border "is the deadliest migration land route in the world." Peter Aitken, *UN Migration Study Deems US-Mexico Border 'Deadliest' Land Route in the World Based on 2021 Numbers*, Fox News (July 4, 2022).[7] It is a portal for sex and forced-labor trafficking. *See Texas v. Biden (MPP I)*, 554 F. Supp. 3d 818, 838 (N.D. Tex. 2021), *rev'd* 142 S. Ct. 2528 ("Aliens 'are particularly susceptible to being trafficked.' Increasing the number of aliens 'present

---

[6] https://www.c-span.org/video/?528717-1/house-hearing-immigration-border-security (38:40 - 39:10). See also a letter from Chief Scott: https://justthenews.com/sites/default/files/2021-09/Honorable%20Rob%20Portman%20%20US%20Senate%20Secuirty%20Concerns%20-%20Rodney%20Scott.pdf.

[7] *Available at* https://www.foxnews.com/us/un-migration-study-deems-us-mexico-border-deadliest-land-route-world-based-2021-numbers.

in the United States, including those claiming asylum, is likely to increase human trafficking.'") (quoting the record). It is also an open pathway for the trafficking of dangerous illegal drugs, particularly fentanyl, *see The Biden Border Crisis – Part I Before House Committee on the Judiciary*, 118th Congress (2023) (testimony of Sheriff Mark Dannels, Cochise County, Arizona) ("In 2021, over 5 million dosages of Fentanyl were seized on the Arizona border. In 2022, over 12,000 pounds of Fentanyl were seized on the SW Border."); *see also Hernandez v. Mesa*, 140 S. Ct. 735, 746 (2020) ("During the last fiscal year, … large quantities of drugs were smuggled across the border."). Driving the illegal drug and human trafficking trade are "powerful criminal organizations on both sides of the border [that] present serious law enforcement problems for" the United States and Mexico. *Hernandez*, 140 S. Ct. at 746 & n.7.

These threats are not limited to the southern border. As the Biden administration acknowledged when it terminated the Migrant Protection Protocol, "many noncitizens proceed to interior States." DHS, *Explanation of the Decision to Terminate the Migrant Protection*

*Protocols* 26 (Oct. 29, 2021).[8] When they do, they bring the consequences of illegal immigration with them.  Many interior States, including many *Amici* States, are destination or transit states that "for human trafficking of migrants from Central America who have crossed the border illegally," *MPP I*, 554 F. Supp. 3d at 839 (discussing Missouri), and illegal drugs, *see Louisiana v. CDC*, 603 F. Supp. 3d 406, 421 (W.D. La. 2022) (discussing evidence from Iberia Parish Sheriff Tommy Romero); Ophelie Jacobson, *Gov. Reynolds Blames Increases in Drugs on Southern Border During Visit*, KCCI 8 (Aug. 21, 2023) ("[Governor] Reynolds says the bulk of drug seizures here in Iowa can be directly tied to Mexico and the cartel.").[9]

Furthermore, the flood of illegal immigration strains States' welfare programs, like education and healthcare programs, and consumes space in State jails that is necessary to house dangerous criminals.  *See MPP I*, 554 F. Supp. 3d at 838–39 (discussing the costs to Missouri of illegal migration); *see also*, *e.g.*, *Gen. Land Office v. Biden*

---

[8]    *Available at* https://www.dhs.gov/sites/default/files/2022-01/21_1029_mpp-termination-justification-memo-508.pdf.

[9]    *Available at* https://www.kcci.com/article/iowa-gov-reynolds-blames-increase-in-drugs-on-southern-border-during-visit/44872372.

*(GLO)*, 71 F.4th 264, 271 n.10, 277 (5th Cir. 2023) (providing the majority's and dissent's agreement that harms from illegal immigration give Missouri standing); *Florida v. United States (Parole+ATD)*, 2023 WL 2399883, at *16 (N.D. Fla. Mar. 8, 2023) (noting the costs to Florida from *en masse* parole); *Louisiana*, 603 F. Supp. 3d at 419–20 (discussing Missouri and Louisiana).

