No. 23-50632

In the
**United States Court of Appeals for the Fifth Circuit**

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

GREG ABBOTT, IN HIS CAPACITY AS GOVERNOR OF THE STATE OF TEXAS;
STATE OF TEXAS,

*Defendants-Appellants*.

**On Appeal from the United States District Court
for the Western District of Texas, Austin Division**

**Supplemental Brief *Amicus Curiae* of
America's Future, U.S. Constitutional Rights Legal Defense Fund,
Tennessee Firearms Association, Tennessee Firearms Foundation, Citizens
United, Citizens United Foundation, The Presidential Coalition, Gun
Owners of America, Gun Owners Foundation, Gun Owners of California,
and Conservative Legal Defense and Education Fund
on Rehearing *En Banc* in Support of Defendants-Appellants and Reversal**

J. MARK BREWER
 Johnson City, TX

JAMES N. CLYMER
 Lancaster, PA

JOHN I. HARRIS III
 Nashville, TN

MICHAEL BOOS
 Washington, DC

RICK BOYER
 Lynchburg, VA

WILLIAM J. OLSON*
JEREMIAH L. MORGAN
ROBERT J. OLSON
 WILLIAM J. OLSON, P.C.
 370 Maple Ave. W., Ste. 4
 Vienna, VA 22180
 (703) 356-5070
 wjo@mindspring.com
Attorneys for *Amici Curiae*

February 23, 2024
*Counsel of Record*

Case No. 23-50632

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

GREG ABBOTT, *et al.*,

Defendants-Appellants.

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

United States of America, Plaintiff-Appellee

Greg Abbott, *et al.*, Defendants-Appellants

America's Future, U.S. Constitutional Rights Legal Defense Fund, Tennessee Firearms Association, Tennessee Firearms Foundation, Citizens

i

United, Citizens United Foundation, The Presidential Coalition, Gun Owners of America, Gun Owners Foundation, Gun Owners of California, and Conservative Legal Defense and Education Fund, *Amici Curiae*.

William J. Olson, Jeremiah L. Morgan, Robert J. Olson, J. Mark Brewer, James N. Clymer, John I. Harris III, Michael Boos, and Rick Boyer are counsel for *Amici Curiae*.

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(c), and 5th Circuit Rule 28.2.1, it is hereby certified that *Amici Curiae* America's Future, U.S. Constitutional Rights Legal Defense Fund, Tennessee Firearms Association, Tennessee Firearms Foundation, Citizens United, Citizens United Foundation, The Presidential Coalition, Gun Owners of America, Gun Owners Foundation, Gun Owners of California, and Conservative Legal Defense and Education Fund are non-stock, nonprofit corporations, have no parent companies, and no person or entity owns them or any part of them.

　　　　　　　　　　　　 */s/ William J. Olson*
　　　　　　　　　　　　William J. Olson
　　　　　　　　　　　　Attorney of Record for *Amici Curiae*

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS. . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

INTEREST OF *AMICI CURIAE* . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT

I.    TEXAS HAS AND RETAINS THE INHERENT POWER TO DEFEND ITS
      BORDER AGAINST INVASION. . . . . . . . . . . . . . . . . . . . . . . . . 4

      A.    Texas Has the Authority of a Sovereign Political Entity to
            Protect Its Borders . . . . . . . . . . . . . . . . . . . . . . . . . 4

      B.    The U.S. Constitution Affirms Texas's Authority over Its
            Border . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      C.    The Biden Administration Has Violated Article IV, Sec. 4 . . . . . 13

      D.    The Panel Erred in Failing to Construe the Statute So as Not
            to Conflict with the Constitution. . . . . . . . . . . . . . . . . . 15

II.   TEXAS FACES AN INVASION . . . . . . . . . . . . . . . . . . . . . . . . 15

      A.    The Societal Reality of the Border Invasion . . . . . . . . . . . . 15

      B.    Previous Historical Invasions Demonstrate Texas's Right to
            Defend Itself . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      C.    The Historical Understanding of the Word "Invasion" Does
            Not Require Military Involvement . . . . . . . . . . . . . . . . . 20

D.    There Is New Reporting about a Chinese Transit Camp in
Panama . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

Page

**U.S. CONSTITUTION**

Art. I, Sec. 8, cl. 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

Art. I, Sec. 10, cl. 3 . . . . . . . . . . . . . . . . . . . . . . . . . 1, 6, 8, 11, 13

Art. II, Sec. 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Art. IV, Sec. 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Art. VI, cl. 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

**STATUTES**

Rivers and Harbors Appropriation Act of 1899 . . . . . . . . . . . . . . . . 3, 7, 8

**CASES**

*Arizona v. United States*, 567 U.S. 387 (2012). . . . . . . . . . . . . . . 4, 5, 6

*Baker v. Carr*, 369 U.S. 186 (1962) . . . . . . . . . . . . . . . . . . . . . 10

*Beirne v. Brown*, 4 W. Va. 72 (1870) . . . . . . . . . . . . . . . . . . . . 12

*Bond v. United States,* 564 U.S. 211 (2011) . . . . . . . . . . . . . . . . .  9

