No. 23-50632

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

GREG ABBOTT, IN HIS CAPACITY AS GOVERNOR OF THE
STATE OF TEXAS; STATE OF TEXAS,

Defendants-Appellants.

On appeal from the United States District Court for the
Western District of Texas, Austin Division

BRIEF FOR *AMICUS CURIAE*
CENTER FOR RENEWING AMERICA, INC.
IN SUPPORT OF DEFENDANTS/APPELLANTS

Kenneth T. Cuccinelli, II
  *Counsel of Record*
CENTER FOR RENEWING
AMERICA, INC.
300 Independence Ave. SE
Washington, D.C. 20003
(202) 656-8825

*Attorney for* Amicus Curiae
*Center for Renewing America*

D. Michael Hurst, Jr.
PHELPS DUNBAR LLP
4270 I-55 North
Jackson, MS 39211
(601) 352-2300

*Local Counsel for* Amicus Curiae
*Center for Renewing America*

## SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 28.2.1 and Fed. R. App. P. 26.1, *amicus curiae*

Center for Renewing America makes the following disclosures:

1)    For non-governmental corporate parties please list all parent corporations: None.

2)    For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock: None.

3)    The following entity has an interest in the outcome of this case: Center for Renewing America.

4)    Interested persons include the government parties in this case as Plaintiff-Appellant and Defendants-Appellees.

5)    Interested persons include Kenneth Cuccinelli, II, Earl "Trey" Mayfield, D. Michael Hurst, Jr., all of whom have worked on this brief for *amicus curiae*.

These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

DATED: February 24, 2024          Respectfully submitted,

 */s/ Kenneth T. Cuccinelli, II*
Kenneth T. Cuccinelli, II

*Lead Counsel for* Amicus Curiae
*Center for Renewing America*

# TABLE OF CONTENTS

INTEREST OF *AMICUS CURIAE*............................................................... 1

INTRODUCTION................................................................................... 2

ARGUMENT ......................................................................................... 3

I.     The Constitution Recognizes that the States Retained Their Sovereign Right to Self Defense against Invasion When They Joined the Union. ..................... 3

II.    It Is the States' Prerogative to Determine When an Invasion Occurs. In Any Event, Constitutional Text and History Shows that Invasions Include Non-State Actors Acting for Private Gain. ............................................................ 9

III.   The State Self-Defense Power Is Distinct From—and Supports—the Commerce, Naturalization, and Immigration Powers Exercised by the Federal Government. ................................................................................ 19

IV.   Texas's Governor Has the Authority as Commander-in-Chief to Defend Texas against the Invasion from Mexico. .................................................. 21

CONCLUSION .................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Arizona v. United States*, 567 U.S. 387 (2012) ............................................. 9

*California v. United States*, 104 F.3d 1086 (9th Cir. 1997)......................... 9

*Dep't of Revenue v. James B. Beam Distilling Co.*, 377 U.S. 341 (1964)................ 20

*Gordon v. Texas*, 355 U.S. 369 (1958)......................................... 20

*Houston v. Moore*, 18 U.S. 1 (1820) .......................................... 11

*Lichter v. United States*, 334 U.S. 742 (1948) .............................. 13

*Luther v. Borden*, 48 U.S. 1 (1849).......................................... 22

*Martin v. Mott*, 25 U.S. 19 (1827) ........................................... 22

*McCulloch v. Maryland*, 17 U.S. 316, 417 (1819)…………………………............ 20

*Melendez v. City of New York*, 16 F.4th 992 (2d Cir. 2021) ................... 9, 19

*Moyer v. Peabody*, 212 U.S. 78 (1909) ........................................ 23

*Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018) ........... 3, 4

*New York v. United States*, 505 U.S. 144 (1992) ............................. 5

*Padavan v. United States*, 82 F.3d 23 (2d Cir. 1996)........................ 9

*Sterling v. Constantin*, 287 U.S. 378 (1932)................................ 23

*Sveen v. Melin*, 584 U.S. 811 (2018)....................................... 9, 20

*United States v. S.-E. Underwriters Ass'n*, 322 U.S. 533 (1944) ............ 10

*Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021)............................. 9

**Constitutional Provisions**

Tex. Const. art. IV, § 7 ................................................. 24

U.S. Const. amd. X ...................................................... 5

U.S. Const. art. I, § 10................................................. 4, 10, 19, 23, 25

U.S. CONST. art. I, § 8 ............................................................................ 11, 22

U.S. CONST. art. I, § 9 .................................................................................. 11

U.S. CONST. art. IV, § 4 ...................................................................... 5, 12, 22

U.S. CONST. art. IV, § 7 ............................................................................... 22

U.S. CONST. art. VI, cl. 2 ..........……………………………………………23, 24

U.S. CONST. pmbl. ........................................................................................ 4

**Statutes**

TEX. GOV'T CODE §§ 437.001 *et seq* ......................................................... 22

TEX. HEALTH & SAFETY CODE § 481.1022 ................................................. 20

TEX. HEALTH & SAFETY CODE § 481.1123 ................................................. 20

TEX. PENAL CODE §§ 20A.01–.04 ............................................................... 20

**Other Authorities**

1 NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828)……………………………………………………………………....10

ADAM MAYERS, DIXIE & THE DOMINION: CANADA, THE CONFEDERACY AND THE WAR FOR UNION (2003)………………………………………………………… 17

Ariz. Att'y Gen'l Op. 22-001, *The Federal Government's Duty to Protect the States and the States' Sovereign Power of Self Defense When Invaded* (Feb. 7, 2022).... 19

