

## KEN PAXTON
ATTORNEY GENERAL OF TEXAS

Aaron L. Nielson
Solicitor General

(512) 936-2834
Aaron.Nielson@oag.texas.gov

March 1, 2024

**Via CM/ECF**

Lyle W. Cayce, Clerk
U.S. Court of Appeals for the Fifth Circuit

**Re:    No. 23-50632, *United States v. Abbott* (en banc)**

Dear Mr. Cayce:

On February 9, 2024, some members of the Court expressed concern about the district court's proposed 60-day trial schedule and urged the district court to consider "both parties' explanations as to what they regard as reasonable dates [for pre-trial proceedings] and to further modify the [trial] schedule …." ECF 142-2 at 9 (Willett, J., concurring). The parties thereafter jointly moved the district court to vacate its order setting a trial schedule, and the district court ordered a status conference on February 22, 2024.

At the status conference, the district court proposed a trial date of April 16, 2024. After hearing from the parties, however, the district court set trial for August and entered orders setting a hearing on Texas's pending Motion to Dismiss for March 19, 2024, and a trial on the merits for August 6, 2024. The scheduling orders and a transcript of the status conference are attached.

Respectfully submitted,

/s/ Aaron L. Nielson

Aaron L. Nielson
Solicitor General

cc: All counsel of record (via CM/ECF)

# Attachment A:
Order Scheduling Hearing on Motion to Dismiss,
ECF 90, No. 1:23-cv-853-DAE
(W.D. Tex. Feb. 23, 2024)

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| United States of America., | § | |
| | § | |
| Plaintiff, | § | NO:  AU:23-CV-00853-DAE |
| vs. | § | |
| | § | |
| Greg Abbott, et al. | § | |
| | § | |
| Defendants. | § | |

## ORDER SETTING MOTION HEARING

It is hereby ORDERED that the above entitled and numbered case is set for **an in person** hearing on the pending Motion to Dismiss for Failure to State a Claim (Dkt no. 62) before Senior U.S. District Judge David A. Ezra in Courtroom 2, on the Fourth Floor of the United States Courthouse, 501 West Fifth Street, Austin, TX, on **Tuesday, March 19, 2024 at 09:00 AM**.

IT IS SO ORDERED.

DATED: Austin, Texas February 23, 2024.

_____
DAVID A. EZRA
SENIOR U.S. DISTRICT JUDGE

# Attachment B:

Order Scheduling Trial on the Merits,
ECF 91, No. 1:23-cv-853-DAE
(W.D. Tex. Feb. 23, 2024)

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| United States of America., | § | |
| | § | |
| Plaintiff, | § | NO:   AU:23-CV-00853-DAE |
| vs. | § | |
| | § | |
| Greg Abbott, et al. | § | |
| | § | |
| Defendants. | § | |

## ORDER RESETTING BENCH TRIAL

IT IS HEREBY ORDERED that the above entitled and numbered case is reset for a Non-Jury Trial in Courtroom 2, on the Fourth Floor of the United States Courthouse, 501 West Fifth Street, Austin, TX, on **Tuesday, August 06, 2024 at 09:00 AM**.

IT IS SO ORDERED.

DATED: Austin, Texas February 23, 2024.

_____

DAVID A. EZRA
SENIOR U.S. DISTRICT JUDGE

# Attachment C:

Transcript of February 22, 2024, Status Conference,
No. 1:23-cv-853-DAE
(W.D. Tex. Feb. 29, 2024)

| 1 | UNITED STATES DISTRICT COURT |
| 2 | FOR THE WESTERN DISTRICT OF TEXAS<br>AUSTIN DIVISION |

```
 1                    UNITED STATES DISTRICT COURT
                    FOR THE WESTERN DISTRICT OF TEXAS
 2                         AUSTIN DIVISION

 3   UNITED STATES OF AMERICA,     )
     Plaintiff,                    )
 4                                 )Case No.
     vs.                           )AU-23-CV-00853-DAE
 5                                 )
     GREG ABBOTT, in his capacity  )Austin, Texas
 6   as Governor of Texas, and THE )
     STATE OF TEXAS,               )
 7   Defendants.                   )February 22, 2024
     **********************************************************

 8

 9                    TRANSCRIPT OF STATUS CONFERENCE
                    BEFORE THE HONORABLE DAVID A. EZRA
10                  SENIOR UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   FOR THE PLAINTIFF:

13   KIMERE J. KIMBALL, ESQUIRE
     BRIAN LYNK, ESQUIRE (appeared telephonically)
14   ANDREW KNUDSEN, ESQUIRE (appeared telephonically)
     BRIAN HARRISON, ESQUIRE (appeared telephonically)
15   ANGELINE PURDY, ESQUIRE (appeared telephonically)
     Department of Justice
16   Environment and Natural Resources Division
     P.O. Box 7611
17   Washington, DC  20044
     (202)514-2285
18   kimere.kimball@usdoj.gov

19   FOR THE UNITED STATES DEPARTMENT OF JUSTICE WESTERN DISTRICT:

20   MARY KRUGER, ESQ.
     LANDON A. WADE, ESQ.
21   601 Northwest Loop 410 #600
     San Antonio, Texas  78216
22   (210)384-7100

23

24

25

                    U.S.D.C. Official Court Reporter
                           Lisa A. Blanks
```

1  APPEARANCES: (CONT'D)

2  FOR THE DEFENDANTS:

3  MONROE DAVID BRYANT, ESQUIRE
   JOHNATHAN STONE, ESQUIRE
4  MUNERA AL-FUHAID, ESQUIRE
   RYAN D. WALTERS, ESQUIRE
5  JACOB E. PRZADA, ESQUIRE
   KYLE TEBO, ESQUIRE
6  Texas Office of the Attorney General
   Special Litigation Division
7  209 W. 14th Street, 7th Floor
   Austin, Texas   78701
8  (512) 936-2172
   david.bryant@oag.texas.gov

9

10

11

12

13

14  **COURT REPORTER:**
    **Lisa A. Blanks, CSR, CRR, RPR**
15  **Official Court Reporter, U.S.D.C.**
    **262 West Nueva Street**
16  **San Antonio, Texas   78207**
    **(210) 244-5038**
17  **lisa_blanks@txwd.uscourts.gov**

18  **Proceedings reported by stenotype, transcript produced by**
    **computer-aided transcription.**

19

20

21

22

23

24

25

1    *(Thursday, February 22, 2024, 9:08 a.m.)*

2                                    *   *   *

3              THE CLERK:  23-CV-853, United States of America versus

4    Abbott, et al.

5              THE COURT:  Good morning to all of you.  So we are

6    here this morning to -- and I expedited this because the State

7    is apparently concerned about the dates.

