No. 23-50632

UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff/Appellee*,

v.

GREG ABBOTT, in his capacity as Governor of the State of Texas, and
STATE OF TEXAS,
*Defendants/Appellants*

On appeal from the United States District Court for the Western District of Texas
Case No. 1:23-cv-00853

**SUPPLEMENTAL EN BANC BRIEF FOR APPELLEE**

JAIME ESPARZA
*United States Attorney*

LANDON A. WADE
*Assistant United States Attorney*
United States Attorney's Office
Western District of Texas
903 San Jancinto Blvd., Ste 334
Austin, TX 78701

TODD KIM
*Assistant Attorney General*

MICHAEL T. GRAY
ANDREW M. BERNIE
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
(202) 514-4010
andrew.m.bernie@usdoj.gov

## CERTIFICATE OF INTERESTED PERSONS

Under the fourth sentence of Fifth Circuit Rule 28.2.1, Appellees, as a

governmental party, need not furnish a certificate of interested persons.

/s/*Andrew M. Bernie*
ANDREW M. BERNIE
Attorney, Appellate Section
Environment and Natural Resources
Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
(202) 514-4010
andrew.m.bernie@usdoj.gov

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is tentatively scheduled for the week of May 13, 2024.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..........................................................i

STATEMENT REGARDING ORAL ARGUMENT ............................................. ii

TABLE OF AUTHORITIES ............................................................................v

INTRODUCTION ..........................................................................................1

STATEMENT OF JURISDICTION..................................................................2

STATEMENT OF THE ISSUE.........................................................................3

STATEMENT OF THE CASE..........................................................................3

    A.    Statutory and Regulatory Background ..................................................3

    B.    Factual background ..............................................................................4

    C.    Procedural History................................................................................4

SUMMARY OF ARGUMENT ........................................................................6

ARGUMENT ..................................................................................................9

I.    The district court correctly held that the United States is likely
to succeed on the merits of its RHA claim. ................................................10

    A.    The district court correctly found that the United States is
likely to prevail in showing that the relevant section of
the Rio Grande is a Section 10 "navigable river." ..............................10

        1.    Evidence of the river's historical navigability
amply supports the court's "navigability" finding....................12

        2.    Evidence of the river's capacity for future
navigation amply supports the court's
"navigability" finding. ............................................................22

B.    Texas's barrier obstructs the Rio Grande's navigable capacity..................................................................28

C.    Texas's barrier is a "boom" or "other structure" built without a permit....................................................34

D.    Texas's constitutional avoidance arguments are without merit............................................................38

II.    The district court did not abuse its discretion in weighing the equities...............................................................44

A.    The district court correctly held that Congress decided the public interest in the RHA...................................45

B.    The district court did not abuse its discretion in finding that the equities weigh in favor of an injunction...............48

III.    At minimum, the district court's prohibitory injunction should be affirmed...............................................53

CONCLUSION .................................................................53

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Bessemer City, N.C.*,
  470 U.S. 564 (1985) .......................................................................... 11

*Anderson v. Seeman*,
  252 F.2d 321 (5th Cir. 1958) ............................................................ 24

*Atlee v. Union Packet Co.*,
  88 U.S. 389 (1874) ........................................................................... 34

*Byrum v. Landreth*,
  566 F.3d 442 (5th Cir. 2009) ............................................................ 27

*California v. United States*,
  104 F.3d 1086 (9th Cir. 1997) .................................................... 41, 42

*Chiles v. United States*,
  69 F.3d 1094 (11th Cir. 1995) .......................................................... 42

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971),
  abrogated on other grounds by *Califano v. Sanders*, 430 U.S. 99 (1977)........... 19

*City of New York v. Golden Feather Smoke Shop, Inc.*,
  597 F.3d 115 (2d Cir. 2010) .............................................................. 45

*Conway v. Taylor's Executor*,
  66 U.S. 603 (1861) .................................................................... 14, 17

*Cooper v. Harris*,
  581 U.S. 285 (2017) .......................................................................... 11

*Crosby v. National Foreign Trade Council*,
  530 U.S. 363 (2000) .......................................................................... 49

*Economy Light & Power Co. v. United States*,
  256 U.S. 113 (1921) ...................................................... 10, 14, 22, 26

v

*Epi's Canoe & Kayak Team, LLC v. Texas*,
  No. D-1-GN-23-003613 (98th Jud. Dist. Travis Co. Tex.) ................................23

*Equitable Life Assur. Soc. of U.S. v. MacGill*,
  551 F.2d 978 (5th Cir. 1977) ................................................................35

*Fanning v. Gregoire*,
  57 U.S. 524 (1853) ...................................................................... 15, 17

*Farmers and Mechanics Sav. Bank of Minneapolis v. Minnesota*,
  232 U.S. 516 (1914) ..............................................................................44

*Fed. Sav. & Loan Ins. Corp. v. Dixon*,
  835 F.2d 554 (5th Cir. 1987) ..................................................................9

*Gibbons v. Ogden*,
  22 U.S. 1 (1824) ..................................................................................14

*Gloucester Ferry Co. v. Pennsylvania*,
  114 U.S. 196 (1885) ...................................................................... 14, 16

*Hawkes v. U.S. Army Corps of Engineers*,
  578 U.S. 590 (2016) ..............................................................................40

*In re Bonvillian Marine Serv., Inc.*,
  19 F.4th 787 (5th Cir. 2021) ................................................................46

*In re MDL-1824 Tri-State Water Rts. Litig.*,
  644 F.3d 1160 (11th Cir. 2011) ...........................................................24

*Jennings v. Rodriguez*,
  138 S. Ct. 830 (2018) ...........................................................................40

*Lomax v. Ortiz-Marquez*,
  140 S. Ct. 1721 (2020) ..........................................................................38

*New Jersey v. United States*,
  91 F.3d 463 (3d Cir. 1996) ............................................................ 41, 42

*New York Cent. & H.R.R. Co. v. Bd. of Chosen Freeholders of Hudson Cnty.*,
227 U.S. 248 (1913) ...................................................................... 14, 16

*NFIB v. Sebelius*,
567 U.S. 519 (2012) ............................................................................ 39

*Nielsen v. Preap*,
139 S. Ct. 954 (2019) ......................................................................... 38

*Norfolk & W. Co. v. United States*,
641 F.2d 1201 (6th Cir. 1980) ........................................................... 32

*Oklahoma v. Texas*,
258 U.S. 574 (1922) ............................................................................ 20

*Padavan v. United States*,
82 F.3d 23 (2d Cir. 1996) ..................................................... 41, 42, 43

*Pennsylvania v. Wheeling & Belmont Bridge Co.*,
54 U.S. 518 (1851) .............................................................................. 17

*PPL Montana, LLC v. Montana*,
565 U.S. 576 (2012) ............................................................................ 21

*Puente de Reynosa, S.A. v. City of McAllen*,
357 F.2d 43 (5th Cir. 1966) ............................................................... 15

*Restaurant Law Center v. U.S. Dep't of Labor*,
66 F.4th 593 (5th Cir. 2023) ............................................................... 9

*Rollins v. Home Depot USA*,
8 F.4th 393 (5th Cir. 2021) ............................................................... 46

*San Luis Unit Food Producers v. United States*,
709 F.3d 798 (9th Cir. 2013) ............................................................. 24

*Sanitary Dist. of Chicago v. United States*,
266 U.S. 405 (1924) ..................................................................... 45, 47

*Sesay v. United States*,
984 F.3d 312 (4th Cir. 2021) ...............................................................49

*Speaks v. Kruse*,
445 F.3d 396 (5th Cir. 2006) .................................................................9

*Texas v. United States*,
106 F.3d 661 (5th Cir. 1997) ...............................................................42

*The Daniel Ball*,
77 U.S. 557, 10 Wall. 557 (1871) ........................................................10

*Torres v. Texas Dep't of Pub. Safety*,
597 U.S. 580 (2022) ............................................................................44

*Trump v. Anderson*,
144 S. Ct. 662 (2024) ..........................................................................44

*Trump v. Vance*,
591 U.S. 786 (2020) ............................................................................44

*Tugwell v. Eagle Pass Ferry Co.*,
74 Tex. 480, 9 S.W. 120 (1888) .................................................... 13, 14

*United States v. Abbott*,
87 F.4th 616 (5th Cir. 2023)
*vacated by* 90 F.4th 870 (5th Cir. 2024) ........................... 5, 6, 11, 13, 50, 51, 52

*United States v. Angell*,
292 F.3d 333 (2d Cir. 2002) ......................................................... 30, 32

*United States v. Appalachian Elec. Power Co.*,
311 U.S. 377 (1940) ........................................................ 10, 11, 14, 15,
.................................................................. 20, 21, 23, 24, 25, 26, 27, 39

*United States v. Boyden*,
696 F.2d 685 (9th Cir. 1983) ...............................................................30

*United States v. Crow, Pope & Land Enter., Inc.*,
    340 F. Supp. 25 (N.D. Ga. 1972) .......................................................................14

*United States v. Estate of Boothby*,
    16 F.3d 19 (1st Cir. 1994) ...................................................................................30

*United States v. FDIC*,
    881 F.2d 207 (5th Cir. 1989) ..............................................................................45

*United States v. Lima-Rivero*,
    971 F.3d 518 (5th Cir. 2020) ..............................................................................11

*United States v. LULAC*,
    793 F.2d 636 (5th Cir.1986) .................................................................................9

*United States v. Mackay*,
    757 F.3d 195 (5th Cir. 2014) ..............................................................................36

*United States v. Marine Shale Processors*,
    81 F.3d 1329 (5th Cir. 1996) .................................................................. 45, 46, 47

*United States v. Milner*,
    583 F.3d 1174 (9th Cir. 2009) ............................................................................46

*United States v. Oakland Cannabis Buyers' Coop.*,
    532 U.S. 483 (2001) ............................................................................................47

*United States v. Raven*,
    500 F.2d 728 (5th Cir. 1974) ..............................................................................30

*United States v. Republic Steel Corp.*,
    362 U.S. 482 (1960) ................................................................................ 25, 29, 30

*United States v. Rio Grande Dam & Irrigation Co.*,
    174 U.S. 690 (1899) .......................................................................... 28, 29, 30, 31

*United States v. Sineneng-Smith*,
    140 S. Ct. 1575 (2020) ........................................................................................35

