## CASE NO. 23-50632

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

GREG ABBOTT, IN HIS CAPACITY AS GOVERNOR OF THE STATE OF TEXAS; STATE OF TEXAS,

*Defendants-Appellants.*

———————————

Appeal from the United States District Court for the Western District of Texas
No. 1:23-CV-853

———————————

## MOTION OF THE CATO INSTITUTE AND PROFESSOR ILYA SOMIN FOR LEAVE TO FILE BRIEF AS *AMICI CURIAE* IN SUPPORT OF APPELLEE'S SUPPLEMENTAL *EN BANC* BRIEF

———————————

Ilya Somin
    *Counsel of Record*
Scalia Law School
George Mason University
3301 Fairfax Dr.
Arlington, VA 22201
(703) 993-8069
isomin@gmu.edu

*Counsel for Amici Curiae*

March 22, 2024

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

CASE NO. 23-50632

*United States v. Abbott.*

The undersigned counsel of record certifies that the following listed persons
and entities as described in Local Rule 28.2.1 have an interest in the outcome of this
case. These representations are made in order that the judges of this court may
evaluate possible disqualification or recusal.

| Person or Entity | Connection to Case |
|---|---|
| Professor Ilya Somin | Counsel to *amici* |
| Cato Institute | *Amicus curiae* |

*Amici* Cato Institute is a Kansas nonprofit corporation that has no parent
companies, subsidiaries, or affiliates, and does not issue shares to the public.

/s/ Ilya Somin

**MOTION FOR LEAVE TO PARTICIPATE AS *AMICI***

Pursuant to Fed. R. App. P. 29(b), *amici* respectfully move for leave to file a brief as *amici curiae* in support of Appellee's supplemental *en banc* brief. All parties consented to the filing of this *amici* brief and do not object to this motion for leave to file.

The Cato Institute has a fundamental interest in ensuring accountability for public officials, and as part of its mission, the Cato Institute regularly files *amicus* briefs in courts around the country. The Cato Institute has special expertise on issues concerning immigration policy and separation of powers and has filed multiple amicus briefs on this subject, both in the Supreme Court and in the U.S. Courts of Appeals.

Ilya Somin is a Professor of Law at the Scalia Law School, George Mason University and B. Kenneth Simon Chair in Constitutional Studies at the Cato Institute. He writes extensively on constitutional law and immigration law and policy, as well as federalism and separation of powers. His amicus briefs and other writings have been cited by the United States Supreme Court, lower federal courts, multiple state supreme courts, and the Supreme Court of Israel. He is the author of multiple books on constitutional law and migration rights.

The proposed brief in this case will provide the Court with a unique perspective that will assist in the resolution of this matter by explaining why the

1

original meaning of "invasion" is at odds with the Defendants' interpretation of that term, and why accepting their position on this issue would have drastically dangerous consequences.

For the foregoing reasons, *amici* respectfully request that the Court grant this motion for leave to file an *amici* brief in support of Appellee's supplemental *en banc* brief.

Respectfully submitted,

/s/ Ilya Somin
Ilya Somin
    *Counsel of Record*
Scalia Law School
George Mason University
3301 Fairfax Dr.
Arlington, VA 22201
703-993-8069
isomin@gmu.edu

March 22, 2024

*Counsel for Amici Curiae*

2

## CERTIFICATE OF COMPLIANCE

1. This motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains 293 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2. This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface in 14-point Times New Roman typeface.

/s/Ilya Somin

March 22, 2024

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court, who will enter it into the CM/ECF system, which will send a notification of such filing to the appropriate counsel.

/s/Ilya Somin

March 22, 2024

CASE NO. 23-50632

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

GREG ABBOTT, IN HIS CAPACITY AS GOVERNOR OF THE STATE OF TEXAS; STATE OF TEXAS,

*Defendants-Appellants.*

———————————————

Appeal from the United States District Court for the Western District of Texas
No. 1:23-CV-853

———————————————

## BRIEF OF THE CATO INSTITUTE AND PROFESSOR ILYA SOMIN AS *AMICI CURIAE* IN SUPPORT OF APPELLEE'S SUPPLEMENTAL *EN BANC* BRIEF

———————————————

Ilya Somin
    *Counsel of Record*
Scalia Law School
George Mason University
3301 Fairfax Dr.
Arlington, VA 22201
(703) 993-8069
isomin@gmu.edu

*Counsel for Amici Curiae*

March 22, 2024

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

CASE NO. 23-50632

*United States v. Abbott.*

The undersigned counsel of record certifies that the following listed persons and entities as described in Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Person or Entity | Connection to Case |
| --- | --- |
| Professor Ilya Somin | Counsel to *amici* |
| Cato Institute | *Amicus curiae* |

*Amici* Cato Institute is a Kansas nonprofit corporation that has no parent companies, subsidiaries, or affiliates, and does not issue shares to the public.

