

**KEN PAXTON**
ATTORNEY GENERAL OF TEXAS

Lanora C. Pettit  
Principal Deputy Solicitor General

Lanora.Pettit@oag.texas.gov  
(512) 463-2127

May 22, 2024

**VIA CM/ECF**

Mr. Lyle W. Cayce, Clerk
U.S. Court of Appeals for The Fifth Circuit

     Re:    *United States v. Abbott*, No. 23-50632

Dear Mr. Cayce:

Defendants submit this letter in response to the Court's notice directing the parties to answer four questions about what both sides concede is a nonjusticiable political question under the Self-Defense Clause, U.S. Const. art I, § 10, cl.3.

1. *Does the political-question doctrine require dismissal of this entire action for want of jurisdiction in the federal courts, based on non-justiciability? Specifically, does the district court* à quo *have jurisdiction to determine whether Texas has properly invoked its war powers by having been invaded or being in imminent danger of invasion?*

The district court lacks jurisdiction to second guess Texas's invocation of the Self-Defense Clause. Because the federal government has not alleged—let alone proved—that the Governor of Texas acted in bad faith when he invoked Article I, Section 10, Clause 3, the district court lacked authority to review his determination that the State is being invaded by violent, criminal cartels who daily smuggle people, drugs, and weapons into Texas. But as explained in response to Question 2, the Court need not reach this constitutional issue because the federal government's statutory claim does not preclude Texas's self-defense measures.

From the outset of this case, the federal government has conceded that whether a sovereign is facing a sufficient threat to exercise its self-defense authority under the U.S. Constitution presents a nonjusticiable political question. *See, e.g.*, ROA.744-45; ROA.916; ROA.947; *see also* ECF 30 at 21; ECF 61 at 47; ECF 78 at 48-49.[1] For good

---

[1] "ECF" refers to filings made in this Court.

Letter to Mr. Cayce, Clerk
Page 2

reason. For over a century, the Supreme Court has held that so long as it is made "in good faith," "the governor's declaration that a state of" danger exists entitling the State to exercise its right of self-defense "is conclusive of that fact." *Moyer v. Peabody*, 212 U.S. 78, 84 (1909); *accord United States v. Salerno*, 481 U.S. 739, 749 (1987) (reaffirming *Moyer*). A court may look behind the declaration only to determine whether the facts "leave no room for doubt that there was no military necessity, which *from any point of view*, could be taken to justify the action of the Governor." *Sterling v. Constantin*, 287 U.S. 378, 403 (1932) (emphasis added); *see generally Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 33 (1827) (describing good-faith presumption with respect to nonjusticiable political questions).

As discussed during oral argument, the federal government has not alleged that exception applies here, much less attempted to prove it. In fact, Congress's Special Committee on the "Texas Frontier Troubles" endorsed Governor Sam Houston's view that an "invasion" of non-state actors from Mexico justified Texas's use of violent force, as well as Governor Richard Coke's express invocation of the Self-Defense Clause—apparently accepted by the U.S. Attorney General—to justify force against "'thieves or marauders'" who crossed into Texas. H. Rep. No. 343, at XV-XVI (Feb. 29, 1876); *see also id.* at 167. Furthermore, "[r]eferences to invasions by pirates"—by definition, non-state actors—"appear in contemporaneous literature" to the Constitution, and "[a]n 'invasion' could refer … to uninvited entry by groups of immigrants." R. Natelson & A. Hyman, *The Constitution, Invasion, Immigration, and the War Powers of States*, Br. J. Am. Leg. Studies 23-24 (Spring 2024).[2]

Analogous circumstances exist today. As a former U.S. Attorney General has explained, transnational cartels "have become potent paramilitary forces, with heavily armed mobile units able to stand their ground against the Mexican military." William Barr, *The U.S. Must Defeat Mexico's Drug Cartels*, Wall St. J. (Mar. 2, 2023),

