

MTG
90-5-1-1-22454

**U.S. Department of Justice**

Environment and Natural Resources Division

---

*Appellate Section*  *Telephone (202) 352-3147*
*P.O. Box 7415*  *Facsimile (202) 514-0557*
*Washington, D.C. 20044*

May 22, 2024

**BY CM/ECF**

Mr. Lyle W. Cayce, Clerk of Court
United States Court of Appeals
For The Fifth Circuit
600 S. Maestri Place, Ste. 115
New Orleans, Louisiana 70130

Re:   United States v. Abbott, No. 23-50632

Dear Mr. Cayce:

      The United States submits this letter brief in response to this Court's order of May 16, 2024.

      The political-question doctrine does not "require dismissal of this entire action for want of jurisdiction in the federal courts." Order, Question 1. If it did, Texas's mere assertion of a defense based on the State War Clause—no matter how insubstantial—would immunize the State from suit by the United States to enforce federal law. That radical result is not permitted here for at least three reasons: 1) Texas has asserted only that the courts should adopt a strained view of the Rivers and Harbors Act to avoid a constitutional question, and has not asserted an affirmative defense based on the State War Clause; 2) the district court did not err because any political question is a narrow one that is committed to the political Branches of the federal government, and not to the State, providing no ground on which to dismiss a lawsuit brought by the United States against the State; and 3) even if the federal courts were sometimes required to accept a State's determination regarding the existence of an invasion, the district court could nonetheless adjudicate the United States' claim in this case without needing to address any issue that is plausibly reserved to the State's sole discretion. Finally, "[i]n a hypothetical case, if an action [were] brought against the President . . . for exercising the constitutional war power," the President would have justiciability defenses that are not available to a Governor in an action, like this one, brought by the United States. Order, Question 4.

**1. Texas has asserted only constitutional avoidance.** To start, Texas has not pleaded a constitutional defense to which the political-question doctrine could even be argued to apply. Texas did not raise the issue in its motion to dismiss the case, ECF 62, nor did Texas invoke the State War Clause in any affirmative defense to the government's claim in its recently filed answer, ECF 118. Instead, Texas argued in response to the preliminary injunction motion only that a preliminary injunction should not issue because the Rivers and Harbors Act should be interpreted to *avoid* the *potential* constitutional question. Similarly, its arguments in this Court have been limited to constitutional avoidance. Texas Panel Brief at 31 ("this Court must construe the Act to avoid the constitutional conflict the district court invited"); Texas Panel Reply Brief at 18; Texas En Banc Brief at 39-42 ("Applying [the constitutional avoidance] canon, this Court should hold that Texas's buoys do not violate any federal statutory prohibition.").

Where Texas has made only a constitutional avoidance argument in this Court and has not raised the State War Clause as a defense in the district court, there is no constitutional defense in this case that could present a political question requiring dismissal. Especially given that courts do not decide constitutional issues gratuitously, this Court thus should do nothing more at this point than decide that the Rivers and Harbors Act cannot be read in a manner that would allow Texas's conduct. *See Nielsen v. Preap*, 586 U.S. ___, 139 S. Ct. 954, 972 (2019) (declining to consider constitutional issue where the "constitutional concerns are offered as just another pillar in an argument for their preferred reading of the language" of the statute and where "respondents might have raised a head-on constitutional challenge" but did not).

**2. The district court correctly recognized that Texas could not invoke the "invasion" exception to the State War Clause as a defense to the claims brought by the United States, because such a defense would necessarily depend on resolving an issue that is committed to the political Branches of the federal government.** The district court determined that "the Constitution commits the question of whether an invasion has occurred to the policy making (or political) branches *of the federal government*." ROA.998 (citation omitted). That determination was correct, and it does not require dismissal of the United States' claims under the Rivers and Harbors Act (Order, Questions 1 and 2) or preclude entry of a preliminary injunction in favor of the United States (Order, Question 3).

a.    As we explain below, *see infra* at 5-9, a court could appropriately reject a defense under the State War Clause here on multiple grounds without addressing any nonjusticiable political question. *Embracing* such a defense, however, would require a court to accept that the specific, present level of irregular migration qualifies as an invasion under the State War Clause—and, further, that the Clause authorizes the State to violate federal law that the United States has determined is fully applicable in the present circumstances and has sued to enforce. The district court correctly

2

recognized that the State War Clause does not provide a justiciable defense in this suit brought by the United States. *See* ROA.995-98.

