

**U.S. Department of Justice**

Environment and Natural Resources Division

MTG
90-5-1-1-22454

*Appellate Section*                                                              *Telephone (202) 532-3147*
*P.O. Box 7415*                                                                  *Facsimile (202) 514-0557*
*Washington, D.C. 20044*

May 24, 2024

**BY CM/ECF**

Mr. Lyle W. Cayce, Clerk of Court
United States Court of Appeals

Re:   United States v. Abbott, No. 23-50632

Dear Mr. Cayce:

  Texas advances a radical understanding of both the State War Clause and the political-question doctrine. Texas argues that it has an absolute right to *engage in war* based on the Governor's unilateral determination that it has been invaded, and that neither the federal Executive nor the federal courts may disagree with that determination or prevent Texas's actions in response. On that view, Governor Abbott could even send armed troops into Mexico, and the United States would have no legal recourse to stop him. Nothing in the Constitution supports that extraordinary result, which would constitute a frontal assault on the Constitution's assignment of power over national defense and foreign affairs to the National Government, and would present serious risks to the Nation's security and foreign relations.

  1. Nearly all the arguments in Texas's submission depend on its claim that a State has unilateral authority to declare an invasion and to respond in whatever manner it deems fit. But that is not the way our Constitution is structured. As the district court recognized, "the Constitution commits the question of whether an invasion has occurred to the policy making (or political) branches *of the federal government*." ROA.998 (citation omitted).

  The Constitution assigns to the United States the responsibility to "protect each of [the States] against Invasion," U.S. Const. art. IV, sec. 4, and entrusts the President with command of "the Militia of the several States" when needed to respond to such an invasion, U.S. Const. art. II, sec. 2; *see* U.S. Const. art. I, sec. 8, cl. 15. And nearly 200 years ago, the Supreme Court held that under the Militia Act of 1795, "the authority to decide whether th[at] exigency has arisen, belongs exclusively to the President, and that his decision is conclusive upon all other persons." *Martin v. Mott*, 25 U.S. 19, 30 (1827). Any other understanding would allow "bordering States" with "a quick sense of apparent interest or injury . . . to excite war with" neighboring nations, The Federalist No. 3, at 44 (C. Rossiter ed. 1961) (J. Jay)—the very thing the

Framers intended to prevent through "the supremacy of federal power in the area of military affairs," *Perpich v. Department of Defense*, 496 U.S. 334, 351 (1990).

Texas argues that because the State War Clause provides that a State "need not obtain 'the Consent of Congress' before taking defensive measures" in response to an invasion, Tex. Letter Br. 3 (citation omitted), it must have final authority to determine whether an invasion has occurred. But as we explain (U.S. Letter Br. 5-6), that language simply authorizes a State to respond in an emergency without waiting for affirmative authorization from Congress. It does not mean that the State can disregard laws passed by Congress, including not only the Rivers and Harbors Act but also the Immigration and Nationality Act, which constitutes Congress' standing response to unlawful immigration. *See United States v. Texas*, 97 F.4th 268, 295 (5th Cir. 2024). Nor does it mean that the State can disregard the paramount role of the federal Executive in deciding an appropriate course of action once it is apprised of the circumstances. *See United States v. Texas*, No. 24-cv-8, 2024 WL 861526, at *35 (recognizing that "[t]he State War Clause, read consistently with other provisions of the Constitution," requires States "to cede authority to the federal government to conduct [any] war once the federal government has had time to respond to the purported invasion"). Thus, where the political Branches of the National Government have addressed the circumstances that a State asserts qualify as an invasion, neither the State nor the courts may depart from that judgment. *See* U.S. Letter Br. 3-5 (collecting authorities).

*Moyer v. Peabody*, 212 U.S. 78 (1909), and *Rucho v. Common Cause*, 588 U.S. 684 (2019), do not suggest otherwise. *Moyer* involved a claim for money damages based on temporary actions taken by a state governor to address a local insurrection, in circumstances in which the United States had not intervened. *See* 212 U.S. at 82. It thus has no bearing on a court's ability to grant injunctive relief in a suit brought by the United States against a State to prevent a violation of federal law with significant implications for the United States' international relations, and certainly does not suggest that a State's declaration of an invasion, and the measures it seeks to take in response, must be accepted by the United States even after it is apprised of the circumstances. *See Martin*, 25 U.S. at 30. *Rucho* is even further afield: There the Supreme Court found no judicially manageable standards for reviewing claims of partisan gerrymandering, and held that the Constitution assigned to Congress and not the federal courts the responsibility to "check[] and balance[]" partisan districting decisions. 588 U.S. at 699. That ruling simply has no bearing on whether federal courts may second-guess the political Branches of the National Government—to which the Constitution assigns the powers of national defense, foreign relations, and immigration—about whether an invasion has occurred that warrants engaging in war.

2. As we explain (U.S. Letter Br. 5-8), this case could in any event be resolved in favor of the United States in multiple ways that would not require addressing any questions of gradation or degree that might be beyond the courts' proper role to decide.

*First*, the district court could decide that that State War Clause does not entitle a State to persist in war-premised activities indefinitely or to disregard the paramount role of the National Government in deciding whether to "engage in War" or pursue other measures in response to particular circumstances. *See* U.S. Letter Br. 5-6; pp. 1-2, *supra*.

*Second*, the district court could hold that "federal statutes addressing matters such as [the construction of barriers in navigable waters] are still supreme even when the State War Clause has been triggered," *Texas*, 97 F.4th at 295, and that those statutes therefore must be complied with—especially when, as here, the United States sues to enforce them, *see* U.S. Letter Br. 6 & n.1. Although that point was decisive in this Court's recent S.B.4-related decision, Texas ignores it.

*Third*, if necessary, the district court could hold that irregular migration and the other activities identified by Texas do not come within the meaning of the phrase "actually invaded" as that phrase is used in the State War Clause. *See* U.S. Letter Br. 7-8. Texas's handful of historical examples are not to the contrary. For example, the "'thieves or marauders'" Texas references, Letter Br. 2 (citation omitted), were forces affiliated with Juan Cortina, and had previously captured the U.S. city of Brownsville and sent large raiding parties to plunder towns and ranches near the border before fleeing back to Mexico. *See* H.R. Rep. No. 343, 44th Cong., 1st Sess. at III-IV, 13-15 (1876). Similarly, the "invasions by pirates" to which Texas refers, Letter Br. 2, involved threats to burn entire port cities to the ground unless they "ransom[ed] themselves from the terrors of a conflagration," The Federalist No. 41 (Madison), at 261. "Even as Texas might compare modern-day cartels to founding-era pirates, there is no evidence that cartels intend to seize American land, militarily plunder cities, or ransom U.S. citizens" in a manner that would justify a State's unilaterally engaging in War. *Texas*, 2024 WL 861526, at *30. But if the actions of cartels in Texas were to take on that character, the President would have the necessary means to respond. And Texas of course retains its authority to combat violence and drug trafficking within its borders through its criminal laws. Finally, even assuming that "contemporaneous literature" sometimes described the "uninvited entry by groups of immigrants" as an invasion, Tex. Letter Br. 2 (citation omitted), "[c]ourts look to the natural or normal meaning, not the broadest possible meaning." *Texas*, 2024 WL 861526, at *26. At the time of ratification, "[t]he natural and normal meaning of 'invade,'" according to "the predominant dictionary definition," did not include immigration, *id.*—particularly in contexts, like the State War Clause, that were specifically focused on military actions. *See id.* at *25-*33.

Respectfully submitted,

s/Michael T. Gray

cc: Counsel of Record