

# KEN PAXTON
ATTORNEY GENERAL OF TEXAS

Lanora C. Pettit
Principal Deputy Solicitor General

Lanora.Pettit@oag.texas.gov
(512) 463-2127

June 18, 2024

**Via CM/ECF**

Mr. Lyle W. Cayce, Clerk
United States Court of Appeals for the Fifth Circuit

   Re:   No. 23-50632, *United States v. Abbott*

Dear Mr. Cayce:

   Pursuant to Rule 28(j), counsel provides notice of the Supreme Court's decision in *Starbucks Corp. v. McKinney*, No. 23-367 (June 13, 2024).

   All members of the *Starbucks* Court agreed (at 6) that "absent a clear command from Congress, courts must adhere to the traditional four-factor test" for preliminary injunctions announced in *Winter v. NRDC*, 555 U.S. 7 (2008). The Court explained (at 5-6) that this presumption applies across "a wide variety of statutes" implicating the public interest, like drug abuse, water pollution, environmental conservation, and consumer protection. The Court further explained (at 2, 6) that "[n]othing in [the] text" of section 10(j) of the National Labor Relations Act "overcomes th[at] presumption"—notwithstanding its statement that a district court "may 'grant to the Board such temporary relief . . . as it deems just and proper.'"

   That decision is irreconcilable with the United States' position in this case that it is *not* required to make *Winter*'s four-part showing anytime it "seeks an injunction enforcing a public-interest statute." ROA.82-83, 947; U.S.Resp.Br.44-47; U.S.Supp.Br.45-48. After all, this Court has described how the NLRA empowers federal courts to "decide the relief appropriate to vindicate the public interest." *Hutchings v. U.S. Indus., Inc.*, 428 F.2d 303, 311 n.8 (5th Cir. 1970). Nevertheless, the Supreme Court unequivocally held (at 7) that does not matter where statutory text "bears no resemblance to the language that Congress has employed" on other occasions to "expressly relieve the party moving for an injunction from showing that he can satisfy one of the traditional criteria." The RHA bears no such resemblance:

Letter to Mr. Cayce, Clerk
Page 2

It says only that courts "may" enjoin the removal of a structure "erected in violation of" the RHA. 33 U.S.C. § 406.

The panel concluded (at 23 & n.16) it "need not consider this argument now" because the district court "addressed each" of *Winter*'s factors. But the district court prevented Texas from making a record on the final three preliminary-injunction factors. *See* ROA.995 n.28. And the result was an injunction that neither properly analyzes the *Winter* factors nor addresses the harm purportedly justifying relief. Tex.Br.41-47; Tex.Reply.Br.20-24; Tex.Supp.Br.43-47. This Court should reverse.

Respectfully submitted.

/s/ Lanora C. Pettit
LANORA C. PETTIT
*Counsel for Defendants-Appellants*

cc: All counsel of record (via CM/ECF)

OCTOBER TERM, 2023

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## STARBUCKS CORP. *v.* McKINNEY, REGIONAL DIRECTOR OF REGION 15 OF THE NATIONAL LABOR RELATIONS BOARD, FOR AND ON BEHALF OF THE NATIONAL LABOR RELATIONS BOARD

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 23–367.  Argued April 23, 2024—Decided June 13, 2024

After several Starbucks employees announced plans to unionize, they invited a news crew from a local television station to visit the store after hours to promote their unionizing effort. Starbucks fired multiple employees involved with the media event for violating company policy. The National Labor Relations Board filed an administrative complaint against Starbucks alleging that it had engaged in unfair labor practices. The Board's regional Director then filed a petition under §10(j) of the National Labor Relations Act seeking a preliminary injunction for the duration of the administrative proceedings that would, among other things, require Starbucks to reinstate the fired employees. The District Court assessed whether the Board was entitled to a preliminary injunction by applying a two-part test that asks whether "there is reasonable cause to believe that unfair labor practices have occurred," and whether injunctive relief is "just and proper." *McKinney* v. *Ozburn-Hessey Logistics, LLC,* 875 F. 3d 333, 339. Applying this standard, the District Court granted the injunction, and the Sixth Circuit affirmed.

*Held*: When considering the NLRB's request for a preliminary injunction under §10(j), district courts must apply the traditional four factors articulated in *Winter* v. *Natural Resources Defense Council, Inc.,* 555 U. S. 7. Pp. 4–11.

(a) Section 10(j) authorizes a federal district court "to grant . . . such temporary relief . . . as it deems just and proper" during the pendency of the Board's administrative proceedings.  §160(j).  When Congress

Syllabus

empowers courts to grant equitable relief, there is a strong presumption that courts will exercise that authority in a manner consistent with traditional principles of equity. For preliminary injunctions, the four criteria identified in *Winter* encompass the relevant equitable principles. Nothing in §10(j) displaces the presumption that those traditional principles govern. Pp. 4–5.

(b) The traditional rule is that a plaintiff seeking a preliminary injunction must make a clear showing that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U. S., at 20, 22. "These commonplace considerations applicable to cases in which injunctions are sought in the federal courts reflect a 'practice with a background of several hundred years of history.'" *Weinberger* v. *Romero-Barcelo*, 456 U. S. 305, 313. When interpreting a statute that authorizes federal courts to grant preliminary injunctions, the Court "do[es] not lightly assume that Congress has intended to depart from established principles." *Ibid.* Absent a clear command from Congress, then, courts must adhere to the traditional four-factor test articulated in *Winter*.

Section 10(j)'s statutory directive to grant injunctive relief when the district court "deems" it "just and proper" does not jettison the normal equitable rules; it simply invokes the discretion that courts have traditionally exercised when faced with requests for equitable relief. Furthermore, §10(j)'s text bears no resemblance to the language that Congress has employed when it has altered the normal equitable rules. Pp. 5–8.

(c) The Board argues that statutory context requires district courts evaluating §10(j) petitions to apply the traditional criteria in a less exacting way, consistent with the Sixth Circuit's reasonable-cause standard. But, the reasonable-cause standard goes far beyond simply fine tuning the traditional criteria to the §10(j) context—it substantively lowers the bar for securing a preliminary injunction by requiring courts to yield to the Board's preliminary view of the facts, law, and equities. Under the traditional standard, for example, the Board would have to make a clear showing that it "is likely to succeed on the merits." *Winter*, 555 U. S., at 20. By contrast, the Board may obtain a §10(j) injunction under the reasonable-cause standard by merely showing "reasonable cause to believe that unfair labor practices have occurred." *Ozburn-Hessey Logistics*, 875 F. 3d, at 339. Section 10(j)'s statutory context does not compel this watered-down approach to equity.