Consequently, the massive influx of illegal aliens and the attendant harms to the affected States constitute an invasion. "'[M]igrants can be a threat to a country's political stability.'" Aaron R. Petty, *Migrants as a Weapons System*, 13 J. Nat'l Security L. & Pol'y 113, 130 (2022) (alterations omitted) (quoting Myron Weiner, *Introduction: Security, Stability and International Migration*, *in International Migration and Security* 9 (Myron Weinger ed. 1993)); *see also* Kenneth Chan, *State Failure and the Changing Face of the* Jus ad Bellum, 18 J. Conflict & Security L. 395, 418 (2013) ("Forced migration is a stimulant for the mobilization of insurgents across boundaries, can destabilize volatile territories, and create conflicts in neighbouring [*sic*] States."). As such, migrants and refugees have "become instruments of warfare and military strategy," Petty, *supra*, at 130 (quotations omitted); *see also id.* at 121–

23 (providing examples); Mark C. Poznansky et al., Opinion, *Putin Weaponizing Refugees: NATO Must Draw Red Lines and Enforce Them* (Mar. 10, 2022) ("Russia's Vladimir Putin, like his supporter President Alexander Lukashenko in Belarus in December 2021, has weaponized refugees (particularly women, children, the elderly and infirm) as a potent way to destabilize neighboring nations."),[10] and "migration and refugee flows have been identified as one of the most significant causes of armed conflict in the post-Cold War period," Petty, *supra*, at 120 (alterations omitted) (quoting Kelly M. Greenhill, *Weapons of Mass Migration: Force Displacement, Coercion, and Foreign Policy* 6 (2020)). Even the White House acknowledges that foreign malign actors "could incite or aid irregular migration to destabilize U.S. allies/partners." The White House, *Report on the Impact of Climate Change on Migration* 9 (2021); *see also* Petty, *supra*, at 119 (linking weaponization of migrants to "gray zone activity" undertaken by nations like China and Russia "to disrupt, destabilize, or coerce targets").

---

[10] *Available at* https://thehill.com/opinion/international/597652-putin-weaponizing-refugees-nato-must-draw-red-lines-and-enforce-them/

**B.    The current Administration has refused to act to stop the flow of illegal immigration on the southern border—and has even made it worse.**

The Constitution imposes a duty on the President "to resist" the migrant invasion and to secure the southern border. *The Prize Cases*, 67 U.S. at 668.  President Biden, however, has failed to do so and so the southern border "has been out of control for the past 2 years." *Florida v. Mayorkas*, 2023 WL 3398099, at *1 (N.D. Fla. May 11, 2023).

Worse than that, President Biden has enacted unlawful, arbitrary policies that are "[c]ollectively … akin to posting a flashing 'Come In, We're Open' sign on the southern border." *Parole+ATD*, 2023 WL 2399883, at *6.  To name just a few:  His administration arbitrarily and capriciously terminated the Migrant Protection Protocol, *see Texas v. Biden (MPP V)*, 2022 WL 17718634, at *10–*17 (N.D. Tex. Dec. 15, 2022), and did not follow the proper procedures for terminating the Title 42 prohibition on admission, *see Louisiana*, 603 F. Supp. 3d at 433–37.  It has enacted categorical parole programs that release aliens into the interior *en masse. See*, *e.g.*, *Parole+ATD*, 2023 WL 2399883, at *32.  And it established enforcement guidelines that would "increase[] the number of aliens with criminal convictions and aliens with final orders

of removal released into the United States." *Texas v. United States*, 40 F.4th 205, 218 (5th Cir. 2022) (per curiam) (quotations omitted), *abrogated on jurisdictional grounds* 143 S. Ct. 1964 (2023). Indeed, those guidelines have effectively compelled ICE and border patrol officers to stand down and allow the vast majority of incoming illegal aliens to remain unlawfully in the United States.