*Chisholm v. Georgia*, 2 U.S. 419 (1793) . . . . . . . . . . . . . . . . . . 8, 9

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) . . . . . . . . . . . . . . . . . .  9

*Houston v. Moore*, 18 U.S. 1 (1820) . . . . . . . . . . . . . . . . . . . . . 12

*Mayor of New York v. Miln*, 36 U.S. 102 (1837) . . . . . . . . . . . . . . .  4

*Sanitary Dist. of Chicago v. United States*, 266 U.S. 405 (1925) . . . . . . 9, 10

*Speer v. School Directors, etc. of Blairsville*, 50 Pa. 150 (1865) . . . . . . . . 13

*United States v. Hansen*, 143 S. Ct. 1932 (2023) . . . . . . . . . . . . . . . 15

**MISCELLANEOUS**

B. Blankley, "51st Texas county declares invasion at southern border,"
    *TheCenterSquare.com* (Jan. 25, 2024) . . . . . . . . . . . . . . . . . . . . 16

G. Carey & J. McClellan, eds., The Federalist (Liberty Fund: 2001) . . . . . .  7

E. de Vattel, The Law of Nations (B. Kapossy & R. Whatmore,
    eds. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

E. Dwinell, "Shocking Cost of the Illegal Immigration Crisis to
    Americans," *Heritage Foundation* (Feb. 17, 2023) . . . . . . . . . . . 15, 16

J. Elliot, Debates of the State Conventions on the Federal Constitution . . . . .  7

"Factsheet: Final FY23 Numbers Show Worst Year at America's
    Borders — Ever," Homeland Security Committee (Oct. 26, 2023) .  16, 17

H. Res. 863 (118th Congress) (Feb. 13, 2024) . . . . . . . . . . . . . . . . . . . . . . 14

A. Hyman, "What The Constitution's Framers Really Meant By
    'Invasion'," *Daily Caller* (Jan. 30, 2024) . . . . . . . . . . . . . . . . . . . . 21

MASS. CONST., Part the Second, chap. II, § 1, art. VII . . . . . . . . . . . . . . 21

R. Natelson and A. Hyman, "The Constitution, Invasion, Immigration,
    and the War Powers of States," Forthcoming in Br. J. Am. Leg.
    Studies (2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 22

R. Natelson, "Understanding the Constitution: How States May Respond
    to Illegal Immigration, Part I," *Epoch Times* (Jan. 8, 2024) . . . . . . . 20

T. Ozimek, "Alarming Rise in Military-Aged Chinese Men Entering
    the US Illegally, Border Patrol Union Chief Warns," *The Epoch*
    *Times* (Feb. 19, 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

T. Ozimek, "Number of Chinese Illegally Crossing US-Mexico Border
    Surges 500 Percent in San Diego Sector," *The Epoch Times*
    (Feb. 22, 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

"Pancho Villa," *History.com* (Nov. 9, 2009). . . . . . . . . . . . . . . . . . . . . . 19

Report of U.S. House Special Committee on Texas Frontier Troubles
    (Feb. 29, 1876) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Republican Governors Ass'n, "Republican Governors Band Together,
    Issue Joint Statement Supporting Texas' Constitutional Right to
    Self-Defense" (Jan. 25, 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . 14

J. Rippy, The United States and Mexico (Alfred A. Knopf: 1926) . . . . . . . 17

J. Sandos, "The Plan of San Diego: War & Diplomacy on the Texas
    Border 1915-1916," ARIZONA AND THE WEST, vol. 14, no. 1
    (Spring 1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

"The Secret Chinese Migration Hiding Under Democrat Policy," *Tucker*
    *Carlson Network* (Feb. 3, 2024). . . . . . . . . . . . . . . . . . . . . . . . 22

Texas Dep't of Public Safety, "Texas Criminal Illegal Alien Data" . . . . . . 16

J. Tierney, Chasing Ghosts: Unconventional Warfare in American History
    (Potomac Books: 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

## INTEREST OF *AMICI CURIAE*[1]

America's Future, U.S. Constitutional Rights Legal Defense Fund, Tennessee Firearms Association, Tennessee Firearms Foundation, Citizens United, Citizens United Foundation, Gun Owners of America, Gun Owners Foundation, Gun Owners of California, and Conservative Legal Defense and Education Fund are nonprofit organizations which work to defend constitutional rights and protect liberties. The Presidential Coalition is a political committee.

## STATEMENT OF THE CASE

In 2021, Texas Governor Greg Abbott responded to the massive invasion of illegal immigration across Texas's border with Mexico by launching multiple defensive strategies termed "Operation Lone Star." He invoked the Invasion Clause of the U.S. Constitution, which states in pertinent part:

> No State shall, without the Consent of Congress … engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay. [Art. I, Sec. 10, cl.3.]

---

[1]  All parties have consented to the filing of this brief *amicus curiae*. No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money intended to fund preparing or submitting the brief. No person other than *amici*, their members, or their counsel contributed money intended to fund preparing or submitting this brief.