Austin Daily Statesman, April 15, 1874………………………………………….17

BENJAMIN HEBER JOHNSON, REVOLUTION IN TEXAS: HOW A FORGOTTEN REBELLION AND ITS BLOODY SUPPRESSION TURNED MEXICANS INTO AMERICANS (2003)........ 18

Bethany Blankley, *Three More Texas Counties Declare Invasion, Bringing Total to 50*, CENTER SQUARE (Jan. 6, 2024) ........................................................ 22

FRANCISCO E. BALDERRAMA & RAYMOND RODRIGUEZ, DECADE OF BETRAYAL: MEXICAN REPATRIATION IN THE 1930S (2006)....................................... 21

Governor Greg Abbott, Notification to President Biden that Texas Is Being Invaded (November 16, 2022) ............................................................... 25

HENDRICKSON, STATE AND CITIZEN, 1763-1865 (2013)....................................7

James Madison, Debate From Virginia Ratifying Convention (June 16, 1788) ....6, 14

John Marshall, Debate From Virginia Ratifying Convention (June 14, 1788)....... 6, 7

MARY ELLEN ROWE, BULWARK OF THE REPUBLIC: THE AMERICAN MILITIA IN
    ANTEBELLUM WEST (2003)..................................................................................8

MICHAEL D. DOUBLER & JOHN W. LISTMAN, JR., THE NATIONAL GUARD: AN
    ILLUSTRATED HISTORY OF AMERICA'S CITIZEN SOLDIERS (2d ed.
    2007).......................................................................................3, 7, 8

MIKE COX. THE TEXAS RANGERS: WEARING THE CINCO PESO 1821-1900 at 245-55
    (2008)...........................................................................................17

NICOLAY AND HAY, WORKS OF ABRAHAM LINCOLN (1894) ..................................... 13

NOAH WEBSTER, A COMPENDIOUS DICTIONARY OF THE ENGLISH LANGUAGE (1806)..10

PATRICK ETTINGER, IMAGINARY LINES: BORDER ENFORCEMENT AND THE ORIGINS OF
    UNDOCUMENTED IMMIGRATION, 1882-1930 (2009)...................................... 21

ROBERT V. REMINI, ANDREW JACKSON (2008)..................................................8

ROGER BRUNS, BORDER TOWNS AND BORDER CROSSINGS: A HISTORY OF THE U.S.
    MEXICO DIVIDE (2019)........................................................ ........17, 18

Syndie Henry, *Human Smuggler Causes $150K in Damage Driving through Private
    Property*, TEXAS SCORECARD (Jan. 10, 2024) ........................................................ 14

T.R. FEHRENBACH, LONE STAR: A HISTORY OF TEXAS AND THE TEXANS
    (1968).......................................................................................17, 18

THE DECLARATION OF INDEPENDENCE (U.S. 1776)..................................................... 3

THE FEDERALIST NO. 28...........................................................................5, 23

THE FEDERALIST NO. 39............................................................................ 4

THE FEDERALIST NO. 43............................................................................ 12

THOMAS KNOWLES, THEY RODE FOR THE LONESTAR; THE SAGA OF THE TEXAS RANGers
    (1999) ........................................................................ ...............15, 16

U.S. Customs & Border Protection, www.cbp.gov/about/contact/ports/TX (last visited January 21, 2024) ................................................................................................ 19

## INTEREST OF *AMICUS CURIAE*[1]

The Center for Renewing America, Inc. ("CRA") works to rebuild a consensus of America as a nation under God with a unique purpose worthy of defending. This purpose flows from its people, institutions, and history, where individuals' enjoyment of freedom is predicated on just laws and healthy communities. Among other areas of policy, CRA supports policies that protect all Americans from the array of harms that naturally arise from a failure to secure our national borders.

---

[1] All parties have consented in writing to the filing of CRA's *amicus curiae* brief if filed timely. No counsel for a party in this case authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation of this brief. No person other than *amicus curiae*, its members, or its counsel made a monetary contribution to the preparation or submission of this brief.

1

# INTRODUCTION

Texas faces a massive invasion in the form of millions of illegal aliens crossing its borders. Foreign nationals are smuggling themselves and others into Texas, committing crimes and disrupting even the most basic governmental services and community order.

Carrying out his authority as the State's Commander-in-Chief, Texas Governor Greg Abbott has taken measures to defend against that invasion. The federal Constitution expressly recognizes Texas's right to do so; it does not need the federal government's permission to fulfill the obligations that the federal Executive Branch has purposefully abdicated. Even before ratifying the Constitution, the sovereign States had the inherent authority to defend themselves against invasions. That authority was explicitly confirmed in the Constitution's text, and it remains to this day. An "invasion" is not limited to just state actors, or to war-making, or even to violence. As James Madison explained, invasions are any foreign encroachment on a State's sovereignty and its lawful exercise of authority within its borders, including resisting smuggling.

Governor Abbott's determinations are not susceptible to judicial review. The appropriate response to invasion is a matter for the political branches of the States and federal government. The federal government's suit here is thus beyond judicial purview, and it should be dismissed.

2

**ARGUMENT**

**I.    The Constitution Recognizes that the States Retained Their Sovereign Right to Self Defense against Invasion When They Joined the Union.**

Starting with the Jamestown settlement in 1607, militias in the thirteen original colonies (except Pennsylvania) originally developed to protect the settlers from Indian attacks.  MICHAEL D. DOUBLER & JOHN W. LISTMAN, JR., THE NATIONAL GUARD: AN ILLUSTRATED HISTORY OF AMERICA'S CITIZEN SOLDIERS 4-5 (2d ed. 2007). As settlements moved westwards into the Appalachian frontier, militias manned stockades and blockhouses, and operated patrols, to protect against Indian uprisings and foil them before they reached settlements.  *Id.* at 6.  In addition to the colonies contributing their militias to the Continental Army, colonial militias also operated independently throughout the Revolution, "preventing American Loyalists from gaining the upper hand," harassing British outposts and attacking their foraging parties, suppressing Indian uprisings, repelling British maritime raids, enforcing local laws, garrisoning forts, guarding prisoners of war, and patrolling against slave insurrections.  *Id.* at 11-13.