8              So we're here on a joint motion to continue dates.

9    Would counsel like to make their appearances, please, for the

10   record.

11             MS. KIMBALL:  Good morning, your Honor.  I'm Kimere

12   Kimball.  I'm here today from the Department of Justice.  With

13   me is Mary Kruger and Landon Wade from the U.S. Attorney's

14   Office, and on the phone we have Brian Lynk, Andrew Knudsen,

15   and Brian Harrison and Angeline Purdy also from the Department

16   of Justice.

17             THE COURT:  Yeah, they're not going to do any -- make

18   any statements; they're just going to listen?

19             MS. KIMBALL:  That's correct, your Honor.

20             THE COURT:  All right.

21             MR. BRYANT:  Your Honor, David Bryant on behalf of

22   defendants from the Attorney General's office.  I have with me

23   Jonathan Stone, Munera Al-Fuhaid, Ryan Walters, Jake Przada and

24   Kyle Tebo, all from the Texas Attorney General's office.

25             THE COURT:  Okay.  My goodness, for the first time in

1  a long time we're missing your friend with the beard over here

2  in the corner.

3        UNIDENTIFIED SPEAKER:  Mr. Sullivan, your Honor?

4  Yeah, he's not here today.

5        MR. BRYANT:  But the Office of the Governor is well

6  represented.

7        THE COURT:  I'm sure they are.  But, I mean, I see him

8  all the time.  I feel like, you know, as many state cases as

9  I've had in my career, that I always see him.  He's a very,

10  very nice man, I think, and I -- it's enjoyable to have him

11  here in court because he'll -- occasionally I'll allow him to

12  make a comment or something.

13        All right.  Let's get down to business.

14        So we're here to -- on this joint motion.  Now, I

15  think we need to clear a few things up.  Let's get some dates

16  out on the record that have occurred in this case.

17        This complaint was filed by the United States way back

18  on June 24th of '23.

19        On September the 6th of '23, I granted, after a

20  hearing, a request for a preliminary injunction.  There was an

21  appeal filed on that day, on September the 6th.

22        I mean, actually the day I entered it, the appeal was

23  filed.

24        So the State was really trying to move it along.

25        On October 23rd, the United States filed an amended

1  complaint.  The defendants, to my knowledge -- I don't check

2  the docket every day so this may have happened and I'm not

3  aware of it.  But to my knowledge, the defendants -- the State

4  has not responded to that complaint, have not filed an answer.

5          MR. BRYANT:  Your Honor, we did respond to the

6  complaint as directed by the Court on December 6th, 2023, with

7  a --

8          THE COURT:  I'm talking about the amended complaint.

9  I'm talking about the amended complaint.

10          MR. BRYANT:  The amended complaint.

11          THE COURT:  You did answer the amended complaint?

12          MR. BRYANT:  No.  We did file motions to dismiss.

13          THE COURT:  Okay.  All right.

14          MR. BRYANT:  Those were fully briefed by early January

15  and are still pending.

16          THE COURT:  Right.  So I was correct.  There has been

17  no answer to the amended complaint, which is the operative

18  complaint in this case now.

19          MR. BRYANT:  That is correct, your Honor.  Our time to

20  answer hasn't come yet.

21          THE COURT:  No.  That's right.  I'm not criticizing

22  you for not answering.  I'm just trying to get the record

23  straight.  The operative complaint is the amended complaint.

24  It subsumes the original complaint.  And so unless I grant the

25  motion to dismiss in whole and dismiss the whole case, the

1  Government, State Government has to file an answer.  That

2  hasn't been done.

3           MR. BRYANT:  That's correct, your Honor.

4           THE COURT:  All right.

5           MR. BRYANT:  And, of course, the Court could grant the

6  motion to dismiss in part which would have a big effect on what

7  we need to do in discovery.

8           THE COURT:  And we're going to get to that, and I'm

9  going to do that as quickly as I possibly can.

10          All right.  On October -- I'm sorry.  On January

11 the 19th, this Court held a status conference, and I set

12 deadlines and a trial date.  That was -- that resulted in

13 the -- after the hearing, the defendants filed an appeal with

14 the Fifth Circuit, which they construed as a writ of mandamus,

15 to attempt to require me to vacate that trial date.

16          As we all know, there was a flurry of opinions out of

17 the Fifth Circuit.  I really have never in my career seen

18 anything quite like it, ever, either sitting as a circuit judge

19 by designation in the Ninth Circuit, which I do three times a

20 year, and have for 30 years, or as a trial judge.

21          I've never seen a flurry of -- and I have received

22 calls from judges, circuit judges and district judges from all

23 over the United States, telling me the same thing.  They just

24 really have never seen anything quite like that flurry of

25 opinions.

1    And that's fine.  I mean, that's the Fifth Circuit's

2  right.  They can do -- they can write what they wish.  That's

3  absolutely -- I have no control over that.  I have no right to

4  suggest that I do and I don't.  And I certainly have no --

5  absolutely no personal animus against any circuit judge in the

6  Fifth Circuit.

7    In fact, many, many of those circuit judges, including

8  a few who were in the dissent, are friends -- well, one that

9  was in the dissent, are friends of mine and have been.  And, in

10  fact, we serve on the same committee together.  Judge Smith,

11  who's a fine guy, and I have a great deal of respect for.

12    The one concern, of course, that I have is that -- and

13  this was, I think, the reason -- and it's now become the fodder

14  of public comment where people are actually writing articles

15  about it -- is the fact that we have this situation where Judge

16  Ho mostly, but a little bit in Judge Oldham, but mostly Judge

17  Ho, are writing these advisory opinions on the merits of the

18  case, and it is concerning.  Not for me, I don't care, I don't

19  pay any attention to it at all.

20    Federal judges are not supposed to be writing advisory

21  opinions.  It's prohibited.  That's part of Article III.  The

22  issue before the Court was whether I was right or wrong in

23  setting a trial date, and whether it was mandamus-able.

24    And that went to the issue of timing, basically.

25  People getting ready, do they have time to get ready; not the

1   merits of the case.