*United States v. Stoeco Homes, Inc.*,
  498 F.2d 597 (3d Cir. 1974).................................................................46

*United States v. Texas*,
  No. 1:23-CV-1537-DAE, 2024 WL 861526
  (W.D. Tex. Feb. 29, 2024) ..................................................... 41, 42, 43

*United States v. Utah*,
  283 U.S. 64 (1931).................................................................. 11, 13

*United States v. W. Indies Transp., Inc.*,
  127 F.3d 299 (3d Cir. 1997)...............................................................32

*United States v. Weil*,
  35 Ct. Cl. 42 (1900) ......................................................................13

*Univ. of Texas v. Camenisch*,
  451 U.S. 390 (1981).................................................................. 12, 18

*Vieux Carre Property Owners, Residents & Assocs., Inc. v. Brown*,
  875 F.2d 453 (5th Cir. 1989) ........................................................ 31, 32

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)....................................................................... 9, 46

*Wyandotte Transp. Co. v. United States*,
  389 U.S. 191 (1967)........................................................................3

## Constitution

U.S. Const. art. I, § 10, cl.3.................................................................43

U.S. Const. art. I, § 8, cl.11................................................................43

## Statutes

28 U.S.C. § 1292(a)(1).........................................................................2

28 U.S.C. § 1331 ..............................................................................2

28 U.S.C. § 1345 ...................................................................................2

28 U.S.C. § 1355 ...................................................................................2

Rivers and Harbors Act of 1899 (RHA) ................................................1

    33 U.S.C. § 403 ................................... 2, 3, 4, 10, 28, 34, 46, 51

    33 U.S.C. § 406 ............................................................... 4, 48

    33 U.S.C. § 413 ........................................................................4

23 Stat. 29 (1884) ...............................................................................20

26 Stat. 495 (1890) .............................................................................20

26 Stat. 502 (1890) .............................................................................20

42 Stat. 1482 (1923) ...........................................................................20

Act of June 30, 1916, c. 200, 39 Stat. 251 ........................................21

Act of May 15, 1886, c. 332, 24 Stat. 28 ..........................................21

Act of May 17, 1886, c. 354, 24 Stat. 63 ..........................................21

## Rules

Fed. R. App. Proc. 28(a)(8)(A) ...........................................................52

Federal Rule of Appellate Procedure 4(a)(1)(B) .................................3

## Regulations

33 C.F.R. § 322.3(a) .............................................................................3

33 C.F.R. § 325.2(e)(4) .......................................................................40

33 C.F.R. § 331.2 ................................................................................40

33 C.F.R. §§ 329.14-329.16 ...............................................................18

# Other Authorities

Black's Law Dictionary (11th ed. 2019) ...................................................29

*Debates and Other Proceedings of the Convention of Virginia*,
     302 (2d ed., 1805) .................................................................................41

Frank Leslie, *The Great Log Jam*, Popular Monthly (July 1901),
     http://www.catskillarchive.com/ ..........................................................35

James Madison, The Report of 1800, (Jan. 7, 1800) ...............................42

Report of U.S. House Special Committee on Texas Frontier Troubles 164-67
     (Feb. 29, 1876) .......................................................................................43

The Century Dictionary and Cyclopedia (1900).......................................35

Treaty between the United States of America and the Mexican
     Republic of Peace, Friendship, Limits, and Settlement,
     February 2, 1848, 9 Stat. 922, 1848 WL 6374.......................................32

Treaty on Utilization of Waters of the Colorado and Tijuana Rivers
     and of the Rio Grande, art. 21, Feb. 3, 1944........................................33

Webster's International Dictionary of the English Language (1890)......................34

Webster's Revised Unabridged Dictionary (1913)....................................34

**INTRODUCTION**

Texas appeals from a preliminary injunction directing it to move to the riverbank a 1,000-foot-long barrier it built in the middle of the Rio Grande, along the international border, without federal authorization. The barrier violates the Rivers and Harbors Act of 1899 (RHA), which Congress enacted to protect navigable rivers both by prohibiting obstructions to their navigable capacity absent congressional authorization and by prohibiting structures in rivers without a permit from the U.S. Army Corps of Engineers (Corps). The United States sued to compel Texas to remove the barrier and to prevent Texas from building more barriers in the river without federal authorization.

After allowing Texas limited discovery and holding an evidentiary hearing, the district court concluded that Texas's actions likely violated the statute, that they caused the United States irreparable harm, and that the equities favored an injunction. The district court therefore granted a preliminary injunction requiring Texas to move the barrier to the riverbank and prohibiting Texas from building more barriers in the river while the case proceeds.

The district court did not abuse its discretion in granting the injunction. The court correctly found that the United States will likely prevail in demonstrating that the relevant stretch of the Rio Grande is navigable within the established meaning of the RHA. The court also correctly held that a 1,000-foot barrier in the middle of

1

the river obstructs its navigable capacity, and that, in any event, the barrier is an

unpermitted "boom" or "other structure." The court also correctly rejected Texas's

theory that the barrier is a constitutionally protected exercise of Texas's right to

"engage in war" in response to being "actually invaded." And the court correctly

concluded that because the RHA is a public-interest statute, once the United States

demonstrates that it is likely to prevail in establishing a violation, the public

interest clearly favors an injunction. The district court also correctly found that the

United States will suffer irreparable harm, including to its relationship with

Mexico, if the barrier is not moved pending a merits determination. Finally, the

court correctly found no credible evidence that Texas's barrier has served to curb

unlawful immigration or cartel activity.

## STATEMENT OF JURISDICTION

(a)     The United States filed this action alleging that Texas violated Section

10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403. The district court had

jurisdiction under 28 U.S.C. §§ 1331, 1345, and 1355.

(b)     The district court entered a preliminary injunction. ROA.1005-1006.

This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

(c)     The district court entered the preliminary injunction order on

September 6, 2023. ROA.1005-1006. Texas filed a notice of appeal the same day.

ROA.1007. This appeal is timely under Federal Rule of Appellate Procedure
4(a)(1)(B).

## STATEMENT OF THE ISSUE

Whether the district court abused its discretion when it issued a preliminary
injunction requiring Texas to move the barrier to the bank of the Rio Grande and
prospectively prohibiting Texas from building other barriers in the river until the
case is resolved.

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background

Congress enacted the RHA "to prevent obstructions in the Nation's
waterways," and the Supreme Court has "consistently found its coverage to be
broad." *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967). Section
10 of the RHA prohibits "creation of any obstruction not affirmatively authorized
by Congress, to the navigable capacity of any of the waters of the United States."
33 U.S.C. § 403. Section 10 independently prohibits "build[ing] or commenc[ing]
the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty,
or other structures in any port, roadstead, haven, harbor, canal, navigable river, or
other water of the United States . . . except on plans recommended by the Chief of
Engineers and authorized by the Secretary of the Army." *Id.*; *see also* 33 C.F.R.
§ 322.3(a).

3

Section 12 of the RHA provides that "the removal of any structures or parts of structures erected in violation of [Section 10, and other enumerated RHA provisions] may be enforced by the injunction of any district court exercising jurisdiction in any district in which such structures may exist, and proper proceedings to this end may be instituted under the direction of the Attorney General of the United States." 33 U.S.C. § 406; *see also id.* § 413.

### B.    Factual background

In midsummer 2023, Texas built a 1,000-foot-long barrier in the Rio Grande parallel to (and initially transgressing) the international border with Mexico near Eagle Pass, Texas. The barrier consists of interlocking four-foot-diameter buoys anchored by almost 140 tons of concrete blocks on the river bottom. ROA.967-968. Texas neither sought nor obtained federal permission to build the barrier. ROA.967. And Texas refused to remove it even after the United States notified Texas that the barrier violated RHA Section 10. ROA.55-56.

### C.    Procedural History

The United States promptly sued Texas and Governor Abbott and moved for a preliminary injunction. After allowing Texas limited depositions and conducting an evidentiary hearing, the district court granted preliminary relief.

The district court found that the United States "presented sufficient evidence to carry its burden at this stage" to demonstrate that the Rio Grande near Eagle

Pass is a navigable water of the United States under the RHA, based on either of two independent grounds: historic navigability or capacity for future navigation. ROA.965, 971-982. Next, the district court concluded that Texas's barrier obstructs the river's navigable capacity, ROA.983-988, and that the barrier violated the RHA for the independent reason that it constitutes a "boom" or "other structure[]" built without a permit. ROA.989.

On the equities, the court found that irreparable harm and the public interest support an injunction given, among other things, that "[t]he floating barrier has already placed tremendous strain on the U.S.-Mexico relationship." ROA.1001-1002. By contrast, "the State of Texas did not present any credible evidence that the barrier as installed has significantly curtailed illegal immigration across the Rio Grande River." ROA.1004. The court enjoined Texas from building new or placing additional structures in the river pending final judgment. ROA.1005-1006. As to the existing barrier, the court "act[ed] in a measured way" and directed that, by September 15, 2023 (nine days after the order), Texas reposition the current barrier to the Texas-side riverbank in coordination with the Corps. ROA.1006 n.32.

Texas appealed, and a panel of this Court affirmed. *United States v. Abbott*, 87 F.4th 616 (5th Cir. 2023) *vacated by* 90 F.4th 870 (5th Cir. 2024). The panel held that the district court did not err in concluding that the United States had shown that it was likely to succeed on its RHA claims because the segment of the

Rio Grande at issue was historically navigable, and thus navigable under the RHA

*Id.* at 622-28. Next, the panel concluded that the barrier is both an obstruction to

the Rio Grande's navigable capacity and an "other structure" placed in the river

without a permit. *Id.* at 628-31.

On the equities, the panel concluded that the district court did not abuse its

discretion. The panel explained that the United States had established likely

irreparable harm to its relationship with Mexico, as well as to federal operations on

the river; and that the public interest, as expressed by Congress in the RHA,

weighed in the United States' favor. *Id.* at 632-35. The panel affirmed.

Judge Willett dissented. He would have held that the 1,000-foot stretch of

the Rio Grande where the barrier is located is not navigable, and that the district

court's order that the barrier be moved, not removed, undercut the district court's

conclusion that the barrier irreparably harmed the United States. *Id.* at 635-44

(Willett, J., dissenting).

Texas petitioned for rehearing en banc, and this Court granted the petition

and ordered supplemental briefing.