/s/ Ilya Somin

i

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND  CORPORATE DISCLOSURE STATEMENT ............................................................................i

TABLE OF AUTHORITIES ................................................................... iii

INTEREST OF *AMICI CURIAE* .............................................................1

INTRODUCTION AND SUMMARY OF THE ARGUMENT .............................2

ARGUMENT ....................................................................................4

    I.   THE TEXT AND ORIGINAL MEANING OF "INVASION" INDICATE IT IS LIMITED TO MILITARY ATTACK. ..........................4

    II.  DEFENDANTS' INTERPRETATION OF INVASION HAS RADICAL AND DANGEROUS IMPLICATIONS ................................13

      A. Defendants' Position Would Give Border States Nearly Unlimited Power to Initiate War Against Neighboring Nations. .............................14

      B. Defendants' Argument Would Empower the Federal Government to Suspend the Writ of Habeas Corpus at any Time. ...............................15

    III. JUDICIAL ENDORSEMENT OF THE DEFENDANTS' DEFINITION OF "INVASION" WOULD CREATE A CIRCUIT SPLIT....................................................................................20

CONCLUSION ...............................................................................23

CERTIFICATE OF COMPLIANCE.......................................................24

CERTIFICATE OF SERVICE ..............................................................25

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Alfaro v. Comm'r of Internal Revenue,* 349 F.3d 225 (5th Cir. 2003)................ 4, 21

*Boumediene v. Bush*, 553 U.S. 723 (2008) ...............................................16

*California v. United States*, 104 F.3d. 1086 (9th Cir. 1997) .............................. 3, 21

*Chiles v. United States*, 69 F.3d 1094 (11th Cir. 1995).................................... 3, 21

*Colorado ex rel. Suthers v. Gonzales*, 558 F. Supp. 2d 1158 (D. Colo. 2007) ....................................................................................................22

*Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959 (2020) .......................20

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .............................................12

*Garcia-Carias v. Holder*, 697 F.3d 257 (5th. Cir. 2012).......................................21

*Lang v. Comm'r of Internal Revenue*, 289 U.S. 109 (1933)..................................11

*New Jersey v. United States*, 91 F.3d 463 (3d Cir. 1996)................................... 4, 21

*Noel Canning v. N.L.R.B.*, 705 F.3d 490 (D.C. Cir. 2013)....................................11

*Padavan v. United States*, 82 F.3d 23 (2d Cir. 1996) .................................. 4, 20, 21

*Rucho v. Common Cause*, 139 S. Ct. 2484 (2019) ....................................... 22, 23

*Russell Motor Car Co. v. United States,* 261 U.S. 514 (1923)................................6

*Schulz v. N.Y. State Exec.*, 960 F. Supp. 568 (N.D.N.Y. 1997).............................22

*Sullivan v. United States*, No. 7:04-CV-103-FL(1), 2004 U.S. Dist. LEXIS 27890 (E.D.N.C. 2004) ........................................................................22

*United States ex rel. Anti-Discrimination Ctr. Of Metro N.Y. v. Westchester County*, 712 F.3d 761 (2d Cir. 2013) ...................................................21

*United States v. Abbott*, 92 F.4th 570 (5th Cir. 2024) .........................................13

*United States v. Abbott*, No. 1-23-CV-852-DAE, 2023 U.S. Dist. LEXIS 157172 (W.D. Tex. Sept. 6, 2023).........................................................14

*United States v. Arizona*, No. CV 10-1413-PHX-SRB, 2011 U.S. Dist. LEXIS 175657 (D. Ariz. 2011)....................................................................21

*United States v. Texas*, No. 1:24-CV-8-DAE, 2024 U.S. Dist. LEXIS 36721 (W.D. Tex. Feb. 29, 2024) ................................................ 10, 11, 16, 22

iii

**Statutes**

33 U.S.C. § 403 ...........................................................................................2

### Constitutional Provisions

U.S. CONST. art. I, § 10, cl. 3 .............................................. 2, 4, 5, 14

U.S. CONST. art. I, § 8, cl. 11 ......................................................3

U.S. CONST. art. I, § 8, cl. 15 ......................................................7

U.S. CONST. art. I, § 9, cl. 2 ................................................. 3, 15

U.S. CONST. art. IV, § 4 ...............................................................5

### Other Authorities

Amanda L. Tyler, *Habeas Corpus and the American Revolution*, 103 CAL. L. REV. 645 (2015) ............................................................16

Amanda L. Tyler, *Suspension as an Emergency Power*, 118 YALE L.J. 600 (2009) ........................................................................16

Anna O. Law, *Lunatics, Idiots, Paupers, and Negro Seamen—Immigration Federalism and the Early American State*, 28 STUD. AM. POL. DEV. 107 (2014) ...............................................................19

Anna O. Law, *The Historical Amnesia of Contemporary Immigration Federalism Debates*, 47 POLITY 302 (2015) ...........................19

Dave Benner, *The Founders' Understanding of "Invasion,"* TENTH AMEND. CTR. (Mar. 15, 2019) .....................................................11

David Bier, *U.S. Citizens Were 89% of Convicted Fentanyl Traffickers in 2022,* CATO AT LIBERTY (Aug. 23, 2023, 11:11 AM) .........................18

Defs.' Mem. in Opp'n to Pl. United States' Mot. for Prelim. Inj., United States v. Abbott, No. 1:23-cv-00853 (W.D. Tex. Aug. 9, 2023), ECF No. 26 ......................................................................... passim

Frank Bowman, *Immigration Is Not an "Invasion" under the Constitution*, JUST SECURITY (Jan. 29, 2024) .......................................... 9, 17

Gerald L. Neuman, *The Lost Century of American Immigration Law (1776-1875)*, 93 COLUM. L. REV. 833 (1993) ...................................19

Ilya Somin, *Immigration, Invasion, and Habeas Corpus*, REASON (Aug. 11, 2023) ........................................................................17

James Madison, *Report of 1800, [7 January] 1800*, NAT'L ARCHIVES: FOUNDERS ONLINE (last visited Aug. 28, 2023) ..............................3, 5