---

[2] *See also, e.g.*, 1 Edward Gibbon, Decline & Fall of the Roman Empire vi (1776) (providing evidence that the public meaning of the term "invasion" contemporaneous with the founding included the mass influx into "Italy by the Lombards," which contributed to the second epoch of Rome's decline and eventual fall); Broadus Mitchell, Alexander Hamilton: Youth to Maturity, 1755-1788 at 630 (1987) (quoting a 1787 letter from Federalist James Kent demonstrating that Gibbon was familiar to the founders).

https://tinyurl.com/drxcdnmv; *see also, e.g.*, DEA, *NDTA: National Drug Threat Assessment 2024* at 9 (May 2024), https://www.dea.gov/sites/default/files/2024-05/NDTA_2024.pdf (describing the "size and firepower of the cartel that controls [large portions of] the border region of Mexico immediately south of the U.S. border" from California to West Texas). Such cartels thus look "more like ISIS than like the American mafia." Barr, *supra.* The FBI Director has also recently admitted in testimony to Congress that "some of the overseas facilitators of the smuggling network have ISIS ties that we're very concerned about." Katie Pavlich, *FBI Director Confirms Prison Gangs and Islamic Terrorists Are Exploiting the Border*, Townhall (Mar. 11, 2024), https://tinyurl.com/mry282bu. And the *Annual Threat Assessment* recently issued by the U.S. Director of National Intelligence contains a sobering discussion of "transnational crime and terrorism" and "cross-border smuggling operations." Off. of the Dir. of Nat'l Intelligence, Annual Threat Assessment of the U.S. Intelligence Community 30, 37 (Feb. 5, 2024), https://tinyurl.com/bdfej39u.

To avoid the implications of its concession that a sovereign's exercise of self-defense powers is a nonjusticiable political question, the federal government suggests "nonjusticiable political questions are those constitutionally committed to the political branches of the *federal* government, not the [S]tates." ECF 78 at 49. The Supreme Court has said the opposite: It "held just four years ago that the propriety (or impropriety) of partisan gerrymandering was a non-justiciable political question committed to *the States*." ECF 83 at 21 (citing *Rucho v. Common Cause*, 588 U.S. 684 (2019)); *see also Luther v. Borden*, 48 U.S. (7 How.) 1, 58 (1849) (political questions are "those settled by political tribunals in *the State and general government*" (emphasis added)). As members of this Court also explained, the idea that States (but not the federal government) are subject to second guessing by federal courts is hard to square with the Constitution's express statement that they need not obtain "the Consent of Congress" before taking defensive measures. ECF 142-2 at 19.

Furthermore, because "[t]he nonjusticiability of a political question is primarily a function of the separation of powers," *Baker v. Carr*, 369 U.S. 186, 210 (1962), the Constitution protects the doctrine in at least two ways, including the limitations of the "judicial Power … vested" in the federal courts, U.S. Const. art. III, § 1, and the Constitution's grant of enumerated powers to the federal government together with the express reservation of other powers to the States. Which strand of the doctrine is at issue may affect the extent to which the Court's jurisdiction is implicated, but both prevent the district court from issuing the preliminary injunction in this case.

One strand of the political-question doctrine applies in the *horizontal* separation-of-powers context. In that circumstance, the Supreme Court has said that "[t]he doctrines of mootness, ripeness, *and political question* all originate in Article III's 'case' or 'controversy' language, no less than standing does." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (emphasis added). This Court too has held that "the concept of justiciability, as embodied in the political question doctrine, expresses the jurisdictional limitations imposed upon federal courts by the 'case or controversy' requirement of Article III." *Spectrum Stores, Inc. v. Citgo Petrol. Corp.*, 632 F.3d 938, 948 (5th Cir. 2011) (cleaned up); *see also Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 715 (5th Cir. 2012). Other circuits agree. *See, e.g.*, *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1280 (11th Cir. 2009); *Jaber v. United States*, 861 F.3d 241, 245 (D.C. Cir. 2017); 13C Charles Wright & Arthur Miller, Fed. Prac. & Proc. § 3534.3 nn.8 & 9 (3d ed.) (collecting cases).