Article IV of the Constitution, along with guaranteeing to the States a republican form of government, assigns to the United States responsibility to "protect each of [the States] against Invasion." U.S. Const. art. IV, sec. 4. That assignment implements in this context the Constitution's "complete delegation of authority to the Federal Government to provide for the common defense," while "divest[ing] the States of like power." *Torres v. Texas Dep't of Pub. Safety*, 597 U.S. 580, 590 (2022). And as the district court recognized, "by placing the responsibility to protect against invasion on the federal government, the Constitution commits the question of whether an invasion has occurred to the policy making (or political) branches of the federal government." ROA.998 (citation and emphasis omitted).

The district court's recognition of that constitutional commitment was consistent with the conclusion of every court to have considered whether a substantial influx of irregular migration qualifies as an invasion for constitutional purposes. Those courts considered the issue in suits brought by States or officials of political subdivisions contending that the federal government's alleged failure to adequately curtail unlawful migration violated the United States' obligation under Article IV of the Constitution to "protect" the States "against Invasion." U.S. Const. art. IV, sec. 4. In every case, the court of appeals held that the claim presented a political question that could not furnish a basis for granting the State relief. *See California v. United States*, 104 F.3d 1086, 1090-91 (9th Cir.), cert. denied, 522 U.S. 806 (1997); *New Jersey v. United States*, 91 F.3d 463, 469-70 (3d Cir. 1996); *Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996); *Chiles v. United States*, 69 F.3d 1094, 1097 (11th Cir. 1995); *cf. Texas v. United States*, 106 F.3d 661, 667 (5th Cir. 1997) (finding that Texas "suggests no manageable standards by which a court could decide the type and degree of immigration law enforcement that would suffice to comply with [the] strictures" of the Constitution).

The district court in this case relied upon those decisions, and Texas agrees with them. ROA.997; Texas Panel Br. at 34. It follows that just as Texas could not rely on an asserted "invasion" to obtain affirmative relief against the federal government, it cannot rely on an asserted "invasion" as either a reason to read the Rivers and Harbors Act to permit its conduct or as an (unasserted) affirmative defense against the United States' claims of statutory violations in this case. As the district court observed, Texas seeks to avoid that conclusion by focusing its argument not on Article IV, but on the "invasion" exception to the State War Clause. But "all Texas's new argument does is to ask the Court to take the *additional* step—*beyond* the nonjusticiable question of whether the federal government has failed to protect Texas from invasion—of sanctioning Texas's assertion of plenary power to declare and

3

respond" to whatever it regards as an invasion, ROA.998 (emphases added), and permitting it to defy federal law.

To recognize that the courts may not intrude upon the political Branches' authority to determine whether an invasion has occurred, and if so what the appropriate response should be, is not to say that in every circumstance a State would require federal permission before taking action to respond to an unexpected invasion or prevent an imminent one. When a State is "actually invaded," or when such an invasion is "imminent," the State War Clause empowers a State to "engage in War" without waiting until it has received the "Consent of Congress," because such situation "will not admit of delay." U.S. Const. art. I, sec. 10, cl. 3. But when the political Branches of the National Government have already been fully apprised of the relevant circumstances and have determined the appropriate response, a State's disagreement with that determination does not provide a judicially cognizable defense against claims by the United States that the State's actions violate federal law.

b.      The asserted invasion here "involves 'the immigration and the status of aliens,'" ROA.996-98 (quoting *Arizona v. United States*, 567 U.S. 387, 394-95 (2012)), which are matters committed to the United States. Those subjects have been addressed repeatedly by Congress and the President, and comprehensively so in the Immigration and Nationality Act. To avoid "inappropriate interference in the business of the other branches" of the federal government, *United States v. Munoz-Flores*, 495 U.S. 385, 394 (1990), the district court correctly declined to consider Texas's unprecedented argument that the current irregular migration could constitute an invasion requiring the court to adopt Texas's view of the Rivers and Harbors Act. Nor would it permit Texas to take matters into its own hands and entitle Texas to engage in an ongoing violation of federal law that the United States has brought this suit to enjoin—or even to engage in war. That is the political question the district court pointed to in declining to embrace Texas's invasion justification, and that the United States addressed in its panel briefing in the context of explaining why the doctrine does not inform any interpretation of the Rivers and Harbors Act in this case. ROA.995-98; U.S. Panel Brief at 36-28. Because *that* question is committed to the political Branches of federal government, the district court did not err by issuing a preliminary injunction after concluding that it could not approve Texas's constitutional argument insofar as it would require deciding that question.