The Board suggests that district courts risk supplanting its adjudi-

Syllabus

catory authority by conducting an independent assessment of the merits and equitable factors. But no matter how searching the district court's merits inquiry or what evidence it considers or credits, the Board remains free to reach its own legal conclusions and develop its own record in its administrative proceedings. And, since irreparable harm and the other equitable factors are not part of the unfair-labor-practice claim, a district court's assessment of those factors is irrelevant to the Board's adjudicatory authority.

The Board also reasons that district courts should apply a deferential standard because the Board's final decisions are reviewed deferentially by a court of appeals. But the views advanced in a §10(j) petition are preliminary and do not represent the Board's formal position. Deference to what is "nothing more than an agency's convenient litigating position" is "entirely inappropriate." *Bowen* v. *Georgetown Univ. Hospital*, 488 U. S. 204, 213. The Board's attempt to salvage the reasonable-cause standard using statutory context thus fails. Pp. 8–10.

77 F. 4th 391, vacated and remanded.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and ALITO, SOTOMAYOR, KAGAN, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined. JACKSON, J., filed an opinion concurring in part, dissenting in part, and concurring in the judgment.

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

_____

No. 23–367

_____

## STARBUCKS CORPORATION, PETITIONER *v.* M. KATHLEEN McKINNEY, REGIONAL DIRECTOR OF REGION 15 OF THE NATIONAL LABOR RELATIONS BOARD, FOR AND ON BEHALF OF THE NATIONAL LABOR RELATIONS BOARD

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[June 13, 2024]

JUSTICE THOMAS delivered the opinion of the Court.

The National Labor Relations Board can bring in-house enforcement proceedings against employers and labor unions for engaging in unfair labor practices.  Section 10(j) of the National Labor Relations Act authorizes the Board to seek a preliminary injunction from a federal district court while these administrative enforcement proceedings take place.  The question in this case is whether the traditional four-factor test for a preliminary injunction articulated in *Winter* v. *Natural Resources Defense Council, Inc.*, 555 U. S. 7 (2008), governs the Board's requests under §10(j).  We conclude that it does, and therefore vacate and remand.

I

A

The National Labor Relations Act (NLRA) prohibits employers and unions from engaging in certain "unfair labor

practice[s]." 49 Stat. 452, 29 U. S. C. §§158(a), (b). The National Labor Relations Board enforces that prohibition. §160(a). The Board's "authority kicks in when a person files a charge with the agency alleging that" an employer or labor union has engaged in an unfair labor practice. *Glacier Northwest, Inc.* v. *Teamsters*, 598 U. S. 771, 775 (2023) (citing 29 CFR §101.2 (2021)). A regional Director then investigates the charge. §101.4 (2023). And, "[i]f the charge appears to have merit," the director institutes a formal action against the offending party by issuing an administrative complaint. §101.8. This complaint triggers adjudicatory proceedings within the agency, first before an administrative law judge, and then before the Board itself. See 29 U. S. C. §§160(b), (c); 29 CFR §§101.10 to 101.12. A federal court of appeals may review the Board's final order, if an aggrieved party seeks judicial review or if the Board seeks enforcement of its order. 29 U. S. C. §§160(e)–(f). On review, the Board's findings of fact are "conclusive" "if supported by substantial evidence." *Ibid.*

Because the Board's administrative proceedings take years, Congress vested the Board with authority to seek a preliminary injunction in federal court while the proceedings unfold. Section 10(j) of the NLRA provides that, "upon issuance of a complaint," the Board may "petition any United States district court . . . for appropriate temporary relief." §160(j). A district court considering a §10(j) petition may "grant to the Board such temporary relief . . . as it deems just and proper." *Ibid.*

B

Starbucks is the world's largest coffeehouse chain, with over 34,000 locations. In 2022, six employees at a Memphis, Tennessee, location announced plans to unionize the store and formed an organizing committee. Several employees, including some members of the organizing committee, invited a news crew from a local television station to visit the

store after hours to promote their unionizing effort. The news crew interviewed the employees about their reasons for organizing and what they hoped to achieve. The next day, store management learned about the media event and launched an investigation. Starbucks ultimately fired multiple employees involved with the media event for violating company policy. These included the members of the organizing committee who were in attendance. The union coordinating with the employees filed charges with the Board. The union alleged that Starbucks unlawfully interfered with the employees' right to unionize and discriminated against union supporters, in violation of 29 U. S. C. §§158(a)(1) and (3). After investigating the allegations, the Board issued a complaint against Starbucks. The regional Director then filed a §10(j) petition in the United States District Court for the Western District of Tennessee, seeking a preliminary injunction that would, among other things, require Starbucks to reinstate the fired employees.

To assess whether the Board was entitled to a preliminary injunction under §10(j), the District Court applied the two-part test established by Sixth Circuit precedent. That test asks whether "there is reasonable cause to believe that unfair labor practices have occurred," and whether injunctive relief is "just and proper." *McKinney* v. *Ozburn-Hessey Logistics, LLC*, 875 F. 3d 333, 339 (2017) (internal quotation marks omitted). The Board could establish reasonable cause by simply showing that its "legal theory [was] substantial and not frivolous." *Ibid.* (internal quotation marks omitted). And, relief would be just and proper if it were "necessary to return the parties to [the] status quo pending the Board's proceedings in order to protect the Board's remedial powers under the NLRA." *Ibid.* (internal quotation marks omitted). Applying this standard, the District Court granted an injunction to the Board. 2022 WL 5434206, *12 (WD Tenn., Aug. 18, 2022). And, applying Circuit precedent, the Sixth Circuit affirmed. 77 F. 4th 391, 400–401

4              STARBUCKS CORP. *v.* McKINNEY

Opinion of the Court

(2023).\*

    Not all courts evaluate petitions for §10(j) injunctions under the standard applied by the Sixth Circuit. Some courts instead apply the four-part test for preliminary injunctions articulated in *Winter* v. *Natural Resources Defense Council, Inc.*, 555 U. S. 7. See, *e.g.*, *Hooks* v. *Nexstar Broadcasting, Inc.*, 54 F. 4th 1101, 1114 (CA9 2022); *McKinney* v. *Southern Bakeries, LLC*, 786 F. 3d 1119, 1122 (CA8 2015); *Muffley* v. *Spartan Mining Co.*, 570 F. 3d 534, 542–543 (CA4 2009); *Bloedorn* v. *Francisco Foods, Inc.*¸ 276 F. 3d 270, 286 (CA7 2001). That familiar standard requires a plaintiff to make a clear showing that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U. S., at 20, 22. We granted certiorari to resolve the Circuit split about what standard governs the Board's requests for preliminary injunctions under §10(j), 601 U. S. ___ (2024), and now vacate and remand.