Another salient example is the Administration's decision to end the construction of physical barriers on the southern border. *See GLO*, 71 F.4th at 269 (discussing that decision). That decision is unlawful. Through the Consolidated Appropriations Act, 2020, and Consolidated Appropriations Act, 2021, Congress mandated that DHS construct the border wall. *See* Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, Div. F, § 210, 134 Stat. 1182, 1456–57 (2020); Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, Div. D, § 209(a)(1), 133 Stat. 2317, 2511 (2019).

It has been well established that physical barriers work, by blocking certain entry points and thereby enabling border agents to control a larger section of the border. "Walls Work," DHS concluded in

December 2018.  DHS, *Walls Work* (Dec. 12, 2018).[11]  "When it comes to stopping … illegal aliens from crossing our borders, border walls have proven to be extremely effective."  *Id.*  In 2020, DHS reaffirmed that conclusion, pointing to significant decreases in illegal entries, apprehensions, and narcotic seizures in areas with physical barriers and to enforcement efficiencies, as the physical barriers allowed DHS to redeploy manpower to other areas of the border.  *See* DHS, *The Border Wall System Is Deployed, Effective, and Disrupting Criminals and Smugglers* (Oct. 29, 2020).[12]

The Biden administration has disregarded that evidence.  It failed to justify its decision to terminate border-barrier construction besides the President's claim—backed by no evidence or analysis—that "building a massive wall that spans the entire southern border is not a serious policy solution" but is instead "a waste of money … ."  Border of the United States and Redirection of Funds Diverted to Border Wall Construction, 86 Fed. Reg. 7,225, 7,225 (Jan. 20, 2021).  But refusing to consider the

---

[11]    *Available    at*    https://www.dhs.gov/news/2018/12/12/walls-work#:~:text=When%20it%20comes%20to%20stopping,%2C%20tribal%2C%20and%20federal%20level.

[12]    *Available at*    https://www.dhs.gov/news/2020/10/29/border-wall-system-deployed-effective-and-disrupting-criminals-and-smugglers.

previous administration's past conclusion that walls do work is the opposite of considering "the relevant issues and reasonably explain[ing] the decision." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). All it shows is a hostility to securing the border—a hostility that is this administration's signature border policy.

### C.     Texas's actions are an appropriate act of self-defense that the Rivers and Harbors Act does not prohibit.

Texas's response to the migrant invasion and the imminent—indeed, currently present—danger from the unchecked illegal immigration on its border is logical and proportionate: building a buoy barrier along a relatively small section of the Rio Grande River. It is logical because, as noted above, physical barriers reduce illegal migration. It is proportionate because while all States suffer the harms from illegal migration, Texas is a border State at the epicenter of the illegal immigration crisis. *See, e.g., Texas v. Biden (MPP III)*, 20 F.4th 928, 989 (5th Cir. 2021) ("[B]order states 'bear many of the consequences of unlawful immigration.'") (quoting *Arizona*, 567 U.S. at 397) (alteration omitted), *rev'd in part* 142 S. Ct. 2528 (2022). Yet the buoy barrier stops short of armed combat. It is instead a passive, non-violent constraint on illegal migration.

Texas's decision to construct the buoy barrier thus fits comfortably within the State's right to self-defense as enshrined in the Self-Defense Clause and as an incident of its retained sovereign status in the federal system. But rather than aiding Texas—and thus fulfilling its constitutional duty and obviating the need for State self-help—the administration sued the State, alleging that the buoy barrier violates Section 10 of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 403.

What is dispositive here is the absence of a clear statement in the Rivers and Harbors Act that the law impairs or disables Texas's ability to engage in self-defense. All Section 10 does—as relevant here—is prohibit the obstruction of "the navigable capacity of any of the waters of the United States" and the construction of structures in navigable waters absent permission from the U.S. Army Corps of Engineers. 33 U.S.C. § 403. Nowhere does the Rivers and Harbors Act address a State's right to self-defense, much more limit it.