1

Governor Abbott began to implement plans to install floating barriers at certain crossing hotspots in the Rio Grande to discourage illegal border crossings, the first of which was at Eagle Pass.

At every turn, the Biden Administration has sought to prevent Texas from taking action to stem the invasion. On July 24, 2023, the Biden Administration sued Governor Abbott and the State of Texas, seeking a preliminary injunction to remove the existing floating barrier and prevent others from being installed, which was granted by the district court on September 6, 2023. The district court ordered that the floating barrier be moved to the Texas shore on the theory that the barrier interfered with the federal government's regulation of navigable waters under the Rivers and Harbors Appropriation Act of 1899. *See United States v. Abbott*, 2023 U.S. Dist. LEXIS 157172 (W.D. Tex. 2023) ("*Abbott I*").

Texas appealed to this Court, which upheld the preliminary injunction on December 1, 2023. *See United States v. Abbott*, 87 F.4d 616 (5th Cir. 2023) ("*Abbott II*"). The panel majority concluded that the Rio Grande was a navigable river under the exclusive control of the national government. Judge Willett dissented, believing that the United States had failed to establish any of the four elements necessary for a preliminary injunction. This Court then

2

granted rehearing *en banc*, vacating the panel opinion. *See United States v. Abbott*, 90 F.4th 870 (5th Cir. Jan. 17, 2024) ("*Abbott III*").

## ARGUMENT

The district court deemed Texas's argument that it is a sovereign state with inherent and constitutionally recognized powers to resist an invasion onto its soil to be a "fallback argument," dismissing it based on two reasons:

> Texas's fallback argument justifies its construction of the floating barrier as an exercise of self defense in the face of "invasion." This argument fails because (1) the **RHA has already balanced** policy interests and determined that the nation's interest in free navigation of its waterways is **supreme to unauthorized state action**; and (2) whether Texas's claim of **"invasion"** is legitimate is a **non-justiciable political question** demonstrably committed to the federal political branches. [*Abbott I* at *27 (emphasis added).]

The district court's analysis is wrong on every point. The Rivers and Harbors Appropriation Act of 1899 ("RHA") is a federal statute — nothing more. Federal district judges are enamored with balancing one interest against another, but no federal statute can be "balanced" against and used to override the inherent, unsurrendered power of a state government. As a sovereign entity, Texas has the power of every sovereign entity, to protect its borders and resist invasion. That power was expressly recognized in constitutional text. Moreover, Texas has the unfettered discretion to determine if it has been invaded

3

without the interference of either the federal political branches or the federal courts.

## I.    TEXAS HAS AND RETAINS THE INHERENT POWER TO DEFEND ITS BORDER AGAINST INVASION.

### A.    Texas Has the Authority of a Sovereign Political Entity to Protect Its Borders.

Prior to the ratification of the U.S. Constitution, there is no doubt that each of the original 13 States possessed and exercised the authority of an independent and sovereign political entity to "prevent [itself] from being burdened by an influx of persons." *Mayor of New York v. Miln*, 36 U.S. 102, 133 (1837).  The one source for the principles that undergirded the relations between nations, with which the Founders were well familiar and on which they relied, was Emer de Vattel's 1758 treatise, which stated:

> The sovereign may forbid the entrance of his territory either to foreigners in general, or in particular cases, or to certain persons, or for certain particular purposes, according as he may think it advantageous to the state.  There is nothing in all this, that does not flow from the rights of domain and sovereignty: every one is obliged to pay respect to the prohibition.…  [E. de Vattel, The Law of Nations, bk. II, ch. VII, § 94, p. 309 (B. Kapossy & R. Whatmore, eds. 2008).]

As Justice Scalia observed, this "power to exclude from the sovereign's territory people who have no right to be there" is, "the defining characteristic of

4

sovereignty." *Arizona v. United States*, 567 U.S. 387, 417 (2012) (Scalia, J.,

dissenting).  Demonstrating the reality of a State's inherent sovereign power over

immigration, for the first 100 years in the nation's history, it was primarily the

States, not the federal government, which set the rules governing immigration.

*See Arizona* at 419 (Scalia, J., dissenting).  It has only been since the late 19th

and 20th centuries that the federal government has entered and sought to usurp the

field on the assumption that its enumerated power to **establish a uniform rule** of

naturalization subsumed the power to **regulate immigration**.  But, as Justice

Scalia has demonstrated, the federal government's power over immigration has

no necessary connection to the Naturalization Clause; rather, such power "is an

inherent attribute of sovereignty no less for the United States than for the States."

As the Supreme Court itself has made clear:

> [I]t is an "'accepted maxim of international law, that every
> sovereign nation has the power, as inherent in sovereignty, and
> essential to self-preservation, to forbid the entrance of foreigners
> within its dominions.'"  [*Arizona* at 422 (Scalia, J., dissenting),
> citing *Fong Yue Ting v. United States*, 149 U.S. 698, 705 (1893).]