"When the original States declared their independence, they claimed the powers inherent in sovereignty—in the words of the Declaration of Independence, the authority 'to do all . . . Acts and Things which Independent States may of right do.'" *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 470 (2018) (quoting THE DECLARATION OF INDEPENDENCE ¶ 32 (U.S. 1776)).  "The Constitution limited but did not abolish the

sovereign powers of the States, which retained 'a residuary and inviolable sovereignty.'" *Id.* (quoting THE FEDERALIST NO. 39, at 245 (James Madison) (C. Rossiter ed. 1961)).

The Thirteen Colonies signed the Articles of Confederation, and then as States entered into the Union created by the Constitution, with the understanding that the new federal government would provide for the common defense. U.S. CONST. pmbl. To that end, they shared much of their sovereign authority for self-defense with the new federal government. But they did not cede it. The Founders recognized that occasions might arise where the federal government could not—or would not—meet its obligations under the grand bargain that produced the Constitution. As a precaution against that eventuality, the States retained in the new Constitution their residual authority to repel actual invasions without seeking congressional approval.

To wit, the State Self-Defense Clause authorizes the States to defend themselves against invasions:

> *No State shall, without the Consent of Congress*, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or *engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay*.

U.S. CONST. art. I, § 10, cl. 3 (emphasis added). In tandem with the State Self-Defense Clause, the Invasion Clause requires the federal government to protect each State from invasion:

> The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; . . . .

4

U.S. Const. art. IV, § 4. And, the Tenth Amendment emphasizes that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amd. X. It thus "confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States." *New York v. United States*, 505 U.S. 144, 157 (1992).

These constitutional provisions show that, while the people conferred upon the federal government a duty to protect each State against invasion, the States also *retained* their own sovereign prerogative to repel invasions themselves. The Founders were explicit that joining the new federal Constitution in no way diminished the States' respective rights of self-defense.

Alexander Hamilton observed that under the new Constitution, state governments retained the power "to take measures for their own defence with all the celerity, regularity and system of *independent nations*." The Federalist No. 28, at 182 (emphasis added). He emphasized that the proposed federal government would have a self-defense power for the collective good that was identical in nature to that already possessed and retained by the individual State governments. *Id.* at 178-79.

At the Virginia Ratifying Convention, James Madison explained that the State Self-Defense Clause means that States "are restrained from making war, unless invaded,

or in imminent danger. *When in such danger, they are not restrained*." James Madison,

Debate From Virginia Ratifying Convention (June 16, 1788) (emphasis added).

At that same Convention, future Chief Justice John Marshall countered the

suggestion that by joining the new federal Union, States might be relinquishing their

sovereign powers of self-defense:

> The state governments did not derive their powers from the general government; but each government derived its powers from the people, and each was to act according to the powers given it. Would any gentleman deny this? He [a delegate questioning whether States were surrendering authority] demanded if powers not given were retained by implication. Could any man say so? Could any man say that this power was not retained by the states, as they had not given it away? For, says he, does not a power remain till it is given away? The state legislatures had power to command and govern their militia before, and have it still, undeniably, unless there be something in this Constitution that takes it away.
>
> For Continental purposes Congress may call forth the militia,—as to suppress insurrections and repel invasions. But the power given to the states by the people is not taken away; for the Constitution does not say so. . . . The truth is, that when power is given to the general legislature, if it was in the state legislature before, both shall exercise it; unless there be an incompatibility in the exercise by one to that by the other, or negative words precluding the state governments from it. But there are no negative words here. It rests, therefore, with the states. To me it appears, then, unquestionable that the state governments can call forth the militia, in case the Constitution should be adopted, in the same manner as they could have done before its adoption. . . . When invaded, they [the States] can engage in war, as also when in imminent danger. *This clearly proves that the states can use the militia when they find it necessary.*

John Marshall, Debate from Virginia Ratifying Convention (June 14, 1788) (emphasis

added). Marshall expounded:

PD.44554193.1

> If Congress neglect our militia, we can arm them ourselves. Cannot Virginia import arms? Cannot she put them into the hands of her militia-men? . . . The power of governing the militia was not vested in the states by implication, because, being possessed of it antecedent to the adoption of the [federal] government, and not being divested of it by any grant or restriction in the Constitution, they must necessarily be as fully possessed of it as ever they had been.

*Id.*

The dual sovereignty self-defense mechanisms advocated by Hamilton, Madison, and Marshall were realized by the Constitution's ratification in 1789. "Under the Constitution, Congress gained the power of establishing and maintaining an army and a navy, but military power resided primarily in the militia of the states." DAVID C. HENDRICKSON, STATE AND CITIZEN, *Bringing the State System Back In*: *The Significance of the Union in Early American History, 1763-1865* at 124 (2013). Within weeks of the Revolutionary's War's end in September 1783, Congress disbanded the Continental Army, leaving only about 80 veterans to guard military stores at West Point and Fort Pitt. DOUBLER at 16-17. In 1792, Congress enacted the Militia Act, "which prescribed the administration of the militia and authorized an Adjunct General to head the militia in each state. For more than a century, the Act governed the administration of citizen-soldiers and identified the militia as primarily a state rather than a federal institution." *Id.* at 18.