2          The merits of the case was not what was in front of

3   the Court in mandamus.  It's very, very reminiscent of another

4   situation I had, unfortunately, with Judge Ho, and to a degree,

5   although she didn't write an advisory opinion, I have to say,

6   let's see, Judge -- she was a chief judge, Judge Jones.

7          I should know that, because Judge Jones' father was my

8   wife's family physician in San Antonio.  Wonderful man and an

9   excellent physician, by the way.

10         In any case, I noted that Judge Jones did not join in

11  any of the dissents in this case, either.

12         But Judge Jones and Judge Ho excoriated me in the

13  fetal tissue case, fetal burial case, we call it, because I had

14  a -- it was a totally unrelated matter that had nothing to do

15  with the merits of the case.  Nothing, zero to do with the

16  merits of the case.

17         There was a question about whether the Catholic

18  bishops had to turn over records relating to the number of

19  fetal tissue burials that they would take in the case, and I

20  ordered that they turn over a limited number of records.  And

21  the lawyers came to me and asked me if I couldn't possibly

22  expedite my ruling and essentially get it to them so that they

23  could work over the weekend, because the trial was to start,

24  you know, the following week, early.

25         And it was Father's Day and I wasn't all that

1 thrilled.  I'm a father of three daughters and I have seven

2 grandchildren and I like to be home for Father's Day.

3          But I did what they asked and I got my order out.

4 Well, I got excoriated by Judge Jones and Judge Ho for making

5 these Catholic lawyers and so forth work over Father's Day.

6          Well, the fact of the matter is, of course, they had

7 asked me to do exactly that.  And I think the implication was

8 that I was somehow, I don't know, anti-Catholic, I don't know.

9 It doesn't make any sense, because I certainly -- anybody who

10 knows me knows that I am absolutely not anti-Catholic.  The

11 opposite is true for reasons I won't get into here.

12          But I happen to be Catholic.

13          In any event, in his concurrence with Judge Jones,

14 Judge Ho decided to tell us that the -- and he says it flat

15 out, that the fetal burial law is perfectly constitutional.

16 That went right to the heart of the merits of the case, one

17 part of the case.  Absolutely right to the heart -- and it was

18 totally gratuitous.  It had nothing to do with what was before

19 the Court.

20          And, apparently, Judge Jones -- Judge Ho -- to her

21 credit, as I say, Judge Jones did not join in that.

22          Judge Ho did it again here.  I've got it right in

23 front of me.  He told us why, in this opinion, in his view, the

24 invasion clause of the Constitution allows the governor to do

25 what the governor has done.

U.S.D.C. Official Court Reporter
Lisa A. Blanks

1              Now, that goes to the merits of the case.

2              And then, apparently, here's an article that was

3    written on the 20th of -- February 20th of this month.  It

4    says, *"Fifth Circuit keeps Texas Anti-Drag Law on Ice as*

5    *State's Appeal Proceeds.*  Judge -- this is the article -- Judge

6    James Ho, though, wrote that, "Texas should immediately be

7    allowed to enforce the law despite the district judge's ruling

8    that the law is unconstitutional."  And he apparently gave his

9    own reasons on the merits.

10             Now, it's a problem because Judge Ho could find

11   himself recused from some of these cases if he isn't careful.

12   That's what it's going to boil down to.  Because it's totally

13   unfair to the opposing party to have the judge weigh in on the

14   merits of the case in a matter that doesn't go -- now, he may

15   disagree with me.  He may think that he has every right to go

16   to the merits, and he may disagree with me that his comments

17   don't go to the -- even though he tried to fashion them as

18   such, this was a -- in this case, this was a mandamus.  That's

19   all it was, a mandamus.

20             If you look at Judge Douglas's opinion, joined in by

21   the majority of the judges who said I did nothing wrong, she

22   didn't go to the merits.  She discussed solely and only the

23   issue of what was before the Court.  And even Judge Willett

24   didn't, you know, opine on the merits.

25             Now, as I say, Judge Ho is a very bright jurist.

1  There's no question about it.  And, you know, he is entitled to
2  do whatever he wants to do.  It's not up to me.  But it is
3  burdensome on this case to have a situation out there where we
4  already have a judge who's decided in his own -- in his
5  writings -- he's citing to us, the Federalist Papers, Madison.

6          Well, you know, I have been looking at Federalist
7  Papers, too.  I'm something of an academic.  I've taught law
8  school, federal courts and advanced civil procedure, for 38
9  years.  I'm not unfamiliar with the library, I can assure you,
10 and it is what it is.

11         Now, some people would say, *Gee, judge, you know,*
12 *you're making these statements.  Judge Ho is going to come*
13 *after you or this may put you in a bad way with the Fifth*
14 *Circuit.*  I don't think so.  The Fifth Circuit judges are
15 distinguished judges.

16         Oh, and by the way, now that -- before I forget to
17 mention it, because some of you may not know about the fetal
18 burial case.  I actually agreed with Judge Ho in the end that
19 the state law was constitutional, and I did that despite the
20 fact that the Tenth Circuit at the time, which was the only
21 decision on exactly the same law, had ruled that it was flat
22 out unconstitutional.

23         That case went to the Supreme Court, and a year and
24 half or so after I made my ruling, the Supreme Court reversed
25 the Tenth Circuit and found the law to be constitutional, as I

1   had.

2         So I agree with Judge Ho.  He and I agree on many

3   issues.  And he is a very bright judge.  He's a very -- I knew

4   of him long before he was, you know, a circuit judge.  Very

5   bright, very capable, but he's -- he's just going to get

6   himself recused from cases, because if a party on the other

7   side says, *Wait a minute, we can't have a judge on our case*

8   *that's already decided the case and we haven't even* -- somebody

9   made the argument, it may have been Judge Oldham, that I had

10  made a decision before hearing argument.

11        And then I thought to myself, yikes, the other dissent

12  is much worse.  It's a decision on the merits before hearing

13  argument.  Either hearing argument in the -- they -- there's

14  been no argument in the appeal, the en banc appeal.  That

15  hasn't been argued yet, let alone my case.  And it also boils

16  over into SB4.

17        So in a situation like that, the chief judge might

18  have to refer it to the chief justice of the Supreme Court to

19  have another circuit hear whether he should be recused.