## SUMMARY OF ARGUMENT

The district court did not abuse its discretion in issuing a preliminary

injunction requiring Texas to move its barrier to the banks of the Rio Grande and

prohibiting Texas from building more barriers in the river during this litigation.

1. The district court correctly ruled that the United States is likely to succeed in demonstrating (i) that the Rio Grande is a "navigable river" under the RHA and (ii) that Texas has obstructed the river's navigable capacity without congressional permission, built a "boom" or "other structure" in the river without a Corps permit, or both.

Navigability is a factual question, and the Supreme Court has long held that a river is "navigable" if it either is historically navigable or could support commercial navigation in the future if subject to reasonable improvements. The district court correctly found both to be true here, based on substantial evidence that the relevant stretch of the river was historically navigable and that with reasonable improvements and re-prioritization of water use, it could support commercial navigation.

Texas's barrier obstructs the navigable capacity of the river both by blocking cross-river activity (as, indeed, it was designed to do) and by forcing any craft navigating up-and-down the river to avoid the barrier. And even if that were not so, the barrier is plainly a "boom" or "other structure" in the river, as it consists of a 1,000-foot-long chain of interconnected buoys anchored to the riverbed with 140 tons of concrete blocks.

Texas's constitutional avoidance arguments are off base. Texas's theory that federal regulation of its barrier potentially runs afoul of the Commerce Clause—an

argument Texas barely even briefed in the district court—is foreclosed by the Supreme Court's precedent interpreting the RHA. Texas's other theory—that the barrier is a constitutionally protected exercise of its supposed right to "engage in war" in response to being "actually invaded," that neither the federal executive, Congress, nor any court can countermand—is unsupported by any legal precedent and contravenes the basic premises of our federal system.

2. The district court also did not abuse its discretion in weighing the equities. The district court correctly concluded that the RHA is a public interest statute such that the public interest carries dispositive weight in favor of an injunction to remedy Texas's unlawful conduct, obviating the need to consider irreparable harm and the balance of the equities. Texas did not argue otherwise in the district court and therefore forfeited any challenge to that analysis. In any event, the district court fully examined the equities and did not abuse its discretion when it concluded that the United States will suffer harm to navigation, federal operations, and its relationship with Mexico if the barrier remains in place. By contrast, the assertion of harm to Texas from an injunction is unsubstantiated, as no credible evidence shows that the barrier is reducing the harm Texas alleges.

3. Finally, Texas makes no argument specific to the part of the injunction prohibiting Texas from building more barriers in the river. This Court should

affirm in full, but at the very least there is no basis for vacating the prohibitory injunction.

## ARGUMENT

This Court reviews the district court's grant of a preliminary injunction for abuse of discretion. *Speaks v. Kruse*, 445 F.3d 396, 399 (5th Cir. 2006). Findings of fact are reviewed for clear error and conclusions of law *de novo*. *Restaurant Law Center v. U.S. Dep't of Labor*, 66 F.4th 593, 597 (5th Cir. 2023) (citation omitted). And "district courts have wide discretion in granting preliminary injunctions." *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1987) (citing *United States v. LULAC*, 793 F.2d 636, 642 (5th Cir. 1986)).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The district court correctly found that the United States met those requirements, and the injunction it granted was not an abuse of discretion.

**I.     The district court correctly held that the United States is likely to succeed on the merits of its RHA claim.**

**A.     The district court correctly found that the United States is likely to prevail in showing that the relevant section of the Rio Grande is a Section 10 "navigable river."**

A "navigable river"[1] under Section 10 of the RHA is one that currently supports commercial navigation, one that historically supported or was susceptible of use for commercial navigation, *or* one that could be made to support future commercial navigation with reasonable improvements. *United States v. Appalachian Elec. Power Co.*, 311 U.S. 377 (1940) ("*Appalachian Power*"); *Economy Light & Power Co. v. United States*, 256 U.S. 113 (1921); *The Daniel Ball*, 77 U.S. 557, 10 Wall. 557 (1871). Commercial navigation, in turn, refers to "the customary modes of trade and travel on water." *Economy Light & Power*, 256 U.S. at 122. The district court correctly found that the United States presented sufficient evidence to obtain a preliminary injunction because the relevant stretch

---

[1] Section 10 prohibits structures built in "any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States." 33 U.S.C. § 403. Though the focus at the preliminary injunction stage was on whether the Rio Grande in this stretch is a "navigable river," the United States may also demonstrate at the merits stage that, as an international boundary water, the Rio Grande is an "other water of the United States."

10

of the Rio Grande was historically navigable and has the capacity for future navigation.[2]

In challenging the district court's grant of the preliminary injunction, Texas bears a particularly heavy burden for two reasons. First, whether a water is navigable is a factual question, and this Court reviews for clear error the district court's factual finding that this stretch of the Rio Grande is navigable. *See Abbott*, 87 F.4th at 622 (citing *Appalachian Power*, 311 U.S. at 405); *see also id.* at 641 (Willet, J. dissenting). Texas must show that "a review of the record results in a definite and firm conviction that a mistake has been committed." *United States v. Lima-Rivero*, 971 F.3d 518, 520 (5th Cir. 2020) (citations omitted). Clear-error review "plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 573 (1985). And Texas cannot prevail by asking the reviewing court to "weigh the trial evidence as if [it] were the first to hear it." *Cooper v. Harris*, 581 U.S. 285, 316-17 (2017). Instead, a finding that is "plausible in light of the full record—even if another is equally or more so—must govern." *Id.* at 293 (citation and internal marks omitted).

---

[2] As the district court explained, a lack of current commercial activity is of "no moment" in the analysis under the RHA. ROA.974. The Supreme Court has made clear that "[t]he extent of existing commerce is not the test" for navigability. *United States v. Utah*, 283 U.S. 64, 82 (1931).

Second, the Supreme Court has made clear that factual findings at the preliminary injunction stage will not be disturbed because they are made "on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Thus, the government was "not required to prove [its] case in full at [the] preliminary-injunction hearing" to carry its burden to demonstrate that this stretch of the Rio Grande is a navigable river for purposes of obtaining a preliminary injunction. *Id.* Instead, the district court was making a predictive judgment about whether the United States is likely to succeed in proving that the Rio Grande is a navigable river. And this Court's clear-error review takes the nature of the district court's task in a preliminary injunction proceeding into account. *See Camenisch*, 451 U.S. at 395. As explained below, Texas cannot show that the district court committed clear error in finding that the United States presented sufficient evidence of the Rio Grande's navigability to demonstrate that the United States is likely to prevail on the merits after trial.

**1.     Evidence of the river's historical navigability amply supports the court's "navigability" finding.**

The district court committed no clear error in its factual findings related to historical navigability. As both the panel and the dissent agreed, historical navigability can be satisfied through evidence of actual historical use of the river in commerce or evidence that the river was historically susceptible of use in

12

commerce. 87 F.4th at 623; *id.* at 637 (Willett, J., dissenting).[3] Evidence of both is

present here, establishing that this segment of the Rio Grande was at least

historically susceptible of use in commerce.

First, two reported cases confirm the historical presence of competitive

commercial navigation on the river at Eagle Pass, as they concerned disputes about

the ferrying of cotton between Eagle Pass and Piedras Negras, Mexico. *See United*

*States v. Weil*, 35 Ct. Cl. 42, 77 (1900) ("At Eagle Pass there were ferryboats in

which the cotton was crossed over."); *Tugwell v. Eagle Pass Ferry Co.*, 74 Tex.

480, 9 S.W. 120 (1888) (resolving dispute between rival ferry companies operating

between Eagle Pass and Piedras Negras). ROA.979-980. The ferry traffic at issue

in *Weil* and *Tugwell* involved *expressly commercial* enterprises transporting a

commercial good across an international boundary by water, bringing this segment

of the Rio Grande squarely within the meaning of a "navigable river" under the

RHA. The evidence of actual foreign commerce conducted by boats on the river

demonstrates, at least for the purpose of obtaining a preliminary injunction, that

this stretch of the Rio Grande is navigable within the meaning of the RHA. "Small

traffic compared to the available commerce of the region is sufficient" to

---

[3] In its navigability analysis, the panel dissent focused only on the "1,000-foot
stretch of the Rio Grande" where the barrier sits. But although that stretch must be
located within a navigable segment of the river, navigability generally concerns
"long reaches with particular characteristics of navigability or non-navigability,"
not short segments of the river. *Utah*, 283 U.S. at 77.

demonstrate navigability. *Appalachian Power*, 311 U.S. at 409; *cf. Gibbons v. Ogden*, 22 U.S. 1, 193-94 (1824) (noting that the foreign commerce clause "comprehend[s] every species of commercial intercourse between the United States and foreign nations" and that "[n]o sort of trade can be carried on between this country and any other, to which this power does not extend").

Texas discounts the ferry traffic reflected in *Weil* and *Tugwell*, claiming that bank-to-bank commercial traffic does not satisfy commercial navigability. En Banc Br. ("Br.") 24-25 (citing *United States v. Crow, Pope & Land Enter., Inc.*, 340 F. Supp. 25, 35 (N.D. Ga. 1972)). But Texas's contention finds no support in the RHA's text. Contrary to Texas's suggestion, Br. 18, using boats to ferry goods or people across borders is a "customary mode[] of trade and travel on water," satisfying the navigability test. *Economy Light & Power*, 256 U.S. at 122. Ferry traffic was particularly significant to trade in the United States in the years after adoption of the Constitution, and thus was subject to state regulation and licensing. *E.g.*, *Tugwell*, 74 Tex. at 488. Disputes arising from interstate ferry traffic were the subject of multiple Supreme Court and state cases. *See*, *e.g.*, *New York Cent. & H.R.R. Co. v. Bd. of Chosen Freeholders of Hudson Cnty.*, 227 U.S. 248, 258-62 (1913) (discussing cases); *Gloucester Ferry Co. v. Pennsylvania*, 114 U.S. 196, 203-04 (1885); *Conway v. Taylor's Executor*, 66 U.S. 603, 630 (1861) (noting the "large number of other cases" concerning interstate ferry traffic and collecting state

cases); *Fanning v. Gregoire*, 57 U.S. 524, 534 (1853). Commercial ferry traffic across the Rio Grande to conduct trade with Mexico was thus a "customary mode" of trade on the river.