John Yoo, *Why Texas Cannot Treat Illegal Immigration as an 'Invasion'*, NAT. REV. (Nov. 18, 2022) ...............................................................................15

Joshua Treviño, *The Meaning of Invasion Under the Compact Clause of the Constitution*, TEX. PUB. POL'Y FOUND. (Nov. 2020) ...................................... 9, 11

Ken Shumate, *The Molasses Act: A Brief History*, J. AM. REVOLUTION (Jan. 24, 2019) ...........................................................................................................19

MARK E. NEELY, JR., THE FATE OF LIBERTIES: ABRAHAM LINCOLN AND CIVIL LIBERTY (1992) ......................................................................................................18

Nikolas Bowie & Norah Rast, *The Imaginary Immigration Clause*, 120 MICH. L. REV. 1419 (2022) ...................................................................................10

NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) ............................................................................................................................11

Robert Natelson & Andrew Hyman, 13 BR. J. AM. LEG. STUD. 1 (2024) ........ 10, 12

SAMUEL JOHNSON, SAMUEL JOHNSON'S DICTIONARY (1755) ..................................11

Steve Vladeck, *Governor Abbott's Perilous Effort at Constitutional Realignment*, LAWFARE (Jan. 29, 2024).................................................................17

THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION, AS RECOMMENDED BY THE GENERAL CONVENTION AT PHILADELPHIA IN 1787, TOGETHER WITH THE JOURNAL OF THE FEDERAL CONVENTION, LUTHER MARTIN'S LETTER, YATES'S MINUTES, CONGRESSIONAL OPINIONS, VIRGINIA AND KENTUCKY RESOLUTIONS OF '98–'99, AND OTHER ILLUSTRATIONS OF THE CONSTITUTION (Jonathan Elliott ed., 2d ed. 1836) .............................................7

THE RECORDS OF THE FEDERAL CONVENTION OF 1787 (Max Farrand ed., rev. ed. 1937)...............................................................................................................8

## INTEREST OF *AMICI CURIAE*[1]

The Cato Institute, established in 1977, is a nonpartisan public policy research foundation dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies helps restore the principles of constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books, studies, and the annual *Cato Supreme Court Review*, and conducts conferences and forums. This case interests Cato because the Institute has long had a focus on both immigration policy and issues of federalism and separation of powers.

Ilya Somin is Professor of Law at the Scalia Law School, George Mason University and B. Kenneth Simon Chair in Constitutional Studies at the Cato Institute. He writes extensively on constitutional law and immigration law and policy, as well as federalism and separation of powers. His amicus briefs and other writings have been cited by the United States Supreme Court, lower federal courts, multiple state supreme courts, and the Supreme Court of Israel. He is the author of multiple books on constitutional law and migration rights, including FREE TO MOVE: FOOT VOTING, MIGRATION, AND POLITICAL FREEDOM (rev. ed. 2022), DEMOCRACY

---

[1] Fed. R. App. P. 29 Statement: No counsel for either party authored this brief in any part. No person or entity other than *amici* made a monetary contribution to its preparation or submission. All parties have consented to the filing of this brief.

AND POLITICAL IGNORANCE: WHY SMALLER GOVERNMENT IS SMARTER (2d ed. 2016), and THE GRASPING HAND: *KELO V. CITY OF NEW LONDON* AND THE LIMITS OF EMINENT DOMAIN (2015).

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

In this case, the United States contends that the Defendants illegally placed buoys in the Rio Grande River, in violation of the Rivers and Harbors Act of 1899, which prohibits "creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States." 33 U.S.C. § 403. The Defendants dispute Plaintiff's interpretation of the statute, but also contend they have constitutional authority to place the buoys there under the Invasion Clause of Article I of the Constitution, which provides, "[n]o State shall, without the Consent of Congress, . . . engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay." U.S. CONST. art. I, § 10, cl. 3.

*Amici* do not opine on the statutory interpretation issue contested by the parties. But they urge the court to reject Defendants' ill-advised Invasion Clause argument. It is at odds with the text and original meaning of the Invasion Clause and would have extraordinarily dangerous implications if accepted by this court. It is also at odds with three circuit court decisions addressing the meaning of "invasion."

In Part I, we explain why Defendants' interpretation of the Invasion Clause is manifestly wrong under the text and original meaning of the Clause. As James

Madison emphasized, "Invasion is an operation of war." James Madison, *Report of 1800, [7 January] 1800*, NAT'L ARCHIVES: FOUNDERS ONLINE (last visited Aug. 28, 2023).[2] The concept does not include illegal migration or drug smuggling.

Part II outlines the dire implications of the Defendants' arguments. State governments would have the power to wage war in response to undocumented migration and smuggling, even if such warfare were not authorized by Congress. This would be a major undermining of Congress' sole power to declare war, U.S. CONST. art. I, § 8, cl. 11, and threatens to involve the United States in warfare at the behest of a single state government. The Defendants' position would also effectively give the federal government the power to suspend the writ of habeas corpus at any time, since the Constitution gives the federal government the authority to do so "when in Cases of Rebellion or *Invasion* the public Safety may require it." U.S. CONST. art. I, § 9, cl. 2 (emphasis added). Since some significant amounts of illegal migration and cross-border smuggling occur at virtually all times, this would give the federal government the power to suspend the writ whenever it wants to.

Finally, Part III outlines how three circuit court decisions have ruled that "invasion" does not include illegal migration and is limited to military attack. *See California v. United States*, 104 F.3d. 1086, 1090–91 (9th Cir. 1997); *New Jersey v.*

---

[2] Available at https://tinyurl.com/veh8wucb.