Article III, however, is not the only source of the political-question doctrine. If it were, *state* courts—which are not, after all, subject to the limitations of Article III—could second guess determinations that the U.S. Constitution commits to the political branches of the state and national governments. *See, e.g.*, *ASARCO, Inc. v. Kadish*, 490 U.S. 605, 617 (1989). Such questions, however, "are not reviewable in *any court*"—including state courts. *McIntyre v. Fallahay*, 766 F.2d 1078, 1081, 1083 (7th Cir. 1985) (Easterbrook, J.) (emphasis added); *see also Morgan v. United States*, 801 F.2d 445, 450 (D.C. Cir. 1986) (Scalia, J.); *Uhler v. AFL-CIO*, 468 U.S. 1310, 1312 (1984) (Rehnquist, J., in chambers). This strand of the political-question doctrine, which is most easily seen in the *vertical* separation-of-powers context, is thus best understood as arising from "the substantive meaning of particular clauses of the Constitution." Richard Fallon et al., Hart & Wechsler's the Federal Courts and the Federal System 248 (7th ed. 2015); *see also id.* at 257. Unsurprisingly, then, state courts are also bound by the political-question doctrine when applying federal law. *See Van Dorn Preston v. M1 Support Servs., L.P.*, 642 S.W.3d 452, 458-59 (Tex. 2022).

Because this case involves a *federal judge* second guessing a *State's* invocation of an executive power reserved to the *State* by the Constitution, both strands of the doctrine are implicated. And, under both, Defendants win. The district court exceeded Article III's constraints by second guessing the Governor's inherently political decision to take measures under the Self-Defense Clause without "judicially manageable standards for deciding such claims." *Rucho*, 588 U.S. at 691. It also

violated the substantive guarantee in Article I, Section 10, Clause 3 by arrogating to itself a power constitutionally assigned to the "Commander-in-Chief of the military forces of the State." Tex. Const. art. IV, § 7. *Cf. Freytag v. Commissioner*, 501 U.S. 868, 878 (1991) (one entity may not "aggrandiz[e] its power at the expense of another" granted power under the Constitution).

*2. If the district court is barred from adjudicating whether Texas has properly invoked its war powers, can either this court or the district court adjudicate the claims of the United States under the Rivers and Harbors Act despite the presence of that non-justiciable political question?*

Federal courts may hold that the federal government's statutory claim under the Act fails but may not second guess Texas's authority under the Self-Defense Clause. During oral argument, Chief Judge Richman was correct when she suggested that *Zivotofsky v. Clinton*, 566 U.S. 189 (2012), bears heavily on this question. *See* Oral Arg. 5:08. There, the Supreme Court reiterated that the political-question doctrine prevents courts from adjudicating a *particular question* that the Constitution "commit[s] … to a coordinate political department" or that does not submit to "judicially discoverable and manageable standards" of review. 566 U.S. at 195. But it also noted that whether the presence of such a question requires dismissal can depend on the "framing of the issue" and the nature of the claims. *Id.* at 197.

Because the doctrine applies where "the issue presented" "would necessarily draw" a court into prohibited political waters, *id.* at 193-95, the mere presence of a political question does not automatically deprive a court of subject-matter jurisdiction to address other issues antecedent to the nonjusticiable one.[3] Indeed, such a conclusion is dictated by cases like *Moyer*, which recognize that a federal court has jurisdiction to consider only whether the Governor has invoked the State's self-defense power "in good faith and in the honest belief" that his actions were "needed in order to head the [danger] off." *Moyer*, 212 U.S. at 85.