The court's conclusion is consistent not only with every other court to have considered the issue, but also with the Supreme Court's conception of the political question doctrine as "essentially a function of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 210 (1962). The doctrine is one of judicial deference to the political Branches of the United States government; it is not a federalism principle. Thus, the Supreme Court observed in *Baker* that suits brought to enforce the Guarantee Clause's related requirement that the United States guarantee to every State a

republican form of government present a political question, and that in those cases "it is the relationship between the judiciary and the coordinate branches of the Federal Government, and not the federal judiciary's relationship to the States, which gives rise to the 'political question.'" *Id.* Texas has not identified a single case in which a federal court has held that a federal constitutional question presents a political question that is reserved to a state governor, much less that the governor may order state officials to violate federal law on that basis. Whatever else the political question doctrine covers, it is not a doctrine that requires the federal judiciary to turn a blind eye to state actions that the federal legislature (through the Rivers and Harbors Act) and the federal executive (through this enforcement action) have determined are improper.

**3. The district court can adjudicate the case in any event.** Even if Texas had actually raised a State War Clause defense, and even if this Court radically modified the political-question doctrine by applying it in this suit by the United States to a state governor's determination that there has been an invasion, dismissal of the United States' claim under the Rivers and Harbors Act would still be improper.

The State War Clause's text makes clear that it provides a time-limited emergency authority to allow a State to respond to circumstances that "will not admit of delay" until the federal government has had an opportunity to respond, U.S. Const. art. I, § 10, cl. 3—which, at the time of the Founding, could have taken substantial time. Once the federal government has been apprised of the situation, as it obviously has been here, that Clause does not entitle a State to persist in its war-related activities indefinitely or disregard a determination by the federal government about whether (and how) to "engage in War" or to pursue other measures in response to particular circumstances. *See United States v. Texas*, 2024 WL 861526, at *35 (recognizing that "[t]he State War Clause, read consistently with other provisions of the Constitution, authorizes states to respond to invasion only as an emergency interim measure before the federal government may respond," and requires them to "cede authority to the federal government to conduct [any] war once the federal government has had time to respond to the purported invasion").

Any contrary reading of the State War Clause—such that the ongoing situation at the border would even authorize Texas to engage in armed hostilities with another Nation or with a group of foreign nationals, without regard to the foreign policy of the United States as a whole—would be extraordinary. The Constitution did not dedicate the common defense to the United States and prohibit the States from engaging in war without consent, only to allow a State to usurp the United States' power based on a governor's unilateral declaration of an "invasion." Otherwise, "a single State c[ould], at her pleasure, embroil us in disastrous quarrels with other nations"—a proposition from which the Supreme Court long ago rightly recoiled. *Chy v. Freeman*, 92 U.S. 275, 280 (1875); *see* The Federalist No. 3 (noting that federal power is necessary in part because "bordering States . . . under the impulse of sudden

5

irritation, and quick sense of apparent interest or injury" could take action that would undermine foreign relations); *see also* 3 J. Story, Commentaries on the Constitution § 1164

Here, Congress has enacted a statutory scheme that comprehensively addresses immigration, including particular mechanisms for the Secretary of Homeland Security to authorize state and local law-enforcement officers to exercise powers conferred by the Immigration and Nationality Act in the event of a "mass influx of aliens." 8 U.S.C. § 1103(a)(10). Congress, in the INA, thus has *already* taken the present circumstances firmly in hand through law enforcement, not military, means, and has entrusted enforcement to the Executive. Under these circumstances, the State War Clause provides no basis for allowing Texas to take measures to counteract unlawful entry that are contrary to federal law and against the United States' explicit opposition in this suit. *See Torres*, 597 U.S. at 592 ("The States ultimately ratified the Constitution knowing that their sovereignty would give way to national military policy."). A court may properly decide that issue without considering the political question of whether an invasion within the meaning of the State War Clause has occurred.