## II

    Section 10(j) authorizes a federal district court "to grant . . . such temporary relief . . . as it deems just and proper" during the pendency of the Board's administrative proceedings. §160(j). When Congress empowers courts to grant equitable relief, there is a strong presumption that courts will exercise that authority in a manner consistent with traditional principles of equity. For preliminary injunctions, the four criteria identified in *Winter* encompass the relevant equitable principles. Nothing in §10(j) displaces the presumption that those traditional principles govern. We

——————

    \*Other courts have applied a similar two-part test when assessing §10(j) petitions. See, *e.g.*, *Kinard* v. *Dish Network Corp.*, 890 F. 3d 608, 612 (CA5 2018); *Chester* v. *Grane Healthcare Co.*, 666 F. 3d 87, 89–90 (CA3 2011).

Opinion of the Court

therefore conclude that district courts must use the traditional four-part test when evaluating the Board's request for a preliminary injunction under §10(j).

A

A preliminary injunction is an "extraordinary" equitable remedy that is "never awarded as of right." *Winter*, 555 U. S., at 24. Its purpose "is merely to preserve the relative positions of the parties until a trial on the merits can be held." *University of Tex.* v. *Camenisch*, 451 U. S. 390, 395 (1981). The default rule is that a plaintiff seeking a preliminary injunction must make a clear showing that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U. S., at 20, 22. "These commonplace considerations applicable to cases in which injunctions are sought in the federal courts reflect a 'practice with a background of several hundred years of history.'" *Weinberger* v. *Romero-Barcelo*, 456 U. S. 305, 313 (1982) (quoting *Hecht Co.* v. *Bowles*, 321 U. S. 321, 329 (1944)); see also *Georgia* v. *Brailsford*, 2 Dall. 402, 406 (1792) (opinion of Iredell, J.); *id.*, at 407 (opinion of Blair, J.).

When interpreting a statute that authorizes federal courts to grant preliminary injunctions, "we do not lightly assume that Congress has intended to depart from established principles." *Romero-Barcelo*, 456 U. S., at 313; see also *Porter* v. *Warner Holding Co.*, 328 U. S. 395, 398 (1946). This Court has consistently employed this presumption when interpreting a wide variety of statutes that authorize preliminary and permanent injunctions. See, *e.g.*, *United States* v. *Oakland Cannabis Buyers' Cooperative*, 532 U. S. 483, 496 (2001) (Controlled Substances Act); *Romero-Barcelo*, 456 U. S., at 312–313 (Federal Water Pollution Control Act); *Amoco Production Co.* v. *Gambell*, 480

Opinion of the Court

U. S. 531, 542–544 (1987) (Alaska National Interest Lands
Conservation Act); *Hecht*, 321 U. S., at 329 (Emergency
Price Control Act). Thus, absent a clear command from
Congress, courts must adhere to the traditional four-factor
test.

Nothing in §10(j)'s text overcomes the presumption that
the four traditional criteria govern a preliminary-injunc-
tion request by the Board. Section 10(j) authorizes a dis-
trict court "to grant to the Board such temporary relief . . .
as it deems just and proper." We do not understand the
statutory directive to grant relief when the district court
"deems" it "just and proper" to jettison the normal equitable
rules. To the contrary, the phrase "just and proper" invokes
the discretion that courts have traditionally exercised when
faced with requests for equitable relief. As a matter of or-
dinary meaning, the word "just" means "fair" and "right-
eous." Funk & Wagnalls New Standard Dictionary 1334
(1942); see also Webster's New International Dictionary
1348 (2d ed. 1934) ("righteous" and "equitable"). And, the
word "proper" means "appropriate," "suitable," or "correct."
*Id.,* at 1983. Crafting "fair" and "appropriate" equitable re-
lief necessitates the exercise of discretion—the hallmark of
traditional equitable practice. See *Hecht*, 321 U. S., at 329
("The essence of equity jurisdiction has been the power of
the Chancellor to do equity and to mould each decree to the
necessities of the particular case"); see also 77 F. 4th, at 403
(Readler, J., concurring); *Kinney* v. *Pioneer Press*, 881 F. 2d
485, 491 (CA7 1989) (Easterbrook, J.) ("Section 10(j) tells
the district court to do what's 'just and proper', which we
read as a statement that traditional rules govern").

This Court's precedent also counsels against reading
§10(j) to supplant the traditional equitable principles gov-
erning injunctions. In *Hecht*, the Court interpreted the
Emergency Price Control Act of 1942's instruction that an
injunction "shall be granted" if the Office of Price Admin-
istration shows that a defendant "has engaged or is about

Opinion of the Court

to engage" in a prohibited act. 321 U. S., at 322 (quoting ch. 26, 56 Stat. 23, 50 U. S. C. App. §925 (1940 ed., Supp. II)). This language is far more favorable to the agency than §10(j) because it seemingly suggests that courts *must* grant injunctive relief where the agency makes the required showing. Yet, the Court refused to read the Emergency Price Control Act to create such "a major departure from th[e] long tradition" of equity. 321 U. S., at 330. The Court reasoned that "if Congress desired to make such an abrupt departure from traditional equity practice . . . , it would have made its desire plain." *Ibid.* If the Emergency Price Control Act did not displace the presumption that traditional equitable principles apply, then §10(j)'s discretion-inviting directive to grant injunctive relief as district courts "dee[m] just and proper" does not either.

Finally, §10(j)'s text bears no resemblance to the language that Congress has employed when it has altered the normal equitable rules. Some statutes increase the burden for obtaining an injunction. Another provision in the NLRA itself, for example, makes it harder for the Government to obtain an injunction against union strikes and lockouts by requiring a showing that the strike or lockout "affects an entire industry or a substantial part thereof" and "imperil[s] the national health or safety." 29 U. S. C. §178(a). And, courts evaluating preliminary-injunction requests under the Prison Litigation Reform Act must "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system." 18 U. S. C. §3626(a)(2). Other statutes expressly relieve the party moving for an injunction from showing that he can satisfy one of the traditional criteria. For instance, plaintiffs alleging trademark violations are entitled to "a rebuttable presumption of irreparable harm . . . upon a finding of likelihood of success on the merits." 132 Stat. 2208, 15 U. S. C. §1116(a). Unlike these statutes, §10(j) omits any specific instruction that suggests Congress altered the traditional equitable rules.

It simply invites courts to grant equitable relief where they deem it "just and proper." And, in exercising this discretionary authority, courts must "be guided by sound [equitable] principles." *Nken* v. *Holder*, 556 U. S. 418, 434 (2009) (internal quotation marks omitted).

In sum, because nothing in §10(j)'s text overcomes the presumption that traditional equitable principles govern, district courts considering the Board's request for a preliminary injunction must apply the *Winter* framework, which embodies those traditional principles.