That resolves this case. But the broader statutory context reinforces that conclusion. *See, e.g., Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 460 (5th Cir. 2020) (acknowledging

that statutory context is relevant in analyzing a law).  To start, the Rivers and Harbors Act does not preempt all State authority over the regulation of structures in navigable waters.  *See Cummings v. City of Chicago*, 188 U.S. 410, 430 (1903).  That the Act is not all-encompassing in this respect indicates that State actions done in self-defense are outside the law's reach.

Indeed, Section 12 of the Act suggests that the Act does not even apply against States.  Section 12 of the Act imposes criminal penalties on "[e]very person and every corporation that violates," for example, Section 10.  33 U.S.C. § 406.  But "'neither a State nor its officials acting in their official capacities are "persons"'" for purposes of federal law.  *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 474–75 (5th Cir. 2020) (en banc) (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)).  Nor are they corporations.  As the close textual connection between "person" and "corporation" in Section 10 suggests, they are "no more a state instrument, than a natural person exercising the same powers would be."  *Trustees of Dartmouth Coll. v. Woodward*, 17 U.S. (4 Wheat.) 518, 636 (1819).

Thus, the enforcement provision of the Rivers and Harbors Act in Section 12 suggests that the Act does not apply to States and State officers in their official capacity. Yet, those are exactly the parties the federal government must sue where a State acts in self-defense—as it has done here by suing Governor Abbott in his official capacity and the State of Texas. As a result, Section 12 reinforces the conclusion that application of clear-statement principles reaches: The Rivers and Harbors Act does not prohibit Texas's buoy barrier.

## CONCLUSION

For those reasons, as well as the ones Texas has provided, this Court should reverse the district court.

Dated: February 23, 2024

Respectfully submitted,

KRIS W. KOBACH
   *Kansas Attorney General*
/s/ Anthony J. Powell
ANTHONY J. POWELL
   *Solicitor General*
120 SW 10th Ave., 2nd Floor
Topeka, KS 66612-1597
(785) 296-2215
anthony.powell@ag.ks.gov

*Counsel for Amicus Curiae*
*State of Kansas*

## ADDITIONAL COUNSEL

Steve Marshall
Attorney General
State of Alabama

Treg Taylor
Attorney General
State of Alaska

Tim Griffin
Attorney General
State of Arkansas

Ashley Moody
Attorney General
State of Florida

Chris Carr
Attorney General
State of Georgia

Raul Labrador
Attorney General
State of Idaho

Theodore E. Rokita
Attorney General
State of Indiana

Brenna Bird
Attorney General
State of Iowa

Russell Coleman
Attorney General
Commonwealth of Kentucky

Jeff Landry
Attorney General
State of Louisiana

Lynn Fitch
Attorney General
State of Mississippi

Andrew Bailey
Attorney General
State of Missouri

Austin Knudsen
Attorney General
State of Montana

Drew Wrigley
Attorney General
State of North Dakota

Gentner Drummond
Attorney General
State of Oklahoma

Alan Wilson
Attorney General
State of South Carolina

Marty Jackley
Attorney General
State of South Dakota

Jonathan Skrmetti
Attorney General
State of Tennessee

Sean Reyes
Attorney General
State of Utah

Jason Miyares
Attorney General
Commonwealth of Virginia

Patrick Morrisey
Attorney General
State of West Virginia

Bridget Hill
Attorney General
State of Wyoming

## CERTIFICATE OF SERVICE

On February 23, 2024, this document was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; and (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1.

s/ Anthony J. Powell
Anthony J. Powell
*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This document complies with the: (1) type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 5619 words, excluding the parts of the document exempted by rule; and (2) the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word (the same program used to calculate the word count).

s/ Anthony J. Powell
Anthony J. Powell
*Counsel for Amici Curiae*