In his majority opinion in Arizona, Justice Kennedy did not quarrel with

Justice Scalia's admonition in principle, stating: "Federalism, central to the

constitutional design, adopts the principle that both the National and State

Governments have elements of sovereignty the other is bound to respect." *Arizona* at 398. From the early history of the United States, the central role of the States in controlling immigration was assumed. Can there be any doubt that, if there is one element of sovereignty due the joint respect of both governments, it is the right to self-preservation of each? And are not border integrity and security essential to the sovereignty of both entities?

### B. The U.S. Constitution Affirms Texas's Authority over Its Border.

Our nation is comprised of one national sovereign and 50 state sovereigns, totaling 51 sovereign entities. The states have all the powers of a sovereign they had before entering the union — except as to those powers expressly limited or exclusively delegated to the national government in the U.S. Constitution. The sovereign power of states over their borders was not surrendered to the national government in joining the United States — in fact, those powers were expressly recognized as a retained state power.

The U.S. Constitution states that "[n]o State shall, without the Consent of Congress … engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay." Art. I, Sec. 10, cl. 3. There was little debate on this provision either at the Constitutional Convention or at the debates

in the various state legislatures. However, in Federalist No. 43, Madison

explained:

> A protection against invasion, is due from every society, to the parts composing it. The latitude of the expression here used, seems to secure each state not only against foreign hostility, but against ambitious or vindictive enterprises of its more powerful neighbours. [G. Carey & J. McClellan, eds., The Federalist at 226 (Liberty Fund: 2001).]

In the Virginia ratifying convention, Patrick Henry did not mince words:

"If you give this clause a fair construction, what is the true meaning of it? What

does this relate to? Not domestic insurrections, but war. If the country be

invaded, a state may go to war...." J. Elliot, Debates of the State Conventions

on the Federal Constitution, Vol. III, p. 392.

To be sure, Congress has the power under the Commerce Clause, Art. I,

Sec. 8, cl. 3, "[t]o regulate Commerce with foreign Nations, and among the

several States, and with the Indian tribes," and the RHA was enacted pursuant to

that power. While the Commerce Clause has been used to justify all manner of

congressional regulation, and to strike down many state laws, this case presents a

rare circumstance of a river that is co-extensive with the border of both the

nation and a state. Such issues would never arise with respect to a river located

within the United States, particularly one where no commerce was being

7

conducted. A statute such as RHA exercising the Congressional Commerce power cannot be interpreted to exceed the scope of the Commerce power. And even if the district court believed that the Rio Grande was a navigable waterway, it cannot reasonably conclude that Texas is interfering with commerce "with foreign Nations, and among the several States, and with the Indian tribes" being impeded where the barrier has been placed on the Rio Grande — unless the United States asks this Court to take the view that the Commerce Clause should protect human trafficking, drug trafficking, and illegal immigration.

The district court's use of the word "supreme" in its first argument, *supra*, is inapposite. The Supremacy Clause states that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof .. shall be the supreme Law of the Land…." Art. VI, cl. 2. And, the RHA is a law of the United States made pursuant to the Commerce Clause, but it should not be interpreted to apply in derogation of the inherent power of Texas or Art. I, Sec. 10, cl. 3.

The retained powers of the States have been recognized since the beginning of the Republic:

> Each State in the Union is sovereign as to all the powers reserved.
> It must necessarily be so, because the United [States] have no claim

8

to any authority but such as the States have surrendered to them: Of course the part not surrenderred [sic] must remain as it did before. [*Chisholm v. Georgia*, 2 U.S. 419, 435 (1793).]

Two hundred years later, the Court reiterated the continuing strength of this basic premise of federalism:

> [T]he people of each State compose a State, having its own government, and endowed with all the functions essential to separate and independent existence … [w]ithout the States in union, there could be no such political body as the United States.  Not only, therefore, can there be no loss of separate and independent autonomy to the States, through their union under the Constitution, but it may be not unreasonably said that the preservation of the States, and the maintenance of their governments, are as much within the design and care of the Constitution as the preservation of the Union and the maintenance of the National government.  The Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States.  [*Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991) (citations omitted).]

The Supreme Court recently affirmed that the constitutional "allocation of powers in our federal system preserves the integrity, dignity, and residual sovereignty of the States" and that "[t]he federal balance … ensure[s] that States function as political entities in their own right."  *Bond v. United States,* 564 U.S. 211, 221 (2011).

The district court cites *Sanitary Dist. of Chicago v. United States*, 266 U.S. 405 (1925), for the proposition that "[t]his is not a controversy between

9

equals.  The United States is asserting its sovereign power to regulate commerce and to control the navigable waters within its jurisdiction." *Id.* at 425.  But (putting aside the fact that no commerce or navigation is occurring here) the State's interest in that case had to do with sewer removal, not invasion.  The State power in question was a common law police power, not a constitutionally reserved sovereign right to defend its border against invasion.  In this case, unlike *Sanitary District*, the federal and State government have co-extensive sovereign rights to defend the border, and particularly since the federal government refuses to defend the border, Texas has every right to do so.