State self-defense powers loomed large in the new nation's public mind. In the late 1780s, settlers in Tennessee were regularly attacked by marauding Indians, and the

settlers formed militia to repel the attacks and retake their lands. ROBERT V. REMINI, ANDREW JACKSON 12-13 (2008). A primary impetus for Tennessee's statehood application to Congress was the federal government's failure to defend the territory against Indian attacks, with Tennesseans deciding in 1794 "that the only way to settle the Indian problem was for Tennessee to become a state and manage its own affairs without any direction from the central government." *Id.* at 17-18.

Even after the War of 1812, the federal Government believed in the 1820s that its national defense role was to be prepared for an attack by a major European power along the Atlantic or Gulf coasts, and that interior defensive matters, particularly in the west, were the responsibility of state and territorial militias. MARY ELLEN ROWE, BULWARK OF THE REPUBLIC: THE AMERICAN MILITIA IN ANTEBELLUM WEST 81-82 (2003).

After the Civil War, as settlers pushed beyond the Mississippi River, they formed militia groups who protected against bandits and vigilantes, guarded prisoners, acted as posses, and controlled riots in the cities. DOUBLER at 43. "A principal function of local militias was to provide security against Indian attacks and to launch reprisal raids. On the Pacific Coast, California created the most substantial militia forces in the West. Kansas developed the most respectable militia organization on the Plains. In the Southwest, New Mexico created the most credible force of citizen-soldiers." *Id.*

Given the consistent State practice of exercising self-defense from colonial times through the Founding and onward through the post-bellum period, courts have correctly

8

affirmed that the State Self-Defense Clause "leaves intact [States'] inherent power to protect their territory." *Arizona v. United States*, 567 U.S. 387, 419 (2012) (Scalia, J., concurring). The limitations in the State Self-Defense Clause are not absolute, but rather permit action when a State is "'actually invaded' or facing 'imminent Danger' not admitting delay." *Melendez v. City of New York*, 16 F.4th 992, 1018 (2d Cir. 2021); *see also id.* at 1018 n.42 (citing *Sveen v. Melin*, 584 U.S. 811, 828 (2018) (Gorsuch, J., dissenting)). And this State authority is at its apex when—as here—the federal government fails to protect a State from invasion. *See Young v. Hawaii*, 992 F.3d 765, 815 (9th Cir. 2021) (citing the prohibition in the State Self-Defense Clause as "corresponding[]" to the federal government's duty to defend against invasion), *vacated and remanded on other grounds*, 142 S. Ct. 2895 (2022).

**II.    It Is the States' Prerogative to Determine When an Invasion Occurs. In Any Event, Constitutional Text and History Shows that Invasions Include Non-State Actors Acting for Private Gain.**

The federal courts have correctly held that what constitutes an "invasion" is a non-justiciable question. *See, e.g.*, *Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996) ("[T]he plaintiffs' Invasion Clause claim is nonjusticiable. The protection of the states from 'invasion' involves matters of foreign policy and defense, which are issues that the courts have been reluctant to consider."); *California v. United States*, 104 F.3d 1086, 1090–91 (9th Cir. 1997) (addressing whether a State had been "invaded" for constitutional purposes would require making "non-judicial policy decision[s]").

The State Self-Defense Clause contemplates invasions from both state or non-state actors. While the clause is commonly understood as a mechanism to thwart attacks by hostile state actors (like Great Britain attacking various American States in the War of 1812), the Clause's text makes no distinction between state and non-state actors. The plain language's critical phrase is "actually invaded, or in such imminent Danger as will not admit of delay." U.S. CONST. art. I, § 10. The Clause does *not* require a State to be actually invaded by or in imminent danger from a *state* actor.

Further, the ordinary meaning of "invade" is not limited to actions by state actors. "Ordinarily courts do not construe words used in the Constitution so as to give them a meaning more narrow than one which they had in the common parlance of the times in which the Constitution was written." *United States v. S.-E. Underwriters Ass'n*, 322 U.S. 533, 539 (1944), *superseded by statute on other grounds*. Webster's 1806 dictionary—the first American English dictionary—defines "invasion" broadly, as meaning "hostile entrance, attack, assault," and defines "invader" as "an assailant, encroacher, intruder."[2] Webster's 1828 dictionary also defines "invade" broadly, to include not just the entrance of a foreign army into a country, but also "To attack; to infringe; to encroach on; to violate."[3] The millions of illegal aliens entering Texas fall within these broad definitions

---

[2] NOAH WEBSTER, A COMPENDIOUS DICTIONARY OF THE ENGLISH LANGUAGE 164 (1806).

[3] 1 NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 113 (1828).

10

of "invade," as they are entering the country in an unlawful manner that encroaches on, violates and burdens the sovereignty of Texas.

As further detailed below, the history of the Constitution's adoption also powerfully shows that the Founders understood the States were sharing certain sovereign powers with the national government, but retaining core self-defense powers against both domestic and foreign threats to their actual security within and adjacent to their territories. The ratification history shows the Framers understood the State self-defense power to be broad, and congruent with the federal power to protect States from invasion, when it came to actions protecting a State's own territory and sovereignty. It would be nonsensical to conclude that either power is artificially limited to invasion by foreign states as opposed to non-state actors, as it would render the State defenseless in the absence of federal support. *See Houston v. Moore*, 18 U.S. 1, 16–17 (1820) (State governments' power over militias and their uses "existed prior to the formation of the constitution, and having not been prohibited by that instrument, it remains with the States").