20        So, I mean, it's a shame because he's a very bright

21  guy.  He's very capable.  He is certainly entitled to his

22  opinions, but it comes -- there comes a time when somebody has

23  to step up to the plate and say this is just not a good thing.

24        Issuing advisory opinions, which these were -- I mean,

25  I -- he may try to suggest that this one on this isn't, but it

1  was.  But nonetheless, clearly the one in the fetal burial case

2  was.  He just flat out said the law's constitutional.  How do

3  you -- what is that?  That's called an advisory opinion.

4       We hadn't even tried the case.  The discovery dispute

5  had nothing to do with the merits.  And, in fact, the bishops

6  weren't even party to the case, weren't even party to the case.

7       Anyway, I'll leave that as it may.

8       Now, I could deny this motion, because in spite of the

9  fact that one of the dissents said something about my being

10  ordered.  There's no order anywhere in -- believe me, I looked.

11  There's no order anywhere in the multiple decisions that have

12  been -- that were issued, multiple opinions that were issued in

13  the -- from the en banc court on the denied motion for mandamus

14  that compelled me to do anything.

15       There are a number of suggestions.  Judge Willett

16  makes a suggestion, but not an order.

17       And so I could deny this motion, but the question is;

18  why would I?  I want the parties to have every opportunity, and

19  I always have, to properly and absolutely be thoroughly

20  prepared.

21       I was under the impression that given the lengthy

22  amount of time we've had and the fact that Texas had always

23  pressed to move quickly, I mean, look -- I mean, everything

24  that Texas has filed has been like either on the day of or the

25  day after the ruling.

1          Texas has made every effort to move quickly.  And I

2     had arguments in front of me in this case early on where Texas

3     wanted to resolve this quickly.

4          It was only when the thing went en banc that all of a

5     sudden Texas decided *Maybe now we want to move slow because*

6     *maybe we'll get a favorable decision out of the en banc court*

7     *that might do something or other.*

8          I don't know, but there was never, ever any type of --

9     there are too many conspiracy theorists floating around these

10    days.  There was never any conspiracy by me to try to usurp the

11    authority or power of the Fifth Circuit.  It's the most

12    ridiculous thing I've ever heard.

13         First of all, no district judge, here or anywhere

14    else, can usurp the authority of the United States Court of

15    Appeals.  It doesn't happen.  It can't happen.  And it was

16    never, ever my intention to attempt to do something so stupid.

17         I was just trying -- as Judge Douglas pointed out, I

18    was just trying to get this thing done as quickly as possible,

19    because I have a lot of other things on the plate, including

20    the SB4 matter, which I'm trying to get out as quickly as I can

21    for the benefit of the lawyers because they want me to get it

22    out quickly.

23         Now, I'm sure that when I get that out, somebody's

24    going to suggest that I, in some way, shape or form, rushed

25    along my opinion.  When you read my opinion, you will see it

1    wasn't rushed out.  My job is to do a thorough job of getting

2    an opinion that will thoroughly and correctly answer and

3    respond to all of the arguments made by both sides, period.

4          And then that, as I said before, as I said during the

5    SB4 hearing, that will go on appeal, and I firmly expect that

6    will go to the Supreme Court.  It has to, because of the nature

7    of it, and the arguments being made by the State and the

8    federal government.  Absolutely, I think that one will go.

9          So I'm not trying to rush anything.  There's no need

10   to rush anything.

11         Oh, one other thing.  Early on in one of the opinions,

12   I think it was my friend Judge Willett, who I have a great deal

13   of respect for, and I've said so in writing, wondered why, if I

14   was so interested in -- and so -- in this case, and believed so

15   thoroughly in my opinion, why didn't I order the State to

16   completely remove the buoys from the river instead of just

17   ordering them to go to the bank?

18         Well, I'll tell you why, and I think the lawyers

19   understand this, although apparently some of the appeals court

20   judges weren't carefully informed of this, which is not their

21   fault.

22         I knew because in virtually every case that's decided

23   in this courthouse involving the State of Texas, they

24   immediately seek a stay and an appeal if they get an

25   unfavorable ruling.  I can't remember the last one that that

1   didn't happen in.

2          I did not want to be in the position of ordering the

3   State to move all of that equipment, that buoy, and put it on

4   the bank.  Not against -- not in the river along the bank, but

5   to pull it out of the river at great expense to the taxpayers

6   in the state of Texas, only to have the Fifth Circuit issue an

7   order.

8          Now, you talk about a judge trying to clip the Fifth

9   Circuit?  That's what I could have done.  I could have ordered

10  the governor immediately to remove it that day, get it out of

11  there, start moving it.  Now, he would have run to the Fifth

12  Circuit, of course, and maybe an order would have issued, but I

13  didn't try that.

14         Why would I do that?  I understood, and I appreciate,

15  and I respect the appeals process.  I participated in that

16  process my entire career as a federal judge, both as a district

17  judge and sitting by designation on the Court of Appeals, and I

18  have great respect for the Fifth Circuit and the judges there.

19         So this is not a criticism of the Fifth Circuit or the

20  judges there and I hope that the media understands that.  It's

21  a concern with some practices that have been going on by a few

22  judges.  I'm not painting the entire Fifth Circuit with a broad

23  brush.

24         But I -- and then what if the Fifth Circuit for

25  whatever reason couldn't get to it, or they -- you know, or the

1  administrative stay wasn't issued; the thing would be sitting

2  out there -- and then if the Fifth Circuit reversed either the

3  three-judge panel -- the three-judge panel, as you know,

4  affirmed by the State, I could have at that point run and

5  ordered the thing out.  I didn't.  I got criticized for that.

6         I didn't.  Why?  Same reason, because I knew that

7  there would be a request for an en banc, and I waited until

8  that was resolved, and -- because, again, I was concerned that,

9  for them to pull that thing out, sit it on the bank, and then

10 if I were to get reversed or the Fifth Circuit were to make

11 some other order, they would have to reassemble everybody and

12 put it back in the water, which would cost a tremendous amount

13 of money to the state taxpayers.

14        Why do that?  Had nothing at all to do about my belief

15 in the correctness of my ruling.  If I didn't think my ruling

16 was correct, I certainly wouldn't rule that way.  Why do that?

17        Believe me, you know, when I ruled in favor of the

18 State of Texas in the fetal burial case, I was getting some

19 pretty substantial criticism from the other side of the fence,

20 from the left, some kind of a state lackey or something,

21 when -- somebody called me -- Governor Abbott's lackey.