Consistent with that understanding, the Supreme Court has expressly acknowledged the existence of ferry traffic as a part of navigability analysis. *Appalachian Power*, 311 U.S. at 413, and this Court has done the same, *see Puente de Reynosa, S.A. v. City of McAllen*, 357 F.2d 43, 51 (5th Cir. 1966). Texas argues that ferry traffic was insufficient to demonstrate navigability in *Appalachian Power*, but there the Court considered ferry traffic crossing the New River at various points in the Radford-to-Wylie Falls section of the river, which is entirely within the state of Virginia. 311 U.S. at 413 & n.46. The purely intrastate ferry traffic in *Appalachian Power* was found not to be by itself enough to demonstrate navigability for purposes of the RHA. The district court opinion in *Crow* similarly considered intrastate bank-to-bank ferry traffic occurring entirely within Georgia on the Chattahoochee River, not commerce across an international boundary, and is readily distinguishable on that basis. In neither case, however, did the court suggest that bank-to-bank ferry traffic was per se insufficient to demonstrate commercial navigability under the RHA.

By contrast, the Supreme Court has recognized the fundamentally commercial nature of interstate and international ferry traffic in holding that such

15

traffic falls within Congress's Commerce Clause powers. *See New York Cent. & H.R.R. Co.*, 227 U.S. at 264 ("all business of the ferries between the two states was interstate commerce within the power of Congress to control"). And the Court has characterized ferry traffic as "navigation" and expressly rejected the argument that ferry traffic, because it is only bank-to-bank, is somehow insufficient to demonstrate that such traffic is commercial in nature:

> It matters not that the transportation is made in ferry-boats which pass between the states every hour of the day. The means of transportation of persons and freight between the states does not change the character of the business as one of commerce, nor does the time within which the distance between the states may be traversed. Commerce among the states consists of intercourse and traffic between their citizens, and includes the transportation of persons and property, *and the navigation of public waters for that purpose*, as well as the purchase, sale, and exchange of commodities. The power to regulate that commerce, as well as commerce with foreign nations, vested in congress, is the power to prescribe the rules by which it shall be governed, that is, the conditions upon which it shall be conducted; to determine when it shall be free, and when subject to duties or other exactions.

*Gloucester Ferry Co.*, 114 U.S. at 203-04 (emphasis added). Thus, "it needs no argument to show that the commerce with foreign nations and between the states, which consists in the transportation of persons and property between them, is a subject of national character" and "a ferry is a means, and a necessary means, of commercial intercourse between the states bordering on their dividing waters, and it must, therefore, be conducted without the imposition by the states of taxes *or other burdens upon the commerce between them*." *Id.* at 216-17 (emphasis added).

16

Similarly, in *Conway v. Taylor's Executor*, the Supreme Court held that States generally may regulate the operation of ferries within their borders under their police power, but was careful to note that "[u]ndoubtedly, the States, in conferring ferry rights, may pass laws so infringing the commercial power of the nation that it would be the duty of this court to annul or control them." 66 U.S. at 634. In making that observation, the Court cited *Pennsylvania v. Wheeling & Belmont Bridge Co.*, 54 U.S. 518, 578 (1851), which required the raising of a bridge that "obstruct[ed] the navigation of the Ohio [River]," 54 U.S. at 578, the clear implication being that physical obstructions to rivers on which interstate or international commercial ferry traffic was being carried out could likewise be regulated by Congress. 66 U.S. at 634. In *Fanning*, 57 U.S. at 534, the Supreme Court noted that states could grant ferry licenses, but it then explained (again, in the context of a case concerning ferries) that "[w]hen navigable rivers, within the commercial power of the Union, may be obstructed," Congress's Commerce Clause powers would be implicated. Those cases preceded enactment of the RHA, but if in 1900 Texas had erected a barrier to cross-river traffic that disrupted the international ferry service at Eagle Pass, under the reasoning of *Conway* and *Fanning*, Congress could have exercised its ability to regulate foreign commerce and prohibited Texas from erecting structures to disrupt that trade with a foreign nation. The international commercial ferry traffic at Eagle Pass is thus sufficient to

17

demonstrate commercial navigability of this segment of the river for purposes of the RHA.

Second, even apart from the documented ferry traffic, the district court correctly relied on other significant evidence that this section of the Rio Grande was historically susceptible to navigation. The court correctly found that a 1975 Corps study memorializes the historical navigability of the relevant river segment. ROA.978-980. To start, the 1975 study is an official government report concluding that this segment of the Rio Grande is a navigable river under the RHA, as reflected by the Fort Worth District's list of navigable waters within its jurisdiction. *See* 33 C.F.R. §§ 329.14-329.16; ROA.763. That study is prima facie evidence of navigability that strongly indicates the United States will be able to prove navigability at trial. It therefore suffices to carry the United States' burden to demonstrate navigability at the preliminary injunction stage, where factual findings may be made "on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Camenisch*, 451 U.S. at 395.

Regardless, the 1975 study's conclusion that this segment of the Rio Grande is navigable was sound. The study found that "a great deal of interest prevailed during the period between 1829-1882 pertaining to transportation of goods along the Rio Grande." ROA.1103. Although navigation "above Laredo up to Eagle Pass" was "impeded by rocks and ledges at low water stages," accounts from the

18

era nonetheless "reveal sufficient interest and available commerce to accommodate river travel above Laredo." ROA.1103. Historical accounts also indicate that, with improvements to the channel, the river would be navigable by steamboat to points above river mile 610.0 and well upstream of Eagle Pass, which lies at river mile 475. ROA.1082, 1095, 1103. Keelboat navigation was successfully completed to more than 800 miles above Eagle Pass. ROA.1095. Texas characterizes the study as something "found stashed in the Corps' Fort Worth office," Br. 20, as if a 1975 study (the authenticity of which Texas does not challenge) were somehow procured for litigation purposes. But the study's meticulous findings appear in an official government report guiding the Corps' exercise of its RHA jurisdiction and reflect the Corps' longstanding and, until recently, uncontroversial views. ROA.1085 (noting that the Corps "anticipate[d] no controversy in connection with" the 1975 report because the segment "has been on the navigable list of the Fort Worth District from the time of the District's creation in 1950"). As such, it is entitled to a "presumption of regularity." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). And the Corps' conclusions were well-supported and were re-adopted by the Corps in 2011. ROA.763.

No less important, during the late nineteenth and early twentieth century, four Acts of Congress protected the Rio Grande's navigability in connection with

authorizing bridges and other projects involving foreign commerce between Eagle Pass, Texas, and Piedras Negras. ROA.975-976. Those Acts prohibit interference with the "free navigation" of this stretch of the Rio Grande, with Congress providing for redress in federal district court for navigability obstructions and reserving the right to withdraw authorization for the projects "in case the free navigation of the river shall at any time be substantially or materially obstructed." 23 Stat. 29 (1884); 26 Stat. 495 (1890); 26 Stat. 502 (1890); *see also* 42 Stat. 1482 (1923). The statutes reflect, at the very least, a congressional judgment that the Rio Grande near Eagle Pass—the location of the construction authorized by the statutes—is susceptible of navigation and that the capacity of the Rio Grande for future navigation should be preserved.[4] Here, Congress four times sought to preserve the navigability of this section of the river. That congressional judgment is entitled to great weight. *See Appalachian Power*, 311 U.S. at 408 ("When once found to be navigable, a waterway remains so.").

Texas incorrectly dismisses those statutes by quoting *Oklahoma v. Texas*, 258 U.S. 574, 585-86 & n.6 (1922). Br. 24. But that case involved State title to riverbeds under the equal-footing doctrine, *see* 258 U.S. at 578-80, which turns on navigability in the river's natural and ordinary condition *at the time of statehood*,

---

[4] Texas's suggestion that the statutes apply only to the "Rio Grande" generally, Br. 23, is incorrect, as the statutes authorized particular projects in a specific area—Eagle Pass—and required maintaining free navigation in that area.

an analysis that does not include the possibility that reasonable improvements to support navigation could be made, *see PPL Montana, LLC v. Montana*, 565 U.S. 576, 592-93 (2012) (explaining different navigability tests). As the Supreme Court explained in *Appalachian Power*, "navigability to fix ownership of the riverbed" is determined as of the time of statehood, whereas "navigability, for the purpose of the regulation of commerce, may arise later." 311 U.S. at 408. At a minimum, the four statutes show that Congress considered this stretch of the river "susceptible" to navigation and sought to preserve its authority over the river, and such susceptibility is sufficient to establish navigability under *Appalachian Power. Id.* at 406. In *Oklahoma*, by contrast, indications that Congress recognized the potential for future navigation on the Red River would have little to no relevance to navigability at the time of statehood under the equal-footing doctrine.

In any event, the statutes here are materially different from those the Supreme Court considered in *Oklahoma*. There, Congress merely delegated the navigability questions to the Secretary of War, giving him "authority" to "secure free and complete navigation" by requiring alterations in the project. Act of May 15, 1886, c. 332, 24 Stat. 28; *see also* Act of May 17, 1886, c. 354, 24 Stat. 63; Act of June 30, 1916, c. 200, 39 Stat. 251. The Eagle Pass statutes, by contrast, precluded interference with navigation directly and provided redress in federal district court.

The district court's historical navigability analysis is fully consistent with Supreme Court precedent on navigability. In *Economy Light & Power*, the Supreme Court affirmed decisions holding that the Des Plaines River in Illinois was navigable for purposes of Section 9 of the RHA. 256 U.S. at 115-17. That river had not been used in commercial navigation *for a century* beforehand. *Id.* at 117-18. The Court nonetheless emphasized that it could not, "without doing violence to [the] manifest purpose" of the RHA, "limit its prohibition to such navigable waters as were, at the time of its passage, or now are, actually open for use." *Id.* at 124. Instead, navigable waters include long unused rivers and streams that were navigable in the past. *Id.* Just so here.