*United States*, 91 F.3d 463, 468–69 (3d Cir. 1996); *Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996). If this court rules the other way, it would create a circuit split, a result disfavored by Fifth Circuit precedent. *See Alfaro v. Comm'r of Internal Revenue,* 349 F.3d 225, 229 (5th Cir. 2003) (noting that "[w]e are always chary to create a circuit split").

## ARGUMENT

## I. THE TEXT AND ORIGINAL MEANING OF "INVASION" INDICATE IT IS LIMITED TO MILITARY ATTACK.

The Constitution states that "[n]o State shall, without the Consent of Congress, . . . engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay." U.S. CONST. art. I, § 10, cl. 3. Defendants claim this gives the state of Texas the power to resist illegal immigration and drug smuggling, including by "engaging in war." *See* Defs.' Mem. in Opp'n to Pl. United States' Mot. for Prelim. Inj., United States v. Abbott, No. 1:23-cv-00853 (W.D. Tex. Aug. 9, 2023), ECF No. 26 [hereinafter "Defs.' Opp'n to Prelim. Inj."].[3] The text and original meaning of the Constitution say otherwise.

The use of "invaded" in Article I is obviously closely linked to the use of "invasion" in the Guarantee Clause of Article IV, which states that "The United States shall guarantee to every State in this Union a Republican Form of

---

[3] Available at https://tinyurl.com/bdhxbzxx.

Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence." U.S. CONST. art. IV, § 4. A state's Article I Invasion Clause power to resort to war when "actually invaded" kicks in only when the federal protection against "invasion" extended by the Guarantee Clause fails, because the invasion has already occurred or there is "such imminent Danger [of invasion] as will not admit of delay." U.S. CONST. art. I, § 10, cl. 3. Thus, it makes sense that the meaning of "invasion" in both clauses must be identical.[4]

And it is clear that the meaning in the Guarantee Clause refers to organized violent attacks, not mere migration or smuggling. As James Madison put it in explicating this part of the Guarantee Clause, "Invasion is an operation of war." Madison, *Report of 1800, supra*. Defendants' attempt to enlist Madison in support of their position ignores the one time where he specifically addressed this issue.

The text of the Guarantee Clause also suggests that it refers to violent attack. "Invasion" is paired with "domestic Violence" (which here obviously refers to violent uprisings against the state government, not the modern use of the term to denote violence in family and intimate relationships). Under the longstanding doctrine of *noscitur a sociis*, "a word may be known by the company it keeps."

---

[4] The Invasion Clause of Article, § 10, cl. 3 is also sometimes referred to as the "State War Clause."

*Russell Motor Car Co. v. United States,* 261 U.S. 514, 519 (1923). Here, it makes little sense to assume that "invasion" includes nonviolent actions, when it is coupled with "domestic Violence."

Similarly, if the term "invasion" includes nonviolent undocumented migration and smuggling, it would make little sense to authorize states to "engage in War" as a response to it. On this theory, Texas—or any other border state—could launch a full-scale attack on Mexico anytime significant numbers of illegal migrants, illegal drugs, or any other contraband goods cross the border. Such an implication is manifestly absurd.

Defendants claim James Madison's statements at the Virginia ratifying Convention of the Constitution support their position. *See* Defs.' Opp'n to Prelim. Inj., *supra*, at 18–19. But these statements do nothing of the kind. Madison states that "[t]he militia ought to be called forth to suppress smugglers" in instances where "[t]here were a number of smugglers, who were too formidable for the civil power to overcome." 3 The Debates in the Several State Conventions on the Adoption of the Federal Constitution, as Recommended by the General Convention at Philadelphia in 1787, Together with the Journal of the Federal Convention, Luther Martin's Letter, Yates's Minutes, Congressional Opinions, Virginia and Kentucky Resolutions of '98–'99, and Other Illustrations of the Constitution 4 (Jonathan Elliott ed., 2d ed.

1836). But this statement has nothing to do with the power to protect against invasions. Rather, it was a response to Patrick Henry's attack on Congress' power of calling forth the Militia "to execute the [L]aws of the Union." *Id.* at 411 (quoting U.S. CONST. art. I, § 8, cl. 15 (Patrick Henry arguing that this power would create a "government of force")). Madison does not claim here that smuggling qualifies as an invasion (though the latter is also one of the purposes for which the militia can be called out). Using the militia to enforce laws is not the same thing as "engaging in war"—the kind of large-scale military action that might be justified in the event of a genuine invasion.

Later in the debate at the ratifying convention, Madison stated that the term "invasion" is included in the Guarantee Clause in order to make clear that "A republican government is to be guarantied to each state, and they are to be protected from invasion from other states, as well as from foreign powers." *Id.* at 425. The reference to "other states" and "foreign powers" suggests the term does not include mere unarmed encroachments by migrants. Similarly, it would be absurd to claim that a state is authorized to "engage in war" against another state merely because illegal drugs were being smuggled from the latter into the former.

The same point applies if a state claims it can engage in war merely because some small percentage of immigrants and drug smugglers are armed. In any large group of people, there will almost always be a few that may carry weapons. Such a

situation does not constitute an "invasion" unless they are actually engaged in a significant organized assault on the United States, as opposed to merely carrying arms for self-defense against criminals, or to engage in ordinary criminal activity themselves.