In other words, though a "case may *potentially* generate nonjusticiable political

---

[3] *Compare Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 101 (1807) (court could not adjudicate whether circumstances amounted to "Rebellion or Invasion" requiring suspension of habeas privilege), *with Ex parte Merryman*, 17 F. Cas. 144, 148, 151-52 (1861) (court could adjudicate whether the proper actor undertook to effectuate suspension of habeas privilege).

questions," a threshold issue may prevent a court from ever needing to reach the nonjusticiable issue. *United States v. Kellogg Brown & Root Servs., Inc.*, 856 F. Supp. 2d 176, 181 (D.D.C. 2012). After all, "[w]hen a court concludes that an issue presents a nonjusticiable political question, it declines to address the merits of *that issue.*" *Dep't of Com. v. Montana*, 503 U.S. 442, 457-58 (1992) (emphasis added).

That is the case here. The federal government properly recognized below that navigability is an "element[]" it needs to prove to show Defendants' prima facie liability under the Rivers and Harbors Act. ROA.79. The parties, however, disagree about what navigability entails. As Defendants have explained at length, the federal government has no claim under the Act because the roughly 200-mile stretch of the Rio Grande from Lake Amistad to the Falcon Reservoir is not part of "a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water." *The Daniel Ball*, 77 U.S. 557, 563 (1871); *see also United States v. Appalachian Elec. Power Co.*, 311 U.S. 377 (1940) (reaffirming *Daniel Ball*).[4] If this Court agrees with Texas on this threshold statutory point, there will be no need to address Texas's assertion of self-defense authority under Article I, Section 10, Clause 3.

Only if the Court *disagrees* with Texas on the statutory question would the federal government's claim "necessarily draw" the federal courts into a prohibited policymaking role. *Zivotofsky*, 566 U.S. at 193-95. If that happens, as noted in response to Question 3, the federal government's statutory claim would be defeated by Texas's constitutional power of self-defense because the Court must "assume that [the Governor] had a right," under both the Self-Defense Clause and "under the state Constitution and laws, to call out troops" and "make the ordinary use of soldiers to that end." *Moyer*, 212 U.S. at 84. As a result, the Governor also "may use the milder measure," *id.*, of deploying a buoy array to encourage those who are coming into Texas with malintent to cross through a lawful point of entry. There, authorities can more easily assess whether individuals are on any criminal or terrorist watchlists as well as whether they are carrying any weapons or lethal narcotics.

---

[4] In response to a question from Judge Higginson, I acknowledged that the Rio Grande is unusual among boundary waters in that it does *not* serve as a highway of commerce. Oral Arg. 1:01:56. The website I referenced during this colloquy is Marine Traffic, https://www.marinetraffic.com/en/ais/home/centerx:-94.4/centery:36.4/zoom:4.

Importantly, even if the Court were split on whether the presence of a political question requires dismissal of this suit for lack of jurisdiction, that would not preclude a judgment addressing the merits. Judges on a multi-member court who would otherwise conclude that the court lacks jurisdiction may reach the merits of a case when the majority determine that jurisdiction exists. *See, e.g.*, *Jennings v. Rodriguez*, 583 U.S. 281, 314 (2018) (Thomas, J., concurring in the judgment); *Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 351 (5th Cir. 2012) (Clement, J., concurring in part); *Stewart v. Lubbock County*, 767 F.2d 153, 157 n.1 (5th Cir. 1985) (Hinojosa, J., concurring in part). The en banc Court should therefore correct the district court's misreading of the Act and reverse its decision awarding an injunction.

3. *Did the district court err in holding that whether Texas has been invaded is a nonjusticiable political question? If not, did the district court err in proceeding to issue a preliminary injunction despite the presence of that question?*

The district court erred by *not* treating Texas's invocation of the Self-Defense Clause as a nonjusticiable political question. True, it briefly acknowledged the parties' agreement that whether a set of circumstances amounts to an "inva[sion]" or creates "imminent Danger" that justifies self-defense measures poses a nonjusticiable question inappropriate for judicial determination. ROA.995-97. But it then proceeded to adjudicate that very question: The district court refused "[t]o credit Texas's allegations of invasion," ROA.995; it "disagree[d]" that "whether an invasion has occurred is a matter constitutionally committed to the Texas Governor," ROA.996; and it declared that a *constitutional* (and nonjusticiable) prerogative must be subordinated to *statutory* restraints, ROA.999 n.29.