The district court could also hold that "federal statutes addressing matters such as [the construction of barriers in navigable waters] are still supreme even when the State War Clause has been triggered." *United States v. Texas*, 97 F.4th 268, 295 (5th Cir. 2024). The "actually invaded" exception to the State War Clause applies by its terms only to the specific constitutional prohibition against "engag[ing] in War." U.S. Const. art. I, § 10, cl. 3. It does not purport to excuse States from compliance with all other federal laws, especially on an ongoing basis. The district court could therefore recognize that even if Texas "ha[d] properly invoked its war powers" as an initial matter, those powers provide no defense to "the claims of the United States under the Rivers and Harbors Act" in this case. Order, Question 2; *see United States v. Texas*, 97 F.4th at 295 (explaining that the "invasion" exception, even if satisfied, would not immunize a Texas immigration law from preemption by federal immigration statutes). Indeed, because neither Texas nor the United States has suggested that Texas actually engaged in war by constructing a floating barrier, the district court could appropriately recognize that the "actually invaded" exception is irrelevant here.[1]

---

[1] Even if Texas really were engaged in war, the courts would still have authority to determine whether the State was doing so in a manner that violated the Constitution, including the Supremacy Clause. *Cf. Sterling v. Constantin*, 287 U.S. 378, 397, 400-01 (1932) (holding that "[w]hat are the allowable limits of [state] military discretion, and whether or not they have been overstepped in a particular case, are judicial questions," because otherwise the "fiat of a state Governor, and not the Constitution of the United States, would be the supreme law of the land"). Thus, in *Sterling*, the Supreme Court noted that in the absence of a true exigency and unavoidable conflict, the

Finally, if necessary, the Court could hold that irregular migration does not qualify as an "actual[] inva[sion]" within the meaning of the State War Clause, and therefore cannot justify a State's decision to "engage in War." U.S. Const. art. I, sec. 10, cl. 3. The original public meaning of the phrase "actually invaded" indicates that the exception was intended to apply to conflict of a military nature, which would not have encompassed surges in unlawful entry of noncitizens of the sort Texas alleges here. *See United States v. Texas*, __ F. Supp. 3d __, 2024 WL 861526, at *25-*33 (W.D. Tex. Feb. 29, 2024) (exhaustively discussing Founding Era sources on the meaning of the "actually invaded" exception). And holding that the text and history of the "actually invaded" exception make it inapplicable in cases of irregular migration would not require a court to address any difficult questions about whether a particular *degree* of irregular migration could justify a State in engaging in war; rather, the court would be rejecting the State's argument about the application of the constitutional text that could be regarded in these circumstances as within the courts' competence to decide. *See Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012); *cf. Ex parte Milligan*, 71 U.S. 2, 80 (1866) (reviewing declaration of martial law in Indiana to determine whether the "necessity" is "actual and present; the invasion real, such as effectually closes the courts and deposes the civil administration," and concluding that "if once invaded, that invasion was at an end, and with it all pretext for martial law").

As explained in our panel brief, the courts that have considered the issue have uniformly concluded (albeit as one of multiple, alternative holdings) that irregular migration is not the sort of invasion in response to which the State War Clause authorizes a State to engage in war. U.S. Panel Brief at 39-40; *see California*, 104 F.3d at 1090-91 (9th Cir.) (observing that James Madison described "invasion" as involving "situations wherein a state is exposed to armed hostility"); *New Jersey,* 91 F.3d at 468 (3d Cir. 1996) (noting that State identified "no support whatsoever" for interpreting "the term 'invasion' to mean anything other than a military invasion"); *Padavan*, 82 F.3d at 28 (holding that "invasion" entails "expos[ure] to armed hostility . . . that is intending to overthrow the state's government"). As the district court explained in the recent case involving Texas SB4, "[c]ontemporary definitions of 'invasion' and 'actually invaded' as well as common usage of the term in the late Eighteenth Century predominantly referred to an 'invasion' as a hostile and organized military force, too powerful to be dealt with by ordinary judicial proceedings." *Texas v. United States*, 2024 WL 861526, at *25; *see id.* at *26-*27 (surveying contemporaneous dictionaries and usage).

---

"proper use" of a State's war powers is to effectuate federal law, "not to attempt to override it." *Id.* at 404. Moreover, as we have explained, En Banc Br. at 40, Texas does not even attempt to show any actual conflict, much less an unavoidable one, between compliance with the Rivers and Harbors Act followed by normal judicial review on the one hand and Texas's desire to exercise its asserted power by building a barrier in the Rio Grande on the other.