## B

Rather than contest that traditional equitable criteria govern, the Board recasts the dispute as one about how statutory context informs the application of those criteria. The Board highlights that Congress made the Board, not federal courts, responsible for adjudicating charges of unfair labor practices in the first instance and that courts of appeals must review the Board's final decisions deferentially. According to the Board, these contextual considerations require district courts evaluating §10(j) petitions to apply the traditional criteria in a less exacting way, and the Sixth Circuit's reasonable-cause standard appropriately accounts for context. The partial dissent also asserts that "a district court's preliminary look at the merits" of a §10(j) petition "should be far less searching than normal" for similar reasons. *Post*, at 14 (JACKSON, J., concurring in part, concurring in judgment, and dissenting in part). We disagree.

The reasonable-cause standard goes far beyond simply fine tuning the traditional criteria to the §10(j) context—it substantively lowers the bar for securing a preliminary injunction by requiring courts to yield to the Board's preliminary view of the facts, law, and equities. Nowhere is this more evident than with what the Board, as movant, must show about the merits of its claims. Under the traditional

standard, the Board would have to make a clear showing that it "is likely to succeed on the merits." *Winter*, 555 U. S., at 20. And, in assessing that likelihood, a district court must evaluate any factual conflicts or difficult questions of law. 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §2948.3 (3d ed. 2013). By contrast, the Board may obtain a §10(j) injunction under the reasonable-cause standard by merely showing "reasonable cause to believe that unfair labor practices have occurred." *Ozburn-Hessey Logistics*, 875 F. 3d, at 339 (internal quotation marks omitted). The Board "need not convince the court of the validity of [its] theory of liability, as long as the theory is substantial and not frivolous." *Gottfried* v. *Frankel*, 818 F. 2d 485, 493 (CA6 1987). And, "[i]n reviewing the supporting facts, a district court may not resolve conflicting evidence or make credibility determinations." 77 F. 4th, at 397.

There is an obvious difference between having the Board show that it is "likely" to succeed on the merits and having it show only that its theory of the case is "substantial and not frivolous," without having to convince the court that its theory is likely meritorious. In fact, it is hard to imagine how the Board could lose under the reasonable-cause test if courts deferentially ask only whether the Board offered a minimally plausible legal theory, while ignoring conflicting law or facts. As Judge Readler explained, if the reasonable-cause standard were "applied in the traditional civil litigation setting, any complaint that could withstand Rule 12(b)(6) would automatically be deserving of injunctive relief as well, rendering the court more a spectator than a referee when it comes to matters of equity." *Id.*, at 408 (concurring opinion). Perhaps unsurprisingly, courts that apply the reasonable-cause standard freely acknowledge that the threshold merits showing is "significantly lower than a requirement to show . . . 'likelihood of success' " under the traditional standard. *Overstreet* v. *El Paso Disposal, L.P.*, 625

Opinion of the Court

F. 3d 844, 851, n. 10 (CA5 2010); see also *Fleischut* v. *Nixon
Detroit Diesel, Inc.*, 859 F. 2d 26, 29 (CA6 1988) (character-
izing the Board's burden to show reasonable cause as "rela-
tively insubstantial" (internal quotation marks omitted)).

Section 10(j)'s statutory context does not compel this wa-
tered-down approach to equity. The Board and the partial
dissent are correct that §10(j) proceedings are different
from ordinary preliminary-injunction proceedings insofar
as the Board, not the district court, will adjudicate the
claims in the first instance. But, they do not explain why
this difference should matter. The Board suggests that dis-
trict courts risk supplanting its adjudicatory authority by
conducting an independent assessment of the merits and
equitable factors. But, no matter how searching the district
court's merits inquiry or what evidence it considers or cred-
its, the Board remains free to reach its own legal conclu-
sions and develop its own record in its administrative pro-
ceedings. See *Camenisch*, 451 U. S., at 395. Also, since
irreparable harm and the other equitable factors are not
part of the unfair-labor-practice claim, the district court's
assessment of those factors is completely irrelevant to the
Board's adjudicatory authority.

The Board and the partial dissent also reason that dis-
trict courts should apply a deferential standard because the
Board's final decisions are reviewed deferentially by a court
of appeals. But, none of the views advanced in a §10(j) pe-
tition represent the Board's formal position—they are
simply the preliminary legal and factual views of the
Board's in-house attorneys who investigated and initiated
the administrative complaint. And, deference to what is
"nothing more than an agency's convenient litigating posi-
tion" is "entirely inappropriate." *Bowen* v. *Georgetown
Univ. Hospital*, 488 U. S. 204, 213 (1988). The Board's at-
tempt to salvage the reasonable-cause standard using stat-
utory context thus fails.

Opinion of the Court

## III

For the foregoing reasons, we hold that district courts must apply the traditional four factors articulated in *Winter* when considering the Board's requests for a preliminary injunction under §10(j). We therefore vacate the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

Opinion of JACKSON, J.

# SUPREME COURT OF THE UNITED STATES

_____

No. 23–367

_____

## STARBUCKS CORPORATION, PETITIONER *v.* M. KATHLEEN McKINNEY, REGIONAL DI-RECTOR OF REGION 15 OF THE NATION-AL LABOR RELATIONS BOARD, FOR AND ON BEHALF OF THE NATIONAL LABOR RELATIONS BOARD

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[June 13, 2024]

JUSTICE JACKSON, concurring in part, concurring in the judgment, and dissenting in part.

"When Congress entrusts to an equity court the enforce-ment of prohibitions contained in a regulatory enactment, it must be taken to have acted cognizant of the historic power of equity to provide complete relief in light of the statutory purposes." *Mitchell* v. *Robert DeMario Jewelry, Inc.*, 361 U. S. 288, 291–292 (1960). Accordingly, when in-terpreting a statute that authorizes equitable relief, like a preliminary injunction, this Court typically employs what amounts to a two-part inquiry focused on congressional in-tent. See *Hecht Co.* v. *Bowles*, 321 U. S. 321, 328–331 (1944). First, we determine whether Congress has stripped courts of their traditional equitable discretion by "a clear and valid legislative command." *Porter* v. *Warner Holding Co.*, 328 U. S. 395, 398 (1946). Second, if no such clear com-mand is found, we look to the statutory context to assess how courts should exercise their equitable discretion "'as conditioned by the necessities of the public interest which Congress has sought to protect.'" *Weinberger* v. *Romero-Barcelo*, 456 U. S. 305, 320 (1982) (quoting *Hecht*, 321 U. S.,

at 330).