The district court's second reason to reject Texas's claim of power was based on the political question doctrine.  That doctrine is typically used by federal courts to avoid reaching an issue, deferring to Congress and the President.  *See Baker v. Carr*, 369 U.S. 186, 217 (1962).  Here it is used by the district court to demand that Texas defer to the federal government.  The district court asserted that "'the Constitution commits the question of whether an invasion has occurred to the policy making (or political) branches *of the federal government*.'"  *Abbott I* at \*31-32.  There is no constitutional or prudential rationale for this position.  The Constitution does not deprive Texas of the power

10

to determine when it is invaded.  Indeed, the Constitution empowers Texas.

Under Art. I, Sec. 10, cl. 3 a state may "engage in War" when "actually

invaded, or in such imminent Danger as will not admit of delay."  The text

makes clear that whenever an invasion or imminent danger exists, a State

expressly may engage in war **without consent of Congress.**

The district court opined that "[u]nder [Texas'] logic, once Texas decides,

in its sole discretion, that it has been invaded, it is subject to no oversight of its

'chosen means of waging war.'…  Such a claim is breathtaking."  *Id.* at *32.

"Such a reading would give the Governor of Texas more power than is possessed

by the President of the [United] States without authorization from Congress," the

court added.  *Id.* at *32 n.29.  To the Framers, the "claim" was apparently not

"breathtaking," as this is precisely what the text provides.  It expressly gives

States the right to act "without the consent of Congress" to repel invasions.

Judge Ho explained why the district court was off base:

> If only "the political branches of the *federal* government" can
> determine that a State has been invaded, that effectively means that a
> State is constitutionally prohibited from exercising its sovereign right
> of self-defense without federal permission.  That's hard to reconcile
> with the text of Article I, section 10, which **makes clear that a
> State does *not* need "the Consent of Congress" to act if it is
> "actually invaded**."  U.S. Const. art. I, § 10, cl. 3.  Article I,
> section 10 establishes, first, a general rule that States ordinarily need

11

Congressional consent to act — and second, an express exception for when States don't.  So it defies the plain meaning of Article I, section 10 to say that, as a general matter, a State must have "the Consent of Congress" to act — but if it's "actually invaded," the State *still* must have "the Consent of Congress." [*United States v. Abbott*, 2024 U.S. App. LEXIS 3263 (5th Cir. 2024) (Ho, J., dissenting from denial of mandamus) (emphasis added).]

Thus, neither of the district court's reasons for rejecting Texas's argument is textually based — but rather, both are at war with the text.

Early in our nation's history, in *Houston v. Moore*, 18 U.S. 1 (1820), the U.S. Supreme Court acknowledged the right of States to use military force without consulting Congress.  "It is obvious that there are two ways by which the militia may be called into service; the one is under **State authority**, the other under authority of the United States."  *Id.* at 36 (emphasis added).  Although dissenting in that case, Justice Story agreed that when Congress stands by, "the States [may] sufficiently provide for their own safety against … the sudden invasion of a foreign enemy."  *Id.* at 52 (Story, J., dissenting).

During the Civil War, multiple State courts agreed that the States could call up State troops to resist invasion by Confederate forces.  West Virginia's Supreme Court ruled:  "In the second section of the first article of the constitution of the United States, the right to engage in war without the consent

12

of Congress, is reserved to the States respectively, if actually invaded…."

*Beirne v. Brown*, 4 W. Va. 72, 79 (1870).  Pennsylvania's Supreme Court

agreed:

> [I]t is said that protection against invasion and insurrection is a
> Federal duty.  True, it is so by an express grant of power.  But, by
> the same constitution, every right not delegated is reserved to the
> states or people; and I find no clause in the constitution by which the
> right of self-protection is taken away from the states, in all respects.
> On the contrary, I find that … when actually invaded … the right of
> the state to keep troops or ships of war is reserved by express
> exception.  [*Speer v. School Directors, etc. of Blairsville*, 50 Pa.
> 150, 164-165 (1865).]

### C.     The Biden Administration Has Violated Article IV, Sec. 4.

A second provision of the Constitution reinforces the decision by Texas to

declare an invasion.  That provision imposes a solemn duty on the national

government:  "The United States **shall … protect** each of them against

Invasion…."  Article IV, Sec. 4 (emphasis added).  *See also* Art. II, Sec. 3

("Take Care Clause").  Although a violation of this duty is not required for a

State to act under Article I, Section 10, clause 3, it certainly provides Texas with

good reason to act.

In fact, the House of Representatives just impeached the Secretary of

Homeland Security for violation of the duty to protect against invasion.  The

articles of impeachment against Mayorkas make clear that the House of Representatives shares Texas's belief that an invasion is occurring.  The articles describe "the increased control of the Southwest border by drug cartels,"[2] and state that Mayorkas has created "a threat to national and border security [and] the safety of the United States people."  *Id*.  The House found that Mayorkas' statements that "the border is 'secure,'" and that America has "'operational control'" over its southern border were "knowingly … false."  *Id*.