Moreover, within the Constitution, "invasion" is contrasted with "insurrections," "rebellion," and "domestic violence," showing that the difference is not state versus non-state actors, but rather foreign versus domestic actors. Article I, § 8, cl. 5 gives Congress the power "[t]o provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions." Article I, § 9 provides that "[t]he Privilege

of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." In Article IV, § 4, the clause immediately following the Invasion Clause provides "[t]he United States . . . shall protect each [State in this Union] … on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic violence." In other words, the Framers were concerned about the federal government using the pretext of domestic violence to send other State militias into a State over its objection, and thus created an additional protection to prevent a federal commandeering of State sovereignty. The Framers were not concerned about artificially limiting the type of hostile foreign actors for which protection against "invasion" would apply (or artificially limiting the States' ability to respond and protect their own territories from such threats).

Indeed, James Madison explained in Federalist No. 43, with respect to the Invasion Clause, that "[a] protection against invasion is due from every society to the parts composing it. The latitude of the expression used here seems to secure each state, not only against foreign hostility, but against *ambitious or vindictive enterprises* of its more powerful neighbors." (emphasis added). This two-part definition does not indicate intent by the Framers to limit the protection to only state, as opposed to non-state, actors. As discussed *supra,* the Invasion Clause's plain language applies to "Invasion" and "domestic Violence." Those two categories must be understood to cover the full panoply

PD.44554193.1

of areas where a State might need external protection, and because actions by foreign non-state actors are not "domestic Violence," they must qualify as "Invasion."

The ratification history makes plain that the purposes of the Invasion and State Self-Defense Clauses were both to protect against invasion and to provide *additional* security to the States in the form of assistance of the militias of other States—not to limit a State's power to defend itself against invasion by non-state (as opposed to state) actors. In fact, whereas a major concern in creating a national government was to speak with one voice in foreign affairs, state action against the agents of a foreign government would implicate that concern far more than state action against non-state actors, such as waves of illegal immigrants straining States and their citizens to the breaking point. But it is undisputed that the Constitution expressly reserved the potentially more intrusive power (action against hostile state actors) to the States, and there is no basis to conclude it silently removed a less intrusive power (action against non-state actors). *Cf. Lichter v. United States,* 334 U.S. 742, 756 n.4 (1948) (quoting 9 NICOLAY AND HAY, WORKS OF ABRAHAM LINCOLN 75–77 (1894)) (holding that because the Constitution gives Congress the greater power to raise and support armies, that includes the lesser powers of determining the means by which to do so). Indeed, Madison addressed the lack of conflict between a State's power to defend itself and the national government's war power: States "are restrained from making war, unless invaded, or in imminent danger. *When in such danger, they are not restrained*. I can perceive no competition in these

clauses. They cannot be said to be repugnant to a concurrence of the power." James

Madison, Debate from Virginia Ratifying Convention (June 16, 1788) (emphasis added).

Madison also made clear at the Virginia Ratifying Convention that the protection

against "invasion" applies to non-state actors. He specifically identified "suppress[ing]

smugglers" as an example of a justified use of a State's militia, and he cited with

approval an actual prior case of Virginia calling out its militia to do just that: "There

were a number of smugglers, who were too formidable for the civil power to overcome.

The military quelled the sailors, who otherwise would have perpetrated their intentions."

James Madison, Debate From Virginia Ratifying Convention (June 16, 1788).

The importance of Madison's invocation of smugglers as a species of invaders

cannot be overstated. Smugglers are (1) non-state actors; (2) engaged in trespass against

a sovereign State and its laws; (3) acting for private gain; and (4) are not acting violently

against the State and its citizens. That is precisely what the majority of illegal aliens are:

persons who are smuggling themselves or others into the sovereign States, such as Texas.

The fact that different categories of illegal aliens—*e.g.*, terrorists, agents of foreign

governments, members of varying levels of Mexican smuggling cartels (smuggling both

humans and drugs), criminals (individuals or gang members), or individuals acting for

their own reasons who enter Texas other than at a legal port of entry[4]—may have

---

[4] The day-to-day reality of the invasion in Texas is the various motives and harm blend together. *See* Syndie Henry, *Human Smuggler Causes $150K in Damage Driving through Private Property*, TEXAS SCORECARD (Jan. 10, 2024) ("The smuggler was attempting to evade law enforcement with several illegal aliens in tow and has yet to be caught.").

14

different levels of moral and legal culpability (and differing degrees of "hostility") for invading the United States and Texas, does not change the fact that all members of each category are, in fact, invaders. The practical difficulty the State of Texas would have in differentiating between these different categories of invaders is an additional reason that this question is non-justiciable, with the authority to decide left to the invaded State's governor and Commander-in-Chief. *See* Part IV, *infra.*

Perhaps no State move vividly illustrates the historical practice of the State Self-Defense Clause empowering States to repel invasions from state and non-state actors alike than Texas. After achieving independence from Mexico in 1836, hostilities continued between Texas and Mexico. In the spring and summer of 1842, a series of small-scale raids by Mexican forces culminated in September with 1,600 Mexican troops invading and occupying San Antonio. They were soon repulsed by a much smaller group of Texas militiamen and rangers at the Battle of Salado Creek. T.R. FEHRENBACH, LONE STAR: A HISTORY OF TEXAS AND THE TEXANS 261–62, 478–79 (1968); THOMAS KNOWLES, THEY RODE FOR THE LONE STAR: THE SAGA OF THE TEXAS RANGERS 87-91 (1999). The 1840s witnessed a complete breakdown in the rule of law and civilized order in the Nueces Strip, the area between the Nueces River and the Rio Grande claimed by both Texas and Mexico. KNOWLES at 79. The Strip was overtaken by bandits, raiders, and rampant criminality, leading Texas President Sam Houston to declare martial law in the region and dispatching the Texas Rangers to (successfully) reestablish order and

trade. *Id.* at 94. The Rangers were the Republic's primary means of self-defense throughout its independence. *Id.* at 87.