22 Honestly.  Honestly.  And there were -- and it was worse.  I'm

23 not going to go into the details.

24        I get criticism.  You know, no matter what you do,

25 they come after you.  No one, when they come into federal

1  court, is entitled -- entitled to win the case.  What they are

2  entitled to is to have their arguments heard, the Court

3  carefully and thoroughly review their arguments and the

4  evidence and the law, and make a thorough and complete ruling,

5  which one side or the other is not going to be happy with.

6       And then we have a, I call it almost a sacred appeals

7  process, where they can then seek additional relief from the

8  Court of Appeals, and then, ultimately, the United States

9  Supreme Court.

10      And that's the way it should be.  And this business of

11 issuing half rulings on the merits before the case is even

12 tried or the merits -- it's just not a -- it's not consistent

13 with that philosophy.  Federal judges are judges.  We are not

14 legislators.  We're judges.  And so we're heavily -- let me

15 just leave it there.  I'll leave it there.

16      All right.  Your motion, by the way, is granted.  So I

17 am looking at -- I don't have -- you know, just give me a trial

18 date.  I have to pick a date which is going to be able to fit

19 on my calendar.

20      You know, I know that it looks like all I do -- and in

21 fact, sometimes it looks that way to me -- is handle these big

22 state cases involving these monumental issues.

23      The fact of life is I handle all kinds of cases here.

24 I've got a trial next week; an individual claims they were

25 discriminated against by a -- by a car dealership and they're

1    claiming damages under Title VII.  That's a pretty typical kind

2    of case.  Nobody cares about that case except the people who

3    are involved in that case, and they care a lot.  And because

4    they care a lot, so do I.  I treat every case with the same

5    importance.

6          I had a case that was going to -- that did settle

7    where somebody slipped and fell at a Dollar General.  Now, on

8    the spectrum of national importance, probably these cases are

9    at the opposite ends, right?  But for the person who slipped

10   and fell, I would think they would think that was a pretty

11   important case, all right, and I treat it as such.  But it

12   settled.  But I would have had a trial here.

13         So I've got a lot of the kinds of trials that Judge

14   Pitman and I have on a regular basis and that's the way it

15   goes.

16         So I'm looking at Tuesday, April the 16th; and we can

17   then fit in the other deadlines, which I'm going to leave to

18   the magistrate judge, and those include the disclosure of

19   expert witnesses by the United States and Texas, the close of

20   fact discovery, disclosure of expert opinion reports, close of

21   expert discovery, proposed findings of fact and conclusions of

22   law, pretrial submissions, including identification of

23   exhibits, witnesses and who may or will be called at trial.

24         We usually don't have a lot of witnesses in these

25   cases, but we may; witnesses whose testimony expected to be

1   presented by deposition and estimated probable length of trial.

2         And any objections to any pretrial submissions, we

3   will -- that will be set by the magistrate judge.  Because --

4   who are you?

5         MR. STONE:  Your Honor, my name is Jonathan Stone.

6   I'm here on behalf of the State.

7         THE COURT:  Oh.  All right.  Have you been here

8   before, Mr. Stone?

9         MR. STONE:  Not on this case, your Honor.

10        THE COURT:  Oh, okay.  See, I'm pretty good with

11   faces.  I didn't remember you on this case.

12        Yes, sir?

13        MR. STONE:  Your Honor, we've been in communication

14   with the federal government about the discovery schedule in

15   this case.  And at least from the State's side, a trial date in

16   April is simply not feasible because of the experts in this

17   case, your Honor.  In order to get experts, we have to go

18   through a whole process --

19        THE COURT:  When is the en banc supposed to be heard?

20        MR. BRYANT:  Your Honor, I believe that's May 24th.

21        THE COURT:  Oh.

22        MR. BRYANT:  Or, I'm sorry, it's in May.

23        THE COURT:  It's in May.  That's when the argument is?

24        MR. BRYANT:  Yes, your Honor.

25        THE COURT:  I don't want to get accused again of

1  somebody going, *Oh, he's back at his conspiracy.  He's trying*
2  *to cut off the Fifth Circuit.  He's trying to rob them of their*
3  *jurisdiction.*

4          MR. STONE:  Yes, Your Honor.

5          THE COURT:  My problem is, I am not available in the
6  latter half of -- I've got something else that has to be done,
7  and I'm not available in the last half of May and I'm not
8  really of the opinion that this thing ought to hang around
9  until June or July.

10         MR. STONE:  Your Honor, we were thinking more of
11 September, a September date.

12         THE COURT:  September?

13         MR. STONE:  September, your Honor.  We need time to --

14         THE COURT:  No, that's not going to work.  September
15 will not work.

16         MR. STONE:  Well, but, your Honor, there's at least
17 five experts that they've identified so far --

18         THE COURT:  Counsel, let me tell you something.  I am
19 not afraid to run afoul of somebody accusing me of rushing this
20 along, okay.  September is just way too long.  I have
21 complicated civil trials, complicated civil trials who have
22 been going less than this that have a less-generous schedule
23 than I'm about to give you, because we have to fit things in.

24         September is not going to happen.  I don't have the
25 time in September, and we're not pushing this until, you

1  know -- it's just not happening.

2          MR. STONE:  Well, your Honor, if I could just

3  elaborate just briefly on why it's such an issue in terms of

4  the experts in this case.

5          Let me give you a specific example with respect to the

6  historians.  So they've identified a historian who's going to

7  testify about whether the Rio Grande has been used commercially

8  in this area as a navigable water.

9          THE COURT:  Yes.

10         MR. STONE:  We're going to have to respond to that,

11 and so we've been talking to other historians and historical

12 outfits.  They're going to need to go down and look at

13 archives.  They might need to go to Mexico and translate

14 documents from Mexico.  They're going to have to actually

15 evaluate to determine whether or not the Rio Grande in this

16 region has been used for commercial purposes historically.

17         It's going to take a little bit of time.  And on a

18 trial schedule in April or even May or June, there's simply not

19 enough time --

20         THE COURT:  Look, I will try to move the trial date

21 past April, okay?  And I told you May is probably out.  But

22 June is not out.  And, look, I've been a lawyer for 53 years or

23 2 or 3 years.  I was a trial lawyer before then.  I used to get

24 experts ready in cases as or more complicated than this.