## 2. Evidence of the river's capacity for future navigation amply supports the court's "navigability" finding.

There likewise was no clear error in the district court's alternative finding that the Rio Grande has the capacity for future navigation. The evidence of historical navigability described above reinforces that the Rio Grande has long been thought susceptible to navigation in this stretch. As the district court found, as early as 1850, a report concluded that "if the channel were improved in certain passages, steam navigation would be entirely feasible." ROA.980. The Corps' 1975 study (again, readopted in 2011) observed that the river's natural flows were diverted, and thereby diminished, at multiple dams, including the Amistad Dam near the Corps' Fort Worth District's upper boundary. ROA.1092-1093. The study

22

found that, even with those diversions, shallow draft boats can navigate the river during periods of sufficient flow, ROA.1096, as Texas proved when installing the barrier, ROA.982 n.15. Indeed, at least one business is already operating commercially on the river, and it sued Texas, alleging that the barrier prevents it from conducting canoe and kayak tours in this section of the river and seeking a permanent injunction to remove the barrier. *See Epi's Canoe & Kayak Team, LLC v. Texas*, No. D-1-GN-23-003613 (98th Jud. Dist. Travis Co. Tex.). And federal agencies likewise operate boats on this section of the river. ROA.1041. As the Supreme Court explained in *Appalachian Power*, the "lack of commercial traffic" is not "a bar to a conclusion of navigability where personal or private use by boats demonstrates the availability of the stream for the simpler types of commercial navigation." 311 U.S. at 416.

That is especially true where, as the study also found, and the district court credited, ROA.981, "[i]mprovement of the Rio Grande for navigation is physically possible" if the river's flow were increased with water from connected reservoirs. ROA.1096. And not much improvement in river flow is necessary to meet the test for navigability. In *Appalachian Power*, for example, the Supreme Court found the New River navigable when it would have been possible to improve the channel "to get 'good sluice navigation of 2 feet at all times'" and the "depth over the shoals could be increased to 2 feet without 'too much increase of velocity of the current.'"

311 U.S. at 417-18. That was true even though such improvements were never carried out and "the region's need for use of the river had so diminished that the army engineers advised against undertaking improvements again, and even referred to the cost as prohibitive." *Id.* at 418. Texas's suggestion, Br. 23, that the Corps would have to "blast[] a canal on par with that in Erie, New York through the bedrock of West Texas" to create a navigable channel is thus unfounded. As the record currently supports, and as the United States will have the opportunity to further prove at trial, repurposing power and irrigation water from upstream dams could provide the necessary flow "for the simpler types of commercial navigation" in the manner contemplated by *Appalachian Power*. 311 U.S. at 416. And that is not a stretch, as many dams across the country have as one of their congressionally authorized purposes the regulation of flow to facilitate navigation. *See*, *e.g.*, *Anderson v. Seeman*, 252 F.2d 321, 326 (5th Cir. 1958) (noting one purpose of dam was to "[b]enefit existing navigation on the Neches River"); *San Luis Unit Food Producers v. United States*, 709 F.3d 798, 801 (9th Cir. 2013) (noting initial congressional prioritization of dam as "first, for river regulation, improvement of navigation, and flood control"); *In re MDL-1824 Tri-State Water Rts. Litig.*, 644 F.3d 1160, 1191 (11th Cir. 2011) (noting that "navigation is universally accepted as an authorized purpose of the Buford Project").

Texas offers two responses to the district court's future navigation analysis, neither of which is persuasive. First, Texas contends that *Appalachian Power* is distinguishable because it involved the Water Power Act rather than the RHA. Br. 21-22. There is nothing to that assertion. In *Appalachian Power*, the Court started with the proposition that "Sections 9 and 10 of the Rivers and Harbors Act of 1899 make it unlawful to construct a dam in any navigable water of the United States without the consent of Congress" and noted that the United States had sued alleging violations of "both the Rivers and Harbors Act and the Federal Water Power Act." 311 U.S. at 398, 401. The Court drew no distinction between navigability under the two statutes, nor did it suggest that its navigability analysis might apply only to the Water Power Act. *Id.* at 406-08. Texas's related assertion, Br. 22, that the Supreme Court "refocused navigability on the *present use* of a waterway" in *United States v. Republic Steel Corp.*, 362 U.S. 482, 483, 485 (1960), is also incorrect, as the navigability of the river in *Republic Steel* was well established and not put in issue.

Texas also contends that the United States failed to quantify what reasonable improvements would be necessary to make the Rio Grande navigable, or to conduct any sort of cost-benefit analysis. Br. 23. Texas's demand for a current cost-benefit analysis is unwarranted, as the Supreme Court in *Appalachian Power* contemplated "a balance between cost and need at a time *when the improvement*

*would be useful*," 311 U.S. at 407-08 (emphasis added). There, the costs of the possible improvements that would make the New River navigable were described by the Corps as "prohibitive," *id.* at 418, yet the Court concluded that the river was navigable nonetheless. *Id.* Thus, no such analysis is required, as Congress does not forfeit its legislative power over a navigable river merely because improvements to facilitate commercial navigation are not currently justified by a cost-benefit analysis. *See id.* Whether the costs justify the necessary improvements is ultimately Congress's call but does not impact the legal analysis of navigability.

As the district court found, reasonable improvements to the Rio Grande to facilitate navigation were contemplated in the late-1800s, but those "improvements were not effectuated, owing to 'the advent of the railroads in 1882' and policy choices prioritizing other river uses and purposes over commercial navigation, including construction of the Amistad Dam to divert water for irrigation." ROA.980. In *Appalachian Power* there was an "absence of use" because of "the coming of the railroad" but the Court held that non-usage "does not affect the navigability of rivers in the constitutional sense." 311 U.S. at 409-410; *see also Econ. Light*, 256 U.S. at 117-18. The same is true here. In any event, the district did not clearly err in finding that the evidence demonstrates improvements to the Rio Grande, reprioritization of water from nearby reservoirs, or even modest changes in flow due to natural causes would make the river susceptible to use in

26

commercial navigation. ROA.981-982. Even if a cost-benefit analysis were required on the merits (which it is not), Texas's demand for a full cost-benefit analysis now demands a level of proof far beyond that necessary at the preliminary injunction stage. *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009) ("A plaintiff is not required to prove its entitlement to summary judgment in order to establish 'a substantial likelihood of success on the merits' for preliminary injunction purposes.").

The facts of *Appalachian Power* are particularly instructive on this issue. In *Appalachian Power*, the Court reversed decisions that erroneously determined the New River in Virginia and West Virginia was not navigable without considering evidence that improvements could make that river available for commercial navigation. 311 U.S. at 406-07. Like the Rio Grande's upper reaches (ROA.1095, 1103), in the 19th century the Radford-Wiley's Falls segment of the New River was navigable by shallow-draft keelboats ("eight feet wide, drawing two feet") and there was interest in improving the channel to facilitate such navigation. 311 U.S. at 417-18. Although those plans were eventually abandoned due to changing economic conditions that made the cost "prohibitive," the Court held the segment navigable based on its historic use and its improvability for keelboat navigation. *Id.* at 418. A river does not lose its navigable-water status merely because alternative uses of the water (like hydropower development) become more economically

27

favored. *See id.* at 426. Such uses are "from the public's standpoint a by-product of the general use of the rivers for commerce." *Id.* Here too, the Rio Grande's current prioritization for power generation and irrigation (ROA.1093, 1096, 1113) does not change its legal status as a navigable water.

There was thus no error in the district court's finding of navigability on either ground, let alone clear error on both grounds.

### B. Texas's barrier obstructs the Rio Grande's navigable capacity.

The district court correctly held that the United States will likely succeed in proving that Texas's barrier violates Section 10 as an obstruction to the Rio Grande's navigable capacity. ROA.983-88; *see* 33 U.S.C. § 403. The district court's factual findings are correct and certainly not clearly erroneous.

Whether there is an obstruction to a river's navigable capacity is a question of fact. *United States v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690, 710 (1899). As a threshold matter, the barrier Texas built in the Rio Grande is *designed* to obstruct passage across the river; indeed, that is the entire purpose of the barrier. ROA.984. It therefore reduces the navigable capacity of the river in that respect, as the district court found credible evidence that it presents "a structural barrier to cross-river navigation." ROA.984. The Court need go no further in its analysis of the issue.

Texas contends that there is no obstruction to navigable capacity here because the obstruction must "tend to destroy the navigable capacity" of the river, and boats can go around its barrier, which lies parallel to the current. Br. 27 (quoting *Republic Steel*, 362 U.S. at 487-88). But the snippet from *Republic Steel* that Texas relies on was itself quoting *Rio Grande Dam*, 174 U.S. at 709, which goes on to explain the test: whether the "act sought to be enjoined is one which fairly and directly tends to obstruct (that is, *interfere with or diminish*) the navigable capacity of a stream." *Rio Grande Dam*, 174 U.S. at 709 (emphasis added). Texas's contention is also entirely atextual; an "obstruction" is simply something that "impedes or hinders" or is "an obstacle." Black's Law Dictionary (11th ed. 2019). It need not prevent or "destroy" the thing that it is obstructing. Texas is thus wrong on the governing standard, and *Republic Steel* did not change the meaning of "obstruct" or narrow the governing test—indeed, the very passage Texas quotes gives "the concept of 'obstruction,' as used in [Section] 10, broad sweep." 362 U.S. at 487. And as the Supreme Court further emphasized, courts must avoid adopting "a narrow, cramped reading of . . . Section 10." *Id.* at 491.

Caselaw implementing the RHA is clear that the orientation of the obstruction is irrelevant and that any interference with navigable capacity is sufficient. Courts routinely find "obstruction" by objects that do not extend perpendicularly from the shore, including this Court's finding that a sunken

schooner in the St. John's River created an obstruction to that river's navigable capacity. *United States v. Raven*, 500 F.2d 728, 731 (5th Cir. 1974); *see also United States v. Estate of Boothby*, 16 F.3d 19, 21 (1st Cir. 1994) ("We believe that this regulation lawfully can be applied to houseboats that are found to constitute permanently moored vessels." (citing *United States v. Boyden*, 696 F.2d 685, 687 (9th Cir. 1983))); *United States v. Angell*, 292 F.3d 333 (2d Cir. 2002) (finding houseboat an obstruction in canal). If permanently moored houseboats and an "83 ft. schooner" that was "grounded . . . toward the [St. John's River's] easterly shore," at a point of the river near 2-miles wide, *Raven*, 500 F.2d at 730, create an obstruction to navigable capacity, surely a 1,000-foot barrier in the middle of the river does. Indeed, any unauthorized obstruction of any scale to the navigable capacity is prohibited, whether it be industrial solids deposited into the river, *Republic Steel*, 362 U.S. at 485, or dams built far upstream in non-navigable stretches of the river, *Rio Grande Dam*, 174 U.S. at 709.