Limiting "invasion" to instances of organized violent attack is also consistent with the usage of the term at the Constitutional Convention. The Guarantee Clause's invasion provision originated in a proposal that would have guaranteed each state protection "against foreign and domestic violence." 2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787 39, 48–49 (Max Farrand ed., rev. ed. 1937). This was later altered to the current wording by the Committee of Detail (which introduced the phrase "foreign invasion") and by a later vote that dropped the term "foreign"—thereby allowing protection against invasion by other states. *See id.* at 159, 459. But there is no evidence that these changes were intended to shift the meaning of the Clause to include nonviolent actions.

So momentous a shift as giving states a guarantee against nonviolent smuggling and immigration—and allowing the state to resort to all-out war if that guarantee fails—would surely have been noted and debated in the Convention. Yet there was no such discussion.

Neither was the issue raised in the state ratifying conventions for the Constitution. As Professor Frank Bowman points out, "throughout the Constitutional

Convention and the state ratification debates that followed, delegates and commentators used the term 'invasion' over and over. With a handful of exceptions where 'invasion' is used metaphorically, as when referring to an 'invasion of rights,' the word invariably refers to a hostile armed incursion into or against the territory of the states or the nation, an incursion that must be met with a military response." Frank Bowman, *Immigration Is Not an "Invasion" under the Constitution*, JUST SECURITY (Jan. 29, 2024);[5] *Cf.* Joshua Treviño, *The Meaning of Invasion Under the Compact Clause of the Constitution*, TEX. PUB. POL'Y FOUND. 4–8 (Nov. 2020) (surveying meaning of "invasion" during the Founding era and reaching similar conclusion).[6]

Similarly, in a recent ruling canvassing the meaning of "invasion" in another case where the state of Texas has advanced the same argument as in this one, the district court concluded that "contemporary definitions of 'invasion' and 'actually invaded' as well as common usage of the term in the late Eighteenth Century predominantly referred to an 'invasion' as a hostile and organized military force, too powerful to be dealt with by ordinary judicial proceedings." *United States v. Texas*,

---

[5] Available at https://tinyurl.com/3e65y4pk.

[6] Available at https://tinyurl.com/2v3ybf62.

No. 1:24-CV-8-DAE, 2024 U.S. Dist. LEXIS 36721, at *74 (W.D. Tex. Feb. 29, 2024).

In the 1798 debate over the constitutionality of the Alien and Sedition Acts, one of which (the Alien Friends Act) gave the president broad power to deport immigrants, critics of the Act, including James Madison, forcefully argued that the Guarantee Clause protection against "invasion" did not give Congress the power to enact the Act. *See* Nikolas Bowie & Norah Rast, *The Imaginary Immigration Clause*, 120 MICH. L. REV. 1419, 1439–41 (2022). Significantly, even defenders of the Act did not claim that invasion provision gave Congress a general power to restrict immigration, but only in cases where the immigrants were planning armed attacks and uprisings against the United States as they (falsely) claimed French immigrants were doing at the time. *Id.* at 1434–35.

Defendants also claim Founding-era dictionary definitions of "invasion" and "invade" support their position. *See* Defs.' Opp'n to Prelim. Inj., *supra*, at 19–20 (Aug. 9, 2023).[7] However, leading dictionaries of that time—including the ones cited by the Defendants—have definitions focused on violent attack as their primary

---

[7] *See also* Robert Natelson & Andrew Hyman, 13 BR. J. AM. LEG. STUD. 1, 20–22 (2024) (listing several such definitions).

ones.[8] During the Founding era, as today, "invasion" also sometimes had metaphorical secondary definitions, as in the case of an "invasion" by a disease or an "invasion" of rights.[9] But there is no evidence the original understanding of the invasion provisions of the Constitution included such secondary meanings. In interpreting terms in statutes and the Constitution, words must be given their "natural or normal meaning, not the broadest possible meaning." *United States v. Texas*, 2024 U.S. Dist. LEXIS 36721, at *76 (citing *Noel Canning v. N.L.R.B.*, 705 F.3d 490, 500 (D.C. Cir. 2013)); *cf. Lang v. Comm'r of Internal Revenue*, 289 U.S. 109, 111 (1933) (courts must apply "natural and ordinary meaning").

---

[8] *See, e.g.*, 1 NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 113 (1828) (defining "invade" as "1. . . to enter as an enemy, with a view to conquest or plunder; to attack"; "2. To attack; to assail; to assault"; "3. To attack; to infringe; to encroach on; to violate"), *accord* Defs.' Opp'n to Prelim. Inj., *supra*, at 19. The first and second definitions clearly focus on violent action, and so does the first part of the third ("to attack"). *See also* Dave Benner, *The Founders' Understanding of "Invasion,"* TENTH AMEND. CTR. (Mar. 15, 2019), https://tinyurl.com/4nsfbpkw (surveying other Founding-era definitions, all of which are similar); *cf.* Treviño, *supra*, at 4–5 (noting existence of "metaphorical" definitions, but emphasizing that "Whenever the phrase "actually invade" was used, however, it retained its non-metaphorical meaning").

[9] *See, e.g.,* SAMUEL JOHNSON, SAMUEL JOHNSON'S DICTIONARY (1755) (listing as its second definition of "invasion" the "Attack of an epidemical disease"; the primary one is "Hostile entrance upon the rights or possessions of another; hostile encroachment," followed by three examples of armed attack illustrating the meaning of "hostile entrance").