The district court insisted that it "was required to address the Governor of Texas's alleged war powers in 'repelling an invasion' … because it was an argument made by the State of Texas and therefore this Court was compelled to address it." ROA.1003-04 n.31; *see also United States v. Texas*, No. 1:24-CV-8, 2024 WL 861526, at *37-38 (W.D. Tex. Feb. 29, 2024). That adopts the federal government's erroneous theory that Texas's prerogative under the Self-Defense Clause may be ignored here because it is asserted as an affirmative defense to a statutory claim. *See* ECF 78 at 50; ECF 195-1 at 55; Oral Arg. 33:10.

That is not how the political-question doctrine works. It is not uncommon for the political-question doctrine to be raised as a defense to an otherwise justiciable claim.

For example, the political-question doctrine entered the litigation as an affirmative defense in *Moyer*, 212 U.S. at 82-83, and more recently in *Rucho*, 588 U.S. at 694-95. *Zivotofsky*—another case in which the political-question doctrine was raised by the defense—recognized that "[t]he existence of a statutory right ... is certainly relevant" to *whether* a case presents a political question, but only to the extent that it means that courts are no longer "asked to supplant a ... policy decision" the Constitution entrusts to a different branch or level of government. 566 U.S. at 196. In other words, Congress cannot by "statute override [the Constitution's] requirement that federal courts refrain from deciding political questions." *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 840-43 (D.C. Cir. 2010) (en banc). As the en banc D.C. Circuit has explained, echoing Supreme Court precedent, it does not matter whether a political question is presented by the statutory claim or as a defense. *See id.* (refusing to consider the "prudence of the political branches in matters of foreign policy" when raised as a defense).

If anything, this case demonstrates the dangers of the federal courts wading into these waters. On the district court's reasoning, no qualifying invasion can exist absent the actions of a "hostile foreign power." *See* 2024 WL 861526, at *27. Yet at oral argument, counsel for the federal government acknowledged (as he must) that invocations of self-defense authority historically *have* involved non-state actors. Oral Arg. 40:01. The district court's error—which the federal government has now disavowed—confirms the wisdom of the political-question doctrine and why it applies here. One of the most important indicators that a question is political rather than justiciable is "a lack of judicially discoverable and manageable standards for resolving it." *Baker*, 369 U.S. at 217. And "courts lack the competence to assess the strategic decision to deploy force or to create standards to determine whether the use of force was justified or well-founded." *El-Shifa*, 607 F.3d at 844.

4. *In a hypothetical case, if an action is brought against the President, rather than a governor, for exercising the constitutional war power, do we apply the same justiciability analysis?*

Yes. Many of the cases in which federal courts have described the political-question doctrine have involved the actions of federal—and not state—actors. *See, e.g.*, *Coleman v. Miller*, 307 U.S. 433 (1939); *Pac. States Tel. & Tel. Co. v. Oregon*, 223 U.S. 118 (1912). But "[t]he dominant consideration in any political question inquiry is whether there is a 'textually demonstrable constitutional commitment of the issue'" to an entity outside the judiciary. *Saldano v. O'Connell*, 322 F.3d 365, 369

(5th Cir. 2003). The Constitution unquestionably demonstrates such a commitment by expressly granting several prerogatives to the States. *See, e.g.*, U.S. Const. art. I, § 4, cl. 1; *id.*, art. II, § 1, cl. 2; *id.*, art. IV, § 3, cl. 1. So, too, when it comes to the fundamental, sovereign prerogative to repel or suppress foreign and domestic disturbances enshrined in Article I, Section 10, Clause 3 and Article IV, Section 4, "the nature of the power itself" is committed to executive discretion, *Sterling*, 287 U.S. at 399, whether it is implemented by a federal or a state executive, *Moyer*, 212 U.S. at 83.