Context reinforces that conclusion. The State War Clause reflects an intent generally to prohibit States from "engag[ing] in War." U.S. Const. art. I, § 10, cl. 3. In allowing for an exception from that prohibition, it was natural for the Framers to refer to exigent circumstances in which a State's temporarily engaging in war would be necessary because of the inadequacy of the States' police powers. In contrast, there would have been no need to authorize States to engage in war—particularly given the risks that would pose to foreign policy, *see* The Federalist No. 3, at 39—to respond to prolonged circumstances that could be addressed through other means and that, here, Congress has comprehensively addressed in the INA. The courts have thus consistently recognized that "invasion" does not include irregular migration. And such migration therefore does not entitle a State to violate federal statutes concerning immigration or regulation of navigable waters that form an international boundary. The district court could decide that narrow constitutional issue without involving itself in any questions of gradation or degree that would be beyond the courts' proper role to decide.

Congress and the Executive are well informed of the irregular migration occurring at the border and have addressed it in the manner they have determined is appropriate. The State War Clause accordingly provides no basis for allowing Texas to violate the Rivers and Harbors Act over the federal government's explicit opposition. *See Torres*, 597 U.S. at 592 ("The States ultimately ratified the Constitution knowing that their sovereignty would give way to national military policy.").

\* \* \* \* \*

It is Texas that seeks relief from the application of the Rivers and Harbors Act based on an assertion that it is exercising its power to "engage in war" when "actually invaded." U.S. Const. art. I, § 10, cl. 3. If the court found that it was unable to resolve some aspects of Texas's argument because those aspects present political questions, that would not mean Texas's conduct is immunized by its invocation of the Clause. Courts are obligated to apply otherwise applicable federal law, including duly enacted statutes like the Rivers and Harbors Act and to respect the more general vesting of responsibility for national security, foreign relations, and immigration in the national government that do not themselves involve political questions. Otherwise, Texas could violate any federal law, and could defeat a resulting suit brought by the United States to enforce that law merely by invoking the State War Clause as a defense to put its actions beyond judicial review. Texas cannot use the political question doctrine as a sword by which to unbind itself from all federal law based on nothing more than the Governor's proclamation that he is exercising the limited, temporary war powers authorized by that Clause. *See Sterling*, 287 U.S. at 397.

**4. In a suit brought against the President concerning the exercise of the constitutional war power, the President would have justiciability defenses that are not available to a Governor in a suit brought by the United States.** The Supreme Court has held that courts generally lack jurisdiction "to enjoin the President in the performance of his official duties," particularly when those duties involve the "exercise of judgment" or "political" determinations. *Mississippi v. Johnson*, 71 U.S. 475, 499, 501 (1867); *see Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992) ("We have left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty, . . . but in general 'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.'") (quoting *Mississippi*, 71 U.S. at 498-99, 501). Accordingly, "[i]n a hypothetical case, if an action [were] brought against the President . . . for exercising the constitutional war power," Order, Question 4, that suit would be subject to dismissal on grounds that are not applicable in a suit against a governor. *See Sterling*, 287 U.S. at 391 (affirming district court injunction against the Governor of Texas barring certain actions putatively taken to prevent a "warlike riot or insurrection").

To recognize that justiciability principles afford greater protection to the President of the United States than to state governors is not anomalous. For example, "[t]he Federal Government can bring suit in federal court against a State," *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 71 n.14 (1996), while "[t]he States of the Union, like all other entities, are barred by federal sovereign immunity from suing the United States in the absence of an express waiver of this immunity by Congress," *Block v. North Dakota ex rel. Bd. of University & School Lands*, 461 U.S. 273, 280 (1983).

Moreover, given "the supremacy of federal power in the area of military affairs," *Perpich v. Department of Defense*, 496 U.S. 334, 351 (1990), as well as in the area of immigration, it would be particularly surprising if the constitutional structure barred the United States from invoking the authority of the federal courts to address state violations of federal law in those areas. As the Supreme Court recognized long ago, the alternative to allowing such a suit is "that in the end there must be a trial of physical strength between the government of the Union and Texas." *United States v. Texas*, 143 U.S. 621 (1892). That is an "alternative [that] has no place in our constitutional system, and cannot be contemplated by any patriot except with feelings of deep concern." *Id.* at 641; *see Seminole Tribe*, 517 U.S. at 71 n.14 (1996) (citing *United States v. Texas* for the proposition that the federal government may bring suit against a State in federal court to "ensur[e] the State['s] compliance with federal law"). Texas's claim of an unreviewable, unilateral right to declare an "invasion" and take any action it sees fit in response to that declared invasion—up to and including engaging in war—would raise just such a specter. This Court should reject it.

9

Respectfully submitted,

s/Michael T. Gray

cc: Counsel of Record