Today, the Court correctly applies the first step, but ignores the second. I agree with the majority that nothing in the National Labor Relations Act (NLRA) clearly strips courts of their equitable discretion to determine whether to issue a so-called §10(j) injunction. And I concur in the conclusion that we should vacate and remand for the Sixth Circuit to reevaluate this case under our traditional four-factor test for assessing requests for preliminary injunctions. But I cannot join the majority in ignoring the choices Congress has made in the NLRA about how courts should exercise their discretion in light of the National Labor Relations Board's authority over labor disputes. Because the majority chooses the simplicity of unfettered judicial discretion over the nuances of Congress's direction, I respectfully dissent in part.

I

The question in this case is how district courts should evaluate the Board's request for a preliminary injunction in light of Congress's intentions. See 29 U. S. C. §160(j) (authorizing a district court to issue "such temporary relief or restraining order as it deems just and proper"). The majority suggests a sharp dichotomy: Either courts retain all of their equitable discretion, or the Board gets undue deference. See *ante,* at 8–10. But, "[w]hen Congress invokes the Chancellor's conscience to further transcendent legislative purposes, what is required is the principled application of standards consistent with those purposes," not unbridled equitable discretion, "'which varies like the Chancellor's foot.'" *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405, 417 (1975) (alteration omitted).

Our *Hecht* case is instructive, for it establishes the frame-

Opinion of JACKSON, J.

work we have long used to assess whether an injunction authorized by a statute should issue.[1]  In *Hecht,* the Court was asked to determine whether the Emergency Price Control Act's direction that an injunction "'shall be granted'" after a violation was found displaced a court's equitable discretion.  321 U. S., at 322.  As the majority acknowledges, after finding no clear indication that Congress intended to displace equitable discretion, the *Hecht* Court concluded that the answer was no.  See *ante,* at 7.[2]

But *Hecht* did not end there.  The Court emphasized that the mere fact that the Emergency Price Control Act lacked an "unequivocal statement" displacing courts' equitable discretion did not "imply that courts should administer [the Act] grudgingly."  321 U. S., at 329–330.  Instead, the Court explained, courts should see themselves as partners of the agency that administered the Act.  Congress "entrusted" each "with a share of . . . responsibility" for effectuating its goals.  *Id.,* at 331.  In other words, "[c]ourt and agency are the means adopted to attain the prescribed end, and so far

_____

[1] As Judge Friendly explained, "Mr. Justice Douglas' classic opinion in *Hecht*" is "a decision of such widely recognized significance that it is not unreasonable to attribute knowledge of it to at least some of the framers of the Taft-Hartley Act of 1947 in which [§]10(j) . . . originated."  *Danielson* v. *Joint Bd. of Coat, Suit and Allied Garment Workers' Union,* 494 F. 2d 1230, 1240 (CA2 1974).

[2] The majority correctly states this holding, but its analysis of *Hecht Co.* v. *Bowles,* 321 U. S. 321 (1944), misleadingly suggests a near-unobtainable standard for displacement.  *Hecht* does not hold that the statutory phrase "shall be granted" is insufficiently clear to displace a court's equitable discretion.  Contra, *ante,* at 6–7.  Rather, the *Hecht* Court found that such language was "less mandatory than a literal reading might suggest" because of two other indicia of congressional intent.  321 U. S., at 328.  First, the statute itself gave courts discretion to enter an injunction "or other order," as they deemed fit.  *Ibid.*  And, second, the legislative history suggested that courts should retain their equitable discretion to provide the relief "'proper in the circumstances of each particular case.'"  *Id.,* at 329 (quoting S. Rep. No. 931, 77th Cong., 2d Sess., 10 (1942)).

as their duties are defined by the words of the statute, those words should be construed so as to attain that end through coordinated action." *Id.,* at 330. Therefore, a court's "discretion . . . must be exercised in light of the large objectives of the Act." *Id.*, at 331.

*Hecht*'s two-step framework is still in use today. We only rarely find that a statute clearly displaces courts' equitable discretion. See, *e.g.*, *TVA* v. *Hill*, 437 U. S. 153, 193–195 (1978) (finding such displacement in the Endangered Species Act). So, in most cases in which equitable relief is authorized by statute, the movant must contend with the court's equitable authority. In statutes that involve preliminary injunctive relief, that means the party seeking relief "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter* v. *Natural Resources Defense Council, Inc.*, 555 U. S. 7, 20 (2008).

Even so, under the *Hecht* framework, we have consistently held that courts' exercise of equitable discretion is informed by congressional intent. Put simply, "a court sitting in equity cannot 'ignore the judgment of Congress, deliberately expressed in legislation.'" *United States* v. *Oakland Cannabis Buyers' Cooperative*, 532 U. S. 483, 497 (2001) (quoting *Virginian R. Co.* v. *Railway Employees*, 300 U. S. 515, 551 (1937)). For each of the four factors, then, courts must look to the choices made by Congress for guidance. See *Oakland Cannabis*, 532 U. S., at 497 ("'Once Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is . . . for the courts to enforce them when enforcement is sought'" (quoting *Hill*, 437 U. S., at 194)).

Opinion of JACKSON, J.

## II
## A

Here, the choices Congress has made regarding how labor disputes are to be resolved—including its decision to authorize preliminary injunctive relief in some circumstances—are clear and comprehensive. As briefly explained below, Congress has long sought to contain the unbounded exercise of judicial discretion to issue injunctions in the context of labor disputes, leaving the resolution of those particular conflicts primarily in the hands of the Board. See Brief for Service Employees International Union as *Amicus Curiae* 4–11.

That is for good reason. To put it bluntly, courts exercising their equitable discretion amidst labor disputes today do so against the backdrop of an ignominious history of abuse. See generally F. Frankfurter & N. Greene, The Labor Injunction (1930). "In the early part of [the 20th] century, the federal courts generally were regarded as allies of management in its attempt to prevent the organization and strengthening of labor unions." *Boys Markets, Inc.* v. *Retail Clerks*, 398 U. S. 235, 250 (1970). "Injunctions figured in virtually every railroad strike; in most strikes in which industrial unionism, 'amalgamation,' or 'federation' was at issue; in most major organizing and recognition strikes, boycotts, closed shop or sympathy strikes or anti-union/open-shop lockouts of significant magnitude; and in a small but still significant and growing portion of ordinary mine-run strikes." W. Forbath, The Shaping of the American Labor Movement, 102 Harv. L. Rev. 1109, 1152 (1989). "[I]n this industrial struggle the injunction became a potent weapon that was wielded against the activities of labor groups." *Boys Markets*, 398 U. S., at 250.