In addition to Governor Abbott, fifty-one Texas counties have now declared that an invasion exists along the border.  Also, the governors of 25 states signed a statement of support for Texas's actions.  The statement read in part:

> The authors of the U.S. Constitution made clear that in times like this, states have a right of self-defense, under Article 4, Section 4 and Article 1, Section 10, Clause 3….  Because the Biden Administration has abdicated its constitutional compact duties to the states, Texas has every legal justification to protect the sovereignty of our states and our nation.[3]

---

[2]  H. Res. 863 (118th Congress) (Feb. 13, 2024).

[3]  Republican Governors Ass'n, "Republican Governors Band Together, Issue Joint Statement Supporting Texas' Constitutional Right to Self-Defense" (Jan. 25, 2024).

14

**D.    The Panel Erred in Failing to Construe the Statute So as Not to Conflict with the Constitution.**

Whenever possible, under the doctrine of constitutional avoidance, a court should interpret a statute to harmonize rather than conflict with the Constitution if possible.  "When legislation and the Constitution brush up against each other, [courts'] task is to seek harmony, not to manufacture conflict." *United States v. Hansen*, 143 S. Ct. 1932, 1946 (2023).  The Act both can and should be interpreted, as Texas argues, so as not to infringe on Texas's constitutional right to prevent invasion and protect its border.  While Congress certainly has a delegated general right in the Constitution to regulate commerce, it cannot in so doing destroy the States' enumerated specific sovereign right to defend its border.  Congress's general authority to regulate commerce is defined and limited by Texas's enumerated right to defend itself against invasion.

## II.    TEXAS FACES AN INVASION.

### A.    The Societal Reality of the Border Invasion.

According to the U.S. Customs and Border Protection ("CBP"), in 2022, that agency:

> arrested 1,142 illegal aliens who were convicted of assault, battery, or domestic violence; 1,614 who were convicted of driving under the influence; and 2,239 who were convicted of drug possession and

trafficking.  Additionally, CBP arrested 62 illegal aliens convicted of homicide or manslaughter and 365 convicted of sexual offenses.[4]

In fiscal year 2023, Texas was invaded by nearly 2 million illegal aliens, constituting half of all the illegal border crossings into the United States.[5]  This invasion has unleashed a wave of crime and drugs across Texas (and indeed the nation).

These are just the persons who were caught.  According to the Texas Department of Public Safety, between 2011 and 2023:  297,000 illegal aliens were charged with more than 509,000 criminal offenses which included arrests for 940 homicide charges; 64,127 assault charges; 9,246 burglary charges; 59,936 drug charges; 1128 kidnapping charges; 25,441 theft charges; 39,694 obstructing police charges; 2,912 robbery charges; 6,422 sexual assault charges; 7,410 sexual offense charges; and 6,193 weapon charges.[6]

In fiscal year 2023, CBP "arrested 35,433 aliens with criminal convictions or outstanding warrants nationwide, including 598 known gang members, 178 of

---

[4]  E. Dwinell, "Shocking Cost of the Illegal Immigration Crisis to Americans," *Heritage Foundation* (Feb. 17, 2023).

[5]  B. Blankley, "51st Texas county declares invasion at southern border," *TheCenterSquare.com* (Jan. 25, 2024).

[6]  Texas Dep't of Public Safety, "Texas Criminal Illegal Alien Data."

those being MS-13 members.…  CBP … has seized 27,293 pounds of fentanyl, coming across the Southwest border—enough to kill more than 6 billion people."[7]

## B. Previous Historical Invasions Demonstrate Texas's Right to Defend Itself.

The existence of border disputes along the Texas-Mexico border is nothing new for Texas.  One constant throughout that history has been the use of state armed forces to resist cross-border incursions from Mexico, including many without official sanction from the Mexican government or military.

Shortly after the Civil War, in 1875, border incursions by gangs of Mexican bandits caused Texas Governor Richard Coke to, just as today, appeal repeatedly to the federal government for help:

> [A] joint committee of the state legislature … reported 105 murders and a 90% decrease in stock in the region below Eagle Pass.…  It also recommended the increase of state forces on the southwestern frontier and expressed the fervent hope that ere long the federal government would do its full duty.…  The governor not only forwarded this report to Washington, but sent protest after protest and plea after plea for federal assistance.[8]

---

[7] "Factsheet: Final FY23 Numbers Show Worst Year at America's Borders — Ever," Homeland Security Committee (Oct. 26, 2023).

[8] J. Rippy, The United States and Mexico at 292 (Alfred A. Knopf: 1926).

The governor was forced to defend the border militarily with state troops. Governor Coke commissioned a force of Texas residents of Mexican heritage, and deputized them to pursue and punish Mexican bandits. Coke's order instructed, "Should the company be in close pursuit of thieves or marauders with their plunder, it will follow as far as possible, whether on this side of the Rio Grande or the other."[9] U.S. Attorney General George Williams questioned the legality of the order, and Governor Coke responded:

> No state has surrendered the right of defense of its people in its own way against aggressions from neighboring states or people.... [I]nternational courtesy, comity, and amity have never been required by the law of nations, carried to the romantic extent of surrendering the great natural right of self-defense against the constant infliction of serious, permanent, and wrongful injury upon the people of one nation by those of another, although the attacks may be unauthorized by the government of the territory from which it comes. [*Id*. at xvi.]