It was not just the Texas Revolution's immediate aftermath that required Texas to be able to defend herself. After the Mexican-American War of 1848, a weak Mexican government was unable to enforce law and order in its northern States bordering Texas, where petty *caudillos* ruled different border regions as competing warlords. That lawlessness also permitted Indian bands to launch raids into Texas towns and ranches in the borderlands as far east as Corpus Christi. This state of affairs continued for decades at least and, arguably, to the present day. FEHRENBACH at 275–76, 375, 473. While Texans had hoped that annexation to the U.S. would lead to the federal government providing security on the southern border, they were woefully mistaken. KNOWLES at 101.

In September 1859, Mexican outlaw Juan Cortina seized Brownsville, Texas, with approximately 100 men, killing three Americans and one Mexican. Cortina's forces had a series of inconclusive engagements with Brownsville militia and the Texas Rangers over the next three months. Finally, a larger force of Rangers joined with the U.S. Army, forcing Cortina's forces out of Brownsville in December 1859, and driving them west along the Rio Grande Valley, eventually forcing them back into Mexico. FEHRENBACH at 514–15. That Ranger contingent crossed the Rio Grande in February 1860 to protect a steamboat heading towards Brownsville. The Army did not. Thirty-five Rangers, with

16

covering fire from the steamboat, crossed the river and engaged Cortina's men, forcing them to retreat, and then escorted the steamer toward Brownsville. When confronted en route by a larger Mexican force, the Ranger commander announced that if the steamer was attacked by anyone on the Mexican side, the Rangers would return. They crossed back into Texas without incident. *Id.*[5]

From the 1870s until 1911, Texas incurred Mexican banditry (including murder, arson, hostage-taking, and robbery), Indian raids, and cattle theft, and the Texas Rangers routinely rode into Mexico to recover stolen cattle and to pursue the bandits (often with the U.S. Army providing support from the Texas side of the border). FEHRENBACH at 585. At the request of Texas's governor,[6] Texas Ranger Captain Harvey McNelly formed his own raiding party in 1875 to counter the prolific cattle rustling and banditry from Mexico along the South Texas border. ROGER BRUNS, BORDER TOWNS AND BORDER CROSSINGS: A HISTORY OF THE U.S.-MEXICO DIVIDE (2019) at 43. "McNelly

---

[5] Texas was hardly alone in taking the initiative to repel foreign invaders. For example, in what would be the northernmost engagement of the Civil War, Confederate soldiers entering from Quebec attacked the town of St. Albans, Vermont on October 19, 1864, stealing the modern equivalent of more that $20 million from three banks, taking the townspeople hostage, and unsuccessfully attempting to burn the town to the ground. Led by a Vermont militia officer, the Vermonters fought off the attackers, and chased them back into Canada, where they captured the senior Confederate officer. All this was accomplished without any direction or authorization from the federal government. ADAM MAYERS, DIXIE & THE DOMINION: CANADA, THE CONFEDERACY AND THE WAR FOR UNION 105-11 (2003).

[6] Responding to a particularly violent series of attacks instigated by Mexican warlord Juan Cortina against the Nuecestown area in March and April 1874, one newspaper exclaimed in words that might as well have been written today: "[A] humiliating statement . . . Can it be possible that the United States cannot protect her citizens and their property! . . . Has it come to this?". MIKE COX, THE TEXAS RANGERS: WEARING THE CINCO PESO 1821-1900 at 245-55 (2008), quoting Austin *Daily Statesman*, April 15, 1874.

crossed the Mexican border on multiple occasions and attacked Mexican gangs and brought back to the United States much stolen cattle[.]" *Id.*

Texas's southern border troubles continued into the twentieth century. The 1910 Mexican Revolution compounded those troubles, sending large numbers of refugees fleeing into Texas, as well as Mexican dissidents, rebels, and large parties of Mexican raiders who killed and looted on both sides of the border. FEHRENBACH at 572–92, 690–92. Starting in July 1915, the instability fomented by the Mexican Revolution led to large Mexican raiding parties of twenty-five to one hundred men attacking from Mexico, destroying property and infrastructure. Twenty-one Americans were killed, and hundreds of Texans were driven from their homes. BENJAMIN HEBER JOHNSON, REVOLUTION IN TEXAS: HOW A FORGOTTEN REBELLION AND ITS BLOODY SUPPRESSION TURNED MEXICANS INTO AMERICANS 76 (2003).

Like Madison's specific example of Virginia taking action against smugglers, Texas's own history confirms that the State Self-Defense Clause does not confine a State to defending itself against only hostile state actors. The ongoing deluge of millions of illegal entrants across Texas's southern border, and their intertwining with drug cartels and gangs, are a far greater threat to State sovereignty and tranquility than either eighteenth century Virginia smugglers or the episodic banditry that pervaded the Texas-Mexican border in the nineteenth and early twentieth centuries. The State Self-Defense Clause reserves to Texas the sovereign right to repel the ongoing invasion.

18

III.    **The State Self-Defense Power Is Distinct From—and Supports—the Commerce, Naturalization, and Immigration Powers Exercised by the Federal Government.**

Texas's power of defense against cross-border invasion under Article I, § 10 can be exercised in a manner separate from federal immigration law by regaining operational control of the border and ensuring that persons and goods entering Texas go through authorized ports of entry, rather than being illegally smuggled.