25         You have months under my schedule, months.  I don't

1 │ know who your experts are, but there's absolutely no

2 │ justification for that kind of delay.

3 │         MR. BRYANT:  Your Honor, I'd like to provide the Court

4 │ with a little bit of background that the Court hasn't heard

5 │ yet, which is this motion that the Court has granted was

6 │ essentially not only to vacate the current schedule but to

7 │ allow the parties to confer on a mutually agreeable schedule.

8 │         We started that process yesterday, and although we

9 │ didn't have agreement on every little specific detail, we

10 │ generally agreed, both sides feel it would be appropriate to

11 │ have a process that leads to a trial at the beginning of August

12 │ or whenever the Court can find time thereafter.

13 │         So I'm not trying to say the Court can't order

14 │ whatever the Court wants to order --

15 │         THE COURT:  Look, I could order we go forward in

16 │ March.  That would be a vindictive, inappropriate thing for me

17 │ to do.

18 │         I would not do that.  I would never do that.  I've

19 │ never behaved that way as a judge and I would hope no federal

20 │ judge would act that way just because they, you know, came out

21 │ of -- they were successful in not being mandamused that they

22 │ say, *Okay, well, now, I don't have an order from the Fifth*

23 │ *Circuit, I'm just going to go ahead and do what I want to do.*

24 │ I told you, I don't operate that way and I never have.

25 │         I am more than happy to give you a reasonable amount

1  of time, but there aren't that many experts in this case.  The

2  issues in this case have been known for several years.  This is

3  not new.  This is absolutely not new.  The issue in this case

4  about the navigability of the water has been -- was a central

5  issue from the date that this complaint was filed and even

6  before that.

7         And to suggest that -- and I'm going to give you an

8  early motion to dismiss date, by the way.

9         But the -- to suggest that somehow by moving the trial

10  date from March, April, May, to June or July, that this Court

11  is somehow rushing you and not giving the experts plenty of

12  opportunity, look, I, in my wildest dreams as a federal trial

13  lawyer, would have loved that kind of latitude.

14         I can tell you, I have gone into courtrooms where the

15  judge sat there with a schedule and said, "You're trying it on

16  this day.  Here's when you're going to disclose your experts,

17  this, this, and this," and the lawyers looked at each other, we

18  looked like the old comedian Jerry Colonna with our eyes

19  popping out of our head.

20         And when we stood up and said, "But Judge," he said,

21  "Do you have a problem?  Take it to the Court of Appeals," and

22  walked off the bench.

23         Now, that's not the way I act, in spite of the fact

24  that I was accused of that.

25         Give them a July trial date.  That's it.  That's long

1  | enough.  That's way long enough.

2  |      MS. KIMBALL:  Your Honor, one of our primary experts

3  | is not available in July.  We could make -- we could make

4  | through May work, and then one of our experts becomes

5  | unavailable until the end of July.  So we could make through

6  | the end of May work or we could make August work.  And I

7  | understand the Court said that the end of May is not --

8  |      THE COURT:  Well, I could do the end of June.

9  |      MS. KIMBALL:  So June and July are the months where

10 | our two primary experts have overlapping unavailability.

11 |      THE COURT:  They have a problem.  Do you even have

12 | experts?

13 |      MR. BRYANT:  Yes, your Honor.  We anticipate between

14 | us --

15 |      THE COURT:  I mean, I was told --

16 |      MR. BRYANT:  -- ten experts or more.

17 |      THE COURT:  I was told that you had experts way back

18 | when we had the first hearing in this case.  What have they

19 | been doing all this time?  Nothing?

20 |      MR. BRYANT:  Your Honor, we were awaiting the initial

21 | disclosures, the initiation of normal discovery in this case.

22 | The plaintiffs typically do that.  There was no discussion

23 | about discovery --

24 |      THE COURT:  So you were doing basically what I -- you

25 | were doing basically, Counsel -- excuse me, I didn't mean to

1  talk over you.  But you were doing basically what I was doing,

2  and that was waiting -- I was waiting for the Fifth Circuit,

3  you were waiting for disclosures.  And --

4        MR. BRYANT:  And then we also had a First Amended

5  Complaint, which added a new count.

6        THE COURT:  It does.

7        MR. BRYANT:  And then we briefed the motions to

8  dismiss.

9        So that's -- ultimately, the result is that discovery

10  on the merits only commenced in 2024.  Both sides have

11  exchanged discovery requests.

12        We're working, we intend to keep working, but the

13  nature of the case and schedules is such that it'll take some

14  time.

15        What we think we can do, all parties, confer together

16  and come up with a proposed schedule for -- that we agree on

17  for the Court's consideration.  The Court can do whatever the

18  Court wants to do with it.

19        THE COURT:  Well, I'm the one that has to give you the

20  trial --

21        MR. BRYANT:  In a short time, we can do that.

22        THE COURT:  I'm sorry, I thought you had finished.

23        I am the one who has to give you the trial date.  The

24  magistrate isn't going to do that, you know, because the

25  magistrate doesn't have my calendar in front of him or her.

1          Who's the magistrate in this case?

2          THE CLERK:  Judge Howell.

3          THE COURT:  Okay.  He does not have my calendar in

4   front of him.

5          But nonetheless, you know, as Judge Douglas pointed

6   out in her opinion, I have a duty and an obligation under Fifth

7   Circuit law to move this case forward.

8          You have to remember, there are people who agree with

9   the position taken by your client, Counsel, in this case, and

10  believe this thing should be resolved in your favor right now.

11         There are people who agree with the United States'

12  position and the buoy is still out there.  And there are

13  state -- I don't know if the state DPS has these boats that go

14  up and down the Rio Grande -- I think they do -- and so does

15  the customs and border protection.

16         And I just, you know, am so hopeful that -- you know,

17  I'm not so worried about them running into the buoy itself,

18  because it's big and it's orange and it's -- you know, you can

19  see it.  But at nighttime, if you're chasing down someone or

20  you're not -- you know, in the middle of a pursuit, let's say

21  somebody's trying to cross the river or they see somebody they

22  think has got some drugs or whatever coming across that river

23  and they're chasing them, you've got these big concrete buoys

24  that sit out many feet -- we don't need to argue the merits of

25  that -- sit out many feet away.  I've seen dozens of pictures.