Regardless, the district court found that the barrier does obstruct navigation even up and down the river because anyone navigating the river must heed and avoid the barrier, particularly its submerged concrete anchors, which "present a serious risk to watercraft of any kind." ROA.985. Texas attacks that finding, claiming that it is "unsupported by record evidence." Br. 31. But there is ample evidence, from Texas's own witnesses, that the barrier includes submerged

concrete anchoring blocks on either side of the visible buoys, including

photographic evidence of the blocks themselves. ROA.74-75; ROA.96-98

(photographs); ROA.299 (Texas's brief, collecting citations); ROA.326 (Texas's

declaration); ROA.896 (U.S. declaration); ROA.2283-2284, 2290, 2293. And the

district court also relied on evidence that anyone navigating the river would have to

take note of and avoid the barrier. ROA.984-985; ROA.526-528. That is a

sufficient evidentiary basis for the district court's finding that the barrier, including

its concrete blocks, obstructs the river's navigable capacity because it tends to

"interfere with or diminish" that capacity. *Rio Grande Dam*, 174 U.S. at 709.

Against that factual record, Texas cannot seriously argue that its anchored, 1,000-

foot-long, 16-foot-wide barrier is like a "stray soccer ball," Br. 31, or that it does

not result in "clogging of the channel," *id.* at 30 (citing *Vieux Carre Property*

*Owners, Residents & Assocs., Inc. v. Brown*, 875 F.2d 453, 462 (5th Cir. 1989)).

Further, the barrier's location in the middle of the river restricts a vessel's

ability to freely navigate by, for example, preventing it from moving to one side of

the river to avoid shallows and hidden obstacles in the river course. ROA.986. As

the district court found, it is "imperative for anyone piloting down the river to have

free reign of the entire width and a clear view of all obstacles, lest they be forced

into a hazard." ROA.986. Indeed, in this respect at least, the barrier's placement in

the middle of the river makes it more of an obstruction to navigable capacity than

docks extending from the shore out some distance into a river, which even Texas

admits are obstructions to navigable capacity. Br. 28 (citing *Angell*, 292 F.3d at

335; *United States v. W. Indies Transp., Inc.*, 127 F.3d 299, 310 (3d Cir. 1997);

*Norfolk & W. Co. v. United States*, 641 F.2d 1201, 1211 (6th Cir. 1980)).

Texas also suggests that navigable capacity should be considered only in

relation to present-day commerce. Br. 28. But the statutory language precludes

obstruction to "navigable capacity," and the "Supreme Court has encouraged a

broad interpretation of a section 10 'obstruction.'" *Vieux Carre*, 875 F.2d at 462-

63. This Court has therefore approved consideration of "possible future effects in

navigable waters." *Id.* A 1,000-foot-long, 16-foot-wide barrier of buoys, chain, and

concrete running down the middle of the Rio Grande obstructs the river's *capacity*

for navigation, as any watercraft in the area is affected for as long as the barrier

remains. And it is not just the current barrier that matters in the analysis, as Texas

has announced its intention to build more, and the preliminary injunction restrains

Texas from doing so. Any additional barrier would further obstruct the Rio

Grande's navigable capacity.

Finally, Texas is wrong to contend that the treaties between the United

States and Mexico are evidence that Congress has allowed obstructions to cross-

river navigation. Br. 31-32. The cited portions of those treaties recognize a free-

navigation rule first mandated in the Treaty between the United States of America

and the Mexican Republic of Peace, Friendship, Limits, and Settlement, February 2, 1848, 9 Stat. 922, 1848 WL 6374.[5] That treaty provides that navigation on the Rio Grande "shall be free and common to the vessels and citizens of both countries; and neither shall, without the consent of the other, construct any work that may impede or interrupt, in whole or in part, the exercise of this right; not even for the purpose of favoring new methods of navigation." *Id.* art. VII. Nowhere in the 1848 Treaty, or in the subsequent treaties requiring the continued adherence to that free-navigation rule, did the two countries limit the rule to only navigation up and down the river. To the contrary, the same provision in the 1848 Treaty imposing the free-navigation rule explicitly contemplates cross-river navigation, as it recognizes that either country's vessels or citizens could be landing upon the other country's shores. *See id*. To the extent Texas also relies on a later 1944 treaty to support its argument that "buoys" are allowed, which it claims suggests cross-river impediment to navigation is permitted, Br. 32 (citing Treaty on Utilization of Waters of the Colorado and Tijuana Rivers and of the Rio Grande, art. 21, Feb. 3, 1944), the argument has no merit because that provision addresses marker buoys that are placed in "artificial lakes" (not the regular course of the river) by the

---

[5] On October 23, 2023, the United States amended its complaint to add a count alleging that Texas's construction of the barrier is preempted by the 1848 Treaty. ECF 60. The merits of that claim are not before this Court in this preliminary injunction appeal.

International Boundary and Water Commission with the consent of both governments, none of which is the case here. No treaty restricts the RHA to cover only navigation up and down the Rio Grande.

### C.   Texas's barrier is a "boom" or "other structure" built without a permit.

The district court also correctly concluded that the United States is likely to prove that Texas violated Section 10's second clause, which makes it unlawful to "build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures" in a "navigable river, or other water of the United States" without a Corps permit. 33 U.S.C. § 403.

As the court concluded, a "boom" generally means "a strong chain of connected floating objects"—exactly what we have here—without any requirement that they extend shore-to-shore. ROA.989-990. The essence of a "boom" is that it "obstruct[s] passage," *Boom*, Webster's International Dictionary of the English Language (1890), whether of vessels, logs, or—as Texas intended—persons and goods. Obstruction of passage may occur laterally as well as longitudinally. For example, a boom may "enclos[e] an area of water" without crossing a river. *Boom*, Webster's Revised Unabridged Dictionary (1913). Moreover, it is not hard to find descriptions and drawings of booms, contemporaneous with the RHA's enactment, that run longitudinally with the river. *E.g.*, *Atlee v. Union Packet Co.*, 88 U.S. 389,

392 (1874) (describing boom running parallel to shore); Frank Leslie, *The Great Log Jam*, Popular Monthly (July 1901), http://www.catskillarchive.com/rrextra/lgjam.html (depicting boom running length of river, parallel to shore).[6]

In any event, Texas's barrier is also clearly prohibited as an "other structure" built without authorization. ROA.990-992. A "structure" is "that which is built or constructed" including "any production or piece of work artificially built up, or composed of parts joined together in some definite manner." *Structure*, The Century Dictionary and Cyclopedia (1900). As the district court concluded, if a "1,000-foot-long barrier of four-foot-spherical buoys, fastened directly underneath with two feet of stainless steel mesh and tethered via chains to heavy concrete blocks placed systematically on the river bed," is not a structure built in the river, then "it is hard to imagine what *would* be." ROA.992 (cleaned up).

---

[6] Texas's contention that the district court violated "the party-presentation principle" by concluding that the barrier was a "boom" notwithstanding a supposed "concession" to the contrary, Br. 34 (citing *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579-81 (2020)), is specious. The United States expressly argued below that the barrier was a boom. ROA.80. That one witness answered "No" when asked whether he would consider the buoys a boom, ROA.1468, was obviously not a concession by the United States, and the district court correctly resolved this legal issue consistent with the United States' position. Regardless, "it is well settled that a court is not bound to accept as controlling stipulations as to questions of law," *Equitable Life Assur. Soc. of U.S. v. MacGill*, 551 F.2d 978, 983 (5th Cir. 1977), and whether the barrier constitutes a boom within the meaning of the statute is a question of law (or at least an application of law to fact).

In arguing that its barrier system is not a "structure," Texas does not actually engage with definitions of that term, and it does not even *argue* that its barrier system does not qualify as a "structure" as that term would commonly have been understood at the time of the RHA's enactment. Texas instead bases its statutory-text argument almost entirely on the *ejusdem generis* principle that a catchall phrase like "other structure" "encompass[es] only what is similar in nature to the preceding specific terms." Br. 35.

That tactic fails for multiple reasons. The principle that Texas invokes is an application of the more basic principle that statutory terms are interpreted according to their ordinary meaning. Thus, it is not a "cast-iron rule," nor may it be applied "to defeat the real purpose of the statute." *United States v. Mackay*, 757 F.3d 195, 197-98 (5th Cir. 2014). Texas's invocation of *ejusdem generis* comes nowhere close to justifying the State's claim that "structure" should be read as excluding its 1,000-foot-long barrier anchored by concrete. Initially, every feature of this clause—including its use of the word "any" and its enumeration of eight terms followed by the catchall term "other structures"—suggests that it was intended to comprehensively establish a need for federal permission before construction of any structures in navigable waterways. There is no indication that Congress intended to limit the clause's requirement to seek that permission to particular *species* of structures, as Texas contends. Br. 35-36.

36

But even assuming the "similar in nature" requirement applies to "other structure," it is easily met here. Each item in the list is a structure that is built in water and tends to obstruct navigation, nothing more. The catchall term "other structure" is thus intended to capture structures built in water that might obstruct navigation. Texas's barrier squarely fits that description. As the district court noted, "the floating barrier meets all of Texas's own criteria for a 'boom' except for its orientation to the banks of the river." ROA.991. As noted above, the directional distinction Texas invokes does not even take its barrier out of the "boom" category. But even if the barrier is not a boom, it strains credulity for Texas to contend that the barrier is so *fundamentally* unlike a boom and the other listed terms as to justify Texas's argument that it is not even an "other structure."

Urging otherwise, Texas contends that its barrier is unlike the RHA's list of prohibited structures because those structures supposedly have two things in common that it claims its barrier lacks: "permanence and the capacity to stretch across a waterway." Br. 36. Neither of those distinctions is persuasive. For example, Texas does not contend that all the specifically listed items *in fact* stretch across a waterway, and they obviously do not—a pier, for example, does not invariably or even usually stretch across an entire waterway, and many of the other listed terms do not either. Plus, bulkheads and breakwaters typically run parallel to the shore to control erosion. And surely Texas's 1,000-foot-long barrier also has

37

the "capacity to stretch across" the 200-foot-wide Rio Grande, even if it is currently not employed in that manner.

Texas's argument based on permanence fares no better. The word permanent appears nowhere in the RHA, and courts "may not narrow a provision's reach by inserting words Congress chose to omit." *Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1725 (2020). Permanence is not a quality inherent in the word "structure," nor is there any apparent reason why Congress would want the requirement to seek a Corps permit to depend on whether a putative structure theoretically could be removed. Texas does not show any meaningful sense in which its 1,000-foot-long barrier anchored to the riverbed by 140 tons of concrete blocks is any less "permanent" than the other enumerated terms, each of which could be disassembled.