In addition, courts must prefer ordinary meaning over "secret or technical meanings that would not have been known to ordinary citizens in the founding generation." *District of Columbia v. Heller*, 554 U.S. 570, 577 (2008). In the context of Article I and Article IV, where the terms "invasion" and "actually invaded" are used to denote actions that would justify "engaging" in war in response, or pose threats comparable to those of "domestic violence," ordinary citizens would not assume that mere unauthorized migration or smuggling qualify as invasions justifying such a drastic response.

There is some founding-era evidence suggesting that a relatively small invasion might have been enough to trigger Article I.[10] But a small invasion must still be an organized armed attack. Moreover, the possibility that a small invasion is enough for a state to qualify as "actually invaded" further undercuts Defendants' argument. If illegal migration or drug smuggling are invasions triggering the power to engage in war in response, and even a small invasion qualifies, that suggests that even small-scale illegal migration or smuggling would be sufficient to enable a state to wage war without congressional authorization. Such an absurd implication goes well beyond the ordinary meaning of the terms, and surely would not have been expected by ordinary citizens reading Article I at the time of the Founding.

---

[10] *See* Natelson & Hyman, *supra*, at 24–25 (citing examples).

If the text had been so understood, it would have raised concerns during the ratification process. Anti-Federalists would surely have cited it as a reason to oppose the Constitution. The same point applies to the implication that small-scale illegal migration or smuggling would authorize suspension of the writ of habeas corpus. *See* §II.B, *infra*.

Today, there may be a "broadly held concern that migration can be weaponized by one sovereign to inflict damage on another." *United States v. Abbott*, 92 F.4th 570, 579 (5th Cir. 2024) (Ho, J., dissenting). There is no significant evidence of such "weaponization" in the present case. Migrants are crossing the southern border to escape oppression and poverty, not to do the bidding of hostile foreign governments.

 But even if "weaponization" were present, it would not qualify as an "invasion" unless it amounted to a violent, armed attack. The mere fact that governments might pressure migrants into fleeing may pose a foreign policy dilemma, one that can be addressed by the federal government, and by ordinary law enforcement. But it is not something to which states can respond by "engaging in war."

## II.     DEFENDANTS' INTERPRETATION OF INVASION HAS RADICAL AND DANGEROUS IMPLICATIONS

Defendants' interpretation of "invasion" to include illegal migration and drug smuggling has drastic radical implications. It would give border states nearly

unlimited authorization to wage war against neighboring foreign nations and empower the federal government to suspend the writ of habeas corpus at virtually any time.

### A. Defendants' Position Would Give Border States Nearly Unlimited Power to Initiate War Against Neighboring Nations.

If illegal migration and smuggling qualify as invasions under Article I, it would give state governments the power to "engage in war" in response, without congressional authorization. U.S. CONST. art. I, § 10, cl. 3. Since large-scale illegal migration and smuggling of drugs and other contraband are ubiquitous and occur routinely, this would give any border state the power to attack neighboring countries and drag the United States into war at any time. As the district court noted, "[u]nder this logic, once Texas decides, in its sole discretion, that it has been invaded, it is subject to no oversight of its 'chosen means of waging war' . . . . Such a claim is breathtaking." *United States v. Abbott*, No. 1-23-CV-852-DAE, 2023 U.S. Dist. LEXIS 157172, at *32 (W.D. Tex. Sept. 6, 2023), *aff'd* 87 F.4th 616 (5th Cir. 2023), *pet. for reh'g en banc granted*, 90 F. 4th 870 (2024). Professor John Yoo points out that Defendants' argument would allow states to "attack drug-cartel members not only across the border but all the way back to their hideouts," thereby potentially triggering large-scale hostilities with Mexico. John Yoo, *Why Texas Cannot Treat*

*Illegal Immigration as an 'Invasion'*, NAT. REV. (Nov. 18, 2022).[11] "Preventing states from provoking such conflicts," he adds "was the very purpose of Article I, Section 10's bar on state war-making." *Id.*

There is no evidence that the Founders contemplated such drastic state usurpation of Congress' authority to declare war, and federal authority over foreign affairs, more generally. It makes far more sense to assume that such state authority is limited to situations where the state is actually faced with large-scale violent attack. Even if that assault might come from large-scale organized private groups, such as insurgents or terrorists, as Defendants contend,[12] it must be an organized violent attack, not mere illegal migration or smuggling.

## B.    Defendants' Argument Would Empower the Federal Government to Suspend the Writ of Habeas Corpus at any Time.

The Suspension Clause of the Constitution states that "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or *Invasion* the public Safety may require it." U.S. CONST. art. I, § 9, cl. 2 (emphasis added). If illegal migration and drug smuggling qualify as "invasion" for purposes of triggering state and federal authority to resist invasion under the Invasion Clause of Article I and the Guarantee Clause of Article IV, they surely also qualify as such

---

[11] Available at https://archive.is/BzABV.

[12] *See* Defs.' Opp'n to Prelim. Inj., *supra*, at 18–19 (Aug. 9, 2023).

under the Suspension Clause. And there is a significant amount of illegal migration and smuggling of contraband goods going on at virtually all times.