This parity between state and federal action is demonstrated by comparing the Self-Defense Clause to other constitutional provisions. Consider the Import-Export Clause, which provides that no State may lay imposts or duties except with "the Consent of the Congress," and even then "subject to [Congress's] Revision and Controul." U.S. Const. art. I, § 10, cl. 2. By contrast, in the very next paragraph, the Self-Defense Clause acknowledges that a State *may* "engage in War" even "without the Consent of Congress" if "invaded, or in such imminent Danger as will not admit of delay." *Id.*, art. I, § 10, cl. 3. The federal government also has a duty to "protect each [State] against Invasion; and … against domestic Violence." *Id.*, art. IV, § 4. Invocation of these self-defense powers has been rare as an historical matter. Nevertheless, the Constitution recognizes that the States have the same sovereign power to respond to an invasion as the federal government. *Cf.* ROA.999 n.29 (recognizing "Texas has the right to defend itself").

Because the nature of that power is the same, the restrictions on policing its exercise are likewise the same. After all, "[w]hen seeking to discern the meaning of a word in the Constitution, there is no better dictionary than the rest of the Constitution itself." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 829 (2015) (Roberts, C.J., dissenting). As the federal government previously admitted in the district court, "there are no manageable standards to ascertain" whether a qualifying invasion exists or justifies defensive measures. ROA.745. The Constitution's textual commitment to the States is no less clear than its commitment to the federal government. And the absence of "manageable standards" when federal action is at issue persists when state action is under consideration.

This parity is also reflected in the way the courts have treated the exercise of the President's power to repel invasion. For example, in *Martin*, an individual sued in replevin to challenge President James Madison's order calling up the New York

militia. 25 U.S. at 23, 27-28. The United States responded that the Constitution obligates it "to protect each [State] against Invasion," U.S. Const. art. IV, § 4; provides for "calling forth the Militia to … repel Invasions," *id.*, art. I, § 8, cl. 15; and makes the President "Commander in Chief … of the Militia of the several States," *id.*, art. II, § 2, cl. 1. 25 U.S. at 29, 31. As Justice Holmes would later do in *Moyer*, Justice Story refused to second guess the President's conclusion that "the exigency has arisen." *Id.* at 29-30. Instead, because the Commander-in-Chief power is "confided by the constitution," the Court stated that the President's determination was "conclusive," and held the constitutional defense trumped any statutory objection. *Id.* at 30-32. The Court even concluded there was no need to "substantiate" the President's invocation of a constitutional prerogative with evidence "as to the existence of the exigency." *Compare id.* at 32-33, *with* ECF 195-1 at 53-54.

This case is similar. As plaintiff, the federal government presented a federal statutory claim under the Rivers and Harbors Act. The Defendants interposed a federal constitutional defense under Article I, Section 10, Clause 3. In mediating a conflict between the two, the district court should have "credit[ed]" the constitutional defense rather than "disagree[ing]" with and "reject[ing]" it. ROA.995-996; 2024 WL 861526, at *24, 37. None of that means Texas seeks to make its conduct "unreviewable." ECF 78 at 50. After all, "it is [*the federal government*] that seeks relief," *i.e.*, to prevent another sovereign from exercising the constitutional prerogative to defend itself. *Id.* Texas merely presses a defense that bars such statutory relief where—as here—there are no allegations that the constitutional defense was raised in bad faith. *See, e.g.*, *Kellogg Brown & Root Servs.*, 856 F. Supp. 2d at 181-82 (example of federal government asserting an affirmative defense raising a nonjusticiable political question to rebut a counterclaim alleged against it). Given both the Constitution's plain language and foundational principles of federalism, there is no basis to treat Texas worse than the federal government.

Respectfully submitted,

/s/ Lanora C. Pettit
Lanora C. Pettit
*Counsel for Defendants-Appellants*

cc: All counsel of record (via CM/ECF)