Congress reacted to this antidemocratic "'government by injunction'" by seeking to cabin courts' power to intervene. *Milk Wagon Drivers* v. *Lake Valley Farm Products, Inc.*, 311 U. S. 91, 102 (1940). Its initial attempt, in the Clayton Act

of 1914, was unsuccessful, due in large part to judicial frustration of congressional intent. See *BE&K Constr. Co.* v. *NLRB*, 536 U. S. 516, 543 (2002) (Breyer, J., concurring in part and concurring in judgment). Its next attempt, the Norris-LaGuardia Act of 1932, was impossible to ignore. There, Congress "deprive[d] the courts of jurisdiction to issue an injunction in any case involving or growing out of a labor dispute, except" under specified circumstances and with particular procedural checks. *New Negro Alliance* v. *Sanitary Grocery Co.*, 303 U. S. 552, 561–562 (1938); see also *Marine Cooks* v. *Panama S. S. Co.*, 362 U. S. 365, 369 (1960) ("The language [of the Norris-LaGuardia Act] is broad because Congress was intent upon taking the federal courts out of the labor injunction business except in very limited circumstances").

Three years later, in 1935, Congress passed the National Labor Relations Act, 29 U. S. C. §151 *et seq.* The Act aimed to "eliminate the causes of certain substantial obstructions to the free flow of commerce" by protecting workers' rights. §151. To achieve this aim, the NLRA codified "[e]mployees['] . . . right to self-organization," to form and join unions, to collectively bargain, and to strike. §157. It also made it unlawful for employers and unions to engage in particular unfair labor practices. See §158. Employers, for example, cannot interfere with employees' efforts to organize a union or engage in collective bargaining. See §§157, 158(a). Similarly, unions cannot, *inter alia*, coerce employees to join a union or refuse to engage in collective bargaining. See §158(b).

Notably, though, Congress did not leave it to courts to protect the rights established in the NLRA. See *Phelps Dodge Corp.* v. *NLRB*, 313 U. S. 177, 193 (1941). Instead, Congress created an expert agency, the National Labor Relations Board, to investigate, adjudicate, and stop unfair labor practices. See 29 U. S. C. §160(a). The agency is headed

Opinion of JACKSON, J.

by a five-member board that is charged with resolving un-
fair labor practice cases, see §153(a); the enforcement role
is occupied by a General Counsel, see §153(d). The General
Counsel is charged with investigating and prosecuting un-
fair labor practice cases, as well as overseeing Regional Of-
fices that carry out much of the day-to-day work of enforc-
ing labor law and policy. See *ibid.*; see also *NLRB* v. *Food
& Commercial Workers*, 484 U. S. 112, 117–118 (1987).

   To evaluate and remedy unfair labor practices, the Board
follows a four-step process. See *ante,* at 2. First, a charge
is filed and investigated, with parties generally permitted
to present evidence and arguments related to the alleged
violation. See 29 CFR §§101.2, 101.4 (2023). Second, if the
investigation yields sufficient information to show an un-
fair labor practice, the Regional Director can issue a com-
plaint. See §101.8. Third, an administrative law judge
holds a hearing and issues a decision on the merits of the
complaint, which a party can then appeal to the Board. See
§§101.10 to 101.12. Finally, if the unfair labor practices al-
leged in the complaint are sustained, the Board can seek
enforcement of the order, and any aggrieved party can seek
review, in a federal court of appeals. See 29 U. S. C.
§§160(e), (f); 29 CFR §101.14.

## B

   Crucially for present purposes, Congress recognized that
delay in vindicating labor rights "during the 'notoriously
glacial' course of NLRB proceedings" can lead to their de-
feat. *Kinney* v. *Pioneer Press*, 881 F. 2d 485, 491 (CA7
1989). This case is illustrative of the problem. In February
2022, Starbucks fired five of six members of an organizing
committee, along with two other union-aligned workers,
just as a campaign for unionization was building momen-
tum. The Board took up the workers' complaint soon after.
Now, more than two years later, their case remains pend-
ing.

To respond to situations such as this one, Congress gave the Board specific power to seek preliminary injunctive relief. These injunctions are generally referred to as "§10(j) injunctions," named after the section of the Taft-Hartley Act of 1947 in which they were originally introduced. See 29 U. S. C. §160(j). There is broad consensus about why Congress allowed the Board to seek §10(j) injunctions. As summarized in the Senate Report on Taft-Hartley:

> "Time is usually of the essence in [labor disputes], and consequently the relatively slow procedure of Board hearing and order, followed many months later by an enforcing decree of the circuit court of appeals, falls short of achieving the desired objectives—the prompt elimination of the obstructions to the free flow of commerce and encouragement of the practice and procedure of free and private collective bargaining. Hence we have provided that the Board, acting in the public interest and not in vindication of purely private rights, may seek injunctive relief in the case of all types of unfair labor practices." S. Rep. No. 105, 80th Cong., 1st Sess., 8 (1947).

See also, *e.g.*, *Kinney*, 881 F. 2d, at 488 (Easterbrook, J.) (quoting this passage); *Miller* v. *California Pacific Medical Center*, 19 F. 3d 449, 455, n. 3 (CA9 1994) (en banc) (same); *Danielson* v. *Joint Bd. of Coat, Suit and Allied Garment Workers' Union*, 494 F. 2d 1230, 1241–1242 (CA2 1974) (Friendly, J.) (discussing similar legislative history).

In short, Congress designed §10(j) "'as a means of preserving or restoring the status quo as it existed before the onset of unfair labor practices'" so that the Board's ultimate ability to remedy an unfair labor practice would not be impeded. *NLRB* v. *Electro-Voice, Inc.*, 83 F. 3d 1559, 1575 (CA7 1996).

In addition to authorizing §10(j) injunctions, Congress made two other pertinent choices in the statute. First, it

granted *the Board* power to seek a §10(j) injunction.  See 29
U. S. C. §160(j).  No private party has authority to seek
§10(j) relief.  See *Clothing Workers* v. *Richman Brothers
Co.*, 348 U. S. 511, 517 (1955).  And, by the statute's own
terms, power is left to the Board itself, rather than the Gen-
eral Counsel or another member of the prosecutorial branch
of the agency.  That is unlike a closely related section of the
statute, §10(*l*), which authorizes the relevant "officer or re-
gional attorney" to file for preliminary relief in cases involv-
ing certain unfair labor practices by unions.  See 29 U. S. C.
§160(*l*).  Second, Congress granted the Board *discretion* to
determine whether or not to seek preliminary injunctive re-
lief.  See §160(j).  Thus, the Board need only seek §10(j) re-
lief when it deems doing so appropriate or necessary.
Again, by contrast, requests for relief under §10(*l*) are man-
datory once an investigation yields "reasonable cause to be-
lieve" that an unfair labor practice has occurred.  See
§160(*l*).