Notably, "Attorney-General Williams acquiesced in these conclusions, and the orders remained in force." *Id.*

In the early 1900s, as Germany grew increasingly aggressive in Europe, its government also began intransigence against American interests, targeting the

---

[9] Report of U.S. House Special Committee on Texas Frontier Troubles at xv (Feb. 29, 1876).

18

southern border.  Mexican bandits, aided and encouraged by German agents, developed the "Plan of San Diego":

> According to the Plan, there would be an armed uprising … against the government and country of the United States…. [T]he supporters of the Plan would reclaim for Mexico the territory comprising Texas, New Mexico, Arizona, Colorado, and California. It was to be a war of race, with every North American male over the age of sixteen put to death.[10]

In 27 border raids, "The raiders killed thirty-three Americans and wounded twenty-four, and destroyed several thousand dollars worth of property. They disrupted economic activity in four Texas counties, causing thousands of families to flee the Lower Rio Grande Valley."  *Id.* at 23.[11]

Although the U.S. Army played the primary role in putting down the "San Diego" raids and the associated cross-border raids of Pancho Villa, the Texas Rangers continued to provide protection of the border and military defense against Mexican bandits.  "In the twentieth century the Texas Rangers … saw increased service on the border, particularly during the 1910 Mexican revolution, which gave rise to dramatic cross-border forays by Pancho Villa and other

---

[10]  J. Sandos, "The Plan of San Diego: War & Diplomacy on the Texas Border 1915-1916," ARIZONA AND THE WEST, vol. 14, no. 1, p. 8 (Spring 1972).

[11]  "Pancho Villa," *History.com* (Nov. 9, 2009).

19

politically driven 'banditos.'"[12]  Pancho Villa's raids killed some 30 additional Americans.

The deaths caused by Villa and the "San Diego" border raids, both in terms of death toll and economic destruction, pale in comparison to the number of Americans killed by illegal aliens in the modern border invasion.  Yet apparently not until recent years has the authority of Texas to defend its border militarily ever even been questioned.

### C.    The Historical Understanding of the Word "Invasion" Does Not Require Military Involvement.

Founding-era dictionaries support what at the time was the plain meaning of "invasion."  As Professor Rob Natelson notes:

> [Of] thirteen editions published between 1713 and 1789 … [o]nly one of the thirteen limited "invade" and "invasion" to formal military incursions.  The other twelve included the military definitions, but also added definitions like "to intrude," "to encroach," and "to enter in a hostile manner."  [And] "hostile" usually meant only "without permission."[13]

---

[12]  J. Tierney, Chasing Ghosts: Unconventional Warfare in American History at 117 (Potomac Books: 2006).

[13]  R. Natelson, "Understanding the Constitution: How States May Respond to Illegal Immigration, Part I," *Epoch Times* (Jan. 8, 2024).  *See also* R. Natelson and A. Hyman, "The Constitution, Invasion, Immigration, and the War Powers of States," Forthcoming in Br. J. Am. Leg. Studies at 13 (2024) (detailing the 13 dictionaries and their definitions of "invasion").

In Federalist No. 41, James Madison referred to "pirates and barbarians" as "invaders." He did not view an invasion as being limited to an armed military assault.

Before the Constitution's ratification, the state of Connecticut claimed the Wyoming Valley in Pennsylvania as belonging to Connecticut. "In 1754, Benjamin Franklin authored a plan 'to divert the Connecticut Emigrants from their Design of Invading this Province.' And in 1783 the Pennsylvania legislature wrote to the Confederation Congress, labeling the Connecticut settlers 'invaders of the State.'" The Connecticut "invasion" was a mere migration. But "the invaded state could use force against the peaceful invaders, as Pennsylvania did in the so-called Pennamite War against the unauthorized immigrants from Connecticut."[14] The Massachusetts Constitution did, and still does, refer to "time of war or invasion."[15]

Further, "invasion" need not refer to the organized military force of an opposing nation. "Participants in the constitutional debates referred to 'invasions of barbarous tribes,' 'invasion of the savages,' and 'hostile invasions of lawless

[14] A. Hyman, "What The Constitution's Framers Really Meant By 'Invasion'," *Daily Caller* (Jan. 30, 2024).