States have the power to require persons and goods entering the country to arrive through authorized ports of entry, or by surrendering themselves to federal officials, and the States can do so without infringing on the separate federal powers over immigration, naturalization, and international commerce. *See generally* Ariz. Att'y Gen'l Op. 22-001, *The Federal Government's Duty to Protect the States and the States' Sovereign Power of Self Defense When Invaded* (Feb. 7, 2022). In fact, channeling such persons to authorized ports of entry and interdicting criminal gangs and cartels strengthens federal power by preventing illegal entrants seeking to circumvent federal law and avoid immigration-enforcement officials.[7] After all, the Constitution expressly provides that States retain the sovereign power to execute inspection laws under the Import-Export Clause in Article I, § 10. The Constitution's adoption qualified this sovereign power held by the States, but it did not eliminate it. *See Melendez*, 16 F.4th at 1018

---

[7] The federal government has established twelve authorized land ports of entry on the Texas-Mexico border. *See* U.S. Customs & Border Protection, www.cbp.gov/about/contact/ports/TX (last visited January 21, 2024).

19

("[A]lthough a state generally may not impose import or export duties, it may do so when "absolutely necessary for executing its inspection Laws.") & n.42 (citing *Sveen*, 584 U.S. at 828 (Gorsuch, J., dissenting)).

That port-of-entry power is implicated here. To enforce *any* inspection laws, States *must* be able to take action to ensure operational control of the border and to ensure that persons and goods enter at authorized ports of entry. *See, e.g.*, *Dep't of Revenue v. James B. Beam Distilling Co.*, 377 U.S. 341, 345–46 (1964) ("It is clear that the gravamen of the offense in *Gordon* [*v. Texas*, 355 U.S. 369 (1958) (per curiam),] was the failure to obtain, or even apply for, a permit as required by state law. Such permits, in addition to other functions, *serve to channelize the traffic in liquor* and thus to prevent diversion of that traffic into unauthorized channels." (emphasis added)); *see also generally McCulloch v. Maryland*, 17 U.S. 316, 417 (1819) (discussing that from the express power of establishing a post office, there is the implied power "to punish those who steal letters from the post-office, or rob the mail"). So too, for example, Texas prohibits possession of narcotic drugs such as fentanyl, *see, e.g.*, Tex. Health & Safety Code §§ 481.1022, 481.1123, and human trafficking, *see, e.g.*, Tex. Penal Code §§ 20A.01–.04 ("Trafficking of Persons").

States have themselves actively enforced federal immigration laws. For instance, while the Immigration Act of August 1882 barred pauper immigration and established federal authority over immigration inspection, the Act left immigration administration

20

to be accomplished by state authorities. PATRICK ETTINGER, IMAGINARY LINES: BORDER ENFORCEMENT AND THE ORIGINS OF UNDOCUMENTED IMMIGRATION, 1882-1930 at 39 (2009). This practice persisted through the 1880s. *Id.* During the Great Depression, local and state law-enforcement agencies in Los Angeles conducted large-scale raids and forcibly deported those arrested. *See, e.g.*, FRANCISCO E. BALDERRAMA & RAYMOND RODRIGUEZ, DECADE OF BETRAYAL: MEXICAN REPATRIATION IN THE 1930S 89–90 (2006). Texas plainly has the authority to channel foreign nationals' access to its territory through authorized ports of entry to ensure its own laws are enforced.

## IV. Texas's Governor Has the Authority as Commander-in-Chief to Defend Texas Against the Invasion from Mexico.

As explained above, at the time of the Founding, the State Self-Defense Clause was understood to include a State's right to defend itself against "foreign hostility [and] ambitious or vindictive enterprises of [a State's] more powerful neighbors." *See* Part II, *supra*. This interpretation is supported by, *inter alia*, James Madison's specific example of a state militia acting to suppress smugglers. The principal activity of transnational cartels and gangs at the border is to smuggle people and drugs for profit. Indeed, using the state militia to suppress smugglers was Madison's paradigmatic example of a justified and constitutional use of the state militia. Furthermore, the commonly understood meaning at the time of the word "invasion" covers the activities of the transnational cartels and gangs at the border, as well as those who work with the

foregoing to smuggle themselves. *See* Part II, *supra*. That understanding continues today, as exemplified by the fifty Texas counties that have declared a state of invasion.[8]

Article 4, § 7 of the Texas Constitution fits hand-in-glove with the federal Constitution's State Self-Defense Clause, providing that the Governor "shall be Commander-in-Chief of the military forces of the State, except when they are called into actual service of the United States. *He shall have power to call forth the militia to execute the laws of the State*, to suppress insurrections, *and to repel invasions*." (emphasis added). Texas's military forces are created by statute, TEX. GOV'T CODE §§ 437.001 *et seq*., and include the Texas National Guard, Texas State Guard, and any other military force created under state law. TEX. GOV'T CODE § 437.001(14).

The discretion afforded the Governor of Texas under the State Self-Defense Clause and his Commander-in-Chief authority is akin to that of the President. Just as the President has "exclusive authority to decide whether the [foreign or domestic] exigency has arisen" for purposes of Article I, § 8, cl. 15, *Martin v. Mott*, 25 U.S. 19, 29–30 (1827) (Story, J.); *see also Luther v. Borden*, 48 U.S. 1, 39 (1849) (stating "that it rested with the political power to decide whether the charter government had been displaced or not" as it relates to U.S. Constitution Article IV, § 4), so too the Texas Governor has exclusive authority to decide whether the foreign or domestic exigency has arisen under Article I,

---

[8] Bethany Blankley, *Three More Texas Counties Declare Invasion, Bringing Total to 50*, CENTER SQUARE (Jan. 6, 2024).