1  And when the river is a little lower, you can see them better.

2  But at night, not so much.

3        But when the river is higher, you can't see them.  But

4  they're just inches below, and those boats, even though they're

5  low draft, are capable of whacking into one of those barriers,

6  and we could lose some lives.

7        That is concerning to me.  It is concerning to me.  So

8  I don't want to be, kind of, sitting on this case.  And if the

9  Court of Appeals ultimately rules in this case that that's

10  okay, they can just be out there, and if somebody gets injured,

11  at least I know that I didn't sit on the case and it wasn't my

12  decision that allowed the thing to be out there.

13        So there are concerns on both sides, and that concern,

14  you know, some people call that a hazard to navigation.

15        MR. BRYANT:  Your Honor, I appreciate you bringing

16  that up and we'll be sure and address it at trial.  My

17  understanding is the boats don't go on the river at night.

18        THE COURT:  I don't think that's entirely true.

19        MR. BRYANT:  Well, we'll present the evidence.  And,

20  of course, the United States --

21        THE COURT:  All right.  They may have changed.  They

22  may have changed.  But I used to sit --

23        MR. BRYANT:  It's rare if it happens.

24        THE COURT:  I used to sit in Del Rio and we would go

25  down by the river and I saw boats on the river at night.

1        MR. BRYANT:  I'm referring to the law enforcement

2  boats.

3        THE COURT:  I'm talking about law enforcement.  But

4  private boats, too.  I'm not talking about Lake Amistad now,

5  I'm talking about the Rio Grande.

6        MR. BRYANT:  Well, we'll be happy to address that with

7  evidence.

8        THE COURT:  But even during the day, if it's high

9  tide, you cannot see that, those darn things.  I mean, I've

10  seen all kinds of pictures.  It is what it is.  This isn't an

11  advisory opinion.  We had a hearing on this.  You can't see

12  'em.

13        Now, whether that makes a difference to the overall

14  strength of the government's case or your case is a whole other

15  matter.  That is not the big issue in the case.  Those are not

16  the big issues in the case.  They are issues but not the big

17  issues.

18        All right.

19        MR. BRYANT:  Your Honor, the defendants share the

20  desire to move expeditiously to the trial of this case.  It

21  would help us a lot if the Court -- understanding the Court has

22  a lot of other demands -- when the Court gets a chance, if it

23  could review and rule on the motions to dismiss --

24        THE COURT:  Oh, no, you're definitely --

25        MR. BRYANT:  Then we'll get an answer and then we will

1  know better what we have.

2         THE COURT:  As I said, you're going to get an

3  expedited date on that, Counsel.

4         MR. BRYANT:  Thank you, your Honor.

5         MS. KIMBALL:  I just want to make clear, we can be

6  prepared to go to trial in April or May.  June and July are

7  just a little bit problematic.  But we could go any time in

8  April or May or starting July 20th.

9         THE COURT:  No.  All right.  Let's give them a trial

10  date in early August.

11         THE CLERK:  August 6th.

12         THE COURT:  By then maybe you'll have your en banc

13  opinion from the Fifth Circuit on the -- on this case and maybe

14  they'll resolve it all and maybe we won't even have to have a

15  trial.  You know, I don't think so, but --

16         MR. BRYANT:  Your Honor, I think we better go ahead

17  and get our schedule, do our discovery, and proceed on the

18  assumption that there will be a trial August 6th.

19         THE COURT:  Counsel, I could not agree with you more.

20  And that's why the suggestion that I was somehow trying to

21  usurp the Fifth Circuit's authority and beat them to the punch

22  and somehow deflate their ability to rule on the merits was so

23  absolutely off point; let me put it that way.

24         Everybody in this courtroom agrees that regardless of

25  what goes on with the en banc, we still need a trial on the

1  merits.

2          Am I correct?

3          MR. BRYANT:  I don't personally understand --

4          THE COURT:  Your colleague over there was shaking his

5  head yes.  So August the 6th, all right.

6          MR. BRYANT:  Very good, your Honor.

7          THE COURT:  Is that all right with you?

8          MS. KIMBALL:  Yes, your Honor.  Thank you.

9          THE COURT:  All right.  Boy, I'm going to have people

10  coming after me on the other side now that I caved to the

11  State.  I didn't cave to anybody.  I did the right thing here,

12  I think, under the circumstances.

13          We have this -- see, this is what a lot of circuit

14  judges do not understand.  We have this back-and-forth between

15  counsel and the judge.  When you read a cold transcript, it

16  looks like the judge is knifing the counsel.

17          Do you feel like I've knifed you today?

18          MR. BRYANT:  No, your Honor.  I seem to be intact.

19          THE COURT:  Or disrespected you?  Or treated you

20  unfairly today?

21          MR. BRYANT:  No, your Honor.

22          My question is whether it would be appropriate for

23  both of the parties to continue and complete the process of

24  coming up with some suggested or proposed interim deadlines

25  that lead to a August 6th trial and submitting those.

1          THE COURT:  We're going to treat this the same way we
2   treat a case, one of our patent cases or one of the other cases
3   that I handle.

4          I will agree to your proposal to -- I'm going to use
5   proposal twice, which is not a good thing.  I'm going to agree
6   to your proposal that you and the United States attempt to work
7   out a proposal on all of those dates.  Except for the trial
8   date, the trial date is firm, okay?

9          MR. BRYANT:  Very good, your Honor.

10          THE COURT:  And if there is any disagreement between
11   the -- I keep saying the State.  Is that all right?

12          MR. BRYANT:  Yes, your Honor.

13          THE COURT:  Between the State and the federal
14   government on this, the United States, then that will be
15   referred.  You need to let me know, and that will be referred
16   to Judge Howell.

17          So if you come to an agreement, you need to -- on all
18   of the dates, submit those in the form of a proposed order to
19   me, a proposed order to me, a joint proposed order to me, and
20   then as long as I look at it and it doesn't look silly, which I
21   doubt, I will approve it.

22          If there's a disagreement, then we have to have
23   Judge Howell intervene, and then if somebody's unhappy with
24   Judge Howell's decision, then you can always appeal it to me.

25          How long do you think you need to -- we have some

1    lawyers in D.C. and you guys are all kind of here in Austin.

2            MR. BRYANT:  In order to prepare both a joint order

3    and reach an agreement, I think we can do that within a week.