### D. Texas's constitutional avoidance arguments are without merit.

Texas briefly argues, Br. 40-42, that this Court should adopt a narrow reading of the RHA, allowing Texas's barrier, to avoid potential conflicts with the Commerce Clause and the State War Clause of the Constitution. The narrowing canon of constitutional avoidance that Texas invokes applies only where there is room in the statute for ambiguity. *Nielsen v. Preap*, 139 S. Ct. 954, 972 (2019). The RHA's prohibitions, however, are clear and do not admit room for the use of such interpretive tools. Texas's constitutional avoidance arguments therefore fail.

38

Texas first suggests that the district court's reading of the RHA potentially raises a Commerce Clause issue that this Court ought to avoid. Br. 40. According to Texas, if there is no evidence of current commercial navigability, then Congress's authority over the river is doubtful because the federal government cannot "bring the subject of the regulation into existence" by speculating on future navigability. *Id.* (quoting *NFIB v. Sebelius*, 567 U.S. 519, 550-58 (2012)). But that runs headlong into *Appalachian Power*, which holds that preserving Congress's authority over the channels of commerce requires interpreting the RHA to preserve Congress's ability to make policy determinations about how to use potentially navigable waters. 311 U.S. at 408 ("The power of Congress over commerce is not to be hampered because of the necessity for reasonable improvements to make an interstate waterway available for traffic."). *Appalachian Power* directly applies to this case.

The State next contends that this Court should nonetheless read the RHA narrowly to allow Texas's barrier to avoid the constitutional question whether requiring Texas to remove the barrier would be contrary to its supposed right to "engage in war" when it is "actually invaded." En Banc Br. 41. Texas devotes barely more than a page to the issue in its en banc brief (after not raising it at all in its en banc petition).

The doctrine of constitutional avoidance cannot apply to narrow the RHA's scope, as Texas has never offered (and the RHA is not susceptible to) any plausible alternative interpretation of the statutory text that would permit Texas's conduct. *Jennings v. Rodriguez*, 138 S. Ct. 830, 843 (2018). The Court should go no further given that Texas forfeits any claim that its "invasion" argument should override the RHA, rather than inform its interpretation, and that courts do not decide novel constitutional issues gratuitously. Moreover, it would be premature to go further in this preliminary-injunction appeal, where Texas has not even attempted to show any actual conflict between the RHA and Texas's desire to exercise its asserted power by building a barrier in the Rio Grande. Texas could have sought Congress's consent to its obstruction of the Rio Grande's navigable capacity. It could have requested a jurisdictional determination from the Corps as to whether the Rio Grande is a navigable river under the RHA, contended in the administrative process that the river was not navigable in this segment, and built a factual record. *See* 33 C.F.R. § 331.2. And it could have challenged any resulting jurisdictional determination by the Corps under the Administrative Procedure Act. *See Hawkes v. U.S. Army Corps of Engineers*, 578 U.S. 590 (2016). Or it could have sought an expedited Corps permit for its barrier. *See* 33 C.F.R. § 325.2(e)(4). If the permit were denied, Texas could have challenged that agency action by seeking judicial review in federal court, too. The failure to substantiate any actual

conflict between the RHA and Texas's supposed right to "engage in war" is a
sufficient basis on which to resolve the issue in this appeal, which Texas has
conspicuously limited to constitutional avoidance. Initial Br. 31, 33-39; Br. 41.

Still, Texas's theory does not raise any serious constitutional question that
could inform this Court's interpretation of the RHA (or the resolution of this
appeal). As the district court in *United States v. Texas* comprehensively explained,
"all tools of constitutional construction cut against Texas's position," 2024 WL
861526, at *25, and they do so on every front. Every court to consider the issue has
concluded that irregular migration is not an "invasion" activating a state's war
powers. *See California v. United States*, 104 F.3d 1086, 1090-91 (9th Cir. 1997);
*New Jersey v. United States*, 91 F.3d 463, 469-70 (3d Cir. 1996); *Padavan v.
United States*, 82 F.3d 23, 28 (2d Cir. 1996). Instead, an invasion under the
Constitution is "armed hostility from another political entity, such as another state
or foreign country that is intending to overthrow the state's government." *Padavan*,
82 F.3d at 28; *California*, 104 F.3d at 1091; *Debates and Other Proceedings of the
Convention of Virginia* 302 (2d ed., 1805) (reflecting James Madison's
understanding that "invasion" means "invasion from other states, as well as from
foreign powers").

That conclusion is consistent with the Constitution's text, 2024 WL 861526,
at *26-*27, and its structure, *id.* at *28-*29. There is no historical evidence

supporting Texas's interpretation, *id.* at *30-*33, and mounds of evidence against it, *id.* Most prominently, James Madison explained that "Invasion is an operation of war" and to "protect against invasion is an exercise of the power of war" and does not relate to the removal of noncitizens. James Madison, The Report of 1800 (Jan. 7, 1800). Even if irregular migration could be an "invasion," whether it is an invasion under any particular set of facts, at least in a dispute between the United States and a State, is nonjusticiable. *See California*, 104 F.3d at 1090-91; *New Jersey*, 91 F.3d at 469-70; *Padavan*, 82 F.3d at 28; *Chiles v. United States*, 69 F.3d 1094, 1097 (11th Cir. 1995); *cf. Texas v. United States*, 106 F.3d 661, 667 (5th Cir. 1997) (finding that Texas "suggests no manageable standards by which a court could decide the type and degree of immigration law enforcement that would suffice to comply with [the] strictures" of the Constitution). That does not mean that Texas's conduct is unreviewable, but that its use of that conduct to *defend* against an otherwise meritorious RHA claim is nonjusticiable and thus unavailable as a defense and should "be rejected in the same way that nonjusticiable claims are rejected" because to hold otherwise "would give any state the right to ignore the Supremacy Clause so long as it could imagine a nonfrivolous claim of invasion." 2024 WL 861526, at *37.

Further, Texas does not even claim to be taking the action putatively authorized under the State War Clause by being "engaged in war" with anyone,

much less another state, foreign nation, or "political entity." *Padavan*, 82 F.3d at
28. That is ample enough reason to reject its argument. But even if it were engaged
in war, Texas's conduct exceeds the very limited circumstances in which the
Constitution authorizes a state to do so. Congress has the power to declare war,
U.S. Const. art. I, § 8, cl.11, and states generally may not engage in war, *id.* § 10,
cl.3. Texas must therefore "cede authority to the federal government to conduct
that war once the federal government has had time to respond to the purported
invasion." 2024 WL 861526, at *35. Texas cites only one historical example of an
invocation of the State War Clause, and it did not involve irregular migration. Br.
41 (citing Report of U.S. House Special Committee on Texas Frontier Troubles
164-67 (Feb. 29, 1876)). There, when Texas sent men into Mexico in the mid-19th
century, it did so primarily in pursuit of forces led by Juan Cortina that had
previously captured the American city of Brownsville, and which later sent large
raiding parties across the Rio Grande to plunder towns and ranches near the border
before fleeing back to Mexico. Report on Texas Frontier Troubles at 13-15. Texas
does not contend that cartels are carrying out comparable attacks on its cities
today. And even in the mid-19th century, the Governor of Texas recognized that if
the federal government concluded that his order to pursue the raiding parties into
Mexico was "in contravention of the laws of the United States, when notified of
the decision, I will revoke the order" because "if the officers of the United States

43

Government entertain a different view, they have the power to prevent its enforcement." *Id.* at 167.

In Texas's view, any state has the ability to supersede federal law on the fiat of a state governor and then ignore the federal government's contrary response, dragging the nation into war based on nothing more than the declaration of a governor that immigration has become invasion. That conclusion would be flatly inconsistent with the principle that, with narrow exceptions, the Constitution provides for a "complete delegation of authority to the Federal Government to provide for the common defense," while "divest[ing] the States of like power." *Torres v. Texas Dep't of Pub. Safety*, 597 U.S. 580, 590 (2022). And it would flout the principle that "the Constitution guarantees the entire independence of the General Government from any control by the respective States." *Trump v. Anderson*, 144 S. Ct. 662, 668 (2024) (quoting *Trump v. Vance*, 591 U.S. 786, 800 (2020), quoting *Farmers and Mechanics Sav. Bank of Minneapolis v. Minnesota*, 232 U. S. 516, 521 (1914)). This Court should reject Texas's "invasion" argument.

## II. The district court did not abuse its discretion in weighing the equities.

The district court concluded that the equities favored the United States in two alternative ways, either of which independently supports affirmance.

**A.    The district court correctly held that Congress decided the public interest in the RHA.**

First, the district court concluded that, where there is a clear violation of the RHA, injunctive relief may issue without further examination of irreparable harm or the balance of equities, because Congress has already resolved where the public interest lies. ROA.999-1001. As the Supreme Court has explained, when considering injunctive relief in an RHA case, courts "are not at liberty to consider [alleged harms to a defendant liable under RHA Section 10] as against the edict of a paramount power." *Sanitary Dist. of Chicago v. United States*, 266 U.S. 405, 432 (1924). That is because "this is not a controversy between equals" and "the authority of the United States to remove obstructions to interstate and foreign commerce . . . is superior to that of the States." *Id.* at 425-26.

Though it has not yet considered injunctive relief in an RHA case, this Court has similarly recognized that when the United States seeks an injunction enforcing a public-interest statute, the "extraordinary weight courts of equity place upon the public interests in a suit involving more than a mere private dispute" justifies a court in granting a preliminary injunction "without making findings of irreparable harm, inadequacy of legal remedy, or the balance of convenience." *United States v. Marine Shale Processors*, 81 F.3d 1329, 1358-59 (5th Cir. 1996); *see also United States v. FDIC*, 881 F.2d 207, 210 (5th Cir. 1989); *City of New York v. Golden Feather Smoke Shop, Inc.*, 597 F.3d 115, 120-21 (2d Cir. 2010). The RHA

preserves the public interest in navigation of the nation's waterways. Other courts have therefore applied that rule to violations of RHA Section 10. ROA.1000; *United States v. Milner*, 583 F.3d 1174, 1193-94 (9th Cir. 2009) ("No balancing of interest or need to show irreparable injury is required when an injunction is sought under [RHA] § 12 to prevent erection or seek removal of an unlawful structure.") (citation omitted); *United States v. Stoeco Homes, Inc*., 498 F.2d 597, 611 (3d Cir. 1974) (same).