"The suspension of habeas corpus is a stunning exercise of power." *United States v. Texas*, 2024 U.S. Dist. LEXIS 36721, at *81–82. It has only been used four times in the entire history of the United States. *See* Amanda L. Tyler, *Suspension as an Emergency Power*, 118 YALE L.J. 600, 662–64 (2009) (listing these instances). British violations of the writ were major grievances of the colonists before and during the American Revolution. Amanda L. Tyler, *Habeas Corpus and the American Revolution*, 103 CAL. L. REV. 645 (2015). In 1774, for example, the Continental Congress complained that colonists were "the subjects of an arbitrary government, deprived of trial by jury, and when imprisoned cannot claim the benefit of the habeas corpus Act, that great bulwark and palladium of English liberty." *Quoted in id.* at 647. The Framers of the Constitution took care to avoid a repeat of such abuses. *See Boumediene v. Bush*, 553 U.S. 723, 739–40 (2008) ("The Framers viewed freedom from unlawful restraint as a fundamental precept of liberty, and they understood the writ of habeas corpus as a vital instrument to secure that freedom."). "It is not plausible that the Framers, so cognizant of past abuses of the writ and so careful to protect against future abuses, would have granted states the unquestioned authority to suspend the writ based on the presence of undocumented immigrants." *United States v. Texas*, 2024 U.S. Dist. LEXIS 36721, at *83. Nor would they have

readily granted such unconstrained power to the federal government merely because there is unauthorized immigration or drug smuggling in some states.

Several scholars and commentators have warned that accepting the Defendants' understanding of "invasion" would trigger a virtually unlimited power to suspend the writ of habeas corpus.[13] This court should refuse the Defendants' invitation to create such a dangerous power.

The danger of creating unlimited power to suspend the writ of habeas corpus is further exacerbated if a small "invasion" is enough to trigger the Suspension Clause. *See* Part I, *infra* (discussing this possibility). If illegal migration and drug smuggling qualify as "invasion" and even a small invasion is sufficient to trigger relevant constitutional provisions, then even small amounts of illegal migration and smuggling would be enough to authorize suspension of the writ.

Even when there is an ongoing "Rebellion or Invasion," the Clause says the writ may only be suspended if "the public Safety may require it." But this is not

---

[13]*See* Bowman, *supra* (noting "terrible . . . possibility that a declaration of 'invasion' [in response to illegal migration] could be used to justify suspension of habeas corpus under Article I, Section 9"); Steve Vladeck, *Governor Abbott's Perilous Effort at Constitutional Realignment*, LAWFARE (Jan. 29, 2024), https://tinyurl.com/ym8yb67j ("[D]o we really think that the federal government could suspend habeas corpus in response to the claimed upsurge of unauthorized entries along the U.S.-Mexico border?"); Ilya Somin, *Immigration, Invasion, and Habeas Corpus*, REASON (Aug. 11, 2023), https://tinyurl.com/yuu8at68 (explicating this danger).

much of a constraint, as the Clause permits suspension even if public safety only "may" require it. Certainty is not necessary.

Particularly in border areas, including those in the state of Texas, it is almost always possible to argue that "public safety" may be improved by suspension. If law enforcement can indefinitely detain anyone who looks like they might be a drug smuggler or an undocumented immigrant, surely that could help combat the "invasion." Or at least it is plausible to argue that it "may" do so.

Moreover, the suspension power is not limited to recent immigrants, but applies to U.S. citizens, as well. Historically, suspension has indeed been used against citizens, as was the case during the Civil War and other conflicts. *See, e.g.*, MARK E. NEELY, JR., THE FATE OF LIBERTY: ABRAHAM LINCOLN AND CIVIL LIBERTIES chs. 3, 6 (1992) (discussing suspension of the writ during the Civil War). And, obviously, U.S. citizens can and do smuggle drugs across the border, and sometimes help undocumented immigrants cross, as well. In 2022, 89% of people convicted of fentanyl trafficking were U.S. citizens. *See* David Bier, *U.S. Citizens Were 89% of Convicted Fentanyl Traffickers in 2022,* CATO AT LIBERTY (Aug. 23, 2023, 11:11 AM).[14] Moreover, suspension need not be limited to border states.

---

[14] Available at https://tinyurl.com/mu7t5p4s.

Undocumented immigrants and drug traffickers can and do make their way to interior states, as well.

While the federal government rarely attempted to restrict migration during the Founding era and there were serious questions about whether it had the power to do so,[15] state governments did restrict migration in various ways. *See* Gerald L. Neuman, *The Lost Century of American Immigration Law (1776-1875)*, 93 COLUM. L. REV. 833 (1993) (describing state restrictions); Anna O. Law, *Lunatics, Idiots, Paupers, and Negro Seamen—Immigration Federalism and the Early American State*, 28 STUD. AM. POL. DEV. 107 (2014) (same). And cross-border smuggling was certainly a well-known phenomenon in the early Republic, particularly since harsh British measures to restrict molasses smuggling had helped precipitate the American Revolution. *See* Ken Shumate*, The Molasses Act: A Brief History*, J. OF AM. REVOLUTION (Jan. 24, 2019).[16]

If the Constitution had given the federal government the power to suspend the writ of habeas corpus whenever illegal migration or cross-border smuggling of contraband occurred, this would surely have been debated at the Constitutional Convention and raised as an issue by Anti-Federalist opponents of the Constitution

---

[15] *See. e.g.,* Anna O. Law, *The Historical Amnesia of Contemporary Immigration Federalism Debates*, 47 POLITY 302 (2015) (noting debate on that score).

[16] Available at https://tinyurl.com/y6s6p4fj.

during the ratification process. The lack of such protest is strong evidence that migration and smuggling were *not* considered forms of "invasion" under the Constitution.

The Supreme Court has ruled that the Suspension Clause does not give migrants the right to use writs of habeas corpus to gain entry or remain in the United States, if they would otherwise be subject to deportation. *Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1969–70 (2020). But the Defendants' radical interpretation of "invasion" would allow the suspension of the writ even for U.S. citizens and for immigrants who have a legal right to remain in the U.S., such as those who have been granted permanent residency.