  The NLRA does not specify how the Board should exer-
cise its discretion to seek §10(j) injunctions.  But the agency
has crafted an extensive, and strikingly deliberative, stand-
ard operating procedure.  See Brief for Respondent 4 (citing
Office of the General Counsel, NLRB, Section 10(j) Manual
(Mar. 2020)).  First, the Regional Director must submit a
written memorandum to the General Counsel explaining
why temporary relief is appropriate in a given case.  Second,
the General Counsel must review the memorandum and de-
termine whether the request for relief is warranted.  Third,
if the General Counsel determines that a §10(j) injunction
should be sought, then she must present a recommendation
to the Board.  Fourth, and finally, the Board must either
accept or reject the recommendation.  It is only after the
Board approves the filing of a request for a §10(j) injunction
in this fashion that the General Counsel or relevant Re-
gional Director files that request in federal district court.

  When the district court receives the Board's application

10          STARBUCKS CORP. *v.* McKINNEY

Opinion of JACKSON, J.

for a §10(j) injunction, the statutory scheme kicks back in. "Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper." 29 U. S. C. §160(j). If granted, a §10(j) injunction returns workers, unions, and employers to the status quo as it existed before the alleged NLRA violation. See *Electro-Voice, Inc.*, 83 F. 3d, at 1575.

### III
#### A

What standard should district courts use to decide whether granting the Board's §10(j) request for interim relief is "just and proper"? That is the question this case presents, and as I previously explained, we use *Hecht*'s framework to answer. So, first, we determine whether Congress has clearly displaced courts' equitable discretion. And, second, if no such clear statement exists, we evaluate how that discretion should be exercised in light of Congress's choices in the NLRA.

At step one, the parties here do not dispute that §10(j)'s text, context, and legislative history lack the clear congressional intent required to preclude district courts from exercising equitable discretion. See Brief for Petitioner 15; Brief for Respondent 9. Also, no Circuit, not even the Sixth Circuit below, holds that §10(j) deprives district courts of their equitable discretion. See, *e.g.*, *Gottfried* v. *Frankel*, 818 F. 2d 485, 493–494 (CA6 1987) ("The granting of injunctive relief under this 'just and proper' standard, is a matter committed to judicial discretion" (some internal quotation marks omitted)). I agree with the majority that courts faced with a Board petition for a §10(j) injunction should evaluate that request using all four factors in our established *Winter* test. See *Winter*, 555 U. S., at 20; see also *ante,* at 6.

The remaining question—*Hecht*'s second step—is the

Opinion of JACKSON, J.

more challenging one. To the extent the majority addresses it at all, it has done an insufficient job of explaining *how* district courts' equitable discretion is channeled by Congress's choices within the NLRA.

The fact that this needs to be done is uncontroversial. "Obviously," Starbucks says, "'statutory context is relevant to the consideration of equitable relief.'" Reply Brief 10 (quoting Brief for Respondent 15); see also Brief for Respondent 9; Reply Brief 2; Tr. of Oral Arg. 20–24, 33–35. And every relevant Circuit, including those that use the standard four-factor test, understands district courts' equitable discretion to issue a §10(j) injunction has to be informed by the statutory context of the NLRA. See, *e.g.*, *Pye* v. *Sullivan Bros. Printers, Inc.*, 38 F. 3d 58, 63 (CA1 1994); *Hoffman* v. *Inn Credible Caterers, Ltd.*, 247 F. 3d 360, 368 (CA2 2001); *Chester* v. *Grane Healthcare Co.*, 666 F. 3d 87, 98–100 (CA3 2011); *Muffley* v. *Spartan Mining Co.*, 570 F. 3d 534, 543 (CA4 2009); *McKinney* v. *Creative Vision Resources, LLC*, 783 F. 3d 293, 296–297 (CA5 2015); *Ahearn* v. *Jackson Hospital Corp.*, 351 F. 3d 226, 237–239 (CA6 2003); *Bloedorn* v. *Francisco Foods, Inc.*, 276 F. 3d 270, 287–288 (CA7 2001); *McKinney* v. *Southern Bakeries, LLC*, 786 F. 3d 1119, 1122–1123 (CA8 2015); *Miller*, 19 F. 3d, at 459–460; *Sharp* v. *Webco Industries, Inc.*, 225 F. 3d 1130, 1133–1136 (CA10 2000); *NLRB* v. *Hartman and Tyner, Inc.*, 714 F. 3d 1244, 1249–1250 (CA11 2013). But the Court today provides little helpful guidance on this front.

B

Given our precedents and the statute's text, the interaction between Congress's choices in the NLRA and a district court's equitable assessment of a request for §10(j) relief is straightforward for three of the four equitable factors.

To show irreparable harm, the Board must establish that its ability to remedy a violation of labor rights will likely be precluded absent interim relief. See, *e.g.*, *Frankl* v. *HTH*

*Corp.*, 650 F. 3d 1334, 1362 (CA9 2012) ("In the context of
the NLRA, permitting an alleged unfair labor practice to
reach fruition and thereby render meaningless the Board's
remedial authority is irreparable harm" (alteration and in-
ternal quotation marks omitted)).  When evaluating the
balance of the equities, district courts may consider harms
to an opposing party, but they are prohibited from crediting
a party's desire to continue engaging in an alleged violation
of the NLRA.  See *Oakland Cannabis*, 532 U. S., at 498
("[W]hen a court of equity exercises its discretion, it may
not consider the advantages and disadvantages of nonen-
forcement of the statute").  When addressing the public in-
terest, courts must defer to Congress's articulation of that
interest in the NLRA itself.  See 29 U. S. C. §151 ("It is . . .
the policy of the United States to . . . encourag[e] . . . collec-
tive bargaining and . . . protec[t] the exercise by workers of
full freedom of association, self-organization, and designa-
tion of representatives of their own choosing"); see also *Vir-
ginia R. Co.*, 300 U. S., at 552 ("The fact that Congress has
indicated its purpose . . . is in itself a declaration of public
interest and policy which should be persuasive in inducing
courts to give relief").

The final factor—the likelihood of success on the merits—
is more difficult to evaluate.  That factor can be articulated
in "a bewildering variety of formulations," but, at core, it
asks courts to predict how likely it is that a party seeking
preliminary relief will ultimately prevail on the merits of
their claims.  11A C. Wright, A. Miller, & M. Kane, Federal
Practice and Procedure §2948.3, p. 197 (3d ed. 2013); see
also *id.,* at 201 ("All courts agree that a plaintiff must pre-
sent a prima facie case but need not show a certainty of
winning" (footnote omitted)).  In my view, three aspects of
the NLRA's scheme should inform this evaluation.