[15] MASS. CONST., Part the Second, chap. II, § 1, art. VII.

and ambitious men intending … to … introduce anarchy, confusion, and every disorder.'"  R. Natelson and A. Hyman, "The Constitution, Invasion, Immigration, and the War Powers of States," *supra* (detailing the 13 dictionaries and their definitions of "invasion") (footnotes omitted).  "The actual or threatened detriment from invasion could be injury to persons; physical damage, such as that resulting from plundering; or the breakdown of normal processes of law and communication."  *Id.*

### D.    There Is New Reporting about a Chinese Transit Camp in Panama.

An interview of Professor Bret Weinstein conducted by Tucker Carlson has revealed what Weinstein found on a visit to a transit camp known as San Vicente in Panama consisting of "almost entirely Chinese" and overwhelmingly male, and of military age.  Visitors were not prohibited from photographing or entering that camp.  *See* "The Secret Chinese Migration Hiding Under Democrat Policy," *Tucker Carlson Network* (Feb. 3, 2024).  Michael Yon is a veteran war correspondent who led Professor Weinstein on his trip, and has been the leading journalist covering this camp.  He reports:

> Sir — our America is under attack in a Hybrid War.  No way this ends nicely.  Attached photo was made about 55 hours ago in Darien Panama.  This is China Bus Stop, aka San Vicente camp.  We call it

22

China Bus Stop (CBS) because most of the Chinese invaders coming through Darien get their busses here toward USA.[16]



There is substantial evidence of a recent influx of military-aged Chinese men crossing the U.S.-Mexico border illegally.  Brandon Judd, the President of the National Border Patrol Council, "believes some of them may be spies working on behalf of China's communist regime to 'infiltrate' the United States."[17]

---

[16]    Michael Yon Tweet @Michael_Yon (Feb. 21, 2024).

[17]    T. Ozimek, "Alarming Rise in Military-Aged Chinese Men Entering the US Illegally, Border Patrol Union Chief Warns," *The Epoch Times* (Feb. 19, 2024).

Border Patrol agents encountered 5,717 single Chinese adults in January, more than twice the number of any other January on record, CBP data shows. In December 2023, that figure rose to a record of 7,581, while the total since January 2023 stands at 64,979. [*Id.*]

Texas is not alone in suffering this invasion.  Jason Owens, chief of the U.S. Border Patrol, has reported that, so far this fiscal year, the San Diego sector has seen over 20,000 apprehensions of Chinese nationals, over five times the number in the comparable period last year.[18]

China is designated a "country of particular concern" by the U.S. State Department, while the FBI says that economic espionage and counterintelligence efforts emanating from China's communist regime are a "grave threat" to America's economic security.  [*Id.*]

While those who advocate for the elimination of national borders are quick to attribute these massive numbers to deteriorating economic conditions in China and human rights abuses, it would be irresponsible for Texas to follow the lead of the Biden Administration in hoping for the best, when the worst could easily be true.

What Texas faces at its border is an invasion of drugs, trafficking, and possibly large numbers of military-age men from enemy nations.  The invasion is

---

[18]  T. Ozimek, "Number of Chinese Illegally Crossing US-Mexico Border Surges 500 Percent in San Diego Sector," *The Epoch Times* (Feb. 22, 2024).

not academic, and it is not hypothetical.  It is Texas's everyday reality.

Governor Abbott has the sovereign right, and the sworn duty, to defend Texas's

citizens against this invasion.

## CONCLUSION

For the foregoing reasons, the preliminary injunction issued by the district

court should be reversed.

Respectfully submitted,

*/s/ William J. Olson*

_____

| | |
|---|---|
| J. MARK BREWER | WILLIAM J. OLSON* |
| 209 N. Nugent Ave. | JEREMIAH L. MORGAN |
| Johnson City, TX 78636 | ROBERT J. OLSON |
| | WILLIAM J. OLSON, P.C. |
| JAMES N. CLYMER | 370 Maple Ave. W., Ste. 4 |
| CLYMER MUSSER & SARNO, P.C. | Vienna, VA  22180 |
| 408 West Chestnut St. | (703) 356-5070 |
| Lancaster, PA 17603 | wjo@mindspring.com |
| | Attorneys for *Amici Curiae* |
| JOHN I. HARRIS III | |
| SCHULMAN, LEROY & BENNETT, P.C. | RICK BOYER |
| 3310 West End Ave., Ste. 460 | INTEGRITY LAW FIRM |
| Nashville, TN 37203 | P.O. Box 10953 |
| | Lynchburg, VA  24506 |
| MICHAEL BOOS | |
| CITIZENS UNITED | |
| 1006 Pennsylvania Ave. S.E. | *Counsel of Record* |
| Washington, DC 20003 | February 23, 2024 |

**CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED that service of the foregoing Supplemental Brief *Amicus Curiae* of America's Future, *et al.* on Rehearing *En Banc* in Support of Defendants-Appellants and Reversal, was made, this 23rd day of February, 2024, by the Court's Case Management/ Electronic Case Files system upon the attorneys for the parties.

*/s/ William J. Olson*
William J. Olson
Attorney for *Amici Curiae*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

IT IS HEREBY CERTIFIED:

1.     That the foregoing Supplemental Brief *Amicus Curiae* of America's Future, *et al.* on Rehearing *En Banc* in Support of Defendants-Appellants and Reversal complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 5,286 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), as well as Circuit Rule 32.1, because this brief has been prepared in a proportionally spaced typeface using WordPerfect version 21.0.0.194 in 14-point CG Times.

    */s/ William J. Olson*

William J. Olson
Attorney for *Amici Curiae*
Dated:  February 23, 2024