§ 10, cl. 3, *Moyer v. Peabody*, 212 U.S. 78, 83–86 (1909) (Holmes, J.). And because "the nature of the power itself" "necessarily" confers discretion, federal and State exercises of this power are subject only to the *same* good faith constraint—not judicial second-guessing. *Sterling v. Constantin*, 287 U.S. 378, 399 (1932).

Indeed, the Founders took for granted that conflicts could arise between the federal Government and individual States as to what measures were appropriate for protecting their respective sovereign spheres.  As Alexander Hamilton explained:

> If the representatives of the people betray their constituents, there is then no resource left but in the exertion of that original right of self-defence, which is paramount to all positive forms of government; and which, against the usurpations of the national rulers, may be exerted with infinitely better prospect of success . . .
> . . .
> Power being almost always the rival of power; the General Government will at all times stand ready to check the usurpations of the state governments; and these will have the same disposition towards the General Government. The people, by throwing themselves into either scale, will infallibly make it preponderate. If their rights are invaded by either, they can make use of the other, as the instrument of redress. How wise will it be in them by cherishing the Union to preserve to themselves an advantage which can never be too highly prised!

THE FEDERALIST No. 28 at 180-81. In other words, conflicts between federal and State governments over the proper exercise of self-defense were to be resolved by the people—through politics.

In its lawless obsession to open America's borders, the current Presidential Administration frequently invokes the Constitution's Supremacy Clause.  U.S. Const., art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made

in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land"). But *the Supremacy Clause does not make the federal government, nor the current presidential administration, supreme. It makes the federal Constitution supreme*, and that Constitution recognizes the coordinate right of States to defend themselves against invasion, most especially when the federal government has failed to carry out this critical responsibility assigned to it at the creation of the federal Union.

Stated differently, the Supremacy Clause does not subordinate Texas' Constitutional authority to that of the federal government to a) solely determine if it is being invaded, and b) to repel any invasion. The Self-Defense Clause makes clear that Texas' authority to determine that it is being invaded and to repel any invasion may not be interfered with by either the federal government nor the Courts.

The Founding-era understanding of the States' right to self-defense demonstrates that unreviewable authority resides with the Governor of Texas to decide if and when Texas has been invaded, and what, if anything, he will do to repel such invasion under Article 4, § 7 of the Texas Constitution. Upon the adoption of the federal Constitution, the State of Georgia was America's southwest border. It is obvious why the Governor of Georgia would have *necessarily* had the sole authority under the Self-Defense Clause of the Constitution to decide whether Georgia was suffering an invasion, as well as having the sole authority to use all state resources to repel such an invasion. In 1789, it

PD.44554193.1

would have taken months for the Governor of Georgia to communicate the fact of an invasion to the nation's then-capital in New York City and to receive either permission to act, or the deployment of federal officers to contend with the invasion. Hence, it is readily comprehensible that border Governors had to have the authority to contend with invasions immediately, without judicial review, and on their own authority. That authority was retained for such state officers in the Self-Defense Clause.

The fact that today's communication between a border-state governor and the federal government can now be accomplished in moments instead of weeks, and transportation can be accomplished in hours instead of months, does not change either the locus or scope of border-state governors' retained authority as their States' Commanders-in-Chiefs to contend with invasions directly, and regardless of the federal government's chosen response.

## CONCLUSION

Article I, § 10, cl. 3 of the Constitution reserves to the Governor of Texas sole and unreviewable authority to make the determination that Texas is being invaded,[9] and to decide how best to repel such invasion. As such, this Court should dismiss this case as non-justiciable, thereby allowing Governor Abbott to exercise his full constitutional authority to secure the entire Texas-Mexico border in between the legal ports of entry established by the federal government of the United States.

---

[9] Governor Greg Abbott, Notification to President Biden that Texas Is Being Invaded (November 16, 2022), *available at* https://gov.texas.gov/uploads/files/press/BidenJoseph_11.16.22.pdf.

PD.44554193.1

Dated: February 24, 2024                    Respectfully submitted,

                                            */s/ Kenneth T. Cuccinelli, II*
                                            Kenneth T. Cuccinelli, II
                                                *Counsel of Record*
                                            CENTER FOR RENEWING AMERICA
                                            300 Independence Ave. SE
                                            Washington, D.C. 20003
                                            Telephone: (202) 656-8825

                                            *Attorney for* Amicus Curiae
                                            *Center for Renewing America*

                                            D. Michael Hurst, Jr.
                                            PHELPS DUNBAR LLP
                                            4270 I-55 North
                                            Jackson, MS 39211
                                            (601) 352-2300

                                            *Local Counsel for* Amicus Curiae
                                            *Center for Renewing America*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5), 32(a)(7), and Fifth Circuit Rule 32.3 because it contains 6,490 words, excluding the parts of the brief exempted by Rule 32(f).

This brief complies with the typeface requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6), and Fifth Circuit Rule 31.1 because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point for the main text and 12-point font for the footnotes.


Dated: February 24, 2024                    Respectfully submitted,

                                             */s/ D. Michael Hurst, Jr.*
                                             D. Michael Hurst, Jr.

## CERTIFICATE OF SERVICE

I electronically filed the foregoing with the Clerk of Court for the U.S. Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. All counsel of record are registered CM/ECF users and will be served by the appellate CM/ECF system.

Dated: February 24, 2024                    Respectfully submitted,

                                            */s/ D. Michael Hurst, Jr.*
                                            D. Michael Hurst, Jr.