4            THE COURT:  A week?

5            MS. KIMBALL:  Yes.

6            THE COURT:  Let me give you a week and a half.

7            THE CLERK:  March 6th.

8            THE COURT:  Give them a week and half just in case

9    somebody gets tied up.

10           March the 6th, is that okay?

11           MR. BRYANT:  Very good, your Honor.

12           THE COURT:  All right.  So you've got an August the

13   6th trial date.  By March the 6th, you will attempt to get to

14   me a joint agreement on discovery deadlines.  And if you can't,

15   then we'll go from there with Judge Howell.

16           Yeah, ma'am?

17           MS. KIMBALL:  Does the Court want a pretrial

18   conference?  And if so, should we set a date for that so that

19   we have it for the --

20           THE COURT:  No, not in this kind of case.  I mean,

21   I've already had hearings in this case, you know, which is -- I

22   mean, pretty big hearing in this case, so it isn't like I'm not

23   aware of what's going on here.

24           Okay.  Let's give them their date for the hearing on

25   the motion to dismiss, and I want it sooner rather than later.

1          THE CLERK:  You have March 19th.

2          THE COURT:  March 19th.  We're going to do it

3    March 19th, okay?

4          I want to be very careful.  The reason I asked you

5    when the en banc hearing was, not so that I could come up with

6    some conspiratorial ruling here, but I didn't want to step on

7    or have some circuit judge come back and tell me, *Well, you*

8    *know, he set this thing the day of the en banc argument just so*

9    *that he would deprive the State of Texas of their lawyers.*

10         I don't know.  It isn't March 19th.  We agree that

11   that's not a date for the en banc hearing, right?

12         MR. BRYANT:  Yes, your Honor, that's not the current

13   schedule.

14         THE COURT:  All right.  So you were supposed to be

15   here anyway.  That was when we were supposed to start the trial

16   before I basically granted Texas' request for an August date.

17   So people should be available, I would hope.

18         I don't think the motion to dismiss is going to take

19   all that long, really.  I would say an hour, hour and a half,

20   maybe, for argument.  I'll give each side about 45 minutes.

21   That's a lot more time than you get on appeal.

22         I don't know about the Fifth Circuit, but in a complex

23   case like this, in the Ninth Circuit you get 25 minutes a side.

24   I know because I've got one coming up.  I'm sitting in -- where

25   am I sitting, Portland?

1        THE CLERK:  Portland?

2        THE COURT:  Oh, San Francisco.  I'm sitting in

3   San Franciso in March.  And I've got a blockbuster case that

4   I -- it's been assigned to me.

5        Yes?

6        MS. KIMBALL:  Is there a time for the March 19th

7   hearing?

8        THE CLERK:  9:00 a.m.

9        THE COURT:  9:00, it's always at 9:00.  And that's

10  good for the lawyers who are in D.C. who might want to listen

11  in and may not be here because their time is later, not

12  earlier.  It's rough when we get California lawyers.  Or worse,

13  lawyers from Hawaii.  Or even worse, lawyers from Saipan or

14  Guam.  Believe it or not, I used to sit in Guam.

15       Oh, yeah, I had one from Germany, too.  That was a

16  whole 'nother story.  I didn't go to Germany, but we had to

17  work out a schedule so he wasn't in the middle of the night.  I

18  think six hours ahead, they are.  Six hours ahead, I believe.

19       Okay.  My friends from the press have got plenty of

20  quotes today.  I hope they don't misquote me.

21       I want to thank counsel, really.  I do not believe

22  that any lawyer walked away from the last hearing feeling that

23  I had disrespected them or treated them unfairly, the one where

24  it was suggested that I just rammed it down your throat.

25       Yes, I was pretty insistent on a trial date, because I

1   had heard from the State of Texas that they really wanted to

2   move this case forward.  And that's always been my experience

3   with Texas.  They don't like to sit on cases.

4        In fact, in another type of case, a water case I had,

5   I mean, the -- Texas was the one that was really insistent on

6   moving the case forward as quickly as possible.

7        Texas doesn't like to sit on their cases.  And for

8   that matter, neither does the United States.  Governmental

9   bodies are not my problem with lawyers sitting on cases.

10        And I am not going to ask you for a comment about

11   whether you agree with me or not, because you've got all these

12   judges that said I was very rude to the lawyers.  And I don't

13   want you to have to step on that, so I'll leave that as it is.

14        But I don't think I was rude.  I think we were having

15   a dialogue like we had today and everybody got a full and ample

16   opportunity to be heard, just like you did today.

17        And after hearing both sides, understanding where you

18   had the difficulties with your experts from both sides, I

19   changed my view on a trial date, which is what a judge should

20   do.  A judge should be open to hearing argument and not making

21   a ruling predicated on a predisposition as to the merits of

22   anything before them.  That just is wrong.  I'm not a

23   politician, I'm a judge.

24        I could have been a politician.  I was asked.  No

25   thank you.  Not here, by the way.  In my previous life.

1          Okay.  Anything else?

2          MS. KIMBALL:  Not from us, your Honor.  Thank you.

3          THE COURT:  All right.  Thank you so very much.  I do

4  appreciate it, and I guess the next time that I will see you

5  will be on March the 19th for the hearing on the motions to --

6  State's motions to -- well, it's a motion, but you tried to

7  dismiss the entire -- you're trying to dismiss the entire case.

8          Okay.

9          MR. BRYANT:  Thank you, your Honor.

10          MR. STONE:  Thank you, your Honor.

11          THE COURT:  Thank you so much.

12          (10:08 a.m.)

13                              * * *

14

15

16

17

18

19

20

21

22

23

24

25

1                              *   *   *   *   *

2    UNITED STATES DISTRICT COURT

3    WESTERN DISTRICT OF TEXAS

4

5        I certify that the foregoing is a correct transcript from

6    the record of proceedings in the above-entitled matter.  I

7    further certify that the transcript fees and format comply with

8    those prescribed by the Court and the Judicial Conference of

9    the United States.

10

11   Date signed:  February 28, 2024

12

13   /S/ Lisa A. Blanks

14   _____
     Lisa A. Blanks, CSR, CRR, RPR
15   Official Court Reporter
     262 West Nueva Street
16   San Antonio, Texas  78207
     (210)244-5038
17   lisa_blanks@txwd.uscourts.gov

18

19

20

21

22

23

24

25

                    U.S.D.C. Official Court Reporter
                           Lisa A. Blanks