Texas did not attempt to rebut this point before the district court and so has forfeited its arguments here. *Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021) ("A party forfeits an argument by failing to raise it in the first instance in the district court—thus raising it for the first time on appeal."). Texas nonetheless contends that those cases do not survive the Supreme Court's decision in *Winter*. En Banc Br. 42. But this Court must apply its precedents unless "unequivocally overruled" by the Supreme Court. *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021) (noting that "for a Supreme Court decision to change our Circuit's law, it '. . . must 'unequivocally' overrule prior precedent'") (citation omitted). And contrary to Texas's assertion, *Marine Shale Processors* is consistent with *Winter*. The United States does not ask to be excused from *Winter*'s four factors. Instead, this Court's decision in *Marine Shale Processors*, the Supreme Court's decision in *Sanitary District*, and the RHA Section 10 cases

46

hold that for some statutes, including the RHA, Congress has already decided that the public interest weighs so heavily in favor of an injunction as to be determinative under "traditional principles of equity." *Marine Shale Processors*, 81 F.3d at 1358-59. That is because of the "extraordinary weight" courts place upon the public interest and the "deference courts afford the political branches in identifying and protecting the public interest." *Id.* at 1359.[7]

The rule from *Marine Shale Processors* is also consistent with other Supreme Court cases. For example, the Supreme Court has held that federal courts' equitable discretion cannot "override Congress' policy choice, articulated in a statute, as to what behavior should be prohibited." *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001). Congress made just such a policy choice in the RHA. *See Sanitary Dist. of Chicago*, 266 U.S. at 432. As the Court explained, in an RHA enforcement action, "[t]here is no question" that "the authority of the United States to remove obstructions to interstate and foreign commerce . . . is superior to that of the States" to implement policies they allege will "provide for the welfare or necessities of their inhabitants." *Id.* at 426. Given

---

[7] *Marine Shale Processors* also notes that under traditional equitable principles, "a court need not balance the hardship when a defendant's conduct has been willful." 81 F.3d at 1358. Texas's open defiance of the RHA thus equally requires a preliminary injunction without further consideration of the equities.

that authority and policy choice of Congress to implement it through the RHA, no

further balancing is required once an RHA violation is found.

Here, the district court concluded that "preliminary injunctive relief is the

only viable mechanism for remedying Texas's statutory violation of the RHA," a

statute that expressly provides for injunctions, 33 U.S.C. § 406, and thus the court

properly concluded relief was appropriate even without further reference to

irreparable harm or the balance of equities. ROA.1001.

**B.     The district court did not abuse its discretion in finding that the equities weigh in favor of an injunction.**

Moreover, the district court was well within its discretion in alternatively

determining that the equities support an injunction. It correctly found that the

barrier is causing significant and ongoing harm to the nation's conduct of foreign

relations with Mexico. ROA.1001-1002. At the hearing, the government's witness

on U.S.-Mexico border matters testified that the barrier is a "major concern" for

Mexico and "will have an adverse impact on U.S. foreign policy" if not removed

expeditiously. ROA.2243, ROA.2253; ROA.1054. As Hillary Quam, the State

Department's U.S.-Mexico Border Coordinator, noted in her declaration, the

barrier's presence in the Rio Grande, if allowed to persist, "would become a major

irritant in U.S.-Mexico relations." ROA.1057. The district court found that

testimony and other "credible evidence" established that the "harm from the

floating barrier is immediate and ongoing" by placing "tremendous strain on the

48

U.S.-Mexico relationship." ROA.1001. In addition, the district court found that the barrier is an obstacle to "critical discussions between the two nations" on Rio Grande water delivery that are at a "sensitive stage." ROA.1002. In light of Texas's conduct, Mexico cancelled a July meeting of those negotiations and "indicated that [it is] less inclined to conclude an Emergency Minute by the end of the year while the buoy barrier remains in place." ROA.2256; ROA.1046. The district court also found that the barrier threatens implementation of the 1944 Treaty between the United States and Mexico and has resulted in humanitarian concerns raised by Mexico "at the highest diplomatic levels." ROA.1002.

That uncontroverted evidence that Texas's barrier is hampering foreign relations is sufficient to warrant injunctive relief, especially because the "nuances of the foreign policy of the United States . . . are much more the province of the Executive Branch and Congress than of this Court." *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 386 (2000). The United States demonstrated diplomatic injury, and the district court did not clearly err in relying on that evidence. *See*, *e.g.*, *Sesay v. United States*, 984 F.3d 312, 315 (4th Cir. 2021) ("[J]udicial deference is required where executive officials, such as the consular officer here, possess expertise in matters falling outside judicial competency, including local conditions in foreign countries, diplomatic relationships and protocols, and national security needs.").

Texas also has not addressed, much less shown abuse of discretion in, the district court's finding that "Texas's conduct irreparably harms the public safety, navigation, and the operations of federal agency officials in and around the Rio Grande." ROA.1005. For example, both the U.S. Border Patrol and the International Boundary and Water Commission carry out activities requiring the ability to freely navigate the river in boats. ROA.1027; ROA.1041-1042; ROA.1048.

Texas contends that because the district court entered an injunction that does not fully remedy the harms that the United States proved, the United States must not be suffering those harms in the first place. Br. 44 (referencing Judge Willett's suggestion that the injunction does not alleviate harm because it requires shifting the barrier to the riverbank rather than removing it). Texas errs in conflating those analytically distinct issues. Both the district court and the panel correctly found that the barrier is causing significant and ongoing harm to the nation's conduct of foreign relations with Mexico, as well as harm to federal operations on the river, which the panel found to be "particularly concerning." ROA.1001-1002; *Abbott*, 87 F.4th at 635 & n.20.

Urging otherwise, Texas cites a supposed "concession" from counsel for the United States at oral argument. Br. 44. Counsel accurately stated that there was no record evidence that moving the barrier to the riverbank would remedy the

diplomatic tensions—which is unsurprising since the United States had not

requested that particular remedy. The district court imposed that remedy as an

*intermediate* measure in light of the preliminary nature of its ruling. ROA.1006 &

n.32. Texas has no legal basis to fault the district court for not ordering *additional*

*relief* against Texas.

Additionally, the question at argument pertained only to diplomatic tensions,

but the injunction requires Texas to move the barrier to the "bank of the Rio

Grande" so that it does not "impede or impair in any way navigation" while

litigation is pending. ROA.1006 & n.32; *Abbott*, 87 F.4th at 634 n.18. The

injunction therefore provides significant relief in removing the obstruction to

navigation from the water and addresses the statutory violation of obstructing the

river's navigable capacity. 33 U.S.C. § 403. And by prohibiting the barrier from

obstructing navigation, the injunction directly addresses the harms to federal

operations on the water. The injunction also prevents Texas from building any

more barriers in this segment of the Rio Grande, providing important relief on that

front as well; Texas does not address this aspect of the injunction whatsoever. *See*

*infra*, Part III.

If the preliminary injunction does not go far enough, perhaps that would

have been grounds for a cross-appeal by the United States. But the United States

was not required to cross-appeal to prove its harms—it made that showing through

51

testimony from several government officials—and Texas does not explain how vacating the injunction will make the situation better rather than worse. Thus, the injunction was intended to provide meaningful interim relief until the district court resolves the case on its merits.

As for its own harms, Texas speculates that the barrier will reduce illegal immigration and criminal trafficking, but the district court found that Texas did not present any credible evidence that the barrier has accomplished that goal. ROA.1004. And there is no such evidence. As Judge Willett recognized, "Texas has not offered concrete evidence that the barrier has saved lives or reduced illegal crossings and drug trafficking." *Abbott*, 87 F.4th at 643 (Willett, J., dissenting).[8] In balancing the real harms suffered by the United States against the entirely speculative claims by Texas, the district court correctly issued an injunction (and at minimum, did not abuse its discretion).

---

[8] Texas's assertion that the district court wrongly prohibited it from asking a government witness about unlawful migration generally—which Texas states in its introduction and then never repeats, Br. 2—is also plainly without merit. What the district court disallowed was Texas's attempt to improperly introduce evidence by asking a government witness questions that she testified were beyond her personal knowledge. ROA.995 n.28. In any event, these topics were irrelevant given the district court's correct conclusion that there is no credible evidence that the barrier has reduced illegal immigration and criminal trafficking.

## III.    At minimum, the district court's prohibitory injunction should be affirmed.

Texas said in its initial brief that it is appealing the "entire injunction," Initial Br. 12, but it never presented any argument about the injunction's prohibition on building further barriers without federal authorization during this appeal, which is subject to a distinct analysis. Any argument against the prohibitory injunction is thus forfeited. *Norris v. Causey*, 869 F.3d 360, 373 n.10 (5th Cir. 2017); Fed. R. App. Proc. 28(a)(8)(A). Regardless, any such argument fails because new unauthorized barriers would violate the RHA in the same way and only increase the harms to navigation, federal operations, and foreign relations that Texas's initial barrier has caused.

## CONCLUSION

This Court should immediately dissolve the administrative stay and affirm the district court's preliminary injunction order.

Respectfully submitted,

/s/*Andrew M. Bernie*
TODD KIM
*Assistant Attorney General*

JAIME ESPARZA
*United States Attorney*

LANDON A. WADE
*Assistant United States Attorney*
United States Attorney's Office
Western District of Texas
903 San Jancinto Blvd., Ste 334
Austin, TX 78701

MICHAEL T. GRAY
ANDREW M. BERNIE
*Attorneys*
Environment and Natural Resources
Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
(202) 514-4010
andrew.m.bernie@usdoj.gov

March 2024
90-5-1-1-22454

## CERTIFICATE OF SERVICE

I hereby certify that on March 18, 2024, I electronically filed the foregoing response with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.

The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/*Andrew M. Bernie*
ANDREW M. BERNIE
Attorney, Appellate Section
Environment and Natural Resources
Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
(202) 514-4010
andrew.m.bernie@usdoj.gov

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

I hereby certify that this response complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font.

I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains **12,878 words**, excluding the parts of the response exempted under Rule 32(a)(7)(B)(iii), according to the count of Microsoft Word.

/s/*Andrew M. Bernie*
ANDREW M. BERNIE
Attorney, Appellate Section
Environment and Natural Resources
Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
(202) 514-4010
andrew.m.bernie@usdoj.gov