## III.   JUDICIAL ENDORSEMENT OF THE DEFENDANTS' DEFINITION OF "INVASION" WOULD CREATE A CIRCUIT SPLIT.

If accepted by this court, Defendants' definition of "invasion" to include illegal migration would create a circuit split. Three circuits have previously rejected similar arguments and concluded that the term "invasion" is limited to military attack, in the context of interpreting the Guarantee Clause of Article IV, which requires the federal government to "protect each of [the states] against Invasion." U.S. Const., art. IV, § 4.

In *Padavan v. United States*, 82 F.3d 23, 28 (2nd Cir. 1996), the Second Circuit held that "[i]n order for a state to be afforded the protections of the Invasion Clause, it must be exposed to armed hostility from another political entity, such as

another state or foreign country that is intending to overthrow the state's government." The Ninth Circuit adopted a similar approach, ruling that the Clause "afford[s] protection in situations wherein a state is exposed to armed hostility from another political entity" and "not intended to be used" to combat illegal migration. *California v. United States*, 104 F.3d. at 1090–91. The Third Circuit reached the same conclusion in *New Jersey v. United States*, 91 F.3d 463, 468–69 (3d Cir. 1996). No federal court has ever adopted a definition of "invasion" like that advocated by Defendants.

Fifth Circuit precedent makes clear there is a presumption against creating circuit splits. *See Garcia-Carias v. Holder*, 697 F.3d 257, 265 (5th Cir. 2012) (noting "uniform alignment of other circuits that have addressed the issue counsels in favor" of reaching the same conclusion); *Alfaro,*, 349 F.3d at 229 (noting that "[w]e are always chary to create a circuit split"). Defendants' extremely dubious interpretation of "invasion" is nowhere near sufficient to overcome that presumption.

Many federal courts have also ruled that the definition of "invasion" is a political question, and therefore not subject to judicial resolution.[17] *Amici* do not

---

[17] *See United States ex rel. Anti-Discrimination Ctr. Of Metro N.Y. v. Westchester County*, 712 F.3d 761, 774–75 (2d Cir. 2013); *California v. United States*, 104 F.3d at 1090–91; *New Jersey v. United States*, 91 F.3d at 468–69; *Padavan*, 82 F.3d at 28; *Chiles v. United States*, 69 F.3d 1094, 1097 (11th Cir. 1995); *United States v. Arizona*, No. CV 10-1413-PHX-SRB, 2011 U.S. Dist. LEXIS 175657, at *16–17 (D. Ariz. 2011); *Colorado ex rel. Suthers v. Gonzales*, 558 F. Supp. 2d 1158, 1160–62

opine on the issue of whether it is a political question or not. But if this court

concludes that it is, it follows that Defendants cannot use the Invasion Clause to

justify disobedience to an otherwise binding federal statute. As the district court

explained in its recent ruling in *United States v. Texas*, where the Defendants raised

the same argument as in the present case:

> Typically, a defendant contends that a plaintiff's claim is nonjusticiable
> and must therefore be dismissed. See, e.g., *Rucho v. Common Cause*,
> 139 S. Ct. 2484, 2495–96 (2019) (holding that claims of political
> gerrymandering are nonjusticiable by federal courts). Here, by contrast,
> Texas asserts an independent affirmative defense and then argues that
> its own affirmative defense is nonjusticiable. Put another way, there is
> a difference between the defense of nonjusticiability and a defense that
> is nonjusticiable.
>
> Texas's argument conflates these two propositions. If the defense is
> nonjusticiable, then it should presumably be rejected in the same way
> that nonjusticiable claims are rejected . . . . To hold otherwise would
> give any state the right to ignore the Supremacy Clause so long as it
> could imagine a non-frivolous claim of invasion.

*United States v. Texas*, 2024 U.S. Dist. LEXIS 36721, at *103.

If this court holds that the definition of "invasion" is a political question, the

Defendants cannot, as a result of such a ruling, use their own ultra-broad definition

of "invasion" as a blank check for circumventing federal statutes such as the Rivers

_____

(D. Colo. 2007); *Sullivan v. United States*, No. 7:04-CV-103-FL(1), 2004 U.S. Dist.
LEXIS 27890, at *10 (E.D.N.C. 2004); *Schulz v. N.Y. State Exec.*, 960 F. Supp. 568,
575–76 (N.D.N.Y. 1997).

and Harbors Act, or engage in war without congressional authorization. If the definition of "invasion" is a political question and such "political questions [are] beyond the reach of the federal courts," then Texas cannot ask a court to use the Invasion Clause to shield it against federal legislation or to grant it a nearly unlimited power to wage war against foreign countries. *Rucho*, 139 S. Ct. at 2506–07.

## CONCLUSION

For these reasons, this court should rule in favor of the Plaintiff-Appellee.

Respectfully submitted,

*/s/ Ilya Somin*
Ilya Somin
   *Counsel of Record*
Scalia Law School
George Mason University
3301 Fairfax Dr.
Arlington, VA 22201
(703) 993-8069
isomin@gmu.edu
*Counsel for amici curiae*

Dated:  March 22, 2024

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and Fed. R. App. P. 32(a)(7)(B) because it contains 5,373 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface in Times New Roman, 14-point font.

*/s/ Ilya Somin*

March 22, 2024

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court, who will enter it into the CM/ECF system, which will send a notification of such filing to the appropriate counsel.

/s/ *Ilya Somin*

March 22, 2024