First, as described above, the NLRA makes the Board,
not district courts, the primary adjudicator of labor dis-
putes and the central expositor of labor policy.  See 29

Opinion of JACKSON, J.

U. S. C. §160(a); see also *Beth Israel Hospital* v. *NLRB*, 437
U. S. 483, 500 (1978) ("It is the Board on which Congress
conferred the authority to develop and apply fundamental
national labor policy"); *Garner* v. *Teamsters*, 346 U. S. 485,
490 (1953) ("Congress . . . confide[d] primary interpretation
and application of its rules to a specific and specially con-
stituted tribunal," the Board). This means that, unlike in
the typical preliminary injunction context, the district court
is not making a predictive judgment about how it will rule
on the merits itself. Instead, the court is predicting the fu-
ture decision of the Board. See *Miller*, 19 F. 3d, at 460;
*Bloedorn*, 276 F. 3d, at 288.

Second, as I previously explained, §10(j) empowers the
Board—acting in its adjudicatory capacity—to seek injunc-
tive relief. 29 U. S. C. §160(j); see also Brief for Respondent
28–29; Tr. of Oral Arg. 50, 63–64. When it does so, the
Board is *not* acting as a party to the underlying dispute.[3]
We also have evidence that the Board's screening process
for determining when to seek a §10(j) injunction is exceed-
ingly rigorous: Of the roughly 20,000 unfair labor practice
charges filed last year, the Board authorized the filing of a
petition for §10(j) relief *only 14 times*. See Brief for Re-
spondent 39. This means that, by the time the district court
gets a (rare) §10(j) request, the Board has already deemed
an unfair labor charge likely meritorious, and has deter-
mined that preservation of the status quo is needed to facil-
itate its own likely judgment.

Finally, the NLRA gives federal courts only a limited role

─────────
[3] If it were, then, of course, the majority would be correct to observe
that the Board should have to demonstrate the merits of its claims under
the traditional test. See *ante,* at 8. What the majority fails to adequately
address is the unique position of the Board when it seeks a §10(j) injunc-
tion, per Congress's directives. Unlike other similar movants for interim
relief, the Board *is the decider* of the merits of the underlying dispute.
So all that the Board is requesting from the district court is a legally
enforceable means of preserving the status quo until it can render its
decision.

in reviewing the Board's decisions.  In the court of appeals, the Board's factual findings are "conclusive" if supported by substantial evidence.  See §§160(e), (f).  We have also long recognized that the Board's legal interpretations are to be accorded "considerable deference."  *NLRB* v. *City Disposal Systems, Inc.*, 465 U. S. 822, 829 (1984); see also *Ford Motor Co. (Chicago Stamping Plant)* v. *NLRB*, 441 U. S. 488, 497 (1979) ("Of course, the judgment of the Board is subject to judicial review; but if its construction of the statute is reasonably defensible, it should not be rejected merely because the courts might prefer another view"); *NLRB* v. *United Ins. Co. of America*, 390 U. S. 254, 260 (1968) (same for "application of law to facts").  What is more, absent highly unusual circumstances, district courts play no role in the review process at all.  See §160(e) (allowing the Board to file enforcement orders in district courts only if "all the courts of appeals to which application may be made are in vacation").

These three features of the statutory scheme necessarily mean that a district court's preliminary look at the merits when considering the Board's petition for interim relief under §10(j) should be far less searching than normal.  A §10(j) injunction request simply does not present the district court with an opportunity to wade into the midst of an ongoing labor dispute (over which it otherwise has no say) and offer its own take about how the merits should be decided.  Instead, in deference to Congress's choices as codified in the NLRA, the district court's task is much simpler: to evaluate a petition for a §10(j) injunction in a manner that accounts for the statutory scheme authorizing such relief and the district court's proper role within it.  Thus, so long as the Board has presented "some evidence to support the unfair labor practice charge, together with an arguable legal theory," a district court should find this final factor satisfied.  *Miller*, 19 F. 3d, at 460.

### C

The majority's contrary conclusion on the likelihood-of-success factor is based on various misrepresentations about the Board's authority under the NLRA. For example, in addition to mistakenly consigning the Board to the status of a mere party movant, see n. 3, *supra,* the majority misstates the Board's role in seeking §10(j) relief generally, see *ante,* at 10 ("[T]he views advanced in a §10(j) petition . . . are simply the preliminary legal and factual views of the Board's in-house attorneys who investigated and initiated the administrative complaint"). Similarly, the majority misrepresents the Board's arguments in this case regarding how the statutory scheme informs district courts' analysis. Far from failing to explain the relevance of district courts' lack of jurisdiction over labor disputes, *ibid.,* the Board has offered a detailed argument, consistent with our precedent and the longstanding decisions of the lower courts, for why this structural feature of the NLRA is important and why it might well be dispositive of the likelihood of success analysis. See Brief for Respondent 26–29, 35–36; see also Tr. of Oral Arg. 35–36. The majority also completely misses the significance of the limited role that federal courts of appeal play in reviewing the Board's decisions. See *ante,* at 2, 10.

Unfortunately, today's decision appears to be another installment in a series of labor cases in which this Court has failed "to heed Congress's intent with respect to the Board's primary role in adjudicating labor disputes." *Glacier Northwest, Inc.* v. *Teamsters,* 598 U. S. 771, 814 (2023) (JACKSON, J., dissenting). And, like its earlier decisions, "[t]he Court's ruling is likely to cause considerable confusion among the lower courts," which have been for decades exercising their equitable discretion informed by the NLRA. *Ibid.* I recognize that, as a practical matter, the majority's decision here may make little difference, since requests for §10(j) relief are rare. But that fact is more a function of the Board's gatekeeping role than anything else. Now that the Court

Opinion of JACKSON, J.

has concluded the Board's authorization to seek §10(j) interim relief is of no moment, the Board may find it unnecessary to play the gatekeeping role Congress designed for it in this context. As a result, today's decision might force not just courts, but also the Board, to disregard Congress's direction.

\*    \*    \*

A petition for §10(j) relief serves a straightforward, but significant purpose: "to preserve the NLRB's remedial power while the Board resolves an unfair labor practice charge." *Miller*, 19 F. 3d, at 452. Today, the majority casts a district court's decision regarding a §10(j) request as one that invokes the full sweep of a court's traditional equitable discretion—without regard for the Board's authority or the statutory scheme that authorizes courts to issue such interim relief in the first place. In doing so, "the Court unnecessarily and casually substitutes the chancellor's clumsy foot for the rule of law." *Weinberger*, 456 U. S., at 335 (Stevens, J., dissenting). I am loath to bless this aggrandizement of judicial power where Congress has so plainly limited the discretion of the courts, and where it so clearly intends for the expert agency it has created to make the primary determinations about both merits and process.